**GARRY J. CLEMENTE, ESQ.**
**ATTORNEY ID. NO. 305992020**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Woodbridge Defendants**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NIJEER PARKS, | : |
| Plaintiff, | : CIVIL ACTION NO. |
| | : 2:21-cv-04021-JXN-LDW |
| -v- | : |
| | : **WOODBRIDGE DEFENDANTS'** |
| JOHN E. MCCORMACK, MAYOR OF WOODBRIDGE, et al. | : **STATEMENT OF MATERIAL FACTS** |
| Defendants. | : |

### WOODBRIDGE DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

The Woodbridge Defendants submit this Statement of Material Facts pursuant to Local Rule 56.1 in support of its Motion for Summary Judgment, which seeks to dismiss Plaintiff's Complaint in its entirety.

Respectfully submitted,

Dated: December 5, 2023      */s/ Garry J. Clemente, Esq.*

      Garry J. Clemente, Esq.
      Law Office of James P. Nolan &
      Associates, Attorneys for
      Woodbridge Defendants

1

**STATEMENT OF MATERIAL FACTS**

1. On January 26, 2019, Woodbridge Police Department ("WPD") Officers Francis Lee and Andrew Lyszyk were separately dispatched to the Hampton Inn on Route 9 North in Woodbridge on a report of shoplifting. (See WPD Director Robert Hubner's Answers to Interrogatories, attached hereto as **Exhibit "B"**).

2. Officer Lee arrived on scene first and encountered the suspect in the lobby, an African American male who identified himself as "Jamal Owens." (Id.)

3. The suspect produced a Tennessee driver's license which listed the name "Jamal Owens" and displayed a photograph of the suspect. (Id.)

4. Officer Lee called WPD headquarters to have dispatch run the suspect's driver's license to determine if it was legitimate. (See Transcript of Deposition of WPD Officer Francis Lee, attached hereto as **Exhibit "D"** Page 18, Line 11-16).

5. Dispatch advised Officer Lee that the suspect's driver's license was not coming back on file. Officer Lyszyk took the suspect's driver's license to his patrol vehicle to further attempt to verify its authenticity. (See Transcript of Deposition of WPD Officer Andrew Lyszyk, attached hereto as **Exhibit "C"** Page 13, Line 22-25).

6. Officer Lyszyk contacted the Tennessee State Police, who confirmed that the suspect's driver's license was fake. (Id. at Page 14, Line 7-13).

7. Since Officers Lee and Lyszyk were unable to confirm the identity of the suspect, who had admitted to shoplifting, the decision was made to place the suspect under arrest. (Id. at Page 14, Line 24-25; Page 15, Line 1-4).

8. When Officer Lyszyk attempted to place the suspect in handcuffs, the suspect slipped away from his grasp and fled the scene by running out the back door of the Hampton Inn lobby. (Id. at Page 15, Line 25; Page 16, Line 1-6).

9. Officers Lee and Lyszyk pursued the suspect as he ran around to the front of the Hampton Inn and entered his vehicle. There, the Officers confronted the suspect and drew their service weapons while demanding that the suspect turn off and exit the vehicle. (Id. at Page 16, Line 10-19).

10. The suspect's vehicle was rented from Hertz and the suspect was at the Hampton Inn to renew his rental agreement at the Hertz kiosk located in the lobby. (See Hertz Rental Agreement, attached hereto as **Exhibit "P"**).

11. The suspect refused to comply with the Officers' commands and fled the scene in his vehicle, striking Officer Lyszyk's patrol vehicle before hitting a pillar in front of the Hampton Inn. During this time, Officer Lee had to jump out of the way to avoid being

3

struck by the suspect's vehicle. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 16, Line 18-22).

12. Officers Lee and Lyszyk engaged in a brief vehicular pursuit of the suspect, but were unable to locate the suspect. The Officers returned to the Hampton Inn to preserve the scene. (Id. at Page 17, Line 1-13).

13. Other officers on patrol were dispatched to the Hampton Inn to guard the doors to the lobby and preserve the scene. The WPD Detective Bureau was notified of the incident and Detective Jorge Quesada arrived to begin processing the evidence left at the scene. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

14. Det. Quesada was assigned to the Identification Unit within the Detective Bureau and was responsible for photographing and collecting evidence at the scene. (See Transcript of Deposition of WPD Detective Jorge Quesada, attached hereto as **Exhibit "E"** Page 8, Line 9-16).

15. Upon his arrival on scene, Det. Quesada was advised of the areas of the Hampton Inn lobby that the suspect interacted with prior to and during his flight from the lobby. (Id. at Page 19, Line 14-20).

16. Det. Quesada learned that the suspect fled through the rear glass common door to the lobby. (Id. at Page 20, Line 3-5).

17. Det. Quesada viewed surveillance video from the Hampton Inn to determine where the suspect touched the door, but the angle of the camera did not cover the door. (Id. at Page 28, Line 3-7).

18. Det. Quesada ultimately collected three fingerprints from the rear glass common door to the lobby. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

19. Det. Quesada also collected a water bottle that the suspect drank from and a sneaker that the suspect lost during his flight from the Hampton Inn. (Deposition of Det. Quesada, **Exhibit "E"** Page 19, Line 14-20.

20. Officer Lyszyk advised Det. Quesada that he still had the suspect's driver's license and that although the license was fake, the picture on the license was that of the suspect. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 18, Line 10-13).

21. The suspect's vehicle was found the next day and five additional fingerprints were lifted and a vape pen was collected from the vehicle. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

22. With the evidence collected, Det. Sgt. Tapia and the Detective Bureau took over the investigation. (Id.; see also the Transcript of Deposition of WPD Det. Sgt. Santiago Tapia, attached hereto as **Exhibit "F"** Page 56, Line 3-6).

23. The fingerprints were reviewed at WPD headquarters to determine if they were suitable to be packaged and sent to the New

5

Jersey State Police ("NJSP") for analysis. (Deposition of Det. Quesada, **Exhibit "E"** Page 25, Line 1-4).

24. As is the case with other local municipal police departments, the WPD does not have the capability to analyze and compare fingerprints in-house. (Id. at Page 27, Line 5-25; Page 28, Line 1-2).

25. The fingerprint evidence was reviewed and packaged by Det. Quesada on January 26, 2019. (See the WPD I.D. Bureau Report, attached hereto as **Exhibit "K"**).

26. Det. Sgt. Tapia had prior experience with facial recognition technology through a prior assignment with the NJSP Auto Theft Task Force, where that technology was used successfully to identify suspects. (Deposition of Det. Sgt. Tapia, attached hereto as **Exhibit "F"** Page 45, Line 6-13).

27. Facial recognition software analyzes a sample photograph and considers the characteristics of an individual's face, including the eyes, ears, nose, mouth, cheekbones, and other features. When the software identifies a potential match, the software gives a probability of a positive match. (See Transcript of Deposition of Rockland County Intelligence Center Investigator Seamus Lyons, attached hereto as **Exhibit "I"** Page 32, Line 2-14).

28. Facial recognition technology is a tool that may be utilized in an investigation. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 50, Line 22-25; See also the Deposition of Det. Quesada,

**Exhibit "E"** Page 32, Line 1-5); See also the Deposition of Investigator Lyons, **Exhibit "I"** Page 30, Line 5-22; Page 86, Line 3-11).

29. Local municipal police departments may submit requests for facial recognition technology analysis to the New Jersey Regional Operations Intelligence Center ("NJROIC"), the New York State Intelligence Center ("NYSIC"), or the Rockland County Intelligence Center ("RCIC"). These entities have several tools at their disposal, including facial recognition technology, that local and State police departments do not have access to. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 46, Line 10-17).

30. On January 27, 2019, Detective Tapia created a bulletin which was sent to these entities and explained the circumstances of the incident at the Hampton Inn. The bulletin contained the suspect's driver's license photograph and requested that facial recognition analysis be performed in an effort to identify the suspect. (See WPD Bulletin Requesting Assistance Identifying Suspect, attached hereto as **Exhibit "Q"**; See also Facial Recognition Initiative Request Form, attached hereto as **Exhibit "T"**).

31. Prior to sending the bulletin, Det. Sgt. Tapia showed the suspect's driver's license to Officers Lyszyk and Lee separately, who each confirmed that the photo on the license depicted the individual they dealt with at the Hampton Inn. (Deposition of Det.

7

Sgt. Tapia, **Exhibit "F"** Page 132, Line 17-25; Page 133, Line 1-6).

32. Defense Expert, Major Joseph Craparotta, New Jersey State Police (Ret.) opined that Sgt. Tapia properly used his training and knowledge to submit the driver's license for facial recognition analysis as a tool to identify the suspect from the Hampton Inn. (See the Report of Defense Expert Major Joseph Craparotta (Ret.), attached hereto as **Exhibit "U"** Page 26).

33. Plaintiff's Expert, Ralph Cilento, New York Police Department (Ret.) opined that Sgt. Tapia was correct in utilizing all investigative means necessary to attempt to identify the suspect and that Sgt. Tapia determination to send the driver's license for facial recognition analysis was an appropriate investigative step. (See the Report of Plaintiff's Expert Ralph Cilento, attached hereto as **Exhibit "V"** Page 6).

34. The bulletin was received by Investigator Seamus Lyons of the Rockland County Intelligence Center ("RCIC") in New York. The RCIC provides services to outside law enforcement, including manpower support, police records management, intelligence gathering, and evidence analysis. (Deposition of Investigator Lyons, attached **Exhibit "I"** Page 8, Line 7-12).

35. Investigator Lyons is a 27-year law enforcement veteran and had received training regarding the use of facial recognition technology. (Id. at Page 8, Line 18-19; Page 23, Line 5-14).

8

36. Investigator Lyons and the RCIC have utilized facial recognition technology with a great deal of success in identifying previously unknown individuals in hundreds of cases. (Id. at Page 21, Line 15-18; Page 27, Line 22-25).

37. Investigator Lyons viewed the photograph of the suspect's driver's license on the bulletin and shrunk it slightly to make the pixels clearer. This is done frequently and enables the facial recognition software to get a better read on the photograph without affecting the validity of the results. (Id. Page 77, Line 1-9; Page 78, Line 1-4).

38. The facial recognition software matched the photograph displayed on the suspect's fraudulent driver's license to Nijeer Parks. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 90, Line 10-13).

39. Upon viewing the results of the facial recognition analysis, Investigator Lyons immediately noted striking similarities in the resemblance between the suspect's driver's license photograph and the photograph returned of Nijeer Parks. (Deposition of Investigator Lyons, **Exhibit "I"** Page 89, Line 18-23).

40. Investigator Lyons showed the results to a fellow RCIC Investigator, Lieutenant Richard Dey, who was in agreement that the resemblance was sufficient to provide the WPD with the facial recognition results as a possible lead on the Hampton Inn suspect. (Id. at Page 89, Line 18-23).

41. The facial recognition software indicated that the probability of a positive match to Plaintiff was 594 out of a possible 1,000, which is sufficient to warrant further investigation into Plaintiff. (Id. at Page 53, Line 9-25; Page 54, Line 1-5).

42. Investigator Lyons has made positive matches with lower threshold probability scores in other investigations than that which identified Plaintiff here. (Id. at Page 53, Line 21-23).

43. After receiving the match from the facial recognition software, Investigator Lyons reviewed Plaintiff's extensive criminal history in New Jersey and noted that Plaintiff's past addresses connected him to New Jersey. (Id. at Page 47, Line 3-12).

44. Investigator Lyons supplied the results of the facial recognition analysis to Sgt. Tapia via email on January 28, 2019. (See Rockland County Intelligence Center Officer Report, attached hereto as **Exhibit "AA"**).

45. Investigator Lyons' email to Sgt. Tapia stated that the facial recognition software came back with a "high number hit" comparison to Plaintiff. (Id. Bates stamped PARKS000034).

46. Upon receiving the results of the facial recognition analysis and criminal history from the RCIC, Det. Sgt. Tapia summoned Officer Lyszyk to the Detective Bureau to determine if he could personally identify the suspect. Officer Lyszyk confirmed to Det.

10

Sgt. Tapia that he was 100% certain that the image returned by the facial recognition software was the individual that he dealt with at the Hampton Inn. (Deposition of Det. Sgt. Tapia **Exhibit "F"** Page 90, Line 10-22).

47. Peter Nastasi was the Assistant Prosecutor who was the point of contact in the Middlesex County Prosecutor's Office for the WPD. (Deposition of Det. Quesada, **Exhibit "E"** Page 13, Line 14-17; see also Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

48. Det. Sgt. Tapia and Officer Lyszyk contacted AP Nastasi and explained the facial recognition results and advised of Officer Lyszyk's positive identification of the suspect as Nijeer Parks. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 135, Line 5-23).

49. AP Nastasi determined that probable cause existed and authorized Det. Sgt. Tapia and Officer Lyszyk to generate Complaint-Warrants against Nijeer Parks. AP Nastasi advised of what charges would be issued and the Complaint-Warrants were sent to AP Nastasi for his review and approval. (Id. at Page 115, Line 6-10; Page 137, Line 13-25; Page 138, Line 1-4).

50. The Affidavit of Probable Cause attached to the Complaint-Warrants stated that facial recognition technology was employed and helped identify Plaintiff as the suspect. (See Complaint-Warrant 1225-W-2019-000156, attached hereto as **Exhibit "N"** and

Complaint-Warrant 1225-W-2019-000158, attached hereto as **Exhibit "O"**).

51. Det. Sgt. Tapia contacted Judge David Stahl and advised him of the Complaint-Warrants before sending them to him for his review. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 119, Line 20-24).

52. Judge Stahl signed off on the Complaint-Warrants on January 30, 2019. (Complaint-Warrant 1225-W-2019-000156, **Exhibit "N"**; Complaint-Warrant 1225-W-2019-000158, **Exhibit "O"**).

53. That same day, Det. Sgt. Tapia, Officer Lyszyk, and another officer drove to Paterson in an attempt to serve the Complaint-Warrants and arrest Parks. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 38, Line 24-25; Page 39, Line 1-3).

54. On February 4, 2019, Det. Quesada packaged the suspect's sneaker, water bottle, and vape pen in preparation to be sent to the NJSP for DNA analysis. (See WPD Vehicle/Property Description Report, attached hereto as **Exhibit "R"**; see also the Deposition of Det. Quesada, **Exhibit "E"** Page 29, Line 1-10).

55. It is standard procedure at the WPD that when several packages of evidence are ready for analysis, a WPD Officer physically transports the packages to the NJSP. (Deposition of Det. Quesada, **Exhibit "E"** Page 25, Line 12-18).

56. The NJSP is extremely backlogged with cases and requests for evidence analysis. It typically takes about four to six weeks for

12

the fingerprint packages to be returned, either with a positive match or with no comparison. (Id. at Page 26, Line 1-10).

57. On February 5, 2019, Plaintiff presented to WPD Headquarters to address the active Complaint-Warrants against him and was placed under arrest without incident. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**; see also the Transcript of the Deposition of Nijeer Parks, attached hereto as **Exhibit "J"** Page 34, Line 10-22).

58. Plaintiff was read the Miranda Warnings and Plaintiff signed a waiver of these rights. (See Miranda Warnings Card, attached hereto as **Exhibit "S"**).

59. While Plaintiff was in custody, he was booked, processed, and interviewed without incident. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**; see also the Deposition of Parks, attached hereto as **Exhibit "J"** Page 35, Line 11-13; Page 40, Line 5-7).

60. Officer Lee was called in to WPD Headquarters to determine if he could positively identify Plaintiff as the suspect from the incident at the Hampton Inn. (Deposition of Ofc. Lee, **Exhibit "D"** Page 24, Line 12-25; Page 25, Line 1-8).

61. Officer Lee observed Plaintiff while he was handcuffed to a bench in the booking area. Officer Lee identified Plaintiff as the suspect that he interacted with at the Hampton Inn on January 26,

2019. (Id. at Page 29, Line 15-20; see also Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

62. Before Plaintiff was transported to the Middlesex County Jail, he feigned an asthma attack and fell to the floor because he believed that he was going to be assaulted by officers. (Deposition of Parks, **Exhibit "J"** Page 41, Line 12-22).

63. The officers present helped Plaintiff off the floor, sat him on the bench, and called for EMTs to respond. (Id. at Page 41, Line 20-22).

64. While Plaintiff was in the custody of the WPD, he was never subjected excessive force, and conceded multiple times that none of the officers present touched Plaintiff in any kind of aggressive manner. (Id. at Page 35, Line 11-13; Page 36, Line 8-11; Page 44, Line 18-23; Page 49, Line 19-22).

65. After the EMTs finished treating Plaintiff, he was transported to the Middlesex County Jail without incident. (Id. at Page 58, Line 10-12).

66. Plaintiff was released from the Middlesex County Jail on February 13, 2019 after being held for eight days. (Id. at Page 119, Line 2-15).

67. The fingerprint and DNA evidence was received by the NJSP on February 8, 2019. (See Request for Latent Fingerprint Examination, attached hereto as **Exhibit "L"**; see also NJSP DNA Evidence Receipt, attached hereto as **Exhibit "W"** Bates stamped PARKS000174).

68. The fingerprint evidence was analyzed on February 14, 2019 and returned to the WPD on February 22, 2019 with information that the fingerprints belonged to an individual named Barrington Walker. By this point, Plaintiff had already been released from custody. (Request for Latent Fingerprint Examination, **Exhibit "L"**; see also WPD I.D. Bureau Suspect Report, attached hereto as **Exhibit "X"**).

69. This identification was of little to no evidentiary value, as the only fingerprints suitable for analysis were recovered from the common door of the Hampton Inn lobby and it was unknown where the suspect physically touched the door. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 121, Line 6-11).

70. The DNA evidence received by the NJSP laboratory was analyzed on April 17, 2019. (NJSP DNA Evidence Receipt, **Exhibit "W"** Bates stamped PARKS000175).

71. The NJSP was not able to obtain any DNA from the sneaker, but did collect DNA from the water bottle. However, the DNA from the water bottle did not result in a match to a suspect. (Deposition of Det. Quesada, **Exhibit "E"** Page 39, Line 13-24).

72. October 18, 2019, DNA analysis complete but no match made. (See the NJSP DNA Laboratory Report, attached hereto as **Exhibit "Y"**).

73. On January 24, 2020, the New Jersey Attorney General told state prosecutors that police officers should stop using the

15

Clearview AI facial recognition app. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 26).

74. Plaintiff initiated the subject lawsuit with the filing of a Complaint with the Superior Court of New Jersey on November 25, 2020. (See Docket No. PAS-L-003672-20, Transaction ID LCV20202148483).

75. On January 15, 2021, Plaintiff amended his Complaint. (See Docket No. PAS-L-003672-20, Transaction ID LCV2021117384).

76. On March 3, 2021, the Woodbridge Defendants removed this matter to the New Jersey District Court. (ECF No. 1).

77. On April 23, 2021, a Motion to Dismiss Plaintiff's Complaint was filed on behalf of the Middlesex County Prosecutor's Office Defendants. (ECF No. 3.) This Motion was terminated on May 27, 2021 and Plaintiff was permitted to amend his Complaint. (ECF No. 15).

78. On June 1, 2021, Plaintiff filed his First Amended Complaint. (ECF No. 16). On June 22, 2021, the Middlesex County Prosecutor's Office Defendants refiled their Motion to Dismiss Plaintiff's Complaint. (ECF No. 19).

79. On July 23, 2021, the Woodbridge Defendants filed a Motion for Judgment on the Pleadings. (ECF No. 24).

80. On July 30, 2021, after further analysis the NJSP determined that the DNA from the water bottle belonged to Barrington Walker. (Deposition of Det. Quesada, **Exhibit "E"** Page 40, Line 14-18; see

16

also the NJSP CODIS Investigative Hit Notification, attached hereto as **Exhibit "Z"**).

81. On May 26, 2022, Plaintiff filed a Motion to Amend the Complaint (ECF No. 24) and the dispositive Motions referenced above were administratively terminated pending resolution of Plaintiff's request to amend the Complaint. (ECF No. 51).

82. Plaintiff's Motion was granted in part (ECF No. 69) and Plaintiff filed his Second Amended Complaint on October 7, 2022. (ECF No. 72).

83. On November 4, 2022, Plaintiff voluntarily dismissed his claims against the Middlesex County Department of Corrections. (ECF No. 76).

84. On December 19, 2022, the Middlesex County Prosecutor's Office Defendants refiled their Motion to Dismiss Plaintiff's Complaint. (ECF No. 80).

85. On July 27, 2023, Plaintiff voluntarily dismissed his claims against the Middlesex County Prosecutor's Office. (ECF No. 103).

**CERTIFICATION OF SERVICE**

I, Garry J. Clemente, hereby certify that on the date set forth below, I caused a true and correct copy of the foregoing Statement of Material Facts and all accompanying documents to be served upon the following counsel of record via operation of the Court's CM/ECF system:

Daniel W. Sexton, Esq.
Daniel W. Sexton, Esquire, LLC
229 New Centre Road
Hillsborough, New Jersey 07304
Attorney for Plaintiff

Dated: December 5, 2023          */s/ Garry J. Clemente, Esq.*
                                 Garry J. Clemente, Esq.