**Garry J. Clemente, Esq.**
**ATTORNEY ID. NO. 305992020**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Woodbridge Defendants**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NIJEER PARKS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-04021-JXN-LDW |
| -v- | : | |
| | : | |
| JOHN E. MCCORMACK, MAYOR OF WOODBRIDGE, et al. | : | |
| | : | |
| Defendants. | : | |

## WOODBRIDGE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Garry J. Clemente, Esq. (#305992020)
On The Brief

1

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT**

**STATEMENT OF MATERIAL FACTS**

**LEGAL STANDARD**

**ARGUMENT**

I.  **COUNT ONE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO PROVE EACH ELEMENT OF A CAUSE OF ACTION FOR MALICIOUS PROSECUTION**

a.  Count One must be dismissed as against Sergeant Joseph Licciardi as he did not participate in the investigation into the incident at the Hampton Inn and had no role whatsoever in the determination that probable cause existed to arrest Plaintiff

b.  Plaintiff has failed to prove the absence of probable cause for the issuance of the Complaint-Warrants against Plaintiff

c.  Plaintiff has failed to prove that the issuance of the Complaint-Warrants against Plaintiff was actuated by malice

d.  Officer Lyszyk acted in good faith and is entitled to qualified immunity

e.  Defendants are entitled to a complete defense of Plaintiff's Malicious Prosecution claim as Defendants relied upon the advice of counsel from the Middlesex County Prosecutor's Office

II. **COUNT TWO OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH A VIOLATION OF THE EQUAL PROTECTION CLAUSE OR RACIAL PROFILING**

III. **COUNT THREE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH THAT HE WAS SUBJECTED TO EXCESSIVE FORCE**

IV. **COUNT FOUR OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH MONELL LIABILITY ON BEHALF OF THE TOWNSHIP OF WOODBRIDGE**

V.  **COUNT SEVEN AND COUNT NINE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH THE ELEMENTS OF A CLAIM FOR CIVIL CONSPIRACY**

**CONCLUSION**

**TABLE OF AUTHORITIES**

Abraham v. Raso, 183 F.3d 279 (3d Cir. 1999)

Alicea v. Johnson, No. 11-3823, 2011 WL 6181906 (D.N.J. 2011)

Andrews v. Scuilli, 853 F.3d 690 (3d Cir. 2017)

Bayer v. Township of Union, 414 N.J. Super. 238, 997 A.2d 1118 (App. Div. 2010)

Beck v. City of Pittsburgh, 89 F.3d 966 (3d Cir. 1996)

Bell v. Atlantic City Railroad Co., 58 N.J.L. 227, 33 A. 211 (1895)

Bennett v. Pillion, 105 N.J.L. 359, 144 A. 601 (1929)

BeVier v. Hucal, 806 F.2d 123 (7th Cir. 1986)

Celotex Corp. v. Catrett, 744 U.S. 317 (1986)

City of Canton, Ohio v. Harris, 489 U.S. 378 (1989)

Connick v. Thompson, 563 U.S. 51 (2011)

Connor v. Powell, 162 N.J. 397, 744 A.2d 1158 (2000)

Craig v. Collins, No. 13-1873, 2013 WL 5271521 (E.D. Pa. 2013)

Curley v. Klein, 499 F.3d 199 (3d Cir. 2007)

Dalton v. Godfrey, 97 N.J.L. 455, 117 A. 635 (1922)

DiBella v. Borough of Beachwood, 407 F.3d 599 (3d Cir. 2005)

Duro Co. v. Wishnevsky, 126 N.J.L. 7, 16 A.2d 64 (1940)

Fioriglio v. City of Atlantic City, 996 F. Supp. 379 (D.N.J. 1998)

Galafaro v. Kuenstler, 53 N.J. Super. 379 (App. Div. 1958)

Gilles v. Davis, 427 F.3d 197 (3d Cir. 2005)

Graham v. Conner, 490 U.S. 386 (1989)

3

Gramenos v. Jewel Cos., 797 F.2d 432 (7th Cir. 1986)

Grimm v. Churchill, 932 F.2d 674 (7th Cir. 1991)

Hankin Family P'Ship v. Upper Merion Twp., No. 01-1622, 2012 WL 43599 (E.D. Pa. 2012)

Harlow v. Fitzgerald, 457 U.S. 800 (1982)

Holmes v. City of Wilmington, 79 F.Supp. 3d 497 (D.Del. 2015)

Jobes v. Evangelista, 369 N.J. Super. 284, 849 A.2d 186 (App. Div. 2004)

Jones v. Dalton, 867 F. Supp. 2d 572 (D.N.J. 2012)

Kelley v. Borough of Carlisle, 622 F.3d 248 (2010)

Kirk v. City of Newark, 109 N.J. 173, 536 A.2d 229 (1988)

Kulwicki v. Dawson, 969 F.2d 1454 (3d Cir. 1992)

Labo v. Borger, No. 02-3975, 2005 WL 1971867 (D.N.J. 2005)

Lake v. Arnold, 112 F.3d 682 (3d Cir. 1997)

Lankford v. City of Clifton Police Department, 546 F.Supp. 3d 296 (D.N.J. 2021)

Lind v. Schmid, 67 N.J. 255, 337 A.2d 365 (1975)

LoBiondo v. Schwartz, 199 N.J. 62, 970 A.2d 1007 (2009)

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986)

Mayflower Industries v. Thor Corp., 15 N.J. Super. 139 (Ch. Div. 1951), aff'd, 9 N.J. 605 (1952)

McTernan v. City of York, 564 F.3d 636 (3d Cir. 2009)

Monell v. Department of Social Services, 436 U.S. 658 (1978)

Morillo v. Torres, 222 N.J. 104, 117 A.3d 1206 (2015)

Orsatti v. N.J. State Police, 71 F.3d 480 (3d Cir. 1995)

Patterson v. Sch. Dist. of Phila., No. 99-CV-4792, 2000 WL 1020332, (E.D. Pa. 2000)

Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231 (3d Cir. 1995)

Penwag Property Co. v. Landau, 76 N.J. 595, 288 A.2d 1265 (1978)

Porter v. Gray, No. 05-CV-231, 2007 WL 464694 (W.D. Pa. 2007)

Ramos v. Flowers, 429 N.J. Super. 13, 56 A.3d 869 (2013)

Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123 (2d Cir. 1997)

Ridgewood Bd. of Educ. v. N.E. ex. Rel. M.E., 172 F.3d 238 (3d Cir. 1999)

Rios v. City of Bayonne, No. 2:12-4716, 2015 WL 2400756 (D.N.J. 2015)

Rodriguez v. Trenton Police Dep't, 828 F. App'x 851 (3d Cir. 2020)

Saucier v. Katz, 533 U.S. 194 (2001)

Schneider v. Simonini, 163 N.J. 336, 749 A.2d 336 (2000)

Shoemaker v. Shoemaker, 11 N.J. Super. 471 (App. Div. 1951)

Smith v. Gonzales, 670 F.2d 522 (5th Cir. 1985)

Snell v. City of New York, 564 F.3d 659 (3d Cir. 2009)

State v. Jones, 143 N.J. 4, 667 A.2d 1043 (1995)

Sunderbrand v. Shills, 82 N.J.L. 700, 82 A. 914 (E.A. 1912)

Thomas v. Cumberland County, 749 F.3d 217 (3d Cir. 2014)

Toft v. Ketchum, 18 N.J. 280 (1955)

United States v. Miknevich, 638 F.3d 178 (3d Cir. 2011)

United States v. Myers, 308 F.3d 251 (3d Cir. 2002)

United States v. Scheets, 188 F.3d 829 (7th Cir. 1999)

Vladar v. Klopman, 89 N.J.L. 575 (E. & A. 1916)

West v. Atkins, 487 U.S. 42 (1988)

Wildoner v. Borough of Ramsey, 162 N.J. Super. 375, 744 A.2d 1146 (2000)

Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000)

Fed. R. Civ. P. 56

42 U.S.C. 1983

42 U.S.C. 1985(3)

N.J.S.A. 10:5-12.1

N.J.S.A. 10:6-2, et seq.

**PRELIMINARY STATEMENT**

This office represents the interests of Woodbridge Township Mayor John E. McCormac, Woodbridge Police Department Director Robert Hubner, Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk and Woodbridge Police Sergeant Joseph Licciardi (collectively herein, "Woodbridge Defendants") with respect to the above-referenced matter. The issue at the heart of this matter is whether the Woodbridge Defendants had probable cause to support the Complaint-Warrants for Plaintiff's arrest. Defendants submit that the evidence adduced in this matter clearly establishes that probable cause existed at the time of Plaintiff's arrest.

**STATEMENT OF MATERIAL FACTS**

1.   On January 26, 2019, Woodbridge Police Department ("WPD") Officers Francis Lee and Andrew Lyszyk were separately dispatched to the Hampton Inn on Route 9 North in Woodbridge on a report of shoplifting. (See WPD Director Robert Hubner's Answers to Interrogatories, attached hereto as **Exhibit "B"**).

2.   Officer Lee arrived on scene first and encountered the suspect in the lobby, an African American male who identified himself as "Jamal Owens." (Id.)

3.   The suspect produced a Tennessee driver's license which listed the name "Jamal Owens" and displayed a photograph of the suspect. (Id.)

7

4.    Officer Lee called WPD headquarters to have dispatch run the suspect's driver's license to determine if it was legitimate. (See Transcript of Deposition of WPD Officer Francis Lee, attached hereto as **Exhibit "D"** Page 18, Line 11-16).

5.    Dispatch advised Officer Lee that the suspect's driver's license was not coming back on file. Officer Lyszyk took the suspect's driver's license to his patrol vehicle to further attempt to verify its authenticity. (See Transcript of Deposition of WPD Officer Andrew Lyszyk, attached hereto as **Exhibit "C"** Page 13, Line 22-25).

6.    Officer Lyszyk contacted the Tennessee State Police, who confirmed that the suspect's driver's license was fake. (Id. at Page 14, Line 7-13).

7.    Since Officers Lee and Lyszyk were unable to confirm the identity of the suspect, who had admitted to shoplifting, the decision was made to place the suspect under arrest. (Id. at Page 14, Line 24-25; Page 15, Line 1-4).

8.    When Officer Lyszyk attempted to place the suspect in handcuffs, the suspect slipped away from his grasp and fled the scene by running out the back door of the Hampton Inn lobby. (Id. at Page 15, Line 25; Page 16, Line 1-6).

9.    Officers Lee and Lyszyk pursued the suspect as he ran around to the front of the Hampton Inn and entered his vehicle. There, the Officers confronted the suspect and drew their service weapons

while demanding that the suspect turn off and exit the vehicle. (Id. at Page 16, Line 10-19).

10. The suspect's vehicle was rented from Hertz and the suspect was at the Hampton Inn to renew his rental agreement at the Hertz kiosk located in the lobby. (See Hertz Rental Agreement, attached hereto as **Exhibit "P"**).

11. The suspect refused to comply with the Officers' commands and fled the scene in his vehicle, striking Officer Lyszyk's patrol vehicle before hitting a pillar in front of the Hampton Inn. During this time, Officer Lee had to jump out of the way to avoid being struck by the suspect's vehicle. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 16, Line 18-22).

12. Officers Lee and Lyszyk engaged in a brief vehicular pursuit of the suspect, but were unable to locate the suspect. The Officers returned to the Hampton Inn to preserve the scene. (Id. at Page 17, Line 1-13).

13. Other officers on patrol were dispatched to the Hampton Inn to guard the doors to the lobby and preserve the scene. The WPD Detective Bureau was notified of the incident and Detective Jorge Quesada arrived to begin processing the evidence left at the scene. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

14. Det. Quesada was assigned to the Identification Unit within the Detective Bureau and was responsible for photographing and collecting evidence at the scene. (See Transcript of Deposition of

WPD Detective Jorge Quesada, attached hereto as **Exhibit "E"** Page 8, Line 9-16).

15.  Upon his arrival on scene, Det. Quesada was advised of the areas of the Hampton Inn lobby that the suspect interacted with prior to and during his flight from the lobby. (Id. at Page 19, Line 14-20).

16.  Det. Quesada learned that the suspect fled through the rear glass common door to the lobby. (Id. at Page 20, Line 3-5).

17.  Det. Quesada viewed surveillance video from the Hampton Inn to determine where the suspect touched the door, but the angle of the camera did not cover the door. (Id. at Page 28, Line 3-7).

18.  Det. Quesada ultimately collected three fingerprints from the rear glass common door to the lobby. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

19.  Det. Quesada also collected a water bottle that the suspect drank from and a sneaker that the suspect lost during his flight from the Hampton Inn. (Deposition of Det. Quesada, **Exhibit "E"** Page 19, Line 14-20.

20.  Officer Lyszyk advised Det. Quesada that he still had the suspect's driver's license and that although the license was fake, the picture on the license was that of the suspect. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 18, Line 10-13).

21.  The suspect's vehicle was found the next day and five additional fingerprints were lifted and a vape pen was collected

from the vehicle. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

22.  With the evidence collected, Det. Sgt. Tapia and the Detective Bureau took over the investigation. (Id.; see also the Transcript of Deposition of WPD Det. Sgt. Santiago Tapia, attached hereto as **Exhibit "F"** Page 56, Line 3-6).

23.  The fingerprints were reviewed at WPD headquarters to determine if they were suitable to be packaged and sent to the New Jersey State Police ("NJSP") for analysis. (Deposition of Det. Quesada, **Exhibit "E"** Page 25, Line 1-4).

24.  As is the case with other local municipal police departments, the WPD does not have the capability to analyze and compare fingerprints in-house. (Id. at Page 27, Line 5-25; Page 28, Line 1-2).

25.  The fingerprint evidence was reviewed and packaged by Det. Quesada on January 26, 2019. (See the WPD I.D. Bureau Report, attached hereto as **Exhibit "K"**).

26.  Det. Sgt. Tapia had prior experience with facial recognition technology through a prior assignment with the NJSP Auto Theft Task Force, where that technology was used successfully to identify suspects. (Deposition of Det. Sgt. Tapia, attached hereto as **Exhibit "F"** Page 45, Line 6-13).

27.  Facial recognition software analyzes a sample photograph and considers the characteristics of an individual's face, including

the eyes, ears, nose, mouth, cheekbones, and other features. When the software identifies a potential match, the software gives a probability of a positive match. (See Transcript of Deposition of Rockland County Intelligence Center Investigator Seamus Lyons, attached hereto as **Exhibit "I"** Page 32, Line 2-14).

28.  Facial recognition technology is a tool that may be utilized in an investigation. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 50, Line 22-25; See also the Deposition of Det. Quesada, **Exhibit "E"** Page 32, Line 1-5); See also the Deposition of Investigator Lyons, **Exhibit "I"** Page 30, Line 5-22; Page 86, Line 3-11).

29.  Local municipal police departments may submit requests for facial recognition technology analysis to the New Jersey Regional Operations Intelligence Center ("NJROIC"), the New York State Intelligence Center ("NYSIC"), or the Rockland County Intelligence Center ("RCIC"). These entities have several tools at their disposal, including facial recognition technology, that local and State police departments do not have access to. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 46, Line 10-17).

30.  On January 27, 2019, Detective Tapia created a bulletin which was sent to these entities and explained the circumstances of the incident at the Hampton Inn. The bulletin contained the suspect's driver's license photograph and requested that facial recognition analysis be performed in an effort to identify the suspect. (See

12

WPD Bulletin Requesting Assistance Identifying Suspect, attached hereto as **Exhibit "Q"**; See also Facial Recognition Initiative Request Form, attached hereto as **Exhibit "T"**).

31. Prior to sending the bulletin, Det. Sgt. Tapia showed the suspect's driver's license to Officers Lyszyk and Lee separately, who each confirmed that the photo on the license depicted the individual they dealt with at the Hampton Inn. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 132, Line 17-25; Page 133, Line 1-6).

32. Defense Expert, Major Joseph Craparotta, New Jersey State Police (Ret.) opined that Sgt. Tapia properly used his training and knowledge to submit the driver's license for facial recognition analysis as a tool to identify the suspect from the Hampton Inn. (See the Report of Defense Expert Major Joseph Craparotta (Ret.), attached hereto as **Exhibit "U"** Page 26).

33. Plaintiff's Expert, Ralph Cilento, New York Police Department (Ret.) opined that Sgt. Tapia was correct in utilizing all investigative means necessary to attempt to identify the suspect and that Sgt. Tapia determination to send the driver's license for facial recognition analysis was an appropriate investigative step. (See the Report of Plaintiff's Expert Ralph Cilento, attached hereto as **Exhibit "V"** Page 6).

34. The bulletin was received by Investigator Seamus Lyons of the Rockland County Intelligence Center ("RCIC") in New York. The RCIC

13

provides services to outside law enforcement, including manpower support, police records management, intelligence gathering, and evidence analysis. (Deposition of Investigator Lyons, attached **Exhibit "I"** Page 8, Line 7-12).

35.  Investigator Lyons is a 27-year law enforcement veteran and had received training regarding the use of facial recognition technology. (Id. at Page 8, Line 18-19; Page 23, Line 5-14).

36.  Investigator Lyons and the RCIC have utilized facial recognition technology with a great deal of success in identifying previously unknown individuals in hundreds of cases. (Id. at Page 21, Line 15-18; Page 27, Line 22-25).

37.  Investigator Lyons viewed the photograph of the suspect's driver's license on the bulletin and shrunk it slightly to make the pixels clearer. This is done frequently and enables the facial recognition software to get a better read on the photograph without affecting the validity of the results. (Id. Page 77, Line 1-9; Page 78, Line 1-4).

38.  The facial recognition software matched the photograph displayed on the suspect's fraudulent driver's license to Nijeer Parks. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 90, Line 10-13).

39.  Upon viewing the results of the facial recognition analysis, Investigator Lyons immediately noted striking similarities in the resemblance between the suspect's driver's license photograph and

14

the photograph returned of Nijeer Parks. (Deposition of Investigator Lyons, **Exhibit "I"** Page 89, Line 18-23).

40. Investigator Lyons showed the results to a fellow RCIC Investigator, Lieutenant Richard Dey, who was in agreement that the resemblance was sufficient to provide the WPD with the facial recognition results as a possible lead on the Hampton Inn suspect. (Id. at Page 89, Line 18-23).

41. The facial recognition software indicated that the probability of a positive match to Plaintiff was 594 out of a possible 1,000, which is sufficient to warrant further investigation into Plaintiff. (Id. at Page 53, Line 9-25; Page 54, Line 1-5).

42. Investigator Lyons has made positive matches with lower threshold probability scores in other investigations than that which identified Plaintiff here. (Id. at Page 53, Line 21-23).

43. After receiving the match from the facial recognition software, Investigator Lyons reviewed Plaintiff's extensive criminal history in New Jersey and noted that Plaintiff's past addresses connected him to New Jersey. (Id. at Page 47, Line 3-12).

44. Investigator Lyons supplied the results of the facial recognition analysis to Sgt. Tapia via email on January 28, 2019. (See Rockland County Intelligence Center Officer Report, attached hereto as **Exhibit "AA"**).

15

45.   Investigator Lyons' email to Sgt. Tapia stated that the facial recognition software came back with a "high number hit" comparison to Plaintiff. (Id. Bates stamped PARKS000034).

46.   Upon receiving the results of the facial recognition analysis and criminal history from the RCIC, Det. Sgt. Tapia summoned Officer Lyszyk to the Detective Bureau to determine if he could personally identify the suspect. Officer Lyszyk confirmed to Det. Sgt. Tapia that he was 100% certain that the image returned by the facial recognition software was the individual that he dealt with at the Hampton Inn. (Deposition of Det. Sgt. Tapia **Exhibit "F"** Page 90, Line 10-22).

47.   Peter Nastasi was the Assistant Prosecutor who was the point of contact in the Middlesex County Prosecutor's Office for the WPD. (Deposition of Det. Quesada, **Exhibit "E"** Page 13, Line 14-17; see also Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

48.   Det. Sgt. Tapia and Officer Lyszyk contacted AP Nastasi and explained the facial recognition results and advised of Officer Lyszyk's positive identification of the suspect as Nijeer Parks. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 135, Line 5-23).

49.   AP Nastasi determined that probable cause existed and authorized Det. Sgt. Tapia and Officer Lyszyk to generate Complaint-Warrants against Nijeer Parks. AP Nastasi advised of what charges would be issued and the Complaint-Warrants were sent

16

to AP Nastasi for his review and approval. (Id. at Page 115, Line 6-10; Page 137, Line 13-25; Page 138, Line 1-4).

50.   The Affidavit of Probable Cause attached to the Complaint-Warrants stated that facial recognition technology was employed and helped identify Plaintiff as the suspect. (See Complaint-Warrant 1225-W-2019-000156, attached hereto as **Exhibit "N"** and Complaint-Warrant 1225-W-2019-000158, attached hereto as **Exhibit "O"**).

51.   Det. Sgt. Tapia contacted Judge David Stahl and advised him of the Complaint-Warrants before sending them to him for his review. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 119, Line 20-24).

52.   Judge Stahl signed off on the Complaint-Warrants on January 30, 2019. (Complaint-Warrant 1225-W-2019-000156, **Exhibit "N"**; Complaint-Warrant 1225-W-2019-000158, **Exhibit "O"**).

53.   That same day, Det. Sgt. Tapia, Officer Lyszyk, and another officer drove to Paterson in an attempt to serve the Complaint-Warrants and arrest Parks. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 38, Line 24-25; Page 39, Line 1-3).

54.   On February 4, 2019, Det. Quesada packaged the suspect's sneaker, water bottle, and vape pen in preparation to be sent to the NJSP for DNA analysis. (See WPD Vehicle/Property Description Report, attached hereto as **Exhibit "R"**; see also the Deposition of Det. Quesada, **Exhibit "E"** Page 29, Line 1-10).

17

55.   It is standard procedure at the WPD that when several packages of evidence are ready for analysis, a WPD Officer physically transports the packages to the NJSP. (Deposition of Det. Quesada, **Exhibit "E"** Page 25, Line 12-18).

56.   The NJSP is extremely backlogged with cases and requests for evidence analysis. It typically takes about four to six weeks for the fingerprint packages to be returned, either with a positive match or with no comparison. (Id. at Page 26, Line 1-10).

57.   On February 5, 2019, Plaintiff presented to WPD Headquarters to address the active Complaint-Warrants against him and was placed under arrest without incident. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**; see also the Transcript of the Deposition of Nijeer Parks, attached hereto as **Exhibit "J"** Page 34, Line 10-22).

58.   Plaintiff was read the Miranda Warnings and Plaintiff signed a waiver of these rights. (See Miranda Warnings Card, attached hereto as **Exhibit "S"**).

59.   While Plaintiff was in custody, he was booked, processed, and interviewed without incident. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**; see also the Deposition of Parks, attached hereto as **Exhibit "J"** Page 35, Line 11-13; Page 40, Line 5-7).

60.   Officer Lee was called in to WPD Headquarters to determine if he could positively identify Plaintiff as the suspect from the

18

incident at the Hampton Inn. (Deposition of Ofc. Lee, **Exhibit "D"** Page 24, Line 12-25; Page 25, Line 1-8).

61.   Officer Lee observed Plaintiff while he was handcuffed to a bench in the booking area. Officer Lee identified Plaintiff as the suspect that he interacted with at the Hampton Inn on January 26, 2019. (Id. at Page 29, Line 15-20; see also Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

62.   Before Plaintiff was transported to the Middlesex County Jail, he feigned an asthma attack and fell to the floor because he believed that he was going to be assaulted by officers. (Deposition of Parks, **Exhibit "J"** Page 41, Line 12-22).

63.   The officers present helped Plaintiff off the floor, sat him on the bench, and called for EMTs to respond. (Id. at Page 41, Line 20-22).

64.   While Plaintiff was in the custody of the WPD, he was never subjected excessive force, and conceded multiple times that none of the officers present touched Plaintiff in any kind of aggressive manner. (Id. at Page 35, Line 11-13; Page 36, Line 8-11; Page 44, Line 18-23; Page 49, Line 19-22).

65.   After the EMTs finished treating Plaintiff, he was transported to the Middlesex County Jail without incident. (Id. at Page 58, Line 10-12).

66. Plaintiff was released from the Middlesex County Jail on February 13, 2019 after being held for eight days. (Id. at Page 119, Line 2-15).

67. The fingerprint and DNA evidence was received by the NJSP on February 8, 2019. (See Request for Latent Fingerprint Examination, attached hereto as **Exhibit "L"**; see also NJSP DNA Evidence Receipt, attached hereto as **Exhibit "W"** Bates stamped PARKS000174).

68. The fingerprint evidence was analyzed on February 14, 2019 and returned to the WPD on February 22, 2019 with information that the fingerprints belonged to an individual named Barrington Walker. By this point, Plaintiff had already been released from custody. (Request for Latent Fingerprint Examination, **Exhibit "L"**; see also WPD I.D. Bureau Suspect Report, attached hereto as **Exhibit "X"**).

69. This identification was of little to no evidentiary value, as the only fingerprints suitable for analysis were recovered from the common door of the Hampton Inn lobby and it was unknown where the suspect physically touched the door. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 121, Line 6-11).

70. The DNA evidence received by the NJSP laboratory was analyzed on April 17, 2019. (NJSP DNA Evidence Receipt, **Exhibit "W"** Bates stamped PARKS000175).

71. The NJSP was not able to obtain any DNA from the sneaker, but did collect DNA from the water bottle. However, the DNA from the

water bottle did not result in a match to a suspect. (Deposition of Det. Quesada, **Exhibit "E"** Page 39, Line 13-24).

72. October 18, 2019, DNA analysis complete but no match made. (See the NJSP DNA Laboratory Report, attached hereto as **Exhibit "Y"**).

73. On January 24, 2020, the New Jersey Attorney General told state prosecutors that police officers should stop using the Clearview AI facial recognition app. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 26).

74. Plaintiff initiated the subject lawsuit with the filing of a Complaint with the Superior Court of New Jersey on November 25, 2020. (See Docket No. PAS-L-003672-20, Transaction ID LCV20202148483).

75. On January 15, 2021, Plaintiff amended his Complaint. (See Docket No. PAS-L-003672-20, Transaction ID LCV2021117384).

76. On March 3, 2021, the Woodbridge Defendants removed this matter to the New Jersey District Court. (ECF No. 1).

77. On April 23, 2021, a Motion to Dismiss Plaintiff's Complaint was filed on behalf of the Middlesex County Prosecutor's Office Defendants. (ECF No. 3.) This Motion was terminated on May 27, 2021 and Plaintiff was permitted to amend his Complaint. (ECF No. 15).

78. On June 1, 2021, Plaintiff filed his First Amended Complaint. (ECF No. 16). On June 22, 2021, the Middlesex County Prosecutor's

21

Office Defendants refiled their Motion to Dismiss Plaintiff's Complaint. (ECF No. 19).

79.  On July 23, 2021, the Woodbridge Defendants filed a Motion for Judgment on the Pleadings. (ECF No. 24).

80.  On July 30, 2021, after further analysis the NJSP determined that the DNA from the water bottle belonged to Barrington Walker. (Deposition of Det. Quesada, **Exhibit "E"** Page 40, Line 14-18; see also the NJSP CODIS Investigative Hit Notification, attached hereto as **Exhibit "Z"**).

81.  On May 26, 2022, Plaintiff filed a Motion to Amend the Complaint (ECF No. 24) and the dispositive Motions referenced above were administratively terminated pending resolution of Plaintiff's request to amend the Complaint. (ECF No. 51).

82.  Plaintiff's Motion was granted in part (ECF No. 69) and Plaintiff filed his Second Amended Complaint on October 7, 2022. (ECF No. 72).

83.  On November 4, 2022, Plaintiff voluntarily dismissed his claims against the Middlesex County Department of Corrections. (ECF No. 76).

84.  On December 19, 2022, the Middlesex County Prosecutor's Office Defendants refiled their Motion to Dismiss Plaintiff's Complaint. (ECF No. 80).

85.  On July 27, 2023, Plaintiff voluntarily dismissed his claims against the Middlesex County Prosecutor's Office. (ECF No. 103).

22

**LEGAL STANDARD**

Fed. R. Civ. P. 56 states: "A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 744 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. Id. at 324. With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by showing the District Court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings. See Celotex, 477 U.S.

23

at 324. Further, the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. See Ridgewood Bd. of Educ. v. N.E. ex. Rel. M.E.*,* 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pennsylvania Coal Ass'n v. Babbitt*,* 63 F.3d 231, 236 (3d Cir. 1995).

**ARGUMENT**

**I.  COUNT ONE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO PROVE EACH ELEMENT OF A CAUSE OF ACTION FOR MALICIOUS PROSECUTION**

Count One of Plaintiff's Second Amended Complaint asserts a cause of action for Malicious Prosecution against WPD Officer Andrew Lyszyk and WPD Sergeant Joseph Licciardi. Plaintiff's malicious prosecution is governed by 42 U.S.C. 1983 and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, et seq. It has generally been stated that malicious prosecution is not a favored cause of action because citizens should not be inhibited in instituting prosecution of those reasonably suspected of crime. Lind v. Schmid, 67 N.J. 255, 263, 337 A.2d 365 (1975). See also Vladar v. Klopman, 89 N.J.L. 575 (E. & A. 1916); Shoemaker v. Shoemaker, 11 N.J. Super. 471 (App. Div. 1951); Toft v. Ketchum, 18 N.J. 280, 287 (1955) (Jacobs, J. concurring).

A malicious prosecution action arising out of a criminal prosecution requires proof that: (1) the defendant initiated a

24

criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. DiBella v. Borough of Beachwood, 407 F.3d 599, 601 (3d Cir. 2005). In order to prevail, plaintiff must prove each of these elements; the absence of any one of these elements is fatal to a successful prosecution of the claim. Penwag Property Co. v. Landau, 76 N.J. 595, 597, 288 A.2d 1265 (1978).

The essence of a cause of action for malicious prosecution is lack of probable cause, and the burden of proof rests on the plaintiff. Lind v. Schmid, 67 N.J. at 263. The plaintiff must establish a negative, namely, that probable cause did not exist. Id. Initially the defendant must have had probable cause to set the action in motion. The plaintiff must demonstrate that at the time when the defendant put the proceedings in motion the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense had been committed. Lind, at 262. See also Mayflower Industries v. Thor Corp., 15 N.J. Super. 139, 152 (Ch. Div. 1951), aff'd, 9 N.J. 605 (1952); Galafaro v. Kuenstler, 53 N.J. Super. 379 (App. Div. 1958).

The Woodbridge Defendants respectfully submit that Plaintiff has failed to prove elements three and four and thus has failed to establish a cause of action for malicious prosecution. As is noted by the authorities above, the burden rests with Plaintiff to establish that he was arrested based on Complaint-Warrants that were unsupported by probable cause. All of the evidence adduced in this matter corroborates that probable cause existed for Plaintiff's arrest. Likewise, Plaintiff has failed to establish that his arrest was grounded in malice or any other motivation beyond seeking to bring the suspect from the Hampton Inn incident to justice.

Furthermore, the named WPD officers are entitled to qualified immunity which shields law enforcement officers from personal liability for civil rights violations when the officers are acting under color of law in the performance of their official duties. Additionally, the named WPD officers are entitled to the complete defense of assistance of counsel because the Complaint-Warrants were issued in good faith on the advice of the Middlesex County Prosecutor's Office. Based upon the arguments and authorities to be addressed in more detail below, it is respectfully submitted that Count One of Plaintiff's Second Amend Complaint must be dismissed as against both Ofc. Lyszyk and Sgt. Licciardi.

26

### a. **Count One must be dismissed as against Sergeant Joseph Licciardi as he did not participate in the investigation into the incident at the Hampton Inn and had no role whatsoever in the determination that probable cause existed to arrest Plaintiff.**

As an initial matter, Count One must be dismissed with prejudice as against Sgt. Joseph Licciardi. Sgt. Licciardi had no involvement whatsoever in the events that led to the arrest of Plaintiff or in establishing that probable cause existed to arrest Plaintiff. Sgt. Licciardi was never present at the scene of the Hampton Inn on January 26, 2019. Sgt. Licciardi did not collect any evidence from the scene nor did he analyze or cause any evidence to be analyzed. Sgt. Licciardi did not participate in the facial recognition analysis of the fraudulent Tennessee driver's license. Sgt. Licciardi did not identify Plaintiff as the suspect from the Hampton Inn. Sgt. Licciardi did not sign an Affidavit of Probable Cause nor did he sign a Complaint-Warrant against Plaintiff. Sgt. Licciardi was not involved in the determination of probable cause whatsoever. The only involvement Sgt. Licciardi had in this matter was in approving the incident reports authored by Officers Lyszyk and Lee. As such, Count One of Plaintiff's Second Amended Complaint must be dismissed with prejudice as against Sgt. Licciardi.

### b. **Plaintiff has failed to prove the absence of probable cause for the issuance of the Complaint-Warrants against Plaintiff**

Contrary to Plaintiff's assertions, all the evidence in this matter, and the authorities that have interpreted probable cause,

27

establish that Ofc. Lyszyk had probable cause to arrest Plaintiff. "Probable cause exists if **at the time of the arrest** 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" Connor v. Powell, 162 N.J. 397, 409, 744 A.2d 1158 (2000) (alteration in original) (quoting Wildoner v. Borough of Ramsey, 162 N.J. Super. 375, 744 A.2d 1146 (2000)). "In determining whether probable cause existed, a court should consider the 'totality of the circumstances,' including the police officer's 'common and specialized experience.'" Bayer v. Township of Union, 414 N.J. Super. 238, 263, 997 A.2d 1118 (App. Div. 2010) (citations omitted).

Probable cause does not require sufficient evidence to prove guilt beyond a reasonable doubt. Rather, probable cause requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." United States v. Miknevich, 638 F.3d 178, 185 (3d Cir. 2011). Worded differently, "[p]robable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002). "[W]hen a police officer has received a reliable

28

identification by a victim of his or her attacker, the police have probable cause." Andrews v. Scuilli, 853 F.3d 690, 701 (3d Cir. 2017) (quoting Wilson v. Russo, 212 F.3d 781, 799 (3d Cir. 2000).

In this matter, Plaintiff was arrested based on Complaint-Warrants that were issued by a neutral and detached magistrate after being fully informed of the officers' basis for probable cause. Where an arrest is made pursuant to a warrant, a plaintiff challenging probable cause must show, by a preponderance of the evidence: (1) that the police officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) that such statements or omissions are material, or necessary, to the finding of probable cause. Wilson v. Russo, 212 at 786-87. (citation omitted). An assertion "is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" Andrews, 853 F.3d at 698 (quoting Wilson, 212 F.3d at 788).

The Affidavit of Probable Cause authored by Sgt. Tapia and attached to Complaint-Warrant 2019-W-000156 clearly outlines the investigative actions that were taken to identify Plaintiff as the suspect from the incident at the Hampton Inn. (See Complaint-Warrant 2019-W-000156, **Exhibit "N"**). Sgt. Tapia explains that the

29

fraudulent Tennessee driver's license was submitted for facial recognition analysis. Plaintiff's Expert opined in his report that Sgt. Tapia was correct in utilizing all investigative means necessary to attempt to identify the suspect and that Sgt. Tapia's determination to send the driver's license for facial recognition analysis was an appropriate investigative step. (See Report of Plaintiff's Expert, Ralph Cilento, **Exhibit "V"**). Sgt. Tapia outlines in the Affidavit what he was told by Investigator Lyons of the Rockland County Intelligence Center, that the facial recognition analysis resulted in a "high number hit" to Plaintiff. (See RCIC Officer Report, **Exhibit "AA"** Bates stamped PARKS000034).

Defendants concede that Sgt. Tapia's Affidavit does not mention that Ofc. Lyszyk viewed the photograph returned by the facial recognition analysis and confirmed that it was the suspect that he interacted with at the Hampton Inn. However, it is respectfully submitted that this minor omission was not material to the finding of probable cause. If anything, the confirmatory identification by Ofc. Lyszyk would only serve to bolster the basis for probable cause to arrest Plaintiff. Regardless of this minor omission in Sgt. Tapia's Affidavit, the Affidavit of Probable Cause drafted by Ofc. Lyszyk does state "[t]he suspect was identified as Parks." (See Complaint-Warrant 2019-W-000158, **Exhibit "O"**). Sgt. Tapia testified that Ofc. Lyszyk was the first person who was shown the results of the facial recognition analysis and that Ofc. Lyszyk

30

was 100% certain that Plaintiff was the suspect that he interacted with at the Hampton Inn. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 97, Line 24-25, Page 98, Line 1). Thus, Ofc. Lyszyk's statement in the Affidavit of Probable Cause that "the suspect was identified as Parks" references Ofc. Lyszyk's confirmatory identification of Plaintiff. All of the statements contained in the respective Affidavits of Probable Cause are truthful and do not contain any material misrepresentations or omissions. Any minor omissions in the Affidavits are not material and would not serve to extinguish the probable cause that these police officers established.

As was noted above, Ofc. Lyszyk identified Plaintiff as the suspect he interacted with at the Hampton Inn after viewing the results of the facial recognition analysis. The identification of an individual as the perpetrator of a crime by a comparison of photographs is sufficient to establish probable cause for an arrest. See United States v. Scheets, 188 F.3d 829, 837-38 (7th Cir. 1999) (finding probable cause to arrest where police officers compared a photograph of the perpetrator at the crime scene produced by a surveillance camera with a photograph of the arrestee and the arrestee himself). Furthermore, "[w]hen an officer has 'received his information from some person...who it seems reasonable to believe is telling the truth,' he has probable

cause." <u>Grimm v. Churchill</u>, 932 F.2d 674, 675 (7th Cir. 1991) (citations omitted).

The email from Investigator Lyons to Sgt. Tapia supplying the results of the facial recognition analysis states that Investigator Lyons received a "high number hit" between the driver's license reference photo and the image of Plaintiff. It was proper for Sgt. Tapia and Ofc. Lyszyk to rely upon the representation of Investigator Lyons when he informed them that he received a "high number hit" that the suspect from the Hampton Inn matched to Plaintiff. Investigator Lyons testified that the facial recognition analysis rated the probability of the comparison at 594 out of a possible 1,000. (Deposition of Investigator Lyons, **Exhibit "I"** Page 53, Line 9-25; Page 54, Line 1-5). Investigator Lyons explained that he has made positive matches with lower threshold probability ratings in other investigations than that which identified Plaintiff here. (<u>Id</u>. at Page 53, Line 21-23). Sgt. Tapia and Sgt. Lyszyk had no reason to distrust the results of the facial recognition analysis here, which performed by a seasoned law enforcement investigator with no interest coloring his judgment. After receiving these facial recognition results, Ofc. Lyszyk viewed the photographs and confirmed to Sgt. Tapia that Plaintiff was the suspect from the incident at the Hampton Inn. When a police officer, who is trained in accordance with the New Jersey Police Training Commission Performance Objectives,

which includes training on eyewitness observation, identifies a suspect, that is a positive identification. (Report of Defense Expert, Maj. Craparotta, **Exhibit "U"** Page 33-34; see also Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 100, Line 21-23). Investigator Lyons corroborated this point when he testified that the officer involved in the incident in the Hampton Inn would be particularly well-suited to identify the individual that he personally interacted with. (Deposition of Investigator Lyons, **Exhibit "I"** Page 72, Line 19-25, Page 73, Line 1-2).

Thereafter, Sgt. Tapia and Ofc. Lyszyk contacted Assistant Prosecutor Peter Nastasi of the Middlesex County Prosecutor's Office and outlined their factual basis for probable cause. The same factual basis was explained to Judge David Stahl when he was presented with the Complaint-Warrants for his review and approval. Defense Expert, Major Craparotta, opined that Sgt. tapia and Ofc. Lyszyk appropriately, professionally, and properly conferred with the prosecutor's office to solicit legal advice before submitting the Complaint-Warrants to Judge Stahl. (Report of Defense Expert, Maj. Craparotta, **Exhibit "U"** Page 31).

Plaintiff contends that the named officers "suppress[ed]...exonerating evidence" and argues essentially that a constitutionally deficient investigation established probable cause for Plaintiff's arrest. However, a plaintiff cannot establish a malicious prosecution claim by merely showing that the

33

police could have done a better job of investigating or failed to exhaust all leads after they had enough information to establish probable cause. Craig v. Collins, No. 13-1873, 2013 WL 5271521, at *7 (E.D. Pa. 2013). "[A] police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997), and has "no general duty to investigate further after acquiring information sufficient to establish probable cause." BeVier v. Hucal, 806 F.2d 123, 127 (7th Cir. 1986) (citing Gramenos v. Jewel Cos., 797 F.2d 432, 437-42 (7th Cir. 1986)). See also Patterson v. Sch. Dist. of Phila., No. 99-CV-4792, 2000 WL 1020332, at *6 (E.D. Pa. 2000) ("Once a police officer has discovered sufficient facts to establish probable cause, the officer has no constitutional duty to further investigate in hopes of finding exculpatory evidence."); Porter v. Gray, No. 05-CV-231, 2007 WL 464694, at *12 (W.D. Pa. 2007) (although police officer could have performed "a more thorough investigation" of allegedly exculpatory evidence, including contacting a person with knowledge of the events, "these arguable deficiencies do not rise to the level of a constitutional violation"); Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995) ("[T]he issue is not whether the information on which police officers base their request for an arrest warrant resulted from a professionally executed investigation; rather, the issue is

34

whether that information would warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.").

The named officers did not suppress any exonerating evidence, but to the contrary and in accordance with departmental policies and procedures, they promptly sent all available evidence collected at the scene of the Hampton Inn to be analyzed by the New Jersey State Police. The fingerprints were packaged for analysis on January 26, 2019 and the DNA evidence was packaged for analysis on February 4, 2019. As per standard procedure at WPD, the fingerprint and DNA evidence was physically transported to the New Jersey State Police Laboratory once several other packages of evidence were ready for analysis. The evidence was received by the New Jersey State Police Laboratory on February 8, 2019.

The results of the fingerprint comparison was returned to WPD on February 14, 2019. The comparison indicated a match to an individual named "Barrington Walker." However, this identification was not considered probative as the only prints suitable for comparison came from the common door in the lobby of the Hampton Inn, and the investigating officers could not ascertain where the suspect actually touched the door. Thus, there was no telling whether these fingerprints were actually left by the suspect or some other individual not involved in the incident.

35

The DNA evidence was not analyzed until April 17, 2019. As was noted above, the New Jersey State Police is inundated with requests for evidence analysis and it takes some time, weeks to months, for the analysis to be completed and the evidence returned to the submitting police department. DNA comparison concluded on October 18, 2019 with no positive match. On July 30, 2021, after further analysis the New Jersey State Police determined that the DNA from the water bottle belonged to Barrington Walker.

The most important fact in the timeline outlined above is that the evidence collected from the scene of the Hampton Inn was submitted for analysis *before* Plaintiff was arrested. It was not until well after Plaintiff was released from the custody of the Middlesex County Jail that the results of the evidence analysis was received by the WPD. That this evidence was ultimately exonerating for Plaintiff does not affect the calculus of probable cause as it was on January 30, 2019, the date the Complaint-Warrants were signed. It was objectively reasonable for Ofc. Lyszyk to believe that Plaintiff was the suspect from the incident at the Hampton Inn when the Complaint-Warrants were signed. As such, Plaintiff's argument that the WPD withheld exculpatory evidence in order to secure the Complaint-Warrants is misplaced and unsupported by the record in this case.

36

**c. Plaintiff has failed to prove that the issuance of the Complaint-Warrants against Plaintiff was actuated by malice**

Not only has Plaintiff failed to establish that probable cause did not exist for his arrest, Plaintiff has also failed to establish that the Ofc. Lyszyk acted with malice when the Complaint-Warrants against Plaintiff were signed. In the context of a malicious prosecution claim, "malice" has been defined as the "intentional doing of a wrongful act without just cause or excuse." LoBiondo v. Schwartz, 199 N.J. 62, 93-94, 970 A.2d 1007 (2009) (quoting Jobes v. Evangelista, 369 N.J. Super. 284, 398, 849 A.2d 186 (App. Div. 2004). Thus, malice consists of "doing a wrongful act in utter disregard of what the actor knew to be his duty, to the injury of another." LoBiondo, 199 N.J. at 94 (quoting Duro Co. v. Wishnevsky, 126 N.J.L. 7, 10, 16 A.2d 64 (1940).

There was no malice whatsoever behind the officers' decision to sign the Complaint-Warrants against Plaintiff because the Complaint-Warrants were supported by probable cause. The only motivation behind the issuance of the Complaint-Warrants was to apprehend a dangerous individual who had displayed a reckless indifference to the safety and welfare of the community. These officers were investigating to identify an individual who went to great lengths to conceal his identity as evidenced by the fraudulent Tennessee Driver's license and the credit card in the same name as displayed on the driver's license, "Jamal Owens."

37

(See WPD Incident Report #19010123/1, attached hereto as **Exhibit "BB"**). Such efforts to conceal one's identity bespeaks an individual involved in past or ongoing criminal activity. Furthermore, Officers Lyszyk and Lee were nearly struck by the fleeing suspect's vehicle when the suspect made his escape. They were firsthand witnesses to the dangerous propensities of this individual and public policy and good police work require that efforts be made to promptly identify and bring that individual to justice.

**d. Officer Lyszyk acted in good faith and is entitled to qualified immunity**

The doctrine of qualified immunity shields law enforcement officers from personal liability for civil rights violations when the officers are acting under color of law in the performance of their official duties. This protection extends to suits brought under 42 U.S.C. 1983 and under New Jersey's analogue, the Civil Rights Act, N.J.S.A. 10:6-1. Morillo v. Torres, 222 N.J. 104, 107-08, 117 A.3d 1206 (2015). (See also Ramos v. Flowers, 429 N.J. Super. 13, 29, 56 A.3d 869 (2013) (Qualified immunity applies to claims under both the United States and the New Jersey constitutions). Police officers performing discretionary functions are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Courts recognize that police officers must often make split second decisions and can make mistakes in the process. See Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005) (citing Saucier v. Katz, 533 U.S. 194, 204-05 (2001)). Accordingly, the qualified immunity afforded to police officers encompasses "mistaken judgments that are not plainly incompetent." Id. Whether a police officer's mistake is reasonable and he is thus entitled to qualified immunity is a "question of law that is properly answered by the court, not a jury." Curley v. Klein, 499 F.3d 199, 211 (3d Cir. 2007).

The qualified immunity doctrine is applied to civil rights claims brought against law enforcement officials engaged in their discretionary functions, including arresting or charging an individual based on probable cause to believe that an offense has occurred. Morillo, 222 N.J. at 117; see also Schneider v. Simonini, 163 N.J. 336, 353-54, 749 A.2d 336 (2000). Defendants rely on the two-stage test laid out by the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001), in which courts must determine: (1) whether the police officers' actions violated a constitutional right, viewed in the light most favorable to the plaintiff; and (2) whether reasonable police officers would find the conduct unlawful in the same situation. Morillo, 222 N.J. at 114 (citing Saucier,

39

533 U.S. 194 (2001)). The Supreme Court in Wildoner v. Borough of Ramsey, 162 N.J. Super. 375, 744 A.2d 1146 (2000) noted that the objective reasonableness standard of this section closely mirrors the standard to be applied in section 1983 actions alleging unconstitutional arrest. "Objective reasonableness is measured by the amount of knowledge available to the officer at the time of the alleged violation." Kulwicki v. Dawson, 969 F.2d 1454, 1463 (3d Cir. 1992).

When a plaintiff asserts that he or she was unlawfully arrested, a law enforcement officer can defend that claim "by establishing either that he or she acted with probable cause, or, even if probable cause did not exist, that a reasonable police officer could have believed in its existence. Morillo, 222 N.J. at 118-19 (quoting Kirk v. City of Newark, 109 N.J. 173, 184, 536 A.2d 229 (1988)). "If officers of reasonable competence could disagree on the issue of probable cause, the doctrine of qualified immunity should be applied." Morillo, 222 N.J. at 119 (quoting Connor, 162 N.J. at 408).

Ofc. Lyszyk is entitled to the defense of qualified immunity because even if probable cause did not exist to arrest Plaintiff, reasonable police officers could, and have, believed that probable cause was established for Plaintiff's arrest. Ofc. Lyszyk's identification of Plaintiff as the suspect from the Hampton, although was mistaken, was made in good faith and was reasonable

40

under the circumstances. Each officer that viewed the photographs of the driver's license and of Plaintiff, including Ofc. Lyszyk, Sgt. Tapia, Lt. Joesph Velez, Investigator Lyons and Investigator Dey, believed that the photographs depicted the same individual, that being Plaintiff.

e. **Officer Lyszyk is entitled to a complete defense to Plaintiff's Malicious Prosecution claim as Defendants relied upon advice of counsel from the Middlesex County Prosecutor's Office**

Advice of counsel is a complete defense to an action for malicious prosecution of a criminal action where it appears that the prosecution was instituted in reliance on good faith on such advice given after a full and fair statement to the attorney of all the facts. Bennett v. Pillion, 105 N.J.L. 359, 144 A. 601 (1929); Dalton v. Godfrey, 97 N.J.L. 455, 117 A. 635 (1922); Bell v. Atlantic City Railroad Co., 58 N.J.L. 227, 33 A. 211 (1895). The Court in Kelley v. Borough of Carlisle, 622 F.3d 248, 255-56 (2010) held that "a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause..." and "that reliance must be objectively reasonable."

With respect to elements three and four that Plaintiff must prove to establish his malicious prosecution claim, our courts have held that even if, objectively, there was no probable cause for the complaint, reliance on the advice of counsel to the

41

contrary will be sufficient because it will defeat the separate element of malicious intent. LoBiondo v. Schwartz, 199 N.J. 62, 94, 970 A.2d 1007 (2009) (citing Sunderbrand v. Shills, 82 N.J.L. 700, 703, 82 A. 914 (E. A. 1912).

As was noted above, the Complaint-Warrants issued against Plaintiff were signed after Sgt. Tapia and Ofc. Lyszyk fully and fairly informed the Assistant Middlesex County Prosecutor, Peter Nastasi, of their basis for probable cause. After considering the evidence proffered by Sgt. Tapia and Ofc. Lyszyk, AP Nastasi gave his approval for them to draft Complaint-Warrants to be submitted for review by a neutral and detached magistrate. After reviewing the Complaint-Warrants and discussing the factual basis for probable cause with Sgt. Tapia and Ofc. Lyszyk, Judge David Stahl was satisfied that probable cause existed and signed the Complaint-Warrants.

II. **COUNT TWO OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH A VIOLATION OF THE EQUAL PROTECTION CLAUSE OR RACIAL PROFILING**

Count two of Plaintiff's Second Amended Complaint alleges a violation of the Equal Protection Clause on the grounds that Plaintiff was subjected to racial profiling. However, it is unclear as to which defendants Count Two is against. Plaintiff's Second Amended Complaint simply states that "[t]hese wrongful acts of Defendants constitute[] an egregious violation of the guarantee to Equal Protection under the law..." (ECF No. 72). It should be noted

42

that most of the allegations contained in Count Two appear to be directed towards the provider[s] of facial recognition software, over which the Woodbridge Defendants had absolutely no control. Furthermore, Plaintiff has not pursued any claims against facial recognition software providers despite naming "Idemia, Inc." as a defendant in this matter. Any error or bias that may be attributed to facial recognition software made or maintained by these providers cannot be attributed to the Woodbridge Defendants.

Insofar as this claim is directed towards the Woodbridge Defendants, this claim is governed by 42 U.S.C. 1983, which provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..." Thus, to establish a cause of action under section 1983, a plaintiff must demonstrate that: (1) there was a violation of a right secured by the Constitution and laws of the United States, and (2) the alleged violation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted).

43

Plaintiff contends that he suffered a constitutional violation because he was racially profiled. It should be noted that the report of Plaintiff's Expert, Ralph Cilento, makes no mention of racial profiling in his 29-page report. (Report of Plaintiff's Expert, Ralph Cilento, **Exhibit "V"**). Racial Profiling contemplates that an individual is targeted on the basis of their race rather than on individual suspicion or available evidence. It is undisputed that the suspect from the Hampton Inn, like Plaintiff, was an African American male. Plaintiff was not targeted because he is African American, but because his face bears an unfortunately uncanny resemblance to the suspect from the Hampton Inn. Suspicion can hardly be more individualized than that.

The fact that Sgt. Tapia submitted the driver's license photo for facial recognition analysis, deemed by Plaintiff's expert to be a proper investigatory step, does not attribute knowledge of any purported bias inherent in facial recognition software to the WPD or any of its officers. (Report of Plaintiff's Expert Ralph Cilento, **Exhibit "V"**). Unable to attribute this knowledge to the WPD or its officers, Plaintiff cannot support his claim that the WPD "intentionally or recklessly disregard[ed]" the "anti-black animus" that Plaintiff accredits to facial recognition software.

44

III.  **COUNT THREE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH THAT HE WAS SUBJECTED TO EXCESSIVE FORCE**

Count three of Plaintiff's Second Amended Complaint alleges that he was subjected to excessive force while he was in custody at the Woodbridge Police Department. Plaintiff's excessive force claim is governed by 42 U.S.C. 1983, discussed above in Section II of this Brief and not repeated here. Claims of excessive force during arrests, investigatory stops and other seizures are governed by the Fourth Amendment. See Graham v. Conner, 490 U.S. 386 (1989). "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999); see also Graham, 490 U.S. at 396–97 (providing that force used to effect an arrest must be reasonable, and reasonableness is measured by "careful attention to the facts and circumstances of each particular case"); see also Rodriguez v. Trenton Police Dep't, 828 F. App'x 851, 852 (3d Cir. 2020); Alicea v. Johnson, No. 11-3823, 2011 WL 6181906 at *2 (D.N.J. 2011).

"A claim for excessive force, which is merely a concomitant to a contested arrest but is not based on some actual allegation of unreasonable force, must be dismissed." Lankford v. City of Clifton Police Department, 546 F.Supp. 3d 296, 317 (D.N.J. 2021) (citing Holmes v. City of Wilmington, 79 F.Supp. 3d 497, 506

45

(D.Del. 2015)). The Third Circuit has repeatedly "rejected similar efforts to bootstrap excessive force claims and probable cause challenges" and thus refused to apply a rule which holds that "force applied was excessive *per se*" because the initial arrest lacked probable cause. Lankford, 546 F.Supp. 3d at 317 (citing Snell v. City of New York, 564 F.3d 659, 672 (3d Cir. 2009)).

As an initial matter, the officers who placed Plaintiff under arrest after he presented to WPD Headquarters in response to the active warrants against him did not have discretion to arrest Plaintiff. "Once a warrant is issued, or probable cause comes into existence, it becomes an officer's duty to arrest the suspect." State v. Jones, 143 N.J. 4, 14, 667 A.2d 1043 (1995) (quoting Smith v. Gonzales, 670 F.2d 522, 527 (5th Cir. 1985)). Officers have no discretion in making arrests where there is an outstanding warrant. If fact, were the officers to have failed to effectuate the warrant against Plaintiff, they would have been derelict in their duties. Jones, 143 N.J. at 14.

With respect to the physical detention of Plaintiff, by Plaintiff's own admission, no WPD officers used excessive force against him. Plaintiff repeatedly denied that he was ever touched in an aggressive manner by any member of the WPD or while he was in WPD custody. Nor has Plaintiff asserted that he was threatened with violence or subjected to racially derogatory comments.

Plaintiff testified about how he was handcuffed when he was placed

under arrest at WPD Headquarters:

> "He just grabbed me and just grabbed my arms and put my hands behind my back. I turned around to look, they just pushed me back against the counter and told me don't move... He turned me back around and told me don't resist, and I didn't, and I just let him put my hands behind my back."

See Transcript of Deposition of Nijeer Parks, attached

hereto as **Exhibit "?"** Page 34, Line 10-22.

Plaintiff testified about being interviewed by WPD Detective

Kondracki while he was in custody:

> "He didn't lay a hand on me."

Parks Deposition, Page 35, Line 13.

> "They got aggressive like with their manner, like with their words, like trying to scare me, but no one put their hands on me or anything."

Parks Deposition, Page 36, Line 8-11.

> "Nobody came and did anything to me."

Parks Deposition, Page 39, Line 2-3.

Plaintiff testified that officers did not touch him while he was

being booked:

> "There were comments the whole time, but there was no physical."

Parks Deposition, Page 46, Line 23-24.

> "No one touched me."

Parks Deposition, Page 49, Line 19.

Insofar as Plaintiff believed that he was going to be assaulted by WPD officers, there is no objective basis for Plaintiff's belief. Plaintiff testified that he believed that he was going to be assaulted because his handcuffs were removed and he was led down a hallway where Plaintiff claims he did not see any surveillance cameras. However, Sgt. Tapia explained that surveillance cameras cover every corner of the processing and booking area. The only area that is not covered by cameras is inside of the bathrooms. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 149, Line 22-25; Page 150, Line 1-12). Nonetheless, Plaintiff believed he was going to be assaulted so he feigned an asthma attack and fell to the floor. The officers in the processing and booking area immediately helped Plaintiff off the floor and called for EMTs to treat Plaintiff. (Deposition of Parks, **Exhibit "J"** Page 41, Line 20-22).). These actions by the officers to render aid to Plaintiff contradicts Plaintiff's claim that the officers' actions caused him to feel threatened with physical harm.

Insofar as Plaintiff asserts claims for Monell liability against the Woodbridge Defendants, Plaintiff cannot claim a policy, custom, or practice permitted the application excessive force where it cannot be said that excessive force was used against Plaintiff in the instant matter. See Monell v. Department of Social Services, 436 U.S. 658 (1978). Each of the WPD officers involved in this matter were highly and professionally trained in all

48

relevant areas of law enforcement. Each received a variety of specialized law enforcement related training on numerous topics and each of them had lengthy computer-based training which included arrest, search, and seizure. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 12). The WPD maintains a systematic in-service training program which includes the Attorney General Guidelines and Middlesex County Prosecutor's Office use of force guidelines. (Id.). The WPD Policies and Procedures, specifically Chapter 432, titled "In-Service, Specialized and Roll Call Training," requires WPD officers to undergo use of force training semiannually. Simply put, Plaintiff cannot point to any deficiencies in the WPD training regimen nor can Plaintiff allege that the individual officers involved in this matter were not up to date on the various training requirements promulgated by both the WPD and the New Jersey Attorney General.

Based upon the foregoing, Count Three of Plaintiff's Second Amended Complaint must be dismissed with prejudice. There is no evidence in the record to support Plaintiff's claim that he was subjected to excessive force while in the custody of the WPD. Nor is there any evidence to support Plaintiff's subjective belief that he was going to be assaulted while he was in custody.

**IV.    COUNT FOUR OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH MONELL LIABILITY ON BEHALF OF THE TOWNSHIP OF WOODBRIDGE**

Count Four of Plaintiff's Second Amended Complaint alleges that Plaintiff's rights were violated because of a municipal policy, custom, or practice pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978). Plaintiff contends that the policies, customs, and practices of the WPD failed to supervise and train officers on the use of facial recognition software. Generally, a governmental entity cannot be held liable under a theory of respondeat superior liability for a violation of 42 U.S.C. 1983 solely because it is the employer of the alleged wrongdoer. A governmental entity can only be held liable where "the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (citing Monell, 436 U.S. 658).

When the alleged policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to a 'deliberate indifference' to the rights of persons with whom those employees will come into contact." Lankford, 546 F.Supp. 3d at 328 (citing Thomas v. Cumberland County, 749 F.3d 217 (3d Cir. 2014). "Deliberate indifference is a stringent standard of fault,

50

requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. Ordinarily, "a pattern of similar constitutional violations by untrained employees" is "necessary 'to demonstrate deliberate indifference for purposes of failure to train.'" Id. (quoting Connick v. Thompson, 563 U.S. 51, 62 (2011). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id. An "identified deficiency in a city's training program...must have actually caused" the constitutional violation. Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 391 (1989).

To support a Monell claim, a Plaintiff must identify a custom or policy and specify what exactly that custom or policy was. McTernan v. City of York, 564 F.3d 636 (3d Cir. 2009). See Rios v. City of Bayonne, No. 2:12-4716, 2015 WL 2400756 at *2 (D.N.J. 2015) (dismissing Monell claim where Plaintiff failed to identify a specific training policy, state why it was inadequate, or propose an alternative policy); see also Labo v. Borger, No. 02-3975, 2005 WL 1971867 at *4 (D.N.J. 2005) (rejecting claim because "Plaintiff cannot point to any actual inadequate training").

Plaintiff cannot support his claim that Plaintiff's arrest was caused by the policies, customs, and practices of the WPD. The WPD is distinguished from its local law enforcement peers as it is

nationally accredited through the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). CALEA is an organization that reviews the policies and procedures of accredited police departments across the county to make sure that they are complying with best practices and meet CALEA's standards. (Deposition of Director Hubner, **Exhibit "H"** Page 49, Line 21-25; Page 50, Line 8-14). Accreditation and compliance with professional standards provide the yard stick by which the community, police administration, and Township administration can quantitively measure the WPD's performance and ensure accountability of their actions. Accredited law enforcement agencies demonstrate a pursuit of excellence and willingness to meet and exceed professional standards. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 6-7).

WPD is been CALEA certified since 1998, making WPD the second-longest nationally accredited police department in New Jersey. (Deposition of Director Hubner, **Exhibit "H"** Page 51, Line 15-23). Only approximately 700 police departments have received national accreditation across the country. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 7). CALEA comes to WPD every two years to review policies and procedures and ensure compliance with CALEA standards. Accreditation is an ongoing process and WPD is constantly sending proofs and updates to CALEA to ensure that WPD is up to date on all policies and procedures. WPD writes its own

52

policies and procedures, which are submitted to CALEA for review and feedback. (Deposition of Director Hubner, **Exhibit "H"** Page 51, Line 1-11). These policies and procedures provide for, among other things, training and supervision of officers and conducting investigations. If, as Plaintiff contends, the WPD was deficient in any of its policies, customs, or practices, WPD would not be a nationally accredited police department.

Each of the WPD officers involved in this matter were highly and professionally trained in all relevant areas of law enforcement. Each received a variety of specialized law enforcement related training on numerous topics and each of them had lengthy computer-based training which included arrest, search, and seizure. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 12). The WPD maintains a systematic in-service training program which includes the Attorney General Guidelines and Middlesex County Prosecutor's Office use of force guidelines. (Id.).

As comprehensive as WPD's policies and procedures are, they cannot anticipate or account for every situation that confronts a police officer. In 2019, facial recognition technology was growing in popularity as an investigative tool to be utilized by police departments conducting criminal investigations. Other than the Attorney General's directive of January 24, 2020 which banned the use of Clearview AI facial recognition software by police

53

departments, the State has not provided any guidance with respect to the use of facial recognition technology.

Plaintiff asserts that the WPD disregarded the "clear anti-black bias consequences" of facial recognition software. Yet, if any such bias exists, Plaintiff has failed to establish that knowledge of this purported bias can be attributed to any of the Woodbridge Defendants. Having failed to demonstrate that any of the Woodbridge Defendants were on notice of such "bias", Plaintiff cannot argue that the Woodbridge Defendants "intentionally or recklessly disregard" this "bias." It is also important to note that the Woodbridge Defendants did not conduct the facial recognition analysis, but rather relied upon the experience and training of the Rockland County Intelligence Center to run the facial recognition analysis. The WPD had never requested facial recognition analysis before January 2019, and upon information and belief, the WPD has not requested facial recognition since. As such, a single, isolated, good faith utilization of facial recognition technology cannot be said to establish a policy, custom, or practice. As such, Count Four of Plaintiff's Second Amended Complaint must be dismissed with prejudice.

V. **COUNT SEVEN AND COUNT NINE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH THE ELEMENTS OF A CLAIM FOR CIVIL CONSPIRACY**

Counts Seven and Nine (misnumbered as Count 8) of Plaintiff's Second Amended Complaint allege that "Defendants" engaged in a

54

conspiracy to deprive Plaintiff of his rights and privileges under the law. Since there is no distinction between these two counts, they will be addressed herein together. Plaintiff's claims of civil conspiracy are brought pursuant to 42 U.S.C. 1985. Plaintiff's Second Amended Complaint also cites to the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12.1. This section of the NJLAD is concerned with discrimination in the employment context and does not provide a basis for Plaintiff's civil conspiracy claim.

Section 1985(3) prohibits conspiracies directed at "depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. 1985(3). "To state a claim under 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." See Lake v. Arnold, 112 F.3d 682, 685 (3d Cir.1997) (citations omitted).

To prove such a claim, the plaintiff must establish the period of the conspiracy, the object of the conspiracy, and certain overt acts of the alleged conspirators taken to achieve that purpose. Lankford, 546 F.Supp. 3d at 317, citing Hankin Family

55

P'Ship v. Upper Merion Twp., No. 01-1622, 2012 WL 43599 (E.D. Pa. 2012). "The mere occurrence of several meetings between defendants does not establish a meeting of the minds" for purposes of a conspiracy claim. Jones v. Dalton, 867 F. Supp. 2d 572, 585 (D.N.J. 2012). See Fioriglio v. City of Atlantic City, 996 F. Supp. 379, 387–88 (D.N.J. 1998) (rejecting claim of conspiracy based on meetings between defendants where "plaintiff admits he has no personal knowledge about what the defendants talked about during the alleged meeting" and "has absolutely no evidence suggesting that defendants set out to retaliate against him"). Thus, a jury may not reasonably infer from the mere fact that individuals met that they reached a conspiratorial agreement. Id.

Plaintiff has failed to carry the burden for any of these elements. The Woodbridge Defendants can speculate as to the grounds for Plaintiff's civil conspiracy claims, but again, Plaintiff's Second Amended Complaint fails to specify any particulars. Count Seven simply alleges that "Defendants engaged in a conspiracy..." and "Defendants acted in furtherance of the conspiracy" but does not specify any individuals as parties to the purported conspiracy. Count Nine falls even further short as Plaintiff does not even cite the boilerplate element of a conspiracy claim that an act was carried out in furtherance of the conspiracy. Plaintiff has not adduced a scintilla of evidence to establish the period of the alleged conspiracy, the object of the conspiracy, or any overt

acts taken in furtherance of the conspiracy. As such, Counts Seven and Nine must be dismissed with prejudice.

<strong><u>CONCLUSION</u></strong>

At this late stage, on summary judgment, Plaintiff is required to offer more than insinuations; he must, through citations to evidence of record, set forth a prima facie case for each of his claims. Plaintiff has simply failed to establish support for Counts One, Two, Three, Four, Seven, and Nine of the Second Amended Complaint in order to survive summary judgment.

Respectfully submitted,

*/s/ Garry J. Clemente, Esq.*

Garry J. Clemente, Esq.
Law Office of James P. Nolan &
Associates, Attorneys for
Woodbridge Defendants

57

## CERTIFICATION OF SERVICE

I, Garry J. Clemente, hereby certify that on the date set forth below, I caused a true and correct copy of the foregoing Notice of Motion for Summary Judgment and all accompanying documents to be served upon the following counsel of record via operation of the Court's CM/ECF system:

Daniel W. Sexton, Esq.
Daniel W. Sexton, Esquire, LLC
229 New Centre Road
Hillsborough, New Jersey 07304
Attorney for Plaintiff

Dated: December 5, 2023          */s/ Garry J. Clemente, Esq.*
                                  Garry J. Clemente, Esq.