# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NIJEER PARKS, |  |
| *Plaintiff*, |  |
| v. |  |
| JOHN E. McCORMAC, et al., | Case No. 2:21-cv-04021-JKS-LDW |
| *Defendants*. |  |

**AMICUS CURIAE BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION AND THE AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Nathan Freed Wessler
American Civil Liberties Union
 Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
nwessler@aclu.org

Dillon Reisman
Alexander Shalom
Jeanne LoCicero
American Civil Liberties Union
 of New Jersey Foundation
570 Broad Street, 11th Floor
P.O. Box 32159
Newark, NJ 07102
(973) 642-2086
dreisman@aclu-nj.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTEREST OF AMICI CURIAE .......................................................... 1

SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT........................................................................................ 4

I.  Face Recognition Technology Is Inherently Unreliable and Cannot Be
    Relied on as a Positive Identification of a Suspect ............................................. 4

II. A Witness Identification Based Solely on a FRT Search Result is
    Inherently Suggestive and Cannot Support Probable Cause .............................14

III. Record Evidence Supports Plaintiff's Malicious Prosecution Claim ...............19

    A. Officers knowingly or recklessly withheld material information from
       the warrant applications, resulting in issuance of warrants not based
       on probable cause .......................................................................19

    B. The facts would support a jury finding of malice .......................................28

    C. Qualified immunity cannot shield officers who submit affidavits
       containing knowingly false statements or statements made in reckless
       disregard of the truth. ..................................................................29

IV. Woodbridge Township Is Liable for its Failure to Train its Officers or
    Institute Policies on the Proper Use of Face Recognition Technology ...........30

CONCLUSION ................................................................................35

i

# TABLE OF AUTHORITIES

## Cases

*Berg v. County of Allegheny*,
219 F.3d 261 (3d Cir. 2000).......................................................................32, 35

*Brady v. Maryland*,
373 U.S. 83 (1963)............................................................................................. 1

*City of Canton, Ohio v. Harris*,
489 U.S. 378 (1989)..........................................................................................30

*Dempsey v. Bucknell University*,
834 F.3d 457 (3d Cir. 2016)............................................................................20

*Edrei v. City of New York.*,
254 F. Supp. 3d 565 (S.D.N.Y. 2017) ............................................................32

*Forrest v. Parry*,
930 F.3d 93 (3d Cir. 2019)..............................................................................30

*Franks v. Delaware*,
438 U.S. 154 (1978)..........................................................................................20

*Harvard v. Cesnalis*,
973 F.3d 190 (3d Cir. 2020)............................................................................28

*Lippay v. Christos*,
996 F.2d 1490 (3d Cir. 1993)..........................................................................29

*Malley v. Briggs*,
475 U.S. 335 (1986)..........................................................................................29

*Maryland v. Pringle*,
540 U.S. 366 (2003)..........................................................................................27

*Monell v. Department of Social Services of New York*,
436 U.S. 658 (1978)..........................................................................................30

*Oliver v. Bussa*,
No. 20-cv-12711 (E.D. Mich.) ............................................................ 3

*Orsatti v. New Jersey State Police*,
71 F.3d 480 (3d Cir. 1995)................................................................29

*Perryman v. City of Bloomington*,
No. 23-cv-1984 (D. Minn.) ................................................................ 3

*Perryman v. City of Bloomington*,
No. 23-cv-1984, 2023 WL 8374283 (D. Minn. Dec. 4, 2023) .........................34

*Pinkney v. Meadville, Pennsylvania*,
648 F. Supp. 3d 615 (W.D. Pa. 2023) ..............................................29

*Reid v. Bartholomew*,
No. 23-cv-4035 (N.D. Ga.) ................................................................ 3

*State v. Arteaga*,
296 A.3d 542 (N.J. Super. Ct. App. Div. 2023).........................1, 5, 16

*State v. Henderson*,
23 A.3d 872 (N.J. 2011)...................................................................18

*Thomas v. Cumberland County*,
749 F.3d 217 (3d Cir. 2014)..............................................................31

*United States v. Williams*,
974 F.3d 320 (3d Cir. 2020)..............................................................20

*Williams v. City of Detroit*,
No. 2:21-cv-10827 (E.D. Mich.) ...................................................1, 3

*Wilson v. Russo*,
212 F.3d 781 (3d Cir. 2000)..............................................................27

*Woodruff v. City of Detroit*,
No. 23-cv-11886 (E.D. Mich) .......................................................... 3

*Zimmerman v. Corbett*,
  873 F.3d 414 (3d Cir. 2017)............................................................19

**Other Authorities**

American Law Institute, *Principles of the Law, Policing* § 10.03 (2023) ..............15

Aman Bhatta et al., *Impact of Blur and Resolution on Demographic
  Disparities in 1-to-Many Facial Identification*, preprint (2023) ....................... 8

Andrew Guthrie Ferguson, *Facial Recognition and the Fourth Amendment*,
  105 Minn. L. Rev. 1105 (2021)......................................................... 5

Bureau of Justice Assistance, U.S. Department of Justice, *Face Recognition:
  Policy Development Template* (2017) ......................................13, 33

City of Detroit Government, *WATCH LIVE: Chief White Will Provide
  Updated Comments on a Lawsuit Filed Last Week*, Facebook
  (Aug. 9, 2023)..................................................................17

David White et al., *Error Rates in Users of Automatic Face Recognition
  Software*, 10 PLoS ONE e0139827 (2015)........................................12

David White et al., *Human Oversight of Facial Recognition Technology in
  Forensic Applications* (U.K. Parliament 2021) ................................12

Drew Harwell, *Federal Study Confirms Racial Bias of Many Facial-
  Recognition Systems, Casts Doubt on Their Expanding Use*, Wash. Post,
  Dec. 19, 2019..................................................................10

Eyal Press, *Does A.I. Lead Police to Ignore Contradictory Evidence*, The
  New Yorker, Nov. 20, 2023 .......................................................5, 11

Gary L. Wells et al., *Eyewitness Identification: Bayesian Information Gain,
  Base-Rate Effect Equivalency Curves, and Reasonable Suspicion*, 39 L.
  & Hum. Behav. 99 (2015)........................................................16

Gary L. Wells et al., *Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence*, 44 L. & Hum. Behav. 3 (2020)...................................................................................15

Georgetown Center on Privacy & Technology, *Model Face Recognition Use Policy* (Oct. 18, 2016)..........................................................................33

Henry H. Perritt Jr., *Defending Face-Recognition Technology (And Defending Against It)*, 25 J. Tech. L. & Pol'y 41 (2021)..................................17

IJIS Institute & IACP, *Law Enforcement Facial Recognition Use Case Catalog* (2019)....................................................................................13

Indiana Intelligence Fusion Center, Face Recognition Policy (2019)...................14

Jason Koebler, *Detroit Police Chief: Facial Recognition Software Misidentifies 96% of the Time*, Vice News (June 29, 2020).............................. 7

K.S. Krishnapriya et al., *Issues Related to Face Recognition Accuracy Varying Based on Race and Skin Tone*, 1 IEEE Transactions on Tech. & Soc'y No. 1 (2020)............................................................................10

Kashmir Hill, *Eight Months Pregnant and Arrested After False Facial Recognition Match*, N.Y. Times, Aug. 6, 2023 ...............................................11

Kate Crookes & Gillian Rhodes, *Poor Recognition of Other-Race Faces Cannot Always Be Explained by a Lack of Effort*, 25 Visual Cognition 430 (2017) ............................................................................................11

Khari Johnson, *The Hidden Role of Facial Recognition Tech in Many Arrests*, Wired, Mar. 7, 2022..........................................................................10

Laura Moy, *Facing Injustice: How Face Recognition Technology May Increase the Incidence of Misidentifications and Wrongful Convictions*, 30 Wm. & Mary Bill Rts. J. 337 (2021) .........................................................16

New Jersey Model Criminal Jury Charges, *Identification: In-Court and Out-of-Court Identifications* (May 18, 2020) ......................................................11

New Jersey Office of the Attorney General, *Attorney General Guidelines for Preparing and Conducting Out-of-Court Eyewitness Identifications* (2021) ...............................................................15, 27

New York State Municipal Police Training Council, Facial Recognition Model Policy (2019) ......................................................................14

Nicole A. Spaun, *Face Recognition in Forensic Science*, *in* Handbook of Face Recognition (Stan Z. Li & Anil Jain, eds., 2011) ...................... 6

Patrick Grother et al., *Face Recognition Technology Evaluation (FRTE) Part 2: Identification*, Nat'l Inst. of Standards & Tech. (2023) ............... 6

Patrick Grother et al., *Face Recognition Vendor Test (FRVT) Part 2: Identification*, Nat'l Inst. Standards & Tech. (2019) ........................ 7

Patrick Grother et al., *Face Recognition Vendor Test Part 3: Demographic Effects*, Nat'l Inst. of Standards & Tech. (2019) ................................. 7

Patrick Grother et al., *Face Recognition Vendor Test (FRVT) Part 3: Demographic Effects,* Nat'l Inst. of Standards & Tech. (2019), ......................10

Raja Parasuraman & Dietrich Manzey, *Complacency and Bias in Human Use of Automation: An Attentional Integration*, 52 Hum. Factors 381 (2010) ..........................................................12

Rank One Computing, *Face Recognition Dictionary* (Nov. 1, 2018) .................... 6

Rebecca Darin Goldberg, *You Can See My Face, Why Can't I? Facial Recognition and* Brady, 5 Colum. Hum. Rts. L. Rev. Online 261 (2021) .........16

Thaddeus L. Johnson et al., *Facial Recognition Systems in Policing and Racial Disparities in Arrests*, 39 Gov't Info. Q. no. 4 (2022) ..........................10

*The Handbook of Eyewitness Psychology*, *Volume 1: Memory for Events* (Michael P. Toglia et al. eds., 2007) ...............................................11

Thomas D. Albright, *Why Eyewitnesses Fail*, 114 Proc. Nat'l Acad. Sci. 7758 (2017) ....................................................................18

U.S. Department of Homeland Security, DHS/ICE/PIA-054, Privacy Impact
   Assessment for the Use of Facial Recognition Services (2020) ......................... 8

William Crumpler & James A. Lewis, *How Does Facial Recognition Work?*
   *A Primer*, Center for Strategic & Int'l Studies (2021) ....................................... 6

## INTEREST OF AMICI CURIAE

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization dedicated to the principles embodied in the United States Constitution and our nation's civil rights laws. The American Civil Liberties Union of New Jersey is a state affiliate of the ACLU whose mission is to preserve, advance, and extend the individual rights and liberties guaranteed to every New Jerseyan by the State and Federal Constitutions in courts, in legislative bodies, and in our communities. The ACLU has appeared before courts throughout the country in cases involving the dangers posed by unfettered police use of emerging technologies, including face recognition technology. Attorneys associated with the ACLU represent Robert Williams in *Williams v. City of Detroit*, No. 2:21-cv-10827 (E.D. Mich.), alleging that the misuse of face recognition technology led to his wrongful arrest. The ACLU and the ACLU of New Jersey have also participated as amici curiae at the state level to protect the rights of defendants under *Brady v. Maryland*, 373 U.S. 83 (1963), and related doctrines to learn about the role facial recognition played in their prosecution. *See State v. Arteaga*, 296 A.3d 542 (N.J. Super. Ct. App. Div. 2023).

## SUMMARY OF ARGUMENT

Officers from the Woodbridge Police Department (WPD) did exactly what they should have known they were not supposed to do: they received a possible lead from a face recognition technology (FRT) search, and just thirty minutes later,

1

without undertaking a single reliable confirmatory investigative step, declared they had their suspect. They then submitted arrest warrant applications riddled with omissions and misrepresentations to a magistrate. As a result, Nijeer Parks spent ten days in jail and nearly ten months under prosecution for a crime he didn't commit. Mr. Parks's case represents the unfortunate and increasingly common story of how the police's uncritical reliance on results of unreliable FRT searches can deprive the innocent of their liberty and directly violate constitutional rights. As in this case, the harms of FRT misidentification disproportionately fall on Black Americans.

The travesty of justice in this case is squarely attributable to grossly deficient investigative practices of Woodbridge Police Department investigators and to the WPD's complete lack of training of its officers on proper use of FRT results in investigations. Here, officers unreasonably relied on a shaky lead from fundamentally unreliable technology, and then withheld material information from the magistrate judge when seeking arrest warrants. Had the Woodbridge Police Department provided *any* training to its personnel about how unreliable FRT results are and the necessity of following them with reliable independent investigation, the officers would not have believed their paper-thin investigation established probable cause. And had the officers accurately described the FRT search result and their lack

2

of confirmatory investigative steps following receipt of that result, the magistrate would not have issued warrants so sorely lacking in probable cause.

Not only did Defendants mislead the magistrate by overstating the reliability of the FRT lead, but they again misrepresent how FRT works and the strength of the FRT lead in their submissions to *this* Court. *See, e.g.*, Defs' Br., Statement of Material Facts ¶¶ 27, 38, 41, ECF No. 109-6 at 11–12, 14–15. Amici write to aid the Court in rendering a decision based on an accurate understanding of face recognition technology and how it was misused in this case. This is particularly important because this case will likely yield the first judicial opinion in the nation on a developed record addressing some of the questions raised here relating to FRT, and the Court's decision could affect the lives of countless individuals.[1]

This brief makes four main points. First, FRT results are nowhere near as reliable as Defendants imply in their motion and as the Woodbridge officers represented in their warrant applications. Second, if police are to ever use FRT in investigations, it must be followed by reliable investigative steps. The slipshod

---

[1] In cases elsewhere in the country raising similar facts, summary judgment proceedings are paused pending settlement negotiations, *see Williams v. City of Detroit*, No. 2:21-cv-10827 (E.D. Mich.); *Oliver v. Bussa*, No. 20-cv-12711 (E.D. Mich.), litigation is still in discovery, *see Woodruff v. City of Detroit*, No. 23-cv-11886 (E.D. Mich); *Perryman v. City of Bloomington*, No. 23-cv-1984 (D. Minn.), or the parties are awaiting decision on jurisdictional and venue issues, *see Reid v. Bartholomew*, No. 23-cv-4035 (N.D. Ga.).

3

subsequent "identification" by an officer in this case was unreliable and tainted by reliance on a false-match lookalike—Mr. Parks—generated by the FRT process. Third, officers in this case misrepresented the strength of their case to a magistrate and procured warrants for Mr. Parks's arrest despite no real probable cause, meeting the elements of a malicious prosecution claim. And fourth, the failures in this case are directly attributable to the Woodbridge Police Department's complete lack of training of its officers about how to handle FRT-generated leads.

## ARGUMENT

I.    **Face Recognition Technology Is Inherently Unreliable and Cannot Be Relied on as a Positive Identification of a Suspect.**

In their briefing to this Court, Defendants misleadingly claim that "[t]he facial recognition software matched the photograph displayed on the suspect's fraudulent driver's license to Nijeer Parks." Defs' Br. 14, ¶ 38, ECF No. 109-6. The warrant applications that gave rise to Mr. Parks's wrongful arrest were similarly misleading, asserting that the FRT search produced a "high profile comparison" (a term apparently made up out of whole cloth by the officers) and as a result "[t]he suspect was identified as Nijeer Parks." ECF No. 109-5 at 253 (Defs' Ex. N); *accord id.* at 268 (Defs' Ex. O). These claims seriously misstate how FRT works and vouch a level of reliability that the technology simply cannot deliver.

Face recognition algorithms used by police are not designed to (and do not) return a single definitive "match." Rather, they are probabilistic systems that return a number of *potential candidates* based on an "algorithmic best guess."[2]

When police personnel run an FRT search, the algorithm extracts a "faceprint"[3] from the image of an unknown suspect (the "probe image") and compares it to a database of faceprints taken from images of known individuals (for example, arrest photos or drivers' license photos). The system generates similarity scores for each comparison, which are often represented (as in this case) as a number between 0 and 1000. Lyons Dep. 54:4–5, ECF No. 109-5 at 176 (Defs' Ex. I). The system outputs a "candidate list" of possible matches, generally organized in order of similarity score. Although higher scores indicate the algorithm's calculation that the candidate appears more similar to the probe image than candidates with lower scores further down the list, a true match may appear anywhere in the candidate list, if it appears at all. Nonetheless, a particularly low similarity score—such as the

---

[2] Eyal Press, *Does A.I. Lead Police to Ignore Contradictory Evidence*, The New Yorker, Nov. 20, 2023, https://www.newyorker.com/magazine/2023/11/20/does-a-i-lead-police-to-ignore-contradictory-evidence/.

[3] A faceprint is a "map written in code that measures the distance between features, lines, and facial elements." *State v. Arteaga*, 296 A.3d 542, 555 (N.J. Super. Ct. App. Div. 2023) (quoting Andrew Guthrie Ferguson, *Facial Recognition and the Fourth Amendment*, 105 Minn. L. Rev. 1105, 1111 (2021)).

"594" accompanying the image of Mr. Parks in this case, Lyons Dep. 53:15–22, ECF No. 109-5 at 176 (Defs' Ex. I) (describing score as "not a very high number"); ECF No. 109-5 at 282 (Defs' Ex. Q)—can be an indicator of a weak possible match.[4]

The number of possible-match candidates returned by an FRT system can be high—for example, the system used by the Detroit Police Department can return "anywhere up to 10 to 100 or 500" potential matches. Dep. of Joseph Dablitz 18:17–18, *Oliver v. Bussa*, No. 20-cv-12711 (E.D. Mich.), ECF No. 51-3. Naturally, only

---

[4] Defendants mislead the Court where they assert that "[w]hen the software identifies a potential match, the software gives a probability of a positive match." Defs' Br. 12, ¶ 27, ECF No. 109-6; *see also id.* at 15, ¶ 41. The similarity score does *not* represent a probability of a positive match. *See* William Crumpler & James A. Lewis, *How Does Facial Recognition Work? A Primer* 11–14, Center for Strategic & Int'l Studies (2021), https://csis-website-prod.s3.amazonaws.com/s3fs-public/publication/210610_Crumpler_Lewis_FacialRecognition.pdf.

A similarity score is "a factor of the system's algorithm." Nicole A. Spaun, *Face Recognition in Forensic Science*, *in* Handbook of Face Recognition 667 (Stan Z. Li & Anil Jain, eds., 2011). For a particular algorithm, a higher similarity score for one image may indicate that a match is more likely than for another image with a lower similarity score. Patrick Grother et al., *Face Recognition Technology Evaluation (FRTE) Part 2: Identification* 29, Nat'l Inst. of Standards & Tech. (2023), https://pages.nist.gov/frvt/reports/1N/frvt_1N_report.pdf. But the score does not represent a probability of a true match (e.g., a score of "500 out of 1000" does not indicate a 50% likelihood of a true match—it is simply a measurement of how similar two faces are according to the algorithms' internal scale). As facial recognition vendor Rank One Computing notes, "While the similarity will be a numerical value, . . . no assumptions can be made about the meaning of a given similarity score for an algorithm without knowledge of the underlying distribution, which will be different for every vendor." Rank One Computing, *Face Recognition Dictionary* (Nov. 1, 2018), https://roc.ai/2018/11/01/face-recognition-dictionary/.

one of the potentially many candidates can be the true identity of the suspect. The rest will be innocent "false positives." And a true match to the suspect photo may not appear in the results at all, either because the quality of the probe image is low, or because the database of images being searched does not include the true match, or for other reasons.[5] As the chief of the Detroit Police Department once put it, "[i]f [police] were just to use the technology by itself, to identify someone, I would say 96 percent of the time it would misidentify."[6]

Although FRT algorithms generate false positives even in controlled test conditions, they are especially prone to error when probe image quality is low. The quality of the probe photo and the ways in which it is manipulated necessarily affect the accuracy of the search results. Lighting, shadow, angle, pixel density, facial expression, and partial occlusion of the face all affect accuracy.[7] And even images

---

[5] *See* Patrick Grother et al., *Face Recognition Vendor Test Part 3: Demographic Effects* 5, Nat'l Inst. of Standards & Tech. (2019), https://pages.nist.gov/frvt/reports/demographics/nistir_8280.pdf.

[6] Jason Koebler, *Detroit Police Chief: Facial Recognition Software Misidentifies 96% of the Time*, Vice News (June 29, 2020), https://www.vice.com/en/article/dyzykz/detroit-police-chief-facial-recognition-software-misidentifies-96-of-the-time.

[7] *See, e.g.*, Patrick Grother et al., *Face Recognition Vendor Test (FRVT) Part 2: Identification* 9–10, Nat'l Inst. Standards & Tech. (2019), https://perma.cc/BR6Y-6X6D; U.S. Dep't of Homeland Sec., DHS/ICE/PIA-054, Privacy Impact Assessment for the Use of Facial Recognition Services 26 (2020),

captured from a higher-quality source can be degraded if the image is scanned into a computer at a low resolution, compressed, resized, or reformatted. The blurriness, or lack of sufficient pixel density, of an image can have a huge effect on the ability of a FRT algorithm to produce an accurate match.[8]

In this case, the probe image suffered from multiple defects that rendered it unsuitable for a face recognition search. The image was "blurry," Lyons Dep. 44:17–18, ECF No. 109-5 at 173 (Defs' Ex. I), the sides and bottom third of the face were heavily shadowed, and an extraneous shape (possibly a watermark from the fake license) was superimposed over the forehead, ECF No. 109-5 at 276, 282 (Defs' Ex. Q). By the time it was run through the FRT program, the image had been manipulated a number of times, leaving it much degraded from its original state: an original digital photo was (1) printed on a fake driver's license (likely losing some image definition), which (2) was photographed by police (in low resolution and creating an apparent shadow on the license), *see* ECF No. 109-5 at 3 (Defs' Ex. A), (3) that photograph was pasted into a flyer and rendered into PDF format, *see* ECF

---

https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-frs-054-may2020.pdf.

[8] *See, e.g.*, Aman Bhatta et al., *Impact of Blur and Resolution on Demographic Disparities in 1-to-Many Facial Identification*, preprint arXiv:2309.04447 (2023), https://arxiv.org/abs/2309.04447.

8

No. 109-5 at 275 (Defs' Ex. Q), which was attached to an email, transmitted, and then (4) extracted from the flyer (into an unknown file format) and (5) resized, Lyons Dep. 77:1–22, ECF No. 109-5 at 182 (Defs' Ex. I). Each step of that process risked progressive degradation of the image quality—in other words, loss of data from the image that the FRT algorithm would have needed to generate a faceprint—resulting in the poor-quality image used in the search. *See* Figure 1 (copied from ECF No. 109-5 at 282 (Defs' Ex. Q)).



*Figure 1:*

Even where probe image quality is ideal, facial recognition systems exhibit race, gender, and age bias, with higher rates of false matches when used on people

of color, women, and young adults than on white people, men, and older people.[9] According to the National Institute of Standards and Technology, "even the best algorithms can be wrong more than 20 percent of the time" in test conditions,[10] and "Asian and African American people were up to 100 times more likely to be misidentified than white men, depending on the particular algorithm and type of search."[11] Additional risk of error is introduced when police conduct a search against a database of images that overrepresents people of color, such as an arrest photo database that reflects historical patterns of overpolicing of communities of color.[12] In this case—as in every known U.S. suit against police alleging wrongful arrest due

---

[9] *See, e.g.*, Patrick Grother et al., *Face Recognition Vendor Test (FRVT) Part 3: Demographic Effects* 7–8, Nat'l Inst. of Standards & Tech. (2019), https://perma.cc/R9RE-HHD9; K.S. Krishnapriya et al., *Issues Related to Face Recognition Accuracy Varying Based on Race and Skin Tone*, 1 IEEE Transactions on Tech. & Soc'y No. 1, at 8–20 (2020), https://ieeexplore.ieee.org/document/9001031.

[10] Khari Johnson, *The Hidden Role of Facial Recognition Tech in Many Arrests*, Wired, Mar. 7, 2022, https://perma.cc/ECB6-LM22.

[11] Drew Harwell, *Federal Study Confirms Racial Bias of Many Facial-Recognition Systems, Casts Doubt on Their Expanding Use*, Wash. Post, Dec. 19, 2019, https://www.washingtonpost.com/technology/2019/12/19/federal-study-confirms-racial-bias-many-facial-recognition-systems-casts-doubt-their-expanding-use/.

[12] Thaddeus L. Johnson et al., *Facial Recognition Systems in Policing and Racial Disparities in Arrests*, 39 Gov't Info. Q. no. 4, at 2 (2022).

to police reliance on an incorrect FRT result—the person falsely identified and wrongly arrested is Black.[13]

Additional risk of error is introduced by human review of the FRT search results. Research has consistently shown that it is difficult for people to accurately identify people from other racial and ethnic groups.[14] When a human analyst does an initial review of the hundreds of FRT-generated candidates, the analyst's own cognitive biases can compound racial biases in the FRT-generated candidate list and introduce further error.

Further, people reflexively over-rely on computer outputs because of "automation bias," "a heuristic replacement for vigilant information seeking and processing" that can "lead to decisions that are not based on a thorough analysis of

---

[13] *See supra* note 1 (listing cases); *see also, e.g.*, Eyal Press, *Does A.I. Lead Police to Ignore Contradictory Evidence*, The New Yorker, Nov. 20, 2023, https://www.newyorker.com/magazine/2023/11/20/does-a-i-lead-police-to-ignore-contradictory-evidence/; Kashmir Hill, *Eight Months Pregnant and Arrested After False Facial Recognition Match*, N.Y. Times, Aug. 6, 2023, https://www.nytimes.com/2023/08/06/business/facial-recognition-false-arrest.html.

[14] *See The Handbook of Eyewitness Psychology*, *Volume 1: Memory for Events* 257–81 (Michael P. Toglia et al. eds., 2007) (detailing dozens of studies); Kate Crookes & Gillian Rhodes, *Poor Recognition of Other-Race Faces Cannot Always Be Explained by a Lack of Effort*, 25 Visual Cognition 430 (2017); N.J. Model Criminal Jury Charges, *Identification: In-Court and Out-of-Court Identifications* 9 (May 18, 2020), https://www.njcourts.gov/sites/default/files/charges/idinout.pdf?cb=5b9183a5.

all available information but that are strongly biased by the automatically generated advice."[15] Automation bias lulls human users of automated technologies, such as FRT, into an over-reliance on the computers, leading the analysts to uncritically accept the computer's returns.[16] Automation bias means analysts will be less critical and discerning when selecting a possible match, including by deferring to the similarity scores generated by the algorithm in place of the analyst's own judgment. Human analysts may also assume there is an accurate match in a computer's returns even when there is not.

For these and other reasons, research shows that human operators make errors on average 50 percent of the time "when deciding which faces in candidate lists match the search image. This is consistent with research on eye-witness identification—which is known to be unreliable, with well-meaning witnesses often mistakenly identifying innocent suspects."[17]

---

[15] Raja Parasuraman & Dietrich Manzey, *Complacency and Bias in Human Use of Automation: An Attentional Integration*, 52 Hum. Factors 381, 391 (2010).

[16] *Id*. at 391–97.

[17] David White et al., *Human Oversight of Facial Recognition Technology in Forensic Applications* ¶ 5 (U.K. Parliament 2021), https://committees.parliament.uk/writtenevidence/38555/html/. *See also* David White et al., *Error Rates in Users of Automatic Face Recognition Software*, 10 PLoS ONE e0139827 at 1 (2015) (concluding that the subjective selection process "potentially reduc[es] benchmark estimates [of FRT accuracy] by 50% in operational settings").

12

Because of these and other sources of unreliability and error in the FRT search process, it is virtually universally understood and acknowledged that the results of a face recognition search do not constitute a positive identification of a suspect, and that additional reliable investigation is needed to develop probable cause to arrest. For example, when Sgt. Tapia filled out a facial recognition search request form during the investigation, the form warned that a "*possible match*" from a FRT search "*should only be considered an investigative lead. Further investigation is needed to confirm a possible match through other investigative corroborated information and/or evidence. **INVESTIGATIVE LEAD, NOT PROBABLE CAUSE TO MAKE AN ARREST**.*" ECF No. 109-5 at 290 (Defs' Ex. T) (emphasis in original). Such warnings to police were common at the time of the face recognition search in this case (2019), including from the International Association of Chiefs of Police,[18] the U.S. Department of Justice,[19] and police departments across the

---

[18] IJIS Inst. & IACP, *Law Enforcement Facial Recognition Use Case Catalog* 3 (2019), https://www.theiacp.org/sites/default/files/2019-10/IJIS_IACP%20WP_LEITTF_Facial%20Recognition%20UseCasesRpt_20190322.pdf (a FRT search result is "a strong clue, and nothing more, which must then be corroborated against other facts and investigative findings before a person can be determined to be the subject whose identity is being sought").

[19] Bureau of Justice Assistance, U.S. Department of Justice, *Face Recognition Policy Development Template* 22 (2017), https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/Face-Recognition-Policy-Development-Template-508-compliant.pdf.

country.[20]

Yet, far from heeding that warning, police in this case treated a single face recognition search result not as a dubious investigative lead requiring independent corroboration, but as a definitive match. *See* Cilento Expert Report, ECF No. 109-5 at 344 (Defs' Ex. V). Instead of conducting reliable confirmatory investigative steps, police merely had an officer eyeball the photo returned by the FRT search process, and then proceeded to seek authorization to arrest. Defendants try to focus attention on whether it was reasonable for Woodbridge police to *submit* the suspect photo for a FRT search. *See* Defs' Br. 30, ECF No. 109-6. But the central issue in this case is what officers did *after* receiving the FRT lead. Because they did not gather any reliable confirmatory evidence before seeking an arrest warrant, the resulting arrest lacked the requisite probable cause.

## II.   A Witness Identification Based Solely on a FRT Search Result is Inherently Suggestive and Cannot Support Probable Cause.

Although the Woodbridge officers did not disclose it to the magistrate in the warrant applications, Defendants now claim that probable cause was "bolster[ed]"

---

[20] *See, e.g.*, N.Y. State Mun. Police Training Council, Facial Recognition Model Policy 3 (2019), https://www.criminaljustice.ny.gov/crimnet/ojsa/standards/ MPTC%20Model%20Policy-Facial%20Recognition%20December%202019.pdf; Ind. Intelligence Fusion Ctr., Face Recognition Policy 14 (2019), https://www.in.gov/iifc/files/Indiana_Intelligence_Fusion_Center_Face_Recogniti on_Policy.pdf.

by a "confirmatory identification" made by Officer Lyszyk following receipt of the FRT results. Defs' Br. 30, ECF No. 109-6. But that identification was the product of an unduly suggestive procedure tainted by the false-match result generated by the FRT search. It could not establish a positive identification.

The presence of someone in a facial recognition candidate list alone is not a sufficient basis to proceed to a witness identification procedure, including a lineup or photo array.[21] As the American Law Institute explains, "[p]olicing agencies should not conduct eyewitness identifications unless they have . . . a substantial basis to believe that the suspect committed the crime and should therefore be presented to the eyewitness." Am. Law Inst., *Principles of the Law, Policing* § 10.03 (2023), https://perma.cc/B9V4-P4DU.[22] As discussed above, facial recognition technology

---

[21] In this case, of course, police did not conduct a photographic lineup according to established best practices for avoiding false identifications. Lyszyk Dep. 55:14–16, ECF No. 109-5 at 37 (Defs' Ex. C). *See, e.g.*, N.J. Off. of the Att'y Gen., *Attorney General Guidelines for Preparing and Conducting Out-of-Court Eyewitness Identifications* (2021), https://www.nj.gov/oag/dcj/agguide/Photo-Lineup-ID-Guidelines.pdf; Gary L. Wells et al., *Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence*, 44 L. & Hum. Behav. 3 (2020), https://doi.org/10.1037/lhb0000359.

[22] *See also Wells*, 44 L. & Hum. Behav. at 8 ("There should be evidence-based grounds to suspect that an individual is guilty of the specific crime being investigated before including that individual in an identification procedure.").

creates a list of speculative and, in most cases, unreliable candidate matches that provide no such basis.

One of the most significant determinants of the reliability of an eyewitness identification from a photo array or lineup is the inclusion of the actual perpetrator of the crime.[23] But as described above, FRT searches are prone to returning false matches—even worse, these false matches are likely to be a lookalike or "doppelgänger" for the true suspect. *Accord* Cilento Expert Report, ECF No. 109-5 at 344 (Defs' Ex. V). As New Jersey's Appellate Division has explained, this "has obvious implications for the accuracy of the identification process because an array constructed around a mistaken potential match would leave the witness with no actual perpetrator to choose." *State v. Arteaga*, 296 A.3d 542, 557 (N.J. Super. Ct. App. Div. 2023). Instead, a witness has a greater chance of believing that the FRT-returned doppelgänger is a match to the suspect.[24] "[T]he witness's corroboration

---

[23] Gary L. Wells et al., *Eyewitness Identification: Bayesian Information Gain, Base-Rate Effect Equivalency Curves, and Reasonable Suspicion*, 39 L. & Hum. Behav. 99, 115 (2015).

[24] *See* Rebecca Darin Goldberg, *You Can See My Face, Why Can't I? Facial Recognition and* Brady, 5 Colum. Hum. Rts. L. Rev. Online 261, 274 (2021); Laura Moy, *Facing Injustice: How Face Recognition Technology May Increase the Incidence of Misidentifications and Wrongful Convictions*, 30 Wm. & Mary Bill Rts. J. 337, 347–350 (2021).

16

may be so closely tied to the computerized face-recognition match that it lacks independence," thus creating an inherently suggestive procedure.[25]

This dynamic has been central to most of the known cases of wrongful arrests due to police reliance on incorrect FRT results. In Detroit, for example, police are known to have wrongfully arrested three people based solely on the combination of a false match from FRT, and a false identification from a witness viewing a six-pack photo lineup that was constructed around the FRT lead and five filler photos. In all three cases, the witnesses chose the FRT-derived false-match, instead of deciding that the true suspect did not in fact appear in the lineup. After DPD's third FRT-derived wrongful arrest became public last year, Detroit's Chief of Police acknowledged the problem of erroneous FRT results tainting subsequent witness identifications, explaining that by moving straight from FRT result to lineup "it is possible to taint the photo lineup by presenting a person who looks most like the suspect" but is not in fact the suspect.[26]

---

[25] Henry H. Perritt Jr., *Defending Face-Recognition Technology (And Defending Against It)*, 25 J. Tech. L. & Pol'y 41, 59 (2021).

[26] City of Detroit Government, *WATCH LIVE: Chief White Will Provide Updated Comments on a Lawsuit Filed Last Week*, Facebook (Aug. 9, 2023), https://www.facebook.com/CityofDetroit/videos/287218473992047.

Automation bias and the belief that FRT algorithms are reliable can also taint witness identifications. A photo array or lineup should be administered by an officer with no knowledge of the investigation. *See, e.g., State v. Henderson*, 23 A.3d 872, 896 (N.J. 2011). As relevant here, if a witness is told that FRT identified a suspect in the investigation, they may succumb to automation bias and believe the computer must have flagged the true suspect. That can lead to overconfidence in their own choice. Mistaken identifications under these circumstances are reflective of the fact that "observers become confident when multiple pieces of sensory evidence point to the same conclusion, even when the individual pieces are themselves sparse and unreliable."[27]

Here, Officer Lyszyk's supposedly confirmatory "identification" suffered from these defects: Mr. Parks's photo was derived from an FRT algorithm designed to identify faces similar to the suspect's image, but he was not in fact a match to the suspect. Nonetheless, Officer Lyszyk was informed prior to attempting the identification that face recognition technology had produced a match, Lyszyk Dep. 51:5–8, ECF No. 109-5 at 36 (Defs' Ex. C), and then was presented with a single photo, not a photo array, an extremely suggestive procedure. Lyszyk's identification

---

[27] Thomas D. Albright, *Why Eyewitnesses Fail*, 114 Proc. Nat'l Acad. Sci. 7758, 7760 (2017).

was fundamentally unreliable and could not provide probable cause. *See* Cilento Expert Report, ECF No. 109-5 at 344–45 (Defs' Ex. V) ("this identification procedure [was] **improper, highly suggestive, and likely inadmissible**").

## III.   Record Evidence Supports Plaintiff's Malicious Prosecution Claim

The elements of a Section 1983 malicious prosecution claim in the Third Circuit are: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the defendants initiated the proceeding without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017). Only the third and fourth elements are contested in this case. Because the record provides ample basis for a reasonable jury to conclude that both those elements are satisfied, amici urge the Court to deny Defendants' motion for summary judgment.

### A.   Officers knowingly or recklessly withheld material information from the warrant applications, resulting in issuance of warrants not based on probable cause.

A police officer can be held responsible for "initiat[ing] [a] proceeding without probable cause," *id.*, when he or she withholds material information from the ultimate decisionmaker (such as a prosecutor or judge). This makes the officer, rather than the judge or prosecutor, culpable for the wrongful arrest or prosecution.

19

Thus, if a "false statement knowingly and intentionally, or with reckless disregard for the truth" was made to support a warrant, and without such statement the warrant would lack probable cause, then the warrant is invalid. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). False assertions are knowing or reckless "when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. Williams*, 974 F.3d 320, 352 (3d Cir. 2020) (internal quotations mark omitted). Similarly, omissions are knowing or reckless when they involve "a fact in [the officer's] ken that any reasonable person would have known . . . was the kind of thing the judge would wish to know." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 470 (3d Cir. 2016) (cleaned up) (citation omitted).

In cases like this, the Third Circuit has instructed courts to first assess the falsehoods recklessly added to and information recklessly omitted from the affidavit. *Id.* Next, courts should reconstruct the affidavit to subtract falsehoods and add any recklessly omitted information. *Id.* And finally, courts should assess the materiality of the falsehoods and omitted information to the probable cause determination. *Id.* Doing so here reveals that, had the Woodbridge officers satisfied their duty of candor to the magistrate, it would have been clear that there was no probable cause and the warrants could not have issued.

20

The warrant application submitted by Sgt. Tapia read, in relevant part:

I sent out the suspect's Tennessee driver's license picture to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) for facial recognition. On January 27, 2019, I received a high profile comparison to the picture on the fraudulent Tennessee driver's license. The suspect was identified as Nijeer Parks with a date of birth of [_____] with a last known address of [_____] Paterson, NJ. I compared the photo on the fraudulent Tennessee driver's license to Nijeer Parks' real New Jersey driver's license and it is the same person.

ECF No. 109-5 at 253 (Defs' Ex. N).

Sgt. Tapia omitted several critical facts from this passage. First, his characterization of the FRT result as a "high profile comparison" is both completely made up and highly misleading. The term "high profile comparison" appears nowhere on the FRT result or in the correspondence between Tapia and Seamus Lyons, who provided the FRT lead. *See* ECF No. 109-5 at 376–81 (Defs' Ex. Z). Rather, Lyons's email transmitting the FRT result describes it as a "possible hit." *Id.* at 381. A later email from Lyons describes the FRT result as a "high number hit," *id.* at 380, but that is at odds with the similarity score actually attached to the FRT result in Tapia's possession, *see* ECF No. 109-5 at 282 (Defs' Ex. Q), which Lyons later acknowledged was "not a very high number." Lyons Dep. 53:15–22, ECF No. 109-5 at 176 (Defs' Ex. I). Critically, Tapia knew—because he filled out a face recognition search request form containing the warning—that FRT results are only

21

a "possible match," "should only be considered an investigative lead," and are "not probable cause to make an arrest."[28] ECF No. 109-5 at 290 (Defs' Ex. T). Yet he omitted that language, instead making up a term, "high profile comparison," which falsely conveyed that the FRT result was highly reliable.

Tapia also omitted information about the low quality of the blurry, shadowy, partially obscured probe image that made it unsuitable to produce a reliable match. And Tapia omitted the fact that Lyons said he had "altered the photo on the license a little to get the pixels clear," ECF No. 109-5 at 380 (Defs' Ex. Z), which would have put the magistrate on further notice that the FRT result was not to be trusted.

Tapia's assertion that "[t]he suspect was identified as Nijeer Parks" is similarly misleading, as it suggests that the FRT search was capable of making an "identification," as opposed to generating a mere investigative lead that must be followed by reliable independent investigation. And Tapia's last sentence, asserting that his own comparison of the photos revealed that "it is the same person" again inappropriately communicates an undeserved confidence, failing to add even a

---

[28] Indeed, at the time of the investigation, Tapia informed another officer that "we might have a *possible lead* on the person," showing that he knew that FRT matches could not be treated as identifications. Quesada Dep. 34:11–12, ECF No. 109-5 at 60 (Defs' Ex. E) (emphasis added).

modest qualifier (i.e., "it appeared to be the same person") that would have more accurately conveyed what he thought he saw.

The material sections of the warrant application submitted by Officer Lyszyk read as follows:

> While investigating a shoplifting of $39.00 worth of merchandise from Hampton Inn, the hotel manager, Richard Charneco, advised us that Parks was the suspect. . . . During the investigation, Parks gave us a fraudulent Tennessee driver's license, TN DL# 801527486, with his image on it. . . . He ended up getting away, but we still had his fraudulent TN driver's license on us that contained his image. Det. S. Tapia conducted an investigation and submitted the photograph through the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC). On Jan. 27, 2019, Det. Tapia received notification from Inv. Seamus Lyons (Rockland County Sheriff's Dept.) and Sgt. Dey (Palisades Interstate Parkway PD) that they had a high profile comparison to the picture on the fraudulent TN DL. The suspect was identified as Parks.

ECF No. 109-5 at 267–68 (Defs' Ex. O).

The falsehoods and omissions in Officer Lyszyk's affidavit are in some ways even more stark than Tapia's. He asserts that the manager of the hotel where the alleged shoplifting took place "advised us that Parks was the suspect." But as Lyszyk has admitted, this is false: the manager did not know who Mr. Parks was and made no such identification. Lyszyk Dep. 57:1–11, 57:24–58:2, ECF No. 109-5 at 38 (Defs' Ex. C). The rest of Lyszyk's affidavit repeatedly refers to the suspect as

23

"Parks" even when describing points in the investigation before Mr. Parks became a suspect.

Incredibly, Lyszyk completely omits the fact that FRT was used, instead writing only that "Det. Tapia received notification from Inv. Seamus Lyons (Rockland County Sheriff's Dept.) and Sgt. Dey (Palisades Interstate Parkway PD) that they had a high profile comparison to the picture on the fraudulent TN DL. The suspect was identified as Parks." ECF No. 109-5 at 268 (Defs' Ex. O). Nowhere does Lyszyk explain that Mr. Parks came to law enforcement's attention through a FRT search (a fact that Lyszyk knew, *see* Lyszyk Dep. 51:5–8, ECF No. 109-5 at 36 (Defs' Ex. C)), nor that Lyons merely transmitted a low-reliability FRT lead, based on a low-quality probe image, which could not by itself constitute a positive identification. The magistrate would have been left with the inescapable impression that Inv. Lyons and Sgt. Dey used some reliable means of identification, but they did not.

Reconstructed versions of the affidavits, correcting misrepresentations and restoring omissions, demonstrate that, had officers satisfied their duty of candor to the magistrate, the court would have rejected the warrants for lack of probable cause.

A corrected version of Sgt. Tapia's affidavit would read, in pertinent part (additions in **bold**; deletions in ~~strikethrough~~):

24

I sent out **an image of the photo on** the suspect's **fake** Tennessee driver's license ~~picture~~ to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) for facial recognition. **The quality of the image was badly degraded: it was blurry, facial features were obscured by heavy shadows, and there was an extraneous mark over the forehead.** On January ~~27~~ **28**, 2019, I received ~~a high profile comparison~~ **an investigative lead** to the **poor-quality** picture on the fraudulent Tennessee driver's license. **Inv. Seamus Lyons (Rockland County Sheriff's Dept.), who conducted the facial recognition search, told me he "altered the photo on the license a little to get the pixels clear" prior to running the search.** The ~~suspect~~ **possible match** was ~~identified as~~ **to** Nijeer Parks with a date of birth of [_____] with a last known address of [_____] Paterson, NJ. **A facial recognition search result should only be considered an investigative lead and is not probable cause to make an arrest.** I compared the photo on the fraudulent Tennessee driver's license to **an old arrest photo of** Nijeer Parks~~' real New Jersey's license~~ and it~~ is the same person~~ **I believe the suspect in the fraudulent driver's license photo looks similar to Parks**. **I was not a witness to the original incident, so my only knowledge of the suspect's appearance comes from the fraudulent driver's license photo. Although forensic evidence, including fingerprints and objects likely to contain the suspect's DNA, were collected from the crime scene, I have not yet received the results of analysis of that evidence.**

A corrected version of Officer Lyszyk's affidavit would read, in pertinent part:

While investigating a shoplifting of $39.00 worth of merchandise from Hampton Inn, the hotel manager, Richard Charneco, advised us that ~~Parks~~ **an unidentified man present at the scene** was the suspect. **No photographic lineup or other identification procedure was administered to Charneco.** . . . During the investigation, ~~Parks~~ **the unidentified man** gave us a fraudulent Tennessee driver's license, TN DL# 801527486, with his image on it. . . . He ended up getting away, but we still had his fraudulent TN driver's license on us that contained his image. Det. S. Tapia conducted an investigation and submitted the photograph through the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) **for a**

25

**facial recognition search**. **The quality of the photograph sent for a facial recognition search was badly degraded: it was blurry, facial features were obscured by heavy shadows, and there was an extraneous mark over the forehead.** On Jan. ~~27~~ **28**, 2019, Det. Tapia received notification from Inv. Seamus Lyons (Rockland County Sheriff's Dept.) and Sgt. Dey (Palisades Interstate Parkway PD) that ~~they had a high profile comparison to~~ **the search had produced an investigative lead for** the picture on the fraudulent TN DL. The ~~suspect was identified as~~ **investigative lead was to Nijeer** Parks. **A facial recognition search result should only be considered an investigative lead and is not probable cause to make an arrest.**[29] **Although forensic evidence, including fingerprints and objects likely to contain the suspect's DNA, were collected from the crime scene, I have not yet received the results of analysis of that evidence.**

Neither officer chose to mention Officer Lyszyk's supposedly confirmatory "identification," so they evidently did not rely on it to try to establish probable cause. Even if they had described Lyszyk's "identification" in the affidavits, a correct recitation of the facts would convey that "Officer Lyszyk was told that facial recognition had returned an investigative lead, shown only one photo, and said he thought Mr. Parks looked like the suspect." *See* Lyszyk Dep. 29:13–15, 30:18–20,

_____

[29] Even if Officer Lyszyk initially lacked first-hand knowledge of the poor quality of the probe image or of the fact that FRT results should only be considered an investigative lead, those facts are properly included in the corrected affidavit because Lyszyk would have learned them from reading a proper affidavit prepared by Sgt. Tapia. *See* Lyszyk Dep. 39:16–40:16, ECF No. 109-5 at 33 (Defs' Ex. C) (Lyszyk wrote his probable cause affidavit after Tapia); *compare* Tapia affidavit, ECF No. 109-5 at 253 (Defs' Ex. N), *with* Lyszyk affidavit, ECF No. 109-5 at 268 (Defs' Ex. O) (Lyszyk affidavit repeating language from Tapia affidavit, including "high profile comparison" and "The suspect was identified as [Nijeer] Parks").

61:6–10, ECF No. 109-5 at 31, 39 (Defs' Ex. C). An accurate affidavit would also need to recite that "no photographic lineup procedure was conducted with Officer Lyszyk or with any witness who saw the suspect at the Hampton Inn." Description of this suggestive and unreliable "identification" procedure would not supply probable cause.[30]

The corrected affidavits make clear how glaringly deficient the probable cause showing was. Probable cause requires showing a "reasonable ground for belief of guilt," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), or "a 'fair probability' that the person committed the crime at issue." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000). Neither the face recognition lead, nor Lyszyk's or Tapia's tainted visual review of the false-match lookalike generated by the FRT search, amounted to a "fair probability" that Mr. Parks committed the crime. The false and omitted facts are particularly material here, where the magistrate was unlikely to have any independent expertise about face recognition technology, and was likely to believe law enforcement's misleading claims about the strength of the FRT result. A fulsome presentation of the facts would have made clear that there was no probable cause.

---

[30] *See* N.J. Off. of the Att'y Gen., *Attorney General Guidelines for Preparing and Conducting Out-of-Court Eyewitness Identifications* (2021), https://www.nj.gov/oag/dcj/agguide/Photo-Lineup-ID-Guidelines.pdf.

**B.   The facts would support a jury finding of malice.**

At summary judgment, the fourth prong of the malicious prosecution standard asks whether "a reasonable juror could, viewing the facts in the light most favorable to [the plaintiff], find that the defendants acted with malice or for a purpose other than bringing [the plaintiff] to justice." *Harvard v. Cesnalis*, 973 F.3d 190, 203 (3d Cir. 2020). The Third Circuit has found this standard satisfied when, as here, police "mischaracterized the events and chose to omit crucial exculpatory information in the affidavit of probable cause," which can give rise to an inference that police were acting for a purpose other than pursuing the *correct* defendant. *Id*. at 203–04. Here, police mischaracterized the strength of the FRT result or elided the technology's use altogether, using language that would leave the magistrate with a vastly inflated understanding of the reliability of the supposed identification of Mr. Parks. Moreover, police immediately seized on the FRT lead as proof of guilt and utterly failed to pursue confirmatory investigation—i.e., checking for means, motive, and opportunity; canvassing witnesses; checking for alibis, etc.—before seeking a warrant. And as detailed in Plaintiff's expert report, after arresting Mr. Parks, police ignored clear indications of innocence and took no steps to check Mr. Parks's alibi, leaving him in jail for 10 days. Cilento Expert Report, ECF No. 109-5 at 349 (Defs' Ex. V). There are ample grounds for a jury to infer that Woodbridge police fixated

28

on the low-reliability FRT result as proof of guilt and eschewed further reliable investigation in service of keeping their first—but innocent—suspect in jail.

**C.   Qualified immunity cannot shield officers who submit affidavits containing knowingly false statements or statements made in reckless disregard of the truth.**

"[T]he right to be free from arrest except on probable cause" is a clearly established right for which officers may be held liable under Section 1983. *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995). In a malicious prosecution case, a police officer can only shield themselves with qualified immunity if their actions in establishing probable cause were nonetheless objectively reasonable. *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 345–46 (1986)). But submitting an affidavit of probable cause "containing statements [the officer] knows to be false or would know are false if he had not recklessly disregarded the truth" is, by definition, unreasonable. *Lippay v. Christos*, 996 F.2d 1490, 1504 (3d Cir. 1993).

As particularly relevant here, courts have found that recklessly or knowingly inflating the purported reliability of a suspect identification and concealing information that would show it to be unreliable is objectively unreasonable under this standard. *See, e.g.*, *Pinkney v. Meadville, Pa.*, 648 F. Supp. 3d 615, 645 (W.D. Pa. 2023) (holding that an officer could not rely on qualified immunity if he was reckless in his affidavit's presentation of a "tentative identification" as "positive and

29

certain" and "falsely implied" non-existent indicia of reliability). Here, a jury finding that Officer Lyszyk knowingly or recklessly withheld material information from the magistrate, *see supra* Part III.A, would necessarily also lead to the conclusion that he acted objectively unreasonably. He therefore cannot resort to qualified immunity to avoid liability.

## IV.   Woodbridge Township Is Liable for its Failure to Train its Officers or Institute Policies on the Proper Use of Face Recognition Technology.

The Woodbridge Police Department's complete failure to train its officers on the limitations of face recognition technology and how to use FRT results in investigations created a severe and foreseeable risk that its officers would violate constitutional rights. That failure makes Woodbridge Township liable for Mr. Parks's malicious prosecution under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).

A municipality can be held liable under § 1983 where its failure to train its officers led to the plaintiff's injuries. *Forrest v. Parry*, 930 F.3d 93, 105–06 (3d Cir. 2019). The question is one of "deliberate indifference": did the municipality disregard a need for training so obvious, and so likely to lead to constitutional violations, that its failure can be said to be "deliberate" or "conscious"? *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389–90 (1989). Although one route to showing "deliberate indifference" is by identifying a pattern of unremedied

30

unconstitutional conduct caused by untrained officers, even a single incident can establish liability when the municipality should have been aware of a need to train its personnel to avoid unconstitutional conduct. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223–24 (3d Cir. 2014).

It is undisputed that WPD provided no training or instruction whatsoever on the proper use of FRT prior to Plaintiff's wrongful arrest (or, for that matter, since).[31] As of 2019, WPD's detectives were empowered to use FRT in their investigations by making requests to the NJ Regional Operations Intelligence Center (ROIC).[32]

---

[31] Lee Dep. 31:20–23, ECF No. 109-5 at 49 (Defs' Ex. D) (Off. Lee: "Q: Had facial recognition technology been addressed at any training that you ever had with the department or with the county? A: No."); Quesada Dep. 31:21–23, ECF No. 109-5 at 59 (Defs' Ex. E) (Det. Quesada: "Q: . . .[H]ave you had any training with facial recognition technology? A: No, sir."); Tapia Dep. 53:3–6, ECF No. 109-5 at 88 (Defs' Ex. F) (Det. Tapia: "Q: Were you aware of any departmental orders or instructions relating to the use of facial recognition technology? A: No."); Lyszyk Answers to Pl's First Interrogatories (Pl's Ex. A) (answer to interrogatory 6: "I have not received any training in the use of facial recognition technology."); Hubner Dep. 39:6–17, ECF No. 109-5 at 148 (Defs' Exh. H) (Dir. Hubner: "Q: . . . Has the department formulated any policy regarding facial recognition technology after January 2019? A: . . . There is no written policy . . . .").

[32] *See* Tapia Dep. 45:6–52:11, ECF No. 109-5 at 86–87 (Defs' Ex. F) (discussing making FRT search requests through ROIC); ECF No. 109-5 at 290 (Defs' Ex. T) (ROIC facial recognition search request form filled out by Sgt. Tapia). Viewing the record in the light most favorable to the plaintiff, a jury could conclude that Woodbridge Township was on notice that FRT was an available investigate tool to WPD investigators through ROIC. *See* Hubner Dep. 39:12–13, ECF No. 109-5 at 148 (Defs' Ex. H) (WPD Director recognizing officers' ability to use ROIC for FRT searches).

WPD should have known it needed to train its officers in how to use results from that technology in their investigations, but it failed to do so.

When law enforcement officers begin using a new technology that risks harming the public if misused, there is an obvious need to provide training to avoid those harms. *See, e.g.*, *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 277 (3d Cir. 2000) ("[W]idespread computerization carries with it the ability and responsibility to institute more effective safeguards against human error than existed in the past."); *Edrei v. City of N.Y.*, 254 F. Supp. 3d 565, 581 (S.D.N.Y. 2017) (denying motion to dismiss *Monell* claim because "[e]ven in the absence of prior similar violations, the NYC [sic] knew that officers with [new, potentially dangerous technology] in the field were likely to face difficult scenarios . . . where the risk and harm of improperly using [the technology] are great–problems that could have been avoided with proper training."). In *Berg v. County of Allegheny*, for example, the Third Circuit held that poor training around the use of a computerized warrant management system created an obvious risk of misidentification leading to arrest and imprisonment, and thus the municipality could be held liable for failing to mitigate errors through training. 219 F.3d at 277 (rejecting summary judgment so a trier of fact could decide whether the county was "deliberately indifferent to [the] obvious risk" of misuse of the department's computerized warrant system).

The need for training was no less stark here. By 2019, the dangers of unconstrained use of FRT were well known, including the inability of FRT to make positive identifications, the correlation between low-quality probe images and low-reliability FRT results, and the disparate rates of false matches by race.[33] WPD would have had no trouble finding policy templates to guide its formation of a policy—the U.S. Department of Justice, for example, had already released policy development templates for local law enforcement agencies on the use of FRT, as had other organizations.[34] WPD had a clear need to instruct its officers on the limitations of FRT, but deliberately adopted a policy of silence instead.

WPD's decision to forego FRT training invited the exact kind of obvious risk of constitutional harm that creates *Monell* liability. Because FRT necessarily places innocent people under investigative scrutiny, the misuse of FRT results could

---

[33] See *supra* notes 18–20 and accompanying text.

[34] Bureau of Justice Assistance, U.S. Department of Justice, *Face Recognition: Policy Development Template* 22 (2017), https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/Face-Recognition-Policy-Development-Template-508-compliant.pdf; *see also, e.g.*, Georgetown Ctr. on Priv. & Tech., *Model Face Recognition Use Policy* (Oct. 18, 2016), https://www.perpetuallineup.org/appendix/model-police-use-policy (citing FRT policies from multiple jurisdictions). Amici do not address here the adequacy of any particular provisions in these model policies, nor suggest that a policy without associated training would be sufficient. The salient point in this case is that WPD provided no policy or training guidance to its officers whatsoever, despite the obvious need to do so.

33

obviously lead to the false arrest and imprisonment of an innocent person. Had Woodbridge's training addressed the unreliability of FRT results or how FRT results can taint witness identification procedures, that risk of simple misidentification could have been mitigated. *See* Cilento Expert Report, ECF No. 109-5 at 353–55 (Defs' Ex. V).

Amici are aware of only one other case where a court has considered *Monell* liability in the context of face recognition technology and wrongful arrest. There, the court granted a municipal defendant's pre-discovery motion to dismiss on the basis that because the police department had provided guidance to officers on how to use FRT results, the plaintiff did not allege enough facts showing that there was a "patently obvious" need for additional training. *Perryman v. City of Bloomington*, No. 23-cv-1984, 2023 WL 8374283, at *1 (D. Minn. Dec. 4, 2023) ("Hennepin County's training manual provides that facial recognition technology is only to be used for investigative purposes and 'is NOT a method to positively identify an individual.'"). In contrast, Woodbridge Township never provided *any* training or policies on the use of face recognition in investigations.[35] *See supra* note 31 (citing uncontroverted testimony regarding lack of training).

----

[35] As of the end of 2022, Woodbridge Township still had not instituted any policy or training on the use of FRT. Hubner Dep. 39:3–17, ECF No. 109-5 at 148 (Defs' Ex. H).

34

The record is clear that Woodbridge provided no training or protections to mitigate against a misuse of FRT results that could "so obviously lead to a constitutional violation." *Berg*, 219 F.3d at 277. The summary judgment record provides ample grounds for a factfinder to find Woodbridge liable. *See id.* Summary judgment must be denied.

## CONCLUSION

For the forgoing reasons, amici urge the Court to deny Defendants' motion for summary judgment.

Dated: January 29, 2024                    Respectfully submitted,

*/s/ Dillon Reisman*
Dillon Reisman
Alexander Shalom
Jeanne LoCicero
American Civil Liberties Union
  of New Jersey Foundation
570 Broad Street, 11th Floor
P.O. Box 32159
Newark, NJ 07102
(973) 854-1718
dreisman@aclu-nj.org

Nathan Freed Wessler*
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
nwessler@aclu.org

*Pro hac vice application forthcoming*

35