| LAW OFFICES OF<br>**JAMES P. NOLAN**<br>**&**<br>**ASSOCIATES**<br>A Limited Liability Company | James P. Nolan, Jr., ID #004591987<br>Certified Criminal Trial Attorney<br>F. Larry Magro<br>Eric L. Lange, ID #038441997<br>Admitted in NY & NJ<br>Brian A. Bontempo, ID #151162016<br>Garry J. Clemente, ID #305992020<br>Sanford Rader – In Memoriam<br>1960-2018 |
|---|---|

February 2, 2024

***Via Electronic Filing Only***
William T. Walsh, Clerk of the Court
United States District Court
District of New Jersey
M.L. King, Jr. Federal Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

> ***Re:  Nijeer Parks v. Township of Woodbridge, et al.***
> ***Civil Action No. 2:21-cv-04021-JKS-LDW***

Dear Mr. Walsh:

Please be advised that this firm represents the interests of Defendants, John E. McCormac of the Township of Woodbridge, Robert Hubner, Director of the Woodbridge Police Department, Township of Woodbridge, Township of Woodbridge Police Officer Andrew Lyszyk and Woodbridge Police Sergeant Joseph Licciardi, with respect to the above-referenced matter. Enclosed herewith please find Defendants' Motion for Summary Judgment to Dismiss Plaintiff's Second Amended Complaint with Prejudice against Defendants, as well as the Certification of Service, Certification of Exhibits, Preliminary Statement, Statement of Facts, Brief and Proposed Form of Order. Kindly provide counsel with an electronically filed copy of same at your earliest convenience.

Thank you for your kind attention to this matter.

Respectfully submitted,

/s/ Garry J. Clemente, Esq.

Enc.
Cc:  Honorable Jamel K. Semper, U.S.D.J.
     Honorable Leda D. Wettre, U.S.M.J.
     Daniel W. Sexton, Esq.
     (Via electronic filing)

**61 GREEN STREET, WOODBRIDGE, NJ 07095**
**PHONE: (732) 636-3344   FAX: (732) 636-1175**

Garry J. Clemente, Esq.
ATTORNEY ID. NO. 305992020
JAMES P. NOLAN AND ASSOCIATES, L.L.C.
61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095
TELEPHONE: (732) 636-3344 FAX: (732) 636-1175
Attorneys for Defendants, Mayor of Woodbridge Township, John E.
McCormac, Woodbridge Police Department Director Robert Hubner,
Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk,
Woodbridge Police Sergeant Joseph Licciardi

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NIJEER PARKS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-04021-JKS-LDW |
| -v- | : | |
| | : | **NOTICE OF MOTION FOR** |
| JOHN E. MCCORMACK, MAYOR OF | : | **SUMMARY JUDGMENT** |
| WOODBRIDGE, et al. | : | |
| | : | |
| Defendants. | : | |

To:  The Honorable Jamel K. Semper, U.S.D.J.
     United States District Court, District of New Jersey
     Martin Luther King Jr. Building, Court Room 5D
     Newark, New Jersey 07101

     Daniel W. Sexton, Esq.
     229 New Centre Road
     Hillsborough, New Jersey 08844
     Attorney for Plaintiff

     **PLEASE TAKE NOTICE** that on February 5, 2024, or as soon

thereafter as counsel may be heard, the undersigned attorneys for

the Woodbridge Defendants will apply to the above-named Court at

the Martin Luther King Building & U.S. Courthouse located at 50

Walnut Street, Newark, NJ 07101, for an Order pursuant to Rule 56

of the Federal Rules of Civil Procedure, granting Summary Judgment

in favor of Defendants and dismissing Plaintiff's Complaint in its

entirety, with prejudice, and other such relief as the Court may deem proper.

**PLEASE TAKE FURTHER NOTICE** that, in support of this Motion, Defendants shall rely on the attached Certification of Service, Certification of Exhibits, Preliminary Statement, Statement of Material Facts, Brief, and proposed form of Order, as well as any accompanying Exhibits submitted herewith, and other documents on file with the Court and cited in Defendants' Brief.

**PLEASE TAKE FURTHER NOTICE** that the original of this Notice of Motion and all supporting papers shall be filed with the Clerk of Court in which venue is laid, and that service of the within Notice of Motion and all supporting papers has been made in accordance with Fed. R. Civ. P. 5 and 11 and L. Civ. R. 7.1.

**PLEASE TAKE FURTHER NOTICE** that a proposed form of Order granting the requested relief is annexed hereto in accordance with the provisions of L. Civ. R. 7.1(e).

**PLEASE TAKE FURTHER NOTICE** that the Defendants herein request Oral Argument.

Respectfully submitted,

Dated: February 2, 2024          */s/ Garry J. Clemente, Esq.*

Law Office of James P. Nolan & Associates, Attorneys for Woodbridge Defendants

## <u>CERTIFICATION OF SERVICE</u>

I, Garry J. Clemente, hereby certify that on the date set forth below, I caused a true and correct copy of the foregoing Notice of Motion for Summary Judgment and all accompanying documents to be served upon the following counsel of record via operation of the Court's CM/ECF system:

Daniel W. Sexton, Esq.
229 New Centre Road
Hillsborough, New Jersey 08844
Attorney for Plaintiff

Dated: February 2, 2024            */s/ Garry J. Clemente, Esq.*

3

**Garry J. Clemente, Esq.**
**ATTORNEY ID. NO. 305992020**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Defendants, Mayor of Woodbridge Township, John E. McCormac, Woodbridge Police Department Director Robert Hubner, Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk, Woodbridge Police Sergeant Joseph Licciardi**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NIJEER PARKS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-04021-JXN-LDW |
| -v- | : | |
| | : | **CERTIFICATION OF SERVICE** |
| JOHN E. MCCORMACK, MAYOR OF WOODBRIDGE, et al. | : | |
| | : | |
| Defendants. | : | |

I, Garry J. Clemente, hereby certify as follows:

1.   I am the Attorney of Record employed at the Law Firm of James P. Nolan and Associates, L.L.C., Attorneys for Defendants, Mayor of Woodbridge Township, John E. McCormac (improperly pled as John E. McCormack), Woodbridge Police Department Director Robert Hubner, Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk, and Woodbridge Police Sergeant Joseph Licciardi in the within matter.

2.   I hereby certify that on Friday, February 2, 2024, I electronically filed the Defendants' Notice of Motion for Summary Judgment to Dismiss Plaintiff's Complaint with Prejudice as to all Woodbridge Defendants, as well as Defendants' Brief in Support of

1

Motion, Certification of Counsel with Exhibits and Proposed Form of Order with William T. Walsh, Clerk of the United States District Court, District of New Jersey, M.L. King, Jr. Federal Building & U.S. Courthouse, 50 Walnut Street, Newark, New Jersey 07102 via the CM/ECF system, which will then send a notification of such filing (NEF) to Daniel W. Sexton, Esq., DANIEL W. SEXTON, L.L.C., Attorney for Plaintiff.

3.   I hereby further certify that on Friday, February 2, 2024, I caused to be served via overnight delivery a Courtesy Copy of Notice of Motion for Summary Judgment to Dismiss Plaintiff's Complaint with Prejudice as to all Woodbridge Defendants, as well as Defendants' Brief in Support of Motion, Certification of Counsel with Exhibits and Proposed Form of Order upon the Honorable Julien X. Neals, U.S.D.J., United States District Court, District of New Jersey, M.L. King, Jr. Federal Building & U.S. Courthouse, 50 Walnut Street, Courtroom 5D, Newark, New Jersey 07102 and the Honorable Leda D. Wettre, U.S.M.J., United States District Court, District of New Jersey, M.L. King, Jr. Federal Building & U.S. Courthouse, 50 Walnut Street, Courtroom 3C, Newark, New Jersey 07102.

JAMES P. NOLAN & ASSOCIATES, L.L.C.
Attorneys for Defendants

Dated: February 2, 2024    /s/ Garry J. Clemente, Esq.

2

**Garry J. Clemente, Esq.**
**ATTORNEY ID. NO. 305992020**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Defendants, Mayor of Woodbridge Township, John E.**
**McCormac, Woodbridge Police Department Director Robert Hubner,**
**Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk,**
**Woodbridge Police Sergeant Joseph Licciardi**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NIJEER PARKS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-04021-JXN-LDW |
| -v- | : | |
| | : | **CERTIFICATION OF COUNSEL** |
| JOHN E. MCCORMACK, MAYOR OF | : | |
| WOODBRIDGE, et al. | : | |
| | : | |
| Defendants. | : | |

I, Garry J. Clemente, hereby certify as follows:

1.    I am the Attorney of Record employed at the Law Firm of James P. Nolan and Associates, L.L.C., Attorneys for Defendants, Mayor of Woodbridge Township, John E. McCormac (improperly pled as John E. McCormack), Woodbridge Police Department Director Robert Hubner, Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk, and Woodbridge Police Sergeant Joseph Licciardi in the within matter.

2.    **Exhibit "A"** is a true and accurate copy of the photographs of the fraudulent Tennessee driver's license and photograph results of facial recognition analysis, previously Bates stamped PARKS000152-000155;

1

3.    **Exhibit "B"** is a true and accurate copy of the Woodbridge Police Department Director Robert Hubner's Answers to Interrogatories;

4.    **Exhibit "C"** is a true and accurate copy of the Transcript of the Deposition of Woodbridge Police Officer Andrew Lyszyk;

5.    **Exhibit "D"** is a true and accurate copy of the Transcript of the Deposition of Woodbridge Police Officer Francis Lee;

6.    **Exhibit "E"** is a true and accurate copy of the Transcript of the Deposition of Woodbridge Police Detective Jorge Quesada;

7.    **Exhibit "F"** is a true and accurate copy of the Transcript of the Deposition of Woodbridge Police Detective Sergeant Santiago Tapia;

8.    **Exhibit "G"** is a true and accurate copy of the Transcript of the Deposition of Woodbridge Police Lieutenant Edward Barrett;

9.    **Exhibit "H"** is a true and accurate copy of the Transcript of the Deposition of Woodbridge Police Director Robert Hubner;

10.   **Exhibit "I"** is a true and accurate copy of the Transcript of the Deposition of Rockland County Intelligence Center Investigator Seamus Lyons;

11.   **Exhibit "J"** is a true and accurate copy of the Transcript of the Deposition of Plaintiff, Nijeer Parks;

12.   **Exhibit "K"** is a true and accurate copy of the Woodbridge Police Department I.D. Bureau Report, previously Bates stamped PARKS000097-000098;

2

13. **Exhibit "L"** is a true and accurate copy of the Request for Latent Fingerprint Examination, previously Bates stamped PARKS000099;

14. **Exhibit "M"** is a true and accurate copy of the Woodbridge Police Department I.D. Bureau Suspect Report, previously Bates stamped PARKS000148;

15. **Exhibit "N"** is a true and accurate copy of Complaint-Warrant 1225-W-2019-000156, previously Bates stamped PARKS000001-000010;

16. **Exhibit "O"** is a true and accurate copy of Complaint-Warrant 1225-W-2019-000158, previously Bates stamped PARKS000011-000023;

17. **Exhibit "P"** is a true and accurate copy of the Hertz Rental Agreement for the vehicle that the suspect from the Hampton Inn operated on January 26, 2019, previously Bates stamped PARKS000024-000027;

18. **Exhibit "Q"** is a true and accurate copy of the WPD Bulletin Requesting Assistance Identifying Suspect;

19. **Exhibit "R"** is a true and accurate copy of the WPD Vehicle/Property Description Report, previously Bates stamped PARKS000083;

20. **Exhibit "S"** is a true and accurate copy of the Miranda Waiver Card signed by Plaintiff, previously Bates stamped PARKS000121;

21. **Exhibit "T"** is a true and accurate copy of the Facial Recognition Initiative Request Form, previously Bates stamped PARKS00091;

22. **Exhibit "U"** is a true and accurate copy of the Report of Defense Expert Maj. Joseph Craparotta (Ret.);

23. **Exhibit "V"** is a true and accurate copy of the Report of Plaintiff's Expert Ralph Cilento (Ret.);

24. **Exhibit "W"** is a true and accurate copy of the New Jersey State Police DNA Evidence Receipt, previously Bates stamped PARKS000173-000176;

25. **Exhibit "X"** is a true and accurate copy of the New Jersey State Police DNA Evidence Laboratory Report, previously Bates stamped PARKS000151;

26. **Exhibit "Y"** is a true and accurate copy of the New Jersey State Police CODIS Investigative Hit Notification, previously Bates stamped PARKS000149;

27. **Exhibit "Z"** is a true and accurate copy of the Rockland County Intelligence Center Officer Report;

28. **Exhibit "AA"** is a true and accurate copy of the Woodbridge Police Department Incident Report #19010123/1, previously Bates stamped PARKS000064-000068;

29. **Exhibit "BB"** is a true and accurate copy of the Woodbridge Police Department, Policies and Procedures, Chapter 432, In-Service, Specialized, and Roll Call Training.

30. I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

JAMES P. NOLAN & ASSOCIATES, L.L.C.
Attorneys for Woodbridge Defendants

Dated: February 2, 2024        /s/ Garry J. Clemente, Esq.

**Garry J. Clemente, Esq.**
**ATTORNEY ID. NO. 305992020**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Defendants, Mayor of Woodbridge Township, John E.**
**McCormac, Woodbridge Police Department Director Robert Hubner,**
**Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk,**
**Woodbridge Police Sergeant Joseph Licciardi**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NIJEER PARKS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-04021-JXN-LDW |
| -v- | : | |
| | : | **(PROPOSED) ORDER** |
| JOHN E. MCCORMACK, MAYOR OF | : | |
| WOODBRIDGE, et al. | : | |
| | : | |
| Defendants. | : | |

**THIS MATTER** having come before the Court on the Motion of Garry J. Clemente, Esq. of the Law Office of James P. Nolan & Associates, LLC, on behalf of Woodbridge Township Mayor John McCormac, Police Director Robert Hubner, Police Officer Andrew Lyszyk, and Sergeant Joseph Licciardi (herein, the "Woodbridge Defendants") for summary judgment dismissing all of Plaintiff's claims with prejudice, and the Court having considered the Briefs in support of the Motion, and the opposition thereto, as well as the oral arguments of the parties, and for good cause having been shown:

**IT IS ON THIS** _____ day of _____ 2024:

1

**ORDERED** that the Woodbridge Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 is hereby **GRANTED**; and it is further

**ORDERED** that Plaintiff's Second Amended Complaint is hereby dismissed in its entirety with prejudice as against the Woodbridge Defendants; and it is further

**ORDERED** that a copy of the within Order shall be electronically filed with the Clerk of the Court.

_____

Honorable Jamel K. Semper, U.S.D.J.

**GARRY J. CLEMENTE, ESQ.**
**ATTORNEY ID. NO. 305992020**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Woodbridge Defendants**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NIJEER PARKS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-04021-JXN-LDW |
| -v- | : | |
| | : | **WOODBRIDGE DEFENDANTS'** |
| JOHN E. MCCORMACK, MAYOR OF | : | **STATEMENT OF MATERIAL FACTS** |
| WOODBRIDGE, et al. | : | |
| | : | |
| Defendants. | : | |

## WOODBRIDGE DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

The Woodbridge Defendants submit this Statement of Material Facts pursuant to Local Rule 56.1 in support of its Motion for Summary Judgment, which seeks to dismiss Plaintiff's Complaint in its entirety.

Respectfully submitted,

Dated: December 5, 2023       */s/ Garry J. Clemente, Esq.*

Garry J. Clemente, Esq.
Law Office of James P. Nolan &
Associates, Attorneys for
Woodbridge Defendants

1

<u>**STATEMENT OF MATERIAL FACTS**</u>

1.   On January 26, 2019, Woodbridge Police Department ("WPD") Officers Francis Lee and Andrew Lyszyk were separately dispatched to the Hampton Inn on Route 9 North in Woodbridge on a report of shoplifting. (See WPD Director Robert Hubner's Answers to Interrogatories, attached hereto as **Exhibit "B"**).

2.   Officer Lee arrived on scene first and encountered the suspect in the lobby, an African American male who identified himself as "Jamal Owens." (<u>Id</u>.)

3.   The suspect produced a Tennessee driver's license which listed the name "Jamal Owens" and displayed a photograph of the suspect. (<u>Id</u>.)

4.   Officer Lee called WPD headquarters to have dispatch run the suspect's driver's license to determine if it was legitimate. (See Transcript of Deposition of WPD Officer Francis Lee, attached hereto as **Exhibit "D"** Page 18, Line 11-16).

5.   Dispatch advised Officer Lee that the suspect's driver's license was not coming back on file. Officer Lyszyk took the suspect's driver's license to his patrol vehicle to further attempt to verify its authenticity. (See Transcript of Deposition of WPD Officer Andrew Lyszyk, attached hereto as **Exhibit "C"** Page 13, Line 22-25).

6.    Officer Lyszyk contacted the Tennessee State Police, who confirmed that the suspect's driver's license was fake. (<u>Id</u>. at Page 14, Line 7-13).

7.    Since Officers Lee and Lyszyk were unable to confirm the identity of the suspect, who had admitted to shoplifting, the decision was made to place the suspect under arrest. (<u>Id</u>. at Page 14, Line 24-25; Page 15, Line 1-4).

8.    When Officer Lyszyk attempted to place the suspect in handcuffs, the suspect slipped away from his grasp and fled the scene by running out the back door of the Hampton Inn lobby. (<u>Id</u>. at Page 15, Line 25; Page 16, Line 1-6).

9.    Officers Lee and Lyszyk pursued the suspect as he ran around to the front of the Hampton Inn and entered his vehicle. There, the Officers confronted the suspect and drew their service weapons while demanding that the suspect turn off and exit the vehicle. (<u>Id</u>. at Page 16, Line 10-19).

10.   The suspect's vehicle was rented from Hertz and the suspect was at the Hampton Inn to renew his rental agreement at the Hertz kiosk located in the lobby. (See Hertz Rental Agreement, attached hereto as **Exhibit "P"**).

11.   The suspect refused to comply with the Officers' commands and fled the scene in his vehicle, striking Officer Lyszyk's patrol vehicle before hitting a pillar in front of the Hampton Inn. During this time, Officer Lee had to jump out of the way to avoid being

struck by the suspect's vehicle. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 16, Line 18-22).

12.   Officers Lee and Lyszyk engaged in a brief vehicular pursuit of the suspect, but were unable to locate the suspect. The Officers returned to the Hampton Inn to preserve the scene. (Id. at Page 17, Line 1-13).

13.   Other officers on patrol were dispatched to the Hampton Inn to guard the doors to the lobby and preserve the scene. The WPD Detective Bureau was notified of the incident and Detective Jorge Quesada arrived to begin processing the evidence left at the scene. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

14.   Det. Quesada was assigned to the Identification Unit within the Detective Bureau and was responsible for photographing and collecting evidence at the scene. (See Transcript of Deposition of WPD Detective Jorge Quesada, attached hereto as **Exhibit "E"** Page 8, Line 9-16).

15.   Upon his arrival on scene, Det. Quesada was advised of the areas of the Hampton Inn lobby that the suspect interacted with prior to and during his flight from the lobby. (Id. at Page 19, Line 14-20).

16.   Det. Quesada learned that the suspect fled through the rear glass common door to the lobby. (Id. at Page 20, Line 3-5).

17.  Det. Quesada viewed surveillance video from the Hampton Inn to determine where the suspect touched the door, but the angle of the camera did not cover the door. (Id. at Page 28, Line 3-7).

18.  Det. Quesada ultimately collected three fingerprints from the rear glass common door to the lobby. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

19.  Det. Quesada also collected a water bottle that the suspect drank from and a sneaker that the suspect lost during his flight from the Hampton Inn. (Deposition of Det. Quesada, **Exhibit "E"** Page 19, Line 14-20.

20.  Officer Lyszyk advised Det. Quesada that he still had the suspect's driver's license and that although the license was fake, the picture on the license was that of the suspect. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 18, Line 10-13).

21.  The suspect's vehicle was found the next day and five additional fingerprints were lifted and a vape pen was collected from the vehicle. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

22.  With the evidence collected, Det. Sgt. Tapia and the Detective Bureau took over the investigation. (Id.; see also the Transcript of Deposition of WPD Det. Sgt. Santiago Tapia, attached hereto as **Exhibit "F"** Page 56, Line 3-6).

23.  The fingerprints were reviewed at WPD headquarters to determine if they were suitable to be packaged and sent to the New

Jersey State Police ("NJSP") for analysis. (Deposition of Det. Quesada, **Exhibit "E"** Page 25, Line 1-4).

24. As is the case with other local municipal police departments, the WPD does not have the capability to analyze and compare fingerprints in-house. (Id. at Page 27, Line 5-25; Page 28, Line 1-2).

25. The fingerprint evidence was reviewed and packaged by Det. Quesada on January 26, 2019. (See the WPD I.D. Bureau Report, attached hereto as **Exhibit "K"**).

26. Det. Sgt. Tapia had prior experience with facial recognition technology through a prior assignment with the NJSP Auto Theft Task Force, where that technology was used successfully to identify suspects. (Deposition of Det. Sgt. Tapia, attached hereto as **Exhibit "F"** Page 45, Line 6-13).

27. Facial recognition software analyzes a sample photograph and considers the characteristics of an individual's face, including the eyes, ears, nose, mouth, cheekbones, and other features. When the software identifies a potential match, the software gives a probability of a positive match. (See Transcript of Deposition of Rockland County Intelligence Center Investigator Seamus Lyons, attached hereto as **Exhibit "I"** Page 32, Line 2-14).

28. Facial recognition technology is a tool that may be utilized in an investigation. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 50, Line 22-25; See also the Deposition of Det. Quesada,

6

Exhibit "E" Page 32, Line 1-5); See also the Deposition of Investigator Lyons, **Exhibit "I"** Page 30, Line 5-22; Page 86, Line 3-11).

29. Local municipal police departments may submit requests for facial recognition technology analysis to the New Jersey Regional Operations Intelligence Center ("NJROIC"), the New York State Intelligence Center ("NYSIC"), or the Rockland County Intelligence Center ("RCIC"). These entities have several tools at their disposal, including facial recognition technology, that local and State police departments do not have access to. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 46, Line 10-17).

30. On January 27, 2019, Detective Tapia created a bulletin which was sent to these entities and explained the circumstances of the incident at the Hampton Inn. The bulletin contained the suspect's driver's license photograph and requested that facial recognition analysis be performed in an effort to identify the suspect. (See WPD Bulletin Requesting Assistance Identifying Suspect, attached hereto as **Exhibit "Q"**; See also Facial Recognition Initiative Request Form, attached hereto as **Exhibit "T"**).

31. Prior to sending the bulletin, Det. Sgt. Tapia showed the suspect's driver's license to Officers Lyszyk and Lee separately, who each confirmed that the photo on the license depicted the individual they dealt with at the Hampton Inn. (Deposition of Det.

Sgt. Tapia, **Exhibit "F"** Page 132, Line 17-25; Page 133, Line 1-6).

32.   Defense Expert, Major Joseph Craparotta, New Jersey State Police (Ret.) opined that Sgt. Tapia properly used his training and knowledge to submit the driver's license for facial recognition analysis as a tool to identify the suspect from the Hampton Inn. (See the Report of Defense Expert Major Joseph Craparotta (Ret.), attached hereto as **Exhibit "U"** Page 26).

33.   Plaintiff's Expert, Ralph Cilento, New York Police Department (Ret.) opined that Sgt. Tapia was correct in utilizing all investigative means necessary to attempt to identify the suspect and that Sgt. Tapia determination to send the driver's license for facial recognition analysis was an appropriate investigative step. (See the Report of Plaintiff's Expert Ralph Cilento, attached hereto as **Exhibit "V"** Page 6).

34.   The bulletin was received by Investigator Seamus Lyons of the Rockland County Intelligence Center ("RCIC") in New York. The RCIC provides services to outside law enforcement, including manpower support, police records management, intelligence gathering, and evidence analysis. (Deposition of Investigator Lyons, attached **Exhibit "I"** Page 8, Line 7-12).

35.   Investigator Lyons is a 27-year law enforcement veteran and had received training regarding the use of facial recognition technology. (Id. at Page 8, Line 18-19; Page 23, Line 5-14).

36. Investigator Lyons and the RCIC have utilized facial recognition technology with a great deal of success in identifying previously unknown individuals in hundreds of cases. (Id. at Page 21, Line 15-18; Page 27, Line 22-25).

37. Investigator Lyons viewed the photograph of the suspect's driver's license on the bulletin and shrunk it slightly to make the pixels clearer. This is done frequently and enables the facial recognition software to get a better read on the photograph without affecting the validity of the results. (Id. Page 77, Line 1-9; Page 78, Line 1-4).

38. The facial recognition software matched the photograph displayed on the suspect's fraudulent driver's license to Nijeer Parks. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 90, Line 10-13).

39. Upon viewing the results of the facial recognition analysis, Investigator Lyons immediately noted striking similarities in the resemblance between the suspect's driver's license photograph and the photograph returned of Nijeer Parks. (Deposition of Investigator Lyons, **Exhibit "I"** Page 89, Line 18-23).

40. Investigator Lyons showed the results to a fellow RCIC Investigator, Lieutenant Richard Dey, who was in agreement that the resemblance was sufficient to provide the WPD with the facial recognition results as a possible lead on the Hampton Inn suspect. (Id. at Page 89, Line 18-23).

9

41. The facial recognition software indicated that the probability of a positive match to Plaintiff was 594 out of a possible 1,000, which is sufficient to warrant further investigation into Plaintiff. (<u>Id</u>. at Page 53, Line 9-25; Page 54, Line 1-5).

42. Investigator Lyons has made positive matches with lower threshold probability scores in other investigations than that which identified Plaintiff here. (<u>Id</u>. at Page 53, Line 21-23).

43. After receiving the match from the facial recognition software, Investigator Lyons reviewed Plaintiff's extensive criminal history in New Jersey and noted that Plaintiff's past addresses connected him to New Jersey. (<u>Id</u>. at Page 47, Line 3-12).

44. Investigator Lyons supplied the results of the facial recognition analysis to Sgt. Tapia via email on January 28, 2019. (See Rockland County Intelligence Center Officer Report, attached hereto as **Exhibit "AA"**).

45. Investigator Lyons' email to Sgt. Tapia stated that the facial recognition software came back with a "high number hit" comparison to Plaintiff. (<u>Id</u>. Bates stamped PARKS000034).

46. Upon receiving the results of the facial recognition analysis and criminal history from the RCIC, Det. Sgt. Tapia summoned Officer Lyszyk to the Detective Bureau to determine if he could personally identify the suspect. Officer Lyszyk confirmed to Det.

Sgt. Tapia that he was 100% certain that the image returned by the facial recognition software was the individual that he dealt with at the Hampton Inn. (Deposition of Det. Sgt. Tapia **Exhibit "F"** Page 90, Line 10-22).

47.   Peter Nastasi was the Assistant Prosecutor who was the point of contact in the Middlesex County Prosecutor's Office for the WPD. (Deposition of Det. Quesada, **Exhibit "E"** Page 13, Line 14-17; see also Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

48.   Det. Sgt. Tapia and Officer Lyszyk contacted AP Nastasi and explained the facial recognition results and advised of Officer Lyszyk's positive identification of the suspect as Nijeer Parks. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 135, Line 5-23).

49.   AP Nastasi determined that probable cause existed and authorized Det. Sgt. Tapia and Officer Lyszyk to generate Complaint-Warrants against Nijeer Parks. AP Nastasi advised of what charges would be issued and the Complaint-Warrants were sent to AP Nastasi for his review and approval. (Id. at Page 115, Line 6-10; Page 137, Line 13-25; Page 138, Line 1-4).

50.   The Affidavit of Probable Cause attached to the Complaint-Warrants stated that facial recognition technology was employed and helped identify Plaintiff as the suspect. (See Complaint-Warrant 1225-W-2019-000156, attached hereto as **Exhibit "N"** and

Complaint-Warrant 1225-W-2019-000158, attached hereto as **Exhibit "O"**).

51.  Det. Sgt. Tapia contacted Judge David Stahl and advised him of the Complaint-Warrants before sending them to him for his review. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 119, Line 20-24).

52.  Judge Stahl signed off on the Complaint-Warrants on January 30, 2019. (Complaint-Warrant 1225-W-2019-000156, **Exhibit "N"**; Complaint-Warrant 1225-W-2019-000158, **Exhibit "O"**).

53.  That same day, Det. Sgt. Tapia, Officer Lyszyk, and another officer drove to Paterson in an attempt to serve the Complaint-Warrants and arrest Parks. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 38, Line 24-25; Page 39, Line 1-3).

54.  On February 4, 2019, Det. Quesada packaged the suspect's sneaker, water bottle, and vape pen in preparation to be sent to the NJSP for DNA analysis. (See WPD Vehicle/Property Description Report, attached hereto as **Exhibit "R"**; see also the Deposition of Det. Quesada, **Exhibit "E"** Page 29, Line 1-10).

55.  It is standard procedure at the WPD that when several packages of evidence are ready for analysis, a WPD Officer physically transports the packages to the NJSP. (Deposition of Det. Quesada, **Exhibit "E"** Page 25, Line 12-18).

56.  The NJSP is extremely backlogged with cases and requests for evidence analysis. It typically takes about four to six weeks for

the fingerprint packages to be returned, either with a positive match or with no comparison. (Id. at Page 26, Line 1-10).

57.  On February 5, 2019, Plaintiff presented to WPD Headquarters to address the active Complaint-Warrants against him and was placed under arrest without incident. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**; see also the Transcript of the Deposition of Nijeer Parks, attached hereto as **Exhibit "J"** Page 34, Line 10-22).

58.  Plaintiff was read the Miranda Warnings and Plaintiff signed a waiver of these rights. (See Miranda Warnings Card, attached hereto as **Exhibit "S"**).

59.  While Plaintiff was in custody, he was booked, processed, and interviewed without incident. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**; see also the Deposition of Parks, attached hereto as **Exhibit "J"** Page 35, Line 11-13; Page 40, Line 5-7).

60.  Officer Lee was called in to WPD Headquarters to determine if he could positively identify Plaintiff as the suspect from the incident at the Hampton Inn. (Deposition of Ofc. Lee, **Exhibit "D"** Page 24, Line 12-25; Page 25, Line 1-8).

61.  Officer Lee observed Plaintiff while he was handcuffed to a bench in the booking area. Officer Lee identified Plaintiff as the suspect that he interacted with at the Hampton Inn on January 26,

2019. (Id. at Page 29, Line 15-20; see also Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

62. Before Plaintiff was transported to the Middlesex County Jail, he feigned an asthma attack and fell to the floor because he believed that he was going to be assaulted by officers. (Deposition of Parks, **Exhibit "J"** Page 41, Line 12-22).

63. The officers present helped Plaintiff off the floor, sat him on the bench, and called for EMTs to respond. (Id. at Page 41, Line 20-22).

64. While Plaintiff was in the custody of the WPD, he was never subjected excessive force, and conceded multiple times that none of the officers present touched Plaintiff in any kind of aggressive manner. (Id. at Page 35, Line 11-13; Page 36, Line 8-11; Page 44, Line 18-23; Page 49, Line 19-22).

65. After the EMTs finished treating Plaintiff, he was transported to the Middlesex County Jail without incident. (Id. at Page 58, Line 10-12).

66. Plaintiff was released from the Middlesex County Jail on February 13, 2019 after being held for eight days. (Id. at Page 119, Line 2-15).

67. The fingerprint and DNA evidence was received by the NJSP on February 8, 2019. (See Request for Latent Fingerprint Examination, attached hereto as **Exhibit "L"**; see also NJSP DNA Evidence Receipt, attached hereto as **Exhibit "W"** Bates stamped PARKS000174).

68.  The fingerprint evidence was analyzed on February 14, 2019 and returned to the WPD on February 22, 2019 with information that the fingerprints belonged to an individual named Barrington Walker. By this point, Plaintiff had already been released from custody. (Request for Latent Fingerprint Examination, **Exhibit "L"**; see also WPD I.D. Bureau Suspect Report, attached hereto as **Exhibit "X"**).

69.  This identification was of little to no evidentiary value, as the only fingerprints suitable for analysis were recovered from the common door of the Hampton Inn lobby and it was unknown where the suspect physically touched the door. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 121, Line 6-11).

70.  The DNA evidence received by the NJSP laboratory was analyzed on April 17, 2019. (NJSP DNA Evidence Receipt, **Exhibit "W"** Bates stamped PARKS000175).

71.  The NJSP was not able to obtain any DNA from the sneaker, but did collect DNA from the water bottle. However, the DNA from the water bottle did not result in a match to a suspect. (Deposition of Det. Quesada, **Exhibit "E"** Page 39, Line 13-24).

72.  October 18, 2019, DNA analysis complete but no match made. (See the NJSP DNA Laboratory Report, attached hereto as **Exhibit "Y"**).

73.  On January 24, 2020, the New Jersey Attorney General told state prosecutors that police officers should stop using the

15

Clearview AI facial recognition app. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 26).

74. Plaintiff initiated the subject lawsuit with the filing of a Complaint with the Superior Court of New Jersey on November 25, 2020. (See Docket No. PAS-L-003672-20, Transaction ID LCV20202148483).

75. On January 15, 2021, Plaintiff amended his Complaint. (See Docket No. PAS-L-003672-20, Transaction ID LCV2021117384).

76. On March 3, 2021, the Woodbridge Defendants removed this matter to the New Jersey District Court. (ECF No. 1).

77. On April 23, 2021, a Motion to Dismiss Plaintiff's Complaint was filed on behalf of the Middlesex County Prosecutor's Office Defendants. (ECF No. 3.) This Motion was terminated on May 27, 2021 and Plaintiff was permitted to amend his Complaint. (ECF No. 15).

78. On June 1, 2021, Plaintiff filed his First Amended Complaint. (ECF No. 16). On June 22, 2021, the Middlesex County Prosecutor's Office Defendants refiled their Motion to Dismiss Plaintiff's Complaint. (ECF No. 19).

79. On July 23, 2021, the Woodbridge Defendants filed a Motion for Judgment on the Pleadings. (ECF No. 24).

80. On July 30, 2021, after further analysis the NJSP determined that the DNA from the water bottle belonged to Barrington Walker. (Deposition of Det. Quesada, **Exhibit "E"** Page 40, Line 14-18; see

16

also the NJSP CODIS Investigative Hit Notification, attached hereto as **Exhibit "Z"**).

81. On May 26, 2022, Plaintiff filed a Motion to Amend the Complaint (ECF No. 24) and the dispositive Motions referenced above were administratively terminated pending resolution of Plaintiff's request to amend the Complaint. (ECF No. 51).

82. Plaintiff's Motion was granted in part (ECF No. 69) and Plaintiff filed his Second Amended Complaint on October 7, 2022. (ECF No. 72).

83. On November 4, 2022, Plaintiff voluntarily dismissed his claims against the Middlesex County Department of Corrections. (ECF No. 76).

84. On December 19, 2022, the Middlesex County Prosecutor's Office Defendants refiled their Motion to Dismiss Plaintiff's Complaint. (ECF No. 80).

85. On July 27, 2023, Plaintiff voluntarily dismissed his claims against the Middlesex County Prosecutor's Office. (ECF No. 103).

## <u>CERTIFICATION OF SERVICE</u>

I, Garry J. Clemente, hereby certify that on the date set forth below, I caused a true and correct copy of the foregoing Statement of Material Facts and all accompanying documents to be served upon the following counsel of record via operation of the Court's CM/ECF system:

Daniel W. Sexton, Esq.
Daniel W. Sexton, Esquire, LLC
229 New Centre Road
Hillsborough, New Jersey 07304
Attorney for Plaintiff

Dated: December 5, 2023

*/s/ Garry J. Clemente, Esq.*
Garry J. Clemente, Esq.

**Garry J. Clemente, Esq.**
**ATTORNEY ID. NO. 305992020**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Woodbridge Defendants**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NIJEER PARKS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-04021-JXN-LDW |
| -v- | : | |
| | : | |
| JOHN E. MCCORMACK, MAYOR OF | : | |
| WOODBRIDGE, et al. | : | |
| | : | |
| Defendants. | : | |

---

### WOODBRIDGE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

---

Garry J. Clemente, Esq. (#305992020)
On The Brief

1

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT

STATEMENT OF MATERIAL FACTS

LEGAL STANDARD

ARGUMENT

I.   COUNT ONE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO PROVE EACH ELEMENT OF A CAUSE OF ACTION FOR MALICIOUS PROSECUTION

a. Count One must be dismissed as against Sergeant Joseph Licciardi as he did not participate in the investigation into the incident at the Hampton Inn and had no role whatsoever in the determination that probable cause existed to arrest Plaintiff

b. Plaintiff has failed to prove the absence of probable cause for the issuance of the Complaint-Warrants against Plaintiff

c. Plaintiff has failed to prove that the issuance of the Complaint-Warrants against Plaintiff was actuated by malice

d. Officer Lyszyk acted in good faith and is entitled to qualified immunity

e. Defendants are entitled to a complete defense of Plaintiff's Malicious Prosecution claim as Defendants relied upon the advice of counsel from the Middlesex County Prosecutor's Office

II.  COUNT TWO OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH A VIOLATION OF THE EQUAL PROTECTION CLAUSE OR RACIAL PROFILING

III. COUNT THREE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH THAT HE WAS SUBJECTED TO EXCESSIVE FORCE

IV.  COUNT FOUR OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH MONELL LIABILITY ON BEHALF OF THE TOWNSHIP OF WOODBRIDGE

V.   COUNT SEVEN AND COUNT NINE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH THE ELEMENTS OF A CLAIM FOR CIVIL CONSPIRACY

**CONCLUSION**

**TABLE OF AUTHORITIES**

Abraham v. Raso, 183 F.3d 279 (3d Cir. 1999)

Alicea v. Johnson, No. 11-3823, 2011 WL 6181906 (D.N.J. 2011)

Andrews v. Scuilli, 853 F.3d 690 (3d Cir. 2017)

Bayer v. Township of Union, 414 N.J. Super. 238, 997 A.2d 1118 (App. Div. 2010)

Beck v. City of Pittsburgh, 89 F.3d 966 (3d Cir. 1996)

Bell v. Atlantic City Railroad Co., 58 N.J.L. 227, 33 A. 211 (1895)

Bennett v. Pillion, 105 N.J.L. 359, 144 A. 601 (1929)

BeVier v. Hucal, 806 F.2d 123 (7th Cir. 1986)

Celotex Corp. v. Catrett, 744 U.S. 317 (1986)

City of Canton, Ohio v. Harris, 489 U.S. 378 (1989)

Connick v. Thompson, 563 U.S. 51 (2011)

Connor v. Powell, 162 N.J. 397, 744 A.2d 1158 (2000)

Craig v. Collins, No. 13-1873, 2013 WL 5271521 (E.D. Pa. 2013)

Curley v. Klein, 499 F.3d 199 (3d Cir. 2007)

Dalton v. Godfrey, 97 N.J.L. 455, 117 A. 635 (1922)

DiBella v. Borough of Beachwood, 407 F.3d 599 (3d Cir. 2005)

Duro Co. v. Wishnevsky, 126 N.J.L. 7, 16 A.2d 64 (1940)

Fioriglio v. City of Atlantic City, 996 F. Supp. 379 (D.N.J. 1998)

Galafaro v. Kuenstler, 53 N.J. Super. 379 (App. Div. 1958)

Gilles v. Davis, 427 F.3d 197 (3d Cir. 2005)

Graham v. Conner, 490 U.S. 386 (1989)

Gramenos v. Jewel Cos., 797 F.2d 432 (7th Cir. 1986)

Grimm v. Churchill, 932 F.2d 674 (7th Cir. 1991)

Hankin Family P'Ship v. Upper Merion Twp., No. 01-1622, 2012 WL
43599 (E.D. Pa. 2012)

Harlow v. Fitzgerald, 457 U.S. 800 (1982)

Holmes v. City of Wilmington, 79 F.Supp. 3d 497 (D.Del. 2015)

Jobes v. Evangelista, 369 N.J. Super. 284, 849 A.2d 186 (App. Div.
2004)

Jones v. Dalton, 867 F. Supp. 2d 572 (D.N.J. 2012)

Kelley v. Borough of Carlisle, 622 F.3d 248 (2010)

Kirk v. City of Newark, 109 N.J. 173, 536 A.2d 229 (1988)

Kulwicki v. Dawson, 969 F.2d 1454 (3d Cir. 1992)

Labo v. Borger, No. 02-3975, 2005 WL 1971867 (D.N.J. 2005)

Lake v. Arnold, 112 F.3d 682 (3d Cir. 1997)

Lankford v. City of Clifton Police Department, 546 F.Supp. 3d 296
(D.N.J. 2021)

Lind v. Schmid, 67 N.J. 255, 337 A.2d 365 (1975)

LoBiondo v. Schwartz, 199 N.J. 62, 970 A.2d 1007 (2009)

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475
U.S. 574 (1986)

Mayflower Industries v. Thor Corp., 15 N.J. Super. 139 (Ch. Div.
1951), aff'd, 9 N.J. 605 (1952)

McTernan v. City of York, 564 F.3d 636 (3d Cir. 2009)

Monell v. Department of Social Services, 436 U.S. 658 (1978)

Morillo v. Torres, 222 N.J. 104, 117 A.3d 1206 (2015)

Orsatti v. N.J. State Police, 71 F.3d 480 (3d Cir. 1995)

Patterson v. Sch. Dist. of Phila., No. 99-CV-4792, 2000 WL 1020332, (E.D. Pa. 2000)

Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231 (3d Cir. 1995)

Penwag Property Co. v. Landau, 76 N.J. 595, 288 A.2d 1265 (1978)

Porter v. Gray, No. 05-CV-231, 2007 WL 464694 (W.D. Pa. 2007)

Ramos v. Flowers, 429 N.J. Super. 13, 56 A.3d 869 (2013)

Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123 (2d Cir. 1997)

Ridgewood Bd. of Educ. v. N.E. ex. Rel. M.E., 172 F.3d 238 (3d Cir. 1999)

Rios v. City of Bayonne, No. 2:12-4716, 2015 WL 2400756 (D.N.J. 2015)

Rodriguez v. Trenton Police Dep't, 828 F. App'x 851 (3d Cir. 2020)

Saucier v. Katz, 533 U.S. 194 (2001)

Schneider v. Simonini, 163 N.J. 336, 749 A.2d 336 (2000)

Shoemaker v. Shoemaker, 11 N.J. Super. 471 (App. Div. 1951)

Smith v. Gonzales, 670 F.2d 522 (5th Cir. 1985)

Snell v. City of New York, 564 F.3d 659 (3d Cir. 2009)

State v. Jones, 143 N.J. 4, 667 A.2d 1043 (1995)

Sunderbrand v. Shills, 82 N.J.L. 700, 82 A. 914 (E.A. 1912)

Thomas v. Cumberland County, 749 F.3d 217 (3d Cir. 2014)

Toft v. Ketchum, 18 N.J. 280 (1955)

United States v. Miknevich, 638 F.3d 178 (3d Cir. 2011)

United States v. Myers, 308 F.3d 251 (3d Cir. 2002)

United States v. Scheets, 188 F.3d 829 (7th Cir. 1999)

Vladar v. Klopman, 89 N.J.L. 575 (E. & A. 1916)

West v. Atkins, 487 U.S. 42 (1988)

Wildoner v. Borough of Ramsey, 162 N.J. Super. 375, 744 A.2d 1146 (2000)

Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000)

Fed. R. Civ. P. 56

42 U.S.C. 1983

42 U.S.C. 1985(3)

N.J.S.A. 10:5-12.1

N.J.S.A. 10:6-2, et seq.

## PRELIMINARY STATEMENT

This office represents the interests of Woodbridge Township Mayor John E. McCormac, Woodbridge Police Department Director Robert Hubner, Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk and Woodbridge Police Sergeant Joseph Licciardi (collectively herein, "Woodbridge Defendants") with respect to the above-referenced matter. The issue at the heart of this matter is whether the Woodbridge Defendants had probable cause to support the Complaint-Warrants for Plaintiff's arrest. Defendants submit that the evidence adduced in this matter clearly establishes that probable cause existed at the time of Plaintiff's arrest.

## STATEMENT OF MATERIAL FACTS

1.   On January 26, 2019, Woodbridge Police Department ("WPD") Officers Francis Lee and Andrew Lyszyk were separately dispatched to the Hampton Inn on Route 9 North in Woodbridge on a report of shoplifting. (See WPD Director Robert Hubner's Answers to Interrogatories, attached hereto as **Exhibit "B"**).

2.   Officer Lee arrived on scene first and encountered the suspect in the lobby, an African American male who identified himself as "Jamal Owens." (Id.)

3.   The suspect produced a Tennessee driver's license which listed the name "Jamal Owens" and displayed a photograph of the suspect. (Id.)

4.   Officer Lee called WPD headquarters to have dispatch run the suspect's driver's license to determine if it was legitimate. (See Transcript of Deposition of WPD Officer Francis Lee, attached hereto as **Exhibit "D"** Page 18, Line 11-16).

5.   Dispatch advised Officer Lee that the suspect's driver's license was not coming back on file. Officer Lyszyk took the suspect's driver's license to his patrol vehicle to further attempt to verify its authenticity. (See Transcript of Deposition of WPD Officer Andrew Lyszyk, attached hereto as **Exhibit "C"** Page 13, Line 22-25).

6.   Officer Lyszyk contacted the Tennessee State Police, who confirmed that the suspect's driver's license was fake. (Id. at Page 14, Line 7-13).

7.   Since Officers Lee and Lyszyk were unable to confirm the identity of the suspect, who had admitted to shoplifting, the decision was made to place the suspect under arrest. (Id. at Page 14, Line 24-25; Page 15, Line 1-4).

8.   When Officer Lyszyk attempted to place the suspect in handcuffs, the suspect slipped away from his grasp and fled the scene by running out the back door of the Hampton Inn lobby. (Id. at Page 15, Line 25; Page 16, Line 1-6).

9.   Officers Lee and Lyszyk pursued the suspect as he ran around to the front of the Hampton Inn and entered his vehicle. There, the Officers confronted the suspect and drew their service weapons

while demanding that the suspect turn off and exit the vehicle. (Id. at Page 16, Line 10-19).

10.  The suspect's vehicle was rented from Hertz and the suspect was at the Hampton Inn to renew his rental agreement at the Hertz kiosk located in the lobby. (See Hertz Rental Agreement, attached hereto as **Exhibit "P"**).

11.  The suspect refused to comply with the Officers' commands and fled the scene in his vehicle, striking Officer Lyszyk's patrol vehicle before hitting a pillar in front of the Hampton Inn. During this time, Officer Lee had to jump out of the way to avoid being struck by the suspect's vehicle. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 16, Line 18-22).

12.  Officers Lee and Lyszyk engaged in a brief vehicular pursuit of the suspect, but were unable to locate the suspect. The Officers returned to the Hampton Inn to preserve the scene. (Id. at Page 17, Line 1-13).

13.  Other officers on patrol were dispatched to the Hampton Inn to guard the doors to the lobby and preserve the scene. The WPD Detective Bureau was notified of the incident and Detective Jorge Quesada arrived to begin processing the evidence left at the scene. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

14.  Det. Quesada was assigned to the Identification Unit within the Detective Bureau and was responsible for photographing and collecting evidence at the scene. (See Transcript of Deposition of

9

WPD Detective Jorge Quesada, attached hereto as **Exhibit "E"** Page 8, Line 9-16).

15.  Upon his arrival on scene, Det. Quesada was advised of the areas of the Hampton Inn lobby that the suspect interacted with prior to and during his flight from the lobby. (Id. at Page 19, Line 14-20).

16.  Det. Quesada learned that the suspect fled through the rear glass common door to the lobby. (Id. at Page 20, Line 3-5).

17.  Det. Quesada viewed surveillance video from the Hampton Inn to determine where the suspect touched the door, but the angle of the camera did not cover the door. (Id. at Page 28, Line 3-7).

18.  Det. Quesada ultimately collected three fingerprints from the rear glass common door to the lobby. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

19.  Det. Quesada also collected a water bottle that the suspect drank from and a sneaker that the suspect lost during his flight from the Hampton Inn. (Deposition of Det. Quesada, **Exhibit "E"** Page 19, Line 14-20.

20.  Officer Lyszyk advised Det. Quesada that he still had the suspect's driver's license and that although the license was fake, the picture on the license was that of the suspect. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 18, Line 10-13).

21.  The suspect's vehicle was found the next day and five additional fingerprints were lifted and a vape pen was collected

from the vehicle. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

22.  With the evidence collected, Det. Sgt. Tapia and the Detective Bureau took over the investigation. (Id.; see also the Transcript of Deposition of WPD Det. Sgt. Santiago Tapia, attached hereto as **Exhibit "F"** Page 56, Line 3-6).

23.  The fingerprints were reviewed at WPD headquarters to determine if they were suitable to be packaged and sent to the New Jersey State Police ("NJSP") for analysis. (Deposition of Det. Quesada, **Exhibit "E"** Page 25, Line 1-4).

24.  As is the case with other local municipal police departments, the WPD does not have the capability to analyze and compare fingerprints in-house. (Id. at Page 27, Line 5-25; Page 28, Line 1-2).

25.  The fingerprint evidence was reviewed and packaged by Det. Quesada on January 26, 2019. (See the WPD I.D. Bureau Report, attached hereto as **Exhibit "K"**).

26.  Det. Sgt. Tapia had prior experience with facial recognition technology through a prior assignment with the NJSP Auto Theft Task Force, where that technology was used successfully to identify suspects. (Deposition of Det. Sgt. Tapia, attached hereto as **Exhibit "F"** Page 45, Line 6-13).

27.  Facial recognition software analyzes a sample photograph and considers the characteristics of an individual's face, including

the eyes, ears, nose, mouth, cheekbones, and other features. When the software identifies a potential match, the software gives a probability of a positive match. (See Transcript of Deposition of Rockland County Intelligence Center Investigator Seamus Lyons, attached hereto as **Exhibit "I"** Page 32, Line 2-14).

28.  Facial recognition technology is a tool that may be utilized in an investigation. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 50, Line 22-25; See also the Deposition of Det. Quesada, **Exhibit "E"** Page 32, Line 1-5); See also the Deposition of Investigator Lyons, **Exhibit "I"** Page 30, Line 5-22; Page 86, Line 3-11).

29.  Local municipal police departments may submit requests for facial recognition technology analysis to the New Jersey Regional Operations Intelligence Center ("NJROIC"), the New York State Intelligence Center ("NYSIC"), or the Rockland County Intelligence Center ("RCIC"). These entities have several tools at their disposal, including facial recognition technology, that local and State police departments do not have access to. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 46, Line 10-17).

30.  On January 27, 2019, Detective Tapia created a bulletin which was sent to these entities and explained the circumstances of the incident at the Hampton Inn. The bulletin contained the suspect's driver's license photograph and requested that facial recognition analysis be performed in an effort to identify the suspect. (See

WPD Bulletin Requesting Assistance Identifying Suspect, attached hereto as **Exhibit "Q"**; See also Facial Recognition Initiative Request Form, attached hereto as **Exhibit "T"**).

31. Prior to sending the bulletin, Det. Sgt. Tapia showed the suspect's driver's license to Officers Lyszyk and Lee separately, who each confirmed that the photo on the license depicted the individual they dealt with at the Hampton Inn. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 132, Line 17-25; Page 133, Line 1-6).

32. Defense Expert, Major Joseph Craparotta, New Jersey State Police (Ret.) opined that Sgt. Tapia properly used his training and knowledge to submit the driver's license for facial recognition analysis as a tool to identify the suspect from the Hampton Inn. (See the Report of Defense Expert Major Joseph Craparotta (Ret.), attached hereto as **Exhibit "U"** Page 26).

33. Plaintiff's Expert, Ralph Cilento, New York Police Department (Ret.) opined that Sgt. Tapia was correct in utilizing all investigative means necessary to attempt to identify the suspect and that Sgt. Tapia determination to send the driver's license for facial recognition analysis was an appropriate investigative step. (See the Report of Plaintiff's Expert Ralph Cilento, attached hereto as **Exhibit "V"** Page 6).

34. The bulletin was received by Investigator Seamus Lyons of the Rockland County Intelligence Center ("RCIC") in New York. The RCIC

13

provides services to outside law enforcement, including manpower support, police records management, intelligence gathering, and evidence analysis. (Deposition of Investigator Lyons, attached **Exhibit "I"** Page 8, Line 7-12).

35. Investigator Lyons is a 27-year law enforcement veteran and had received training regarding the use of facial recognition technology. (Id. at Page 8, Line 18-19; Page 23, Line 5-14).

36. Investigator Lyons and the RCIC have utilized facial recognition technology with a great deal of success in identifying previously unknown individuals in hundreds of cases. (Id. at Page 21, Line 15-18; Page 27, Line 22-25).

37. Investigator Lyons viewed the photograph of the suspect's driver's license on the bulletin and shrunk it slightly to make the pixels clearer. This is done frequently and enables the facial recognition software to get a better read on the photograph without affecting the validity of the results. (Id. Page 77, Line 1-9; Page 78, Line 1-4).

38. The facial recognition software matched the photograph displayed on the suspect's fraudulent driver's license to Nijeer Parks. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 90, Line 10-13).

39. Upon viewing the results of the facial recognition analysis, Investigator Lyons immediately noted striking similarities in the resemblance between the suspect's driver's license photograph and

14

the photograph returned of Nijeer Parks. (Deposition of Investigator Lyons, **Exhibit "I"** Page 89, Line 18-23).

40. Investigator Lyons showed the results to a fellow RCIC Investigator, Lieutenant Richard Dey, who was in agreement that the resemblance was sufficient to provide the WPD with the facial recognition results as a possible lead on the Hampton Inn suspect. (Id. at Page 89, Line 18-23).

41. The facial recognition software indicated that the probability of a positive match to Plaintiff was 594 out of a possible 1,000, which is sufficient to warrant further investigation into Plaintiff. (Id. at Page 53, Line 9-25; Page 54, Line 1-5).

42. Investigator Lyons has made positive matches with lower threshold probability scores in other investigations than that which identified Plaintiff here. (Id. at Page 53, Line 21-23).

43. After receiving the match from the facial recognition software, Investigator Lyons reviewed Plaintiff's extensive criminal history in New Jersey and noted that Plaintiff's past addresses connected him to New Jersey. (Id. at Page 47, Line 3-12).

44. Investigator Lyons supplied the results of the facial recognition analysis to Sgt. Tapia via email on January 28, 2019. (See Rockland County Intelligence Center Officer Report, attached hereto as **Exhibit "AA"**).

15

45.   Investigator Lyons' email to Sgt. Tapia stated that the facial recognition software came back with a "high number hit" comparison to Plaintiff. (Id. Bates stamped PARKS000034).

46.   Upon receiving the results of the facial recognition analysis and criminal history from the RCIC, Det. Sgt. Tapia summoned Officer Lyszyk to the Detective Bureau to determine if he could personally identify the suspect. Officer Lyszyk confirmed to Det. Sgt. Tapia that he was 100% certain that the image returned by the facial recognition software was the individual that he dealt with at the Hampton Inn. (Deposition of Det. Sgt. Tapia **Exhibit "F"** Page 90, Line 10-22).

47.   Peter Nastasi was the Assistant Prosecutor who was the point of contact in the Middlesex County Prosecutor's Office for the WPD. (Deposition of Det. Quesada, **Exhibit "E"** Page 13, Line 14-17; see also Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

48.   Det. Sgt. Tapia and Officer Lyszyk contacted AP Nastasi and explained the facial recognition results and advised of Officer Lyszyk's positive identification of the suspect as Nijeer Parks. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 135, Line 5-23).

49.   AP Nastasi determined that probable cause existed and authorized Det. Sgt. Tapia and Officer Lyszyk to generate Complaint-Warrants against Nijeer Parks. AP Nastasi advised of what charges would be issued and the Complaint-Warrants were sent

16

to AP Nastasi for his review and approval. (Id. at Page 115, Line 6-10; Page 137, Line 13-25; Page 138, Line 1-4).

50.  The Affidavit of Probable Cause attached to the Complaint-Warrants stated that facial recognition technology was employed and helped identify Plaintiff as the suspect. (See Complaint-Warrant 1225-W-2019-000156, attached hereto as **Exhibit "N"** and Complaint-Warrant 1225-W-2019-000158, attached hereto as **Exhibit "O"**).

51.  Det. Sgt. Tapia contacted Judge David Stahl and advised him of the Complaint-Warrants before sending them to him for his review. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 119, Line 20-24).

52.  Judge Stahl signed off on the Complaint-Warrants on January 30, 2019. (Complaint-Warrant 1225-W-2019-000156, **Exhibit "N"**; Complaint-Warrant 1225-W-2019-000158, **Exhibit "O"**).

53.  That same day, Det. Sgt. Tapia, Officer Lyszyk, and another officer drove to Paterson in an attempt to serve the Complaint-Warrants and arrest Parks. (Deposition of Ofc. Lyszyk, **Exhibit "C"** Page 38, Line 24-25; Page 39, Line 1-3).

54.  On February 4, 2019, Det. Quesada packaged the suspect's sneaker, water bottle, and vape pen in preparation to be sent to the NJSP for DNA analysis. (See WPD Vehicle/Property Description Report, attached hereto as **Exhibit "R"**; see also the Deposition of Det. Quesada, **Exhibit "E"** Page 29, Line 1-10).

55.  It is standard procedure at the WPD that when several packages of evidence are ready for analysis, a WPD Officer physically transports the packages to the NJSP. (Deposition of Det. Quesada, **Exhibit "E"** Page 25, Line 12-18).

56.  The NJSP is extremely backlogged with cases and requests for evidence analysis. It typically takes about four to six weeks for the fingerprint packages to be returned, either with a positive match or with no comparison. (<u>Id</u>. at Page 26, Line 1-10).

57.  On February 5, 2019, Plaintiff presented to WPD Headquarters to address the active Complaint-Warrants against him and was placed under arrest without incident. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**; see also the Transcript of the Deposition of Nijeer Parks, attached hereto as **Exhibit "J"** Page 34, Line 10-22).

58.  Plaintiff was read the Miranda Warnings and Plaintiff signed a waiver of these rights. (See Miranda Warnings Card, attached hereto as **Exhibit "S"**).

59.  While Plaintiff was in custody, he was booked, processed, and interviewed without incident. (Director Hubner's Answers to Interrogatories, **Exhibit "B"**; see also the Deposition of Parks, attached hereto as **Exhibit "J"** Page 35, Line 11-13; Page 40, Line 5-7).

60.  Officer Lee was called in to WPD Headquarters to determine if he could positively identify Plaintiff as the suspect from the

incident at the Hampton Inn. (Deposition of Ofc. Lee, **Exhibit "D"** Page 24, Line 12-25; Page 25, Line 1-8).

61. Officer Lee observed Plaintiff while he was handcuffed to a bench in the booking area. Officer Lee identified Plaintiff as the suspect that he interacted with at the Hampton Inn on January 26, 2019. (Id. at Page 29, Line 15-20; see also Director Hubner's Answers to Interrogatories, **Exhibit "B"**).

62. Before Plaintiff was transported to the Middlesex County Jail, he feigned an asthma attack and fell to the floor because he believed that he was going to be assaulted by officers. (Deposition of Parks, **Exhibit "J"** Page 41, Line 12-22).

63. The officers present helped Plaintiff off the floor, sat him on the bench, and called for EMTs to respond. (Id. at Page 41, Line 20-22).

64. While Plaintiff was in the custody of the WPD, he was never subjected excessive force, and conceded multiple times that none of the officers present touched Plaintiff in any kind of aggressive manner. (Id. at Page 35, Line 11-13; Page 36, Line 8-11; Page 44, Line 18-23; Page 49, Line 19-22).

65. After the EMTs finished treating Plaintiff, he was transported to the Middlesex County Jail without incident. (Id. at Page 58, Line 10-12).

66. Plaintiff was released from the Middlesex County Jail on February 13, 2019 after being held for eight days. (Id. at Page 119, Line 2-15).

67. The fingerprint and DNA evidence was received by the NJSP on February 8, 2019. (See Request for Latent Fingerprint Examination, attached hereto as **Exhibit "L"**; see also NJSP DNA Evidence Receipt, attached hereto as **Exhibit "W"** Bates stamped PARKS000174).

68. The fingerprint evidence was analyzed on February 14, 2019 and returned to the WPD on February 22, 2019 with information that the fingerprints belonged to an individual named Barrington Walker. By this point, Plaintiff had already been released from custody. (Request for Latent Fingerprint Examination, **Exhibit "L"**; see also WPD I.D. Bureau Suspect Report, attached hereto as **Exhibit "X"**).

69. This identification was of little to no evidentiary value, as the only fingerprints suitable for analysis were recovered from the common door of the Hampton Inn lobby and it was unknown where the suspect physically touched the door. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 121, Line 6-11).

70. The DNA evidence received by the NJSP laboratory was analyzed on April 17, 2019. (NJSP DNA Evidence Receipt, **Exhibit "W"** Bates stamped PARKS000175).

71. The NJSP was not able to obtain any DNA from the sneaker, but did collect DNA from the water bottle. However, the DNA from the

water bottle did not result in a match to a suspect. (Deposition of Det. Quesada, **Exhibit "E"** Page 39, Line 13-24).

72.  October 18, 2019, DNA analysis complete but no match made. (See the NJSP DNA Laboratory Report, attached hereto as **Exhibit "Y"**).

73.  On January 24, 2020, the New Jersey Attorney General told state prosecutors that police officers should stop using the Clearview AI facial recognition app. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 26).

74.  Plaintiff initiated the subject lawsuit with the filing of a Complaint with the Superior Court of New Jersey on November 25, 2020. (See Docket No. PAS-L-003672-20, Transaction ID LCV20202148483).

75.  On January 15, 2021, Plaintiff amended his Complaint. (See Docket No. PAS-L-003672-20, Transaction ID LCV2021117384).

76.  On March 3, 2021, the Woodbridge Defendants removed this matter to the New Jersey District Court. (ECF No. 1).

77.  On April 23, 2021, a Motion to Dismiss Plaintiff's Complaint was filed on behalf of the Middlesex County Prosecutor's Office Defendants. (ECF No. 3.) This Motion was terminated on May 27, 2021 and Plaintiff was permitted to amend his Complaint. (ECF No. 15).

78.  On June 1, 2021, Plaintiff filed his First Amended Complaint. (ECF No. 16). On June 22, 2021, the Middlesex County Prosecutor's

Office Defendants refiled their Motion to Dismiss Plaintiff's Complaint. (ECF No. 19).

79.   On July 23, 2021, the Woodbridge Defendants filed a Motion for Judgment on the Pleadings. (ECF No. 24).

80.   On July 30, 2021, after further analysis the NJSP determined that the DNA from the water bottle belonged to Barrington Walker. (Deposition of Det. Quesada, **Exhibit "E"** Page 40, Line 14-18; see also the NJSP CODIS Investigative Hit Notification, attached hereto as **Exhibit "Z"**).

81.   On May 26, 2022, Plaintiff filed a Motion to Amend the Complaint (ECF No. 24) and the dispositive Motions referenced above were administratively terminated pending resolution of Plaintiff's request to amend the Complaint. (ECF No. 51).

82.   Plaintiff's Motion was granted in part (ECF No. 69) and Plaintiff filed his Second Amended Complaint on October 7, 2022. (ECF No. 72).

83.   On November 4, 2022, Plaintiff voluntarily dismissed his claims against the Middlesex County Department of Corrections. (ECF No. 76).

84.   On December 19, 2022, the Middlesex County Prosecutor's Office Defendants refiled their Motion to Dismiss Plaintiff's Complaint. (ECF No. 80).

85.   On July 27, 2023, Plaintiff voluntarily dismissed his claims against the Middlesex County Prosecutor's Office. (ECF No. 103).

## **LEGAL STANDARD**

Fed. R. Civ. P. 56 states: "A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. <u>Celotex Corp. v. Catrett</u>, 744 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. <u>Id</u>. at 324. With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by showing the District Court that there is an absence of evidence to support the nonmoving party's case. <u>Id</u>. at 325. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings. See <u>Celotex</u>, 477 U.S.

at 324. Further, the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. See Ridgewood Bd. of Educ. v. N.E. ex. Rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

<u>**ARGUMENT**</u>

I. **COUNT ONE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO PROVE EACH ELEMENT OF A CAUSE OF ACTION FOR MALICIOUS PROSECUTION**

Count One of Plaintiff's Second Amended Complaint asserts a cause of action for Malicious Prosecution against WPD Officer Andrew Lyszyk and WPD Sergeant Joseph Licciardi. Plaintiff's malicious prosecution is governed by 42 U.S.C. 1983 and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, et seq. It has generally been stated that malicious prosecution is not a favored cause of action because citizens should not be inhibited in instituting prosecution of those reasonably suspected of crime. Lind v. Schmid, 67 N.J. 255, 263, 337 A.2d 365 (1975). See also Vladar v. Klopman, 89 N.J.L. 575 (E. & A. 1916); Shoemaker v. Shoemaker, 11 N.J. Super. 471 (App. Div. 1951); Toft v. Ketchum, 18 N.J. 280, 287 (1955) (Jacobs, J. concurring).

A malicious prosecution action arising out of a criminal prosecution requires proof that: (1) the defendant initiated a

24

criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. DiBella v. Borough of Beachwood, 407 F.3d 599, 601 (3d Cir. 2005). In order to prevail, plaintiff must prove each of these elements; the absence of any one of these elements is fatal to a successful prosecution of the claim. Penwag Property Co. v. Landau, 76 N.J. 595, 597, 288 A.2d 1265 (1978).

The essence of a cause of action for malicious prosecution is lack of probable cause, and the burden of proof rests on the plaintiff. Lind v. Schmid, 67 N.J. at 263. The plaintiff must establish a negative, namely, that probable cause did not exist. Id. Initially the defendant must have had probable cause to set the action in motion. The plaintiff must demonstrate that at the time when the defendant put the proceedings in motion the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense had been committed. Lind, at 262. See also Mayflower Industries v. Thor Corp., 15 N.J. Super. 139, 152 (Ch. Div. 1951), aff'd, 9 N.J. 605 (1952); Galafaro v. Kuenstler, 53 N.J. Super. 379 (App. Div. 1958).

25

The Woodbridge Defendants respectfully submit that Plaintiff has failed to prove elements three and four and thus has failed to establish a cause of action for malicious prosecution. As is noted by the authorities above, the burden rests with Plaintiff to establish that he was arrested based on Complaint-Warrants that were unsupported by probable cause. All of the evidence adduced in this matter corroborates that probable cause existed for Plaintiff's arrest. Likewise, Plaintiff has failed to establish that his arrest was grounded in malice or any other motivation beyond seeking to bring the suspect from the Hampton Inn incident to justice.

Furthermore, the named WPD officers are entitled to qualified immunity which shields law enforcement officers from personal liability for civil rights violations when the officers are acting under color of law in the performance of their official duties. Additionally, the named WPD officers are entitled to the complete defense of assistance of counsel because the Complaint-Warrants were issued in good faith on the advice of the Middlesex County Prosecutor's Office. Based upon the arguments and authorities to be addressed in more detail below, it is respectfully submitted that Count One of Plaintiff's Second Amend Complaint must be dismissed as against both Ofc. Lyszyk and Sgt. Licciardi.

a. **Count One must be dismissed as against Sergeant Joseph Licciardi as he did not participate in the investigation into the incident at the Hampton Inn and had no role whatsoever in the determination that probable cause existed to arrest Plaintiff.**

As an initial matter, Count One must be dismissed with prejudice as against Sgt. Joseph Licciardi. Sgt. Licciardi had no involvement whatsoever in the events that led to the arrest of Plaintiff or in establishing that probable cause existed to arrest Plaintiff. Sgt. Licciardi was never present at the scene of the Hampton Inn on January 26, 2019. Sgt. Licciardi did not collect any evidence from the scene nor did he analyze or cause any evidence to be analyzed. Sgt. Licciardi did not participate in the facial recognition analysis of the fraudulent Tennessee driver's license. Sgt. Licciardi did not identify Plaintiff as the suspect from the Hampton Inn. Sgt. Licciardi did not sign an Affidavit of Probable Cause nor did he sign a Complaint-Warrant against Plaintiff. Sgt. Licciardi was not involved in the determination of probable cause whatsoever. The only involvement Sgt. Licciardi had in this matter was in approving the incident reports authored by Officers Lyszyk and Lee. As such, Count One of Plaintiff's Second Amended Complaint must be dismissed with prejudice as against Sgt. Licciardi.

b. **Plaintiff has failed to prove the absence of probable cause for the issuance of the Complaint-Warrants against Plaintiff**

Contrary to Plaintiff's assertions, all the evidence in this matter, and the authorities that have interpreted probable cause,

27

establish that Ofc. Lyszyk had probable cause to arrest Plaintiff. "Probable cause exists if **at the time of the arrest** 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" Connor v. Powell, 162 N.J. 397, 409, 744 A.2d 1158 (2000) (alteration in original) (quoting Wildoner v. Borough of Ramsey, 162 N.J. Super. 375, 744 A.2d 1146 (2000)). "In determining whether probable cause existed, a court should consider the 'totality of the circumstances,' including the police officer's 'common and specialized experience.'" Bayer v. Township of Union, 414 N.J. Super. 238, 263, 997 A.2d 1118 (App. Div. 2010) (citations omitted).

Probable cause does not require sufficient evidence to prove guilt beyond a reasonable doubt. Rather, probable cause requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." United States v. Miknevich, 638 F.3d 178, 185 (3d Cir. 2011). Worded differently, "[p]robable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002). "[W]hen a police officer has received a reliable

28

identification by a victim of his or her attacker, the police have probable cause." Andrews v. Scuilli, 853 F.3d 690, 701 (3d Cir. 2017) (quoting Wilson v. Russo, 212 F.3d 781, 799 (3d Cir. 2000).

In this matter, Plaintiff was arrested based on Complaint-Warrants that were issued by a neutral and detached magistrate after being fully informed of the officers' basis for probable cause. Where an arrest is made pursuant to a warrant, a plaintiff challenging probable cause must show, by a preponderance of the evidence: (1) that the police officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) that such statements or omissions are material, or necessary, to the finding of probable cause. Wilson v. Russo, 212 at 786-87. (citation omitted). An assertion "is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" Andrews, 853 F.3d at 698 (quoting Wilson, 212 F.3d at 788).

The Affidavit of Probable Cause authored by Sgt. Tapia and attached to Complaint-Warrant 2019-W-000156 clearly outlines the investigative actions that were taken to identify Plaintiff as the suspect from the incident at the Hampton Inn. (See Complaint-Warrant 2019-W-000156, **Exhibit "N"**). Sgt. Tapia explains that the

fraudulent Tennessee driver's license was submitted for facial recognition analysis. Plaintiff's Expert opined in his report that Sgt. Tapia was correct in utilizing all investigative means necessary to attempt to identify the suspect and that Sgt. Tapia's determination to send the driver's license for facial recognition analysis was an appropriate investigative step. (See Report of Plaintiff's Expert, Ralph Cilento, **Exhibit "V"**). Sgt. Tapia outlines in the Affidavit what he was told by Investigator Lyons of the Rockland County Intelligence Center, that the facial recognition analysis resulted in a "high number hit" to Plaintiff. (See RCIC Officer Report, **Exhibit "AA"** Bates stamped PARKS000034).

Defendants concede that Sgt. Tapia's Affidavit does not mention that Ofc. Lyszyk viewed the photograph returned by the facial recognition analysis and confirmed that it was the suspect that he interacted with at the Hampton Inn. However, it is respectfully submitted that this minor omission was not material to the finding of probable cause. If anything, the confirmatory identification by Ofc. Lyszyk would only serve to bolster the basis for probable cause to arrest Plaintiff. Regardless of this minor omission in Sgt. Tapia's Affidavit, the Affidavit of Probable Cause drafted by Ofc. Lyszyk does state "[t]he suspect was identified as Parks." (See Complaint-Warrant 2019-W-000158, **Exhibit "O"**). Sgt. Tapia testified that Ofc. Lyszyk was the first person who was shown the results of the facial recognition analysis and that Ofc. Lyszyk

was 100% certain that Plaintiff was the suspect that he interacted with at the Hampton Inn. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 97, Line 24-25, Page 98, Line 1). Thus, Ofc. Lyszyk's statement in the Affidavit of Probable Cause that "the suspect was identified as Parks" references Ofc. Lyszyk's confirmatory identification of Plaintiff. All of the statements contained in the respective Affidavits of Probable Cause are truthful and do not contain any material misrepresentations or omissions. Any minor omissions in the Affidavits are not material and would not serve to extinguish the probable cause that these police officers established.

As was noted above, Ofc. Lyszyk identified Plaintiff as the suspect he interacted with at the Hampton Inn after viewing the results of the facial recognition analysis. The identification of an individual as the perpetrator of a crime by a comparison of photographs is sufficient to establish probable cause for an arrest. See United States v. Scheets, 188 F.3d 829, 837-38 (7th Cir. 1999) (finding probable cause to arrest where police officers compared a photograph of the perpetrator at the crime scene produced by a surveillance camera with a photograph of the arrestee and the arrestee himself). Furthermore, "[w]hen an officer has 'received his information from some person...who it seems reasonable to believe is telling the truth,' he has probable

cause." Grimm v. Churchill, 932 F.2d 674, 675 (7th Cir. 1991) (citations omitted).

The email from Investigator Lyons to Sgt. Tapia supplying the results of the facial recognition analysis states that Investigator Lyons received a "high number hit" between the driver's license reference photo and the image of Plaintiff. It was proper for Sgt. Tapia and Ofc. Lyszyk to rely upon the representation of Investigator Lyons when he informed them that he received a "high number hit" that the suspect from the Hampton Inn matched to Plaintiff. Investigator Lyons testified that the facial recognition analysis rated the probability of the comparison at 594 out of a possible 1,000. (Deposition of Investigator Lyons, **Exhibit "I"** Page 53, Line 9-25; Page 54, Line 1-5). Investigator Lyons explained that he has made positive matches with lower threshold probability ratings in other investigations than that which identified Plaintiff here. (Id. at Page 53, Line 21-23). Sgt. Tapia and Sgt. Lyszyk had no reason to distrust the results of the facial recognition analysis here, which was performed by a seasoned law enforcement investigator with no interest coloring his judgment. After receiving these facial recognition results, Ofc. Lyszyk viewed the photographs and confirmed to Sgt. Tapia that Plaintiff was the suspect from the incident at the Hampton Inn. When a police officer, who is trained in accordance with the New Jersey Police Training Commission Performance Objectives,

32

which includes training on eyewitness observation, identifies a suspect, that is a positive identification. (Report of Defense Expert, Maj. Craparotta, **Exhibit "U"** Page 33-34; see also Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 100, Line 21-23). Investigator Lyons corroborated this point when he testified that the officer involved in the incident in the Hampton Inn would be particularly well-suited to identify the individual that he personally interacted with. (Deposition of Investigator Lyons, **Exhibit "I"** Page 72, Line 19-25, Page 73, Line 1-2).

Thereafter, Sgt. Tapia and Ofc. Lyszyk contacted Assistant Prosecutor Peter Nastasi of the Middlesex County Prosecutor's Office and outlined their factual basis for probable cause. The same factual basis was explained to Judge David Stahl when he was presented with the Complaint-Warrants for his review and approval. Defense Expert, Major Craparotta, opined that Sgt. tapia and Ofc. Lyszyk appropriately, professionally, and properly conferred with the prosecutor's office to solicit legal advice before submitting the Complaint-Warrants to Judge Stahl. (Report of Defense Expert, Maj. Craparotta, **Exhibit "U"** Page 31).

Plaintiff contends that the named officers "suppress[ed]...exonerating evidence" and argues essentially that a constitutionally deficient investigation established probable cause for Plaintiff's arrest. However, a plaintiff cannot establish a malicious prosecution claim by merely showing that the

33

police could have done a better job of investigating or failed to exhaust all leads after they had enough information to establish probable cause. Craig v. Collins, No. 13-1873, 2013 WL 5271521, at *7 (E.D. Pa. 2013). "[A] police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997), and has "no general duty to investigate further after acquiring information sufficient to establish probable cause." BeVier v. Hucal, 806 F.2d 123, 127 (7th Cir. 1986) (citing Gramenos v. Jewel Cos., 797 F.2d 432, 437-42 (7th Cir. 1986)). See also Patterson v. Sch. Dist. of Phila., No. 99-CV-4792, 2000 WL 1020332, at *6 (E.D. Pa. 2000) ("Once a police officer has discovered sufficient facts to establish probable cause, the officer has no constitutional duty to further investigate in hopes of finding exculpatory evidence."); Porter v. Gray, No. 05-CV-231, 2007 WL 464694, at *12 (W.D. Pa. 2007) (although police officer could have performed "a more thorough investigation" of allegedly exculpatory evidence, including contacting a person with knowledge of the events, "these arguable deficiencies do not rise to the level of a constitutional violation"); Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995) ("[T]he issue is not whether the information on which police officers base their request for an arrest warrant resulted from a professionally executed investigation; rather, the issue is

34

whether that information would warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.").

The named officers did not suppress any exonerating evidence, but to the contrary and in accordance with departmental policies and procedures, they promptly sent all available evidence collected at the scene of the Hampton Inn to be analyzed by the New Jersey State Police. The fingerprints were packaged for analysis on January 26, 2019 and the DNA evidence was packaged for analysis on February 4, 2019. As per standard procedure at WPD, the fingerprint and DNA evidence was physically transported to the New Jersey State Police Laboratory once several other packages of evidence were ready for analysis. The evidence was received by the New Jersey State Police Laboratory on February 8, 2019.

The results of the fingerprint comparison was returned to WPD on February 14, 2019. The comparison indicated a match to an individual named "Barrington Walker." However, this identification was not considered probative as the only prints suitable for comparison came from the common door in the lobby of the Hampton Inn, and the investigating officers could not ascertain where the suspect actually touched the door. Thus, there was no telling whether these fingerprints were actually left by the suspect or some other individual not involved in the incident.

The DNA evidence was not analyzed until April 17, 2019. As was noted above, the New Jersey State Police is inundated with requests for evidence analysis and it takes some time, weeks to months, for the analysis to be completed and the evidence returned to the submitting police department. DNA comparison concluded on October 18, 2019 with no positive match. On July 30, 2021, after further analysis the New Jersey State Police determined that the DNA from the water bottle belonged to Barrington Walker.

The most important fact in the timeline outlined above is that the evidence collected from the scene of the Hampton Inn was submitted for analysis *before* Plaintiff was arrested. It was not until well after Plaintiff was released from the custody of the Middlesex County Jail that the results of the evidence analysis was received by the WPD. That this evidence was ultimately exonerating for Plaintiff does not affect the calculus of probable cause as it was on January 30, 2019, the date the Complaint-Warrants were signed. It was objectively reasonable for Ofc. Lyszyk to believe that Plaintiff was the suspect from the incident at the Hampton Inn when the Complaint-Warrants were signed. As such, Plaintiff's argument that the WPD withheld exculpatory evidence in order to secure the Complaint-Warrants is misplaced and unsupported by the record in this case.

### c. **Plaintiff has failed to prove that the issuance of the Complaint-Warrants against Plaintiff was actuated by malice**

Not only has Plaintiff failed to establish that probable cause did not exist for his arrest, Plaintiff has also failed to establish that the Ofc. Lyszyk acted with malice when the Complaint-Warrants against Plaintiff were signed. In the context of a malicious prosecution claim, "malice" has been defined as the "intentional doing of a wrongful act without just cause or excuse." LoBiondo v. Schwartz, 199 N.J. 62, 93-94, 970 A.2d 1007 (2009) (quoting Jobes v. Evangelista, 369 N.J. Super. 284, 398, 849 A.2d 186 (App. Div. 2004). Thus, malice consists of "doing a wrongful act in utter disregard of what the actor knew to be his duty, to the injury of another." LoBiondo, 199 N.J. at 94 (quoting Duro Co. v. Wishnevsky, 126 N.J.L. 7, 10, 16 A.2d 64 (1940).

There was no malice whatsoever behind the officers' decision to sign the Complaint-Warrants against Plaintiff because the Complaint-Warrants were supported by probable cause. The only motivation behind the issuance of the Complaint-Warrants was to apprehend a dangerous individual who had displayed a reckless indifference to the safety and welfare of the community. These officers were investigating to identify an individual who went to great lengths to conceal his identity as evidenced by the fraudulent Tennessee Driver's license and the credit card in the same name as displayed on the driver's license, "Jamal Owens."

(See WPD Incident Report #19010123/1, attached hereto as **Exhibit "BB"**). Such efforts to conceal one's identity bespeaks an individual involved in past or ongoing criminal activity. Furthermore, Officers Lyszyk and Lee were nearly struck by the fleeing suspect's vehicle when the suspect made his escape. They were firsthand witnesses to the dangerous propensities of this individual and public policy and good police work require that efforts be made to promptly identify and bring that individual to justice.

### d. Officer Lyszyk acted in good faith and is entitled to qualified immunity

The doctrine of qualified immunity shields law enforcement officers from personal liability for civil rights violations when the officers are acting under color of law in the performance of their official duties. This protection extends to suits brought under 42 U.S.C. 1983 and under New Jersey's analogue, the Civil Rights Act, N.J.S.A. 10:6-1. Morillo v. Torres, 222 N.J. 104, 107-08, 117 A.3d 1206 (2015). (See also Ramos v. Flowers, 429 N.J. Super. 13, 29, 56 A.3d 869 (2013) (Qualified immunity applies to claims under both the United States and the New Jersey constitutions). Police officers performing discretionary functions are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Courts recognize that police officers must often make split second decisions and can make mistakes in the process. See Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005) (citing Saucier v. Katz, 533 U.S. 194, 204-05 (2001)). Accordingly, the qualified immunity afforded to police officers encompasses "mistaken judgments that are not plainly incompetent." Id. Whether a police officer's mistake is reasonable and he is thus entitled to qualified immunity is a "question of law that is properly answered by the court, not a jury." Curley v. Klein, 499 F.3d 199, 211 (3d Cir. 2007).

The qualified immunity doctrine is applied to civil rights claims brought against law enforcement officials engaged in their discretionary functions, including arresting or charging an individual based on probable cause to believe that an offense has occurred. Morillo, 222 N.J. at 117; see also Schneider v. Simonini, 163 N.J. 336, 353-54, 749 A.2d 336 (2000). Defendants rely on the two-stage test laid out by the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001), in which courts must determine: (1) whether the police officers' actions violated a constitutional right, viewed in the light most favorable to the plaintiff; and (2) whether reasonable police officers would find the conduct unlawful in the same situation. Morillo, 222 N.J. at 114 (citing Saucier,

39

533 U.S. 194 (2001)). The Supreme Court in <u>Wildoner v. Borough of Ramsey</u>, 162 N.J. Super. 375, 744 A.2d 1146 (2000) noted that the objective reasonableness standard of this section closely mirrors the standard to be applied in section 1983 actions alleging unconstitutional arrest. "Objective reasonableness is measured by the amount of knowledge available to the officer at the time of the alleged violation." <u>Kulwicki v. Dawson</u>, 969 F.2d 1454, 1463 (3d Cir. 1992).

When a plaintiff asserts that he or she was unlawfully arrested, a law enforcement officer can defend that claim "by establishing either that he or she acted with probable cause, or, even if probable cause did not exist, that a reasonable police officer could have believed in its existence. <u>Morillo</u>, 222 N.J. at 118-19 (quoting <u>Kirk v. City of Newark</u>, 109 N.J. 173, 184, 536 A.2d 229 (1988)). "If officers of reasonable competence could disagree on the issue of probable cause, the doctrine of qualified immunity should be applied." <u>Morillo</u>, 222 N.J. at 119 (quoting <u>Connor</u>, 162 N.J. at 408).

Ofc. Lyszyk is entitled to the defense of qualified immunity because even if probable cause did not exist to arrest Plaintiff, reasonable police officers could, and have, believed that probable cause was established for Plaintiff's arrest. Ofc. Lyszyk's identification of Plaintiff as the suspect from the Hampton, although was mistaken, was made in good faith and was reasonable

under the circumstances. Each officer that viewed the photographs
of the driver's license and of Plaintiff, including Ofc. Lyszyk,
Sgt. Tapia, Lt. Joesph Velez, Investigator Lyons and Investigator
Dey, believed that the photographs depicted the same individual,
that being Plaintiff.

**e. Officer Lyszyk is entitled to a complete defense to Plaintiff's
Malicious Prosecution claim as Defendants relied upon advice of
counsel from the Middlesex County Prosecutor's Office**

Advice of counsel is a complete defense to an action for
malicious prosecution of a criminal action where it appears that
the prosecution was instituted in reliance on good faith on such
advice given after a full and fair statement to the attorney of
all the facts. Bennett v. Pillion, 105 N.J.L. 359, 144 A. 601
(1929); Dalton v. Godfrey, 97 N.J.L. 455, 117 A. 635 (1922);
Bell v. Atlantic City Railroad Co., 58 N.J.L. 227, 33 A. 211
(1895). The Court in Kelley v. Borough of Carlisle, 622 F.3d 248,
255-56 (2010) held that "a police officer who relies in good faith
on a prosecutor's legal opinion that the arrest is warranted under
the law is presumptively entitled to qualified immunity from Fourth
Amendment claims premised on a lack of probable cause..." and "that
reliance must be objectively reasonable."

With respect to elements three and four that Plaintiff must
prove to establish his malicious prosecution claim, our courts
have held that even if, objectively, there was no probable cause
for the complaint, reliance on the advice of counsel to the

41

contrary will be sufficient because it will defeat the separate element of malicious intent. LoBiondo v. Schwartz, 199 N.J. 62, 94, 970 A.2d 1007 (2009) (citing Sunderbrand v. Shills, 82 N.J.L. 700, 703, 82 A. 914 (E. A. 1912).

As was noted above, the Complaint-Warrants issued against Plaintiff were signed after Sgt. Tapia and Ofc. Lyszyk fully and fairly informed the Assistant Middlesex County Prosecutor, Peter Nastasi, of their basis for probable cause. After considering the evidence proffered by Sgt. Tapia and Ofc. Lyszyk, AP Nastasi gave his approval for them to draft Complaint-Warrants to be submitted for review by a neutral and detached magistrate. After reviewing the Complaint-Warrants and discussing the factual basis for probable cause with Sgt. Tapia and Ofc. Lyszyk, Judge David Stahl was satisfied that probable cause existed and signed the Complaint-Warrants.

## II.   **COUNT TWO OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH A VIOLATION OF THE EQUAL PROTECTION CLAUSE OR RACIAL PROFILING**

Count two of Plaintiff's Second Amended Complaint alleges a violation of the Equal Protection Clause on the grounds that Plaintiff was subjected to racial profiling. However, it is unclear as to which defendants Count Two is against. Plaintiff's Second Amended Complaint simply states that "[t]hese wrongful acts of Defendants constitute[] an egregious violation of the guarantee to Equal Protection under the law..." (ECF No. 72). It should be noted

that most of the allegations contained in Count Two appear to be directed towards the provider[s] of facial recognition software, over which the Woodbridge Defendants had absolutely no control. Furthermore, Plaintiff has not pursued any claims against facial recognition software providers despite naming "Idemia, Inc." as a defendant in this matter. Any error or bias that may be attributed to facial recognition software made or maintained by these providers cannot be attributed to the Woodbridge Defendants.

Insofar as this claim is directed towards the Woodbridge Defendants, this claim is governed by 42 U.S.C. 1983, which provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..." Thus, to establish a cause of action under section 1983, a plaintiff must demonstrate that: (1) there was a violation of a right secured by the Constitution and laws of the United States, and (2) the alleged violation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted).

Plaintiff contends that he suffered a constitutional violation because he was racially profiled. It should be noted that the report of Plaintiff's Expert, Ralph Cilento, makes no mention of racial profiling in his 29-page report. (Report of Plaintiff's Expert, Ralph Cilento, **Exhibit "V"**). Racial Profiling contemplates that an individual is targeted on the basis of their race rather than on individual suspicion or available evidence. It is undisputed that the suspect from the Hampton Inn, like Plaintiff, was an African American male. Plaintiff was not targeted because he is African American, but because his face bears an unfortunately uncanny resemblance to the suspect from the Hampton Inn. Suspicion can hardly be more individualized than that.

The fact that Sgt. Tapia submitted the driver's license photo for facial recognition analysis, deemed by Plaintiff's expert to be a proper investigatory step, does not attribute knowledge of any purported bias inherent in facial recognition software to the WPD or any of its officers. (Report of Plaintiff's Expert Ralph Cilento, **Exhibit "V"**). Unable to attribute this knowledge to the WPD or its officers, Plaintiff cannot support his claim that the WPD "intentionally or recklessly disregard[ed]" the "anti-black animus" that Plaintiff accredits to facial recognition software.

### III.   COUNT THREE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH THAT HE WAS SUBJECTED TO EXCESSIVE FORCE

Count three of Plaintiff's Second Amended Complaint alleges that he was subjected to excessive force while he was in custody at the Woodbridge Police Department. Plaintiff's excessive force claim is governed by 42 U.S.C. 1983, discussed above in Section II of this Brief and not repeated here. Claims of excessive force during arrests, investigatory stops and other seizures are governed by the Fourth Amendment. See Graham v. Conner, 490 U.S. 386 (1989). "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999); see also Graham, 490 U.S. at 396-97 (providing that force used to effect an arrest must be reasonable, and reasonableness is measured by "careful attention to the facts and circumstances of each particular case"); see also Rodriguez v. Trenton Police Dep't, 828 F. App'x 851, 852 (3d Cir. 2020); Alicea v. Johnson, No. 11-3823, 2011 WL 6181906 at *2 (D.N.J. 2011).

"A claim for excessive force, which is merely a concomitant to a contested arrest but is not based on some actual allegation of unreasonable force, must be dismissed." Lankford v. City of Clifton Police Department, 546 F.Supp. 3d 296, 317 (D.N.J. 2021) (citing Holmes v. City of Wilmington, 79 F.Supp. 3d 497, 506

(D.Del. 2015)). The Third Circuit has repeatedly "rejected similar efforts to bootstrap excessive force claims and probable cause challenges" and thus refused to apply a rule which holds that "force applied was excessive *per se*" because the initial arrest lacked probable cause. <u>Lankford</u>, 546 F.Supp. 3d at 317 (citing <u>Snell v. City of New York</u>, 564 F.3d 659, 672 (3d Cir. 2009)).

As an initial matter, the officers who placed Plaintiff under arrest after he presented to WPD Headquarters in response to the active warrants against him did not have discretion to arrest Plaintiff. "Once a warrant is issued, or probable cause comes into existence, it becomes an officer's duty to arrest the suspect." <u>State v. Jones</u>, 143 N.J. 4, 14, 667 A.2d 1043 (1995) (quoting <u>Smith v. Gonzales</u>, 670 F.2d 522, 527 (5th Cir. 1985)). Officers have no discretion in making arrests where there is an outstanding warrant. If fact, were the officers to have failed to effectuate the warrant against Plaintiff, they would have been derelict in their duties. <u>Jones</u>, 143 N.J. at 14.

With respect to the physical detention of Plaintiff, by Plaintiff's own admission, no WPD officers used excessive force against him. Plaintiff repeatedly denied that he was ever touched in an aggressive manner by any member of the WPD or while he was in WPD custody. Nor has Plaintiff asserted that he was threatened with violence or subjected to racially derogatory comments.

Plaintiff testified about how he was handcuffed when he was placed under arrest at WPD Headquarters:

> **"He just grabbed me and just grabbed my arms and put my hands behind my back. I turned around to look, they just pushed me back against the counter and told me don't move... He turned me back around and told me don't resist, and I didn't, and I just let him put my hands behind my back."**

See Transcript of Deposition of Nijeer Parks, attached hereto as **Exhibit "?"** Page 34, Line 10-22.

Plaintiff testified about being interviewed by WPD Detective Kondracki while he was in custody:

> **"He didn't lay a hand on me."**

Parks Deposition, Page 35, Line 13.

> **"They got aggressive like with their manner, like with their words, like trying to scare me, but no one put their hands on me or anything."**

Parks Deposition, Page 36, Line 8-11.

> **"Nobody came and did anything to me."**

Parks Deposition, Page 39, Line 2-3.

Plaintiff testified that officers did not touch him while he was being booked:

> **"There were comments the whole time, but there was no physical."**

Parks Deposition, Page 46, Line 23-24.

> **"No one touched me."**

Parks Deposition, Page 49, Line 19.

Insofar as Plaintiff believed that he was going to be assaulted by WPD officers, there is no objective basis for Plaintiff's belief. Plaintiff testified that he believed that he was going to be assaulted because his handcuffs were removed and he was led down a hallway where Plaintiff claims he did not see any surveillance cameras. However, Sgt. Tapia explained that surveillance cameras cover every corner of the processing and booking area. The only area that is not covered by cameras is inside of the bathrooms. (Deposition of Det. Sgt. Tapia, **Exhibit "F"** Page 149, Line 22-25; Page 150, Line 1-12). Nonetheless, Plaintiff believed he was going to be assaulted so he feigned an asthma attack and fell to the floor. The officers in the processing and booking area immediately helped Plaintiff off the floor and called for EMTs to treat Plaintiff. (Deposition of Parks, **Exhibit "J"** Page 41, Line 20-22).). These actions by the officers to render aid to Plaintiff contradicts Plaintiff's claim that the officers' actions caused him to feel threatened with physical harm.

Insofar as Plaintiff asserts claims for <u>Monell</u> liability against the Woodbridge Defendants, Plaintiff cannot claim a policy, custom, or practice permitted the application excessive force where it cannot be said that excessive force was used against Plaintiff in the instant matter. See <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978). Each of the WPD officers involved in this matter were highly and professionally trained in all

relevant areas of law enforcement. Each received a variety of specialized law enforcement related training on numerous topics and each of them had lengthy computer-based training which included arrest, search, and seizure. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 12). The WPD maintains a systematic in-service training program which includes the Attorney General Guidelines and Middlesex County Prosecutor's Office use of force guidelines. (Id.). The WPD Policies and Procedures, specifically Chapter 432, titled "In-Service, Specialized and Roll Call Training," requires WPD officers to undergo use of force training semiannually. Simply put, Plaintiff cannot point to any deficiencies in the WPD training regimen nor can Plaintiff allege that the individual officers involved in this matter were not up to date on the various training requirements promulgated by both the WPD and the New Jersey Attorney General.

Based upon the foregoing, Count Three of Plaintiff's Second Amended Complaint must be dismissed with prejudice. There is no evidence in the record to support Plaintiff's claim that he was subjected to excessive force while in the custody of the WPD. Nor is there any evidence to support Plaintiff's subjective belief that he was going to be assaulted while he was in custody.

**IV.   COUNT FOUR OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH MONELL LIABILITY ON BEHALF OF THE TOWNSHIP OF WOODBRIDGE**

Count Four of Plaintiff's Second Amended Complaint alleges that Plaintiff's rights were violated because of a municipal policy, custom, or practice pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978). Plaintiff contends that the policies, customs, and practices of the WPD failed to supervise and train officers on the use of facial recognition software. Generally, a governmental entity cannot be held liable under a theory of respondeat superior liability for a violation of 42 U.S.C. 1983 solely because it is the employer of the alleged wrongdoer. A governmental entity can only be held liable where "the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (citing Monell, 436 U.S. 658).

When the alleged policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to a 'deliberate indifference' to the rights of persons with whom those employees will come into contact." Lankford, 546 F.Supp. 3d at 328 (citing Thomas v. Cumberland County, 749 F.3d 217 (3d Cir. 2014). "Deliberate indifference is a stringent standard of fault,

50

requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. Ordinarily, "a pattern of similar constitutional violations by untrained employees" is "necessary 'to demonstrate deliberate indifference for purposes of failure to train.'" Id. (quoting Connick v. Thompson, 563 U.S. 51, 62 (2011). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id. An "identified deficiency in a city's training program...must have actually caused" the constitutional violation. Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 391 (1989).

To support a Monell claim, a Plaintiff must identify a custom or policy and specify what exactly that custom or policy was. McTernan v. City of York, 564 F.3d 636 (3d Cir. 2009). See Rios v. City of Bayonne, No. 2:12-4716, 2015 WL 2400756 at *2 (D.N.J. 2015) (dismissing Monell claim where Plaintiff failed to identify a specific training policy, state why it was inadequate, or propose an alternative policy); see also Labo v. Borger, No. 02-3975, 2005 WL 1971867 at *4 (D.N.J. 2005) (rejecting claim because "Plaintiff cannot point to any actual inadequate training").

Plaintiff cannot support his claim that Plaintiff's arrest was caused by the policies, customs, and practices of the WPD. The WPD is distinguished from its local law enforcement peers as it is

nationally accredited through the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). CALEA is an organization that reviews the policies and procedures of accredited police departments across the county to make sure that they are complying with best practices and meet CALEA's standards. (Deposition of Director Hubner, **Exhibit "H"** Page 49, Line 21-25; Page 50, Line 8-14). Accreditation and compliance with professional standards provide the yard stick by which the community, police administration, and Township administration can quantitively measure the WPD's performance and ensure accountability of their actions. Accredited law enforcement agencies demonstrate a pursuit of excellence and willingness to meet and exceed professional standards. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 6-7).

WPD is been CALEA certified since 1998, making WPD the second-longest nationally accredited police department in New Jersey. (Deposition of Director Hubner, **Exhibit "H"** Page 51, Line 15-23). Only approximately 700 police departments have received national accreditation across the country. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 7). CALEA comes to WPD every two years to review policies and procedures and ensure compliance with CALEA standards. Accreditation is an ongoing process and WPD is constantly sending proofs and updates to CALEA to ensure that WPD is up to date on all policies and procedures. WPD writes its own

policies and procedures, which are submitted to CALEA for review and feedback. (Deposition of Director Hubner, **Exhibit "H"** Page 51, Line 1-11). These policies and procedures provide for, among other things, training and supervision of officers and conducting investigations. If, as Plaintiff contends, the WPD was deficient in any of its policies, customs, or practices, WPD would not be a nationally accredited police department.

Each of the WPD officers involved in this matter were highly and professionally trained in all relevant areas of law enforcement. Each received a variety of specialized law enforcement related training on numerous topics and each of them had lengthy computer-based training which included arrest, search, and seizure. (Report of Defense Expert Maj. Craparotta, **Exhibit "U"** Page 12). The WPD maintains a systematic in-service training program which includes the Attorney General Guidelines and Middlesex County Prosecutor's Office use of force guidelines. (Id.).

As comprehensive as WPD's policies and procedures are, they cannot anticipate or account for every situation that confronts a police officer. In 2019, facial recognition technology was growing in popularity as an investigative tool to be utilized by police departments conducting criminal investigations. Other than the Attorney General's directive of January 24, 2020 which banned the use of Clearview AI facial recognition software by police

departments, the State has not provided any guidance with respect to the use of facial recognition technology.

Plaintiff asserts that the WPD disregarded the "clear anti-black bias consequences" of facial recognition software. Yet, if any such bias exists, Plaintiff has failed to establish that knowledge of this purported bias can be attributed to any of the Woodbridge Defendants. Having failed to demonstrate that any of the Woodbridge Defendants were on notice of such "bias", Plaintiff cannot argue that the Woodbridge Defendants "intentionally or recklessly disregard" this "bias." It is also important to note that the Woodbridge Defendants did not conduct the facial recognition analysis, but rather relied upon the experience and training of the Rockland County Intelligence Center to run the facial recognition analysis. The WPD had never requested facial recognition analysis before January 2019, and upon information and belief, the WPD has not requested facial recognition since. As such, a single, isolated, good faith utilization of facial recognition technology cannot be said to establish a policy, custom, or practice. As such, Count Four of Plaintiff's Second Amended Complaint must be dismissed with prejudice.

## V. <u>COUNT SEVEN AND COUNT NINE OF PLAINTIFF'S SECOND AMENDED COMPLAINT MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH THE ELEMENTS OF A CLAIM FOR CIVIL CONSPIRACY</u>

Counts Seven and Nine (misnumbered as Count 8) of Plaintiff's Second Amended Complaint allege that "Defendants" engaged in a

conspiracy to deprive Plaintiff of his rights and privileges under the law. Since there is no distinction between these two counts, they will be addressed herein together. Plaintiff's claims of civil conspiracy are brought pursuant to 42 U.S.C. 1985. Plaintiff's Second Amended Complaint also cites to the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12.1. This section of the NJLAD is concerned with discrimination in the employment context and does not provide a basis for Plaintiff's civil conspiracy claim.

Section 1985(3) prohibits conspiracies directed at "depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. 1985(3). "To state a claim under 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." See Lake v. Arnold, 112 F.3d 682, 685 (3d Cir.1997) (citations omitted).

To prove such a claim, the plaintiff must establish the period of the conspiracy, the object of the conspiracy, and certain overt acts of the alleged conspirators taken to achieve that purpose. Lankford, 546 F.Supp. 3d at 317, citing Hankin Family

55

P'Ship v. Upper Merion Twp., No. 01-1622, 2012 WL 43599 (E.D. Pa. 2012). "The mere occurrence of several meetings between defendants does not establish a meeting of the minds" for purposes of a conspiracy claim. Jones v. Dalton, 867 F. Supp. 2d 572, 585 (D.N.J. 2012). See Fioriglio v. City of Atlantic City, 996 F. Supp. 379, 387–88 (D.N.J. 1998) (rejecting claim of conspiracy based on meetings between defendants where "plaintiff admits he has no personal knowledge about what the defendants talked about during the alleged meeting" and "has absolutely no evidence suggesting that defendants set out to retaliate against him"). Thus, a jury may not reasonably infer from the mere fact that individuals met that they reached a conspiratorial agreement. Id.

Plaintiff has failed to carry the burden for any of these elements. The Woodbridge Defendants can speculate as to the grounds for Plaintiff's civil conspiracy claims, but again, Plaintiff's Second Amended Complaint fails to specify any particulars. Count Seven simply alleges that "Defendants engaged in a conspiracy..." and "Defendants acted in furtherance of the conspiracy" but does not specify any individuals as parties to the purported conspiracy. Count Nine falls even further short as Plaintiff does not even cite the boilerplate element of a conspiracy claim that an act was carried out in furtherance of the conspiracy. Plaintiff has not adduced a scintilla of evidence to establish the period of the alleged conspiracy, the object of the conspiracy, or any overt

acts taken in furtherance of the conspiracy. As such, Counts Seven and Nine must be dismissed with prejudice.

## **CONCLUSION**

At this late stage, on summary judgment, Plaintiff is required to offer more than insinuations; he must, through citations to evidence of record, set forth a prima facie case for each of his claims. Plaintiff has simply failed to establish support for Counts One, Two, Three, Four, Seven, and Nine of the Second Amended Complaint in order to survive summary judgment.

Respectfully submitted,

*/s/ Garry J. Clemente, Esq.*

Garry J. Clemente, Esq.
Law Office of James P. Nolan &
Associates, Attorneys for
Woodbridge Defendants

## CERTIFICATION OF SERVICE

I, Garry J. Clemente, hereby certify that on the date set forth below, I caused a true and correct copy of the foregoing Notice of Motion for Summary Judgment and all accompanying documents to be served upon the following counsel of record via operation of the Court's CM/ECF system:

Daniel W. Sexton, Esq.
Daniel W. Sexton, Esquire, LLC
229 New Centre Road
Hillsborough, New Jersey 07304
Attorney for Plaintiff


Dated: December 5, 2023          */s/ Garry J. Clemente, Esq.*
Garry J. Clemente, Esq.

# EXHIBIT "A"





PARKS000153



PARKS000154

PARKS000155

# EXHIBIT "B"

**FREDRICK L. RUBENSTEIN, ESQ.**
**ATTORNEY ID. NO. 004651994**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Defendants, John E. McCormac, Mayor of Woodbridge,**
**Robert Hubner, Director of the Woodbridge Police, Township of**
**Woodbridge, Woodbridge Police Officer Andrew Lyszyk and Woodbridge**
**Police Sergeant Joseph Licciardi**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| NIJEER PARKS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-04021-JXN-LDW |
| -v- | : | |
| | : | **DEFENDANT, ROBERT HUBNER'S,** |
| JOHN E. McCORMACK, MAYOR OF | : | **CERTIFIED ANSWERS TO PLAINTIFF'S** |
| WOODBRIDGE, In his personal | : | **FIRST SET OF INTERROGATORIES** |
| and official capacity, ROBERT | : | |
| HUBNER, DIRECTOR OF THE | : | |
| WOODBRIDGE POLICE In his | : | |
| personal and official capacity: | | |
| CITY OF WOODBRIDGE POLICE | : | |
| OFFICERS, ANDREW LYSZYK and | : | |
| WOODBRIDGE POLICE SGT. JOSEPH | : | |
| LICCIARDI, WOODBRIDGE POLICE | : | |
| OFFICERS JOHN AND JANE DOE 1- | : | |
| 20, MIDDLESEX DEPARTMENT OF | : | |
| OF CORRECTIONS, MIDDLESEX | : | |
| COUNTY PROSECUTOR, ACTING | : | |
| PROSECUTOR CHRISTOPHER | : | |
| KUBERIET, in his personal and | : | |
| Official capacity, and | : | |
| ASSISTANT MIDDLESEX COUNTY | : | |
| PROSECUTOR PETER NATASI, and | : | |
| IDEMIA, INC.'S being the maker: | | |
| of the facial recognition | : | |
| software and ABC CORPORATION, | : | |
| being an as yet unknown seller: | | |
| or servicer of the facial | : | |
| recognition programs, | : | |
| | : | |
| Defendants. | : | |
| | : | |

TO:  Daniel W. Sexton, Esq.
     DANIEL W. SEXTON, L.L.C.
     229 New Centre Road
     Hillsborough, New Jersey 08844
     Attorneys for Plaintiff

**DEFENDANT ROBERT HUBNER'S CERTIFIED ANSWERS TO PLAINTIFF NIJEER PARKS'S FIRST SET OF INTERROGATORIES**

1. **State the names, titles, counsel and contact information and addresses of all persons known to you to possess knowledge of any relevant facts relating to the case and give a summary of each person's knowledge.**

**ANSWER:**

a)  Police Officer Andrew Lyszyk #519
    1 Main Street
    Woodbridge, New Jersey 07095

    Officer Lyszyk was on scene on with suspect on January 26, 2019. Signed Complaint-Warrant #2019000158.

b)  Lieutenant Joseph Licciardi #450
    1 Main Street
    Woodbridge, New Jersey 07095

    Lieutenant Licciardi approved the Incident Report filed by Police Officer Andrew Lyszyk.

c)  Detective Santiago Tapia #481
    1 Main Street
    Woodbridge, New Jersey 07095

    Detective Tapia forwarded photo of suspect's fake Driver's License to Regional Operations Information Center and signed Complaint-Warrant #2019000156.

d)  Police Officer Francis Lee #591
    1 Main Street
    Woodbridge, New Jersey 07095

    Officer Lee was on scene with suspect on January 26, 2019. Identified Suspect at Woodbridge Police Headquarters during arrest processing.

e)   Detective Jorge Quesada #525
     1 Main Street
     Woodbridge, New Jersey 07095

     Detective Quesada collected evidence on scene on January
     26, 2019.

f)   Sergeant Scott Flavell #405
     1 Main Street
     Woodbridge, New Jersey 07095

     Sergeant Flavell located suspect's vehicle and had same
     towed to Woodbridge Police Headquarters.

g)   Sergeant Anthony Penicaro #472
     1 Main Street
     Woodbridge, New Jersey 07095

     Sergeant Penicaro approved Incident Report filed by
     Detective Tapia and was present when Plaintiff, Nijeer
     Parks, was being processed for his arrest.

h)   Police Officer David Mirdala #547
     1 Main Street
     Woodbridge, New Jersey 07095

     Booking Officer during Plaintiff, Nijeer Parks's,
     arrest.

i)   Police Officer Stephanie Andersen #493
     1 Main Street
     Woodbridge, New Jersey 07095

     Officer Anderson approved Incident Reports filed by
     Officer Mirdala and Officer Lee.

j)   Detective Andrew Kondracki #545
     1 Main Street
     Woodbridge, New Jersey 07095

     Detective Kondracki interviewed Plaintiff, Nijeer Parks,
     while Plaintiff was in custody on February 5, 2019.

k)   Richard Charneco
     370 Route 9 North
     Woodbridge, New Jersey 07095

Mr. Charneco was the Manager of the Hampton Inn on January 26, 2019.

l)   Caleigh Higgins
     370 Route 9 North
     Woodbridge, New Jersey 07095

     Ms. Higgins was working as a front desk clerk at the Hampton Inn on January 26, 2019.

m)   Kamisha Grant
     370 Route 9 North
     Woodbridge, New Jersey 07095

     Ms. Grant was working as a front desk clerk at the Hampton Inn on January 26, 2019.

n)   Michael Dones
     370 Route 9 North
     Woodbridge, New Jersey 07095

     Mr. Dones was the Manager of the Hertz Rental at the Hampton Inn on January 26, 2019.

Defendant reserves the right to amend this answer throughout the continuing course of discovery.

2.   **Provide your complete understanding of the police response to the incident at the Hampton Inn on January 26, 2019, through the arrest and prosecution, providing a detailed narrative of the same to Plaintiff and append any and all relevant documents including reports.**

**ANSWER:**

On January 26, 2019, Officer Francis Lee and Officer Andrew Lyszyk were dispatched to the Hampton Inn on Route 9 North due to reports of shoplifting of certain "snacks" from the gift shop. Headquarters advised that the Suspect's vehicle, a Gray Dodge Challenger, NY License Plate JBD2162, was parked in front of the Hampton Inn. Officer Lee arrived on scene prior to Officer Lyszyk and was already speaking to the Suspect, an African-American male, who identified himself as "Jamal Owens."

Officer Lyszyk approached the Hampton Inn front desk and spoke to the manager, Richard Charneco, and two clerks, Caleigh Higgins and Kamisha Grant. Mr. Charneco advised that he called the police

after a member of the hotel cleaning staff informed him that the male placed assorted snack items into a bag and then took the bag out to his vehicle. Officer Lyszyk told the male that the manager wanted him to pay for the snacks and asked him where the snacks were. The male explained that the snacks were in his vehicle and the male and Officer Lyszyk walked out to his vehicle to retrieve them. They returned to the front desk where the male paid for the snacks. At this time, the male also purchased a bottle of water and drank it during the transaction. The male then threw the bottle away in the hotel garbage can.

Officer Lee informed Officer Lyszyk that the Tennessee driver's license produced by the male identified him as "Jamal Owens" 765 Oakdell Avenue, Madison, TN 37115. Officer Lee advised that the driver's license produced was not coming back on file, and Officer Lyszyk took the driver's license to his police vehicle to check again, with negative results. Officer Lyszyk noted multiple discrepancies with regard to the authenticity of the driver's license, including asterisks where numbers were supposed to appear and a zip code containing only five digits instead of nine.

Officer Lyszyk contacted the Tennessee State Police and spoke with Supervisor Jason Beary in an attempt to cross-check with the Tennessee DMV files. Again, the driver's license number and name "Jamal Owens" was not on file. Supervisor Beary also indicated that a Tennessee driver's license should start with an "o" instead of an "8."

Officer Lyszyk returned to the lobby and asked the male if he had any other forms of identification. The male produced a credit card with the name "Jamal Owens." The male indicated that he was not a guest of the hotel and was only there for the Hertz rental car service.

Since the male admitted to shoplifting the snacks and Officers Lee and Lyszyk were unable to identify him, Officer Lyszyk began to arrest the male. When the male placed his hands behind his back, Officer Lyszyk noticed a bag of suspected marijuana protruding from his jacket pocket. Officer Lyszyk grabbed the male by the wrist, removed the bag of marijuana and threw it on the ground. While attempting to handcuff the male, he slipped from Officer Lyszyk's grip and ran towards the rear of the hotel.

When the male reached the rear door, which is right next to the Hertz Rental kiosk, his right sneaker fell off. The male reached a closed gate but pushed through and continued to run.

Officers Lee and Lyszyk chased the male on foot and during the pursuit, the male repeatedly turned back to look in the direction of the pursuing officers with his right hand placed on his jacket pocket. The officers caught up with the male at his vehicle. Officers Lee and Lyszyk drew their service weapons and pointed them at the suspect as he sat in the driver's seat of his locked and running vehicle. Officer Lyszyk was on the passenger side of the vehicle and Officer Lee was on the driver's side. The male refused requests to turn the vehicle off and unlock the doors. The male placed the car in reverse, backed up a few feet, then stopped. Officers Lee and Lyszyk repeatedly demanded that the male turn off the vehicle and unlock the doors.

After several minutes of refusing the officers' commands, the male placed the car in drive, hit the gas, turned the steering wheel to the left, struck the rear driver's side door of patrol vehicle #3, and then hit the pillar in front of the Hampton Inn. When that happened, the male turned his vehicle towards Officer Lee, who had to abruptly move out of the way to avoid serious injury. The suspect fled the Hampton Inn parking lot at a high rate of speed and entered Route 9 North.

Officers Lee and Lyszyk got into their police vehicles and attempted to follow the fleeing suspect. When they were unable to locate the suspect, they returned to the Hampton Inn to secure the scene. Prior to leaving the scene, Officer Lyszyk notified Detective Quesada that the male left his right shoe and water bottle behind. Officer Lyszyk also advised that he still had the male's driver's license in his possession. Officer Lyszyk transported these items to headquarters without incident. At this point, the Detective Bureau took over the investigation.

See Incident Reports attached hereto, Bates Labeled PARKS000060-PARKS000078. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

3.   **Provide an exhaustive list of any and all bias and/or demeanor complaints including both complaints made only internally and those resulting in litigation, against any member of the Woodbridge Police Department (WPD) from January 26, 2016, until January 26, 2021, appending copies of same and including in your response the following information: (a) the name of the complainant; (b) the nature of the allegation; (c) the disposition of the matter.**

**ANSWER:**

Defendant objects to the request for internal complaints as these documents are part of Defendant Officers' personnel files and will not be produced without a Court Order. If/When said Court order is obtained, Defendants will produce all relevant documents in response to this request following the redaction of any personal identifiers and other confidential information. Complaints resulting in litigation are to be provided. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

4.  **Provide an exhaustive history of the use of facial recognition by the WPD, providing: (a) names of any and all such technology, makers and providers, providing all marketing materials or guidelines for use; (b) names of any and all external agencies which worked with the WPD using facial recognition technology, e.g., Regional Operations Intelligence Center (ROIC), the New York Intelligence Center (NYSIC), and provide a history of such cooperation; (c) list of all arrests effectuated by the WPD which relied in any part on facial recognition technology, giving the date, nature of the underlying crime, and provide copies of all relevant reports; (d) an account of all policies, rules, regulations, and training related to the use of facial recognition technology by the WPD, also providing true copies of any such documents.**

**ANSWER:**

I have no personal knowledge with respect to the use of Facial Recognition Technology. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

5.  **Provide an exhaustive history of any discipline, including a written warning, to any member of the WPD for the misuse of facial recognition technology.**

**ANSWER:**

None known at this time. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

6.  **Provide an exhaustive list of any and all excessive force or false arrest complaints, including both complaints made only internally and those resulting in litigation, against any member of the WPD from January 26, 2016, until January 26, 2021, appending copies of same and including in your response the following information: (a) the name of the complainant;**

**(b) the nature of the allegation; (c) the disposition of the matter.**

**ANSWER:**

Defendant objects to the request for internal complaints as these documents are part of Defendant Officers' personnel files and will not be produced without a Court Order. If/When said Court order is obtained, Defendants will produce all relevant documents in response to this request following the redaction of any personal identifiers and other confidential information. Complaints resulting in litigation are to be provided. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

7.  **Provide an exhaustive list of any and all alleged false arrests, including both complaints made only internally and those resulting in litigation, against any member of the WPD from January 26, 2016, until January 26, 2021, appending copies of same and including in your response the following information: (a) the name of the complainant; (b) the nature of the allegation; (c) the disposition of the matter.**

**ANSWER:**

See response to Interrogatory #6. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

8.  **Set forth in detail all declarations against interest in any form obtained by You, Your Attorney, or anyone acting on Your behalf, including the name(s), address(es), employer(s) and job title(s) of the person(s); dates; and whether such statements were written or oral, and provide copies of same.**

**ANSWER:**

None known at this time. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

9.  **State the name, address, and field of expertise of each person upon whose expert testimony You may rely upon at the time of trial.**

**ANSWER:**

No experts have been retained at this time. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

10. **Identify and provide a true copy of the curriculum vitae, each written report, including drafts, (or detailed resume if report was oral) of every expert retained or consulted by You, including any person who has conducted an examination, whether or not you intend to use such expert at the time of trial; identify and provide true copies of all correspondence and agreements with such expert; identify and provide the comparison agreement and/or all amounts paid to such expert.**

**ANSWER:**

See Answer to Interrogatory #9. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

11. **State whether (and how) any person named in the above Interrogatories is related by blood, marriage, law, contract, employment, or in any other way to the person(s) to whom these questions are addressed.**

**ANSWER:**

I am not related to any person named in these Interrogatory Answers, either by blood, marriage, law or contract. I have an employment relationship with members of the Woodbridge Police Department through my role as civilian Director of Police. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

12. **Identify and provide true copies of all photographs, videos, movies, slides or other visual, electronic, computer and/or audio records that were taken by You or on Your behalf, which relates to the subject matter of this litigation, including, but not limited to, the video obtained from the Hampton Inn of the incident on January 26, 2019. In the event that said videotape of January 26, 2019 is not available, please give a complete account of it, including when the WPD asked for it, when it was obtained, and what happened to it.**

**ANSWER:**

See Investigation Photographs attached hereto, Bates Labeled as PARKS000152-PARKS000171. See Hampton Inn Surveillance Video, attached hereto, Bates labeled as PARKS000173. Defendant reserves

the right to amend this answer throughout the continuing course of discovery.

13. **Provide a list of all insurance policies, including excess policies, which pertain to acts or omissions of the WPD and its members, providing copies of the Declaration Page.**

**ANSWER:**

See Central Jersey Joint Insurance Fund Declarations Sheet attached hereto, Bates Labeled as PARKS000150. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

14. **Provide a complete account of the policies and practices of the WPD concerning the gathering of evidence, including, but not limited to, fingerprints, DNA, and video surveillance, and the subsequent safekeeping of said evidence.**

**ANSWER:**

See CODIS Fact Sheet attached hereto, Bates Labeled as PARKS000122-PARKS000133. See Woodbridge Collection and Preservation of Evidence Policy and Procedures attached hereto, Bates Labeled as PARKS000134-PARKS000147. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

15. **Please provide a complete account of the gathering of evidence related to the incident on January 26, 2019 at the Hampton Inn, including the safekeeping of said evidence and the use or failure to use said evidence, including, but not limited to, the following evidence: (a) fingerprints of suspect; (b) DNA of suspect; (c) video surveillance of suspect; (d) analysis of clothing of suspect, e.g., sneaker of suspect.**

**ANSWER:**

Officers Lee and Lyzsyk ended their pursuit of the suspect and returned to the Hampton Inn to secure the scene. Upon their arrival on scene, Mr. Charneco advised Officer Lyzsyk that he collected the items that were dropped on the floor, placed them in a bag, and moved it to the side. Mr. Charneco gave Officer Lyzsyk the bag and he secured it in his police vehicle. Officer Lyzsyk then notified headquarters that additional units were needed to help preserve the scene. Officer Lyszyk also asked headquarters to notify the detective bureau about the incident and the need to

have the scene processed. Officer Campagnio arrived on scene and preserved the rear gate. Officer Lee preserved the rear door. Officer Montalvo preserved the front entrance where the motor vehicle crash occurred. Detective Tapia and Detective Quesada arrived and began to process the scene.

Prior to leaving the scene, Officer Lyszyk notified Detective Quesada that the male left his right shoe and water bottle behind. Officer Lyszyk also advised Detective Quesada that he still had the male's driver's license in his possession. Officer Lyszyk transported these items to headquarters without incident and placed them into the evidence locker for safekeeping. At this point, the Detective Bureau took over the investigation.

Detective Quesada photographed the scene and collected three fingerprints from the rear glass door that the suspect pushed open as he fled the scene. After the suspect's vehicle was located on January 27, 2019, a consent search was conducted and five additional fingerprints were lifted from the vehicle. A vape pen was also recovered from the vehicle. See Investigation Photos attached hereto, Bates Labeled as PARKS000152-PARKS000171. Back at headquarters, Detective Quesada took custody of the evidence collected and submitted same for DNA analysis and fingerprint comparison.

On January 22, 2021, Detective Quesada received the results of the fingerprint comparison, which identified Barrington Walker as the suspect. See Fingerprint Results Report attached hereto, Bates Labeled as PARKS000148. On July 30, 2021, Detective Quesada received the results of the DNA analysis which also identified Barrington Walker as the suspect. See DNA Results Report attached hereto, Bates Labeled as PARKS000149.

Defendant reserves the right to amend this answer throughout the continuing course of discovery.

16. **Please provide a complete account of how the WPD works together with, or at the direction of, the Middlesex Prosecutor's Office, in the investigation of crimes and the execution of arrest warrants and criminal complaints, providing copies of any relevant agreements, policies, and procedures.**

**ANSWER:**

The Middlesex County Prosecutor's Office (MCPO) is the lead law enforcement agency in Middlesex County. MCPO assigns an

Assistant Prosecutor to serve as a liaison to the Woodbridge Police Department. The MCPO liaison to Woodbridge is Assistant Prosecutor Peter Natasi. When an officer files a complaint alleging an indictable offense, the Department will contact MCPO to discuss the factual allegations and obtain a legal opinion as to the proper charges to be brought against the suspect. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

17. **Was the arrest of Plaintiff for the events of January 26, 2019 the result of input or assistance from the Middlesex Prosecutor's Office, and if yes, provide the following information: (a) Names, ranks, assignment of all persons involved, both from the WPD and the Middlesex Prosecutor's Office; (b) Describe in detail the assistance and involvement of the Middlesex Prosecutor's Office; (c) Provide copies of any and all communications at any time between the WPD or any member of the WPD and the Middlesex Prosecutor's Office or any member of the Middlesex Prosecutor's Office.**

ANSWER:

The Middlesex County Prosecutor's Office was involved in this matter to the extent that Assistant Prosecutor Peter Natasi reviewed the complaint and, based on the information available at that time, advised as to what charges should be brought. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

18. **Please provide a complete account of how the WPD worked together with, or at the direction of, the Middlesex Prosecutor's Office, in the investigation of crimes and the execution of arrest warrants and criminal complaints, providing copies of any relevant agreements, policies, and procedures.**

ANSWER:

See response to Interrogatory #16. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

19. **Please give a complete account of the arrest of Plaintiff, including the names of all persons who took part in the arrest, provide any papers signed by Plaintiff during the arrest, copies of any papers provided to Plaintiff during the**

**arrest, and copies of all video surveillance of Plaintiff during his arrest.**

**ANSWER:**

On February 5, 2019, Plaintiff, Nijeer Parks, presented to the Woodbridge Police Station in reference to his active warrants, #2019000156 and #2019000158. See Complaint-Warrant #2019000156 attached hereto, Bates Labeled as PARKS000001-000010. See Complaint-Warrant #2019000158 attached hereto, Bates Labeled as PARKS000011-PARKS000023. Prior to being interviewed by Detective Kondracki, Plaintiff was read his Miranda Rights and signed waiver of same. See Miranda Card attached hereto, Bates Labeled as PARKS000121. Thereafter, Detective Kondracki conducted the interview in the interview room at Woodbridge Police Station. See Interview Transcript attached hereto, Bates Labeled as PARKS000045-PARKS000059.

Plaintiff was booked and processed by Officer Mirdala. Officer Lee was contacted by Lieutenant Ng, who advised that the suspect from the January 26, 2019 Hampton Inn incident was in custody. Officer Lee was brought to the processing area accompanied by Lieutenant Ng and Detective Sergeant Penicaro. Officer Lee observed Plaintiff, Nijeer Parks, sitting in the processing area and identified him as being the suspect from the January 26, 2019 incident. Plaintiff was thereafter transported to Middlesex County Jail. See Booking Report attached hereto, Bates Labeled as PARKS000036-PARKS000044. See Incident Reports attached hereto, Bates Labeled as PARKS000060-PARKS000078.

Defendant reserves the right to amend this answer throughout the continuing course of discovery.

20. **Please provide a complete account of all communications between the WPD, and any of its members, and the Middlesex Prosecutor's Office, and any employee there, from January 26, 2019 up until the present day, relating to any and all aspects of this matter, giving the following information: (a) the identities of the individuals making, receiving or being copied on these communications; (b) the dates of these communications; (c) the substance of any such communication.**

**ANSWER:**

I do not have any knowledge with respect to communications between the Middlesex County Prosecutor's Office and the Woodbridge Police Department in this matter. I am a civilian

Director of Police and I am not involved in criminal investigations. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

21. **Provide an account of all claims made against the WPD, or any of its members, alleging anti-black bias from January 26, 2009 until January 1, 2020, whether the claim is by a governmental entity, member of the public, or by an employee, and include the following information in your response: (a) the name and position of complainant; (b) the name of the officer or employee who is the subject of the complaint; (c) the nature of the complaint; (d) the disposition of the complaint.**

**ANSWER:**

Defendant objects to this request as overbroad and unduly burdensome. Defendant further objects to the request for internal complaints as these documents are part of Defendant Officers' personnel files and will not be produced without a Court Order. If/When said Court order is obtained, Defendants will produce all relevant documents in response to this request following the redaction of any personal identifiers and other confidential information. Complaints resulting in litigation are to be provided. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

22. **Provide an account of all claims made against the WPD, or any of its members, alleging anti-black bias from January 26, 2009 until January 1, 2020, whether the claim is by a governmental entity, member of the public, or by an employee, and include the following information in your response: (a) the name and position of complainant; (b) the name of the officer or employee who is the subject of the complaint; (c) the nature of the complaint; (d) the disposition of the complaint.**

**ANSWER:**

See Answer to Interrogatory #21. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

23. **Provide an account of all claims made against the WPD, or any of its members, asserting Monell liability from January 26, 2009 until January 1, 2020, whether the claim is by a member of the public or by an employee, and include the following information in your response: (a) the name and position of**

complainant; (b) the name of the officer or employee who is the subject of the complaint; (c) the nature of the complaint, including the theory upon which Monell liability is based, e.g., unconstitutional policy, failure to train, negligent hiring, failure to discipline, etc.; (d) the disposition of the complaint.

**ANSWER:**

Defendant objects to this request as overbroad and unduly burdensome. Defendant further objects to the request for internal complaints as these documents are part of Defendant Officers' personnel files and will not be produced without a Court Order. If/When said Court order is obtained, Defendants will produce all relevant documents in response to this request following the redaction of any personal identifiers and other confidential information. Complaints resulting in litigation are to be provided. Defendant reserves the right to amend this answer throughout the continuing course of discovery. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

24.   Provide a summary of the disciplinary history of Det. S. Tapia, Lt. J. Licciardi, Officer Lyszyk, Det. Sgt. Penicaro, Officer Mirdala, and Officer Anderson, as well as divulging any and all complaints made against each by citizens or peers, also providing a copy of all relevant documents including the personnel files, IA files, and Academy file for each.

**ANSWER:**

Defendant objects to this request as these documents are part of Defendant Officers' personnel files and will not be produced without a Court Order. If/When said Court order is obtained, Defendants will produce all relevant documents in response to this request following the redaction of any personal identifiers and other confidential information. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

## CERTIFICATION

I hereby certify that the foregoing statements made by me are true, I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

I further certify that copies of any and all reports by experts and others and any and all writings annexed hereto are exact and true copies of the entire reports and/or writings; that the existence of any other report or writing of said experts or others; either written or oral, is unknown to me and if such become later known or available, I shall serve them promptly upon the propounding party.

I further acknowledge the continuing obligation to provide the information and documentation requested by these interrogatories, and to provide same even after the original of these interrogatories have been submitted.

Robert Hubner

Dated: 12-28-21

# EXHIBIT "C"

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 2:21-cv-04021 (JSX)(LDW)

X------------------------   X

NIJEER PARKS,
               CIVIL ACTION
    Plaintiff,    DEPOSITION
               OF:
   v.
               ANDREW LYSZK
JOHN E. McCORMACK, MAYOR OF
WOODBRIDGE, In his personal
and official capacity,
ROBERT HUBNER,DIRECTOR OF
THE WOODBRIDGE POLICE, In
his personal and official
capacity, CITY OF WOODBRIDGE
POLICE OFFICERS, ANDREW
LYSZK and WOODBRIDGE POLICE
SGT. JOSEPH LICCARDI,
WOODBRIDGE POLICE OFFICERS
JOHN AND JANE DOE 1-20,
being as yet unknown actors,
MIDDLESEX DEPARTMENT OF
CORRECTIONS, JOHN AND JANE
DOES 1-20, being unknown
actors, MIDDLESEX COUNTY
PROSECUTOR, ACTING
PROSECUTOR CHRISTOPHER
KUBERIET, In his personal
and official capacity, and
ASSISTANT MIDDLESEX COUNTY
PROSECUTOR PETER NATASI, and
IDEMIA INC.'S being the
maker of the facial
recognition software and ABC
CORPORATION, being as yet
unknown seller or servicer
of the facial recognition
programs,
    Defendants.
X------------------------   X
HUDSON COURT REPORTING & VIDEO   (732) 906-2078

## Page 2

1  T R A N S C R I P T   of the stenographic notes
2
   of the proceedings in the above-entitled matter as
3
4  taken by and before CARMEN WOLFE, a Certified
5
   Court Reporter and Notary Public of New Jersey,
6
7  at offices of JAMES P. NOLAN AND ASSOCIATES LLC, 61
8
   Green Street, Woodbridge, New Jersey on Tuesday, August
9
10 16, 2022 commencing at 1:00 in the afternoon.
11
12
13
14
15
16
17
18
19
20        HUDSON COURT REPORTING
      90 WOODBRIDGE CENTER DRIVE, SUITE 240
          WOODBRIDGE, NJ 07095
21   Toll-Free 800.310.1769 | NJ 732.906.2078 | NY
            212.273.9911
22    scheduling@hudsoncourtreporting.com |
23        www.hudsonreporting.com
24
25

## Page 3

1
2     A P P E A R A N C E S
3
  DANIEL W. SEXTON ESQ, LLC
  BY:  DANIEL W. SEXTON, ESQ.
4    danielsextonesq@gmail.com
    229 New Center Road
5    Hillsborough, New Jersey 08844
  Attorneys for the Plaintiff.
6
7   JAMES P. NOLAN AND ASSOCIATES LLC
  BY:  FREDERICK L. RUBENSTEIN, ESQ.
8    frubenstein@jpnlaw.us
    -and-
9   GARRY CLEMENTE ESQ.
    61 Green Street
10   Woodbridge, New Jersey 07095
  Attorneys for the Defendants Woodbridge.
11
12   DVORAK & ASSOCIATES LLC
  BY:  GRACE E. LEMPKA, ESQ.
13    glempka@dvoraklegal.com
    467 Middlesex Avenue
14    Metuchen, New Jersey 08840
  Attorneys for the Defendants, Middlesex County
15   Department of Corrections.
16
17
18
19
20
21
22
23
24
25

## Page 4

1       I N D E X
2 WITNESS   DIRECT  CROSS  REDIRECT  RECROSS
3 ANDREW LYSZK
4   By Mr. Sexton  5      54
5   By Mr. Rubenstein   50
6
7
8       EXHIBITS
9 NUMBER    DESCRIPTION    PAGE
  P-AA   Andrew Lyszk's report, dated  5
10     1/26/19
                 5
11   P-BB   Andrew Lyszk's Affidavit of
    Probable Cause
12               5
  P-CC   Andrew Lyszk's resume
13
  P-DD   Complaint and Affidavit of  40
14     Probable Cause
15
16
17    (Exhibits retained by counsel.)
18
19
20
21
22
23
24
25

Pages 1 to 4

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 5

1            (Plaintiff's Exhibits P-AA through P-CC
2    are marked for identification.)
3
4    ANDREW LYSZK, having been sworn by the court reporter,
5    testifies as follows:
6
7    DIRECT EXAMINATION BY MR. SEXTON:
8        Q.    Good afternoon, Officer.
9    A.    Hi.
10       Q.    Have you had your deposition taken
11   before?
12   A.    I believe so.
13       Q.    Okay.  In what context did you have your
14   deposition taken?
15   A.    It's been a long time.  Probably 15 years ago.
16   So --
17       Q.    Was it a case involving the department?
18   A.    No.  It was just a trial.
19       Q.    What kind of trial?  Criminal trial?
20   A.    Criminal trial.  Yes.
21       Q.    Have you ever had your testimony taken
22   in a private matter?
23   A.    Not like this.  No.
24       Q.    Just a couple of rules then.  You see
25   the record's being taken down --

Page 6

1    A.    Yes.
2        Q.    -- of the proceeding.  So we have to
3    communicate verbally.  She can't note nods and kind of
4    body language or stuff.  So we have to make sure we
5    articulate our responses.  If there's a question you
6    don't understand, I'll be happy to rephrase it.  From
7    time to time your attorney will make objections.  Those
8    are mostly for the record, and we just continue on.  If
9    there comes a time where he instructs you not to
10   answer, then he and I will try to hash that out and
11   then resume.  You should testify to the best of your
12   recollection.  You shouldn't make pure guesses, though.
13   We have to let each other finish.  You can't anticipate
14   where we're going and talk over each other because that
15   makes the reporter go crazy because she can't record
16   two people talking at once.  So, when did you join the
17   department?
18   A.    In 2006 of June.
19       Q.    This was premarked as Plaintiff's Double
20   C.  So is that your resume?
21   A.    Yes.
22       Q.    When did you join the department?
23   A.    2006.
24       Q.    Okay.  Is this resume up-to-date?
25   A.    Yes.

Page 7

1        Q.    So what's American Military University?
2    A.    College.
3        Q.    Where is that located?
4    A.    I believe Virginia.  It's online based.
5        Q.    And these 90-day rotations, were they in
6    the early part of your career?
7    A.    Yes.
8        Q.    And are those rotations, are they
9    standard for every member of the department?
10   A.    If you put in for it.
11       Q.    So were those rotations would it be safe
12   to say they were done in the first couple of years of
13   your career as a police officer?
14   A.    Within the first eight years probably.
15       Q.    In 2019 what was your assignment?
16   A.    Patrol.
17       Q.    And what was your shift?
18   A.    6:00 A.M. to 4:00 P.M.
19       Q.    To 4:00 P.M.?
20   A.    Yes.
21       Q.    Is Woodbridge divided into districts or
22   is it one --
23   A.    It's multiple areas.  Four areas.
24       Q.    And did you have a regular area you were
25   assigned to on patrol?

Page 8

1    A.    Most likely the 2N.
2        Q.    What does that consist of?
3    A.    Ford, Hopelawn and Keasbey.
4        Q.    Are those streets?
5    A.    Towns.
6        Q.    Are they like sections of Woodbridge?
7    A.    Yes.
8        Q.    How many patrol areas is the township
9    broken up into?
10   A.    Four.
11       Q.    Where does the Hampton Inn fall in?
12   A.    That's the Woodbridge section which borders --
13   which borders Fords.
14       Q.    So other than these rotations, is it
15   safe to say you've been on patrol for your entire
16   career?
17   A.    Yes.
18       Q.    What do you recall about the incident at
19   the Hampton Inn on the 26th of January 2019?
20   A.    We got called there for a shoplifter.
21       Q.    Who called you?
22   A.    Not sure who called, but I got dispatched out
23   there.
24       Q.    Did you have a partner at that time?
25   A.    We drove alone daytime.

Pages 5 to 8

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 9

1    Q.   So what did you do after you were called
2  by dispatch?
3    A.   Responded to Hampton Inn.
4    Q.   What did you find when you got there?
5    A.   When I got there Officer Lee was already there
6  with a male.
7    Q.   Where did you find them?
8    A.   I believe in the lobby.
9    Q.   Can you describe the male who Officer
10  Lee was with?
11    A.   Black male. I can't tell you specifics anymore.
12  It's been a while.
13    Q.   Do you remember anything about facial
14  hair?
15    A.   I don't want to say. I'm not a hundred percent
16  about it.
17    Q.   Hardly anything's a hundred percent. Do
18  you have any recollection?
19    A.   I don't want to make guesses.
20    Q.   How about his build?
21    A.   He was taller.
22    Q.   Heavy or athletic?
23    A.   Not sure because I know he had a jacket on.
24    Q.   Do you remember anything about his dress
25  other than there was a jacket?

Page 10

1    A.   He had a jacket. I don't remember what he was
2  wearing.
3    Q.   So where did you come upon them? Where
4  were they?
5    A.   The lobby.
6    Q.   Were you familiar with the Hampton Inn?
7    A.   The lobby area, yes.
8    Q.   How were you familiar with that lobby in
9  the Hampton Inn?
10    A.   We've been there for previous calls.
11    Q.   What kind of previous calls?
12    A.   Numerous calls throughout the years. A lot of
13  things happen.
14    Q.   Busy place?
15    A.   Sometimes.
16    Q.   Was anybody else in the lobby?
17    A.   I believe one of the employees from the -- from
18  the hotel. I'm not really sure if there were any other
19  patrons there or not.
20    Q.   Do you remember the name of the employee
21  from the hotel?
22    A.   Not off the top of my head.
23    Q.   By the way, did you talk to anybody
24  about this case before you came down here today other
25  than your lawyer?

Page 11

1    A.   No.
2    Q.   Did you talk to Officer Lee?
3    A.   No.
4    Q.   Or Detective Tapia?
5    A.   No. I just came back from vacation.
6    Q.   You did?
7    A.   Yes.
8    Q.   What about in general? Have you talked
9  to many people about this case?
10    A.   My girlfriend.
11    Q.   When did you talk to her?
12    A.   When I heard about it.
13    Q.   When did you hear about it?
14    A.   When -- first the news. When it hit the news.
15    Q.   Did you learn about it from the news or
16  from somebody in the department?
17    A.   From the news.
18    Q.   Did you talk to anybody else other than
19  your girlfriend about the case after you -- or your
20  lawyer after hearing about it from the news?
21    A.   Well, we had that whole pow wow with the lawyers
22  and everybody. So that's everybody else that was
23  involved.
24    Q.   Who was in -- without telling me what
25  was said can you tell me who was in the pow wow?

Page 12

1    A.   The director. You had -- who was there?
2    MR. RUBENSTEIN: I can't answer.
3    A.   Director. Detective Tapia was there. I would
4  assume -- I would assume everybody on the case. I'm
5  not sure. I remember the lawyers and the director was
6  there and Detective Tapia was there.
7    Q.   And by lawyer you mean Frederic
8  Rubenstein?
9    A.   And his assistant.
10    Q.   Any other -- was the mayor there?
11    A.   No.
12    Q.   Any council member or town manager,
13  anybody like that?
14    A.   No.
15    Q.   Who is the town manager?
16    A.   No idea.
17    MR. RUBENSTEIN: At which point in time?
18    MR. SEXTON: At that time.
19    A.   Don't know.
20    Q.   You say you found them in the lobby.
21  And do you recall what happened after you got there?
22    A.   When I got to the lobby Officer Lee was with him,
23  with the male. And he had his driver's license. We
24  checked him.
25    Q.   So the guy gave you -- who had the

Pages 9 to 12

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

1   license when you arrived?  Did you see Officer Lee
2   already had it?
3   A.   I believe so.  I believe he had it or I grabbed
4   it off him, but I know Officer Lee checked the license.
5        Q.   Did Lee have to go back -- go to his car
6   to do that?
7   A.   No.  That was me.
8        Q.   Okay.  So --
9   A.   Normally -- I'm not sure how he checked, ran the
10  license, but he either checked the license through the
11  radio or via telephone or headquarters.
12       Q.   Did Lee leave the lobby to do that?
13  A.   I don't believe so.
14       Q.   Okay.  Did he step away from the male
15  suspect?
16  A.   I don't recall.
17       Q.   What did you do while Lee was checking
18  the license?
19  A.   Probably just standing there observing or talking
20  to the manager.
21       Q.   Do you remember what happened next?
22  A.   I know that that license did not come back on
23  file.  So I know I took the license and went to my
24  patrol car with the license.  Plus, I have a book that
25  identifies government licenses.

1        Q.   What do you mean?
2   A.   It's a book that has every single license from
3   every state.  So you compare it to see what's fake,
4   what's not.
5        Q.   Okay.  Were you able to make a
6   determination?
7   A.   It appeared to be fake because it was missing
8   certain things.  I believe asterisks and zip code.
9        Q.   Okay.  What happened next?
10  A.   Once I confirmed it was fake and I called
11  Tennessee state police.
12       Q.   What did you learn?
13  A.   Confirmed it was fictitious.
14       Q.   What did you do then?
15  A.   I went back to the lobby.
16       Q.   By the way, how much time do you think
17  this took you to check the book and then make the call
18  to Tennessee?
19  A.   Some time.
20       Q.   15 minutes, 10?
21  A.   I don't know.
22       Q.   What happened next when you went back to
23  the lobby?
24  A.   He -- the male admitted to shoplifting already.
25  I know he said he's going to pay for -- even though he

1   said he's going to pay for the items it's our policy
2   placed him under arrest.  And since we didn't have good
3   identification for the male we decided to place him
4   under arrest.
5        Q.   For the shoplifting or --
6   A.   For shoplifting.
7        Q.   What were you going to arrest him for?
8   A.   Shoplifting.
9        Q.   Did he tell you why he was at the hotel?
10  A.   I believe he was there for the Hertz rental
11  service.
12       Q.   Was he renting a vehicle or returning a
13  vehicle?  Do you know?
14  A.   I didn't get that far.
15       Q.   So did you communicate -- did you
16  communicate to him -- you told him you were going to
17  arrest him or what?
18  A.   Well, I told him place his hands behind his back.
19       Q.   Okay.  What happened next?
20  A.   When he did that I saw a bag of marijuana.
21       Q.   Where did you see that?
22  A.   Don't recall.  One of his pockets.
23       Q.   Then what happened?
24  A.   I went to put handcuffs on him.
25       Q.   Then what happened?

1   A.   He slipped away and ran off.
2        Q.   While you where doing this where was
3   Lee?
4   A.   Next to me.
5        Q.   Then what happened?
6   A.   He ran out the back door.
7        Q.   Can you describe how he --
8   A.   He ran towards the back door.  Believe his shoe
9   fell off in the lobby.  Not sure if he dropped his
10  jacket behind.  I don't recall.  Ran outside the back
11  door.  Ran towards the front.  Got into his vehicle.
12       Q.   What happened -- what were you and
13  Officer Lee doing?
14  A.   Chasing him.  We let headquarters know we were in
15  foot pursuit.
16       Q.   Then what happened?
17  A.   Then he sat in his car for a short period of
18  time.  Not sure how long, how many minutes.  We drew
19  our weapons on him.  Told him to get out.  He pulled
20  forward and hit my patrol car, the pillar.  And Officer
21  Lee had to jump out of the way.  He then backed out and
22  drove -- sped off.
23       Q.   Had backup arrived yet?
24  A.   No.  Just myself and Officer Lee.  Oh, I did have
25  his license still in my back pocket.

Pages 13 to 16

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 17

1    Q.   What happened after he hit the pillar?
2   A.   He took off Route 9.
3    Q.   Okay.
4   A.   And we went to look for him.
5    Q.   Both cars?
6   A.   Yes.
7    Q.   Then what happened?
8   A.   There were multiple cars at that time looking for
9   the vehicle. After a short time went back to Hampton
10   Inn.
11    Q.   Okay. And what did you do at Hampton
12   Inn?
13   A.   I began to preserve the scene. Ask for
14   additional units.
15    Q.   People arrive?
16   A.   Yes.
17    Q.   Who arrived?
18   A.   I couldn't tell you who exactly, but I know
19   Detective Brewer was there. Detective Quesada was
20   there for a fact, but I can't recall who else was there
21   without referring to my report.
22    Q.   Do you recall Detective Tapia? Tapia?
23   A.   Yes, I believe he was out there. Yes. Yes, he
24   was there.
25    Q.   What do you remember about the securing

Page 18

1   of the scene?
2   A.   I remember there's an officer by the rear door
3   for a hand print. I know the clerk. I'm not sure if
4   that's the manager. But the stuff that dropped in the
5   middle of the lobby he gathered it up and put it in the
6   bag.
7    Q.   Did you talk to the detectives at all?
8   A.   Yes.
9    Q.   Do you remember what was said?
10   A.   Briefed them what happened. I told them that I
11   had the driver's license. The name on the driver's
12   license was not the individual, but the picture on the
13   driver's license was the individual.
14    Q.   Do you remember anything else said?
15   A.   No.
16    Q.   Do you remember who you gave -- who you
17   gave the driver's license to?
18   A.   I believe it says in my report. One of the
19   detectives. I'm not sure which one.
20    Q.   I'll give you the report in a second.
21   Just try to see what you remember. Did you review your
22   report before you came down here today?
23   A.   Yes.
24    Q.   Oh, you did. Did you review anything
25   else other than your report?

Page 19

1   A.   Just these three reports down here which is my
2   reports and Officer Lee's report, and my supplemental
3   report.
4    Q.   Sorry. Your report?
5   A.   Officer Lee's report and my supplemental report.
6    Q.   Show you what's been premarked as
7   Plaintiff's Double A. Do you recognize this?
8   A.   Yes, I do.
9    Q.   And what do you recognize it as?
10   A.   It's my report.
11        (There is a recess.)
12    Q.   So I asked you if you recognize this
13   report.
14   A.   Yes.
15    Q.   What is it?
16   A.   It's my report I wrote.
17    Q.   And did you write just one report or are
18   there any other reports?
19   A.   There are two reports I believe.
20    Q.   I show you what we marked as double A.
21   Is this your first report?
22   A.   Yes.
23    Q.   And when was this report made?
24   A.   January 26, 2019.
25    Q.   So it was made the same day as the

Page 20

1   incident?
2   A.   Yes.
3    Q.   Then I'm showing you what's previously
4   marked as Plaintiff's Exhibit R.
5        MR. RUBENSTEIN: I'm just going to show
6   it to him.
7        MR. SEXTON: Yeah.
8    Q.   And is this your second report?
9   A.   Yes.
10    Q.   And when did you make this report?
11   A.   I believe the date and time says January 3rd --
12   January 30, 2019.
13    Q.   That's the last page date/time on the
14   report, 1/30/2019?
15   A.   This is what the report says. Yes.
16    Q.   What do you know about -- by the way,
17   were you -- did you ever receive any discipline for the
18   events surrounding with this matter?
19   A.   No.
20    Q.   Did you ever receive and including any
21   discipline that would include a verbal warning or
22   reprimand? No?
23   A.   No.
24    Q.   Written reprimand?
25   A.   No.

Pages 17 to 20

Page 21

```
 1        Q.      No.  Did you ever receive any training
 2   regarding it?
 3        A.   No.
 4        Q.      Were you ever offered to go to any
 5   training regarding it?
 6        A.   As far as facial recognition regarding --
 7        Q.      The way this matter was handled.
 8        A.   No.
 9        Q.      What -- at the time of this incident in
10   January, February, 2019, up to that time what had your
11   experience with -- prior to this incident, rather, what
12   had your experience been with facial recognition
13   technology?
14        A.   Nothing.
15        Q.      Had you ever received any training
16   regarding the use of facial recognition technology?
17        A.   No.
18        Q.      Had you been aware of any controversies
19   regarding the use of facial recognition technology?
20        A.   No.
21        Q.      Were you aware that facial recognition
22   technology had been held to be racially biased?
23             MR. RUBENSTEIN:  Objection as to form.
24   You can answer.  You can answer the question.
25        A.   No.
```

Page 22

```
 1        Q.      Were you aware that the ACLU had filed a
 2   class action lawsuit against the State of New Jersey to
 3   stop the use of certain facial recognition
 4   technologies?
 5        A.   No.
 6        Q.      Were you aware that around this time the
 7   Attorney General of New Jersey issued a moratorium on
 8   the use of facial recognition technology?
 9        A.   No.
10             MR. RUBENSTEIN:  Objection as to form.
11        Q.      When Officer Tapia told you he had used
12   facial recognition technology in this case were you
13   surprised?
14             MR. RUBENSTEIN:  Objection as to form.
15   You can answer.
16        A.   No.
17        Q.      Were you confused?
18        A.   No.
19        Q.      Because you said you had -- from your
20   description it's almost as if you had never heard of it
21   before.  And yet, somebody told you that they were
22   using it to resolve a case and now you're telling me
23   you had no surprise about it.
24        A.   I never said I didn't hear about it.  I said on
25   patrol we don't have those tools.
```

Page 23

```
 1        Q.      Okay.  Well, then tell me what you had
 2   heard about it.  I didn't ask you had you used it.  Any
 3   knowledge at all from any source.
 4        A.   What I see on TV.
 5        Q.      Okay.  What do you see on TV?
 6        A.   NCIC.
 7        Q.      I don't watch TV.  So tell me about
 8   NCIC.  What is NCIC?
 9        A.   It's a show.
10        Q.      What does that stand for?
11        A.   No idea.
12        Q.      It's about some kind detective work?
13        A.   It's a police show.
14        Q.      Where's the police?  For what city?
15        A.   I don't watch that much of it, but I think
16   military.
17        Q.      Military police?
18        A.   Yes.  Something like that probably.
19        Q.      Were you military police?
20        A.   No.
21        Q.      You were?
22        A.   I was marine.
23        Q.      So what do they do with facial
24   recognition technology in NCIC?
25        A.   I guess they get a face and compare to images in
```

Page 24

```
 1   the system.
 2        Q.      And is it used often in those -- in that
 3   show?
 4             MR. RUBENSTEIN:  Objection as to form.
 5   Go ahead.  You an answer.
 6        A.   I don't know.
 7        Q.      Do you remember any particular --
 8        A.   I watched a few episodes only so I can't tell you
 9   who the characters are.
10        Q.      Did you see it in any other shows?
11        A.   Quite possibly.
12        Q.      Do you remember how it was used?
13        A.   I mean the word facial recognition is quite
14   self-explanatory.  You know, I'm not sure the science
15   behind it if that's what you're asking or the technical
16   skills needed to acquire facial recognition.
17        Q.      I guess we all have it on our phones
18   now; right?  Do you have a smart phone?
19             MR. RUBENSTEIN:  Objection as to form.
20   Go ahead.
21        A.   I would assume.  I don't use it.
22             MR. RUBENSTEIN:  Don't assume.  You're
23   not supposed to guess.
24        Q.      You don't lock your phone by your facial
25   -- face password?
```

Pages 21 to 24

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 25

```
 1   A.   Fingerprint.
 2        Q.   So when Detective Tapia told you that he
 3   had found the guy with facial recognition technology
 4   did you think like, oh, cool, that's just like NCIC?
 5   A.   No.
 6        Q.   What did you think?
 7   A.   I think with the totality of the circumstances of
 8   the results from the facial recognition we confirmed
 9   that it looked like the suspect that was dealt with at
10   the Hampton Inn.  Was that it was a good tool to
11   assist.
12        Q.   So that phrase "good tool to assist", is
13   that a term of art from the detective work and
14   policing?
15   A.   Can you rephrase?
16        Q.   Is that another phrase -- is that phrase
17   equivalent to an investigative lead?
18   A.   Still don't understand.
19        Q.   Do you know the term investigative lead?
20   A.   Yes.
21        Q.   What do you understand that to mean?
22   A.   During investigation you get a good lead and you
23   then follow it up.  And --
24        Q.   Like, are you aware that there are
25   certain evidence that's never admissible in court?
```

Page 26

```
 1   A.   Yes.
 2        Q.   And can you name some evidence that's
 3   never admissible in court?
 4   A.   No.
 5        Q.   If I told you polygraph results are
 6   never admissible in court would that refresh your
 7   recollection?
 8   A.   Yes.
 9        Q.   And you know the reason that polygraph
10   results are never admissible in court is because
11   they're found to be inherently unreliable; correct?
12   A.   I guess so.  No guessing.  I don't know.
13        Q.   Fingerprints are admissible; correct?
14   Or are fingerprints admissible?
15   A.   I believe so.
16        Q.   And DNA?
17   A.   Yes.
18        Q.   Can you think of other evidence that's
19   also admissible?
20        MR. RUBENSTEIN:  You want him to give
21   you a laundry list?
22   A.   Statements.
23        Q.   By the way, have you testified in
24   criminal court often?
25   A.   No.
```

Page 27

```
 1        Q.   No.  Ever?
 2   A.   I believe once.
 3        Q.   What kind of a case was that?
 4   A.   Person break into cars.
 5        Q.   So you described that you thought that
 6   the facial recognition hit was a, quote, good tool to
 7   assist.  Did you have any impression of the totality of
 8   the case of what evidence there was to help find the
 9   person who was the actual actor?
10   A.   Can you repeat that question one more time?
11        MR. SEXTON:  Can you read that back?
12        (The pending question is read back.)
13   A.   No, I didn't know what the detective bureau had.
14        Q.   You didn't have any idea what they had?
15   A.   I knew they had certain prints, but I didn't
16   know --
17        Q.   They had prints.  How do you know they
18   had prints?
19   A.   Because they processed the scene.
20        Q.   You saw them taking prints?
21   A.   Well, I saw them guarding the door for prints.
22   So --
23        Q.   What do you mean "guarding the door?"
24   A.   We wanted to preserve the scene.
25        Q.   I think you also mention -- didn't you
```

Page 28

```
 1   mention a sneaker?
 2   A.   Yes.
 3        Q.   So you knew they had the sneaker; right?
 4   A.   Yes.
 5        Q.   You thought there might have been a
 6   jacket?
 7   A.   Yeah, I think.
 8        Q.   Not sure?
 9   A.   Not sure.
10        Q.   Let me see.  On the second page there's
11   driver's license.  You see the list?
12   A.   Yes.
13        Q.   Cigars, pot, marijuana grinder, SIM
14   card, Dunkin' Donuts receipt.  Did you look at that
15   Dunkin' Donuts receipt?
16   A.   I'm sure I did.
17        Q.   Do you remember where that came back
18   from?
19   A.   No.
20        Q.   If I told you it came back from the
21   Dunkin' Donuts in the Bronx would that trigger your
22   memory?
23   A.   Yes.
24        Q.   So you said that you characterize the
25   hit as a good tool to assist.  But in your report, P-R,
```

Pages 25 to 28

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 29

1   you say -- the narrative relates that Tapia advised
2   you. Then you say, "As a result, I signed the
3   complaint for the following charges." So were you --
4   am I correct in understanding that you signed the
5   complaint based solely on the facial recognition hit as
6   reported to you by Tapia?
7             MR. RUBENSTEIN:  Objection as to form.
8   You can answer.
9   A.   No.
10        Q.    What other basis did you have to sign
11  that Warrant of Probable Cause against Nijeer Parks?
12  A.   I saw the suspect on scene.  So I knew what he
13  looked like.  The facial recognition, that hit that
14  came back provided an image that looked like the
15  suspect that I had.
16        Q.    Your report doesn't note that you saw
17  the image from -- that Tapia had gotten, does it?
18  A.   It does not specifically say that I looked.
19        Q.    Is there anything that even possibly
20  suggests that you looked?
21  A.   The suspect was identified as Nijeer Parks.
22        Q.    That sentence follows, "On January 27th,
23  he", that's the [inaudible], "received notification
24  from Investigator Shamos Lyons, Rockland County
25  Sheriff's Department Intelligence Center and Sergeant

Page 30

1   Dey, Palisades Interstate Parkway Police", close
2   parens, "that they had a high profile comparison to the
3   picture of a fraudulent Tennessee driver's license.
4   The suspect was identified as Nijeer Parks." I read
5   that as saying that Lyons and Dey identified the
6   subject as Parks.  Is there any basis for me -- for you
7   to tell me that I'm misreading that?
8   A.   No, sir.  Just bad report writing.
9        Q.    You've never met Nijeer Parks; correct?
10  A.   No.
11        Q.    So it's impossible for you to identify
12  anyone as Nijeer Parks, isn't it, since you've never
13  met him?
14  A.   Physically, yes.
15        Q.    Isn't it true that the name Nijeer Parks
16  became associated with the suspect based upon the
17  report of Sergeant Dey and Investigator Lyons?
18  A.   No.  It was a totality of everything.  The image
19  that was shown to me looked like the suspect that I had
20  at the Hampton Inn.
21        Q.    And you wrote this report the day --
22  when did you write this report in relation to the time
23  when Detective Tapia told you about the hit?
24  A.   I don't recall the timeframe of when the report
25  was written.

Page 31

1        Q.    Is it your policy to write reports soon
2   after the events that you're recounting?
3   A.   We normally do it by the end of the tour.
4        Q.    Showing you Exhibit BB.  This is a
5   13-page document.  Do you recognize it?
6   A.   Yes.
7        Q.    What do you recognize it as?
8   A.   It is my complaint.
9        Q.    And the last -- page 11 and 12 are your
10  Affidavit of Probable Cause?
11  A.   Yes.
12        Q.    Is there anyplace in this Affidavit of
13  Probable Cause where you report that you independently
14  verified the picture provided by ROIC as being the
15  person you had interacted with at the Hampton Inn?
16  A.   No.
17        Q.    Were you aware that the facial
18  recognition tech altered the picture by changing pixels
19  before you made the search?
20  A.   No.
21        Q.    If you knew that would that cause you to
22  doubt the accuracy of the hit?
23            MR. RUBENSTEIN:  Objection as to form.
24  If you can answer.
25  A.   I would say yes.

Page 32

1        Q.    Do you know that -- did you know
2   anything about the identification made by Officer Lee
3   of the suspect?
4   A.   No.
5        Q.    By the way, do you have any training in
6   photo arrays?
7   A.   Just SOP.  Standard policies.
8        Q.    What's the SOP for a photo array?
9   A.   I know it has to be approved by the prosecutor.
10  You need six photographs.
11        Q.    Is there a little speech you have to
12  give?
13  A.   I don't give them so -- I assume, but I don't
14  want to assume.
15        Q.    Like, do you have a little card for
16  Miranda Rights, stuff like that?
17  A.   No.  We do have them, but I don't have them.
18        Q.    Just have them memorized?
19  A.   No.
20        Q.    What do you do then?
21  A.   I don't.
22        Q.    You don't do Miranda Rights?
23  A.   We don't question.  To my knowledge when you
24  question a criminal.  And then you Google Miranda
25  Rights on NJ Courts.

Pages 29 to 32

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 33

1      Q.     What about lineups?  Do you know
2  anything about lineups?
3  A.  No.
4      Q.     Not even from TV?
5  A.  No.
6      Q.     They don't do lineups on NCIC?
7  A.  No.
8      Q.     Do you know -- so after the complaint --
9  after you sent out the warrant and complaint and they
10 brought Nijeer Parks in that they called Officer Lee in
11 on his day off to make an ID.  Did you know about that?
12 A.  I was off.
13     Q.     So Officer -- Lieutenant Ng, N-G.  How
14 do you say his name?
15 A.  Ng.
16     Q.     Lieutenant Ng and some other lieutenant,
17 sergeant, walked him, brought him down and showed --
18 told Lee that he was in the holding center.  And Lee
19 saw him sitting on the bench with his hands handcuffed
20 to the bar.  Does that sound right?
21 A.  I wasn't there.
22     Q.     Can you picture?  You know the bench?
23 You know the bar?
24 A.  Yes.  All depends which bar, but I know the bars.
25 There's multiple bars.

Page 34

1      Q.     And from what you know of policing and
2  investigations, do you think that that was an overly
3  suggestive presentation of the suspect to Officer Lee?
4      MR. RUBENSTEIN:  Objection as to form.
5  You can answer.
6  A.  What do you mean?
7      Q.     Well, you know about photo arrays.  And
8  there's rules so that they're not overly suggestive --
9  A.  Yes.
10     Q.     -- so that they have some value.  And if
11 you showed a suspect one person in handcuffs that might
12 be suggestive; right?
13 A.  I mean if it's out in the public on a street, but
14 the environment back there everybody's in handcuffs.
15     Q.     But there wasn't a -- his report makes
16 no mention of anybody else in handcuffs.
17 A.  I have no idea.
18     Q.     Actually, his report doesn't even
19 mention handcuffs.  It just mentions seeing him sitting
20 on the bench.
21 A.  I wasn't there.
22     Q.     You mention in your description of the
23 suspect that he was tall.  Do you know that Nijeer
24 Parks was five, seven?
25 A.  No.

Page 35

1      MR. RUBENSTEIN:  Objection as to form.
2  You can answer the question.
3  A.  No.
4      Q.     You would agree that five, seven is not
5  tall for a man?
6      MR. RUBENSTEIN:  Objection as to form.
7  You could answer it.
8  A.  Taller than me, no.  Taller than somebody else,
9  yes.
10     Q.     But five, seven in our -- is an average
11 height.  What would you guess that the average height
12 in America today?
13     MR. RUBENSTEIN:  I'm going to object as
14 to form.  If he could possibly answer that question.
15     Q.     You have no idea?  If I told you the
16 average height is five, ten would that sound right to
17 you?
18     MR. RUBENSTEIN:  Objection as to form.
19     Q.     I'm pretty sure that's what it is.
20 Five, nine.  So if the average height is five, nine,
21 you describe the suspect as being tall.  So tall is
22 taller than average; correct?
23     MR. RUBENSTEIN:  Objection as to form.
24 You can answer it if you can.
25 A.  I guess depends in whose eyes.

Page 36

1      Q.     You recovered a sneaker of the suspect.
2  A sneaker was recovered, you reported being recovered;
3  correct?
4  A.  Yes.
5      Q.     And you had seen it on the suspect's
6  feet and you noted that it fell off while he was
7  running; correct?
8  A.  Yes.
9      Q.     There's a picture taken by Detective
10 Quesada that shows the sneaker about -- it's next to a
11 ruler that's 12 inches long.  You would agree that the
12 fact that Nijeer Parks' foot is five, eight or five,
13 nine would be indicative of his innocence?
14     MR. RUBENSTEIN:  Once again I'm
15 objecting to the form.  And you said that his -- he was
16 5-foot 8 and that's the size of his foot.
17     MR. SEXTON:  Did I?
18     MR. RUBENSTEIN:  Yes.
19     Q.     Size eight.  Size eight and a half I
20 believe.
21     MR. RUBENSTEIN:  And I'm objecting to
22 the form of the question, but you could answer it if
23 you could.
24 A.  I'm not a shoe expert.
25     Q.     You need to be a shoe expert to tell the

Pages 33 to 36

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 37

1 difference between somebody who's foot is size eight
2 and somebody who's foot is size 12?
3       MR. RUBENSTEIN: Objection as to form.
4 You can answer. Go ahead.
5   A.   I mean if I put my foot up here would you be able
6 to tell what size shoe I am?
7   Q.   Probably could guess.
8       MR. RUBENSTEIN: We're not here to
9 guess, so ask the next question.
10   Q.   Anyway, you didn't have to guess because
11 you had possession of the shoe.
12   A.   Yes, we did.
13   Q.   Did you view this as a serious offense
14 that was being investigated and prosecuted?
15   A.   Every offense is a serious offense.
16   Q.   There's no difference in gravity between
17 serial murder and shoplifting?
18   A.   Different degrees.
19   Q.   Of seriousness. I mean the law has
20 gradations, the whole criminal code; right?
21   A.   Yes.
22   Q.   So did you view this as a serious crime?
23   A.   Again, every --
24       MR. RUBENSTEIN: Just note my objection
25 because he was charged with -- they were investigating

Page 38

1 and he was charged with multiple crimes. So which
2 crime are you referring to? Shoplifting? Which crime?
3   Q.   You're the charging officer. So did you
4 view this matter as a serious matter? And if so, which
5 was serious?
6   A.   I'm going to stick to my answer. Every -- every
7 crime is serious.
8   Q.   Well, isn't generally assault on a
9 police officer one of the most serious of offenses
10 there can be? New York there's only one murder one.
11 It's an attack on a -- a murder of a police officer,
12 for instance.
13   A.   Personal opinion I think sexual assault is the
14 most serious offense or murdering or crimes against
15 women or little kids. You know, personal opinions.
16   Q.   So there are certain categories of
17 victims that make the elevated crime?
18   A.   No, I didn't say that.
19   Q.   Well, you have children. Children are
20 one category of victims; women are another category;
21 law enforcement are another category?
22   A.   No.
23   Q.   No. Now, in Exhibit R you said that in
24 the last sentence in your narrative, "After signing the
25 warrant, Detective Tapia, Detective Goines and I drove

Page 39

1 to Paterson PD to arrest Parks." Did you go -- you
2 went in one vehicle?
3   A.   Yes.
4   Q.   And it was your vehicle? You drove?
5   A.   No.
6   Q.   Okay. Who drove?
7   A.   I believe it was Detective Goines.
8   Q.   And did you do your Affidavit of
9 Probable Cause and your complaint at the same time
10 together with Tapia? Tapia?
11   A.   I did mine downstairs in the report room.
12   Q.   Do you know if you did yours before,
13 after or at the same that time Tapia was doing his?
14   A.   I don't know.
15       (There is a recess.)
16   Q.   I think the question was did you do your
17 warrant and affidavit at the same time or after Tapia
18 and you said you didn't know. So when did you do yours
19 in relation to when Detective Tapia told you about the
20 hit?
21   A.   Do you have Detective Tapia's warrant?
22   Q.   I do.
23       MR. RUBENSTEIN: But just to be clear,
24 he asked for his complaint, he didn't ask for just the
25 Affidavit of Probable Cause.

Page 40

1   Q.   Do you need the full complaint or can
2 you tell from the affidavit?
3   A.   Both.
4       MR. RUBENSTEIN: Parks 1 and it goes
5 through Parks 22.
6       MR. SEXTON: You talking about your
7 Bates stamps?
8       MR. RUBENSTEIN: Yes.
9       (Plaintiff's Exhibit P-DD, Complaint and
10 Affidavit of Probable Cause, was received and marked
11 for identification.)
12   Q.   Does that help you?
13   A.   Repeat the question.
14   Q.   Did you do it before, at the same time
15 or after?
16   A.   According to this I did it after.
17   Q.   How long after?
18   A.   I don't know.
19   Q.   How can you tell? Is it the numbering?
20   A.   The numbering.
21   Q.   Okay. So yours is 1225 --
22   A.   Mine's 158. His is 156.
23   Q.   So there's one in between you. Do you
24 remember -- after Detective Tapia told you about the
25 hit, how long after that did you do the report --

Pages 37 to 40

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 41

```
 1    rather the warrant complaint and affidavit?
 2    A.    I do not know the exact specific time.
 3         Q.    Estimate?
 4    A.    I cannot give you that.
 5         Q.    You went down -- your report says after
 6    signing the reports you guys drove to Paterson; right?
 7    A.    Yes.
 8         Q.    Am I over reading this, but the way I
 9    read it it makes it sound like you were -- this is all
10    sort of happening at the same time.  After signing the
11    warrant -- let me say warrant's singular.  "Tapia,
12    Goines and I drove to Paterson."  So it sounds like
13    this is all kind of happening together at the same
14    time.
15    A.    I believe so.
16         Q.    So you guys were being efficient?
17    A.    Yes.
18         Q.    After driving to Paterson to try to
19    serve him and arrest him did you have any other
20    involvement with this matter?
21    A.    No.
22         Q.    Did you hear anything else about this
23    matter through the grapevine?
24    A.    Besides from what I told you, no.
25         Q.    So up until you saw it in the news
```

Page 42

```
 1    nothing after that day when you tried to arrest him?
 2    A.    No.  Nothing.
 3         Q.    So do you know if you were working the
 4    day that Nijeer came down to headquarters which was
 5    Tuesday, February 5, 2018?
 6    A.    I don't think I was.
 7         Q.    Why don't you think you were?
 8    A.    Logically speaking, if I was they would have
 9    called me down there.
10         Q.    Officer Lee lives in town?
11    A.    I don't know where Officer Lee lives.
12         Q.    You live in town?
13    A.    During this time, no.
14         Q.    No, you didn't.  Today?
15    A.    I live in town now, but I didn't live then.
16         Q.    Where did you live then?
17    A.    Middletown.
18         Q.    When you did your 90-day rotation in the
19    detective bureau did you -- strike that.
20              Have you ever had at anytime involvement
21    in sending fingerprints to the Holmdel lab or any other
22    lab?
23    A.    No.
24         Q.    Do you have any idea how long it takes
25    to get a report on fingerprints?
```

Page 43

```
 1    A.    No.
 2         Q.    How about DNA?
 3    A.    No.
 4         Q.    You said you were never a defendant in a
 5    lawsuit?
 6    A.    No.
 7         Q.    You did not say that?  Were you a
 8    defendant in a lawsuit?
 9    A.    No.  I think 18 I rear ended somebody.
10         Q.    Wasn't there a excessive force complaint
11    at the mall, Ayler, Harris and Gordan v. Woodbridge?
12    A.    I wasn't even there.  I was their off duty.  I
13    just stood by.
14         Q.    But you were named as a defendant,
15    weren't you?
16    A.    I mean the mayor was named defendant for this
17    trial and he wasn't there.
18         Q.    What do you remember about that case?
19    A.    This case?
20         Q.    No.  The mall case.
21    A.    Mall case.  I was shopping.  I saw people chasing
22    somebody.  I walked out with my goods.  I saw the
23    Officer Benigno standing there with three females on
24    the ground.  I stood by there off to the side to make
25    sure he was okay.  Other cops came and I left.
```

Page 44

```
 1         Q.    But now having raised this matter, do
 2    you remember being named as a defendant?
 3    A.    Yes.
 4         Q.    Okay.  Are you aware that that was
 5    settled for a payout to the plaintiffs?
 6    A.    Yes.
 7         Q.    Did you receive any discipline as a
 8    result of that?
 9    A.    No.
10         Q.    Do you know if Benigno did?
11    A.    I don't know.
12         Q.    Were you required to testify at a
13    disciplinary hearing either in the department or at
14    OAL?
15    A.    No.
16         Q.    Did IA ever interview you regarding the
17    matter?
18    A.    I don't know.
19         Q.    Have you ever been interviewed by IA?
20    A.    Yes.
21         Q.    When have you been interviewed by IA?
22    A.    I don't know exactly, but when I got hired I got
23    interviewed by them.
24         Q.    As a part of the hiring process?
25    A.    Yes.
```

Pages 41 to 44

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 45

1    Q.    Any other time since then?
2    A.    There may have been other times, but I can't
3    recall.  But nothing -- no discipline was ever
4    occurred.
5    Q.    Do you remember who else was named in
6    that lawsuit besides you and Benigno?
7    A.    No.
8    Q.    Benigno is retired, isn't he?
9    A.    Yes.
10   Q.    Do you remember that there was some
11   security guards from Woodbridge Mall named?
12   A.    I don't know.
13   Q.    Do you remember any of the process in
14   that case?  Were you deposed in that case?
15   A.    No.
16   Q.    Like this?
17   A.    Like I said, my involvement in that was minimal.
18   Q.    Did you observe any misconduct by
19   Benigno at that time?
20   A.    No.  Like I said, my only involvement was they
21   were out there and they were on the ground.
22   Q.    When you were writing out your complaint
23   did you make -- did you talk to anybody at the
24   prosecutor's office?
25   A.    Yes.  Before we even write anything out we always

Page 46

1    contact the prosecutor and we give -- we tell them what
2    we have who as at that time I believe Peter Nastasi.
3    And he tells us whether or not we have enough to sign
4    the complaint.
5    Q.    Do you write any memos or emails or
6    anything memorializing your discussion with the
7    prosecutor?
8    A.    In reports we say spoke to prosecutor --
9    assistant prosecutor, whoever we spoke with.
10   Q.    Do you ever do this by email?
11   A.    No.  By supplemental report number three.
12   Q.    Your report says, "Peter Nastasi
13   approved the warrant."
14   A.    Yes.
15   Q.    Can you tell me with as much detail as
16   you can recall how he approved the warrant?  What was
17   presented to him?
18   A.    Well, it's common practice, well, for me whenever
19   I call the assistant prosecutor I tell them everything,
20   all the information I have, all the facts.  And he
21   advised me -- he's like, all right, you have enough for
22   this or that.  So.
23   Q.    Is this before or after you've drafted
24   it?
25   A.    This is before.  I don't now if it's a warrant or

Page 47

1    summons.  He'll tell me whether or not there's a
2    warrant or summons or no warrant at all.
3    Q.    What's the difference between a warrant
4    and a summons?
5    A.    Summons they don't get arrested unless it's like
6    a domestic violence.
7    Q.    And so there's a complaint with both,
8    but one's a complaint -- a warrant and a complaint,
9    one's a summons and complaint?
10   A.    Yes.
11   Q.    And do you know why this was a warrant
12   and complaint and not a summons and complaint?
13   A.    I would assume the severity of the incident.
14   Q.    And then you say, "It was signed by the
15   Honorable Judge David Stahl."  Did you have any
16   communications with Stahl?
17   A.    I don't remember.
18   Q.    Would you agree that your report
19   suggests that you did not have any communications with
20   Judge Stahl?
21   MR. RUBENSTEIN:  Objection as to form.
22   Q.    Reading your report it says, "Nastasi
23   approved the warrant and it was signed by the Honorable
24   Judge David Stahl on 1/30/19."  Is there anything there
25   suggesting that you communicated or spoke or were

Page 48

1    questioned by Judge Stahl?
2    A.    Yes.  When I -- if I write that down sometimes I
3    talk to the judges.  I don't specifically say I talked
4    to Judge So and So.  You know, so a good chance I
5    talked to him, but possibly it's changed.  Sometimes we
6    call the judges; sometimes we don't.  I don't recall
7    what the policy was at this time.
8    Q.    Actually, when you look at your report
9    closely it seems like you signed the complaint and
10   drafted it up before you talked to Nastasi.  Says, "I
11   signed the complaint charges", dot, dot, dot.  And then
12   with the number.  Then you say period, "AP Peter
13   Nastasi approved the warrant."  So your report makes it
14   sound like you drafted it and submitted it and he
15   approved it after the fact.
16   A.    I understand, but it's not possible because he
17   has to tell me if it's a warrant or summons.  You can't
18   -- you know.  And --
19   Q.    Could it be that you had a good sense
20   that this was going to be a warrant and complaint not a
21   summons and complaint and had that approved by him
22   after?
23   A.    Possible, yes.  But again, I don't recall which
24   came first.  I can't -- you know, I don't know that day
25   if I drafted it first or -- it's three years ago.

Pages 45 to 48

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 49

1    Q.    Did we talk about S, Exhibit S?
2  A.  No.
3    Q.    Have you ever seen this form before?
4  A.  No.
5    Q.    Do you know what the ROIC is?
6  A.   State Police Intelligence Regional Office
7  something.  Intelligence Center I assume.  I'm
8  guessing.
9         MR. RUBENSTEIN:  Don't guess.
10  A.   No, I know its basis.  I'm not sure what it
11  stands for.
12    Q.    So it's some kind of intelligence unit
13  with the state police?
14  A.  Yes.
15    Q.    So their form says -- this is in big
16  letters -- "Investigative lead, not probable cause to
17  make an arrest regarding facial recognition request
18  form."  Do you have an understanding of what was meant
19  by that?
20  A.   I've never seen that form.
21    Q.    Knowing that, do you have any
22  understanding what that would mean on a form issued by
23  the ROIC?
24  A.  Yes.
25    Q.    Okay.  What is that understanding?

Page 50

1  A.    What's the exact wording?
2    Q.    "Investigative lead, not probable cause
3  to make an arrest."
4  A.   That it's just a lead.
5         MR. SEXTON:  That's all I have.  I'm
6  sure your attorney has some.
7
8  CROSS EXAMINATION BY MR. RUBENSTEIN:
9    Q.    So Officer Lyszk, you went out -- you
10  were dispatched to the scene of the Hampton Inn on
11  January 26, 2019?
12  A.  Yes.
13    Q.    And when you arrived you went to the
14  hotel lobby and Officer Lee was already there?
15  A.  Yes.
16    Q.    And was Officer Lee dealing with the
17  person who they believed had shoplifted at this point?
18  A.  Yes.
19    Q.    After -- what you described to us is
20  after the events that occurred at the Hampton Inn you
21  were at some later point dealing with Detective Tapia.
22  And did he show you a photograph that was obtained
23  through the use of facial recognition software?
24  A.  Yes.
25    Q.    When you saw the photograph did you

Page 51

1  identify the person in that photograph as being the
2  same person who you recognized from being at the scene
3  of the incident on January 26, 2019?
4  A.  Yes.
5    Q.    And were you informed that that person
6  in the photograph that was obtained through facial
7  recognition was of Nijeer Parks?
8  A.  Yes.
9    Q.    Was it after you confirmed that it was
10  Nijeer Parks to Detective Tapia that you communicated
11  with Assistant Prosecutor Nastasi about filing a
12  complaint against that individual?
13  A.  Yes.
14    Q.    And did Assistance Prosecutor Nastasi
15  give you the go ahead to prepare the complaint and have
16  him review it before you submitted it to the judge?
17  A.  Yes.
18    Q.    So your Affidavit of Probable Cause is
19  written in document BB.  This whole document was
20  submitted to Assistant Prosecutor Nastasi?
21  A.  Yes.
22    Q.    And for lack of a better term, he gave
23  it his blessing to submit to the judge for his approval
24  for issuance of the complaint?
25  A.  Yes.

Page 52

1    Q.    Is there anything in your Affidavit of
2  Probable Cause that is not true?
3  A.  No.
4    Q.    Are you certain that you communicated
5  with Detective Tapia that you saw the photograph taken
6  -- obtained through facial recognition and that you
7  acknowledge that that is the same person that you saw
8  at the Hampton Inn on January 26, 2019?
9  A.  Yes.
10    Q.    After Assistant Prosecutor Nastasi gave
11  you the okay after he reviewed the affidavit, after he
12  reviewed the complaint, did you submit the complaint to
13  Judge Stahl?
14  A.  Yes.
15    Q.    Now, back when this was done in 2019 was
16  it done where you had to hand it to the judge actually
17  or was it by electronic where you submit it to the
18  judge?
19  A.   I believe it was electronic.
20    Q.    Okay.  Do you recall if that's how you
21  submitted it for review by Assistant Prosecutor
22  Nastasi?  Was it electronically that you hand it to
23  him?
24  A.  Yes.
25    Q.    Was it electronically?

Pages 49 to 52

Page 53

1    A.   Yes.
2         Q.   And then you submitted it -- you
3    submitted your complaint to Judge Stahl for review and
4    ultimately his approval?
5    A.   Yes.
6         Q.   Did you in fact obtain Judge Stahl's
7    approval for the issuance of the complaint?
8    A.   Yes.
9         Q.   And it was after Judge Stahl -- was it
10   after Judge Stahl had agreed to sign off on the
11   complaint warrant that you went out to -- with other
12   two detectives you went out to Paterson to try to
13   locate Mr. Parks?
14   A.   Yes.
15        Q.   And when you went out there that time
16   you were not successful in locating him?
17   A.   That's correct.
18        Q.   After that date did you have any
19   involvement in this case in terms of giving any
20   testimony or having to identify anyone or anything like
21   that?
22   A.   No.
23        Q.   So is it fair to say that your
24   involvement ceased on the day that you went out to
25   Paterson to try to locate Nijeer Parks but were

Page 54

1    unsuccessful in your attempt?
2    A.   Yes.
3         Q.   Now, your supplemental report you
4    indicated is January 30th of 2019; is that correct?
5    A.   Yes.
6         Q.   And in the body of the report, the
7    second -- the first full paragraph it states on the
8    bottom the complaint number, "AP Nastasi approved the
9    warrant and it was signed by Honorable David Stahl on
10   1/30/19."  Does it help you remember what date the
11   judge signed it?
12   A.   Yes.
13        Q.   Okay.  Was it the same date that you
14   wrote this document?
15   A.   Yes.
16        Q.   Okay.  And when you presented the matter
17   to Assistant Prosecutor Nastasi did you indicate to him
18   that you saw the photograph from facial recognition and
19   it was the same person that you had recognized from the
20   Hampton Inn?
21   A.   I believe so.
22        Q.   I don't have anything further.  Counsel
23   might have some follow-up.
24
25   REDIRECT EXAMINATION BY MR. SEXTON:

Page 55

1         Q.   Where did Detective Tapia show you --
2    strike that.
3              You just testified that Detective Tapia
4    showed you a picture he received from the facial
5    recognition search; correct?
6    A.   Yes.
7         Q.   And do you know how was this picture
8    presented to you?  Was it in hard copy?  Was it sent to
9    you by email?  Did you view it on one of his devices?
10   A.   I believe it was a hard copy.
11        Q.   And do you recall where you saw it?
12   A.   Either report room or detective bureau.  I don't
13   recall exactly.
14        Q.   Were you given an array of photos from
15   which to identify the picture or just a photo?
16   A.   Just a photo.
17        Q.   Do you remember what the photo of the --
18   can you describe the photo of the person?
19   A.   No.
20        Q.   You have no recollection?
21   A.   No.
22        Q.   Do you know if it was a family photo?
23   A.   I don't know.  I don't remember.  It's been
24   sometime.
25        Q.   You don't remember if it was a school ID

Page 56

1    photo?
2    A.   I would just be making speculations if I answered
3    that question.
4         Q.   You don't remember if it was a driver's
5    license photo?
6    A.   No, I do not.
7         Q.   You never saw any of the surveillance
8    footage; correct?
9    A.   No.
10        Q.   Do you know were you presented -- at the
11   time you identified the photo that was presented to you
12   as a result of the facial recognition search, were you
13   also showed photographs of the driver's license,
14   Tennessee driver's license photo?
15   A.   I don't know.
16        Q.   And why is there no mention in your
17   report or your affidavit of being shown the results of
18   the facial recognition search?
19   A.   I don't know.
20        Q.   And why is there no mention of this in
21   the report or affidavits of Detective Tapia?
22        MR. RUBENSTEIN:  Objection as to form.
23   You can answer.
24   A.   I would assume bad report writing.
25        Q.   If you look at your Affidavit of

Pages 53 to 56

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 57

1  Probable Cause. It's BB, page 11 of 13. First line of
2  your affidavit says, quote, "While investigating a
3  shoplifting of $39 worth of merchandise at the Hampton
4  Inn, the hotel manager, Richard Traneco, advised us
5  that Parks was the suspect." That's an incorrect
6  statement, isn't it?
7      A.  That's bad report writing.
8      Q.      That's false, isn't it? Did Richard
9  Traneco advise you that Parks was the suspect? Yes or
10  no.
11     A.  No.
12     Q.      Okay. And indeed you rewrote the
13  history concerning Parks' name that you got from the
14  facial recognition search back into the investigation
15  as if you had his name from the beginning, didn't you,
16  starting with the narrative of the hotel -- of the
17  hotel manager?
18     A.  This was done after we received the facial
19  recognition. And normal practice that we do, once we
20  identify a suspect we add a suspect's name in.
21     Q.      So that was a false report submitted to
22  the prosecutor and to the judge; correct?
23          MR. RUBENSTEIN: Objection as to form.
24     Q.      Because Tarneco did not identify the
25  suspect as Parks; correct? He never uttered that word;

Page 58

1  correct?
2      A.  Tarneco never said.
3      Q.      By the way, when you went to Paterson
4  you went to -- did you meet with Nijeer's grandmother?
5      A.  We met with somebody.
6      Q.      An older African American lady at the
7  address where Nijeer lived?
8      A.  Yes.
9      Q.      Okay. And do you remember your
10  conversation with her?
11     A.  No. I wasn't really speaking. I don't believe I
12  was really speaking anything.
13     Q.      Who was doing the talking?
14     A.  One of the detectives.
15     Q.      Do you remember which one?
16     A.  No.
17     Q.      Do you remember what was said?
18     A.  No.
19     Q.      Were you within earshot?
20     A.  Yes.
21     Q.      Fair to say that Nijeer's grandmother
22  was upset? Concerned?
23     A.  I would assume, yes.
24     Q.      She said she'd call him?
25     A.  I don't recall what she said.

Page 59

1      Q.      Do you remember her giving -- calling
2  him while you were there?
3      A.  I don't remember.
4      Q.      Do you know that all of these other
5  eyewitnesses --
6          MR. RUBENSTEIN: Which document are you
7  referring to?
8      Q.      I'm looking at -- I think it's in your
9  report, but I have in front of me Exhibit A which is
10  Lee's report. And he indicates Kaley Higgins, white
11  female mall witness, Kamisha Grant, a black female
12  witness. Both lived in Woodbridge. And he also lists
13  Richard Tarneco. Do you know why none of these persons
14  were involved in the identification of Parks when he
15  was brought in?
16          MR. RUBENSTEIN: Objection as to form.
17  You can answer.
18     A.  I wasn't working so I can't answer that.
19     Q.      If you were one of the detectives would
20  you have called one of these eyewitnesses?
21          MR. RUBENSTEIN: Objection as to form.
22     Q.      To identify the suspect?
23          MR. RUBENSTEIN: Objection as to form.
24  If you can answer it. It calls for speculation.
25     A.  It's what if's.

Page 60

1      Q.      Well, you got the wrong guy here. What
2  could you have done better?
3      A.  I wasn't working that day.
4      Q.      Had you been working what could have
5  been done better?
6          MR. RUBENSTEIN: Objection as to form.
7  If you can answer.
8      A.  But I wasn't.
9      Q.      Were you aware of any urgency -- strike
10  that.
11          Are there certain times when it becomes
12  time is of the essence to arrest somebody even when you
13  don't have all your ducks lined up?
14          MR. RUBENSTEIN: Objection as to form.
15     Q.      I don't know the answer. Maybe there is
16  or isn't.
17     A.  Repeat that.
18     Q.      Are there some times where you go ahead
19  and you have to arrest somebody as quickly as possible
20  even if all the ducks aren't lined up in a row?
21     A.  No. You arrest somebody when you have probable
22  cause.
23     Q.      What if you have fear of an emanant --
24  if the person's eminently dangerous or something like
25  that?

Pages 57 to 60

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 61

1   A.   I mean if there's no probable cause no probable
2   cause.
3       Q.   Was there any urgency in this case?
4   A.   Probable cause was developed.
5       Q.   How was it developed?
6   A.   We received a facial recognition hit.  I also
7   confirmed that -- I confirmed that the person in the
8   facial recognition hit was the person that was at the
9   hotel, that looked like the person that was at the
10  hotel.  And after approval from the prosecutor of what
11  I had, he told me probable cause has been developed and
12  signed the complaint.
13      Q.   And the facial recognition hit was done
14  on an altered photo of the picture.  You know that?
15          MR. RUBENSTEIN:  Objection as to form.
16      Q.   And you don't recall if you were given
17  comparison photos between the driver's license and the
18  facial recognition hit; correct?
19  A.   I don't remember.
20      Q.   And you know physically Nijeer Parks is
21  a small, slight man not a tall person as identified by
22  you?
23          MR. RUBENSTEIN:  Objection to the form.
24  You can answer.
25  A.   I never met him.

Page 62

1       Q.   They didn't bother to call you in to ID
2   him?
3           MR. RUBENSTEIN:  Objection as to form.
4   You can answer.
5   A.   No.
6       Q.   You know Officer Lee agreed with you
7   that he was tall, the suspect; right?  You're aware of
8   that.  It's in his report; correct?
9   A.   If that's what his report says, yes.
10      Q.   But Officer Lee only ID'd him when
11  sitting down.  You can't really gauge a man's height
12  when he's seated.  Rather difficult.  Do you agree?
13          MR. RUBENSTEIN:  Objection as to form.
14  You can answer.
15  A.   Again, I wasn't there.
16      Q.   Your understanding of probable cause,
17  what's that -- where did you derive that from?
18          MR. RUBENSTEIN:  The generic definition
19  or this specific case?  I just want to make sure he's
20  answering what you're asking.
21      Q.   The term probable cause, your
22  understanding, where does that -- where do you derive
23  that from?
24  A.   From the 2C.
25      Q.   Referring to Title 2C of New Jersey

Page 63

1   Statutes?
2   A.   Yes.
3       Q.   Do you know which particular --
4   A.   Definitions.
5       Q.   Can you elaborate on that in any detail?
6   A.   I mean I could look up the definition of it.
7       Q.   Do you have a -- without looking it up
8   do you have an understanding of it?
9   A.   I believe I do.
10      Q.   Can you tell us what that is?
11  A.   When you have probable cause you develop certain
12  facts.  I couldn't tell you exact termage [phon] of it
13  they use, but you have to develop certain amount of
14  facts to -- in order to have enough to arrest somebody.
15  You can't just go arresting people.
16      Q.   Doesn't it require evidence that will be
17  admissible at trial?
18          MR. RUBENSTEIN:  Objection as to form.
19      Q.   Do you know?
20          MR. RUBENSTEIN:  If you can answer the
21  question go ahead.
22  A.   I don't know for a fact.
23      Q.   All right.  Thank you, sir.  I
24  appreciate your time.
25          THE COURT REPORTER:  Ms. Lempka, will

Page 64

1   you be ordering a transcript?
2           MS. LEMPKA:  Yes.
3
4           (The witness is excused.)
5           (The matter is adjourned at 3:07 P.M.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Pages 61 to 64

New York
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

New Jersey
732-906-2078

Page 65

```
1              CERTIFICATE
2
3          I, CARMEN WOLFE, a Certified Shorthand
4     Reporter and Notary Public of the State of New Jersey,
5     certify that the foregoing is a true and accurate
6     transcript of the deposition of ANDREW LYSZK, who was
7     first duly sworn by me.
8
9          I further certify that I am neither
10    attorney or counsel for, nor related to or employed by
11    any of the parties to the action in which the
12    deposition is taken and that I am not a relative or
13    employee of any attorney or counsel employed in this
14    case, nor am I financially interested in the action.
15
16
17
18              CARMEN WOLFE
19         CERTIFIED SHORTHAND REPORTER
20
21
22    Dated:  September 6, 2022
23    Notary Expiration Date:  November 10, 2026
24
25
```

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

# EXHIBIT "D"

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CIVIL ACTION NO. 21-04021-(JXN)-(LDW)

NIJEER PARKS,
        vs.
JOHN E. McCORMACK, MAYOR OF WOODBRIDGE, in his
personal and official capacity, ROBERT HUBNER,
DIRECTOR OF THE WOODBRIDGE POLICE, in his personal
and official capacity, CITY OF WOODBRIDGE POLICE
OFFICERS, ANDREW LYSZK and WOODBRIDGE POLICE
SGT. JOSEPH LICCIARDI, WOODBRIDGE POLICE OFFICERS,
JOHN AND JANE DOES 1-20, being as yet unknown
actors, MIDDLESEX DEPARTMENT OF CORRECTIONS, JOHN
AND JANE DOES 1-20, being unknown actors, MIDDLESEX
COUNTY PROSECUTOR, ACTING PROSECUTOR CHRISTOPHER
KUBERIET, in his personal and official capacity, and
ASSISTANT MIDDLESEX COUNTY PROSECUTOR, PETER NATASI,
and IDEMIA INC.'S being the maker of the facial
recognition software and ABC CORPORATION, being an
as yet unknown seller or servicer of the facial
recognition programs,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

OFFICER FRANCIS LEE

TRANSCRIPT of the stenographic notes of
the proceedings in the above-entitled matter, as
taken by and before LAURA P. REAM, a Certified
Court Reporter and Notary Public of the State of
New Jersey, held at the law offices of James P.
Nolan and Associates, 61 Green Street, Woodbridge,
New Jersey, on Friday, August 12, 2022, commencing
at 9:34 a.m.

HUDSON COURT REPORTING & VIDEO   (732) 906-2078

Page 2

1    A P P E A R A N C E S :
2
3    DANIEL W. SEXTON, ESQ., LLC
     BY: DANIEL W. SEXTON, ESQUIRE
     229 New Center Road
4    Hillsborough, NJ 08844
     201-406-9960
5    Danielsextonesq@gmail.com
     Representing the Defendant,
6    Middlesex Department of Corrections
7
     DVORAK & ASSOCIATES
8    BY:  GRACE LEMPKA, ESQUIRE
     467 Middlesex Avenue
9    Metuchen, NJ 08840
     732-317-0130
10   Glempka@dvoraklegal.com
     Representing the Defendant,
11   Middlesex Department of Corrections
12
     LAW OFFICES OF JAMES P. NOLAN AND ASSOCIATES
13   BY:  FREDERICK L. RUBENSTEIN, ESQUIRE
     61 Green Street
14   Woodbridge, New Jersey  07095
     732-636-3344
15   Frubenstein@jpnlaw.us
     Representing the Defendant,
16   Township of Woodbridge
17
18
     ALSO PRESENT:
19
     SAMANTHA SALZONE, ESQUIRE
20
     GARRY CLEMENTE, ESQUIRE
21
22
23
24
25

Page 3

1               I N D E X
2    WITNESS                      PAGE
3    OFFICER FRANCIS LEE
4    DIRECT EXAMINATION BY MR. SEXTON      5
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              E X H I B I T S
2    PLAINTIFF'S
3    No.      Description              Page
4    A        2/13/19 Police Report     14
5    B        1/26/19 Police Report     15
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Pages 1 to 4

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 5

1  OFFICER FRANCIS LEE, L-E-E, sworn by the
2  Notary Public, testified as follows:
3  DIRECT EXAMINATION
4  BY MR. SEXTON:
5    Q.  Good morning, Officer.  My name is
6  Dan Sexton.  I represent the plaintiff.
7       Have you had your deposition taken
8  before?
9    A.  No.
10   Q.  Okay.  So as you can see, there's a
11  reporter taking everything up, so it's
12  important that we communicate verbally because she
13  can't take down gestures or nods.  So just keep
14  that in mind.
15   A.  Okay.
16   Q.  If there's any question that I ask
17  that you don't understand, I'll be happy to
18  rephrase it.  From time to time your attorney will
19  interject with objections.  Normally that's just
20  for the record.  If he instructs you not to
21  answer, then he and I will work that out.
22       Do you have any questions of me
23  before we proceed?
24   A.  No.
25   Q.  Okay.  When did you come on the job?

Page 6

1    A.  2010.
2    Q.  What's your date of birth?
3    A.  10/17/1982.
4    Q.  And do you have a -- what was your
5  last year of education?
6    A.  I have college, two years of college.
7    Q.  Okay.  Was that Middlesex Community
8  or...?
9    A.  Middlesex Community College, yes.
10   Q.  And is Woodbridge a Civil Service
11  jurisdiction?
12   A.  Yes.
13   Q.  So you took a test to get on the list?
14   A.  Yes, sir.
15   Q.  So where did you go -- can you briefly
16  describe your training when you came on the job?
17   A.  I went to Stamler Police Academy in Union.
18  That's where -- my police academy training.
19   Q.  And how many weeks was that?
20   A.  Probably about -- approximately about six
21  months.
22   Q.  Six months, okay.
23       And so then were you -- what was the
24  chronology?  Were you hired and then went to the
25  academy, or did you go right to the academy and

Page 7

1  then -- like, did you work as a special or
2  anything like that before going into the academy,
3  or...?
4    A.  No.  I was hired and then went into the
5  academy.
6    Q.  Okay.  So you would have been finished
7  the academy about mid-2010?
8    A.  No, it was two thousand -- because I got
9  hired December 2010, so it was 2011 I was in the
10  academy.
11   Q.  Okay.  After the academy did you have
12  any other training, other than on-the-job
13  training?  Were you ever sent to -- back to the
14  academy or to any other facility for training?
15   A.  No.
16   Q.  Okay.  Did you have -- was there any
17  on-the-job training?
18   A.  Yes.
19   Q.  Can you describe the on-the-job
20  training?
21   A.  Different, like, firearms training,
22  training through the agency for, like, domestic
23  violence.
24   Q.  Anything else that you can recall?
25   A.  Pretty much anything going to, like,

Page 8

1  different seminars through the agency.
2    Q.  Through the --
3    A.  Different seminars for, like, domestic
4  violence for -- I'm trying to think.  There was a
5  lot of stuff.
6    Q.  These would be in the department,
7  though?
8    A.  In the department, and also I would be sent
9  to, like, stuff run by the county.
10   Q.  When it was done by the county, would
11  this be the county prosecutor running it?
12   A.  For the most part, yes.
13   Q.  How many seminars, approximately,
14  would you do yearly?
15   A.  At least one because it was mostly for,
16  like, domestic violence.
17   Q.  And of the -- what percentage of these
18  seminars were done by the department and what
19  percent were done by the county?
20   A.  Most of them by the county.
21   Q.  Do you know -- do you remember any
22  names of the county who did the training?
23   A.  It would be probably mostly Middlesex
24  County.
25   Q.  Yeah, but do you remember any

Pages 5 to 8

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 9

1  individuals?
2  A.  No.
3      Q.  Were they assistant county
4  prosecutors?
5  A.  Assistant county prosecutors and other
6  staff members from the county.
7      Q.  Were they investigators from the --
8  A.  I'm not sure.
9      Q.  Would you get certifications after
10  completing these seminars?
11  A.  Yes.  We would get like a certificate
12  saying we attended.
13      Q.  Did you ever have any training
14  following the -- after the events of this case
15  addressing how this case was handled?
16  A.  No.
17          MR. RUBENSTEIN:  Specific as to this
18      case, right?
19          MR. SEXTON:  Correct.
20          THE WITNESS:  No.
21  BY MR. SEXTON:
22      Q.  Okay.  Was there ever -- did anybody
23  ever say anything to you about this case?
24  A.  No.
25      Q.  So then you -- fair to say then you

Page 10

1  never received a verbal warning concerning this
2  case, anything about this case?
3  A.  No.
4      Q.  And there was no -- you never received
5  any discipline relating to this case?
6  A.  No.
7      Q.  Do you know if anybody in the
8  department ever did a review of this case or an
9  investigation?
10  A.  As in -- what do you mean, like a detective
11  doing the investigation or...
12      Q.  No.  Do you have an Internal Affairs'
13  office?
14  A.  Yes.
15      Q.  Who is the commander of IA?
16  A.  We usually report to Lieutenant Barrett.
17      Q.  Lieutenant Barrett?
18  A.  Yeah.
19      Q.  So would Lieutenant Barrett be the one
20  who handles all investigations of misconduct or
21  things -- problematic conduct of officers?
22  A.  Yes.
23      Q.  And do you know if Lieutenant Barrett
24  ever did any kind of review or investigation of
25  events based on this case?

Page 11

1  A.  I don't know if he did or not.
2      Q.  And as far as you know --
3  A.  Yes.  As far as I know, I don't think he
4  has.
5      Q.  Now, have you regularly testified in
6  court?
7  A.  No.
8          MR. RUBENSTEIN:  What do you mean by
9      "regularly"?
10  BY MR. SEXTON:
11      Q.  Have you testified in court?
12  A.  Yes, I have.
13      Q.  How many times have you testified in
14  court, approximately?
15  A.  Depends -- testify as in trial or as in...?
16      Q.  Well, in trial or hearing, evidentiary
17  hearing or something like that?
18  A.  Two or three times.
19      Q.  What were those -- why were you
20  testifying?  What were you testifying about in
21  those cases?
22  A.  One was for a shoplifting that turned into
23  armed robbery.
24      Q.  Was that at the criminal trial?
25  A.  Yes.

Page 12

1      Q.  And were you one of the responding
2  officers to that?
3  A.  Yes.
4      Q.  Okay.  What were the other two?
5  A.  At that time, I was also with -- I was
6  still in training, actually, so I was a training
7  officer.
8      Q.  Okay.  So but when you testified, what
9  did you testify about?  So you testified there was
10  three, so one was shoplifting?
11  A.  One was shoplifting.  The other ones I've
12  done, like, grand jury testimony.
13      Q.  And those other two were for grand
14  jury.
15          And do you know what those matters
16  were about?
17  A.  No, I don't.  It was early.
18      Q.  Have you had any training in setting
19  up IDs of suspects?
20  A.  What kind of setting up of IDs?
21      Q.  Did you know what a lineup is?
22  A.  Yes.
23      Q.  And tell me what you understand the
24  lineup to be.
25  A.  Well, the lineups would be -- as the

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 13

1    patrol, we primarily don't do lineups.  It's
2    usually detectives that do those.
3          Q.   Okay.  And were you trained in the
4    academy about lineups?
5    A.   We were told about it.
6          Q.   Do you remember what you were told?
7    A.   I can't remember.
8          Q.   Did lineups ever come up in any of the
9    seminars you have yearly?
10   A.   No.
11         Q.   Do you, from any source, whether it's
12   from watching Law & Order or from being on the
13   job, have any understanding about the science of
14   lineups?
15   A.   Yeah.
16         Q.   Okay.  What's your understanding of
17   the science of lineups?
18   A.   It's to -- well, if they have an
19   individual, they'll match them up with other
20   individuals that are similar looking, similar
21   stature.
22         Q.   Okay.  Then what do they do?
23   A.   Then asking an individual to see if that
24   person is -- if that person that they're looking
25   for is in that group of people.

Page 14

1          Q.   Okay.  So when they have a witness and
2    they want to make an ID, they get similarly
3    looking -- similar suspects together; is that what
4    you're saying?
5    A.   Yes.
6          Q.   And is there also a science of how
7    these suspects are presented?
8    A.   That I'm not sure how that's...
9          Q.   Okay.
10         MR. SEXTON:  I'd like to mark this
11   as Plaintiff's Exhibit A, I guess.
12         (Plaintiff's Exhibit A was marked
13   for identification purposes.)
14   BY MR. SEXTON:
15         Q.   I'll show you what's been marked as
16   Plaintiff's Exhibit A.  Take a couple seconds to
17   look at it and...
18         This three-page document has been
19   marked as Plaintiff's A.  Is this the report that
20   you issued on January 26, 2019?
21   A.   No.  This is not the January 26th report.
22   This is the February 12th.
23         Q.   Okay.  Where's the date?
24         MR. RUBENSTEIN:  It says right on
25   the top, February 12, 2019.

Page 15

1    BY MR. SEXTON:
2          Q.   Did you do another report on the date
3    of the -- on the 26th itself?
4    A.   Yes.
5          MR. SEXTON:  So we'll mark this as
6    Plaintiff's B.
7          (Plaintiff's Exhibit B was marked
8    for identification purposes.)
9    BY MR. SEXTON:
10         Q.   Is this the one from the 26th?
11   A.   Yes, sir.
12         Q.   Okay.  So this is a four-page
13   document, right?
14   A.   Yes, sir.
15         Q.   And how do we know that this was
16   authored -- when was this authored?
17         MR. RUBENSTEIN:  Exhibit B.  He
18   wants you to look at Exhibit B and tell
19   him how you know it was authored on
20   January 26th.
21   BY MR. SEXTON:
22         Q.   It says date/time reported, 1/26/2019,
23   12:21:50.  Is that indicating when this was
24   generated?
25   A.   That's when it came into our dispatch

Page 16

1    center, when it came in.
2          Q.   Okay.  So 12/21 in the morning is
3    that...
4    A.   P.m.
5          Q.   Oh, that's p.m.?  So that's when it
6    was received by the -- by your report system?
7    A.   Yes.
8          Q.   Okay.  These witnesses, did you take
9    the names of these witnesses?
10   A.   No, I did not.
11         Q.   Okay.  Who did that?
12   A.   Possibly Officer Lyszk.
13         Q.   The property, did you do this property
14   inventory?
15   A.   No.
16         Q.   Did you personally observe any of this
17   property?
18         MR. RUBENSTEIN:  At which point in
19   time?
20         MR. SEXTON:  At any time.
21         THE WITNESS:  During the
22   investigation, while initially at the
23   hotel, maybe some items.  Not all.
24   BY MR. SEXTON:
25         Q.   Looking down these items here, which

Pages 13 to 16

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 17

1    ones did you -- which ones, if any, did you
2    observe on the 26th at the hotel?
3        A.   The Tennessee DL, the fake Tennessee DL.
4        Q.   Okay.  By the way, sir, how tall are
5    you?
6            MR. RUBENSTEIN:  Hold on a minute.
7        He was in the middle of answering your
8        question.
9            MR. SEXTON:  Okay.  That's fair.
10           THE WITNESS:  The DL and the
11       suspected marijuana, 44 grams of suspected
12       marijuana.  Those are the only two at the
13       scene.
14   BY MR. SEXTON:
15       Q.   Did you see the Dunkin' Donuts
16   receipt?
17       A.   No, I did not.
18       Q.   Did you see his -- the sneaker that
19   fell off the suspect as he fled?
20       A.   That was -- later I was told about that,
21   since we were doing a foot pursuit.
22       Q.   When later?
23       A.   Probably -- we also had a short pursuit.
24   But after that, coming back, was told there was a
25   sneaker.

Page 18

1        Q.   So that day?
2        A.   Yes.
3        Q.   Okay.  Did you observe it?
4        A.   I can't remember if I did.
5        Q.   Now, you -- when you were responding
6    to the Hampton Inn, you had taken -- am I correct
7    in recalling you took the driver's license from
8    the suspect?
9        A.   Yes.
10       Q.   And you ran it?
11       A.   I did not -- it was -- yeah, I had it run
12   because the -- but it was not coming back.  So
13   then that was -- that's probably the last thing I
14   did with that, was trying to have dispatch run it
15   and see if it came back to anybody, if it was
16   legitimate.
17       Q.   Now, your report said that you
18   estimated that the suspect was about 5' 11",
19   right?
20       A.   Yes.
21       Q.   And how did you make that estimation?
22       A.   See, I'm 5' 6", so the suspect was taller
23   than I am.
24       Q.   Okay.  And you were face to face with
25   the suspect, right?

Page 19

1        A.   Yes.
2        Q.   So you were able to suss him out by
3    being next to him; is that fair to say?
4        A.   Yes.  I was able to kind of see how tall he
5    was.
6        Q.   So I guess this report is -- am I
7    understanding correctly this report was started on
8    the day of the incident, but it's updated with
9    additional information as it came in?  Because,
10   for instance, it indicates that the suspect is
11   Nijeer Parks.
12       A.   Yes.
13       Q.   And that was -- would have been input
14   later, correct?
15       A.   Yes.
16       Q.   And did you put that into your report,
17   or did someone else put that into your report?
18       A.   I did not put it in.
19       Q.   Okay.  How would that have gotten into
20   your report?
21       A.   It could be either possibly a detective
22   following up.
23       Q.   Now, at the end of your narrative you
24   say, "Investigation was turned over to the
25   Detective Bureau."

Page 20

1            How was the investigation turned over
2    to the Detective Bureau?
3        A.   We notify our dispatch and let them know
4    that a detective will need to be coming out to the
5    scene.
6        Q.   Okay.  And then do you -- is there
7    some kind of a briefing or a handoff that you do
8    to the detective when the detective arrives?
9        A.   I'm trying to think...  There is.  We do
10   try to give him a little information about
11   what's -- what transpired with the incident.
12       Q.   Okay.  Do you know if any such
13   briefing was done in this instance?
14       A.   That I'm not too sure because I was
15   mostly -- like I said, we had been trying to look
16   for the individual that had left the -- took off
17   in the vehicle.
18       Q.   But you pursued him onto, was it
19   Route 9?
20       A.   Yes.
21       Q.   And then did you go -- did you recover
22   the car, or was it someone else?
23       A.   I believe it was recovered later.
24       Q.   Okay.  After you went onto Route 9 and
25   you lost sight of the vehicle, what did you do

Pages 17 to 20

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 21

1  next?
2      A.   Checked the area to see if we can still
3  find the area, if he turned off any other street
4  or -- did that for a little bit.
5      Q.   Did you return to the scene at the
6  Hampton Inn?
7      A.   Yes.
8      Q.   When you returned to the scene at the
9  Hampton Inn, what did you find?
10     A.   The detectives, they were basically looking
11  over the area, the scene.
12     Q.   Do you remember which detectives?
13     A.   I do know Detective Quesada because he's
14  our ID detective.  He would be the one taking
15  pictures, collecting evidence.
16     Q.   What is an ID detective?
17     A.   They come out and process the scene, taking
18  pictures, fingerprints, evidence collection.
19     Q.   Did you speak to Detective Quesada?
20     A.   Yes.
21     Q.   Do you remember what you talked about?
22     A.   Just told him, like, which way -- when we
23  did the foot pursuit, which way they came out, any
24  possibilities of where the suspect may have
25  touched anything.  I also told him about the -- we

Page 22

1  might have video footage from the hotel.
2      Q.   Anything else?
3      A.   I think that's about it.
4      Q.   Do you know if any other detective
5  besides Detective Quesada came out?
6      A.   I know another detective would come out,
7  but I wasn't sure which one.
8      Q.   Would it have been Detective Tapia?
9      A.   Tapia?  It's possible.
10     Q.   You know, one of the instructions
11  should have been don't guess.  If you have --
12     A.   Yeah, that's -- the thing is it is
13  possible.  I'm not 100 percent sure because once
14  it's turned over to the Detective Bureau, the
15  detective that comes out may not be the one
16  assigned to the case.
17     Q.   How many are in the Detective Bureau?
18     A.   I do not know.
19     Q.   And are all of the Woodbridge police
20  officers in a facility at the Town Hall?
21     A.   No.
22     Q.   You don't have any precincts or
23  anything like that?
24     A.   No.
25     Q.   Substations?

Page 23

1      A.   Substation, yes, but that's only used on a
2  holiday.
3      Q.   Is that at the mall?
4      A.   Yes.
5      Q.   Did you have a training facility or
6  anything like that at a different site, a range?
7      A.   Range is the only other facility.
8      Q.   And where's the range?
9      A.   It's on Crow's Mill Road in Keasbey.
10     Q.   Are there any officers at the range?
11     A.   For the firearms instructors.
12     Q.   Where is IA's office?
13     A.   1 Main Street, the municipal building.
14     Q.   When you get post orders, who assigns
15  them?
16     A.   Our shift commander.
17     Q.   Did you follow the investigation in
18  any way after the incidents on the 26th of
19  January, 2019?
20     A.   No.
21     Q.   What was the next thing you heard
22  about the incident on the 26th after that date, if
23  ever?
24     A.   Being told that they may have a suspect.
25     Q.   Okay.  And do you remember when that

Page 24

1  was?
2      A.   I believe I did the supplemental report to
3  it in February.
4      Q.   Okay.  Do you want to refresh your
5  recollection?
6      A.   Yes.
7      Q.   That's plaintiff's A.
8           Do you remember when that was then?
9      A.   The report was February 5th.
10     Q.   So without looking at your report, do
11  you have a present recollection of what happened?
12     A.   I was contacted by Lieutenant Ng.
13     Q.   By lieutenant who?
14     A.   Ng.
15     Q.   I-N-G?
16     A.   N-G.
17     Q.   It's just N-G?
18     A.   Yes.
19     Q.   Okay.  And so the lieutenant called
20  you.
21           Were you on patrol at the time, or
22  where were you?
23     A.   I don't believe so.  I believe I was off
24  that day.
25     Q.   Did Lieutenant Ng call you on your --

Pages 21 to 24

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 25

```
 1   how did he call you, on your phone, on the radio,
 2   on your house phone?
 3       A.   On my phone.
 4       Q.   That would be your cell phone?
 5       A.   Yes.
 6       Q.   What did he say in that conversation?
 7       A.   Saying that he may have someone from the
 8   January incident, asking if I can come in.
 9       Q.   And did you, in fact, go in?
10       A.   Yes.
11       Q.   Tell us what you remember about
12   responding.
13       A.   Came in, was in the Detective Bureau.  They
14   were saying they might have someone that was
15   involved in that January incident in the
16   processing area, or booking area, and they asked
17   me to see if I can help identify.
18       Q.   Okay.  And where is that Detective
19   Bureau -- well strike that.
20            After that discussion, what happened?
21       A.   Then we went down to the processing/booking
22   area, and then --
23       Q.   What did they tell you before you went
24   down to that area?
25       A.   That they possibly had a suspect, to see if
```

Page 26

```
 1   I can help ID that individual.
 2       Q.   Did they tell you where the suspect
 3   was?
 4       A.   Yes.
 5       Q.   What did they say?
 6       A.   It was in the processing room where we
 7   brought processed prisoners.
 8       Q.   Did he say who he was with?
 9       A.   No.
10       Q.   Your report says that -- okay.
11            Tell us about what happened after you
12   were at the bureau.
13       A.   I was brought down to the
14   processing/booking area.
15       Q.   What's the processing/booking area
16   like?
17       A.   It's just no -- there's two rooms.  One is
18   like a main area -- maybe it's, like, three rooms,
19   the main area with two rails.
20       Q.   What's a rail?
21       A.   It's, like, a bench and then a railing
22   behind the bench where a handcuff goes onto, so
23   prisoners are handcuffed to this bench.
24       Q.   All right.  So you went to the
25   processing/booking area and -- are the rooms -- do
```

Page 27

```
 1   they have a number on it, room one, room two,
 2   or...?
 3       A.   No, it's just -- one of them will say,
 4   like, processing.  But he was in the main area
 5   where we come in from the sally port, so it's,
 6   like, a main holding area essentially.
 7       Q.   A sally port is sort of the -- when
 8   you come in the building, it's sort of a vestibule
 9   or something, a foyer?
10       A.   Yeah.  That's where police vehicles would
11   come in, and then we'll take the prisoner out
12   from the vehicle, bring it into this main holding
13   area.
14       Q.   So when you went to the main holding
15   area, how many people were in it?
16       A.   I can't remember.
17       Q.   Okay.  How many officers were in it?
18       A.   That I don't remember either.
19       Q.   What did you observe when you went
20   into the main holding area?
21       A.   The alleged suspect sitting on one of the
22   benches.
23       Q.   How did you know he was a suspect?
24       A.   I was told by Lieutenant Ng that was the
25   individual that they had brought in from that
```

Page 28

```
 1   incident.
 2       Q.   And the suspect, was he handcuffed to
 3   the rail?
 4       A.   I believe so.
 5       Q.   How close did you get to the suspect?
 6       A.   I was probably about 20, 30 feet.
 7       Q.   Now, on January 26th at the Hampton
 8   Inn you had been face to face with the suspect,
 9   correct?
10       A.   Yeah.
11       Q.   And you had an extended conversation
12   with the suspect, correct?
13       A.   Had some conversation, but I was mostly
14   watching his hands.
15       Q.   Okay.
16       A.   Just part of the job is always got to watch
17   their hands to make sure nothing -- you know, the
18   individual is not going to do anything.
19       Q.   But you also made eye contact with him
20   at some point?
21       A.   Yes.
22       Q.   Okay.  On February 5th, in the main
23   holding area, did you have any conversation with
24   him?
25       A.   No.
```

Pages 25 to 28

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 29

1       Q.  Did you -- were you able to gauge the
2   height of this individual in the holding area on
3   February 5th?  Did he stand up?
4       A.  No.
5       Q.  So fair to say it's pretty impossible
6   to gauge his height since he was sitting and
7   shackled to a rail?
8           MR. RUBENSTEIN:  Objection.
9           Go ahead.  You can answer.
10          THE WITNESS:  Okay.  Yes.
11  BY MR. SEXTON:
12      Q.  And were you -- and were you able to
13  go eye to eye with the suspect?
14      A.  No.
15      Q.  Okay.  After being shown the suspect
16  by the Lieutenant Ng, what happened next?
17      A.  I was dismissed and...
18      Q.  Did you say anything to the lieutenant
19  and detective, I think it's Penicaro?
20      A.  I told them that was the individual.
21      Q.  Okay.  And what did they say, if
22  anything?
23      A.  I don't remember if they said anything to
24  me after that.
25      Q.  Do you know the video surveillance of

Page 30

1   that holding area, how long that's retained?
2       A.  No, I do not know.
3       Q.  After telling the lieutenant -- the
4   statement "that was the individual," you said that
5   to whom?
6       A.  I was telling that to Lieutenant Ng and
7   Penicaro.
8       Q.  To both of them?
9       A.  Yes, because they were both there.
10      Q.  Did you do anything else as a result
11  of this -- observing this suspect?
12      A.  No.
13      Q.  You did issue this report, did you
14  not?
15      A.  Yes.
16      Q.  Why did you do that?
17      A.  Just so it's on the record showing that I
18  had come in and made that identification.
19      Q.  Okay.  Were you asked to write the
20  report?
21      A.  Yes.
22      Q.  Who asked you to write the report?
23      A.  Supervisor.
24      Q.  Which supervisor?
25      A.  Which would be the Staff Sergeant Penicaro

Page 31

1   and Lieutenant Ng.
2       Q.  Did you know any of the circumstances
3   about how the suspect had been identified whom you
4   ID'd on that date?
5       A.  No.
6       Q.  Did there come a time when you learned
7   how the suspect had been identified?
8       A.  Yes.
9       Q.  When was that time?
10      A.  When this whole incident started coming up,
11  the reason why we came to the deposition.
12      Q.  When the lawsuit was filed?
13      A.  Yes.
14      Q.  What is your knowledge of facial
15  recognition technology?
16      A.  Not much.
17      Q.  When did you first hear about facial
18  recognition technology?
19      A.  Essentially when this came up.
20      Q.  Had facial recognition technology been
21  addressed at any training that you ever had with
22  the department or with the county?
23      A.  No.
24      Q.  And that answer, is that good for
25  through today, up to this time?

Page 32

1       A.  Yes.
2       Q.  Were you aware that the Attorney
3   General had, around this time, put a moratorium
4   on the use of certain facial recognition
5   technologies?
6       A.  No.
7       Q.  Did you have any interaction with the
8   Middlesex County Prosecutor's Office at any time
9   regarding anything relating to this case?
10      A.  No.
11      Q.  So you never received any request for
12  statements or anything like that during the
13  prosecution?
14      A.  No.
15      Q.  Did you ever receive a notice that you
16  were going to have to appear in the case?
17      A.  No.
18      Q.  Have you ever been disciplined for
19  anything during your career with the Woodbridge
20  Police Department?
21      A.  Can you be more specific?
22      Q.  Have you ever been charged with any
23  misconduct?
24      A.  No.
25      Q.  Have you ever received a verbal

Pages 29 to 32

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 33

1   warning for any attendance issue?
2   A.   No.
3        Q.   Any timeliness issue?
4   A.   No.
5        Q.   Have you ever been the target of an IA
6   investigation?
7   A.   No.
8        Q.   Have you ever been a defendant in a
9   lawsuit against the department?
10  A.   No.
11       Q.   Have you ever been a witness in a
12  lawsuit against the department?
13  A.   No.
14            MR. SEXTON:  I don't think I have
15  anything else.
16            MS. LEMPKA:  We don't have anything.
17            MR. SEXTON:  Thank you, sir, for
18  your time.  I appreciate it.
19
20
21       (Deposition was adjourned at 10:18 a.m.)
22
23
24
25

Page 34

1                    C E R T I F I C A T I O N
2
3        I, LAURA P. REAM, being a Certified
4   Court Reporter and Notary Public within
5   and for the State of New Jersey, do hereby
6   certify that the foregoing is a true and
7   correct transcript of the proceedings.
8
9
         LAURA P. REAM, Notary Public
10       License No. 3XT00004000
11
12       DATED:
13
14
15       This transcript is not to be copied
16  unless under the direct control and supervision of
17  the certifying reporter.
18
19
20
21
22
23
24
25

# EXHIBIT "E"

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 2:21-cv-04021 (JSX)(LDW)

x———————————— x

NIJEER PARKS,

                  CIVIL ACTION
      Plaintiff,    DEPOSITION
                  OF:
  v.
                 JORGE QUESADA
JOHN E. McCORMACK, MAYOR OF
WOODBRIDGE, In his personal
and official capacity,
ROBERT HUBNER,DIRECTOR OF
THE WOODBRIDGE POLICE, In
his personal and official
capacity, CITY OF WOODBRIDGE
POLICE OFFICERS, ANDREW
LYSZK and WOODBRIDGE POLICE
SGT. JOSEPH LICCARDI,
WOODBRIDGE POLICE OFFICERS
JOHN AND JANE DOE 1-20,
being as yet unknown actors,
MIDDLESEX DEPARTMENT OF
CORRECTIONS, JOHN AND JANE
DOES 1-20, being unknown
actors, MIDDLESEX COUNTY
PROSECUTOR, ACTING
PROSECUTOR CHRISTOPHER
KUBERIET, In his personal
and official capacity, and
ASSISTANT MIDDLESEX COUNTY
PROSECUTOR PETER NATASI, and
IDEMIA INC.'S being the
maker of the facial
recognition software and ABC
CORPORATION, being an as yet
unknown seller or servicer
of the facial recognition
programs,
        Defendants.

x———————————— x
HUDSON COURT REPORTING & VIDEO   (732) 906-2078

Page 2

1         T R A N S C R I P T   of the stenographic notes

2

3   of the proceedings in the above-entitled matter as

4   taken by and before CARMEN WOLFE, a Certified

5

6   Court Reporter and Notary Public of New Jersey,

7   at offices of JAMES P. NOLAN AND ASSOCIATES LLC, 61

8   Green Street, Woodbridge, New Jersey on Tuesday, August

9   16, 2022 commencing at 9:38 in the forenoon.

10

11

12

13

14

15

16

17

18

19

20         HUDSON COURT REPORTING
       90 WOODBRIDGE CENTER DRIVE, SUITE 240
           WOODBRIDGE, NJ 07095
21   Toll-Free 800.310.1769 | NJ 732.906.2078 | NY
            212.273.9911
22   scheduling@hudsoncourtreporting.com |
23        www.hudsonreporting.com
24
25

Page 3

1          A P P E A R A N C E S
2
3   DANIEL W. SEXTON ESQ, LLC
    BY:  DANIEL W. SEXTON, ESQ.
4      danielsextonesq@gmail.com
     229 New Center Road
5      Hillsborough, New Jersey  08844
    Attorneys for the Plaintiff.
6
7   JAMES P. NOLAN AND ASSOCIATES LLC
    BY:  FREDERICK L. RUBENSTEIN, ESQ.
8      frubenstein@jpnlaw.us
        -and-
9      GARRY CLEMENTE ESQ.
     61 Green Street
10     Woodbridge, New Jersey  07095
    Attorneys for the Defendants Woodbridge.
11
12   DVORAK & ASSOCIATES LLC
    BY:  GRACE E. LEMPKA, ESQ.
13      glempka@dvoraklegal.com
     467 Middlesex Avenue
14      Metuchen, New Jersey  08840
    Attorneys for the Defendants, Middlesex County
15   Department of Corrections.
16
17
18
19
20
21
22
23
24
25

Page 4

1          I N D E X
2   WITNESS       DIRECT   CROSS   REDIRECT   RECROSS
3   JORGE QUESADA
    By Mr. Sexton   5
4     By Mr. Rubenstein     73
5
6
7         EXHIBITS
8   NUMBER      DESCRIPTION      PAGE
9   PX     Evidence receipt     75
10   PY    Second page of evidence receipt  76
11   PY    Report for state police    77
       laboratory report
12
    PZ    Evidence return receipt    78
13
14
15       (Exhibits retained by counsel.)
16
17
18
19
20
21
22
23
24
25

Pages 1 to 4

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 5

1   JORGE QUESADA, having been sworn by the court reporter,
2   testifies as follows:
3
4          MR. RUBENSTEIN:  I produced five
5   documents that have to do with the receipt and review
6   of the evidence -- some of the evidence in this matter
7   having to do with the fingerprint and palm print and
8   DNA evidence.  I'm not sure if any of this was
9   produced.  I think one or two pages were produced.  I
10  just gave it to Counsel to make sure because I know
11  some of the documents were not previously produced.
12
13  DIRECT EXAMINATION BY MR. SEXTON:
14  Q.   Good morning, Detective.
15  A.   Good morning, sir.
16  Q.   Have you had your deposition taken
17  before?
18  A.   For this?  No.
19  Q.   For -- ever.
20  A.   Yes.  Yes.
21  Q.   When have you been -- what matters were
22  you previously deposed in?
23  A.   It was an armed robbery case that I had many
24  years ago.  Maybe about eight years ago, nine years
25  ago.

Page 6

1   Q.   It was in a criminal case or a civil
2   case?
3   A.   Criminal case.
4   Q.   And have you ever been in a deposition
5   for a civil case?
6   A.   No.
7   Q.   Either related to your professional life
8   or your personal life?
9   A.   My wife had one I believe for a lawsuit.  So.
10  Q.   Were you questioned?
11  A.   I was there for that.  We were both questioned
12  together.
13  Q.   Okay.
14  A.   So I don't know if that was like a formal
15  deposition or not.
16  Q.   Okay.  Well, I'll just give you the run
17  down of the rules.  You see that a transcript is being
18  taken by the reporter.  So it's important for us to
19  communicate orally.  She can't take down nods or
20  gestures, things like that.  If I ask a question you
21  don't understand, feel free to ask me to clarify.  At
22  different times your attorney will be interjecting
23  objections.  Most of those are for the record.  If he
24  instructs you not to answer, he and I will have to
25  figure that out --

Page 7

1   A.   Okay.
2   Q.   -- and then move on.  That's about it.
3   At different times you might be asked things that you
4   need to refresh your recollection, and I'll show you a
5   document.  And it will be important for you to try to
6   testify from your active memory rather than just
7   reading a document.  And then finally, you're not
8   supposed to guess at answers.  So if you don't know,
9   you don't know.  But you can give your best -- best
10  recollection.  All right.  So how long -- when did you
11  come on the job, sir?
12  A.   In '07.
13  Q.   And prior to that -- what's your date of
14  birth?
15  A.   6/3/75.
16  Q.   Okay.  And what were you doing before
17  you became a member of the department?
18  A.   I was a chef.
19  Q.   Oh.  And how long had you been a chef?
20  A.   I ran a catering business four years prior.
21  Q.   And what's your highest education level?
22  A.   High school.
23  Q.   And let's see.  When did you become a
24  detective?
25  A.   About three years after getting hired.  So

Page 8

1   probably around '11 or '12.
2   Q.   And how did you become a detective?
3   A.   They had a -- department has rotations.  You do
4   90-day rotations up there.  And during my rotation
5   there was a spot that opened up.  Ended up just taking
6   the retiring detective's case load.  And I got lucky
7   and I was able to stay up there.  My rotation went down
8   for six months and then it came back up.
9   Q.   In this matter -- this matter being the
10  one matter involving Nijeer Parks -- you were the ID
11  detective; is that correct?
12  A.   Yes, sir.
13  Q.   What's an ID detective?
14  A.   We process leads.  If somebody breaks into a home
15  we go photograph.  We look for evidence, collect
16  evidence, and submit the evidence.
17  Q.   Are you always an ID detective or only
18  in certain cases are you an ID detective?
19  A.   For about four years now I've been an ID
20  detective.  And my only other duty I do arson
21  investigations also.
22  Q.   So then 2019 you would have -- how long
23  had you been --
24  A.   '18.  At the end of '18.
25  Q.   I forgot that instruction.  We can't

Pages 5 to 8

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 9

1  talk at the same time because she can only take one of
2  us down.  So when did you become -- to the best of your
3  recollection when did you become an ID detective?
4  A.  The end of 2018.
5  Q.  So fair to say in January 2019 you had
6  only been an ID detective for a couple months?
7  A.  Yes, sir.
8  Q.  When you came on the job what kind of
9  training did you get?
10  A.  The police academy training.  Six months' worth
11  of police academy.  Then we do yearly in-service
12  training.  And early on in the career I tried to go to
13  any additional classes that were available.  Our
14  department would pay for the classes and we can go on
15  off time or work days.
16  Q.  Which academy did you go to?
17  A.  Somerset County Police Academy.
18  Q.  When you became a detective was there
19  any special training?
20  A.  They start sending you to different detective
21  schools for interviews, various schoolings for that and
22  classes, basically.  And I used to go on my own to
23  different classes.
24  Q.  Can you recall some of the training
25  you've had relating to your detective work?

Page 10

1  A.  Reed Interview School.  There was a couple
2  different interview schools that I went to.
3  Q.  Where was that?  In South Jersey?
4  A.  I'm not sure where they're at.  They're all over
5  the place.  I did a couple drug interdiction schools.
6  I don't recall the other interview schools that I went
7  to.
8  Q.  By interview school, interviewing
9  techniques?
10  A.  Yes.
11  Q.  Other than interviewing -- interview
12  training and drug interdiction training, have you
13  received any other type of training?
14  A.  I was attached with the auto theft task force
15  voluntarily.  I used to go two days a week when I first
16  started my career here.  And through my police career
17  -- I'm not going to be able to recall the classes that
18  I did -- but I was just trying to keep up-to-date with
19  case law and the policing techniques.  For the ID
20  school that's a state run, state police run schooling
21  that they teach us how to read fingerprints,
22  photography, evidence collection, and all that.  That
23  was completed in '18.
24  Q.  Fingerprints, photography?
25  A.  Evidence collection, shooting reconstruction.

Page 11

1  Q.  Accident reconstruction?
2  A.  No accident reconstruction.
3  Q.  Is that a separate unit?
4  A.  Yeah.  That's for the traffic unit.
5  Q.  For the who?
6  A.  Traffic.
7  Q.  Traffic.  The auto theft, what was that
8  -- what was your term for the auto theft?
9  A.  Auto theft task force.
10  Q.  Okay.  Task force.  Okay.  Was that with
11  the state police?
12  A.  That was with the Union Essex County Auto Theft
13  Task force at the time.
14  Q.  And who ran that?
15  A.  I don't know who the captain was at the time for
16  that.  I really don't recall.  I did that for about a
17  year and a half.  I used to go up there two days a
18  month.
19  Q.  Have you -- well, have you had any
20  training or interaction -- let me break that up.  Have
21  you had any interactions with the Middlesex County
22  Prosecutor's office during your career as a detective?
23  A.  Yes.
24  Q.  Okay.  What kind of interactions do you
25  have with them?

Page 12

1  A.  We've worked side by side -- I've worked side by
2  side with them depending on what type of case it is.
3  If we have anything major here that happens in town we
4  automatically contact the county.  They decide if
5  they're going to respond to assist in the investigation
6  or they just request that we contact them if anything
7  new comes up if they don't respond.  They basically
8  only respond for any sexual assaults, shootings with
9  hits, and serious injuries or sometimes suspicious
10  deaths and overdoses.
11  Q.  How do you work side by side?  How do
12  you --
13  A.  Depending on the case, as an ID detective if we
14  have a -- for example, we had a shooting here in the
15  apartment complex and they responded.  Before we knew
16  that they were responding, I started doing the
17  photography part of it.  Once I realized that they were
18  going to respond, I stopped all my actions.  We
19  maintained the scene.  Their ID detective comes and
20  then we work together, but they end up handling the
21  investigation from that point forward with the
22  photography and their collection.  I would just assist.
23  For other investigations they're basically another
24  detective that work side by side with you to assist in
25  the case if they deem that they need to get involved.

Pages 9 to 12

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 13

1    Q.    What are some -- who are some of the
2    detectives that -- do you remember the detectives whom
3    you've worked either with or under from the county
4    prosecutor's?
5    A.    No, I don't.
6    Q.    Do you remember any?
7    A.    No.  I would -- it's been quite a few years since
8    -- the last person I probably worked with for -- it was
9    a lieutenant with the prosecutor's office.  He was in
10   charge of the arson unit.  And I worked with him quite
11   a bit at arson investigations.
12   Q.    Do you remember his name?
13   A.    No, I don't.
14   Q.    Did you ever work with Peter Natasi?
15   A.    Yes.  He was the AP who we used to contact for --
16   if we needed -- he was our point of contact for the
17   prosecutor's office.
18   Q.    When you would have assistance in
19   investigations would it be through Peter Natasi?
20   A.    He was our prosecutor.  So we would call him, but
21   he wouldn't be involved in the actual investigation.
22   The detectives from the county would be.
23   Q.    But would -- how would you get to the
24   detectives?  Would it be through Peter or --
25   A.    No, it would not be.  Peter just on a legal

Page 14

1    side's the person that we talk to.  If we needed the
2    assistance from the county we call the county -- the
3    main number -- off hours would be their main number --
4    and then they would contact us back.  And we let them
5    know what kind of case we have, what we have, and see
6    if they want to get involved in it.
7    Q.    By the way, did you talk to anybody
8    about this case before you came here today?
9    A.    No, sir.
10   Q.    You didn't talk to Officer Lee?
11   A.    No.
12   Q.    You didn't talk to officer -- Detective
13   Tapia?
14   A.    No.
15   Q.    Has anyone -- were you ever -- did
16   anybody from the department ever talk to you about this
17   case?
18   A.    When it -- when the first case was going on,
19   yeah, we discussed this case.
20   Q.    And who's "we?"
21   A.    When we found out about the -- just we spoke with
22   the lawyer when he came to our department for it.
23   Q.    Okay.  Who's "we?"
24   A.    Our department.
25   Q.    No.  But you said we discussed the case.

Page 15

1    So who's "we?"
2    A.    Myself, Detective Tapia, Lyszk at that point.
3    That was, I don't know, maybe like a year and a half
4    ago.
5    Q.    So you discussed amongst yourselves?
6    A.    No.
7    MR. RUBENSTEIN:  Don't discuss because I
8    was present.  Any communications that I was not present
9    for is fine.
10   Q.    The question was -- you obviously can't
11   tell me what you said with your lawyer, but did you
12   discuss this matter amongst yourselves without your
13   lawyer?
14   A.    No.
15   Q.    You never ever?
16   A.    No, sir.
17   Q.    And do you -- and that was sometime
18   after the filing of this lawsuit that there had been a
19   lawyer already assigned?
20   A.    Yes, sir.
21   Q.    Does Woodbridge have -- the Woodbridge
22   Police Department have -- you must have a town
23   attorney.  Who's your town attorney?
24   A.    I don't know, sir.
25   Q.    Did any lawyer before your present

Page 16

1    lawyer talk to you about this matter?
2    A.    No, sir.
3    Q.    Did anybody in the department, any --
4    not your lawyer -- but anybody in the department talk
5    to you about the case?
6    A.    No, sir.
7    Q.    Nobody ever gave you a written warning
8    about the matter?
9    A.    Not at all, sir.
10   Q.    Or a verbal warning?
11   A.    No.
12   Q.    You weren't -- there was no major
13   discipline regarding it?
14   A.    Absolutely not.
15   Q.    There was no training that you utilized
16   the facts of this case in any way?
17   A.    No.
18   Q.    Are you aware of any of the media
19   interest in the case?
20   A.    I saw that was in 60 Minutes or 60 Seconds.  One
21   of the shows.
22   Q.    Did you watch that?
23   A.    No.
24   Q.    Are you aware of any other --
25   A.    No, sir.

Pages 13 to 16

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 17

1      Q.      -- coverage of the case? Have you ever
2  been disciplined during your career?
3  A.   No.
4      Q.      And is that answer the same if we
5  include verbal warnings or written warnings?
6  A.   I had a car accident once. And they talked to me
7  about the car accident, but nothing internal with
8  Internal Affairs.
9      Q.      So IA investigated but nothing happened?
10  A.   I've never been investigated.
11      Q.      So IA talked to you about it?
12  A.   No. My captain did.
13      Q.      When was that car accident?
14  A.   Maybe five years ago, six years ago.
15      Q.      It's fair to say you have no criminal
16  record?
17  A.   No.
18      Q.      You still have your catering business?
19  A.   No. It wasn't my own catering business. Two
20  brothers owned it, and I ran the kitchen for them.
21      Q.      Have you ever been sued for anything
22  relating to your work as a police officer?
23  A.   No.
24      Q.      You did a report; right?
25  A.   An actual incident report like that? No, I did

Page 18

1  not, sir.
2      Q.      Oh, you didn't. Okay. Maybe that's why
3  I'm not finding it. What do you recall about -- do you
4  recall going to a scene on January 26, 2019, at the
5  Hampton Inn?
6  A.   Yes.
7      Q.      What do you recall about that?
8  A.   The radio transmissions for assistance. We
9  responded out there. Lyszk -- Lyszk and Officer Lee
10  were in a foot pursuit.
11      Q.      In what?
12  A.   In a foot pursuit. And then they put out that
13  the vehicle took off. It had crashed into a police car
14  I believe. And I went out there initially to look for
15  the car on the way to the scene. Did not see the car.
16  And then once I got to the scene I spoke with the
17  officers to find out what happened and on my end what I
18  need to do to start processing the scene.
19      Q.      So what officers did you talk to when
20  you got to the scene if you recall?
21  A.   It was Lyszk and Lee were together.
22      Q.      And what was their condition when you
23  came upon them?
24  A.   They were excited. They just were involved in a
25  foot pursuit. And the situation had escalated.

Page 19

1      Q.      What do you mean by that?
2  A.   They just chased after somebody so they're going
3  to be a little bit, you know, a little winded and
4  trying to give out as much information on the radio to
5  responding cars to try so apprehend the person.
6      Q.      Were you aware that C.O. Lee had been --
7  P.O. Lee rather had been the victim of an assault?
8  A.   I'm sorry. Who?
9      Q.      Lee.
10  A.   Lee? At that time I don't think I was aware of
11  that.
12      Q.      Okay. So what did they ask you to do
13  initially?
14  A.   It's what I asked them. I asked them, you know,
15  which way the person ran. They told me there was
16  a sneaker in the parking lot. They told me that he was
17  carrying a bag that he had left behind. And he was
18  drinking the water bottle that he actually placed in
19  the garbage can during the interaction. I believe they
20  had a lengthy interaction with the person at that time.
21      Q.      After this briefing what if anything did
22  you do?
23  A.   I start processing the scene. I start with
24  overall photos of the scene. I photographed where the
25  bag was, contents of the bag. I photographed where the

Page 20

1  garbage can was and where I recovered the water bottle
2  that was in the garbage can. And then they showed me
3  the direction which way he ran. He ran out through a
4  back door which was a common door that everybody in the
5  hotel uses. And then he went down the sidewalk, went
6  through a gated area, made the right. And I believe
7  that's where the sneaker was was in the back parking
8  lot. And he ran around the building. And then that's
9  when he jumped in the car. And there was damage to the
10  hotel, damage to the police car I believe. So I
11  photographed all that. Once my photographs were
12  completed I started checking for fingerprints.
13      Q.      You said he ran out through a back door?
14  A.   Yeah. A common doorway.
15      Q.      Can you describe that common doorway?
16  A.   It was a glass door with a like I believe the
17  handle on it just to go out into the sidewalk. And
18  then the sidewalk leads out to the rear parking lot of
19  the hotel. And at the end of the sidewalk there's a
20  metal gate, like a four-foot gate.
21      Q.      And you said you found a sneaker?
22  A.   Yes.
23      Q.      Okay. And can you describe that
24  sneaker?
25  A.   I cannot. I don't recall what kind of sneaker it

Pages 17 to 20

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 21

1  was.
2      Q.    I show you what's marked in the previous
3  depositions as PL.  Do you recognize those as the
4  pictures you took?
5  A.    Yes.
6      Q.    And is that a ruler next to the sneaker?
7  A.    Yes.
8      Q.    Actually in every frame; right?
9  A.    Yes.
10      Q.    Is that standard?
11  A.    Just for size comparison.
12      Q.    Okay.  And so looking at that picture,
13  does that refresh your recollection of the sneaker you
14  recovered?
15  A.    Yes.
16      Q.    Can you describe the sneaker?
17  A.    It looks like a tennis/basketball sneaker, white
18  sole.  I can't distinguish the colors on this since
19  it's black and white.
20      Q.    And it looks to be at least size 12 or
21  more?
22  A.    Well, that's the outside of the sneaker.  The
23  actual foot size is going to vary from different
24  manufacturers.
25      Q.    So it's roughly the size of the ruler;

Page 22

1  though?
2  A.    Yes.
3      Q.    All right.  After taking pictures and
4  securing the sneaker and the bottle and all that I
5  think you said you started to take -- lift some prints?
6  A.    Yes, sir.
7      Q.    Okay.  What do you recall about lifting
8  prints?
9  A.    The common doorway that he exited through is a
10  common doorway.  So I basically just dusted the whole
11  door to see if I would see anything.  Once I dusted the
12  door I was able to see some of the prints.  Those
13  prints were lifted and photographed.  Once I was done
14  with the glass door I went out -- outside with the
15  metal gate.  And I also processed the metal gate, but I
16  wasn't able to find any fingerprints on the metal gate.
17      Q.    So at that time is it correct to say
18  that you only got prints off the glass door?
19  A.    Yes, sir.
20      Q.    Did you do anything else that night?
21  A.    Once the vehicle was located I went and processed
22  the vehicle once consent was granted.
23      Q.    Was that that same night?
24  A.    Yes, sir.
25      Q.    Was it located at some other place than

Page 23

1  the Hampton Inn?
2  A.    Yes, sir.
3      Q.    Do you remember where it was located?
4  A.    Off of Main Street close to Route 9 in the back
5  rear parking lot of a house or maybe like an office
6  building.  A house converted into an office building.
7      Q.    And what did you do when you got there?
8  A.    Photographed the scene.  The vehicle was towed
9  back to a secured lot, and then it was processed.  I
10  don't know if it was the same -- I'm pretty sure it was
11  probably the same day once consent was granted.
12      Q.    Who processed it?
13  A.    I did.
14      Q.    Can you describe what processing is?
15  A.    To collect any items that are inside the vehicle,
16  photograph, collect items, and then check for
17  fingerprints.
18      Q.    I show you what's been marked as D.  Do
19  you recognize the receipt in that picture?
20  A.    I don't recall the receipt, but if it was in the
21  vehicle I would have photographed it as being part of
22  the stuff that I collected out of the vehicle.
23      Q.    Okay.  And did you do anything in
24  addition to collecting items out of the vehicle?
25  A.    Photograph and fingerprints.

Page 24

1      Q.    Were you able to get any prints out of
2  the vehicle?
3  A.    I don't believe anything usable was recovered
4  from the vehicle.
5      Q.    Did that surprise you?
6  A.    No, it did not.  No.
7      Q.    Go ahead.
8  A.    In cases like this the cars get wiped down real
9  quick.  And fingerprints are very delicate to be left
10  behind.  So if they do a quick wipe down -- there isn't
11  too many surfaces in the vehicle you can recover
12  fingerprints from.
13      Q.    There are not too many surfaces?
14  A.    No, there isn't.
15      Q.    But who would have wiped down the
16  vehicle?
17  A.    The person driving the vehicle.
18      Q.    Intentionally?
19  A.    Intentionally, yeah.
20      Q.    Did you take some prints that you
21  thought might be usable?
22  A.    I believe so.  I'd have to look at my photos.
23      Q.    Do you remember what you did after you
24  took the prints of the car if you took them?
25  A.    Once -- once we're done at the scene we go back

Pages 21 to 24

Page 25

1   to headquarters.  And then headquarters will review all
2   the fingerprints that are taken.  If I believe that
3   they're suitable to send out to the state police they
4   get packaged.  And once we have a couple packages ready
5   to go down to the state police, one person from our
6   unit drops them off there to the Holmdel barracks.
7       Q.   Do you always use the Holmdel barracks?
8       A.   Majority of the time, yes.
9       Q.   And how often -- what's the normal
10  routine for -- or timeframe for submitting prints after
11  they've been obtained?
12      A.   Once we have a couple jobs that are -- we have a
13  little folder we keep the file -- the packages that go
14  gown to the state police.  Once when have a couple of
15  them ready to go down our -- one of our retired guys is
16  the one that transports them to the state police.  It
17  probably happens within a week to two weeks of coming
18  in.
19      Q.   Do you ever expedite it to get them
20  delivered immediately?
21      A.   No.
22      Q.   Never?
23      A.   I never have.  No.
24      Q.   What's the normal turnaround after you
25  submit the prints to Holmdel?

Page 26

1       A.   I would say maybe four to six weeks we get them
2   returned.  And that's either with a comparison or with
3   nothing.  That they've been placed into the system and
4   then they'll be randomly ran through the system to see
5   if anything new comes in to compare them to.
6       Q.   Is there any way to get that expedited?
7       A.   If it's a serious case.  If it's like an
8   aggravated sexual assault, a shooting, something like
9   that.  The state police is extremely backlogged with --
10  with cases.
11      Q.   So if it's a serious case what can be
12  done?
13      A.   Like a homicide, shooting with a hit, aggravated
14  sexual assault.
15      Q.   I understand.  So what could be done to
16  get the prints read more quickly?
17      A.   You contact the state police and have them --
18  say, hey, this is a case that we have; we would like to
19  have it expedited.
20      Q.   And if they expedite it what's the
21  timeframe then?
22      A.   I never had to do that so I don't know.
23      Q.   Is there any ability in your office to
24  search any database of fingerprints?
25      A.   No, sir.  Just our in-house.

Page 27

1       Q.   Just what?
2       A.   Our in-house fingerprints.
3       Q.   Okay.  Just the fingerprints that you
4   have?
5       A.   We would have to go through individual card by
6   card.  We don't have a computerized fingerprint system.
7       Q.   Is that true of all departments?
8       A.   For Woodbridge we're pretty on top of things.  I
9   imagine most departments are like that that they don't
10  have an in-house.  State police handles that.  That's
11  who does all the fingerprinting.
12      Q.   You don't have a special investigations
13  unit, do you?
14      A.   For sex crimes?  Yes.
15      Q.   Can they do fingerprints?
16      A.   No.
17      Q.   Do you have a Bureau of Criminal
18  Investigation?
19      A.   Yes.
20      Q.   That's where you work in?
21      A.   Yeah.  We're part of CID.  And then ID is another
22  unit.
23      Q.   And your BCI cannot search fingerprints?
24      A.   No.
25      Q.   And you're saying that's kind of typical

Page 28

1   of municipal police departments?
2       A.   From my experience, yes.
3       Q.   And what's the population of Woodbridge?
4   About 175?
5       A.   I think -- I think it's 100,000 right now.  It's
6   been like that for the past 30 years.
7       Q.   Did you do anything with the other
8   evidence?
9       A.   It was packaged and sent out to state police for
10  DNA comparison.
11      Q.   So the bottle and the -- what else?
12  What was packaged?
13      A.   I think there was a vape pen, a bottle and a
14  sneaker.  Maybe just the sneaker and the water bottle
15  was sent out for DNA.
16      Q.   So you don't take the -- you don't try
17  to find DNA on these items, you sent them to try to
18  find DNA on them?
19      A.   Yes, sir.
20      Q.   And where does get sent to?
21      A.   State police lab.  I don't know which lab it goes
22  to.  I think it's down in -- it's by the shore.  Sea
23  Girt I believe it goes to.  We don't deliver that
24  ourselves.  It goes down by our evidence department.
25      Q.   What do you mean?

Pages 25 to 28

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 29

1  A.   Once I get the item, the water bottle and the
2  sneaker, I got to package it a certain way. I turn it
3  over to our evidence department. And then once they
4  have a couple of cases that got to go down, they have
5  to be taken down to Sea Girt by a police officer. And
6  then it gets dropped off there. And then once the
7  state police is done with their processing of it, we
8  actually have to go back with another police officer
9  and the evidence guy come pick up the items to be
10 put back in our evidence department.
11    Q.   Do you know how often these deliveries
12 are made to Sea Girt?
13 A.   It depends how many cases are there, but they're
14 there within a couple of weeks. I'll say within, you
15 know, four weeks or so I believe they could make it
16 down to the lab.
17    Q.   And is there a way to expedite delivery
18 to Sea Girt?
19 A.   It would be similar to what we discussed with the
20 fingerprints.
21    Q.   And once at Sea Girt for DNA testing,
22 how long -- what's the turnaround usually?
23 A.   I've been seeing stuff come back in about a year
24 DNA, less than a year.
25    Q.   And is there a way to expedite that?

Page 30

1  A.   If you would contact them like we discussed
2  before I'm sure it would be able to get expedited.
3     Q.   Have you ever been involved in a request
4  to expedite DNA testing?
5  A.   No, sir.
6     Q.   Would you agree that assault on a police
7  officer is a serious crime?
8  A.   Yes.
9     Q.   Because it was a serious crime -- strike
10 that.
11        You said that the investigators from the
12 county prosecutor's office routinely got involved in
13 investigations of serious crimes; correct?
14 A.   Yes.
15    Q.   In this case did the investigators from
16 the county prosecutor's office become involved?
17 A.   This wouldn't be a serious crime to them. This
18 is something that happens on a regular basis.
19    Q.   So it's a serious crime to you but not
20 to the prosecutor?
21 A.   They deem what they decide to come out and
22 investigate. If the officer was -- had serious
23 injuries, if he was in a hospital, I would think that
24 they would get involved with something like that. It
25 would be their call, their decision to come out.

Page 31

1     Q.   Do you know for a fact that they had an
2  opportunity to review this to determine whether it was
3  serious enough to investigate?
4  A.   No, I do not. I wouldn't be contacted. The lead
5  detective would be.
6     Q.   And do you know for a fact that they
7  were not involved in investigating this?
8  A.   They did not respond at the time because I
9  processed the scene.
10    Q.   Do you know if they responded -- became
11 involved at anytime?
12 A.   I do not know.
13    Q.   It does happen, doesn't it, that the
14 prosecutor -- investigators from the prosecutor's
15 office will become involved after the initial
16 investigation done at the scene?
17 A.   Yes, that does happen.
18    Q.   Do you have any experience with facial
19 recognition technology?
20 A.   No, sir.
21    Q.   Have you ever -- have you had any
22 training with facial recognition technology?
23 A.   No, sir.
24    Q.   Do you know anything about facial
25 recognition technology?

Page 32

1  A.   It was a tool that could have been used. I
2  believe you can go through the ROIC with state police,
3  but I've never dealt with it, never done it.
4     Q.   How do you know that?
5  A.   That it's a tool?
6     Q.   Yeah.
7  A.   From classes I've taken in the past, in case law
8  updates, and stuff like that that I've read.
9     Q.   So then you have had some training on it
10 then?
11 A.   Just my reading of it. No -- I haven't gone to a
12 class that had specific training for it, no.
13    Q.   Then what are you referring when you
14 said you know this from going to classes?
15 A.   From just reading case law and people at a class
16 say, hey, have you seen facial recognition technology
17 before; you know, this is what we did, but no formal
18 teaching of it from anybody.
19    Q.   So based on case law, what case law are
20 you referring to?
21 A.   I can't cite the case law, but that it has been
22 used in cases prior.
23    Q.   Do you know where -- by cases do you
24 mean reported cases in law books or do you mean --
25 A.   No. Detectives using it. The investigations.

Pages 29 to 32

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 33

```
 1       Q.      So do you know where it has been used
 2   before?
 3   A.  I don't, sir.
 4       Q.      Has it been used by the Woodbridge
 5   Police Department before?
 6   A.  I don't know.  I never used it.
 7       Q.      Okay.  Are you aware of it -- other than
 8   this case -- you're aware it was used in this case?
 9   A.  Yes.
10       Q.      Okay.  Had you ever been -- are you
11   aware of it ever being used on another case prior to
12   this case?
13   A.  No, sir.
14       Q.      Are you aware of it ever being used in a
15   case after this?
16   A.  No, sir.
17       Q.      How did you become aware that it was
18   used in this case?
19   A.  When they -- when they got the information and
20   they signed the complaints.
21       Q.      So you were aware that the facial
22   recognition technology was the basis for signing the
23   complaint?
24              MR. RUBENSTEIN:  Objection.  That's not
25   what he said.
```

Page 34

```
 1              MR. SEXTON:  That's the question.
 2              MR. RUBENSTEIN:  You're interpreting his
 3   answer that way in answer to your question.
 4              MR. SEXTON:  Well, I'm asking the
 5   question.  That's the question.
 6   A.  No, sir.  No.  I was walking down the hallway and
 7   Tapia said, hey, we got a hit on this guy.
 8       Q.      Who said?
 9   A.  Tapia.
10       Q.      Tapia?
11   A.  Yes.  We might have a possible lead on the
12   person.
13       Q.      We might have?
14   A.  A lead.
15       Q.      A lead.  Okay.
16   A.  It was to that extent the conversation.  It
17   wasn't any information that was put out or anything
18   like that.  Just in conversation.
19       Q.      Did you -- what did you say in response
20   to that?
21   A.  Great.
22       Q.      Did you learn anything else about it?
23   A.  No, sir.
24       Q.      This a document that was marked as
25   Plaintiff's Exhibit E last week.  Do you recognize
```

Page 35

```
 1   that?
 2   A.  This is a comparison report where the fingerprint
 3   that came from the state police gets compared by two
 4   people that are certified to do so.
 5       Q.      Whose signature is that at the bottom?
 6   A.  I think it's Cioni.
 7       Q.      Who?
 8   A.  Maybe Cioni.
 9       Q.      Okay.  Is that somebody out of the
10   Woodbridge department?
11   A.  Yeah.  He's the other ID detective.
12       Q.      How do you spell his name?
13   A.  It's C-I-O-N-I.
14       Q.      Was he helping out on this matter?
15   A.  No.
16       Q.      So this says the date submitted --
17   A.  Yes.
18       Q.      -- 2/8/2019?
19   A.  Yes, sir.
20       Q.      So that's -- that's 12 days after the
21   incident?
22   A.  Yes.
23       Q.      And you're saying that's normal?
24   A.  Yes, sir.
25       Q.      That's a normal delay.
```

Page 36

```
 1              MR. RUBENSTEIN:  Just note my objection
 2   to the form.  "Delay."
 3       Q.      And the return date is 2/22/19.  You see
 4   that?
 5   A.  Yes.
 6       Q.      And you say that's a normal turnaround
 7   time of 14 days?
 8   A.  I would say almost a month sometimes turnaround
 9   time.
10       Q.      What does it mean by the -- right above
11   the narrative it says, "Identification made by
12   Detective Cioni", and same thing for Velez?
13   A.  So once the state police has the fingerprint and
14   they have a hit in their system, the fingerprint gets
15   sent back to us.  Once we have that fingerprint, if
16   it's somebody of interest it has to be identified and
17   compared by two individuals from our department.  So
18   when the state police says, hey, this has so many
19   points that are identifiable, we have to locate those
20   same points.  And then a secondary person has to
21   confirm those identifiers to be able to say, yes, this
22   is the fingerprint belonging to such and such person.
23       Q.      The narrative says, "The details make,
24   quote, the latent an exact match to the left palm
25   impression of Barrington Walker."  End quote.  Fair to
```

Pages 33 to 36

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 37

1    say that's a very strong result?
2    A.    Yeah, it has to be a hundred percent that person.
3    Once the state police has their identification, we have
4    to back it up and verify it.
5        Q.    Do you know if that was done?
6    A.    That's what this is identifying, that that was
7    done by our department.  Yes.
8        Q.    Oh, so your department did the narrative
9    below?
10   A.    Yes.
11       Q.    Okay.
12   A.    This is our report that's generated by our ID
13   bureau once we get the fingerprint back as a match from
14   the state police.
15       Q.    And then what happens -- what happened
16   next as a result of anything of this report?
17   A.    This was done later on.  Once the fingerprint was
18   lifted off the door, once it was received back to our
19   department, I send it over to Detective Tapia.  And
20   then --
21       Q.    Oh, actually it wasn't done until
22   1/22/21.
23   A.    Correct.
24       Q.    So it wasn't done until after this
25   lawsuit was well in the hopper?

Page 38

1    A.    Yes.
2        Q.    And why did it take so long?
3    A.    At that time it was a common doorway.  There was
4    nothing pointing to that fingerprint having a
5    connection to the actual suspect.  I don't believe
6    there's any type of video or anything showing that the
7    person touched it or --
8        Q.    Why did you take it then?
9    A.    What's that?
10       Q.    Why did you take it then?
11   A.    For a possibility for evidence of -- if you go
12   into an evidence scene, into a homicide and you see a
13   water bottle sitting there or a Chapstick, you're going
14   to try to collect what you can and then hold on to it.
15   It could possibly be used later on in the case.
16       Q.    Really?
17   A.    Yes.  I'm not going to discard -- if the person
18   -- if I saw the person went out that door I'm going to
19   do my due diligence to dust the whole door.  Whatever
20   fingerprints I find I'm going to try to lift.
21       Q.    The prints were left on the glass;
22   right?
23   A.    Yes, sir.
24       Q.    On the interior; correct?
25   A.    Correct.

Page 39

1        Q.    And that made sense because the guy was
2    running and pushed -- would have pushed the door while
3    he was running rather than using the handle; correct?
4    A.    I believe so.
5        Q.    And that's probably why you were smart
6    enough to take these prints; right?
7    A.    I just took them because it was a common door and
8    there's a possibility that I could have picked up
9    anything from the person.
10       Q.    This is a document that was marked as P
11   -- Plaintiff's Exhibit F last week.  Do you recognize
12   that?
13   A.    This is from the state police DNA laboratory.
14   This is for the water bottle and for the sneaker
15   swabbing.
16       Q.    Okay.  And they were not able to find
17   anything.  Is that what this says?
18   A.    No.  On the -- if I could see it.  For the
19   sneaker they were not able to recover anything to find
20   for comparison purposes.  And then for the water bottle
21   they were able to find something.  And it was entered
22   into the DNA database.
23       Q.    But it doesn't give you a result?
24   A.    No.  What happens with DNA is if the person's not
25   in the system, once they're in the system it could

Page 40

1    become a match.  I don't know how quickly that works
2    with the state police, as soon as it gets put into the
3    system, you know, how long it takes for a match to come
4    up if it's in the system.
5        Q.    The date of this report is October 18,
6    2019.
7    A.    Yes.
8        Q.    And you're saying that that's kind of a
9    normal timeline of when these things are processed?
10   A.    Yeah.  At that point the state police already had
11   all the items in their possession.
12       Q.    Here's Exhibit G previously entered.
13   What is this?
14   A.    This is an actual hit for the DNA that comes up
15   to Walker.
16       Q.    And this was -- this is dated July 30,
17   2021?
18   A.    Yes.
19       Q.    So again, this is -- the test was done
20   long after the fact after this lawsuit?
21   A.    No.  The test was done on that previous thing.
22   This is when actually a match happened in the system.
23       Q.    So the test was done on what date?
24   A.    10/18/19 was the date of this report saying that
25   they recovered some DNA from the water bottle and they

Pages 37 to 40

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 41

1  placed it into CODIS.
2      Q.    Notification will occur if there is a
3  hit in the database?
4  A.    Correct.
5      Q.    And so CODIS generated this report on
6  July 30, 2021, based on some new -- why did it -- I'm
7  sorry. Strike that.
8          What is your explanation why it happened
9  on July 30, 2021?
10  A.   I believe his DNA wasn't in the system. So he
11  could have been arrested or his DNA was introduced to
12  the system and that's why the match finally came up.
13      Q.    Showing you Exhibit H from last week.
14  You say on your narrative, "The above three prints
15  recovered from glass door the suspect ran out from."
16  You see that?
17  A.   Yes.
18      Q.    There's nothing in your narrative here
19  to indicate any skepticism or doubt that those prints
20  were from the suspect, is there?
21  A.   No. There was just a point of exit that the
22  suspect went out of.
23      Q.    Correct. But there's nothing here
24  saying, 'I'm taking this even though these prints are
25  probably not his because this is a common door' as you

Page 42

1  keep referring to?
2  A.   No, I wouldn't put that in the report.
3      Q.    And indeed you're saying these are
4  prints from the glass door that the suspect ran out
5  from.
6  A.   Correct.
7      Q.    So clearly communicating that you
8  suspected at the time of your report that these prints
9  belonged to the actor.
10          MR. RUBENSTEIN: Objection. That's not
11  what he said.
12          MR. SEXTON: That's his answer.
13          MR. RUBENSTEIN: That is not his answer.
14          MR. SEXTON: Please don't answer for
15  him. Please don't answer for him.
16          MR. RUBENSTEIN: I'm not answering for
17  him.
18          MR. SEXTON: Yes, you are.
19          MR. RUBENSTEIN: You are deliberately
20  misinterpreting what he's saying.
21          MR. SEXTON: You are answering. You're
22  telegraphing him his answer and that's inappropriate.
23          MR. RUBENSTEIN: No, I'm not. Not at
24  all. I'm saying that your question is inappropriate
25  because you are twisting what he says and you've

Page 43

1  deliberately been doing it.
2          MR. SEXTON: No, I'm not.
3          MR. RUBENSTEIN: Absolutely. His
4  testimony speaks for itself.
5          MR. SEXTON: Would you let him testify
6  and stop interrupting?
7          MR. RUBENSTEIN: No. I'm going to let
8  you continue to pervert what he's saying. Ask your
9  question and let him answer.
10      Q.    You wrote right here, "The three prints
11  recovered from the glass door the suspect ran out
12  from." Now, you wrote that because you believed these
13  were from the suspect; correct?
14  A.   No, sir.
15      Q.    Where did you -- where did you qualify
16  that statement suggesting that you didn't really think
17  these were his but they were someone else's because it
18  was a common door? Is there anything on this
19  document --
20          MR. SEXTON: And please don't answer,
21  Mr. Rubenstein. Let your witness answer.
22  A.   No. The suspect went out through the door so
23  that's where I dusted to look for possible evidence.
24      Q.    But is there anything in this report
25  where you hedge your good investigative performance

Page 44

1  here by saying, you know, in any way?
2  A.   No, sir.
3      Q.    Thank you. There's a second page to
4  Exhibit H. It's not -- the second page, was it
5  generated at the same time?
6  A.   Once the vehicle was processed I just added.
7  What normally happens is I'll do the first report, give
8  it to him. I guess he left that in his folder. When I
9  later processed the vehicle I just added onto the
10  report.
11      Q.    I see. So this indicates you thought
12  you had five usable prints from the car; is that
13  correct?
14  A.   Yes.
15      Q.    And then that ultimately turned out not
16  to be true?
17  A.   Yeah. Once I get back to the lab and I actually
18  look at them closer and determine if they're not going
19  to be usable, then I don't send them in.
20      Q.    Do you still have those?
21  A.   No.
22      Q.    You discarded them?
23  A.   They get discarded, yes.
24      Q.    Again, in this narrative you say,
25  "Above." Oh, I guess that's just the same narrative?

Pages 41 to 44

Page 45

1    A.   Yes.
2         Q.      Then you added on.  Is there anything on
3    the second page where you hedge your fine detective
4    work here in anyway suggesting that the three prints
5    off the glass door were not connected to the suspect?
6    A.   No.
7         Q.      I show you Exhibit I from last week.  Do
8    you recognize this document?
9    A.   Yes.
10        Q.      What do you recognize it as?
11   A.   That's the packet that we send the fingerprints
12   in down to this one to Holmdel.
13        Q.      Okay.  Do you know would you have
14   prepared this or someone else?
15   A.   I prepared the initial package to go down.
16        Q.      Is some of this your handwriting?
17   A.   Yes.  The handwriting under the item numbers is
18   mine.  And the top portion for submitting agency, the
19   case number, the crimes and all that is my handwriting.
20   Everything has to be completed by the state police so
21   the person who dropped off or picked up the items.
22        Q.      Do you know what date you prepared this?
23   A.   I would have prepared this most likely the day of
24   the incident or the day after.
25        Q.      So item one, JMQI?

Page 46

1    A.   Yes. JMQ1.
2         Q.      JMQ1.  What does JMQ stand for?
3    A.   It's my initials and print number one.  Item
4    number one.  Print or item.
5         Q.      Where does this FBI number come from?
6    A.   From the state police.
7         Q.      And how did that -- that number get
8    connected to these prints?
9    A.   So each individual print card that comes out is
10   labeled JMQ1, JMQ2, and so on, or item.  Once this --
11   this is an envelope actually that you place those
12   prints into the envelope.  It gets sent down to the
13   state police.  Once the state police has them, they
14   take each print card and they put it through the system
15   or the computer, whatever they do.  And if they have a
16   match that's where the FBI number comes back.  This is
17   a possible match for this FBI number that's located on
18   there.
19        Q.      And you got that number the day you were
20   submitting these?
21   A.   No, sir.
22        Q.      When did that number get added to?
23   A.   We got this back on 2/14 of '19.  Or 2/22.
24   Returned on 2/22/19.
25        Q.      What's number SBI number?  It's

Page 47

1    special --
2    A.   It's similar.  It's a state ID number.  The FBI
3    number's a federal one.  Everybody has a federal
4    number.  And it matches to the person with an SBI
5    number.
6         Q.      Everyone has a federal number?
7    A.   No.  Criminal.
8         Q.      One of your colleagues said everybody
9    has one which alarmed me.
10   A.   No.  If you have a firearms permit, firearms
11   permit then you can have an SBI number.
12        Q.      Do you know did you fill out the SBI
13   number?
14   A.   No.
15        Q.      Do you know who did that?
16   A.   State police lab.
17        Q.      Oh, okay.  So they take your form, they
18   fill it out and send it back to you?
19   A.   They send the original envelope back to us with
20   everything inside of it.
21        Q.      What else did they fill out on this
22   form?
23   A.   So they filled out everything on the right here.
24   From Candidate FBI Number all the way to the right is
25   all filled out by the state police.

Page 48

1         Q.      I see.
2    A.   And then down here Delivered By is going to be
3    whoever delivered it.  And then on the state police
4    side is whoever entered it and then returned.
5         Q.      And then NS means no -- what does it
6    mean?
7    A.   Not suitable.  Or no suspect also.
8         Q.      Do you remember getting this form back?
9    A.   I don't recall specifically getting it back, but
10   on the date that I got it back that's when I would have
11   gotten it back.  We have multiple packets that go out
12   and then they end up on my desk for the ones I sent
13   out.
14        Q.      Do you remember -- actually, this is the
15   14th now.
16   A.   22nd.
17        Q.      22nd rather.  Do you remember what if
18   anything you did with it?
19   A.   Once I get the folder back we actually have to
20   make copies of it.  It has to be filed in our end side
21   of it.  And then I prepare the copy and give it to
22   Detective Tapia.  And then that goes in his folder.
23   And then that folder eventually goes to the county.
24        Q.      Do you know who at the county?
25   A.   No.

Pages 45 to 48

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 49

| | |
|---|---|
| 1 | Q.   Do you know what office at the county? |
| 2 | A.   No, sir. |
| 3 | Q.   Who sends it to the county? |
| 4 | A.   When the detective has to do the case file they |
| 5 | ask for all the information involved in the case.  So |
| 6 | whatever AP or detective works on it up there they |
| 7 | would get the information. |
| 8 | Q.   So then Detective Tapia would have sent |
| 9 | it to the county? |
| 10 | A.   Yes. |
| 11 | Q.   Okay.  And do you know would we send it |
| 12 | to an investigator or to a -- |
| 13 | A.   I don't know. |
| 14 | Q.   -- AP? |
| 15 | A.   Yeah.  When I used to be a detective we used to |
| 16 | do the whole case, make copies of everything and then |
| 17 | send it on out. |
| 18 | Q.   And then would you be sending it to an |
| 19 | investigator or to an AP? |
| 20 | A.   It goes to the county.  So it wasn't anybody |
| 21 | specific.  So I don't know who receives it at the |
| 22 | county. |
| 23 | Q.   Would you have it hand delivered over |
| 24 | there or mailed? |
| 25 | A.   No, mailed.  It gets printed in an office and |

Page 50

| | |
|---|---|
| 1 | then it gets mailed through. |
| 2 | Q.   Just to the main number? |
| 3 | A.   Yeah. |
| 4 | Q.   The main address?  You said when you get |
| 5 | a fingerprint match it has to be a hundred percent? |
| 6 | A.   It has to be -- yes. |
| 7 | Q.   99.9 doesn't work? |
| 8 | A.   No.  Everybody's fingerprint is different. |
| 9 | Q.   I'm showing you Exhibit K that was |
| 10 | marked the other day. |
| 11 | A.   This is the DNA request form. |
| 12 | MR. RUBENSTEIN:  Is this a form? |
| 13 | MR. SEXTON:  Yeah, he said it's a form. |
| 14 | Q.   And it goes to whom? |
| 15 | A.   To our evidence bureau. |
| 16 | Q.   Your internal evidence bureau? |
| 17 | A.   Yes, sir.  They use this form to prepare their |
| 18 | sheet to send out to the state police lab. |
| 19 | Q.   Does this also go out to the state |
| 20 | police? |
| 21 | A.   No, it does not. |
| 22 | Q.   Exhibit M from the other day.  Do you |
| 23 | recognize this? |
| 24 | A.   This is the NCIC information. |
| 25 | Q.   And what does it indicate? |

Page 51

| | |
|---|---|
| 1 | A.   It's for Walker. |
| 2 | Q.   And how is this generated? |
| 3 | A.   We can actually look this up, but this might have |
| 4 | came back with the fingerprint packet from the state |
| 5 | police with the FBI number that matches -- it comes |
| 6 | back with our fingerprint picture of our fingerprint |
| 7 | picture of the fingerprint on file.  And they sent the |
| 8 | person's information along with that.  And it's |
| 9 | actually -- it says at the bottom this is generated -- |
| 10 | this is by the state police. |
| 11 | Q.   So you would have seen this when the |
| 12 | prints came back? |
| 13 | A.   Yes, sir. |
| 14 | Q.   And what would you do -- do you remember |
| 15 | what you did with it? |
| 16 | A.   Yeah.  Like we spoke before, we have to file it |
| 17 | in our system.  And then the packet gets forwarded to |
| 18 | Detective Tapia or whatever lead detective handles the |
| 19 | case. |
| 20 | Q.   When you -- after you forwarded it to |
| 21 | Detective Tapia did you have any communication with |
| 22 | Tapia about it? |
| 23 | A.   No. |
| 24 | Q.   Did you know if Barrington Walker was |
| 25 | the person whom the facial recognition hit had |

Page 52

| | |
|---|---|
| 1 | identified? |
| 2 | A.   No. |
| 3 | Q.   Did you have any curiosity? |
| 4 | A.   No. |
| 5 | Q.   Why not? |
| 6 | A.   I'm too busy.  We're very, very business in |
| 7 | Woodbridge.  It's kind of, you know, you do your job, |
| 8 | get it done, and file it where it goes. |
| 9 | Q.   Do you have any questions as to why this |
| 10 | state police -- the state police information did not |
| 11 | change the department's position on who the actor was? |
| 12 | A.   No. |
| 13 | Q.   Did you have any -- did you have any |
| 14 | other involvement with this case after receiving this |
| 15 | information back from the state police? |
| 16 | A.   No, sir. |
| 17 | Q.   Did you receive the DNA results? |
| 18 | A.   That was sometime later.  Yeah, they end up |
| 19 | putting one of the -- the sheet on my desk and I got to |
| 20 | file that in with my paperwork. |
| 21 | Q.   Is there any -- does the department have |
| 22 | any kind of a procedure or sort of alarm bell system or |
| 23 | tickle system when you get information, hard |
| 24 | information from the crime labs that contradicts |
| 25 | determinations that the detective bureau has made? |

Pages 49 to 52

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 53

1    MR. RUBENSTEIN:  Objection as to form.
2  You can answer.
3  A.   No.  It -- no.
4    Q.    Did you ever hear of the Innocence
5  Project?
6  A.   I have.  Yes.
7    Q.    You don't have like an internal
8  Innocence Project thing that's just trying to make sure
9  you have the right guy when exonerating evidence comes
10  out?
11    MR. RUBENSTEIN:  Objection as to form.
12  You can answer.
13  A.   No.  I believe he was already arrested and
14  released before the fingerprints even came -- before
15  the fingerprints came back.  I think he was arrested
16  within a couple -- like within a week or two and the
17  fingerprints didn't come back for another three or
18  four weeks on this.  At that point it's just filed.
19  And somebody's already been charged.  And it was left
20  alone.
21    Q.    Is there any provision for when an
22  officer swears out a warrant or an Affidavit of
23  Probable Cause when -- what happens if he gets
24  information that is contradictory to the basis of which
25  he swore out an affidavit?

Page 54

1  A.   I don't know.  I've never been involved -- I
2  never had that happen to me.
3    Q.    You've never been informed in any of
4  your training -- who taught you how to fill out an
5  Affidavit of Probable Cause?
6  A.   You kind of just go with it when you talk to the
7  prosecutor.  Our systems have been changing.  We used
8  to go from paper warrant to move on to computer
9  systems.  So they had in-house training on how to fill
10  out all -- the online complaint system.
11    Q.    Do you know when that switch was made?
12  A.   I do not know.
13    Q.    Do you know approximately?  You came on
14  in, what, '07?
15  A.   '07.  So we had paper complaints for quite a few
16  years after that.  So maybe '15, '16, maybe.
17    Q.    Now, you knew that the actor at the
18  Hampton Inn had been a black male; correct?
19  A.   Yes.
20    Q.    Had you -- were you aware that facial
21  recognition technology had been found to be biased
22  against Blacks?
23  A.   No.
24    Q.    You never heard that before?
25  A.   No.

Page 55

1    Q.    Are you aware that the attorney general
2  had outlawed certain facial recognition technologies
3  around this time, the time of this incident?
4  A.   No.
5    Q.    Were you aware that the ACLU had brought
6  lawsuits against the use of this technology because it
7  was alleged to be racially biased?
8  A.   No.  I've never used this so I never looked into
9  it.
10    Q.    Showing you S, Exhibit S.
11  A.   I've never filled one of these out before.
12    Q.    Have you ever seen this before?
13  A.   No.
14    Q.    It says "For NJ ROIC Use Only."  Is this
15  the ROIC that you had referenced?
16  A.   Yes.  So I guess this came from the ROIC.  Yeah.
17    Q.    It says, "Request for facial
18  recognition/photo array."  Is that two different
19  things?  Or by reading this if you know --
20  A.   I don't know.
21    Q.    Okay.  What is a photo array?  Do you
22  know?
23  A.   Photo array is something that we use with a
24  victim of a crime where we compare a number of
25  pictures.  The pictures have to be approved by the

Page 56

1  prosecutor's office that are very similar.  And they
2  got to be very similar.  They all have to be White,
3  Asian, whatever the suspect was.  And it gets presented
4  to them individually or at the same time.  And there's
5  actually a form that you follow and you read verbatim
6  that's provided by the county prosecutor's office.
7  It's just for victims.
8    Q.    Just for victims?
9  A.   Yes, sir.
10    Q.    Never eyewitnesses?
11  A.   Witnesses also.  I'm sorry.
12    Q.    Do you know why there's all of these
13  rules around how to use a photo array?
14  A.   I'm sure because of court purposes.  They want to
15  have a standard set for it.
16    Q.    Is that because the law requires a
17  certain objectivity?
18  A.   I believe so.
19    Q.    Have you ever done a photo array as you
20  just described?
21  A.   Yes, sir.
22    Q.    What happens when a witness or victim
23  makes an identification in a photo array?
24  A.   They have to sign it, circle it and sign it.  And
25  everything's recorded visually and audio.  And the

Pages 53 to 56

Page 57

1   person handling the case does not present the photo
2   array.  Nobody involved with the case presents it.
3       Q.      Is that so that the person doing it
4   doesn't even know who the actual person is?
5   A.  Correct.
6       Q.      Or the suspect is?
7   A.  Correct, sir.
8       Q.      So there can be no improper suggestions
9   or anything like that?
10  A.  Correct.
11      Q.      And then when an ID is made what's done
12  with it?
13  A.  It's put into evidence.  And then the
14  investigation is -- you move further with the
15  investigation.
16      Q.      In your experience an ID in a photo
17  array by a witness or a victim is that alone enough to
18  swear in an Affidavit of Probable Cause and make an
19  arrest?
20  A.  It depends on the -- we call the prosecutor and
21  depends on other facts of the case surrounding it.
22      Q.      Totality of the circumstances stuff?
23  A.  You know, put everything together and see what
24  you have and then you go to the prosecutor's office.
25      Q.      So the prosecutor will help you with the

Page 58

1   investigation?
2   A.      You would contact them this is what I have, what
3   you think, and they would recommend charges or what
4   they recommend for.
5       Q.      Or additional investigation?
6   A.  Uh-huh.  Not additional investigation, no.  They
7   would just -- the prosecutor's office's basically the
8   lawyer for the prosecutor.  And they'll help you out
9   with, you know, this is what I got, and then they'll
10  give their recommendation for it.
11      Q.      What about do you ever work with
12  investigators in your photo arrays?
13  A.  No.  Me personally, no.  For sex assaults I
14  believe that they sometimes get involved with that.
15      Q.      Well, you said that the prosecutor sends
16  down the little speech you make and the pictures.
17  A.  Yes.
18      Q.      So that's put together by investigators
19  or by prosecutors?
20  A.  I don't know.  It's their set standard form.  We
21  have -- we log into a computer and we have standard
22  forms from the prosecutor's office to use for our
23  investigations, consent searches, photo arrays, Spanish
24  and English and stuff like that.
25      Q.      Have you ever sworn in an affidavit

Page 59

1   based solely on a photo array ID?
2   A.  I don't believe so.  I don't recall.  I've done
3   quite a few of them in the past.  I think it's been
4   depending on the case.
5       Q.      Do you know what a lineup is?
6   A.  Like a lineup for a suspect?
7       Q.      Yeah.
8   A.  I know what they are, yes.
9       Q.      What do you know them to be?
10  A.  A live person lineup?
11      Q.      Yeah.
12  A.  I've seen them on TV.
13      Q.      Does it really happen?  So you've -- I
14  guess it's more labor intensive to set up a real live
15  lineup than a photo array?
16  A.  Yes, sir.  I've never done one or never looked
17  into doing one.
18      Q.      You ever heard of one being done?
19  A.  No, sir.
20      Q.      Do you know what the term investigative
21  lead means?
22  A.  It's a lead to assist in your investigation.
23      Q.      Can you give some examples?
24  A.  The DNA hit that came back on the person, it will
25  say that terminology on it.  And once we have a DNA

Page 60

1   hit, they actually request that you locate this person
2   and get a comparison buccal swab to confirm or deny.
3       Q.      A comparison vehicle?
4   A.  Comparison swab, DNA swab from the person on the
5   DNA hit.
6       Q.      If you get -- if that's positive that
7   -- is that DNA evidence or a lead?
8   A.  It's evidence.  It's also a lead in the
9   investigation.
10      Q.      Is it fair to say evidence is different
11  than a lead, isn't it?
12  A.  Well, evidence is something you have, which DNA
13  you have evidence.  And the information provided by the
14  DNA is a lead.
15      Q.      Did you ever review the interview of
16  Nijeer Parks?
17  A.  No.
18      Q.      Did you know that Barrington Walker is
19  six, one?
20  A.  No.
21      Q.      Well, you looked at the Tenessee
22  driver's license; right?
23  A.  I might have taken a picture of it.  I don't --
24  if it was my job, my side of it was just to photograph
25  stuff, but I didn't get involved with the actual

Pages 57 to 60

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 61

```
1    investigation.
2        Q.    And did you know that Nijeer Parks is
3    five, seven?
4    A.    I didn't know.
5        Q.    So you saw the picture of the sneaker
6    that was the size of a ruler.  And did you know that
7    Nijeer Parks' foot is I think five, eight?
8    A.    No, sir.
9            MR. RUBENSTEIN:  I'm sorry.  His foot is
10   five, eight?  That's what your question was.  I'm not
11   sure that's what you meant.
12       Q.    I didn't.  Is size eight?
13   A.    No, sir.
14       Q.    So the sneaker was in evidence at
15   headquarters?
16   A.    Yes.
17       Q.    The same time that Nijeer Parks was
18   being questioned and put under arrest?
19   A.    I believe so.  I don't think the evidence went
20   out for like three weeks or so.
21       Q.    And so simply taking the sneaker down
22   and asking him to put it on would have exonerated the
23   suspect?
24           MR. RUBENSTEIN:  Objection as to form.
25       Q.    Wouldn't it have?
```

Page 62

```
1    A.    No, sir.
2        Q.    Why not?
3    A.    The sneaker can't be touched because it's
4    packaged for DNA submission.
5        Q.    So you could have taken it down with a
6    plastic bag and put it next to his foot?
7    A.    No, sir.  It's already packaged and signed and
8    labeled in a brown paper bag that's all sealed up, all
9    sealed up with duct tape.
10       Q.    Well, you could have taken a picture
11   that you nicely took of the sneaker as being 12 inches
12   long and considered that and put a ruler next to
13   Nijeer's foot, could you not have?
14           MR. RUBENSTEIN:  Objection as to form.
15   You can answer.
16   A.    No, sir.  I wasn't there.  I didn't know he got
17   arrested.  So on my end I -- it's not my investigation.
18       Q.    Your bureau -- is that what you call
19   yourselves, a bureau?
20   A.    Yes, sir.
21       Q.    The detective bureau had this
22   information.  You talk to each other when you work
23   together?
24   A.    Yes.  I don't even know who interviewed Parks.
25   Kondracki.
```

Page 63

```
1        Q.    Okay.  So you told me about special
2    rules for a photo array.
3    A.    Yes.
4        Q.    Have you ever done -- and then there's a
5    lineup we know from TV.  And then is there also like
6    other identification tools that detectives use?
7    A.    A show-up?
8        Q.    Yeah, what's a show-up?  That's what I
9    was looking for.
10   A.    If you have a crime that's active and the
11   person's stopped and it's suspected that's the person,
12   we could bring the suspect -- the victim to the suspect
13   while he's in the vehicle and attempt to positively or
14   -- identify or not identify the person.  That's all
15   recorded also.  And there's a form for that process.
16       Q.    There's a form also for that?
17   A.    Yes, sir.
18       Q.    And that form, where does that form come
19   from?
20   A.    It's a county form.
21       Q.    Do you remember some things that it
22   contains?  What do you remember about it?
23   A.    I haven't done one in quite a bit.  So it's just
24   a certainty of the identification I believe is in
25   there.  And I believe you got to say that this might
```

Page 64

```
1    be, might not be the person suspected of whatever crime
2    is committed.
3        Q.    Were you given any training in show-ups?
4    A.    No.
5        Q.    Do you know how show-ups are used in an
6    investigation?
7    A.    It could be as a tool also.  It could confirm or
8    deny that the person was involved by the victim's or
9    witness' answer.
10       Q.    And can you explain again the context of
11   when a show-up occurs?
12   A.    If a crime is committed and there's a description
13   of the suspect and the suspect is located, it's got to
14   be within -- within a certain timeframe from the
15   original call to the time the suspect is located or
16   person of interest is located.
17       Q.    Do you remember that timeframe?
18   A.    I don't.  I want to say an hour.  I don't think
19   -- maybe two hours.
20       Q.    Are there certain conditions before you
21   -- that have to be met before you subject somebody to a
22   show-up ID?
23   A.    What do you mean by that?
24       Q.    Like, does the victim or witness have to
25   give you a certain description?  We know there's a time
```

Pages 61 to 64

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 65

1  and I guess a distance within the area or something?
2  A.  It's got to be within reason.  Everything kind of
3  comes together in a situation like that.  If the
4  witness has a description, a clothing description, if
5  he's Hispanic, he's Asian, he's Black, he's White,
6  possible height, information like that.
7      Q.      Do you agree the height is important?
8  A.  Height's very -- it's not very accurate with
9  descriptions.
10     Q.      So you're saying it's not important?
11 A.  They're all important.
12     Q.      Do you know anything about the
13 identification that Officer Lee made?
14 A.  No, sir.
15     Q.      If I told you that Lee made the
16 identification after being called down on his day off
17 and was showed Nijeer Parks sitting on a bench cuffed
18 to the rail having been told that the guy was in there,
19 do you think that's a fair and appropriate manner of
20 identification?
21     MR. RUBENSTEIN:  Objection as to form.
22 I don't know what you mean by the guy was there.  I
23 don't know what you mean, but you can answer if you
24 understand.
25 A.  I wasn't there so I don't know.  So I can't speak

Page 66

1  for how he identified him.
2      Q.      So his narrative is, "On February 5,
3  2019, I was contacted by Lieutenant Ng", N-G, "who
4  advised me that they currently had an individual,
5  Nijeer Parks, who was involved in the incident on
6  January 26, 2019."  We agree that that states a
7  conclusion, doesn't it?
8      MR. RUBENSTEIN:  What are you reading
9  from, Counsel?
10     MR. SEXTON:  Reading from A.
11 Plaintiff's Exhibit A.
12     Q.      So "Parks who was solved in the incident
13 on January 26, 2019."  That's a conclusion, isn't it?
14 A.  Whatever Officer Lee wrote in his report he
15 wrote.  I'm not going to comment to his reports.
16     Q.      You read English; right?
17 A.  I do read English; correct.
18     Q.      Okay.  And so, "Nijeer Parks who was
19 involved in the incident on January 26, 2019."  That's
20 a conclusion, isn't it?
21     MR. RUBENSTEIN:  I'm going to object to
22 the form because you haven't established when this
23 report was written before or after Lee obviously saw
24 the suspect.  Makes a difference.
25     MR. SEXTON:  I don't need to do that.

Page 67

1      Q.      I'm reading the narrative.  The
2  narrative says, "On February 5, 2019, I was contacted
3  by Lieutenant Ng who advised me that they currently had
4  an individual, Nijeer Parks, who was involved in the
5  incident on January 26, 2019."  The question is a
6  grammatical question.  Leaving your attorney's attempts
7  to coach you aside --
8      MR. RUBENSTEIN:  You know what, Counsel?
9  Stop it.  I am not going to tolerate your crap anymore.
10     MR. SEXTON:  Okay.
11     MR. RUBENSTEIN:  I am not coaching the
12 witness at all.  I'm just trying to make sure that
13 you're deliberately not confusing.  And you're not
14 going to get away with it anymore.  Stop.
15     MR. SEXTON:  Okay.
16     Q.      You can answer the question.  It's a
17 grammatical question.
18 A.  So what's the question again?
19     Q.      That's a statement, is it not?
20 A.  Whatever he wrote in the report is here.
21     Q.      I know that.  I don't need you here to
22 tell me that.  What I'm asking you is that a question?
23 Is there anything about that first sentence that
24 indicates it's an interrogatory?  Is there any question
25 mark after it?

Page 68

1  A.  No, there's not a question mark.
2      Q.      It's a period; right?
3  A.  It's period.  Correct.
4      Q.      And it says, "I was contacted."  Right?
5  A.  Yes.
6      Q.      That's a simple past tense; correct?
7  A.  Yes, sir.
8      Q.      "He advised me" -- "who advised me that
9  they currently had an individual, Nijeer Parks, who was
10 involved in the incident on January 26, 2019."
11 A.  Okay.
12     Q.      That statement that's in this report, is
13 there anything in that sentence that suggests that they
14 had -- that Nijeer Parks was a suspect?
15 A.  I believe at that time a warrant was signed
16 already and he was arrested.
17     Q.      Okay.  What's your basis and belief for
18 that?
19 A.  If he's in custody then -- if he was in custody
20 then there had to have been a warrant signed for him to
21 be arrested.
22     Q.      Okay.
23 A.  Am I correct on that?  He already --
24     MR. RUBENSTEIN:  That's okay.  That's
25 your answer.

Pages 65 to 68

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 69

```
1        Q.      What would be the reason then to have
2   Officer Lee come down?
3        A.   Just another further lead in the investigation.
4        Q.      Now, his narrative continues, "Once
5   there, I observed Mr. Parks sitting on the rail and
6   identified him as being the suspect."  I can represent
7   to you that Officer Lee testified that Parks was
8   handcuffed to the rail when he went into the processing
9   area.
10       A.   Okay.
11       Q.      As a detective, would you agree that
12  that was highly suggestive to the witness?
13       A.   As a police officer we're able to -- we don't
14  need a show-up, a lineup or anything like that to show
15  a possible suspect.  If Officer Lee suspected that that
16  was the person or knew that that was the person, then
17  that's his identification of the person.
18       Q.      So the normal human fallibility doesn't
19  apply to police officers?
20       MR. RUBENSTEIN:  Objection as to form.
21       A.   It's handled differently than a witness or a
22  suspect would be on the civilian side, not as an
23  officer.
24       Q.      Are officers -- witnesses who happen to
25  be officers are never shown a photo array?
```

Page 70

```
1        A.   No, sir.
2        Q.      And why is that?
3        A.   I don't know, sir.  That's just the way it is.
4   It's not mandatory through the county.
5        Q.      Pardon?
6        A.   It's not mandatory through the county to do that.
7            (There is a recess.)
8        Q.      Thank you, Detective Quesada.  I just
9   have a couple questions about the surveillance videos.
10  Did you obtain the surveillance footage?
11       A.   No, I never observed it.
12       Q.      You never did?
13       A.   No.
14       Q.      Do you know if it was ever obtained?
15       A.   I believe so.  That's something we normally --
16  one of the first things we look for.
17       Q.      And why did you never obtain it?
18       A.   It's not my job.
19       Q.      It's not the ID detective's job?
20       A.   No, sir.
21       Q.      Whose job is it?
22       A.   The lead detective.
23       Q.      And you would never -- you were never
24  involved in reviewing it or making any kind of
25  assessment?
```

Page 71

```
1        A.   The only time I would get involved in it is maybe
2   if it show for a burglary that neighbor if he goes in
3   through somewhere I would look at it to see if the
4   person touched anything or something like that.
5        Q.      How about the Tenessee driver's license
6   in this case?  Did you do anything with that?
7        A.   No because the officers were handling it.  I
8   think I took a picture of it.
9        Q.      Did you do anything to evaluate it?
10       A.   No, sir.
11       Q.      Somebody else ran it; right?
12       A.   I believe Lee or Lyszk did it during their
13  interaction with the person.
14       Q.      I believe you testified that you had no
15  communications with Tapia after forwarding him the
16  fingerprint match to Barrington Walker; is that
17  correct?
18       A.   What do you mean "no communication?"  About the
19  case?  No.
20       Q.      And did you ever discuss anything about
21  where you obtained the prints from with Tapia?
22       A.   He was there.  He was there doing his
23  investigation.  I was doing my thing.  And I let him
24  know, hey, I got some prints from here; I got some
25  prints from there.
```

Page 72

```
1        Q.      Okay.  Do you recall any statements by
2   Tapia at that time when you were getting all this
3   evidence?
4        A.   No, sir.
5        Q.      When the prints came back from the cars
6   not NS, not --
7        A.   It's either not suitable or not in the system.
8        Q.      Was -- those are very different things?
9        MR. RUBENSTEIN:  Objection.
10       A.   So when we get a hit back it comes back with the
11  SBI number.  When I determine it's not suitable, I
12  discard those prints.  The prints that were sent out
13  that's on that -- on the packet, the envelope, those
14  prints we still have.  That's what state police ran
15  through.  They still might keep on running those prints
16  through the system to eventually get a hit on those
17  other prints if they're in the system.  I only deal
18  with it when there's a SBI number located to the print.
19  And then there's prints that constantly get run through
20  the system.  They could be in there for years and then
21  we'll get a hit back in one of the prints.
22       Q.      So in Exhibit I, the NS.
23       A.   Is done by the state police.
24       Q.      And do you know whether that's not
25  suitable or not in the system?
```

Pages 69 to 72

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 73

1    A.   I do not know.
2         Q.   And those prints, did you say they're
3    still maintained by you?
4    A.   Yes.  And they should be maintained by the state
5    police also.  My understanding is that they're
6    constantly run through the system for possible -- for
7    possible hits.
8         Q.   But if it's not suitable that means
9    they're not readable?
10   A.   Not readable.  Correct.
11        Q.   If they're not suitable are they
12   maintained?
13   A.   Yes, those prints we still maintained on our end.
14        Q.   When you looked at -- do you recall
15   looking at them and thinking these are readable or not
16   readable?
17   A.   If I sent them out I believe there's a
18   possibility that they could be readable.
19        Q.   All right.  That's all I have.  Thank
20   you.
21   A.   Thank you.
22
23   CROSS EXAMINATION BY MR. RUBENSTEIN:
24        Q.   Detective, when you were dispatched to
25   the scene and you elected to take fingerprints and palm

Page 74

1    prints from the door that lead to the outside of the
2    hotel, did you look for certain that these were
3    fingerprints or palm prints that would come back to the
4    suspect?
5    A.   No, sir.
6         Q.   So you did that -- you took the
7    fingerprint and the palm print as a tool to try find
8    out if someone would come back as a match who there was
9    other evidence to suggest that this person could have
10   been the suspect?
11   A.   Yes, sir.
12        Q.   Okay.  When the fingerprint came back or
13   the palm print came back, came back with the hit the
14   gentleman by the name of Barrington Walker, that was
15   around the tail end of February of 2019; is that
16   correct?
17   A.   Yes, sir.
18        Q.   At that point in time do you know if Mr.
19   Parks was under arrest?
20   A.   Yes.
21        Q.   And the process for having someone
22   arrested like Mr. Parks in this case, do you know if it
23   requires the prosecutor's office to review of all the
24   evidence and the facts that they have at that point in
25   time before a complaint warrant is issued?

Page 75

1    A.   Yes.
2         Q.   And the prosecutor would then disclose
3    to Detective Tapia in this case or to the investigating
4    officer whether to -- whether there was enough evidence
5    to -- or probable cause to file the complaint warrant?
6    A.   Yes, sir.
7         Q.   Was that done in this matter?
8    A.   Yes, sir.
9         Q.   And was that done with Assistant
10   Prosecutor Natasi?
11   A.   Yes, sir.
12        Q.   At the time that Mr. Parks was arrested,
13   he did not have any results -- or did you have any
14   results of the DNA at that point?
15   A.   No, sir.
16        MR. RUBENSTEIN:  Okay.  I guess I'm
17   going to have this marked.  So I guess I'll continue
18   along the lines of where you left off with other P --
19   so if you could mark this as PX and just put today's
20   date on it, I'd appreciate it.
21        (Plaintiff's Exhibit PX, Evidence
22   receipt, was received and marked for identification.)
23        Q.   So Detective Quesada, I'm showing you
24   what was marked as PX for identification.  Can you tell
25   me what that this?

Page 76

1    A.   This is the evidence receipt I believe when the
2    evidence was dropped off for a DNA signature.
3         Q.   Okay.  Does this have anything to do
4    with the fingerprints or just the DNA?
5    A.   Just the DNA.
6         Q.   On the bottom it has one and two.  It
7    says the water bottle and the sneaker.
8    A.   Yes, sir.
9         Q.   And does it say when it was dropped off?
10   Or do you know when it was dropped off?
11   A.   I'm looking for the date.  I believe it was
12   dropped off the same date that the fingerprints
13   happened to be dropped off.
14        Q.   That was about February 8th of 2019?
15   A.   I believe so.  Yes.
16        Q.   All right.
17        MR. RUBENSTEIN:  We have this marked as
18   PY?
19        (Plaintiff's Exhibit PY, Second page of
20   evidence receipt, was received and marked for
21   identification.)
22        Q.   This is page one of two.  Is that what
23   it says on the bottom right-hand corner?
24   A.   Yes.  Yes.
25        Q.   Is this the second page of that report?

Pages 73 to 76

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 77

1    A.   Yes.  So it was delivered on 2/8/19.
2         Q.   So that's when the items were dropped
3    off to be tested by the state for the DNA evidence?
4    A.   Yes, sir.
5         Q.   Okay.  And that was about 13, 14 days
6    after the incident?
7    A.   Yes, sir.
8         Q.   Is that common or is it too long a
9    timeframe or is it within the realm of normal, normal
10   under these circumstances, for this type of case?
11   A.   It's within the realm of normal.
12             MR. RUBENSTEIN:  Now, I'm going to have
13   this marked as PY.
14             (Plaintiff's Exhibit PY, Report for
15   state police laboratory report, was received and marked
16   for identification.)
17        Q.   And this PY is the document -- does it
18   say April 17, 2019, in the top right-hand corner?
19   A.   Yes, sir.
20        Q.   Okay.  What report is this?
21   A.   This is for the state police laboratory report.
22        Q.   Okay.  And what does this show?  Does it
23   show when the tests were run?  Does it show when it was
24   sent out to be tested?  What exactly does this report
25   indicate?

Page 78

1    A.   Here it's for the -- that the DNA -- DNA has been
2    submitted to the DNA laboratory.
3         Q.   And for testing?
4    A.   For testing.  Correct.
5         Q.   Okay.  So they received the DNA -- we'll
6    call it evidence for lack of a better term -- from
7    Woodbridge on February 8, 2019; is that correct?
8    A.   Correct.
9         Q.   And they sent it out to be tested on
10   April 17, 2019, a little bit more than two months
11   later?
12   A.   Correct.
13        Q.   Okay.  And then you were shown a
14   document earlier dated October 19, 2019, which
15   establishes that that's when they got the initial
16   results back; is that correct?
17   A.   Yes.
18             MR. RUBENSTEIN:  Now I'm going to ask
19   that this be marked as PZ.
20             (Plaintiff's Exhibit PZ, Evidence return
21   receipt, was received and marked for identification.)
22        Q.   Showing you what's been marked PZ for
23   identification.  What does this document reflect?
24   A.   This is the evidence return receipt.
25        Q.   And this evidence that you're referring

Page 79

1    to is the DNA evidence?
2    A.   Yes, sir.
3         Q.   And this is when it's returned from the
4    state police to the Woodbridge police?
5    A.   Yes.  Once they're finished with the processing
6    we have to go there and pick up the items to put back
7    in our evidence bureau.
8         Q.   And do you maintain that evidence?
9    A.   Yes.
10        Q.   Okay.  Do you know if it still exists
11   today?
12   A.   It should be.  Yes.
13        Q.   Okay.  So the whole process took a
14   little bit less than -- my math is right -- nine months
15   for you to submit the DNA, for you to -- for the state
16   police to send it out to their lab to be tested, and
17   for you to get the results, and get the sneaker and the
18   water bottle back; is that about right?
19   A.   Yes, sir.
20        Q.   Okay.  Is that an inordinate amount of
21   time from the negative standpoint or is that, again,
22   within the realm of normal?  Or how would you
23   characterize the timeframe?
24   A.   Normal.
25        Q.   Okay.  Does Woodbridge have any control

Page 80

1    over the state police in how quickly it does -- absent,
2    let's say, a homicide or a sexual assault matter -- how
3    quickly it sends things out for testing and getting the
4    results back?
5    A.   No, sir.
6         Q.   So this DNA that was -- what was found
7    in October of '19, the results that were given to the
8    Woodbridge police, that in no way reflected that Mr.
9    Walker -- it was Mr. Walker's DNA at that point in
10   time?
11   A.   No.
12        Q.   You were shown earlier a document dated
13   July 2021.  Was that the first indication from a DNA
14   standpoint that Mr. Walker's DNA was on the water
15   bottle and -- was that the first time you had found
16   that out?
17   A.   Yes, sir.
18        Q.   Okay.  There was no previous notice from
19   the state police?
20   A.   No, sir.
21        Q.   Okay.  If there had been anything
22   earlier than that would Woodbridge have received
23   notification that there was a hit?
24   A.   Yes.
25        Q.   Okay.  So if something came out in '19,

Pages 77 to 80

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 81

```
 1   in the latter part of '19 or '20 or in '21 before July
 2   from the state police, you would have gotten
 3   notification or the Township of Woodbridge Police
 4   Department would have gotten notification?
 5   A.   Correct.
 6        Q.      And when you get the prosecutor's
 7   blessing to -- on the complaints that Tapia and Lyszk
 8   had drafted does it go to a magistrate?
 9   A.   Yes.
10        Q.      Do you know if it went to the magistrate
11   in this case?
12   A.   It would have to.
13        Q.      And what purpose does the magistrate
14   serve? Do you know?
15   A.   To determine if the complaints can be signed
16   against the person.
17        MR. SEXTON: A magistrate?
18        MR. RUBENSTEIN: I think that that's
19   what he referred to.
20        MR. SEXTON: Municipal court judge.
21        MR. RUBENSTEIN: Municipal court judge.
22        Q.      So in this case my understanding is that
23   Municipal Court Judge Stahl reviewed the evidence that
24   was shown to him and he gave his blessing on signing
25   the complaint; is that correct?
```

Page 82

```
 1   A.   Yes.
 2        Q.      And his review, is it considered an
 3   independent review separate and apart from your
 4   department?
 5   A.   Yes.
 6        MR. SEXTON: Objection. That asks for a
 7   legal conclusion.
 8        Q.      Do you know why it's given to a judge
 9   such as Judge Stahl to review?
10        MR. SEXTON: Objection. Calls for a
11   legal conclusion.
12   A.   Just to -- that's the way the process goes. If
13   we believe we have enough to sign a complaint against
14   the person we have to verify with the judge so he could
15   determine if there's enough -- enough there to sign the
16   complaint.
17        Q.      Okay. And is that -- but did Judge
18   Stahl sign off on these complaints?
19   A.   I believe so. Yes.
20        Q.      Now, at some juncture is -- all of this
21   evidence you indicated was put together in a package
22   and ultimately is sent to the prosecutor's office?
23   A.   Yes, sir.
24        Q.      Do you know if in fact that was done in
25   this case?
```

Page 83

```
 1   A.   All the cases that I've worked personally, when
 2   it goes to the grand jury ultimately we prepare the
 3   folder. And the folder goes to the prosecutor's
 4   office.
 5        Q.      And from there do you have any
 6   involvement once it reaches the prosecutor's office?
 7   A.   No.
 8        Q.      Do you have any decision making powers
 9   as to whether to prosecute this person such as Nijeer
10   Parks or any other person who you send this package of
11   information on?
12   A.   No.
13        Q.      Is that decision making solely within
14   the purview of the in this case the Middlesex County's
15   Prosecutor's Office?
16   A.   Yes, sir.
17        MR. SEXTON: Continued objection as to
18   legal opinions.
19        Q.      I don't have anything else. Counsel may
20   have some more.
21        MR. SEXTON: I don't have anything
22   further. Thank you.
23        MS. LEMPKA: I have nothing.
24
25        (The witness is excused.)
```

Page 84

```
 1        (The matter is adjourned at 11:58 A.M.)
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Pages 81 to 84

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 85

```
 1              CERTIFICATE
 2
 3          I, CARMEN WOLFE, a Certified Shorthand
 4   Reporter and Notary Public of the State of New Jersey,
 5   certify that the foregoing is a true and accurate
 6   transcript of the deposition of JORGE QUESADA, who was
 7   first duly sworn by me.
 8
 9          I further certify that I am neither
10   attorney or counsel for, nor related to or employed by
11   any of the parties to the action in which the
12   deposition is taken and that I am not a relative or
13   employee of any attorney or counsel employed in this
14   case, nor am I financially interested in the action.
15
16
17
18              CARMEN WOLFE
19          CERTIFIED SHORTHAND REPORTER
20
21
22   Dated:  September 6, 2022
23   Notary Expiration Date:  November 10, 2026
24
25
```

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

# EXHIBIT "F"

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CIVIL ACTION NO. 21-04021-(JXN)-(LDW)

NIJEER PARKS,
vs.
JOHN E. McCORMACK, MAYOR OF WOODBRIDGE, in his
personal and official capacity, ROBERT HUBNER,
DIRECTOR OF THE WOODBRIDGE POLICE, in his personal
and official capacity, CITY OF WOODBRIDGE POLICE
OFFICERS, ANDREW LYSZK and WOODBRIDGE POLICE
SGT. JOSEPH LICCIARDI, WOODBRIDGE POLICE OFFICERS,
JOHN AND JANE DOES 1-20, being as yet unknown
actors, MIDDLESEX DEPARTMENT OF CORRECTIONS, JOHN
AND JANE DOES 1-20, being unknown actors, MIDDLESEX
COUNTY PROSECUTOR, ACTING PROSECUTOR CHRISTOPHER
KUBERIET, in his personal and official capacity, and
ASSISTANT MIDDLESEX COUNTY PROSECUTOR, PETER NATASI,
and IDEMIA INC.'S being the maker of the facial
recognition software and ABC CORPORATION, being an
as yet unknown seller or servicer of the facial
recognition programs,

Defendants.

- - - - - - -

DEPOSITION OF

SERGEANT SANTIAGO TAPIA

TRANSCRIPT of the stenographic notes of
the proceedings in the above-entitled matter, as
taken by and before LAURA P. REAM, a Certified
Court Reporter and Notary Public of the State of
New Jersey, held at the law offices of James P.
Nolan and Associates, 61 Green Street, Woodbridge,
New Jersey, on Friday, August 12, 2022, commencing
at 10:32 a.m.
HUDSON COURT REPORTING & VIDEO   (732) 906-2078

Page 2

1    A P P E A R A N C E S:
2
3    DANIEL W. SEXTON, ESQ., LLC
     BY: DANIEL W. SEXTON, ESQUIRE
     229 New Center Road
4    Hillsborough, NJ 08844
     201-406-9960
5    Danielsextonesq@gmail.com
     Representing the Defendant,
6    Middlesex Department of Corrections
7
     DVORAK & ASSOCIATES
8    BY:  GRACE LEMPKA, ESQUIRE
     467 Middlesex Avenue
9    Metuchen, NJ 08840
     732-317-0130
10   Glempka@dvoraklegal.com
     Representing the Defendant,
11   Middlesex Department of Corrections
12
     LAW OFFICES OF JAMES P. NOLAN AND ASSOCIATES
13   BY:  FREDERICK L. RUBENSTEIN, ESQUIRE
     61 Green Street
14   Woodbridge, New Jersey  07095
     732-636-3344
15   Frubenstein@jpnlaw.us
     Representing the Defendant,
16   Township of Woodbridge
17
18
     ALSO PRESENT:
19
     SAMANTHA SALZONE, ESQUIRE
20
     GARRY CLEMENTE, ESQUIRE
21
22
23
24
25

Page 3

1           I N D E X
2    WITNESS                      PAGE
3    SERGEANT SANTIAGO TAPIA
4    DIRECT EXAMINATION BY MR. SEXTON       7
5    CROSS-EXAMINATION BY MR. RUBENSTEIN  130
6    REDIRECT EXAMINATION BY MR. SEXTON   143
7    RECROSS-EXAMINATION BY MR. RUBENSTEIN  149
8    REDIRECT EXAMINATION BY MR. SEXTON   150
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1             E X H I B I T S
2    PLAINTIFF'S
3    No.      Description              Page
4    C     Sergeant Tapia's 2/4/19       58
           Supplemental Report
5
6    D     1/26/19 Dunkin' Donuts Receipt   60
7    E     1/26/19 Woodbridge Police      62
           Department ID Bureau Suspect
           Report
8
9    F     10/18/19 New Jersey State Police   65
           Office of Forensic Sciences DNA
           Laboratory Report
10
11   G     7/30/21 New Jersey State Police   67
           Office of Forensic Sciences CODIS
           Investigative Hit Notification
12
13   H     1/26/19 Woodbridge Police      68
           Department ID Bureau Report
14   I     2/8/19 Request For Latent       70
           Fingerprint Examination
15
16   J     Fingerprint Card for Walker,    72
           Barrington
17   K     DNA Request From Det. Quesada    75
18   L     Collage of Photographs        76
19   M     CJIS 2000 Response            79
20   N     1/27/19 Motor Vehicle Consent   81
           To Search
21
22   O     New York State Intelligence Center  82
           Request For Information Form
23   P     Rockland County Intelligence    86
           Center Officer Report for
24         Incident 19R100076
25

Pages 1 to 4

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 5

1    E X H I B I T S, Cont.
2   PLAINTIFF'S
3   No.    Description              Page
4   Q    1/28/19 E-mail Chain Between    87
         Seamus Lyons and Santiago Tapia
5
     R    Officer Lyszk's 1/26/19 Report    95
6
     S    Request For Facial Recognition/    98
7        Photo Array
8    T    2/5/19 Woodbridge Police      107
         Department Criminal Investigation
9        Division - Voluntary Statement
         Transcript
10
     U    CODIS Fact Sheets - 2021      112
11
12   V    Sergeant Tapia's Affidavit of    115
         Probable Cause
13
     W    Officer Lyszk's Affidavit of    116
14       Probable Cause
15
16
17
18
19
20
21
22
23
24
25

Page 6

1
2         INFORMATION REQUESTED
3        Page    Line
4         23     8
5         54     17
6         85     14
7         88     20
8        149     12
9
10
11    QUESTIONS INSTRUCTED NOT TO ANSWER
12       Page    Line
13        40     17
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1    SERGEANT SANTIAGO TAPIA, T-A-P-I-A, sworn by the
2    Notary Public, testified as follows:
3    DIRECT EXAMINATION
4    BY MR. SEXTON:
5         Q.    Good morning, Sergeant.
6     A.    Good morning.
7         Q.    Have you had your deposition taken
8    before?
9     A.    Never.
10        Q.    So just a couple of instructions.  You
11   see the court reporter here taking down everything
12   we say.  It's important for our communications to
13   be verbal because she can't take a nod -- she
14   can't record a nod of the head or something like
15   that.
16        Also, I would ask that if there's any
17   question that I ask that you don't understand,
18   I'll be happy to rephrase it.  From time to time
19   your attorney will make objections.  Normally
20   they're just objections for the record and you'll
21   continue to answer.  If your attorney says don't
22   answer, then he and I will discuss the issue and
23   figure it out and resume the deposition.  I think
24   that's it.  Then we'll just get started.
25        When did you come on the job?

Page 8

1     A.    June 3, 2003.
2         Q.    And can you describe your training,
3    when you came on in 2003?
4     A.    Yes.  I went to the police academy until
5    December of 2003, graduated from Somerset County
6    Police Academy.  I was assigned to the Radio
7    Patrol Division, squad 11, which is nightshift.
8         From there I did five years in the
9    Radio Patrol Division.  I was assigned to the
10   Middlesex County Prosecutor's Office Gangs, Guns,
11   and Drugs Task Force.  From then I became a
12   detective in the Criminal Investigations Division
13   in Woodbridge.
14        Q.    So Middlesex County -- what's it
15   called Middlesex County...?
16    A.    Gangs, Guns, and Drugs Task Force.
17        Q.    And do you remember what year that
18   was?
19    A.    2005/2006.
20        Q.    And when you were on that task force,
21   were you physically working out of the
22   prosecutor's office at that time?
23    A.    Yes, I was on loan to them.
24        Q.    And how did that come about?  Did you
25   request that, or were you chosen for that?

Pages 5 to 8

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 9

1    A.   I was chosen for it.
2        Q.   And as a member of that task force,
3    did you receive special training?
4    A.   No training.
5        Q.   And --
6    A.   On-the-job training.
7        Q.   Okay.  So how was the on-the-job
8    training for that?
9    A.   Surveillance, undercover work, identifying
10   drug dealers, learn the drug trade, both in
11   Spanish and English, monitored wire taps.
12       Q.   Do you remember who at the
13   prosecutor's office was conducting this training?
14   A.   Joseph Montone, Sergeant Joseph Montone.
15       Q.   M-O-N-T-O-N-E?
16   A.   Yes.
17       Q.   And was he a sergeant detective?
18   A.   Yes, sir, and anyone else at the
19   prosecutor's office that was involved in training.
20   He was the sergeant in charge.  There was a
21   lieutenant called Mimi Alvarez.
22       Q.   Mimi?
23   A.   Yes.
24       Q.   Is he a lieutenant detective?
25   A.   Yes.

Page 10

1        Q.   So there's like the Detective Bureau,
2    is that correct, in the --
3    A.   Yes, sir.
4        Q.   -- prosecutor's office?
5            Do you know how many people are in
6    the Middlesex County Prosecutor's Office Detective
7    Bureau?
8    A.   There's a lot.  I can't recall how many.
9    In that specific task force there was three squads
10   at the time, but I can't tell you how many people.
11       Q.   Were any assistant prosecutors
12   involved in the training at all?
13   A.   No.
14       Q.   Were any of the assistant prosecutors
15   involved in the supervision of the task force?
16   A.   No.
17       Q.   Okay.  So did you have any interaction
18   with any lawyer in that office?
19   A.   No, I did not.  I didn't deal with them.
20       Q.   And so you were there for just two
21   years, 2005/2006?
22   A.   It was approximately one year.  It was
23   between 2005 and 2006.
24       Q.   Okay.  So then we're up to -- so what
25   happened in 2006 then, after you left the --

Page 11

1    A.   I went back to the radio patrol division.
2        Q.   And why did that happen?
3    A.   I was still assigned to a squad.  I was
4    only on loan.
5        Q.   Okay.  Do you know at the time you
6    were loaned to the task force how many other
7    officers in the department were on loan to the
8    prosecutor's office?
9    A.   Just one more from Woodbridge.
10       Q.   From Woodbridge?
11   A.   Yeah.
12       Q.   Who was that?
13   A.   Officer John Rial.
14       Q.   John...
15   A.   Rial.
16           MR. RUBENSTEIN:  Is that R-I-A-L?
17           THE WITNESS:  Yes, sir.
18   BY MR. SEXTON:
19       Q.   Okay.  All right.  So back to the
20   radio patrol in 2006.  Continue on.  You were
21   doing great with your narrative.
22           What happened?
23   A.   I went back to the radio patrol division,
24   my same squad, squad 11 nightshift.  In 2009 I was
25   promoted to detective, and I was assigned to the

Page 12

1    Criminal Investigations Division.
2        Q.   Did you take a test to become a
3    detective?
4    A.   No.  I was chosen.
5        Q.   Okay.  And is that considered, in
6    the department, in the Woodbridge Police
7    Department, is detective considered a rank or an
8    assignment?
9    A.   It's an assignment.
10       Q.   When you were promoted to detective,
11   what was your initial specific assignment?
12   A.   There is -- it's general detective work, so
13   I was assigned to Criminal Investigations
14   Division.  Criminal Investigations Division is
15   responsible for burglaries, robberies, homicides,
16   thefts, indictable thefts.  It's not specific to
17   one crime.
18       Q.   How many in this time, 2009, I
19   believe, how many detectives were in the
20   general -- in the criminal investigation division?
21   A.   At that time I could not say.  I don't
22   recall how many detectives.
23       Q.   How many are in the whole department
24   in 2009?
25   A.   I'd say close to 200.

Pages 9 to 12

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 13

1     Q.  And how about today?
2   A.  Closer to 220.
3     Q.  Did you say 220?
4   A.  Two-twenty, yes.
5     Q.  So would the Detective Bureau have
6  about 50 people in it maybe?
7   A.  I'd say 30, if you combine all the
8  divisions.
9     Q.  And within the detective assignment
10  there are different ranks, there's sergeant
11  detectives, is that correct?
12   A.  That's correct.
13     Q.  And the lieutenant detectives?
14   A.  Yes, sir.
15     Q.  Captain detective?
16   A.  There's a captain, yes.
17     Q.  When you became, in 2009, a detective,
18  were you given special training?
19   A.  I was.  I was sent to homicide school.
20     Q.  Where was that?
21   A.  Baltimore, Maryland.
22     Q.  Who ran that?
23   A.  It was the coroner's office in Baltimore
24  County.
25     Q.  And how long was that training in

Page 14

1  Baltimore?
2   A.  I don't recall.
3     Q.  Was it longer than a month?
4   A.  No.
5     Q.  So it was a couple of weeks?
6   A.  Approximately one week.
7     Q.  And were you given some kind of
8  certification or certificate after that training?
9   A.  Yes, sir.
10     Q.  And can you describe what that
11  training consisted of?
12   A.  It consisted of autopsies.  We were able to
13  view autopsies being performed on gunshot wound
14  victims, drowning victims, young adults, car
15  accidents.  Then there was training on gunshot
16  trace residue, blood splatter, crime scene
17  investigations.
18     Q.  Crime scene investigations, do you
19  remember what they taught you about crime scene
20  investigations?
21   A.  Secure a crime scene, preserving the
22  evidence, collecting evidence, staged crime
23  scenes.
24     Q.  What do you mean by that?
25   A.  Well, let's say, for instance, there's a

Page 15

1  drowning victim.  Supposably they drowned in the
2  bathtub and you draw everything out, and you
3  conclude at the end of your investigation that
4  that person didn't, in fact, drown inside of a
5  bathtub, but they were drowned inside of a toilet
6  bowl.
7     Q.  So it's like a -- is it a thing you do
8  to test the hypothesis, you see if it works?
9   A.  Yes.
10     Q.  All right.  So can you describe -- are
11  you still -- you're sergeant detective now?
12   A.  No, sir.  I'm back on the Radio Patrol
13  Division.
14     Q.  So why don't you describe your time as
15  a detective.
16   A.  So I was received training in interview and
17  interrogations.
18     Q.  And where did you receive that?
19   A.  It's in New Jersey.  I forget the town down
20  south.  I would have to refer back to that
21  certificate to see where it was given.  It was the
22  John Reid Technique.
23     Q.  And is that -- that's a special
24  interview technique?
25   A.  That's correct.

Page 16

1     Q.  Okay.  And what's the history of the
2  John Reid Technique?
3   A.  John Reid was a polygraph expert, and he
4  interviewed people while he was conducting the
5  polygraph, and he teaches his -- what he called
6  the Reid Technique.
7     Q.  And do you remember what the Reid
8  Technique -- can you describe the Reid Technique?
9   A.  Sure.  When people are lying, they have
10  tells.  Their body mechanism, the way that they
11  move their eyes.
12     Q.  Would he also -- were you also taught
13  how to use a polygraph?
14   A.  No.
15     Q.  Were polygraphs used at all in your
16  work as a detective?
17   A.  Not myself, but I did see them used in
18  several cases.
19     Q.  By Woodbridge?
20   A.  Yes.  There was two cases:  One was a
21  homicide case; and one was an arson case.
22     Q.  Who determines when a polygraph is
23  used in the Woodbridge department?
24   A.  Usually the lead detective.
25     Q.  Does somebody have to sign off on the

Pages 13 to 16

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 17

```
 1    use of a polygraph?
 2    A.   I'm not certain about that.
 3         Q.   Do you know if anybody -- when the
 4    polygraph is used, is the prosecutor's office
 5    involved in that decision?
 6    A.   They can be.  Specifically if it's a
 7    homicide, they would be.
 8         Q.   Do you have an understanding on what
 9    role a polygraph result can play in an
10    investigation?
11    A.   I've never used it myself.
12         Q.   So did you --
13    A.   I wouldn't know.
14         Q.   You wouldn't know.  Okay.
15              How about, do you know, from any
16    source, what role a polygraph result can play in a
17    prosecution in court?
18    A.   No.
19         Q.   Do you know what Reid's background
20    was?  Was he a psychologist, or...?
21    A.   He was -- I know he was a polygraph expert,
22    but I don't know what department he worked for.
23         Q.   Now, you don't remember the South
24    Jersey town this was in.
25    A.   No, sir.
```

Page 18

```
 1         Q.   Do you remember if this was a
 2    municipal police department, or a county police
 3    department, or any law enforcement office?
 4    A.   I don't recall.
 5         Q.   Or could it have been a private
 6    outfit?
 7    A.   It wasn't a private outfit.  It was a
 8    department somewhere down in South Jersey.
 9         Q.   Okay.  Thanks.
10              And when did you do that class?
11    A.   They usually give it to us the first year
12    as a detective.  So I had to -- I'm not going to
13    guess.  I don't recall, but it was closer to my
14    assignment.
15         Q.   And so is this something everybody
16    went through?
17    A.   Yes, sir.
18         Q.   What other training did you have, if
19    any?
20    A.   Well, I was assigned to the New Jersey
21    State Police Auto Theft Task Force in 2016 to
22    2017.
23         Q.   And then, once again, were you on loan
24    to them?
25    A.   Yes, sir.
```

Page 19

```
 1         Q.   And what do they call them, barracks?
 2    Where were you?
 3    A.   I was in Metro North in Irvington, New
 4    Jersey.
 5         Q.   Did you receive any training when you
 6    were with the State Troopers?
 7    A.   It was on-the-job training.
 8         Q.   Can you describe some of that?
 9    A.   Undercover work, surveillance, search
10    warrants, identifying -- well, we were
11    investigating sophisticated auto theft.  They
12    would steal high-end motor vehicles from affluent
13    neighborhoods in New Jersey, secrete them in
14    shipping containers, and destined for overseas.
15         Q.   So there was an ID part of this
16    training?  What was that?  I think you started to
17    say surveillance, search warrants, and ID?
18    A.   They did send me to identification school,
19    yes.
20         Q.   And what do you learn -- where was
21    that?
22    A.   Totowa.
23         Q.   And was that run by the Troopers?
24    A.   Yes, sir.
25         Q.   And what was taught there?
```

Page 20

```
 1    A.   Lift fingerprints from motor vehicles.
 2         Q.   Anything else?
 3    A.   No.  That was it.
 4         Q.   DNA testing?
 5    A.   No.
 6         Q.   Did you have any other training as a
 7    detective?
 8    A.   They sent me to sexual assault school, but
 9    in my division we don't run sexual assault cases
10    unless nobody's available from the Juvenile Aid
11    Bureau.
12         Q.   The what?
13    A.   The Juvenile Aid Bureau.  They handle all
14    the sexual assault cases.
15         Q.   The Juvenile Aid Bureau.
16              That bureau is part of what
17    department?
18    A.   Woodbridge.
19         Q.   Woodbridge Police Department?
20    A.   Yes, sir.
21         Q.   Any other training that you can
22    recall?
23    A.   They sent me to several homicide schools.
24    There was one in Jersey City -- I'm sorry,
25    Atlantic City, which was drowning homicide school.
```

Pages 17 to 20

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 21

```
 1          Q.   And by "they," is that the Woodbridge
 2   department or the NJ Troopers?
 3      A.   That was actually -- it was a private --
 4          Q.   But who sent you?
 5      A.   Oh, Woodbridge Police Department.
 6          Q.   And the school itself, was it private?
 7      A.   Yes, sir.
 8          Q.   I guess Woodbridge is on the Raritan;
 9   is that right?
10      A.   Arthur Kill.
11          Q.   Arthur Kill?
12          Do you have boats, does the
13   department have a boat?
14      A.   They used to.  They don't have one now.
15          Q.   Any other training?
16      A.   Not significant training, no.
17          Q.   Did you ever get any training on how
18   lineups are conducted?
19      A.   Yes.
20          Q.   Where did you receive that training?
21      A.   I don't recall.
22          Q.   Are there any departmental documents,
23   or orders, policies regarding lineups?
24      A.   Yes.
25          Q.   Do you know what policies those would
```

Page 22

```
 1   be?
 2      A.   I don't know the exact policy.  It's
 3   out-of-court identification.
 4          Q.   How are the departmental policies
 5   organized?  Is there a handbook or a --
 6      A.   It's all online now.  It's called IDS.
 7          Q.   IDS?
 8      A.   Yes, sir.
 9          Q.   And are you, like, required to go
10   through the policies when they're issued and it
11   keeps track of you electronically, whether you've
12   opened it, something like that, and sign it?
13      A.   Yes, sir.
14          Q.   Do they -- they used to read them out
15   at like roll call and things like that, right, new
16   policies; is that correct?
17      A.   They assign it to you electronically
18   through IDS.  You have to go in there and read the
19   policy and sign off on it.
20          Q.   Do you remember a time when -- before
21   the IDS?
22      A.   Before IDS it was all paper.
23          Q.   When did IDS come in?
24      A.   I don't know the exact year that it came
25   in.
```

Page 23

```
 1          Q.   Approximately?
 2      A.   I don't want to guess.  I don't know.
 3          Q.   Are the policies still -- are they
 4   maintained in written forms anywhere in the
 5   department, or is it -- you only access them
 6   through IDS now?
 7      A.   We only access through IDS.
 8          MR. SEXTON:  We'll make a demand for
 9          policies relating to lineups.
10   BY MR. SEXTON:
11          Q.   Had you, as a detective, had an
12   occasion to conduct lineups?
13      A.   Yes.
14          Q.   How often would you conduct lineups?
15      A.   Approximately once every six months.
16          Q.   And what kind of -- what's the
17   situation that would cause you to do a lineup?
18      A.   Burglary cases.
19          Q.   Anything else?
20      A.   Aggravated assault, sexual assaults.  Any
21   time that somebody saw the suspect that would be
22   able to identify them through a photo array.
23          Q.   Through a what?
24      A.   Through a photo array.
25          Q.   Okay.  So were the lineups you did,
```

Page 24

```
 1   were they all photo arrays?
 2      A.   Yes.
 3          Q.   And you don't remember where you
 4   received training in how to conduct a photo array,
 5   do you?
 6      A.   I don't recall.
 7          Q.   Now, did you ever do an actual
 8   physical lineup?
 9      A.   Never.
10          Q.   Do you know if the department ever
11   conducted physical lineups?
12      A.   Not since I've been on the job.  Now, can
13   you clarify physical?  Are you talking about a
14   live lineup?
15          Q.   Yes.
16      A.   Okay.  Yeah, not since I've been on the
17   job.
18          Q.   But you know about those?
19      A.   Yes.
20          Q.   And when you did a photo array lineup,
21   would you consult or be directed in any way by
22   anyone from the Middlesex County Prosecutor's
23   Office?
24      A.   Yes, the zone prosecutor.
25          Q.   I'm sorry?
```

Pages 21 to 24

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 25

1    A.   The zone prosecutor.
2        Q.   The zone?
3    A.   The zone.
4        Q.   Z-O-N-E?
5    A.   Yes, sir.
6        Q.   So the zone prosecutor.  Is that like
7    a designated -- what is a zone prosecutor?
8    A.   So we get assigned zone prosecutors.  An
9    assistant prosecutor would be assigned several
10   towns that they would cover.
11       Q.   And what are the duties of that zone
12   prosecutor?
13   A.   In regards to a photo lineup, he would have
14   to approve the photo array before it is shown.
15       Q.   And is there some kind of a policy or
16   order that sets this out?
17   A.   It's an Attorney General guideline.
18       Q.   Do you happen to recall the -- which
19   one, the number?
20   A.   No.  It would be under out-of-court
21   identification.
22       Q.   What zone prosecutors did you work
23   with while you were a detective?
24   A.   They change so often.  They do.
25       Q.   Do you remember any?

Page 26

1    A.   Yeah, Assistant Prosecutor Natasi.
2        Q.   Is that Peter?
3    A.   Yes.  Assistant prosecutor Cindy Glaser.
4    Several others.  I can't remember the names.
5        Q.   Now, when you would do a photo array,
6    what were the rules?
7    A.   The rules would be that first and foremost,
8    they'd have to be -- you're asking for when
9    they're being prepared?
10       Q.   Yeah.
11   A.   When they're being prepared, they usually
12   go through the identification bureau, and they
13   have a set of rules they have to follow as far as
14   choosing the photographs that they're going to put
15   together for the photo array.  It has to be one of
16   the suspect and five fillers in random order
17   presented to the witness one at a time.
18       Q.   Does the witness have a chance to go
19   back through them, or is it once through and
20   that's it?
21   A.   No.  He has a chance to go back through.
22       Q.   Does he also have the opportunity to
23   spread them out on a table?
24   A.   No.  That's not an option.
25       Q.   Are there rules about how the

Page 27

1    different photos or people in the different photos
2    are dressed?
3    A.   Not dressed because it's only their face.
4    But it has to be the same complexion, same
5    hairstyle.  If there's visible tattoos, you have
6    to have similar people with similar tattoos.
7        Q.   How about facial hair?
8    A.   Same facial hair, correct.
9        Q.   Same race?
10   A.   Yes.
11       Q.   Same sex?
12   A.   Yes.
13       Q.   Do you know of any neighboring
14   departments or anybody in the county or anywhere
15   that does actual live lineups?
16   A.   Not that I know of.
17       Q.   Now, the rules you described for the
18   photo array, do you under -- can you tell us the
19   rationale for those rules?
20   A.   For the rules -- I don't understand your
21   question.
22       Q.   Why are there all these rules about
23   having the same sex, same complexion, same race?
24   A.   Right.  Because you want to make sure that
25   the person who is viewing the photographs has a

Page 28

1    clear picture of who the suspect was.
2        Q.   If you showed an eye witness one
3    single photo of somebody that you thought was the
4    suspect, would that be a good way to ID a suspect?
5        MR. RUBENSTEIN:  Objection to form.
6        You can answer.
7        When you say show a witness, are you
8    referring to lay people, police officers
9    as the witness?  Because that's a
10   difference.  I'm just asking.
11       MR. SEXTON:  I think the question
12   can be answered as is.
13       MR. RUBENSTEIN:  I don't think it
14   can because you're not asking him -- when
15   you say a witness, what kind of witness
16   are we talking about, a lay witness or not
17   a lay witness?
18       MR. SEXTON:  Your objection is on
19   the record.
20   BY MR. SEXTON:
21       Q.   If you can answer the question,
22   please.
23   A.   There is a difference between a police
24   officer and a regular witness.  What are you
25   referring to as far as...

Pages 25 to 28

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 29

1      Q.   Well, the question is, if you show a
2   witness -- without any coaching from your lawyer,
3   if you show a witness a picture of a suspect and
4   ask them if that's the person, the perpetrator
5   they observed, is that consistent with your
6   training as to how to conduct a photo array
7   lineup?
8      A.   No.
9      Q.   So you were -- we've gone up through
10  your time at the auto task force and in Irvington,
11  right?  That was up to 2017?
12     A.   Yes.
13     Q.   So were you called back to Woodbridge
14  after that auto task force?
15     A.   I was, yes.
16     Q.   So sometime in 2017?
17     A.   I don't know the exact date that I came
18  back, but in 2017 I came back.
19     Q.   And what did you do when you came back
20  to Woodbridge?
21     A.   I continued my assignment as a detective.
22     Q.   And were you still on the nightshift?
23     A.   I was actually dayshift when I was assigned
24  to the Detective Bureau.
25     Q.   Well, because you had been on the

Page 30

1   nightshift for a while, right?
2      A.   For patrol, yes.
3      Q.   But never as a detective?
4      A.   No.
5      Q.   Oh, okay.
6          So basically when you became a
7   detective in 2009?
8      A.   Yes, sir.
9      Q.   So from 2009 you were dayshift?
10     A.   Yes, sir.
11     Q.   Are there detectives on the
12  nightshift?
13     A.   Yes, there is.
14     Q.   Is it, like, one?
15     A.   No, there's several.
16     Q.   And did you have any particular
17  assignment during the dayshift when you came back
18  in 2017?
19     A.   When I came back, I had a homicide.
20     Q.   And how long were you on that
21  assignment?
22     A.   Seven months.
23     Q.   Then what was your assignment?
24     A.   I was working the case.
25     Q.   Working the case?

Page 31

1      A.   Yes, homicide case.
2      Q.   No, but after seven months, what
3   happened?
4      A.   Oh, after I cleared the case?
5      Q.   Yes.
6      A.   I was continuing my detective work.
7      Q.   So you were put on one case for seven
8   months, or...?
9      A.   Well, soon after I came back I was assigned
10  a homicide case, and I worked that.
11     Q.   Did that become like a full-time --
12     A.   Early -- in the very early months, yes, it
13  becomes a full-time job.
14     Q.   Did you work with anyone at the
15  prosecutor's office on that?
16     A.   I did.
17     Q.   Who was that?
18     A.   He's now a sergeant David Abromitis.
19         MR. RUBENSTEIN:  Could you spell his
20  last name?
21         THE WITNESS:  A-B-R-O-M-I-T-I-S.
22         MR. RUBENSTEIN:  Thank you.
23  BY MR. SEXTON:
24     Q.   Okay.  And then after that
25  investigation, what were you working on?

Page 32

1      A.   Regular detective work.
2      Q.   And that would bring you up -- did you
3   continue to do regular detective work up until the
4   events at the basis of this matter in January or
5   February/March of 2019?
6      A.   Yes, sir.
7      Q.   And when did you leave the Detective
8   Bureau?
9      A.   December 14th of 2021.
10     Q.   And why did you leave the Detective
11  Bureau at that time?
12     A.   I was promoted to sergeant.
13     Q.   Are you a detective still?
14     A.   I'm not a detective.  I'm in the Radio
15  Patrol Division.
16     Q.   Did you go on a -- did you take a test
17  to be promoted?
18     A.   Yes, sir.
19     Q.   And did you have the option, once you
20  were promoted to sergeant, to stay in the
21  detective bureau or to go on patrol?
22     A.   I was not given the option.
23     Q.   Did you ask to remain as a detective?
24     A.   I asked, but there's no openings.
25     Q.   So is there any other training you had

Pages 29 to 32

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
New Jersey
732-906-2078

Page 33

1    during this -- your time from 2009 until 2021 that
2    we haven't discussed yet?
3        A.   I would have to refer back to my
4    training -- my training sergeant to see if
5    there's -- I've been to schools.  I just can't
6    recall what they are.
7        Q.   Okay.  I don't think I got your
8    background.
9             What was your last year of education?
10       A.   I did about two years in college, but I
11   don't have a degree.
12       Q.   And where did you work before you came
13   on the job?
14       A.   I was with the United States Air Force.
15       Q.   How long were you in the Air Force?
16       A.   I did seven years active duty and the rest
17   of my time I did in the National Guard.
18       Q.   Are you still in the Guard?
19       A.   No.  I retired in November of 2018.
20       Q.   Did you do any training, either with
21   the Air Force or the National Guard, relating to
22   detective work?
23       A.   No.
24       Q.   I think they call it Military Police.
25       A.   Office of Special Investigations.

Page 34

1        Q.   You weren't in that?
2        A.   No.
3        Q.   And do you have any disciplinary
4    history?  Have you ever been disciplined?
5        A.   Never been disciplined.
6        Q.   Have you ever received a written
7    warning for anything?
8        A.   No.
9        Q.   How about an oral warning?
10       A.   No, sir.
11       Q.   Okay.  Did you ever receive any
12   discipline for the events at the basis of this
13   matter?
14       A.   No.
15       Q.   Did you ever receive any written
16   warning regarding this matter?
17       A.   No.
18       Q.   Did you ever receive an oral reprimand
19   or anything orally regarding this matter?
20       A.   No.
21       Q.   Did you ever receive a corrective
22   action memo or anything like that regarding this
23   matter?
24       A.   No.
25       Q.   Have you ever received any

Page 35

1    communication about this matter from anyone in the
2    department?
3        A.   Yes.
4             MR. RUBENSTEIN:  Pertaining to...?
5             MR. SEXTON:  Pertaining to anything.
6             MR. RUBENSTEIN:  Go ahead.
7    BY MR. SEXTON:
8        Q.   The second question is, what were
9    those communications?  If they're communications
10   from your lawyer, you can tell me you talked to
11   your lawyer, but you can't tell me what you talked
12   about.
13       A.   I talked to may lawyer about it.
14       Q.   What was that?
15       A.   I talked to may lawyer about it.
16       Q.   Okay.  Anybody in the department?
17       A.   Oh, yes.
18       Q.   Who in the department?
19       A.   I spoke to Captain Neste.
20       Q.   N-E-S...
21       A.   T-E.
22       Q.   And what's Captain Neste's assignment?
23       A.   He's the division commander for the
24   Detective Bureau.
25       Q.   And when did you talk to Captain

Page 36

1    Neste?
2        A.   I don't recall the exact date.
3        Q.   Do you recall the approximate date?
4        A.   It was close to December of -- last
5    December, this last December.
6        Q.   2021?
7        A.   Yes.
8        Q.   Okay.  And do you know what triggered
9    the conversation with Neste?
10       A.   It was when the -- the department was
11   advised that there was a lawsuit.
12       Q.   And when you had this conversation
13   with Captain Neste, was anyone else present?
14       A.   Lieutenant Klimuc, K-L-I-M-U-C.
15       Q.   And what is Lieutenant Klimuc's
16   assignment?
17       A.   At that time he was the XO.
18       Q.   Command XO?
19       A.   He's the Detective Bureau's administrative
20   lieutenant.  They call them the XO.
21       Q.   The XOs, they take care of all the
22   scheduling and that type of stuff?  What does he
23   do, I guess?
24       A.   I really don't know what he does.
25       Q.   Okay.  Where did this discussion take

Pages 33 to 36

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 37

1  place?
2  A.  In the captain's office, Captain Neste's
3  office.
4      Q.  Do you remember what was said?
5  A.  They just advised me that there was a
6  lawsuit.
7      Q.  Other than telling you there was a
8  lawsuit, was there any discussion about the
9  allegations?
10  A.  I don't -- no, there wasn't.
11     Q.  Did they give you a copy of the
12  complaint?
13  A.  No, sir.
14     Q.  Was there any other communication you
15  ever had with anyone in the department or the
16  town, to extend that to include the mayor or
17  mayor's office or --
18  A.  No, sir.
19     Q.  Okay.  So just this one -- how long
20  did this conversation last in Captain Neste's
21  office?
22  A.  It was brief, and they advised me there was
23  a lawsuit.
24     Q.  Have you ever been a defendant in a
25  lawsuit before?

Page 38

1  A.  No.  Not that I can recall, no.
2      Q.  Have you ever been a plaintiff in a
3  lawsuit?
4  A.  On the job?
5      Q.  In any kind of lawsuit.
6          MR. RUBENSTEIN:  Do you know what a
7      plaintiff is?
8          THE WITNESS:  Yeah, I know what a
9      plaintiff is.
10         MR. RUBENSTEIN:  Just making sure.
11         THE WITNESS:  I was a plaintiff in
12     an eviction process.
13  BY MR. SEXTON:
14     Q.  Where you had a tenant where you were
15  trying to get...?
16  A.  Yeah.
17     Q.  Were you ever a witness in a lawsuit
18  brought against the department?
19  A.  I've been brought up to IA as a witness
20  once.  I just don't recall if there was a lawsuit
21  in place.  This was over 15 years ago.
22     Q.  Do you have -- what do you guys call
23  citizen complaints that IA reviews?
24  A.  Demeanor complaints.
25     Q.  Do they have -- do you call them 500

Page 39

1  complaints?  Is there a special name for citizen
2  complaints that IA reviews?
3  A.  We call them demeanor complaints.
4      Q.  Have you ever had a demeanor complaint
5  against you?
6  A.  No, sir.
7      Q.  Are you aware of any lawsuits that
8  were ever brought against the Woodbridge
9  department?
10  A.  Against the Woodbridge Police Department in
11  which I was involved in?
12     Q.  No, of any.
13  A.  I'm not aware of any.
14     Q.  You're not aware of any?
15  A.  If there was, I'm not involved in them.
16     Q.  No, just from -- do you live in town?
17  A.  I used to live in Port Reading.
18     Q.  Where is that?
19  A.  It's near Carteret.
20     Q.  Okay.  So just from being -- living in
21  the area, working in the department, were you
22  aware of any civil rights lawsuits ever brought
23  against anybody in the Department or the
24  department as the entity?
25  A.  I'm not aware of any.

Page 40

1      Q.  Have you ever brought charges against
2  any officer?
3  A.  Have I charged any officer?
4      Q.  Yeah, with any misconduct?
5  A.  No.
6      Q.  Have you ever been a witness in a
7  departmental disciplinary hearing?
8  A.  Can you rephrase that?
9      Q.  Are you ever -- are you aware of any
10  discipline ever being brought against any member
11  of the department, major discipline?
12  A.  Major?  Yeah, there was one a couple years
13  ago.
14     Q.  What did that involve?
15         MR. RUBENSTEIN:  Hold on a second.
16     You're asking -- I'm going to object and
17     instruct you not to answer.  You're asking
18     him about IA stuff, about other people who
19     are not parties to this case.  Forget it.
20     You asked him the question if he's aware
21     of it.  We're still in dispute about that
22     topic.
23         MR. SEXTON:  I'd like to get the
24     Judge on the phone then because this is a
25     waste of time.

Pages 37 to 40

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 41

1    MR. RUBENSTEIN:  It still has to be
2    briefed before the Judge.  It's due the
3    next couple of days, a week.  She hasn't
4    made her decision yet because it hasn't
5    been flushed out yet.  But you're asking
6    him about someone else who is not a party.
7        MR. SEXTON:  No, I understand.  So
8    let's get the Judge on the...
9        (Whereupon, a brief break was taken
10    and a call was placed to the Judge.)
11        MR. SEXTON:  So for the record,
12    defense counsel is making a frivolous and
13    clearly baseless instruction to the
14    witness not to answer questions about
15    Internal Affairs -- about disciplinary
16    matters in the department, even having
17    been advised that the Attorney General
18    now, as of the last two years, has all of
19    these matters published.
20        Despite being informed of that,
21    defense counsel continues to instruct and
22    insist that the witness not answer
23    questions regarding these disciplines.
24        We made an effort to get a ruling
25    from the Court, but unfortunately the

Page 42

1    magistrate was unavailable.  Therefore, if
2    we have to come back, I'm going to ask for
3    costs because it's obstructionist and
4    going to run up the bill for my client,
5    who is a man without financial means.
6        MR. RUBENSTEIN:  It was one question
7    posed to the witness that I have
8    instructed him not to answer.  That's the
9    only thing we're dealing with at this
10    point in time.
11        MR. SEXTON:  No, I --
12        MR. RUBENSTEIN:  Excuse me.  I did
13    not interrupt you.  Please don't interrupt
14    me.
15        I don't feel that I'm an
16    obstructionist.  I believe this is a
17    legitimate issue, and issue in which the
18    Court is still  entertaining and has not
19    made a ruling on in this case.
20        Counsel is aware of that fact.  He
21    could have gotten the ruling earlier; he's
22    chosen not to.  It's not my responsibility
23    to do his work.  I don't feel that I've
24    done anything wrong.
25        If the Court orders he has to answer

Page 43

1    it, Sergeant Tapia will come back and
2    he'll answer the question.  But I have a
3    legitimate basis for my objection.  That's
4    it.
5        MR. SEXTON:  Actually, there's no
6    basis, and this has been discussed in
7    conference with the Court.  The Court has
8    indicated that this is something that we
9    are entitled to and we should be able to
10    resolve.
11        And defense counsel has strongly
12    said, we've got it all, we've got it all
13    worked out.  I'll get it to you, I'll get
14    it to you, I'll get it to you, and then it
15    never comes and now it's being presented
16    next week at our conference.
17        And this is just delaying matters
18    and is obstructionist, and this was the
19    first of a whole line of questioning.
20    It's not just one question.  Now we're
21    going to have to come back another day,
22    and this is all, you know, improper --
23    based on improper objections of defense
24    counsel.
25        MR. RUBENSTEIN:  And I would like to

Page 44

1    know at which point did the Judge make a
2    ruling that she said you were entitled to
3    this information because I haven't been
4    privy to that yet.
5        MR. SEXTON:  No --
6        MR. RUBENSTEIN:  You said the Judge
7    has made a decision on this issue.  I'm
8    not aware of that.
9        MR. SEXTON:  Well, you weren't
10    listening then.
11        MR. RUBENSTEIN:  She's made a
12    decision --in fact, she said --
13        MR. SEXTON:  She indicated clearly
14    what she thought.  This is my deposition,
15    and I'm going to continue with my
16    deposition now.  Thank you.
17        MR. RUBENSTEIN:  No. I'm going to
18    place what I want to on the record, and if
19    you don't let me, we'll end this
20    deposition right now.
21        MR. SEXTON:  Go ahead.
22        MR. RUBENSTEIN:  The Judge has made
23    it clear that it's to be narrowly
24    construed not to be broadly construed.
25    She has said that on several occasions,

Page 45

```
1     and counsel's aware of this fact.
2          MR. SEXTON:  I'm not.
3          MR. RUBENSTEIN:  Then you weren't
4     listening.  Now you can continue.
5   BY MR. SEXTON:
6          Q.  Sergeant, when did you become aware of
7     facial recognition technology?
8     A.    While I was working on with the Auto Theft
9     Task Force.
10          Q.  And tell us how you became aware of it
11    with the task force.
12    A.    There was members on the tasks force that
13    used it successfully.
14          Q.  And how was it used at the
15    auto -- this is the auto task force of the --
16    A.    New Jersey State Police.
17          Q.  And that was out of Irvington?
18    A.    Yes, sir.
19          Q.  And how was it used there?
20    A.    To identify people involved in auto theft,
21    whether it was the low-level thieves or the
22    higher-ups in the trade.
23          Q.  Can you recall particular cases where
24    this technology was used?
25    A.    Particular cases, no.
```

Page 46

```
1          Q.  Do you remember particular individuals
2     who used it at the task force?
3     A.    It was Sergeant Pyrzanowski.
4          Q.  Could you spell Pyrzanowski?
5     A.    I'll try my best.  P-Y-R-Z-A-N-O-W-S-K-I.
6     He's a lieutenant with the Department of Criminal
7     Justice.
8          Q.  Do you know what software Sergeant
9     Pyrzanowski used?
10    A.    No.  He didn't run it.  He sent out for it.
11          Q.  Do you know where he sent it to?
12    A.    The Regional Operation Intelligence Center,
13    the ROIC.
14          Q.  What do you know about the ROIC?
15    A.    They assist law enforcement agencies in
16    several -- they have several tools that they use
17    that we don't have the access to.
18          Q.  When did you first encounter the
19    R-O-I-C?
20    A.    As a detective.  I don't recall the first
21    time I ever encountered them or used them for
22    anything.
23          Q.  Had you encountered them before being
24    on the Auto Theft Task Force?
25    A.    Yes.
```

Page 47

```
1          Q.  Do you know what that acronym stands
2     for?
3     A.    The ROIC?
4          Q.  Yeah.
5     A.    Regional Operation Intelligence Center.
6          Q.  Operations or Operation?
7     A.    You got me there, sir.
8          Q.  And do you know where it's located?
9     A.    It's in North Jersey.  I don't know what
10    town.
11          Q.  Do you know who runs it?
12    A.    The New Jersey State Police.
13          Q.  Do you remember any of the
14    factual -- if you don't remember specific cases,
15    do you remember specific factual scenarios where
16    Lieutenant Pyrzanowski used facial recognition
17    technology?
18    A.    In one instance that I can recall it was
19    the possibility of an individual having a
20    duplicate New Jersey driver's license.
21          Q.  And how exactly -- so this guy was a
22    suspect?
23    A.    Yes, sir.
24          Q.  And he was suspected of stealing cars?
25    A.    Yes, sir.
```

Page 48

```
1          Q.  And it was determined that he might
2     have a dup -- not a duplicate.  Oh, you mean a...
3     It's not a duplicate, you mean a false one, right?
4     A.    A false one.
5          Q.  There's also an invalid one?
6     A.    One with the same picture, different
7     information on it.
8          Q.  And how would facial recognition
9     technology be useful in that instance?
10    A.    Same picture on the driver's license.
11          Q.  So you had a false license and an
12    actual license and you wanted to see if it was the
13    same person pictured?
14    A.    The same person who had different -- two
15    licenses.
16          Q.  So then both photos were sent to be
17    analyzed to see if the facial recognition
18    technology said they were the same person; is that
19    what you're...?
20    A.    Yes.
21          Q.  Do you remember if the facial
22    recognition technology at the ROIC made a
23    determination in that instance?
24    A.    That was Lieutenant Pyrzanowski's
25    investigation.  I don't remember the outcome of
```

Pages 45 to 48

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 49

1    it.
2         Q.   Do you remember any other factual
3    scenario where facial recognition technology was
4    used at the task force?
5    A.   In reference to social media, when people
6    would utilize accounts without their true name.
7         Q.   How were these -- what social media
8    site, like Facebook?
9    A.   Facebook, Instragram.
10        Q.   And how would the facial recognition
11   technology help in an investigation?
12   A.   They would submit the photos from the
13   social media site and attempt to get an
14   identification of the person.
15        Q.   So you had -- would you have -- you'd
16   have a suspect in one of these autos rings --
17   A.   Yes, sir.
18        Q.   -- that you correlated with a social
19   media site?
20   A.   Yes.
21        Q.   How would that connection be made?
22   A.   Usually with informants.  They would only
23   know them through their Instragram name or their
24   Facebook name.
25        Q.   So these informants were participants

Page 50

1    in the crime?
2    A.   They were informants.  They would often
3    just know people by either their street name or
4    their social media names because that's how they
5    communicated amongst themselves.  They never put
6    their true identify on social media.
7         Q.   So why were they cooperating, these
8    informants?
9    A.   Usually to work off charges on their own.
10        Q.   And would you make -- were you able to
11   get hits, IDs through the facial recognition
12   technology to get names of suspects?
13   A.   The task force members that were doing the
14   facial recognitions, yes, they would.
15        Q.   When a connection was made, a hit was
16   made, what would happen next?
17   A.   Well, we probably would corroborate that.
18        Q.   How would you corroborate it?
19   A.   Through -- get -- finding an address,
20   doing surveillance on the individuals.  Then known
21   associates, do surveillance on them as well.
22        Q.   Would it be fair to say that at the
23   task force facial recognition technology was used
24   an as investigative tool?
25   A.   Yes.

Page 51

1         Q.   Would you be involved in the swearing
2    out of probable cause affidavits while on the task
3    force?
4    A.   Yes.
5         Q.   Did you ever use a facial recognition
6    hit as a basis for probable cause while at the
7    task force?
8    A.   No.
9         Q.   Would you be involved in any of
10   the -- in testifying as a witness in the criminal
11   prosecutions of cases arising out of the Auto
12   Theft Task Force?
13   A.   I'm sorry, can you say that again?
14        Q.   When these cases are coming out of the
15   task force, went to trial, were you ever called as
16   a witness?
17   A.   No.
18        Q.   How about at the grand jury?
19   A.   No.
20        Q.   What about at a -- probable cause
21   hearings?
22   A.   No.
23        Q.   So you left the task force in 2017; is
24   that right?
25   A.   Yes.

Page 52

1         Q.   And when you came to the -- back to
2    Woodbridge, when was the first time you have any
3    knowledge of facial recognition technology being
4    used at Woodbridge?
5    A.   I don't recall any cases specifically.
6         Q.   How about this case?
7    A.   That case, yes.
8         Q.   Okay.  Other than this case, do you
9    recall facial recognition technology ever being
10   used at --
11   A.   Prior to this one, no.
12        Q.   How about since this one?
13   A.   I've used it, yes.
14        Q.   When have you used facial recognition
15   technology after this incident?
16   A.   To identify known associates through a
17   homicide suspect.
18        Q.   And was this to allow you to reach out
19   to these associates to question them?
20   A.   Yes.
21        Q.   Do you recall ever -- any other use of
22   facial recognition technology?
23   A.   No.
24        Q.   Is it fair to say that the use in this
25   homicide investigation, that was used as an

Pages 49 to 52

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 53

```
 1    investigative lead?
 2    A.   Yes.
 3         Q.   Were you aware of any departmental
 4    orders or instructions relating to the use of
 5    facial recognition technology?
 6    A.   No.
 7         Q.   Are you aware of any policies or
 8    instructions from the Middlesex County
 9    Prosecutor's Office relating to the use of facial
10    recognition technology?
11    A.   No.
12         Q.   Were you aware that the AG barred the
13    use of facial recognition technology in 2020
14    because of this -- racially biased?
15    A.   It was actually one software that he
16    banned, which was called Clearview.
17         Q.   Do you remember when that actually
18    took place?
19    A.   I don't.
20         Q.   And do you know how you know about the
21    information relating to Clearview?
22    A.   He sent out a memo.
23         Q.   And how did you come to see that memo?
24    A.   It was distributed.
25         Q.   Who distributed it?
```

Page 54

```
 1    A.   Well, he distributed it to the county
 2    prosecutor's office, and the county prosecutor's
 3    office distributed it to police departments.
 4         Q.   Do you have a copy of that memo?
 5    A.   No.
 6         Q.   Did you read it online or in paper, do
 7    you remember -- or did you read it?
 8    A.   I did read it.  Yeah, it was online.
 9         Q.   Was it required reading?  Did you have
10    to check off on the -- what's that system...
11    A.   IDS?
12         Q.   Yeah.
13    A.   No.  I don't believe there was an IDS.  It
14    was an e-mail.
15         Q.   And who was the e-mail sent to?
16    A.   I don't recall.
17              MR. SEXTON:  If you could get me a
18         copy of that e-mail, that would be great.
19              MR. RUBENSTEIN:  You provide it to
20         me, and I'll provide it to counsel.  Thank
21         you.
22    BY MR. SEXTON:
23         Q.   Let's switch gears and talk about this
24    matter.
25              What do you recall about your
```

Page 55

```
 1    involvement with the investigation of the events
 2    at the Hampton Inn in Woodbridge on January 26,
 3    2019?
 4    A.   I was working that day as my detective
 5    role.  I was summoned to the scene.  Detective
 6    Quesada from the Identification Bureau responded
 7    as well.  I spoke to the officers on scene,
 8    Officer Lee and Officer Lyszk.
 9              They explained what had unfolded.  I
10    secured the crime scene, tried to preserve the
11    evidence that was left behind by the suspect,
12    specifically one shoe and one empty water bottle.
13              I had them secure the glass door to
14    the lobby that the suspect had exited from.
15    Detective Quesada began to process the crime
16    scene, collect evidence and photograph.  I
17    attempted to get the video from the lobby.
18         Q.   Did you get it?
19    A.   No, I did not.  No one could access it at
20    that time.  I did get a copy of it later.
21         Q.   What was the holdup at the time?
22    A.   It was -- the manager wasn't available, and
23    he was the only one who could access it and no one
24    else could do it who was working there.
25         Q.   Do you remember when you got it?
```

Page 56

```
 1    A.   It was not that day.  I don't recall an
 2    exact date that I got it.
 3         Q.   Were you jointly in charge of this
 4    investigation with Quesada, or was one of you in
 5    charge?
 6    A.   So I was in charge, but Quesada is just in
 7    charge of processing a crime scene.  He's the
 8    identification detective.  So he's in charge of
 9    the crime scene.
10         Q.   Okay.  So as the ID detective, what
11    were his responsibilities?
12    A.   Photograph the crime scene, dust and lift
13    for prints, collect evidence.
14         Q.   And does he do anything with these
15    things, or what does he do with these things?
16    A.   If he collects evidence, he would package
17    it and send it off to the State Police lab for
18    examination.
19         Q.   What is the time frame for sending the
20    evidence off?
21    A.   You would have to ask him.  Detective
22    Quesada would be able to answer that question.
23         Q.   You have no knowledge about what time
24    frame the evidence --
25    A.   No.
```

Pages 53 to 56

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 57

```
1          Q.  Let me finish.
2          You have no knowledge about when
3   evidence is supposed to be sent to the lab?
4      A.  When?  Is there a specific time frame?
5      Q.  Yeah.
6      A.  No.
7          Q.  Do you know if it's better to send it
8   sooner rather than later?
9      A.  I would ask Detective Quesada that
10  question.
11         Q.  Well, you were a detective for many
12  years in many different offices.  Do you have
13  any -- whether as a detective or as a layman, do
14  you have any opinion as to when evidence should be
15  sent in for processing?
16     A.  I don't know of any timeline.  If you're
17  asking for my opinion, sooner would be better.
18         Q.  Can you think of any reason to hold
19  off for weeks and not send it in?
20     A.  Any reasons?  It has to be physically
21  dropped off.
22         Q.  So you're saying there's a problem
23  with getting things delivered from the Woodbridge
24  Police Department to the New Jersey State Police
25  lab?
```

Page 58

```
1          MR. RUBENSTEIN:  Objection to form.
2      You can answer.
3          THE WITNESS:  I wouldn't be able to
4      answer that question.  That would be
5      better suited for Detective Quesada, who
6      handles that.
7   BY MR. SEXTON:
8      Q.  But are you aware of any problems --
9      A.  I'm not aware of any problems.
10         Q.  Where is the lab, do you know?
11     A.  I don't -- I don't know.
12         MR. SEXTON:  I think we're up to C.
13         (Plaintiff's Exhibit C was marked
14     for identification purposes.)
15  BY MR. SEXTON:
16     Q.  Do you recognize -- this is a
17  four-page document.  Do you recognize this?
18     A.  Yes.
19         Q.  What do you recognize it as?
20     A.  It's my supplemental report.
21         Q.  So there was a prior report?
22     A.  This is No. 4, so there would be three
23  prior to that.  Not mine, just in sequence.
24         Q.  But by you -- oh, so it says report
25  number at the top --
```

Page 59

```
1      A.  Yeah.
2      Q.  -- 4, is that what you're referring
3   to?
4      A.  Yes.
5          Q.  So this is the fourth report on this
6   matter or the fourth report of yours?
7      A.  The fourth report on the matter.
8          Q.  Okay.  So is this your first and main
9   report?
10     A.  Yes.
11         Q.  All right.  When did you make this
12  report?
13     A.  It's dated February 4, 2019.
14         Q.  And it says, "Approved."  Who approved
15  it?
16     A.  Sergeant Penicaro.
17         Q.  When you issued this report, did you
18  check with Detective Quesada about the status of
19  the evidence, the fingerprint evidence?
20     A.  The status of it?
21         Q.  Yeah.
22     A.  No.
23         Q.  The report says in the middle that
24  "Detective Quesada processed the inside of the
25  vehicle for fingerprints and several were lifted."
```

Page 60

```
1          Do you see that?
2      A.  Yes.
3          Q.  When you wrote -- so he lifted the
4   prints on the 26th, the day that you guys
5   responded there, correct?
6      A.  Yes.
7          Q.  And you're writing this report how
8   many days later... 11 days later.
9          Do you know by 11 days later whether
10  he had sent those prints to be processed -- to the
11  lab to be reviewed?
12     A.  I don't recall.
13         Q.  In your report you note evidence on
14  page 2 -- who found the Dunkin' Donuts receipt?
15     A.  Detective Quesada.
16         Q.  Okay.  Did you look at that receipt?
17     A.  Yes.
18         Q.  Okay.
19         MR. SEXTON:  And let me mark that.
20         (Plaintiff's Exhibit D was marked
21     for identification purposes.)
22  BY MR. SEXTON:
23     Q.  Do you recognize this as the receipt?
24     A.  Yes.
25         Q.  Okay.  So that's -- it's got a
```

Pages 57 to 60

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 61

1    (914)297-9042 number, right?
2    A.   Yes.
3         Q.   And that was traced back to a Dunkin'
4    Donuts in the Bronx, correct?
5    A.   Yes.
6         Q.   At 47 East Gun Hill Road, Bronx, New
7    York 10467?
8    A.   Sounds like the one, yeah.
9         Q.   And that is dated -- It's the same
10   date, January 26th, and the time looks to be
11   5:11:22 in the morning, right?
12   A.   Yes.
13        Q.   So did you draw any conclusions from
14   the presence of this receipt in that vehicle?
15   A.   Any conclusions?  I contacted that Dunkin'
16   Donuts to see if they had video available.
17        Q.   Okay.  Is it fair to say that, based
18   upon the presence of this receipt in the vehicle,
19   that there appeared to be a connection with the
20   Bronx and a suspect?
21   A.   Could have been.
22        Q.   The rental car had been in his
23   possession for the entire day, had it not?
24   A.   Yes.
25        Q.   There wasn't another renter who had

Page 62

1    the car --
2    A.   No.
3         Q.   -- at 5:11 --
4    A.   But I'm not --
5         Q.   -- in the morning, right?
6    A.   I'm sorry.  I didn't mean to interrupt.
7         Q.   Right?
8    A.   Right.
9         MR. SEXTON:  We're going to mark
10        this as E.
11        (Plaintiff's Exhibit E was marked
12        for identification purposes.)
13   BY MR. SEXTON:
14        Q.   Do you recognize this document marked
15   as E for identification purposes?
16   A.   This is an identification report.
17        Q.   And what is that?
18   A.   Usually when they submit fingerprints to
19   the lab.  It's a receipt.
20        Q.   Who's the ID detective's signature
21   below, if you recognize it?
22   A.   It says identification made by -- the
23   signature, I can't make that out.  I don't know
24   who that is.  Just by those scribbles I can't
25   tell.

Page 63

1         Q.   Okay.  Now, the date in the top left,
2    the date is January 26, 2019.  What does that date
3    refer to?
4    A.   The date of the incident.
5         Q.   And it says, "Alarm #."  What's an
6    alarm number?
7    A.   That would be your case number.
8         Q.   And then it says, "Suspect's Name:
9    Walker, Barrington A," and gives his address and
10   date of birth.  What does that indicate?
11   A.   The match to the fingerprint.  Was it a
12   fingerprint or...
13        Q.   It says result of AFIS submission.
14   What is AFIS?
15   A.   AFIS is Automated Fingerprint
16   Identification System.
17        Q.   Latent fingerprint JMQ-2, what is
18   that, do you know?
19   A.   I don't.
20        Q.   And then it says left palm finger.  I
21   guess that's -- we can all understand that.
22        Do you know Detective Douglas Cioni?
23   A.   I do.
24        Q.   And who is he?
25   A.   He's an identification detective.

Page 64

1         Q.   And how about Lieutenant J. Velez?
2    A.   Currently he's the Internal Affairs
3    lieutenant, but he was in Identification Bureau as
4    well.
5         Q.   Now, these dates of -- all the other
6    dates are January 22, 2021.
7         What does that date signify?
8    A.   I don't know.
9         Q.   Are you used to dealing with these
10   reports?
11   A.   No.
12        Q.   You don't use these reports in your
13   investigations?
14   A.   No.  This is identification report done by
15   the Identification Bureau.
16        Q.   It has a narrative.  It says,
17   "The above listed individual was supplied by...
18   AFIS."  There was a hit and it was, quote, an
19   exact match with the left palm impression of
20   Barrington, Walker.
21        So this is not the type of report
22   that you regularly use in your investigations?
23   A.   As a regular detective, I don't use this.
24   This is from the Identification Bureau.
25        Q.   Do you know what happens to these?

Pages 61 to 64

Page 65

1    A.    They get -- currently now they get uploaded
2    onto the system.
3        Q.    Do you know when that started?
4    A.    I don't know the exact year.
5        Q.    Do you know -- there's a handwritten
6    scribble next to Velez's line.  It appears to be
7    GSV 332 to me.
8            Do you know what that means?
9    A.    It's -- I think it's his initials because I
10   believe that's JSV.
11       Q.    Oh, right.
12   A.    And 332 is his badge number.
13       Q.    Okay.  Got it.
14           MR. SEXTON:  What is this, F?
15           (Plaintiff's Exhibit F was marked
16       for identification purposes.)
17   BY MR. SEXTON:
18       Q.    Do you recognize this document?
19   A.    Yes.
20       Q.    What do you recognize it as?
21   A.    This is a DNA lab report from the State
22   Police.
23       Q.    Is this the type of report that you
24   regularly use in your investigations?
25   A.    No.  This is something that the ID Bureau

Page 66

1    sends out or receives back from the lab.
2        Q.    So this would not be part of your file
3    or anything you'd ever review --
4    A.    It would be part of my file, yes, but this
5    is not something I would generate.  This is all
6    done by the Identification Bureau.
7        Q.    So when it becomes part of your file,
8    would you use it in your investigation?
9    A.    Yes.
10       Q.    Okay.  And going back to Exhibit E,
11   the fingerprint, left palm fingerprint report,
12   would this go into your file?
13   A.    Yes.
14       Q.    And would it be something you would
15   rely upon in your investigation?
16   A.    Yes.
17       Q.    Okay.  The only date on this is
18   October 18, 2019.  Do you see that, date of
19   report?
20   A.    Yes.
21       Q.    Is there anywhere on here where it
22   indicates when the evidence was submitted to the
23   lab for a report?
24   A.    Not on this piece of paper.
25       Q.    Do you know how long the DNA lab

Page 67

1    report -- DNA lab takes to turn around a sample?
2    A.    It could take a long time.
3        Q.    What's a long time?
4    A.    It could be anywhere between six months to
5    over a year.
6        Q.    Is there any way to expedite the
7    testing of a sample?
8    A.    No.
9        Q.    Is there any other lab that you can
10   use other than the New Jersey State Police Office
11   of Forensic Sciences?
12   A.    I know that's what my department uses.  I
13   don't deal with the lab ever as my day-to-day job.
14   That would be the Identification Bureau.  I don't
15   know of any other lab.
16           MR. SEXTON:  I'll show you what's
17       been marked as G.
18           (Plaintiff's Exhibit G was marked
19       for identification purposes.)
20   BY MR. SEXTON:
21       Q.    Do you recognize G?
22   A.    Yes.
23       Q.    What do you recognize it as?
24   A.    This is a CODIS Hit Notification.
25       Q.    And this is for DNA sample from the

Page 68

1    scene at the Hampton Inn on the 26th of 2019?
2    A.    Yes.
3        Q.    And like the prior fingerprint hit, it
4    matched Barrington Walker, right?
5    A.    Yes.
6        Q.    Again, the date.  So this says July
7    30th of 2021.  Is there any -- and it has the
8    offense date, January 26, 2019.
9            Is there anything on this document
10   that indicates when this was submitted to the New
11   Jersey State Police?
12   A.    No.
13       Q.    So this is two-and-a-half years after
14   the sample was taken, right?
15   A.    Yes.
16       Q.    Have you ever heard of a lab taking
17   two-and-a-half years to do a -- run a sample?
18   A.    This is the date that it got a hit, not the
19   date that they ran a sample.
20       Q.    Well, don't you think they're related?
21   A.    No.
22       Q.    How so?
23   A.    Because it could take years for somebody's
24   DNA to go into the system.
25           (Plaintiff's Exhibit H was marked

Pages 65 to 68

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 69

1          for identification purposes.)
2     BY MR. SEXTON:
3          Q.  Do you recognize Exhibit H?
4          A.  I do.
5          Q.  Okay.  This is another ID -- actually,
6     there's two bureau reports here, right?
7          A.  I wouldn't be able to answer this question
8     because Detective Quesada would be better suited
9     to answer this.  I don't know if it's one report
10    or two.
11         Q.  Okay.  Before you told us that the
12    date on the top left is the date of the incident?
13         A.  Yes.
14         Q.  And then there's a date at the bottom
15    and that's the same date?
16         A.  Yes.
17         Q.  So would this confirm that all this
18    evidence was taken on that same day?
19         A.  Yes.
20         Q.  On the first page it says, "Items
21    processed for latent prints - Glass Door."
22              What is SAA under the Location
23    column?
24         A.  I would say same as above.
25         Q.  Oh, okay.  It says, "All property,"

Page 70

1     and I think -- it says, "abd."  "All property and
2     CD's."
3              What CDs?
4          A.  I don't know.
5          Q.  Now, the end of the narrative, second
6     page, says, "All property prepared for evidence or
7     DNA analysis."  Then it says, "JMQ 1, 2, 3, 12,
8     13, 14, 15, 16 was sent to AFIS."
9              Do you know what JMQ is?
10         A.  That's Detective Quesada's initials.
11         Q.  Oh, okay.  And what do those numbers
12    refer to, do you know?
13         A.  I don't.  He would be able to answer that.
14         Q.  And then this is dated, again, the
15    26th.  Is it your impression that this
16    was -- indicates that this evidence was sent to
17    the lab on that date, the 26th?
18         A.  I would let him answer that question.  I
19    wouldn't know that answer.
20         Q.  Have you talked to Quesada about this
21    matter at all?
22         A.  No.
23              (Plaintiff's Exhibit I was marked
24         for identification purposes.)
25    BY MR. SEXTON:

Page 71

1          Q.  Do you recognize I?
2          A.  Yes.
3          Q.  Okay.  What do you recognize it as?
4          A.  This is a request to the lab for the
5     fingerprint.
6          Q.  Okay.  Who's making the request,
7     submitting agency and addressee?
8          A.  Detective Quesada.
9          Q.  Where do you see his --
10         A.  JMQ.  He labels his exhibits as his
11    initials.
12         Q.  Do you see anything on this that
13    indicates what date this was submitted?  Do you
14    see where it says delivered by?
15         A.  Yes.
16         Q.  And do you recognize --
17         A.  Receipt by.  I see it.  I can't make out
18    that.
19         Q.  Is that 2/8/19?
20         A.  That's what it looks like.  It's hard to
21    read, though.
22         Q.  Do you know why it would have taken 11
23    days for this to be delivered from Woodbridge to
24    Holmdel, which is about 20 miles away?
25         A.  I don't.

Page 72

1          Q.  And by the 8th, the plaintiff in this
2     matter had already been charged and arrested and
3     in prison, correct?
4          A.  Yes.
5              (Plaintiff's Exhibit J was marked
6         for identification purposes.)
7     BY MR. SEXTON:
8          Q.  Exhibit J is a five-page document.  Do
9     you recognize it?
10         A.  It appears to be a fingerprint card.
11         Q.  And what's a fingerprint card?
12         A.  It's something done with ink and paper,
13    where you role a finger onto the paper.
14         Q.  It has Barrington Walker's name up
15    top, right?
16         A.  Yes.
17         Q.  And it has an FBI number up there?
18         A.  Yes.
19         Q.  What's an FBI number?
20         A.  FBI number is an identification number that
21    we all have individually.
22         Q.  Really?
23         A.  Yeah.
24         Q.  And then what's the -- do you see on
25    the bottom of the first page there's a number C7

Pages 69 to 72

Page 73

1  46DN_Holmdel 02-14 - the first page.  Here.
2       Do you know what that refers to?
3  A.  No, I don't.
4       Q.  The second page has the same thing.
5  It's the C746DN_Holmdel, and then it has a date,
6  2/14/2019 at 8:45:33?
7  A.  I don't know what that is.
8       Q.  The third page -- so this page has
9  a -- yeah, turn it on the side.  It says,
10  "Workstation: NJSPWSholmdel1."
11       So would that be the State Police lab
12  in Holmdel?
13  A.  Yeah.  There's a State Police lab in
14  Holmdel.
15       Q.  And the Exhibit I was the delivery of
16  the prints to Holmdel, correct?  Submitted At, you
17  see there's a...
18  A.  Yeah, it says Holmdel.
19       Q.  So that looks like this was submitted
20  on the 14th.  And if you look at this document,
21  this document being J, that the results were made
22  on the 13th.  And this report generated on the
23  14th indicated that the prints belonged to
24  Barrington Walker.
25       Does that seem right to you?

Page 74

1  A.  Again, this is all something I don't deal
2  with.  So I think Detective Quesada would be
3  better suited to answer these questions as far as
4  delivery dates and -- I don't want to speak for
5  him.
6       Q.  So my understanding, looking at these
7  two, is that it took them six days to do the assay
8  and to determine if the prints belonged to
9  Barrington Walker.  Do you have any basis to think
10  I'm misreading this?
11  A.  No, but I don't know.  You would have to
12  ask Detective Quesada.
13       Q.  A six-day turnaround, does that seem
14  about average to you for prints going to a lab?
15  A.  I don't know their procedure, sir.
16       MR. SEXTON:  Do we want to take a
17  break for lunch at some point?
18       MR. RUBENSTEIN:  I have some
19  questions I have to ask him, so you can
20  take lunch, if you'd like.
21       MS. LEMPKA:  Whatever you guys want
22  to do.
23       MR. SEXTON:  Want to take a half
24  hour?
25       MR. RUBENSTEIN:  Half hour's fine.

Page 75

1       (A recess was taken from 12:41 to
2  you 1:30 p.m.)
3       (Plaintiff's Exhibit K was marked
4  for identification purposes.)
5  BY MR. SEXTON:
6       Q.  I'm showing you Exhibit K.  Do you
7  recognize this?
8  A.  The DNA request by Detective Quesada.
9       Q.  Okay.  The only date on this is the
10  1/26/2019.  Am I missing a date somewhere else?
11  A.  No, I don't see one.
12       Q.  So is this -- can you tell when this
13  was submitted?
14  A.  I can't.
15       Q.  Is this a form?
16  A.  I don't know -- it looks like a Word
17  document.  I mean...  But, again, I would like
18  Detective Quesada to answer this.
19       Q.  So it says, "Suspects:  Unknown."
20  So this would have had -- is it fair to say this
21  would have had to have been written prior to
22  Nijeer -- the plaintiff becoming the suspect?
23  A.  I don't know.
24       Q.  Because all the other reports that are
25  issued afterward, they list Parks as the suspect.

Page 76

1  A.  Okay.
2       (Plaintiff's Exhibit L was marked
3  for identification purposes.)
4  BY MR. SEXTON:
5       Q.  I'm showing you Exhibit L.  Do you
6  recognize these pictures?
7  A.  Yes.  It's the shoe and the water bottle
8  retrieved from the Hampton Inn.
9       Q.  So were these pictures taken by
10  Detective Quesada?
11  A.  Yes.
12       Q.  Okay.  Fair to say that that seems to
13  indicate that's a ruler next to the shoe?
14  A.  Yes.
15       Q.  It seems to indicate a size 12 shoe or
16  13?
17  A.  I don't know.  I mean...
18       Q.  Roughly the size of the ruler, would
19  you agree?
20  A.  It says 12, but I don't know how it's
21  measured.  I would ask Detective Quesada that
22  question.
23       Q.  Did you ever handle the sneaker or see
24  it at any point?
25  A.  I saw it.  I didn't handle it.

Pages 73 to 76

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 77

1    Q.   When did you see it?
2    A.   When we arrived at the scene.
3        Q.   Did you ever see it when it was in the
4    evidence -- where is the evidence kept?
5    A.   In a lab inside the Detective Bureau.  Only
6    accessed from the detectives from ID Bureau.
7        Q.   From the ID Bureau?
8    A.   Yes, sir.
9        Q.   Did you ever try to match the sneaker
10   to -- when you brought in Parks, was the sneaker
11   ever matched to him?
12       MR. RUBENSTEIN:  Objection to form.
13       Go ahead.  You can answer.
14       THE WITNESS:  I was not working that
15   day.  I've never seen Nijeer Parks.
16   BY MR. SEXTON:
17       Q.   But do you know if anybody tried to
18   match the sneaker to the suspect?
19   A.   I don't know, no.
20       Q.   Would you agree that would have been
21   an intelligent thing to do?
22   A.   Well, I don't know where the sneaker was at
23   the time.  Was it submitted to a lab?  I don't
24   know those answers.  Those are better suited for
25   Detective Quesada.  Was it available at the time

Page 78

1    that Nijeer Parks was there?  I don't know.
2        Q.   But assuming it was, as you just
3    testified, in the Detective Bureau, being
4    maintained by the ID detectives, would it have
5    been intelligent to try to match that sneaker to
6    Nijeer Parks when you had him in custody?
7        MR. RUBENSTEIN:  Objection to form.
8        You can answer.
9        THE WITNESS:  Yeah.  Again, this
10       would be better suited for Detective
11       Quesada to answer.
12   BY MR. SEXTON:
13       Q.   But obviously your common sense --
14   you're a detective, not a layperson.  Would it
15   have been -- like Cinderella, does this slipper
16   fit?  You have the sneaker of the suspect.  Does
17   it fit the guy we brought in?
18       MR. RUBENSTEIN:  Objection to the
19       form.
20   BY MR. SEXTON:
21       Q.   Doesn't seem to require special
22   training or anything, just sort of common sense.
23   Would you agree, from a common sense perspective,
24   it would make sense to make sure the shoe fit.
25   What did they say during the OJ trial?  If the

Page 79

1    glove fits, you must acquit.  So, if the shoe
2    fits, you gotta let him go, right?  If it doesn't
3    fit, you have to let him go?
4    A.   I think from the common sense aspect, yes,
5    it makes sense.  I don't know how to answer that
6    question any better than that.
7        (Plaintiff's Exhibit M was marked
8        for identification purposes.)
9    BY MR. SEXTON:
10       Q.   Do you recognize this?
11   A.   Yes.
12       Q.   What do you recognize it as?
13   A.   This is the CJIS 2000 Response.
14       Q.   What's CJIS?
15   A.   I don't know what the acronym stands for
16   off the top of my head.  But it's usually when
17   you've run a criminal history request, it will
18   list where this specific person has a criminal
19   history in.  In this particular case, Mr. Walker
20   has a criminal history in Florida and Maine and
21   with the FBI.
22       Q.   Does this indicate who asked for this
23   report?
24   A.   I don't see any identifiers on this piece
25   of paper that would identify a specific detective.

Page 80

1        Q.   It says, "Inquiry Date, February 14,
2    2019."  That seems to match the date on...
3    Fingerprint, Exhibit J.  I read it as indicating
4    that there had been a search -- a hit on
5    February 14, 2019.  Both J and M indicate that
6    evidence matches a guy named Barrington Walker,
7    right?
8    A.   Yes.
9        Q.   And this CJIS 2000 Response gives us a
10   black male born in 1993.  He's 6' 1" and 180
11   pounds, right?
12   A.   Yes.
13       Q.   Do you know Nijeer Parks' height and
14   weight?
15   A.   It's got to be in the report somewhere.  In
16   his DMV -- off the top of my head -- to answer
17   your question, off the top of my head, I don't.
18       Q.   If I told you that he was 5' 7", would
19   that refresh your recollection?
20   A.   Okay.
21       Q.   And do you know Nijeer's foot size?
22   A.   I don't.
23       Q.   Shoe size?
24   A.   I do not.
25       Q.   If I told you 9-and-a-half, size

Pages 77 to 80

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 81

1  9-and-a-half --
2  A.  Okay.
3      Q.  -- would that refresh your
4  recollection or --
5  A.  No.
6      Q.  Do you know what these miscellaneous
7  numbers are?  It looks like two documents AR and
8  FN.
9  A.  I don't.
10     (Plaintiff's Exhibit N was marked
11     for identification purposes.)
12 BY MR. SEXTON:
13     Q.  Is this the -- well, do you recognize
14 this?
15 A.  Yes.
16     Q.  What do you recognize this as?
17 A.  It's a Motor Vehicle Consent to Search
18 form.
19     Q.  Did this allow you to search the car
20 that was used in the attempted assault?
21 A.  Yes.
22     Q.  And did you fill this out?
23 A.  I did.
24     Q.  Okay.  And is that Michael Jones?
25 A.  Dones.

Page 82

1      Q.  Okay.  And was he -- who is he?
2  A.  He's the manager for the Hertz rental
3  place.
4      Q.  So I guess the vehicle was searched
5  the next day, the 27th?
6  A.  Yes.
7      MR. SEXTON:  This is O.
8      (Plaintiff's Exhibit O was marked
9      for identification purposes.)
10 BY MR. SEXTON:
11     Q.  You have Exhibit O before you.  Do you
12 recognize that?
13 A.  Yes.
14     Q.  What do you recognize it as?
15 A.  It's a Request For Facial Recognition
16 Technology submitted to New York State
17 Intelligence Center.
18     Q.  It says, "Requestor Name:  Santiago
19 Tapia," correct?
20 A.  Yes.
21     Q.  That's you, right?
22 A.  Yes.
23     Q.  The narrative on the second page was
24 written by you?
25 A.  Yes.

Page 83

1      Q.  And then it references the Gun Hill
2  Road Dunkin' Donuts, right, in the Bronx?
3  A.  Yes, sir.
4      Q.  And -- did you submit it to New York
5  because of that Bronx connection?
6  A.  Yes.
7      Q.  Had you ever interacted with the
8  New York State Intelligence Center prior to this?
9  A.  No.
10     Q.  How did you know of the existence of
11 the New York State Intelligence Center?
12 A.  This was also a tool I learned of when I
13 was with the Auto Theft Task Force.
14     Q.  How did the Auto Theft Task Force use
15 the services of the NYSIC?
16 A.  They used for requests as far as facial
17 recognition.  And also they have the means to run
18 LPR checks, which was highly used in that unit.
19     Q.  What's an LPR check?
20 A.  License plate reader.
21     Q.  How does that work?
22 A.  So there's license plate readers that are
23 affixed to some police cars.  Also, they're
24 affixed to the poles at intersections.  They're
25 also affixed to bridges and tunnels leading to and

Page 84

1  from New York City.  And they read license plates,
2  time stamp them, and they take a picture of the
3  vehicle.
4      Q.  So you did not request an LPR check,
5  though?
6  A.  No.
7      Q.  Why not?
8  A.  I have my own means of doing that now.  I
9  have access to what's called Vigilant, so I did
10 not need their assistance in doing so.
11     Q.  Did you do an LPR search for the
12 plates on this vehicle?
13 A.  I don't recall.
14     Q.  Could you check your records?  Because
15 no LPR search has been produced.  So could you
16 check wherever such a search -- record search
17 would be?
18 A.  I don't know how I would be able to do that
19 unless I go through my file and see if I did one,
20 if I bring something up.  But if I did, I would
21 have produced it.
22     Q.  But you do that through a service or
23 something.  They must have a record of all the LPR
24 searches you ever made.
25 A.  Yeah, I don't know how I would be able to

Pages 81 to 84

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 85

1    get a hold of that.
2        Q.   Did you do it through the department
3    or do that independently, like on a machine at
4    home or something?
5        A.   No, it's through the department, but it's
6    accessed -- and I was given access by the State
7    Police through this software.
8        Q.   So you probably have a user number
9    that you could access?
10       A.   Yes.
11       Q.   Couldn't you get a printout of all the
12   LPR searches you've done?
13       A.   I don't know.
14           MR. SEXTON:  I would ask your
15           attorney to try to...
16           MR. RUBENSTEIN:  No problem.
17   BY MR. SEXTON:
18       Q.   Toll Analysis, does that go through
19   like all the EZPass, whatever things where a car
20   would have gone?
21       A.   I would assume so.  I've never used that
22   before.
23       Q.   Social Media Checks, what's that?
24       A.   I've never used that either.
25       Q.   Mapping Request?

Page 86

1        A.   I don't know what that is.
2            (Plaintiff's Exhibit P was marked
3            for identification purposes.)
4    BY MR. SEXTON:
5        Q.   The document that's been marked as
6    Exhibit P, do you recognize this?
7        A.   It's a report from Rockland County
8    Intelligence Center.
9        Q.   Have you seen this before?
10       A.   Yes.
11       Q.   When did you see it?
12       A.   It was sent to me.
13       Q.   On page 3 it says, RCIC provided all
14   information to the NJ PIP -- what is that,
15   Palisades?
16       A.   Palisades Interstate Parkway.
17       Q.   -- and Woodbridge PD.
18           What's the Palisades police have to
19   do with this?
20       A.   There was an individual assigned to the New
21   York State Intelligence Center -- or Rockland
22   County Intelligence Center, sorry, who was on loan
23   from the PIP police department.
24       Q.   It says, "See attached PDF and flier."
25           Do you know what that means?

Page 87

1        A.   No.
2        Q.   Do you remember an attachment to this,
3    an attached PDF and flier?
4        A.   I don't recall.
5        Q.   Do you remember when you received
6    this?
7        A.   It's dated January 28, '19.
8        Q.   Looking at the first page where it
9    says Disposition or...?
10       A.   When Reported.
11       Q.   1/28/19?
12           MR. SEXTON:  Q.
13           (Plaintiff's Exhibit Q was marked
14           for identification purposes.)
15   BY MR. SEXTON:
16       Q.   Exhibit Q, this is a series of
17   e-mails.  Do you remember e-mailing Investigator
18   Lyons?
19       A.   Yes.
20       Q.   How did you come to be exchanging
21   e-mails with Investigator Lyons?
22       A.   He reached out to us.  Specifically the
23   sergeant that was on duty at the time, that he did
24   reach out to Woodbridge Police Department,
25   contacted me.  He took down Seamus Lyons's

Page 88

1    information and his e-mail address, or gave him my
2    e-mail address.  That's how we got into contact.
3        Q.   The first in this line is from him to
4    you, and that's January 28, '19, at 8:48 a.m.  it
5    says, "See attached PDF regarding your PD police
6    information flier aggravated assault..."
7            What is this PD -- police information
8    flier aggravated assault?  Do you know what that
9    refers to?
10           MR. RUBENSTEIN:  Go to the second
11           page of the e-mail document.
12           THE WITNESS:  Yeah, I don't recall
13           what that was.
14   BY MR. SEXTON:
15       Q.   Did you create some kind of a flier or
16   information thing to circulate?
17       A.   I did.  Prior to being in contact with them
18   I did reach out.
19       Q.   Okay.
20           MR. SEXTON:  I don't think that's
21           been produced so if you can make a search
22           and get that to me.
23           MR. RUBENSTEIN:  Yup.
24           THE WITNESS:  No problem.  That's a
25           track flier that I sent out.

Pages 85 to 88

Page 89

1       MR. RUBENSTEIN:  Okay.
2   BY MR. SEXTON:
3       Q.   Do you know whether this was the first
4   of the e-mails or whether you had prior e-mail
5   communication between you and Seamus Lyons?
6   A.   No, this is it.
7       Q.   Okay.  Did you have any telephone
8   conversations with either Investigator Lyons or
9   Officer Dey, or Sergeant Dey.
10  A.   I did speak to Seamus Lyons after the fact
11  to see if he can send me any further
12  documentation, anything else that they can produce
13  from their office.
14      Q.   The Re: line here is "Aggravated
15  Assault on a Police Officer."
16          Is it fair to say that you were
17  highly motivated to track down a person who had
18  attempted to assault Officer Lee?
19  A.   That's how I labeled the flier.
20      Q.   Right.  But --
21  A.   You have to label the flier as to, like,
22  what the most serious offense was.
23      Q.   Okay.  And that would -- of the crimes
24  charged, that's the most serious?
25  A.   Yes.

Page 90

1       Q.   What's the second most serious after
2   that, do you remember?
3   A.   Possession of a weapon.
4       Q.   Then the next exchange is from Seamus
5   Lyons to you, "Excellent" -- you respond and say,
6   "That's him.  Thank you and Sergeant Dey for your
7   help."
8          How did you know -- why did you say
9   that to him?
10  A.   When I received the -- Mr. Parks's DMV
11  picture and what they sent out, I called Officer
12  Lyszk up to the Detective Bureau and had him look
13  at the DMV photo.
14      Q.   Okay.  What did Lyszk say when he
15  looked at the photo?
16  A.   He said he was 100 percent sure that was
17  the person he dealt with.
18      Q.   Did you do anything else before you
19  made that response?
20  A.   I don't recall.  I know the first thing I
21  did was call Officer Lyszk to come into the
22  Detective Bureau.
23      Q.   The e-mail from Seamus comes in at
24  8:40, and you respond at 9:16, so just over a half
25  hour later.  So there's not a whole lot of time.

Page 91

1   Is it probable that the only thing you did was
2   reach out to Lyszk and have him look at it in that
3   half hour?
4   A.   It's possible, yeah.
5       Q.   You don't remember now, as you sit
6   here, doing anything else in that half hour?
7   A.   I don't recall.
8       Q.   So then you get an e-mail from Seamus
9   saying, "Excellent," exclamation, exclamation,
10  exclamation, exclamation, exclamation,
11  exclamation, exclamation, exclamation,
12  exclamation, exclamation mark.  "How is the
13  officer.  Is he okay?"
14          You say, "Yes, he's fine."  Actually
15  your Re: line says, "Aggravated Assault on a
16  Police Officer."  It wasn't an aggravated assault,
17  it was an attempted aggravated assault, right?
18  A.   No, it's an aggravated assault.
19      Q.   Even if you don't --
20  A.   Yeah.  Because he had the intent.
21      Q.   Well, then -- okay.  I'm not going
22  to -- so if you intend to assault somebody --
23  A.   Yes.
24      Q.   -- but you don't -- you miss --
25  A.   Yes.

Page 92

1       Q.   -- you're guilty of the --
2   A.   Aggravated assault.
3       Q.   Oh.  Then you ask -- you say, "Yes,
4   he's fine."  And then you ask, "How did you guys
5   ID him.  Facial recognition through NYSIC or the
6   ROIC?"
7          And Seamus answers, "Good news," I
8   guess that Lee's fine.  "Yes, I used facial
9   recognition software but altered the photo on the
10  license a little to get the pixels clear."
11         Did that concern you when Seamus told
12  you that he had altered the photo in order to get
13  the hit?
14  A.   No, because there's hieroglyphics on the
15  driver's license.  And that's the way I perceived
16  it as, is that he took the hieroglyphics off.
17  He --
18      Q.   That doesn't say that there, though,
19  does it?
20      MR. RUBENSTEIN:  Let him finish his
21  answer.
22         Please finish.
23      THE WITNESS:  No, it didn't concern
24  me.
25  BY MR. SEXTON:

Pages 89 to 92

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 93

1    Q.  You're mentioning hier -- what about
2  hieroglyphics on a...?
3    A.  There were hieroglyphics on the driver's
4  license.
5    Q.  Which driver's license?
6    A.  The Tennessee driver's license.
7    Q.  Can you point to anything in this
8  e-mail that indicates it was the hieroglyphics?
9    A.  No.
10    Q.  He says he altered it to get the
11  pixels clear.
12       Did you ask him what he meant by
13  that?
14    A.  No.
15    Q.  It says, "Got a high number hit."
16       What does that mean?
17    A.  Those computers are never 100 percent.
18    Q.  Is it -- are these hits done on a 100
19  percentage basis?
20    A.  No.  That would be a better question for
21  them.  But the way that it was explained to me
22  when I was with the Auto Theft Task Force, is that
23  they never hit 100.  It's always a
24  99-point-something.  But I can't say for --
25    Q.  So there's presumably zero or not a

Page 94

1  hit at all?  When you said it's always 99.9 --
2    A.  Not it's not always -- you know what I
3  mean, when they say high probability, it's always
4  99-point-something.  The way it was explained to
5  me -- I don't work the software, I've never worked
6  the software, so I don't know how it works.
7  That's the way it was explained to me.
8    Q.  Okay.  Then he says, "We have facial
9  recognition here at Rockland County Intel Center."
10       So you had made a page, a hit from
11  Rockland county, right?
12    A.  Yes.
13    Q.  Do you know when you got Exhibit P?
14    A.  It's dated on the 28th.
15    Q.  And that's the day you have in this
16  e-mail exchange, correct?
17    A.  Yes.
18    Q.  Did you get the -- was this an
19  attachment to one of these e-mails from Seamus or
20  something else?
21    A.  I don't know if there was an attachment or
22  it was sent directly to the Detective Bureau.
23    Q.  Okay.  I mean, he ends with, "Keep my
24  info and if you need anything in the future, call
25  or e-mail."

Page 95

1       Did you ever use him after this?
2    A.  No.
3    Q.  Why not?
4    A.  I never had to.
5       (Plaintiff's Exhibit R was marked
6       for identification purposes.)
7  BY MR. SEXTON:
8    Q.  Do you recognize this as Officer
9  Lyszk's report?
10    A.  Yes.
11       MR. RUBENSTEIN:  Mind my asking if
12    he knows if there's more than one report
13    for Officer Lyszk?  Because you said his
14    report.  I'm not sure if he only authored
15    one.
16       MR. SEXTON:  Okay.
17  BY MR. SEXTON:
18    Q.  Well, take a look at -- did Officer
19  Lyszk issue multiple reports in this matter or
20  one?
21    A.  I'd have to go through all the reports.
22       MR. RUBENSTEIN:  To cut to the
23    chase, he did author more than one.
24       MR. SEXTON:  He did?
25       MR. RUBENSTEIN:  Yes.

Page 96

1  BY MR. SEXTON:
2    Q.  So this is one of the reports -- would
3  you agree this is a report authored by Lyszk?
4    A.  Yes.
5    Q.  If you look at the narrative, is there
6  anywhere in this narrative where Lyszk says he
7  confirmed that this was the correct match?
8    A.  He writes in there the suspect was
9  identified as Nijeer Parks, but he doesn't
10  specify -- he doesn't elaborate on it.
11    Q.  Well, if you read that, the suspect
12  was identified as Nijeer Parks by ROIC.
13       MR. RUBENSTEIN:  That's not what it
14    says.  It says the suspect was identified
15    as Nijeer, period.
16       MR. SEXTON:  No, it says -- let's
17    read it.  So, "On January 27th he received
18    notification from Investigator Seamus
19    Lyons and Sergeant Dey that they had a
20    high profile comparison to the picture on
21    the fraudulent Tennessee driver's license.
22    The suspect was identified as Nijeer
23    Parks."
24       I read this as saying Seamus and Dey
25    identified him as Nijeer Parks.  Do you

Pages 93 to 96

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 97

1     share that understanding.
2          THE WITNESS:  No.  Officer Lyszk
3     identified him as Nijeer Parks.
4  BY MR. SEXTON:
5          Q.  Well, where would he have gotten that
6     name from?
7     A.  Because we had the DMV information with his
8     picture.
9          Q.  But it came from Seamus Lyons.
10    A.  Right.  But he identified him as being the
11    person he dealt with at the Hampton Inn.
12         Q.  But that's --
13    A.  I can't speak --
14         Q.  But this doesn't say -- it says the
15    suspect was identified as Nijeer Parks.  That
16    information didn't come from Lyszk, it came from
17    Lyons and Dey, right?
18    A.  The information, yes.  The identification
19    came from Lyszk.
20         Q.  But he's not saying I confirmed that
21    that was the man I saw anywhere in this.
22    A.  Okay.  I'm not going to elaborate on his
23    report.  You can talk to him about it when he has
24    his deposition.  Officer Lyszk was the first one
25    to see it.  He identified Nijeer Parks 100 percent

Page 98

1  as the person he dealt with.
2          Q.  You agree it's not in this report?
3     A.  He wrote in there, "The suspect was
4     identified as Nijeer Parks."  I'm not going to add
5     on to his report or speculate what he was thinking
6     at the time.
7          Q.  Well, where does he say that I looked
8     at the hit and I, based upon my present
9     recollection, confirmed that that was the person?
10    A.  He doesn't put it in there.  But you're
11    writing the report for him, and I'm not going to
12    do that for him.
13         Q.  Thank you.
14         MR. SEXTON:  I'm missing a report
15    that I wanted to go over.  Can we take a
16    ten-minute break?
17         (A recess was taken from 2:11 to
18    2:18 p.m.)
19         (Plaintiff's Exhibit S was marked
20    for identification purposes.)
21  BY MR. SEXTON:
22         Q.  Do you recognize this document marked
23    as S?
24    A.  Yes.
25         Q.  What do you recognize it as?

Page 99

1     A.  This is the request for facial recognition
2  photo array from the ROIC, from me to the ROIC.
3          Q.  You sent this via e-mail?
4     A.  Yes.  The e-mail that's underlined on the
5     second paragraph.
6          Q.  Now, right underneath the heading it
7  says, "If the NJ ROIC Facial Recognition
8  Initiative produces a possible match, this should
9  only be considered an investigative lead."
10              Did you read this at the time that
11  you sent this?
12    A.  Yes.
13         Q.  Were you aware of that?
14    A.  Yes.
15         Q.  "Further investigation is needed to
16  confirm a possible match through other
17  investigative corroborative information in our
18  evidence."
19    A.  That's correct.
20         Q.  Okay.  "Investigative lead, not
21  probable cause to make an arrest," did you read
22  that?
23    A.  Yes, sir.
24         Q.  In this case, the only basis for the
25  probable cause and the warrant and the complaint

Page 100

1  was the possible match; isn't that correct?
2          MR. RUBENSTEIN:  Objection to form.
3          THE WITNESS:  No.
4  BY MR. SEXTON:
5          Q.  What are the other bases?
6     A.  Positive identification with the officer
7     that dealt with the person, Officer Lyszk.
8          Q.  Can you explain how that's an
9     independent -- how that evidence is not merely the
10    facial recognition hit?
11    A.  It's not.  It's the positive identification
12    with the officer who dealt with the person one on
13    one.
14         Q.  Did you receive specific training for
15    you -- what do you base that assertion on?
16    A.  It's an identification.
17         Q.  And has anybody ever told you that's
18    an acceptable way to corroborate a hit?
19    A.  Yes.
20         Q.  Who told you?
21    A.  My 19-plus years on the job.  If an officer
22    identifies somebody, it's a positive
23    identification.
24         Q.  This is the only time -- if I heard
25    you correctly, this was the only time you ever

Pages 97 to 100

Page 101

1   used the facial recognition while at Woodbridge,
2   correct?
3   A.   Yes.
4       Q.   And I think you said you had done it
5   two or three times at the task force, if I
6   remember correctly?
7   A.   I've done it a few times, but I've also
8   done it after this fact, yes.
9       Q.   In your training at the task force, is
10   there anything that -- the only training you've
11   had with facial recognition is at the task force,
12   correct?
13   A.   And at Woodbridge.
14      Q.   So I missed that. So let's back up
15   then.
16          So there was training at the task
17   force on facial recognition, correct?
18   A.   There was on-the-job training.
19      Q.   Right.
20   A.   Yes.
21      Q.   And that was by one of the lieutenants
22   or somebody?
23   A.   Yes, Lieutenant Pyrzanowski.
24      Q.   Okay. And did he also give you
25   written materials?

Page 102

1   A.   No.
2       Q.   Were you -- did you have to listen to
3   pod casts or anything on it --
4   A.   No.
5       Q.   -- or anything like that?
6          So is there anything that that
7   lieutenant at the task force told you that
8   would support your assertion that this was
9   independent corroborative evidence, if I correctly
10   understood?
11         MR. RUBENSTEIN:  That what was
12         independent corroborative evidence?
13   BY MR. SEXTON:
14      Q.   The manner in which you relied upon
15   Lyszk's ID of the reported hit.
16   A.   How I relied on another police officer's
17   identification? I will do that every day. I
18   don't understand the question.
19         MR. RUBENSTEIN:  That's okay.
20         MR. SEXTON:  Okay. Let's try to...
21   BY MR. SEXTON:
22      Q.   You understood we talked before about
23   lineups and how you do a photo array?
24   A.   Yes.
25      Q.   And you understood the science of

Page 103

1   lineups was to screen out undue influence, bias,
2   et cetera, so that the identification is worth
3   something, right?
4   A.   Yes. Yes.
5       Q.   When you get a positive hit from the
6   software, are you aware of safeguards to prevent
7   the erroneous use of such a hit?
8   A.   Sure.
9       Q.   Okay. And what are some of those
10   safeguards?
11   A.   If it was a witness, a civilian witness, I
12   would have done a photo array in that
13   circumstance. A police officer, totally different
14   story.
15      Q.   And what do you base that assertion
16   on?
17   A.   Officer Lyszk dealt with him for over 20
18   minutes.
19      Q.   But your distinction wasn't -- the way
20   you described the distinction was positing a
21   different standard for a police eye witness
22   testimony and civilian eye witness testimony.
23         So my question is, where do you get
24   that from?
25   A.   We don't show lineups to police officers.

Page 104

1   The police officer who was conducting an
2   investigation dealt with this person over 20
3   minutes. He knows who he dealt with. I don't
4   have to do a photo lineup with him. It's kind of
5   a confirmatory ID at that point.
6       Q.   And is it your assertion that lineups
7   are never used --
8   A.   I never said never.
9         MR. RUBENSTEIN:  Let him ask.
10        THE WITNESS:  I'm sorry.
11        MR. SEXTON:  That's okay.
12   BY MR. SEXTON:
13      Q.   -- are never presented to law
14   enforcement officers?
15   A.   If their witness is off duty, that's a
16   whole totally different story. He's working, he's
17   on duty, he's dealing with that person. His
18   investigation at the time. I get the hit back, I
19   talk to Officer Lyszk. I present him the photo
20   that comes in. He says he's 100 percent sure
21   that's the person he dealt with.
22      Q.   So are you saying then that lineups
23   are never used for eye witness testimony of
24   on-duty law enforcement officers?
25   A.   I've never done it. No.

Pages 101 to 104

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 105

1      Q. So, in your opinion, they're never
2 used?
3      A. No.
4      Q. You've been trained in doing lineups?
5      A. Yes.
6      Q. Would you agree that the manner in
7 which Officer Lyszk identified the actor in that
8 photo that you showed to him lacked any of the
9 safeguards that are normally used in a lineup or
10 photo array?
11      A. Yes.
12      Q. Are you aware that Officer Lee also
13 made -- was asked to make an identification of
14 Nijeer Parks after he was arrested?
15      A. Yes.
16      Q. Okay. And do you know the
17 circumstances of that identification?
18      A. After reading his report, yes. I was not
19 present. I was not working that day.
20      Q. Okay. Would you agree that calling
21 Officer Lee in from his day off and leading him to
22 the holding room where plaintiff was handcuffed to
23 the rail also lacked the safeguards of a lineup or
24 photo array?
25      MR. RUBENSTEIN: Just object to the

Page 106

1 form.
2      You can answer.
3      THE WITNESS: Yes, but --
4      MR. RUBENSTEIN: Go ahead. Give
5 your answer.
6      THE WITNESS: Okay. So to a
7 civilian, I would say that would be highly
8 suggestive. To a police officer, no, not
9 at all.
10 BY MR. SEXTON:
11      Q. But none of the safeguards were there?
12      A. To a live lineup? No.
13      Q. Or -- yeah. There were no
14 similar -- like looking fellows, black guys in
15 their twenties with goatees lining up?
16      A. No.
17      Q. Plus he was handcuffed. That's
18 suggestive --
19      A. It's at least suggestive --
20      MR. RUBENSTEIN: Is there a
21 question?
22 BY MR. SEXTON:
23      Q. That's suggestive, isn't it, yes or
24 no?
25      A. To a civilian, yes. To a police officer

Page 107

1 who arrests people every day, handcuffs people
2 every day, navigates the booking area every day, I
3 don't think that's highly suggestive, no.
4      (Plaintiff's Exhibit T was marked
5      for identification purposes.)
6 BY MR. SEXTON:
7      Q. I can represent this is the transcript
8 of the statement of the plaintiff.
9      Have you read this before?
10      A. Yes.
11      Q. When did you read it?
12      A. Soon after it was produced.
13      Q. You read in the transcript that the
14 plaintiff said he had never been to Woodbridge
15 before --
16      A. Yes.
17      Q. -- that day.
18      Did that concern you?
19      A. No.
20      Q. Did you read that the plaintiff
21 asserted that he did not and never had, up to that
22 point, a driver's license?
23      A. Did that concern me, you ask?
24      Q. Yes. Did you read it?
25      A. Oh, I've read it, yes.

Page 108

1      Q. Did that concern you?
2      A. No.
3      Q. Did you read that he said he had an
4 alibi, he went to a basketball came in the morning
5 and he was at his mother's house in Paterson for
6 that entire day?
7      A. I read that, yes.
8      Q. Did that concern you?
9      A. No.
10      Q. He told you that his cousin drove him
11 to Woodbridge that day because he doesn't drive.
12      Did that concern you?
13      A. No, but can I... Detective Kondracki took
14 this statement. I never actually saw or spoke to
15 Nijeer Parks ever.
16      Q. Okay. I'm just asking.
17      So you read it shortly after?
18      A. I read it, yes.
19      Q. Did someone -- how did it come about
20 that you read it? Did you ask for it, was it
21 given to you?
22      A. So I was the lead detective, so Detective
23 Kondracki took the interview from Nijeer Parks.
24 Once it was transcribed, he turned that over to
25 me.

Pages 105 to 108

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 109

1    Q.  When he asserted -- you saw that he
2  asserted in his interview that he had knee surgery
3  for a torn ACL and meniscus several months before
4  that and was unable to run.
5        Did that concern you?
6  A.   No.
7        Q.  Because the -- now, we know it was
8  Barrington Walker who was the actual wrongdoer on
9  the 26th --
10       MR. RUBENSTEIN:  I just want to
11   object to that.  He hasn't been convicted
12   of anything yet.  We don't know if
13   Barrington Walker has anything -- I'm just
14   saying we better be careful what we say.
15 BY MR. SEXTON:
16   Q.  Okay.  All the evidence, real
17  evidence, matches Barrington Walker, a 6-foot-1
18  African-American male who ran on that day, did he
19  not?
20  A.   We don't know 100 percent.  He's only a
21  suspect at this point.
22   Q.  Now, you're careful.
23       MR. RUBENSTEIN:  Well, Counsel, I
24   think since he hasn't been convicted, I
25   don't think it's right to say he's --

Page 110

1        MR. SEXTON:  Of course.  You're so
2  careful now.
3        MR. RUBENSTEIN:  And I don't like
4   the snide comments.  So why don't you just
5   stop and ask the questions and we'll get
6   out of here today.
7        MR. SEXTON:  Sure.
8  BY MR. SEXTON:
9   Q.  So the actor on the 26th at the
10  Hampton Inn, he ran and eluded custody, right?
11  A.   Yes.
12   Q.  He was halfway in cuffs, right?
13  A.   Yes.
14   Q.  And there were how many of you there
15  at the time?
16  A.   It was Officer Lyszk and Officer Lee.
17   Q.  So he outran two guys, jumped in the
18  car, and not consistent with someone who had
19  recent knee surgery?
20  A.   Okay.  You're right.
21   Q.  Did you read in here that the
22  plaintiff had called the Hampton Inn and talked to
23  him about the incident before coming down to the
24  police station?
25  A.   I did read that.

Page 111

1    Q.  And that he asked you to call and look
2  at the video footage?
3  A.   I read it.
4   Q.  Did that seem unusual to you?
5  A.   No.
6   Q.  Does a guilty guy call the victim
7  normally in any of your investigations?
8        MR. RUBENSTEIN:  Objection to the
9   form.
10       You can answer.
11 BY MR. SEXTON:
12   Q.  In your experience?
13  A.   No.  But I don't even know how he knew to
14  call the Hampton Inn.
15   Q.  I think he explains...
16  A.   If he wasn't involved and he was never in
17  Woodbridge, how did he know to call the Hampton
18  Inn?
19   Q.  I'm not sure if he says it here, but
20  he had called, I think, the department before,
21  when he thought he was arranging to come down to
22  the police headquarters to clear up the warrants
23  that was based on the mistaken identification.
24  And during those conversations, he got some of the
25  details about the incident.

Page 112

1  A.   Okay.  He doesn't specify who he spoke to,
2  and I highly doubt they would give any information
3  on an active investigation to somebody on the
4  phone.
5   Q.  And did you see where the plaintiff
6  was looking forward to having his fingerprints
7  checked against the prints at the site?
8  A.   Yeah.  I read that.
9   Q.  What's an NCIC warrant?
10  A.   National Crime Information Center.
11       (Plaintiff's Exhibit U was marked
12   for identification purposes.)
13 BY MR. SEXTON:
14   Q.  Do you recognize this?
15  A.   I've never seen this.
16   Q.  If you can grab C.  It's your report.
17  In the narrative on the third page of the report.
18  A.   Yes.
19   Q.  In the second-to-last paragraph
20  beginning, "On January 27, 2019," you talk about
21  getting the report from Seamus Lyons.  You say,
22  "I compared the photo on the fraudulent Tennessee
23  driver's license to Nijeer Parks' assigned New
24  Jersey driver's license number and it is the same
25  person."

Pages 109 to 112

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 113

```
 1              Nowhere do you reference there
 2   Officer Lyszk making any contribution to this
 3   process, correct?
 4       A.   That is correct.
 5       Q.   The next paragraph you describe
 6   showing the picture to Michael Dones, the rental
 7   car manager, right?
 8       A.   I showed him the Tennessee driver's license
 9   picture.
10       Q.   Okay.  Why didn't you show him a
11   picture of Nijeer Parks?
12       A.   I can't.
13       Q.   Why not?
14       A.   I would have to do a photo array with him.
15       Q.   Why is that?
16       A.   He's a civilian.
17       Q.   So why didn't you do a photo array
18   with him?
19       A.   At that point, I didn't think it was
20   necessary.
21       Q.   How come you could show him the
22   Tennessee license without a photo array?
23       A.   He already seen it.  That's what the
24   suspect produced when he rented the car.
25       Q.   But you weren't asking him was this
```

Page 114

```
 1   what you were shown.  You were asking him was this
 2   the picture of the actor, correct?
 3       A.   On the driver's license, yes.
 4       Q.   You weren't asking him is this the
 5   license that you saw?
 6       A.   No, I didn't say license.
 7       Q.   You asked, is this the person who —
 8   the bad actor?
 9       A.   Right, because what I was getting at was
10   his verification techniques.  Did he pay attention
11   to the person on -- the picture of the driver's
12   license with the person that he was dealing with
13   and what their procedures were to verify that.
14       Q.   Explain again why you didn't do a
15   photo array with Mr. Dones.
16       A.   I just didn't.
17       Q.   So you didn't say I contacted
18   Middlesex County AP Natasi.  He was the zone --
19       A.   Yes, he was.
20       Q.   -- prosecutor?  And presented him with
21   the facts of the case and he authorized a warrant.
22            Now, this was done orally?
23       A.   Yes.
24       Q.   And was there any paperwork provided
25   to him?
```

Page 115

```
 1       A.   The warrant itself, when we generate it, we
 2   have to submit it to the zone prosecutor.
 3       Q.   Did you have to first and then get it
 4   authorized or you get a verbal authorization and
 5   then generate it?
 6       A.   Verbal authorization.  And then once you
 7   generate it, you submit it to him and he -- either
 8   he submits it to the Court or he sends it back to
 9   you for any corrections, and then you submit it to
10   the Court.
11       Q.   Do you know was this sent back to you
12   for any -- what happened in this instance?
13       A.   Yeah, I don't recall that I had to do any
14   corrections.
15            MR. SEXTON:  I'm sorry, I would like
16        you to make copies of this.
17            (Plaintiff's Exhibit V was marked
18        for identification purposes.)
19   BY MR. SEXTON:
20       Q.   Is this the Affidavit of Probable
21   Cause that we were just talking about?
22       A.   Yes.
23       Q.   Okay.  And you submitted one affidavit
24   for all of the charges, correct?
25       A.   No.  Officer Lyszk wrote his own complaint.
```

Page 116

```
 1       Q.   Was that submitted the same time as
 2   yours?
 3       A.   Yes.
 4       Q.   At the end of your Affidavit of
 5   Probable Cause you say, "I compared the photo on
 6   the fraudulent Tennessee driver's license to
 7   Nijeer Parks' real New Jersey driver's license and
 8   it is the same person."
 9       A.   Correct.
10       Q.   You don't make a mention of showing it
11   to Lyszk?
12       A.   No, I did not.
13       Q.   And you don't reference any ID
14   by -- oh, no, because the ID by Lee came after.
15            On your report, Exhibit C, do you
16   reference Lyszk's probable cause affidavit?
17       A.   I do or I don't?
18       Q.   Do you?  I may have missed it, but I
19   don't see it.
20       A.   I don't think I did, no.
21            (Plaintiff's Exhibit W was marked
22        for identification purposes.)
23   BY MR. SEXTON:
24       Q.   On Lyszk's -- what is Exhibit W?
25       A.   I'm sorry?
```

Pages 113 to 116

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 117

1    Q.  What is Exhibit W?
2    A.  Oh, W.
3    Q.  Is that Lyszk's Affidavit of Probable
4    Cause?
5    A.  Yes.
6         MR. RUBENSTEIN:  Just for the
7    record, it's not the complete document.
8    That's page, I think, 11 of 13.  That's
9    just one page of 13 for an entire
10   document, just so that the record is
11   clear.
12        MR. SEXTON:  Although --
13        MR. RUBENSTEIN:  It is an Affidavit
14   of Probable Cause.  I'm not disputing
15   that.
16        MR. SEXTON:  Lyszk's affidavit.
17        MR. RUBENSTEIN:  I'm just saying
18   it's part and parcel of 12 other pages, I
19   believe.
20   BY MR. SEXTON:
21   Q.  On the second page, the end of his
22   narrative, it says, "Detective Tapia received
23   notification from Lyons and Dey that they had a
24   high-profile comparison to the picture on the
25   fraudulent Tennessee driver's license.  The

Page 118

1    suspect was identified as Parks."
2         Fair to say there's nothing in this
3    probable cause stating that Lyszk gave a positive
4    ID to that picture, correct?
5    A.  Again, I can't speculate on what he wrote
6    or what he was thinking.  This is his report.
7    Q.  Just in plain English, is there
8    anything in this that says that he was asked by
9    you to review it and that he gave it a -- I think
10   your quote was that he said it's 100 percent?
11   A.  Yes.  All he says is, "The suspect was
12   identified as Parks."
13   Q.  By Dey and Lyons?
14   A.  It doesn't say that.  He says, "The suspect
15   was identified as Parks."
16   Q.  Did you do anything else in this
17   investigation after the arrest of plaintiff?
18   A.  After the arrest?
19   Q.  Yeah.
20   A.  I don't recall anything.
21   Q.  Who was the lead detective on this
22   case?
23   A.  I was.
24   Q.  Were you on duty the day he was
25   arrested?

Page 119

1    A.  No.
2    Q.  Were you aware of any of the court
3    dates he had at any time?
4    A.  No.
5    Q.  Were you ever -- did you know who was
6    assigned to prosecute the case?
7    A.  No.
8    Q.  Did you have any other conversations
9    with Peter Natasi about -- how many conversations
10   with Peter Natasi did you have about this case?
11   A.  Just the one.
12   Q.  And how long was that conversation?
13   A.  I don't recall.
14   Q.  If it were a long, extended
15   conversation, fair to say you would remember?
16   A.  Yes.
17   Q.  So then the inference is that it was a
18   brief conversation?
19   A.  Yes.
20   Q.  And did you ever have any contact with
21   the Judge, Judge Stahl?
22   A.  Yeah, I -- yes, I called him.  I let him
23   know that I was generating a complaint and that I
24   was going to send it over to him to review.
25   Q.  Is that standard practice?

Page 120

1    A.  Yes.
2    Q.  And was that also a brief
3    conversation?
4    A.  Yes.
5    Q.  So after the issuance -- after you
6    sent over the Affidavit of Probable Cause and the
7    complaints to Judge Stahl, what, if anything, did
8    you do after that on this case?
9    A.  Faxed it over to Paterson Police Department
10   after I tried to locate him and I could not.
11   Q.  Did you also take a ride out to
12   Paterson?
13   A.  Yes.
14   Q.  When did you do that?
15   A.  The day the complaints were signed.
16   Q.  Did you do anything else in the case?
17   A.  I don't recall.
18   Q.  Did you ever inquire about the
19   fingerprint evidence?
20   A.  From the door?
21   Q.  From the door of the car.  There was a
22   whole bunch of fingerprint evidence.
23   A.  Yeah.  Just wait to see when it comes back.
24   When that palm print did come back to the other
25   individual, I reviewed the video from the Hampton

Pages 117 to 120

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 121

1    Inn and I reviewed the crime scene photos from
2    Detective Quesada to see if I saw the suspect
3    running the back door, the glass door where
4    the palm print was lifted from, see if I can see
5    where the suspect touched the door.
6         But the camera angles didn't cover
7    that area when he ran out the back door, so the
8    palm prints that Detective Quesada collected were
9    not of any evidential value because they cannot
10   corroborate where the suspect touched the glass
11   door.
12        Q.   Exhibit I. Lift ID/pattern
13   type/Minutiae in the right-hand column.  What is
14   the first -- how do you -- are you able to read
15   the first line?  It seems to say 01-01, palm 106
16   PTS.
17        A.   I don't know what that means.
18        Q.   Do you know what the NS -- does that
19   mean not specify?  Or in the first column and
20   that's NS, NS, NS, NS.
21        Do you know what that means?
22        A.   I don't.
23        Q.   If you could get Exhibit H. It says
24   in the results, the far right column, "Lifted
25   three prints off glass door."

Page 122

1         So those are the prints that you had
2    questions about?
3         A.   Correct.
4         Q.   And then under there it says, "Five
5    usable prints lifted."  And those are from the car
6    itself, outside driver window and interior.
7         So there were eight prints submitted,
8    correct?
9         A.   Yes.
10        Q.   How do you know that of the eight
11   prints submitted it was only prints from the glass
12   door that were matching Barrington Walker?
13        A.   That's the only report that was given to
14   me, was of the palm print that was lifted off the
15   glass door.
16        Q.   But Exhibit J -- so the first page is
17   this his, like -- is this what's on file for this
18   guy?  What is the first page?
19        A.   You can request -- and I'm not going to
20   speak for Detective Quesada.  But I know that you
21   can request an individual's fingerprint card,
22   just as you can request their criminal history
23   report.
24        Q.   Does this first page appear to be --
25        A.   It does appear to be what I'm talking

Page 123

1    about, yes.
2         Q.   Now, the second page of Exhibit J, it
3    looks like a palm.  Does it say that this is a
4    palm anywhere?
5         A.   It doesn't.
6         Q.   But this is clearly not the card
7    because it's got Holmdel and the date right on it,
8    suggesting this is something provided by the
9    Holmdel lab relating to the prints taken at the
10   scene, or from the vehicle, right?
11        A.   I don't know.
12        Q.   So is it fair to say that when you
13   went back to the video, you weren't able to get a
14   visual of the glass door, correct?
15        A.   Correct.
16        Q.   So you weren't able to say positively
17   or negatively whether those -- based on that
18   video, whether he had used the door in such a
19   manner to leave prints?
20        A.   Correct.
21        Q.   Do you know -- did you talk to Quesada
22   about why he lifted prints from the glass door?
23        A.   Yes.
24        Q.   What was the conversation with
25   Quesada?

Page 124

1         A.   The day of the incident we could not get
2    video from Hampton Inn, so he processed the whole
3    door to preserve the evidence.
4         Q.   Did you do anything else after looking
5    at the surveillance footage relating to the glass
6    door?
7         A.   I don't recall.
8         Q.   Did you ever try to find out if the
9    prints from the car had been tested?
10        A.   I know they were submitted.  I never
11   received a hit back from any of those prints.
12        Q.   And did you ever follow up and try to
13   find...?
14        A.   No.  Detective Quesada, he gets the kits
15   back.  When they come back, they give them to him
16   and he gives them to me.
17        Q.   Did you ever ask Quesada for them?
18        A.   I don't remember if I did or didn't.
19        Q.   Did you ever inquire about the DNA --
20        A.   Oh, yes.
21        Q.   -- evidence?
22        A.   Yes, several times.
23        Q.   Did you do that?
24        A.   I would ask Detective Quesada to follow up
25   with that.

Pages 121 to 124

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 125

1    Q.  Did you ever do that in writing?
2    A.  No.
3    Q.  Did you ever yourself contact the lab?
4    A.  No.
5    Q.  When did you learn that the plaintiff
6  is 5-foot-7?
7    A.  When did I learn that?
8    Q.  Yes.
9    A.  When the DMV information, along with his
10  picture, were sent to me.
11    Q.  Now, the reports from the day of the
12  incident all indicated that the actor was tall.
13    A.  Uh-huh.
14    Q.  Did that raise any questions?
15    A.  I mean, we were uncertain as to whether --
16  how tall this person -- we're going off the DMV
17  information, which is written down by the person
18  getting his driver's license.  Nobody actually
19  measures people when they go get their driver's
20  license.  You fill out your own card.  So that's
21  never really accurate.  I've never seen this
22  person before, Nijeer Parks.
23    Q.  Officer Lee's report says that the
24  actor was 5' 11"?
25    A.  Okay.  Again, I never met Nijeer Parks, so

Page 126

1  I don't know if his height on his DMV information
2  is accurate.
3    Q.  But you had Nijeer Parks in custody at
4  this point?
5    A.  No.
6    Q.  Because we're talking about --
7    A.  I never met Nijeer Parks.
8    Q.  But he's in your custody, he's in
9  custody of the State now as part of your
10  investigation.
11    A.  Okay.
12    Q.  And he was questioned by your
13  colleagues, several of them.  So you've laid eyes
14  on him now, the department.
15      And did you -- was that ever
16  processed, the fact that the -- the disparity of
17  the height of the plaintiff and the height of the
18  actor?
19    A.  No, because Officer Lee had the chance to
20  do an identification when he was arrested.  And he
21  said it was the person he dealt with.
22    Q.  And you know that he was seated and
23  shackled at the time of that ID?
24    A.  I was not there.
25      MR. RUBENSTEIN:  Objection to form.

Page 127

1      Go ahead.
2  BY MR. SEXTON:
3    Q.  But he issued a report that you made
4  part -- you were the head detective on this, so it
5  was part of your package, right?
6    A.  As part of -- I don't understand what
7  you're asking.
8    Q.  But you've been -- that was part of
9  your thinking process, that Officer Lee had
10  identified him and he gave a description of that
11  identification that said he's sitting on the bench
12  shackled?
13      MR. RUBENSTEIN:  Objection to the
14  word "shackled."
15      But go ahead and answer the
16  question.
17      THE WITNESS:  All I was told by
18  Officer Lee and my supervisor, that he
19  identified him.  I don't remember any
20  reports where they said he was shackled or
21  sitting on a bench.  I don't recall.
22  BY MR. SEXTON:
23    Q.  I'll show you what's marked as
24  Exhibit A, if you look at that.  It says we "had
25  an individual, Nijeer Parks, who was involved in

Page 128

1  the incident on January 26, 2019.  We agree that
2  that's a declarative statement, isn't it?  They
3  told him we have the guy.  They don't say we have
4  a suspect.
5      He says in his report, "they
6  currently had an individual, Nijeer Parks, who was
7  involved in the incident on January 26, 2019."
8  That's suggestive, isn't it?
9    A.  That's Officer Lee's report.  I'm not going
10  to speculate on his report.
11    Q.  "I arrived at headquarters and was
12  brought down to the processing area with
13  lieutenant and detective.  I observed Parks
14  sitting on the rail and identified him as being
15  the suspect."
16      MR. RUBENSTEIN:  Nowhere does it say
17  "shackled."
18  BY MR. SEXTON:
19    Q.  The rail apparently, according to his
20  sworn deposition testimony, that the -- that he
21  was handcuffed to the rail.  That's what the rail
22  is used for?
23    A.  It's used for that, yes.  I don't know if
24  he was handcuffed to it.
25    Q.  He testified that he was.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 129

1    A.   Okay.
2         Q.   You would agree that even a police
3    officer would be perhaps influenced and suggestive
4    by that presentation?
5              MR. RUBENSTEIN:  Objection to form.
6         You can answer, if you can.
7              THE WITNESS:  I would have to
8         disagree.  It's not suggestive for a
9         police officer to see somebody handcuffed.
10   BY MR. SEXTON:
11        Q.   Now, you testified you never were the
12   subject of any lawsuits.  Do you remember a matter
13   Datel (ph) V. Woodbridge?
14   A.    You mean the Shelly?  Yes.
15        Q.   Yes?
16   A.    It was not sustained.
17        Q.   The question was, were you ever a
18   defendant in a lawsuit?
19   A.    No, that wasn't the question either.  If
20   you were to ask me if I was a defendant in a
21   lawsuit for Woodbridge Police Department, I would
22   have told you 15, 20 years ago that case came up.
23        Q.   Okay.  Is this the only time you were
24   a defendant?
25   A.    Yes.

Page 130

1              MR. SEXTON:  I think you had some
2         questions, right?
3              MR. RUBENSTEIN:  Yes.
4              MR. SEXTON:  It might move things
5         along.
6              MS. LEMPKA:  We don't have any.
7         Thank you.
8              MR. RUBENSTEIN:  No problem.
9    CROSS-EXAMINATION
10   BY MR. RUBENSTEIN:
11        Q.   I put Exhibit C in front of you, but
12   I'm going to ask you to refer to it from time to
13   time.
14             So during the day of January 26,
15   2019, were you dispatched out to the Hampton Inn?
16   A.    Yes.
17        Q.   Okay.  And what was the reason for
18   your dispatch to the Hampton Inn on that day?
19   A.    They requested a detective.  I was
20   listening to what was going on the radio.  So I
21   knew what was going on.  And when they requested a
22   detective, I was already on my way there.
23        Q.   And were you with anyone, or did you
24   drive by yourself?
25   A.    I don't recall if I was with anybody.

Page 131

1         Q.   And was Detective Quesada also
2    dispatched at that point in time?
3    A.    Yes.
4         Q.   Okay.  So you and Detective Quesada,
5    at some point, arrive at the Hampton Inn?
6    A.    Yes.
7         Q.   And at that point you start conducting
8    your investigation?
9    A.    Yes.
10        Q.   Now, what is your job as the lead
11   detective, in general terms, when you get to the
12   scene?
13   A.    So I'm to secure the scene, preserve all
14   the evidence with -- interview witnesses, gather
15   video footage, and allow Detective Quesada to
16   process the scene, collect evidence to make sure
17   it gets back to headquarters for processing.
18        Q.   And, in fact, Detective Quesada, was
19   he given that job responsibility when he arrived
20   at the scene?
21   A.    Yes.
22        Q.   And to your knowledge, did he complete
23   his investigation?
24   A.    Yes.
25        Q.   Did he secure all the evidence?

Page 132

1    A.    Yes, he did.
2         Q.   Now -- and he took fingerprints not
3    knowing -- because of the situation he was
4    confronted with, he took fingerprints and let the
5    results be what they were, right?
6    A.    Yes.
7         Q.   You weren't sure -- or were you sure
8    if these fingerprints were going to be helpful or
9    not?
10   A.    I was not, no.
11        Q.   Now, the timing in this is important.
12   So at some juncture -- and you can refer to your
13   report, if you wish.  At some juncture the
14   Tennessee license you had possession of; is that
15   correct?
16   A.    Yes.
17        Q.   And at any point in time did you show
18   it to Officer Lyszk and Officer Lee before you
19   ever did any request for facial recognition in
20   this matter?
21   A.    Yes.
22        Q.   Did you show it to them at the same
23   time, did you show it to them separately?
24   A.    Separately.
25        Q.   Okay.  And what did Officer Lyszk say

Pages 129 to 132

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 133

1    when he saw the identification on the Tennessee
2    license, the picture?
3        A.   He said that was the person that he was
4    dealing with.
5        Q.   And what did Officer Lee say?
6        A.   He said the same thing.
7        Q.   So before you ever engaged facial
8    recognition software to try to get a hit,
9    Officers Lee and Lyszk confirmed that the person
10   in the photograph on the ID was the person who was
11   engaged in this event with them?
12       A.   Yes.
13       Q.   Now, at some point thereafter, as was
14   asked by counsel, you sought the assistance of
15   facial recognition, the software?
16       A.   Yes.
17       Q.   You ran this photograph, or this
18   photograph was run and it came back with a hit?
19       A.   Yes.
20       Q.   And that it came back to Mr. Parks; is
21   that correct?
22       A.   Correct.
23       Q.   When that hit came back to Nijeer
24   Parks, at that point did you speak to Officer
25   Lyszk?

Page 134

1        A.   Yes.
2        Q.   And did you ask Officer Lyszk if the
3    person in the photograph that came back from the
4    hit from the facial recognition program, if that
5    was still the same person?
6        A.   Yes.
7        Q.   And what did he say?
8        A.   He said, yes, he was 100 percent sure.
9        Q.   So at this point in time it was -- you
10   had -- Police Officer Lyszk had confirmed two
11   times that the person in the photographs
12   were -- that was the person who had engaged in the
13   conduct on that particular day at the Hampton Inn?
14       A.   Yes.
15       Q.   And Officer Lee had confirmed it once
16   before?
17       A.   Yes.
18       Q.   But at this point you still hadn't
19   issued -- or had you issued any complaints or any
20   affidavits for anything like that at this point in
21   time when you spoke with them and you got this
22   back from facial recognition that was run?
23       A.   No.
24       Q.   Was Officer Lyszk with you when you
25   started to -- strike that.

Page 135

1        What did you do first, did you
2    contact the prosecutor's office, or did you begin
3    to compare the complaints?
4        A.   No, I contacted AP Natasi.
5        Q.   Okay.  So you contacted Assistant
6    Prosecutor Natasi and you relayed to him all of
7    the facts that you had at this point in time?
8        A.   Yes.
9        Q.   Did you tell him that you ran -- that
10   the facial recognition software came back with a
11   hit to Nijeer Parks?
12       A.   Yes.
13       Q.   Did you tell Officer Natasi -- I'm
14   sorry, Prosecutor Natasi, that officers Lee and
15   Officer Lyszk confirmed that, in fact, this was
16   the person that -- based on the actions on
17   January 26, 2019?
18       A.   At that time it was Officer Lyszk.
19       Q.   Did you tell Prosecutor Natasi that
20   previously Officer Lee had to confirm the picture
21   in the Tennessee ID was the person who had engaged
22   in the conduct at the Hampton Inn?
23       A.   Yes.
24       Q.   And did Prosecutor Natasi or Assistant
25   Prosecutor Natasi tell you to issue the complaints

Page 136

1    against Nijeer Parks?
2        A.   Yes, he did.
3        Q.   And is that your standard protocol in
4    this type of matter, that you would get the okay
5    from the prosecutor before you issue any
6    complaints?
7        A.   Yes.
8        Q.   So you did not issue any of these
9    complaints until Prosecutor Natasi said it was
10   okay?
11       A.   Yes.
12       Q.   And did he indicate that there was a
13   lack of probable cause?
14       A.   No.
15       Q.   Did he say there was probable cause
16   and you should issue the complaints?
17       A.   Yes, he did.
18       Q.   After you spoke to Assistant
19   Prosecutor Natasi, you then, together with Officer
20   Lyszk, prepared the complaints?
21       A.   Yes.
22       Q.   And you prepared what the charges were
23   against him?
24       A.   Yes.
25       Q.   Now, were those charges part of the

Pages 133 to 136

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 137

1    conversation you had with Assistant Prosecutor
2    Natasi?
3    A.    Yes.
4        Q.    And did he tell you what charges to
5    bring against Nijeer Parks at that point in time?
6    A.    Yes.
7        Q.    And did you follow his instructions?
8    A.    Yes.
9        Q.    And once these documents are prepared,
10   the Affidavit of Probable Cause, the complaints,
11   they are sent to who?
12   A.    The Judge.
13       Q.    Okay.  Did Assistant Prosecutor Natasi
14   review them before they went to see the Judge?
15   A.    Yes.
16       Q.    So before the Judge ever had an
17   opportunity to issue a bench warrant, Assistant
18   Prosecutor Natasi had an opportunity to review the
19   Affidavit of Probable Cause as well as the
20   complaints?
21   A.    Yes, he did.
22       Q.    And does he call you up or does he
23   e-mail you saying you've got my blessing, it seems
24   like everything is in order, go ahead and bring it
25   to the Judge?

Page 138

1    A.    Yes.
2        Q.    Do you know, did he call you or e-mail
3    you about this?
4    A.    We spoke on the phone.
5        Q.    So once you got the okay from
6    Assistant Prosecutor Natasi, is that when you
7    contacted Judge Stahl?
8    A.    Yes.
9        Q.    And did you appear in his courtroom,
10   did you go to his house?  Where did you go?
11   A.    No, it's submitted electronically to the
12   Court.
13       Q.    And the Court, does it have -- does
14   Judge Stahl have the opportunity to review the
15   Affidavit of Probable Cause and the complaints?
16   A.    Yes.
17       Q.    And based upon his independent review
18   of the facts, did he issue the bench warrant?
19   A.    Yes.
20       Q.    Did he have any questions or concerns
21   that he relayed to you before he signed off on
22   this?
23   A.    No.
24       Q.    So there was an independent judge,
25   looked at all the facts that you had put down on

Page 139

1    paper in your Affidavit of Probable Cause, and
2    that judge determined that there was enough there
3    to sign off on the arrest warrant?
4    A.    Yes.
5        Q.    Okay.  Is there anything in the
6    complaint or the Affidavit of Probable Cause that
7    is not true?
8    A.    No.
9        Q.    When the Affidavit of Probable Cause
10   and the complaints were issued, did you have the
11   results of the fingerprint evidence yet?
12   A.    No.
13       Q.    Did you have the results of the DNA
14   evidence yet?
15   A.    No.
16       Q.    We've seen documentation here today
17   that the DNA evidence wasn't received until
18   sometime in October of the same year, 2019; is
19   that correct?
20   A.    Correct.
21       Q.    And the results of that back in
22   October of 2019, was that -- there was no hit
23   because, according to what you had testified to,
24   his DNA may not have been in the system at that
25   point in time?

Page 140

1    A.    That's correct.
2        Q.    And there was a second document that
3    was shown to you, it was a 2021, where DNA
4    evidence showed a hit to Barrington Walker; is
5    that correct?
6    A.    Correct.
7        Q.    You didn't wait -- or Woodbridge
8    Police Department didn't wait until 2021 to run
9    the DNA evidence, did it?
10   A.    No.
11       Q.    It was submitted contemporaneous with
12   the event?
13   A.    Correct.
14       Q.    And it was submitted to the New Jersey
15   State Police?
16   A.    Yes.
17       Q.    Did Woodbridge Police -- or Township
18   of Woodbridge have any control over the State
19   Police and how long it takes to get the stuff
20   back?
21   A.    No.
22       Q.    Is there, for lack of a better term, a
23   pecking order of cases and which ones get
24   processed first and which once gets put to the
25   side?

Pages 137 to 140

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 141

1    A.   Yes, sir.
2        Q.   Can you briefly describe for us which
3    cases get priority?
4    A.   Homicides, sexual assaults.
5        Q.   Okay.  So when you get the DNA
6    evidence back, it's exclusively up to the New
7    Jersey State Police and them running it?
8    A.   Yes.
9        Q.   Was there anything in this particular
10   matter where you saw -- or anyone on behalf of the
11   Woodbridge Police Department saw the delay in
12   getting that evidence back to you with the
13   fingerprints or the DNA at any point in time?
14   A.   No.
15       Q.   When the fingerprint evidence and the
16   DNA evidence comes back, or if any evidence comes
17   back, where does it go within the Woodbridge
18   Police Department?
19   A.   To the ID Bureau.
20       Q.   And what happens with it once it gets
21   to the ID Bureau?
22   A.   The ID Bureau would make a copy for myself
23   or the lead detective in the case, and then it
24   would be sent over to the evidence unit for them
25   to either upload it, which is the new system,

Page 142

1    upload it into the system.  In the old system they
2    would put it in a packet ready for the
3    prosecutor's office.
4        Q.   Well, back in the beginning of 2019
5    was the old system in place or was the new system
6    up and running?
7    A.   I believe it was the --
8        Q.   If you know?
9    A.   Yeah, I don't recall.
10       Q.   Okay.  So is it fair to say that any
11   and all information and/or evidence that is
12   gathered in a particular case is subsequently
13   provided by the Woodbridge Police Department to
14   the prosecutor's office that is handling the
15   matter?
16   A.   Yes.
17       Q.   Did that, in fact, occur in this
18   particular case?
19   A.   Yes.
20       Q.   To your knowledge, was the fingerprint
21   evidence that was obtained, was that not provided
22   to the prosecutor's office?
23   A.   It would have.
24       Q.   To your knowledge, was any DNA
25   evidence not provided to the prosecutor's office?

Page 143

1    A.   No.
2        Q.   So any evidence, be it confirmatory or
3    possibly exculpatory, was provided to the
4    Middlesex County Prosecutor's Office?
5    A.   Yes.
6        Q.   The lineups -- well, the
7    identifications that were made in this matter, is
8    that common that an officer would be shown either
9    a photograph or, like in the case, where they
10   spent in 20 -- is this like an aberration?
11   A.   No, this is common.
12       Q.   And did the Prosecutor Natasi make any
13   comment at all to you about the manner in which
14   the identifications were made?
15   A.   No.
16       Q.   Did he question it at all?
17   A.   No.
18       Q.   Did the Judge question it at all?
19   A.   No.
20           MR. RUBENSTEIN:  I don't have
21       anything else.
22           MR. SEXTON:  Just a couple of
23       redirect.
24   REDIRECT EXAMINATION
25   BY MR. SEXTON:

Page 144

1        Q.   Officer Lee is -- he's Asian, correct?
2    A.   He's Asian, correct.
3        Q.   East Asian?
4    A.   I don't know where he's from.  I can't hear
5    you very well.
6        Q.   East Asian is his race?
7    A.   I don't know.  He's Asian.  I don't know if
8    he's East Asian.
9        Q.   But Asia is a big place, from Turkey
10   to Indonesia.  And East Asian refers to people who
11   are from China, Korea, Japan, and they have a
12   certain -- it's a distinct race?
13   A.   Okay.
14       Q.   Do you recognize Officer Lee as being
15   East Asian?
16   A.   I don't.  I know he's Asian.  I don't know
17   where he's from.
18       Q.   Does he look Indian to you?
19   A.   No.
20       Q.   Does he look Arab?
21   A.   No.
22       Q.   Could he be -- and Lee is a Chinese
23   name, is it not?
24   A.   Yes.
25       Q.   Is he Chinese or some other East

Pages 141 to 144

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 145

```
 1   Asian?
 2      A.  I don't know.
 3         Q.  You don't know what race he is?
 4      A.  He's Asian.  I don't know what country he's
 5   from.
 6         Q.  He's certainly not African-American?
 7      A.  Right.
 8         Q.  Lyszk is -- the name is Polish.  He
 9   could be black for all I know.  What race do you
10   perceive him as?
11      A.  He's a white man.
12         Q.  Who's the ID detective?
13      A.  Quesada?
14         Q.  Quesada.  Is it an Hispanic name?
15   What is his race.
16      A.  He's Hispanic.
17         Q.  Do you know what country of origin he
18   is?
19      A.  Costa Rica.
20         Q.  Is he light skinned or dark skinned?
21      A.  He's medium.
22         Q.  You're partly Hispanic?
23      A.  I am Hispanic.
24         Q.  And light skinned?
25      A.  Light skinned.
```

Page 146

```
 1         Q.  So none of these involve officers who
 2   are black; fair to say?
 3      A.  Fair.
 4         Q.  Seamus Lyons sounds Irish to me.
 5      A.  Never seen him before.
 6         Q.  Dey, an Irish name?
 7      A.  Don't know.
 8         Q.  Do you know if any African-Americans
 9   were involved in this investigation at all?
10      A.  The Hertz manager was black.
11         Q.  That's Dones?
12      A.  Dones.
13         Q.  There were a number of other eye
14   witnesses, I think, listed in the report, Caleigh
15   Higgins, Kamisha Grant.  Was Richard Charneco also
16   a witness?
17      A.  I don't know who he is.
18         Q.  It's listed as reporting person on
19   Lee's report.  Probably someone from the... Race
20   is white.  Do you know why Dones is not listed as
21   a person on Lee's report?
22      A.  He wasn't there the day of the -- let me
23   rephrase it.  He was there the day of the
24   incident.  However, he left prior to police
25   arrival.  I followed up with him, I believe, the
```

Page 147

```
 1   next day.
 2         Q.  He's not listed on your report either.
 3      A.  I wrote him in the body of my report.
 4         Q.  But you don't list him under persons,
 5   with addresses and...
 6      A.  No.
 7         Q.  Did you contact Caleigh Higgins, a
 8   white female, who was identified as a witness and
 9   whose telephone number and address is in the
10   reports?
11      A.  I don't recall if I did or didn't.
12         Q.  Did you contact Kamisha Grant, a black
13   female, also listed with contact information as a
14   witness?
15      A.  I believe they were at the hotel.  They
16   were behind the clerk desk.
17         Q.  Okay.  Did you contact them and set up
18   a photo -- what do you call it, a photo spread?
19      A.  No.
20         Q.  Director Hubner, has he ever addressed
21   your -- you said nobody's ever talked to you about
22   this incident, right?
23      A.  Just my captain and lieutenant when --
24         Q.  That one meeting?
25      A.  Yeah.
```

Page 148

```
 1         Q.  And the police director's never
 2   addressed the use of facial recognition?
 3      A.  No.
 4         Q.  Does the police director -- does he
 5   interact with members of the department?
 6      A.  Yes.
 7         Q.  How does he interact?
 8      A.  He goes to the musters every so often.
 9         Q.  Does he have a police background, or
10   is he a civilian?
11      A.  He has a long police career, yes.
12         Q.  Is he now a civilian?
13      A.  Yes.
14         Q.  And is he also -- does he have other
15   hats besides being director of the police in the
16   municipal universe?  Is he director of public
17   safety or anything like that?
18      A.  No, just the police director.
19         Q.  And so what's your understanding of
20   Dones again?
21      A.  He's the Hertz manager.
22         Q.  And Charneco?
23      A.  I don't recall who he is.
24         Q.  Because the report -- he's listed
25   as -- in your report I believe you describe him
```

Pages 145 to 148

Page 149

```
 1    as -- you requested video footage from the Hampton
 2    Inn manager Richard Charneco.
 3        A.   Yes.
 4             Q.   So the manager is Charneco and Dones
 5    is what?
 6        A.   The manager for Hertz.
 7             Q.   Okay.  Is the Hertz office at the
 8    hotel?
 9        A.   Yes.  It's a kiosk.
10             Q.   Okay.  It says here that Dones gave
11    you the rental agreements.
12             MR. SEXTON:  I don't think I got
13        those in discovery.  Could we get the...
14             MR. RUBENSTEIN:  Sure if we have
15        them, we'll provide them.
16             MR. SEXTON:  Thank you very much for
17        your time, sir.
18             MR. RUBENSTEIN:  I have two last
19        questions, or possibly three.
20    RECROSS-EXAMINATION
21    BY MR. RUBENSTEIN:
22        Q.   The police station where the
23    processing area is, where Mr. Parks was apparently
24    handcuffed, that area, is there cameras?
25        A.   Yes.
```

Page 150

```
 1        Q.   Is there anywhere where you get
 2    processed, you get fingerprinted, you'd be
 3    photographed that is not subject to a camera
 4    looking at you at all times?
 5        A.   There's always a camera.  Every angle is
 6    covered.
 7        Q.   Is there any place within the police
 8    department in that area that you can think of that
 9    is not covered with cameras at the time of
10    Mr. Parks being arrested?
11        A.   Unless you utilize the bathroom.  That's
12    the only place it wouldn't have cameras.
13        Q.   And do you know the race of
14    Mr. Barrington Walker?
15        A.   He's African-American.
16             MR. RUBENSTEIN:  Thank you.
17    FURTHER REDIRECT EXAMINATION
18    BY MR. SEXTON:
19        Q.   Following up on that, so how many
20    bathrooms are there in the police department?
21        A.   I couldn't give you that answer.  I don't
22    know.
23        Q.   Okay.
24        A.   There's several floors to the police
25    department, and a couple of them I don't even go
```

Page 151

```
 1    into myself.
 2        Q.   On the first floor?
 3        A.   So on the first floor you have one in the
 4    lobby.  Then inside the police department you have
 5    a female and a male locker room.  Then by the
 6    dispatch office you have a male and female
 7    bathroom.  And then if you go into the booking
 8    area, there's bathrooms in every cell.
 9        Q.   Other than the bathrooms being outside
10    of the purview of the surveillance cameras, every
11    other inch of the first floor is surveyed?
12        A.   Yes, sir.
13             MR. SEXTON:  Thank you.  Oh, wait.
14    BY MR. SEXTON:
15        Q.   And how long has that been the case?
16        A.   Since I've been on the job, almost 20
17    years.  It's always been covered by cameras.
18             MR. SEXTON:  Thank you.
19
20
21             (Deposition was adjourned at 3:43 p.m.)
22
23
24
25
```

Page 152

```
 1         C E R T I F I C A T I O N
 2
 3         I, LAURA P. REAM, being a Certified
 4    Court Reporter and Notary Public within
 5    and for the State of New Jersey, do hereby
 6    certify that the foregoing is a true and
 7    correct transcript of the proceedings.
 8
 9
         LAURA P. REAM, Notary Public
10       License No. 3XT00004000
11
12       DATED:
13
14
15         This transcript is not to be copied
16    unless under the direct control and supervision of
17    the certifying reporter.
18
19
20
21
22
23
24
25
```

Pages 149 to 152

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

# EXHIBIT "G"

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 21-4021 (JXN)(LDW)

NIJEER PARKS,
Plaintiff,

Deposition of:
LIEUTENANT EDWARD
vs.          BARRETT
October 18, 2022

JOHN E. MCCORMAC, MAYOR OF WOODBRIDGE,
in his personal and official capacity,
ROBERT HUBNER, DIRECTOR OF THE WOODBRIDGE
POLICE, in his personal and official
capacity, CITY OF WOODBRIDGE POLICE
OFFICERS, ANDREW LYSZK and WOODBRIDGE
POLICE SGT. JOSEPH LICCIARDI, WOODBRIDGE
POLICE OFFICERS, JOHN AND JANE DOES 1-20,
being as yet unknown actors, MIDDLESEX
DEPARTMENT OF CORRECTIONS, JOHN AND JANE
DOES 1-20, being unknown actors, MIDDLESEX
COUNTY PROSECUTOR, ACTING PROSECUTOR
CHRISTOPHER KUBERIET, in his personal
and official capacity, and ASSISTANT
MIDDLESEX COUNTY PROSECUTOR, PETER NATASI,
and IDEMIA, INC.'S being the maker of the
facial recognition software and ABC
CORPORATION, being an as yet unknown seller
or servicer of the facial recognition
programs,
Defendants.
- - - - - - - - - - - - - - - - - -

HUDSON COURT REPORTING & VIDEO    (732) 906-2078

Page 2

1    T R A N S C R I P T of the stenographic
2    notes of the proceedings in the above-entitled
3    matter as taken by and before LAURA A. BURNS, a
4    Certified Court Reporter of the State of New Jersey,
5    held at the office of JAMES P. NOLAN AND ASSOCIATES,
6    61 Green Street, Woodbridge, New Jersey, on Tuesday,
7    October 18, 2022, commencing at approximately 1:35
8    in the afternoon, pursuant to notice.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    A P P E A R A N C E S :
2
3    DANIEL W. SEXTON, ESQ., LLC
4    Attorneys for Plaintiff
5    229 New Center Road
6    Hillsborough, New Jersey  08844
7    danielsextonesq@gmail.com
8    BY:  DANIEL W. SEXTON, ESQ.
9
10   DVORAK & ASSOCIATES
11   Attorneys for Defendant, Middlesex Department
12   of Corrections
13   467 Middlesex Avenue
14   Metuchen, New Jersey  08840
15   glempka@dvoraklegal.com
16   BY:  GRACE LEMPKA, ESQ.
17
18   LAW OFFICE OF JAMES P. NOLAN & ASSOCIATES
19   Attorneys for Defendant, Township of Woodbridge
20   61 Green Street
21   Woodbridge, New Jersey 07095
22   frubenstein@jpnlaw.us
23   BY:  FREDERICK L. RUBENSTEIN, ESQ.
        GARRY CLEMENTE, ESQ.
24
25

Page 4

1    A P P E A R A N C E S :
2
3    STATE OF NEW JERSEY
4    Attorneys for Defendants, Middlesex County
5    Prosecutor, Acting Prosecutor Christopher
6    Kuberiet and Peter Natasi
7    25 Market Street
8    Trenton, New Jersey  08625
9    peter.sosinski@law.njoag.gov
10   BY:  PETER SOSINSKI, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Pages 1 to 4

Page 5

```
 1              I N D E X
 2
        WITNESS            DIRECT
 3
        LIEUTENANT EDWARD BARRETT
 4
        By:  Mr. Sexton          6
 5
 6           E X H I B I T S
 7      NUMBER      DESCRIPTION      PAGE
 8      B-1  Photocopy of driver's license, Tennessee  59
 9
10         DISCOVERY PRODUCTION REQUESTS
11         PAGE    DESCRIPTION
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1   LIEUTENANT EDWARD BARRETT, 61 Green Street,
 2   Woodbridge, New Jersey is duly sworn and testifies
 3   under oath as follows:
 4   DIRECT EXAMINATION BY MR. SEXTON:
 5       Q.    Good afternoon, Lieutenant, my name is
 6   Dan Sexton, I represent the plaintiff in this
 7   matter.  Just a couple of preliminaries.  Have you
 8   ever had your deposition taken before?
 9   A.    Yes.
10       Q.    How many times?
11   A.    Once or twice.
12       Q.    Okay.  And was it for cases involving
13   the department or was it in your personal life?
14   A.    Department.
15       Q.    So then I'll be brief with the
16   instructions since you've been through it before.
17   As you can see, there's a record being taken of
18   this, so that we have to give our -- communicate
19   only through words.  She can't -- the reporter can't
20   take down our gestures or nods of the head.  We have
21   to be careful, I'm usually the one who's always
22   forgetting this, but you can't talk over the other
23   person because the reporter will go crazy.  She can
24   only record one person's statement at a time.
25           If there's any question that you don't
```

Page 7

```
 1   understand, you should ask -- you say you don't
 2   understand and I'll try to rephrase it.
 3           Your lawyer will be making objections
 4   throughout, those are for the record, unless he says
 5   don't answer that and then he and I will hash that
 6   out, but otherwise we just keep going.
 7           Do you remember the names of those
 8   matters that you testified in?
 9   A.    The latest one was involving a Michael Hodges
10   and if there was another one, I couldn't remember
11   the name.
12       Q.    Okay.  That's an excessive force case,
13   right?
14   A.    Yes, I believe so.
15       Q.    What was your involvement in that
16   matter?
17   A.    I was the investigator of the internal
18   affairs investigation.
19       Q.    Did IA -- what did IA find in that
20   case?
21   A.    The officer's actions were proper and they
22   were exonerated.
23       Q.    Where does that -- where does that
24   case -- what stage is that case in?
25   A.    I believe it may have been settled.
```

Page 8

```
 1       Q.    Do you recall the terms of the
 2   settlement?
 3   A.    No, I was never informed.
 4       Q.    Do you know -- do you know if anyone
 5   in the department ever gives any input as to whether
 6   a matter should be settled or not settled?
 7   A.    As far as lawsuits go?
 8       Q.    Yes.
 9   A.    I'm not involved with that, so I'm not
10   certain.
11       Q.    When did you come on the department?
12   A.    December of 2005.
13       Q.    And how long have you been a
14   lieutenant?
15   A.    Approximately five years.
16       Q.    And when did you become commander of
17   internal affairs?
18   A.    About two years ago.
19       Q.    Do you remember was it after this
20   incident of the basis of this lawsuit, after
21   January 2019?
22   A.    It might have been about the same time.  I
23   think it might have been the beginning of 2020 when
24   I took over.
25       Q.    So a year after the incident, the
```

Pages 5 to 8

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 9

1  incident was in January of 2019?
2  A.  Yeah.  To the best of my recollection, I
3  think it's been about two years.
4  Q.  What were you doing before that?
5  A.  I was assigned as one of the investigators.
6  Q.  How long have you been in IA?
7  A.  Five years about.
8  Q.  So around the time you became a
9  lieutenant?
10  A.  Yes.
11  Q.  And who was the commander before you?
12  A.  Before me it was Lieutenant Muir.
13  Q.  M-u-i-r?
14  A.  Yes, correct.
15  Q.  And where is Lieutenant Muir now?
16  A.  He is retired.
17  Q.  Have you discussed this matter with
18  Lieutenant Muir?
19  A.  No.
20  Q.  Whom have you discussed this matter
21  with?
22      MR. RUBENSTEIN:  Besides your counsel
23  if we had any conversations.
24  BY MR. SEXTON:
25  Q.  No, you can tell me which lawyers, you

Page 10

1  can't tell me what you spoke about.
2      MR. RUBENSTEIN:  Right.
3  A.  Our counsel here.
4  Q.  Whom did you speak with here?
5  A.  Mr. Rubenstein.
6  Q.  Anyone else?
7  A.  And the name is escaping me.
8  Q.  Mr. Clemente?
9  A.  Yes, Clemente, I'm sorry.
10      Are you talking from the inception of the
11  case or --
12  Q.  Yeah, from the inception.
13  A.  Captain Kuzma was aware of it, Lieutenant
14  Velez was the investigator, the police directors
15  were aware of it as well.
16  Q.  Plural directors?
17  A.  We have a director and we have a deputy
18  director.
19  Q.  Who is the deputy director again?
20  A.  Joseph Nisky.
21  Q.  Nisky?
22  A.  Nisky.
23  Q.  What kind of training did you have to
24  be an IA?
25  A.  After I was assigned to the unit, I attended

Page 11

1  courses through Middlesex County Prosecutor's
2  Office, and also I went to a class through the
3  Rogers Group, which was through Stockton University
4  I believe, and most recently the state police --
5  state police/attorney general's office I think
6  hosted a class down in Waretown that I attended.
7  Q.  Who ran the training at the
8  prosecutor's office?
9  A.  At the time I believe it was Michael
10  Danowitz.  That was several years ago.  I know he
11  was there I think I was the highest ranking person
12  there.
13  Q.  Was Danowitz an assistant prosecutor
14  or was he an investigator or --
15  A.  No, I believe he was a lieutenant right
16  before he retired.  I'm not sure if he was sergeant
17  or lieutenant when we did the training.
18  Q.  And what did the training consist of?
19  A.  Went over the attorney general's guideline
20  that was in effect at the time.  How they -- the
21  county prosecutor's office expected us to, you know,
22  handle internal affairs, the methods to utilize,
23  things of that nature.
24  Q.  Was anyone else -- anybody else from
25  the department taking those classes with you?

Page 12

1  A.  Captain Kuzma may have attended some of them,
2  Lieutenant Velez may have attended some of them, the
3  most recent one in Waretown Lieutenant Ng and I went
4  to.
5  Q.  Ng?
6  A.  N-g.
7      The one from Stockton, the Rogers Group one,
8  I went there alone.  That one I attended by myself.
9  Q.  Did -- COLIA, do you know that group
10  that comes into to do standards and stuff?
11  A.  Oh, CALEA?
12  Q.  Yes.
13  A.  Yes.
14  Q.  Did you -- did they have any -- did
15  they provide any training or guidance?
16  A.  Not that I am aware of, no.
17      Well, as far as guidance goes, they aid with
18  accreditation standards, so I don't know if that
19  would be guidance or not.
20  Q.  Do they -- so they review -- do they
21  review IA for compliance with standards; is that
22  what you're saying?
23  A.  There are certain accreditation standards
24  that I have to provide proofs for, as far as the way
25  we maintain our indexes and filing system, our

Pages 9 to 12

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 13

1    reporting, you know, I provide proofs that are
2    redacted to show compliance with the standards that
3    are set forth.
4         Q.   So what are the -- can you recall --
5    so what are the -- what are some of the categories
6    that are given this accreditation review in your --
7    A.   I'm sorry, are you done?
8         Q.   Yes.
9    A.   Our yearly indexes, officer indexes, examples
10   of different types of discipline that are imposed,
11   there's a spreadsheet for our recruitment and
12   selection, use of force reports, different
13   categories of use of force, other firearms
14   discharges.  There's several.  That's the ones I can
15   think of right now.
16        Q.   And is there like a yearly report that
17   you make to CALEA on -- on these discreet --
18   A.   Our accreditation manager, he's the one that
19   compiles all the proofs and submits everything to
20   CALEA.
21        Q.   Who is that person?
22   A.   Andrew Tuttle.  He's a civilian employee.
23        Q.   Is he retired?
24   A.   No.
25        Q.   Have you ever gotten like anything

Page 14

1    from CALEA that you are not in compliance in any of
2    these areas?
3    A.   No, I have not.
4         Q.   Did you ever get anything like that
5    from the prosecutor's office, and by that I mean
6    anything saying that you weren't in compliance with
7    some relevant standards by any of the sources of
8    training that you've identified, that is the
9    prosecutor's office, the AG's office, or any of
10   these -- Stockton or anyplace?
11   A.   No.
12        Q.   Are these reports, does Andrew Tuttle
13   maintain sets of these reports, the yearly indexes,
14   the recruitment analysis, et cetera, the use of
15   force analysis?
16   A.   He collects them, he submits them on an
17   annual basis as far as I know.  Whether or not he
18   retains them once they're submitted, I am not
19   certain.
20        Q.   Do you know the person at CALEA whom
21   you have interacted with?
22   A.   From the -- from CALEA itself?
23        Q.   Yes.
24   A.   No, nobody.  Not directly anyway.
25        Q.   Where is CALEA located, headquartered?

Page 15

1    A.   I know they have a conference every year, I
2    believe it's in Mississippi.  But other than that, I
3    don't know where their national headquarters is at.
4         Q.   Do you guys go to that conference?
5    A.   When we're up for accreditation, I believe we
6    send people down there for that.  I have never gone
7    myself.
8         Q.   Who goes?
9    A.   Mr. Tuttle goes down and generally Captain
10   Kuzma goes down.
11        Q.   The chief never goes down?
12   A.   Captain Kuzma is our chief law enforcement
13   officer.  We don't have a ranking chief.
14        Q.   But the director never does?
15   A.   I'm not sure if he does or doesn't.
16        Q.   When -- how does -- how do -- how does
17   your office open a file?  What causes it to open a
18   file?
19   A.   Any time somebody makes an allegation of
20   officer misconduct or any time anybody in the agency
21   observes what may be officer misconduct and our
22   office is notified, sometimes it comes from our
23   offices itself, we generate a number, an indexing
24   number to start the case.
25        Q.   So sometimes it comes from, is that I

Page 16

1    guess superior officers or peer officers or --
2    A.   It can come from regular police officers.  It
3    can come from sergeants, lieutenants, captains,
4    citizens, anonymous complaints.  Sometimes things
5    are seen on social media, lawsuits.
6         Q.   For your caseload, what percentage is
7    internally driven by superiors -- I guess agency
8    complaints and what percentage is citizen
9    complaints?
10   A.   I would have to look.  It varies year to
11   year.
12        Q.   Do you know what it was last year?
13   A.   Not off the top of my head, no.
14        Q.   Do you have an estimate of how it
15   breaks down?
16   A.   I would be guessing.
17        Q.   Does it switch or does it have a
18   pattern where there's generally --
19   A.   Just depends on what's going on, you know, if
20   there's some sort of new policy that has been
21   instituted, sometimes it takes time for people to
22   get up to speed with that, sometimes there's more
23   motor vehicle crashes one year than the next.
24        Q.   Is there -- I'm sorry, is there an
25   accident investigation unit?

Pages 13 to 16

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 17

1   A.   We have a traffic enforcement unit, yes.
2        Q.   So if there's a motor vehicle accident
3   involving officers, is that traffic that
4   investigates that or you?
5   A.   No, on the scene is investigated by the
6   officer's supervisor.
7        Q.   And then who reviews it through --
8   A.   Determination is made whether or not the
9   officer is at fault, not at fault, or partially at
10  fault, and it gets sent up to our office and it's
11  indexed there.
12       Q.   Am I correct in understanding that a
13  motor vehicle accident is initially investigated by
14  a traffic unit?
15  A.   No, the officer's direct supervisor.
16       Q.   Okay.  And is there something -- some
17  investigation through traffic?
18  A.   Well, it would depend on the severity of the
19  accident.  If there's a severe motor vehicle
20  accident with severe personal injury or death, the
21  prosecutor's office would be notified and I guess at
22  this point now the OPIA would be notified.
23       Q.   What is OPIA?
24  A.   That's the Office of Public Integrity and
25  Accountability, through the attorney general's

Page 18

1   office, and they handle any sort of investigation
2   that's related to death that occurs as a result of a
3   law enforcement encounter.
4        Q.   When did OPIA come into existence?
5   A.   A year or two ago.  I can't remember what the
6   directive was exactly that the mandatory
7   notifications were.  It might have been like --
8   maybe it was 2018-5 and 6, off the top of my head.
9   So it might have been since 2018.
10       Q.   So citizen complaints, how are they
11  initiated?
12  A.   They can either walk in, they can request a
13  supervisor at the scene.  We get emails.  We get
14  postal mail, telephone calls, anyway that they can
15  get in contact with us.
16       Q.   What is a 500 complaint?
17  A.   500 complaints are complaints that are not
18  forwarded up to the county prosecutor's office.
19  Ones that don't require some sort of criminal
20  review.
21       Q.   What are the reports called that
22  require a criminal review?
23  A.   They're like 00 numbers, so it would be 001,
24  002 and so on and so forth.
25       Q.   So it's fair to say that there's often

Page 19

1   a gray line between what is a 00 and what's a 500?
2   A.   I guess at times there could be.  Generally
3   if we think that there might be a criminal aspect to
4   it, we will send it to the prosecutor's office.
5        Q.   Who reviews it at the prosecutor's
6   office?
7   A.   Our contact person there is Detective Joe
8   Russo right now.
9        Q.   How long has he been the contact for
10  that?
11  A.   Maybe a year and a half.  They rotate their
12  people pretty frequently.
13       Q.   Does the prosecutor's office review
14  your 500 reports?
15  A.   They get unloaded into Infoshare, which is I
16  guess a document sharing or information sharing
17  thing that they have set up.  I enter everything
18  into there, as far as the case numbers and a brief
19  description of the case.  Whether or not they look
20  at it, I'm not aware.
21       Q.   Have you ever had -- had a comment or
22  criticism about a 500 report from the prosecutor's
23  office?
24  A.   No.  Sometimes, though, they do -- people
25  complain to them and then they send things down to

Page 20

1   us, demeanor complaints and minor rule infractions.
2   So that's another way we get complaints, through the
3   prosecutor's office.  And also sometimes through the
4   attorney general's Office, things filter down
5   through them, as well.
6        Q.   Lieutenant, this is previously marked
7   as Exhibit 1, it's a list of complaints that your
8   attorney sent to me.  Do you just briefly want to go
9   through each one of those and see if you recognize
10  them and are familiar with the cases.  The Ayler
11  case?
12  A.   No, I'm not familiar with that.
13       Q.   The Naveo case?
14  A.   No, I'm not familiar with that.
15       Q.   The Wint case?
16  A.   No.
17       Q.   Hearns?
18  A.   That one, yeah, I remember that one.
19       Q.   What was that about?
20  A.   That was -- I believe it was an allegation of
21  false arrest.  I think it was pertaining to credit
22  card theft, if I remember correctly.
23       Q.   Do you know what it was settled for?
24  A.   No, no idea.
25       Q.   Did your office do any investigation

Pages 17 to 20

Page 21

1   into --
2   A.    Prior to my being up there, there was an
3   investigation.
4       Q.    Testa case?
5   A.    I am not familiar with that.
6       Q.    What is your understanding of the
7   use -- acceptable use of facial recognition
8   technology?
9   A.    As far as our internal policies or --
10      Q.    Well, yeah, what is the Woodbridge
11  Police Department's policies regarding facial
12  recognition technology?
13  A.    We don't have any formal policies regarding
14  facial recognition, not that I'm aware of anyway.
15      Q.    Has any guidance been provided to
16  members of the department about how to use it?
17  A.    The only guidance that I'm aware of was a
18  memo or some sort of directive that was sent out by
19  the attorney general a couple years ago saying, I
20  believe it was not to use -- to not use Clearview AI
21  facial recognition.  That's the only thing I'm aware
22  of.
23      Q.    Was that circulated to members of the
24  department?
25  A.    At some point it came cross my desk, so I --

Page 22

1   I'm not sure who received it, but I did.
2       Q.    So you don't know if that was
3   circulated?
4   A.    No, no.
5       Q.    If it had been circulated, in what
6   form would it have been circulated?  Would it have
7   been made a general order or put on the -- what's
8   that computer thing everybody uses?
9   A.    Oh, PowerDMS?
10      Q.    Yes.  Would it have been put on
11  PowerDMS?
12  A.    That would have been the most effective way
13  to distribute it.
14      Q.    As far as you know was that -- was
15  that ever distributed through PowerDMS?
16  A.    I don't remember that it was.
17      Q.    Do you know anything else about facial
18  recognition technology other than the AG ruling
19  against Clearview AI?
20  A.    No, I'm not really familiar with it.
21      Q.    Have you been to the ROIC?
22  A.    To the actual location?
23      Q.    Yes.
24  A.    No, I have never been there.
25      Q.    Do you work with people regularly from

Page 23

1   the ROIC?
2   A.    No.
3       Q.    Do you know if anyone else in IA has
4   any special knowledge of facial recognition
5   technology other than the knowledge that you just
6   described for yourself?
7   A.    No.
8       Q.    Are you aware that facial recognition
9   technology has been reported to be racially biased?
10          MR. RUBENSTEIN:  Objection as to
11  form, but you can answer.
12  A.    I have seen media reports and things of that
13  nature, and I'm not sure if that was a reason why
14  the attorney general at the time put out that order.
15  But I've heard such things.  I don't know the
16  evidence behind it.
17      Q.    Do you remember where you heard this?
18  A.    News broadcasts, articles on-line.
19      Q.    Did you read or see any news articles
20  about this matter?
21  A.    Yeah.  When the allegations were made and it
22  was in the local news, yeah, I saw those articles.
23      Q.    Do you remember what papers those
24  were?
25  A.    It might have been mycentraljersey.com, it

Page 24

1   might have been Woodbridge Patch.  Those are
2   probably the ones I'm most familiar with.
3       Q.    Did you -- how about in the national
4   media, did you watch or hear or read any of those
5   stories?
6   A.    No, I really don't follow too much of that
7   stuff.
8       Q.    Is there anybody in the office IA
9   whose job it is to sort of do clippings, you know,
10  clip news articles or things like that to keep track
11  of coverage?
12  A.    Coverage pertaining to?
13      Q.    Anything in the department?
14  A.    Oh, just specific to the Woodbridge Police
15  Department?
16      Q.    Yes.
17  A.    If something is relevant I guess to a case
18  that's going on, we'll generally try to print it out
19  and include it in the investigation file.
20      Q.    But there's no general attempt to keep
21  track of every article written about the department
22  or every story that's run?
23  A.    No.  Because everything pretty much persists
24  forever on-line, so it's not like where you had the
25  newspaper and you've got to cut it out and laminate

Pages 21 to 24

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 25

1   it. Just generally it's always available now.
2       Q.    Were you aware of the article -- I
3   mean, the issue about the barbershop with the PPO --
4   the PP -- the pandemic money, were you involved in
5   that investigation?
6   A.    No.
7       Q.    How did that -- how did that become an
8   issue, do you know?
9           MR. RUBENSTEIN:  Objection as to
10  form.  If you know.
11  A.    No, I don't know how it evolved, it came to
12  be.
13      Q.    Did IA get involved in that at all?
14  A.    No, the county prosecutor's office was going
15  to look into that.
16      Q.    So when the county prosecutor takes
17  over investigating a situation, do you keep a shadow
18  file so that you're sort of also following?
19  A.    No.  Generally if there's something that we
20  need to have on file that they do, they will provide
21  it to us.  So if, you know, they start investigating
22  something and then it gets returned to us for
23  whatever reason, they will provide us with a copy of
24  their investigation.
25      Q.    But you don't automatically start a

Page 26

1   file on everything that the prosecutor is doing?
2   A.    No.
3       Q.    So unless they get back to you, you
4   will not have realized -- for example, if they had
5   had an investigation for a criminal matter involving
6   an officer, unless they get back to you, you
7   wouldn't even have any record in your office of such
8   an investigation?
9   A.    Well, if they're investigating an officer for
10  a criminal matter, I would expect them to notify us
11  of that, unless there's some reason that they think
12  notifying us would hinder the investigation or cause
13  a problem in the investigation somehow.
14      Q.    Okay.  So it's fair -- so if they
15  notify you, do you start a file?
16  A.    Yes, if there's a criminal allegation against
17  one of our officers, yes, then we start a file.
18      Q.    So then did you start -- for instance,
19  they were investigating this use of monies for the
20  barbershop in the department, it must have been
21  because they thought there was potentially some
22  criminal activity there?
23  A.    I'm --
24          MR. RUBENSTEIN:  Objection as to
25  form, but go ahead.

Page 27

1   A.    I'm not really familiar with what it was they
2   would have been investigating.  I don't --
3       Q.    But you said that they only
4   investigate matters that are potentially criminal?
5   A.    Not only.  I mean, if they have to have -- an
6   example is, if you need somebody that's impartial to
7   look into something, it's like when our chief law
8   enforcement officer, if he uses force, I am not the
9   one who reviews his force.  The county prosecutor's
10  office reviews his force, because it's one step
11  removed.  There's -- I don't know what you want to
12  call it, there's a buffer there, there's a break
13  there, they're more impartial.
14      Q.    So, I mean, that was a pretty high
15  profile investigation in all newspapers and --
16  A.    I think that's probably why they held onto
17  it.
18      Q.    And you didn't even have a file on it
19  in your office?
20          MR. RUBENSTEIN:  Objection as to
21  form, go ahead.
22  A.    Yeah, I don't have one.
23      Q.    Did you have much to do with the
24  Gutierez matter?
25          MR. RUBENSTEIN:  Objection as to

Page 28

1   form.  If you know what the Gutierez matter is.
2   A.    I am not sure what that is, no.
3       Q.    It was a case that was settled
4   recently for $125,000, does that refresh your
5   recollection?
6           MR. RUBENSTEIN:  Objection as to
7   form.  I'm pretty sure it wasn't recent.
8           MR. SEXTON:  Oh, yeah, it's not
9   recent.  It was back in 2017.
10  A.    No, I don't recall that.
11  BY MR. SEXTON:
12      Q.    I'm showing you H-3, it's an index
13  sheet.  Did you run these reports?
14  A.    This one, yes.
15      Q.    And did you do this in response to
16  requests from counsel?
17  A.    Yes.
18      Q.    And how did you go about creating
19  these reports?
20  A.    Each year they had an Excel spreadsheet that
21  indexed all the internal affairs complaints and then
22  I sorted through them and I printed out what was
23  relevant to the request.
24      Q.    Can I see it again?
25          Do you remember what you were told is

Pages 25 to 28

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 29

1  relevant?
2          MR. RUBENSTEIN: Objection, it's
3  communication between me and Lieutenant Barrett. Do
4  not answer that question.
5          THE WITNESS: Huh?
6          MR. RUBENSTEIN: Do not answer that
7  question.
8          MR. SEXTON: Well, I can ask him how
9  he was told to create this report.
10         MR. RUBENSTEIN: If he was told
11 anything about how to create it, you can ask him.
12 BY MR. SEXTON:
13     Q.   Were you given -- when you created
14 this report, what were your criteria?
15     A.   Based on what I remember, any complaints of I
16 guess bias or differential treatment and any
17 complaints of -- or allegations of false arrest.
18     Q.   Who codes them as differential
19 treatment, bias, false arrest?
20     A.   Generally they are coded based on what the
21 primary or the most serious complaint is of the
22 complainant or whoever brings the complaint forward.
23     Q.   Do you know -- for instance, the first
24 page is about 2014 and it has three differential
25 treatment allegations.

Page 30

1          MR. RUBENSTEIN: Can you show him the
2  paperwork, please?
3          MR. SEXTON: Yeah, I will.
4  BY MR. SEXTON:
5      Q.   If I'm reading that correctly, the
6  first page -- the order of this document is the
7  order it was produced by -- you can see that they're
8  numbered on the upper right -- upper left from where
9  you're sitting.  And the first page is 2014, and I
10 think it's differential treatment, and the last page
11 of that document I think is also 2014, but it's
12 improper arrest?
13     A.   Yes, that's correct.
14     Q.   So those -- that's five complaints for
15 2014. I believe that's all that was produced for
16 2014.
17     A.   Yes.
18     Q.   Does that -- in your experience is
19 five --
20     A.   Well, there's -- 2014 there's three more
21 improper arrests here on this page.
22     Q.   Oh, okay.  Well, would that page be
23 the second to last page?
24     A.   Second to last, yes.
25     Q.   So then it's three, six -- or six,

Page 31

1  seven, eight complaints for 2014?
2      A.   Yes.
3      Q.   Do you have any -- is that a normal
4  number for a year or is there such a thing as a
5  normal number or does it vary --
6          MR. RUBENSTEIN: Objection as to
7  form.
8  BY MR. SEXTON:
9      Q.   -- to the extent that you can't really
10 answer in that manner?
11     A.   Yeah, there's no standard normal number for
12 any complaints that we receive.
13     Q.   So if I'm reading this correctly,
14 there are eight allegations in 2014 of improper
15 arrests or differential treatment, and only one of
16 them was sustained, is that --
17     A.   For differential treatment?
18     Q.   For both, both?
19     A.   Both combined?
20     Q.   Yeah.
21     A.   Yeah, there was one sustained for improper
22 arrest.
23     Q.   So nothing sustained for differential
24 treatment?
25     A.   No.

Page 32

1      Q.   So that's one out of eight.
2          Were you ever given training as to
3  what red flags -- when a low level of sustaining
4  complaints becomes a red flag for the effectiveness
5  of an IA unit?
6      A.   Not that I remember.
7      Q.   You never heard any type of analysis
8  like that at all?
9      A.   No.  I mean, you do the investigations, you
10 know, as completely and logically as you're able to,
11 and you make your determination as to whether or not
12 the complaint is sustained or otherwise based on the
13 information that's available to you.
14     Q.   So you never -- in all of your
15 training, all your reading and all of your police
16 experience, you never heard that it's a problem when
17 an IA unit never -- fails to sustain a certain
18 percentage of complaints?
19         MR. RUBENSTEIN: Objection as to
20 form.
21     A.   Not that I remember.  But there are plenty of
22 other sustained complaints, they're just not in
23 these categories.
24     Q.   What categories would they have been
25 in?

Pages 29 to 32

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 33

1    A.   Other categories include demeanor, other rule
2  violation, excessive force.  What are the others?
3  There are several different categories.  Off the top
4  of my head I'm trying to remember.
5    Q.   Improper search, excessive force,
6  demeanor, improper search?
7    A.   Other rule violations.
8    Q.   And these would all be 500 reports?
9    A.   It would depend.  Generally excessive force
10  are 00 numbers.  All excessive force complaints get
11  forwarded to the county prosecutor's office.
12      Additionally, the way that they were indexing
13  these back in 2014, I don't know if they were
14  assigning them numbers the same way that we are now.
15  That was before my time up there.
16    Q.   By numbers, they were given a case
17  number, is that it?
18    A.   Case numbers, yeah.  How they're assigning
19  case numbers.
20    Q.   And that's 14 -- so here it says,
21  "'14, 569," so that indicates that there were 569 --
22  that this is the 569th complaint on or about
23  July 10, 2014?
24    A.   No, it would be the 69th, because you start
25  at 501, 502.

Page 34

1    Q.   Oh, 500, okay, I got it.
2       So you get -- it looks like then you
3  get about 100 complaints a year?
4       MR. RUBENSTEIN:  Objection as to
5  form.  You can answer.
6    A.   It varies.
7    Q.   What does it vary between in your
8  experience?
9    A.   Historically, I would have to find out.  I
10  can't recall off the top of my head.
11    Q.   What's your -- so can you give me the
12  definition of unfounded, exonerated, and not
13  sustained?
14    A.   Unfounded means that the alleged conduct did
15  not occur.  Exonerated means that the alleged
16  conduct did happen, but the officer's actions were
17  justified, legal, and proper.  And what was the
18  third one, not sustained?
19    Q.   Yeah.
20    A.   Not sustained is that there's insufficient
21  proof to either prove or disprove the allegation.
22    Q.   Thank you.
23       What is your general involvement with
24  discipline with officers?
25    A.   We do the investigation, we'll bring the

Page 35

1  findings to the chief law enforcement executive and
2  the director, and then they make a determination on
3  discipline, based on what happened and the officer's
4  history.  So I present the facts to them or one of
5  the other investigators do, and then they make a
6  determination as to what type of discipline is to be
7  imposed.
8    Q.   Do you give like a recommendation or a
9  kind of analysis of what rules, regs, or laws might
10  be involved in that regard?
11    A.   Yeah.  Any rules, regulations, anything that
12  would have been violated, we inform them as such.
13    Q.   Is there like a recommendation report
14  or do you --
15    A.   No.  Just a recommendation if the complaints
16  are sustained that discipline should be imposed in
17  some way.
18    Q.   Is there typically a memo to the
19  chief -- what do you call him?  CLEO?
20    A.   Yeah, the CLEO, yeah, he's given the report,
21  the file, if he requests it, that's up for review.
22    Q.   The report with all the relevant
23  reports and stuff, but is there also like a memo
24  from you or Velez or Kuzma about each -- in each
25  case?

Page 36

1    A.   A memo regarding what?
2    Q.   The facts in the case.
3    A.   No, that's the purpose of the report.
4    Q.   So it's -- I'm sorry.
5    A.   It's a report.
6    Q.   So would every 500 report have --
7  every 500 complaint have such a report?
8    A.   Some are handled informally through the
9  radio patrol office, sometimes people come in and
10  they would just fill out the preliminary IA
11  investigation report, and then sometimes they're
12  able to complete the investigation or handle it in
13  some way.  And they would write their findings on
14  that report and send it upstairs for index and
15  filing.
16    Q.   And so if the matter is handled
17  informally would be lesser matters?
18    A.   Yeah, minor rule violations, some demeanor
19  complaints, lower level misconduct.
20    Q.   How about with major discipline,
21  what's your involvement with major discipline?
22    A.   As far as recommendations or investigations?
23    Q.   Well, how -- just -- if you can just
24  tell me your whole -- serious matter that results in
25  major discipline, what would your typical

Pages 33 to 36

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 37

1    involvement be with that matter?
2    A.    If something is a serious rule violation or
3    something that's egregious, then our office would
4    handle the investigation, and it would be handled
5    the same way with the discipline, we would provide
6    the facts of the case to the chief law enforcement
7    officer and the director's office and they would
8    make a determination as to what type of discipline
9    would be imposed.
10        Q.    Have you been involved in any cases
11   that go to hearings?
12   A.    As an investigator?
13        Q.    As a -- as a witness.
14   A.    Have I been a witness? I don't think so.
15   Oh, have I?  No, not like you're talking -- what
16   type of hearing are you talking about?
17        Q.    Major disciplinary hearing.
18   A.    Oh, you're talking like administrative law,
19   that kind of stuff?
20        Q.    Well, before you go to administrative
21   law, there's a hearing that --
22   A.    Oh, like an in-house hearing, yes.
23        Q.    With a BA or he's designated as the
24   hearing officer?
25   A.    Yes.

Page 38

1        Q.    How many times have you been a
2    witness?
3    A.    Once or twice.
4        Q.    That's a witness once or twice out of
5    the departmental?
6    A.    Yes.
7        Q.    How about at OAL level?
8    A.    Never.
9        Q.    Is there -- do you know about Velez,
10   if he's testified much?
11   A.    I don't believe he has.
12        Q.    How about Kuzma?
13   A.    Not to my knowledge.
14        Q.    So is it fair to that if somebody is
15   going to testify, are you usually the person who
16   gets the --
17   A.    Usually it's the person who conducts the
18   investigation.
19        Q.    How many -- how are files split up at
20   the office?  Are they split up between the three of
21   you or --
22   A.    Which type of files?
23        Q.    Well, all types of files.  So you have
24   500s, you have the 00s.  What other files are there?
25   A.    There are personnel files, there are medical

Page 39

1    files.
2        Q.    But those aren't cases?
3    A.    Oh, you're talking about cases?
4        Q.    Yes.
5    A.    They're, you know, separated, you know,
6    they're grouped together year by year, you know, in
7    different filing cabinets we have in our office.
8        Q.    For handling, like is it -- are they
9    assigned -- does a case get assigned to a
10   particular -- either -- there's three of you in the
11   IA, right?
12   A.    Yes.
13        Q.    So do you split up the cases
14   between -- among the three of you?
15   A.    Yes.
16        Q.    And is -- do like 500s go to you and
17   00s goes to Velez or is there any rhyme or reason
18   or --
19   A.    No.  That they get assigned based on the
20   caseload, you know, so it's whatever is most
21   appropriate based on how much work somebody has
22   going on.
23        Q.    And what's your average caseload,
24   would you say?
25   A.    Well, for investigative, it varies.

Page 40

1        Q.    What does it vary between?
2    A.    From nothing at all to several cases.
3        Q.    Several being three or four?
4    A.    I couldn't put a hard number on it.
5        Q.    What's the most cases you've ever
6    handled at a single time?
7    A.    Right now I've got a couple.  Four to five
8    maybe.
9        Q.    Do you think you need more personnel
10   in IA or are you adequately staffed?
11   A.    No, we are adequately staffed.
12        Q.    I am showing you what has been marked
13   as Exhibit 5 -- H-5.
14   A.    Okay.
15        Q.    So did you create those reports, as
16   well?
17   A.    Yes.
18        Q.    Okay.  And what's difference between
19   H-5 and H-3?
20   A.    The years are different, I believe.
21        Q.    This says it's 2014 through --
22   A.    Yeah, there's 2017.  This is all differential
23   treatment.  And that's -- there's a mix here.  Yeah,
24   differential treatment and you've got false arrest
25   in these.

Pages 37 to 40

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 41

1    Q.    Can I see that?  Thanks.
2          Is this just a different form from a
3    report from the same database?
4    A.    Yes, they all come from the same index
5    sheets.  Why they're presented this way, I don't
6    remember compiling them in this matter.  When I
7    prepared them, I don't believe they were in this
8    order.  This looks like a different order than even
9    when I prepared them.
10        Q.    Yeah.  Because I don't quite
11   understand -- so these are not like the order of a
12   specific report or is it the order of a specific
13   report?
14   A.    Well, this top sheet here would be -- this is
15   all the differential treatments from 2019.
16        Q.    That's just one then?
17   A.    Yeah, just one in that year.  And this is all
18   for 2018, differential treatment.  Differential
19   treatment, bias profiling, 2017.  And you've got
20   '16, '15, and '15 again and '14.
21        Q.    What's the difference between bias
22   profiling and differential treatment?
23   A.    They are essentially the same thing.  It's
24   whoever did the index that year, that's how they
25   decided to label it.

Page 42

1    Q.    If you can help me read this left-hand
2    column, it says, "Case number," that's obvious
3    enough, date obvious.  What's the investigation
4    number that's --
5    A.    Investigator number.
6         Q.    Investigator number, okay.  That's the
7    badge number of the person?
8    A.    Correct.
9         Q.    Who is 505?
10   A.    That's me.
11        Q.    Okay.  Then IS is what?
12   A.    Infoshare.
13        Q.    What's an Infoshare?
14   A.    That's the number that's assigned by
15   Infoshare through the county prosecutor's office.
16   So that's the prosecutor's office, that's their
17   investigation number.
18        Q.    I see.  And what's PH?
19   A.    I'm not sure what that means.
20        Q.    And Y, yes?
21   A.    Yes, I suppose.
22        Q.    You don't know what it means.
23   Prosecutor hold?
24   A.    Yeah, I didn't prepare that report.  That's
25   before my time I think.  Those are 2000 and what,

Page 43

1    17.  Yeah, I didn't generate that report.
2         Q.    Well, wouldn't these have all been
3    generated for the response to the discovery demands?
4    A.    No, I had to go into the Excel spreadsheets
5    and I had to select the relevant cases and include
6    them.
7         Q.    So --
8    A.    I didn't change any of the data, I just
9    copied it.
10        Q.    So these reports aren't -- they're not
11   generated through some kind of an application,
12   they're manually created?
13   A.    Yes.
14        Q.    What's this 30th day, 45th day?
15   A.    That's the -- pertains to the time
16   constraints on internal affairs investigations.
17        Q.    So it comes up to make sure you don't
18   miss the day?
19   A.    Yeah, that's the intention.
20        Q.    What happens at the 30th day?
21   A.    I believe that in our policies it used to be
22   that the investigations had to be concluded by the
23   30th day, that was our agency's reference, but I
24   think since then that's changed.
25        Q.    The 45-day rule, what is that?  That's

Page 44

1    something else?
2    A.    Well, there's the 45-day rule as it pertains
3    to internal affairs investigations.  That says
4    generally any internal affairs investigation should
5    be completed within 45 days unless there's a cause
6    not to.  And then the other 45-day rule is that once
7    you have sufficient cause to charge, you have 45
8    days to do so.
9         Q.    Officer involved, that's --
10   A.    That's the target officer.
11        Q.    And remarks, that's the coding,
12   differential?
13   A.    Yeah.  That would be the primary or the --
14   the primary allegation.
15        Q.    Source, does that mean where it came
16   from?
17   A.    That's where the complaint originated.
18        Q.    What's CIT?
19   A.    Citizen.
20        Q.    Source -- anonymous as a source, so
21   that could be anonymous, either an officer or a
22   citizen?
23   A.    It could come from anywhere.  We might not
24   necessarily know anything about who made the
25   complaint.

Page 45

1    Q.    Do you remember what case you
2  testified in with major disciplinary case?
3    A.    In the department level, it was -- I think it
4  was Officer Graham.
5    Q.    Do you know what Graham was charged
6  with?
7    A.    Sick time violation, unauthorized secondary
8  employment, a couple other things.
9    Q.    Is there off-duty work in Woodbridge?
10   A.    Yes, there is.
11   Q.    And do you know how many officers are
12 involved in that?
13   A.    I'd say the majority of them. I couldn't put
14 a specific number on that.
15   Q.    Okay. And do you know who sets the
16 rates?
17   A.    The union contract I believe does.
18   Q.    And have you -- do you get many
19 complaints from private businesses about the
20 off-duty demands of officers?
21        MR. RUBENSTEIN: Objection as to
22 form. You can answer.
23   A.    Can you repeat the question?
24   Q.    Have you ever gotten any complaints
25 about -- from citizens about how the off-duty work

Page 46

1  is handled?
2    A.    From citizen, no, I don't remember any in
3  recent history. Agency -- no, not from citizens.
4    Q.    Who makes the complaints?
5    A.    On occasion there were agency complaints
6  where an officer might miss an off-duty assignment,
7  and they'll face some sort of discipline for that or
8  a counseling or something of the like.
9    Q.    But there's never complaints by
10 private industry that they feel they're being shaken
11 down by the police?
12        MR. RUBENSTEIN: Objection as to
13 form.
14   A.    No, not that I remember.
15   Q.    Have you heard about that in other
16 towns?
17        MR. RUBENSTEIN: If you know.
18   A.    I have seen the articles about Edison
19 that have been going on for several years now.
20   Q.    What do you know about the situation
21 in Edison?
22   A.    From what I've read, that officers were
23 working their regular job and also getting paid for
24 secondary employment, and it may have had something
25 to do with kickbacks. I don't -- I'm not sure of

Page 47

1  all the specifics of it. All I know is there's an
2  indictment that was dismissed and then they charged
3  him again and then there was another indictment. It
4  just came out the other day I guess.
5    Q.    Has it -- has off duty come up as a
6  political issue?
7    A.    Not to my knowledge.
8    Q.    Has there been any politically charged
9  issue relating to the Woodbridge Police Department
10 that you're aware of?
11        MR. RUBENSTEIN: Objection as to
12 form.
13   A.    Political charged in what regard?
14   Q.    In any way that --
15   A.    Well, there were some protests over the last
16 couple of years. I know Mr. Parks' name was brought
17 up at council meetings, and what was the other guy's
18 name from the QuickChek? Daniels-Porter. I know
19 those two -- oh, and there was a third one, there's
20 a burglar that was arrested after breaking into cars
21 at somebody's house, and I can't remember that guy's
22 name, but that was brought up in the newspapers over
23 the last couple of years, too. And I think that
24 might have been brought up at council meetings, as
25 well.

Page 48

1    Q.    Did you ever work as a detective?
2    A.    I did a 90-day rotation in the detective
3  bureau probably around 2012.
4    Q.    So you've been on the job for seven
5  years?
6    A.    Yeah, about -- about that.
7    Q.    So what was that -- why did you do a
8  90-day rotation at that time?
9    A.    I put in a request to do a 90-day rotation,
10 so they sent me up there, and I wasn't -- I didn't
11 really like the schedule at the time and I preferred
12 patrol, so I ended up going back downstairs.
13   Q.    Did you get any specific -- special
14 training while you were in the detective bureau for
15 those 90 days?
16   A.    Not that I remember.
17   Q.    Let's see. Did you make any
18 investigation -- strike that.
19        Let me show you what's been marked as
20 H-6. If you could go to what's Parks probable cause
21 affidavit?
22        MR. RUBENSTEIN: Which one?
23        MR. SEXTON: The last one, page --
24        MR. RUBENSTEIN: There's two
25 complaints in this stack.

Pages 45 to 48

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 49

1 THE WITNESS: Okay.
2 MR. RUBENSTEIN: Two different
3 complaints.
4 MR. SEXTON: Parks 21.
5 MR. RUBENSTEIN: He's going by the
6 Bates stamp number.
7 THE WITNESS: Okay.
8 BY MR. SEXTON:
9 Q. So the -- this is the affidavit of
10 probable cause of Lyszyk. You've seen this before,
11 right?
12 A. No, I don't believe I ever read the complaint
13 before.
14 Q. Were you involved in the investigation
15 in this matter in any way?
16 A. No.
17 Q. Who did the investigation?
18 A. Lieutenant Velez.
19 Q. And you're the commander of the unit,
20 though?
21 A. Yes.
22 Q. So you reviewed it after he did it?
23 A. I don't remember having read through the
24 entire complaint. I think this is the first time I
25 am looking at it.

Page 50

1 Q. This is the first time you're looking
2 at it? It's fair to say that this is the highest
3 profile complaint you have in the department; is
4 that fair to say?
5 MR. RUBENSTEIN: Objection as to
6 form. You can answer if you can.
7 A. I am. I'm not sure if it is or isn't.
8 Q. Has 60 Minutes done many other full
9 segments on any other cases involving the
10 department?
11 MR. RUBENSTEIN: Objection as to
12 form. You're mischaracterizing it, but you can
13 answer.
14 A. I don't know if it was on 60 Minutes.
15 Q. Yeah. It was 60 Minutes, it was on
16 CNN, it was MSNBC, it was on French TV, Swedish TV,
17 English TV, Chinese TV.
18 MR. RUBENSTEIN: Do you have a
19 question?
20 MR. SEXTON: Yes.
21 MR. RUBENSTEIN: Good. Ask the
22 question.
23 BY MR. SEXTON:
24 Q. The question is: Is there any
25 other -- tell me any other case that's in the

Page 51

1 department that has had near the public interest
2 that this case has had.
3 MR. RUBENSTEIN: Objection as to
4 form, but you can answer.
5 A. I don't know. I wouldn't be able to compare
6 any of them.
7 Q. But is there anyone that you think
8 might be near it? Because maybe I'm wrong, maybe 60
9 Minutes has done a lot of investigations into the
10 department.
11 MR. RUBENSTEIN: Objection --
12 A. It's --
13 MR. RUBENSTEIN: Hold on. Objection
14 as to form. You keep mischaracterizing what the
15 story is about. So I'd appreciate it if you would
16 not do that. You can answer if you can.
17 A. Yeah, I would have to speculate. I'm not
18 really sure.
19 Q. But as you sit here, can you think of
20 another high profile --
21 A. Is there a question, about the high profile
22 what?
23 Q. Another high profile case?
24 MR. RUBENSTEIN: Objection, but you
25 can answer.

Page 52

1 A. The most recent thing that I can think of is
2 perhaps the Daniels-Porter matter. But how they --
3 I don't know how you compare one to the other.
4 Q. And that was -- you mentioned that was
5 brought up at a council meeting, and Daniels-Porter
6 is a black guy, I guess?
7 A. Yes, he is a black man.
8 Q. And what was alleged in this case?
9 A. Excessive force.
10 Q. And what happened to him allegedly or
11 actually?
12 A. He alleged that the officers used excessive
13 force while arresting him, groped his genitals and,
14 you know, called him "boy," I think was the crux of
15 it.
16 Q. What media outlets had stories on it?
17 A. I saw it in the local newspapers, local news
18 on-line. I'm not sure if it was carried anywhere
19 else.
20 Q. So page 21, this is the first time you
21 are looking at this?
22 A. That I can remember, yes.
23 Q. The first sentence of this affidavit
24 says, "While investigating a shoplifting of $39
25 worth of merchandise from Hampton Inn, the hotel

Pages 49 to 52

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 53

1  manager, Richard Charneco, C-h-a-r-n-e-c-o, advised
2  us that Parks was the suspect."
3      That's a false statement, is it not?
4      MR. RUBENSTEIN:  Objection as to
5  form. Answer if you can.
6  A.   I don't know if it is or isn't.
7      Q.   Do you know how Parks came to be
8  associated with this case?
9  A.   Ultimately how he became involved with it, is
10 that what you're asking me?
11     Q.   Initially, intermediary, how did he
12 get -- how is he involved in this case?
13 A.   He was identified as the suspect in the
14 shoplifting and the assault.
15     Q.   How did that happen?
16 A.   Based on what I know, it was based on the
17 identification of Officer Lyszyk and the
18 identification through the facial recognition
19 through the ROIC, which sent it out to somebody
20 else.
21     Q.   Okay. So when was the facial
22 recognition done?
23 A.   The specific date, I'm not certain of that.
24     Q.   It was done after the incident, right?
25 A.   Correct.

Page 54

1      Q.   So -- and the hotel manager Richard
2  Charneco was not privy to the facial recognition
3  process, was he?
4      MR. RUBENSTEIN:  Objection as to
5  form, if you know.
6  A.   Not to my knowledge.
7      Q.   So how could the hotel manager Richard
8  Charneco have advised the Woodbridge Police that
9  Parks was the suspect?
10 A.   I'm not certain. Based on what's written
11 here, I'm not certain.
12     Q.   When Lyszyk was deposed, he conceded
13 that that was a false statement.
14     MR. RUBENSTEIN:  Objection as to
15 form. Go ahead.
16 A.   Okay.
17     Q.   So he was deposed in August.
18     Has your office done any
19 investigation -- is it a problem if somebody makes
20 a -- makes false statements of fact in an affidavit
21 of probable cause?
22 A.   I would say, yes.
23     Q.   Okay. What rules and regulations does
24 that -- such a thing implicate?
25 A.   Off the top of my head, truthfulness. I

Page 55

1  would have to look through our policies to get other
2  ones or be more specific.
3      Q.   I mean, an affidavit is a sworn
4  statement, correct, an affidavit?
5  A.   Yes, I believe it is.
6      Q.   It's actually criminal to make a false
7  statement in an affidavit, isn't it?
8      MR. RUBENSTEIN:  Objection to form.
9  A.   To purposely make a false statement, I
10 believe it is.  Purposely or knowingly.
11     Q.   Yet no one brought to this the -- your
12 attention even though the author of this report
13 admitted under oath in August that that was a false
14 statement in his affidavit and this is the first
15 you're hearing about it?
16     MR. RUBENSTEIN:  Objection as to
17 form. You can answer.
18 A.   Nobody told me about that.
19     Q.   Now you said that you understood that
20 Lyszyk made an identification of Parks based on his
21 eyewitness experience of the perpetrator, correct?
22 A.   Based on the information that I received.
23     Q.   Okay. Can you take some time and look
24 through this affidavit of probable cause and point
25 out where -- anywhere that Lyszyk make such a sworn

Page 56

1  statement?
2  A.   Can you repeat the question one more time? I
3  just want to make sure I got it.
4      Q.   Yes. Is there anywhere in this
5  affidavit of probable cause where Officer Lyszyk
6  states that he identified Parks?
7  A.   It doesn't say that in this document, no.
8      Q.   Are you aware of all the exonerating
9  evidence that Woodbridge Police Department ignored
10 or put to the side in this matter?
11     MR. RUBENSTEIN:  Objection as to
12 form. You can answer.
13 A.   I don't know that there is any.
14     Q.   You're not aware of any exonerating
15 evidence?
16 A.   As far as -- pertaining to the internal
17 affairs investigation or pertaining to the criminal
18 investigation?
19     Q.   Pertaining to the charges against my
20 client.
21     MR. RUBENSTEIN:  I am not sure that
22 answers his question. And I'm not sure what you're
23 asking him.
24 A.   Based on what I know, following Mr. Parks'
25 arrest and release, there was extrapolatory evidence

Pages 53 to 56

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 57

1    that came to the forefront that led to the charges
2    being dismissed and another person being charged.
3         Q.    What -- so that evidence which allowed
4    Mr. Parks to be released and to identify another
5    person as the actor, what is your knowledge of that
6    evidence?
7    A.    Well, I think he was released on his own
8    without the evidence. But there was a handprint I
9    believe and there was some DNA evidence that was
10   recovered.
11        Q.    By handprint you mean a fingerprint?
12   A.    I think it was a palm print or a handprint.
13        Q.    And how do you know about the print?
14   A.    There was followup to the investigation that
15   was in the reports.
16        Q.    Do you know why no lineups or photo --
17   what's it called?  Photo -- what's the --
18   A.    Photo array.
19        Q.    Photo array.  Why a photo array or a
20   lineup was not done?
21   A.    No, I don't know.
22        Q.    Do you know that -- that at the scene
23   at the Hamilton Inn the actor you've been describing
24   was over 6-foot?
25             MR. RUBENSTEIN:  Objection as to

Page 58

1    form.  You can answer.
2    A.    I'm not familiar with that.
3         Q.    You do know -- the print of the DNA
4    evidence, do you know the name of the person that
5    ultimately matched?
6    A.    I don't remember his name.
7         Q.    If I told you it was Barrington
8    Walker, does that refresh your recollection?
9    A.    That sounds familiar, yes.
10        Q.    Do you know he's over 6 feet tall?
11   A.    No.
12        Q.    You didn't know that?
13   A.    No, I'm not aware of that.
14        Q.    By the way, your understanding of the
15   prints, do you know when that exonerating evidence
16   was obtained by the department?
17             MR. RUBENSTEIN:  Objection as to form
18   and the use of the word exonerating.
19   A.    When the prints were collected?
20        Q.    Yeah.
21   A.    I guess they were collected the same day that
22   the incident occurred.
23        Q.    Do you know when the results came
24   back?
25   A.    No.

Page 59

1         Q.    If I told you they came back on -- do
2    you remember the day of the incident?
3    A.    No, not exactly.
4         Q.    If I told you the day of the incident
5    was January 26, does that refresh your recollection?
6    A.    I remember it was the beginning of the year.
7         Q.    And that the prints -- print match was
8    made on the 14th of February?
9    A.    Okay.
10        Q.    Were you aware of that time frame?
11   A.    No.  Well, I mean, I knew that they submitted
12   the prints at some point, I didn't know the exact
13   time when they came back.
14             MR. SEXTON:  Mark this Barrett 1, I
15   guess.
16             (Whereupon, photocopy of driver's
17   license, Tennessee, was received and marked as
18   Exhibit No. B-1 for identification.)
19   BY MR. SEXTON:
20        Q.    Do you recognize this?
21   A.    Well, this is a license that reports to be
22   Jamal Owens.  Other than that, no.
23        Q.    So you never saw this before?
24   A.    Well, I have seen it before, but, I mean,
25   it's -- it's been a while since I looked at any of

Page 60

1    these things.
2         Q.    So looking at -- if I tell you that
3    that's the fake ID that was used by the perpetrator
4    on the 26th at the Hampton Inn, does that refresh
5    your recollection?
6    A.    Yes.
7         Q.    And then furthermore, that all the
8    testimony was that this was the -- this was an
9    accurate photo of the -- even though it was a false
10   license, it was an accurate picture and the ID
11   matched up with the actor?
12             MR. RUBENSTEIN:  Okay, that's fine.
13   A.    Yeah, I believe so.
14        Q.    And you see it gives a height there of
15   6'2"?
16   A.    Yes.
17        Q.    And if I told you that the reports
18   were consistent with that and said that he was a
19   person of 6 feet or more?
20             MR. RUBENSTEIN:  Objection as to
21   form.  I'm sorry.
22   BY MR. SEXTON:
23        Q.    Do you remember that now?
24             MR. RUBENSTEIN:  Objection as to
25   form.

Pages 57 to 60

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 61

1     A.    It's a false document, it could have any
2  height on there.  I mean, just by its nature,
3  nothing is reliable on this.
4          Q.    So you don't remember the report
5  saying that the suspect was over 6 feet?
6     A.    I don't remember anything over -- I would
7  have to look at the CAD reports or anything else
8  that had the suspect description in it from the
9  scene.
10         Q.    Do you know how tall Nijeer Parks is?
11    A.    No, I don't remember.
12         Q.    If I told you he's 5'7"?
13         MR. RUBENSTEIN:  Objection as to
14  form.  If you know.
15    A.    Yeah, I don't know for certain.
16         Q.    Do you know that they retrieved a
17  sneaker from the scene that fell off the foot of the
18  actor?
19    A.    Yeah, I think I remember reading that.
20         Q.    Do you know that was like a size 12
21  and a half?
22    A.    I don't recall the size.
23         Q.    I am trying to find the report that
24  discusses his height.
25         Are you aware of any -- strike that.

Page 62

1          Are you aware of any other evidence
2  other than the facial recognition hit that tied
3  Nijeer Parks to the events at the Hampton Inn?
4     A.    I thought that there was an eyewitness or
5  Officer Lyszyk identified Mr. Parks based on the
6  comparison.
7          Q.    We saw that that was not in his
8  affidavit of probable cause, correct?
9     A.    That was not --
10         MR. RUBENSTEIN:  Objection as to
11  form, but you can answer.
12    A.    It wasn't in the affidavit, no.
13         Q.    Do you know the circumstances of how
14  Nijeer Parks ended up at the police department?
15    A.    I believe he came in on his own after finding
16  out that there was a warrant out for him.
17         Q.    Okay.  Would you agree that that's
18  pretty unusual for a suspect to come down to the
19  department?
20         MR. RUBENSTEIN:  Objection as to
21  form.  You can answer.
22    A.    People do it.  People come in and turn
23  themselves in on warrants.  Not very frequently, but
24  it happens.
25         Q.    Do you know further that Mr. Parks

Page 63

1  said he'd never been in Woodbridge before that time
2  he came down to the police department?
3     A.    If he said that?  I think I read that
4  somewhere.  I can't remember exactly what the source
5  was.  And I don't know if it's true or not.
6          Q.    So the report of Lee states that
7  Richard Charneco, the manager, stated that the
8  suspect was about 5'10" to 5'11".
9          MR. RUBENSTEIN:  Is there a question?
10  BY MR. SEXTON:
11         Q.    So would you agree that 5'7" is
12  significantly shorter than the height provided by
13  the manager?
14         MR. RUBENSTEIN:  Objection as to
15  form.  You can answer.
16    A.    It's different.  In my experience eyewitness
17  sometimes don't get information completely accurate.
18         MR. SEXTON:  Off the record.
19         (Whereupon, at 3:05 p.m., a recess was
20  taken.)
21         (Whereupon, at 3:10 p.m., the deposition
22  resumed.)
23  BY MR. SEXTON:
24         Q.    Did you generate that report?
25    A.    No, I don't think I -- did I?  I don't think

Page 64

1  so.
2          Q.    Is that a report generated from the
3  same database that you generated the other reports
4  that we previously discussed?
5     A.    It's not a database, it's just each officer
6  has its own Excel spreadsheet that lists whatever
7  allegations of misconduct.
8          Q.    So Officer Lyszyk has three sustained
9  charges of misconduct?
10    A.    Yeah.  Based on that.
11         Q.    Now, is it also possible to generate a
12  report with all the unsustained or not -- or
13  exonerated or -- what's the other category?
14    A.    Unfounded.
15         Q.    Unfounded.  Can a report be generated
16  to list all allegations made and what happened to
17  them?
18    A.    Yes.
19         Q.    I mean, because clearly it's -- nobody
20  has a hundred percent allegations -- sustained
21  allegations, right?
22         MR. RUBENSTEIN:  Objection as to
23  form.
24  BY MR. SEXTON:
25         Q.    Almost every police officer has false

Pages 61 to 64

Page 65

1  allegations or allegations that are found to be
2  unfounded?
3            MR. RUBENSTEIN:  Objection as to
4  form.
5  A.   Most officers have a variety of different
6  dispositions and complaints, yes.
7        Q.   So this snapshot is probably only part
8  of the picture?
9            MR. RUBENSTEIN:  Objection as to
10  form.  Go ahead.
11  A.   I believe it is, yes.
12        Q.   The letter of reprimand that he was
13  given back in 2014 was before your time, but if
14  you -- it involves arresting the wrong person for a
15  warrant?
16  A.   It may.  I don't know the specifics of the
17  case.
18        Q.   It's attached if you want to look at
19  it.
20  A.   Oh, okay.
21        Q.   I think it's the second -- the next
22  page, I think.
23  A.   Yes, that's what the letter says.
24        Q.   And that was sustained, correct?
25  A.   Correct.

Page 66

1        Q.   So that clearly would be relevant to
2  the allegations in this matter, would it not be?
3            MR. RUBENSTEIN:  Objection as to
4  form.
5  A.   The allegations in regards to what?
6        Q.   Arresting the wrong person?
7  A.   You're talking about the internal affairs
8  complaint?
9        Q.   No.  That --
10  A.   Oh, you're talking about --
11        Q.   -- Lyszyk, one of the main officers
12  involved in this case, this case being that Nijeer
13  Parks, who was wrongly arrested?
14  A.   According to the civil lawsuit.
15        Q.   Well, pertaining also to the IA
16  investigation, you investigated the wrongful arrest
17  of Nijeer Parks, right?
18  A.   Yeah, Lieutenant Velez did.
19        Q.   Your office that you command, right?
20  A.   Yes.
21        Q.   Okay.  And so Lyszyk being the -- one
22  of the main officers, the officer who submitted a
23  false affidavit of probable caused, had a previous
24  sustained discipline for arresting the wrong person?
25            MR. RUBENSTEIN:  Objection as to

Page 67

1  form.  You can answer.
2  BY MR. SEXTON:
3        Q.   Correct?
4  A.   He did, but that investigation would not be
5  part of the current investigation.
6        Q.   So an officer's past misconduct about
7  an identical nature of the instant alleged
8  misconduct has no relevance in an investigation?
9            MR. RUBENSTEIN:  Objection as to
10  form.
11  A.   It would be as far as discipline is concerned if
12  there's a sustained finding for probable --
13        Q.   For progressive discipline?
14  A.   For progressive discipline.
15        Q.   What about for credibility and for
16  evaluating what happened?  For instance, if a
17  person's got -- typically, you know, there will be a
18  cop whose name always comes up, right, you know, you
19  always see the same characters over and over, right,
20  and there's somebody who's always involved
21  demeanor, who's always alleged to use the "N" word
22  or this or that, and, you know, it's not sustained,
23  not sustained, not sustained, but then after ten of
24  them, one gets sustained.  Have you ever seen such
25  fact patterns?

Page 68

1            MR. RUBENSTEIN:  Objection as to
2  form.
3  A.   You can say the same thing about someone with
4  a criminal history.
5        Q.   Right.  Human conduct.  But here we're
6  dealing with cops who sometimes are on both sides of
7  the aisle here sometimes, right?
8            MR. RUBENSTEIN:  I'm sorry, I'm
9  completely confused by what you're asking.  Can you
10  calm down and maybe ask him something simple and
11  straightforward than this garbage that you're
12  pulling?  Ask him a question.  Because you've been
13  doing it a number of times today, and we're here to
14  try to get answers that are to your questions.  But
15  if you're going to go on a diatribe, it makes no
16  sense.  It's going to get confusing.
17            MR. SEXTON:  Well, I don't know, it's
18  so obvious that --
19            MR. RUBENSTEIN:  I don't think it's
20  obvious at all.
21  BY MR. SEXTON:
22        Q.   If a guy has a past sustained
23  aggressive force for beating up somebody, say, and
24  then he's accused of it again, are you telling me
25  that the first time he did it that's it's sustained

Pages 65 to 68

Page 69

1  it's irrelevant to your investigation?
2         MR. RUBENSTEIN: Objection as to
3  form.
4  A.   Each investigation is based on the facts
5  pertaining to that investigation, not prior
6  investigations.
7      Q.   So past bad acts have no relevance?
8         MR. RUBENSTEIN: Objection as to
9  form. He didn't say that.
10 A.   Not pertaining to the investigation itself.
11     Q.   Where did you learn that?
12 A.   Unless there's some sort of direct nexus
13 between the two, which I can't imagine being the
14 case in this regard.
15     Q.   So I'm curious, where did you learn
16 that principle?
17 A.   What did --
18     Q.   That you don't -- prior bad acts are
19 not relevant in investigations of current bad acts?
20 A.   I think it only makes sense, I think it's
21 only logical.
22     Q.   So how is it only logical?
23 A.   Because if somebody makes an allegation that
24 this happened on this date and these were the
25 circumstances, that's what you look into pertaining

Page 70

1  to that complaint.  You don't roll back the clock
2  five years or six years, I'm not really sure what it
3  is at this point, and somehow drawn an inference
4  from five, six years ago.  I don't understand how
5  that would make sense.
6      Q.   Do you know that the New Jersey Rules
7  of Evidence allow that in civil trials, for
8  instance, prior bad acts to be used?
9         MR. RUBENSTEIN: Objection as to
10 form.
11 BY MR. SEXTON:
12     Q.   Did you know that?
13 A.   No.
14     Q.   That's also used -- the Rules of
15 Evidence allow to become for character evidence
16 prior bad acts?
17        MR. RUBENSTEIN: Objection to form.
18 Are you asking him -- he's supposed to be an expert
19 on the Rules of Evidence.  I'm sure that he's not.
20 And I'm sure he's not supposed to be.  So can we --
21 please.
22 BY MR. SEXTON:
23     Q.   Do you know reputation can be used
24 also, if a person has a reputation for certain
25 conduct, that can be used?

Page 71

1         MR. RUBENSTEIN: Objection as to
2  form.
3  A.   I believe that to be true.  But as I said, I
4  don't know all the rules that you're speaking of.
5      Q.   And as an IA investigator, you would
6  never use a cop's reputation in trying to figure
7  out -- get to the bottom of allegations?
8  A.   The investigations are supposed to be
9  objective, not subjective.
10     Q.   So a reputation is never helpful?
11 A.   The facts are what make the case, the
12 evidence that's available.  The statements that
13 whatever complainants make, you know, the
14 participation that we get from the complainant, the
15 witnesses, and the involved offices, these are all
16 things that play into the investigation, not, you
17 know, what somebody's writing on Facebook on their
18 days off, you know.  Not, you know, how well, you
19 know -- you know, what people generally think of
20 this person.
21     Q.   Are you -- have you testified at a lot
22 of criminal matters?
23        MR. RUBENSTEIN: Objection as to
24 form.
25

Page 72

1  BY MR. SEXTON:
2      Q.   Or any?
3  A.   Mostly -- mostly DWI, at least one criminal
4  trial, suppression hearing.
5      Q.   So could you maybe be confounding the
6  standards in a criminal trial where the rules are
7  very, very strict about not bringing in other things
8  into the criminal trial?
9         MR. RUBENSTEIN: Objection as to
10 form.
11 A.   I've never been trained to look at past
12 investigations for an officer and bring them forward
13 into a current investigation or to consider their
14 character, unless their character is what is the
15 subject of the investigation where it would be a
16 demeanor complaint or something of that nature.
17     Q.   Some people have a reputation for
18 being liars, right, we all know them, right?  And
19 you must be -- there must be some members of the
20 department whom you don't trust?
21        MR. RUBENSTEIN: Objection as to
22 form.
23 BY MR. SEXTON:
24     Q.   Or you can't think of a one?
25 A.   Are there some people I trust more than

Pages 69 to 72

Page 73

1    others?  There's -- I don't know that there's any I
2    would not trust at all.
3         Q.    Fair enough.  Some you trust with
4    everything, you trust them with your -- and there's
5    other people you go like, "huh," take it with a
6    grain of salt?
7    A.    Perhaps.  Depending on the circumstances,
8    too.  You know, there are personal times you deal
9    with people and professionals in another realm.
10        Q.    In your investigations, do you get
11   uncooperative targets?
12   A.    Officers?
13        Q.    Yes.
14   A.    Not that I can remember.
15        Q.    I'll show you what has been marked as
16   H-7.  This is the request for facial recognition.
17   Do you remember ever seeing that?
18   A.    No, not specifically, no.
19        Q.    There's a paragraph up here that I
20   just read into the record before, the director, it
21   says after -- it says three times "not evidence"?
22   A.    Okay.
23        Q.    Not to be used as an investigative
24   lead only.  Then I think in all caps it says,
25   "investigative lead only," what does it say?

Page 74

1    A.    "Not probable cause to make an arrest."
2         Q.    Not probable cause to make an arrest,
3    okay.
4         In this case it looks like the
5    department did the opposite, they used facial
6    recognition technology as the sole basis for making
7    an arrest?
8         MR. RUBENSTEIN:  Objection as to
9    form.  That's not what the testimony has been.  You
10   can answer.
11   A.    No, I don't believe so.  Based on my
12   knowledge of the case, no.
13        Q.    What was the -- what was the main
14   evidence here?
15   A.    That -- that Officer Lyszyk was also part of
16   the probable cause establishing the identity of the
17   suspect.
18        Q.    But we went over that that's not in
19   the affidavit.
20   A.    But I can't change my recollection of what I
21   knew back then or at the time or what was known back
22   then.
23        Q.    There has been -- none of these
24   officers have been disciplined, right?
25   A.    No.

Page 75

1         Q.    No corrective has been sent out to the
2    department about the use of facial recognition
3    technology, correct?
4         MR. RUBENSTEIN:  Objection as to
5    form.
6    A.    So far as I know, it has not been employed
7    again, and I don't even know if it was ever
8    employed --
9         Q.    That's not the question.  Has any
10   instruction, general order or anything -- what's
11   the --
12   A.    PowerDMS.
13        Q.    PowerDMS saying this is to be used
14   only as an investigative lead?
15   A.    Not that I remember.
16        Q.    And what's the difference between an
17   investigative lead and evidence?
18   A.    I guess an investigative lead gives you a
19   starting point, gives you an idea --
20        Q.    Right.  It can be anything, right?
21   A.    -- of where to begin, yeah.
22        Q.    Hunch, tea leaf, but it's not -- you
23   seem to be rightfully concerned about proofs, and an
24   investigative lead doesn't ever go into court,
25   correct?

Page 76

1         MR. RUBENSTEIN:  Objection as to
2    form.
3    A.    I don't know if it does or doesn't.
4         Q.    I'm showing you H-10.  This is Parks
5    318.
6         Have you seen this before?
7    A.    Yes.
8         Q.    Did you review it before it went out?
9    A.    Yes, I read through it before it went out.
10        Q.    Do you have to -- is that standard
11   that you review any -- as the commander, that you
12   would review any report like this?
13   A.    Yeah, myself or Captain Kuzma.
14        Q.    It doesn't have any cc's.  Do you know
15   if this went to anyone else other than Captain
16   Kuzma?
17   A.    A copy would have been retained for the file.
18        Q.    Okay.  Would it go to the police
19   director?
20   A.    No.
21        Q.    The mayor?
22   A.    No.
23        Q.    The business administrator?  Nowhere
24   else?
25   A.    No.

Pages 73 to 76

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 77

1    Q.    It's marked confidential, is anyone
2    else allowed to see it?
3    A.    Only the three of us in the office and
4    Captain Kuzma have access to all the internal
5    affairs files and the office, the office is also
6    secure.
7    Q.    So you're saying that this is -- the
8    director is not even given access to this?
9    A.    I don't know if he saw it or if he didn't see
10   it.  But -- I mean, generally all our files are --
11   that's why when it becomes to the discipline, we
12   present the facts of the case, that way we try not
13   to cross that line, you know.  Because, yeah,
14   they're not allowed access to our office, they're
15   not allowed to be in there unless we are in there.
16   Q.    Who is "they"?
17   A.    The directors.
18   Q.    Why is that?
19   A.    They're civilian.
20   Q.    So the civilian person running the
21   department is not allowed in the office without you
22   being there?
23   A.    No.
24   Q.    And what do you base that -- where
25   does that come from?

Page 78

1    A.    From the attorney general guidelines I
2    believe.
3    Q.    Do you know what the rational for that
4    is?
5    A.    To maintain the integrity of the filing
6    system.  Only certain people are supposed to have
7    access to the files in the filing system.
8    Q.    Do you know -- can you site the AG
9    guideline for that?
10   A.    It would be in the internal affairs policies
11   and procedures.  I think the latest revision came
12   out the end of last year, perhaps, December 2021.
13   But the filing system preexisted those directors, so
14   it may have been based on an older one.  I don't
15   recall.
16   Q.    So the director is the one who
17   disciplines officers, right?
18   A.    Yes.
19   Q.    So how does he do that without getting
20   access to those reports and these files?
21        MR. RUBENSTEIN:  Objection as to
22   form.  As you can see, there was no punishment here
23   to be meted out, so why would he need to see it?
24   It's an improper question.
25        MR. SEXTON:  No, it's not improper.

Page 79

1        MR. RUBENSTEIN:  Sure it is.
2    A.    We present -- the chief -- the chief law
3    enforcement officer Captain Kuzma, he gets the
4    report, he reviews the reports, and then we
5    conference with the director's office, you know, the
6    director, deputy director, if appropriate, and then
7    based on the circumstances, the nature of the
8    misconduct, and the officer's history pertaining to
9    that type of misconduct or other misconduct, that's
10   how they decide what type of discipline is metered
11   out.
12   Q.    What -- do you have lawyers who
13   present the case at the departmental hearings?
14   A.    Our labor attorneys, yes, I believe they
15   assist us with that.
16   Q.    Who are those?
17   A.    Currently it's Coughlin's office, I can't
18   remember -- Lou Rainone, I think he's the -- in
19   charge of that.
20   Q.    Lou?
21   A.    Rainone, it's Rainone is the way it's
22   spelled, R-a-i-n-o-n-e, but I can't remember what
23   the name of their firm is.
24   Q.    Do they get access to these reports?
25   A.    Yeah.  In order for them to present their

Page 80

1    case, yeah, they need to have access to these
2    reports.  It becomes part of the discovery for the
3    departmental hearing.
4    Q.    And to your attorney's point, it's
5    when it's sustained.
6        Why did this -- this report says on
7    December 28th Hubner got the summons and complaint.
8    And this is dated December -- a year later -- a year
9    and a day later.  Why did it take so long for this
10   to get written?
11   A.    I'm not certain of that.  Other than
12   sometimes when there's a lawsuit involved, they tell
13   us to put the brakes on things to see what's going
14   to happen next.  One of the things in the internal
15   policies and procedures they say if there's a
16   lawsuit involved, generally to confer with counsel
17   to see what appropriate steps would be taken in
18   regards to the internal affairs complaint.
19   Q.    So those -- the 35-day rule or the
20   45-day rule, they're kind of preempted by litigation
21   considerations?
22   A.    There are allowances for the investigative
23   45-day rule where it's permissible to go past 45
24   days if there's sufficient reason to do so.  And I
25   think it's pretty -- spelled out pretty clearly in

Pages 77 to 80

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 81

1  the internal affairs policies and procedures that
2  the tort claim is generally one of them.
3      Q.   Under the findings conclusions, it
4  states that Parks never made a formal internal
5  affairs complaint?
6  A.   No.
7      Q.   So am I reading this correctly that
8  from that fact Lieutenant Velez made an adverse
9  inference?
10      MR. RUBENSTEIN: Objection as to
11  form. If you know what an adverse inference is.
12  A.   Could you explain that to me?
13      Q.   Sure. Sort of like he said, he
14  didn't -- he never made a complaint, and when we
15  contacted him, he never -- he never responded. So,
16  therefore, that makes me think there's nothing here?
17  A.   No, the --
18      Q.   Then why is that related under
19  findings conclusion?
20  A.   Because we do our best to reach out to any
21  complainants or victims to get their input so that
22  we can know how to best proceed with the
23  investigation. Absent that, it makes it much more
24  difficult for us to do our jobs.
25      Q.   Well, the next paragraph immediately

Page 82

1  following that he says, "I find that Detective Tapia
2  acted in good faith." He doesn't mention Lyszyk.
3  Why is Tapia the only -- I guess Tapia was the only
4  target?
5  A.   Yes, I believe he was.
6      Q.   And how did you decide that Tapia was
7  the only target?
8  A.   He was the primary investigator and he was
9  the one who submitted the evidence that was relative
10  to the matter.
11      Q.   Well, why wasn't Lyszyk also a target?
12  A.   I didn't know that it was appropriate at the
13  time.
14      Q.   As you sit here today, would you
15  concede that Lyszyk should have been a target of the
16  investigation, as well?
17      MR. RUBENSTEIN: Objection as to
18  form.
19  A.   I don't -- I don't know that. Again, knowing
20  what I know now, I know some different things that I
21  may have to look into going forward. But at the
22  time I don't think that it was appropriate.
23      Q.   So are you going to open an
24  investigation on Lyszyk now?
25      THE WITNESS: Can I ask you a

Page 83

1  question? Is this improper? I don't know if we
2  should put this on the record or not pertaining to
3  you stated that he says he admitted that he made a
4  false statement in that affidavit?
5      MR. SEXTON: Yes.
6      THE WITNESS: Right. Would I be able
7  to get a transcript of that affidavit? Transcript
8  of the statement that he made?
9      MR. SEXTON: Yes, your lawyer has
10  that.
11      THE WITNESS: Because I would like to
12  see the context of that conversation and
13  determine -- you know, you implied that he, you
14  know, made a false report or false -- you know, a
15  false swearing or whatever the case may be. And
16  like I said, if it was intentional in some way, then
17  that's definitely something that we are going to
18  have to address going forward. But I wasn't aware
19  of that until earlier today now.
20  BY MR. SEXTON:
21      Q.   I think Velez makes a funny statement
22  here, he goes, "I reviewed the photographs of
23  Mr. Parks in the high profile comparison and they
24  are similar and could be mistaken for the same
25  person." So the potential for them being mistaken

Page 84

1  is a basis for saying there's no claim here?
2      MR. RUBENSTEIN: Objection. I'm
3  sorry, no claim meaning -- he's here to testify
4  about internal affairs, not the civil case. You're
5  asking no claim, I don't understand what that means.
6  BY MR. SEXTON:
7      Q.   Well, he says that, yeah, you can make
8  a mistake, and if you base an arrest on an affidavit
9  of probable cause on a mistake, that he says he
10  could make a mistake, he doesn't say it could not be
11  mistaken, they're the same person. That they are
12  not the same person. He says, you know, this is --
13      MR. RUBENSTEIN: I'm sorry, if you
14  understand what he's saying, you can answer it, but
15  I'll object to the form because it's convoluted.
16  BY MR. SEXTON:
17      Q.   Yeah, it is. And could be mistaken as
18  the same person. Does that sound very strong?
19  A.   It doesn't sound strong, but mistakes do
20  happen, mistakes are made. I don't think there was
21  any malice made. And on top of that, Lieutenant
22  Velez is also looking backwards at this knowing more
23  than they knew then at the time.
24      Q.   Oh, really, because you know what's --
25  where in here does it talk about the exonerating

Pages 81 to 84

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 85

1    evidence?
2    A.    Well, the complaint was is that he was
3    improperly arrested.
4         Q.    Where does it mention the
5    fingerprint -- the print that goes to Barrington
6    Walker?
7    A.    That all came following the arrest.  The
8    complaint was that he was improperly arrested.  So
9    the investigation was to see whether or not the
10   officers acted improperly or lack some sort of
11   justification for their actions.
12        Q.    But isn't the point --
13   A.    Not the -- not to convict or exonerate, you
14   know, whoever may have been responsible ultimately.
15        Q.    Wasn't it the point that they
16   shouldn't have made any arrest until they got the
17   prints matched?
18        MR. RUBENSTEIN:  Objection to the
19   form.
20   A.    As far as the submission of the fingerprints,
21   I don't know enough specifics about that.
22        Q.    This was H-9.  Do you recognize that?
23   A.    I'm not really sure.  This is an NCIC
24   response?
25        Q.    Yeah.  Do you see the date?

Page 86

1    A.    2/14?
2         Q.    Yeah, 2019?
3    A.    Yes.
4         Q.    So three weeks after the incident?
5         MR. RUBENSTEIN:  Objection.
6    BY MR. SEXTON:
7         Q.    Fourteen days after the wrongful
8    accusatory instruments were issued?
9         MR. RUBENSTEIN:  Objection as to
10   form.
11   BY MR. SEXTON:
12        Q.    And what does it show?
13   A.    It shows here, result of your inquiry it
14   says, "Walker Barrington," and I guess -- okay, I
15   guess this is a fingerprint hit?
16        Q.    Yeah.
17   A.    Matching Mr. Walker's fingerprints?
18        Q.    Yes.  And that is not mentioned in
19   Velez' report, is it?
20   A.    No, because it didn't preexist the probable
21   cause for the arrest.
22        Q.    Yeah, but the probable cause is based
23   on a facial recognition hit, which the form says,
24   "Not to be used as a basis for probable cause."
25        MR. RUBENSTEIN:  Objection as to

Page 87

1    form.  That is not what he's testified to and you've
2    repeatedly said the same bull crap.  Now would you
3    please make sure that you ask questions that are
4    consistent with what his testimony and other's
5    testimony has been.  You are deliberately misleading
6    the witness.  And that is improper.
7         He has said repeatedly that if the
8    facial recognition software and the outcome of
9    that -- and the picking out of the person by Lyszyk.
10   And you keep saying it's exclusively based on facial
11   recognition, which is complete fabrication.
12        MR. SEXTON:  Because he now knows
13   having looked at the affidavit --
14        MR. RUBENSTEIN:  He now knows
15   nothing --
16   BY MR. SEXTON:
17        Q.    Now having looked at the affidavit of
18   probable cause for the first time, now knows that
19   there's no such statement in the affidavit of
20   probable cause.  So based on that, and presumably
21   Velez read the affidavit of probable cause, would
22   you concede that Velez should have included the
23   information about the fingerprint hit in his report?
24   A.    No.
25        Q.    This report was done in 2021 -- the

Page 88

1    end of 2020?
2    A.    End of 2020, yes.
3         Q.    You know, too, that -- because you
4    testified that the DNA evidence subsequently
5    confirmed also hit with Barrington Walker?
6    A.    Yeah.  I believe that came back a long time
7    after that.
8         Q.    Right.  But that had the effective --
9    conclusively tying Barrington Walker to the events
10   on January 26, correct?
11   A.    Yeah, I believe that's what led them to
12   charge him.
13        Q.    And pretty conclusively exonerated
14   fully and finally Nijeer Parks?
15   A.    I believe the -- that he was -- all his
16   charges were dismissed long before Mr. Walker was
17   charged, if I'm remembering correctly.
18        Q.    Right.  But sometimes the prosecutor
19   will dismiss something and it's just because he
20   doesn't have his case together, not because the guy
21   is innocent as driven snow or something, right?
22        MR. RUBENSTEIN:  Objection as to
23   form.  If you can answer.
24   A.    I don't know what the prosecutor's motivation
25   was.

Pages 85 to 88

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 89

```
1         Q.     But in this case, given the DNA and
2    the fingerprints, we know that Nijeer Parks was as
3    innocent as the driven snow for the charges that
4    your department brought against him on January 1,
5    2019, correct?
6              (Reporter asked for clarification.)
7         Q.     Because of the DNA and the
8    fingerprint, we know now that Nijeer Parks is as
9    pure as the driven snow and innocent of the charges
10   that your department wrongfully brought against him
11   on January 1st of 2019, correct?
12             MR. RUBENSTEIN:  Objection as to
13   form.  You can answer.
14   A.     Based on knowing what we knew once we got all
15   that other information back, that he was mistakenly
16   arrested -- or mistakenly charged, but I still don't
17   see that the officers acted improperly or with any
18   sort of malice or any sort of misconduct.  They made
19   a mistake that ultimately was rectified.  And it's
20   unfortunate that he was arrested, but --
21        Q.     He spent time, a couple weeks in jail,
22   spent until November fighting the charges on the eve
23   of trial, he was threatened with 25 years in jail.
24   That's unfortunate.
25             What about -- oh, malice.  Where do
```

Page 90

```
1    you -- maybe I'm confused, but is malice an
2    element -- a necessary element for you to find a --
3    to sustain a charge?
4    A.     No.  But if an officer acts in bad faith or
5    with some sort of evil in their heart, that's
6    definitely -- that would definitely be misconduct.
7         Q.     In this case this involved an assault
8    on an officer, I understand how that's upsetting,
9    right?
10   A.     It could be to some, yes.
11        Q.     I mean, any decent person would be
12   upset that the idea that a law enforcement officer
13   would be assaulted.  And it was a real assault, the
14   actor tried to run over Officer Lee, right?
15   A.     Yeah.  Based on what I read, yes.
16        Q.     So it's clear from communications that
17   people were, I guess the term would be, ginned up to
18   find the perpetrator?
19             MR. RUBENSTEIN:  Objection as to
20   form.
21   A.     I don't know that I would characterize it
22   that way.
23        Q.     Do you know that the -- there's emails
24   back and forth between Tapia and I think it's Day up
25   at the ROIC, and he's thrilled, "How did you find
```

Page 91

```
1    him?"  And then Day reports that -- that he altered
2    the pixels on the photograph before finding --
3    having a high profile hit.
4              MR. RUBENSTEIN:  Objection as to
5    form.
6    BY MR. SEXTON:
7         Q.     Are you aware of that?
8    A.     No.  And I just want to be clear, that was
9    the officer at the ROIC, not officer -- or Detective
10   Tapia.
11        Q.     Right.  But he told Tapia that he
12   altered the pixels on the photo in order to get a
13   high profile hit?
14   A.     I don't know if that's --
15             MR. RUBENSTEIN:  Objection as to
16   form.
17   A.     Yeah, I don't know if that's -- what kind of
18   technique or what specifically that means or if it's
19   permissible or not so --
20        Q.     You know, on the very day they got the
21   hit, I believe they all drove out to Paterson to try
22   to arrest Nijeer.  Does that also suggest a strong
23   motivation to arrest this actor -- bad actor because
24   of the attempted assault on Officer Lee?
25   A.     Not necessarily.  I've had shoplifters where
```

Page 92

```
1    I have driven to Elizabeth the same day I figured
2    out who they were to go lock up a shoplifter.
3         Q.     But Elizabeth is next door, Paterson
4    is an hour plus away?
5              MR. RUBENSTEIN:  Objection to form.
6    A.     I don't think it's an hour plus away.  Is it
7    that far?  I go there not very often, but --
8         Q.     There's no reason to go there.
9    A.     New Jersey is a fairly small state anyway.
10        Q.     Unless you're going to Cape May.
11             I don't think I asked you to look at
12   the sneaker, did I?
13   A.     No.
14        Q.     It's right there.  And you can see it
15   looks like it's size 12 and a half?
16   A.     Maybe a little bit bigger than 12.  I'm
17   guessing that's in inches.
18        Q.     And it's your evidence room so -- so
19   Nijeer Parks was a size 9.
20             MR. RUBENSTEIN:  Objection as to
21   form.
22   BY MR. SEXTON:
23        Q.     You'd agree that that's exonerating
24   evidence?
25             MR. RUBENSTEIN:  Objection as to
```

Pages 89 to 92

Page 93

```
 1   form.
 2   BY MR. SEXTON:
 3       Q.    Cinderella's slipper?
 4             MR. RUBENSTEIN:  Objection as to
 5   form.
 6   A.    No, the stepsister's feet were too big, not
 7   too small.
 8       Q.    Well, adverse Cinderella's slipper?
 9   A.    Well, I've seen -- personally I've seen
10   people wear shoes that were too big for them and
11   sometimes --
12       Q.    Three or four sizes too big?  Three
13   sizes too big?
14   A.    Yeah, I've seen some strange things.  And
15   sometimes if they're not almost falling off their
16   feet, sometimes people wear multiple layers of socks
17   and things like that.
18       Q.    So you -- you believe the picture on
19   the license, but not the height in the license,
20   there's a sneaker and you assume it's -- doesn't --
21   it's not the right size.  And these are all things
22   in possession immediately?
23             MR. RUBENSTEIN:  Objection as to
24   form.  You can answer.
25   A.    Again, this was collected at the scene and
```

Page 94

```
 1   they did not have Mr. Parks' feet at the scene to
 2   compare it to.
 3       Q.    But that had it when they arrested
 4   him?  Well, before they arrested him, when they took
 5   him in -- I guess they took him into -- initially
 6   what was that, when they put him in handcuffs in the
 7   lobby and brought him in for questioning?  Would
 8   that be -- he's arrested then, right, but it's still
 9   an investigatory stage?
10   A.    Yeah.  They can still continue to compile
11   evidence relating to the offense, you know,
12   exculpatory or otherwise.
13       But again, that comparison was only able to
14   be made after the complaint was already issued.
15       Q.    I think that's all I have.
16             MS. LEMPKA:  I have nothing,
17   Lieutenant.
18             (Whereupon, at 3:49 p.m., the
19   deposition was concluded.)
20
21
22
23
24
25
```

Page 95

```
 1            C E R T I F I C A T E
 2
 3       I, LAURA BURNS, a Certified Court
 4   Reporter and Notary Public of the State of New
 5   Jersey, certify that the foregoing is a true and
 6   accurate transcript of the stenographic notes of the
 7   deposition of said witness who was first duly sworn
 8   by me, on the date and place hereinbefore set forth.
 9       I FURTHER CERTIFY that I am neither
10   attorney, nor counsel for, nor related to or
11   employed by, any of the parties to the action in
12   which this deposition was taken, and further that I
13   am not a relative or employee of any attorney or
14   counsel in this case, nor am I financially
15   interested in this case.
16
     LAURA BURNS, C.C.R.
17   LICENSE NO. 30X100218200
18
19
20
21
22
23
24
25
```

Pages 93 to 95

# EXHIBIT "H"

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 21-4021 (JXN)(LDW)

NIJEER PARKS,
Plaintiff,

                              Deposition of:
                              ROBERT HUBNER
        vs.                   October 18, 2022

JOHN E. MCCORMAC, MAYOR OF WOODBRIDGE,
in his personal and official capacity,
ROBERT HUBNER, DIRECTOR OF THE WOODBRIDGE
POLICE, in his personal and official
capacity, CITY OF WOODBRIDGE POLICE
OFFICERS, ANDREW LYSZK and WOODBRIDGE
POLICE SGT. JOSEPH LICCIARDI, WOODBRIDGE
POLICE OFFICERS, JOHN AND JANE DOES 1-20,
being as yet unknown actors, MIDDLESEX
DEPARTMENT OF CORRECTIONS, JOHN AND JANE
DOES 1-20, being unknown actors, MIDDLESEX
COUNTY PROSECUTOR, ACTING PROSECUTOR
CHRISTOPHER KUBERIET, in his personal
and official capacity, and ASSISTANT
MIDDLESEX COUNTY PROSECUTOR, PETER NATASI,
and IDEMIA, INC.'S being the maker of the
facial recognition software and ABC
CORPORATION, being an as yet unknown seller
or servicer of the facial recognition
programs,
Defendants.
- - - - - - - - - - - - - - - - - -

HUDSON COURT REPORTING & VIDEO    (732) 906-2078

---

Page 2

1    T R A N S C R I P T of the stenographic
2    notes of the proceedings in the above-entitled
3    matter as taken by and before LAURA A. BURNS, a
4    Certified Court Reporter of the State of New Jersey,
5    held at the office of JAMES P. NOLAN AND ASSOCIATES,
6    61 Green Street, Woodbridge, New Jersey, on Tuesday,
7    October 18, 2022, commencing at approximately 10:07
8    in the forenoon, pursuant to notice.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1    A P P E A R A N C E S:
2
3    DANIEL W. SEXTON, ESQ., LLC
4    Attorneys for Plaintiff
5    229 New Center Road
6    Hillsborough, New Jersey  08844
7    danielsextonesq@gmail.com
8    BY:  DANIEL W. SEXTON, ESQ.
9
10   DVORAK & ASSOCIATES
11   Attorneys for Defendant, Middlesex Department
12   of Corrections
13   467 Middlesex Avenue
14   Metuchen, New Jersey  08840
15   glempka@dvoraklegal.com
16   BY:  GRACE LEMPKA, ESQ.
17
18   LAW OFFICE OF JAMES P. NOLAN & ASSOCIATES
19   Attorneys for Defendant, Township of Woodbridge
20   61 Green Street
21   Woodbridge, New Jersey 07095
22   frubenstein@jpnlaw.us
23   BY:  FREDERICK L. RUBENSTEIN, ESQ.
          GARRY CLEMENTE, ESQ.
24
25

---

Page 4

1    A P P E A R A N C E S:
2
3    STATE OF NEW JERSEY
4    Attorneys for Defendants, Middlesex County
5    Prosecutor, Acting Prosecutor Christopher
6    Kuberiet and Peter Natasi
7    25 Market Street
8    Trenton, New Jersey  08625
9    peter.sosinski@law.njoag.gov
10   BY:  PETER SOSINSKI, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Pages 1 to 4

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 5

```
 1               I N D E X
 2
    WITNESS     DIRECT CROSS REDIRECT RECROSS
 3
    ROBERT HUBNER
 4
    By: Mr. Sexton   6      86,90
 5
    By: Mr. Rubinstein   82        89
 6
 7            E X H I B I T S
 8  NUMBER      DESCRIPTION           PAGE
 9  H-1 Document                        42
    H-2 Newbrunswicktoday.com., Another Lawsuit  47
10      Against Woodbridge Police Cost Taxpayers
        125K article
11  H-3 Woodbridge Police Department Internal   52
        Affairs Bureau, 2014 Internal Affairs
12      Investigation 500 Index Sheet, was
    H-4 Document for Andrew Lyszyk            54
13  H-5 Woodbridge Police Department Internal   57
        Affairs Bureau 2019 Internal Affairs
14      Investigation Index Sheet
    H-6 Complaint Warrant                    59
15  H-7 Facial Recognition Initiative Request   62
        For Facial Recognition/Photo Array
16  H-8 Photocopy of photographs           68
    H-9 CJIS 2000 Response                  71
17  H-10 Woodbridge Police Department Professional 76
        Standards Division, Internal Affairs Bureau
18      report
19
20        DISCOVERY PRODUCTION REQUESTS
21        PAGE   DESCRIPTION
22
23
24
25
```

Page 6

```
 1  ROBERT  HUBNER, 61 Green Street, Woodbridge, New
 2  Jersey is duly sworn and testifies under oath as
 3  follows:
 4  DIRECT EXAMINATION BY MR. SEXTON:
 5      Q.    Good morning, Director Hubner, my name
 6  is Dan Sexton, I represent the plaintiff in this
 7  matter.  Just a couple of preliminaries.  Have you
 8  ever been deposed before?
 9  A.    I have.
10      Q.    Approximately how many times?
11  A.    Probably two or three.
12      Q.    And was that in -- related to your
13  position in the Woodbridge Police Department or in
14  your personal life?
15  A.    Actually, I was on duty, so it had to do with
16  the police department.  It was a motor vehicle
17  accident, so.
18      Q.    Were you a third-party witness for a
19  motor vehicle accident?
20  A.    Yes, yes.
21      Q.    And when was that?
22  A.    Oh, geez.  A lot of years ago.  Probably
23  2008, 2009, that's the last one.
24      Q.    And did you also testify at trial in
25  that or just a deposition?
```

Page 7

```
 1  A.    No, just deposition.
 2      Q.    Any other --
 3  A.    It was all motor vehicle related in one
 4  capacity or the other, but never as a civilian.
 5      Q.    So I'll just give you some refreshers
 6  for ground rules.  So as you can see, a record is
 7  being made of this, so it's important that we make
 8  our -- we communicate verbally since hand gestures
 9  and nods can't be taken down by the reporter.
10          It's also important that we don't
11  speak over each other.  And if you don't understand
12  one of my questions, I'm happy to try to rephrase
13  it.
14          From time to time your lawyer may
15  interject with objections, those are normally for
16  the record.  If there comes a point where he
17  instructs you not to answer, then we'll hash it out.
18          Do you have any questions for me
19  before we begin?
20  A.    I don't think.
21      Q.    So what is your position with
22  Woodbridge?
23  A.    I am the police director.
24      Q.    And what are your duties as police
25  director?
```

Page 8

```
 1  A.    I oversee the department administratively, so
 2  I'm responsible for budget, overseeing bills, make
 3  sure they're paid, all the property that's owned by
 4  the Woodbridge Police Department, inventory it.  I
 5  keep track of hirings, promotions, dismissals,
 6  retirements.  I report to the mayor on the actions
 7  in what we're doing in the police department.  I
 8  also track crime trends and make sure there's
 9  adequate staffing to address those issues, and I'm
10  responsible for final discipline.
11      Q.    Now, are -- you're a civilian?
12  A.    I am.
13      Q.    And are you -- you're retired?
14  A.    Yes.
15      Q.    And you'd been a member of the
16  department?
17  A.    That's correct.
18      Q.    What year did you retire?
19  A.    2010.
20      Q.    What year were you named director?
21  A.    2011.
22      Q.    How long has McCormac been mayor?
23  A.    Oh, geez.  Good question.  I think this is
24  his fourth term.  I'm not absolutely positive.
25      Q.    Obviously there's no term limits in
```

Pages 5 to 8

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 9

```
 1   Woodbridge.
 2         When is he up for election again?
 3   A.   Not this November, the following November.
 4         Q.   So has Woodbridge always -- when did
 5   you go on -- become a member of the department?
 6   A.   1981.
 7         Q.   Okay.  Did you go right from high
 8   school to the department or what were you doing
 9   before that?
10   A.   Graduated high school, went to college,
11   graduated from William Paterson University, 1979,
12   and I was appointed as police officer in 1981.  In
13   between I worked for the Woodbridge Township Board
14   of Education.
15         Q.   And what rank did you achieve in the
16   department?
17   A.   Captain.
18         Q.   Is that the highest rank in the
19   department?
20   A.   At this time it is.
21         Q.   At this time?
22   A.   Yes.
23         Q.   How about when you were a member?
24   A.   No, there a chief at the time.
25         Q.   When was the chief — office of the
```

Page 10

```
 1   chief abolished?
 2   A.   I want to say around April -- April of 2011
 3   the chief retired.
 4         Q.   And there was -- was there legislation
 5   to change the organization?
 6   A.   An ordinance.
 7         Q.   An ordinance.
 8         And were you involved in that
 9   ordinance change?
10   A.   No, I was not.
11         Q.   Do you know who spearheaded that or
12   why that happened?
13   A.   I have no clue.
14         MR. RUBENSTEIN:  Objection to the
15   form spearheaded, but you can answer.
16   A.   I have no clue.
17         Q.   But it was under -- McCormac was mayor
18   then?
19   A.   That is correct.  There have been police
20   directors in the past.
21         Q.   Working with the chief or working
22   without --
23   A.   Normally without a chief.
24         Q.   And when there were chiefs in the
25   past, would the chiefs do the operations and the
```

Page 11

```
 1   directors do the rest, is that how it was -- how was
 2   it divided?
 3   A.   Again, most of the time that there were
 4   directors, there was not a chief, so the director
 5   had a little more power in the police department.
 6   There were some overlaps -- and I can only speak to
 7   when I was appointed, there was about a month
 8   overlap between myself and the chief's retirement.
 9         Q.   Now, is there also a public safety
10   director?
11   A.   No, there is not.
12         Q.   Do you have any -- as director of
13   police, do you have any other -- do you have any
14   responsibilities outside the police department?
15   A.   The deputy director oversees EMS delivery for
16   the township.
17         Q.   Who is that?
18   A.   Joseph Nisky.
19         Q.   How is fire organized?
20   A.   They're their own entity.  There's 11
21   districts in each one.
22         Q.   How many members are in the
23   department?
24   A.   We are budgeted for 225, at this -- today we
25   are at 214.
```

Page 12

```
 1         Q.   Do you know how many there were in
 2   January 2019?
 3   A.   Not off the top of my head.
 4         Q.   Is there a training bureau?
 5   A.   Yes, there is.
 6         Q.   And who's in charge of that?
 7   A.   That would be Sergeant Lee Scarano --
 8   actually, I'm sorry, it would be Sergeant Medina.
 9         Q.   What does the training bureau do?
10   A.   They ensure that we are doing all the
11   necessary and required training that the attorney
12   general requires.  We do our own in-house training,
13   we document -- or the training unit documents any
14   in-house training and training we send our officers
15   to.
16         Q.   New -- where do you send -- how do you
17   train recruits?
18   A.   They'll be hired several weeks before the
19   police academy starts.  There's some required
20   in-house training prior to going to the police
21   academy.  They receive that under the training unit
22   and then they go to the police academy.  Normally
23   anywhere from five to seven weeks prior to we train
24   them.
25         Q.   Which police academy do they get sent
```

Pages 9 to 12

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 13

1  to?
2  A.    Cape May, in most instances.  If there's not
3  an academy available, sometimes we use Mercer, but
4  for the most part we use Cape May.
5        Q.    Is Woodbridge a civil service
6  jurisdiction?
7  A.    It is.
8        Q.    How long has this been the way the
9  training has been be done?  Have you always used the
10  Cape May Academy as your primary or --
11  A.    Well, the training unit was created after I
12  became police director.  There were individuals who
13  kind of handled training prior to that, but nobody
14  was dedicated.  But -- if you can repeat your
15  question, I kind of lost track there.
16       Q.    It would be better if I just gave you
17  a new question.
18  A.    Okay.
19       Q.    So when you came on -- became director
20  in 2011, you set up the training bureau, correct?
21  A.    That's correct.
22       Q.    At that time in 2011, were new
23  recruits already being sent to Cape May or is that
24  something you started?
25  A.    No, that's something I started.  The

Page 14

1  department used several different police academies.
2        Q.    Had you ever had your own academy?
3  A.    Yes, Middlesex County did.  I don't know what
4  years they closed, but that wasn't available for
5  quite some time.
6        Q.    At William Paterson, what was your
7  degree in?
8  A.    Criminal justice administration.
9        Q.    Is that a BS?
10  A.    Yes.
11       Q.    Did you take any more classes after
12  your undergrad?
13  A.    I attended the FBI National Academy in 2002
14  and received 15 credits from the University of
15  Virginia.
16       Q.    What did -- in 2002, you were a
17  captain then?
18  A.    Yes.  No, I'm sorry, I was a lieutenant in
19  2002.
20       Q.    When did you become a captain?
21  A.    2007.
22       Q.    What -- that course at the FBI, what
23  did that consist of?
24  A.    Legal issues for command staff, forensics,
25  computer forensics, community policing.  There was a

Page 15

1  physical aspect of it and -- I'm going back quite a
2  few years, trying to remember what -- I think that
3  basically covers it.
4        Q.    Was facial recognition technology on
5  the horizon yet?
6  A.    No.
7        Q.    What do you know about facial
8  recognition technology?
9  A.    Just what I read in the paper, not a whole
10  lot.  I don't know the technical aspects of it.
11       Q.    What papers did you read about --
12  A.    Newspaper articles, especially after this --
13  after we were served.
14       Q.    So was it fair to say it was something
15  you didn't know much about?
16  A.    Correct.
17       Q.    How is discipline handled in the
18  department?
19  A.    What will happen is, if something comes to
20  our attention or we receive a complaint, it's
21  assigned to the internal affairs unit, they will
22  conduct an investigation.  Once they're completed,
23  then they normally will come in, sit down with me
24  and the deputy director and our chief law
25  enforcement officer, who is Captain Kuzma, will go

Page 16

1  over the facts and how they came to find either
2  sustaining or not sustaining, whatever disposition
3  they find, and then I will decide on what the
4  discipline is with conversation with them.
5        Q.    So does IA -- who is the commander of
6  IA?
7  A.    Well, Captain Kuzma, our CLEO, actually
8  oversees internal affairs, but the lead is
9  Lieutenant Barrett.
10       Q.    So can you spell Kuzma?
11  A.    K-u-z-m-a.
12       Q.    Thank you.
13       Does IA -- so IA investigates all
14  instances of alleged misconduct or only those
15  involving the public?
16  A.    No, they can involve just about everything,
17  but normally if it's a demeanor complaint, the
18  division officer works, the division commander
19  will assign a supervisor to investigate it.
20  Those -- those findings will be forwarded up to
21  internal affairs.  That will be reviewed to make
22  sure it's a thorough investigation, proper, and
23  normally that would be the way it goes.
24       Q.    So as a civil service jurisdiction,
25  you have minor/major discipline?

Pages 13 to 16

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 17

1     A.    That's correct.
2          Q.    And who determines if it is -- what's
3     your understanding of minor discipline?
4     A.    Five days or under.  Well, actually five days
5     and over is a major, so I guess it would be anything
6     under five would be a minor.
7          Q.    And how is minor discipline in your
8     department meted out?
9     A.    Again, it could be anything from a
10    performance, notice letter of reprimand, or a
11    suspension.
12         Q.    And is this sort of -- is this -- how
13    is this -- what's the mechanics of it?  What's the
14    term, captain's discipline or whatever, have you
15    ever heard that term?
16    A.    No, I haven't.  So normally what will happen
17    is, if it's demeanor complaint, the captain will
18    come up and let me know what he's recommending and
19    I'll give my approval or won't give my approval.  If
20    it's a performance notice, they will handle it right
21    there in the division, he'll write it, it will go
22    into the personnel file for six months.  If it's a
23    letter of reprimand, I actually will sign that along
24    with the division commander.
25         Q.    So if you get a letter of reprimand,

Page 18

1     it stays in the file for six months?
2     A.    No.  A performance notice stays in for six
3     months.  A letter is permanent.
4          Q.    What's the next one -- so performance
5     notice?
6     A.    Right.
7          Q.    And then the next?
8     A.    Would be a letter.
9          Q.    A letter of reprimand?
10    A.    Correct.
11         Q.    A letter of reprimand stays in the
12    file?
13    A.    That's correct.
14         Q.    Then above a letter of reprimand would
15    be suspension?
16    A.    Correct.
17         Q.    Do you -- for -- for suspension of
18    five days and under, do you use a minor disciplinary
19    form?
20    A.    There's a civil service form that has to be
21    filled out, I believe it's called a 31-A.
22         Q.    A 31-A or -- 31-A and 31-Bs, they
23    aren't they just for major discipline?  Weren't they
24    just for major discipline?
25    A.    No, I believe that they're -- now I could be

Page 19

1     wrong, so I shouldn't really say, but I thought one
2     could be any type of discipline that has any days
3     involved in it loss of pay.
4          Q.    Who determines -- do you have -- is
5     there a hearing -- do you have a hearing
6     procedure --
7     A.    Yes.
8          Q.    -- in the department?
9               Okay.  Can you describe that?
10    A.    Yes.  Well, any discipline can be appealed.
11    If that happens, the town normally has a hearing
12    officer who will hear the facts of the case.
13    Normally whoever is being served the discipline, has
14    five business days to appeal it.
15         Q.    Minor -- are you saying minor
16    discipline then can be appealed?
17    A.    Letters can actually be appealed, and we've
18    had that.
19         Q.    Is that part of the collective
20    bargaining agreement?
21    A.    No.  We were kind of surprised by it, too.
22    We had a case several years back where we gave a
23    letter and there was an appeal and they wanted a
24    hearing and they got a hearing.
25         Q.    Do you know who told you that they

Page 20

1     were entitled to a hearing?
2     A.    I believe the business administrator at that
3     time.
4          Q.    So for -- when major discipline is
5     given, is that -- is the hearing -- strike that.
6               Tell me how major discipline is meted
7     out.
8     A.    Again, the -- we'll get together, myself the
9     IA investigator, the deputy director, and the CLEO,
10    and more times than not, the division commander will
11    sit in and have some say, and then we'll decide on
12    how the -- how many days will be involved.
13         Q.    And so that's decided without a
14    hearing initially?
15    A.    Right.
16         Q.    Okay.  And then how is that
17    communicated to the officer?
18    A.    He's served with the notice, the paperwork.
19         Q.    The 31-B?
20    A.    I'm -- I'm guessing that is what it is,
21    because --
22         Q.    So is the --
23    A.    -- I don't get involved in that.
24               MR. RUBENSTEIN:  Two people talking
25    at one time.  You asked him a question, now let him

Pages 17 to 20

Page 21

```
1   answer.
2        MR. SEXTON:  I apologize.
3   A.   I'm not sure which one is used, but they
4   receive a form.
5        Q.   Is there back and forth -- strike
6   that.
7             Typically are the officers represented
8   by counsel?
9   A.   In some cases.  In other cases they'll have a
10  PBA rep if they want to, you know, talk to me about
11  the discipline.  Whenever they're interviewed,
12  they're entitled to a rep, and in most cases they
13  will have an attorney.
14       Q.   When an officer demands a hearing, you
15  referenced a hearing officer?
16  A.   Yes.  We'll notify the business
17  administrator, in most cases he'll appoint a hearing
18  officer.  The business administrator has acted as
19  the hearing officer in some cases, too, but not
20  recently.
21       Q.   Who is currently the BA?
22  A.   Vito Cimmilluca.
23       Q.   Can you spell the last name?
24  A.   C-i-m-a-l-u-c-a, something like that.
25            MR. RUBENSTEIN:  I know it's
```

Page 22

```
1   C-i-m-m-a-l, I think it's u-c-a.
2             THE WITNESS:  I missed an M.
3        Q.   How long has Mr. Cimmilluca been the
4   BA?
5   A.   I'm not sure of the exact date.  It's got to
6   be over two years, two-and-a-half years.  I'm not
7   sure of the exact date.
8        Q.   Do you know who the BA was in 2019?
9   A.   I'm not -- I don't recall.
10       Q.   Do you record your disciplinary
11  hearings?
12  A.   That would be up to the hearing officer.
13       Q.   Okay.  Do you know what the practice
14  is or does it vary?
15  A.   Any that I've been involved there, there was
16  not a recording.
17       Q.   Have you been involved in many cases
18  that were appealed to the Office of Administrative
19  Law?
20  A.   One.
21       Q.   In ten years just one?
22  A.   Yeah -- yes.
23       Q.   And do you recall what that appeal was
24  about?
25  A.   Yes, it was for a dismissal.
```

Page 23

```
1        Q.   Do you remember the officer's name?
2   A.   Yes, Batiuk.
3        Q.   Batiuk?
4   A.   You're going to ask me how to spell it.
5             MR. RUBENSTEIN:  I can't help you
6   with that.
7   A.   B-a-t-i-u-k.
8        Q.   Do you know what Officer Batiuk was --
9   do you recall what Officer Batiuk was terminated
10  for?
11  A.   A number of different issues.  I don't recall
12  exactly what they were, but he had also been demoted
13  from sergeant, so it was an ongoing issue.
14       Q.   Do you recall what happened with OAL
15  -- what happened at OAL?
16  A.   Yes, everything was upheld.
17       Q.   Do you -- had there been other
18  officers terminated during your tenure as director?
19  A.   No.
20       Can I ask you to clarify that?  Do you mean
21  through a hearing or through an agreement?  Because
22  where they're not really -- they're resigning in
23  lieu of not being terminated.
24       Q.   Yeah, thanks, that's a good
25  distinction.
```

Page 24

```
1             So were there resignations that were
2   negotiated because of performance issues?
3   A.   There have been.
4        Q.   And can you recall approximately how
5   many?
6   A.   I don't recall off the top of my head.
7        Q.   Can you recall any specific officers?
8   A.   I'm trying to think.  Not off the top of my
9   head.
10       Q.   Can you recall any of the
11  circumstances of officers who were in that
12  situation?
13  A.   Normally conduct unbecoming, things of that
14  nature.
15       Q.   What's the worse thing an officer has
16  done that resulted in a resignation?
17            MR. RUBENSTEIN:  Objection as to
18  form.  Your definition of the worst thing and his
19  definition might be two different things.
20  BY MR. SEXTON:
21       Q.   In your estimation.
22  A.   You're asking me to go back, you know, 10, 11
23  years.  I don't really recall what could have been
24  the worst.
25       Q.   Do you -- you can't recall any -- any
```

Pages 21 to 24

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 25

1  of the circumstances that --
2  A.   Not off the top of my head.
3      Q.   Have you ever had a case -- are you
4  ever aware of any time that you've been involved in
5  a department either as a member or as a director
6  where an officer was disciplined by the department,
7  but gotten the discipline either stricken down or
8  lessened by an ALJ?
9  A.   Not to my knowledge.  I can't speak to when I
10  was a sworn officer, because I wasn't involved in
11  that.  But under my tenure as director, not to my
12  knowledge.
13     Q.   Were you active in the union when you
14  were a member?
15  A.   Yes.
16     Q.   Did you have any --
17  A.   Trustee for the supervising officers
18  association.
19     Q.   Have you had any offices in the union?
20  A.   I was a trustee in the SOA, Supervising
21  Officers Association.
22     Q.   Were you involved in negotiations?
23  A.   Yes.  I should say I was present, I didn't
24  really have much to do with it.
25     Q.   Do you know how long the collective

Page 26

1  bargaining agreements, what the terms are for them?
2  Are they three-year terms, five-year terms?
3  A.   I believe they were three-year terms.
4      Q.   So Captain Kuzma?
5  A.   Kuzma.
6      Q.   He -- he oversees IA?
7  A.   Correct.
8      Q.   And does he also oversee other units?
9  A.   Well, being the chief law enforcement
10  officer, he's the highest rank in captain, so he
11  kind of oversees all the divisions.
12     Q.   So he's, what, the chief -- he does
13  what the chief had done?
14  A.   Really he only does firearms, things that I'm
15  not able to do.  Firearms, most of the IA I don't
16  get involved in, other than what I explained to you
17  earlier, he does those things.
18     Q.   In promotions, how are promotions
19  handled in the department?
20  A.   Well, being a civil service police
21  department, they are tested by the civil service, a
22  list comes out, when we have an opening, we normally
23  go right down the list as required by civil service.
24     Q.   Have you ever utilized the Rule 3?
25  A.   No.

Page 27

1          MR. RUBENSTEIN:  And you're talking
2  about as his tenure as director?
3          MR. SEXTON:  Yes.
4          MR. RUBENSTEIN:  Okay.
5  BY MR. SEXTON:
6      Q.   Had -- has anyone ever proposed that
7  you use the Rule 3?
8  A.   Not to my knowledge.  Not to my recollection.
9      Q.   Have you ever promoted somebody who
10  you had misgivings about?
11         MR. RUBENSTEIN:  Objection as to
12  form.  You can answer.
13  A.   We do an interview process.  If we have any
14  concerns, we usually address it there.  So most of
15  the people who are promoted in my opinion deserve to
16  be promoted.
17     Q.   How long has -- had Lieutenant Barrett
18  been the -- is it commander of IA?
19  A.   Supervisor.  I don't know off the top of my
20  head.  It's been at least three -- four years.
21  Again, I'm guessing, I don't know exactly.
22     Q.   In your tenure as director, have you
23  done any -- spearheaded any reforms in the
24  department?
25  A.   Yes.

Page 28

1      Q.   What would those be?  What are those?
2  A.   Well, we civilianized a lot of positions so
3  we can get more officers on the road doing what
4  police officers should be doing.  We've, you know,
5  obviously had to conform to a lot of attorney
6  general guidelines that I normally would make sure
7  were taking place in the training unit or division
8  commanders were making sure that was being done.
9  And there's been a lot of things from use of force,
10  body-worn cameras.
11     Q.   When did you put cameras in?
12  A.   The in-car cameras have been there quite a
13  while.  The body-worn cameras are probably just less
14  than a year now.
15     Q.   Why did you put the body cameras in?
16  A.   Well, it was required of us, but it took us a
17  while to get the financing because it was an
18  unfunded mandate.
19     Q.   Is that a mandate from the AG?
20  A.   Yes, correct.
21     Q.   Who do you interact with, if anyone,
22  at the office -- in the AG's office?
23  A.   I don't normally.  We've been kind of
24  directed that any conversation with the AG's office
25  should go through the prosecutor's office.

Pages 25 to 28

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 29

1    Q.    And who at the prosecutor's office do
2  you interact with?
3  A.    Normally the prosecutor.  At times their
4  assistants.
5    Q.    Is Woodbridge the largest town in
6  Middlesex?
7  A.    As far as?
8    Q.    Population?
9  A.    I believe it is.
10    Q.    And is it the largest police
11  department?
12  A.    Yes.
13    Q.    Do you have -- in making policy
14  changes such as civilianization, do you -- how
15  involved is the mayor, is Mayor McCormac?
16  A.    Not very.  Obviously, you know, I'll
17  communicate to him things that are taking place, but
18  as far as his involvement, other than his knowledge,
19  he's not involved.
20    Q.    Has the mayor ever contacted you
21  about -- has the mayor ever opposed any of your
22  reforms?
23  A.    Not to my recollection.
24    Q.    And when I say "the mayor," the mayor
25  or anybody associated with the mayor's office or his

Page 30

1  campaign or anybody like that?
2  A.    No.
3    Q.    What about, has any -- has the mayor
4  or anybody in his office ever contacted you
5  regarding a recruit?
6  A.    I'm not sure I understand that question.
7    Q.    What don't you understand about it?
8  A.    About a recruit, I mean, contact me in
9  relation to a recruit.
10    Q.    To suggest that somebody be -- well,
11  you have a list, right?
12  A.    Yeah, we have a civil service list, so it
13  doesn't really apply.
14    Q.    But you have to -- you have to go down
15  a list to get to certain people, right?
16  A.    Yes.
17    Q.    Have you ever -- anybody in the
18  mayor's office ever contacted you about getting to a
19  certain person on a list?
20  A.    They've never asked that we specifically get
21  to somebody, they've inquired where somebody was on
22  the list, if we knew.
23    Q.    How many times has that happened?
24  A.    Not very often.  I couldn't give you a
25  number.

Page 31

1    Q.    How about for -- that's a hiring list.
2  How about a promotional list?
3  A.    That's also civil service list that, you
4  know, we go right down the list so --
5    Q.    Right.  So the question is:  Has the
6  mayor -- anybody from the mayor's office ever made
7  an inquiry to you about where somebody was on a
8  promotional list?
9  A.    Yes.
10    Q.    Who -- is it the mayor himself who
11  inquires or one of his aides?
12  A.    No, the mayor has asked, some of his aides
13  have asked.
14    Q.    Has the mayor or anybody in his office
15  ever inquired about any pending discipline?
16  A.    No, not to my -- normally we'll let him know
17  if there's something that he needs to know about,
18  and, you know, once there's a disposition, I'll let
19  him know what it was.  But other than that, they
20  don't usually get involved in that.
21    Q.    Have you done anything with community
22  -- I think you mentioned community policing?
23  A.    Correct.
24    Q.    What were the community policing
25  initiatives?

Page 32

1  A.    What is it in the Woodbridge's?
2    Q.    Yes.
3  A.    Obviously interact with the community, get
4  involved with our religious organizations, the
5  schools, try to attend as many events as possible to
6  represent the police department.  We hold a number
7  of programs, from the junior police academy to the
8  senior police academy.  We play basketball and
9  hockey against high school students.
10    Q.    Is there a police athletic league or
11  anything like that?
12  A.    No.  But there is a PBA street hockey league
13  that involves kids of all ages up to high school.
14    Q.    Was there -- the incident that's the
15  base of this lawsuit involving Nijeer Parks, was
16  there any discussion about bringing discipline as a
17  result of the actions of the members of your
18  department?
19  A.    Once we received the letter of claim, I asked
20  to initiate an IA investigation to make sure there
21  wasn't any misconduct or policy violations.
22    Q.    And who took that referral, Kuzma or
23  Barrett?
24  A.    I don't remember if it was Kuzma or Barrett.
25  It may have been both at the same time.

Pages 29 to 32

Page 33

1       Q.    And did you get a response from IA?
2   A.    Upon the completion of their investigation?
3       Q.    Yes.
4   A.    Yes.
5       Q.    And what did they say?
6   A.    They found no misconduct and at the time
7   there were no policy violations as it stood during
8   that investigation.
9       Q.    Did you personally review the facts of
10  the case?
11  A.    No. I had a conversation with the IA
12  investigators.
13      Q.    Do you remember which investigators
14  you talked to?
15  A.    I believe it was Lieutenant Velez, Lieutenant
16  Barrett, and Captain Kuzma.
17      Q.    Do you recall the content of those
18  discussions with Velez, Barrett, and Kuzma?
19  A.    No. Just an overall knowledge that there was
20  no misconduct and, again, no policy violations.
21      Q.    Have you ever read any of the
22  documents in the case?
23  A.    No.
24      Q.    Is there -- there's a detective bureau
25  in the department, right?

Page 34

1   A.    Correct.
2       Q.    Is there also like a -- well, describe
3   investigations in the department if you could.
4   Who -- how -- who oversees investigations?
5   A.    The criminal investigation division is -- the
6   commander and captain is Captain Neste.
7       Q.    N-e-s-t-i?
8   A.    E.
9       Q.    Okay. And the criminal investigation
10  division, does it have -- does it have units within
11  it?
12  A.    It does.
13      Q.    What are those?
14  A.    The juvenile aid bureau and the
15  identification unit, digital crimes unit.
16      Q.    Is the detective bureau within that?
17  A.    Well, the detective bureau is the entire
18  division. They're subdivisions of the detective
19  bureau.
20      Q.    So is Captain Neste the commander of
21  the detective bureau?
22  A.    That is correct. It's also called the
23  criminal investigations division, but they're --
24  it's synonymous.
25      Q.    Is there -- do you have like a special

Page 35

1   investigations unit or is that --
2   A.    Yes. When you say "special investigations
3   unit," there is one named special investigations,
4   they are tasked with narcotics enforcement,
5   organized crime, and vice control. But they are not
6   under the criminal investigation division.
7       Q.    They're not?
8   A.    They are not.
9       Q.    So they're kind of freestanding?
10  A.    It's actually part of the criminal
11  investigation -- or I'm sorry, special
12  investigations division.
13      Q.    Okay. So there's something called
14  special investigations division?
15  A.    Correct.
16      Q.    Which is separate from the detective
17  bureau, the criminal investigation division?
18  A.    Right.
19      Q.    And the special investigation
20  division has --
21  A.    I should say units, not really division. It
22  comes under the office of the police director, but
23  it's led by a captain.
24      Q.    And are there subparts to the special
25  investigations unit?

Page 36

1   A.    Yes, training, the special operations team.
2   That's pretty much it.
3       Q.    How about the -- the digital --
4   A.    Digital crimes is up in the criminal
5   detective bureau.
6       Q.    Who's -- and who's in charge of the
7   special investigation unit?
8   A.    Captain Murphy.
9       Q.    Do you have like a printed, what's it
10  called? Table organization?
11  A.    We do.
12          MR. SEXTON: Fred, if I can just --
13          MR. RUBENSTEIN: I'll get it for you.
14          THE WITNESS: I can get that this
15  afternoon, just remind me.
16          MR. RUBENSTEIN: Sure.
17  BY MR. SEXTON:
18      Q.    When Captain Kuzma and Lieutenant
19  Barrett and Velez reviewed the alligations in this
20  matter, did they confer with anybody in the AG's
21  office?
22  A.    I don't know.
23      Q.    Do you know if they conferred with
24  anybody in the prosecutor's office?
25  A.    I don't know.

Pages 33 to 36

Page 37

1     Q.     Did anyone -- when this notice of
2  claim came in -- did anybody from the mayor's office
3  communicate with you?
4  A.    Yes.
5     Q.     And who from the mayor's office?
6  A.    I believe both the business administrator and
7  the mayor.
8     Q.     And was this by phone or in person?
9  A.    I believe it was in person.
10     Q.     And were you altogether or were these
11  separate?
12  A.    No, I believe we were altogether.
13     Q.     Was the BA at the time, was that --
14  A.    I believe it was Vito Cimmilluca.
15     Q.     Was anyone else in the meeting besides
16  you, McCormac --
17  A.    I don't recall.
18     Q.     -- and Cimmilluca?
19         Where was the meeting?
20  A.    It really wasn't a meeting.  It was -- in
21  fact, if I remember correctly, we were served with a
22  notice, I received a copy and I believe the mayor's
23  office did, they called me up to ask about it, you
24  know, if I knew, and I said I got the same paperwork
25  as them, and that was really the extent of the

Page 38

1  conversation, just are we all aware of the letter of
2  claim.
3     Q.     Were you aware of the lawsuit by the
4  ACLU against Clearview Technology?
5  A.    No.
6     Q.     You have never heard of that
7  litigation?
8  A.    Until afterwards.
9     Q.     When did you learn about the
10  litigation?
11  A.    Probably just recently.
12     Q.     And how did you come to learn about
13  it?
14  A.    Probably a newspaper article or, you know,
15  something on the internet.
16     Q.     What have you come to learn?
17  A.    That they were suing Clearview, and quite
18  honestly, ACLU was I think asking that facial
19  recognition be abolished as a tool for law
20  enforcement.
21     Q.     And the source of your understanding
22  is either the internet or a newspaper?
23  A.    Correct.
24     Q.     And what newspapers would that have
25  been in?

Page 39

1  A.    Probably, again, nj.com, which I believe is
2  the Star Ledger.
3     Q.     Have you discussed -- a couple times
4  in your testimony today you've said that at the time
5  of the incident here there was no policy that was
6  violated.  Has the department formulated any policy
7  regarding facial recognition technology after
8  January 2019?
9  A.    Other than not being able to use Clearview,
10  which we never did, at the AG's directive, everyone
11  was told that you cannot use it.  And as I stated
12  before, we never did.  And to use the ROIC, if at
13  all.  There is no written policy, because the AG
14  hasn't even created a policy, so we're not going to
15  create something that may once he decides -- he or
16  she decides what the policy is, we don't want to be
17  outside of those recommendations or directives.
18     Q.     By the ROIC, you mean the -- what is
19  it, the ROIC?
20  A.    Yeah, Regional Operational Intelligence
21  Center.
22     Q.     What is that?
23  A.    It's a location, I think there's two in the
24  state, where the state police run it and collect
25  criminal data and aid in investigations.  Pretty

Page 40

1  much an intelligence center.
2     Q.     What sort of things do you use it for,
3  you being the department?
4  A.    The department uses it for a host of --
5  there's an ongoing issue with vehicle thefts,
6  catalytic converter thefts, things of that nature.
7  We'll report to them any suspicious activity reports
8  that may involve any kind of either foreign or
9  domestic terrorism, we need to report those things
10  to the ROIC.
11     Q.     And that's -- is this just New Jersey
12  and New York that are in the ROIC?
13  A.    I don't know exactly, but I think there's
14  representatives of the FBI, probably DEA.
15     Q.     DEA?
16  A.    DEA, the Drug Enforcement Administration.
17     Q.     Thank you.  Were you ever a detective?
18  A.    Yes, I was.
19     Q.     How many years were you a detective?
20  A.    I was put into the special investigations
21  unit in 1987.  1988 I was probably given the title
22  of detective.
23     Q.     I'm sorry, what year was that?
24  A.    I believe -- I was placed in special
25  investigations in 1987, 1988 I believe I received my

Pages 37 to 40

Page 41

```
 1    detective's badge.
 2         Q.    Do you recall any civil rights claims
 3    ever being brought against the county other than the
 4    instant matter?
 5    A.    I have no clue.
 6         Q.    I mean, the department.  You don't
 7    recall any?
 8         MR. RUBENSTEIN:  Hold on, Fred, is
 9    your question the county because --
10         MR. SEXTON:  No, I corrected it.  The
11    department obviously.
12         MR. RUBENSTEIN:  It's not obviously,
13    you have to ask your questions and make it clear.
14         MR. SEXTON:  I did make it clear.
15    A.    Am I aware of any civil rights claims against
16    Woodbridge Police Department?
17         Q.    Yes.
18    A.    I know there have been.
19         Q.    Can you recall any?
20    A.    I know there is one pending right now, the
21    Brady matter.
22         Q.    What does that entail?
23    A.    It was a superior Court judge who was
24    charged.
25         Q.    That's a federal court one?
```

Page 42

```
 1    A.    Yes.
 2         Q.    Where is that now, do you know?
 3    A.    That is still all pending.
 4         Q.    Do you recall any other matter?
 5    A.    Off the top of my head, no.  I'm sure there
 6    probably were, but I don't recall.
 7         MR. SEXTON:  Let's mark this as --
 8    how do we want to mark these?
 9         (Whereupon, document, was received and
10    marked as Exhibit No. H-1 for identification.)
11    BY MR. SEXTON:
12         Q.    I am showing you a document marked as
13    H-1 for identification purposes.  I would just like
14    to ask you about the complaints.  It's a letter from
15    your -- the lawyer for the department to me, and he
16    lists a number of complaints.
17    A.    Okay.
18         Q.    Shaquita Ayler, do you know what that
19    matter is about?
20    A.    No, I don't.
21         Q.    Melanie Navaro, do you know what that
22    matter is about?
23    A.    No, I don't.
24         Q.    Travis Wint?
25    A.    I do not.
```

Page 43

```
 1         Q.    Sheryl Hearns?
 2    A.    Do not.
 3         Q.    Anthony Testa?
 4    A.    Do not.
 5         Q.    Okay.  Thank you.
 6         Is there any -- who is the lawyer for
 7    Woodbridge?
 8    A.    The township attorney?
 9         Q.    Yes.
10    A.    James Nolan.
11         MR. RUBENSTEIN:  Make sure that was
12    the question, because there's a bunch of lawyers.
13    BY MR. SEXTON:
14         Q.    And is that -- do you know if that's a
15    part-time or full-time job?
16    A.    I don't know.
17         Q.    And does he have -- is there -- are
18    there attorneys on staff or is everything handled by
19    outside lawyers or by this firm, Nolan & Associates?
20    A.    I am not sure.
21         Q.    Do you know of any other -- does
22    Mr. Nolan have an office at the city hall?
23    A.    There is an office, yes.
24         Q.    And have you been to his office?
25    A.    Yes.
```

Page 44

```
 1         Q.    And are there other lawyers besides
 2    Mr. Nolan in that office?
 3    A.    Yes.
 4         Q.    And who are those?
 5    A.    To my knowledge, Fred Rubenstein, Garry, who
 6    is seated here, Brian.
 7         Q.    What's Brian's last name?
 8    A.    Brian Bontempo.
 9         Q.    Is he -- are all of these lawyers also
10    part of this law firm where we are today?
11    A.    To my knowledge they are.
12         Q.    Is there anybody in the office of
13    Mr. Nolan, the township attorney at Woodbridge, who
14    is not in this law firm?
15    A.    Not to my knowledge.
16         Q.    Do you know how long Mr. Nolan has the
17    township attorney?
18    A.    I don't.
19         Q.    Do you recall his predecessor?
20    A.    I don't.
21         Q.    So it's fair to say the township
22    attorney has been Mr. Nolan for as long as you can
23    recall?
24    A.    That is correct.
25         Q.    Do you know the case Hodges v
```

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 45

```
 1   Rastegarpanah?
 2   A.    I'm aware of it.
 3        Q.    What -- what are you -- what do you
 4   know about that case?
 5   A.    I know Mr. Hodges -- I don't remember the
 6   fact pattern of the case, but he brought suit
 7   against the police department and some officers.
 8        Q.    Do you remember that he alleged
 9   excessive force?
10   A.    Yeah, I believe so.
11        Q.    And do you know what the status --
12   what happened in that matter or --
13   A.    I believe I just learned last week that the
14   case was settled.
15        Q.    Do you know how much it was settled
16   for?
17   A.    I don't remember off the top of my head. I
18   don't want to guess at the number.
19        Q.    Were you involved in the defense of
20   the case?
21   A.    No.
22        Q.    Were you -- were you consulted about
23   settling that matter?
24   A.    No.
25        Q.    When you heard that the matter was
```

Page 46

```
 1   settled, did you have any reaction?
 2   A.    Not to my recollection.
 3        Q.    Do you think it's appropriate for the
 4   police director to be involved in settlement of
 5   matters?
 6   A.    I would think in some instances, but a lot of
 7   that takes place above my level.
 8        Q.    Do you remember a case called Gutierez
 9   v Woodbridge?
10   A.    I do.
11        Q.    What do you remember about that case?
12   A.    If I have it correctly, that was an
13   individual at Fridays -- TGI Fridays who alleged
14   excessive force.
15        Q.    And were you involved in the defense
16   of that case?
17   A.    I was not.
18        Q.    Were you involved in the settlement of
19   that case?
20   A.    No, I was not.
21        Q.    Are you aware for how much the matter
22   was settled?
23   A.    I don't --
24        MR. RUBENSTEIN:  Okay.  That
25   settlement has a confidentiality agreement.  We're
```

Page 47

```
 1   not allowed to disclose unless you get a court
 2   order, so.
 3   BY MR. SEXTON:
 4        Q.    Did you know it was reported in the
 5   newspaper that it was settled for 125,000?
 6   A.    No, I didn't know that.
 7        MR. SEXTON:  Can you mark this as
 8   H-2.
 9        (Whereupon, newbrunswicktoday.com.,
10   Another Lawsuit Against Woodbridge Police Cost
11   Taxpayers 125K article, was received and marked as
12   Exhibit No. H-2 for identification.)
13   BY MR. SEXTON:
14        Q.    I'll show you a document marked for
15   identification purposes as H-2. It's an article
16   from newbrunswicktoday.com.  This article indicates
17   that the Hodges --
18        MR. RUBENSTEIN:  No, not Hodges,
19   Gutierez.
20   BY MR. SEXTON:
21        Q.    Gutierez was settled for 125,000.
22   Does that refresh your recollection about what the
23   dollar figure was?
24   A.    No, I never knew.
25        Q.    You had no idea?
```

Page 48

```
 1   A.    No.
 2        Q.    And nobody asked you about it?
 3   A.    That is correct.
 4        Q.    The article also references a recent
 5   settlement of $70,000 to three Elizabeth residents
 6   who claimed they were falsely charged on charges
 7   that were later dismissed.  Do you -- do you know
 8   what case that $70,000 would have been related to?
 9   A.    I do not.
10        Q.    Do you remember a case that was down
11   at the mall involving alleged excessive force by a
12   woman complainant, the mall being Jersey Gardens?
13        MR. RUBENSTEIN:  I don't think that's
14   the mall, so I don't want to confuse the witness.  I
15   don't want you to confuse the witness.  There's no
16   Jersey mall here by that name.
17        MR. SEXTON:  Jersey Gardens?
18        MR. RUBENSTEIN:  There is no mall by
19   that name here.
20        MR. SEXTON:  That might be -- excuse
21   me.
22   BY MR. SEXTON:
23        Q.    With these settlements, is there a --
24   do you know anything about the procedure for how
25   these settlements are approved?
```

Pages 45 to 48

Page 49

1    A.    No, I don't.
2         Q.    Do you know anything about the
3    insurance, the Joint Insurance Commission?
4    A.    Very little, but I know it exists.
5         Q.    Have you ever spoken to anybody at the
6    Joint Insurance Commission about any matter?
7    A.    No.
8         Q.    Do you know if anybody from your
9    department on your behalf has spoken to the Joint
10   Insurance Commission about anything?
11   A.    When you say "behalf," if you're talking
12   maybe an attorney, possibly, but I don't have any
13   direct knowledge of that.
14        Q.    Does the Joint Insurance Commission
15   ever get involved in helping limit exposure of the
16   department by -- in any way?
17   A.    I don't know.
18        Q.    Have they ever, like, weighed in on
19   policies, procedures, and things to try to make sure
20   the department was current, for instance?
21   A.    No, we are CALEA certified nationally, that's
22   how we develop our policies and procedures.
23        Q.    What's that, CALEA?
24   A.    CALEA, it's Commission on Accreditation for
25   Law Enforcement Agencies.

Page 50

1         Q.    C-O-A-L-A?
2    A.    No, it's actually C-A-L.
3         Q.    Commission on -- oh, Commission on
4    Accreditation --
5    A.    For Law Enforcement Agencies.  And they call
6    it. CALEA.
7         Q.    And -- so what does CAL --
8    A.    It's a national organization who come in
9    every so often, go over all your policies and
10   procedures to make sure you have best practices and
11   you have to meet standards.  They review hundreds of
12   our policies and procedures, and you're awarded
13   certification after their review if you're in
14   compliance with their regulations.
15        Q.    Is there any person at CALEA whom you
16   regularly interface with and deal with?
17   A.    We have accreditation manager, who is a
18   civilian, Drew Tuttle, he does most of the -- but
19   I'm interviewed when there is an on site along with
20   the command staff.
21        Q.    And do you know how often they come on
22   site?
23   A.    It was every three years.  A little change in
24   that when Covid struck, we did it by Zoom, the
25   on-site interviews, but we had to send policies and

Page 51

1    procedures out to them.  And I believe now it's
2    every two years, but it's an ongoing process where
3    we have to send certain proofs to them on an ongoing
4    basis to make sure we're staying up to date on our
5    policies and procedures.
6         Q.    Do they write the policies and
7    procedures?
8    A.    No.  We normally write them.  They'll review
9    them to make sure we meet all of their standards.
10   They'll make recommendations if they feel we can be
11   doing something better.  We'll research it, if it
12   makes sense, we'll adopt them.
13        Q.    How long have you had this
14   relationship with CALEA?
15   A.    I think we were first accredited in 1998, so
16   it's been a long ongoing relationship that we intend
17   on keeping.
18        Q.    Do you know if they -- do they work
19   with other departments in New Jersey?
20   A.    Yeah, I believe there are several in New
21   Jersey.  I think we're the second longest department
22   in New Jersey to be nationally certified, but more
23   and more departments are being members of CALEA.
24        Q.    Do you know what other New Jersey
25   departments are in?

Page 52

1    A.    I know the New Jersey State Police.  I don't
2    want to guess.  I don't want to name other
3    departments because I'm not sure exactly, but there
4    are a number.
5         Q.    Do you know what the term progressive
6    discipline means?
7    A.    Yes.
8         Q.    What's your understanding?
9    A.    That discipline becomes progressive depending
10   on the situation where it rises in severity.
11        Q.    Have you ever visited the ROIC?
12   A.    I've been there only for a tour, not for any
13   type of investigative purpose.
14        Q.    What's a 500 report?
15   A.    I have no idea.
16        (Whereupon, a discussion was held off
17   the record.)
18        MR. SEXTON:  Could you mark this as
19   H-3.
20        (Whereupon, Woodbridge Police Department
21   Internal Affairs Bureau, 2014 Internal Affairs
22   Investigation 500 Index Sheet, was received and
23   marked as Exhibit No. H-3 for identification.)
24   BY MR. SEXTON:
25        Q.    I'll show you a document marked as

Pages 49 to 52

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 53

1    H-3. It is multi-page, one, two, three, four, five,
2    it's five sheets. And it's Woodbridge Police
3    Department Internal Affairs Bureau 500 index sheet.
4    A.    Okay.
5         Q.    Does that refresh your recollection
6    what a 500 report is?
7    A.    Well, I know -- obviously it's something that
8    internal affairs use. But what 500 stands for, I
9    don't know. But this obviously is an officer's
10   discipline sheet. I have seen these, but didn't
11   know they were called 500 reports.
12        Q.    Have you -- when have you seen these?
13   A.    Normally when internal affairs comes to me,
14   if there's a sustained complaint when we're deciding
15   upon discipline, we want to see their past
16   discipline, and that's when I would see this so I
17   have knowledge of what their past history has been.
18        Q.    Do you regularly get a printout like
19   this for each year?
20   A.    I don't. I believe it is published, but I'm
21   not handed a -- and the published wouldn't have the
22   officers' names, I don't believe.
23        Q.    Are you aware of the reporting
24   requirements that were recently made by the AG
25   concerning misconduct -- police misconduct and the

Page 54

1    identification -- and the required identification of
2    the officer?
3    A.    I am aware that there have been new standards
4    put in place and directives, but, again, I don't get
5    involved in that. That's something internal affairs
6    does and they would do the listing. And now that
7    you mention about naming the officer, in the past it
8    hadn't been or they hadn't been named.
9         MR. SEXTON: Can you mark this as
10   H-4.
11        (Whereupon, document for Andrew Lyszyk,
12   was received and marked as Exhibit No. 4 for
13   identification.)
14   BY MR. SEXTON:
15        Q.    So I'll show you what's been marked as
16   H-4.
17        MS. LEMPKA: Dan, can I just ask, is
18   there a Parks number on that?
19        MR. SEXTON: Yes, Parks 300.
20        MS. LEMPKA: Thank you.
21        MR. SEXTON: You're welcome. And
22   then I think they follow, yeah, Parks 300 through
23   303.
24   BY MR. SEXTON:
25        Q.    What's the -- do you recognize the

Page 55

1    first page of this?
2    A.    It appears to be Andrew Lyszyk's past
3    discipline.
4         Q.    And when you said you would be shown
5    reports, is this the -- is the form of the report
6    you would be shown about an officer?
7    A.    I believe it is, yes.
8         Q.    Now this -- this shows that Officer
9    Lyszyk had three sustained complaints, right?
10   A.    Right.
11        Q.    Doesn't -- the reports don't list
12   unsustained complaints, is that correct, or do they?
13        MR. RUBENSTEIN: Objection as to
14   form. I think your --
15        MR. SEXTON: I'll rephrase it.
16   BY MR. SEXTON:
17        Q.    Do you know if there had been
18   complaints that were not sustained whether they
19   would be noted on this page?
20   A.    I have seen printouts with everything,
21   whether it's sustained, not sustained, exonerated.
22        Q.    Did you know what -- are there
23   different -- can you have the program spit out
24   different types of reports or does it always spit
25   out the report in a certain way?

Page 56

1    A.    I don't know.
2         Q.    In this case it shows three sustained
3    instances of misconduct, correct?
4    A.    That's correct.
5         Q.    Then it says -- for discipline, it
6    says, "performance notice"?
7    A.    Correct.
8         Q.    And that was in '09, right?
9    A.    Yes.
10        Q.    And that's the thing that gets put in
11   and then gets taken out after six months?
12   A.    That's correct.
13        Q.    And does that require six months of
14   good conduct or is it taken out no matter what?
15   A.    Well, after good conduct. I would imagine if
16   there was something less than good conduct, there
17   would be different discipline, so I would imagine
18   that would be removed.
19        Q.    So it gets removed regardless?
20   A.    I believe so.
21        Q.    And then a letter of reprimand, is
22   that -- that's one up from --
23   A.    Correct.
24        Q.    -- a performance notice?
25        Now counseling?

Pages 53 to 56

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 57

1   A.   Yes, sir.
2   Q.   Is counseling discipline?
3   A.   No, it's not really discipline.
4   Q.   In this case it would appear that the
5   discipline is not progressive, it does not get more
6   serious as the misconduct occurs; is that fair to
7   say?
8   A.   Well, as I said, before when you asked me if
9   I knew what progressive discipline was, I said
10  depending on the circumstances it could rise.  But
11  there are situations where somebody may have done
12  something that wasn't in conformance of a policy,
13  but doesn't rise to the level of a letter and you
14  could receive counseling or a PN, performance
15  notice.
16      So it doesn't necessarily have to go from a
17  PN to a letter to days off.  It's depending on the
18  circumstances.
19   Q.   Thank you.
20      MR. SEXTON:  Mark this as H-5.
21      (Whereupon, Woodbridge Police Department
22  Internal Affairs Bureau 2019 Internal Affairs
23  Investigation Index Sheet, was received and marked
24  as Exhibit No. 5 for identification.)
25

Page 58

1   BY MR. SEXTON:
2   Q.   I'll show you what's been marked as
3   H-5.  Do you recognize this?
4      MR. SEXTON:  For the record, it's
5   Parks 304 through 311.
6   A.   I haven't seen it printed this way.  As I
7   stated earlier, normally when we're going to dole
8   out any type of discipline, I will get a
9   chronological order and it may say "exonerated," it
10  may say "sustained."  It has the whole list.  I've
11  never seen it broken down like this before.
12   Q.   Do you know -- so this -- these
13  dispositions are either exonerated, unfounded, or
14  not sustained.  Is there -- are those terms
15  synonymous or are they different?
16   A.   They're different.
17   Q.   And what does exonerated mean?
18   A.   The action took place and it was found to be
19  within policy.
20   Q.   And what is not sustained?
21   A.   Not enough information was gathered during
22  the investigation to sustain it.
23   Q.   What does unfounded mean?
24   A.   Didn't happen.  The accusation didn't happen
25  from what was found during the investigation.

Page 59

1   Q.   Do you know are these terms used
2   universally in law enforcement by IA in law
3   enforcement agencies or is this a use only of
4   Woodbridge?
5   A.   No, I believe New Jersey is required to use
6   these through the AG guidelines and internal affairs
7   investigations.
8   Q.   Do you know how long this terminology
9   has been used?
10  A.   No.
11   Q.   Thanks.
12      MR. SEXTON:  Mark this as H-6,
13  please.
14      (Whereupon, Complaint Warrant, was
15  received and marked as Exhibit No. H-6 for
16  identification.)
17  BY MR. SEXTON:
18   Q.   I'll show you a document we've marked
19  as H-6.  It's Parks 1 through 23.
20  A.   Okay.
21   Q.   You said you never looked at any --
22  any documents relating to this case?
23  A.   Not to my knowledge.  I don't recall --
24   Q.   So --
25  A.   -- purposely looking at anything.

Page 60

1   Q.   Do you recognize what this exhibit is?
2   A.   It's obvious by the title of it, it's a
3   complaint warrant.  They're a little bit different
4   than how I used them back in 2010 and previously,
5   but it's obvious that's what it is.
6      MR. RUBENSTEIN:  Just for the record,
7   there's two complaint warrants, they're two separate
8   documents, but you lumped them together as one.
9   There's complaint 000156, which is Bates stamped
10  Parks -- Parks 1 through Parks 10, and then it's
11  000158, that's Parks 11 through 22.  So that there's
12  no confusion, it's two separate complaints.
13  BY MR. SEXTON:
14   Q.   Can you look at page Parks 21?
15  A.   Okay.
16   Q.   This is an affidavit of probable cause
17  completed by Patrolman Lyszyk, correct?
18  A.   I don't know who it was completed by, because
19  there's nothing on here --
20      MR. RUBENSTEIN:  Next page.
21  A.   Okay.  I see it typed, yeah, Lyszyk.
22   Q.   Do you see the first sentence, "While
23  investigating a shoplifting of $39 worth of
24  merchandise from Hampton Inn, the hotel manager,
25  Richard Charneco, C-h-a-r-n-e-c-o, advised us that

Pages 57 to 60

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 61

1  Parks was the suspect." Do you see that?
2  A.  I do see it.
3  Q.  Do you know that in Lyszyk's
4  deposition he conceded that that was a false
5  statement?
6  MR. RUBENSTEIN:  Objection to form.
7  You can answer if you know.
8  A.  I don't know.
9  Q.  Okay.  So nobody contacted you after
10  his deposition to advise you that he testified under
11  oath that he had made a false statement in an
12  affidavit of probable cause?
13  MR. RUBENSTEIN:  The only caveat to
14  that is, any conversations you might have had with
15  your attorney, but other than that you can
16  certainly, you know, answer his question.
17  A.  I wasn't contacted by anyone, no.
18  Q.  Sitting here as the police director
19  and -- well, as you read that sentence, do you
20  understand why that's false -- why it has to be
21  false?
22  A.  Well, I had nothing to do with the
23  investigation and don't know the facts of the
24  investigation, so it's obvious that Mr. Parks wasn't
25  the suspect, so I see it's false.

Page 62

1  Q.  And as you also know from various
2  sources that the name Parks came up because of a
3  wrongful hit on a facial recognition technology?
4  MR. RUBENSTEIN:  Objection as to the
5  form.  You can answer.
6  A.  Yes, I do know that.
7  Q.  So that the hotel manager at the time
8  could not have identified it as Parks?
9  A.  That makes sense.
10  (Whereupon, Facial Recognition
11  Initiative Request For Facial Recognition/Photo
12  Array, was received and marked as Exhibit No. H-7
13  for identification.)
14  BY MR. SEXTON:
15  Q.  I'm showing you a document, a
16  three-page document marked as H-7.  It's marked
17  request for facial recognition/photo array.
18  A.  Yes, sir.
19  Q.  Have you ever seen this form before?
20  A.  No.
21  Q.  Okay.  Do you recognize the insignia
22  as a ROIC insignia?
23  A.  I haven't seen that insignia, but I would
24  imagine it probably is.
25  Q.  The first paragraph, it reads as

Page 63

1  follows:  "If the NJ ROIC facial recognition
2  initiative produces a possible match, this should
3  only be considered an investigative lead.  Further
4  investigation is needed to confirm a possible match
5  through other investigative corroborated information
6  and/or evidence."  Then it all caps it says,
7  "Investigative lead, not probable cause to make an
8  arrest."
9  Do you understand what that is saying
10  at the top of this form that the ROIC uses?
11  A.  I do.
12  Q.  And what is your understanding?
13  A.  That you can't use just a facial recognition
14  positive hit to make an arrest.
15  Q.  Investigative leads is a pretty broad
16  category, would you agree?
17  A.  Yes.
18  Q.  It could be anything from a tea leaf
19  to a hunch, almost anything, right?
20  A.  Well, I hope it's more than a hunch, but it's
21  a wide range.
22  Q.  Like what was the -- Monk, right,
23  investigators might have very unorthodox ways of
24  going about the very sort of off the margins
25  investigation.

Page 64

1  MR. RUBENSTEIN:  Is there a question?
2  BY MR. SEXTON:
3  Q.  Correct?
4  MR. RUBENSTEIN:  Objection as to
5  form.  If you understand it, you can answer.
6  A.  I don't really understand it.
7  Q.  There's certain evidence that can be
8  used to present to a court to support the legal
9  process, right?
10  A.  Yes.
11  Q.  And then there's other stuff that
12  can't go into court for a variety of reasons, right?
13  A.  I believe so.
14  Q.  Can you think of any -- things that
15  aren't allowed to be -- other things other than
16  facial recognition?
17  A.  I would imagine hearsay evidence, things of
18  that nature.
19  MR. RUBENSTEIN:  I'm just going to
20  object that this calls for a legal conclusion, but
21  you can answer.
22  BY MR. SEXTON:
23  Q.  What about like lie detector tests?
24  A.  Unless the counsel for the person agrees,
25  then, no, it can't be used.

Pages 61 to 64

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 65

1    Q.    So in this case, are you aware of any
2  other evidence other than the facial recognition
3  technology that led to the complaints that were
4  sworn out against Nijeer Parks?
5            MR. RUBENSTEIN:  Objection as to form
6  again. He's indicated he wasn't a part of the
7  investigation and it wasn't involved in the
8  underlying matter, but if you can answer, you can
9  answer.
10   A.    I believe there might have been an
11 identification.
12   Q.    What do you -- what is your
13 understanding of the identification that there might
14 have been?
15   A.    That either one or both of the officers that
16 were involved prior to Mr. Parks being placed under
17 arrest, may have identified him as the person that
18 was on scene that day that they confronted.
19   Q.    And what are you basing that
20 understanding on?
21   A.    Just things that I have heard.
22   Q.    Where did you -- whom did you hear
23 them from or how did you hear them?
24   A.    I think that may have been with
25 discussion with --

Page 66

1    Q.    You can't tell me about counsel.
2            MR. RUBENSTEIN:  If you heard it from
3  anyone other than anyone from this office or any of
4  the attorneys, you can talk about it.  Other than
5  that, you can't.
6  A.    I believe when I was -- Captain Neste or
7  somebody from the detective bureau said there was an
8  identification.
9    Q.    Okay.  Now, there are rules about how
10 identification is done, correct?
11 A.    Correct.
12   Q.    What do you recall about -- what can
13 you tell us about those rules?
14 A.    Well, since I have been out of the
15 investigative field for 11 years, I'm sure they've
16 changed, but, you know, you could do show-up lineups
17 within a certain amount of time or you could do a
18 photo array.
19   Q.    And there are certain rules for how to
20 do show-ups, a show-up has to done within such a --
21 recently after the event, for instance?
22 A.    Yeah, but I believe there's a caveat to that,
23 that, you know, with civilian witnesses, when an
24 officer has direct contact with somebody, there's a
25 little more weight to their identification.

Page 67

1    Q.    And what do you base that on?
2  A.    Just past knowledge.
3    Q.    Now, the CALEA --
4  A.    CALEA.
5    Q.    -- CALEA process, that would review
6  your use of show-ups and lineups, would it not?
7  A.    Yeah, they would touch on that.
8    Q.    Are you aware of the exonerating
9  evidence in this case --
10          MR. RUBENSTEIN:  Objection as to
11 form.
12   Q.    -- that was overlooked by your
13 department?
14          MR. RUBENSTEIN:  Objection as to
15 form.  You can answer.
16 A.    I'm not sure.  Can you repeat it?
17   Q.    Sure.  Are you aware of the
18 exonerating evidence that was -- in this case from
19 the start that your department ignored?
20          MR. RUBENSTEIN:  Objection.
21 A.    No, I'm not aware.
22   Q.    Okay.  Are you aware that the suspect
23 was described as being over 6 feet tall?
24          MR. RUBENSTEIN:  Objection to the
25 form.  I don't think that's what it says, but if you

Page 68

1  know, you know.
2  A.    I'm not aware.
3    Q.    Okay.  Were you aware that a sneaker
4  was recovered at the scene that was a size 12,
5  whereas the plaintiff has a size 7?
6            MR. RUBENSTEIN:  Objection as to
7  form.
8  BY MR. SEXTON:
9    Q.    Were you aware of that?
10          MR. RUBENSTEIN:  You can answer.
11          THE WITNESS:  I can answer?
12          MR. RUBENSTEIN:  I'm sorry.
13          THE WITNESS:  When you object, I'm
14 not going to answer until somebody says go ahead.
15 BY MR. SEXTON:
16   Q.    Unless he tells you not to answer,
17 he's just creating a record.
18 A.    No, I am not aware.
19          (Whereupon, photocopy of photographs,
20 was received and marked as Exhibit No. H-8 for
21 identification.)
22 BY MR. SEXTON:
23   Q.    This is Parks 162 previously entered
24 in the other depositions, we will mark it as H-8.
25          This is the OJ moment.  Not a glove,

Pages 65 to 68

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 69

```
1    but a shoe.
2          So I'll present to you that this is a
3    picture from your department taken of -- marked as
4    H-8, of a sneaker that fell off the perpetrator at
5    the Hampton Inn, and it indicates, it's next to a
6    ruler, that a size 12 or 12 and a half.  The
7    plaintiff in this matter is 5'7" and has a size nine
8    shoe.
9          Would you agree that it was an
10   oversight not to have tested this against Mr. Parks
11   when he came down to your office to clear this
12   matter up?
13         MR. RUBENSTEIN:  Objection as to
14   form.  You can answer.
15   A.   Well, if things remained the same way as when
16   I was a detective, things are packaged up for
17   evidence, you don't open them once they're sealed.
18   So I don't know what the circumstances were, so it's
19   hard to answer that.
20   Q.   Well, so even if -- but you would
21   agree if they couldn't take it out of the plastic
22   bag because it had been preserved in the plastic
23   bag, they had this picture that showed it was a size
24   12 or 12 and a half, correct?
25   A.   Well, people do wear oversized clothing, and,
```

Page 70

```
1    you know, it looks like from -- this is very hard to
2    see, because it's not a very clear picture, but it
3    looks like the shoe is not tied.  It's kind of wide
4    open.
5    Q.   Which would explain why it fell off?
6    A.   Could be.  Because it was oversized.
7    Q.      Fingerprints are admissible evidence,
8    correct?
9    A.   Yes.
10   Q.      And you are aware that your department
11   did not obtain fingerprint matches until Mr. Parks
12   had been arrested for a couple of weeks, are you?
13   Or are you?
14   A.   Can I consult with my attorney?
15   Q.      No.  Maybe I didn't make the question
16   clear.
17   A.   No, I wasn't aware.
18   Q.      Okay.  Did you -- as you sit -- you
19   were never aware?
20   A.   No.
21   Q.      Okay.
22   A.   I didn't have the details of the
23   investigation.
24         THE WITNESS:  Can I consult with you
25   now?
```

Page 71

```
1          MR. RUBENSTEIN:  No.  Once we start.
2          THE WITNESS:  All right.
3          MR. RUBENSTEIN:  I am here for
4    support.
5          THE WITNESS:  Okay.
6          MR. SEXTON:  I am going to mark as
7    H-9, it's Parks 100 through 105.
8          (Whereupon, CJIS 2000 Response, was
9    received and marked as Exhibit No. 9 for
10   identification.)
11   BY MR. SEXTON:
12   Q.   So I believe the date is February 14?
13   A.   Of 2019.
14   Q.   Yeah.  I think -- if I am recalling
15   the dates correctly, the incident occurred on the
16   26th of January and Mr. Parks came down to your
17   offices on I think it was February -- let me see.
18   The first week of February.  And the warrants were
19   sworn out on January 30.
20         So two weeks after the warrants were
21   sworn out, this what's represented as H-9 is that
22   the fingerprints at the scene belong to Barrington
23   Walker?
24   A.   Okay.
25   Q.   This is evidence that is reliable in
```

Page 72

```
1    court, is it not?
2    A.   Yes.
3    Q.      And you -- would you agree that this
4    is evidence that exonerates the plaintiff?
5          MR. RUBENSTEIN:  Objection as to
6    form.  You can answer.
7    A.   I guess I have a question.  Is this what was
8    taken from the scene?
9    Q.   Yes.  I can represent that the -- that
10   these were taken from the scene from the glass door,
11   that they were taken by your department to the lab I
12   believe in Monmouth County, and that it took -- the
13   lab was, you know -- there was nothing -- there was
14   a little delay in it being delivered to Monmouth
15   County and there was a little bit of delay at
16   Monmouth County for the results to come back.
17         MR. RUBENSTEIN:  Objection to the
18   term delay.
19   A.   Well, I guess to your initial question, if
20   you're asking that the results are from what was
21   lifted at the scene, I agree that it was for
22   Barrington Walker.
23   Q.   Are you aware that DNA evidence was
24   also taken at the scene?
25   A.   I believe -- yes, I am aware, yes.
```

Pages 69 to 72

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 73

1     Q.    And were you made aware that the DNA
2   also matched Barrington Walker, albeit for
3   disclosure at a later time?
4   A.    I didn't know that.
5     Q.    All right.  I have come to understand
6   that one can get a hit after the fact when data I
7   guess gets into the system or something?
8   A.    Okay.
9     Q.    So at a later time there was a DNA hit
10  for the same person?
11  A.    I didn't know that.
12    Q.    Given that there was fingerprints and
13  a DNA hit from the evidence that was taken by your
14  detectives at the scene, would you agree that all
15  the evidence indicates that it was Barrington Walker
16  who was the actor at the Hampton Inn on January 26,
17  2019?
18          MR. RUBENSTEIN:  At what point in
19  time are you asking his opinion?
20          MR. SEXTON:  None.
21          MR. RUBENSTEIN:  So as of
22  October 18th.
23  A.    Yes, I agree.
24    Q.    Did you ever -- did anybody ever talk
25  to you about the statement that Nijeer Parks gave --

Page 74

1   strike that.
2          Are you aware of the circumstances of
3   how Nijeer Parks came to be at your police
4   headquarters?
5   A.    I was told by either Captain Neste or
6   Sergeant Penicaro from the criminal investigation
7   bureau that I believe that our officers went to
8   wherever Mr. Parks lives and notified a relative,
9   I'm not sure who, that they needed to talk to him,
10  that -- I'm not sure if they said they had a
11  warrant, but that he came to our headquarters.
12    Q.    So you're aware that he came
13  voluntarily?
14  A.    Yes.
15    Q.    And are you aware that he said he'd
16  never been in Woodbridge before at that time?
17  A.    No.
18    Q.    Were you aware that he said he had an
19  alibi?
20  A.    No.
21    Q.    Were you aware that he never had --
22  that the evidence shows that he asserts that he
23  never had a driver's license until recently after
24  the events of this case?
25  A.    I didn't know that.

Page 75

1     Q.    Are you aware that facial recognition
2   has been particularly has been inherently and particularly
3   fallible when used with -- with black faces?
4          MR. RUBENSTEIN:  Objection as to
5   form.  You can answer.
6   A.    I have read it.
7     Q.    Where did you read that?
8   A.    Same thing, newspaper or on-line.
9     Q.    And --
10  A.    I don't know that to be a fact.  That's
11  what's being claimed and --
12    Q.    Fair enough.  Are you aware that none
13  of the officers involved on Woodbridge -- from
14  Woodbridge in this matter are African American?
15          MR. RUBENSTEIN:  I'm going to object
16  as to every officer that was involved in this
17  matter?  That's all I'm asking, that's all, I just
18  want to make sure I understand the question.
19  BY MR. SEXTON:
20    Q.    Well, are you aware of any African
21  America officers who were involved in the
22  investigation or arrest of Nijeer Parks?
23  A.    I am not.
24          MR. SEXTON:  Off the record.
25          (Whereupon, at 12:08 p.m., a recess

Page 76

1   was taken.)
2          (Whereupon, at 12:15 p.m., the
3   deposition resumed.)
4          (Whereupon, Woodbridge Police Department
5   Professional Standards Division, Internal Affairs
6   Bureau report, was received and marked as Exhibit
7   No. H-10 for identification.)
8   BY MR. SEXTON:
9     Q.    H-10 appears to be first a memo to
10  Captain Kuzma, who is the CLEO.
11  A.    That's Chief Law Enforcement Officer, who is
12  the highest ranking captain.
13    Q.    That's his title, okay.
14  A.    Yeah.
15    Q.    From the Valez 3 page report and then
16  followed by copies of a letter with a certified mail
17  receipt to plaintiff.  Could you -- have you seen
18  this before?
19  A.    No, I haven't.
20    Q.    Do you recognize this as something you
21  have seen before?
22  A.    I have seen reports like this before, yes.
23    Q.    What is this -- is this -- does this
24  have a specific name, this report?
25  A.    It is the summary of the investigation by the

Pages 73 to 76

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 77

1    internal affairs unit.
2        Q.    Is it fair to call it a closeout
3    report?
4        A.    I don't know that we actually have a name for
5    it.  You would have to ask internal affairs.  I see
6    it at the conclusion of their investigation with
7    their findings.
8        Q.    This is done -- this was just done
9    December 29, 2021, so at the end of last year, about
10   a year after this lawsuit was filed?
11       A.    Correct.
12       Q.    And with the benefit of all of the
13   documents that indicates some of which we have
14   looked at today, correct?
15       A.    Correct.
16       Q.    Is any exonerating evidence mentioned
17   in this report?
18              MR. RUBENSTEIN:  I am going to object
19   to the form, but, again, you can answer.
20       A.    I have to read through it.
21       Q.    Take your time.
22       A.    No, not that I see.  There's no mention of
23   the fingerprint match to Barrington Walker anywhere
24   in there.  So there is no mention of the DNA
25   matching Barrington Walker in there.

Page 78

1        Q.    So there's no mention by assertion by
2    the suspect that he had never been in Woodbridge
3    before?
4        A.    No.
5        Q.    There is no mention that the suspect
6    said he had never driven -- had a driver's license
7    before the incident?
8        A.    No.
9        Q.    There's no mention that Barrington
10   Walker, who is over 6-foot tall while Nijeer Parks
11   is a short, slight man?
12       A.    No.
13       Q.    There's no mention that the -- is it
14   fair to say this IA report relies entirely on the
15   facial recognition evidence to conclude that there
16   is no -- that there was no problem with the charging
17   and arresting Nijeer Parks?
18       A.    No.  I think there's a little more than that,
19   because it talks about presenting it to the
20   assistant prosecutor and finding probable cause and
21   then the judge finding probable cause.
22       Q.    If you look at findings and
23   conclusions.
24       A.    Where are we at?
25       Q.    Last page.  I find that Detective --

Page 79

1        A.    Right.
2        Q.    -- Tapia --
3        A.    Right.
4        Q.    -- acted in good faith when he
5    submitted the fraudulent Tennessee driver's license
6    for a facial recognition comparison?
7        A.    Right.
8              MR. RUBENSTEIN:  It says more than
9    that.
10             MR. SEXTON:  It has a whole page.
11             MR. RUBENSTEIN:  In that paragraph
12   that you are leaving out.
13   BY MR. SEXTON:
14       Q.    My question is about -- in the
15   findings of internal affairs, what evidence did they
16   find in support of the charging and arresting of
17   Nijeer Parks, the findings and conclusions, I see
18   only the facial recognition comparison mentioned.
19   That he himself says that Investigator Velez --
20   third -- fourth paragraph down and findings
21   conclusions, "I reviewed the photographs of
22   Mr. Parks in the high profile comparison and they
23   are similar and can be mistaken as the same person."
24       A.    I see that.
25       Q.    Is there any other physical evidence?

Page 80

1        A.    Not in that section.  But again, I think you
2    have to take the report as a whole incident and
3    summary where probable cause was found by the
4    assistant prosecutor and then again by the judge.
5        Q.    What is the evidence, if any,
6    mentioned?
7        A.    In this report?
8        Q.    Yeah.
9        A.    There isn't other than facial recognition and
10   interview by Detective Kondracki.
11       Q.    Where does it say that Kondracki
12   obtained evidence?
13       A.    It says he interviewed him.
14       Q.    Given what you have seen here today,
15   will you issue any new rules and regulations for
16   this facial technology in your department?
17       A.    Not unless the attorney general comes out
18   with his directive.
19       Q.    So would you -- so somebody tomorrow
20   could be arrested on the same basis that Nijeer
21   Parks was in your department because the AG has not
22   given you --
23       A.    Again, it would have to be in conjunction
24   with other evidence of probable cause other than
25   just facial recognition.

Pages 77 to 80

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 81

1  Q.   What other evidence was there in this
2  case other than face recognition?
3  A.   Again, I think I stated earlier, I was told
4  that there was an identification by one of the
5  officers.
6  Q.   Nine days after an incident, that is
7  way too late for a show-up even for a police
8  officer?
9  MR. RUBENSTEIN:  Objection as to
10  form.  You can answer.
11  A.   Again, I think more weight is put on an
12  officer's identification because he had physical
13  contact with the individual, was actually in the
14  process of putting handcuffs on him, so I think it's
15  pretty reasonable that an identification could take
16  place.
17  Q.   Did you know that Officer Lee was told
18  that we have the guy Parks and he was handcuffed on
19  the bench and Lee went in and said that's the guy?
20  A.   I didn't know that.
21  Q.   Do you see some problems with the way
22  that's set up?
23  MR. RUBENSTEIN:  Objection as to
24  form.  You can answer.
25  A.   If I happened the way you're stating?

Page 82

1  Q.   Yeah.
2  A.   It is very suggestive.
3  Q.   And because Parks was sitting down,
4  Lee didn't get to -- would you agree he would not be
5  able to gauge the man's height as easily as if he
6  were standing next to him?
7  A.   I can't speak for Officer Lee, I mean --
8  Q.   Just your experience, if somebody is
9  sitting down, it's hard to --
10  A.   You can't tell exactly, but you can tell if
11  somebody is tall or short.
12  Q.   It's a lot more clear if the person is
13  standing next to you, you would agree?
14  A.   I would agree, yeah.
15  Q.   Thank you for your time.  I know
16  you've got a lot on your desk.  I appreciate your
17  coming down.
18  MR. RUBENSTEIN:  I just have a couple
19  of questions.
20  MS. LEMPKA:  I'm good, Director.
21  CROSS-EXAMINATION BY MR. RUBENSTEIN:
22  Q.   You mentioned at the beginning of your
23  deposition that you initiated an -- asked an IA
24  investigation be performed into the circumstances
25  surrounding Nijeer Parks' address; is that correct?

Page 83

1  A.   That is correct.
2  Q.   Was that -- you mentioned it was a
3  notice of disclaim that made you ask for the IA
4  investigation.  Were you talking about the formal
5  complaint that was filed in Superior Court where he
6  was -- Mr. Parks alleged his wrongful arrest and is
7  seeking damages and everything, is that what made
8  you, the Notice of Claim, the actual complaint that
9  his attorney filed for him?
10  A.   Yes.
11  Q.   You also discussed with counsel some
12  detail about IA investigations.  Are there
13  certain -- is there certain types of conduct where
14  the internal affairs division does not do the
15  investigation, but the prosecutor's office does?
16  A.   Yes.
17  Q.   What types of matters are there?
18  A.   Criminal, anything that may relate to a
19  criminal or a possibility a criminal charge, the
20  prosecutor will charge, and we are not allowed to
21  investigate until they return it to you.
22  Q.   And the prosecutor's office
23  investigates and determines whether to file criminal
24  charges; is that correct?
25  A.   Yes.

Page 84

1  Q.   Later on if applicable, the
2  prosecutor's office will tell you you can conduct an
3  IA investigation, it's up to you or will instruct
4  you to conduct an IA investigation; is that correct?
5  A.   Yes.
6  Q.   Okay.  And in this document marked as
7  H-1, this is the internal affairs investigation, the
8  second page, second full paragraph, you were asked a
9  few minutes ago about what evidence at the time of
10  Mr. Parks' arrest, not years later.  Can you read
11  this paragraph into the record?
12  A.   Yes.
13  Q.   Thank you.
14  A.   "January 27, 2019, Detective Tapia received
15  notification from Rockland County Sheriff's
16  Intelligence Center that they had a high profile
17  comparison to the photo on the fraudulent Tennessee
18  driver's license.  The high profile comparison was
19  identified as Nijeer Parks with a date of birth of
20  September 11, 1987.  Detective Tapia compared the
21  photo on the fraudulent Tennessee driver's license
22  photo with the photo on Nijeer Parks' assigned New
23  Jersey driver's license, number P, as in Paul,
24  06195927209872 and determined it to be the same
25  person."

Pages 81 to 84

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 85

1    Q.    All right.  So upon -- when you read
2  that, does it indicate that Mr. Parks had a driver's
3  license that was assigned -- given an assigned
4  number?
5    A.    Yes.
6    Q.    Okay.  And according to Detective
7  Tapia, at the time when the events were occurring,
8  he -- did he compare the facial recognition results
9  together with this driver's license?
10   A.    Yes.
11   Q.    And what was his opinion?
12   A.    He determined it to be the same person.
13   Q.    Okay.  And that was at the time that
14  all these events were occurring?
15   A.    That's correct.
16   Q.    Okay.  Would -- if you know, in your
17  experience as a both police officer and as the
18  director of the Woodbridge Police Department, would
19  back in 2019 the hit that was received from facial
20  recognition coupled with an officer or in this case
21  a Sergeant Tapia -- Detective Tapia finding at the
22  same -- they looked the same -- looked like the same
23  person, would that be ample probable cause to
24  initiate an arrest?
25        MR. SEXTON:  Objection to form.

Page 86

1    A.    I believe that would be.
2    Q.    That's all I have.
3  REDIRECT EXAMINATION BY MR. SEXTON:
4    Q.    Just a couple of follow up.
5        You know Detective Tapia wasn't at the
6  scene and never saw the actor?
7    A.    I don't know that, but it makes sense.
8    Q.    So knowing that he was not -- did not
9  observe the actor, do you want to change your answer
10  that you just gave to your attorney?
11   A.    Well, I don't believe so.  If he was looking
12  at the facial recognition and the driver's license,
13  he can make a judgment.
14   Q.    And that's enough evidence to arrest
15  somebody?
16   A.    With other things.
17   Q.    Is there anything other mentioned in
18  this report?
19   A.    As I stated earlier, I believe one of the
20  officers identified Mr. Parks as being the same
21  person who he dealt with on scene on the day of the
22  incident.
23   Q.    When you have IDs, the process of
24  ID'ing in an investigation, isn't that a process
25  where eyewitnesses are providing an account?

Page 87

1        MR. RUBENSTEIN:  Objection as to
2  form.  Again, you can answer if you understand the
3  question.
4    A.    Am I understanding you to say considering
5  Detective Tapia to be an eyewitness, he wasn't, I
6  agree, if he wasn't on scene if that's the fact.
7  But being able to look at a photo, and a photo of
8  the person you have with you, and comparing them, I
9  think he can still make an identification.
10   Q.    But the process of trying to confirm
11  the reliability of visual identification of a
12  suspect, there is -- there's -- there's show-ups,
13  right?
14   A.    Correct.
15   Q.    And that's -- and that happens right
16  after a crime?
17   A.    Correct.
18   Q.    Victim or an eyewitness, right, so
19  somebody who's laid their own eyes on, and then
20  there's the addition of reliability that it just
21  happened, it's fresh in your mind, so that allows --
22  because he's clearly suggestive when the police are
23  holding somebody, but because of the time and being
24  right there, the law says that it's reliable enough
25  to put into evidence, right?

Page 88

1    A.    Correct.
2    Q.    Now, later when it's not at the scene,
3  there's all these kinds of rules, you have to get
4  all the people dressed in the same way, have the
5  same facial hair, put them all up, same race, da,
6  da, da, da, and that's also -- the eyewitness does
7  that, right?
8    A.    Correct.
9    Q.    And I gather -- I've learned in this
10  case that lineups are rarely used anymore because of
11  people -- your detective said they only see them in
12  movies, and they do photo arrays?
13   A.    Correct.
14   Q.    And there's all kinds of rules for
15  photo arrays?
16   A.    That's correct.
17   Q.    But those are all ways of testing the
18  reliability of eyewitness evidence, isn't it?
19   A.    Yes.
20   Q.    So somebody -- so Tapia getting a
21  report from the ROIC and then getting a license --
22  picture of a license, a grainy picture of a license
23  from the scene, where -- what is that?  That doesn't
24  appear -- I don't even know how to contextualize it,
25  because it doesn't appear to fall into these types

Pages 85 to 88

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 89

1   of things dealing with eyewitness testimony.
2         MR. RUBENSTEIN:  Objection as to
3   form.  You can answer.
4   A.    Well, in my opinion, it's still a form of
5   identification, because you're looking at, as I said
6   before, a photograph of what the ROIC has returned
7   to you or one of the ROIC's, I think it was Rockland
8   County returned, and a driver's license of the
9   subject who's being identified, and he can form an
10  opinion that they could be one in the same.  It's a
11  form of identification.
12        Q.    You think that's enough to satisfy
13  probable cause?
14  A.    As I said before, not by itself, I think with
15  other factors.
16        Q.    All right.  Thank you.
17  RECROSS-EXAMINATION BY MR. RUBENSTEIN:
18        Q.    Would Officer Lyszyk in this matter
19  having also identified Mr. Parks as being the person
20  who perpetrated the crime, coupled with Detective
21  Tapia's identification when he looked at the two
22  photographs and the document that -- the photograph
23  that was received from the ROIC be enough probable
24  cause to arrest?
25  A.    I believe so.

Page 90

1         MR. SEXTON:  Objection to form.
2   BY MR. RUBENSTEIN:
3         Q.    And this is based on your experience
4   of 30 years?
5   A.    Correct.
6         Q.    Okay.  Thank you.
7   REDIRECT EXAMINATION BY MR. SEXTON:
8         Q.    Just following up on that.  If you
9   look at H-6 --
10        MR. RUBENSTEIN:  Of which document?
11        MR. SEXTON:  Page Parks 21.
12  A.    Counselor, did you say 21?
13        Q.    Parks 21, yeah.
14  A.    Got it.
15        Q.    Is there anywhere in page 21 or 22
16  where Officer Lyszyk asserts in support of probable
17  cause that he personally made, based on his having
18  been an eyewitness, an identification of Parks?
19  A.    Just repeat the question, please.
20        Q.    Is there anything in this affidavit of
21  probable cause where Officer Lyszyk indicates that
22  he identified Parks based upon his having identified
23  the perpetrator -- having observed the perpetrator
24  on January 26?
25  A.    Not that I see.

Page 91

1         Q.    Thank you.
2               (Whereupon, at 12:40 p.m., the
3   deposition was concluded.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 92

1              C E R T I F I C A T E
2
3         I, LAURA BURNS, a Certified Court
4   Reporter and Notary Public of the State of New
5   Jersey, certify that the foregoing is a true and
6   accurate transcript of the stenographic notes of the
7   deposition of said witness who was first duly sworn
8   by me, on the date and place hereinbefore set forth.
9         I FURTHER CERTIFY that I am neither
10  attorney, nor counsel for, nor related to or
11  employed by, any of the parties to the action in
12  which this deposition was taken, and further that I
13  am not a relative or employee of any attorney or
14  counsel in this case, nor am I financially
15  interested in this case.
16
    LAURA BURNS, C.C.R.
17  LICENSE NO. 30X100218200
18
19
20
21
22
23
24
25

Pages 89 to 92

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

# EXHIBIT "I"

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 21-4021
(JXN)(LDW)
-----------------------
NIJEER PARKS,

     Plaintiff,

     -v-

JOHN E. MCCORMAC, MAYOR OF
WOODBRIDGE, IN HIS PERSONAL
AND OFFICIAL CAPACITY, ROBERT
HUBNER, DIRECTOR OF THE
WOODBRIDGE POLICE, IN HIS
PERSONAL AND OFFICIAL CAPACITY,
CITY OF WOODBRIDGE POLICE
OFFICERS, ANDREW LYSZK AND
WOODBRIDGE POLICE SGT. JOSEPH
LICCIARDI, WOODBRIDGE POLICE
OFFICERS, JOHN AND JANE DOES
1-20, BEING AS YET UNKNOWN
ACTORS, MIDDLESEX DEPARTMENT
OF CORRECTIONS, JOHN AND JANE
DOES 1-20, BEING UNKNOWN
ACTORS, MIDDLESEX COUNTY
PROSECUTOR, ACTING PROSECUTOR
CHRISTOPHER KUBERIET, IN HIS
PERSONAL AND OFFICIAL CAPACITY,
AND ASSISTANT MIDDLESEX COUNTY
PROSECUTOR, PETER NATASI, AND
IDEMIA, INC.'S BEING THE MAKER
OF THE FACIAL RECOGNITION
SOFTWARE AND ABC CORPORATION,
BEING AN AS YET UNKNOWN SELLER
OR SERVICER OF THE FACIAL
RECOGNITION PROGRAMS,

     Defendants.
-----------------------
HUDSON COURT REPORTING & VIDEO    (732) 906-2078

Page 2

1        TRANSCRIPT of the stenographic notes of
2  the deposition of the above-named witness, called
3  for Oral Examination in the above-entitled matter,
4  said deposition being taken pursuant to District
5  Court Rules of Civil Practice and Procedure, by and
6  before BARBARA DELACRUZ, a Certified Court Reporter
7  of the State of New Jersey, License No. XI01772,
8  and Notary Public of the State of New Jersey and
9  New York, at the Law Offices of DANIEL W. SEXTON,
10  ESQ., 229 New Center Road, Hillsborough, New
11  Jersey, 08844-4003, on September 28, 2023,
12  commencing at 10:54 in the forenoon.

Page 3

2        IT IS HEREBY STIPULATED AND AGREED by
3  and between the attorneys for the respective
4  parties herein that the sealing, filing and
5  certification of the within deposition be waived;
6  that such deposition may be signed and sworn to
7  before any officer authorized to administer an oath
8  with the same force and effect as if signed and
9  sworn to before a judge.

11        IT IS FURTHER STIPULATED AND AGREED
12  that all objections, except as to form, are
13  reserved to the time of trial.

Page 4

1  A P P E A R A N C E S :
2
3     DANIEL W. SEXTON, ESQ.
      229 NEW CENTER ROAD
4     HILLSBOROUGH, NJ 08844-4003
      PHONE:(201) 406-9960
5     ATTORNEYS FOR THE PLAINTIFF
6
      (REMOTELY)
7     GARRY J. CLEMENTE, ESQ.
      JAMES P NOLAN & ASSOCIATES, LLC
8     61 GREEN STREET
      WOODBRIDGE, NJ 07095-2915
9     PHONE:(732) 636-3344
      FAX(ES):(732) 636-1175
10    GCLEMENTE@JPNLAW.US
      ATTORNEYS FOR THE DEFENDANTS

Pages 1 to 4

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 5

```
 1              I N D E X
 2   WITNESS
 3   SEAMUS LYONS
 4          DIRECT  CROSS  REDIRECT  RECROSS
 5   By Mr. Sexton     5              90
 6   By Mr. Clemente          83          95
 7          EXHIBITS
 8   NUMBER        DESCRIPTION         PAGE
     Lyons-1    10-page document        42
 9   Lyons-2    Request for facial      57
                recognition photo array
10   Lyons-3    NYSIC request form      59
     Lyons-4    Rockland County Intel   61
11              Center incident report
     Lyons-5    E-mail chain            66
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1   INVESTIGATOR SEAMUS LYONS,
 2   witness herein, having been duly sworn according to
 3   law by the Officer, Barbara Delacruz, a Certified
 4   Court Reporter for the State of New Jersey and a
 5   Notary Public within and for the State of New
 6   Jersey and New York, testified as follows:
 7
 8   DIRECT EXAMINATION BY MR. SEXTON:
 9       Q.    All right. Good morning, sir, thank
10   you for coming and appearing today. I wonder if
11   you could just -- how long have you -- what is your
12   position currently?
13       A.    I'm currently an investigator with
14   the Rockland County Sheriff's Department, assigned
15   to the intel division.
16       Q.    I should do a couple preliminaries.
17   Have you ever been deposed before?
18       A.    Yes, I have.
19       Q.    Approximately how many times?
20       A.    Five or six.
21       Q.    Okay. When was the most recent time
22   you've been deposed?
23       A.    Probably four years ago.
24       Q.    Okay. So, I'll, because of your
25   experience, just very briefly go over the rules.
```

Page 7

```
 1   As you see, a stenographic record is being made, so
 2   it's important that make all our communications
 3   verbally. She can't -- the reporter can't take
 4   down nods of the head, et cetera, so we have to say
 5   yes, no, things like that. If there is any
 6   question -- you're here as a nonparty witness. I
 7   appreciate your cooperation, and I appreciate you
 8   coming all the way down from New York.
 9           If there is a question you don't
10   understand, please say so and I'll rephrase it.
11   If, yeah, so, I think -- do you have any questions
12   of me before we proceed?
13       A.    No, I do not.
14       Q.    So, you were telling me that you're
15   an investigator with the Rockland County Sheriff's
16   Office?
17       A.    That is correct.
18       Q.    You mentioned something about a
19   division within that?
20       A.    The intel division.
21       Q.    And what is the intel division of
22   the Rockland County Sheriff's Office?
23       A.    We are comprised of multiple
24   agencies, both Federal and state agencies, law
25   enforcement. We work in conjunction with other
```

Page 8

```
 1   police departments throughout the county, in
 2   Rockland, the New York area, New Jersey, and other
 3   states.
 4       Q.    When was -- does it have a -- was
 5   it, what is this inter, interagency, multistate
 6   entity known as?
 7       A.    It's known as the Rockland County
 8   Intelligence Center, where we support -- we provide
 9   services to outside law enforcement, be it manpower
10   support, be it police records management, providing
11   them with intelligence gathering, things of that
12   nature.
13       Q.    Okay, does it, does it have the
14   acronym ROCK?
15       A.    RCIC, Rockland County Intel Center.
16       Q.    RCIC, okay. And when was that
17   formed?
18       A.    Well, I've been a police officer for
19   over 27 years, so, I would say probably over 20
20   years ago it was formed.
21       Q.    Do you know what, why it was formed,
22   what was, surrounded its formation or --
23       A.    It was just a law enforcement
24   gathering, a meeting, actually, that took place
25   where they decided to get experienced law
```

Page 9

1  enforcement officers together and, after 9/11, it
2  was basically focused on terrorism, crimes,
3  homicides, gangs, things of that nature.
4      Q.    Okay.  Were you there in your early
5  days?
6      A.    No.  My early days started, many
7  years ago, I was a police officer.  I graduated the
8  Rockland County Police Academy, and I was a village
9  police officer for approximately two and a half
10  years.  I left that, and I attended the New York
11  City Police Academy, where I worked in the confines
12  of the four-six precinct.  I was there a short
13  period of time.  I left there, and then attended
14  the New York State Police Academy, where I finished
15  out my career before coming to the Rockland County
16  Sheriff's Department.
17      Q.    So, when you say 27 years of
18  service, would that encompass from when you were a
19  village officer to when you served as a state
20  trooper?
21      A.    That would be combined years of
22  service, yes.
23      Q.    When did you leave the State, the
24  State Police?
25      A.    I left the State Police in the year

Page 10

1  of 2013.
2      Q.    And so now you're an investigator in
3  the sheriff's office.  Are you, are you a sworn law
4  enforcement officer, or --
5      A.    I am a sworn police officer, yes, I
6  am.
7      Q.    What is your position within the
8  intel division of the Rockland County Intelligence
9  Center?
10      A.    I'm assigned as an investigator.
11      Q.    So, an investigator is an
12  assignment, not a rank?
13      A.    Correct, my title, as an
14  investigator, is investigator with the Rockland
15  County Sheriff's Department.  It is basically being
16  a detective within the Rockland County Sheriff's
17  Department.  We have the same functions.
18      Q.    And what is your rank?
19      A.    I don't hold a rank, I am just a
20  title, investigator.
21      Q.    What was the -- what rank were you
22  with the State Police?
23      A.    I was a uniformed New York State
24  Trooper promoted to investigator, and retired as a
25  New York State Trooper.

Page 11

1      Q.    How long were you an investigator
2  with the State Police?
3      A.    A short period of time.  I came back
4  to the road as a uniformed member.
5      Q.    When you were an investigator for
6  the state police, did you have any special
7  training?
8      A.    Yes, I did.
9      Q.    Tell me about your state police
10  training.
11      A.    I graduated the New York State
12  Police Academy in Albany, which is six months long,
13  where you actually have to reside at the academy.
14  Where you live there and just come home on the
15  weekends.  Basically you're trained in police
16  science, New York State penal law, vehicle and
17  traffic law, and, basically, police functions
18  as a uniformed member of the New York State Police.
19      Q.    Okay.  When you became -- how about
20  when you were briefly an investigator, was there
21  special training associated with that?
22      A.    It's pretty -- it's basically
23  on-the-job training, where you attend the academy
24  for another week, where you learn investigative
25  techniques.

Page 12

1      Q.    In that week, do you remember, when
2  was that week?
3      A.    I don't recall when that was.
4      Q.    A while back?
5      A.    Yeah, many years ago.
6      Q.    Do you remember anything that you
7  were taught in that week?
8      A.    Basically, interview techniques,
9  surveillance techniques, interviewing and
10  interrogation, pretty much, basically, that's it,
11  and then it's basically on-the-job training.
12      Q.    Okay.  Skipping ahead to, I guess it
13  was 2013, when you go to the RCIC --
14      A.    Correct.
15      Q.    -- when -- was that -- did you go
16  straight into the RCIC when you went to Rockland
17  County?
18      A.    No, I did not.
19      Q.    Okay.  When you -- where did you
20  first land at Rockland County?
21      A.    I landed in the Rockland County
22  Sheriff's patrol division as a deputy sheriff in
23  prisoner transports.
24      Q.    Okay.  When did you move to the
25  RCIC?

Pages 9 to 12

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 13

| | | |
|---|---|---|
| 1 | A. | Within that first year, so, 2013. |
| 2 | Q. | How did that come about? |
| 3 | A. | I requested it through the Sheriff's |

4  Department. You put a resume together, and your
5  training experience and background, and then it's
6  an appointed position by the sheriff.
7      Q.    Okay, when, when you moved there,
8  did you have any -- were you given training?
9      A.    Yes.
10     Q.    Can you tell me about the training
11 you were given?
12     A.    It's basically on-the-job training,
13 where you're taught by a senior officer, you know,
14 it's basically, conducting backgrounds, running
15 checks, like I stated earlier, surveillance
16 techniques, pole cameras, installation,
17 investigating crimes, rapes, homicides, and
18 basically assisting outside agencies with manpower
19 support or workups. When I say "workups," we
20 conduct criminal histories, we run financials, we
21 do clear reports. When I say "clear reports," it's
22 pretty much a check of your background,
23 recordkeeping, banks, prior addresses, family
24 members, last known addresses.
25     Q.    Who, whom do you do this for?

Page 14

1      A.    This usually comes in through a
2  request, through any agency, be it through an
3  e-mail or direct call or in person, an agency can
4  come in and request assistance with any criminal
5  investigation. It's then assigned a case number.
6  That case number is then turned over to either a
7  boss or a lieutenant, who will then assign it to a
8  member of the Rockland County Intel Center.
9      Q.    How many, how many members are in
10 the RCIC?
11     A.    Right now, I believe we have 15
12 members, and one senior crime analyst, and we have
13 another analyst starting very shortly.
14     Q.    Other than the senior crime analyst,
15 is everyone else an investigator?
16     A.    No, we have, we are a mix of both
17 investigators, detectives, and patrol, patrol
18 personnel.
19     Q.    Okay. Approximately how many are --
20 how does that break down number wise?
21     A.    Number wise it's more than half of
22 our investigators or detectives.
23     Q.    Is there any difference between the
24 duties of a detective and an investigator?
25     A.    No, they're both the same duties.

Page 15

1      Q.    Why the different title?
2      A.    Because some are sent or appointed
3  to Rockland County at the intel center from other
4  departments. We have a detective from another
5  police department, which would be the Village or
6  the Town of Haverstraw, so he is assigned to the
7  Rockland County Intel Center as a detective from
8  that department.
9      Q.    Is that, how -- Officer Dey, D-E-Y?
10     A.    Lieutenant Rich Dey.
11     Q.    Okay. So he's with the Palisades
12 Interstate Police, right?
13     A.    He's with the Palisades Interstate
14 Parkway Police in Alpine, New Jersey.
15     Q.    PIPP.
16     A.    Correct.
17     Q.    What's his first name?
18     A.    Richard.
19     Q.    Richard. Okay. He's a lieutenant,
20 you said?
21     A.    He's a lieutenant.
22     Q.    Is he one of these 15 members?
23     A.    He is assigned to the Rockland
24 County Intel Center, yes.
25     Q.    And when you're assigned there, is

Page 16

1  that your full-time gig, or you do other --
2      A.    You wear different hats. He'll be
3  assigned one or two days a week, and then he does
4  the patrol function at his station, in Alpine.
5      Q.    When you assist another agency, do
6  they, is there a fee for the service?
7      A.    None, no, not at all.
8      Q.    So, this sounds like kind of an
9  expensive operation. Who pays for it?
10     A.    It's funded, it's funded both by the
11 Federal grant money, the County, and also the
12 Rockland County Sheriff's Department, and also
13 grants. And we also take forfeit money, so, half
14 the moneys are, if there is a case that's resolved,
15 or, it's taken care of in court, the money is
16 actually spent and shared within the County to
17 different departments, including the Rockland
18 County Intel Center.
19     Q.    In your experience -- well, prior to
20 coming to RCIC, had you -- what was your experience
21 with biometric evidence?
22     A.    Not too much. I wasn't really too
23 familiar with it until reading it, or in training
24 at the -- for HIDTA, which is the high-intensity
25 drug trafficking area. It's an acronym for

Pages 13 to 16

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 17

1    eJustice.
2        Q.    H-I-D-E-A?
3        A.    H-I-D-T-A.
4        Q.    When were you involved in HIDTA?
5        A.    Basically, HIDTA is part of
6    eJustice. EJustice is the learning tool where we
7    can access records through New York State. These
8    records give us direct access to criminal
9    histories, mugshots, DMV files, registered
10   vehicles, DMV photos, out-of-state criminal
11   histories.
12       Q.    What's the FBI database? What's the
13   thing that, you know, everybody used to look up,
14   and then it was rather insecure, then it became
15   secure? You would just sort of find -- you would
16   run someone's plates, and you would get a whole --
17       A.    That is through eJustice.
18             MR. CLEMENTE: Object to form, you
19   can answer.
20             THE WITNESS: I can answer?
21       Q.    Okay. I forgot you were there.
22             Go ahead.
23       A.    Basically, eJustice gives the same
24   functions as the files you're describing. We have
25   access to running out-of-state plates, criminal

Page 18

1    histories. If you run a plate, we'll get
2    associated hits, if there's an associated hit on a
3    wanted person, so, as for the FBI, they have their
4    own records management, keeping system. I really
5    can't speak about what records they run. I know
6    they can do offline searches, but again, I'm not
7    familiar with that.
8        Q.    Who manages eJustice?
9        A.    It's managed by the State of New
10   York up in Albany, so it's part of the New York
11   State Police portal, and it's -- it's basically run
12   by the division of criminal justice in the State of
13   New York.
14       Q.    So, when did you work -- so HIDTA,
15   was that, like, an initiative, or is it a tool?
16       A.    It's a tool. It's a software, and
17   it's a tool, part of eJustice.
18       Q.    Okay, when did you use that tool?
19       A.    We basically use it all the time.
20       Q.    Now, when I said, asked you about
21   biometric evidence, what do you understand
22   biometric to be?
23       A.    Like I said, I'm not too familiar
24   with biometrics or algorithms or how HIDTA works
25   with facial recognition. I know that it's been

Page 19

1    discussed before, and it's part of the software
2    that HIDTA utilizes in using facial recognition.
3        Q.    Okay. If I told you that biometric
4    would encompass everything from eye irises to
5    facial recognition to fingerprints and DNA,
6    would that -- would you agree with that?
7        A.    I would agree with that, yes.
8        Q.    So, have you -- of those biometric
9    tests, if we could just go briefly through, have
10   you any experience with iris, eye, iris tests, in
11   your work as an investigator?
12       A.    No.
13       Q.    How about fingerprints?
14       A.    In what form?
15       Q.    Any form, have you dealt with
16   fingerprints?
17       A.    Absolutely.
18       Q.    And what, what -- when have you
19   dealt with fingerprints?
20       A.    I've been a police officer 27 years.
21   I have fingerprinted hundreds of people, be it ink,
22   or be it LiveScan. When I say LiveScan, that is a
23   computer-recognized imaging where we actually roll
24   the fingerprints.
25       Q.    I think that's how I was printed for

Page 20

1    when I got out of the -- became a lawyer in New
2    York.
3              What about in, as an investigator?
4    Have you taken prints from a scene, a crime scene?
5        A.    No, I have not done that, no.
6        Q.    Have you utilized prints taken by
7    others in investigating persons or incidents?
8        A.    No. I have assisted in crime scene,
9    we have a separate unit that will actually do crime
10   scenes where they actually do the fingerprinting.
11       Q.    Do prints come back, is it CODIS?
12       A.    Correct.
13       Q.    Who runs CODIS?
14       A.    That's part of the eJustice system
15   too, out of Albany, I believe.
16       Q.    And do you get results back from
17   CODIS, fingerprint results back from CODIS, and
18   have to evaluate the reports of CODIS?
19       A.    You could. That's out of my realm.
20   I would never take part in that. That would be a
21   trained crime scene investigator that's assigned to
22   the BCI, the Bureau of Criminal Identification.
23       Q.    Okay. How about, let me see,
24   D.N.A., have you worked with D.N.A. evidence?
25       A.    I have assisted. I've never

Pages 17 to 20

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 21

1    physically been part of collecting D.N.A.  Again,
2    that falls under the crime scene unit, which is
3    part of the BCI unit.
4         Q.    And how about in investigations of
5    persons or incidents?  Have you had occasion to
6    have to interpret D.N.A. results?  Is it also from
7    CODIS?
8         A.    It could be.  There are different
9    systems that the BCI utilizes.  Again, I'm going to
10   say that's out of my realm.  That's part of crime
11   scene, and they are the trained professionals that
12   do the evidence collection, so they're part of the
13   evidence collection team.
14        Q.    Okay.  And how about facial
15   recognition?  What's your experience with facial
16   recognition technology?
17        A.    As for utilizing it at the
18   intelligence center, we've been successful with it.
19        Q.    Okay.  When did you start using it?
20        A.    Probably, we started utilizing it at
21   the intel center over four years ago, but prior to
22   that, there were usages where we actually used it,
23   we would send it up to another agency to request a
24   facial rec before we obtained access to facial rec.
25        Q.    So, the investigation that is at the

Page 22

1    basis of this lawsuit involved a, work done by the
2    RCIC in January, 2019.  Would that have been right
3    at the start, then, of the RCIC's use of conducting
4    facial recognition?
5         A.    It would be around that time period,
6    yes.
7         Q.    Okay.  So, prior to 2019, where
8    would you -- how would you deal with facial
9    recognition?
10        A.    It would be submitted, if we were
11   provided a photograph at that point in time, we
12   would submit the photo through the New York State
13   Police information center, and have them run the
14   image through their facial rec.
15        Q.    Okay.  Do you have any idea what
16   technology the New York State Police had been using
17   prior to 2019?
18        A.    Prior to 2019, no.  I believe it was
19   the same technology, biometrics, I believe, but I'm
20   not 100 percent sure.
21        Q.    Do you know, in 2019, when the RCIC
22   started using it, do you know what technology you
23   were using?
24        A.    No.  We were just using the software
25   provided through HIDTA.

Page 23

1         Q.    So you don't have any idea what
2    company?
3         A.    I don't know the company, no.  It's
4    a software that they utilize, like if I could use a
5    comparison, we are operators, we are not, we are
6    not -- we don't know how to maintain software.  All
7    we know how to do is use the system.  We're trained
8    to use the system.  Just like anything else, like a
9    Dräger, like an instrument to detect alcohol, we're
10   trained operators.  If we have to take the
11   instrument apart, that's a different story.
12        Q.    Tell me about the training to be an
13   operator of this software.
14        A.    Well, it's basically, we're tested,
15   there is two tests.  There is tests to run criminal
16   histories, which is, I believe it's a 25-question
17   test.  And then there is a separate test, exam,
18   same amount of questions, I believe, for running
19   plates, data, driver's license.
20        Q.    Plates, you mean license plates?
21        A.    Correct, sir.
22        Q.    Now, so, is this, like, the same
23   software that does the criminal history, the
24   plates, and the facial?
25        A.    Facial rec is part of eJustice.

Page 24

1    EJustice has HIDTA attached to eJustice, yes.
2    They're basically the same software, where you're
3    logging onto the computer, and you're running the
4    software through eJustice.
5         Q.    Did you have any specific, any
6    training that was specific to the facial
7    recognition aspect of this software?
8         A.    There is always training.  There is
9    bulletins that are put out on eJustice that you'll
10   either read, initial, they're always sent down.  As
11   for training, it's part of the process of when you
12   learn how to run HIDTA, to submit an image through,
13   it's basically going through the steps, the
14   direction of facial recognition and how it works.
15        Q.    Where would this training take
16   place?
17        A.    It could take place at your desk,
18   your cubicle, as soon as you log on.
19        Q.    Did you ever do any -- did anybody
20   ever come into the office to give you, like,
21   training seminars or anything like that on the use
22   of facial recognition?
23        A.    Not for eJustice.  For other
24   software they have, but not for eJustice.
25        Q.    Was it ever about facial

Pages 21 to 24

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 25

1  recognition?
2      A.   No.
3      Q.   Did you ever go to any, any outside
4  place to get training in facial recognition
5  technology?
6      A.   No, I did not.
7      Q.   Do you know if anybody from the RCIC
8  ever went to any other place to get facial
9  recognition training?
10     A.   No, I don't.
11     Q.   Do you know if anybody ever went to
12 FBI training in Quantico or anyplace for facial
13 recognition training?
14     A.   No.
15     Q.   Do you know if the FBI ever sent
16 people to the RCIC to train personnel in the use of
17 facial recognition technology?
18     A.   No.  Recently, they did assign a
19 training course, which is a three-day course, which
20 is being taught, I believe, by the FBI, and that's
21 assigned to all members at the Rockland County
22 Intel Center.
23     Q.   When did that start?
24     A.   Probably four or five months ago.
25 They're doing periodic training, training a few at

Page 26

1  a time.
2      Q.   Do they come into the RCIC, or do
3  people go to them?
4      A.   This is going to be a web-based.
5  Web-based, where it's a three-day course.
6      Q.   Like, do you guys have to do, as
7  investigators, do you have to do, do you have some
8  kind of, like, continuing education requirement you
9  have to do each year or anything like that?
10     A.   For which aspect of it?
11     Q.   Any aspect.
12     A.   Yeah, we're continuously training,
13 just like firearms, just doing the range, doing on
14 course, line, computer-based training, we do a lot
15 of, you know, meetings, we have brochures that are
16 sent down, or e-mails that you have to read or take
17 a course in this, and it's pretty much web-based,
18 so, we're always, we're always learning.
19     Q.   Now, you mentioned that you would
20 get bulletins from, I think you said eJustice, or
21 was it HIDTA, about facial recognition technology.
22         Do you remember any bulletins that
23 you received over the years about facial
24 recognition?
25     A.   No.

Page 27

1      Q.   If I wanted to see those, where
2  would I, would they be from the State Police?
3      A.   Correct, they would be in records.
4  They're constantly sending out stuff for years.  I
5  believe they would be archived.  You log on to
6  eJustice, you can actually see, they'll give you
7  updates on technology, on changes of the law,
8  changing of aspects of running plates or looking
9  into a DMV photo or certain aspects of that.  There
10 is always a post where you actually have to read it
11 and just continue on.
12     Q.   Now, you said that, a little bit ago
13 you said that you've had a lot of success with
14 facial recognition technology.
15     A.   Yes.
16     Q.   Could you tell me about the success?
17 And by "you," I take it you mean the RCIC?
18     A.   Correct.
19     Q.   What success have you had with it?
20     A.   Me, personally, you want to know?
21     Q.   Yeah, you can start with yourself.
22     A.   Me, personally, I've been provided
23 hundreds of cases where me, as an investigator, if
24 I'm assigned a case, and there is an image, and
25 they want the image run through facial rec, either

Page 28

1  the agency or the police department or who it's
2  coming in through or the request is basically,
3  they've either exhausted all measures and tried
4  separate facial rec technology, where they then
5  submit it to us.
6          Me, personally, I'll do a facial
7  rec, the software has a threshold.  I will look at
8  that image, I will do a comparison on that image.
9  I will get a second investigator to get his opinion
10 on the image, and then from there, me personally
11 will dig into the subject that the image resembles,
12 or is the subject, and when I say, I do further
13 investigation, I do my due diligence, I'll either
14 run the criminal history, run the photo, get the
15 attached photos.  When I say "attached photos,"
16 there is more than one mugshot image throughout the
17 state.  We'll do a comparison, we will do a
18 side-by-side.
19     Q.   Who is we?
20     A.   The intel center, whoever's
21 assisting me.  Or if it's just me, basically from
22 soup to nuts, we can just basically do the full
23 investigation, and then determine whether or not it
24 is the subject.
25     Q.   And this, this process you described

Pages 25 to 28

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 29

1  here, is this the way you were trained to do this?
2      A.     Yes, it is.
3      Q.     Okay. And this training was the, I
4  think you described it as being on the job and
5  through the, I think, other investigators and
6  detectives, and then through the bulletins and the
7  State Police; is that correct?
8      A.     Basically, you know, I can't speak
9  for other officers or other investigators, but it's
10  more of on-the-job training, you know, what to do,
11  what to look for, what investigative steps you have
12  to take as the investigator. You do your due
13  diligence. You take every avenue before making a
14  decision. You look into the arrest record, you
15  know, run a criminal history. Gather all of that
16  intel, be it through facial rec, where we then look
17  outside the image, where we go through social media
18  accounts.
19          We then provide all this information
20  to the investigative party, be it another police
21  department, a Federal law enforcement, an outside
22  law enforcement, be it New Jersey, Pennsylvania,
23  California, you name it, we've assisted many
24  states.
25      Q.     What's your understanding, when you

Page 30

1  give an outside investigating agent or agency your
2  results, what are you giving them?
3      A.     Pretty much we're taking the files,
4  we'll either PDF all the files together, or send
5  them individually via e-mail, and we explain to the
6  individual that this is a possible lead. There is
7  a preamble that goes with that where this is a
8  possible learning tool only. It is up to the
9  investigator to determine or take any legal or
10  lawful action.
11      Q.     A possible learning tool, did you
12  say?
13      A.     Yes, learning tool or possible lead
14  to follow.
15      Q.     Okay. And you said that disclaimer
16  is somewhere on the --
17      A.     That comes via the e-mail on the
18  bottom of the e-mail, and it's sent along with all
19  the documents that we send, or if it's in person,
20  we explain that, or if it's through a phone call,
21  we explain to them on the phone that this is only a
22  lead, and should be treated as such.
23      Q.     And where -- where does this
24  language come from, do you know?
25      A.     It's part of the Rockland County

Page 31

1  Sheriff's policy program, that they come up with.
2      Q.     And do you know when that policy
3  was, was promulgated?
4      A.     I believe the policy was put into
5  effect last year.
6      Q.     You wouldn't happen to know, is it
7  by general order, or do you know?
8      A.     No, I don't.
9      Q.     Are you able to -- so when you get a
10  match, can you describe for me how an investigator
11  would view that match in kind of the world of
12  solving a crime? Like, you know, would you agree
13  that there is a, there is a spectrum of reliability
14  of evidence, so, for instance, a show-up has
15  certain, certain accepted levels of validity? A
16  shoe print in the mud would have certain weight?
17  What would a -- am I making sense?
18      A.     Somewhat.
19          MR. CLEMENTE: Objection to form,
20  Dan, can you bring that up a little bit,
21  please.
22      Q.     In the universe of evidence, where
23  does a facial recognition hit fall?
24          MR. CLEMENTE: Objection to form.
25      Q.     You can answer.

Page 32

1      A.     I wouldn't really refer to it as a
2  spectrum. I would refer to it as the software
3  conducting what it's made to do, and taking the
4  characteristics of the ears, the nose, the
5  cheekbones, the nose, giving you a probability of a
6  match. Again, sometimes you won't get a match if
7  this person was never arrested before. The
8  probability that you're looking at, this
9  computer-based software will give you a threshold.
10  That threshold could be from a number, I'll just
11  throw a number out there, from 200 to 999.
12  Obviously, the higher the threshold number is, the
13  closer you are to the suspect, or possible suspect,
14  we like to look at all images.
15      Q.     What do you mean? I'm confused by
16  200 to 299. Isn't 100 percent, like, the highest?
17      A.     You could get an image, you could
18  get an image and get 200 results.
19      Q.     I see --
20      A.     You got to scan through them. The
21  higher the probability is, the more you're going to
22  look at that subject. You look at each, each one,
23  when you do -- when you compare an image, you
24  physically take the human factor into effect where
25  you're looking at that image, not just based on the

Pages 29 to 32

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 33

1 computerized image, but by the mugshot, by prior
2 images, things of that nature, you want to do, you
3 want to keep the human element part of it.
4    Q.    Is it your understanding that the
5 facial recognition technology that you were using,
6 and are using, that it, that its database only
7 consists of faces of persons who have been
8 previously incarcerated, or some -- or processed,
9 at any rate, or -- with mugshots, et cetera? You
10 referenced mugshots.
11    A.    The images that the software is
12 sorting through are arrest photos.
13    Q.    That's it?
14    A.    Be it New York or New Jersey, where
15 they're -- at some point, that subject was
16 photographed for crime.
17    Q.    There is no faces from Facebook or
18 --
19    A.    No, that's something later on, where
20 you conduct as an investigator, or a detective, if
21 you want to look into the case, where you decide
22 this is your suspect, then you take that next step,
23 or the investigator or detective would say, Now let
24 me dig a little bit further into social media, be
25 it Facebook, be it Instagram.

Page 34

1    Q.    Are you -- you're absolutely certain
2 that only mugshots are in the database of your
3 facial recognition software?
4    A.    Basically, yes.
5    Q.    What do you base that understanding
6 on?
7    A.    My training and experience.
8    Q.    What do you remember -- do you
9 remember, prior to coming here today, did you
10 review any records?
11    A.    Yes, I did.
12    Q.    What records did you review?
13    A.    I only reviewed the, once the
14 subpoena was issued, I reviewed the incident report
15 and the attachments to that incident report. When
16 I say "incident report," it's the Rockland County
17 Intel incident report.
18    Q.    When you received the subpoena, was
19 that the first time you were made aware of this
20 lawsuit?
21    A.    No. I was made aware of it by my
22 current supervisor, Detective Lieutenant Ford,
23 F-O-R-D.
24    Q.    Okay. And what did Lieutenant -- do
25 you remember when that was?

Page 35

1    A.    Not offhand. I was provided the
2 e-mail sent, and requested to attach the subpoena
3 to the report.
4    Q.    So, this was recent?
5    A.    Correct, yeah, treatment. Wasn't
6 too long ago.
7    Q.    Okay. Did you, did you talk to
8 anybody about this case before coming here today?
9    A.    No, I did not.
10    Q.    You didn't talk to -- you haven't
11 talked to Lieutenant Ford?
12    A.    Lieutenant Ford is away at training.
13 He is aware that I'm here today, along with
14 counsel.
15    Q.    Okay. Have you talked to anybody at
16 the New York State Police about the case?
17    A.    No.
18    Q.    So, having reviewed your records,
19 what do you recall about the request for assistance
20 from Woodbridge on or about January 26, 2019?
21    A.    Basically, on that day, I was
22 working a day tour. Day tour is 0800 to 1500, 8:00
23 a.m. to 3:00 p.m. While in the office, via e-mail,
24 we receive bulletins, be it New York State,
25 statewide. One of the bulletins was an assault on

Page 36

1 a police officer that came in through Woodbridge.
2 Lieutenant Dey was working that day. He had also
3 advised me of this bulletin that was sent out.
4         On the bulletin it had an image. We
5 took that image and we submitted it through facial
6 rec.
7    Q.    So you took the initiative to do
8 this investigation based on just this coming across
9 the tran -- this bulletin?
10    A.    Yes. The bulletin is basically a
11 request for police service, or a request to assist.
12    Q.    When you -- of your investigations,
13 what -- what percentage are done pursuant to a
14 bulletin coming across your desk? Is that how all
15 of your investigations are done, or do you get
16 specific -- do you get a call from -- Hi, I'm Joe
17 in Atlantic City, can you help me, Seamus,
18 something like that?
19    A.    Well, basically you get a phone
20 call, an e-mail, a request, be it in person, where
21 somebody will come in, or provide us with video
22 footage, a fraudulent document with a photo.
23 Basically, the requests that come in are through
24 bulletins, and if the agency, like, we have New
25 Jersey personnel that works in our office. If it's

Pages 33 to 36

Page 37

1  part of a New Jersey investigation, we assist them.
2  If we have any records or any police contact
3  locally, we will take that information and send
4  that to the police department and provide it to the
5  requesting party.
6       Q.    Do you -- do you know anything about
7  the use of facial recognition technology by the New
8  Jersey State Police in their, some of their special
9  initiatives regarding auto theft, auto rings, theft
10 rings?
11      A.    No, I don't.
12      Q.    Okay. All right. So, when this
13 comes across, you call it a bulletin. So does that
14 go -- is that going to many different, like, is
15 that sent nationwide, for instance, like, you know,
16 an all-points bulletin, such-and-such person, or,
17 where does it go?
18      A.    It is basically up to that
19 department or that investigator, to, how far he
20 wants that bulletin to go. You can basically do
21 just the State of New Jersey. You could do it New
22 York, Pennsylvania, Connecticut. Again, it depends
23 on the investigator or detective.
24      Basically, they're sent out
25 requesting assistance or similar incidents that

Page 38

1  happened out of state, where you can connect the
2  dots and say, We had a similar case in New York,
3  New Jersey, Florida, it's the same subject.
4       Q.    Do you know or remember how broadly
5  circulated this bulletin was? Was it just sent to
6  you, or was it sent to multiple places?
7       A.    This bulletin was sent to multiple,
8  multiple agencies.
9       Q.    So, you said that Lieutenant Dey was
10 working that day in the RCIC. Was he involved in
11 the actual investigation, or did he just
12 green-light the investigation?
13      A.    He wasn't directly involved. He
14 provided the same bulletin that I had received via
15 my e-mail. Either he was at our station, or he was
16 at his station, I don't recall, but either way, we
17 had a conversation and we were in contact with each
18 other, where I did send, actually, the results to
19 both him and Woodbridge PD.
20      Q.    Okay. So what did your
21 investigation consist of?
22      A.    This was very basic. Like I said,
23 we took the image, we submitted it, we did get a
24 return. There were two photos, I believe, with
25 images. There was a resemblance, there was some

Page 39

1  characteristics that did match enough for us to be
2  in agreement where we would provide Woodbridge with
3  this information as a possible lead.
4       Q.    Are there different gradations, is
5  that a term of art, a possible lead?
6       A.    Basically, they all are. It's up to
7  the agency to conduct their investigation.
8       Q.    So when you forward it out, you
9  don't characterize it as a, as a, a surefire lead
10 or a direct hit or a near hit, or anything like
11 that?
12      A.    Not 100 percent.
13      Q.    So, how long did this -- you said it
14 was a very basic investigation. How long did this
15 take?
16      A.    The process itself probably took
17 less than 15 or 20 minutes.
18      Q.    You said you showed it. Did you
19 show it -- sent results to Dey in Woodbridge. Did
20 you do that simultaneously, or did you send it
21 first to one, and then to the other?
22      A.    No, simultaneous.
23      Q.    What happened next?
24      A.    After it's sent, like I said, it's
25 sent via e-mail, so, I don't recall if it was a

Page 40

1  direct response back from Woodbridge. I then take
2  those files, attach them to our Rockland County
3  Intel incident report, where it's documented and
4  lodged into our records, management keeping, and
5  either the day after or the next day, I did receive
6  an e-mail that the information was received.
7       Q.    Anything else?
8       A.    No.
9       Q.    Okay. How did you receive
10 confirmation of receipt, was that by --
11      A.    I believe Detective Tapia responded
12 to my e-mail, and I didn't hear back from them
13 after the fact. A lot of cases, after we've
14 provided service, we don't follow each and every
15 case. We deal with hundreds of cases. After we
16 provide the service, that department will go on and
17 do their investigation. There are times where
18 there will be an updated bulletin, where the person
19 -- where the bulletin will state, Subject has been
20 identified and charged, but that doesn't happen all
21 the time, and like I said, we don't keep track of
22 the outside cases that are actually going on,
23 because we deal with so many cases.
24      Q.    Did you ever speak to Detective
25 Tapia?

Pages 37 to 40

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 41

1   A.   Detective Tapia and I had a phone
2   conversation briefly, months later.  He only called
3   to request the Rockland County Intel incident
4   report number, and I inquired as to the condition
5   of the officer that was almost struck.  It was a
6   brief conversation, and that's pretty much all we
7   discussed.
8   Q.   It was your understanding that an
9   officer had been struck?
10   A.   Nearly struck, or was injured during
11   this incident.
12   Q.   So on what do you base your
13   understanding that there had been an officer
14   injured in the original incident?
15   A.   I believe it stated it in the police
16   bulletin.
17   Q.   Now, has -- after the RCIC became
18   aware of this lawsuit, has any critical analysis
19   been done about this file?
20   A.   When you say, "file" --
21   Q.   This investigation.
22   A.   This particular investigation?
23   Q.   Yes.
24   A.   No.
25   Q.   There has been no trainings that

Page 42

1   have been given as a result of this investigation?
2   A.   No.
3   Q.   There's been no discipline?
4   A.   No.
5   Q.   Let me look at some documents.
6       (Exhibit Lyons-1, 10-page document,
7   received and marked for identification by
8   the Reporter.)
9       (Recess taken at 11:46 a.m.)
10       (Proceedings resumed at 11:58 a.m.)
11   Q.   So, I'm showing you, sir, the
12   document, 10-page document, that we marked as
13   Lyons-1, and I represented to you that I received
14   this in response to a subpoena duces tecum on your
15   office.  Do you recognize this document?
16   A.   Yes, I do.
17   Q.   What do you recognize it as?
18   A.   This is a bulletin that was sent out
19   from Woodbridge Township Police.
20   Q.   The bulletin we were just talking
21   about?
22   A.   Correct, it's an aggravated assault
23   upon a police officer, attempt to ID.
24       MR. CLEMENTE:  I want to clarify, is
25   he referring to all 10 pages as what was

Page 43

1   provided by the WPD, or is it just the first
2   page he's referring to?
3   Q.   I believe it's just the first page,
4   but can you clarify that?
5   A.   Page 1, just the Woodbridge Township
6   bulletin, just page 1.
7       MR. CLEMENTE:  Thank you.
8   Q.   And so it says, sent 1/27, at 11:12,
9   so that's -- that would be military time?
10   A.   Correct.
11   Q.   And that case number, that would be
12   Woodbridge's case number, or your case number?
13   A.   That would be the Woodbridge
14   Township Police Department's case number.
15   Q.   And author 481, that refers to
16   somebody at Woodbridge?
17   A.   That's correct.
18   Q.   And the narrative there, that's also
19   written by Woodbridge?
20   A.   Correct, the entire, the entire
21   bulletin is prepared by the Woodbridge Township
22   Police Department.
23   Q.   Now, the next page of this, Lyons-1,
24   up top it says, top left corner says, Comparison in
25   regular size print and enlarged print side-by-side

Page 44

1   comparison.
2   A.   Yes.
3   Q.   Do you recognize this document?
4   A.   I do.
5   Q.   What do you recognize it as?
6   A.   This is part of the image search
7   that returned, through HIDTA, through facial
8   recognition, as part of the subject and part of the
9   possible suspect.
10   Q.   Would this be the first data point
11   you got in your search?
12   A.   This would be the first point, yes.
13   Q.   Okay.  Would you agree that the
14   left, the picture on the left is extremely dark and
15   hard to make out?
16       MR. CLEMENTE:  Objection to form.
17       THE WITNESS:  I would say the photo
18   is blurry, the image is blurred.
19   Q.   The bottom date is 1/28/2019, so
20   that's the day after this bulletin was issued?
21   A.   That's correct.
22   Q.   What's the third page, Lyons-1, if
23   you recognize that page?
24   A.   Yes, this would be an arrest photo
25   mugshot profile image of the suspect.  The subject

Pages 41 to 44

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 45

1  in this, Nijeer Parks, this is one of his mugshot
2  profiles when he was arrested.
3       Q.     And did you obtain this as part of
4  your investigation as well?
5       A.     I did.
6       Q.     Is this, going through this
7  document, are these in order of how you received
8  them in your investigation?
9       A.     Yes, they are.
10      Q.     Okay.  And is this how they exist in
11 your file?  Do you maintain a file on
12 investigations?
13      A.     Yes, I do.
14      Q.     Either electronic or physical?
15      A.     Yes, I do both, actually.
16      Q.     Okay.
17      A.     This entire, this entire 10-page
18 document would be scanned and attached to my
19 incident intel report, as a file.
20      Q.     To your, was it called your intel?
21      A.     Intel report, yes.
22      Q.     Third page, it's another mugshot
23 profile of Nijeer Parks.
24      A.     Page 3 is another.
25      Q.     I guess this is the fourth page of

Page 46

1  page, actually, one, two, three, four?
2       A.     Yes, page 4, it's another mugshot
3  profile image of an arrest.
4       Q.     The first mugshot, page 3, what's
5  the date of that picture, does it say on it?
6       A.     The arrest date is, is blank.  The
7  records-keeping management from the arrest,
8  obviously, there is, there is parts that are not
9  completed, such as AKA, Social Security, phone
10 number, address is blank.  Those things are --
11 that's, that's on the police department affecting
12 this arrest and processing the subject.
13      Q.     The second mugshot, page 4, that's
14 the arrest date is February 24, 2011, correct?
15      A.     Correct.
16      Q.     That's pretty dark, would you agree,
17 the second mugshot?
18      A.     I would agree the image is blurry,
19 and it does have a tint of darkness to it.  Again,
20 I'm looking at photocopies of the, the image.
21      Q.     Okay.  The next page, looks to me,
22 is this a one -- yeah, it's a document.  At the top
23 it says, FBI state delayed response, in the top
24 left corner, page 1 of 1, additional inquiry
25 response, do you recognize this document?

Page 47

1       A.     Yes, I do.
2       Q.     What is this document?
3       A.     This is an additional criminal
4  history that I conducted on the same date on the
5  subject that I got the hit on.  What this does is
6  this provides me a little bit more information
7  before sending it out as a possible suspect.  I can
8  gather some more intelligence regarding his past
9  criminal history, if the subject is, indeed,
10 incarcerated or out of prison or in jail, or no
11 longer in existence, I can obtain some more
12 intelligence gathering.
13      Q.     In the middle of it, it says, scars,
14 marks, tattoos, what is that -- underneath it says
15 art, RR, what does that mean?  Do you see?
16      A.     Yes, this is issued by, again, by
17 the arresting agency.  Basic pedigree information,
18 we'll ask you for scars, marks, tattoos.  You'll
19 note these on your arrest report taken in, so these
20 images, or the document is, which they can be saved
21 and documented and photographed, so that way you'll
22 have future -- in the future, you'll be able to
23 observe these images.  For this, it looks like the
24 officer, and again, I can't be 100 percent sure.
25 He wrote, art on right arm, and it could be some

Page 48

1  form of artwork or a tattoo image.
2             Again, I can't answer for what the
3  officer wrote that for.  Usually you're a little
4  more descriptive, explaining what the tattoo is.
5       Q.     And this would have been -- this
6  would have been sent to Woodbridge, right?
7       A.     Yes.
8       Q.     Did you notice -- did you note the
9  height and weight of the suspect?
10      A.     On the criminal history?
11      Q.     Yes.
12      A.     I did.
13      Q.     Little guy, would you agree?
14      A.     He was five seven, 145.  I don't
15 know.
16      Q.     The next page, one, two, three,
17 four, five, six, sixth page of this, Lyons-1,
18 additional inquiry response, page 1 of 1, top left
19 it says, N.C.I.C. delayed response.
20      A.     Correct.
21      Q.     What is this?
22      A.     Okay.  You're looking at my initial
23 inquiry.  So, if we could go back to the first
24 page.
25      Q.     Sure.

Pages 45 to 48

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 49

1      A.      Where you're looking at the name on
2   the subject, Parks, Nijeer, this was page 1, this
3   is sent out.
4      Q.      By the first page, you mean the
5   previous page?
6      A.      Correct.
7      Q.      Okay.
8      A.      You're looking at the name and the
9   date of birth, the purpose code C, standing for
10  criminal investigation.  Again, basically, when you
11  run the name, or you take a name, you'll either get
12  a hit or no hit.  When I say "hit or no hit," there
13  is an assigned FBI number to this criminal history.
14  That FBI number follows this individual, so for
15  more information, you would run this FBI number,
16  and this would provide you the full rap sheet, and
17  when I say the full rap sheet, a complete criminal
18  history on this subject.
19     Q.      Where is the FBI number?
20     A.      On the first page, if you scroll
21  down to the first sentence, where it says, Parks,
22  Nijeer, over to the right-hand side, inquiry date,
23  1/28/2019, that FBI number.
24     Q.      Inquiry date, okay, FBI number.  I
25  see, 534795 PCO, do you know what PCO stands for?

Page 50

1      A.      It's just an identifier, P as in
2   Paul, C as in Charles.
3      Q.      Off the record.
4              (Discussion held off the record.)
5      Q.      All right.  So, then, this FBI
6   number, what does that have to do with the next
7   page?
8      A.      It ends here.  This is where the
9   information provided is up top is my ORI number,
10  New York 043013Y.
11     Q.      That's your number?
12     A.      That's my ORI, assigned to my intel
13  division in Rockland County.  So this is basically,
14  this document is page 1 of 1.  Two documents where
15  now, he, an investigator, or detective, or any
16  agency, will now have, to look further into this
17  individual, would run this FBI number and get a
18  complete form of his prior criminal history.  And
19  when I say "prior criminal history," you'll have
20  the dates, the times, date of arrest, and in some
21  cases you will obtain another image.  Not always,
22  but sometimes.
23     Q.      But in this case, there was no such,
24  there were no such records?
25     A.      Well, I didn't complete the complete

Page 51

1   criminal history.  This is just a basic, additional
2   inquiry response to give the investigator,
3   detective, the law enforcement agency a tool to
4   say, Hey, let me just run this name, date of birth,
5   this FBI number, this name, run it through the FBI,
6   get a full, complete history, and in the State of
7   either New York, New Jersey, or out of state, this
8   will give you every arrest he's been involved in.
9              If you scroll down a little further,
10  back on page 1 of the document, for the additional
11  inquiry response, and you scroll, pretty much all
12  the way to the bottom, and it says New Jersey,
13  there is a state ID number.
14     Q.      Um-hm.
15     A.      That state ID number is assigned by
16  the State of New Jersey for the subject's arrest.
17     Q.      Okay.  What's the next page?
18     A.      The next page, for the additional?
19     Q.      Yes.
20     A.      That's just the name, date of birth,
21  that's the end of the return.
22     Q.      What is the, No N.C.I.C. protection
23  order file record, what is that?
24     A.      So, basically, New York, in the
25  State of New York and the State of New Jersey, if

Page 52

1   you run somebody via a criminal history, by name,
2   date of birth, or a registered motor vehicle, or a
3   driver's license ID number, there is a protection
4   order in play that's going to pop up on the screen,
5   or pop up on the criminal history.  Even if you run
6   somebody through the police vehicle, say you're
7   just on a traffic stop, you will get notified for
8   the N.C.I.C. information, either there's a
9   stay-away order, order of protection, pretty much,
10  basically, it also checks for if you're wanted, if
11  the subject is wanted, a stay-away.
12     Q.      Okay.  The next page, after the, in
13  this packet, appears to be a blowup of the
14  fraudulent Tennessee license plate.  Would you
15  agree?
16     A.      This is a blowup of the Tennessee
17  driver's license.
18          MR. CLEMENTE:  For the record, this
19  is page 7 out of 10?
20          MR. SEXTON:  Yes.
21     Q.      What's that on the forehead of the
22  picture on this blown up license plate?
23          Do you see what I'm talking about?
24  It looks like an ampersand or something, carved
25  into the --

Pages 49 to 52

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 53

1    A.    On the Tennessee driver's license?
2    Q.    Yeah.
3    A.    It could be a blemish.  Again, this
4  picture is blurry.  It could be a shadow, could be
5  a scar, could be anything.
6    Q.    Okay.  It looks odd, doesn't it?
7    A.    It does look odd.
8    Q.    Page 8, what is this?
9    A.    This is the image submitted through
10  the facial recognition software, on the left, and
11  that image was searched through, and the probes in
12  the search revealed a result onto your right side
13  of that photo, and that's the image result that we
14  obtained as a possible.
15    Q.    Under -- on the right, this is
16  number 594 dash -- point 000, what is that?
17    A.    That's, that's part of the threshold
18  in the software that it utilizes when it searches.
19    Q.    Okay.  How does that -- what does
20  that number indicate?
21    A.    It's a probable.  It's not a very
22  high number, but it's worth a second look.  I've
23  had cases with lower numbers than that.
24    Q.    What's, what's this, what is the,
25  what number would you get to indicate the highest

Page 54

1  possible --
2    A.    I've had 991 in the past, and I've
3  had as low as four something.
4    Q.    So 1,000 is the highest?
5    A.    Yes.
6    Q.    Next page, page 9, this appears to
7  be the picture for the license, Tennessee license?
8    A.    That's correct.
9    Q.    And where did this, is this the same
10  picture for the license, or a different picture?
11    A.    This is the same picture, it's just
12  enlarged.
13    Q.    That thing on the forehead, looks
14  stranger even now, doesn't it?
15    A.    Yes.
16    Q.    Looks like a tattoo or something,
17  doesn't it?
18    A.    I really can't answer.
19    Q.    And the last page, what is that?
20    A.    This is, these are results of past
21  addresses, basically, all based out of the State of
22  New Jersey.  These results are from a Clear report.
23  This is a, this is a software we utilize where we
24  can run a name and date of birth and get, like I
25  stated earlier, we get past addresses, bank

Page 55

1  information, some financials, criminal histories
2  attached sometimes, it provides us with some more
3  intel-gathering information that we could utilize
4  in any investigation.
5         In this particular page we have one,
6  two, three, four different names bearing the same
7  name, with the addresses, with different addresses.
8  So again, this is just another learning tool that
9  we use as part of the investigation.
10    Q.    Now, you said it was your
11  understanding that an officer had been assaulted.
12    A.    Correct.
13    Q.    What did you base that upon?
14    A.    Basically, on this all-points
15  bulletin, it pretty much states when confronted by
16  patrol officers, he ran into a 2008 Dodge
17  Challenger, and rammed into a patrol officer's
18  marked police vehicle, and nearly struck the
19  officer.
20         Again, I don't know if there is an
21  officer in the car, somebody standing outside the
22  car, so it's my understanding that an officer was
23  injured.
24    Q.    If there is nobody in the car, it's
25  not an assault on a police officer, correct?

Page 56

1    A.    It could be an attempt.
2         MR. CLEMENTE:  Objection to form.
3         THE WITNESS:  It could be an
4    attempted assault on an officer.
5    Q.    Your understanding was that there
6  had been an assault?
7    A.    Right.
8    Q.    And actually, the heading says
9  aggravated assault, it doesn't say, attempted
10  aggravated assault.
11    A.    Aggravated assault --
12         MR. CLEMENTE:  Objection to form.
13         THE WITNESS:  Aggravated assault
14    upon a police officer, attempt to ID.
15    Q.    Actually, what is, what are the
16  elements of an aggravated assault on a police
17  officer?
18    A.    It could be anything.  It could be
19  from a motor vehicle, it could be from a fist, it
20  could be fighting.
21    Q.    Okay, but, well, you know, I guess
22  it is what it is in the penal code.
23         Now, the bulletin connects the
24  suspect to New York, does it not?
25    A.    It connects the suspect, possibly

Pages 53 to 56

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 57

```
 1    through a receipt that was located in the vehicle.
 2         Q.    Did you consider that in your, in
 3    your investigation?
 4         A.    Did I consider what?
 5         Q.    The fact that there was a possible
 6    New York connection for the person or suspect?
 7         A.    Yes, we always do.  We always
 8    consider every aspect.
 9         Q.    Let's call this Lyons-2.
10              MR. SEXTON:  Garry, this Lyons-2 is
11    Parks, from your production, page 91.
12              (Exhibit Lyons-2, Request for facial
13         recognition photo array, received and marked
14         for identification by the Reporter.)
15         Q.    Sir, do you recognize this document,
16    this one-page document?
17         A.    I do.
18         Q.    What do you recognize it as?
19         A.    It's a request for facial
20    recognition or a photo array through the New Jersey
21    intel center.
22         Q.    So, did you receive this?
23         A.    No, I did not.
24         Q.    Okay.  So, where is the New Jersey
25    intel?
```

Page 58

```
 1         A.    The center?
 2         Q.    Center, yeah.
 3         A.    I believe they're located in Newark,
 4    New Jersey.
 5         Q.    Okay.  So NJROIC.  Does that have
 6    any, which is mentioned in the first line, above,
 7    does that have any, is that part of your
 8    organization?
 9         A.    They are a separate entity.
10         Q.    Okay.  All right.  I guess this is
11    an online form.  I see a box in the top right,
12    says, Reset form.
13         A.    Yes.
14         Q.    Do you have any similar type of
15    online request for information?
16         A.    Not online.  It would be noted
17    through the e-mail with the department's case
18    number, which would then be taken from their
19    requests and highlighted and put into our intel
20    report.
21         Q.    Okay.  Okay, let's mark -- this is a
22    two-page document, Lyons-2.
23              MR. SEXTON:  Garry, I'm marking as
24    Lyons-2 -- Lyons-3, a two-page document
25    that's Parks, your production, page 92 and
```

Page 59

```
 1    93.
 2              MR. CLEMENTE:  Got you.
 3              (Exhibit Lyons-3, NYSIC request
 4         form, received and marked for identification
 5         by the Reporter.)
 6         Q.    Sir, do you recognize this two-page
 7    document?
 8         A.    Yes, I do.
 9         Q.    What do you recognize it as?
10         A.    This is a New York State Intel
11    Center NYSIC request form through the intelligence
12    center.
13         Q.    And so this is, this is, is this a
14    form that your -- the RCIC uses to process cases?
15         A.    Yes, it is.
16         Q.    Okay.  And case number 19010123,
17    whose case number is that?  Is that yours or
18    Woodbridge's?
19         A.    I believe this case number would be
20    Woodbridge, I'm not sure.
21         Q.    And it has checked off, facial
22    recognition assistance requested, correct?
23         A.    Yes.
24         Q.    And then, case details, it says, see
25    second page.  Bottom of this page says, Submit this
```

Page 60

```
 1    form to the NYSIC via e-mail, gives the address or
 2    fax.  And you, I believe you previously testified
 3    you get your receipt by e-mail; is that correct?
 4         A.    Correct.
 5         Q.    Now, did you receive this request
 6    for, for information after you contacted them, or
 7    just at the same time you used -- let me withdraw
 8    that.
 9              The second page, it has additional
10    information, and, which basically consists of the
11    narrative.  Is this the identical narrative that
12    was on the bulletin?
13         A.    It is.
14         Q.    Not quite.  It's missing the last
15    sentence.
16         A.    That's the information, pedigree
17    information for the police officer.
18         Q.    Have you seen this two-page document
19    before?
20         A.    I've seen these documents before,
21    and I've utilized these documents before, yes.
22         Q.    Did you see it in this case?
23         A.    No, I did not.
24         Q.    You testified that you did your
25    investigation as a result of the bulletin?
```

Pages 57 to 60

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 61

1    A.    Correct.
2    Q.    Do you know, let me see, does this
3    have a date on it?
4          Do you see any date?
5    A.    No.  There is no date on this one.
6    Q.    And you don't know if you received
7    this?
8    A.    I never saw this document, no.
9    Q.    Okay.  Lyons-4.
10         MR. SEXTON:  Garry, this is Parks 30
11   through 33.
12         (Exhibit Lyons-4, Rockland County
13   Intel Center incident report, received and
14   marked for identification by the Reporter.)
15   Q.    Sir, do you recognize this document?
16   A.    Yes, I do.
17   Q.    What do you recognize it as?
18   A.    This is my Rockland County Intel
19   Center incident report.
20   Q.    And you had previously referred to
21   this report, correct?
22   A.    Correct.
23   Q.    Okay.  When was -- you authored
24   this?
25   A.    Yes, I did.

Page 62

1    Q.    Okay.  And when, when did you create
2    this?
3    A.    I would have created this on January
4    28th of 2019.  This is a draft.
5    Q.    You said because there's no
6    signatures?
7    A.    It's a draft.  It's not listing the
8    attached files, and I could see that this isn't
9    even the narrative.  This was just a brief
10   narrative that was thrown in there the day of, and
11   it wasn't finalized by me.  Plus there is two
12   spelling errors.  There is more to the narrative --
13   it's a draft, but it's my incident report number
14   bearing number 19RI0076.  It is basically the
15   report.
16   Q.    Okay.  So the final report had no
17   spelling errors?
18   A.    Yes, the final report, there is no
19   spelling errors, and there is attachments made, and
20   then the narrative is also all the, the provided
21   paperwork from Woodbridge for the, for the lawsuit.
22   And the subpoenas, et cetera.
23   Q.    So, if you were to give me a copy of
24   the final report, you're saying it would note that,
25   the recent subpoenaed documents and stuff?

Page 63

1    A.    The, the final report, this
2    narrative will probably stay the same, with the
3    corrected spelling errors.  Underneath that where
4    it says, Closed by investigation, will be all the
5    added subpoenas, et cetera, contacted, and the
6    final, maybe my boss may have added something in
7    there, but everything else has stayed the same.
8    Q.    It says, See attached PDF and flyer.
9    Do you see that?
10   A.    Correct, in that attached, those
11   attached PDF and flyer are part of this report as
12   enclosures.
13   Q.    That would have been Lyons-1,
14   essentially?
15   A.    Correct.
16   Q.    What's that, Responsible LEO under
17   the narrative?  Lead, what is that?  It looks like
18   there's three.
19   A.    Responsible law enforcement officer.
20   Q.    Okay.
21   A.    Approval by a supervisor, and then
22   dated.
23         (Discussion held off the record.)
24   Q.    So we were -- were you there when I
25   marked Lyons-4?

Page 64

1    A.    Yes, I was.
2          MR. SEXTON:  Okay, so, I was asking
3    about the signatures on the signature lines
4    on the third page, one, two, three, of that
5    document.
6          MR. CLEMENTE:  Okay.
7          MR. SEXTON:  And the witness was
8    explaining that LEO means law enforcement
9    officer.
10   Q.    So, do you know, sir, if these -- if
11   anybody ever signed off on this report?
12   A.    No, I do not.  We basically are
13   self-approved, our reports.  The boss will actually
14   go through them.  He'll look through the files for
15   the day, so we pretty much self-approve our
16   reports.  If he sees an issue with one, he'll kick
17   it back to us, and then we'll correct that issue.
18   Q.    So you routinely send these reports,
19   out without somebody else approving them?
20   A.    Correct.
21         MR. CLEMENTE:  I'm getting a bad
22   signal here.
23         MR. SEXTON:  We can hear you, let me
24   -- I'm going to move the wifi tower even a
25   little closer.

Pages 61 to 64

Page 65

1          (Recess taken at 12:36 p.m.)
2          (Proceedings resumed at 12:38 p.m.)
3     Q.     All right.  So, you said you
4  self-approve reports.  Where does that policy come
5  from?
6     A.     It's just through our intel center.
7  It's been that way since I've been there.
8     Q.     Is it still that way?
9     A.     Yes.
10     Q.     So, even though the form has a place
11  for, for two signatures, this is not, well, it has,
12  I guess, the investigating officer, responsible
13  LEO?
14     A.     Yes, and it has an approval line for
15  a supervising officer.  And a date.
16     Q.     And a date.  But those are not
17  routinely used?
18     A.     Nope.
19     Q.     Do you know why the form indicates
20  that they are, they are to be used?
21     A.     Well, if we're printing out this
22  report, and somebody comes in for the -- for, if
23  they request a report, then it would be signed by
24  me, approved by my member in charge, which would be
25  Detective Lieutenant Ford, dated, and then provided

Page 66

1  to that person.
2          Rockland County Intel Center, we use
3  a reporting system that is basically other the
4  departments, due to the fact that we're an intel
5  center, these reports are basically partitioned, so
6  the only ones that have access to these are intel
7  investigators.
8     Q.     This was provided, though, to
9  Woodbridge without the signatures, correct?
10     A.     Correct.  Correct.
11     Q.     It also provided, I guess, he's
12  actually -- he's part of your group, correct?
13     A.     Correct.
14     Q.     Okay.  I think this is the last
15  exhibit.  It would be five.
16          (Exhibit Lyons-5, E-mail chain,
17          received and marked for identification by
18          the Reporter.)
19          MR. SEXTON:  Garry, here are Parks
20  -- your production pages 34 and 35.
21          MR. CLEMENTE:  Okay.
22     Q.     The first page of Lyons-5 is an
23  e-mail from you to Tapia.  Do you agree with that?
24     A.     Yes.
25     Q.     It's dated January 28, 2019 at 9:29

Page 67

1  a.m.
2          Is this -- what's the order of, of
3  -- actually, there's two pages, there is a number
4  of e-mails, and I'm a little confused about the
5  order of e-mails here.
6     A.     Okay.
7     Q.     Can you take a moment and look at
8  that and describe your understanding of the e-mail
9  exchanges that you had with Tapia?
10     A.     Looks like on January 28th, 9:29
11  a.m., I e-mailed the Detective Tapia.
12     Q.     So, you initiated the e-mails?
13     A.     Yes, his e-mail, I guess, would be
14  on the bulletin.
15     Q.     Okay.  What time, 9:29?
16     A.     Looks like 9:29 a.m.
17     Q.     So, those, this e-mail which says,
18  Good news, yes, I used facial recognition.
19     A.     Yes.
20     Q.     The thing is, to me that sounds like
21  you're responding to something, because --
22          MR. CLEMENTE:  If I may, it appears
23          the e-mails go back in time, from most
24          recent to oldest, so I believe that the
25          e-mail chain starts on the second page.

Page 68

1          MR. SEXTON:  That was my question,
2  all right.
3     Q.     So, 8:40 a.m., 1/28/19, see attached
4  PDF, regarding your PD police information.  So
5  that's the first one?
6     A.     Correct, 8:40 am on the 28th of
7  2019.
8     Q.     Okay.  So, you say, in your initial
9  e-mail, Good possible hit on facial recognition.
10     A.     Yes.
11     Q.     See attached PDF.  The attached PDF
12  is what's Lyons-1, right?
13     A.     Correct.
14     Q.     Now, on Lyons-1, is there any
15  disclaimer language in this 10-page document?
16     A.     No.
17     Q.     Okay.  Now, you testified about some
18  disclaimer language that is used now.
19     A.     Yes.
20     Q.     And that began to be used recently,
21  or when did that begin?
22     A.     Last year.
23     Q.     Last year.  Okay.  So, if this were
24  issued today, where would the disclaimer language
25  be, and what would it say?

Pages 65 to 68

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 69

1   A.   It would be on all our returns that
2   are sent out, again, via e-mail.  It's always on
3   the bottom of the e-mail, where it says, preamble.
4   Q.   And is it sent, is it also -- would
5   it also be on the attachments?
6   A.   No, it would just be in the e-mail.
7   Q.   Just in the e-mail.  And do you
8   know, I think you've already testified to it, but
9   could you remind me what the disclaimer language
10  says on the e-mails?
11  A.   It says, The attached is, only
12  should be treated as a possible lead.  It is up to
13  the arresting agency and police officer to do their
14  due diligence, and provide each and every law
15  enforcement step before affecting a lawful arrest,
16  or taking any legal action.  I believe that's the
17  preamble.
18  Q.   This is on the top and bottom?
19  A.   It's just on the bottom of the
20  e-mail, so once you send a document, it's actually
21  highlighted in red.
22  Q.   Okay.  Tapia says, That's him, thank
23  you and Sergeant Dey for your help, Tapia.
24  A.   Yes.
25  Q.   Do you remember receiving that?

Page 70

1   A.   Yes, I do.
2   Q.   And did you have any -- what's your
3   impression of that response?
4   A.   That this officer, this detective,
5   made a decision that this was, indeed, the subject
6   he was looking for.
7   Q.   Okay, and that's, you sent your
8   e-mail at 8:40, and he responded just over a half
9   hour later?
10  A.   Correct.
11  Q.   Does -- can due diligence be
12  accomplished in a half hour?
13  A.   I can't answer for him.
14      MR. CLEMENTE:  Objection, you can
15  answer.
16      THE WITNESS:  I can't answer for the
17  detective, but if the officer that was
18  involved was with him at the time, and I
19  identified him, it's possible, but again, I
20  can't, I can't describe his due diligence.
21  Q.   How would it be possible?
22  A.   If the arresting officer looked at
23  the photos, and said, Agreed, it's possible that's
24  my subject, that's him.  Again, I don't know what
25  steps were taken.

Page 71

1   Q.   But, even -- now, you said you've
2   only had limited training as an investigator, but
3   an identification by an arresting officer of a
4   photo obtained through facial recognition, what
5   kind of weight is that given --
6       MR. CLEMENTE:  Objection.
7   Q.   -- in your experience?
8   A.   My experience, and my past
9   experience is it's a learning tool, it's a stepping
10  stone to go, Hey, let me obtain more images, let me
11  dig a little deeper into the background, there are
12  investigative steps you have to take.
13      In this case, again, I can't
14  describe what Detective Tapia, his steps or
15  investigative skills were in this investigation.
16  Our part kind of ends when --
17  Q.   This e-mail from Tapia reads like
18  the investigation is concluded.  Quote, "that's
19  him," end quote.
20  A.   Again, I can't --
21      MR. CLEMENTE:  Objection, calls for
22  speculation.
23  Q.   Did you have any concern about that
24  declarative language?
25  A.   No.

Page 72

1   Q.   Why not?
2   A.   He was the investigative detective.
3   Again, I don't have all the facts of this case.
4   Again, we're looking at a brief narrative in a
5   police bulletin.  There could be other facts of the
6   case.  I stated earlier, maybe the officer that was
7   involved was there.  Again, I don't know.  Like I
8   said, it ends pretty much when we provide you with
9   a possible lead.
10  Q.   But even if the arresting officer
11  were there, is it -- can you think of any scenario
12  where an arresting officer from an incident two
13  days prior would be able to ID, and based upon that
14  ID, move forward with a probable cause affidavit
15  and a criminal complaint?
16      MR. CLEMENTE:  Objection to form.
17      THE WITNESS:  I mean, looking at it
18  you could -- again, I can't answer for what
19  they did, but an officer could observe
20  photographs and say, that definitely, you
21  know, in my opinion, that's the guy, if it
22  was the officer involved, and again, you
23  know, aggravated assault on a police
24  officer, if he tried to drive over him, I
25  mean, you look at the car, there is heavy

Pages 69 to 72

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 73

1   damage there.  The cop obviously got a good
2   look at the subject.  And he's got a photo
3   of a fraudulent license.  Did the officer
4   make a conscious decision and say, This is
5   the subject?  Again, I can't answer for that
6   --
7       Q.    You would not have had concerns
8   about the presentation of the photo to the officer
9   as being overly suggestive?
10      A.    Not really, I really can't answer
11  that.
12      Q.    Have you had any training in photo
13  arrays?
14      A.    Yes.
15      Q.    Okay.  And what's your -- what is
16  the science around photo arrays?
17      A.    When you say "science," what do you
18  mean?
19      Q.    Are, are there certain procedures
20  for doing a photo array so that any identification
21  may be used in prosecution of crimes?
22      A.    Yeah, we like to do a photo array.
23  We refer to it as a six-pack.  We'll take either
24  six photos that are similar, putting your suspect
25  or subject into this a photo array.  We usually do

Page 74

1   it in both color and black and white, and we have
2   either the witness or the victim attempt to pick
3   out that subject.
4       Q.    And do you know why this procedure
5   is used?
6       A.    It's basically for court, court
7   procedures, and identification purposes.
8       Q.    And is this to, isn't it true that
9   it's done to give a certain validity to the ID?
10      A.    It gives validity, and it gives a
11  positive identification on the subject, yes.
12      Q.    Isn't it supposed to lessen the
13  probability of mistaken identifications?
14      A.    Yes.
15      Q.    And, there are limited circumstances
16  where an ID is made without an array, correct?
17      A.    Yes.  Correct.
18      Q.    Like a show-up, for instance?
19      A.    Correct.
20      Q.    But an ID by an arresting officer
21  based upon a photo provided by facial recognition
22  doesn't fall into either a photo array or a show-up
23  or any other type of allowable identification
24  process, does it?
25      A.    No, it's just, it's a tool to look

Page 75

1   further into the investigation.
2       Q.    You respond on the first page --
3       A.    Yes.
4       Q.    -- at 9:17, Excellent, how is the
5   officer, is he okay, so, you remember sending that?
6       A.    Yes, I do.
7       Q.    Okay.  And then his response is,
8   looks like it was about, you wrote at 9:17, he
9   writes back at 9:24, yes, he's fine.  He asks, How
10  did you guys ID him?  Facial recognition through
11  the NYSIC or the ROIC?
12      A.    Correct.
13      Q.    Okay.  So, now, the term, "ID him,"
14  did you ID him?
15      A.    I IDed a possible suspect.  He
16  wasn't positively identified, no.
17      Q.    But Tapia is saying that you IDed
18  him.  Why did you not correct him?
19      A.    Because we're going based on a
20  trained detective's experience and training that he
21  -- that this is, in fact, the subject, or his
22  suspect.
23      Q.    So, you thought, even though he
24  said, How did you guys ID him, you, you supplied
25  in, like, parentheses, how did you guys provide a

Page 76

1   possible, what's the language, a possible suspect?
2       A.    Correct.
3       Q.    Okay.  NYSIC, actually NYSIC and
4   ROIC, are they the same?
5       A.    No.
6       Q.    What is the NYSIC?
7       A.    New York State Identification
8   Center, it's part of the New York State Police,
9   it's actually New York State Information Center, I
10  believe.
11      Q.    And the ROIC?
12      A.    No, that's New Jersey, that's the
13  New Jersey intel center.
14      Q.    Oh, New Jersey intel.  Okay.  So you
15  used the NYSIC?
16      A.    We use NYSIC, but we also have
17  access to facial recognition.  It's the same
18  software that they utilize.
19      Q.    Now, you say back, on 9/29, Good
20  news, and I think you're referring to the fact that
21  the officer is not injured.  Yes, I used facial
22  recognition software, but altered the photo and the
23  license a little to get the pixels clearer.
24      A.    Correct.
25      Q.    Okay.  What -- explain that, please.

Pages 73 to 76

Page 77

1     A.     It's pretty much just taking the
2  photo and shrinking it down, and then submitting it
3  through the software.
4     Q.     How do you do that?
5     A.     It is basically like any photo.
6  Once you take the photo image, if you expand it,
7  the blurrier it gets.  The more you crop it in, the
8  pixels become more visual, and it's submitted
9  through the software, and gets a better read.
10    Q.     On the software, are there, you
11  know, like, how on your phone, your iPhone, you can
12  take pictures and you can alter the photo by, in
13  different ways?
14    A.     Yes.
15    Q.     So, is it, is it that type of thing?
16    A.     No, it's just basically shrinking,
17  it's the size of the photo like on the first
18  original document.  You have the photo enlarged
19  here.  That photo we could never submit through, so
20  we just shrank the image down.  In this case we
21  just took the image off that fraudulent license and
22  submitted it.
23    Q.     Why did you say "altered," and not
24  "shrunk"?
25    A.     Just a choice of words.

Page 78

1     Q.     When you, when you alter a photo in
2  this way, does that have any effect on the validity
3  of any image?
4     A.     No, it doesn't.
5     Q.     All right.  Now, you said you got a
6  high number hit?
7     A.     Um-hm.
8     Q.     But the number was 540 or something
9  like that.
10    A.     594, I believe.
11    Q.     594.  And you conceded that was a
12  low number hit?
13    A.     It's not the highest hit, but it's
14  definitely worth a second look.
15    Q.     "Definitely worth a second look"
16  sounds very different to me from "a high number
17  hit."
18    A.     In what sense?
19    Q.     "High number hit" sounds like you
20  were hitting a 999 or something, 950.
21    A.     Right.  That's a very high hit.
22    Q.     540, 594.
23          Then you say, He is a Paterson, New
24  Jersey guy.  That's also declarative.  Now, you
25  seem to be adopting Tapia's tone that this

Page 79

1  investigation is completed.
2     A.     Well, not that it's completed, but
3  there are connections between Woodbridge, a
4  connection with a possible lead, and a suspect, and
5  the Paterson, New Jersey address, so there are
6  connections to the State of New Jersey.
7     Q.     Did you raise to him, to Tapia, in
8  any way that this is only to be used as a lead?
9     A.     Yes, it's the understanding that you
10  just don't go out and arrest somebody based on
11  facial rec.
12    Q.     But did you express that in your
13  communications anywhere?
14    A.     No.
15    Q.     Did you caution Tapia in any way
16  that you -- that you connected this man to
17  Paterson, New Jersey, and not to New York, as
18  contrary to the original bulletin?
19    A.     No, just the documents that were
20  provided to him.
21    Q.     I'm close to wrapping up.
22          Have you read anything, are you
23  aware of the criticisms of facial recognition
24  technology, any criticisms of it?
25    A.     In what, in what sense?

Page 80

1     Q.     In any sense.
2     A.     In my personal opinion, or just in
3  general?
4     Q.     Any sense.  Personal, professional?
5     A.     I'm aware of, it's criticized by the
6  public.
7     Q.     And do you know what the basis of
8  the criticisms are?
9     A.     Basically, race, color and creed,
10  and that it manipulates the race of the person.
11    Q.     So have you heard that some of the,
12  I guess, I never did very well in algebra, but
13  everything is algorithm driven.  Have you heard the
14  criticism that facial recognition technologies have
15  algorithms that result in false matches for blacks?
16    A.     I'm not aware of that.
17    Q.     So, what are you aware of?
18    A.     Just, that people are cautious, and
19  people are against it.  I mean, there are many,
20  there are many different applications for facial
21  recognition.  I mean, just not only what we
22  utilize, but out there, there are many companies
23  that are applying for facial rec technology, so I
24  know it's big right now.  It's a big issue.
25    Q.     Madison Square Garden, right?

Pages 77 to 80

Page 81

1    A.    Madison Square Garden being one of
2  them.
3    Q.    So, you said you talked to, I think
4  it was Lieutenant Ford?
5    A.    My lieutenant?
6    Q.    Yes.
7    A.    Yes.
8    Q.    About this. Are you aware of,
9  you're not aware of any of the other, what's come
10  out in this case at all?
11    A.    No, I'm not.
12    Q.    So -- so, it's uncontroverted that
13  this was a false match, and that the lead was of a
14  person who had never been to Woodbridge, who had
15  nothing to do with the event, and this had been
16  borne out by D.N.A., fingerprints, and other
17  biometrics, knowing that, do you have any thoughts
18  about how your investigation could have been done
19  differently?
20          MR. CLEMENTE: Objection to form,
21      calls for speculation.
22          THE WITNESS: You want me to answer
23      that?
24    Q.    Yes.
25    A.    No, my investigation pretty much

Page 82

1  ends when we give you, when we give any law
2  enforcement agency a lead. It's not like we do the
3  complete investigation, or do another agency's job
4  to do their due diligence, so, we provide you with
5  a plausible or possible suspect, you look into the
6  suspect. That department, that agency, makes the
7  determination, Hey, it either is my guy or it's not
8  my guy. There has been no further contact with
9  this agency, after the fact that we provided a
10  possible suspect.
11    Q.    Are you aware of criticism of facial
12  recognition technology made by the Attorney General
13  of New Jersey?
14    A.    No, I'm not.
15    Q.    Are you aware that certain facial
16  recognition has been outlawed in New Jersey?
17    A.    I've heard that, yes.
18    Q.    Where did you hear that?
19    A.    Through social media.
20    Q.    Facebook?
21    A.    Correct.
22    Q.    Do you know, what's going on in New
23  York? Has the AG weighed in on it?
24    A.    It's still, it's still in the
25  courts. They haven't made a final determination

Page 83

1  yet. It's limited. I know facial rec is limited
2  to intel centers, police departments, there is only
3  a certain number of individuals that have access to
4  facial rec.
5    Q.    You know, I didn't get -- what's
6  your, just some background, what is your highest
7  level of education?
8    A.    I have an associate's degree in
9  criminal justice from Rockland Community College.
10    Q.    What year was that?
11    A.    '95, I believe, and I graduated
12  three police academies in the State of New York.
13    Q.    Great.
14          MR. SEXTON: Garry, do you have any
15      questions, and I'll try to think if I have
16      any --
17          MR. CLEMENTE: Yeah, do you mind if
18      I take five minutes to run to the bathroom?
19          MR. SEXTON: That's fine.
20          (Recess taken at 1:05 p.m.)
21          (Proceedings resumed at 1:14 p.m.)
22
23  CROSS EXAMINATION BY MR. CLEMENTE:
24    Q.    Good afternoon, Investigator Lyons,
25  my name is Garry Clemente. I'm representing the

Page 84

1  Township of Woodbridge in this matter. I just have
2  a couple of follow-up questions for you.
3    A.    Sure.
4    Q.    Earlier, you were explaining how,
5  the software that the ROIC utilizes, and I just
6  wanted to clarify that. Now, you said that there
7  was the high -- the HIDTA, what was that acronym
8  again?
9    A.    HIDTA.
10    Q.    High-density drug trafficking area?
11    A.    Correct.
12    Q.    Is that a software, or is that a
13  program that's underneath the eJustice?
14    A.    It's a part of the program
15  underneath the eJustice. They're one system, but
16  you log on, and then you become part of HIDTA, so
17  it's a drop-down window. You have to attempt to
18  log on to that to run facial rec, and you have to
19  have access to do that.
20    Q.    And this -- the eJustice program,
21  that's provided through the New York State Division
22  of Criminal Justice?
23    A.    Correct, through the New York State
24  Police in Albany, correct.
25    Q.    And you don't have any understanding

Pages 81 to 84

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 85

1  of what the name of the software is, or what the
2  company is that provides the facial recognition
3  technology?
4      A.    No, I do not.
5      Q.    Investigator Lyons, would you agree
6  with me that utilizing facial recognition is an
7  investigative tool, correct?
8      A.    Yes, it is.
9      Q.    And there needs to be other steps
10  that need to be taken in an investigation to follow
11  up on that, the results of the facial recognition,
12  correct?
13          MR. SEXTON:  Objection to form.
14          THE WITNESS:  Absolutely.
15      Q.    Investigator Lyons, if the officer
16  who dealt with the suspect who was identified
17  through facial recognition software, he came in, he
18  compared the photos and said, That's the individual
19  that I dealt with, would you agree with me that
20  that's a proper investigative step to follow up on
21  that lead?
22      A.    Yes, it is.
23          MR. SEXTON:  Objection to form.
24      Q.    Investigator Lyons, you testified
25  earlier that you've been successful in utilizing

Page 86

1  facial recognition in the past.  Can you elaborate
2  on that for me?
3      A.    Yes, I've been continuing using the
4  software, and basically, my investigative skills
5  and my unit at the intel center, I utilize facial
6  rec for outside agencies all the time.  And, pretty
7  much on a daily basis.  We've had an extreme
8  success rate with it.  It's a valuable tool, and a
9  learning step to move forward in any investigation,
10  in identifying either a suspect or a subject
11  through any criminal or noncriminal investigation.
12      Q.    You said that you get requests for
13  facial recognition daily.  Does that come from
14  local police departments, state police departments,
15  Federal law enforcement agencies, or all of the
16  above?
17      A.    It would be all of the above.
18      Q.    And why, why would those various
19  entities go to the RCIC for this kind of resource?
20      A.    We are an intel center based in
21  Rockland County, New York.  We're 20 miles north of
22  New York City.  Basically, we're our first stepping
23  stone to move forward to the next intel center,
24  which would be up in another county, such as Orange
25  County or Westchester County, so we're pretty much

Page 87

1  a hub, NYSIC being the base for all facial rec and
2  all other intel centers, so, NYSIC is pretty much,
3  if, if you could compare it to the mother station,
4  and then we are all just satellites spread out
5  through the State of New York, just like New
6  Jersey.
7      Q.    Is it fair to say that these various
8  entities go to the RCIC because the services you
9  provide are reliable and accurate?
10      A.    Yes.
11          MR. SEXTON:  Objection to form.
12      Q.    Investigator Lyons, did you know
13  Detective Tapia prior to him submitting his request
14  for you to perform facial recognition analysis?
15      A.    No, I did not, sir.
16      Q.    Did you know any police officer with
17  the Woodbridge Police Department at the time that
18  this initial request was submitted?
19      A.    No, I did not.
20      Q.    Did you stay in contact with anybody
21  at the Woodbridge Police Department since your
22  investigation into this matter?
23      A.    No, I had not.
24      Q.    You described that you received
25  training in regards to utilizing facial recognition

Page 88

1  software.  As part of that training, did you
2  receive any instruction on how to submit the photos
3  to be analyzed?
4      A.    Yes.
5      Q.    Let me just clarify that.  Did they
6  tell you there are any steps you need to take to
7  make sure the photograph is suitable for a
8  comparison?
9      A.    No, basically, you can take any
10  photo, be it blurry, a poor quality, you're going
11  to submit that photo.  You'll let the instrument or
12  the device or the software make that decision if
13  it's readable, if it's nonreadable, if you get no
14  returns back on it.  When I say "alter a photo,"
15  like I stated earlier, it's just shrinking the
16  photo down to fit into the criteria.  You don't
17  want to submit this huge photo that takes up the
18  whole screen where it's unable to search.
19      Q.    I believe you testified earlier that
20  the act of shrinking down the photo prior to
21  submitting it that has no effect on the validity of
22  the facial recognition results?
23      A.    No, it doesn't.
24      Q.    How often, in your experience, when
25  you're utilizing facial recognition, do you have to

Pages 85 to 88

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 89

1  shrink a photo in order to, before you submit it?
2      A.    Quite often.  I mean, there are
3  times when you're provided a photo, it may not just
4  be one subject in that photo, where they're
5  attempting to ID, for example, I'll use an example,
6  like if you're provided a photo with three
7  individuals, and one is shooting the gun, and the
8  only one they're trying to identify is the man with
9  the gun, is you have to shrink that photo down and
10  get the other two people out of the photo, so
11  you're only focusing on one face and one photo.
12      Q.    Investigator Lyons, when you
13  submitted the photograph of the suspect on the
14  Tennessee driver's license, and you received the
15  results that was a mugshot photo of Nijeer Parks,
16  what was your first reaction when you saw the
17  photograph?
18      A.    My, my initial reaction was like,
19  there was resemblance, the eyes and ears, there was
20  a match.  I then clarified that with Lieutenant
21  Rich Dey, and we were in agreement that there were
22  definitely similarities that had to be looked at
23  further that we provided to Detective Tapia.
24      Q.    So, through your investigation, and
25  your, I guess, corroboration with Sergeant Dey,

Page 90

1  that was enough for you to say that this is worth
2  sending to Woodbridge to follow up on, correct?
3      A.    Yes, it is.
4      Q.    And I had indicated to you earlier
5  that if Woodbridge, following up on that, were to
6  have the officer directly interacting with the
7  suspect and take a look at the photograph, and if
8  that officer was able to confirm that that was the
9  person that he dealt with, that that would be
10  sufficient follow-up investigation?
11      A.    Yes, it would be.
12          MR. CLEMENTE:  Dan, I don't have any
13      further questions.  Thank you, Investigator
14      Lyons.
15          THE WITNESS:  Thank you, Counselor.
16
17  REDIRECT EXAMINATION BY MR. SEXTON:
18      Q.    Just a few based on that.
19          So in your report, you don't mention
20  running this by Dey before sending it on to
21  Woodbridge, do you?
22      A.    No, it's, it's a mutual agreement,
23  where we discuss it, we like to get a second
24  opinion, and basically, we do that all the time.
25      Q.    But there is nothing in -- there is

Page 91

1  nothing in any of these documents that suggest that
2  you did that?
3      A.    No.  This would just be a verbal
4  conversation between myself and Lieutenant Dey.
5      Q.    Currently, in the process, is there,
6  are you required to document when you get a peer
7  review of an impression of a result?
8      A.    When you say "document" --
9      Q.    Are you supposed to note who, who
10  you -- if you did it, and with whom you did it?
11      A.    Well, my name, or the individual
12  that runs the photo or does the facial rec, his
13  name is going to be attached to that report and
14  that photo, so, basically, no, it's just the
15  investigator that's handling the case.
16      Q.    Currently, so you don't --
17      A.    Yes.
18      Q.    So if this one comes in tomorrow, do
19  you need to run that by somebody else, or can you,
20  can you --
21      A.    No, you can do it yourself.
22      Q.    There is no need for peer, like,
23  collaboration or corroboration?
24      A.    Right.  It's part of the process,
25  you want a second opinion.

Page 92

1      Q.    But it's not --
2      A.    It's not necessary.
3      Q.    Now, you agree, right, there is no
4  funny mark on Nijeer Parks' forehead, like there is
5  on the Tennessee driver's license photo?
6      A.    I can't say what that mark is.  I
7  can't tell you if that mark is a blemish from the
8  fake identification on the Tennessee license, or if
9  it's a scratch on the license itself, or if it's on
10  the subject itself.
11      Q.    Okay.  But you would agree it's not
12  on Nijeer Parks?
13      A.    Yes.
14      Q.    If that's a tattoo on his forehead,
15  that would be a quite startling difference in the
16  face, would it not?
17      A.    A tattoo on the forehead?
18      Q.    Yes.
19      A.    Yes.
20      Q.    Now, you said that you never, you
21  don't act as a gatekeeper for using any photo for
22  one of these inquiries.  You'll put anything in,
23  and then the software will decide whether or not
24  it's usable?
25      A.    Correct.

Pages 89 to 92

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 93

1    Q.    And what do you base that practice
2    on?
3    A.    Past experience, and the
4    characteristics that the software utilizes.  It
5    will either deny it, or you'll get no results from
6    the photo.
7    Q.    So you've never been told that
8    certain photos are not suitable for this, these, or
9    images are not suitable for submission?
10   A.    No.
11   I think I mentioned this.  Why did
12   you use the word "altered"?  "I altered pixels,"
13   what's a pixel?
14   A.    It's the clarity of the photo.
15   Obviously, that license photo, and again, we're
16   looking at photocopies.  The image that was cropped
17   and shrunk down, the more you expand it, the pixels
18   become -- agitated, and the image will get blurred.
19   You shrink it down to a smaller quality and submit
20   the image through the software.
21   Q.    Is there a --
22   A.    Technically, if you're asking me
23   about altering a photo, I shrunk it down.
24   Q.    And is there any way in the software
25   to alter the photo in other ways?  For instance,

Page 94

1    could you ask the software to remove facial hair?
2    A.    No.
3    Q.    Or remove a tattoo?
4    A.    No.
5    Q.    Or change an eye color?
6    A.    No.
7    Q.    Are you aware of any facial
8    recognition software that allows the search, search
9    to be done in that fashion?
10   A.    Not through facial rec, but there
11   are ways to search through eJustice portals for a
12   suspect.  If you don't have a name, you could put a
13   possible age, height, weight, ethnicity, and do a
14   group search and get thousands and thousands of
15   returns.
16   Q.    The documents that were marked here,
17   Lyons-1 through 5, were there any other documents
18   that were relevant -- I think you said that we
19   don't have the final report.
20   A.    No, I actually have the final
21   report.  I could e-mail it, or e-mail it to
22   Counsel, and just, it is the final report.
23   Q.    Okay.
24   A.    In that report, noted, it's going to
25   state the same thing.  The attached documents.

Page 95

1    Q.    Okay.
2    A.    So those attached documents are the
3    exact documents that we're looking through here.
4    Q.    Okay.
5    A.    So if you want those, too, they
6    could be e-mailed to you as well.
7    Q.    Okay.  Yeah, that would be great.
8    If you could do that, sir, I would really
9    appreciate it.  And other than that, is there any
10   other document that might be in your file that we
11   don't have here?
12   A.    Nothing, there is nothing in the
13   case report.
14   Q.    And no other e-mails?
15   A.    No other e-mails.
16   Q.    Okay.  All right.  Well, thank you
17   again for, for your time.  I appreciate it very
18   much.
19   MR. CLEMENTE:  I just have one or
20   two follow-ups.
21   MR. SEXTON:  Okay.
22
23   RECROSS-EXAMINATION BY MR. CLEMENTE:
24   Q.    Investigator Lyons, in your 27 years
25   of law enforcement, have you come across your fair

Page 96

1    share of driver's licenses?
2    A.    Yes, I have.
3    Q.    From all different states across the
4    country, correct?
5    A.    All of the United States.
6    Q.    In your experience, do driver's
7    license have security features on them to make them
8    more difficult to forge?
9    A.    Yes, they do.
10   Q.    Can you describe to me what some of
11   those security features might entail?
12   A.    Some of them have an image on the
13   front of the document itself, or on the rear of the
14   document.  There'll be a client ID number on the
15   side of an ID, with a letter on it.  That letter
16   will coincide with the Department of Motor Vehicles
17   from that state.  There is usually a hologram
18   imposed onto the license itself.  There is many,
19   there is many ways to look at a fraudulent
20   document.  In the course of my 27 years, I must
21   have seen thousands of them.  We actually were
22   teaching a class in the academy where we showed
23   people how to understand and read fraudulent
24   documents.
25   Q.    Investigator Lyons, earlier counsel

Pages 93 to 96

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 97

1   indicated to you that there is some kind of mark on
2   the driver's license, on the suspect's forehead.
3   In your opinion, what do, what do you believe that
4   mark to be?
5        A.      That mark could be anything.  Like I
6   stated, it could be a blemish, it could be a scrape
7   on the license from being in his wallet, it could
8   be there on purpose, it could be there, you know,
9   by accident.  The smaller image to the right
10  doesn't seem to have that mark, from what I can
11  see, through the naked eye, but again, that mark
12  could be anything.
13       Q.      If you believe that marking on the
14  suspect's driver's license to be a forehead tattoo,
15  and then you received the results that identified
16  Nijeer Parks, who clearly doesn't have a forehead
17  tattoo, that would have raised a red flag for you,
18  correct?
19       A.      Absolutely.  We probably would have
20  eliminated him as a possible lead.
21       Q.      Thank you, Investigator Lyons.  I
22  don't have anymore questions.
23       A.      Thank you.
24              MR. SEXTON:  Thank you, sir.
25              THE WITNESS:  Thank you, sir.

Page 98

1              MR. CLEMENTE:  Thank you.
2              For the court reporter, I would like
3   to order a copy of the transcript.
4              (Witness excused at 1:31 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 99

1                C E R T I F I C A T E
2
3        I, BARBARA DELACRUZ, License No.
4   XI01772, a Certified Court Reporter of the State of
5   New Jersey, do hereby certify that prior to the
6   commencement of the examination the witness was
7   duly sworn by me.
8
9        I DO FURTHER CERTIFY that the foregoing
10  is a true and accurate transcript of the testimony
11  as taken stenographically by and before me at the
12  time, place and on the date hereinbefore set forth,
13  to the best of my ability.
14
15       I DO FURTHER CERTIFY that I am neither
16  a relative nor employee nor attorney nor counsel of
17  any of the parties to this action, and that I am
18  neither a relative nor employee of such attorney or
19  counsel, and that I am not financially interested
20  in the action.
21
22              _____
                BARBARA DELACRUZ, C.C.R.
23              License No. XI01772
24
25

Pages 97 to 99

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

# EXHIBIT "J"

1

```
 1                       UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY
 2                      CIVIL ACTION NO. 2:21-cv-04021
       NIJEER PARKS,
 3
                        Plaintiff,
 4     -vs-                                    CIVIL ACTION

 5     JOHN E. McCORMACK, MAYOR OF             DEPOSITION OF:
       WOODBRIDGE, In his personal and
 6     official capacity, ROBERT HUBNER,       NIJEER PARKS
       DIRECTOR OF THE WOODBRIDGE POLICE
 7     In his personal and official
       capacity, CITY OF WOODBRIDGE
 8     POLICE OFFICERS, ANDREW LYSZK
       and WOODBRIDGE POLICE SGT. JOSEPH
 9     LICCIARDI, WOODBRIDGE POLICE
       OFFICERS JOHN AND JANE DOE 1-20,
10     being as yet unknown actors,
       MIDDLESEX DEPARTMENT OF CORRECTIONS,
11     JOHN AND JANE DOES 1-20, being
       unknown actors, MIDDLESEX COUNTY
12     PROSECUTOR, ACTING PROSECUTOR
       CHRISTOPHER KUBERIET, in his
13     personal and official capacity,
       and ASSISTANT MIDDLESEX COUNTY
14     PROSECUTOR PETER NATASI, and
       IDEMIA INC.'S being the maker
15     of the facial recognition
       software and ABC CORPORATION,
16     being an as yet unknown seller
       or servicer of the facial
17     recognition programs,

18                      Defendants.
       - - - - - - - - - - - - - - - - - -
19                      T R A N S C R I P T  of the stenographic
       notes of the proceedings in the above-entitled matter,
20     as taken by and before MARYANN C. MEISTER, a Certified
       Shorthand Reporter of the State of New Jersey, License
21     No. XI00901, at the offices of DANIEL W. SEXTON,
       ESQUIRE LLC, 229 New Centre Road, Hillsborough, New
22     Jersey on Thursday, June 30, 2022, commencing at 11:24
       in the afternoon.
23
                        VITALE REPORTING SERVICE
24                           P.O. Box 369
                          Manasquan, NJ 08736
25                          (732) 223-1263
```

2

```
 1   A p p e a r a n c e s:

 2       DANIEL W. SEXTON, ESQUIRE, LLC
         Attorney for Plaintiff
 3       254 New Centre Road
         Hillsborough, New Jersey  07334
 4       BY: DANIEL W. SEXTON, ESQUIRE
         DanielSextonEsq@gmail.com
 5
         JAMES F. NOLAN & ASSOCIATES, LLC
 6       Attorneys for Defendants McCormac, Buhmer,
         Township of Woodbridge, Lyszk and Liszlard
 7       41 Green Street
         Woodbridge, New Jersey  07095
 8       BY: FREDRICK RUBENSTEIN, ESQUIRE
         FRubenstein@jfnlaw.us
 9
         DVORAK & ASSOCIATES, LLC
10       Attorneys for Defendant Middlesex Department
         of Corrections
11       4x7 Middlesex Avenue
         Metuchen, New Jersey  08440
12       BY: IORI A. DVORAK, ESQUIRE
         Iori@voraklegal.com
13
         NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
14       DIVISION OF LAW
         Attorneys for Defendants Kubaniet and Natasi
15       25 Market Street
         P.O. Box 116
16       Trenton, New Jersey  08625
         BY: PHOENIX M. MEYERS, ESQUIRE
17       Phoenix.meyers@law.njoag.gov

18   Also present:

19       Jillian Mencel

20

21

22

23

24

25

              VITALE REPORTING SERVICE (732) 223-1263
```

3

```
 1                     I N D E X

 2   Name          Direct    Cross     Redirect

 3   NIJEER PARKS

 4   By Mr. Rubenstein    4                 181

 5   By Ms. Dvorak              110

 6

 7

 8

 9

10

11

12

13                    EXHIBITS

14   For Id.      Description          Page

15   P-1          Complaint             4

16   P-2          Woodbridge Police Department
                  ID Bureau Suspect Report    93
17
     P-3          Photocopy of driver's license   95
18
     P-4          DNA Laboratory Report          104
19
     P-5          Certification                  165
20
                  (Exhibits retained by counsel.)
21

22

23

24

25

              VITALE REPORTING SERVICE (732) 223-1263
```

4

1  N I J E E R   P A R K S,

2  311 9th Avenue, Apartment 3, Paterson, New

3  Jersey,

4  Having been duly sworn and testifies as follows:

5  DIRECT EXAMINATION BY MR. RUBENSTEIN:

6          (Complaint marked Exhibit P-1 for

7      Identification.)

8      Q    Mr. Parks, good morning.

9      A    Good morning.

10     Q    My name is Fred Rubenstein and I

11 represent the interests of the Woodbridge

12 Township defendants in a lawsuit that you have

13 brought as a result of an incident that occurred

14 on January 26th of 2019.  We're here today for

15 your deposition which is just a fancy way of

16 saying it's a question-and-answer session between

17 you and I and the other lawyers.  Throughout the

18 day we're going to ask you questions and we're

19 going to expect that you're going to give us

20 answers that are truthful to the best of your

21 knowledge, okay?

22     A    Yes.

23     Q    So there are some instructions that I

24 want to give you for purposes of making this

25 process move along smoothly and hopefully we'll

              VITALE REPORTING SERVICE (732) 223-1263

5

1  get done today.

2          First and foremost, let me ask my question

3  in full without interruption and I'll give you

4  the same courtesy.  Now, we're bound to talk over

5  each other at some point during the deposition

6  and that's understandable, but we need to try to

7  prevent that as much as possible because the

8  court reporter who's sitting to your left is

9  taking everything down and it's going to be in a

10 booklet form when we finish here today and she

11 can't take down when people talk at the same

12 time.  It makes for a messy transcript, all

13 right?

14     A    No problem.

15     Q    My other -- the next instruction is

16 please keep all of your responses verbal.

17 Although the court reporter is capable of

18 understanding if you gave me a hand gesture or a

19 head movement, she's not in a position where

20 she's allowed to interpret what you are trying to

21 say, so keep all your responses verbal as best

22 you can.

23     A    Okay.

24     Q    Also, as the court reporter has asked,

25 please keep your voice up.  I'm not yelling or

              VITALE REPORTING SERVICE (732) 223-1263

6

1  anything like that, but just try to keep your
2  voice up so that everyone can hear your responses
3  and you're not going to be asked repeatedly or
4  have to repeat your response.
5      A    No problem.
6      Q    Although we're in an informal setting
7  in the conference room in your attorney's office,
8  the testimony here today has the same force and
9  effect as if you were sitting before a judge and
10 a jury.  Do you understand that?
11     A    Yes.
12     Q    If your attorney or anyone else places
13 an objection to one of my questions throughout
14 the day, and it's certainly possible, please
15 cease stating an answer and then your attorney
16 will state his objection and then we'll continue
17 with your response if you're permitted, okay?
18     A    Okay.
19     Q    I don't want you to guess at anything.
20 If you don't know an answer, that's perfectly
21 acceptable.  If you don't know, you don't
22 remember, all perfectly fine, but the last thing
23 any of us wants you to do here today is guess.
24     A    Okay.
25     Q    If you need to take a break for any

7

1  reason, you're welcome to do so.  It's your
2  deposition.  You take as many breaks as you need.
3  However, the only caveat is if there is a
4  question pending before you by any of the
5  attorneys, please answer that question and then
6  we'll take a break for as long as needed, okay?
7      A    No problem.
8      Q    Do you need an opportunity to speak to
9  Mr. Sexton before we begin here today?
10     A    I was asking him did he have anything
11 he needed to speak to me about.
12     MR. SEXTON:  No.
13     Q    Because once we begin here, you can't
14 look to Mr. Sexton for any help.  That's why I'm
15 asking.  If you want an opportunity to ask him
16 any last-minute questions, I'll be happy to give
17 it to you before we begin.
18     A    I'm okay.
19     Q    So I want to get some background
20 information.  Mr. Parks, what is your address?
21     A    311 9th Avenue, Paterson, New Jersey,
   Apartment 3.
22     Q    And how long have you resided at that
   [23]
24 address?
25     A    Almost two years.

8

1      Q    So you were not -- is it safe to say
2  you were not living there when this incident
3  occurred in '19?
4      A    No, no.
5      Q    So -- and you were living there about
6  two years.  Where did you live before that?
7      A    I was living 485 East 19th Street with
8  my grandmother and I was taking care of my
9  grandmother maybe four days a week and I was
10 living with my ex-fiancee.  We had an apartment
11 together but I was mostly like kind of at my
12 grandma's house.  She had brain cancer so she was
13 like on her last year and I was like the main
14 person taking care of her.
15     Q    And the current address that you're
16 at, do you live there with anyone?
17     A    Me and my kids.
18     Q    How many children do you have?
19     A    Two.
20     Q    And their respective ages?
21     A    13 and 11.
22     Q    And what is your social security
23 number?  And we can just take the last three.
24     A    Xxx-xx-0832.
25     Q    And your date of birth?

9

1      A    9/11/1987.
2      Q    Are you currently employed?
3      A    Yes.
4      Q    And who are you employed with?
5      A    Touch of Class Fine Touch and
6  Finishing.
7      Q    And what's your position there?
8      A    I do a lot of different things.  We
9  make kitchen cabinets, we paint, we install them,
10 so I do a little bit of everything.
11     Q    And how long have you held that
12 position?
13     A    Two years.
14     Q    Is it safe to say you didn't have that
15 position when this incident happened in January
16 of 2019?
17     A    Yes.
18     Q    What job did you hold before that?
19     A    I was working at Price Rite.
20     Q    And where is that located?
21     A    In Paterson, New Jersey.
22     Q    And what did you do there, what was
23 your title?
24     A    I was assistant manager for the
25 produce department.

10

1    Q    And how long did you work there?

2    A    **For almost four years.**

3    Q    Were you working at that job when this

4  incident occurred in January of -- January 26th

5  -- I think I might have been saying 25th -- 2019?

6    A    **Yes.**

7    Q    And did you graduate from high school?

8    A    **Yes.**

9    Q    Where did you graduate from?

10   A    **I graduated from William Allen High**

11 **School in Allentown, Pennsylvania.**

12   Q    In what year?

13   A    **2006.**

14   Q    Did you take any college courses or

15 anything like that?

16   A    **I was supposed to go to George**

17 **Washington in Maryland on a partial football**

18 **scholarship, but all the paperwork -- kind of got**

19 **a new coach during the middle of the summer and I**

20 **wasn't on his list for the kids that he wanted to**

21 **bring in so I never went.**

22   Q    Did you attend any higher education

23 facility?

24   A    **After that, no. I worked for the**

25 **summer there for some summer classes and then**

11

1  they got a new coach and I never went back.

2    Q    In terms of -- besides this incident

3  on January 26th, I'm asking you if you've ever

4  been arrested before for any reason.

5    A    **Yes.**

6    Q    Let's, as best we can, start with the

7  first time you were arrested, if there's more

8  than one. And, again, excluding January 26th.

9        MR. SEXTON:  Just objection to the

10       relevance but you can answer these

11       questions.

12   A    **No problem. I was arrested in --**

13 **numerous times. I've been arrested, I've been in**

14 **prison two to three -- two times, I've been in**

15 **county --**

16       MR. SEXTON:  Answer the question.

17   A    **-- a couple of times so I can't**

18 **remember the exact first dates.**

19   Q    Forget dates. Why don't you start

20 with, as best as you can remember, the first time

21 you were ever arrested.

22   A    **It would be 2006 or '7.**

23   Q    And what were you arrested for?

24   A    **Possession of CDS.**

25   Q    And out of where were you arrested?

12

1    A    **Paterson, New Jersey.**

2    Q    The possession of CDS in roughly 2006,

3  2007 out of Paterson, New Jersey, did you plead

4  guilty, were you convicted of it?

5    A    **I pled guilty. I got probation.**

6    Q    So you never served any term of

7  incarceration for the 2006 or 2007 CDS?

8    A    **Maybe a couple of days where I was**

9  **waiting to get bailed out.**

10   Q    What is the next time that you recall

11 having been arrested?

12   A    **2008.**

13   Q    And what were you arrested for?

14   A    **Possession of CDS with intent to**

15 **distribute.**

16   Q    What town was that?

17   A    **Paterson.**

18   Q    And what was the end result of that

19 arrest and charges?

20   A    **I went to prison for three years, I**

21 **did 18 months.**

22   Q    And were you actually in prison for

23 approximately three years and ten months?

24   A    **I was in prison for 18 months. I was**

25 **sentenced to three years with 18 months**

13

1  eligibility for parole.

2    Q    So after approximately 18 months, you

3  were released from jail.

4    A    **Yes.**

5    Q    And the next time, if there was a next

6  time, you were arrested?

7    A    **2010 or '11.**

8    Q    And for what was the alleged

9  violation?

10   A    **Same thing.**

11   Q    And out of what town?

12   A    **Probation. Paterson.**

13   Q    And what was the disposition of that?

14   A    **Probation.  2012 --**

15       MR. SEXTON:  Is there a question?

16       MR. RUBENSTEIN:  Well, it was --

17       MR. SEXTON:  Okay.

18       MR. RUBENSTEIN:  I understand what

19       you're doing. I appreciate it.

20   Q    Because I'm asking you just to tell me

21 all of them but I'll ask the questions so that

22 it's clear.

23       After the 2010, 2011 arrest when you were

24 convicted and you were given probation, what was

25 the next time you were arrested?

14

1    A    2012.

2    Q    Out of?

3    A    Paterson, possession of CDS with

4    intent to distribute.

5    Q    Out of Paterson.

6    A    Yes.

7    Q    And what was the disposition?

8    A    I was sentenced to six years.  I did

9    39 months.

10   Q    I'm sorry.  Six years was your

11   sentence?

12   A    I was sentenced to six years.  I had a

13   three-year eligibility for parole and I did 39,

14   maybe 40, months before I was released in 2016.

15   Q    So you were sentenced to six years,

16   you were given -- you were eligible for parole in

17   about 39 months?

18   A    In three years I was eligible for

19   parole.

20   Q    I'm sorry, and you --

21   A    I was released in about 39, 40 months.

22        MR. SEXTON:  You can't talk over him

23   because the reporter can only take one

24   person's words down at one time.

25   Q    Again, besides the 2019 arrest,

VITALE REPORTING SERVICE (732) 223-1263

---

15

1    anything else between 2012 and 2019?

2    A    I was arrested for possession of

3    marijuana in 2018.  I just got a fine.

4    Q    Was that in Paterson?

5    A    Yes.

6    Q    Anything else before 2019?

7    A    No.

8    Q    Again, skipping over the 2019 incident

9    for a few minutes, anything since January 26,

10   2019 where you were arrested?

11   A    No.

12   Q    So the last time you've ever been

13   arrested was January -- was a result of the

14   January 26, 2019 incident.

15   A    Yes.

16        MS. DVORAK:  If I can.  What name were

17   you arrested under for each of those that

18   you just described to us?

19        THE WITNESS:  Nijeer Parks.

20        MS. DVORAK:  N-i-j-e-e-r?

21        THE WITNESS:  Yes.

22        MS. DVORAK:  P-a-r-k-s?

23        THE WITNESS:  Yes.

24   Q    Have you ever gone by any aliases or

25   anything like that?

VITALE REPORTING SERVICE (732) 223-1263

---

16

1    A    No.

2    Q    Might as well go right to the topic at

3    hand.

4        At some point did the Woodbridge Police

5    Department contact you in January of 2019 about

6    an incident at the Hampton Inn?

7    A    No, they actually went to my

8    grandmother's house while I was out going food

9    shopping.

10   Q    And your grandmother's house is the

11   address that you gave us earlier.

12   A    Yes.

13   Q    And what, if anything, do you know

14   about the conversation that the police had with

15   your grandmother?

16   A    I just know that they scared her half

17   to death.  That's pretty much it.  She just

18   called me and said there's a whole bunch of

19   police here, what did you do.  I was clueless.  I

20   didn't know anything about what was going on and

21   that was pretty much the conversation.

22   Q    When she called you, being your

23   grandmother, were the police still there?

24   A    I think they were.

25   Q    And did you -- what did you do then

VITALE REPORTING SERVICE (732) 223-1263

---

17

1    when she contacted you, scared her half to death,

2    she told you what they were there for, what did

3    you do at that moment when you were contacted by

4    her?

5    A    I called Paterson Police Department to

6    ask them did I have a warrant out for my arrest

7    or anything, why were they at my residence.  They

8    told me that they didn't have a warrant out for

9    me but there was a warrant out for me from the

10   City of Woodbridge.  So I immediately hung up

11   with Paterson, they gave me a number for

12   Woodbridge, I called Woodbridge and they told me

13   there was an incident at a hotel and they

14   couldn't give me any more information, and I

15   called back -- I hung up with them that night.  I

16   called back the next morning to find -- they said

17   I should call back in the morning, there would be

18   somebody else I could talk to.  I called back in

19   the morning and a lady -- I spoke to one of the

20   ladies and she told me that, oh, it's just a

21   formality to come in, show us that you weren't

22   the person we're looking for, bring ID, some

23   paperwork and stuff like that, and I told them I

24   had work earlier and I don't drive so the

25   earliest I could get down would be Wednesday.

VITALE REPORTING SERVICE (732) 223-1263

18

1    That was my next day off.
2           MR. SEXTON:  Try to speak louder and
3    more slowly and as distinctly as possible.
4       A     So I told them Wednesday would be my
5    next day off.  I had my cousin, asked one of my
6    cousins can he drive me down there.  He drove me
7    down there.  I went there with the paperwork and
8    my ID and stuff and showed who I am and I handed
9    the lady my stuff.  I was standing there talking
10   to her and two officers just walked up and told
11   me to put my hands behind my back.
12      Q     When your grandmother contacted you,
13   you said you were food shopping?
14      A     Yes.
15      Q     Were you food shopping for your
16   grandmother?
17      A     Yes.
18      Q     Was it local?
19      A     Yes.
20      Q     Is there a reason why you just didn't
21   head home if the police were still there?
22      A     Yes.  I didn't do anything wrong so I
23   wasn't planning on going to jail that night.
24      Q     Did your grandmother say to you that
25   the police were here to arrest you?

19

1       A     No, but I was pretty sure if they were
2    there, they were there to arrest me so --
3       Q     So is it fair to say that you
4    deliberately didn't go back to your grandmother's
5    house that time because the police were there?
6       A     Yes, I wanted to call to see what was
7    the reason that they were there which I did.  If
8    you check the record, I called and spoke to the
9    Paterson Police Department that night and
10   Woodbridge Police Department that night.
11      Q     But you were -- you contacted the
12   Paterson Police Department, you contacted the
13   Woodbridge Police Department to find out what the
14   situation was.
15      A     Yes.
16      Q     And you were told by Paterson that
17   there was a warrant out for your arrest in
18   Woodbridge.
19      A     Yes.
20      Q     And you did that almost immediately
21   after --
       A     Immediately.
23      Q     You got to let me finish.
24   You contacted the Paterson Police Department
25   almost immediately after your grandmother had

20

1    contacted you.
2       A     Yes.
3       Q     So you knew within a matter of
4    minutes, would you say, that -- what the issue
5    was with Woodbridge.
6       A     No.
7       Q     When did you figure it out that there
8    was an issue with Woodbridge?
9       A     I never knew exactly what happened in
10   Woodbridge until after I was arrested.
11      Q     So when you called the Woodbridge
12   Police, did you -- for the first time, when you
13   contacted them and said --
14      A     Yes.
15      Q     -- you know, you came to my house,
16   I'm -- you know, you knew that there was an issue
17   with the Woodbridge Police.  You didn't know what
18   it was but you knew there was an issue; is that
19   correct?
20      A     Yes.
21      Q     Did they tell you on the phone there
22   was a warrant out for your arrest?
23      A     Yes, and I spoke to the lady.  I said
24   do you need me to come in?  She said when can you
25   get here?  I said the earliest I can get there is

21

1    Wednesday.  She said I'll see you Wednesday.
2       Q     And this is all within what period of
3    time from when your grandmother called you?
4       A     This is all within an hour, all within
5    the hour, within that hour I called Passaic
6    County, I called Paterson.  I got the number for
7    Woodbridge, I called Woodbridge.  And within that
8    hour, I spoke to both police departments, I spoke
9    with someone to tell them that I'd be there on
10   Wednesday.
11      Q     Did you ever contact your grandmother
12   on the phone or through other means before you
13   went back to her house?
14      A     That night?
15      Q     Yes.
16      A     Yes, I went back there that night.  I
17   stayed there.
18      Q     So do you remember what day of the
19   week January -- what day of the week this
20   happened when your grandmother called you?
21      A     Not exactly sure the exact day.  You
22   don't want me to guess so I'm not exactly sure.
23      Q     Perfectly fine.
24   And then you told Woodbridge that you were
25   going to come down to the police station at some

22

1   point when you could, right?
2       A       Yes.  I knew it was before Wednesday
3   because my next day off -- I know my days off are
4   always on Wednesdays so I knew Wednesday was
5   going to be my next day off.  My days off are
6   always on Wednesday around the time.
7       Q       So you went down on the Wednesday.
8       A       I'm pretty sure I went down on
9   Wednesday.
10      Q       And someone take you to the police
11  station?
12      A       Yes.
13      Q       Who took you?
14      A       My cousin.
15      Q       What's his name?
16      A       Tyris Robertson.
17      Q       And when you were going to the police
18  station in Woodbridge on that Wednesday, you had
19  an understanding, did you not, that there was a
20  bench warrant?
21      A       At that time, I just -- I spoke with
22  someone, they just told me I should come in and
23  talk to them.  They didn't tell me that they were
24  arresting me.  They just said I should come in to
25  see what was going on with the incident, to tell

VITALE REPORTING SERVICE (732) 223-1263

23

1   my side of the story.  I didn't know that I was
2   going to be arrested or anything.
3       Q       I'm not asking if you knew you were
4   going to be arrested.  I want to know what
5   you knew before you went --
6       A       No, I didn't.
7       Q       I'm trying to understand what you knew
8   before you went down to the Woodbridge Police
9   Department on that Wednesday.  So --
10              MR. SEXTON:  It's been asked and
11      answered.
12              MR. RUBENSTEIN:  I'm just trying to
13      lay the groundwork of what I'm asking so
14      there's no confusion.
15      Q       When you contacted Paterson the day
16  your grandmother called you, they did tell you
17  that there was a warrant out for your arrest, did
18  they not?
19      A       Yes, and when I talked to Woodbridge,
20  they told me --
21      Q       You answered my question.
22      A       -- to come in for questioning.
23      Q       That's fine.  But you've answered my
24  question yes, and I'm sure your attorney doesn't
25  want you to go on and on giving an answer above

VITALE REPORTING SERVICE (732) 223-1263

24

1   and beyond what the question calls for.
2       So you knew there was an arrest warrant for
3   you in Woodbridge on the day you drove -- when
4   you were driven down to Woodbridge on that
5   Wednesday.
6       A       Yes.
7       Q       Forget about whether they were going
8   to arrest you or not.  You were aware of that
9   fact.
10      A       No, I wasn't.  I was told to come down
11  in for questioning.
12      Q       So even though Paterson had told you
13  there was an arrest warrant for you in
14  Woodbridge, you didn't know there was an arrest
15  warrant.
16      A       When I spoke to Woodbridge, they
17  didn't tell me there was a warrant.  They told me
18  to come in for questioning so --
19      Q       But when you contacted Paterson --
20      A       So I'm going to say no.
21              MR. SEXTON:  Wait for the question.
22      A       No.
23              MR. SEXTON:  Wait for the question.
24              THE WITNESS:  My answer is no.
25              MR. SEXTON:  I don't know the question

VITALE REPORTING SERVICE (732) 223-1263

25

1   so I -- what's the question?  Don't answer
2   until I tell you to.
3       Q       When Paterson indicated --
4       A       No.
5               MR. SEXTON:  Don't answer until I tell
6       you.
7       Q       Sir, I'm going to be very nice about
8   this.  We're going to be here for a very long
9   time and I'm going to get all my questions in and
10  you can either answer them or you can leave, I
11  don't care, but you pick one.  You answer my
12  questions, we'll get done.  If you don't, we'll
13  leave and we'll deal with the court because you
14  don't want to answer.
15              MR. SEXTON:  There's no reason for
16      this.
17              MR. RUBENSTEIN:  There is certainly --
18              MR. SEXTON:  No, there's not.
19              MR. RUBENSTEIN:  He says I'm attacking
20      him.  I'm very polite.  He hasn't seen
21      attack yet.  I don't plan on attacking
22      anyone, but if he feels he's attacked, he's
23      in for a long day.
24              So counsel, calm him down and get him
25      to answer my question.

VITALE REPORTING SERVICE (732) 223-1263

26

1      MR. SEXTON:  I've been doing that.
2      (Whereupon a short recess was taken.)
3      Q    Again, I know I've asked this but I'm
4   a little confused.
5      When you contacted Paterson, Paterson
6   indicated to you that there was an arrest warrant
7   for you out of the Township of Woodbridge.
8      MR. SEXTON:  Objection to form.  You
9   can answer.
10     A    Yes.
11     Q    Do you understand what it means when
12  someone tells you that there's an arrest warrant
13  out of a particular town for you?
14     A    Yes.
15     Q    What is your understanding?
16     A    It means a warrant.
17     Q    And that means that unless something
18  changes, they're going to arrest you, does it
19  not?
20     A    No.
21     MR. SEXTON:  Objection to form.
22     Q    You can answer.
23     A    No.
24     Q    So it's your understanding that if an
25  arrest warrant is issued, that doesn't mean

VITALE REPORTING SERVICE (732) 223-1263

27

1   they're going to arrest you.
2      MR. SEXTON:  Argumentative.  He
3      answered the question.
4      MR. RUBENSTEIN:  I'm sorry.  He did?
5      MR. SEXTON:  Yeah.
6      Q    You can answer.
7      A    Yes.
8      Q    So -- and thereafter, you contacted
9   the Woodbridge Police Department on the same day
10  that you contacted the Paterson Police
11  Department.
12     A    Yes.
13     Q    Did whoever you spoke to tell you that
14  there was an arrest warrant for you?
15     A    No.
16     Q    Did you ask if there was an arrest
17  warrant for you?
18     A    Yes.  They told me they just wanted me
19  to come in for questioning.
20     Q    So was it your understanding that
21  there was an arrest warrant for you in Woodbridge
22  and that Woodbridge Police Department wanted you
23  to come in to find out about your side of the
24  story or what information you had about some
25  incident?

VITALE REPORTING SERVICE (732) 223-1263

28

1      A    Yes.
2      Q    Do you know the name of the person you
3   spoke to at Woodbridge?
4      A    No.
5      Q    Do you know if it was a male or a
6   female?
7      A    Female.
8      Q    Was it -- did you call the emergency
9   number or did you call the main number of
10  Woodbridge Police Department, if you remember?
11     A    Not sure.
12     Q    Do you know who you spoke to in
13  Paterson?
14     A    No.
15     Q    Do you know if you called the main
16  number or the 911 emergency number?
17     A    The main number.
18     Q    Did you make any other phone calls to
19  the Woodbridge Police Department after that first
20  phone call to them between the time of that first
21  phone call and the time you went to the police
22  station?
23     A    Pretty sure I did.
24     Q    Do you have a recollection of when
25  that conversation took place?

VITALE REPORTING SERVICE (732) 223-1263

29

1      A    No.
2      Q    Do you have a recollection of about
3   what the content of that conversation was?
4      A    No.  I do actually.  I kept calling
5   trying to see what happened.  They just kept
6   telling me to come -- I kept calling asking about
7   what was the incident.  They just kept telling me
8   to come.
9      Q    Do you remember if you spoke to a
10  dispatcher or police officer, do you have any
11  knowledge?
12     A    I spoke to a court clerk, I spoke to
13  an officer.  I spoke to a couple of different
14  people.
15     Q    And was this all during the same phone
16  call or was it a number of phone calls?
17     A    No, during that phone call I was
18  transferred to a couple of different people.  The
19  court clerk was the first person I talked to.
20  She transferred me to an officer.  The officer
21  transferred me to another officer.
22     Q    And that officer told you to just come
23  on down to Woodbridge and we'll deal with it.
24     A    Um-hum.
25     Q    Is that a yes?

VITALE REPORTING SERVICE (732) 223-1263

30

1    A    Yes.

2    Q    So on that Wednesday, you and your

3 relative drive down to the Township of Woodbridge

4 Police Department; is that correct?

5    A    Yes.

6    Q    Do you go into the police station

7 alone or does he escort you into the police

8 station?

9    A    **I go in alone.**

10   Q    He was waiting outside for you or he

11 just dropped you off and then --

12   A    **He was waiting outside for me.**

13   Q    When you got inside, tell me what

14 happened next.

15   A    **I walked up to a desk, I talked to the**

16 **lady at the desk.  She asked my name.  I gave her**

17 **my ID, I gave her my paperwork.  She told me they**

18 **were waiting for me, she would go get them and**

19 **she said she'll be right back.  When she came**

20 **back, she started talking to me.  Me and her were**

21 **having a conversation and two officers came up**

22 **and asked me to put my hands behind my back and**

23 **told me that I was under arrest.**

24   Q    So when you arrived, did you speak to

25 a dispatcher, did you speak to a police officer

31

1 when you first arrived?

2         MR. SEXTON:  Asked and answered.  You

3    can answer again.

4    A    **I spoke to a lady at the desk.  I**

5 **spoke to the lady at the desk.  When you walk in,**

6 **there's a desk right there with an officer**

7 **sitting at the desk.  I spoke to an officer at**

8 **the desk.  She asked me my name.  I gave her my**

9 **ID, I gave her the paperwork that I had and told**

10 **her I was waiting for -- that I was told to come**

11 **in.**

12   Q    Was this particular woman, was she

13 behind like a glass partition?

14   A    **She was just sitting behind a desk.**

15   Q    And you said at some point two police

16 officers came out and told you that you were

17 under arrest?

18   A    **Yes.**

19   Q    Do you know the name of the person who

20 you first spoke with?

21   A    **No.**

22   Q    Do you know the names of the police

23 officers who told you that you were under arrest?

24   A    **No.**

25   Q    Do you remember if they were both

32

1 males?

2    A    **Yes.**

3    Q    Do you remember if the person who you

4 first spoke with when you arrived at Woodbridge

5 was a male or female?

6    A    **The person at the desk?**

7    Q    Yes.

8    A    **It was a female.**

9    Q    At that point, were you handcuffed?

10   A    **Yes.**

11   Q    Were you told what you were under

12 arrest for?

13   A    **No, they just handcuffed me and took**

14 **me upstairs to an interrogation room.**

15   Q    At that point when you were downstairs

16 or when you were first being arrested or

17 handcuffed, I should say, did they read you your

18 Miranda warning?

19   A    **No.**

20   Q    They just handcuffed you and --

21   A    **They handcuffed me, took me upstairs**

22 **and left me in a room for about maybe 20 minutes.**

23   Q    So they put you in a room for about

24 20 minutes where you were left alone.  Were you

25 handcuffed this entire time?

33

1    A    **Yes.**

2    Q    And then someone came -- at least one

3 person came in to speak to you; is that correct?

4    A    **Yes.**

5    Q    Was it one person or was it more than

6 one person?

7    A    **It was one officer.**

8    Q    Do you remember his or her name?

9    A    **No.**

10   Q    What did that police officer tell you?

11   A    **I asked him why was I being arrested.**

12 **He told me basically, "You know what you did.**

13 **You know why you're here."  He didn't tell me**

14 **anything.  He asked me do I have anything to tell**

15 **him about the incident.  I didn't know about the**

16 **incident.**

17   Q    Is there anything else that you can

18 tell me about that back and forth with the first

19 police officer that came in to speak to you?

20   A    **He was just basically trying to make**

21 **me tell him that I did something that I didn't**

22 **do.**

23   Q    Did he threaten you in any way?

24   A    **Just told me, "You know what you did.**

25 **You did it.  We know you did it.  We got you.**

34

1    That's what you're here for.  You know what you
2    did."
3         I'm asking him what am I here for, what did
4    I do.
5         "There's no reason for me to tell you what
6    you did.  You know why you're here for."
7         Q    Going back for a second, the police
8    officer that put the handcuffs on you, was he
9    aggressive in any way?
10        A    He just grabbed me and just grabbed my
11   arms and put my hands behind my back.  I turned
12   around to look, they just pushed me back against
13   the counter and told me don't move.  I was
14   talking to the lady.  They just walked up on
15   me -- I thought they were walking past and when
16   they got behind me, he just grabbed my arms and
17   started -- I turned, like what's going on and he
18   pushed me back against the counter.  I turned to
19   check to see like what's going on and he pushed
20   me against the counter like and he turned me back
21   around and told me don't resist, and I didn't,
22   and I just let him put my hands behind my back.
23        Q    And then you were, like you said
24   before, you were brought up to the room where you
25   spent about 20 minutes by yourself.

VITALE REPORTING SERVICE (732) 223-1263

35

1        A    Yes.
2        Q    And then the other officer came in and
3    didn't tell you what you were there for, correct?
4        A    No.
5        Q    He was just trying to get you to admit
6    to what had happened and your involvement in it.
7        A    Yes.
8        Q    And is it fair to say that he didn't
9    lay a hand on you or is it not say fair to say?
10        MR. SEXTON:  Who is he?
11        Q    The police officer who came in to
12   speak to you.
13        A    No, he didn't lay a hand on me.
14        Q    At any point in time during the
15   conversation or the back and forth with this
16   police officer, did he ever tell you why you were
17   there?
18        A    No.
19        Q    Did you ever ask him why you were
20   there?
21        A    Yes.  His only answer to why I was
22   there was "You know what you did.  You know why
23   you're here."
24        Q    And did anyone else come in to speak
25   to you while that officer was in the room?

VITALE REPORTING SERVICE (732) 223-1263

36

1        A    He left, another officer came in and
2    asked me the same questions.
3        Q    Do you know the name of that police
4    officer?
5        A    No.
6        Q    Did that police officer get aggressive
7    with you in any way?
8        A    They got aggressive like with their
9    manner, like with their words, like trying to
10   scare me, but no one put their hands on me or
11   anything.
12        Q    So there was no physical
13   interaction --
14        A    No.
15        Q    -- between you and the first police
16   officer as well as the second police officer.
17        A    No.
18        Q    Thank you.
19        Did the second police officer who came into
20   the room ever tell you what you were -- what the
21   charges were or why you were there?
22        A    No.
23        Q    And how long had you been in that room
24   when the second police officer came to speak to
25   you?  Approximately.

VITALE REPORTING SERVICE (732) 223-1263

37

1        A    Maybe about close to an hour now.
2        Q    So you were upstairs in this room for
3    about an hour, two police officers at different
4    times had come in to talk to you but you still
5    didn't know --
6        A    No.
7        Q    -- what you were charged with or what
8    the allegations were.
9        A    No.
10        Q    And did you inquire from the second
11   police officer why you were there?
12        A    Yes.
13        Q    And he didn't answer.
14        A    He didn't answer me either.
15        Q    Was there any other conversation
16   between you and the police officer during
17   that conversation that you had?
18        A    No.  We had pretty much the same
19   conversation that I had with the first officer,
20   him asking me what I did, me
21   asking him what did I do, what happened and my --
22   pretty much my answer from -- the same answer was
23   from him, "You know what you did.  You know why
24   you're here."
25        Q    So he didn't describe in any way --

VITALE REPORTING SERVICE (732) 223-1263

38

1    A    No. Only thing they told me was the
2 incident at a hotel. That's the only thing I
3 knew about the incident was that it happened at a
4 hotel.
5    Q    After -- at some point in time did
6 that second police officer leave the room you
7 were in?
8    A    Yes.
9    Q    And were you kept in that room during
10 this time?
11    A    Yes.
12    Q    At some point did someone else come
13 into the room?
14    A    I'm not sure. I know a couple of
15 other officers came and looked, like poked their
16 head in the room and looked at me, but no one
17 came -- I don't remember anybody asking me no
18 questions. I remember a couple of officers
19 coming to look.
20    Q    But they didn't say anything to you.
21    A    No.
22    Q    They didn't touch you physically in
23 any way?
24    A    No. Just was seeing a lot of happy
25 officers come in and look like we got him,

39

1 smiling, giving each other high fives and stuff
2 like that, but nobody came and did anything to
3 me.
4    Q    Do you know the names of any of these
5 officers?
6    A    No.
7    Q    Do you remember if they were male or
8 female?
9    A    Mostly males.
10    Q    Were there any female officers?
11    A    Only female officer that I seen was at
12 -- was not at the -- not in the county area, was
13 at the jail. They weren't in like the -- I guess
14 that's their court or holding facility. They
15 weren't there.
16    Q    What was the next interaction you had
17 with anyone from the Woodbridge Police
18 Department?
19    A    When they took me from up there, they
20 took me for fingerprinting and stuff like that
21 and there was a bunch of officers and they
22 fingerprinted me, they sat me down in like a
23 little bench area, they took my photos and
24 they had me sitting in this hallway. Like the
25 hallway was wide open and I could see another

40

1 office right here, another office right here,
2 another office right here, and then there was a
3 long hallway down at the end, like another --
4 like a long hallway going down this way, and like
5 we were sitting there. After they fingerprinted
6 me and stuff, I think I was waiting for transport
7 and I was just sitting there for a while.
8    Q    So the next interaction you had after
9 the first two officers had spoken to you, is it
10 fair to say that someone came into the room to
11 take you to be fingerprinted and processed?
12    A    Yes.
13    Q    Other than the usual holding onto you
14 and escorting to where you had to be
15 fingerprinted, was there any excessive force or
16 any type of excessive conduct on behalf of that
17 officer or officers?
18    A    Trying to where I just was getting to
19 that, there was a long hallway down at the end as
20 I stated before. They had me handcuffed to the
21 bench, so after they fingerprinted me and took
22 their pictures, I'm sitting on this bench for a
23 while. So now there's a bunch of officers coming
24 in and they're all looking at me, asking me
25 little questions like "We got him," making little

41

1 statements like "We got him," smart remarks like
2 "Oh, look at this fucker," excuse my language.
3 "Oh, we got him," "This is the prick right here,"
4 "This is the A-hole right here." They all going
5 down this long hallway to another -- couple of
6 doors down the hallway, but there's a camera
7 right here but I don't see a camera down this
8 hallway. So they uncuff me and they want me to
9 go down this hallway, but as I'm looking, I don't
10 see a camera down this hallway and there's a
11 million officers down there.
12    So I fake like an asthma attack like I can't
13 breathe because I didn't want to go down the
14 hallway till any of the other officers down there
15 because I didn't see a camera in the hallway and
16 it was just too many officers down there for me
17 to go down -- like to go down there so I faked
18 like an asthma attack or something and told them
19 I couldn't breathe, and I fell to the floor and
20 they like -- they helped me up off the floor and
21 sat me on the bench and they set me there until
22 the EMTs came.
23    Q    Going back to my question, though,
24 that I was asking.
25    You had said all of this occurred after you

42

1   were fingerprinted, correct?
2       A       This was when -- this is going to
3   fingerprinting -- yeah, after I got
4   fingerprinted, they were taking me to take the
5   pictures.
6       Q       The incident -- the thing that you
7   just described to us --
8       A       Yeah, after fingerprinting --
9              MR. SEXTON:  Wait, wait, wait, wait,
10   wait.
11      Q       The thing that you just described
12   about being -- you know, taking the handcuffs off
13   you, the officer going down the hall into another
14   room, is that after or before you were
15   fingerprinted?
16      A       After they took the fingerprints and
17   the pictures.
18      Q       So my question was as you were going
19   to be fingerprinted, you were escorted to where
20   they take your fingerprints by police officers,
21   correct?
22      A       Um-hum.
23      Q       Is that a yes?
24      A       Yes.
25      Q       How many police officers escorted you

43

1   to be fingerprinted?
2       A       The officer that -- two officers that
3   I spoke to in the office.
4       Q       During the time that they were
5   escorting you from the room that you were in to
6   where you were fingerprinted, would you describe
7   their conduct as being anything but appropriate?
8       A       Aggressive.
9       Q       In what way?
10      A       Like their demeanor, like the way they
11   were talking to me.  Like the way they were just
12   like -- you can walk somebody down the hallway
13   without nudging them and pushing them forward
14   and pretty much.
15      Q       So they were aggressive in what they
16   were saying to you?
17      A       Yes.
18      Q       Were they aggressive in physically
19   contacting you?
20      A       I just said you can walk me down the
21   hallway without pushing me forward and nudging me
22   forward, so yes.
23      Q       So how were they aggressive physically
24   towards you?
25      A       Pushing me forward, nudging me

44

1   forward.  You can walk with me without pushing me
2   or touching me.  You don't have to push me
3   forward if I'm walking with you agreeably, I'm
4   not resisting, I'm cuffed.
5       Q       And was it both officers, was it one
6   of the officers?
7       A       Both.
8       Q       And at this point, do you know -- I
9   know you don't know their names when they first
10   are talking to you.  Do you remember their names
11   at any point?
12      A       I still don't know their names.
13      Q       And then is it fair to say that you
14   are taken into the room to be fingerprinted?
15      A       Yes.
16      Q       And were you fingerprinted?
17      A       Yes.
18      Q       Were you fingerprinted without
19   incident, meaning there was no physical
20   encounters or anything like that?
21      A       No, just the usual, just mostly
22   talking and just -- they were just talking
23   disrespectfully.
24      Q       Can you tell me what you recall about
25   what they were saying that you felt was

45

1   disrespectful?
2       A       "Hurry up, you fucking asshole, you
3   fucking prick."  They were just being
4   disrespectful.
5       Q       And did you respond in any way to
6   them?
7       A       No.
8       Q       Did you talk on your way up to the
9   fingerprinting area?
10      A       No.
11      Q       After you were fingerprinted, what did
12   they do -- what was the next part in their
13   process on that particular day?
14      A       They tried to take me -- I sat on a
15   bench for a little while in the hallway where I
16   was cuffed at.  They tried to take me down the
17   hallway.  I told you I was acting like I had the
18   asthma attack, like I fell to the floor.  The
19   EMTs came.  I sat on that bench with the EMTs
20   until I was transported.
21      Q       Were you photographed?
22      A       Yes.
23      Q       Were you photographed in the same room
24   that you were fingerprinted in?
25      A       I honestly can't remember.

46

1    Q    Were you photographed before what
2  you've described about going down the hallway --
3    A    **Yes, it was before that.**
4    Q    Do you recall who photographed you?
5    A    **One of the officers that brought me**
6  **downstairs.**
7    Q    Was it a different officer from the
8  two that escorted --
9    A    **It was one of the two.**
10   MR. SEXTON:  Wait until he finished.
11  Just sort of let him finish and then like
12  count to three and then answer.
13   Q    So one of the two officers who had
14  brought you up to be fingerprinted also took you
15  to be photographed.
16   A    **Yes.**
17   Q    But you don't recall his name.
18   A    **No.**
19   Q    Were you photographed without
20  incident, meaning that there was no physical
21  interaction between you and the officer or any
22  comments that were made, anything at all?
23   A    **There were comments the whole time,**
24  **but there was no physical.**
25   Q    Were the comments along the same lines

47

1  of what you described to me a short time ago?
2    A    **Yes.**
3    Q    Do you recall any other comments that
4  stood out to you while you were being
5  photographed?
6    A    **No.**
7    Q    After you were photographed, did they
8  -- where did they take you next?
9    A    **Back out to the hallway, handcuffed me**
10 **to the bench.**
11   Q    As you're sitting there handcuffed to
12  the bench, did anyone speak to you at all?
13   A    **A bunch of officers are walking past**
14 **talking to each other, looking at me and making**
15 **comments, but they weren't -- like nobody was**
16 **talking to me that I was able to hear everything**
17 **that was going on around me.**
18   Q    So it's your testimony that there were
19  officers who were talking about you but not
20  talking directly to you.
21   A    **Yes.**
22   Q    Did you say anything to any of these
23  officers?
24   A    **No.**
25   Q    And if I understood you correctly, you

48

1  said that it's a long hallway and that some of
2  these officers had gone into a room towards the
3  end of the hallway; is that correct?
4    A    **Some of them were going in the room,**
5  **some of them were coming back towards me. There**
6  **was just officers walking back and forth past me**
7  **the whole time I was sitting there.**
8    Q    And all this time you were handcuffed
9  to the bench.
10   A    **Yes.**
11   Q    And then at some point you said that
12  you were picked up off the bench and there was --
13  you were no longer in handcuffs; is that correct?
14   A    **Yes, I still was in handcuffs.  I was**
15 **unhandcuffed from the bench, though.**
16   Q    So you were still in handcuffs.
17   A    **Yes.**
18   Q    And you believe that at that point you
19  were going to be taken to some other room down
20  the hall.
21   A    **Yes.**
22   Q    But you didn't want to go to that room
23  down the hall for fear --
24   A    **I believe they were taking me down the**
25 **hall to beat me up.**

49

1    Q    Did any of the officers say that that
2  was their intent?
3    A    **They didn't have to say it.  Just from**
4  **their demeanor and the look the way things were**
5  **going on around me and this is not my first time**
6  **being arrested or going -- being in these type --**
7  **being in this type of environment so I knew from**
8  **prior situations that the best thing for me to do**
9  **was stay under the camera.**
10   Q    So up until you were -- you're
11  handcuffed, you were handcuffed to the bench, but
12  up until that time when you were handcuffed to
13  the bench and then you were not handcuffed to the
14  bench anymore, did any of the police officers try
15  to rough you up?
16   A    **Not -- no.  Like I said, my best -- to**
17 **me, my best thing was to stay under this camera.**
18   Q    That's not what I'm asking.
19   A    **So no one touched me.**
20   Q    That's not what I'm asking.
21  From the time of your arrest --
22   A    **I said no one touched me.**
23   MR. SEXTON:  Don't talk over.
24   Q    But you're saying -- I just want to
25  make sure that we're talking about the same

50

1    timeframe.  That's it.
2        From the time of your -- from the time you
3    were handcuffed to that moment in time when
4    you're sitting at the bench and they're getting
5    ready to remove -- you're no longer cuffed up to
6    that bench area, were you roughed up at all?
7        A    No.
8        Q    Did they give you any reason to
9    believe that you were going to be roughed up at
10   that point in time?
11       A    **Yes.**
12       Q    And what did they -- what reason do
13   you have to believe that you were going to be
14   roughed up?
15       A    **Their words and their demeanor.**
16       Q    What words did they say?
17       A    **"Get the fuck up," "Come the fuck with**
18   **us," "Hurry the fuck up," "Stop moving so damn**
19   **slowly, we're going to give you something to move**
20   **slowly for," "Let's go."**
21       Q    Had they used that type of language
22   before this?
23       A    **They were being aggressive but they**
24   **were more aggressive at this time.**
25       Q    Do you have any idea whose names -- of

VITALE REPORTING SERVICE (732) 223-1263

51

1    the names of any of these officers?
2        A    No.
3        Q    And you don't really know, do you, if
4    you were going to be assaulted or roughed up in
5    any way.  You thought you might be but you didn't
6    know that that was their intention?
7        MR. SEXTON:  Objection to form.  You
8    can answer.
9        A    No.
10       Q    So do you know what room they were
11   going to bring you into, if at all, at that
12   moment in time when you were -- handcuffs were no
13   longer against the bench and you were standing
14   up?
15       A    No.
16       Q    So at this point in time, your
17   decision was that you wanted to fake an asthma
18   attack; is that correct?
19       A    Yes.
20       Q    And what makes you think that those
21   other rooms down the hall don't have video
     cameras?
23       A    **As I was sitting there when they**
24   **started -- as I was getting uncuffed and they**
25   **started walking me towards the hallway, I was**

VITALE REPORTING SERVICE (732) 223-1263

52

1    **looking, I didn't see a camera.**
2        Q    But it's possible that there are video
3    cameras in the room.
4        A    **Yeah, but there was none going down**
5    **that hallway.  I was -- from leaving the area**
6    **where I was cuffed at, I would have been walking**
7    **down a hallway where there wasn't any cameras.**
8        Q    So was it your thought process that
9    you were going to be assaulted in the hallway?
10       A    **Yes.**
11       Q    And not in a private room.
12       A    **Going somewhere down that way, I**
13   **figured I was going to be assaulted so I figured**
14   **the best thing for me to do was stay under the**
15   **camera.**
16       Q    So there were some cameras in the
17   hallway because you were in the hallway cuffed
18   to --
19       A    **There was a camera above me where I**
20   **was sitting on the bench.**
21       Q    And you don't know how far that camera
22   is able to --
23       A    **You have to go --**
24       Q    How far that camera is able to record.
25       A    **You have to go around the corner to go**

VITALE REPORTING SERVICE (732) 223-1263

53

1    **down the hallway.  Like I don't think the camera**
2    **could see through the walls.**
3        Q    So the area that you thought you were
4    going to be walked after you were not handcuffed
5    to the bench, it wasn't a straight line, so to
6    speak, it wasn't a straight walkway.
7        A    **It wasn't a straight area where the**
8    **camera -- it wasn't in the area where I think the**
9    **camera could see, the hallway.**
10       Q    Was there a turn to the left, a turn
11   to the right?
12       A    **To the right.**
13       Q    And you were able to see from where
14   you were standing or seated, you were able to see
15   around the right side to see if there were
16   cameras?
17       A    **No, once they walked me to where I was**
18   **-- the turn to go down the hallway, then I looked**
19   **up and I seen that I didn't see one in the**
20   **hallway, like coming, like I didn't see one in**
21   **front of me.  I looked but I didn't see one**
22   **behind me and that's when I realized I don't**
23   **think I want to go down this hallway.**
24       Q    Do you recall how many cameras you
25   noticed, if at all, during the time that you were

VITALE REPORTING SERVICE (732) 223-1263

54

1  walking before you faked the asthma attack?

2  **A      I didn't walk anywhere.  I probably**

3  **took two to three steps before I got to where the**

4  **hallway -- to where it got to where I could turn**

5  **to go down the other side of the hallway.**

6  Q      Did you ever go to the right at all

7  during this time?

8  **A      No, I just -- once I was walking and I**

9  **got to where I could make the right and I looked**

10  **and I didn't see anything, I just --**

11  Q      That's when you decided to fake the

12  asthma attack.

13  **A      Yes.**

14  Q      And at this point in time the officers

15  put you back on the bench; is that correct?

16  **A      Yes.**

17  Q      And then they called for the EMTs?

18  **A      Yes.**

19  Q      And did the EMTs come?

20  **A      Yes.**

21  Q      Did they provide you with medical

22  care?

23  **A      Yes.**

24  Q      Did you have to go to the hospital at

25  all?

55

1  **A      The EMTs told me I didn't need to go**

2  **to the hospital, but I spoke to one, I spoke to**

3  **the EMT and I told him that I was scared for my**

4  **life and that I didn't want to go to -- I was**

5  **scared for my life, I didn't want to be --**

6  **basically the EMTs, they stayed there until I was**

7  **transported.**

8  Q      And did they stay with you during the

9  entire --

10  **A      They stayed till I was transported.**

11  Q      Do you remember the names of any of

12  these EMTs?

13  **A      No.  It's a couple of years now, I**

14  **don't remember.**

15  Q      Do you remember -- did more than one

16  EMT respond?

17  **A      Yes, a male and female.**

18  Q      And who did you tell that you felt

19  scared for your life, you feared for your life,

20  which EMT?

21  **A      Both of them.**

22  Q      Do you recall if they -- what -- do

23  you recall which particular squad they worked

24  for?

25  **A      No.**

56

1  Q      So if I said to you it was the

2  Woodbridge squad, an Avenel squad, you

3  wouldn't --

4  **A      I wouldn't know the difference.**

5  MS. DVORAK:  On that topic, if I can.

6  How long were you with the EMTs from

7  the time they arrived to the time they left

8  and you were transported?

9  THE WITNESS:  Maybe about an hour or

10  so.

11  MS. DVORAK:  Thank you.

12  THE WITNESS:  Could have been more,

13  but I think about an hour.

14  MS. DVORAK:  Is that your best

15  estimate?

16  THE WITNESS:  Yes.

17  MS. DVORAK:  Thank you.

18  Q      So you were with the EMTs.  At this

19  point were you still handcuffed to the bench?

20  **A      Yes, I was handcuffed back to the**

21  **bench.**

22  Q      Did any of the police officers say

23  anything to you during this approximate hour that

24  you were handcuffed to the bench?

25  **A      They were just walking back.  Like a**

57

1  **lot of different officers just walking back and**

2  **forth looking at me, some smiling, like "We got**

3  **him" and still making snide remarks.  There was**

4  **just a lot of back and forth just looking at me.**

5  Q      Did they say that they -- did they

6  comment about, you know, catching you or catching

7  the guy?

8  **A      Yes.**

9  Q      And when they were saying that or

10  commenting about it, did you have an

11  understanding at this point in time what you were

12  under arrest for?

13  **A      No.  Actually I still didn't know what**

14  **I was under arrest for.**

15  Q      So no one ever told you other than

16  what you've said earlier that you knew it had

17  something to do about a hotel or something

18  Hampton Inn --

19  **A      That's all I knew about.**

20  Q      No one had described to you at this

21  point in time or up to this point in time that

22  someone had tried to essentially run over two

23  police officers?

24  **A      No.  Only thing that I was -- only**

25  **other thing they asked me about besides, they**

58

1  asked me about a blue Dodge Challenger, and I
2  said I don't even have a driver's license. That
3  was like the only -- that was the farthest we got
4  with any of the questions, like I don't even have
5  a driver's license, but I was never told anything
6  about whatever happened or anything.
7      Q      So there's about an hour where the
8  EMTs are sitting or staying with you because of
9  your concerns. After the approximate hour went
10 by, were you transported where?
11     A      To Middlesex County jail, if I'm not
12 mistaken.
13     Q      Were there any other interactions
14 before you were transported to the jail with the
15 Woodbridge Police Department where someone
16 stopped and asked you questions about whatever
17 they were questioning you about, whatever you
18 were being arrested for?
19     A      No. Not that I recall anyway.
20     Q      And as you sit here today, you don't
21 know the names of any of the police officers that
22 you had interactions with up until this point in
23 time.
24     A      No.
25     Q      So at this point in time you're then

VITALE REPORTING SERVICE (732) 223-1263

59

1  transported to Middlesex County Correctional
2  Facility, correct?
3      A      Yes.
4      Q      And were you ever told what you were
5  charged with when you were there?
6      A      I didn't find out exactly what I was
7  charged with until I met with a public defender
8  when she came and gave me my paperwork. I was
9  there for a couple of days already.
10     Q      Did she come to the correctional
11 facility or was it in court?
12     A      She came to the correctional facility.
13 My first court appearance I went to for my video
14 court at the correctional facility.
15     Q      Do you know the name of the public
16 defender?
17     A      No.
18     Q      Was it a he or she?
19     A      A she, female.
20     Q      Do you recall what she told you the
21 charges were?
22     A      She didn't actually tell me. I think
23 she gave me a piece of paper that had all the
24 charges on it.
25     Q      Did you have an opportunity to review

VITALE REPORTING SERVICE (732) 223-1263

60

1  that?
2      A      Yes.
3      Q      How long were you at the correctional
4  facility before you had your first court
5  appearance?
6      A      I think almost -- I can't be sure. It
7  was a few days. It was some days, though. I
8  can't be sure exact how many days. It was a
9  while ago. It was some days. I think I went
10 through a weekend or something.
11     Q      Do you recall if it was more or less
12 than a week?
13     A      Around that time.
14     Q      Going back to the fingerprints that
15 were taken, did anyone ever discuss -- and,
16 again, conversations with your attorney are off
17 limits -- did anyone ever tell you what the
18 results were of the fingerprints that were taken?
19     A      My other attorney had no knowledge of
20 the results of the fingerprints. Every time we
21 went to court and asked the question, they said
22 they didn't have any.
23     Q      Did you know if any other tests were
24 run like a DNA or anything like that?
25     A      Yes, we asked for DNA.

VITALE REPORTING SERVICE (732) 223-1263

61

1      MR. SEXTON: At what time?
2      MR. RUBENSTEIN: I'm sorry?
3      MR. SEXTON: At what time?
4      Q      Fair enough.
5      Let's start with your public defender. Did
6  she -- do you know if there was ever a request
7  made for the results of fingerprints that were
8  taken?
9      A      I don't know. I only had that lady
10 for I think the first two court appearances while
11 I was incarcerated.
12     Q      Do you know if she asked for DNA
13 samples?
14     A      No.
15     Q      You don't know if she asked for the
16 results of any DNA --
17     A      I don't know what she asked for.
18     Q      Do you know if she asked for the
19 results of any DNA that was taken during the
20 first two court appearances or whatever she was
21 representing you for?
22     A      No. The first two court appearances
23 were only for bail.
24     Q      Were you given bail?
25     A      I was released under the -- New Jersey

VITALE REPORTING SERVICE (732) 223-1263

62

1  has no bail so I was released under -- I forgot
2  the name of the law where I have to report once a
3  week.
4      Q      And approximately how long were you
5  incarcerated at the county jail -- I'm sorry, at
6  the Middlesex County Correctional Facility before
7  you were released?
8      A      Maybe 10 or 11 days.
9      Q      And do you recall how many court
10 appearances you had before you were released?
11     A      Two.
12     Q      At some point you decided or a
13 decision was made to hire a different attorney?
14     A      Yes.
15     Q      And who made that decision?
16     A      Me and my fiancee.
17     Q      Do you recall the name of the attorney
18 that you retained?
19     A      Ravi Shah.
20     Q      Ravi?
21     A      Ravi Shah.
22     Q      Can you spell his or her --
23     A      R-a-v-i.
24     Q      And is it a he or she?
25     A      A he.

VITALE REPORTING SERVICE (732) 223-1263

63

1      Q      Where is Mr. Shah's office located?
2      A      I think it's in Woodbridge.
3      Q      And --
4      A      Somewhere in Middlesex County. It
5  might not be Woodbridge.
6      Q      Did Mr. Shah represent you for the
7  remainder of your case?
8      A      Yes.
9      Q      Do you know if Mr. Shah ever made a
10 request for the fingerprints that were taken?
11     A      Yes.
12     Q      Did he ever get those results?
13     A      No. We were told that they lost them
14 or that they didn't take them in time or
15 something happened to them.
16     Q      Who supposedly lost the fingerprint
17 results?
18     A      Middlesex County. I don't know
19 exactly who, what department, but --
20     Q      Did Mr. Shah ever request the results
21 of any DNA analysis that was run?
22     A      Yes.
23     Q      Was he provided -- do you know if he
24 was provided that?
25     A      No.

VITALE REPORTING SERVICE (732) 223-1263

64

1      Q      Do you know why he wasn't provided
2  that?
3      A      I have no idea.
4      Q      Who -- I'm sorry?
5      A      I know one court, he asked for one
6  court date and it wasn't provided at the next
7  court date and the judge basically told the
8  prosecutor that she wasn't going to go any
9  further until fingerprints and the DNA evidence
10 were brought to court.
11     Q      And who did she direct that inquiry to
12 about the DNA evidence?
13     A      To the prosecutor.
14     Q      During this time that you were
15 incarcerated and your criminal matter was
16 proceeding in court, did you ever have any other
17 contact with the Woodbridge Police Department?
18     A      No.
19     Q      Do you have any reason to believe that
20 the Woodbridge Police Department didn't send the
21 fingerprint out for analysis in a timely manner?
22     A      Yes.
23     Q      What evidence do you have?
24     A      Do I have any evidence?
25     Q      Yes.

VITALE REPORTING SERVICE (732) 223-1263

65

1      A      They didn't have it at court which is
2  months later.
3      Q      But again, that could be for a variety
4  of reasons, could it not?
5             MR. SEXTON:  Objection. Just can you
6      give a timeframe because when he knew and --
7      there's been discovery in this matter
8      obviously so --
9      Q      When you were taken to the prison and
10 you had your first court appearance, was there a
11 discussion about fingerprint analysis that was
12 done?
13     A      The first court appearances were only
14 about bail.
15     Q      Do you know why the fingerprint
16 evidence, as you've indicated, was not provided
17 to your attorney?
18     A      No. My lawyer told me that it was
19 lost or mishandled or something and that's all I
20 was told.
21     Q      And your lawyer -- I'm sorry.
22     Did you have an indication as to who
23 misplaced or lost it?
24     A      The people who the case is against, he
25 never got it or he never got any word that the

VITALE REPORTING SERVICE (732) 223-1263

**66**

1 fingerprints or the DNA stuff was put inside the
2 system. He never got any stuff.
3     Q     And the court had discussed this
4 issue, as well as the DNA, with the prosecutor's
5 office, correct? That's your understanding?
6     A     That's my understanding.
7     Q     Do you have anything to establish at
8 this point in time that, you know, that these
9 conferences are taking place on your criminal
10 matter that the Woodbridge Police Department
11 didn't send the fingerprints out for analysis?
12     A     Do I have --
13         MR. SEXTON: That's asked and
14 answered.
15         MR. RUBENSTEIN: I don't think it was
16 answered.
17     A     I went to court and the courts didn't
18 have any of the -- didn't have any fingerprints
19 or any DNA, so the judge said she's not going any
20 further until they produce it.
21     Q     Do you know, if that's true, that
22 there was no fingerprints and there was no DNA --
23     A     Yes.
24     Q     I'm not done with the question. I
25 understand that.
                VITALE REPORTING SERVICE (732) 223-1263

**67**

1     Do you have any reason to believe
2 evidentially-wise that that was as a result of
3 the conduct of the Woodbridge PD?
4     A     Yes.
5     Q     What evidence do you have to show that
6 the Woodbridge Police Department didn't provide
7 the prosecutor's office with the results of
8 either the fingerprint analysis or the DNA?
9     A     It wasn't in court.
10     Q     So it wasn't possible that it was
11 provided and it was misplaced by someone else.
12         MR. SEXTON: Objection to questioning
13 about what's possible.
14     Q     So if it is shown to you that, in
15 fact, the DNA -- I'm sorry, that the fingerprint
16 analysis was provided to the prosecutor's office,
17 would you agree with me that the police provided
18 it --
19         MR. SEXTON: Objection.
20     -- and it was lost by someone else?
21         MR. RUBENSTEIN: You're objecting in
22     the middle of the question. He's going to
23     have a problem with answering my question.
24     A     No.
25         MR. SEXTON: I was starting the
                VITALE REPORTING SERVICE (732) 223-1263

**68**

1     objection so he wouldn't answer. Finish
2     your question.
3     Q     So it's your belief that the
4 Woodbridge Police Department didn't send the
5 fingerprints out for analysis?
6         MR. SEXTON: You can answer.
7     A     Yes.
8     Q     And it's your belief that the
9 Woodbridge Police Department didn't send whatever
10 DNA analysis out to be analyzed.
11     A     Yes.
12     Q     Do you have any proof that that is, in
13 fact, true?
14     A     It wasn't in court.
15     Q     And it's your position that it had to
16 be the Woodbridge Police Department as opposed to
17 somebody else such as the prosecutor's office or
18 another entity that was responsible for that.
19     A     Yes.
20     Q     Do you know for a fact that the
21 Woodbridge Police Department did not send out the
22 fingerprints to be analyzed?
23     A     The prosecutor didn't have it so --
24     Q     But that's not what I'm asking you.
25 The fact that the prosecutor's office didn't have
                VITALE REPORTING SERVICE (732) 223-1263

**69**

1 it does not mean that Woodbridge did not send it
2 out to be analyzed.
3         MR. SEXTON: Objection.
4     Q     So I'll ask again.
5     A     I can only go by what they tell me in
6 court.
7     Q     Did anyone in court ever tell you that
8 the Woodbridge Police Department didn't send it
9 out, the fingerprints, for analysis?
10         MR. SEXTON: Objection to the argument
11     that counsel placed prior to this question.
12     Q     You can answer.
13         MR. SEXTON: You can answer.
14     A     My attorney.
15     Q     Your attorney told you this?
16     A     My attorney told me that they didn't
17 send it.
18     Q     So your attorney specifically told you
19 that the Woodbridge Police Department did not
20 send your fingerprints out for analysis.
21     A     Yes, that's what he said. That's why
22 they didn't have it at court, said if they didn't
23 have it at court, that means the police
24 department didn't send it.
25     Q     And did anyone ever advise you
                VITALE REPORTING SERVICE (732) 223-1263

70

1  specifically that there was DNA, that that also
2  was not sent out to be analyzed?
3      A      Yes, my attorney.
4      Q      And did he say that it was as a result
5  of Woodbridge Police Department or did he say it
6  was as a result of someone else's conduct or that
7  they didn't get the results back yet?
8      A      They didn't get the results back yet
9  and they were supposed -- Woodbridge Police
10  Department was supposed to send it.
11      Q      Do you know if the fingerprints were
12  ever sent out by the Woodbridge Police Department
13  to be analyzed?
14      A      I don't know.
15      Q      Do you have any knowledge as to
16  whether or not the DNA evidence that you've
17  alleged, was that ever sent out to be analyzed?
18  If you know.
19      A      As of now, right now?  Are we talking
20  about as of today?
21      Q      Yeah, at any point in time.
22      A      As of today, yes, I know that that
23  stuff was sent out.
24      Q      And do you know when it was sent out,
25  the DNA analysis?

71

1      A      Yeah, when my case went public.
2      Q      So when was that?
3      A      Maybe last year.
4      Q      So it's your belief that the DNA
5  analysis wasn't sent out to be analyzed until
6  2021.
7      A      That's when I think -- that's when I
8  think it was sent in.  I think that's when we
9  received note on it, received something on it,
10  yes.
11      Q      And the fingerprint analysis, when was
12  that sent out, if at any point in time?
13      A      I have no idea about that.  I know we
14  have it now.
15      Q      Do you know when you received it?
16      A      I think my attorney sent it to me but
17  I don't know exactly when.  It wasn't anywhere
18  back then.
19      Q      Do you need to take a break at all?
20      A      We can take a break.
21          MR. RUBENSTEIN:  Can we take -- I
22  don't know if anybody wants to take a lunch
23  or if you want to take ten minutes?
24          MS. DVORAK:  Off the record.
25      (Discussion off the record.)

72

1          (Whereupon a short recess was taken.)
2      Q      Mr. Parks, we took a brief break.  All
3  the same instructions apply and obviously your
4  testimony is still under oath.
5          MR. RUBENSTEIN:  I'm going to ask that
6  this be marked as P-2.
7          (Woodbridge Police Department ID
8  Bureau Suspect Report marked Exhibit P-2 for
9  Identification.)
10      Q      Mr. Parks, I'm going to show you a
11  document which for today's purposes we've marked
12  as P-2 for Identification, and this has been
13  previously provided in discovery to your attorney
14  and Bates stamped Parks 000148.
15          Have you had a chance to ever see that
16  document before?
17      A      No.
18      Q      Well, it states on the top of the page
19  Woodbridge Police Department ID Bureau Suspect
20  Report and it's dated January 26, 2019.
21          That was the date that you were arrested by
22  the Woodbridge Police, correct?
23      A      Yes.
24      Q      And it addresses the fingerprints that
25  were taken on that day.  Does it state on here

73

1  the date that it was submitted for analysis?
2          MR. SEXTON:  Just before you answer --
3      Q      If you know.
4          MR. SEXTON:  -- he says he's never
5  seen it so I don't know how you can question
6  him about it since he says he's never seen
7  it.
8          MR. RUBENSTEIN:  He knows how to read.
9          MR. SEXTON:  He's never seen it, how
10  can he be questioned about it?
11          MR. RUBENSTEIN:  Because he knows how
12  to read and it says on the form when it was
13  submitted and I'm just asking for him --
14          MR. SEXTON:  So he's going to read
15  documents that he's never seen?
16          MR. RUBENSTEIN:  Yeah.  Your client
17  has testified that Woodbridge Police
18  Department somehow didn't do their job by
19  not submitting fingerprints and DNA and this
20  document would tend to contradict what he is
21  saying.
22          MR. SEXTON:  So --
23          MR. RUBENSTEIN:  So I'm asking him if
24  he can tell me -- if he can't tell me the
25  date that that thing was issued and what day

74

1     it was sent out, then he'll tell me that,

2 but I still have a right to ask him.

3     Q     So looking at this document, is there

4 any date on there that says when this was

5 submitted for analysis, the fingerprints?

6     A     **2/8/19.**

7     Q     And so that was about 10 or 11 days

8 after it was taken, correct?

9     A     **Yes.**

10     Q     And does it state when it was

11 returned?

12     A     **2/22.**

13     Q     So according to this document, your

14 fingerprints were sent out on February 8th of

15 2019 to be analyzed.  I should say the

16 fingerprints, your fingerprints -- I'm sorry, the

17 fingerprints that were taken at the scene of the

18 incident at Hampton Inn was sent out on

19 February 8th, correct?

20     A     **Yes.**

21     Q     And on February 22nd, it came back.

22     A     **Um-hum.**

23     MS. DVORAK:  I'm sorry, you said

24 uh-huh.  Was that a yes?

25     A     **Yes, excuse me.**

---

76

1 recognition in this particular matter?

2     A     **Yes.**

3     Q     Do you know how that process works?

4     A     **No.**

5     Q     Do you know if Woodbridge has a

6 capability of doing their own facial recognition?

7     A     **No.**

8     Q     So you don't know one way or the other

9 whether or not Woodbridge sent a request to some

10 other forum to find out about the use of facial

11 recognition -- I can't say that at all.  I will

12 ask the question again.

13     You have no knowledge one way or the other

14 as to whether the Woodbridge Police Department

15 sought the assistance of another agency in the

16 use of facial recognition software.

17     MR. SEXTON:  At any time or --

18     Q     Yes, at any time.

19     A     **Like right now?**

20     Q     Yeah.

21     A     **I know now.  I didn't know then.**

22     Q     So you didn't know at the time of your

23 arrest, correct?

24     A     **No.**

25     Q     When did you first become aware?

---

75

1     MS. DVORAK:  Thank you.

2     A     **Can I ask a question?**

3     Q     I don't think your attorney wants you

4 to ask any questions.

5     MR. SEXTON:  You can't -- you can't

6     ask questions but you can --

7     Q     If you have anything you want to add,

8 you can certainly add it.

9     MR. SEXTON:  I just want for the

10     record, you know, the witness is relying

11     upon the document provided him for his

12     answers.

13     MR. RUBENSTEIN:  Absolutely.

14     Q     Do you know if any analysis was done

15 of any DNA taken at the Hampton Inn that day?

16     A     **No.**

17     Q     Was any DNA taken from you on the day

18 that you were arrested?

19     A     **No.  My DNA is in the system.  I've**

20 **been in prison already.**

21     Q     So the only thing taken was

22 photographs and your fingerprints.

23     A     **Yes.**

24     Q     Do you know if the Woodbridge Police

25 Department sought the assistance with facial

---

77

1     A     **When I got my first discovery from my**

2 **criminal attorney.**

3     Q     And what is your understanding of what

4 the police, Woodbridge Police, did when it comes

5 to facial recognition in this particular matter?

6     A     **I guess they scanned the ID, scanned**

7 **the driver's license that the guy had and came**

8 **back to a comparison to me or something.  That's**

9 **all I --**

10     Q     Do you know if Woodbridge themselves

11 does the facial recognition or that they send it

12 out someplace else?

13     A     **No.**

14     Q     You don't know.

15     A     **No.**

16     Q     Do you know what the results were of

17 facial recognition that was run on this ID that

18 they had, the Woodbridge Police Department had?

19     A     **Yes, that it was me, I guess, that I**

20 **was the person.**

21     Q     And do you know if prior to your

22 arrest or at the time of your arrest whether or

23 not the Woodbridge Police Department ever showed

24 your photograph to the people at the Hampton Inn?

25 Do you know?

78

1  A    I don't.

2  Q    So you don't know what, if anything,

3  they told the Woodbridge Police.

4  A    No.

5       MR. SEXTON: Objection to form. Who

6  told?

7       MR. RUBENSTEIN: I'll ask it

8  differently.

9  Q    When the -- did the Woodbridge Police

10 ever contact anyone at the Hampton Inn, to your

11 knowledge, and show them a photograph that was

12 yours and they said that's the guy who committed

13 this offense?

14 A    Not that I know of.

15 Q    Do you know if the Woodbridge Police

16 Department ever asked any of the officers who

17 were involved at the incident at the Hampton Inn

18 whether they ever showed your photograph or that

19 you ever -- were you ever picked out of any

20 particular -- strike that.

21      Were you ever picked out by any of the

22 Woodbridge police officers who were involved at

23 this incident at the Hampton Inn as being the

24 person who did the offense?

25      MR. SEXTON: Objection to form. If

79

1  you understand the question, you can answer.

2  A    I don't.

3  Q    You don't understand the question?

4  A    No.

5  Q    Okay.

6       MR. SEXTON: Picked out, I myself --

7  objection to the word what he means by

8  picked out.

9  Q    That's fine.

10      The officers, there were officers who were

11 involved in the incident at the Hampton Inn,

12 correct?

13 A    Yes.

14 Q    Do you know if any of those officers

15 ever saw a picture of you, ever saw you in person

16 and said you're the guy?

17 A    From my knowledge, I think they did.

18 Q    Do you know at what point in time this

19 happened?

20 A    My criminal attorney told me that they

21 did that while I was there.

22 Q    At the Woodbridge Police Department?

23 A    Yes.

24 Q    And --

25 A    To my knowledge, he was one of the

80

1  officers -- they was one of the officers that was

2  walking past me.

3  Q    And you don't believe that your

4  photograph was ever shown to anyone at the

5  Hampton Inn; is that correct?

6  A    I don't know.

7  Q    Fair enough.

8       MR. RUBENSTEIN: Just for the record,

9  I'm not going to get into any of the conduct

10 that's alleged against the Middlesex County

11 Correctional. I'm going to leave that to

12 Lori, but I reserve the right to ask any

13 follow-up questions so I go forego asking

14 anything about that.

15 Q    So you were released from Middlesex

16 County Correctional Facility maybe 10 or 11 days

17 after you arrested; is that correct?

18 A    Yes.

19 Q    Were you ever incarcerated again for

20 the incident that occurred on January 26, 2019?

21 A    No.

22 Q    So you spent about 10 or 11 days in

23 jail.

24 A    Yes.

25 Q    During the course of the criminal

81

1  matter, were you ever provided, either through

2  your attorney or directly, with any of the

3  discovery in that particular matter, discovery

4  being any paperwork or any statements or anything

5  that they were going to use against you?

6  A    Yes.

7  Q    Did you review that discovery?

8  A    Minimally. Went through certain

9  points with my attorney that he thought was

10 important.

11 Q    Do you recall seeing anything from the

12 Hampton Inn about you being picked out as the

13 person who committed the offense?

14 A    No.

15 Q    Do you recall seeing anything about

16 the police officer or police officers who picked

17 you out as being the person who committed the

18 offense or offenses?

19 A    No, just remember my lawyer telling me

20 that some of the officers were -- some of the

21 officers that were at the scene said I was the

22 person when I was at Woodbridge Police

23 Department.

24 Q    The criminal matter proceeded for

25 about how long before its ultimate conclusion?

82

1   A   I think it concluded in '21 or '20.
2   I'm not sure exactly when I got the letter that
3   said the case was dismissed.
4   Q   Do you know --
5   A   I know it went on for over a year.
6   Q   And after a year, thereabouts, after a
7   year, the case was dismissed against you.
8   A   Yes.
9   Q   Did the prosecutor who was prosecuting
10   the matter explain to you or to your -- you know,
11   or to the judge why the matter was being
12   dismissed?
13   A   No. I was never called back to court
14   or anything. I was just told it was dismissed
15   through a letter.
16   Q   So other than the two times that you
17   appeared when you were incarcerated for
18   bail-related issues, did you ever appear in court
19   for this particular matter?
20   A   Yes.
21   Q   About how many times?
22   A   Like once a month for about six
23   months.
24   Q   So about six times thereafter?
25   A   Yes, about five or six times.

83

1   Q   And was a plea bargain ever offered to
2   you?
3   A   I think it was five years.
4   Q   And obviously you elected not to --
5   you wanted to go to trial.
6   A   Yes.
7   Q   And all you received was a letter from
8   the Middlesex County prosecutor's office?
9   A   Yes.
10   Q   Saying the matter was dismissed.
11   A   Dismissed.
12   Q   No explanation.
13   A   No explanation or anything.
14   Q   And you believe this was in 2020?
15   A   '20 or '21.
16   Q   Well, the arrest was January 26, 2019.
17   A   So it had to be in 2020 sometime.
18   Q   Fair enough.
19   The criminal attorney that you retained, Mr.
20   Shah, what was his retainer for his services?
21   A   It was going to be $10,000 if we went
22   to trial and he end up asking for $5,000 because
23   we didn't go to trial. We ended up agreeing on
24   $5,000 because we weren't going to trial.
25   Q   Did you pay him $5,000?

84

1   A   He got paid -- he was on a payment
2   plan. He got paid $3,700 and he told me that we
3   were done with everything because we never ended
4   up finishing because they just dismissed
5   everything.
6   Q   So you paid him the gross amount of
7   $3,700.
8   A   Yes.
9   Q   Did you pay by check, did you pay in
10   cash, did you pay by credit card?
11   A   Cash.
12   Q   Do you have any receipts to establish
13   that you paid him $3,700?
14   A   No.
15   Q   Because I believe that in your answers
16   to interrogatories you asserted that it was
17   $5,000 that you had --
18   A   That was the amount that we agreed --
19   that we agreed on.
20   Q   But you didn't pay him the full --
21   A   I never finished paying the whole
22   $5,000 because the case got -- in the midst of
23   that time, one court date we were told not to
24   come back until they had the evidence and then we
25   weren't back in court for about another six

85

1   months. Actually I never went back to court. I
2   used to pay him every court date, so we never
3   went back to court. It was dismissed through a
4   letter.
5   Q   Other than the $3,700 you paid to your
6   criminal attorney, have you had to expend any
7   monies for either the prosecution -- the defense
8   of your criminal matter or for any other reasons
9   related to this incident?
10   A   Yes, getting back and forth to court,
11   taking days off of work to get to court, taking
12   days off of work to go back and forth to the
13   pretrial intervention program every week so
14   that's --
15   Q   Sorry. You said going back and forth
16   to the pretrial intervention program every week?
17   A   Yes, I had to go -- at first it was
18   twice -- first it was every week and then it went
19   up to twice a month where I had to take a day off
20   from work twice a month. Instead of taking a day
21   off of work every week, then it went from every
22   week to every two weeks where I had to go twice a
23   month and then it went up to -- I think it went
24   up to once a month like the last month or two.
25   Q   Are you -- have you been able to

86

1 calculate how much you believe you've had to
2 expend or have lost as a result of this at this
3 point in time?
4      A      No, I've never sat down and actually
5 tried to calculate it.  Calculate the days that I
6 was arrested that I had to miss work, every day I
7 had to take off to go to court, I haven't sat
8 down and actually calculated everything.
9      Q      Well, do you understand that if you're
10 seeking that amount of money back against either
11 Woodbridge or any of the other defendants, you
12 would need to provide us with a calculation of
13 that amount?
14      A      Yes.
15             MR. SEXTON:  Objection to the form.
16 He's not a lawyer.
17             MR. RUBENSTEIN:  I just asked him if
18 he knew.
19      Q      So as you sit here today, you're
20 unable to tell me how much you believe that you
21 are out of pocket as a result of this incident.
22      A      Yes.
23             MR. SEXTON:  One, two, three, answer.
24      Q      You have to answer the question.  You
25 answered in the midst of my question.

87

1      A      I thought you were done.
2      Q      That's okay.  Again, the court
3 reporter is trying to get everything down, so if
4 you can answer it again, I know what your answer
5 is, but if you can answer it again, I appreciate
6 it.
7      A      Yes.
8      Q      Did you seek any medical treatment as
9 a result of this incident?
10      A      No.
11      Q      You have not spoken -- is it fair to
12 say that you have not spoken to any therapist,
13 any counselor, psychiatrists, psychologists, at
14 all about this incident?
15      A      No.
16      Q      Do you take any medications as a
17 result of this incident?
18      A      No.
19      Q      Do you have --
20      A      I don't believe in taking any type
21 of -- I don't take any prescribed medication.  I
22 don't take any pills or anything.
23      Q      Do you have any intention of going to
24 seek the assistance of a therapist or a counselor
25 of any type as a result of this incident?

88

1      A      I've had intentions, yes.
2      Q      I'm sorry?
3      A      I've had intentions, yes.
4      Q      Do you have any appointments
5 scheduled?
6      A      Not at the time.
7      Q      Have you ever spoken to any Woodbridge
8 police officer about this incident other than
9 what you've described up until this point in time
10 using today as a timeframe?
11      A      No.
12      Q      How are you feeling at the present
13 time about what happened, your arrest, the
14 charges against you?  Ultimately they were
15 dismissed.  And I don't mean how you're feeling
16 today but overall, how have you felt about this
17 incident?
18      A      Overall it's been a very stressful
19 moment, very stressful time.  Like I've been in
20 trouble before but for things that I did so now
21 for being in trouble for something that I didn't
22 do that I had no knowledge about, it's like
23 changed my outlook on police.  Like I'm
24 definitely afraid of them now and I try not -- I
25 don't want any type of police contact.  I try to

89

1 stay as far away from them as possible because I
2 just know now that I don't have to do anything to
3 actually be charged or be in trouble for
4 anything.  It's just scary, man.
5      Q      Well, you said they've changed your
6 attitude about the police.  What was your
7 attitude about the police prior to January 26th
8 of 2019?
9      A      I never had a problem with them.  If I
10 did something wrong and I was in trouble, I got
11 what I deserved because they did their job, but
12 now looking at it, I just look at it now that
13 they can do anything they want to you because of
14 their job.  Because they have a badge, they can
15 do whatever they want to you and it's nothing
16 that -- pretty much nothing nobody can do about
17 it.  You're at their whim until -- unless
18 somebody believes you.  Now, now like I'm deathly
19 afraid of them.
20      Q      So prior to this incident, you were
21 arrested and convicted, as best you can recall,
22 one, two, three, four, five times.
23      A      Yes.
24      Q      Since this, you haven't had any
25 incidents with the police.

90

1    A    None.

2    Q    Do you feel that this particular
3  incident on January 26th of '19 has played any
4  role in why you haven't had any interactions with
   the police at all?

6    A    Yes, actually I haven't had any
7  contact with them since before this incident. I
8  came home from jail, I was getting my life -- I
9  got my life in order. I've been working for the
10 last -- since 2016 nonstop, just been doing the
11 right thing. I was younger when I was getting in
12 a lot of trouble and as I got a little bit older,
13 I just got myself together.

14   Q    Well, your last encounter with the
15 police was 2018. Do you remember if it was the
16 beginning of the year, the tail end of the year,
17 middle?

18   A    I can remember the incident. It was
19 the wintertime. I went and bought two bags of
20 marijuana to smoke and they were watching the guy
21 who I bought the marijuana off. So it was
22 wintertime, it was cold.

23   Q    Is there anything else about how
24 you're feeling -- and, again, I don't mean today,
25 I mean in general.

VITALE REPORTING SERVICE (732) 223-1263

91

1    A    That's like why I smoke marijuana,
2  like anxiety right now. Just kind of one of the
3  things, that's like my personal medication, like
4  I smoke marijuana and -- I get anxiety, that's
5  kind of how I calm down.

6    Q    Do you get anxiety over this incident?

7    A    Yes.

8    Q    How often would you say you get
9  anxiety over this incident?

10   A    Like it happens like if cops get
11 behind me if I'm driving and a cop just pulls
12 behind me, he's not about to pull me over, we're
13 going in the same direction. He's behind me,
14 automatically I'm just like drenched in sweat
15 everywhere, like I'm just soaking wet. Like I
16 can't help it. You know, even though I know I
17 didn't do anything, it's nothing I can do about
18 it, it just happens. If I'm walking down the
19 street and there's a cop on the same side of the
20 street with me, I'm crossing the street, and it's
21 nothing that I could do about it. I just
22 automatically get tense, sweating, and it's like
23 I didn't do that before. I do it now because
24 something happened to me where I didn't do
25 anything wrong and that's where -- now that's

VITALE REPORTING SERVICE (732) 223-1263

92

1  what happens to me when I see them. But before
2  that, I didn't do anything. If I did something
3  wrong, I dealt with the consequences, but I was
4  never scared of police. Like when I see police
5  now, I see police, I'm scared.

6    Q    So you never experienced any of the
7  anxiety you just described during the time period
8  before 2019.

9    A    No.

10   Q    Even when you were being -- you know,
11 possibly when you were being arrested for, you
12 know, possession and you were serving -- you
13 know, you could possibly go to jail, you didn't
14 have any anxiety about this.

15   MR. SEXTON:    Asked and answered.    You
16 can answer.

17   A    No, not at the time because I was --
18 like I said, I was doing something illegal, I was
19 doing something wrong so I knew the consequences
20 of my actions so I didn't feel any type of way at
21 that time because I knew that there was a
22 consequence that I could go to jail because of
23 what I was doing. But when I wasn't doing
24 anything wrong and I'm doing the right thing and
25 I'm not doing anything wrong, there shouldn't be

VITALE REPORTING SERVICE (732) 223-1263

93

1  a consequence of me walking down the street. So
2  at the time, no.

3    Q    Is there anything else in terms of how
4  you're feeling that you haven't told me that you
5  wish to tell me other than being anxious and as
6  you've described to me so far this morning or
7  this afternoon?

8    A    Even as far as like being inside this
9  environment, I still get -- like it just makes me
10 extra nervous, like just being inside this
11 environment right now. I don't know if you've
12 seen how jumpy I got earlier where we just were
13 starting, it's just because of being in this
14 environment, it's like it's never -- it's always
15 been a sketchy thing so like this time it was
16 like it kind of got worse since this incident
17 because, as I stated before, before I knew I did
18 something so I kind of knew I had consequences
19 of -- I had drugs, this is my consequence, I knew
20 I'm going through my consequences, but this time
21 it was different because it's like I really had
22 no clue on what was going on. I just was like --
23 I felt like I was like in outer space, like out
24 of body experience because I'm here but it's like
25 I didn't do what I was being charged -- I didn't

VITALE REPORTING SERVICE (732) 223-1263

94

1    do what I was being charged for, I didn't do
2    anything that was going on so that was like -- it
3    made me feel very different about the whole -- it
4    made my aspect about the court system totally
5    different where like I'm totally afraid of being
6    involved in the system or any type of way now.
7        Q    Anything further?
8        A    That's it.
9        Q    Other than feeling anxious --
10       A    Depressed.
11       Q    You feel depressed. And but you have
12   not sought any treatment or any assistance for
13   your -- for your feeling depressed.
14       A    I told you, I self-medicate. I don't
15   take any pills or anything like that. I've been
16   through a lot of drugs, I've been through drug
17   programs, drug treatment programs. I don't
18   believe marijuana is a drug in my mind. It's
19   being prescribed and I also, I have an
20   appointment at my doctor now to set up trying to
21   get a marijuana card to go about it the right way
22   for me with the anxiety and stuff.
23       Q    And I'm not talking about medication
24   only. I'm talking about talking to someone, you
25   know, and describing how you feel to that person,
                VITALE REPORTING SERVICE (732) 223-1263

95

1    whether it's a counselor or minister or a
2    therapist of some kind.
3        A    I speak to people about how I feel. I
4    don't think it has to be a therapist. I don't
5    believe in going to tell somebody I don't know
6    about my problems. Like if I'm going to talk to
7    someone, I'm going to talk to --
8        Q    Who do you talk to?
9        A    I talk to my old football coaches,
10   family members. My father is like the person
11   that I usually talk to the most.
12       Q    And describe for me what you talk to
13   them about.
14       A    Talk to them about just day-to-day
15   life, how the situation occurred, still how --
16   still how today like I'm still afraid of police,
17   how the conversation I have with my son
18   about police. The conversation I have with my
19   kids about how to deal with police, how to talk
20   to officers. A lot of stuff that you have to
21   deal with after the situation that's just
     difficult.
23       MR. RUBENSTEIN: Could you have this
24   marked as P-3?
25       (Photocopy of driver's license marked
                VITALE REPORTING SERVICE (732) 223-1263

96

1        Exhibit P-3 for Identification.)
2        Q    Going to show you what's been marked
3    as P-3 and it's allegedly a license out of the
4    State of Tennessee.
5        The photograph that's in that picture, is
6    that you?
7        A    No.
8        Q    Do you know who that is?
9        A    No.
10       Q    You don't have any clue who that
11   person is.
12       A    No.
13       Q    Thank you.
14       The Woodbridge Police during this incident
15   that occurred at the Hampton Inn, do you know if
16   they were able to obtain any materials or like,
17   you know, let's just say they picked up a water
18   bottle and a shoe. Do you know if they ever sent
19   that out to be tested?
20       A    I have no idea.
21       Q    As you sit here today, you don't know?
22       A    As of today, I know they sent it out.
23       Q    Do you know what the results were?
24       A    That it wasn't me.
25       Q    Do you know when that was sent out?
                VITALE REPORTING SERVICE (732) 223-1263

97

1        A    No.
2        Q    Do you know if it was sent out in --
3    at the onset of this matter, you know, close to
4    January 26, 2019, was it sent out two years
5    later, three years later?
6        A    I have no idea.
7        Q    I'm going to show you what's been
8    marked as P-1 for Identification. Have you ever
9    seen that document before today?
10       A    Yes, I think I seen this. My lawyer
11   sent -- my lawyer sent it to me. I went over it.
12       Q    Do you know that that's the current
13   Complaint that has been filed against the
14   Woodbridge and the Middlesex County prosecutors
15   as well as the correctional facility? Your
16   attorney has filed a motion to amend it but
17   that's the current Complaint in this matter.
18       A    Okay.
19       Q    Is that your understanding of what
20   that document is?
21       A    Okay.
22       Q    I'm asking you.
23       A    Yes.
24       Q    Good.
25   Did you have an opportunity to review this
                VITALE REPORTING SERVICE (732) 223-1263

98

1   document before it was filed with the court?
2       A       I go over them, yes.  My attorney
3   sends them to me.
4       Q       And having had an opportunity to
5   review it before it was filed with the court, is
6   it your opinion that everything in here is
7   accurate to the best of your knowledge?
8       A       To the best of my knowledge, yes.
9       Q       Just trying to think about how to word
10  this.
11          Do you believe that your race played any
12  factor in this case?
13      A       Yes.
14      Q       What is your belief?
15      A       What is my belief?
16      Q       Yes.
17      A       I believe that my race and my
18  background was the reason that they came and
19  arrested -- that they went about it so fast.
20      Q       When you say your background, are you
21  referring to your other arrests --
22      A       Yes.
23      Q       -- and convictions?
24          And you believe that your race was a factor
25  in this particular matter for that reason.

100

1   Woodbridge, did it come back with a high
2   probability match?
3       A       High probability doesn't mean nothing.
4   It wasn't me.
5       Q       Again, I'm asking you a question.  You
6   just have to answer my question.  Your opinion is
7   not what I'm asking.  I'm asking --
8       A       It's not me.
9          MR. SEXTON:  Wait, you got to take a
10  deep breath and you have to wait till Mr.
11  Rubenstein finishes the question and then
12  just take two seconds for the reporter's
13  sake and answer the question he asked and
14  not the question you think he should have
15  asked but the question right before you.
16  Just answer it and nothing more.  If you can
17  do that, that will help the record.
18          MR. RUBENSTEIN:  Can you read back my
19  original question?
20          (Whereupon the following question was
21  read back by the reporter:
22          "Question:  The facial recognition
23  that was run on you not by Woodbridge but
24  that was requested of Woodbridge, did it
25  come back with a high probability match?")

99

1       A       Yes.
2       Q       Other than your opinion, do you have
3   anything to support your -- what you're claiming?
4       A       Usually they wait till the
5   fingerprints and the DNA stuff come back before
6   they go get somebody.  If they would have waited
7   another week or two, as it says right here on
8   this paper which it says -- if they had waited
9   another two weeks, they would have had the whole
10  proof right there to show that.  They wouldn't
11  have had to come get me.  It would have told them
12  I wasn't the person.  If they would have waited
13  to the 8th when the DNA -- when the fingerprints
14  came back, it would have showed that I wasn't the
15  person.  So how do you arrest somebody before
16  your fingerprints come back?
17      Q       So your familiarity with the system is
18  that police don't arrest a suspect until after
19  fingerprint evidence comes back.
20      A       You question the suspect.  You don't
21  arrest them.
22      Q       Under no circumstances.
23      A       I was arrested without any proof.
24      Q       The facial recognition that was run on
25  you not by Woodbridge but that was requested of

101

1       A       Yes.
2          MR. SEXTON:  Objection.  Timeframe
3   when?
4       Q       Did it come back with a high
5   probability match before you were arrested?
6       A       Yes.
7       Q       And you don't know if they showed your
8   photograph prior to being arrested to anyone at
9   the Hampton Inn.
10      A       I don't know.
11      Q       Would it surprise you to find out that
12  there was someone at the Hampton Inn who said it
13  was you?
14          MR. SEXTON:  Objection to form.
15      A       Yes.
16      Q       So it would surprise you?
17      A       Um-hum.
18          MS. DVORAK:  Is that a yes?
19          THE WITNESS:  Yes.
20          MS. DVORAK:  Thank you.
21      Q       And this would be prior to your arrest
22  that someone at the Hampton Inn said that that
23  was --
24          MR. SEXTON:  Objection.  He said he
25  doesn't know about it, he would be

102

1    surprised, so how are you asking him for
2    confirmation that this would be before
3    because he doesn't know about it.  He just
4    answered it so --
         MR. RUBENSTEIN:  I understand.
6    Q      Now, please, just answer my question.
         MR. SEXTON:  That's not a question.
8        MR. RUBENSTEIN:  It is.
9        MR. SEXTON:  It's not a question.
10   He's not going to answer.
11       MR. RUBENSTEIN:  You're instructing
12   him not to answer?
13       MR. SEXTON:  There's not a question.
14   Q      Mr. Parks, when you were arrested by
15   the Woodbridge Police Department, would you agree
16   with me that they had the facial recognition
17   software -- the facial recognition results?
18       MR. SEXTON:  Asked and answered.  You
19   can answer.
20   A      **Would I agree?**
21   Q      Yes.
22   A      **Yes.**
23   Q      And would you agree with me --
24   A      **Hold on.  I didn't know that they had**
25   **that when they arrested me.  So obviously no.**
         VITALE REPORTING SERVICE (732) 223-1263

103

1    Q      As you sit here now, do you understand
2    that they had the results of the facial
3    recognition analysis that was done on you prior
4    to your arrest?
5    A      **Yes.**
6    Q      And as you stated, you don't know
7    whether or not the Woodbridge Police showed your
8    photograph to anyone at the Hampton Inn.
9        MR. SEXTON:  Asked and answered.  You
10   can answer for the fourth time.
11   Q      You don't know.
12   A      **No.**
13   Q      And you believe that an officer whose
14   name you don't know said that you were the person
15   prior to be taken off to the county jail.
16       MR. SEXTON:  Asked and answered.  You
17   can answer.
18   A      **Yes.**
19       MR. RUBENSTEIN:  Excuse me for one
20   second.
21       (Whereupon a short recess was taken.)
         Q      Mr. Parks, did you ever become aware
23   that the police had taken something that could be
24   tested for DNA such as a water bottle and sneaker
25   in this particular matter?
         VITALE REPORTING SERVICE (732) 223-1263

104

1    A      **Yes.**
2    Q      And I believe you said earlier that
3    your attorney had indicated that the town or the
4    prosecutor never got the results of that DNA
5    during the course of your criminal matter.
6    A      **At that time, they didn't have it**
7    **while we were going back and forth to court.**
8    Q      Do you know when Woodbridge or if
9    Woodbridge sent that DNA out to be tested?
10   A      **No.**
11   Q      So you would have no knowledge as to
12   when, if they did send it out, when the results
13   came back.
14   A      **Yeah, I would not know that.**
15   Q      Did anyone ever discuss with you that,
16   for lack of a better term, that it's customary
17   that DNA could take seven, eight or nine months
18   to get back?
19   A      **No.**
20       MR. RUBENSTEIN:  Could you mark this?
21   I believe it's P-4.
22       (DNA Laboratory Report marked Exhibit
23   P-4 for Identification.)
24   Q      Have you ever seen that document
25   that's marked as P-4 for Identification before
         VITALE REPORTING SERVICE (732) 223-1263

105

1    today?
2    A      **No.**
3    Q      Do you have any idea what that
4    document is by looking at it today?
5    A      **No.**
6    Q      Just for the record, it says on the
7    top left-hand box, it says DNA Laboratory Report.
8    A      **Yes.**
9    Q      And maybe a third of the way down it
10   discussed -- it has a code number 1-1-1 and it
11   addresses a water bottle?
12   A      **Yes.**
13   Q      And underneath it says 2-1-1 and it
14   talks about a -- I believe it says a sneaker?
15   A      **Yes.**
16   Q      And does it have a date on the
17   right-hand side where it says the date of the
18   report?
19   A      **10/18/19.**
20   Q      Does the -- does this indicate in any
21   way the date that it was sent out to be analyzed,
22   do you know?
23   A      **No.**
24   Q      The 10/18/19 date is about
25   approximately eight to nine months after you were
         VITALE REPORTING SERVICE (732) 223-1263

1  arrested, correct?

2     A    Yes.

3     Q    And this report, does it indicate what

4  the results were at all, do you know?

5     A    No.

6     Q    So no, you don't know or no, it

7  doesn't?

8     A    **It just says result obtained. Results**

9  **obtained where it says comments.**

10     Q    And that reading a little further down

11  in the middle of the page, does it say what the

12  results were?

13         MR. SEXTON: Objection. He's never

14  seen it before. He's reading.

15         MR. RUBENSTEIN: Yeah.

16     A    **Yes, says nothing was concluded, they**

17  **needed -- said they needed a reference, a body --**

18  **a DNA to reference it to which would show proof**

19  **that it couldn't be me because I've been in**

20  **prison and my DNA has been in the system since**

21  **2008.**

22     Q    And the date of this was about eight

23  and a half months after your arrest.

24     A    Yes.

25     Q    But you don't know when this DNA was

1  sent out --

2     A    No.

3     Q    -- for analysis.

4         MR. SEXTON: Asked and answered.

5     Q    The officer who you've named in this

6  lawsuit is Andrew -- I'll spell his last name --

7  L-y-s-z-k. Do you know what his involvement in

8  this case is?

9     A    No.

10     Q    Do you know if he was the officer who

11  said you were the guy?

12     A    No.

13     Q    Do you know if Officer Lyszk used

14  excessive force against you?

15     A    **Was he one of the officers who**

16  **questioned me?**

17     Q    I'm not here to answer --

18         MR. SEXTON: Objection. Wait, wait,

19  wait. Let me put my objection. He stated

20  that he doesn't know who the officer is so

21  he can't answer any questions about him

22  because he doesn't know who he is.

23         MR. RUBENSTEIN: Then he can tell me

24  that.

25     A    **That's what I was just trying to tell**

1  **you, that I don't know -- I can't answer the**

2  **question if I don't know who he is.**

3     Q    So you have no knowledge of what

4  Officer Lyszk's involvement in this particular

5  matter is or was?

6     A    **I'm asking you which officer was**

7  **Officer Lyszk, if he was one of the officers in**

8  **the room that questioned me.**

9         MR. SEXTON: Just answer the question

10  and the question -- you've already answered

11  it but you can answer it for the third time.

12  So the question was, if you want her to read

13  it back or restate it.

14         MR. RUBENSTEIN: Please do.

15         MR. SEXTON: Just listen and then

16  respond to the question, please.

17         (Whereupon the following question was

18  read back by the reporter:

19     "Question: So you have no knowledge

20  of what Officer Lyszk's involvement in this

21  particular matter is or was?")

22     A    No.

23     Q    Thank you.

24         MR. RUBENSTEIN: I'm going to have

25  this marked as P-5.

1         (Certification marked Exhibit P-5 for

2  Identification.)

3     Q    During the course of this matter that

4  we're here for today, a series of written

5  questions were sent to your attorney that we

6  asked that you provide answers to. Those are

7  called interrogatories. Attached to our

8  interrogatories that were sent to your attorney's

9  office was a certification page.

10     Showing you what's been marked P-5 for

11  Identification, is that your signature?

12     A    Yes.

13     Q    And the date on there is what?

14     A    **2/2/2022.**

15     Q    And is that the date you signed that

16  certification?

17     A    Yes.

18     Q    And this certification indicates that

19  the statements contained -- I'm not reading it

20  verbatim, but the gist of it is that the

21  statements contained in your answers to

22  interrogatories are true and correct to the best

23  of your knowledge. Is that true?

24     A    Yes.

25     Q    Did you review these answers to

110

1  interrogatories before they were sent out on your
2  behalf?
3     A   Yes.
4        MR. RUBENSTEIN:  I believe that I'm
5     done.  I'm just going to wait for Lori to --
6        (Whereupon a recess was taken for
7     lunch.)
8  CROSS-EXAMINATION BY MS. DVORAK:
9     Q   Good afternoon.  My name is Lori
10 Dvorak.  I represent the Middlesex County
11 Department of Corrections in this matter and it's
12 my turn to ask you some questions.  The same
13 rules that Mr. Rubenstein gave you earlier
14 continue to apply.  Do you understand that?
15    A   Yes.
16    Q   If you don't understand my question,
17 most important instruction, I can't emphasize it
18 enough, if my question doesn't make sense, tell
19 me, hey, I have no idea what the hell you're
20 talking about and I will be happy to repeat it or
21 rephrase it, but if you answer a question, I'm
22 going to assume two things; first of all, that
23 you understood my question and, second, that
24 you're giving me a truthful response.  Do you
25 understand that?

111

1     A   Yes.
2     Q   Again, we have to be very careful with
3  the talking over each other or the court reporter
4  is going to give us both dirty looks until we
5  learn to wait until the question and answer are
6  done.  Do you understand that?
7     A   **No problem.**
8     Q   Again, if at any time you need a
9  break, I know it's a little warm out, we've been
10 here for a while, just let me know, okay?
11    A   **No problem.**
12    Q   We started off this morning, there
13 were some questions about your prior contacts
14 with law enforcement and I want to follow up with
15 some questions.  I'm just setting the tone for
16 that area.
17    A   **Okay.**
18    Q   Your first arrest was out of Paterson,
19 correct?
20    A   Yes.
21    Q   And it was possession of CDS, correct?
22    A   Yes.
23    Q   And you said that was a probationary
24 sentence that you received?
25    A   Yes.

112

1     Q   Were you incarcerated at all during
2  the course of that arrest?
3     A   **Probably like two days.**
4        MR. SEXTON:  Wait until you answer.
5     Q   Where were you incarcerated?
6     A   **Passaic County.**
7     Q   In '08 when you were charged with
8  possession with intent, your sentence was three
9  years and it was with an 18-month stip, correct?
10    A   Yes.
11    Q   And the stip is a period of parole and
12 eligibility that we're talking about, correct?
13    A   Yes.
14    Q   And you, in fact, served the
15 18 months?
16    A   Yes.
17    Q   Did you get parole on your first
18 attempt?
19    A   Yes.
20    Q   Where did you serve your time, both
21 county and state, for the '08 conviction?
22    A   **Passaic County and Annandale**
23 **Mountainview Youth Correction Facility.**
24    Q   About how much time was in Annandale
25 and how much time was in Passaic County, if you

113

1  recall?  Just an estimate.
2     A   **Probably a couple of months in the**
3  **county and most of the time in Annandale.**
4     Q   The '06 conviction, that was a plea on
5  your part?
6     A   Yes.
7     Q   The '08 conviction, was that also a
8  plea?
9     A   Yes.
10    Q   And '10 or '11, you received another
11 charge that was probation, correct?
12    A   Yes.
13    Q   And that was out of Paterson as well?
14    A   Yes.
15    Q   And did you serve any jail time
16 regarding that charge?
17    A   **No.  Maybe a day or so waiting for**
18 **bail.**
19    Q   And in '12, you were charged again
20 possession with intent to distribute out of
21 Paterson, correct?
22    A   Yes.
23    Q   And that was a six-year sentence with
24 a three-year stip?
25    A   Yes.

114

1    Q    And, again, we're talking three-year
2  period of parole and eligibility, correct?
3    A    **Yes.**
4    Q    Where did you serve that sentence?
5    A    **Garden State Correction Facility.**
6    Q    And I assume there was some
7  preliminary time or pre-sentence time in --
8    A    **In county, yes.**
9    Q    In county.
10   The last charge for the possession of
11 marijuana, was that heard in superior court or
12 municipal court?
13   A    **Municipal.**
14   Q    Was there any jail time for that?
15   A    **No.**
16   Q    Have you ever served more than a few
17 days in county at a time?
18   A    **Yes.**
19   Q    When was that?
20   A    **I can't tell you.**
21   Q    Just looking at the way the charges
22 went, your probation from 2010, 2011, was that
23 violated and you got resentenced when you got
24 charged with the indictable?
25   A    **Yes.**

116

1    Q    When you were at Mountainview, did you
2  have a job while you were there?
3    A    **Yes.**
4    Q    What was your job?
5    A    **I had a few different jobs.  Yard**
6  **detail, they give you -- I forgot what it's**
7  **called -- common area cleaning.**
8    Q    Did you attend any educational
9  programs while you were at Mountainview?
10   A    **No.**
11   Q    What is your educational background,
12 by the way?
13   A    **Completed high school.**
14   Q    And what year did you complete high
15 school?
16   A    **2006.**
17   Q    Was that a graduation or a GED?
18   A    **Graduation.**
19   Q    While you were at Mountainview, did
20 you catch any institutional charges?
21   A    **No.**
22   Q    Were you housed in the medical unit
23 for any period of time while you were at
24 Mountainview?
25   A    **No.**

115

1    Q    And was your final sentence, I think
2  it was a five over three for the probation
3  violation once you were resentenced, correct?
4    A    **Yes.**
5    Q    And was that concurrent with the
6  possession with intent charge?
7    A    **Yes.**
8    Q    Let's talk about Mountainview for a
9  minute.
10   When you were there, you were transferred
11 from Passaic County after you pled and your
12 sentencing to Mountainview, correct?
13   A    **You go to CRAF first and then you go**
14 **to Mountainview.**
15   Q    And CRAF stands for central something
16 reception facility, correct?
17   A    **Yes.**
18   Q    And that's sort of when they decide
19 what place you're going to be lodged at long-term
20 in the state system, correct?
21   A    **Yes.**
22   Q    Keeping CRAF aside for a minute, you
23 were at Mountainview for the majority of that
24 sentence, correct?
25   A    **Yes.**

117

1    Q    Were you injured in any way while you
2  were at Mountainview?
3    A    **No.**
4    Q    Let's move forward to Garden State
5  and ask you the same types of questions.
6    Did you have any jobs while you were at
7  Garden State?
8    A    **Yes, I was a tier rep.  I ran the**
9  **tier.**
10   Q    What did that entail?
11   A    **Usually I worked for the correction**
12 **officer and I got the water, cleaning up, do**
13 **all -- I go do whatever she tells me to do for**
14 **the day on the unit.**
15   Q    And that could include things like
16 cleaning up or providing some sort of assistance,
17 correct?
18   A    **Yes.**
19   Q    About how long did you do that for?
20   A    **Like two years.**
21   Q    Did you attend any educational courses
22 while you were at Garden State?
23   A    **No.**
24   Q    Did you catch any institutional
25 charges while you were at Garden State?

118

1    A    No.
2        MR. SEXTON:  What does that mean,
3    catch any institutional charges?
4        MS. DVORAK:  Was he charged
5    institutionally with any violations of the
6    institution's rules and regulations.
7    A    No.
8    Q    Since the date of arrest in the
9    incident that brings us here today, have you been
10   arrested for any other reason?
11   A    No.
12   Q    Your date of birth you said was
13   9/11/1987?
14   A    Yes.
15   Q    And you've never gone by any other
16   names other than Nijeer Parks, correct?
17   A    Yes.
18   Q    In representing the adult corrections
19   center, I have some records from them and I just
20   want to double-check on some dates.
21       I have in the records, I'll represent to you
22   that it looks like you were arrested on
23   February 5, 2019 which is a Tuesday.  Do you have
24   any reason to dispute that?
25   A    **No.  I thought it was a Wednesday**

119

1    **but --**
2    Q    I'm going to represent that checking
3    my iPhone, February 5, 2019 is a Tuesday.
4    A    **Okay.**
5    Q    And my records indicate that on
6    February 13, 2019, you were released on a
7    Wednesday.  Does that sound about right?
8    A    **Sounds right.**
9    Q    So you were incarcerated for eight
10   days?
11   A    **Eight?  I thought it was more than**
12   **that.**
13   Q    Well, do you have any reason to doubt
14   the records of the facility?
15   A    **No.**
16   Q    We were talking 10 or 11 before.  I
17   just want to clarify.
18   A    **Yeah, that's what I thought it was.**
19   Q    That's fine.  That's why I'm doing
20   this.
21   A    **No problem.**
22   Q    So Woodbridge PD transported you to
23   the county correctional facility, correct?
24   A    **I think it was sheriff's officers came**
25   **and picked me up and took me to the county.**

120

1    Q    So it was corrections officers -- I'm
2    sorry, sheriff's officers who brought you in --
3    A    **Corrections, somebody came to the**
4    **Woodbridge thing and they took me there.**
5    Q    I'm going to represent to you that
6    corrections officers don't do transports.  So
7    with that, you're certain it was not Woodbridge
8    people who transported you, correct?
9    A    **Yeah, I'm sure.**
10   Q    It was some other agency other than
11   Woodbridge that brought you to the county
12   facility, correct?
13   A    **Yeah, it was someone else.**
14   Q    When you were transported, were you
15   the only prisoner in the vehicle?
16   A    **Yes.**
17   Q    And I take it there were two officers
18   in the vehicle from whatever agency?
19   A    **Yes.  I'm trying to -- I'm actually**
20   **trying to remember who picked me up.**
21   Q    And you left straight from Woodbridge
22   headquarters, correct?
23   A    **Yes.**
24   Q    Do you recall approximately what time
25   of day you left Woodbridge headquarters?

121

1    A    **No.  I went there maybe like nine or**
2    **ten o'clock in the morning, but it was like an**
3    **all-day process so I have no idea what time I**
4    **left.**
5    Q    Were there any problems with your
6    transport?
7    A    **No, not that I remember.**
8    Q    When you got to the adult correction
9    center, did you come in through the Sally port
10   entrance.  Do you know what I'm talking about?
11   A    **I came in where I guess they bring all**
12   **the inmates at.**
13   Q    If I described to you a garage door
14   opening, driving into a concrete room with the
15   door closing behind you and then you get out of
16   the vehicle, does that sound similar to where you
17   came in?
18   A    **Yes.**
19   Q    And then you were brought from there
20   in through a series of doors across a short
21   hallway and in through another door into a
22   receiving area.
23   A    **Yes.**
24   Q    Once you got inside the receiving
25   area, what happened?

122

1      A     I get inside the receiving area.  The
2  people who brung me, they started talking to the
3  correction officers.  I seen them turn around
4  pointing at me and I overhear them saying
5  something about with the cops, something about
6  with some officers, and he turned around, he
7  pointed in my direction and he turned back
8  around, continued talking.
9      Q     In looking at a picture in your mind
10 for a moment, do you have any recollection of
11 whether the officers that brought you in on the
12 transport were wearing the same uniforms as the
13 person standing behind the desk?
14     A     They -- actually I think they were
15 Middlesex County police officers who brung me but
16 just not the same officers who -- that were in
17 with us all day.
18     Q     You said Middlesex County police
19 officers?
20     A     I think --
21           MR. SEXTON:  Wait, wait, wait.  Do not
22     talk while she's talking.
23     Q     You said Middlesex County police
24 officers.  Did you mean to say something else?
25           MR. SEXTON:  Don't talk until I put my

123

1       hand up, okay?
2      Q     We'll get this.  It's okay.  It's all
3  okay.  We'll get our timing down.
4        So you believe it was Woodbridge officers
5  that brought you in?
6      A     Yes.
7      Q     And you heard parts of a conversation
8  between Woodbridge officers and the receiving
9  officers at adult corrections, correct?
10     A     Yes.
11     Q     And that's where you heard something,
12 some reference to police officers, correct?
13     A     Yes.
14     Q     Is there anything else other than what
15 you've told me about the conversation that you
16 overheard?
17     A     No.
18     Q     Once you got into the receiving area,
19 did they take the handcuffs off of you?
20     A     Not immediately.
21     Q     At some point they did, though,
   correct?
23     A     Yes.
24     Q     I assume you spoke with the civilian
25 clerk and answered some questions?

124

1      A     Yes.
2      Q     And at some point did you speak to a
3  nurse?
4      A     Yes.
5      Q     And at some point you spoke to some
6  corrections officers.
7      A     No.
8      Q     Were you placed in a holding cell in
9  that receiving area?
10     A     Yes.
11     Q     Do you recall if there were any other
12 individuals in the cell with you?
13     A     Yes.
14     Q     About how many?
15     A     About four to five people that were
16 already there.
17     Q     And were these people and you being
18 taken in and out of the cell for various parts of
19 this process?
20     A     Yes.
21     Q     And then at some point you were taken
22 down the hall into a change-out room and changed
23 out into facility clothing, correct?  An orange
24 jumpsuit, I would assume?
25     A     Yes.

125

1      Q     And your property and possessions were
2  put into a bag and put on something that looked
3  like it belongs in a dry cleaners conveyance
4  belt, correct?
5      A     Yes.
6      Q     And where did you go from there, if
7  you know?
8      A     Back inside the holding cell.
9      Q     Once you left that receiving area
10 holding cell, where in the facility did you go?
11 And such as medical, a housing unit, can you
12 describe for me where you went?
13     A     The housing room when you first come
14 in, intake unit.
15     Q     The intake unit or a November unit, N
16 unit?  Does that sound familiar?
17     A     Intake unit.
18     Q     Did you have any problems or
19 complaints with any of the Middlesex County
20 personnel that you dealt with in the receiving or
21 intake area that we just talked about?
22     A     Yes.
23     Q     Who did you have a problem with?
24     A     I don't know the person's name, but it
25 was a guard.  He basically -- I asked him for

126

1  something and he told me no.  I went back and
2  asked him again and he basically told me like he
3  don't help people who harm officers.
4      Q    What did you ask him for?
5      A    I think it was toilet paper or tissue.
6  I think toilet paper or soap, one or the other.
7      Q    How long were you in the intake area
8  for?
9      A    Five, six days.
10     Q    I'm sorry.  That reception area that
11 you were walked into with the holding cell, I'm
12 going to call that the receiving and discharge
13 area.  And so I'll ask you how long were you in
14 that receiving and discharge area up to the point
15 like where you got changed out?
16     A    Hours.
17     Q    When you say hours, one to two?  If
18 you can estimate, would that be accurate?
19     A    I can't estimate.  It was a long day.
20     Q    Can you estimate if it was more or
21 less than 12 hours?
22     A    Less than 12 hours.
23     Q    Can you estimate if it was more or
24 less than six hours in that receiving and
25 discharge area?

VITALE REPORTING SERVICE (732) 223-1263

127

1      A    I can't.
2      Q    Did anyone else ask for toilet paper
3  or soap while you were there in your presence?
4      A    Not in my presence.
5      Q    Were you ever seen by the medical
6  staff at the adult correction facility?
7      A    Yeah.
8      Q    When was that?
9      A    In the intake room, in the receiving
10 room when we first come in.
11     Q    Other than that, did you ever go down
12 to the medical unit for a more thorough --
13     A    They have a medical unit right on the
14 unit.  When they bring you into the intake unit,
15 they sit you down, you have to see medical before
16 they send you to your cell, before they give you
17 a paper with your assigned cell, you get a book
18 and stuff like that, you sit down in a chair and
19 see the nurse first.
20     Q    Did you have any physical complaints
21 when you saw the nurse?
22     A    No.
23     Q    And that's where you were told you
24 were being assigned to the intake unit which I'll
25 refer to as N or November unit; is that correct?

VITALE REPORTING SERVICE (732) 223-1263

128

1      A    Yes.
2      Q    You were -- or strike that.
3      Were you escorted down the hall to the
4  intake unit for your housing assignment?
5      A    I can't remember.
6      Q    Do you recall what time of day it was
7  when you got to November unit for your housing
8  assignment?
9      A    Nighttime.
10     Q    And were you assigned a cell?
11     A    Yes.
12     Q    Do you remember -- or strike that.
13     Describe the intake unit for me.
14     A    Come in, there's a desk when you first
15 walk with where all the officers sit.  You walk
16 straight.  A little to the left there's like two
17 nurse's offices, and there's like another door to
18 the side, I don't know exactly what that door is
19 in there.  Some steps you go up.  Once you go up
20 the steps, that's where all the cells are around.
21 Then you go up another flight of steps, there's
22 cells all the way around again.
23     Q    There's three levels of cells in N
24 unit?
25     A    Yes.

VITALE REPORTING SERVICE (732) 223-1263

129

1      Q    So there's a --
2      A    Bottom floor where like when you first
3  walk in, there's cells around there.  Then you go
4  upstairs, there's cells around, and you go up to
5  the third floor, there's cells around.
6      Q    And which floor were you assigned a
7  cell on?
8      A    On the second.
9      Q    Do you recall initially being assigned
10 to a cell on the first floor, cell number 013?
11     A    No.
12     Q    Were you ever in a cell on the first
13 floor even for a few minutes?
14     A    No.
15     Q    So when you got up to the unit, you
16 went to a cell on the second floor, correct?
17     A    Yes.
18     Q    If I said the number 208, does that
19 mean anything to you?
20     A    Not offhand.  I know it was like in
21 the middle -- I think it was in the middle -- it
22 was directly in the middle of the floor.
23     Q    I'm going to represent to you the
24 screen shot that I have says the time the cell
25 was assigned was 2355 hours or about five minutes

VITALE REPORTING SERVICE (732) 223-1263

130

1  before midnight.  Does that refresh your
2  recollection at all as to what time you might
3  have got to the unit?
4       A       I just know it was nighttime.
5       Q       When you were assigned to the cell,
6  was anyone else assigned to the cell?
7       A       I think there was somebody in there
8  when I first got there.  Was there somebody in
9  there the first day or did they come the second
10 day?  I think it was somebody in there the first
11 day with me when I got there and I think they
12 left and then somebody else came the next day.
13      Q       And a cell has a toilet and some
14 bunkbeds in it, correct?
15      A       Yes.
16      Q       Now, how long were you in N unit for?
17      A       At least five days.
18      Q       And from N unit, where were you
19 transferred to?
20      A       Another unit.  I don't know the name
21 of it.
22      Q       If I said J unit or Juliet unit, does
23 that ring a bell?
24      A       Not really.
25      Q       The next unit that you go to, I'm

131

1  going to represent to you my records indicate it
2  is J unit.
3       Was that an open dormitory style unit?
4       A       Yes.
5       Q       And the unit you came from was
6  individual cells, was the intake unit, correct?
7       A       Yes.
8       Q       When you were in the intake unit,
9  during what period of time were you in your cell
10 versus allowed out of your cell?
11      A       I was in my cell the whole day except
12 for when it was time to eat or I had to see my
13 lawyer or someone.  Other than that, I was inside
14 the cell.
15      Q       So when breakfast is served, it comes
16 in on trays, correct?
17      A       Breakfast is served, you go --
18 breakfast come in come to your room.  Once you go
19 out -- if I'm not mistaken, once you go out -- or
20 was it dinner that you go out?  I'm not really
21 sure exactly which one.
22      Q       So in the morning the breakfast is
23 brought to your cell, correct?
24      A       Yes.
25      Q       And you are in your cell at the time

132

1  breakfast is served?
2       A       It's not brought to your cell.  They
3  send you out on a thing.  They call out, you open
4  the door and then you walk downstairs in the one
5  line, you get it and you walk back in a line to
6  your cell.
7       Q       And are you locked back in your cell
8  once you've picked up your breakfast tray?
9       A       Yes.
10      Q       How are the breakfast trays collected?
11      A       Actually you just sit them by your
12 door and when it's time, when they open the door,
13 you got to go out, for people to go out or if
14 somebody going to do something, they tell you to
15 open the door and everybody just slide the tray
16 in front of the door and the door close.
17      Q       There's a large common area on the
18 floor, on the ground floor in N unit, correct?
19      A       Yes.
20      Q       There are a couple of tables and
21 chairs down there?
22      A       Yes.
23      Q       And there are two televisions down
24 there, correct?
25      A       Yes.

133

1       Q       And at some point in the day, although
2  you didn't remember whether it was lunch or
3  dinner, you come out of your cell and you can go
4  down onto the dayroom floor, correct?
5       A       Yes.
6       Q       And you spend several hours out on the
7  dayroom floor with all of the other individuals
8  who are housed in N unit; is that correct?
9       A       No.
10      Q       At some point you come out of your
11 cell, though, correct?
12      A       I came out of my cell when I was there
13 just to eat.
14      Q       And were you the only individual
15 coming out of your cell at one time or was it a
16 communal everybody comes out together?
17      A       Everybody came out.  When they gave us
18 an hour, we came out to dinner.  We got one hour
19 to come out around dinnertime.  We came out
20 around an hour at dinnertime, you either could
21 get on the phone, you could eat your dinner or
22 you can get on the phone, take a shower or you
23 could just sit there.  Just one hour, though,
24 just one hour that they allowed us to do this.
25      Q       And as you sit here today, you're

134

1  absolutely certain it was just one hour?
2      A      I'm pretty sure it was like one hour.
3      Q      And if I said to you that the policies
4  and procedures say that it is the afternoon
5  shift, you would disagree with that?
6      A      I would disagree.
7      Q      During the time that you were out,
8  though, you were in common contact with all the
9  other individuals housed in the unit, correct?
10     A      For the hour, yes.
11     Q      And you had access to telephone
12  services, correct?
13     A      Yes, for the hour.
14     Q      When was the first phone call you made
15  home to anybody to let them know what happened?
16     A      In the receiving area in the county.
17     Q      And that phone was in that holding
18  cell.
19     A      Yes.
20     Q      And that's when you first called
21  someone to tell them what happened?
22     A      Yes.
23     Q      Who did you call?
24     A      I called my cousin who drove me down
25  there and he said he pretty much already knew

VITALE REPORTING SERVICE (732) 223-1263

135

1  because he went inside to ask what happened to me
2  and he went home and told my fiancee and told my
3  mother.
4      Q      When you got to N unit, did you use
5  the phone during the time you were in N unit?
6      A      Yes.
7      Q      Who did you call while you were housed
8  in N unit?
9      A      My mother and my fiancee.
10     Q      And during the time you were housed in
11  N unit, you got three meals a day, correct?
12     A      Yes.
13     Q      And you were allowed to use the
14  showers, correct?
15     A      Yes.
16     Q      You had a bathroom in the cell,
17  correct?
18     A      Yes.
19     Q      There were televisions on the floor,
20  correct?
21     A      Yes.
        Q      Televisions were working?
        A      Yes.
24     Q      And there were tables and chairs where
25  you could sit and eat the meal that you were

VITALE REPORTING SERVICE (732) 223-1263

136

1  allowed to eat outside of the cell, correct?
2      A      Yes.
3      Q      Was there any -- strike that.
4      Did you ever request law library privileges
5  while you were in N unit?
6      A      I was told that we couldn't.
7      Q      Did you ever request it?
8      A      I was told by office -- I asked the
9  officer, he said that we couldn't.
10     Q      Did you ever file a grievance about
11  that?
12     A      No.
13     Q      Did you file a grievance about
14  anything?
15     A      No.
16     Q      And you mentioned something about --
17  in your Complaint about recreation?  Do you
18  recall that?
19     A      Yeah, I wasn't getting out.  I was
20  only getting of my cell at dinnertime for that
21  one hour.
22     Q      Were you -- I'm going to describe some
23  parts of the unit.  I'm going to ask if this was
24  a unit you were in while you were at county
25  corrections, okay?

VITALE REPORTING SERVICE (732) 223-1263

137

1  Were you ever in a unit that had a cage or
2  secure enclosure in the middle of the dayroom
3  floor?
4      A      No.
5      Q      Were you ever in a unit that you
6  walked up a half a flight of stairs to get to the
7  balcony or dayroom floor?
8      A      Not that I know of.
9      Q      Were you ever in a unit that you heard
10  referred to as C pod, C as in Charlie, pod,
11  p-o-d?
12     A      No.
13     Q      Were you ever in disciplinary
14  detention?
15     A      No.
16     Q      Were you ever charged with any
17  institutional violations while you were at
18  Middlesex County Adult Corrections?
19     A      No.
20     Q      Did you ever charge anyone else with
21  any complaints while you were at Middlesex County
22  Adult Corrections?
23     A      No.
24     Q      Upon admission, did you receive an
25  inmate handbook?

VITALE REPORTING SERVICE (732) 223-1263

138

1    A    Yes.
2    Q    Do you still have it?
3    A    No.
4    Q    Do you know what happened to it?
     A    I left it there.
6    Q    Did you read the handbook?
7    A    Yes.
8    Q    And what did it say about the
9    conditions of being housed in N unit?
10   A    I don't remember.  I don't remember
11   offhand right now.
12   Q    Did it say anything about law library
13   access or recreation when you're in N unit?
14   A    I remember -- not offhand but it did.
15   Q    And as you sit here today, you just
16   don't recall what that was; is that fair to say?
17   A    Yes.
18   Q    I'm going to reference the term
19   classification committee.
20   Did you ever appear before any
21   classification committee to make any
22   determination about your housing assignment?
23   A    No.
24   Q    At some point you were told your
25   housing assignment was changing?

139

1    A    Yes.
2    Q    And how did you learn that?
3    A    They just told me to pack up.
4    Q    And you packed up whatever you had and
5    you moved to the new unit?
6    A    Yes.
7    Q    How many times did you see your
8    attorney or public defender, as the case may be,
9    when you were at Middlesex County Adult
10   Corrections?
11   A    Twice.
12   Q    Where were those visits when you spoke
13   with your attorney?
14   A    One was on the unit and one was by the
15   video conference area.
16   Q    And by video conference area, you're
17   talking the area where you go to speak on the
18   video teleprompter to go speak with the judge,
19   correct?
20   A    Yes.
21   Q    Were there any times that your
     attorney came to visit you where you were denied
     the right to meet with your attorney?
24   A    Not that I know of.
25   Q    Anyone -- any time that your attorney

140

1    told you, said, hey, I couldn't get in to see
2    you, anything like that?
3    A    Not that I know of.
4    MS. DVORAK:  Counsel, just for the
5    record, I'm going to ask about the Complaint
6    that is currently filed, and if an amended
7    Complaint is filed, I'm going to reserve the
8    right to ask any additional questions
9    depending on what the final version of the
10   amended Complaint may look like.
11   Q    I'm going to ask you some questions
12   about what's been previously marked as P-1.  I'm
13   placing a copy in front of you in case you want
14   to review it, and I'm going to generally be
15   asking questions about paragraphs 61 to 68 in
16   here which deals with your time in confinement at
17   the Middlesex County Adult Corrections Center, so
18   if you want to look at that part or any part,
19   please feel free.
20   Are you aware as to whether or not you were
21   the only inmate that was kept in that intake unit
22   for five days upon arrival?
23   A    I'm not sure if I was the only one
24   there, but I know I was there longer than both
25   bunkees that I had inside my room.  They both

141

1    left and went to the other units.  I know that
2    both bunkees left before me.  One came after me
3    and still left to go to another unit before me.
4    And everyone that I came to the unit with was
5    gone within two or three days and I was still
6    there maybe for five or six.
7    Q    So we decided before you were in the N
8    unit for five days, correct?
9    A    Yes.
10   Q    And you're saying most people were
11   gone by three days and you had to stay for five
12   days, correct?
13   A    Um-hum.
14   Q    Yes?
15   A    Yes.
16   Q    The two individuals or bunkees, as you
17   referred to them, do you know if either of them
18   had been to the adult correction center before?
19   A    Yes.
20   Q    You know that and they had been, in
21   fact, there previously?
22   A    Yes.
23   Q    Do you know if they were transferred
24   to another unit or bailed out?
25   A    They were transferred to another unit.

142

1   Q   And do you know if the fact that they
2   had been there previously had played any part in
3   them receiving a transfer sooner?
4   A   **Not that I know of.**
5   Q   Not that you know of. You don't know
6   one way or the other; is that correct?
7   A   **I don't know one way or the other.**
8   Q   Perfect.
9   In your Complaint at paragraph 62, you say
10  because you were kept at intake. You're
11  referring to this N unit, correct?
12  A   **Yes.**
13  Q   You said plaintiff took meals alone,
14  and I'm reading paragraph 62. You're referring
15  to the two of the three meals in the day, you and
16  every other member of the unit took meals alone,
17  correct?
18  A   **I was in a cell by myself for the last**
19  **two days. No one was in the cell with me.**
20  Q   So the first three days you had a
21  bunkmate --
22  A   **Yes.**
23  Q   -- in the cell with you, correct?
24  A   **Yes.**
25  Q   And then after the second bunkmate

143

1   transferred out, you did not get assigned a new
2   bunkmate.
3   A   **Yes.**
4   Q   So for lack of a better term, you had
5   a private room for the last two days, correct?
6   A   **Yes.**
7   Q   And your breakfast and at least one
8   other meal were taken privately in your cell,
9   correct?
10  A   **Yes.**
11  Q   And one meal was taken communally with
12  everyone else in the unit, correct?
13  A   **Yes.**
14  Q   And during the five days that you were
15  there, you did not have any outside recreation,
16  correct?
17  A   **No.**
18  Q   Is that correct?
19  A   **Yes.**
20  Q   Are you aware of whether anyone else
21  in the intake unit had outside recreation?
22  A   **No.**
23  Q   And paragraph 64 says because you were
24  kept at intake, you were denied recreational
25  opportunities on the regular tiers, television,

144

1   library and conversation.
2   Did I read that correctly?
3   A   **Yes.**
4   Q   So you did have television in the
5   unit, though, but your complaint is that you did
6   not have as much television as others?
7   A   **I've never -- I didn't watch the**
8   **television. I had an hour. When I came out,**
9   **when we came out for dinner, I had an hour. You**
10  **could eat your dinner, take a shower or use a**
11  **phone. I didn't have time to watch television.**
12  Q   You would have if you wanted to but
13  decided there were more important things you
14  wanted to do first, is that a fair statement?
15  A   **Yes.**
16  MR. SEXTON: Objection to form.
17  Q   And did you request any access to the
18  library, other than the law library, for any
19  other type of books other than legal materials?
20  A   **Yes, I actually asked for books to**
21  **read while I was inside the cell by myself and he**
22  **told me to come out and find them.**
23  Q   I'm sorry?
24  A   **Come out and find them. That was a**
25  **way of him being funny, like come out and find**

145

1   them.
2   Q   And conversation, you were able to
3   have conversation during your time out if you so
4   choose and you're saying while you were in your
5   cell for the two days where there wasn't another
6   bunkmate, you didn't have conversation then; is
7   that fair to say?
8   A   **Yes.**
9   Q   While you were in your cell when you
10  didn't have a bunkmate, could you talk to inmates
11  in the adjoining cells nearby?
12  A   **No.**
13  Q   Why not?
14  A   **Brick walls.**
15  Q   Is it fair to say other inmates
16  commonly talked to each other in the adjoining
17  cells that you heard while you were there?
18  A   **No. We're not facing like towards**
19  **each other. Everything is just --**
20  Q   I understand, but each cell is right
21  next to each other, correct, they're in a row?
22  A   **But you can't hear through the brick**
23  **walls.**
24  Q   But there's openings in the front door
25  of the cells such as where the trays pass

146

1  through, correct?
2      A      Yes.
3      Q      And you're saying you couldn't hear
4  anybody through your cell?
5      A      **Screaming through those, you'd get in**
6  **trouble.**
7      Q      You say in your Complaint at paragraph
8  65 that you were in fear of physical abuse as the
9  corrections officers verbally threatened you with
10  excessive force.
11      So how many times were you threatened by
12  corrections officers with excessive force?
13      A      **One officer, when I went down to ask**
14  **for tissues and stuff told me "Don't come back**
15  **over here again, I told you already.  You know**
16  **what's going to happen next time.  I told you**
17  **already."**
18      **So when you get told that, he doesn't have**
19  **to tell me like I'm going to do this to you if**
20  **you come back over here.  He's basically letting**
21  **me know already if I come back over here, there's**
22  **going to be a problem without telling me there's**
23  **going to be a problem.**
24      Q      And any other time?
25      A      **And I was told that numerous times.**

VITALE REPORTING SERVICE (732) 223-1263

147

1      Q      Tell me about the next time.
2      A      **I was told that by another -- not -- I**
3  **wasn't exactly told that by another officer but**
4  **another officer made a reference to the reason**
5  **why I was arrested, why I was there.  So that**
6  **just told me like get away from him, it's not**
7  **going to be a good interaction.**
8      Q      Tell me about the next time if there
9  was one.
10      A      **That's it.  That's the other time**
11  **right there.**
12      Q      So there were two times that you
13  believe you were threatened with excessive force
14  that you've just described for me, correct?
15      A      Yes.
16      Q      Now, let's talk about the first one
17  again about the tissue.  You said the officer
18  said to you "and don't come back again."  Had you
19  asked him previously?
20      A      Yes.
21      Q      So you asked him on more than one
22  occasion for a tissue or for soap; is that
23  correct?
24      A      Yes.
25      Q      And on one of the subsequent times

VITALE REPORTING SERVICE (732) 223-1263

148

1  that you came back, he said, "I told you no,
2  don't ask me again," correct?
3      A      **"Don't bring your ass back over here."**
4      Q      And you interpreted that to mean that
5  you were being threatened with excessive force
6  because he told you to stop repeatedly asking
7  him; is that correct?
8      MR. SEXTON:  Objection to form.
9      A      Yes.
10      Q      The second time you believed you were
11  going to be threatened with excessive force was
12  because an officer made a reference to the reason
13  why you were arrested?
14      A      Yes.
15      Q      Did either the first officer or the
16  second officer make any -- have any physical
17  interaction with you?
18      A      **Wasn't physical but it was their**
19  **demeanor and their anger, like the way they**
20  **carried theirself when they said it and the way**
21  **they were acting, the way they were carrying**
22  **theirselves, I knew that either leave these guys**
23  **alone or it's going to be -- the interaction was**
24  **not going to be good.**
25      Q      Is it fair to say that officer number

VITALE REPORTING SERVICE (732) 223-1263

149

1  one and officer number two never physically
2  touched you?  Is that a fair statement?
3      A      No.  Yes.
4      Q      They never touched you, right?
5      A      **No, they never touched me.**
6      Q      Did either officer actually verbally
7  utter a threat to your safety?
8      MR. SEXTON:  Objection to form.
9      A      Yes.
10      Q      Did they ever say I'm going to beat
11  you, I'm going to get you, I'm going to smack
12  you, any words to that effect?
13      A      **As I stated before, he doesn't have to**
14  **say those words specifically for me to know what**
15  **that mean inside that environment.**
16      Q      Did they ever specifically say those
17  words?
18      A      **No.**
19      Q      They -- you interpreted that they were
20  threatening you by other words.
21      A      Yes.
22      Q      And that was don't come back again and
23  talking about the reason why you were arrested;
24  is that correct?
25      A      Yes.

VITALE REPORTING SERVICE (732) 223-1263

150

1    Q    Now that we've talked about you were
2 there for eight days from Tuesday to Wednesday,
3 do you recall when your first court appearance
4 was in that timeline?
5    A    **No.**
6    Q    You came in on a Tuesday late in the
7 day, correct?
8    A    **Yes.**
9    Q    And you got to the cell near midnight,
10 I'm assuming, sometime in the night, correct?
11    A    **Yes.**
12    Q    Was your court appearance the very
13 next day, if you recall?
14    A    **No.**
15    Q    It was the day after?
16    A    **No. I think it was Friday.**
17    Q    So you think the first court
18 appearance was Friday.
19       Do you recall when the second court
20 appearance was?
21    A    **Yes, the day I was released.**
22    Q    So you had one court appearance at
23 some point after your arrival and another one on
24 the day you were released, correct?
25    A    **Yes.**

VITALE REPORTING SERVICE (732) 223-1263

151

1    Q    Were you advised at some point that
2 the prosecutor had filed a motion for pretrial
3 detention?
4    A    **Yes.**
5    Q    And that was while you were still
6 continuing to be held at the adult correctional
7 facility, correct?
8    A    **Yes.**
9    Q    And on the return date of that motion,
10 I take it that's when an order was entered giving
11 you some additional conditions of your release
12 such as your reporting to pretrial services and
13 the like, correct?
14    A    **Yes.**
15    Q    And you were released that same day,
16 correct?
17    A    **Yes.**
18    Q    Do you recall when in your -- strike
19 that.
20       Do you recall when or if there was any
21 correlation between when you went to the
22 dormitory unit in relation to when your first
23 court date was?  Was that the same day or were
24 those different days?
25    A    **A day apart, if I'm not mistaken.**

VITALE REPORTING SERVICE (732) 223-1263

152

1 **Maybe a day or two.  I think two days.**
2    Q    Which came first, the court appearance
3 or the move to Juliet unit?
4    A    **The move.**
5    Q    So is it fair to say even before you
6 or anybody else knew if you were going to be able
7 to get out by going to court, you were already
8 moved out to Juliet unit, correct?
9    A    **Yes.**
10    Q    In your Complaint, I'm going to ask
11 you to clarify paragraph 66, you said you were
12 only transferred to a tier after your second
13 court appearance seven days later and after the
14 public defender intervened.  So I want to ask you
15 about that.
16    A    **Maybe we had got the time wrong.**
17 **Maybe we got the time confused.  I thought I was**
18 **there ten days so the time is just wrong.**
19    Q    So which one is correct, is it in the
20 Complaint or what we were talking about?  Which
21 one he is more accurate?
22    A    **The numbers that you have are more**
23 **accurate.  That was just me talking off of**
24 **recollection.**
25    Q    So as you sit here today, you recall

VITALE REPORTING SERVICE (732) 223-1263

153

1 two court appearances and you were -- you were
2 incarcerated for eight days, right?
3    A    **Yes.**
4    Q    And you were transferred to the tier
5 before your court appearance, right?
6    A    **Yes.**
7    Q    And do you have -- or strike that.
8       What is the basis of you believing that your
9 public defender intervened to get you
10 transferred?
11    A    **Because I was asking her all day, like**
12 **the last time I was going to -- the last time I**
13 **seen her, I was asking her when am I getting out**
14 **of intake unit, and I kept asking her and she**
15 **basically said she was going to look into it.  So**
16 **I figured maybe it happened right after I seen**
17 **her that Friday, I think, so I figured she got it**
18 **done.**
19    Q    As you sit here today, is it fair to
20 say you don't know one way or the other?
21    A    **Yeah, at the time I probably -- pretty**
22 **sure I assumed she was the one who got it done**
23 **because she was the one I was talking to.**
24    Q    But you don't actually know.
25    A    **No.**

VITALE REPORTING SERVICE (732) 223-1263

154

1    Q    Is that correct?

2    A    **Yes.**

3    Q    Do you have any knowledge as to what

4  the standard or timeframe is at Middlesex County

5  for individuals to stay in that intake unit?

6    A    **No, I just -- I just knew that in my**

7  **past experiences, I never stayed in the intake**

8  **unit more than two days, three days.**

9    Q    And that was at other facilities --

10   A    **Other facilities, yes, state and**

11 **county.**

12   Q    And Passaic County.

13   A    **Yes.**

14   Q    Do you have any personal knowledge

15 about Middlesex County Corrections' litigation

16 history?

17   A    **No.  I was just going off my personal**

18 **knowledge.**

19   Q    And that's fine.  That's what we're

20 here to find out, what you know versus what you

21 learned versus anything else.

22        In some of the paperwork that was provided

23 in this matter, it's called initial disclosures,

24 there were the names of some people who were

25 listed.  I'm going to ask you some questions

155

1  about them.

2        The first one was I guess Tyris Robertson?

3    A    **Yes.**

4    Q    Who was that?

5    A    **That was my cousin who drove me there.**

6    Q    And Mr. Robertson, do you have any

7  personal knowledge of whether Mr. Robertson

8  interacted in any way with anybody from Middlesex

9  County Adult Corrections?

10   A    **No.**

11   Q    You don't know one way or the other?

12   A    **I know he didn't deal with anybody**

13 **from corrections.**

14   Q    Do you know -- or strike that.

15       Patricia Parks, that's your mother?

16   A    **Yes.**

17   Q    Do you know if she dealt with anybody

18 from corrections?

19   A    **She didn't.**

20   Q    She did not?

21   A    **She did not.**

22   Q    Lateefah Gary, who is that?

23   A    **That's my ex-fiancee.**

24   Q    And same question, do you know if she

25 did?

156

1    A    **No, she didn't contact any of them.**

2    Q    In this same document you claim -- one

3  of your claims is for lost wages.  I'm going to

4  ask you some questions about your employment

5  history.

6    A    **No problem.**

7    Q    At the time of your arrest on

8  February 5, 2019, where were you employed?

9    A    **Price Rite.**

10   Q    And what kind of -- is that the one

11 you described earlier?

12   A    **Yes.**

13   Q    Some type of a home improvement --

14   A    **No, that's a grocery store.**

15   Q    When were you employed with that home

16 improvement group that you described earlier?

17   A    **I didn't start there till -- I've been**

18 **there the last two years.**

19   Q    So if we're in '22, it would have been

20 in sometime in 2020 to the present?

21   A    **Yes.**

22   Q    When did you start working at Price

23 Rite?

24   A    **Two thousand -- I started -- I was at**

25 **Shop-Rite first.  Shop-Rite owns the Price Rite**

157

1  **and they started opening the Price Rite in**

2  **Paterson, they started building it and they put a**

3  **sign up asking anybody want to transfer, it was**

4  **closer.  And I was at Shop-Rite since 2017 or**

5  **'16, end of '16, early '17.**

6    Q    And that's Wakefern Corporation?

7    A    **Yes.**

8    Q    Is that what it would have said on

9  your pay stubs?

10   A    **Yes.**

11   Q    And what location of Shop-Rite you did

12 work at in 2016, 2017?

13   A    **Fair Lawn.**

14   Q    And what was your job position or

15 positions that you held when you were at

16 Shop-Rite?

17   A    **I worked -- I got hired for produce.**

18   Q    And during the time you were at the

19 Fair Lawn Shop-Rite, were you always in produce?

20   A    **Yes.**

21   Q    What was your rate of pay when you

22 were at the Fair Lawn Shop-Rite?

23   A    **I can't remember.**

24   Q    Do you have any pay stubs or anything

25 at home?

158

1    A    Not from there.

2    Q    When did you transfer over to Price

3 Rite?

4    A    I think it was maybe '18.

5    Q    And what position did you hold while

6 you were at Price Rite?

7    A    I was an assistant manager for the

8 produce department.  At first I was just produce

9 and then by the time when I left I was assistant

10 manager of the produce department.

11    Q    When did you receive the promotion

12 approximately?

13    A    About -- I can't even say.

14    Q    Can you tell me whether the promotion

15 was before or after the date of your arrest that

16 brings us here for this litigation?

17    A    I think it was before.

18    Q    Do you have any pay stubs from that

19 timeframe, 2018, 2019, 2020 at Price Rite?

20    A    I don't.  I guess I could try to get

21 some.

22         MS. DVORAK:  Counsel, if he's

23         maintaining a lost wage claim, I'm going to

24         request pay stubs from either 2018 and/or

25         2019 and/or 2020 timeframe.

VITALE REPORTING SERVICE (732) 223-1263

159

1    Q    Were you an hourly employee or were

2 you salaried?

3    A    I was hourly.

4    Q    And do you remember what your hourly

5 rate was?

6    A    That's the same question.

7    Q    As an assistant manager, does that

8 ring a bell when you got promoted, what was your

9 salary?

10    A    I know when I first started, it was

11 like seven something, then it went up, but I

12 don't know exactly what it went up.  I'm not even

13 sure what it was when I left.

14    Q    Were you a full-time employee at Price

15 Rite?

16    A    Yes.

17    Q    And full-time being 40 hours a week?

18    A    Yes.

19    Q    And did you receive benefits while you

20 were employed there?  Or were they offered, I

21 should say?

22    A    No.

23    Q    And when did you leave Price Rite?

24    A    Around the time the pandemic started.

25    Q    Was that your decision or were you

VITALE REPORTING SERVICE (732) 223-1263

160

1 terminated or how did that work out?

2    A    Actually I was terminated because I

3 actually caught COVID and it was like right

4 before they had -- it wasn't -- it wasn't -- they

5 wasn't calling it COVID yet and I was out for a

6 couple of weeks.  I was out for maybe like two

7 weeks.  And me and the new store manager, we kind

8 of had like a disagreement.  He thought I was

9 faking it, and that's pretty much what it was.

10 Like I couldn't get my strength right after --

11 after I was cleared, I got cleared to go back to

12 work, like my strength just wasn't right coming

13 back from being sick so he thought I was faking

14 it and he let me go.

15    Q    You did file for unemployment?

16    A    Yes.

17    Q    And did you receive unemployment?

18    A    Yes.

19    Q    Would this have been around February

20 or March of 2020?

21    A    I could say, yeah, around that time.

22    Q    The shutdown started toward the end of

23 March of 2020.  If I gave you that as a reference

24 point, is it fair to say that --

25    A    Yes, it's around that time because I

VITALE REPORTING SERVICE (732) 223-1263

161

1 had -- I was sick in like early, mid-January.  I

2 caught COVID like mid-January, early February and

3 I was very -- I was out of it for about two weeks

4 and then it was like another two to three weeks

5 for it just to like get my strength up.  It was

6 very hard, I'm going to work but I couldn't do

7 the daily -- couldn't do daily duties.  Potatoes

8 and bags are 50 pounds, and I just didn't have

9 the strength after coming back from being sick.

10    Q    In relation to that that we're talking

11 about, having COVID, coming back to work, leaving

12 employment with Shop-Rite, when was the dismissal

13 of the charges against you?

14    A    Sometime after that.

15    Q    Do you recall if it was in the spring,

16 summer, fall of 2020?

17    A    It was going into the summer because I

18 remember it was getting hot.  I remember it was

19 getting hot so I remember going to the mailbox

20 and it was hot that day.

21    Q    When was the last court appearance

22 that you recall making?

23    A    Maybe five or six months before I got

24 the letter.

25    Q    So using COVID as your benchmark in

VITALE REPORTING SERVICE (732) 223-1263

162

1    your mind, did you make any court appearances
2    after you believe you had COVID?
3         A    I don't think so.
4         Q    So your last court appearance would
     have been pre-COVID.
6         A    Yes.
7         Q    And if you think you got COVID in
8    January of 2020 --
9         A    So probably around December, early
10   January or December sometime.
11        Q    So December 2019 or early January 2020
12   was your last court appearance for this matter,
13   correct?
14        A    Yes.
15        Q    When I say this matter, I'm talking
16   about the charges that underlie this litigation.
17        A    Um-hum. I know I didn't go to court
18   for months before the letter came.
19        Q    Do you still have tax returns, copies
20   of your tax returns, from 2018, 2019, 2020, 2021?
21        A    I got 2021. I don't have other years.
22             MS. DVORAK:  Counsel, I'm going to
23        make a request for his tax returns including
24        the W-2 forms for 2018 to 2021, please.
25             MR. SEXTON:  If he has them.
             VITALE REPORTING SERVICE (732) 223-1263

163

1              MS. DVORAK:  I was going to say, I can
2         try and go through a process to get an
3         authorization requested, send it in to the
4         IRS or, if you want to do that, you can get
5         them and provide them to me, but if he wants
6         to maintain a lost wage claim, I'm going to
7         request that level of information.
8         Q    Another item that's listed here is
9    loss of business reputation. Did you have any
10   business that you were running or anything?
11        A    Just at work, period. I had to come
12   back to work and tell them that I was
13   incarcerated for a whole week. Then when they
14   asked me what were you incarcerated for, I have
15   to explain that I'm incarcerated -- I was
16   incarcerated for a charge of assaulting a police
17   officer, assault with a deadly weapon, eluding,
18   stuff that I didn't do, so it did make me look
19   bad.
20        Q    It didn't cost you anything at your
21   job, though. In fact, you had been promoted, you
     kept your job; is that fair to say?
23        A    Yes, but I did because the owner knew
24   me ahead of time, but with the new store manager
25   and stuff, like I just didn't -- me and him, it
             VITALE REPORTING SERVICE (732) 223-1263

164

1    just -- it was a bad way to come in and meet a
2    new store manager.
3         Q    When did the new store manager start?
4         A    I came back to a new store manager.
5    After the week I was gone, I came back to a new
6    store manager, so it was just a bad way to come
7    in and meet a new store manager and come in
8    with --
9         Q    Did you receive any write-ups while
10   you were employed at either Shop-Rite or Price
11   Rite?
12             MR. SEXTON:  You mean disciplines?
13        Q    Counseling, discipline, whether it's
14   formal or informal? Did you receive anything
15   like that while you were at Price Rite or
16   Shop-Rite?
17        A    What does that have to do with this?
18             MR. SEXTON:  You have to answer the
19        question.
20        A    No. I don't understand what that has
21   to do with this.
22        Q    Do you recall answering some written
23   questions in this case?
24        A    No.
25        Q    I believe -- I'm going to show you a
             VITALE REPORTING SERVICE (732) 223-1263

165

1    certification page that was marked P-5 earlier.
2    You recall this, right?
3         A    Um-hum.
4         Q    Yes?
5         A    Yes.
6         Q    And that referred to some questions
7    and answers that were prepared with the
8    assistance of your attorney. Does that ring any
9    kind of a bell?
10        A    Okay.
11        Q    I'm going to ask you some questions
12   about some of it and I'm happy to show it to you.
13   I can mark it and provide you a copy, but I think
14   some of them are going -- I think it's going to
15   go pretty fast either way.
16        One of the items in question number one that
17   you mention in here was that you were kept in
18   intake for an extended period of at least seven
19   days. As we talked about today, that was five
20   days, right?
21        A    Yes.
22        Q    And you say in this, during that time
23   plaintiff was first alone in his temporary cell.
24        You indicated that someone was in there when
25   you got there?
             VITALE REPORTING SERVICE (732) 223-1263

166

1    A     Yes, then there was company and then I
2  was alone again.
3    Q     And you estimate it was three days you
4  had a cellmate and two days without, correct?
5    A     Yes.
6    Q     Was your bunkmate mentally ill, in
7  your opinion?
8    A     Yes.
9    Q     Which bunkmate, the first one or the
10 second one?
11   A     The second one.
12   Q     How long was the second one in your
13 cell with you?
14   A     Like two days.
15   Q     What about him led you to believe that
16 he was mentally ill?
17   A     His conversation.
18   Q     How so?
19   A     Stuff that he was saying.
20   Q     Give me an example.
21   A     He had marks on his wrist from trying
22 to harm himself before, he would sit on the bunk
23 and just sit there and just tap his head against
24 the wall, stuff like I've never seen normal
25 people do.

VITALE REPORTING SERVICE (732) 223-1263

167

1    Q     Did he threaten physical violence
2  against you at all?
3    A     No.
4    Q     And do you know where he was
5  transferred to?
6    A     He was transferred to the same housing
7  unit that I was transferred to.
8    Q     And is it your belief that he was
9  deranged?
10   A     There was something wrong with him.
11   Q     I'm using the word deranged
12 specifically.  Is that a word you would use to
13 describe him?
14   A     I can't give you -- I don't know what
15 the exact meaning of deranged is so --
16   Q     That's fine.
17      And do you think this prisoner was put in
18 there to cause you concern?
19   A     Somewhat.
20   Q     So is it your position that you think
21 someone, one of the corrections officers, made
22 the decision to put him in with you just to mess
23 with you?
24   A     Yes.
25   Q     Did you come across any other inmates

VITALE REPORTING SERVICE (732) 223-1263

168

1  in the facility during the time you were at the
2  Middlesex County Adult Correction Center that you
3  felt were a little off?
4    A     No, not really, no.
5    Q     He was the only one that you felt had
6  any kind of mental problem?
7    A     That I've been -- that I was in close
8  contact with and that I know for sure that I've
9  talked to, yes.
10   Q     And when you went out to J unit, were
11 you in the same bunking area with that inmate
12 again?
13   A     Not in the same sleeping area but he
14 was on that unit but he wasn't in the same
15 four-man pod with me.
16   Q     How many general pop housing units are
17 there to your understanding at Middlesex Adult
18 Corrections?
19   A     I have no idea.
20   Q     Do you know if there was any other
21 general pop?
22   A     I have no idea.
23   Q     When did you first learn why you were
24 in jail?
25   A     The first time I seen the public

VITALE REPORTING SERVICE (732) 223-1263

169

1  defender.
2    Q     And how soon was that after you
3  arrived at the county facility?
4    A     A couple of days.
5    Q     Fair to say you had access to a TV,
6  correct?
7    A     No.
8    Q     You did not have access to a TV while
9  you were in the November unit?
10   A     No.
11   Q     When you were -- part of the day you
12 were out on the dayroom floor?
13   A     Right.  I've never seen a TV on while
14 I was there so I didn't have access to it.
15   Q     Didn't you tell me earlier that there
16 were TVs on and working?
17   A     I said there was TVs there.
18   Q     And you're saying that you never saw
19 the TVs on?
20   A     I never watched TV while I was there.
21 I said that before.
22   Q     Did you observe anyone else watching
23 TV?
24   A     I can't remember, but I didn't watch
25 TV while I was there.

VITALE REPORTING SERVICE (732) 223-1263

170

1    Q    You had the opportunity to watch TV if
2 you chose instead of a shower or phone call,
3 correct?
4    **A    Probably could have, but I went to use**
**the phone and took a shower.**
6    Q    In these answers you say you only came
7 out of the cell to eat lunch and dinner.  So you
8 came out twice a day, correct?
9    **A    Yeah, but they walk you back to your**
10 **cell.**
11   Q    Lunch and dinner that were eaten on
12 the tier, correct?
13   A    Yes.
14   Q    So it was only breakfast was in your
15 cell; lunch and dinner was outside?
16   **A    No, dinner -- dinner was the only one**
17 **that we ate outside on the chair.**
18   Q    I'm going to read the answer to
19 question number two.  The question reads,
20 [reading] Set forth all facts in support of the
21 allegation at paragraph 62 that plaintiff took
22 his meals alone.
23       And your answer was, [reading] For seven
24 days in intake, plaintiff ate breakfast alone in
25 the cell.  However, lunch and dinner were eaten

171

1 on the tier with other inmates.
2    **A    I don't remember exactly -- I don't**
3 **remember exactly if lunch was actually eaten out,**
4 **too, but I don't think so.**
5    Q    So you recall signing this
6 certification at P-5, correct?
7    A    Yes.
8    Q    And in here you reviewed your question
9 and answers before you certified it, correct?
10   **A    Right.  It's three years later.  I'm**
11 **kind of losing a little bit of memory.  I'm**
12 **trying my best.**
13       MR. SEXTON:  Just do your best.  If
14   you don't know, say you don't recall.
15   **A    I don't recall.  That's my answer.**
16   Q    Okay.
17       Is it fair to say, though, that you reviewed
18 your questions and answers before --
19   **A    I don't recall.**
20       MR. SEXTON:  Wait for the question.
21       You want to take a break?
         THE WITNESS:  Yes.
23       MS. DVORAK:  Sure.
24       (Whereupon a short recess was taken.)
25   Q    We were talking before the break, you

172

1 answered the questions and answers to the written
2 questions and you signed this certification on or
3 about February 2, 2022, correct?
4    **A    Yes.**
5    Q    Do you recall, did you review the
6 questions and answers before you signed this
7 certification?
8    **A    Yes.**
9    Q    And the certification says you believe
10 everything to be true and correct, correct?
11   **A    Yes.**
12   Q    And when you signed it, that was
13 accurate, correct?
14   **A    Yes.**
15   Q    And as you sit here today, you don't
16 have any basis to recall whether or not that has
17 changed; is that fair to say?
18   **A    Yes.**
19   Q    You described two officers, two
20 corrections officers, being more specific,
21 earlier, the one that you asked about a tissue
22 and the one who referenced the reason why you
23 were arrested.  You recall that testimony
24 generally?
25   **A    Yes.**

173

1    Q    What was the race of the first officer
2 that you asked about the tissue?
3    **A    They both were white officers.**
4    Q    Did any corrections officers make any
5 statements to you that were racially derogatory?
6    **A    No.**
7    Q    Did you ever request to go into
8 protective custody?
9    **A    No.**
10   Q    And I believe you said, and I just
11 want to confirm, you never went into C pod or
12 disciplinary detention or lockdown; is that fair
13 to say?
14   **A    Yes.**
15   Q    Did you ever request medical treatment
16 and were denied?
17   **A    No.**
18   Q    And were you ever the victim of actual
19 excessive force?
20   **A    No.**
21   Q    Did you ever interact with any
22 corrections officers whom you in any way through
23 conversations or insignia believed to be a
24 superior officer, sergeant, lieutenant, captain?
25   **A    No.**

174

1    Q    All of your interactions were with
2  rank and file corrections officers, correct?
3    A    **Yes.**
4    Q    Did you ever request to speak with a
     sergeant or supervisor?
6    A    **No.**
7    Q    Did you ever attend college at all?
8    A    **No.**
9    Q    You mentioned earlier that you had
10 been involved in some substance abuse programs?
11   A    **Yes.**
12   Q    How many times?
13   A    **I completed two programs.**
14   Q    When was the first program?
15   A    **Maybe like 2008.**
16   Q    And where was that?
17   A    **New Jersey, I don't know exactly**
18 **where.  It was in New Jersey, though.**
19   Q    Do you remember the name of the
20 program?
21   A    **Sunrise House or something like that.**
22   Q    Say that again?
23   A    **Like Sunrise House.**
24   Q    And where was the program?
25   A    **It's in New Jersey.  I don't know**

176

1    A    **No.**
2    Q    Did you receive -- participate in any
3  type of like group therapy or talking to a
4  psychologist while you were there?
5    A    **You got to participate in those type**
6  **of things but I didn't talk to a psychiatrist or**
7  **anything.**
8    Q    So you did participate in some type of
9  mental health treatment while you were at Sunrise
10 House; is that fair to say?
11   A    **I guess, yes.**
12   Q    And you said there was a second
13 program?
14   A    **Yes.**
15   Q    When was that?
16   A    **In 2010, 2011.**
17   Q    And what was the name of that program?
18   A    **I can't remember the name of that**
19 **program right now.**
20   Q    Do you remember where it was?
21   A    **Secaucus.**
22        MR. SEXTON:  Cura?
23        THE WITNESS:  No, it wasn't Cura.
24   A    **No, it was Integrity House.**
25   Q    How long was the Integrity House

175

1  where.  I was sent there by probation.
2    Q    Was it in Paterson or the Paterson
3  area or somewhere else in the state?
4    A    **It was somewhere else in the state.**
5    Q    Do you recall any other landmarks
6  either by turnpike, parkway exit number, anything
7  else?
8    A    **No, when they transport you inside the**
9  **van, the windows and stuff be blocked up.**
10   Q    How long was the first program?
11   A    **30 days.**
12   Q    And did you successfully complete the
13 program?
14   A    **Yes.**
15   Q    Was the program for substance abuse?
16   A    **I was sent there just for my**
17 **behaviors.**
18   Q    And what type of behaviors were you
19 sent there for?
20   A    **In drug court they said drug dealing**
21 **is a behavior, they said drug dealing is just as**
22 **addictive as using drugs, so that was what I was**
23 **sent there for.**
24   Q    Did you receive any mental health
25 services while you were there?

177

1  program?
2    A    **Like six months.**
3    Q    And what was the purpose of your
4  admission to that program?
5    A    **Probation.**
6    Q    Was it similar to the Sunrise House
7  program, only longer?
8    A    **Yes.**
9    Q    And fair to say you received some type
10 of mental health counseling while you were there
11 as part of the program?
12   A    **Yes.**
13   Q    Other than at Sunrise House and
14 Integrity House, have you ever had any mental
15 health counseling or treatment or anything like
16 that other than those two programs?
17   A    **No.**
18   Q    And that's both before and after this
19 incident, correct?  Those are the only two?
20   A    **Yes.**
21   Q    When in your life did you first start
22 to experience anxiety?
23   A    **When?  I didn't feel -- I didn't have**
24 **any type of anxiety until after this situation.**
25   Q    Now, you said you smoked marijuana to

---

178

1    deal and self-medicate with the anxiety, correct?

2    **A**    **Um-hum.**

3    **Q**    Yes?

4    **A**    **Yes.**

     **Q**    When did you start smoking marijuana?

6    **A**    **I started smoking marijuana young but**

7    **that was for recreation, for fun. I started**

8    **smoking it later, I started getting different**

9    **effects from it after the situation where it just**

10   **calms me down and relaxes me from when I get**

11   **tense and stuff like that.**

12   **Q**    So fair to say -- well, let me ask you

13   this.

14      Approximately what age did you start smoking

15   marijuana?

16   **A**    **Probably like 16 or 17.**

17   **Q**    And how old are you now?

18   **A**    **35.**

19   **Q**    So from age 17 to 35, you smoked

20   marijuana fairly consistently throughout with the

21   exception of your incarcerations; is that

22   correct? Is that a fair statement?

23   **A**    **Not all the time.**

24   **Q**    How often do you smoke marijuana now?

25   **A**    **Now I smoke often. I didn't smoke**

---

179

1    **often then.**

2    **Q**    How often is often? Can you give me

3    an idea?

4    **A**    **Couple of times a week.**

5    **Q**    And prior to 2019, how often did you

6    smoke marijuana?

7    **A**    **A couple of times a month.**

8    **Q**    When you were arrested in 2018 for the

9    marijuana, how often were you smoking at that

10   time?

11   **A**    **At that time, around the same time,**

12   **like a couple of times a week around that time.**

13   **Q**    So in 20 --

14   **A**    **In 2018, I probably like just got off**

15   **parole so I just really started smoking again so**

16   **it wasn't a lot. I just started parole.**

17   **Q**    And after you completed parole, you

18   started smoking, that's when you got arrested for

19   attempting to buy or buying marijuana, correct?

20   **A**    **Yes.**

21   **Q**    When you got arrested, you can use

     that as a frame of reference, how often were you

23   smoking then?

24   **A**    **Probably like a couple of times a**

25   **month. Couple of times a month because I wasn't**

---

180

1    **smoking a lot then. I was just -- I was just**

2    **getting off parole so it was kind of --**

3    **Q**    When did you switch from a couple of

4    times a month to a couple of times a week?

5    **A**    **After everything happened and I came**

6    **home and I was kind of like -- I was stressed**

7    **out. I switched to a couple of times a week when**

8    **I started going through the process for the**

9    **case, like going through that, going through the**

10   **stuff and all the stuff, like that's when it**

11   **really went up to a lot, like being stressed out,**

12   **it was my stress relief.**

13   **Q**    And now that the charges are

14   dismissed, did you go back to your couple of

15   times a month?

16   **A**    **Now I went down. I don't smoke as**

17   **much as I used to during that period.**

18   **Q**    So what are you smoking currently?

19   **A**    **Currently maybe two to three times a**

20   **week. During that period, I was smoking every**

21   **day.**

22   **Q**    So do you have an understanding about

23   why you choose to smoke two to three times a

24   week when prior to you were smoking a couple of

25   times a month?

---

181

1    **A**    **Now, I just -- I started because my --**

2    **when I started going through everything, it went**

3    **up to where I was smoking every day and now it's**

4    **going back down where like I smoke maybe a couple**

5    **of times, two to three times a week. Not every**

6    **day no more.**

7    **Q**    Is it your expectation you're

8    eventually going to go back to a couple of times

9    a month?

10   **A**    **That's my plan. I can't actually**

11   **stop, period.**

12   **Q**    And now that it's legal, you don't

13   have to.

14   **A**    **Yeah. I still do plan on stopping.**

15   **Q**    Is it fair to say you have no training

16   in correctional procedures and practices? Is

17   that a fair statement?

18   **A**    **No.**

19   **Q**    Is it fair to say you were never

20   trained in how to be a corrections officer?

21   **A**    **Yes.**

22   **Q**    And is it fair to say you have no

23   particular experience in county corrections

24   procedures? Is that a fair statement?

25   **A**    **No.**

182

1    Q    It's not a fair statement?

2    A    **No.**

3    Q    So what is your training or experience

4 in county corrections procedures?

     A    **Experience.**

6    Q    And that is based on being?

7    A    **Being incarcerated, going through the**

8 **process.**

9    Q    Can you estimate for me how many days

10 you've been incarcerated in a county facility?

11    A    **A lot.**

12    Q    If you had to give me your best

13 estimate --

14    A    **Over a year.**

15    Q    You spent over a year in county

16 corrections, correct?

17    A    **Yes.**

18    Q    And that has all been up at Passaic

19 County Corrections, correct?

20    A    **Yes.**

21    Q    Do you have any knowledge as to

22 whether Passaic County Corrections does it right,

23 does it wrong or anything else?

24    A    **No.**

25    Q    Have you ever taken any classes in

VITALE REPORTING SERVICE (732) 223-1263

183

1 county corrections or county corrections

2 management?

3    A    **No. I've read plenty of handbooks.**

4        MR. SEXTON: Off the record.

5        (Discussion off the record.)

6        MS. DVORAK: At one point in this

7    litigation, counsel, this is just a note for

8    you, you indicated that you would not be

9    providing some of the tax returns. I take

10    it based on today's conversation, you'll be

11    revisiting that?

12        MR. SEXTON: Yes.

13    Q    Other than your lost wages, have you

14 suffered any other monetary losses that you're

15 claiming in this litigation?

16    A    **No.**

17    Q    Are there any activities you can no

18 longer do as a result of the events which

19 occurred?

20    A    **Just only like big events, like if**

21 **there's a lot of police there, I'm not going. I**

22 **just can't be -- I really get very nervous now**

23 **if I see too many police officers.**

24    Q    Okay. Other than that, anything else?

25    A    **No.**

VITALE REPORTING SERVICE (732) 223-1263

184

1    Q    You sure? This is your chance.

2    A    **That's it. That's pretty much it.**

3 **Like if I go to a bigger event or anything, like**

4 **if I see a group of police officers, I just start**

5 **sweating, getting drenched in sweat and there's**

6 **nothing I can do about it. Just automatically I**

7 **just leave without paying for the tickets or**

8 **anything, I just leave because I can't enjoy**

9 **myself being there now.**

10    Q    You make any distinction between

11 police officers and corrections officers?

12    A    **Yeah.**

13    Q    Any problems with corrections

14 officers?

15    A    **I haven't seen any since I've been --**

16 **so I can't really say.**

17    Q    Does your feelings about how you deal

18 with and react when you're around police

19 officers, does it have anything to do with

20 corrections officers?

21    A    **If I -- I'm pretty sure if I see them**

22 **in uniform, I'm probably going to get -- probably**

23 **have the same reaction.**

24    Q    That hasn't happened.

25    A    **It just hasn't happened. I haven't**

VITALE REPORTING SERVICE (732) 223-1263

185

1 **seen any corrections officers or anything like in**

2 **uniform to say that, but I'm like kind of pretty**

3 **sure if I see them in uniform, it's going to**

4 **probably happen.**

5        MS. DVORAK: I am going to take a look

6    at my notes. I don't think I have anything

7    further. I'm not sure if Fred has anything

8    further in follow-up.

9        MS. MEYERS: I would just like to

10    place on the record that when this

11    deposition began, there was a stay of

12    discovery as to my clients so I would like

13    to reserve the right to depose plaintiff

14    should the prosecutors have to move forward

15    with discovery.

16        MS. DVORAK: I don't think I have

17    anything else. I'm going to continue to

18    look while you're talking.

19        MR. RUBENSTEIN: I only have a few

20    more questions.

21 REDIRECT EXAMINATION BY MR. RUBENSTEIN:

22    Q    Mr. Parks, while you were at the

23 Woodbridge Police Department, did any of the

24 officers take a written statement from you, an

25 oral statement which was then put into writing?

VITALE REPORTING SERVICE (732) 223-1263

186

1    A    I guess that's what he was doing when
2 he had me in the interrogation room.
3    Q    And during that statement, were you
4 advised what you were being charged with or what
5 the facts were that were why you were there?
6    A    No, because after he told me, he said
7 one thing to me like "You know what you did," and
8 I was like I want a lawyer, so I think that
9 stopped the questioning.
10   Q    And while you were at the Township of
11 Woodbridge Police Department, did any of the
12 officers refer to you in a racially derogative
13 way?
14   A    I didn't hear any racially words but I
15 heard a lot of "That's the mother fucker right
16 there," "That's the prick right right there,"
17 "That's the asshole right there" and that sort
18 of --
19   Q    But you would agree that they didn't
20 say anything that was, at least in your mind,
21 racially motivated.
22   A    No, there was not at that time.
23        MR. SEXTON:  Objection to form.
24        You're asking about race is his tone and
25        race is -- and then you switched it to

187

1 racially motivated so --
2    Q    Was there anything about your time at
3 the Woodbridge Police Department that led you to
4 believe that race was a factor at all in what was
5 going on there?
6    A    I believe that was why I -- I believe
7 my race and my background was the reason why they
8 kept -- why they kept going after me.  I do
9 believe that.
10   Q    So you believe that race was a factor
11 in this matter.
12   A    Yes.
13   Q    The picture of the person that I
14 showed you earlier, what race was he?
15   A    He was black.
16   Q    And so was there any -- do you have
17 any reason to believe that they were trying to
18 hold you accountable for what happened that day
19 based solely on your race?
20   A    Yes.
21   Q    And what --
22   A    I'm black, he's black.  He has a
23 jacket, he had a criminal background, we got our
24 conviction.
25   Q    Do you know if Mr. Barrington was

188

1 convicted of this?
2    A    I'm -- I wasn't talking about his
3 criminal background.  I was talking about my
4 criminal background.
5    Q    So when you were talking about your
6 background, his background, they got a
7 conviction, what did you mean by that?
8    A    I wasn't -- I didn't say --
9    Q    If I misheard you, I apologize.  Can
10 you just repeat what you said?
11   A    I said he's black, I'm black.  When
12 they looked at my name, once they looked at my
13 name and came up, once they seen my background,
14 he's black and he has a conviction, we got him.
15 That's it.
16   Q    The person whose fingerprints came
17 back to you eventually, was he a black individual
18 or was he a white individual or was he an Asian
19 individual, do you know?
20   A    I don't know any of that.
21        MR. SEXTON:  Asked and answered.  You
22        got to ask your question again.
23   Q    So you don't know the race of the
24 person who you claim or who is claimed to have
25 committed this offense.

189

1        MR. SEXTON:  Objection.  He's answered
2        that.  He answered contrary to what you just
3        said.
4    A    At the time?  Are you asking at the
5 time or --
6    Q    As of today.
7    A    As of today, I know he's black.
8    Q    So when you were giving -- when the
9 Woodbridge Police were taking a statement from
10 you, at the onset of the statement, that's when
11 you gave -- you said you wanted an attorney; is
12 that correct?
13   A    Yes.
14   Q    And did they stop asking you questions
15 at that point in time?
16   A    Yes.
17        MR. RUBENSTEIN:  Great.  I believe
18        that is it.
19        MS. DVORAK:  I have nothing else.
20              (Witness excused.)
21        (Deposition concluded at 4:22 p.m.)
22
23
24
25



190

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF NEW JERSEY

3          CIVIL ACTION NO. 2:21-cv-04021

4     NIJEER PARKS,

           Plaintiff,

6     -vs-                    CERTIFICATE

7     JOHN E. McCORMACK, et al,

8          Defendants.

9     - - - - - - - - - - - - - - - -

10          I, MARYANN C. MEISTER, the officer before

11    whom the foregoing deposition was taken, do hereby

12    certify that the witness whose testimony appears in the

13    foregoing deposition was duly sworn by me, and that

14    said deposition is a true record of the testimony given

15    by said witness; that I am neither attorney nor counsel

16    for nor related to or employed by any of the parties to

17    the action in which the deposition was taken; and

18    further that I am not a relative or employee of any

19    attorney or counsel employed by the parties hereto or

20    financially interested in the action.

21

22    _____

23    NOTARY PUBLIC AND CERTIFIED SHORTHAND REPORTER

24    License No. XI00901        Dated: _____

25

           VITALE REPORTING SERVICE (732) 223-1263

# EXHIBIT "K"

## WOODBRIDGE POLICE DEPARTMENT
## I.D. BUREAU REPORT

Date: <u>01-26-2019</u>     Alarm#: <u>19010123</u>     Case #: _____
Type of Crime: <u>Agg Assault PD, Shoplifting</u>
Victims Name: <u>Hampton Inn</u>     Address: <u>370 US HWY 9 N Hopelawn NJ</u>
Location of Incident: <u>SAA</u>
I.D. Detective: <u>Quesada</u>     C.I.D. Detective: <u>Det. S. Tapia</u>
Arrival Time: <u>1230</u>     Departure Time: <u>1330</u>
Scene Processed?     Yes ☒     No ☐
Scene Photographed?     Yes ☒     No ☐     Photo File #: <u>014-19</u>

| Items Processed for Latent Prints | Location | Process Type | Results |
|---|---|---|---|
| <u>Glass Door</u> | <u>SAA</u> | <u>Metalic Powder</u> | <u>Lifted 3 prints off glass door</u> |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ |

Prepared for AFIS Entry:     Yes ☒     No ☐

**Narrative:**
Responded to the Hampton Inn, for a shoplifting turned robbery and agg assault on PD. The scene was processd and photos taken that were placed of 2 dics 1 of 1 w 45 images and 2 of 2 with 17 images. Photos consited of the damge to patrol car #3 and damge to building from the suspect crashing into it. A water bottle that office saw the suspect drink and place into trash can was recovered. Above 3 prints recovered from glass door the suspet ran out from. The suspect sneaker that he lost during foot pursuit was recovered. All property abd CD's will be perpared for evidence or DNA comparison.

**I.D. Detective: <u>Quesada</u>**     **Date:** <u>1-26-19</u>

WPD-062 (10/05-b)

PARKS000097

**WOODBRIDGE POLICE DEPARTMENT**
**I.D. BUREAU REPORT**

Date: 01-26-2019          Alarm#: 19010123          Case #: _____
Type of Crime: Agg Assault PD, Shoplifting
Victims Name: Hampton Inn          Address: 370 US HWY 9 N Hopelawn NJ
Location of Incident: SAA
I.D. Detective: Quesada          C.I.D. Detective: Det. S. Tapia
Arrival Time: 1230          Departure Time: 1330
Scene Processed?     Yes ☒     No ☐
Scene Photographed?     Yes ☒     No ☐          Photo File #: 014-19

| Items Processed for Latent Prints | Location | Process Type | Results |
|---|---|---|---|
| Glass Door | SAA | Metalic Powder | Lifted 3 prints off glass door |
| Vehicle outside driver window & inteior | Tow Yard | metalic powder | 5 useable prints lifted |
| Febreze air fresher spray bottles | Lab | metalic powder | Neg |
| 2 Lighter | Lab | metalic powder | Neg |
| cell phone charger | Lab | metalic powder | Neg |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

Prepared for AFIS Entry:     Yes ☒     No ☐

**Narrative:**
Responded to the Hampton Inn, for a shoplifting turned robbery and agg assault on PD. The scene was processed and photographed, photos were placed of 2 discs 1 of 1 w 45 images and 2 of 2 with 17 images. Photos consisted of the damage to patrol car #3 and damage to building from the suspect crashing into it. A water bottle that office observed the suspect drink and place into trash can was recovered. Above 3 prints recovered from glass door the suspect ran out from. The suspect sneaker that he lost during the foot pursuit was recovered. Consent search was conducted on the MV and additional prints and property were recovered and photographed. Prints recovered from MV and property will be sent out for processing. A Vape pen was recovered in the vehicle and a DNA along with THC test will be requested. An additional water bottle was recovered by patrol in a bag of property he dropped during the foot pursuit will be sent out for DNA along with a bag of suspected marijuana. Two Fabreze Air freshener spray bottles were recovered in MV w/Neg results. All property, prepared for evidence or DNA analysis. JMQ 1,2,3,12,13,14,15,16 was sent to Afis

**I.D. Detective: Quesada**          **Date:** 1-26-19

PARKS000098

# EXHIBIT "L"

## REQUEST FOR LATENT FINGERPRINT EXAMINATION

STATE OF NEW JERSEY
DEPT. OF LAW & PUBLIC SAFET
IDENTIFICATION & INFORMATION TECHNOL
POST OFFICE BOX 7068
W. TRENTON, NEW JERSEY 08628

THIS PACKAGE CONTAINS POTENTIAL SUSPECT
IDENTIFICATION. IT IS INCUMBENT UPON THE
SUBMITTING AGENCY TO PROVIDE POSITIVE ID FOR
PROSECUTORIAL PURPOSES.

**LAW ENFORCEMENT FINAL VERIFICATION**

NAME:
DATE:
AGENCY:

| SUBMITTED AT: | SUBMITTING AGENCY AND ADDRESS: |
|---|---|
| ☐ W. TRENTON: 609-882-2000 EXT. 2461 | Woodbridge Police |
| ☒ HOLMDEL: 732-441-4500 EXT. 7225 | 1 Main St Woodbridge NJ 07095 |
| ☐ BUENA VISTA: 609-561-1800 EXT. 3326 | SUBMITTING AGENCY CASE NUMBER: 19010123 |

| INVESTIGATIONG OFFICER: | ORI NUMBER: NJ 0122500 | TELEPHONE NUMBER: 732 634-7700 ext 2114 |
|---|---|---|
| CRIME: 2C:12-1B(2) 2C:20-11 | CRIME DATE: 01/26/19 | SUSPECT: UNK |

BRIEF HISTORY: Shoplifting turned Robbery with Agg Assault on Police.

| ITEM # | COMMENT | CANDIDATE FBI NUMBER | CANDIDATE SBI NUMBER | FING/PALM NUMBER | LIFT ID/PATTERN TYPE/MINUTIAE |
|---|---|---|---|---|---|
| JMQ1 | | 382204AE1 | | LP LP | (01-01)PALM 106 PTS (01-02)PALM 51 PTS |
| JMQ2 | | 382204AE1 | | LP | (02-01)PALM 106 PTS |
| JMQ3 | | | | NS | |
| JMQ12 | | | | NS | |
| JMQ13 | | | | NS | |
| JMQ14 | | | | NS | |
| JMQ15 | | | | NS | |
| JMQ16 | | | | NS | |

COMMENTS:

| DELIVERED BY: 328 | RECEIVED BY: (INITIALS/DATE) PMB 2-8-19 | ADMINISTRATIVE REVIEW BY: (INITIALS/DATE) TW2-19-19 |
|---|---|---|
| ENTERED BY: (INITIALS/DATE) PMB 2-13-19 | COMPARED BY: (INITIALS/DATE) PMB 2-14-19 | |
| RETURNED TO: (INITIALS/DATE) 375 | RETURNED BY: (INITIALS/DATE) PMB 2-22-19 | |
| RELAUNCH ID BY: (INITIALS/DATE) | TP/UL ID BY: (INITIALS/DATE) | IAFIS BY: (INITIALS/DATE) 2-14-19. PM L3 WB |

IN THE EVENT THAT THIS CRIME IS CLEARED, EITHER AS A RESULT OF LATENT SEARCH
OR OTHER MEANS, PLEASE ADVISE THE BIOMETRIC IDENTIFICATION UNIT.

# EXHIBIT "M"

# WOODBRIDGE POLICE DEPARTMENT
# ID BUREAU SUSPECT REPORT

Date: <u>01-26-2019</u>          Alarm #: <u>19010123</u>          Case#: _____

Suspect's Name: <u>Walker, Barrington A</u>          Sex:    <u>Male</u>
Address: <u>240 West 141 St Manhattan, NY</u>          SBI#:  <u>-</u>
DOB:  <u>02/28/1993</u>          FBI#:   <u>382204AE1</u>
SOC: _____          WPD#: <u>-</u>

Latents Submitted to AFIS?          Yes  ☒          No ☐          NA ☐
Date Submitted: <u>02-08-2019</u>          Submitted By: <u>ID Tech W. Trevena #375</u>
Return Date:    <u>02-22-2019</u>          Returned By: <u>ID Tech W. Trevena #375</u>

**Results of AFIS Submission**

Latent Finger Print #: <u>JMQ-2</u>          Identified as # <u>Left Palm</u> Finger
Latent Finger Print #: _____          Identified as # _____ Finger
Latent Finger Print #: _____          Identified as # _____ Finger

Identification Made By: <u>Det. Douglas Cioni #476</u>          Date: <u>01-22-2021</u>
Identification Confirmed By: <u>Lt. J Velez #332</u>          Date: <u>01-22-2021</u>  *QSV/332*

**Narrative:**
<u>The above listed individual was supplied by New Jersey State Police A.F.I.S.(Automated Fingerprint</u>
<u>Identification System). The candidate was supplied as a result from a hit within AFIS. The individuals rolled</u>
<u>impressions supplied by NJSP AFIS were then compared to the latent fingerprint discovered on the Hampton</u>
<u>Inn exit door (above listed alarm #).The latent, similar in pattern, also displayed at least twenty exact minutea</u>
<u>details making the latent an exact match with the left palm impression of Barrington Walker.</u>

I.D. Detective: _____ Date: _<u>1-22-21</u>_
Signature          Completed

WPD-063 (10/05-b)

# EXHIBIT "N"

## COMPLAINT - WARRANT

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| **1225** | **W** | **2019** | **000156** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO |

**THE STATE OF NEW JERSEY**
*VS.*
NIJEER K PARKS

WOODBRIDGE MUNICIPAL COURT
1 MAIN STREET
WOODBRIDGE          NJ  07095-0000
732-636-6430  COUNTY OF: MIDDLESEX

ADDRESS: 485 E. 19TH ST. APT # 3G

PATERSON          NJ 07522-0000

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 5 | 0 | 19010123 |

COMPLAINANT
NAME: DET. S TAPIA
1 MAIN ST.

WOODBRIDGE          NJ  07095

DEFENDANT INFORMATION
SEX: **M**  EYE COLOR: **BROWN**  DOB: 09/11/1987
DRIVER'S LIC. #: P06195927209872  DL STATE: NJ
SOCIAL SECURITY #: xxx-xx-x832  SBI #:
TELEPHONE #:  ( )
LIVESCAN PCN #:

By certification or on oath, the complainant says that to the best of his/her knowledge, information and belief the named
defendant on or about 01/26/2019 in          WOODBRIDGE TWP          , MIDDLESEX County, NJ did:
WITHIN THE JURISDICTION OF THIS COURT, COMMIT AGGRAVATED ASSAULT BY ATTEMPTING
TO CAUSE BODILY INJURY TO OFFICER LEE, A LAW ENFORCEMENT OFFICER, ACTING IN THE
PERFORMANCE OF HIS DUTIES, WHILE IN UNIFORM, SPECIFICALLY BY ATTEMPTING TO
STRIKE HIM WITH A VEHICLE WHILE RESISTING ARREST.
IN VIOLATION OF N.J.S. 2C:12-1B(5)(A).

WITHIN THE JURISDICTION OF THIS COURT, KNOWINGLY POSSESS A WEAPON, NAMELY, A
2018 DODGE CHALLENGER BEARING NEW YORK REGISTRATION JBD2162 UNDER CIRCUMSTANCES
NOT MANIFESTLY APPROPRIATE FOR LAWFUL USE, SPECIFICALLY BY ATTEMPTING TO USE THE
VEHICLE AS A WEAPON TO STRIKE OFFICER LEE.
IN VIOLATION OF N.J.S. 2C:39-5D

WITHIN THE JURISDICTION OF THIS COURT, POSSESS A WEAPON, OTHER THAN A FIREARM,
WITH A PURPOSE TO USE IT UNLAWFULLY AGAINST THE PERSON OR PROPERTY OF ANOTHER.
in violation of:

| Original Charge | 1) 2C:12-1B(5)(A) | 2) 2C:39-5D | 3) 2C:39-4D |
|---|---|---|---|
| Amended Charge | | | |

CERTIFICATION: I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject
to punishment.
Signed: _____ PTL. S TAPIA _____          Date: 01/30/2019

You will be notified of your Central First Appearance/CJP date to be held at the Superior Court          in the county of MIDDLESEX
at the following address: MIDDLESEX SUPERIOR COURT
56 PATERSON STREET          NEW BRUNSWICK          NJ 08901-0000
Date of Arrest:          Appearance Date:          Time:          Phone: 732-645-4300

### PROBABLE CAUSE DETERMINATION AND ISSUANCE OF WARRANT

☐ Probable cause **IS NOT** found for the issuance of this complaint.

_____          ____          _____          ____
Signature of Court Administrator or Deputy Court Administrator          Date          Signature of Judge          Date

☑ Probable cause **IS** found for the issuance of this complaint.  DAVID    STAHL JUDICIAL OFFICER     01/30/2019
                                        Signature and Title of Judicial Officer Issuing Warrant          Date
TO ANY PEACE OFFICER OR OTHER AUTHORIZED PERSON: PURSUANT TO THIS WARRANT YOU ARE HEREBY COMMANDED TO ARREST THE
NAMED DEFENDANT AND BRING THAT PERSON FORTHWITH BEFORE THE COURT TO ANSWER THE COMPLAINT.

Bail Amount Set: _____ by: _____
                                        (if different from judicial officer that issued warrant)

| ☐ **Domestic Violence – Confidential** | ☐ **Related Traffic Tickets or Other Complaints** | ☐ **Serious Personal Injury/ Death Involved** |
|---|---|---|

Special conditions of release:
☐ No phone, mail or other personal contact w/victim
☐ No possession firearms/weapons
☐ Other (specify):

**ORIGINAL**

Page 1 of 10          NJ/CDR2 1/1/2017

PARKS000001

## COMPLAINT - WARRANT

| COMPLAINT NUMBER | | | | STATE V. |
|---|---|---|---|---|
| **1225** | **W** | **2019** | **000156** | **NIJEER K PARKS** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | |

SPECIFICALLY BY PURPOSELY ATTEMPTING TO STRIKE OFFICER LEE WITH A  2018 DODGE
CHALLENGER BEARING NEW YORK REGISTRATION JBD2162.
IN VIOLATION OF N.J.S. 2C:39-4D

WITHIN THE JURISDICTION OF THIS COURT, COMMIT AGGRAVATED ASSAULT BY PURPOSELY
ATTEMPTING TO CAUSE SERIOUS BODILY INJURY TO OFFICER LEE SPECIFICALLY BY DRIVING
AT HIM WITH THE 2018 DODGE CHALLENGER BEARING NEW YORK REGISTRATION JBD2162.
IN VIOLATION OF N.J.S. 2C:12-1B(1)

WITHIN THE JURISDICTION OF THIS COURT, COMMIT AGGRAVATED ASSAULT BY PURPOSELY
ATTEMPTING TO CAUSE BODILY INJURY TO OFFICER LEE WITH A DEADLY WEAPON,
SPECIFICALLY BY DRIVING AT HIM WITH THE 2018 DODGE CHALLENGER BEARING NEW YORK
REGISTRATION JBD2162.
IN VIOLATION OF N.J.S. 2C:12-1B(2)

| Original Charge | 4) **2C:12-1B(1)** | 5) **2C:12-1B(2)** | |
|---|---|---|---|
| Amended Charge | | | |

COMPLAINT - WARRANT
Page 2 of 10                    NJ/CDR2 1/1/2017

PARKS000002

# COMPLAINT – WARRANT (Court Action)

**COMPLAINT NUMBER**

| 1225 | W | 2019 | 000156 |
|------|---|------|--------|
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. |

**STATE V.**

**NIJEER K PARKS**

**FTA Bail Information** | Date Bail Set: | Amount Bail Set: $ _____ | by: _____ | ☐ Bail Recog. Attached

| Released on Bail (√) | R.O.R. | Committed Default | Committed w/o Bail | Place Committed: | Date Referred to County Prosecutor: _____ |
|---|---|---|---|---|---|

Date of First Appearance: | ☐ Advised of Rights by _____ | Defendant Desires Counsel: ☐ Yes  ☐ No

### Prosecuting Attorney Information

Name:

| State | County | Municipal | Other |
|---|---|---|---|

### Defense Counsel Information

Name:

| None | Retained | Public Def | Assigned | Waived | Other |
|---|---|---|---|---|---|

| | 1) 2C:12-1B(5)(A) | 2) 2C:39-5D | 3) 2C:39-4D |
|---|---|---|---|
| Original Charge | 1) 2C:12-1B(5)(A) | 2) 2C:39-5D | 3) 2C:39-4D |
| Amended Charge | | | |
| Waiver Indt/Jury | | | |
| Plea/Date of Plea | Plea:   Date: | Plea:   Date: | Plea:   Date: |
| Adjudication (* see code) | Finding Code:   Date: | Finding Code:   Date: | Finding Code:   Date: |
| Jail Term | Jail time credit  Susp. Imp | Jail time credit  Susp. Imp | Jail time credit  Susp. Imp |
| Probation Term | Susp. Imp | Susp. Imp | Susp. Imp |
| Cond. Discharge Term | | | |
| Community Service | | | |
| D/L Suspension Term | | | |
| Fines/Costs | Fines:   Costs: | Fines:   Costs: | Fines:   Costs: |
| VCCB/SNSF | VCCB:   SNSF: | VCCB:   SNSF: | VCCB:   SNSF: |
| DEDR/Lab Fee | DEDR:   LAB: | DEDR:   LAB: | DEDR:   LAB: |
| CD Fee/Drug Ed Fnd | CD:   DAEF: | CD:   DAEF: | CD:   DAEF: |
| DV Surch/Other Fees | DV:   Other: | DV:   Other: | DV:   Other: |
| Restitution Beneficiary: | | | |

**Miscellaneous Information, Adjournments, Companion Complaints, Co-Defendants, Case Notes:**

**Related Traffic Tickets and Complaints:**

**\* Finding Codes**
1 – Guilty
2 – Not Guilty
3 – Dismissed – Other
4 – Guilty but Merged
5 – Dismissed-Rule
6 – Dismissed Lack of Prosecution
7 – Dismissed – Pros Motion/Vic Req
8 – Conditional Discharge
D – Dismissed- Prosecutor Discretion
M – Dismissed- Mediation
P - Dismissed-Plea Agreement
S – Disposed at Superior
W – Dismissed-False ID

JUDGE'S SIGNATURE _____   DATE _____

**COMPLAINT - WARRANT (Court Action)**

Page 3 of 10   NJ/CDR2 1/1/2017

PARKS000003

# COMPLAINT – WARRANT (Court Action)

| COMPLAINT NUMBER | | | | STATE V. |
|---|---|---|---|---|
| **1225** | **W** | **2019** | **000156** | **NIJEER K PARKS** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO | |

| FTA Bail Information | Date Bail Set: | | | Amount Bail Set: $_____ | by:_____ | ☐ Bail Recog. Attached |
|---|---|---|---|---|---|---|
| Released on Bail (√) | R.O.R. | Committed Default | Committed w/o Bail | Place Committed: | | Date Referred to County Prosecutor: |

| Date of First Appearance: | ☐ Advised of Rights by _____ | Defendant Desires Counsel: ☐ Yes   ☐ No |
|---|---|---|

| Prosecuting Attorney Information | | | | Defense Counsel Information | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name: | | | | Name: | | | | | |
| State | County | Municipal | Other | None | Retained | Public Def | Assigned | Waived | Other |

| | | | | |
|---|---|---|---|---|
| Original Charge | 4)  2C:12-1B(1) | 5)  2C:12-1B(2) | | |
| Amended Charge | | | | |
| Waiver Indt/Jury | | | | |
| Plea/Date of Plea | Plea:        Date: | Plea:        Date: | Plea:        Date: | |
| Adjudication (* see code) | Finding Code:        Date: | Finding Code:        Date: | Finding Code:        Date: | |
| Jail Term | | Jail time credit | Susp. Imp | Jail time credit | Susp. Imp | Jail time credit | Susp. Imp |
| Probation Term | | | Susp. Imp | | Susp. Imp | | Susp. Imp |
| Cond. Discharge Term | | | | |
| Community Service | | | | |
| D/L Suspension Term | | | | |
| Fines/Costs | Fines:        Costs: | Fines:        Costs: | Fines:        Costs: | |
| VCCB/SNSF | VCCB:        SNSF: | VCCB:        SNSF: | VCCB:        SNSF: | |
| DEDR/Lab Fee | DEDR:        LAB: | DEDR:        LAB: | DEDR:        LAB: | |
| CD Fee/Drug Ed Fnd | CD:        DAEF: | CD:        DAEF: | CD:        DAEF: | |
| DV Surch/Other Fees | DV:        Other: | DV:        Other: | DV:        Other: | |
| Restitution Beneficiary:_____ | | | | |

**Miscellaneous Information, Adjournments, Companion Complaints, Co-Defendants, Case Notes:**

**Related Traffic Tickets and Complaints:**

**\* Finding Codes**
1 – Guilty
2 – Not Guilty
3 – Dismissed – Other
4 – Guilty but Merged
5 – Dismissed-Rule
6 – Dismissed Lack of Prosecution
7 – Dismissed – Pros Motion/Vic Req
8 – Conditonal Discharge
D – Dismissed- Prosecutor Discretion
M – Dismissed- Mediation
P – Dismissed-Plea Agreement
S – Disposed at Superior
W – Dismissed-False ID

JUDGE'S SIGNATURE                    DATE

COMPLAINT - WARRANT (Court Action)
Page 4 of 10        NJ/CDR2 1/1/2017

# COMPLAINT - WARRANT

**COMPLAINT NUMBER**

| 1225 | W | 2019 | 000156 |
|---|---|---|---|
| COURT CODE | PREFIX | YEAR | SEQUENCE NO |

*THE STATE OF NEW JERSEY*

*VS.*

**NIJER K PARKS**

WOODBRIDGE MUNICIPAL COURT
1 MAIN STREET
WOODBRIDGE          NJ  07095-0000
732-636-6430    COUNTY OF: MIDDLESEX

ADDRESS  485 E. 19TH ST. APT # 3G

PATERSON                    NJ  07522-0000

| # of CHARGES 5 | CO-DEFTS 0 | POLICE CASE #: 19010123 |
|---|---|---|

**DEFENDANT INFORMATION**
SEX: M  EYE COLOR: BROWN       DOB: 09/11/1987
DRIVER'S LIC. #: P06195927209872        DL STATE: NJ
SOCIAL SECURITY #: xxx-xx-x832    SBI #:
TELEPHONE #:                     ( )
LIVESCAN PCN #:

COMPLAINANT
NAME:    DET. S TAPIA

By certification or on oath, the complainant says that to the best of his/her knowledge, information and belief the named defendant on or about 01/26/2019 in    WOODBRIDGE TWP      , MIDDLESEX County, NJ did:
WITHIN THE JURISDICTION OF THIS COURT, COMMIT AGGRAVATED ASSAULT BY ATTEMPTING
TO CAUSE BODILY INJURY TO OFFICER LEE, A LAW ENFORCEMENT OFFICER, ACTING IN THE
PERFORMANCE OF HIS DUTIES, WHILE IN UNIFORM, SPECIFICALLY BY ATTEMPTING TO
STRIKE HIM WITH A VEHICLE WHILE RESISTING ARREST.
IN VIOLATION OF N.J.S. 2C:12-1B(5)(A).

WITHIN THE JURISDICTION OF THIS COURT, KNOWINGLY POSSESS A WEAPON, NAMELY, A
2018 DODGE CHALLENGER BEARING NEW YORK REGISTRATION JBD2162 UNDER CIRCUMSTANCES
NOT MANIFESTLY APPROPRIATE FOR LAWFUL USE, SPECIFICALLY BY ATTEMPTING TO USE THE
VEHICLE AS A WEAPON TO STRIKE OFFICER LEE.
IN VIOLATION OF N.J.S. 2C:39-5D

WITHIN THE JURISDICTION OF THIS COURT, POSSESS A WEAPON, OTHER THAN A FIREARM,
WITH A PURPOSE TO USE IT UNLAWFULLY AGAINST THE PERSON OR PROPERTY OF ANOTHER,
in violation of:

| Original Charge | 1) 2C:12-1B(5)(A) | 2) 2C:39-5D | 3) 2C:39-4D |
|---|---|---|---|
| Amended Charge | | | |

CERTIFICATION: I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment
Signed:            PTL. S  TAPIA                    Date: 01/30/2019

You will be notified of your **Central First Appearance/CJP** date to be held at the  Superior Court        in the county of **MIDDLESEX**
at the following address:  MIDDLESEX SUPERIOR COURT
56 PATERSON STREET                                      NEW BRUNSWICK    NJ 08901-0000
Date of Arrest:          Appearance Date:           Time:        Phone: 732-645-4300

## PROBABLE CAUSE DETERMINATION AND ISSUANCE OF WARRANT

☐  Probable cause IS NOT found for the issuance of this complaint.

Signature of Court Administrator or Deputy Court Administrator    Date        Signature of Judge        Date

☑  Probable cause IS found for the issuance of this complaint.  DAVID    STAHL JUDICIAL OFFICER  01/30/2019
Signature and Title of Judicial Officer Issuing Warrant        Date
TO ANY PEACE OFFICER OR OTHER AUTHORIZED PERSON: PURSUANT TO THIS WARRANT YOU ARE HEREBY COMMANDED TO ARREST THE NAMED DEFENDANT AND BRING THAT PERSON FORTHWITH BEFORE THE COURT TO ANSWER THE COMPLAINT.

Bail Amount Set: _____ by: _____
(if different from judicial officer that issued warrant)

| ☐  **Domestic Violence – Confidential** | ☐  **Related Traffic Tickets or Other Complaints** | ☐  **Serious Personal Injury/ Death Involved** |
|---|---|---|

**Special conditions of release:**
☐  **No phone, mail or other personal contact w/victim**
☐  **No possession firearms/weapons**
☐  **Other (specify):**

**COMPLAINT - WARRANT (DEFENDANT'S COPY)**

**Page 5  of 10**                    NJ/CDR2 1/1/2017

## COMPLAINT - WARRANT

| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | STATE V. |
|---|---|---|---|---|
| 1225 | W | 2019 | 000156 | NIJEER K PARKS |

| COMPLAINT NUMBER | | | |

SPECIFICALLY BY PURPOSELY ATTEMPTING TO STRIKE OFFICER LEE WITH A  2018 DODGE CHALLENGER BEARING NEW YORK REGISTRATION JBD2162.
IN VIOLATION OF N.J.S. 2C:39-4D

WITHIN THE JURISDICTION OF THIS COURT, COMMIT AGGRAVATED ASSAULT BY PURPOSELY ATTEMPTING TO CAUSE SERIOUS BODILY INJURY TO OFFICER LEE SPECIFICALLY BY DRIVING AT HIM WITH THE 2018 DODGE CHALLENGER BEARING NEW YORK REGISTRATION JBD2162.
IN VIOLATION OF N.J.S. 2C:12-1B(1)

WITHIN THE JURISDICTION OF THIS COURT, COMMIT AGGRAVATED ASSAULT BY PURPOSELY ATTEMPTING TO CAUSE BODILY INJURY TO OFFICER LEE WITH A DEADLY WEAPON, SPECIFICALLY BY DRIVING AT HIM WITH THE 2018 DODGE CHALLENGER BEARING NEW YORK REGISTRATION JBD2162.
IN VIOLATION OF N.J.S. 2C:12-1B(2)

| Original Charge | 4) 2C:12-1B(1) | 5) 2C:12-1B(2) | |
|---|---|---|---|
| Amended Charge | | | |

COMPLAINT - WARRANT (DEFENDANT'S COPY)

Page 6 of 10

NJ/CDR2 1/1/2017

PARKS000006

## COMMITMENT

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| **1225** | **W** | **2019** | **000156** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. |

**THE STATE OF NEW JERSEY**
*VS.*
NIJEER K PARKS

**WOODBRIDGE MUNICIPAL COURT**
**1 MAIN STREET**
**WOODBRIDGE          NJ  07095-0000**
**732-636-6430**   COUNTY OF: **MIDDLESEX**

ADDRESS
     **485 E. 19TH ST. APT # 3G**

     **PATERSON                    NJ 07522-0000**

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| **5** | **0** | **19010123** |

COMPLAINANT **DET. S TAPIA**
NAME:     **1 MAIN ST.**

          **WOODBRIDGE          NJ  07095**

DEFENDANT INFORMATION
SEX: **M**  EYE COLOR: **BROWN**   DOB: **09/11/1987**
DRIVER'S LIC. #. **P06195927209872**          DL STATE: **NJ**
SOCIAL SECURITY #: **xxx-xx-x832**   SBI #:
TELEPHONE #:                    **( )**
LIVESCAN PCN #:

## To any Law Enforcement Official of New Jersey, You are commanded to transport this defendant to the Warden of this county who is required to keep the defendant in custody until a release or detention decision is made.

|  | Offense | Aux Offense | Drug Code | Degree | Offense Description |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

Commitment Reason:

You will be notified of your **Central First Appearance/CJP** date to be held at the  Superior Court          in the county of **MIDDLESEX**
at the following address:  MIDDLESEX SUPERIOR COURT
**56 PATERSON STREET**                         **NEW BRUNSWICK          NJ 08901-0000**

Date of Arrest:                                        Phone: **732-645-4300**

_____          _____
Signature and Title of Judicial Officer Issuing Warrant          Date

## COMMITMENT

Page 7 of 10                                        NJ/CDR2 1/1/2017

PARKS000007

## Affidavit of Probable Cause

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| 1225 | W | 2019 | 000156 |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO |

**THE STATE OF NEW JERSEY**
*VS.*
NIJEER K PARKS

WOODBRIDGE MUNICIPAL COURT
1 MAIN STREET
WOODBRIDGE          NJ  07095-0000
732-636-6430   COUNTY OF: **MIDDLESEX**

ADDRESS
     485 E. 19TH ST. APT # 3G

PATERSON          NJ  07522-0000

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 5 | | 19010123 |

COMPLAINANT **DET. S TAPIA**
NAME:          1 MAIN ST.

          WOODBRIDGE          NJ  07095

**DEFENDANT INFORMATION**
SEX: **M** EYE COLOR: **BROWN**    DOB: 09/11/1987
DRIVER'S LIC #. **P06195927209872**          DL STATE: **NJ**
SOCIAL SECURITY #: xxx-xx-x832    SBI #:
TELEPHONE #:                    (   )
LIVESCAN PCN #:

Purpose: This Affidavit/Certification is to more fully describe the facts of the alleged offense so that a judge or authorized judicial officer may determine probable cause.

1. Description of relevant facts and circumstances which support probable cause that (1) the offense(s) was committed <u>and</u> (2) the defendant is the one who committed it:

On Saturday January 26, 2019, The suspect went in to the Hertz rental located within the Hampton inn hotel on rt.9 No. in Woodbridge with the intent of exchanging a previously rented 2018 grey Challenger bearing New York registration JBD2162 with another Dodge Challenger. He presented a fraudulent Tennessee Driver's License with the name Jamal Owens and the suspect's real picture on it. Woodbridge Police Officers Lyszyk and Officer Lee were dispatched to investigate and the suspect presented them with the Tennessee driver's license. Officer Lyszyk contacted the Tennessee State Police and confirmed that the Tennessee driver's license was fraudulent. When the suspect was confronted by Patrol Officers Lyszyk and Lee, he resisted arrest and ran into the Dodge Challenger. He drove at Officer Lee, rammed the police car and the building. Officer Lee had to jump out of the way to avoid serious injury. Patrol Officers pursued the vehicle for a short distance and lost sight of it. Woodbridge Police I.D. Detective Quesada responded to the Hampton Inn Hotel and processed the scene. The suspect's sneaker, the fake Tennessee driver's license, and a water bottle that the suspect drank out of were brought back to Woodbridge headquarters for further processing. The vehicle was later located by Sgt. Flavell unoccupied on Mattison St. Woodbridge. Sgt. Flavell towed the vehicle to our impound yard for further processing by detectives. I contacted Hertz corporate security manager and I was given consent to search the vehicle. Detective Quesada processed the inside of the vehicle for fingerprints and several prints were lifted. I verified with Officer Lee and Officer Lyszyk that the picture on the fraudulent Tennessee driver's license was the picture of the suspect and they were 100% sure it was the suspect's picture. I sent out the suspect's Tennessee driver's license picture to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) for facial recognition. On January 27, 2019, I received a high profile comparison to the picture on the fraudulent Tennessee driver's license. The suspect was identified as Nijeer Parks with a date of birth of September 11, 1987 with a last known address of 485 E. 19th St. Apt # 3G Paterson, NJ. I compared the photo on the fraudulent Tennessee driver's license to Nijeer Parks' real New Jersey driver's license and it is the same person.

**Affidavit of Probable Cause**

Page 8 of 10                              1/1/2017

## Affidavit of Probable Cause

| COMPLAINT NUMBER | | | | THE STATE OF NEW JERSEY |
|---|---|---|---|---|
| 1225 | W | 2019 | 000156 | *VS.* |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | NIJEER K PARKS |

2. I am aware of the facts above because: (Included, but not limited to: your observations, statements of eyewitnesses, defendant's admission, etc.)

3. If victim was injured, provide the extent of the injury:

Certification:
I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Signed: PTL. S TAPIA LAW ENFORCEMENT OFFICER      Date: 01/30/2019

Affidavit of Probable Cause

Page 9 of 10                                        1/1/2017

PARKS000009

## Preliminary Law Enforcement Incident Report

| COMPLAINT NUMBER | | | | | THE STATE OF NEW JERSEY |
|---|---|---|---|---|---|

| 1225 | W | 2019 | 000156 |
|---|---|---|---|
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. |

*THE STATE OF NEW JERSEY*
*VS.*
**NIJEER K PARKS**

WOODBRIDGE MUNICIPAL COURT
1 MAIN STREET
WOODBRIDGE          NJ  07095-0000
732-636-6430  COUNTY OF: MIDDLESEX

ADDRESS:
    485 E. 19TH ST. APT # 3G

PATERSON                    NJ 07522-0000

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 5 | | 19010123 |

COMPLAINANT  DET. S TAPIA
NAME:        1 MAIN ST.

WOODBRIDGE              NJ  07095

DEFENDANT INFORMATION
SEX: M  EYE COLOR: BROWN        DOB: 09/11/1987
DRIVER'S LIC. #: P06195927209872              DL STATE:  NJ
SOCIAL SECURITY #: xxx-xx-x832      SBI #:
TELEPHONE #:          ( )
LIVESCAN PCN #:

**Purpose: The Preliminary Law Enforcement Incident Report (PLEIR) is intended to document basic information known to the officer at the time of its preparation. It is recognized that additional relevant information will emerge as an investigation continues. The PLEIR shall be in addition to, not in lieu of, any regular police arrest, incident, or investigation reports. Note that the PLEIR is specific to each defendant charged in an investigation.**

-The complaining officer personally observed the offense.

-The offense/incident was recorded using electronic/surveillance via:
        •Dash Camera/MVR/DIVR
        •Surveillance Camera

-The defendant was a stranger to the victim.

-Identification procedures were used by utilizing:
        •Other/Explain Facial recognition

-A weapon was involved in the incident:
        •Other/Explain Vehicle

-Physical evidence was seized/recovered:
        •CDS:
                *Marijuana
        •Drug Paraphernalia
        •Other Type(s) of physical evidence water bottle, sneaker

-The defendant fled, attempted flight, or resisted arrest.

                *Foot pursuit
                *Motor Vehicle pursuit
                *Physical resistance

-The defendant operated a motor vehicle in a manner that endangered public safety.

-The case involves CDS and the evidence was recovered via:
        •Pedestrian Stop

-The case involves a consent search.

**Certification:**
I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Signed:    PTL. S   TAPIA LAW ENFORCEMENT OFFICER        Date:    01/30/2019

Preliminary Law Enforcement Incident Report
**Page 10 of 10**                                    7/20/2018

PARKS000010

# EXHIBIT "O"

# COMPLAINT - WARRANT

## COMPLAINT NUMBER

| 1225 | W | 2019 | 000158 |
|---|---|---|---|
| COURT CODE | PREFIX | YEAR | SEQUENCE NO |

**WOODBRIDGE MUNICIPAL COURT**
**1 MAIN STREET**
**WOODBRIDGE        NJ  07095-0000**
**732-636-6430   COUNTY OF:  MIDDLESEX**

*THE STATE OF NEW JERSEY*
*VS.*
**NIJEER K PARKS**

ADDRESS  **485 E. 19TH ST APT. 3G**

**PATTERSON                NJ 07522-0000**

| # of CHARGES 9 | CO-DEFTS | POLICE CASE #: 19010123 |
|---|---|---|

COMPLAINANT NAME: **PTL. A.    LYSZYK**
**1 MAIN STREET**
**ATTN WARRANTS**
**WOODBRIDGE          NJ  07095**

DEFENDANT INFORMATION
SEX: **M**  EYE COLOR: **BROWN**    DOB: **09/11/1987**
DRIVER'S LIC. #. **P06195927209872**     DL STATE: **NJ**
SOCIAL SECURITY #: **xxx-xx-x832**   SBI #:
TELEPHONE #:                    ( )
LIVESCAN PCN #:

By certification or on oath, the complaint says that to the best of his/her knowledge, information and belief the named defendant on or about **01/26/2019 in        WOODBRIDGE TWP          , MIDDLESEX** County,NJ did:
WITHIN THE JURISDICTION OF THIS COURT, COMMIT THE OFFENSE OF SHOPLIFTING SPECIFICALLY BY, TAKING THIRTEEN ASSORTED CANDIES AND TWO CLEAR EYE EYE DROPS (TOTAL VALUE $39,00) FROM THE HAMPTON INN CONCESSION SHELF, CONCEALING THEM IN A BAG, BYPASSING THE REGISTER, WALKING OUT OF THE LOBBY, AND PLACING THEM INSIDE THE VEHICLE HE WAS DRIVING (NY JBD2162) IN AN ATTEMPT TO DEPRIVE HAMPTON INN OF THE FULL RETAIL VALUE OF THE ITEMS.

WITHIN THE JURISDICTION OF THIS COURT, COMMIT THE OFFENSE OF HINDERING SPECIFICALLY BY, GIVING PTL. LEE AND PTL. LYSZYK A FRAUDULENT TENNESSEE DRIVER'S LICENSE, DL # 801527486 JAMAL OWENS DATE OF BIRTH 10-15-1993, THAT CONTAINED HIS PICTURE ON IT IN AN ATTEMPT TO HINDER THE INVESTIGATION.

WITHIN THE JURISDICTION OF THIS COURT, COMMIT THE OFFENSE OF POSSESSION OF MARIJUANA UNDER 50 GRAMS SPECIFICALLY BY, HAVING 44 GRAMS OF SUSPECTED MARIJUANA
in violation of:

| Original Charge | 1) **2C:20-11B(1)** | 2) **2C:29-3A(7)** | 3) **2C:35-10A(4)** |
|---|---|---|---|
| AmendedCharge | | | |

CERTIFICATION: I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.
Signed: _____**PTL. A.   LYSZYK**_____       Date: **01/30/2019**

You will be notified of your **Central First Appearance/CJP** date to be held at the Superior Court in the county of **MIDDLESEX**
at the following address: MIDDLESEX SUPERIOR COURT

**56 PATERSON STREET**                                           **NEW BRUNSWICK        NJ 08901-0000**
Date of Arrest:          Appearance Date:              Time:        Phone: **732-645-4300**

### PROBABLE CAUSE DETERMINATION AND ISSUANCE OF WARRANT

☐ Probable cause **IS NOT** found for the issuance of this complaint.

Signature of Court Administrator or Deputy Court Administrator   Date          Signature of Judge           Date

☑ Probable cause **IS** found for the issuance of this complaint. **DAVID    STAHL JUDICIAL OFFICER**   01/30/2019
                                              Signature and Title of Judicial Officer Issuing Warrant          Date
TO ANY PEACE OFFICER OR OTHER AUTHORIZED PERSON: PURSUANT TO THIS WARRANT YOU ARE HEREBY COMMANDED TO ARREST THE NAMED DEFENDANT AND BRING THAT PERSON FORTHWITH BEFORE THE COURT TO ANSWER THE COMPLAINT.

Bail Amount Set: _____  by: _____
                                              (if different from judicial officer that issued warrant)

| ☐ Domestic Violence – Confidential | ☐ Related Traffic Tickets or Other Complaints | ☐ Serious Personal Injury/ Death Involved |
|---|---|---|

Special conditions of release:
☐ No phone, mail or other personal contact w/victim
☐ No possession firearms/weapons
☐ Other (specify):

**ORIGINAL**

Page 1 of 13

NJCDR2 1/1/2017

PARKS000011

# COMPLAINT - WARRANT

| | COMPLAINT NUMBER | | | STATE V. |
|---|---|---|---|---|
| **1225** | **W** | **2019** | **000158** | |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | **NIJEER K PARKS** |

HALFWAY IN A BLACK PLASTIC BAG WHICH WAS LOCATED IN HIS LEFT JACKET POCKET.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF POSSESSION OF DRUG
PARAPHERNALIA SPECIFICALLY BY, HAVING A MARIJUANA GRINDER, WHICH CONTAINED
SUSPECTED MARIJUANA RESIDUE, INSIDE A BLACK PLASTIC BAG THAT WAS LOCATED INSIDE
HIS LEFT JACKET POCKET.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF OBSTRUCTING
ADMINISTRATION OF LAW SPECIFICALLY BY, RUNNING AWAY FROM PTL. LEE AND PTL.
LYSZYK AFTER BEING TOLD THAT HE WAS BEING PLACED UNDER ARREST.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF FALSE GOVERNMENT
DOCUMENTS SPECIFICALLY BY, HANDING PTL. LEE AND PTL. LYSZYK A FRAUDULENT
TENNESSEE DRIVER'S LICENSE, DL # 801527486 JAMAL OWENS DATE OF BIRTH 10-15-1993,
THAT CONTAINED HIS PICTURE ON IT IN AN ATTEMPT TO HINDER THE INVESTIGATION.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF RESISTING ARREST
SPECIFICALLY BY, RUNNING AWAY FROM PTL. LEE AND PTL. LYSZYK AFTER BEING TOLD TO
STOP RUNNING AND THAT HE WAS UNDER ARREST.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF ELUDING SPECIFICALLY
BY, GETTING INTO A VEHICLE, NY JBD2162, AND DRIVING AWAY AT A HIGH RATE OF SPEED
IN A BUSY PARKING LOT AFTER HE WAS GIVEN A SIGNAL, VIA VERBAL COMMANDS AND
GUNPOINT, TO PLACE HIS VEHICLE IN PARK AND EXITED IT.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF CRIMINAL MISCHIEF
SPECIFICALLY BY, PURPOSELY RAMMING HIS VEHICLE, NY JBD2162, INTO THE BACK OF
WOODBRIDGE POLICE PATROL CAR #3, WHICH CAUSED DAMAGE TO THE REAR DRIVER'S SIDE
BUMPER.

| Original Charge | 4) **2C:36-2** | 5) **2C:29-1A** | 6) **2C:21-2.1C** |
|---|---|---|---|
| Amended Charge | | | |

**COMPLAINT - WARRANT**

Page 2 of 13    NJ/CDR2 1/1/2017

PARKS000012

## COMPLAINT - WARRANT

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| 1225 | W | 2019 | 000158 |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO |

STATE V.

NIJEER K PARKS

| Original Charge | 7) 2C:29-2A(2) | 8) 2C:29-2B | 9) 2C:17-3A(1) |
|---|---|---|---|
| Amended Charge | | | |

**COMPLAINT - WARRANT**

Page 3 of 13    NJ/CDR2 1/1/2017

PARKS000013

# COMPLAINT – WARRANT (Court Action)

**COMPLAINT NUMBER**

| 1225 | W | 2019 | 000158 |
|---|---|---|---|
| COURT CODE | PREFIX | YEAR | SEQUENCE NO |

**STATE V.**

NIJEER K PARKS

**FTA Bail Information** | Date Bail Set: | Amount Bail Set: $ | by: | ☐ Bail Recog. Attached

| Released on Bail (√) | R.O.R. | Committed Default | Committed w/o Bail | Place Committed: | Date Referred to County Prosecutor: |
|---|---|---|---|---|---|

Date of First Appearance: | ☐ Advised of Rights by _____ | Defendant Desires Counsel: ☐ Yes ☐ No

| Prosecuting Attorney Information | | | | Defense Counsel Information | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name: | | | | Name: | | | | | |
| State | County | Municipal | Other | None | Retained | Public Def | Assigned | Waived | Other |

| | 1) 2C:20-11B(1) | 2) 2C:29-3A(7) | 3) 2C:35-10A(4) |
|---|---|---|---|
| Original Charge | 1) 2C:20-11B(1) | 2) 2C:29-3A(7) | 3) 2C:35-10A(4) |
| Amended Charge | | | |
| Waiver Indt/Jury | | | |
| Plea/Date of Plea | Plea:    Date: | Plea:    Date: | Plea:    Date: |
| Adjudication (* see code) | Finding Code:   Date: | Finding Code:   Date: | Finding Code:   Date: |

| | | Jail time credit | Susp. Imp | | Jail time credit | Susp. Imp | | Jail time credit | Susp. Imp |
|---|---|---|---|---|---|---|---|---|---|
| Jail Term | | | | | | | | | |
| Probation Term | | | Susp. Imp | | | Susp. Imp | | | Susp. Imp |
| Cond. Discharge Term | | | | | | | | | |
| Community Service | | | | | | | | | |
| D/L Suspension Term | | | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Fines/Costs | Fines:  Costs: | Fines:  Costs: | Fines:  Costs: |
| VCCB/SNSF | VCCB:  SNSF: | VCCB:  SNSF: | VCCB:  SNSF: |
| DEDR/Lab Fee | DEDR:  LAB: | DEDR:  LAB: | DEDR:  LAB: |
| CD Fee/Drug Ed Fnd | CD:  DAEF: | CD:  DAEF: | CD:  DAEF: |
| DV Surch/Other Fees | DV:  Other: | DV:  Other: | DV:  Other: |
| Restitution Beneficiary: | | | |

**Miscellaneous Information, Adjournments, Companion Complaints, Co-Defendants, Case Notes:**

**Related Traffic Tickets and Complaints:**

**\* Finding Codes**
1 – Guilty
2 – Not Guilty
3 – Dismissed – Other
4 – Guilty but Merged
5 – Dismissed-Rule
6 – Dismissed Lack of Prosecution
7 – Dismissed – Pros Motion/Vic Req
8 – Conditional Discharge
D – Dismissed- Prosecutor Discretion
M – Dismissed- Mediation
P – Dismissed-Plea Agreement
S – Disposed at Superior
W – Dismissed-False ID

**COMPLAINT - WARRANT (Court Action)**

JUDGE'S SIGNATURE | DATE | Page 4 of 13 | NJ/CDR2 1/1/2017

PARKS000014

# COMPLAINT – WARRANT (Court Action)

| COMPLAINT NUMBER | | | | STATE V. |
|---|---|---|---|---|
| **1225** | **W** | **2019** | **000158** | |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | NIJEER K PARKS |

**FTA Bail Information** | Date Bail Set: | Amount Bail Set: $_____ | by:_____ | ☐ Bail Recog. Attached

| Released on Bail (√) | R.O.R. | Committed Default | Committed w/o Bail | Place Committed: | Date Referred to County Prosecutor: |
|---|---|---|---|---|---|

Date of First Appearance:    ☐ Advised of Rights by _____ .    Defendant Desires Counsel: ☐ Yes ☐ No

| Prosecuting Attorney Information | | | | Defense Counsel Information | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name: | | | | Name: | | | | | |
| State | County | Municipal | Other | None | Retained | Public Def | Assigned | Waived | Other |
| **Original Charge** | 4) 2C:36-2 | | | 5) 2C:29-1A | | | 6) 2C:21-2.1C | | |
| **Amended Charge** | | | | | | | | | |
| **Waiver Indt/Jury** | | | | | | | | | |
| **Plea/Date of Plea** | Plea:   Date: | | | Plea:   Date: | | | Plea:   Date: | | |
| **Adjudication** (* see code) | Finding Code:   Date: | | | Finding Code:   Date: | | | Finding Code:   Date: | | |
| **Jail Term** | | Jail time credit | Susp. Imp | | Jail time credit | Susp. Imp | | Jail time credit | Susp. Imp |
| **Probation Term** | | | Susp. Imp | | | Susp. Imp | | | Susp. Imp |
| **Cond. Discharge Term** | | | | | | | | | |
| **Community Service** | | | | | | | | | |
| **D/L Suspension Term** | | | | | | | | | |
| **Fines/Costs** | Fines:   Costs: | | | Fines:   Costs: | | | Fines:   Costs: | | |
| **VCCB/SNSF** | VCCB:   SNSF: | | | VCCB:   SNSF: | | | VCCB:   SNSF: | | |
| **DEDR/Lab Fee** | DEDR:   LAB: | | | DEDR:   LAB: | | | DEDR:   LAB: | | |
| **CD Fee/Drug Ed Fnd** | CD:   DAEF: | | | CD:   DAEF: | | | CD:   DAEF: | | |
| **DV Surch/Other Fees** | DV:   Other: | | | DV:   Other: | | | DV:   Other: | | |
| **Restitution** Beneficiary:_____ | | | | | | | | | |

**Miscellaneous Information, Adjournments, Companion Complaints, Co-Defendants, Case Notes:**

**Related Traffic Tickets and Complaints:**

* Finding Codes
1 – Guilty
2 – Not Guilty
3 – Dismissed – Other
4 – Guilty but Merged
5 – Dismissed-Rule
6 – Dismissed Lack of Prosecution
7 – Dismissed – Pros Motion/Vic Req
8 – Conditional Discharge
D – Dismissed- Prosecutor Discretion
M – Dismissed- Mediation
P – Dismissed-Plea Agreement
S – Disposed at Superior
W – Dismissed-False ID

JUDGE'S SIGNATURE _____ DATE _____

**COMPLAINT - WARRANT (Court Action)**

Page 8 of 13    NJ/CDR2 1/1/2017

PARKS000015

## COMPLAINT – WARRANT (Court Action)

| COMPLAINT NUMBER | | | | STATE V. |
|---|---|---|---|---|
| **1225** | **W** | **2019** | **000158** | **NIJEER K PARKS** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO | |

**FTA Bail Information** Date Bail Set: | Amount Bail Set: $_____ by:_____ | ☐ Bail Recog. Attached

| Released on Bail (√) | R.O.R. | Committed Default | Committed w/o Bail | Place Committed: | Date Referred to County Prosecutor: |
|---|---|---|---|---|---|

| Date of First Appearance: | ☐ Advised of Rights by_____ | Defendant Desires Counsel: ☐ Yes  ☐ No |
|---|---|---|

| Prosecuting Attorney Information | | | | Defense Counsel Information | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name: | | | | Name: | | | | | |
| State | County | Municipal | Other | None | Retained | Public Def | Assigned | Waived | Other |

| | | | | |
|---|---|---|---|---|
| Original Charge | 7) 2C:29-2A(2) | 8) 2C:29-2B | 9) 2C:17-3A(1) | |
| Amended Charge | | | | |
| Waiver Indt/Jury | | | | |
| Plea/Date of Plea | Plea:        Date: | Plea:        Date: | Plea:        Date: | |
| Adjudication (* see code) | Finding Code:    Date: | Finding Code:    Date: | Finding Code:    Date: | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Jail Term | | Jail time credit | Susp. Imp | Jail time credit | Susp. Imp | Jail time credit | Susp. Imp |
| Probation Term | | | Susp. Imp | | Susp. Imp | | Susp. Imp |
| Cond. Discharge Term | | | | | | |
| Community Service | | | | | | |
| D/L Suspension Term | | | | | | |

| | | | |
|---|---|---|---|
| Fines/Costs | Fines:    Costs: | Fines:    Costs: | Fines:    Costs: |
| VCCB/SNSF | VCCB:    SNSF: | VCCB:    SNSF: | VCCB:    SNSF: |
| DEDR/Lab Fee | DEDR:    LAB: | DEDR:    LAB: | DEDR:    LAB: |
| CD Fee/Drug Ed Fnd | CD:    DAEF: | CD:    DAEF: | CD:    DAEF: |
| DV Surch/Other Fees | DV:    Other: | DV:    Other: | DV:    Other: |
| Restitution Beneficiary:___ | | | |

**Miscellaneous Information, Adjournments, Companion Complaints, Co-Defendants, Case Notes:**

**Related Traffic Tickets and Complaints:**

* Finding Codes
1 – Guilty
2 – Not Guilty
3 – Dismissed – Other
4 – Guilty but Merged
5 – Dismissed-Rule
6 – Dismissed Lack of Prosecution
7 – Dismissed – Pros Motion/Vic Req
8 – Conditional Discharge
D – Dismissed- Prosecutor Discretion
M – Dismissed- Mediation
P – Dismissed-Plea Agreement
S – Disposed at Superior
W – Dismissed-False ID

| | |
|---|---|
| | **COMPLAINT - WARRANT (Court Action)** |
| JUDGE'S SIGNATURE _____ DATE _____ | Page 6 of 13    NJ/CDR2 1/1/2017 |

# COMPLAINT - WARRANT

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| **1225** | **W** | **2019** | **000158** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. |

*THE STATE OF NEW JERSEY*
*VS.*
NIJEER K PARKS

**WOODBRIDGE MUNICIPAL COURT**
**1 MAIN STREET**
**WOODBRIDGE            NJ  07095-0000**
**732-636-6430**      COUNTY OF: **MIDDLESEX**

ADDRESS: **485 E. 19TH ST APT. 3G**

**PATTERSON              NJ  07522-0000**

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 9 | | 19010123 |

COMPLAINANT
NAME:      PTL. A.    LYSZYK

DEFENDANT INFORMATION
SEX: **M**  EYE COLOR: **BROWN**      DOB: **09/11/1987**
DRIVER'S LIC. #. **P06195927209872**              DL STATE: **NJ**
SOCIAL SECURITY #: **xxx-xx-x832**       SBI #:
TELEPHONE #:                       ( )
LIVESCAN PCN #:

By certification or on oath, the complainant says that to the best of his/her knowledge, information and belief the named defendant on or about **01/26/2019** in      **WOODBRIDGE TWP**          , **MIDDLESEX** County, NJ did:
WITHIN THE JURISDICTION OF THIS COURT, COMMIT THE OFFENSE OF SHOPLIFTING SPECIFICALLY BY, TAKING THIRTEEN ASSORTED CANDIES AND TWO CLEAR EYE EYE DROPS (TOTAL VALUE $39.00) FROM THE HAMPTON INN CONCESSION SHELF, CONCEALING THEM IN A BAG, BYPASSING THE REGISTER, WALKING OUT OF THE LOBBY, AND PLACING THEM INSIDE THE VEHICLE HE WAS DRIVING (NY JBD2162) IN AN ATTEMPT TO DEPRIVE HAMPTON INN OF THE FULL RETAIL VALUE OF THE ITEMS.

WITHIN THE JURISDICTION OF THIS COURT, COMMIT THE OFFENSE OF HINDERING SPECIFICALLY BY, GIVING PTL. LEE AND PTL. LYSZYK A FRAUDULENT TENNESSEE DRIVER'S LICENSE, DL # 801527486 JAMAL OWENS DATE OF BIRTH 10-15-1993, THAT CONTAINED HIS PICTURE ON IT IN AN ATTEMPT TO HINDER THE INVESTIGATION.

WITHIN THE JURISDICTION OF THIS COURT, COMMIT THE OFFENSE OF POSSESSION OF MARIJUANA UNDER 50 GRAMS SPECIFICALLY BY, HAVING 44 GRAMS OF SUSPECTED MARIJUANA
**in violation of:**

| Original Charge | 1) **2C:20-11B(1)** | 2) **2C:29-3A(7)** | 3) **2C:35-10A(4)** |
|---|---|---|---|
| Amended Charge | | | |

CERTIFICATION: I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment

Signed:          **PTL. A.    LYSZYK**                    Date: **01/30/2019**

You will be notified of your **Central First Appearance/CJP** date to be held at the Superior Court      in the county of **MIDDLESEX**
at the following address: MIDDLESEX SUPERIOR COURT
**56 PATERSON STREET**                         **NEW BRUNSWICK**      **NJ** 08901-0000
Date of Arrest:        Appearance Date:         Time:         Phone: **732-645-4300**

## PROBABLE CAUSE DETERMINATION AND ISSUANCE OF WARRANT

☐  Probable cause **IS NOT** found for the issuance of this complaint.

_____      _____    _____      _____
Signature of Court Administrator or **Deputy** Court Administrator   Date        Signature of Judge                      Date

☑  Probable cause **IS** found for the issuance of this complaint.  **DAVID    STAHL JUDICIAL OFFICER** 01/30/2019
                                              Signature and Title of Judicial Officer Issuing Warrant        Date
**TO ANY PEACE OFFICER OR OTHER AUTHORIZED PERSON: PURSUANT TO THIS WARRANT YOU ARE HEREBY COMMANDED TO ARREST THE NAMED DEFENDANT AND BRING THAT PERSON FORTHWITH BEFORE THE COURT TO ANSWER THE COMPLAINT.**

Bail Amount Set: _____  by: _____
                                     (if different from judicial officer that issued warrant)

| ☐  **Domestic Violence – Confidential** | ☐  **Related Traffic Tickets or Other Complaints** | ☐  **Serious Personal Injury/ Death Involved** |
|---|---|---|

Special conditions of release:
☐  No phone, mail or other personal contact w/victim
☐  No possession firearms/weapons
☐  Other (specify):

**COMPLAINT - WARRANT (DEFENDANT'S COPY)**

**Page 7  of 13**                  NJ/CDR2 1/1/2017

## COMPLAINT - WARRANT

| COMPLAINT NUMBER | | | | STATE V. |
|---|---|---|---|---|
| **1225** | **W** | **2019** | **000158** | |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | **NIJEER K PARKS** |

HALFWAY IN A BLACK PLASTIC BAG WHICH WAS LOCATED IN HIS LEFT JACKET POCKET.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF POSSESSION OF DRUG PARAPHERNALIA SPECIFICALLY BY, HAVING A MARIJUANA GRINDER, WHICH CONTAINED SUSPECTED MARIJUANA RESIDUE, INSIDE A BLACK PLASTIC BAG THAT WAS LOCATED INSIDE HIS LEFT JACKET POCKET.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF OBSTRUCTING ADMINISTRATION OF LAW SPECIFICALLY BY, RUNNING AWAY FROM PTL. LEE AND PTL. LYSZYK AFTER BEING TOLD THAT HE WAS BEING PLACED UNDER ARREST.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF FALSE GOVERNMENT DOCUMENTS SPECIFICALLY BY, HANDING PTL. LEE AND PTL. LYSZYK A FRAUDULENT TENNESSEE DRIVER'S LICENSE, DL # 801527486 JAMAL OWENS DATE OF BIRTH 10-15-1993, THAT CONTAINED HIS PICTURE ON IT IN AN ATTEMPT TO HINDER THE INVESTIGATION.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF RESISTING ARREST SPECIFICALLY BY, RUNNING AWAY FROM PTL. LEE AND PTL. LYSZYK AFTER BEING TOLD TO STOP RUNNING AND THAT HE WAS UNDER ARREST.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF ELUDING SPECIFICALLY BY, GETTING INTO A VEHICLE, NY JBD2162, AND DRIVING AWAY AT A HIGH RATE OF SPEED IN A BUSY PARKING LOT AFTER HE WAS GIVEN A SIGNAL, VIA VERBAL COMMANDS AND GUNPOINT, TO PLACE HIS VEHICLE IN PARK AND EXITED IT.

WITHIN THE JURISDICTION OF THIS COURT,COMMIT THE OFFENSE OF CRIMINAL MISCHIEF SPECIFICALLY BY, PURPOSELY RAMMING HIS VEHICLE, NY JBD2162, INTO THE BACK OF WOODBRIDGE POLICE PATROL CAR #3, WHICH CAUSED DAMAGE TO THE REAR DRIVER'S SIDE BUMPER.

| Original Charge | 4) **2C:36-2** | 5) **2C:29-1A** | 6) **2C:21-2.1C** |
|---|---|---|---|
| Amended Charge | | | |

COMPLAINT - WARRANT (DEFENDANT'S COPY)

**Page 8 of 13**

NJ/CDR2 1/1/2017

PARKS000018

# COMPLAINT - WARRANT

| | COMPLAINT NUMBER | | | STATE V. |
|---|---|---|---|---|
| **1225** | **W** | **2019** | **000158** | NIJEER K PARKS |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | |

| | | | |
|---|---|---|---|
| Original Charge | 7) 2C:29-2A(2) | 8) 2C:29-2B | 9) 2C:17-3A(1) |
| Amended Charge | | | |

PARKS000019

## COMMITMENT

| | COMPLAINT NUMBER | | | *THE STATE OF NEW JERSEY VS.* |
|---|---|---|---|---|
| **1225** | **W** | **2019** | **000158** | NIJEER K PARKS |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | |

WOODBRIDGE MUNICIPAL COURT
1 MAIN STREET
WOODBRIDGE          NJ  07095-0000
732-636-6430          COUNTY OF: **MIDDLESEX**

ADDRESS :
     485 E. 19TH ST APT. 3G

PATTERSON          NJ 07522-0000

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 9 | | 19010123 |

COMPLAINANT
NAME: PTL. A.     LYSZYK
1 MAIN STREET
ATTN WARRANTS
WOODBRIDGE          NJ  07095

DEFENDANT INFORMATION
SEX: **M**  EYE COLOR: **BROWN**     DOB: 09/11/1987
DRIVER'S LIC. #. P06195927209872          DL STATE: NJ
SOCIAL SECURITY #: xxx-xx-x832     SBI #:
TELEPHONE #:          ( )
LIVESCAN PCN #:

**To any Law Enforcement Official of New Jersey, You are commanded to transport this defendant to the Warden of this county who is required to keep the defendant in custody until a release or detention decision is made.**

| | Offense | Aux Offense | Drug Code | Degree | Offense Description |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

Commitment Reason:

You will be notified of your **Central First Appearance/CJP** date to be held at the Superior Court     in the county of **MIDDLESEX**
at the following address: MIDDLESEX SUPERIOR COURT
**56 PATERSON STREET**

**NEW BRUNSWICK**          NJ 08901-0000

Date of Arrest:          Phone: 732-645-4300

_____          _____
Signature and Title of Judicial Officer Issuing Warrant          Date

## COMMITMENT

Page 10 of 13          NJ/CDR2 1/1/2017

PARKS000020

## Affidavit of Probable Cause

| COMPLAINT NUMBER | | | | *THE STATE OF NEW JERSEY* |
|---|---|---|---|---|

| 1225 | W | 2019 | 000158 |
|---|---|---|---|
| COURT CODE | PREFIX | YEAR | SEQUENCE NO |

*VS.*

**NIJEER K PARKS**

**WOODBRIDGE MUNICIPAL COURT**
**1 MAIN STREET**
**WOODBRIDGE        NJ   07095-0000**
**732-636-6430**        COUNTY OF: **MIDDLESEX**

ADDRESS
      **485 E. 19TH ST APT. 3G**

**PATTERSON                 NJ  07522-0000**

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 9 | | 19010123 |

COMPLAINANT  PTL. A.    LYSZYK
NAME:       1 MAIN STREET
            ATTN WARRANTS
            WOODBRIDGE        NJ   07095

DEFENDANT INFORMATION
SEX: **M**  EYE COLOR: **BROWN**   DOB: 09/11/1987
DRIVER'S LIC. #. **P06195927209872**        DL STATE: **NJ**
SOCIAL SECURITY #: **xxx-xx-x832**   SBI #:
TELEPHONE #:                        (     )
LIVESCAN PCN #:

Purpose: This Affidavit/Certification is to more fully describe the facts of the alleged offense so that a judge or authorized judicial officer may determine probable cause.

1. Description of relevant facts and circumstances which support probable cause that (1) the offense(s) was committed and (2) the defendant is the one who committed it:

While investigating a shoplifting of $39.00 worth of merchandise from Hampton Inn, the hotel manager, Richard Charneco, advised us that Parks was the suspect.Parks told us that he was going to pay for the items, but forgot his money inside his vehicle. He brought the items out to his vehicle, placed them on the seat, and retrieved his money, but did not return to the register to pay for the items. During the investigation, Parks gave us a fraudulent Tennessee driver's license, TN DL# 801527486, with his image on it.  After discovering that the identification was false and he admitted to shoplifting, he was told that he was being placed under arrest. He turned around, placed his hands behind his back, and I was able to see a bag of marijuana protruding from his left jacket pocket that was halfway in a black plastic bag. I removed the bag and went to place the handcuffs on him, but he broke free and began to run from us. He ran around the building and made it back to his rented vehicle, NY JBD2162, placed it in reverse and backed up a few feet. We caught up to the vehicle and ordered him at gunpoint to place the vehicle in park and shut it off. After some time, he placed the vehicle in drive, rammed Woodbridge PD patrol car #3 and the pillar to the carport of Hampton Inn, which caused Ptl. Lee to have to move out of the way to prevent him from being struck. After striking the pillar, he placed the vehicle in reverse and sped off at a high rate of speed through the parking lot after he was signaled to stop and get out of his car. After I returned to the scene, I conducted an inventory of the black plastic bag and discovered the marijuana grinder.

Affidavit of Probable Cause

Page 11 of 13                                    1/1/2017

## Affidavit of Probable Cause

| | COMPLAINT NUMBER | | | THE STATE OF NEW JERSEY |
|---|---|---|---|---|
| **1225** | **W** | **2019** | **000158** | **VS.** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | **NIJEER K PARKS** |

2. I am aware of the facts above because: (Included, but not limited to: your observations, statements of eyewitnesses, defendant's admission, etc.)

Statements that were made by the hotel manager, Charneco, and Parks admitting to taking the items. During the investigation, Parks gave us a fraudulent TN driver's license that had his image on it. When Parks was told he was under arrest, he ended up fleeing by foot, entered his vehicle, NY JBD2162, and rammed Woodbridge PD car #3 and the carport of Hampton Inn. After ramming the carport, he backed the vehicle up ad sped off. He ended up getting away, but we still had his fraudulent TN driver's license on us that contained his image. Det. S. Tapia conducted an investigation and submitted the photograph through the Regional Operation Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC). On Jan. 27, 2019, Det. Tapia received notification from Inv. Seamus Lyons (Rockland County Sheriff's Dept.) and Sgt. Dey (Palisades Interstate Pkwy PD) that they had a high profile comparison to the picture on the fraudulent TN DL. The suspect was identified as Parks.

3. If victim was injured, provide the extent of the injury:

Certification:
I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Signed: ___PTL. A. LYSZYK LAW ENFORCEMENT OFFICER___     Date: ___01/30/2019___

**Affidavit of Probable Cause**

PARKS000022

# Preliminary Law Enforcement Incident Report

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| **1225** | **W** | **2019** | **000158** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO |

*THE STATE OF NEW JERSEY*
*VS.*
**NIJEER K PARKS**

WOODBRIDGE MUNICIPAL COURT
1 MAIN STREET
WOODBRIDGE             NJ  07095-0000
732-636-6430  COUNTY OF: MIDDLESEX

ADDRESS:
485 E. 19TH ST APT. 3G

PATTERSON                    NJ  07522-0000

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 9 | | 19010123 |

COMPLAINANT  PTL. A.    LYSZYK
NAME:        1 MAIN STREET
             ATTN WARRANTS
             WOODBRIDGE        NJ  07095

**DEFENDANT INFORMATION**
SEX: M  EYE COLOR: BROWN      DOB: 09/11/1987
DRIVER'S LIC. #. P06195927209872         DL STATE: NJ
SOCIAL SECURITY #: xxx-xx-x832    SBI #:
TELEPHONE #:                    ( )
LIVESCAN PCN #:

**Purpose:** The Preliminary Law Enforcement Incident Report (PLEIR) is intended to document basic information known to the officer at the time of its preparation. It is recognized that additional relevant information will emerge as an investigation continues. The PLEIR shall be in addition to, not in lieu of, any regular police arrest, incident, or investigation reports. Note that the PLEIR is specific to each defendant charged in an investigation.

-The complaining officer personally observed the offense.

-Another law enforcement officer(s) personally observed the offense, List the officer(s) and their badge#
  Ptl. Lee 591

-The charge was based on the observations/statements made by an eyewitness(es).
      •The witness statement(s) were recorded via:
           *Dash Camera/MVR/DIVR

-The defendant made statements/admissions.
      •It was recorded using:
           *Dash Camera/MVR/DIVR

-The offense/incident was recorded using electronic/surveillance via:
      •Dash Camera/MVR/DIVR
      •Surveillance Camera

-Identification procedures were used by utilizing:
      •Other/Explain facial recognition

-Physical evidence was seized/recovered:
      •CDS:
           *Marijuana
      •Drug Paraphernalia

-The defendant fled, attempted flight, or resisted arrest.

           •Foot pursuit
           •Other Explain sped off in vehicle

-The defendant operated a motor vehicle in a manner that endangered public safety.

-The case involves CDS and the evidence was recovered via:
      •Pedestrian Stop

**Certification:**
I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Signed:  **PTL. A.    LYSZYK LAW ENFORCEMENT OFFICER**        Date:  01/30/2019

| | |
|---|---|
| | **Preliminary Law Enforcement Incident Report** |
| | **Page 13 of 13**                    7/20/2016 |

# EXHIBIT "P"

Rental Record: **183932744**   **CORPORATE**   **Brand: ZE**   **Own:**   (Press CTRL+P to Print)

## CUSTOMER INFORMATION

NAME: OWENS JAMAL

SVC:                GUAR:

HOME: 3505 GLENGARRY CT

KNOXVILLE              TN 37921

BUS:

3505 GLENGARRY CT

KNOXVILLE              TN 37921

HM PH: 6159885769

DL: 9C17*****        ST: NJ

BD: 04/1992

## RENT/RETURN INFORMATION

RENT:   12/28/2018 15:28 NJWOD01 05911-01

RETURN: 01/25/2019 17:00 NJWOD01 05911-01

DUE:    01/25/2019 17:00 NJWOD01 05911-01

EXP RN: Y

CLS CHNG: S     ARR:FLT N     ARR:BUS N

## RESERVATION INFORMATION

RES#: H8942764407   REF: 00318496

RES CLS: F        BK: 12/28/2018 15:20

CTRY: USA

REM:   EXCH NJWOD 0591101 010819 1731

6674345 22283 PREF

## TOTALS

| | | | |
|---|---|---|---|
| WEEKS | 4 @ | 205.00 | 820.00 |
| EX HOUR | 2 @ | 13.74 | 27.48 |
| EX DAY | @ | 41.00 | |

SUBTOTAL                    847.48

VEH UPG TTL        @ $ 44 DY   1276.00

SUBTOTAL                   2123.48

% TRANSACTION FEE            15.71

CONCESSION FEE RECOVERY     213.92

## FORM OF PAYMENT INFORMATION

FP:  MC   XXXXXXXXXXXX1745    EX: 02/2021

FFP: MC   XXXXXXXXXXXX1745    EX: 02/2021

AUTH 1: 44866P CC APP:$  935.00 DT: 12/28

AUTH 2: DENIED CC APP:$   98.00 DT: 01/26

## USER/DRB INFORMATION

REV MGT USER:    1989/0591101

RENT USER/LOC:   1589/NJWOD01

RETURN USER/LOC: 7456/NJWOD01

LAST PT USER/LOC: 7456/NJWOD01

LAST PN USER/LOC:      /

# COPIES RNT: 1  # COPIES RTN: 1

RENT DT/TM POSTED:    12/28/2018 15:31

RETURN DT/TM POSTED:  01/26/2019 11:49

LAST DT/TM POSTED (CST): 01/26/2019 10:49

GDRB DATE: 01/26/2019

DRB AREA/LOC: 05911-01

RR STATUS: T

EXCHANGE: E

## VEHICLE/FUEL INFORMATION

OWN/VEHICLE: 01998/9199635  MODEL: N1CR

YEAR: 2018  LIC: JBD2162    STATE: NY

VCLS: V4  COLOR: SIL

NEVERLOST: N  SATRAD: Y  PRESTIGE: N

FUEL: 9.99 GL    .624 MI   TK CAP: 18.5

MI IN: 13568        FUEL IN: 4

MI OUT: 12568       FUEL OUT: 4

## CDP/RATE/MILEAGE

## CUSTOMER SATISFACTION

| | | |
|---|---|---|
| LDW | @ | 29.99 |
| LIS | @ | 18.85 |
| P&P | @ | 6.95 |
| PERS | @ | 8.99 |

## ADDITIONAL EQUIPMENT

RT RN CHG  DAY  WEEK  MONTH REPLACE

RT CDP: 99         RN CDP: 99

PLAN IN: OAUW8  OUT: OAUW8  ORIG: OAUW5

BEST: Y RCLS: F   UCLS: V4  MIN DAY: 7

LDW: N  LIS: N S  P&P: N  B/L: L

DRIVEN: 1000

VDI: X

SATRAD:N

TAX SUBTOTAL                2353.11

TAX           @   06625     155.89

TOTAL CHARGES              2509.00

## TOUR INFORMATION

DOM SEC FEE                 140 00

NET DUE                    2649.00

Rental Record: **183932744**   **CORPORATE**   **Brand:** ZE   **Own:**   (Press CTRL+P to Print)

**VEHICLE EXCHANGE 1**

VEHEXCHG: NJWOD01  01/08/2019 17:31

OWN/VEHICLE: 01894/6674345 DRIVEN: 271
ORIG RENT LOC: NJWOD01
VEH ON SITE? Y

**VEHICLE EXCHANGE 2**

**VEHICLE EXCHANGE 3**

**VEHICLE EXCHANGE 4**

Rental Record: **199993216**   **CORPORATE**   **Brand: ZE**   Own:   (Press CTRL+P to Print)

## CUSTOMER INFORMATION

NAME: OWENS JAMAL
   SVC:   GUAR:
HOME: 765 OAKDELL AVE
MADISON   TN 37115
BUS:
765 OAKDELL AVE
MADISON   TN 37115
   HM PH: 6159885769
DL: 801527486   ST: TN
BD: 10/1993   PR MAIL: H

## RENT/RETURN INFORMATION

RENT:   01/26/2019 12:07 NJWOD01 05911-01

DUE:   01/30/2019 04:00 NJWOD01 05911-01

CLS CHNG: S   ARR:FLT N   ARR:BUS N

## RESERVATION INFORMATION

RES#: H9213640841   REF: 00318496
RES CLS: F   BK: 01/24/2019 23:57
CTRY: USA

## TOTALS

| | | | |
|---|---|---|---|
| DAYS | 3 @ | 32.04 | |
| EX HOUR | @ | 10.89 | |
| EX DAY | 1 @ | 67.04 | |

## FORM OF PAYMENT INFORMATION

FP: MC   XXXXXXXXXXXX1061   EX: 02/2020

AUTH 1: 03153P CC APP:S  744.00 DT: 01/26

## USER/DRB INFORMATION

REV MGT USER:   7456/0591101
RENT USER/LOC:   7456/NJWOD01
RETURN USER/LOC:   /
LAST PT USER/LOC:   /
LAST PN USER/LOC   /
# COPIES RNT: 1
RENT DT/TM POSTED:   01/26/2019 12:07

LAST DT/TM POSTED (CST): 01/26/2019 11:07

DRB AREA/LOC:   -00
   RR STATUS: O

VEH UPG TTL   @ $ 70 DY   280.00

% TRANSACTION FEE   3.28

## VEHICLE/FUEL INFORMATION

OWN/VEHICLE: 01998/9199639   MODEL: N1CR
YEAR: 2018  LIC: JBD2162   STATE: NY
VCLS: V4  COLOR: SIL
NEVERLOST: N  SATRAD: Y  PRESTIGE: N
FUEL: 9.93 GL   .624 MI  TK CAP: 19.5

MI OUT: 1358   FUEL OUT: 8

## CDP/RATE/MILEAGE

## CUSTOMER SATISFACTION

| | | |
|---|---|---|
| LDW | @ | 29.99 |
| LIS | @ | 18.85 |
| P&P | @ | 6.95 |
| PERS | @ | 8.99 |

## ADDITIONAL EQUIPMENT

RT CDP: 99   RN CDP: 99
PLAN IN:   OUT: OAUE3  ORIG: OAUE3
   RCLS: F  UCLS: V4  MIN DAY: 3
LDW: N   LIS: N S   P&P: N   B/L: L

   RT RN CHG  DAY  WEEK  MONTH REPLACE

TAX   @   .06625

SATRAD:N

## TOUR INFORMATION

PARKS000026

# EXHIBIT "Q"

## Aggravated Assault on Police / Attempt to I.D.

Sent:  2019-01-27 @ 11:12          Case: 19010123          Author:  481





| Fake Tennessy D.L / with the suspect's picture | 2018 Dodge Challenger / Hertz rental |

On Saturday January 26,2019,  The suspect depicted above presented the above fake Tennessee D.L. at the Hertz rental car located within the Hampton Inn Hotel on Rt. 9 No. in Woodbridge.  When he was confronted by patrol officers, he ran into the above 2018 Dodge Challenger and rammed into the patrol officer's marked police vehicle and nearly struck the officer.  The vehicle was located unoccupied nearby but the suspect got away. Inside of the vehicle, we located a Dunkin Donuts receipt from earlier in the morning. The Dunkin Donuts is located on Gun Hill Rd. Bronx, NY.  The picture on the D.L. is of the suspect but the other identifiers are false. Anyone who can identify the suspect or requires further information, please contact Det. Tapia at (732) 602-7394 or (732) 675-2555.



**EXHIBIT**
Lyons-1
9/28/23

---

## WOODBRIDGE TOWNSHIP POLICE
### (732) 634-7700

# Side By Side Comparison

 

| | |
|---|---|
| **EVENT#:** | **29000591** |
| **SID#:** | **742831D** |
| **NAME:** | **NIJEER PARKS** |
| | |
| **ARREST DATE:** | |
| **AGE AT ARREST:** | **28** |
| **HEIGHT:** | **508** |
| **WEIGHT:** | **150** |
| **HAIR COLOR:** | **BLACK** |
| **EYE COLOR:** | **BROWN** |

MUGSHOT PROFILE



# NY/NJ HIDTA
## MUGSHOT PROFILE

Photo Ref #:    29000591



| | |
|---|---|
| NAME: | **PARKS, NIJEER K** |
| AKA: | |
| SSN: | |
| SID#: | **742831D** |
| FBI#: | |
| USMS#: | |
| | |
| DOB: | **09-11-1987** |
| SEX: | **MALE** |
| RACE: | **BLACK** |
| HEIGHT: | **508** |
| WEIGHT: | **150** |
| HAIR COLOR: | **BLACK** |
| HAIR LENGTH: | |
| EYE COLOR: | **BROWN** |
| SMT: | |
| | |
| ADDRESS: | |
| | **0** |
| | |
| PHONE: | |
| | |
| ARREST#: | **160804000631** |
| ARREST DATE: | |
| AGENCY: | **NJSP** |
| CHARGE CODE: | |
| CHARGE DESC: | |

HIDTA          CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY          1/28/19

MUGSHOT PROFILE



# NY/NJ HIDTA
## MUGSHOT PROFILE

Photo Ref #:   **29000101**



| | |
|---|---|
| NAME: | **PARKS, NIJEER K** |
| AKA: | |
| SSN: | |
| SID#: | **742831D** |
| FBI#: | |
| USMS#: | |
| | |
| DOB: | **09-11-1987** |
| SEX: | **MALE** |
| RACE: | **BLACK** |
| HEIGHT: | **507** |
| WEIGHT: | **150** |
| HAIR COLOR: | **BLACK** |
| HAIR LENGTH: | |
| EYE COLOR: | **BROWN** |
| SMT: | |
| | |
| ADDRESS: | **240 DONOR AVE** |
| | **ELMWOOD PK, NEW JERSEY** |
| | **0** |
| | |
| PHONE: | |
| | |
| ARREST#: | **160804010919** |
| ARREST DATE: | **02-24-2011** |
| AGENCY: | **NJSP** |
| CHARGE CODE: | **2C:35-10A(1)** |
| CHARGE DESC: | |

HIDTA                CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY                1/28/19

III/FBI/State Delayed Response

## Additional Inquiry Response

### ORI: NY043013Y

**Rockland County Intelligence Center**

New York State Division of Criminal Justice Services
Alfred E. Smith Building, 80 South Swan St.
Albany, New York 12210. Tel:1-800-262-DCJS
Michael C.Green, Executive Deputy Commissioner of the NYS Division of Criminal Justice Services

**● III Information**

The following information is provided in response to your request for a search of the III based on:

| | |
|---|---|
| **Name:** | PARKS, NIJEER |
| **Sex:** | Male |
| **Race:** | Black |
| **Date of Birth:** | September 11, 1987 |
| **Purpose Code:** | C |

```
NY043013Y
THIS NCIC INTERSTATE IDENTIFICATION INDEX RESPONSE IS THE RESULT OF YOUR
INQUIRY ON NAM/PARKS,NIJEER K DOB/19870911 SEX/M RAC/B PUR/C ATN/LYONSSI
NAME                          FBI NO.          INQUIRY DATE
PARKS,NIJEER                  534795PC0        2019/01/28

SEX RACE BIRTH DATE  HEIGHT WEIGHT EYES HAIR PHOTO
M   B    1987/09/11  507    145    BRO  BLK  Y

BIRTH PLACE
NEW JERSEY

FINGERPRINT CLASS       PATTERN CLASS

ALIAS NAMES
PARKS,NIJEER K                  PARKS,NIJER K

SCARS-MARKS-
TATTOOS         SOCIAL SECURITY
ART R ARM       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

IDENTIFICATION DATA UPDATED 2018/04/13

THE CRIMINAL HISTORY RECORD IS MAINTAINED AND AVAILABLE FROM THE
FOLLOWING:
 NEW JERSEY     - STATE ID/NJ742831D

THE RECORD(S) CAN BE OBTAINED THROUGH THE INTERSTATE IDENTIFICATION
INDEX BY USING THE APPROPRIATE NCIC TRANSACTION.

END
```

## Additional Inquiry Response
### ORI: NY043013Y
### Rockland County Intelligence Center

New York State Division of Criminal Justice Services
Alfred E. Smith Building, 80 South Swan St.
Albany, New York 12210. Tel:1-800-262-DCJS
Michael C.Green, Executive Deputy Commissioner of the NYS Division of Criminal Justice Services

**○ Federal NCIC** 

**WARNING:** Release of any NCIC information to unauthorized individuals or agencies,including the subject of the data, is prohibited. Please refer to section 4.2 of the CJIS security policy and Title 28, Part 20 of the code of Federal Regulations for the proper access, use, and dissemination of the information contained in the NCIC restricted and non-restricted files.

**The following information is provided in response to your request for a search of the NCIC - Protection Order File based on:**

| | |
|---|---|
| Name: | PARKS, NIJEER |
| Sex: | Male |
| Race: | Black |
| Date of Birth: | September 11, 1987 |

NY043013Y

NO NCIC PROTECTION ORDER FILE RECORD NAM/PARKS,NIJEER K DOB/19870911 RAC/B SEX/M







| | | | |
|---|---|---|---|
| PARKS, NIJEER K | 09/XX/1987 31 | 694 E 24TH ST PATERSON NJ 07504 | 02/29/2016 |
| PARKS, NIJEER K | 09/XX/1987 31 | 425 E 28TH ST APT 1E PATERSON NJ 07514 | 03/04/2013 |
| PARKS, NIJEER 148-82-XXXX | | 400 ELLISON ST APT 2 PATERSON NJ 07501 | 06/30/2016 |
| PARKS, NIJEER | 09/XX/1987 31 | 694 E 24TH ST PATERSON NJ 07504 | 02/29/2016 |

# EXHIBIT "R"

VEHICLE PROPERTY DESCRIPTION REPORT (SHORT FORM)

| 1. DEPARTMENT | 2. ORI NO. | 3. DEPT. CASE NO. | 4. PROS. CASE NO. | 5. INCIDENT NO. |
|---|---|---|---|---|
| Woodbridge | NJ0122500 | | | 19010123 |

| 6. VICTIM NO. OF VICTIMS | 7. OWNERS NAME (LAST, FIRST, MIDDLE) | 8. PHONE (AREA) |
|---|---|---|
| 1 of 2 | Woodbridge Police Dept. | 7326347700- |

| 9. OWNERS ADDRESS (STREET, MUN., STATE, ZIP) | 10. DATE OF LOSS (MM/DD/YY) |
|---|---|
| 1 Main St Woodbridge NJ 07095 | - |

| 11. LOCATION OF LOSS (STREET, MUN., STATE, ZIP) | 12. N.C.I.C. NO. |
|---|---|
| | - |

| 13. FINDER/POSSESSORS NAME (LAST, FIRST, MIDDLE) | 14. PHONE (AREA) | 15. DATE N.C.I.C. CANCELLED |
|---|---|---|
| Woodbridge Police Dept. | 732-634-7700 | - |

| 16. FINDER/POSSESSORS ADDRESS (STREET, MUN., STATE, ZIP) | 17. TELETYPE NO. |
|---|---|
| 1 Main St Woodbridge NJ 07095 | - |

| 18. LOCATION OF RECOVERY/SEIZURE (STREET, MUN., STATE, ZIP) | 19. DATE OF RECOVERY/SEIZURE |
|---|---|
| 370 US HWY 9N | 01/26/2019 |

| 20. YEAR | 21. MAKE | 22. MODEL | 23. BODY TYPE | 24. COLOR | 25. REGISTRATION NO. | STATE | 26. V.I.N. / OTHER IDENTIFYING NO. |
|---|---|---|---|---|---|---|---|
| - | - | - | - | - | - | - | - |

| 27. LOCATION OF IMPOUND / STORAGE | 28. DATE OF STORAGE | 29. CONDITION OF VEHICLE |
|---|---|---|
| Woodbridge Police Evidence | 2-4-2019 | - |

PROPERTY DESCRIPTION CODE TABLE (ENTER NUMBER IN CODE COLUMN BELOW)

| PROPERTY DESCRIPTION CODE TABLE | | | PROPERTY STATUS |
|---|---|---|---|
| 1. AIRCRAFT | 14. GAMBLING EQUIPMENT | 26. RADIO / TV / VCR | 50. CRACK |
| 2. ALCOHOL | 15. HEAVY CONST. / INDUST. EQUIP | 27. RECORDINGS-AUDIO / VISUAL | 51. OTHER COCAINE / 1. STOLEN |
| 3. AUTOMOBILE | 16. HOUSEHOLD GOODS | 28. RECREATIONAL VEHICLES | 52. HASHISH / 2. LOST |
| 4. BICYCLE | 17. JEWELRY / PRECIOUS METALS | 29. STRUCT-SINGLE OCCUPANCY | 53. HEROIN / 3. FOUND |
| 5. BUS | 18. LIVESTOCK | 30. STRUCT-OTHER DWELLING | 54. MARIJUANA / 4. SEIZED |
| 6. CLOTHING / FURS | 19. MERCHANDISE | 31. STRUCT-COMM / BUSINESS | 55. MORPHINE / 5. RECOVERED |
| 7. COMPUTER HARD. / SOFT. | 20. MONEY | 32. STRUCT-INDUST. / MANUFACT. | 56. OPIUM / 6. BURNED |
| 8. CONSUMABLE GOODS | 21. NEGOTIABLE INSTRUMENT | 33. STRUCT-PUBLIC / COMMUNITY | 57. OTHER NARCOTICS / 7. DAMAGED / DESTROYED |
| 9. CREDIT / DEBIT CARDS | 22. NON-NEGOTIABLE INST. | 34. STRUCT-STORAGE | 58. LSD / 8. SAFEKEEPING |
| 10. DRUGS / NARCOTIC EQUIP. | 23. OFFICE EQUIPMENT | 35. STRUCT-OTHER | 59. PCP / 9. COUNTERFEITED |
| 11. FARM EQUIPMENT | 24. OTHER MOTOR VEHICLE | 36. TOOLS | 60. OTHER HALLUCINOGENS / DISPOSITION |
| 12. FIREARMS | 25. PURSE / HANDBAG / WALLET | 37. TRUCK | 61. AMPHETAMINES / METH / 1. RETURNED |
| 13. FIREARMS | | 38. VEHICLE PARTS / ACC | 62. OTHER STIMULANTS / 2. HELD AS EVIDENCE |

| UNIT OF MEAS. | GM-GRAM / KG-KILOGRAM / OZ-OUNCE | LB-POUND / ML-MILLILITER / LT-LITER | FO-FLUID OUNCE / GL-GALLON / DU-DOSAGE UNIT | NP-NUMBER OF PLANTS / EA-EACH | 39. WATERCRAFT | 63. BARBITURATES / 3. OTHER HELD |
|---|---|---|---|---|---|---|
| | | | | | 77. OTHER | 64. OTHER DEPRESSANTS / 4. OWNER KNOWN |
| | | | | | | 65. OTHER DRUGS / 5. DESTROYED |
| | | | | | | 66. UNKNOWN DRUG / 6. AUCTIONED |

| 30. ITEM NO. | 31. PROP CODE | 32. PROP. STATUS | 33. ESTIMATED QUANTITY | 34. UNIT OF MEAS. | 35. DESCRIPTION / O.A.N. | 36. SERIAL NUMBER | 37. ESTIMATE VALUE | 38. DISPOSITION OF ITEM |
|---|---|---|---|---|---|---|---|---|
| 1 | 8 | 5 | 1 | EA | 1st Nestle Pure Life water, recovered from garbage can labled JMQ4 | | | 2 |
| 2 | 6 | 5 | 1 | EA | Nike Air Jorden Sneaker belonging to unk suspect, Blk grey and red, Labled JMQ5 | | | 2 |
| 3 | 8 | 5 | 1 | EA | 2st Nestle Pure Life water, recovered from suspects property labled JMQ6 | | | 2 |
| 4 | 77 | 5 | 1 | EA | "The Kind Pen" Vape Pen suspected THC recovered in vehicle, labled JMQ7 | | | 2 |
| | | | | | The listed property was recovered and a DNA &THC test will be requested | | | |
| | | | | | ------------Nothing Follows------------ | | | |

| TOTAL VALUE STOLEN PROPERTY | 39. CURRENCY | 40. JEWELRY | 41. FURS | 42. CLOTHING | 43. AUTO | 44. MISCELLANEOUS |
|---|---|---|---|---|---|---|
| | - | - | - | - | - | - |

| 45. PRINT RANK / OFF. NAME | SIGNATURE | 46. BADGE NO. | 47. REPORT DATE | 48. PAGE NO. | 49. REVIEWED BY |
|---|---|---|---|---|---|
| Det. J. Quesada | Det. Jose Quesada 525 | 525 | 2-4-2019 | 1 of 1 | 472 |

CHAIN OF CUSTODY

| 50. ITEM NO. | 51. DATE | 52. | | 53. | | 54. PURPOSE FOR CHANGE OF CUSTODY/ PROOF OF OWNERSHIP |
|---|---|---|---|---|---|---|
| | | SIGNATURE | BADGE NUMBER | RECEIVED BY | | |
| | | AUTHORIZED FOR RELEASE | | PRINT NAME | | |
| | | RELEASED BY | | SIGNATURE | | |
| | | AUTHORIZED FOR RELEASE | | PRINT NAME | | |
| | | RELEASED BY | | SIGNATURE | | |
| | | AUTHORIZED FOR RELEASE | | PRINT NAME | | |
| | | RELEASED BY | | SIGNATURE | | |

DCJ 2/91

O /VEH_PROP_SHORTFORM_RPT

WHITE – TO RECORD ROOM        YELLOW – TO DETECTIVE BUREAU        PINK – TO PROSECUTORS OFFICE        GOLDENROD – TO        PR1

# EXHIBIT "S"

## MIRANDA WARNINGS

1. You have the right to remain silent.

2. Anything you say can be used against you in a court of law.

3. You have the right to talk to a lawyer and to have the lawyer present with you while you are being questioned.

4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.

5. You can decide to exercise these rights at any time.

**I ACKNOWLEDGE THAT I HAVE BEEN ADVISED OF AND UNDERSTAND THE CONSTITUTIONAL RIGHTS FOUND ON THE REVERSE SIDE OF THIS CARD.**

**I VOLUNTARILY WAIVE THESE RIGHTS AND I AGREE TO SPEAK WITH YOU NOW.**

Print Name _Nijeer Parks_

Signature _Nijeer Parks_

Date _2-5-19_     Time _12:00pm_

Witness _____

Incident No. _19010123_

WPD-109 (10-18)

# EXHIBIT "T"

Reset Form



**FACIAL RECOGNITION INITIATIVE**
## Request for Facial Recognition/Photo Array

*If the NJ ROIC Facial Recognition Initiative produces a possible match, this should only be considered an investigative lead. Further investigation is needed to confirm a possible match through other investigative corroborated information and/or evidence.*
***INVESTIGATIVE LEAD, NOT PROBABLE CAUSE TO MAKE AN ARREST.***

Please submit this form by email to: frlab@mvc.nj.gov. For questions or additional information, contact NJ ROIC Analysis at (609) 963-6900, ext. 6240, 6246, 6282, 6969, and 6277.

| Date: **January 27, 2019** | Agency: **Woodbridge Police Department** | |
|---|---|---|
| Requestor: **Det. Santiago Tapia #481** | | Title: **Detective** |
| Email: **santiago.tapia@twp.woodbridge.nj.us** | Telephone: **(732) 675-2555** | Fax: **(732) 634-2554** |
| Jurisdiction: **Middlesex County** | Case Number: **19010123** | ORI Number: **nj0122500** |
| Supervisor Name **Lt. Michael NG** | Email: **Michael.ng@twp.woodbridge.nj.us** | Telephone: **(732) 634-7319** |

### Suspect *(If known)*:

| Name: **unknown** | Alias(es) **Jamal Owens** | |
|---|---|---|
| Date of Birth **unknown** | Race: **Black** | Gender: **Male** |

**Reason for Request:**
*Please be specific, and include any scars, marks, tattoos, blemishes, or other distinguishing characteristics that your subject may have.*
**Individual presented Woodbridge officers a fake Tennessee drivers license with his picture on it. When officers confronted him, he attempted to run over the officer with his vehicle, struck the rear of the police car and the side of a building before fleeing the scene. The vehicle was later recovered unoccupied. Inside of the vehicle we found evidence suggesting that he may be from the Bronx NY. I attached a copy of the fake drivers license. The officers are certain the picture on the drivers license is of the suspect.  Can you check both NY and NJ database? I attached a copy of the fake drivers license.**

*For best results, please attach the image(s) separately in jpg format.*

| *For NJ ROIC Use Only* |
|---|
| MPTL #: |

S.P. 383 (Rev. 06/17)

PARKS000091

# EXHIBIT "U"

**Parks v. Woodbridge Twsp.**                    **222103**                    **Page 1**

September 26, 2023

Garry J. Clemente, Esq.
James P. Nolan & Assoc. LLC
61 Green Street,
Woodbridge Township, NJ, 07095

               **Re:**   **Nijeer Parks v. Woodbridge Township, et al.**
                     **United States District Court, District of New Jersey**
                     **Civil Action No: 2:21-cv-04021 MCA LDW**
                     **Date of Incident: January 26, 2019**
                     **My File No: 222103**

Dear Mr. Clemente:

Pursuant to your request, I have reviewed the following materials and conducted a site inspection on February 18, 2023 related to the above-titled matter:

1.     Plaintiffs' Complaints;
2.     Woodbridge Police Department Incident Reports #19010123;
3.     Woodbridge Police Department Training records of Lt. Edward Barrett, Lt. Joseph Velez, Lt. Michael Ng, D/Sgt. Anthony Penicaro, D/Sgt. Andrew Kondracki, Sgt. Santiago Tapia, Det. Jorge Quesada, Off. Andrew Lyszyk, Off. Francis Lee, & Off. David Mirdala;
4.     New Jersey Police Training Commission Performance Objectives;
5.     New Jersey Attorney General Guidelines;
6.     New Jersey Criminal Law;
7.     Woodbridge PD, Professional Standards Bureau IA Unit 2021-501 file;
8.     Woodbridge Police Department Rules and Regulations;
9.     Woodbridge PD Internal Affairs Policy & Procedures Revised November and the Attorney General August 2020 Version;
10.    Woodbridge Police Department Policies & Procedures # 430, 431,432, 620;
11.    New Jersey Uniform Crime Report;
12.    Plaintiff discovery Responses;
13.    Woodbridge Discovery Responses;

**Parks v. Woodbridge Twsp.**                    222103                         **Page 2**

14.    Deposition Transcript of Nijeer Parks;
15.    Deposition Transcript of Officer Lee;
16.    Deposition Transcript of Detective Tapia;
15.    Deposition Transcript of Officer Lyszyk;
17.    Deposition Transcript of Detective Quesada;
18.    Deposition Transcript of Director Robert Hubner;
19.    Woodbridge Township eCode;
20.    U.S. Department of Homeland Security, Bureau of Justice Assistance, U.S. Department of Justice, Face Recognition Policy Development Template, December 2017;
21.    U.S. Department of Justice, National Institute of Justice, Strengthen Science, Advance Justice, History of NIJ Support for Face Recognition Technology, March 5, 2020;
22.    U.S. Department of Commerce, National Institute of Standards and Technology, Facial Recognition Technology, February 6, 2020;
23.    New Jersey State Police Practical Guide to Intelligence-led Policing, The New Jersey Regional Operations and Intelligence Center (ROIC) Task Force;
24.    The IJIIS & IACP Guiding Principles for Law Enforcement Use of Facial Recognition Technology July 2019;
25.    Security Industry.org / center-of-excellence/ What Science Really Says About Facial Recognition Accuracy and Bias Concerns;
26.    Deposition Transcript of Lt. Barrett;
27.    Report of Ralph Cilento - Blue Top Consulting.

It is my professional opinion based on the available information received to date, that the Township of Woodbridge, the Woodbridge Township Police Department and its members, including Police Director Hubner and Police Officers, Lt. E. Barrett, Lt. J. Velez, Lt. M. Ng,  D/Sgt. Anthony Penicaro, D/Sgt. Andrew Kondracki, Sgt. Santiago Tapia,  Det. Jorge Quesada, Off. Andrew Lyszyk, Off. Francis Lee, & Off. David Mirdala, involved with this incident of January 26, 2019, acted in a professional manner, in accordance with accepted New Jersey Training Standards, accepted New Jersey Police Practices and Procedures, New Jersey Attorney General Guidelines, Woodbridge Township Police Department Rules, Regulations and Procedures, and New Jersey Law. My opinions are based on a reasonable degree of certainty in the field of law enforcement and the following:

My thirty-year law enforcement career with the New Jersey State Police, and the training and experience I received while a member.

I attained the rank of Major and became a Staff Officer participating in the policy making and command decisions of the organization.

- My Designation as a Certified Public Manager (CPM) by the State of New Jersey and Rutgers University in November of 1984. CPM is part of a national effort to develop effective management skills through training and education of supervisors and managers in State and local safety community. CPM is a  certification program for public sector managers and supervisors to maintain and improve the effectiveness

Parks v. Woodbridge Twsp.                 222103                    Page 3

and professionalism of government mangers.

- The degree of Associate in Science (Criminal Justice) from the Mercer County Community College in May of 1982.

- Having gone through the hiring process to become a law enforcement officer; having been a part of the investigating process to become a law enforcement officer; and having been the officer-in-charge of the oral interview board in the process of hiring law enforcement officers for the New Jersey State Police, I am very familiar with the hiring process.

- As the Captain of the New Jersey State Police Narcotic Bureau and Major of the Emergency Management Section and Deputy State Director of the Office of Emergency Management, I established positions and developed the criteria for promotion of enlisted and civilian personnel under my command.

- As the Captain of the New Jersey State Police, I prepared an annual budget for the Narcotic Bureau. As Major of the New Jersey State Police Emergency Management Section and Deputy State Director of the Office of Emergency Management, my responsibility included receiving and disbursing funding from the Federal Emergency Management Agency and the New Jersey Radiological Emergency Response Program.

- As a supervisor in the New Jersey State Police I participated in the disciplinary procedures and policies of bringing charges against my subordinates. I also served as a hearing officer in court-martials. As a Major and Staff Officer I was a Hearing Officer in General Court martials with the authority to recommend suspension upon a finding of guilty.

- September, 1990 Retired from the New Jersey State Police and formed J.C. Consulting Services, Inc. as a New Jersey licensed Private Detective, and consultant. On November 8, 1990, founding partner of Triangle IV Enterprises, a private investigations business. Founding partner of Planned Building Security, Inc., a uniformed security and guard business.

## Township of Woodbridge Demographics

The New Jersey 2016 Uniform Crime Report list the Township of Woodbridge as an Urban Suburban area of 23.10 square miles, with an estimated population of 102,105 with 184 sworn police employees and 62 civilian employees.

- URBAN SUBURBAN Near an urban center but not as extremely developed and more residential areas.

Parks v. Woodbridge Twsp.                    222103                    Page 4

**Township of Woodbridge Police Department Enabling Ordinance**

POLICE DEPARTMENT RULES AND REGULATIONS: TOWNSHIP ORDINANCE
"CREATION AND ESTABLISHMENT OF A POLICE DEPARTMENT AND A BUREAU OF
EMERGENCY MANAGEMENT WITHIN THE TOWNSHIP OF WOODBRIDGE"
ORDINANCE NO. 98-92

TOWNSHIP OF WOODBRIDGE
COUNTY OF MIDDLESEX
STATE OF NEW JERSEY

AN ORDINANCE AMENDING, REVISING AND SUPPLEMENTING THE TOWNSHIP CODE
OF THE TOWNSHIP OF WOODBRIDGE AS TO THE ESTABLISHMENT OF A POLICE
DEPARTMENT AND A BUREAU OF EMERGENCY MANAGEMENT

WHEREAS, the Township of Woodbridge previously adopted as Article 11 of the code of the
Township of Woodbridge an ordinance creating and governing a police department within the
Township; and,

WHEREAS, the Department is presently engaged in a process of departmental accreditation through
the Commission On Accreditation For Law Enforcement Agencies (CALEA); and,

WHEREAS, the Township of Woodbridge desires to bring its enabling ordinance into conformity
with the national accreditation standards and state statutes;

NOW THEREFORE, BE IT ORDAINED by the Township Council of the Township of Woodbridge
that the Township Code of the Township of Woodbridge be amended, revised and supplemented as
follows:

Section I:      Article 11 of the Code of the Township of Woodbridge be hereby repealed in its
entirety.

Section 2: There is hereby created, ratified and adopted a new Article to be entitled "Department of
Police" and to read as follows:

Section 1.    The ordinances of the Township of Woodbridge in the County of Middlesex, State of
New Jersey, of a general and permanent nature, as codified, Chapters I to XXXV hereby ordained
and shall be adopted as "The Revised General Ordinances of the Township of Woodbridge, 1996."

Article XI, Police Department provides in relevant part:

2-18  POLICE DEPARTMENT.

PARKS000196

**Parks v. Woodbridge Twsp.**          **222103**          **Page 5**

2-18.1   Establishment; Personnel.
There is hereby established in the Township of Woodbridge a Police Department which shall consist of such members and employees as deemed necessary by the Appointing Authority and may include a Police Director, Deputy Police Director, and/or a Chief of Police. (N.J.S.A. 40A:14-118) (Ord. #98-92 § 2; Ord. #11-10 § 1; Ord. #11-14 § 1)

2-18.2   General Duties of the Police Department.
The Police Department shall preserve the peace; protect life and property; detect, arrest and prosecute offenders of the laws of New Jersey and the ordinances of the Township of Woodbridge; direct and control traffic; provide attendance and protection during emergencies; provide appearances in court; cooperate with all other law enforcement agencies; and, provide training for the efficiency of its members and employees. (N.J.S.A. 40A:14-118) (Ord. #98-92 § 2)

2-18.6   Appointment.
No person shall be appointed to the Police Department who is not qualified as provided in the New Jersey Statutes. The Appropriate Authority may also require that the applicant for appointment to the Police Department successfully complete a physical, medical and psychological examination. (Ord. #98-92 § 2)

2-18.9   Police Training Course.
a.    No person shall be given or accept a permanent appointment as a police officer unless they successfully complete a police training course at a school approved and authorized by the Police Training Commission in the Department of Law and Public Safety of the State of New Jersey, pursuant to the provisions of N.J.S.A. 52:17B-66 et seq.
b.    This subsection shall not prohibit the giving or accepting of probationary or temporary appointment as a police officer for a period not to exceed one (1) year, to enable a person seeking a permanent appointment to complete a police training course as prescribed by the Police Training Commission. (Ord. #98-92 § 2)

2-18.13   Established; Police Director; Appointment.
The head of the Division shall be the Police Director, who shall be appointed by the Mayor and shall be the executive head of the Division. (Ord. #11-10 § 4)

2-18.14   Duties of Police Director.
The Police Director shall be charged with the duties of supervising the Department of Police in all areas and aspects as it shall impact upon policy and the good order and discipline of the Department and shall adopt rules and regulations for the Police Department and establish policies for the daily operation of the Police Department and the discipline of its members. These duties shall be consistent with the authority permitted to be vested in the Police Director pursuant to N.J.S.A. 40A:14-118 and shall include, but not be limited to:
      a.    Have charge and responsibility for all property of the Township used
          by the Division of Police.
      b.    Keep a record of all business transacted by the Division of Police and

Parks v. Woodbridge Twsp.                    222103                    Page 6

shall approve all bills for the expense of the Division.

c.   Keep and maintain an accurate record and submit an annual report to the Mayor and Township Council, on or before January 1, which report shall assess the operations of the Division, and its personnel, equipment and property.

d.   Keep and maintain all records, reports, documents and data required to be kept and maintained by the Federal and/or State government and/or any of their respective subdivisions.

e.   Keep and maintain a record of all appointments, dismissals, removals, resignations and deaths of officers as they take place, with such other information as may be necessary.

f.   Have responsibility for developing the annual budget for the Division of Police and shall be responsible for overseeing any and all expenditures of the Division.

g.   Analyze crime trends and statistics to ensure that the Division makes the best use of available funds, personnel, equipment and supplies.

h.   Evaluate effectiveness of work program and procedures of all units and bureaus within the Division and develop effective work methods for subordinates.

i.   Undertake special studies pertaining to public safety functions and promote close coordination of planning efforts.

j.   Establish and maintain helpful and cooperative relations with civic and business organizations, schools, and court offices, and with other groups and public authorities and other jurisdictions, and with others interested in the maintenance of law and order.

k.   All such other duties not specifically reserved to the Chief of Police pursuant to N.J.S.A. 40A:14-118.  (Ord. #11-10 § 5)

It is my professional opinion that the Township of Woodbridge appropriately and properly established the Adopting Ordinance to form the Woodbridge Police Department, which included the process of a departmental accreditation through the Commission On Accreditation For Law Enforcement Agencies (CALEA);  in accordance with accepted New Jersey Police Practices and Law.

The Woodbridge Township Police Department is an accredited Law Enforcement Agency.

**Accreditation by C.A.L.E.A.**

Accreditation and compliance to professional standards provides the yardstick by which the community, Police Administration, Mayor and Township Council can qualitatively measure their performance and ensure accountability of their actions.

**Parks v. Woodbridge Twsp.**                    **222103**                    **Page 7**

No matter how effective daily operations are, there is always room for improvement.

The Meaning of Accreditation

Essentially, accreditation is a seal of approval from an independent agency. By being accredited, these organizations illustrate the pursuit of excellence in their particular line of work and their willingness to meet and exceed industry standards.

In many fields, obtaining organizational accreditation is common practice. Colleges and hospitals, for instance, regularly participate in an accreditation process.

In the field of law enforcement, the Commission on Accreditation for Law Enforcement Agencies (CALEA) is the non-profit agency that grants accreditation. It was formed in 1979 by four major law enforcement bodies; the International Association of Chiefs of Police, Police Executive Research Forum, National Organization of Black Law Enforcement Executives, and the National Sheriff's Association. Law enforcement agencies may voluntarily apply for accreditation, as many across North America have done. Over 700 agencies are currently accredited by CALEA with many more in various stages of the accreditation process.

Accreditation is a progressive and time-proven way of helping law enforcement agencies calculate and improve their overall performances. The foundation of Accreditation lies in the adoption of standards containing a clear statement of professional objectives. Participating agencies conduct a thorough self-analysis to determine how existing operations can be adapted to meet these objectives. When the procedures are in place, a team of trained assessors verifies that applicable standards have been successfully implemented. Accreditation status represents a significant professional achievement.

The attitudes, training and actions of personnel of New Jersey's law enforcement agencies best reflect compliance with the standards contained in this program. Policy and procedure based on Accreditation will not insure a crime-free environment for citizens, nor will it ensure an absence of litigation against law enforcement agencies and executives.

However, effective and comprehensive leadership through professionally based policy development is directly influenced by a law enforcement program that is comprehensive, obtainable and based on standards that reflect professional service delivery.

Scope of the Standards

The standards cover six general areas:
1. Roles, responsibilities and relationships with other agencies;
2. Organization, management and administration;
3. Personnel administration;
4. Law enforcement operations, operational support and traffic law enforcement;

**Parks v. Woodbridge Twsp.**                222103                **Page 8**

5. Prisoner and court related services; and
6. Auxiliary and technical services.

CALEA currently maintains 462 standards related to these areas. However, it was not necessary for the Woodbridge Police Department to re-write every policy and procedure to meet CALEA standards.

Instead, the Woodbridge Police Department worked to confirm that existing operations and management conform to the spirit of the standards, formalize any unwritten or unstated policies, correct any deficiencies in operations, and refine and contemporize other procedures where necessary.

In the end, the standards simply tell the Woodbridge Police Department what it has to do. Just how they do it will still be based on accepted policing techniques in Woodbridge and the needs of the community.

Benefits of Accreditation

It is difficult to attach a dollar value to the benefits of the accreditation process. However, for the police and the public, the benefits are nevertheless numerous and tangible.

From the perspective of members of the public, the accreditation process:
Reinforces the Woodbridge Police Department's devotion to professionalism and a body of precise and high standards; and ensures the Woodbridge Police Department uses a consistent and evenhanded approach to applying effective and responsive policies.

To the Woodbridge Police Department the accreditation process will:
Enhance the reputation of the police service, and help attract the most qualified and suitable applicants;
Increase morale by giving personnel faith in the Woodbridge Police Department's effectiveness, and in the fairness of internal systems; and
Provide state-of-the-art, up-to-date policy and procedures manuals.

And to other law enforcement agencies and components of the criminal justice system, accreditation:
Improves interactions and strengthens relationships; and Promotes standardization of policies, and increases efficiency in handling joint investigations and referrals.

Ultimately, the existence of thorough standards gives the public, police and elected policy makers a norm against which to evaluate the Woodbridge Police Department's performance.

Woodbridge Police Director Robert Hubner testified in his deposition on October 28, 2022 on page 49, line 21, in relevant part: "We are CALEA certified nationally, that's how we develop our policies and procedures. I think we were first accredited in 1998, so it's been a long ongoing relationship that

**Parks v. Woodbridge Twsp.**                 222103                 **Page 9**

we intend on keeping."

It is my professional opinion that the Accreditation is a process and time-proven method of assisting law enforcement agencies to calculate and improve their overall performance. The foundation of Accreditation lies in the adoption of standards containing a clear statement of professional objectives. Participating agencies conduct a thorough self-analysis to determine how existing operations can be adapted to meet these standards and objectives. When the procedures are in place, a team of trained, independent assessors verifies that the applicable standards have been successfully implemented.

It is also my professional opinion that the CALEA accredited Woodbridge Police Department is a highly professional police organization with all of the necessary Rules, Regulations, Policies and Directives to efficiently, professionally, and effectively carry out all of the police functions of a New Jersey Police Agency, in accordance with accepted New Jersey police practices and procedures.

It is my further professional opinion that the Accredited status represents a significant professional achievement. Accreditation acknowledges the implementation of policies and procedures that are conceptually sound and operationally effective.

## TRAINING

New Jersey Law <u>N.J.S.A.</u> 52:17B-66 et seq. "Statutory and Commission Requirements Pertaining to the Police Training Act" provides ".......that no person shall hereinafter be given or accept a permanent appointment as a police officer unless such person has successfully completed a police training course at an approved school ...." According to this Act, the appointing authority shall make certain that the police officer:

- Completes the required training within one year of the date of appointment

                      or

- Begins, or is scheduled to begin, the required training within one year of the date of appointment. The training must be completed within 18 months after the date of appointment.

The mandatory training objectives include the following functional areas:

    1.0   Professional Development
    2.0   Criminal Justice Systems
    3.0   Police Community Relations
    4.0   Law
    5.0   Legal requirements of Arrest, Search, Seizure, Evidence, and Use of Force
    6.0   Communications
    7.0   Vehicle Operations
    8.0   Emergency Medical Care

**Parks v. Woodbridge Twsp.**                222103                    **Page 10**

    9.0   Weaponry and Unarmed Defense
   10.0  Patrol Concepts
   11.0  Traffic
   12.0  Criminal Investigations
   13.0  Physical Fitness
   14.0  Practical Exercises
   15.0  Agency Training

The Woodbridge Township Police Department Policies & Procedures Agency Training Chapter 430 provides in relevant part:

430.1 POLICY & PURPOSE:

430.1.1
POLICY: It will be the policy of the Woodbridge Township Police Department to implement, and maintain, a comprehensive agency training program for all agency employees. The nature of police service imposes strong intellectual, emotional, and ethical demands on police officers. Police officers must deal with extremely complicated and unusual situations which often require innovative problem solving approaches. To meet these challenges, police officers must be alert, resourceful, decisive, and most significantly trained. Training, as such, has often been cited as one of the most important responsibilities in any law enforcement agency. For these reasons one of the goals of this agency is to provide continuous training for all members of the department. The training function within this department is designed to prepare new officers to conform to the high standards expected of them, to maintain and develop skills of in-service personnel, and to provide supervisory and command officers with the skills, knowledge and abilities to perform their assigned tasks. Officers who are well trained will generally be better prepared to act decisively and correctly in a broad spectrum of situations. Training will also impact upon greater productivity and effectiveness, as well as, foster cooperation and unity of purpose, thereby enabling this department to achieve its overall mission.

430.1.2
PURPOSE: The purpose of police training and education programs is to enable officers to develop and maintain the skills, attitude and good judgment necessary for the effective performance of their duties. To that end, the purpose of this directive is to outline the various training initiatives utilized by this department to adequately train, its personnel, and to assign responsibility and accountability for all training programs.

The Woodbridge Township Police Department Policies & Procedures Agency Training Chapter 431, Recruit Training, provides in relevant part:

431.1 Policy & Purpose

431.1.1
POLICY: It will be the policy of the Woodbridge Township Police Department to require all recruits

**Parks v. Woodbridge Twsp.**                    222103                    **Page 11**

to successfully complete the New Jersey Police Training Commission's certified recruit academy training program prior to assuming sworn status as a Police Officer.

431.1.2
PURPOSE: The purpose of this policy is to preclude assigning personnel to positions requiring the carrying of a weapon, enforcing the law, or making arrests until they successfully complete a structured basic training course.

A review of the training records of Lt. Edward Barrett, Lt. Joseph Velez, Lt. Michael Ng, D/Sgt. Anthony Penicaro, D/Sgt. Andrew Kondracki, Sgt. Santiago Tapia, Det. Jorge Quesada, Off. Andrew Lyszyk, Off. Francis Lee, and Off. David Mirdala, revealed that each of Woodbridge Police Department members successfully completed the required training provisions of the N.J. Law, the N.J. Police Training Commission and the Woodbridge Township requirements.

It is my professional opinion that the members of the Woodbridge Township Police Department were properly trained in accordance with the New Jersey Law, New Jersey Police Training Commission Performance Objectives and the Woodbridge Township requirements.

The Woodbridge Township Police Department Policies & Procedures Agency Training Chapter 432, In-Service Training, provides in relevant part:

432.1 POLICY & PURPOSE:

432.1.1
POLICY: It will be the policy of the Woodbridge Township Police Department to implement, and maintain, a comprehensive in-service training program.

432.1.2
PURPOSE: The purpose of in-service training and education is to keep personnel up to date with new laws, technological improvements, and revisions in agency policy, procedures, rules, and regulations. In-service training serves to motivate experienced officers and furthers the professionalism of the agency.

432.2 ESTABLISHMENT OF IN-SERVICE TRAINING:

432.2.1
ANNUAL TRAINING: In accordance with guidelines issued by the Attorney General of the State of New Jersey, all employees authorized to carry a weapon or make arrests shall receive annual in service training. Training may include periodic refresher courses, specialized skill development training, career development training to include promotional supervisory training, and roll call training. All other personnel may receive in-service training as required by their assignment or position within the organization.

**Parks v. Woodbridge Twsp.**                     222103                     **Page 12**

TRAINING COURSES: The Departmental Training Officer is responsible for the completion of the agency training program. Training shall be scheduled by the departmental Training Officer and may be accomplished through several methods. These may include, but are not limited to, scheduled training assignments at courses offered by police training academies; attendance at seminars and lectures offered by private and governmental entities presenting relevant training seminars; scheduled in-house training programs, roll call briefings, video training and computer based training.

It is duly noted that the Woodbridge Police Department training office use NJ Learn. NJ Learn is an online e-learning management system primarily for sworn and certified first responders throughout New Jersey. and the PowerDMS program which provides a central, standardized system for tracking and documenting field training, recruit on boarding and employee performance. The program printout is part of the training records of each of the Woodbridge Police Department police officers involved with the Parks investigation.

My review of the training records of Lt. Edward Barrett, Lt. Joseph Velez, Lt. Michael Ng, D/Sgt. Anthony Penicaro, D/Sgt. Andrew Kondracki, Sgt. Santiago Tapia, Det. Jorge Quesada, Off. Andrew Lyszyk, Off. Francis Lee, & Off. David Mirdala, revealed that each of these Woodbridge Police Department members received a variety of specialized law enforcement related training on numerous topics and each of them had  lengthy computer-based training which included arrest, search & seizure.

It is my further professional opinion that the Township of Woodbridge and the Woodbridge Township Police Department have a systematic in-service training program which includes the Attorney General and Middlesex County Prosecutor's Office use of force guidelines and also includes in each session a review of the domestic violence policy, pursuit policy and aerosol agents, as well as arrest, search and seizure.

It is also my professional opinion that each of the Woodbridge Police members involved in this incident were highly and professionally trained in all relevant areas of law enforcement which included legal updates of statutes and case law which affects law enforcement operations.

**The New Jersey Police Training Commission Basic Training Course** effective January 1, 2015 revised April 2022,  provides in relevant part:

FUNCTIONAL AREA 5 - LEGAL REQUIREMENTS OF ARREST, SEARCH, SEIZURE, EVIDENCE, AND USE OF FORCE

UNIT GOAL: The trainee will understand the constitutional principles and legal precedents relating to arrest, search, and seizure. Additionally, policy and law relating to use of force will be covered. INSTRUCTIONAL UNITS:

1.      CONSTITUTIONAL RIGHTS
The unit covers the basic rights of individuals as provided by the United States  Constitution and the

**Parks v. Woodbridge Twsp.**                    222103                    **Page 13**

New Jersey Constitution, with special emphasis on the federal First, Fourth, Fifth and Sixth Amendments and the corresponding state provisions. The authority of the courts in resolving constitutional issues is  described and the purpose of the court-created Exclusionary Rule is explained.

2.    PROBABLE CAUSE
The unit discusses the concept and definition of probable cause. It covers the sources for developing probable cause and the considerations that should be identified for establishing probable cause. The trainee will be given practice in determining whether sufficient basis exists for establishing probable cause.

3.    LEGAL REQUIREMENTS AND PROCEDURES OF LAWFUL ARREST
The unit covers the legal requirements that must exist before an arrest can be made, the law enforcement officer's authority and jurisdiction to arrest, the requirements and limitations of an arrest with or without a warrant, and the process for obtaining a complaint-summons and a complaint-warrant. The unit presents other arrest authorities, for example, citizen arrest, and the police procedures for persons exempt from arrest. The unit emphasizes the conditions  when Miranda warnings are to be given. The unit provides the trainee with  practice in determining whether an arrest is lawful and in determining when  Miranda warnings are to be given.

4.    FIELD INQUIRIES, TERRY STOPS AND TERRY FRISKS
The unit covers the legal requirements necessary for street encounters including inquiries, stops, and detention and covers legal guidelines regarding frisks. The unit also explains the legal limitations to a field stop and pat down.

5.    SEARCH WARRANTS
This unit covers the legal requirements that must exist before a search warrant  can be issued, the requirements for obtaining a search warrant, and the procedures to follow in the execution of the search warrant. Exceptions to the search warrant requirement are covered including searches incident to arrest, consent searches, plain view, automobile exception and exigent circumstances. Body intrusion searches and telephonic search warrants are also covered in the unit.

6.    WARRANTLESS SEARCHES AND SEIZURES
This unit discusses interpreting the Fourth Amendment, and whether or not an  officer can search and/or seize evidence without a warrant.

7.    FIFTH AMENDMENT AND MIRANDA WARNINGS
This unit discusses when Miranda warnings are required to be given.

8.    USE OF FORCE
This unit provides an overview of the statutory requirements regarding use of force. The concept of reasonable force is emphasized in self-defense situations, in defense of others, in law enforcement situations and in defense of premises  and personal property. Through the use of simulated

**Parks v. Woodbridge Twsp.**                    222103                    **Page 14**

situations, the trainee is provided with the opportunity to evaluate whether the force used was reasonable under the circumstances. The Attorney General's guidelines prohibiting warning shots and describing sanctions a law enforcement officer may incur for the improper use of force are also covered.

9.    EYEWITNESS IDENTIFICATION

This unit discusses the procedures which must be followed to conduct a proper show up, photo array, and lineup to ensure that the results are admissible in court. The suspect's rights and the role of counsel during these procedures are outlined. The steps necessary to compel a person not in police custody to appear in a lineup are also identified.

10.    RULES OF EVIDENCE

This unit touches upon the basic legal concepts regarding the rules of evidence as they apply to a law enforcement officer's duty. Classification of evidence, types of evidence, witness qualification, testimonial privileges, hearsay evidence and the types of statements or evidence which may or may not be admissible in court are topics introduced in the unit. The importance of demonstrating the chain of evidence is also introduced.

11.    ASSET FORFEITURE

This unit discusses the legal issues surrounding asset forfeiture including what can be seized and how to initiate asset forfeiture proceedings. The Attorney General's Forfeiture Guidelines are presented and investigation techniques used to enhance forfeiture proceedings are identified. Through the use of simulated situations trainees will be required to determine whether a forfeiture action against property is appropriate.

**INSTRUCTIONAL UNIT 5.2:  PROBABLE CAUSE**

UNIT GOAL: The trainee will identify the concept of probable cause.

PERFORMANCE OBJECTIVES

1 The trainee will identify the definition of probable cause as it pertains to:

A.    An arrest with a warrant;
B.    An arrest without a warrant;
C.    A search with a warrant; and
D.    A search without a warrant.

2 The trainee will identify sources for developing probable cause.

3 The trainee will identify problems with establishing probable cause through anonymous informants.

**FUNCTIONAL AREA 10 - PATROL CONCEPTS**

**Parks v. Woodbridge Twsp.**                    **222103**                    **Page 15**

UNIT GOAL: The trainee will possess the skills and knowledge to perform the patrol function safely and effectively.

INSTRUCTIONAL UNITS:

10.2 OBSERVATION AND PERCEPTION
This unit focuses on perception and observation skills. It is designed to help the officer develop basic techniques in observation and perception. It provides a variety of approaches to develop these skills.

**INSTRUCTIONAL UNIT 10.2: OBSERVATION AND PERCEPTION**
UNIT GOAL: The trainee will understand the relationship between what an individual sees and what the individual perceives. The trainee additionally will know methods by which the trainee's own perception skills may be improved, and will possess the ability to utilize those skills effectively.

PERFORMANCE OBJECTIVES

10.2.1 The trainee will identify factors which affect perception by an individual. These factors will include:
A.      Past individual experiences;
B.      Experiences of other community members;
C.      Mental condition/cognitive ability;
D.      Emotional involvement;
E.      Environmental conditions present;
F.      Cultural influences;
G.      Media coverage of police actions; and
H.      Personal bias.

10.2.2 The trainee will identify at least two (2) means by which skills of observation and perception can be improved.

Instructor's Note: Given simulated situations where the trainee observes a scene and/or an activity for a specific period of time, the trainee will identify the scene or activity with acceptable accuracy.

**10.13 TACTICAL CONSIDERATIONS FOR CRIMES-IN-PROGRESS**
This unit deals with the principles and procedures of responding to reports of crimes-in-progress. Tactical considerations such as approach routes, use of vehicle, approach techniques and coordination of other units are described. Three types of calls are given special attention:
A.      Robbery;
B.      Burglary; and
C.      Suspicious persons.

PERFORMANCE OBJECTIVES

**Parks v. Woodbridge Twsp.**                      222103                      **Page 16**

10.13.1 The trainee will identify the purpose and utilization of different methods when responding to a crime in progress; these methods will include:
A.     Proceed directly to scene as quickly and quietly as possible;
B.     Proceed directly to scene utilizing siren and flashing lights;
C.     Proceed to the location most likely to intercept fleeing suspect(s);
D.     Proceed to scene and coordinate arrival and/ or deployment with other units; and
E.     Proceed to an adjacent location and continue on foot.

**10.29 IDENTIFYING FRAUDULENT OR ALTERED DOCUMENTS**
This unit describes commonly altered identification documents and methods to identify forged or altered documents

UNIT GOAL: The trainee will be able to identify genuine documents including Passports, New Jersey and International Driver Licenses, Social Security Cards, Visas, Permanent Resident Cards and Resident Alien Cards.

PERFORMANCE OBJECTIVES

10.29.1      The trainee will identify two ways passports are counterfeited or altered.
10.29.2      The trainee will identify two most commonly altered points on a driver license.
10.29.7      The trainee will identify what steps a law enforcement officer should take when encountering fraudulent, altered or expired documents.

**FUNCTIONAL AREA 12 — CRIMINAL INVESTIGATION**

UNIT GOAL: The trainee will possess the knowledge and skill necessary to satisfactorily accomplish the investigative duties and responsibilities associated with being the first officer to discover or respond to the scene of a crime.

INSTRUCTIONAL UNITS

12.1 PRELIMINARY INVESTIGATION-RESPONSIBILITY OF THE RESPONDING OFFICER
This unit provides the trainee with the information and practice necessary to conduct a preliminary investigation at the scene of a crime.

12.2 IDENTIFICATION OF PHYSICAL EVIDENCE
This unit presents the techniques to use in searching a crime area for physical evidence. Practice is provided for various search methods, and identification of items as evidence.

12.3 EVIDENCE PROCESSING
This unit provides the information and procedures necessary to mark or package and tag items of evidence in a manner that will suffice for identification in court. This unit covers the special treatment, storage and transmission of evidence found at a crime scene, in addition to explaining the

**Parks v. Woodbridge Twsp.**                222103                **Page 17**

"chain of custody" and the proper completion of agency forms to insure the admissibility of crime scene evidence in a court of law.

Requirements for handling specific materials such as soil, liquids, firearms, minute items, clothing and restricted substances are given.

## 12.7 LOCATING AND PROCESSING FINGERPRINTS

This unit focuses on fingerprints, and includes a description of the two types, latent and plastic. Practice is given in locating, processing, lifting, and preserving both types of prints in a manner that will ensure admissibility in court.

## 12.8 DEVELOPING SOURCES OF INFORMATION

This unit focuses on the identification and development of sources of information, including record searches, the availability of information in both private and public records, and the associated legal requirements.

## INSTRUCTIONAL UNIT 12.1: PRELIMINARY INVESTIGATION RESPONSIBILITY OF THE RESPONDING OFFICER

UNIT GOAL: The trainee will know the law enforcement officer's duties and responsibilities at the scene of a crime, and will possess the knowledge and skill necessary to perform those duties.

## PERFORMANCE OBJECTIVES

12.1.1  The trainee will identify the steps necessary to conduct a preliminary investigation.

12.1.2  The trainee will identify the role and responsibilities of the first officer to arrive at a crime scene. These will include:

A.      Ensure officer safety and the safety of others present;

B.      Ensure medical aid for injured;

C.      Preservation and control of crime scene;

D.      Notification to supervisor;

E.      Identify and secure witnesses and victims; and

F.      Documentation observations.

12.1.3  The trainee will identify three (3) common mistakes which can contaminate a crime scene.

12.1.4  The trainee will identify why it is particularly critical that the responding officer is sensitivity to the emotional state and needs of victims, family members, and witnesses at a crime scene.

12.1.5  The trainee will identify evidence that would logically be classified as "fragile", and will specify the actions necessary to preserve each piece of evidence. This will minimally include:

A.      Biologicals (blood, semen, and other bodily fluids);

B.      DNA (hair, saliva, etc.);

C.      Footprints;

D.      Tire marks; and

E.      Broken Glass.

**Parks v. Woodbridge Twsp.**                    **222103**                    **Page 18**

INSTRUCTIONAL UNIT 12.2: IDENTIFICATION OF PHYSICAL EVIDENCE

UNIT GOAL: The trainee will be proficient in the identification of physical evidence.

PERFORMANCE OBJECTIVES

12.2.1  The trainee will identify what constitutes evidence at a crime scene.
12.2.2  The trainee will identify the three different types of evidence.
12.2.3  The trainee will identify the different classifications of evidence.
12.2.4  The trainee will identify: (A) individual and (B) class evidence.
12.2.5  The trainee will define "strip," "spiral," "grid," and "quadrant" methods of searching a crime scene for physical evidence.

INSTRUCTIONAL UNIT 12.3: EVIDENCE PROCESSING

UNIT GOAL: The trainee will possess the knowledge and skill needed to mark and/or tag and preserve items of evidence for identification.

PERFORMANCE OBJECTIVES

12.3.1 The trainee will identify various types of evidence at a crime scene. The trainee will identify the steps to mark or package and tag each kind of evidence in a manner which is consistent with proper chain of custody procedures.

INSTRUCTIONAL UNIT 12.7: LOCATING AND PROCESSING FINGERPRINTS

 UNIT GOAL: The trainee will possess the knowledge and skill necessary to locate and process fingerprint evidence in a manner that will ensure evidential value.

PERFORMANCE OBJECTIVES

12.7.1 The trainee will identify the differences between "latent fingerprints" and "plastic fingerprints."
12.7.2 The trainee will identify the use and advantages of the Automated Fingerprinting Identification System (AFIS) as it pertains to criminal investigations.

INSTRUCTIONAL UNIT 12.8: DEVELOPING SOURCES OF INFORMATION

UNIT GOAL: The trainee will possess the ability to recognize effective techniques of identifying and developing sources, informants, and records as means of collecting information.

PERFORMANCE OBJECTIVES

**Parks v. Woodbridge Twsp.**  222103  **Page 19**

12.8.1  The trainee will identify methods of identifying and developing sources of information.
12.8.2  The trainee will identify types of private records which may be of assistance when collecting investigative information, and will identify the legal requirements regarding use of private records.
12.8.3  The trainee will identify public records which may be of assistance when collecting information.

INSTRUCTIONAL UNIT 12.9: PLANNING AND CONDUCTING AN INTERVIEW

UNIT GOAL: The trainee will recognize the importance of planning interviews and will know how and when to advise a person of his/her Miranda rights in a manner that conforms to the judicial requirements.

PERFORMANCE OBJECTIVES
12.9.1  The trainee will identify the difference between an interview and an interrogation.
12.9.2  The trainee will identify specific factors which can affect the ability of a witness to observe or recall an event.
12.9.3  The trainee will identify the steps a law enforcement officer should take to prepare for an interview.
12.9.4  The trainee will identify the steps for conducting an interview.

INSTRUCTIONAL UNIT 12.10: INVESTIGATIVE REPORTS

UNIT GOAL: The trainee will demonstrate through written submissions how to effectively write investigative reports, use of force reports, search warrant affidavits, search warrants and communications data warrants.

PERFORMANCE OBJECTIVES

12.10.1  The trainee will identify the elements included in investigative reports.
12.10.2  The trainee will identify the elements included in use of force reports.
12.10.3  The trainee will identify the elements included in a search warrant affidavit.
12.10.4  The trainee will identify the elements included in a search warrant.
12.10.5  The trainee will identify the elements included in a communications data warrant.

Instructor's Note: The trainee shall write various reports for editing and subsequent to the editing process, final reports should be prepared and graded. The trainee shall be provided an opportunity to resubmit all work after editing by instructor. The trainee will be graded on a Pass/Fail basis after resubmitting edited work.

Again it is my professional opinion that the Township of Woodbridge and the Woodbridge Township Police Department have a systematic in-service training program which includes the Attorney General and Middlesex County Prosecutor's Office use of force guidelines and also includes in each session a review of the domestic violence policy, pursuit policy and aerosol agents,

**Parks v. Woodbridge Twsp.**          222103          **Page 20**

as well as arrest, search and seizure.

It is also my professional opinion that each of the Woodbridge Police members involved in this incident were highly and professionally trained in all relevant areas of law enforcement which included legal updates which includes statutory and/or case law which affects law enforcement operations.

Again it is my professional opinion that each Woodbridge Police Officer involved in this incident was highly and thoroughly trained from their Basic Academy Training, through their specialized training, continual agency training and on a daily field learning experience, in accordance with accepted police practices, New Jersey Law, New Jersey Attorney General guidelines, Woodbridge Township Police Department Rules, Regulations, Policies & Procedures.

**Nijeer K. Parks Investigation**

In the Woodbridge Police Department Incident Report # 19010123/1 Officer A. Lyszyk reported, " While on patrol, Ptl. Lee and I were dispatched to Hampton Inn (370 Rt. 9 North Woodbridge) on a report of a shoplifting. HQ advised us that the caller stated that the male's vehicle, NY JBD2162 Gray Dodge Challenger, was parked in front of the hotel.

Ptl. Lee arrived on location prior to my arrival and was already speaking to the male, that identified himself as Jamal Owens. The male told us that he was going to pay for the snacks that he took, but left his money in the car. When he went out to his car, he placed the snacks on the seat and came back in with his money. However, when he was coming back into the hotel lobby to pay for the snacks, he felt the need to go to the bathroom. When he came out of the bathroom, he saw Ptl. Lee standing there.

I walked over to the hotel counter and spoke to the two clerks, Caleigh Higgins and Kamisha Grant, and the hotel manager, Richard Charneco. Charneco advised me that one of the cleaning personnel saw the male place a bunch of snacks into his bag and then put it in his vehicle. At that point he called the police. Charneco stated that he wanted the male to pay for the items, 13 assorted candies and 2 Clear eye drops (total value $39.00), that he took. I told the male that the hotel wanted him to pay for the items and asked him where they were. The male told us that the snacks were in his car. We then walked out to the car, grabbed the snacks from the vehicle, brought them back to the counter, and paid for them. The male also purchased a bottle of water and took a sip out of it when he paid for the snacks. Ptl. Lee advised me that the Tennessee driver's license, DL # 801527486 Jamal Owens 765 Oakdell Ave. Madison TN 37115 DOB 10-15-93, that he gave him was not coming back on file and gave it to me so I can check it in the car.

While in my car, I attempted to find Jamal Owens, but kept on receiving a not on file result. At that time, I compared the license that he gave Ptl. Lee to the Tennessee license on the I.D. checking guide and found multiple discrepancies. The discrepancies that I found were that there were asterisks where numbers were supposed to be and the zip code to his mailing address was 5 digits instead of nine.

PARKS000212

**Parks v. Woodbridge Twsp.**                    222103                    **Page 21**

At that time, I contacted the Tennessee State PD at the Knoxville, TN office and spoke with supervisor Jason Beary. I advised him of my situation and asked him if he could check his system to confirm that there was not a glitch between our systems. Supervisor Beary advised me that the DL number and the name Jamal Owens was not on file within their DMV. Supervisor Beary also advised me that the driver's license in Tennessee should start with 0 instead of 8 .

At that point I went back into to the lobby and confronted the male. The male was still holding onto the bag of candy and water bottle. I advised him of the situation and asked him if he had any other forms of identification on him. At first he stated that he did not have his wallet on him, but then took out his wallet from his pocket. He opened up his wallet and showed me a credit card with the name, Jamal Owens. I then asked him if he was staying at the hotel so that I can confirm who he is. He advised me that he was not staying at the hotel and was just there for the Hertz rental car store.

Since he admitted to shoplifting the snacks and I was not able to identify him; I told him to turn around and place his hands behind his back. The male turned around and placed his hands behind his back. When he did that, I was able to see a big bag of suspected marijuana, that was halfway in a black plastic shopping bag, protruding from his left jacket pocket. I grabbed him by the wrist, took the bag out of his pocket, dropped it on the floor, and went to place Ptl. Lee's handcuffs on him. As I was about to place the handcuff on his wrist, the male slipped away from my grip and started to run towards the rear of the lobby.

We called out the foot pursuit and began to chase him towards the rear of the lobby. His right sneaker fell off prior to exiting the rear door, which is next to the Hertz car rental kiosk. He exited the rear door and ran towards the rear gate, which was closed. He pushed open the gate, made a right turn, ran towards Dunkin Donuts, and began to run back towards the front of the hotel. While he was running, he kept placing his right hand into his jacket pocket and kept looking back at us. He ran back towards the front of the building and jumped into the driver's seat of the vehicle, NY JBD2162. We caught up to him at the vehicle, pointed our weapons at him and ordered him to shut the car off. However, the male placed the vehicle in reverse and backed the vehicle up a few feet and stopped. Once stopped he told us not to shoot him and moved his left hand towards the side of his seat. I told him to keep his hands where I could see them or I was going to shoot him. I then told him to unlock his door, but he refused and said that he will unlock the door only if we put our guns away. We told him that our guns were staying out and ordered him to open the door. However, he refused again and began to hit the steering wheel with his fists while sitting in the driver's seat unbuckled. After some time, the male placed the car in drive, hit the gas, turned the steering wheel to the left, struck the rear driver's side of patrol car #3, and then hit the pillar at the Hampton Inn. When he did that, the male turned the vehicle towards Ptl. Lee and Ptl. Lee had to move out of the way to avoid serious injury. After hitting the pillar, the male put the vehicle in reverse, I moved out of the way, and the male backed the vehicle up. The male then sped off towards Miller's Ale House, made a left towards Rt. 9 north, drove the wrong way on the ramp (ramp from Rt. 9 North to Millers Ale House), and made a right onto Rt. 9 north. Once on Rt. 9, the vehicle sped off at a high rate of speed.

We hoped in our vehicles and attempted to follow him. At this time multiple units were on Rt. 9

**Parks v. Woodbridge Twsp.**                    222103                    **Page 22**

north, but we were unable to locate the vehicle or the suspect. Therefore, I went back to Hampton Inn to preserve the scene. As I returned to the scene, Charneco advised me that he collected the items that were dropped on the floor, placed it in a bag, and moved it to the side. Charneco then gave me the bag and I secured the items in my patrol car. I then notified HQ that I needed additional units on scene to help preserve the scene. I also asked HQ to notify the detective bureau about the incident and to notify them that we need the scene processed. Ptl. Campagnio arrived on scene and preserved the rear gate, Ptl. Lee arrived on scene and preserved the rear door, Ptl. Montalvo arrived and preserved the front entrance where the motor vehicle crash occurred, and Det. Tapia and Det. Quesada arrived on scene to process it, see additional reports.

I then went to the Hertz kiosk to talk to the employee that was dealing with the male. However, there was no one there so I went to the hotel desk. I asked the hotel clerks if they knew where the Hertz employee was. Higgins advised me that the employee came over to her and said " ah shit that was one of my cars". The employee then handed Higgins a key to another vehicle and told her that a customer is going to pick up a vehicle. After giving her the key the Hertz employee told her " I just got to step outside and figure it out". After the employee went outside, she did not see him again. None of the hotel personnel know who the Hertz employee is. I attempted to get a hold of a manager, but had negative results. Charneco also advised me that there is CCTV on site, but he would not be able to access it until Monday.

Prior to leaving the scene, I notified Det. Quesada that the male left his right shoe and water bottle behind. I also advised him that I still had the fake driver's license that the male gave me in my possession. The following items were inside the black bag, which came out of the male's left jacket pocket, suspected marijuana, a crumpled Dunkin Donuts receipt, four packs of Backwood cigars, a Sprint sim card, and a marijuana grinder. The other bag that the male dropped contained 13 assorted candies and two Clear eyes eye drops that he purchased.

I transported the items to HQ without incident. I placed the suspected marijuana on a scale to weigh it. The total weight of the suspected marijuana was 44 grams. The information on the Tennessee driver's license did not match any Tennessee driver's license on file. However, the image on the driver's license was the suspect. The suspected marijuana, grinder, Sprint sim card, four packs of Backwoods cigars, fake license, and the Dunkin Donuts receipt was placed into evidence locker. The candies and eye drops were also placed into the evidence locker for safe keeping. Det. Quesada came downstairs and took custody of the Air Jordan sneaker and bottle of water so that he can attempt to extract DNA from them. The detective bureau took over the investigation."

Officer Lyszyk testified in his deposition on page 13, line 12, "A. I know that that license did not come back on file. So I know I took the license and went to my patrol car with the license. Plus, I have a book that identifies government licenses. It's a book that has every single license from every state.  So you compare it to see what's fake, what's not. It appeared to be fake because it was missing certain things. I believe asterisks and zip code. Once I confirmed it was fake and I called Tennessee state police. Confirmed it was fictitious"

**Parks v. Woodbridge Twsp.**                    222103                    **Page 23**

It is my professional opinion that Officer Lyszyk in his exemplary performance, responded to the shoplifting call, made his observations, recovered suspected marijuana, and went to his patrol vehicle and looked into his personal book that identifies government licenses, telephoned the Tennessee State Police and confirmed the license was fictitious, called for more Woodbridge Officers to preserve the scene, continue the investigation and secured the evidence, in accordance with accepted New Jersey Police Practices & Procedures, and his overall training knowledge and experience enumerated above.

In the Woodbridge Police Department Incident Report # 19010123/2 Officer F. Lee #591 reported, "On January 26, 2019, I was dispatched to the Hampton Inn on Rt. 9N to assist Car 3 on a shoplifting. CAD notes showed that the suspect vehicle, a  Dodge Challenger NY Reg#JBD2162, was in the lot and that a black male had taken some items from the gift shop, then went to the vehicle and was now in the bathroom. The vehicle had come back as a gray 2018 Dodge Challenger registered to Hertz. It should be noted that the hotel does have a Hertz rental desk in the main lobby.

Upon arrival to the hotel, I was met by the reporting person, Richard Charneco, who advised that the suspect was still in the rest room. There had not been any clothing description given while I was en route to the hotel, so he advised that the suspect was about 5'10 - 5'11 wearing a black jacket. After several minutes the suspect came out of the bathroom and I asked about the snacks/candy he was being suspected of taking. He apologized and said he will pay for the items. I then asked him for his ID and he handed me a Tennessee driver's license with DL#801527486 and with a name of Jamal Owens. I then had dispatch run the DL. Dispatch came back stating that the DL did not come back on file. At about that time Officer Lyszyk arrived on scene. I advised Officer Lyszyk about the incident and about the driver's license not coming back on file. While we were talking with the suspect he did pay for the items and apologized. Officer Lyszyk then went to his vehicle to further investigate the DL (See Officer Lyszyk's report). I was watching the suspect and he was pacing around, then bought a bottle of water from the hotel and drank it quick. He then threw it away in one of the hotel garbage can. He then continued to pace and got another bottle of water, this time from the Hertz rental car employee. Then I had him sit down on one of the sofas in the lobby. Officer Lyszyk then came back in and had the suspect turn around and that was when Officer Lyszyk observed a big bag of suspected Marijuana in the left pocket of the suspects jacket. As he was handcuffing the suspect, the suspect darted across the lobby, lost a sneaker, then went out the back door. We then began to chase the suspect calling out a foot pursuit over the air. We had also commanded for the suspect to stop but he kept running. The suspect ran around the hotel back to his vehicle that was in front of the hotel. He was able to get in and back the vehicle slightly. He stopped as we drew our service weapons. Officer Lyszyk was by the front passenger window, while I was next to the front driver side window. We gave him commands to stop moving and to shut the vehicle off. We had also radioed for additional units. The suspect was not complying with our commands and the suspect vehicle drove directly towards me, as a result, I had to jump out of the way to avoid serious bodily injury. The vehicle did strike Car 3's rear bumper and a column that was part of the hotel. The vehicle sustained major driver side front end damage. Despite this, the suspect was able to drive the vehicle onto Rt.9N in an extremely high rate of speed. By the time I got into my vehicle and got onto Rt. 9N, I no longer had visual of the vehicle. A description of the suspect along with

**Parks v. Woodbridge Twsp.**                   222103                   **Page 24**

the description of the vehicle was radioed to dispatch along with direction of travel. Multiple units were dispatched checking the area. I drove up Rt. 9N to Rt.1 N up to the Rahway border and did not see the vehicle. I then turned around to go back to the hotel. The suspect vehicle was found later by Sgt. Flavell parked in a parking lot off of Mattison St. just off the Main St. exit of Rt. 9N (See incident#19010148). Investigation was turned over to the Detective Bureau."

Officer Lee testified in his deposition testimony, on page 18, line 17, " Now, your report said that you estimated that the suspect was about 5' 11", right? A. Yes. Q. And how did you make that estimation? A. See, I'm 5' 6", so the suspect was taller than I am. Q. Okay. And you were face to face with the suspect, right? A. Yes. Q. So you were able to suss him out by being next to him; is that fair to say? A. Yes. I was able to kind of see how tall he was.

In the Woodbridge Police Department Incident Report # 19010123/4 Detective S. Tapia #481 reported, " On Saturday, January 26, 2019, Woodbridge Police Officers Lyszyk and Lee were dispatched to the Hampton Inn Hotel on a report of a man shoplifting snacks from the lobby. Officers responded and the suspect identified himself as Jamal Owens and produced a fraudulent Tennessee driver's license # 801527486. Officer Lyszyk contacted the Tennessee State Police and they confirmed that the Tennessee driver's license was fraudulent. Officers Lyszyk and Lee attempted to place the suspect under arrest and the suspect resisted arrest. The suspect ran into a 2018 Dodge Challenger bearing New York registration JBD2162. The suspect disobeyed several verbal commands to shut off and exit the vehicle. The suspect drove at Officer Lee, rammed the rear of the police car and crashed into part of the building. Officer Lee had to jump out of the way to avoid serious injury. Patrol Officers pursued the vehicle for a short distance and lost sight of it. I requested video footage from the Hampton Inn Hotel manager, Richard Charneco and the video was later turned over to the Woodbridge Police for evidence. Woodbridge Police I.D. Detective Quesada responded to the Hampton Inn Hotel and processed the scene. The suspect's sneaker, the fraudulent Tennessee driver's license, and a water bottle that the suspect drank out of were brought back to Woodbridge headquarters for further processing. The vehicle was located by Sgt. Flavell unoccupied on Mattison St. Woodbridge which is approximately 1 mile away from the Hampton Inn. Sgt. Flavell towed the vehicle to our impound yard for further processing upon my request. I contacted Hertz corporate security manager, Matthew Knowles and I learned that the suspect went in to the Hertz rental located within the Hampton inn hotel on rt.9 North in Woodbridge with the intent of extending his rental agreement on a 2018 grey Challenger bearing New York registration JBD2162. He presented the fraudulent Tennessee Driver's License with the name Jamal Owens. Matthew Knowles gave me verbal and written consent to search the vehicle. Inside the vehicle, I found the rental agreement for the Dodge Challenger with the name Jamal Owens. Detective Quesada processed the inside of the vehicle for fingerprints and several prints were lifted.

I verified with Officer Lee and Officer Lyszyk that the picture on the fraudulent Tennessee driver's license was the picture of the suspect. They both stated that they were 100% sure it was the suspect's picture. I sent out the suspect's Tennessee driver's license picture to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) for facial recognition.

**Parks v. Woodbridge Twsp.**                          222103                          **Page 25**

It is appropriately noted that the NJ ROIC form that Det. S. Tapia submitted clearly states that a possible match should only be considered an investigative lead and no probable cause to make an arrest. INVESTIGATIVE LEAD, NOT PROBABLY CAUSE TO MAKE AN ARREST. The NYRCIC reported utilizing facial recognition software and received a possible HIT on a subject NIJEER K. PARKS, 09/11/1987 (NJ).

It is also appropriately noted on the New York State Intelligence Center Request for Information Form submitted by Det. Tapia, he reported, "The picture on the D.L. is of the suspect but the other identifiers are false."

On January 27, 2019, I received notification from Investigator Seamus Lyons (Rockland County Sheriff's Intelligence Center) and Sgt. Dey (Palisades Interstate Parkway Police) that they had a high profile comparison to the picture on the fraudulent Tennessee driver's license. The suspect was identified as Nijeer Parks with a date of birth of September 11, 1987 with a last known address of 485 E. 19th St. Apt # 3G Paterson, NJ. I compared the photo on the fraudulent Tennessee driver's license to Nijeer Parks' assigned New Jersey driver's license # P06195927209872 and it is the same person. Inv. Seamus Lyons emailed me the Identification Report for evidence.

On February 1, 2019, I went to Hertz and I took a taped statement of the manager, Michael Dones who tended to the suspect. During his interview; he explained the identification procedures when renting a vehicle. Furthermore, Mr. Dones stated that he verified the picture on the Tennessee driver's license to the customer's face and it was the same person. Mr. Dones provided me with a copy of the rental agreements which were placed into evidence.

I contacted Middlesex County A.P. Nastasi and presented him with the facts of the case and he authorized a warrant. I generated warrant # 2019000156 against Nijeer Parks charging him with aggravated assault on police, possession of a weapon and possession of a weapon for unlawful purpose. The Honorable Municipal Court Judge Stahl read the affidavit of probable cause and signed the warrant. Officer Lyszyk generated warrant # 2019000158. (See officer Lyszyk's warrant for the list of charges)

After signing the complaints, Officer Lyszyk, Det. Goins, and I drove to Patterson and checked several addresses looking for Nijeer Parks but were unsuccessful. All of the evidence collected during this investigation is secured in the Woodbridge Police Evidence Bureau.

On February 2, 2019, I faxed the warrants to Patterson P.D. for service. This investigation is concluded pending court."

Sergeant Santiago Tapia testified in his deposition in relevant part on page 45 line 6, "Q. Sergeant, when did you become aware of facial recognition technology? A. While I was working on with the Auto Theft Task Force. Q. And tell us how you became aware of it with the task force. A. There was members on the tasks force that used it successfully. Q. And how was it used at the auto -- this is the auto task force of the – A. New Jersey State Police. Q. And that was out of Irvington? A. Yes, sir.

**Parks v. Woodbridge Twsp.**                    **222103**                    **Page 26**

Q. And how was it used there? A. To identify people involved in auto theft, whether it was the low-level thieves or the higher-ups in the trade. Q.   Do you remember particular individuals who used it at the task force? A. It was Sergeant Pyrzanowski. He's a lieutenant with the Department of Criminal Justice. Q.   Do you know what software Sergeant Pyrzanowski used? A. No. He didn't run it. He sent out for it. Q. Do you know where he sent it to? A. The Regional Operation Intelligence Center, the ROIC. Q. What do you know about the ROIC? A. They assist law enforcement agencies in several -- they have several tools that they use that we don't have the access to. Q. When did you first encounter the R-O-I-C? A. As a detective. I don't recall the first time I ever encountered them or used them for anything.

And on page 50 line 22, " Q.  Would it be fair to say that at the task force facial recognition technology was used an as investigative tool? A. Yes."

And on page 53, line 12, "Q.  Were you aware that the AG barred the use of facial recognition technology in 2020 because of this -- racially biased? A. It was actually one software that he banned, which was called Clearview."

It is duly noted that on January 24, 2020, a year after the Parks arrest,  New Jersey Attorney General Gurbir S. Grewal, told state prosecutors in all 21 counties that police officers should stop using the Clearview AI app. Nowhere in his ban did the Attorney General refer to "racially biased".

It is my professional opinion that Sgt. S. Tapia appropriately and properly used his on the job training knowledge to send the fraudulent Tennessee drivers license to the New Jersey Regional Operations Center (ROIC) and the New York State Intelligence Center (NYSIC)  Rockland County Sheriff's Intelligence Center (RCSIC) for Facial Recognition Technology (FRT) comparison as a tool to identify the Hampton Inn suspect, in accordance with accepted New Jersey police practices, procedures, training standards, New Jersey Attorney General Guidelines, the New Jersey Police Training Commission Performance Objectives, the Woodbridge Township Police Department Training and New Jersey Criminal Law.

Detective Jorge Quesada testified in his deposition testimony, in relevant part on August 16, 2022, Page 8, line 16 "Q. What's an ID detective? A. We process leads. If somebody breaks into a home we go photograph. We look for evidence, collect evidence, and submit the evidence. Q. when did you become an ID detective? A. The end of 2018. Q. So fair to say in January 2019 you had only been an ID detective for a couple months?  A. Yes, sir. And on page 9, line 8 "Q. When you came on the job what kind of training did you get? A. The police academy training. Six months' worth of police academy. Then we do yearly in-service training. And early on in the career I tried to go to any additional classes that were available. Our department would pay for the classes and we can go on off time or work days. Q. Which academy did you go to? A. Somerset County Police Academy. Q. When you became a detective was there any special training? A. They start sending you to different detective schools for interviews, various schoolings for that and classes, basically. And I used to go on my own to different classes. And on page 18, line 3, Q. do you recall going to a scene on January 26, 2019, at the Hampton Inn? A. Yes.

**Parks v. Woodbridge Twsp.**                          222103                          **Page 27**

On page 19, line 12, Q. Okay. So what did they ask you to do initially? A. It's what I asked them. I asked them, you know, which way the person ran. They told me that there was a sneaker in the parking lot. They told me that he was carrying a bag that he had left behind. And he was drinking the water bottle that he actually placed in the garbage can during the interaction. I believe they had a lengthy interaction with the person at that time. I start processing the scene. I start with overall photos of the scene. I photographed where the bag was, contents of the bag. I photographed where the garbage can was and where I recovered the water bottle that was in the garbage can. And then they showed me the direction which way he ran. He ran out through a back door which was a common door that everybody in the hotel uses. And then he went down the sidewalk, went through a gated area, made the right. And I believe that's where the sneaker was was in the back parking lot. And he ran around the building. And then that's when he jumped in the car. And there was damage to the hotel, damage to the police car I believe. So I photographed all that. Once my photographs were completed I started checking for fingerprints. And on page 22, line 7, Q Okay. What do you recall about lifting prints? A. The common doorway that he exited through is a common doorway. So I basically just dusted the whole door to see if I would see anything. Once I dusted the door I was able to see some of the prints. Those prints were lifted and photographed. Once I was done with the glass door I went out -- outside with the metal gate. And I also processed the metal gate, but I wasn't able to find any fingerprints on the metal gate. Once the vehicle was located I went and processed the vehicle once consent was granted. On page 25, line 9, Q. And how often -- what's the normal routine for -- or timeframe for submitting prints after they've been obtained? A. Once we have a couple jobs that are -- we have a little folder we keep the file -- the packages that go down to the state police.   Once when have a couple of them ready to go down our -- one of our retired guys is the one that transports them to the state police. It probably happens within a week to two weeks of coming in. Q. What's the normal turnaround after you submit the prints to Holmdel? A. I would say maybe four to six weeks we get them returned. And that's either with a comparison or with nothing. That they've been placed into the system and then they'll be randomly ran through the system to see if anything new comes in to compare them to. And on page 28, line 7, Q.  Did you do anything with the other evidence? A. It was packaged and sent out to state police for DNA comparison. Once I get the item, the water bottle and the sneaker, I got to package it a certain way. I turn it over to our evidence department. And then once they have a couple of cases that got to go down, they have to be taken down to Sea Girt by a police officer. And  then it gets dropped off there. And then once the state police is done with their processing of it, we actually have to go back with another police officer and the evidence guy to come pick up the items to be put back in our evidence department.

On page 31, line 21. Q. Have you ever -- have you had any training with facial recognition technology?  A. No, sir. Q. Do you know anything about facial recognition technology? A. It was a tool that could have been used. I believe you can go through the ROIC with state police, but I've never dealt with it, never done it. From just reading case law and people at a class say, hey, have you seen facial recognition technology before; you know, this is what we did, but no formal teaching of it from anybody. Q. So you were aware that the facial recognition technology was the basis for signing the complaint? A. No, sir. No. I was walking down the hallway and Tapia said, hey, we got a hit on this guy. Yes. We might have a possible lead on the person. And on page 36, line 10,  Q.

**Parks v. Woodbridge Twsp.**                    222103                    **Page 28**

What does it mean by the -- right above the narrative it says, "Identification made by Detective Cioni", and same thing for Velez? A. So once the state police has the fingerprint and they have a hit in their system, the fingerprint gets sent back to us. Once we have that fingerprint, if it's somebody of interest it has to be identified and compared by two individuals from our department. So when the state police says, hey, this has so many points that are identifiable, we have to locate those same points. And then a secondary person has to confirm those identifiers to be able to say, yes, this is the fingerprint belonging to such and such person. Q. The narrative says, "The details make, quote, the latent an exact match to the left palm impression of Barrington Walker." End quote. Fair to say that's a very strong result? A. Yeah, it has to be a hundred percent that person. Once the state police has their identification, we have to back it up and verify it. A. This was done later on. Once the fingerprint was lifted off the door, once it was received back to our department, I send it over to Detective Tapia.

Det. Quesada continued to testify that he appropriately tagged, marked and submitted the evidence found and collected to the New Jersey State Police Laboratory.

It is my professional opinion that the Woodbridge Township Police Department utilized their officers, Lee, Lyszyk, Tapia and Quesada with their appropriate expertise, experience and training to respond to the Hampton Inn shoplifting complaint on January 26, 2019 and as the process continued turned the investigation over to the detectives and crime scene personnel for continued investigation, evidence collection and documentation and submission, in accordance with accepted police practices, New Jersey Law, New Jersey Attorney General guidelines, Woodbridge Township Police Department Rules, Regulations, Policies & Procedures.

It is my further professional opinion that the Woodbridge Township Police Department continued to verify the leads generated and received as testified by Det. Quesada in accordance with accepted police practices, New Jersey Law, New Jersey Attorney General guidelines, Woodbridge Township Police Department Rules, Regulations, Policies & Procedures.

Nijeer K. Parks testified in his deposition, in relevant part that he was arrested numerous times and in prison two times, in New Jersey and that his DNA is in the system.

It is my knowledge and professional opinion that when an individual is arrested in New Jersey, the individual during processing is photographed and fingerprinted and that those photographs and fingerprints (mugshot & prints) are then on file in the New Jersey State Police, Bureau of Identification.

**New Jersey State Police (NJSP) Practical Guide to Intelligence-led Policing**

On September 26, 2006 The New Jersey State Police (NJSP) Practical Guide to Intelligence-led Policing details the processes that the NJSP has adopted in order to operationalize the principles of Intelligence-led Policing (ILP). It was written to ensure that all members of the NJSP share the same understanding of the concepts and vernacular that we have embraced to institutionalize intelligence

**Parks v. Woodbridge Twsp.**                    222103                    **Page 29**

as the foundation of all operations. The need for this guide was born from the understanding that before any law enforcement organization can benefit from the use of intelligence its members must truly understand the fundamental concepts linked to the application of intelligence and ILP. In essence, this guide is a reference for the trooper on patrol, our analysts, detectives in the field, and the NJSP's senior leadership. It acknowledges that the NJSP's primary responsibility as a state policing organization is to prevent and disrupt crime and terrorism and that they will do so by leveraging an intelligence apparatus that communicates clearly, shares information, and focuses resources.

The New Jersey Regional Operations and Intelligence Center (ROIC). As New Jersey's fusion center, the ROIC's intended benefits are to increase situational awareness of what is taking place in the operational environment, to provide a tactical intelligence analysis of how to best prevent or respond to changes in this environment, and to better manage asset allocation. Taken together, these ROIC's activities will enable the NJSP to maximize the utility of their resources, streamline operations, and improve their collective ability to fight crime and terrorism. With New Jersey's focus on an "all crimes - all hazards - all threats - all the time" preparedness strategy, it is imperative that the ROIC's analytical capacity be aligned with the NJSP's intelligence cycle in order to promote ongoing tactical situational awareness by the NJSP and relevant partners. This integration will evolve over time, and should be fostered by close interaction among the ROIC and the Investigations Branch's operational and strategic analysts. A central role is played by the ROIC's Watch Operations function, whereby NJSP personnel provide near-real-time situational awareness and coordinate with state and federal agencies to track issues of concern. Of equal importance is the performance of the analysts who, daily, are responsible for "connecting the dots" and producing finished intelligence products required for influencing decision-makers. Each function is carried out on a continual basis, though they are of course greatly energized and consume much greater attention during various crisis operations. At the same time, the ROIC must remain engaged in the management of emergency response assets.

The NJSP Biometric Identification Unit:

The Biometric Identification Unit (BIU), formerly called the Automated Fingerprint Identification Unit, classifies, searches, stores and verifies all criminal and noncriminal fingerprint, palm print, and mug photo record submissions. The master fingerprint file contains more than 6,800,000 fingerprints and nearly 674,000 palm prints.

The NJSP Facial Recognition Initiative since its inception in 2015, is administered by the ROIC and its Request for Facial Recognition/Photo Array clearly states, "If the NJ ROIC Facial Recognition Initiative produces a possible match, this should only be considered an investigative lead. Further investigation is needed to confirm a possible match through other investigative corroborated information and/or evidence. **INVESTIGATIVE LEAD, NOT PROBABLY CAUSE TO MAKE AN ARREST.**

It is duly noted that each Woodbridge Township police officer who testified in this Parks matter stated that the facial recognition technology is **only** a tool.

**Parks v. Woodbridge Twsp.**                    222103                    **Page 30**

The Security Industry What Science Really Says About Facial Recognition Accuracy and Bias Concerns on July 23,2022 provides in relevant part: " **For the past 20 years, the National Institute of Standards and Technology (NIST) Facial Recognition Vendor Test (FRVT) program has been the world's most respected evaluator of facial recognition algorithms** (emphasis added)– examining technologies voluntarily provided by developers for independent testing and publication of results. But even NIST's most significant work has been continually misrepresented in policy debates.

In 2019, NIST published its first comprehensive report on the performance of facial recognition algorithms specifically across race, gender and other demographic groups. Importantly, the report found that the leading top-tier facial recognition technologies had "undetectable" differences in accuracy across racial groups, after rigorous tests against millions of images. Many of the same suppliers are also relied upon for the most well-known U.S. government applications, including the FBI Criminal Justice Information Services Division and U.S. Customs and Border Protection's (CBP's) Traveler Verification Service

NIST's FRVT Ongoing series releases up-to-date analysis on a monthly basis, which surprisingly contradicts the 2019 demographic report. In fact, accuracy among subdemographics is very closely balanced, and if anything, the white male subdemographic shows the lowest accuracy, not the highest.

According to data from the most recent evaluation from June 28, 2022 for the top 20 algorithms, accuracy of the highest performing demographic versus the lowest varies only between 99.7% and 99.8%. Unexpectedly, white male is the lowest performing of the four demographic groups for the top 20 algorithms. For 17 of these algorithms, **accuracy for white female, black male and black female are nearly identical at 99.8%, while they are least accurate for the white male demographic at 99.7%.** (Emphasis added).

Furthermore, FRVT Ongoing uses mugshot data from US law enforcement records, which has firmly established ground truth (accurately labeled data), in contrast to the 2019 demographic report's reliance on foreign governments to supply visa application data, which can be unreliable. In other words, the NIST FRVT Ongoing's finding an absence of demographic bias is both more up to date and based on more accurate data than the 2019 demographic report.

NIST research has documented massive improvements in overall accuracy in recent years, noting even in 2018 the software tested was at least 20 times more accurate than it was in 2014, and in 2019 finding "close to perfect" performance by high-performing algorithms with "miss rates" against a database of 12 million images averaging 0.1%. On this measurement, the accuracy of facial recognition is reaching that of automated fingerprint comparison, which is generally viewed as the gold standard for identification.

While no method of scientifically testing the accuracy of facial recognition algorithms is without limitations, so far the science shows that to the extent accuracy might vary across demographic

**Parks v. Woodbridge Twsp.**                    222103                    **Page 31**

groups (i.e., "bias"), the highest-performing algorithms do not have such an issue. At the same time, it is also clear that much more thorough, frequent scientific research, testing and evaluation of facial recognition technologies is necessary to both validate accuracy gains and provide tools to developers to ensure performance is consistent.

**Middlesex County Prosecutor's Office Liaison Program**

Woodbridge Township Police Director Robert Hubner stated in his

answers to Interrogatories:. The Middlesex County Prosecutor's Office (MCPO) is the lead law enforcement agency in Middlesex County. MCPO assigns an Assistant Prosecutor to serve as a liaison to the Woodbridge Police Department. The MCPO liaison to Woodbridge is Assistant Prosecutor Peter Nastasi. When an officer files a complaint alleging an indictable offense, the Department will contact MCPO to discuss the factual allegations and obtain a legal opinion as to the proper charges to be brought against the suspect.

Sergeant Tapia, testified in his deposition on page 114, line 23 that he briefed Assistant Prosecutor Peter Nastasi of his probable cause and received Nastasi's approval to sign a complaint against Nijeer Parks with Municipal Judge David Stahl, which was done on January 30, 2019.

Officer Lyszyk testified in his deposition and reported that he spoke with Assistant Prosecutor Peter Nastasi, who approved his complaint and the complaint warrant against Nijeer Parks with Municipal Judge David Stahl, which was done on January 30, 2019.

The Middlesex County Prosecutor's Office website provides in relevant part "The Middlesex County Prosecutor has an obligation to investigate crimes, authorize arrests, and is responsible for obtaining indictments and prosecuting criminal cases through trial. The Prosecutor has a duty to uphold the United States and New Jersey Constitutions in order to protect and preserve the rights of all citizens, including suspects, defendants, victims and witnesses. In addition, the Prosecutor works in partnership with other local, state and federal law enforcement agencies; as well as the citizens and members of the county's diverse communities.

The Middlesex County Prosecutor's Office is currently staffed with over two hundred members including Assistant Prosecutors, Detectives, Agents, and Support Personnel. As the chief law enforcement officer for the county, the Prosecutor also has authority over approximately 1900 sworn law enforcement officers from 29 law enforcement agencies in 25 municipalities."

It is my professional opinion that Sgt. Tapia and Officer Lyszyk, appropriately, professionally and properly conferred with Middlesex County Assistant Prosecutor Peter Nastasi, the Woodbridge Police Department liaison and after his review and counsel appeared before Municipal Judge David Stahl, on January 30, 2019 and signed the Nijeer Parks complaint warrants, in accordance with the

**Parks v. Woodbridge Twsp.**                    222103                    **Page 32**

Middlesex County Prosecutor's Office directive and the Woodbridge Police Department Directive Policy and Procedures.

**Nijeer K. Parks Arrest**

Det. Sgt. Kondracki reported in his Incident #19010123/6 on February 5, 2019 after the arrest of Nijeer Parks, he mirandized Nijeer Parks, who signed the Miranda card and conducted an interview of Nijeer Parks, in accordance with accepted police practices, New Jersey Law, New Jersey Attorney General guidelines, Woodbridge Township Police Department Rules, Regulations, Policies & Procedures.

Officer Francis Lee, testified in his deposition on August 12, 2022 on page 29, line 20,"I told them that was the individual."

Officer Lee also reported, On February 5, 2019, I was contacted by Lt. Ng, who advised me that they currently had an individual, Nijeer Parks, who was involved in the incident on January 26, 2019. I arrived at HQ and was brought down to the processing area with Lt. Ng and Det. Sgt. Penicaro. Once there, I observed Mr. Parks sitting on the rail and identified him as being the suspect from the January 26, 2019 incident at the Hampton Inn on Rt. 9N.

It is my professional opinion that Officer Lee positively identified Nijeer Parks as the individual he had interactions with at the Hampton Inn on January 29, 2019.

Officer Andrew Lyszk, testified in his deposition on August 16, 2022 on page 25, line 7, " I think with the totality of the circumstances of the results from the facial recognition we confirmed that it looked like the suspect that was dealt with at the Hampton Inn. Was that it was a good tool to assist. Assist. And on page 61, line 6, "We received a facial recognition hit. I also confirmed that -- I confirmed that the person in the facial recognition hit was the person that was at the hotel, that looked like the person that was at the hotel."

In Defendant Andrew Lyszyk's Certified Answers to Plaintiff Nijeer Parks's First Set of Interrogatories, Officer Lyszyk certified, "I relied upon my personal observations to identify the suspect after directly interacting with him for over twenty minutes. My observations and recognition of the suspect was corroborated by Officer Lee, who was on scene with the suspect and myself, and directly interacted with the suspect for over twenty minutes."

It is my professional opinion that Officer Lyszk positively identified Nijeer Parks as the individual he had interactions with at the Hampton Inn on January 29, 2019.

Sgt. Santiago Tapia, while testifying in his deposition on August 12, 2022 concerning Officer Lyszk's identification of Nijeer Parks, testified on page 96, line 2, " Officer Lyszk identified him as Nijeer Parks. And on page 97, line 7, "Because we had the DMV information with his picture". And on line 10," But he (Lyszk) identified him as being the person he dealt with at the Hampton

**Parks v. Woodbridge Twsp.**                 222103                 **Page 33**

Inn." And on line 18, "The identification came from Lyszk." And on Line 24, Officer Lyszk was the first one to see it. He identified Nijeer Parks 100 percent as the person he dealt with. And on page 100, line 6, in answer to the Q. What are the other bases? " Positive identification with the officer that dealt with the person, Officer Lyszk". And on line 16, in answer to the Q. What do you base that assertion on? "It's an identification."

It is also my professional opinion that Det. Tapia ulitized facial recognition as a tool to identify Nijeer Parks, and along with the identifications of Officers Lee and Lyszk, had developed enough probable cause, confirmed by Assistant Prosecutor Nastasi, to sign the complaint warrant.

### Review of the Cilento Report

My review of the Cilento report does not in any way change my professional opinions rendered in this report, in fact it substantiates my professional opinions that the Township of Woodbridge, the Woodbridge Township Police Department and its members, including Police Director Hubner and Police Officers, Lt. E. Barrett, Lt. J. Velez, Lt. M. Ng, D/Sgt. Anthony Penicaro, D/Sgt. Andrew Kondracki, Sgt. Santiago Tapia, Det. Jorge Quesada, Off. Andrew Lyszyk, Off. Francis Lee, & Off. David Mirdala, involved with this incident of January 26, 2019, acted in a professional manner, in accordance with accepted New Jersey Training Standards, accepted New Jersey Police Practices and Procedures, New Jersey Attorney General Guidelines, Woodbridge Township Police Department Rules, Regulations and Procedures, and New Jersey Law.

It is my professional opinion that the Cilento report is fraught with his own slanted opinions and innuendo's with statements like on page 5,"However,  "[officers] should not use their firearm to shoot at or from a moving vehicle unless deadly physical force is being used against them other than the vehicle." using the NYPD Patrol Guide Use of Force standard, which is not the same as the State of New Jersey or Woodbridge Use of Force standards.

And on page 7,  On January 26, 2019, Det. Tapia verified that the photo on the Tennessee driver's license was the person with whom POs Lyszyk and Lee engaged in the hotel lobby by showing each one of them the license separately. This was an appropriate, but unnecessary, investigative step because the suspect had previously given the license to these officers, who had turned it over to Det. Tapia. Therefore, there was no need for him to show them the license again, to which I disagree, it was appropriate and part of Det, Tapia's continuing investigation.

And on page 9, The act of showing PO Lyszyk the single photo of Nijeer Parks from the facial recognition hit was a confirmatory identification procedure. It is well known, and considered a best practice, to only utilize single-photo confirmatory identifications when there is a prior relationship between the parties and/or a close temporal proximity to the incident. Neither factor was present in this case, rendering this identification procedure improper, highly suggestive, and likely inadmissible. Further, as it pertains specifically to the identification procedure, it is of no legal significance that PO Lyszyk is a police officer, and under these facts should have been treated like any other witness. And in my professional opinion not taking into account that PO Lyszyk is a

**Parks v. Woodbridge Twsp.**                    222103                    **Page 34**

properly trained N.J. police officer in accordance with the New Jersey Police Training Commission Performance Objectives which includes eye witness observation.

It is because of these types of slanted statements and innuendo's that my review of the Cilento report does not in any way change my professional opinions rendered in this report, in fact it substantiates my professional opinions that the Township of Woodbridge, the Woodbridge Township Police Department and its members, including Police Director Hubner and Police Officers, Lt. E. Barrett, Lt. J. Velez, Lt. M. Ng, D/Sgt. Anthony Penicaro, D/Sgt. Andrew Kondracki, Sgt. Santiago Tapia, Det. Jorge Quesada, Off. Andrew Lyszyk, Off. Francis Lee, & Off. David Mirdala, involved with this incident of January 26, 2019, acted in a professional manner, in accordance with accepted New Jersey Training Standards, accepted New Jersey Police Practices and Procedures, New Jersey Attorney General Guidelines, Woodbridge Township Police Department Rules, Regulations and Procedures, and New Jersey Law.

**Internal Affairs Report**

On December 29, 2021, Lt. Joseph Velez sent IA Report 2021-501 report to: To: Chief Law Enforcement Officer Captain Scott Kuzma

On December 28, 2020, Woodbridge Township Police Director Robert Hubner received a Summons notifying him that a Lawsuit had been filed against the township and police department. Nijeer Parks filed the lawsuit because of his arrest by Woodbridge Police Officers on February 5, 2019.

Incident Summary:
On January 26, 2019, Officers Andrew Lyszyk #519 and Officer Francis Lee #591 were dispatched to the Hampton Inn on Route #9 in Woodbridge on a report of shoplifting. Officers located a black male in the hotel lobby. He admitted taking some items from the gift shop and placing them in his car but stated he was going to pay for them. The suspect gave Officer Lee a Photo Tennessee Driver's license with the name Jamal Owens. Officer Lyszyk discovered the driver's license to be fraudulent. Officers decided to arrest the suspect for the shoplifting offense because they were unable to verify his identity. When advised him he was under arrest he jumped into a Hertz rental car and drove away. While fleeing the scene he struck patrol car #3 and caused Officer Lee to move out of his path to avoid injury. He also struck a hotel pillar in front of the building before exiting onto Route #9 North. Officers attempted to follow him but could not locate. Officers returned to the hotel and collected items that the suspect left behind including the Fraudulent Tennessee driver's license.

Detective Tapia arrived on scene and determined from the Officers and employees at the scene that the photo on the driver's license was the same as the suspect that fled the scene. Detective Tapia then sent the Tennessee driver's license photo to the New Jersey State Police Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) for entry into facial recognition software.

January 27, 2019, Detective Tapia received notification from Rockland County Sheriff's Intelligence

**Parks v. Woodbridge Twsp.** 222103 **Page 35**

Center that they had a high profile comparison to the photo on the fraudulent Tennessee driver's license. The high profile comparison was identified as Nijeer Parks with a date birth of September 11, 1987. Detective Tapia compared the photo on the Fraudulent Tennessee driver's license photo with the photo on Nijeer Parks assigned New Jersey driver's license #P0619 59272 09872 and determined it to be the same person.

February 1, 2019, Detective Tapia contacted Middlesex County Assistant Prosecutor Nastasi and presented him with the facts of the case and he authorized a warrant. Detective Tapia then generated warrant #2019000156 against Nijeer Parks charging him with aggravated assault on a police officer, possession of a weapon and possession of a weapon for unlawful purpose. Municipal Court Judge Stahl read the affidavit of probable cause and signed the warrant.

February 5, 2019, Nijeer Parks responded to Woodbridge Police department because he became aware that a warrant was issued for his arrest. Mr. Parks was interviewed by Detective Andrew Kondracki, arrested and later in the day transported to the Middlesex County Correction Center in North Brunswick, NJ.

February 13, 2019, Nijeer Parks was released from custody at the Middlesex County Correction Center.

November 2, 2019, Middlesex County Prosecutor's Office decides not to pursue prosecution and the case is closed.

November 25, 2020, Nijeer Parks files False Arrest lawsuit against Woodbridge Township.

January 1, 2021, Woodbridge Police Internal Affairs starts investigation in to the lawsuit allegations. I started to collect and review all Reports, case files, statements, audio and video recordings and photographs related to this incident.

February 25, 2021 at 10:25am, I made contact with Nijeer Parks via phone #1-570-516-4620. I informed Mr. Parks I would be investigating the claims from his lawsuit. I asked Mr. Parks if he would speak to me about the claims and give me a statement. Mr. Parks declined my request and informed me he has an attorney.

March 3, 2021, I send out certified letter to Mr. Parks at 485 E. 19th Street Apt.#3G, Paterson, NJ 07522 formally requesting his input related to this investigation.

April 1, 2021, the certified letter is Returned to Sender unopened.

Findings / Conclusion:

Mr. Parks filed a lawsuit almost two years after his arrest but never made a formal Internal Affairs Complaint. When contacted by Internal Affairs he declined to comment on his complaint or provide

**Parks v. Woodbridge Twsp.**                    222103                    **Page 36**

any additional details.

I find that Detective Tapia acted in good faith when he submitted the fraudulent Tennessee driver's license photo for a facial recognition comparison. At the time of his submission, there were no restrictions on the use of facial recognition software. The New Jersey Attorney General advised Law Enforcement to stop using Certain Facial Recognition Software on January 24, 2020, almost one year after Detective Tapia used it.

Detective Tapia received approval for the warrant from an Assistant Prosecutor and a Municipal Court Judge.

I reviewed the photographs of Mr. Parks and the high profile comparison and they are similar, and could be mistaken as the same person.

I reviewed the audio and video recordings of Mr. Parks while he was in Woodbridge Police custody, and find no evidence of any mistreatment.

I conclude that Detective Santiago Tapia #481 is EXONERATED of the complaint of Improper Arrest. A record of this shall be entered into the Internal Affairs Index System.

**Analysis of the Woodbridge Township Police Department Internal Affairs Investigation**

It is duly noted that Nijeer Parks did not make an Internal Affairs complaint to the Woodbridge Police Department from February 5, 2019, the date of the incident when the alleged false arrest occurred to December 28, 2021 when Director Hubner received the false arrest complaint.

My review of the Attorney General IA Policy & Procedures that were in place, during Nijeer Parks investigation and the Woodbridge Police Department Internal Affairs Chapter 620, were revised to mirror the NJAG revisions and the Parks Internal Affairs report was in my professional opinion conducted accordingly.

The New Jersey Attorney General Internal Affairs Policy & Procedures Issued August 1991, Revised November 1992, Revised November 2000, Revised September 2011, revised July 2014, and revised August 2020, provides in relevant part:

Internal Affairs Policy & Procedures was first published in 1991. Updates to the policy were issued in 1992, 2000, 2011,2014 and 2020. The purpose of the policy is to assist the State's law enforcement agencies with investigating and resolving complaints of police misconduct that originate with private citizens or are generated by the supervisors, officers or employees of a law enforcement agency. The goals of the policy are to enhance the integrity of the State's law enforcement agencies, improve the delivery of police services and assure the citizens of New Jersey that complaints of police misconduct are properly addressed.

**Parks v. Woodbridge Twsp.**                    222103                    **Page 37**

Every law enforcement agency shall adopt and implement guidelines which shall be consistent with the guidelines governing the "Internal Affairs Policy and Procedures" of the Police Management Manual promulgated by the Police Bureau of the Division of Criminal Justice in the Department of Law and Public Safety, and shall be consistent with any tenure or civil service laws, and shall not supersede any existing contractual agreements.

It is important for county and municipal law enforcement agencies to recognize that, as they conduct internal affairs investigations, they do so under the general supervision of the Attorney General. The Criminal Justice Act of 1970 designates the Attorney General as the State's chief law enforcement officer. (N.J.S.A. 52:17B-98). As such, the Attorney General is responsible for the general supervision of the State's law enforcement agencies to provide for the efficient administration of the criminal justice system. Subordinate law enforcement agencies, including county and municipal police forces, have a duty to cooperate with the Attorney General to improve the administration of the criminal justice system, including the efficient delivery of police services. For county and municipal law enforcement agencies, cooperation in internal affairs matters begins with strict adherence to the Attorney General's policy requirements.

County and municipal law enforcement agencies must also recognize that they conduct internal affairs investigations, particularly those that involve allegations of criminal conduct, under the direct supervision of the county prosecutors.

County and municipal law enforcement agencies must inform the appropriate county prosecutor when allegations of police misconduct involve potential criminal conduct. In addition, county and municipal law enforcement agencies must confer with and follow the instructions given by the county prosecutor at all critical points in the investigative process. This is particularly true when the agency is in the process of gathering evidence, including the taking of statements, concerning allegations of criminal conduct.

It is my professional opinion the Woodbridge Township Police Department Policy & Procedure INTERNAL AFFAIRS Chapter 620 mirrors the NJ Attorney General Internal Affairs Policy and Procedures.

It is also duly noted that the Internal Affairs Unit's quarterly reports to the county prosecutor summarizing the allegations received and the investigations concluded for that period are posted online, in accordance with the New Jersey Attorney General and Woodbridge Township Police Department Internal Affairs Policy.

It is my professional opinion and duly noted that Lt. Joseph Velez completed the Middlesex County Training Center, Internal Affairs Policy and Procedures training on November 13, 2020 in accordance with the N. J. Attorney General Guidelines & Woodbridge Police Department Policy and Procedures.

It is also my professional opinion that a  complete and proper internal affairs investigation was

**Parks v. Woodbridge Twsp.**                    **222103**                    **Page 38**

conducted in this matter and logical conclusions were arrived at based on the facts and evidence, in accordance with the New Jersey Attorney General Internal Affairs Policy & Procedures and the Woodbridge Township Police Department Internal Affairs Chapter 620.

It is my further professional opinion that Sgt. S. Tapia investigated in the December 29, 2021 Lt. Joseph Velez IA 2021-501was appropriately and properly exonerated.

It is my professional opinion, based on my review of all of the records, materials and testimony in this matter. That the incidents alleged by Nijeer Parks do not establish any practice, scheme, custom policy or pattern of deliberate indifference on behalf of the Township of Woodbridge, the Woodbridge Township Police Department, Director Robert Hubner, Sgt. Tapia or any of the Woodbridge Township Police Department members involved in this matter, of any violations of the New Jersey Police Practices, Procedures and Training Standards and the Woodbridge Police Department Rules, Regulations, Policies & Procedures, the New Jersey Attorney General Guidelines, New Jersey Law or NJ Constitution.

**Conclusions**

Supported by my professional opinions contained within this report, I make the following findings and conclusions:

1.      The Township of Woodbridge, The Woodbridge Township Police Department, Woodbridge Township Police Director Robert Hubner, and all of the Woodbridge Township Police Department members involved in this matter,  acted  in good faith, reasonably, justifiably, properly and in accordance with accepted New Jersey police practices, procedures and training standards, the New Jersey Police Training Commission Performance Objectives, the New Jersey Attorney General Guidelines, the New Jersey Criminal Code, Motor Vehicle Statutes, the Woodbridge Township Police Department Rules, Regulations, Policies & Procedures, Training Standards, and the New Jersey Constitution.

2.      The Township of Woodbridge appropriately and properly established the Adopting Ordinance to form the Woodbridge Township Police Department, in accordance with accepted New Jersey police practices and Statutes.

3.      The Township of Woodbridge appropriately and properly established the Woodbridge Township Police Department in accordance with New Jersey Statute Annotated 40A:14-118 et seq.

4.      It is my professional opinion that the Township of Woodbridge appropriately and properly established the Adopting Ordinance to form the Woodbridge Police Department, which included the process of a departmental accreditation through the  Commission On Accreditation For Law Enforcement Agencies (CALEA);  in accordance with accepted New Jersey Police Practices and Law.

**Parks v. Woodbridge Twsp.**                    222103                    **Page 39**

5.      It is my professional opinion that the Accreditation is a process and time-proven method of assisting law enforcement agencies to calculate and improve their overall performance. The foundation of Accreditation lies in the adoption of standards containing a clear statement of professional objectives. Participating agencies conduct a thorough self-analysis to determine how existing operations can be adapted to meet these standards and objectives. When the procedures are in place, a team of trained, independent assessors verifies that the applicable standards have been successfully implemented.

6.      It is also my professional opinion that the CALEA accredited Woodbridge Police Department is a highly professional police organization with all of the necessary Rules, Regulations, Policies and Directives to efficiently, professionally, and effectively carry out all of the police functions of a New Jersey Police Agency, in accordance with accepted New Jersey police practices and procedures.

7.      It is my further professional opinion that the Accredited status represents a significant professional achievement. Accreditation acknowledges the implementation of policies and procedures that are conceptually sound and operationally effective.

8.      It is my professional opinion that the members of the Woodbridge Township Police Department were properly trained in accordance with the New Jersey Law, New Jersey Police Training Commission Performance Objectives and the Woodbridge Township requirements.

9.      It is my professional opinion and duly noted that the Woodbridge Police Department training office use NJ Learn and the PowerDMS program which provides a central, standardized system for tracking and documenting field training, recruit on boarding and employee performance. The program printout is part of the training records of each of the Woodbridge Police Department police officers involved with the Parks investigation.

10.     My review of the training records of Lt. Edward Barrett, Lt. Joseph Velez, Lt. Michael Ng, D/Sgt. Anthony Penicaro, D/Sgt. Andrew Kondracki, Sgt. Santiago Tapia, Det. Jorge Quesada, Off. Andrew Lyszyk, Off. Francis Lee, & Off. David Mirdaia, revealed that each of Woodbridge Police Department members received numerous and a variety of specialized law enforcement related training and each of them had a lengthy computer based training which included arrest, search & seizure.

11.     It is my further professional opinion that the Township of Woodbridge and the Woodbridge Township Police Department have a systematic in-service training program which includes the Attorney General and Middlesex County Prosecutor's Office use of force guidelines and also includes in each session a review of the domestic violence policy, pursuit policy and aerosol agents, as well as arrest, search and seizure.

12.     It is also my professional opinion that each of the Woodbridge Police members involved in this incident were highly and professionally trained in all relevant areas of law enforcement which included legal updates which includes statutory and/or case law which affects law enforcement

PARKS000231

**Parks v. Woodbridge Twsp.**                    **222103**                         **Page 40**

operations

13.      It is also my professional opinion that each of the Woodbridge Police members involved in this incident were highly and professionally trained in all relevant areas of law enforcement which included probable cause, legal updates which includes statutory and/or case law which affects law enforcement operations.

14.      It is also my professional opinion that each Woodbridge Police Officer involved in this Nijeer Parks investigation were highly and thoroughly trained from their Basic Academy Training, through their specialized training and continual agency training and on a daily field learning experience, in accordance with accepted police practices, New Jersey Law, New Jersey Attorney General guidelines, Woodbridge Township Police Department Rules, Regulations, Policies & Procedures.

15.      It is my further professional opinion that Officer Lyszyk in his exemplary performance, responded to the shoplifting call, made his observations, recovered suspected marijuana, and went to his patrol vehicle and looked into his personal book that identifies government licenses, telephoned the Tennessee State Police and confirmed the license was fictitious, called for more Woodbridge Officers to preserve the scene, continue the investigation and secured the evidence, in accordance with accepted New Jersey Police Practices & Procedures, and his overall training knowledge and experience enumerated above.

16.      It is duly noted that on January 24, 2020, a year after the Parks arrest,  New Jersey Attorney General Gurbir S. Grewal, told state prosecutors in all 21 counties on Friday that police officers should stop using the Clearview AI app. Nowhere in his ban did the Attorney General refer to "racially biased".

17.      It is my professional opinion that Sgt. S. Tapia appropriately and properly used his on the job training knowledge to send the fraudulent Tennessee drivers license to the New Jersey Regional Operations Center (ROIC) and the New York State Intelligence Center (NYSIC)  Rockland County Sheriff's Intelligence Center (RCSIC) for Facial Recognition Technology (FRT) comparison as a tool to identify the Hampton Inn suspect, in accordance with accepted New Jersey police practices, procedures, training standards, New Jersey Attorney General Guidelines, the New Jersey Police Training Commission Performance Objectives, the Woodbridge Township Police Department Training and New Jersey Criminal Law.

18.      It is my professional opinion that the Woodbridge Township Police Department utilized their officers with the appropriate expertise, experience and training to respond to the Hampton Inn shoplifting complaint on January 26, 2019 and as the process continued  turned the investigation over to the detectives and crime scene personnel for continued investigation, evidence collection and documentation and submission, in accordance with accepted police practices, New Jersey Law, New Jersey Attorney General guidelines, Woodbridge Township Police Department Rules, Regulations, Policies & Procedures.

**Parks v. Woodbridge Twsp.**                    222103                    **Page 41**

19.      It is my further professional opinion  that the Woodbridge Township Police Department continued to verify the leads generated and received as testified by Det. Quesada  in accordance with accepted police practices, New Jersey Law, New Jersey Attorney General guidelines, Woodbridge Township Police Department Rules, Regulations, Policies & Procedures.

20.      It is my knowledge and professional opinion that when an individual is arrested in New Jersey, as Nijeer Parks admitted and was, the individual during processing is photographed and fingerprinted and that those photographs and fingerprints (mugshot & prints) are then on file in the New Jersey State Police, Bureau of Identification and recorded.

21.      It is my professional opinion that Sgt. Tapia and Officer Lyszyk, appropriately, professionally and properly conferred with Middlesex County Assistant Prosecutor Peter Nastasi, the Woodbridge Police Department liaison and after his review and counsel appeared before Municipal Judge David Stahl, on January 30, 2019 and signed the Nijeer Parks complaint warrants, in accordance with the Middlesex County Prosecutor's Office directive and the Woodbridge Police Department Directive Policy and Procedures.

22.      It is my professional opinion that the Cilento report is fraught with his own biased opinions and innuendo's with statements like on page 5,"However,  "[officers] should not use their firearm to shoot at or from a moving vehicle unless deadly physical  force is being used against them other than the vehicle." or  "The act of showing PO Lyszyk the single photo of Nijeer Parks from the facial recognition  hit was a confirmatory identification procedure. It is well known, and considered a best  practice, to only utilize single-photo confirmatory identifications when there is a prior  relationship between the parties and/or a close temporal proximity to the incident. Neither  factor was present in this case, rendering this identification procedure improper, highly  suggestive, and likely inadmissible. Further, as it pertains specifically to the identification  procedure, it is of no legal significance that PO Lyszyk is a police officer, and under these  facts  should have been treated like any other witness. Not taking into account that PO Lyszyk is a properly trained N.J. police officer in accordance with the New Jersey Police Training Commission Performance Objectives which includes eye witness observation.

23.      It is my professional opinion and duly noted that Lt. Joseph Velez completed the Middlesex County Training Center, Internal Affairs Policy and Procedures training on November 13, 2020, and Lt. Edward Barrett completed the Middlesex County, Internal Affairs Policy and Procedures training on April 28, 2017, in accordance with the N. J. Attorney General Guidelines & Woodbridge Police Department Policy and Procedures.

24.      It is also my professional opinion that a  complete and proper internal affairs investigation was conducted in this matter and logical conclusions were arrived at based on the facts and evidence, in accordance with the New Jersey Attorney General Internal Affairs Policy & Procedures and the Woodbridge Township Police Department Internal Affairs Chapter 620.

**Parks v. Woodbridge Twsp.**                    222103                    **Page 42**

25.     It is my further professional opinion that Sgt. S. Tapia investigated in the December 29, 2021 Lt. Joseph Velez IA 2021-501 was appropriately and properly exonerated.

26.     It is my professional opinion, based on my review of all of the records, materials and testimony in this matter. That the incidents alleged by Nijeer Parks do not establish any practice, scheme, custom  policy or pattern of deliberate indifference on behalf of the Township of Woodbridge, the Woodbridge Township Police Department, Director Robert Hubner, Sgt. Tapia or any of the Woodbridge Township Police Department members involved in this matter, of any violations of the New Jersey Police Practices, Procedures and Training Standards and the Woodbridge Police Department Rules, Regulations, Policies & Procedures, the New Jersey Attorney General Guidelines, New Jersey Law or NJ Constitution.

27.     It is my professional opinion that Officer Lee positively identified Nijeer Parks as the individual he had interactions with at the Hampton Inn on January 29, 2019.

28.      It is my professional opinion that Officer Lyszk positively identified Nijeer Parks as the individual he had interactions with at the Hampton Inn on January 29, 2019.

29.     It is also my professional opinion that Det. Tapia utilized facial recognition as a tool to identify Nijeer Parks, along with the identifications of Officers Lee and Lyszk, had developed enough probable cause, confirmed by Assistant Prosecutor Nastasi, to sign the complaint warrant.

Regards,


Major Joseph J. Craparotta (Ret.)
President

# EXHIBIT "V"

# Daniel W. Sexton, Esq. LLC

**ATTORNEY AT LAW**

229 New Centre Road
Hillsborough, New Jersey  08844
PHONE: (201) 332-5455
FAX: (201) 332-5455
DanielSextonEsq@gmail.com

March 21, 2023

*Via email only: FRubenstein@jpnlaw.us*
Frederick L Rubenstein (Woodbridge Defendants)
James P. Nolan & Associates
61 Green Street
Woodbridge, NJ 07095

*Via email only: Phoenix.Meyers@law.njoag.gov*
Phoenix Meyers, DAG
Division of Law
Hughes Justice Complex
Trenton, NJ 08625

     RE: Parks, Nijeer  v.  Middlesex County Prosecutor, et al.
     Docket 2:21 — cv— 04021

Dear Counsel:

     Please find the initial report of Plaintiff's liability expert, Ralph Cilento, along with his CV.  Plaintiff reserves the right to supplement same in light of continuing discovery.

     Please provide your proposed statement for the joint letter on settlement negotiations which is to be submitted today as soon as possible.

     Thank you for your continued courtesies in this regard.

          Very truly yours,

          Daniel W. Sexton

SWD/DS
*cc  client*




**PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT**

Ralph Cilento is a retired Lieutenant Commander of Detectives in the NYPD with more than twenty-seven years of experience in the New York City Police Department. Lt. Cilento has been assigned to supervise investigations for more than 16 years, commanding detectives in the 44th, 45th, and 48th Precinct Detective Squads, Bronx Homicide Squad and Major Case Squad. Lt. Cilento served as the NYPD's project manager and authority on Electronic Recording of Custodial Interrogations and implemented all facets of the program throughout the city, as well as having authored the current NYPD policy on electronic recording of custodial interrogation.

He has testified as an expert witness for the NYPD and provided sworn testimony before the New York State Criminal Justice Task Force regarding witness intimidation and open discovery statutes. While serving as Commanding Officer of the NYPD's Detective Bureau Training Unit, he was responsible for developing, implementing, and assessing training for more than 5000 members of the NYPD's Detective Bureau, including the college accredited and nationally recognized courses: Homicide Investigators Course, Special Victims Investigators Course, Criminal Investigators Basic Course, and the Custodial Interrogation Course. He has co-authored sections of the NYPD Patrol and Detective Guides relating to general operational policy, identification procedures, and custodial interrogation.

In his capacity as a respected law enforcement educator, he has traveled throughout the country to deliver lectures on various law enforcement topics including homicide investigation, and custodial interrogation. He is core faculty member of the FBI's INLETS Violent Crimes Training Services. He has guest lectured at several non-law enforcement public safety/conflict resolution educational events such as Metro North Railroad, The Rubin Museum of Art, Pace University Law School, Autism Speaks, and the NYS Baseball Umpires Association. He has also appeared as a subject matter expert on FOX5, PIX11, Fox News and the nationally syndicated, series, *The Dr. Oz Show,* and History Channel's *"History's Greatest Mysteries".*

Lt. Cilento holds a B.A. degree in History and Psychology from Pace University and is an MPA candidate and an Adjunct Professor of Police Science at John Jay College of Criminal Justice in New York City. He is a member of the International Association of Chiefs of Police (IACP), and a graduate of the 271st Session of the FBI National Academy, where he also served as the class president.

bluetopconsulting@gmail.com  | 845.228.4911 | Blue Top Consulting Inc.



BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

Ralph Cilento - Blue Top Consulting Inc.

Report and Analysis Regarding the Arrest of Nijeer Parks by Woodbridge NJ Police Department

Case of <u>Parks, Nijeer v. McCormack, John, et al.</u>

Civil Action 2:21-cv-04021


**Introduction:**

On February 5, 2019, at about 11:18am, Nijeer Parks was arrested by the Woodbridge Police Department and charged with two counts of Aggravated Assault, two counts of Criminal Possession of Weapons, Shoplifting, Hindering Apprehension of Prosecution, Possession of CDS (Marijuana) under 50 Grams, Use or Possession of Drug Paraphernalia, Obstructing Administration of Law or other Government Official, Exhibits False Government Document, Resisting Arrest/Flight, Eluding, and Criminal Mischief.[1]

The arrest was the result of an incident occurring on January 26, 2019, at the Hampton Inn Hotel, 370-US 9, Woodbridge Township, NJ. A sum and substance account of the incident is as follows: On the aforementioned date, an unknown male black subject entered the lobby of the Hampton Inn and began taking items from the gift shop. The subject apparently arrived in a rented 2018 grey Dodge Challenger, NY registration JBD2126. The hotel manager, Richard Charneco, called the police and Officer Francis Lee responded, followed by Officer Andrew Lyszyk, in separate marked police vehicles. After the unknown male emerged from the bathroom in the hotel lobby, he was verbally engaged by PO Lee. The male admitted to taking the items, apologized, and offered to pay for the items. PO Lee requested identification from the male, who, in response, handed him a Tennessee driver's license bearing the name Jamal Owens. Multiple computer checks revealed that the license was fraudulent. The male eventually did pay for the items. PO Lyszyk asked the subject to turn around so he could place him under arrest for shoplifting and possession of the fraudulent license. At that time PO Lyszyk observed what appeared to be a bag of marijuana in the subject's jacket pocket. When PO Lyszyk attempted to handcuff the suspect, the suspect fled out of the lobby through the rear door. With the officers giving chase, the suspect ran to, and entered, his vehicle. With the suspect in his vehicle and the vehicle running, POs Lee and Lyszyk drew

---

[1] Woodbridge PD Booking Report #TW00019000220, Mirdala, D.



BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

their service weapons and ordered him out of the car. The officers also radioed for additional units. The suspect did not comply with these demands and attempted to hit PO Lee with the vehicle. The suspect crashed into one of the marked police units and a support pillar of the hotel, and fled out of the parking lot onto Route 9N at a high rate of speed. The officers initially chased the suspect but then terminated the pursuit when they lost sight of the suspect's vehicle. POs Lee and Lyszyk returned to hotel, and turned the investigation over to the detective bureau.[2]

Multiple officers arrived at the scene, including Detectives Santiago Tapia and Jorge Quesada, both of whom collected several items of physical evidence left behind by the suspect including, but not limited to, the fraudulent Tennessee driver's license that was handed to PO Lee, a discarded water bottle, and a sneaker which fell off the suspect's foot as he evaded capture.[3] Detective Quesada also recovered three useable fingerprints from glass of the rear lobby door of the hotel.[4] Detective Tapia then transmitted the picture from the Tennessee driver's license to the Regional Operations Intelligence Center (ROIC) and, by extension, the New York State Intelligence Center (NYSIC) for analyzation using facial recognition.[5] The facial recognition inquiry borne from the image on the Tennessee driver's license produced an incorrect "hit" wrongfully identifying plaintiff, Nijeer Parks, as the person depicted on the Tennessee Driver's License. The resulting investigation culminated with the wrongful arrest and malicious prosecution of Nijeer Parks until his criminal case was eventually dismissed on or about November of 2019, some nine months after his arrest.

Attorneys for the plaintiff, Nijeer Parks, have retained my services as an expert in police policy and procedure. The goal of this report is to provide an after-action critique and analysis of the entire incident surrounding the wrongful arrest of Nijeer Parks, and in doing so, identifying matters within the scope of my expertise about which I have been hired to analyze. The ultimate use of this report is to inform the Court about matters possibly outside the Court's expertise concerning the disputed matters before it, and upon which the Court must reach a decision; specifically, the actions of the Woodbridge Police Department personnel leading to the wrongful arrest of Nijeer Parks on February 5, 2019.

---

[2] Woodbridge PD Incident Report #19010123, Lee.
[3] Lyszyk deposition, Page 36.
[4] Woodbridge PD I.D Bureau report (PARKS 97,98).
[5] Woodbridge Incident Report #19010123-4, Tapia.



BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

Following the above **Introduction** of the report, and the **Background and Qualifications** section, I have broken the incident down into four distinct sections for analysis and review as follows:

    I.     **Actions of Woodbridge Police Department personnel at the Hampton Inn**

    II.    **Subsequent Investigation of Incident**

    III.   **Supervision/Training**

    IV.   **Defensive Avoidance, Cognitive Bias, and Investigative Failure**

Report Sections **I-IV** will be followed by sections **V-VIII** as indicated below:

    V.     **Conclusion**

    VI.    **Documents Reviewed**

    VII.   **Publications Reviewed**

    VIII.  **Fee schedule**

**Background and Qualifications:**

I am currently employed by Putnam County, NY District Attorney's Office as the Chief Criminal Investigator. I am a retired Lieutenant Commander of Detectives in the NYPD with more than twenty-seven years of experience in the New York City Police Department. I have been assigned to supervise investigations for more than 16 years, commanding detectives in the 44th, 45th, and 48th Precinct Detective Squads, Bronx Homicide Squad, and Major Case Squad. I served as the NYPD's project manager and authority on Electronic Recording of Custodial Interrogations and implemented all facets of the program throughout the city, as well as having authored the current NYPD policy on electronic recording of custodial interrogation.

I have testified as an expert witness for the NYPD and provided testimony before the New York State Criminal Justice Task Force regarding witness intimidation and open discovery statutes. In the latter part of my career, while serving as Commanding Officer of the NYPD's Detective Bureau Training Unit, I was responsible for developing, implementing, and assessing training for more than 5,000 members of the NYPD's Detective Bureau, including the college-accredited and nationally-recognized Homicide Investigators Course, Special Victims Investigators Course, Criminal Investigators Basic Course, and Custodial Interrogation Course. I have co-authored

3



BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

sections of the NYPD Patrol and Detective Guides relating to general operational policy, identification procedures, and custodial interrogation.

In my capacity as a law enforcement educator, I have traveled throughout the country to deliver lectures on various law enforcement topics including homicide investigation, custodial interrogation, management, ethics, and general police function. I am a core faculty member of the FBI's INLETS Violent Crimes Training Services. I have guest lectured at several non-law enforcement public safety and conflict resolution educational events for clients including, but not limited to, Metro North Railroad, The Rubin Museum of Art, Pace University Law School, Autism Speaks, and the NYS Baseball Umpires Association. I have appeared as a subject matter expert on FOX5NY, PIX11, Fox News, the nationally syndicated series *"The Dr. Oz Show,"* and History Channel's *"History's Greatest Mysteries."*

I hold a B.A. degree in History and Psychology from Pace University, an MPA candidate at John Jay College, and a graduate of the 271st Session of the FBI National Academy, where I also served as Class President. I am an Adjunct Professor of Police Science at John Jay College of Criminal Justice in New York City, a member of the International Association of Chiefs of Police (IACP), and the FBI National Academy Associates. I have been granted Top Secret security clearance by the U.S. Department of Defense.


I.    **Actions of The Woodbridge Police Department Personnel at The Hampton Inn**

The Woodbridge Police Department covers about twenty-five square miles in Middlesex County, New Jersey. It is staffed by approximately 220 sworn officers and led by Police Director Robert Hubner, who has held the position since 2011.[6] This incident began as a radio run for a shoplifter at the Hampton Inn broadcasted to POs Francis Lee and Andrew Lyszyk. The immediate police response to the hotel is not what led to the wrongful arrest of Nijeer Parks. Rather, it was the improper police investigation that followed. Nonetheless, for the purpose of the thoroughness of this report, an analysis of the initial source event and responding officers' and detectives' actions will be conducted herein.

---

[6] https://www.twp.woodbridge.nj.us/197/Police-Department.

4



Although the 911 call from The Hampton Inn was assigned to Car 3 (Officer Lyszyk), Officer Lee, who was assigned to assist, arrived on the scene first.[7] PO Lee interviewed the hotel manager, Mr. Charneco, and determined that the suspect was still on the scene. Having arrived at the scene thereafter, PO Lyszyk had established probable cause to arrest the unknown male black suspect because he had admitted to taking the items and offered to pay for them.[8] WPD officers may effect an arrest for the crime of shoplifting although not specifically witnessed,[9] and PO Lyszyk additionally believed that the suspect was in possession of a fraudulent Tennessee Driver's License. When PO Lysyzk attempted to arrest the perpetrator by asking him to "turn around" he noticed that the suspect was in possession of suspected marijuana which was visible in the perpetrator's jacket.[10] The perpetrator then "slipped away and ran off," and ran out the back door.[11] Thus far, the initial patrol response of POs Lee and Lyszyk were consistent with best practices, in that they responded to the call for police service in a timely manner, conducted a proper cursory field investigation, engaged the suspect in a professional manner, correctly developed probable cause, and attempted to place the perpetrator under arrest.

When the perpetrator fled through the rear lobby door of the hotel one of his shoes came off. The suspect then ran around the hotel and entered his vehicle. Officers Lee and Lyszyk properly informed the dispatcher via their department radio that they were engaged in a foot pursuit of the suspect. After the suspect entered his vehicle, the officers drew their service weapons and demanded that the suspect get out of his vehicle. It is widely understood in police work that an officer's decision to draw their firearm at an incident should be based on the officer's perception that their life or the lives of others are in grave risk of serious physical injury or death. However, "[officers] should not use their firearm to shoot at or from a moving vehicle unless deadly physical force is being used against them *other than the vehicle.* Prematurely drawing a firearm may limit the [officer's] options in controlling a situation and may result in an unintended discharge of the firearm."[12]

The suspect did not obey the officers' commands and proceeded to use his vehicle to ram one of the officer's marked cars and crash into a support pillar of the hotel. Officer Lee states that he had

---

[7] Woodbridge Incident report #19010123-2, Lee.
[8] Lyszyk deposition, page 14.
[9] Woodbridge Policies and Procedures manual 115.2.1 – D2.
[10] Lyszyk deposition, page 15.
[11] Id., page 16.
[12] NYPD Patrol Guide, 221.01 Use of Force Guidelines.



to jump out of the way in order to avoid being struck by the perpetrator's car.[13] The suspect then sped off onto Route 9. The officers initially began a vehicle pursuit but terminated it as they had lost sight of the subject's vehicle.[14] The termination of the pursuit was the correct action by the officers because when "the pursued vehicle's location is no longer known or the distance between the pursuing vehicles and the violator's vehicle becomes so great that further pursuit is futile."[15] Officers Lee and Lyszyk then returned to the Hampton Inn to secure the [crime] scene and called for detectives.[16] The abandoned car would eventually be recovered by other officers and more evidence would be safeguarded from within the car, including a receipt from Dunkin Donuts.

At minimum, Detectives Quesada, Brewer, and Tapia were present at the hotel and began to process the crime scene.[17] Detective Tapia spoke to POs Lee and Lyszyk and then secured the crime scene in order to "preserve evidence that had been left behind by the suspect, specifically one shoe and one empty water bottle."[18] Tapia further stated, "I had them secure the glass door to the lobby that the suspect had exited from."[19] Detective Tapia then attempted to, and eventually did, obtain video surveillance from the hotel clerk. Detective Quesada collected and packaged evidence and recovered multiple fingerprints from the rear hotel lobby door. Detectives Tapia and Quesada acted properly at the scene in that they identified, collected and packaged evidence, including the suspect's sneaker, photographed the scene, secured items for possible DNA recovery, and recovered possible fingerprints where they were available on the rear glass door. The collection of crime scene evidence, and actions to catalogue them appear to be largely in compliance with Woodbridge Police Department Policy and Procedures – Collection and Preservation of Evidence, Chapter 870.[20] Once Det. Tapia verified with POs Lee and Lyszyk that the person on the fraudulent Tennessee Driver's license was the same person they had encountered in the lobby,[21] he was correct in utilizing all legal investigative means necessary to attempt to identify the suspect. As such, Det. Tapia's determination to send the photo on the Tennessee Driver's license to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC)[22] was an appropriate investigative step.

---

[13] Woodbridge Incident report #19010123-2, Lee.
[14] Lyszyk deposition, page 17.
[15] Woodbridge Police Department Policy and Procedures, 512.2.2, A4.
[16] Lyszyk deposition, page 17.
[17] Id.
[18] Tapia deposition, page 55.
[19] Id.
[20] Woodbridge Police Department Policy and Procedures, Chapter 870.
[21] Woodbridge Incident report #19010123-4, Tapia.
[22] Id.



BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

## II.    Subsequent Investigation of Incident

Several of the necessary post-incident investigative steps in this case were ignored, dismissed, or improperly executed which led to Nijeer Parks to be misidentified, wrongly arrested, and wrongly charged with the crimes at the Hampton Inn Hotel. A temporal order of events and critiques of those events that transpired after the initial incident at the hotel are as follows:

a.  On January 26, 2019, Det. Tapia verified that the photo on the Tennessee driver's license was the person with whom POs Lyszyk and Lee engaged in the hotel lobby by showing each one of them the license separately.[23] This was an **appropriate, but unnecessary, investigative step** because the suspect had previously given the license to these officers, who had turned it over to Det. Tapia. Therefore, there was no need for him to show them the license again.

b.  On January 26, 2019, Det. Tapia contacted the Regional Operations Intelligence Center (ROIC) and requested assistance from their facial recognition technology to help identify the person on the license photo. This was an **appropriate investigative step**. Detective Tapia, as the lead detective, should use all legal means necessary and available to generate investigative leads to attempt to identify the perpetrator as soon as possible after the initial event.

c.  On January 28, 2019 at 8:40am, two days after the incident, Rockland County Intelligence Center Inv. Seamus Lyons contacted Det. Tapia via email in which he stated that he got a "good possible hit on facial recognition," and provided the name and photograph of Nijeer Parks.[24] Detective Tapia replied to the email at 9:16am and wrote "That's him,"[25] Det Tapia's assertion of "that's him" in the email was **improper,** but also legally negligible. Det. Tapia had never seen the suspect in person and therefore was not in the position to affirmatively state any position on the suspect's identity, but he appeared to be merely responding to the viewing of the facial recognition photo and the likeness of the photo on the Tennessee driver's license. His reaction is understandable on a human level because of the excitement an investigator presumably feels when receiving a good investigative lead.

---

[23] Tapia deposition page 132.
[24] Tapia/Lyons email (PARKS 35).
[25] Id.

7


PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

However, it does speak to an investigator's *Defensive Avoidance* which will be addressed later in this report.

d. After Det. Tapia received the facial recognition photo of Nijeer Parks, he showed that single photo to PO Lyszyk, who stated that he was 100% sure that the person in the photograph was the perpetrator from the hotel.[26] This was an **improper investigative step, and the first bad identification procedure conducted.** This one event lies at the heart of this case and marks the beginning of the downward spiral of legal and procedural missteps by the Woodbridge Police Department. It is clear that Det. Tapia wrongfully believed that he had conducted a valid "confirmatory identification" with PO Lyszyk and thereby utilized that confirmatory identification to establish probable cause. Both assertions are incorrect. The correct investigative step at this time would have been to recognize this facial recognition hit for what it legally was: merely an investigative lead. Because facial recognition hits are inherently suggestive, effectively creating a software generated doppelganger; it becomes critical for investigators to complete a range of investigative steps. Some basic investigative steps which are consist with best practices and should have been completed in this case *prior* to showing a photograph to witnesses, or taking Nijeer Parks into custody are:

Incarceration status- If available, verify the subject was not incarcerated at the date and time the crime was committed.[27]

Public records search- use tools provided by public data services companies to check on the likelihood of the subject having a twin, sibling, or similar-looking relative.[28]

Open-source social media search- Look for other potentially legitimate alibis, such as photos or messages posted on the same date and time of the crime from an alternate location. Additionally, does posted photos look like the probe image (same clothes) or produce incriminating evidence (admissions or images depicting proceeds from crime).[29]

Vehicles- is the subject connected to any vehicles (registration, summons, accident report, etc.)? If so, check license plate reader history (if available) of the vehicle to see if it was in the vicinity of the crime scene, as well as toll transponder history, if applicable.[30]

---

[26] Tapia deposition, page 134.
[27] IDEMIA Best Practices for Facial Recognition Leads, 2021
[28] Id.
[29] Id.
[30] Id.



BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

Known address(es)- Does the subject live in the vicinity of the crime scene? If not, is there any documented history of the subject frequenting the area (prior arrests, relatives, girlfriend, boyfriend, etc.)[31]

Arrest history- is the subjects arrest history comparable to the crime being investigated?[32]

Other forensic/biometric evidence- Check on status of other forensic/biometric evidence collected. Attempt to expedite the processing of fingerprint and or DNA evidence, if applicable.[33]

After these recommended computer checks were completed, and having compared all the rest of the physical evidence recovered at the scene to Nijeer Parks for inculpation or exculpation, Det. Tapia would have been in the position to make a more informed assessment of the totality of the circumstances.

The act of showing PO Lyszyk the single photo of Nijeer Parks from the facial recognition hit was a confirmatory identification procedure. It is well known, and considered a best practice, to only utilize single-photo confirmatory identifications when there is *a prior relationship between the parties* and/or *a close temporal proximity to the incident*. Neither factor was present in this case, rendering this identification procedure **improper, highly suggestive, and likely inadmissible.** Further, as it pertains specifically to the identification procedure, it is of no legal significance that PO Lyszyk is a police officer, and under these facts should have been treated like any other witness. Therefore, an identification procedure of the kind outlined by the New Jersey Attorney General's Office's guide for out-of-court identifications, or a corporeal line up would have been the correct investigative step. By assessing the available discovery in this case, it is apparent that PO Lyszyk did not personally know the suspect and had never seen him prior to the incident at the hotel, and therefore did not have familiarity with him sufficient to participate in a confirmatory identification process. Because the facial recognition lead was generated and communicated two days after the interaction with the suspect, PO Lyszyk is well outside any temporal proximity, as described and thusly cannot properly participate in a confirmatory identification procedure.

---

[31] Id.
[32] Id.
[33] Id.



**BLUE TOP CONSULTING**
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

e. Detective Tapia utilized the procedurally incorrect and inadmissible confirmatory identification of Nijeer Parks by PO Lyszyk to establish probable cause for arrest. This was **an invalid and incorrect investigative step**. Facial recognition "hits" are merely investigative leads. They should not be the sole investigative product that establishes probably cause. Detective Tapia himself acknowledged this fact.[34]

f. Detective Tapia incorrectly believed that he had established probable cause to arrest Nijeer Parks, which then prompted him to call to Assistant Prosecutor Natasi.[35] In doing so, it is apparent from reviewing the discovery in this case, that Det. Tapia made the conscious decision to abandon all other investigative processes and unilaterally moved forward to have warrants sworn and to arrest Nijeer Parks.[36] This was an **incorrect investigative step**. All leads and evidence should be followed up on, and pursued to their natural end, when investigating a case – particularly a crime as serious as a felony assault against a police officer, and especially a case where a lead is generated by facial recognition all while acknowledging the limitations of the technology.

g. In drafting the Affidavit of Probable Cause, Det. Tapia wrote that he "compared the photo on the fraudulent Tennessee driver's license to Nijeer Parks' real New Jersey driver's license, and it is the same person."[37] This was an **incorrect investigative step.** There are three problematic issues with this one statement. Taken in order, the first problem is that in stating that "he compared the photo[s]," Det. Tapia is introducing yet another identification procedure into this case, one that has no legal legitimacy yet he asserts it to bolster probable cause against Nijeer Parks. Second, and most obvious, Nijeer Parks does not have a New Jersey driver's license. If Det Tapia simply confused a New Jersey non-driver ID or learner's permit with an actual New Jersey driver's license, the error would be of no legal consequence because the photo formats would presumably be the same. But in the Affidavit of Probable Cause, he refers to the item as "Nijeer Parks' _real_ New Jersey driver's license," in effect asserting that Nijeer Parks possessed and/or produced the fraudulent Tennessee one possessed by the perpetrator, which is a conclusion that Det. Tapia is unable to make. However, he used that phraseology to again bolster his Affidavit of Probable Cause. Third, Det. Tapia has no special training, no standing, and no basis

---

[34] Tapia deposition, pages 50, 52, 53.
[35] Id., page 135.
[36] State of New Jersey Complaint-Warrant (PARKS 1-7).
[37] State of New Jersey Affidavit of Probable Cause (PARKS 8).



**BLUE TOP CONSULTING**
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

whatsoever to affirmatively state that the person in the photo recognition hit "is the same person" as the individual who was at the hotel. He never personally made a corporeal observation of the suspect at the hotel and therefore he was not competent to draw this conclusion. Yet, this is the second instance where he determined *on his own* that Nijeer Parks is the suspect from the hotel lobby, irrespective of the fact that he had never seen the suspect in person. Again, this phrase would ordinarily be considered harmless had it not been written to bolster probable cause, which is the intent of its usage here. It is not clear whether Det. Tapia, a twenty-year veteran, was unaware of the significance of what he was affirming, or whether he *was* aware and chose to do so anyway. In either event, this was **improper**.

h. After reviewing the deposition testimony of PO Lyszyk and Det Tapia, it's clear there was a rush to get the complaint-warrants and Affidavits of Probable Caused signed quickly. Detectives Goines and Tapia and PO Lyszyk then set out in one vehicle in an unsuccessful attempt to arrest Nijeer Parks at his home in Paterson, NJ.[38] Although there is nothing inherently improper about this, there is a patina of haste conferred just from reading it. Consider that Woodbridge Township Police Department is thirty-two miles away from Paterson, NJ, where Nijeer Parks lives. The trip takes approximately forty-five minutes to drive. It seems unlikely and far outside normal process that PO Lyszyk, a uniformed patrol officer, would go with two detectives forty-five minutes away, outside the Woodbridge Police Department's jurisdiction, to make an arrest on an open complaint. As a police manager, I would never allow that to occur.

i. Detective Tapia stated that he looked at the Dunkin Donuts receipt recovered by Det Quesada and called them [Dunkin Donuts] to see if they had video available.[39] However, he failed to followed up with recovering the video. This was an **incorrect investigative step.** The Dunkin Donuts video was a highly probative investigative lead, which was not exploited, and probably would have yielded exculpatory evidence very early in the investigation, which could have eliminated Nijeer Parks as the suspect irrespective of any facial recognition hit. No known attempt was ever made to recover the video from Dunkin Donuts. In preparation for this report, and with minimal difficulty, I was able to confirm

---

[38] Lyszyk deposition, page 1-7.
[39] Tapia deposition, page 61.

11

BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

that the Dunkin Donuts does in fact have multiple interior and exterior cameras, as illustrated in the attached photos. According to the manager, Ms. Lysaudi, those cameras archive recordings for a month. That video surveillance footage is permanently lost now. There is also a pole camera directly across the street that appears as if it's maintained by Montefiore Hospital Recreation Center personnel, but was actually installed and is maintained by the NYPD, which Det. Tapia would have discovered had he actually responded to the Dunkin Donuts location as basic investigative technique demands.



j.  On February 5, 2019, the day that Nijeer Parks surrendered at the Woodbridge Police Department, PO Lee was summoned in on his day off by Lieutenant Michael Ng who told him that "they might have someone from the January incident." [40] Officer Lee came to the detective bureau, where "they said they might have someone that was involved in the January incident in the processing area or the booking area and they asked me to see if I could help identify." [41] He was then brought down to the arrest processing/booking area where he observed Nijeer Parks sitting on a bench in the cell area, cuffed to the railing some 20-30 feet away. [42] Lt. Ng told him "that was the individual that they had brought in from the incident." [43] **This was an improper and inappropriate investigative step,** and constituted the **second bad identification procedure**. This was an extraordinarily suggestive show up identification procedure, and one laden with mistakes. Consider that PO Lee was directed by his boss to come in on his day off, specifically to view "the individual from the incident." Before even participating in the identification procedure, the expectations and subordinate rank pressure inherent with that situation are palpable, not to mention the subsequent peer pressure he would have endured from his fellow officers had

---

[40] Lee deposition, page 24.
[41] Id., page 25.
[42] Id., page 28.
[43] Id., page 27.



BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

he failed to make the identification. Officer Lee testified in his deposition that even though he had "some conversation with the suspect at the Hampton Inn hotel, he was mostly watching his hands."[44] Like PO Lyszyk, PO Lee did not know the suspect and had never seen him prior to this incident. He therefore could not participate in a legally sound show up identification procedure because he did not have prior familiarity with the suspect. In addition, ten days had passed since the incident, far beyond any temporal proximity that is a prerequisite for a single-person show up identification.[45] Officer Lee was purely a witness in this instance and it is of no legal consequence that he is a police officer. With Nijeer Parks present in the police building, the correct investigative step would have been to assemble a corporeal line up where PO Lee would have been instructed on the viewing of a line up, made to fill out the necessary documents applicable for a line up procedure - the steps that would have been done with a civilian witness.

k.  During Nijeer Parks' interrogation, he made several important statements which necessitated investigatory action.[46] For example, he provided and alibi describing where he was and who he was with. He also stated that he did not possess a New Jersey driver's license. Detective Kondracki, who conducted the interrogation, explored none of these assertions. This was an **incorrect investigative step**. Apropos of interrogations, suffice it to say, an experienced investigator would not simply halt an interrogation or stop an arrest process merely because the suspect claims, *he didn't do it*. However, investigative prudence and professional responsibility demand that unambiguous claims made by the suspect that may exculpate the individual be followed up on without delay, lest we run the risk of sending an innocent man to jail because of laziness, apathy, or defensive avoidance, which seems to be the case here. Nijeer gave an emphatic alibi statement which included dates, times, locations, and names, as well as indicating to the detective that he did not possess a New Jersey driver's license.[47] Detective Kondracki's feigned interest in the content of Nijeer's assertions were plainly evident during the interview, which was as unenthusiastic as it was ineffectual. According to the Woodbridge Police Department Policy and Procedures manual, some of the main goals of the interrogation process are to:

---

[44] Id., page 28.
[45] New Jersey Division of Criminal Justice – Instructions For Using Showup ID Procedure Worksheet (Rev.10/1/12).
[46] Video Interrogation Annotation Log, (PARKS 53).
[47] Id.



*"learn the truth," "acquire all the facts,"* and *"gather information which may corroborate or disprove information obtained from other sources."*[48] Detective Kondracki accomplished none of these goals. Although the interrogation was structurally and legally sound, according to the Woodbridge Police Department Policy and Procedures Manual,[49] it literally served no purpose. Nijeer Parks made no incriminating statements, and Det Kondracki made no attempt to investigate Nijeer's exculpatory information. Even if the detective believed that Nijeer Parks was guilty of the crime, investigative responsibility demands follow up steps be taken to attempt to investigate his alibi.

### III.   Supervision/Training

<u>Supervision</u>

The lack of supervision in this case is of paramount importance and necessarily needs to be analyzed and critiqued. Several operational and investigatory missteps that occurred in the events surrounding Nijeer Parks' arrest could have been avoided if Woodbridge Police Department supervisors were performing their first-line and middle management supervisory functions adequately. The failure to supervise exacerbated each incident in the timeline of events. Some noteworthy incidents of failed supervision are as follows:

a.   Det. Tapia's original request to have the Tennessee Driver's license photo submitted for facial recognition comparison **should require supervisory approval**.

b.   Det. Tapia's errant "confirmatory identification" procedure with PO Lyszyk **should require supervisory oversight and approval.** Identification procedures should be supervised, period. They should require a supervisor's assent and signature.

c.   PO Lysyzk and Det Tapia's Complaint-Warrant and Affidavits of Probable Cause contain no supervisory signature line and therefore there is no indication that they were approved by a supervisor. Therein, PO Lysyk falsely represented Nijeer Parks' name several times as the known perpetrator.[50] These errors **could have been avoided with supervisory**

---

[48] Woodbridge Policy and Procedures Manual, Section 100.2.2A.
[49] <u>Id.</u>, 100.4.4.
[50] Tapia/Lyszyk Complaint-Warrant, Affidavit of Probable Cause, (PARKS 1-27).



oversight. Effecting an arrest and official documentation relating to the arrest should require at least a conferral with a supervisor, if not a supervisor's approval and signature.

d.  No photo arrays or line ups were conducted with any of the witnesses from the Hampton Inn Hotel. These are basic investigative steps that should have been completed. Detective Tapia failed to perform these steps and this demonstrates a **failure to supervise** by the detective squad supervisor.

e.  Detectives Tapia and Goines took PO Lyszyk, a uniformed patrol officer with no investigative or secondary apprehension responsibility, more than thirty miles outside of their jurisdiction to apprehend Nijeer Parks. This is an unorthodox action in a police paramilitary structure, it is beyond the scope of a patrol officer's duties, and it should not have been permitted. This action displays a **failure to supervise** on behalf of both the patrol supervisor and detective squad supervisor. As noted above, it is highly irregular for a uniformed patrol officer to be brought more than 30 miles outside of his jurisdiction, and there is no obvious reason for that to have been done here other than for the detectives to have PO Lyszyk identify Nijeer Parks in person. Notably, such a one-on-one show up identification would likely have also been inadmissible if it had occurred.

f.  Det. Tapia failed to investigate or recover video surveillance from the Dunkin Donuts. This lack of action caused the loss of potentially probative video that could have exculpated Nijeer Parks, and is indicative of poor case management and a **failure to supervise.** Investigators, even if well-meaning and hard-working, need supervisory oversight to help manage their cases and prioritize their assignments. Detectives left to their own devices will frequently miss investigative steps. A supervisory "hands off" approach often runs counter to the common good of the organization. This is precisely one of the reasons why detectives *produce* investigative work product and supervisors *review and approve* that work product.

g.  Lt. Ng presided over, and personally contaminated, the show up identification procedure with PO Lee in the cell area.[51] This demonstrates Lt. Ng's **failure to supervise,** as well as mistakes in his personal involvement in this case. Additionally, the show up identification

---

[51] Lee deposition, page 28.



procedure conducted with PO Lee required documentation in the form of the <u>Showup Identification Procedures Report Worksheet</u>, as per the New Jersey Division of Criminal Justice (Rev 10/1/12). This worksheet was not completed by Lt. Ng.

h. Latent prints collected at the crime scene were a match to Barrington Walker who lives in upper Manhattan and in close proximity to the Dunkin Donuts related to the recovered receipt. This information was communicated to the Woodbridge Police Department on February 22, 2019, but this exculpatory evidence was not acknowledged until January 22, 2021 (nearly two years later).[52] This inexcusable delay demonstrates a **failure to supervise** by the detective squad supervisor.

i. The failure of Det Kondracki to follow up on unambiguous alibi information conveyed to him by Nijeer Parks is indicative of poor detective management and demonstrates a **failure to supervise** by the detective squad supervisor. Had Det. Kondracki's supervisor been fulfilling their duties effectively, that supervisor should have directed Det. Kondracki to investigate Nijeer's alibi without delay, in order to confirm or disprove Nijeer's claim. At a minimum, the alibi claim and information should have been communicated to involved personnel and other supervisors, *particularly* because at the time of the interrogation there was no other evidence connecting Nijeer Parks to the crime. Of course, the corpus of research on alibis is that they are not taken at face value and must be investigated and evaluated for their believability.[53] Thus, gathering information to confirm or disprove a suspect's alibi is a basic, fundamental investigative step. The arrest process could have been - and in fact <u>should</u> have been - halted that day, pending the outcome of the alibi investigation.

j. Police Director Hubner stated in his deposition that he agreed that the manner in which PO Lee participated in the show up was "very suggestive."[54] Yet, Lt. Ng has not been disciplined or re-instructed regarding his personal contamination of this show up identification procedure. This constitutes **a failure to supervise.**

---

[52] Woodbridge Police Department ID suspect report, (PARKS 148).
[53] <u>Alibi Generation and Discriminability</u> (Matuku 2022).
[54] Hubner deposition, Page 82.



Training

During his deposition, Director Hubner testified that the Woodbridge Police Department has a Training Bureau, which is run by Sergeant Medina.[55] However, the Woodbridge Police Officers who provided depositions in this case testified to receiving little or no training by the department regarding facial recognition, or identification procedures:

    a.  Police Officer Lee stated that after he has had no training on identification procedures, and no training on facial recognition hits, even after this incident.[56] He states that he goes to a mandatory seminar run by the county once a year and the training mostly consists of domestic violence.[57] He also attends firearms training.[58] Shockingly, he affirmed that what he knows about line ups and other identification procedures he references from television shows.[59]

    b.  Police Officer Lyszyk stated that he has had no training on identification procedures or facial recognition hits, even after this incident.[60] He knows that there are *standard operating procedures* regarding photo arrays, although he doesn't conduct them and knows nothing about lineups.[61]

    c.  Although Det. Tapia stated that he had attended multiple training seminars and events, including at least two homicide schools, he concedes that this was his first experience utilizing facial recognition technology in the Woodbridge Police Department, but he affirmed that he has received on-the-job training facial recognition hits.[62] He stated that he has received training in line up identification procedures.[63] He further stated that the way he corroborated that facial recognition lead was based on his "19 plus years on the job. If an officer identifies somebody, it's a positive identification".[64] He further states that "the police officer who was

---

[55] Id., Page 12.
[56] Lee deposition, Page 9.
[57] Id., Page 8.
[58] Id., Page 7.
[59] Id., Page 29.
[60] Lyszyk deposition, Page 21.
[61] Id., Pages 32,33.
[62] Tapia deposition, Page 101.
[63] Tapia deposition, Page 105.
[64] Id., Page 100.



conducting an investigation dealt with this person for over 20 minutes. He knows who he dealt with. I don't have to do a photo line up with him. It's kind of a confirmatory ID at that point."[65] Detective Tapia reaffirmed his incorrect belief multiple times during his deposition that in substance, on duty police officers don't view line ups or photo arrays.[66]

d. Detective Quesada stated that he has had evidence collection training relative to his work as an ID detective, but no training in use of facial recognition.[67] Detective Quesada also stated that he has never received any training regarding how to fill out the Affidavit of Probable Cause and that "you just kind of go with it when you speak to the prosecutor."[68] Detective Quesada gives a relatively thorough description of the process of conducting a photo array in his deposition.[69] Among other guidelines and rules, he states that the photo array itself must be approved by the county prosecutor and there are papers that the viewer must sign, and that an uninvolved person must present the photo array to the viewer.[70] What Det. Quesada is describing is a double-blind photo array.

e. Police Director Robert Hubner stated that he created a dedicated training unit after he became Police Director in 2011.[71] According to Director Hubner's testimony, "There were individuals who kind of handled training prior to that, but nobody was dedicated."[72] Dir. Hubner stated that the training unit holds the necessary training as directed by the Attorney General's Office and that they (the training unit), document any in-house training and what training they send their officers to.[73] He further stated that the Attorney General's office does not have a model policy for

---

[65] Id., Page 104.
[66] Id., Page 104.
[67] Quesada deposition, Page 32.
[68] Id., Page 54.
[69] Id., Pages 55-57.
[70] Id., Page 57.
[71] Hubner deposition, Page 13.
[72] Id.
[73] Id., Page 12



the use of facial recognition technology and as such he has no plans to create one for his department until such time as the Attorney General produces one.[74]

## IV.   Defensive Avoidance, Cognitive Bias, and Investigative Failure

According to Drs. Griffiths and Shepherd, defensive avoidance is a decision to minimize mental demands and to evade the complexity and implications of detail. It is manifested in taking the "short cut" as much as possible.[75] Many stressors contribute to these short cuts, including the volume of work, shortage of staff, resource limitations, etc. There are several indicators of Defensive Avoidance in the case of Nijeer Parks which are self-evident in this report and do not require a point-by-point analysis. Defensive avoidance crystallizes the need for strong supervision in organizations, but *especially* in law enforcement organizations because of how often in policing the product of our work necessarily demands the removal of one's freedom via arrest. Therefore, it is crucially important to uncover and fully explore as much detail as possible, not to avoid it. The lack of attention to detail, among other operational and legal failures, was a reoccurring problem with regard to Nijeer Parks' arrest. The commonality in cases of defensive avoidance is confirmation bias.[76] There are four main themes in Defensive Avoidance which are as follows:

a) <u>Assumption</u> - The investigator assumes something to be the case, is established, or to have been done without independently verifying the information. In the case of Nijeer Parks, it's clear that Det Tapia assumed that the recovered sneaker belonged to Nijeer Parks.. He assumed that the video at the Dunkin Donuts would not be probative.  He assumed that the hotel clerks would have identified Nijeer similarly as PO Lyszyk did, so he failed to independently verify this information.  Had he done so, he would have discovered Nijeer Parks was a much smaller person than the person encountered in the hotel lobby in stature and shoe size.

b) <u>Freezing</u> – The investigator succumbs to premature closure of the case. He stops considering alternate explanations and will not revise the current theory. In the case of Nijeer Parks, Det Tapia's rush to make an arrest resulted in his tunnel vision and did not consider alternate theories.

---

[74] <u>Id.</u>, Page 80.
[75] <u>Investigative Interviewing</u> (Griffiths, Shepherd, 2013).
[76] <u>Id.</u>



c) <u>Seizing</u> - The investigator is only drawn to the material that stimulates their senses. The material is dramatic, memorable, or vivid. It requires little mental effort because "it fits." In the case of Nijeer Parks there are strong indicators of "seizing." Once Det. Tapia received the facial recognition lead, no other investigative steps were conducted beyond verifying Nijeer's address and conducting an improper confirmatory identification procedure.

d) <u>Relevance Filtering and Rapid Editing</u> – The investigator "knows what he needs to know," resulting in skim-reading reports, marginalizing evidence, perfunctory or unexecuted interviews, and reduction of facts in to main points.[77] The introduction of, what Det Tapia believed to be strong evidence produced by facial recognition technology, led to all of the other evidence in the case being apparently discounted, ignored or marginalized by Det Tapia. As evidenced in this case, there was no follow up interviews or identification procedures conducted with any of the hotel staff, fingerprints that were recovered at the scene received no investigatory follow up, and he reduced all the facts in the case to one main point, which is that the facial recognition lead was all he needed.

There are numerous ways a detective can be affected by cognitive biases and defensive avoidance which can lead to investigative failures. Bias is simply defined as prejudice for or against some person, place, or thing, usually in a way that lacks foundation or is unfair. In some instances, detectives display bias for or against evidence simply because of the way the incoming information is contextualized and framed. For example, in the case of Nijeer Parks, broadly speaking, the facial recognition lead was based on technology. Research shows that forensic or scientific evidence is often considered infallible, undeniable truth.[78] This often results, as it did in this case, in a detective *seizing* on a singular piece of scientific evidence, then discounting alternative theories, or exploiting potential leads, having given too much weight to the one piece of scientific evidence. The facial recognition lead, and the invalid identification procedures that followed, led Det. Tapia to shift from an evidence-based investigation to a suspect-based investigation where the detective is investigating the suspect and not the crime. Strong evidence that emerges early in an investigation can produce a rush to judgment, even if its reliability is uncertain.[79] This is supported by the fact that Det Tapia conducted no follow up investigation of any kind after receiving the facial recognition hit and was solely focused on Nijeer Parks. Depending on the crime under

---

[77] Id.
[78] Criminal Investigative Failures, D. Kim Rossmo Routledge, (2009).
[79] Cognition and detection: Reluctant Bedfellows. Stelfox, P. "Pease, (2005).



BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

investigation, a suspect-based investigation is not always incorrect and has its place in anti-terrorism cases, drug cartel investigations, and organized crime investigations, just to name a few situations. However, it was incorrect in this case. The premature shift from evidence-based investigation to a suspect-based investigation has led to numerous false convictions.[80] Instances of *relevance filtering*, and other defensive avoidance techniques are more prevalent when there is a high-profile crime being investigated. In this case, the suspect vehicle attempted to hit PO Lee with his car, crashed into the hotel, and then led officers on a brief pursuit. Irrespective of the size of a police department, it's assumed and understandable that this would be considered a high-profile case within the Woodbridge Police Department.

Particular causal factor combinations tend to cluster together; for instance, high-profile crimes often caused a rush to judgment, followed by the premature shift from an evidence-based to a suspect-based investigation. These problems then led to tunnel vision and confirmation bias, ultimately leading to evidence failures.[81] As evidence flows through all phases of a criminal investigation, any integral evidentiary problems risk derailing a successful outcome. There are three types of evidence error that can impede or bias detective decision-making:[82] I have listed them below followed by examples of specific evidence failures from this case.

1. Evidence Collection—a failure to collect all the relevant evidence necessary to thoroughly investigate the case (e.g., crime scene evidence, neighborhood canvass, interviews); In this case, although the initial evidence collection at the crime scene was completed, follow up evidence was ignored. No Dunkin Donuts video was recovered and no identification procedures were conducted with any of the hotel staff. The alibi offered by Nijeer Parks were not investigated to either prove or disprove it.

2. Evidence Evaluation—a failure to assess evidence reliability (the probability an item of evidence—e.g., a confession, a witness statement, a lab analysis—is accurate or true); In this case, the fingerprints recovered from the hotel rear lobby door received no follow up for results, and the interrogation of Nijeer was ineffectual. Additionally, there was no known attempt to compare Nijeer Parks' shoe size to the discarded shoe

---

[80] Id.
[81] Confirmation bias and other systemic causes of wrongful convictions, Rossmo, D. Kim, and Pollock (2019).
[82] Id.


PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

that was recovered at the crime scene. There was no known attempt to perform a direct comparison between Nijeer's fingerprints and the prints recovered from the scene.

3. <u>Evidence Analysis</u>—a failure to logically analyze the evidence (e.g., strength, reliability implications, connections, patterns). Here, the photo recognition lead was given far too much value by Det. Tapia. He stated in his deposition that he was aware that a facial recognition hit was merely an investigative lead and required other evidence to demonstrate probable cause.[83] The connection between the Dunkin Donuts receipt, the connection to the Bronx, and the recovery of potential probative video was not exploited or connected sufficiently by Det. Tapia.

Confirmation bias, with the support of faulty assumptions, probability errors, and groupthink, plays a key role in wrongful arrests and prosecutions. Detectives suffering from confirmation bias are more likely to interpret evidence in a prejudicial manner, uncritically accepting what supports their investigative theory while cursorily rejecting what does not (such as alibi information). They often fail to engage in differential diagnoses by considering other hypotheses of the crime or alternative suspects.[84]

Confirmation bias has proved to be a major factor in the case of Nijeer Parks, with investigators and supervisors forging ahead with him as a suspect based solely on the facial recognition lead. Evidence that was either pending or already in police custody, such as the discarded sneaker, was prejudiced and therefore not considered.

## V.    Conclusion

> *"Society is no longer willing to pay the cost of miscarriages of justice, ruined lives, compensation, and erosion of faith in the law, and those tasked with protecting the law, arising from improper conduct by investigators and their managers acting above the law."* [85]

The job of any police executive is to keep the organization connected to its environment. That means monitoring court decisions, legislative trends, community attitudes, and police practices.[86] It also means keeping an agency's officers trained and informed about salient matters and

---

[83] Tapia deposition, page 99
[84] <u>Confirmation bias and other systemic causes of wrongful convictions,</u> Rossmo, D. Kim, and Pollock (2019).
[85] <u>Investigative Interviewing.</u> Griffiths, Shepherd, (2013).
[86] <u>Why Law Enforcement Organizations Fail,</u> O'Hara, (2012).



BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

instituting policy revisions to ensure that police personnel are operating within the boundaries of the law.

The wrongful arrest and prosecution of Nijeer Parks was due to four main causes; a failed investigative process, improper identification procedures, failed supervision, and lack of training. The Woodbridge Police Department personnel failed to know, practice and/or be in compliance with, accepted out-of-court identification procedures, New Jersey Attorney General policies, and existing case law. The Woodbridge Police Department executive administration failed create or revise policies, and/or train its officers on lawful and admissible identification procedures, facial recognition technology, applicable case law, and legal investigative steps when utilizing facial recognition leads during investigations, as well as other basic and fundamental investigative functions during the investigations of crimes.

At the moment when Rockland County Intelligence Center returned a "high number hit"[87] via Facial Recognition technology to Det. Tapia identifying Nijeer Parks as the possible perpetrator - a pivotal moment for Nijeer Parks - the widespread intradepartmental lack of knowledge regarding identification procedures, facial recognition lead generation, basic investigative function, coupled with general administrative sloppiness and ineffective or absentee supervision, set in motion a confluence of events that resulted in the improper and suggestive identification procedures which led to the wrongful arrest of Nijeer Parks. Despite PO Lyszyk affirming his knowledge that facial recognition technology may only produce an investigative lead,[88] and Det. Tapia affirming that he was aware that a facial recognition "hit" does not establish probable cause,[89] the "hit" by Rockland County ROIC was in fact improperly used to establish probable cause in this case and served as the catalyst for Nijeer Parks' arrest. Post initial crime scene, nearly all the investigative steps taken, up to and including the day of Nijeer Parks' arrest (and his subsequent prosecution) were predicated upon a bad identification procedure initially conducted by Det. Tapia, to wit, having PO Lyszyk view the single photo contained in the Facial Recognition lead apparently contemporaneously with Nijeer Parks' DMV photo.[90] The identification procedures conducted thereafter were predicated upon the first tainted one. Multiple identifications were made with either no understanding of, or the erroneous administration of, lawful and appropriate identification procedures. The fact that so many of the involved officers and supervisors had no knowledge or

---

[87] Tapia/Lyons email (PARKS 34).
[88] Lyszyk deposition, page 25.
[89] Tapia deposition, page 99.
[90] Tapia deposition, page 97 (unclear as to "we").



BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

training on how to handle a facial recognition hit, and so many of the involved officers had no training or knowledge about how to produce a legally sufficient, line up, show up, or photo array, or confirmatory identification, is almost inconceivable and speaks to a systemic failure within the WPD executive leadership and an abdication of their shared responsibility to keep their personnel informed and trained. These failures must be laid at the feet of the leaders of the city government and most directly, Police Director Hubner.

The lack of training for its personnel by the WPD's administration contributed to the officers' inability to perform their duties in a way that was legally, morally, and ethically sound. It is clear after reviewing several discovery documents that at minimum, those WPD members who provided deposition statements in this matter should have possessed the necessary knowledge to successfully conduct identification procedures, but did not. Specifically, the WPD members should know the necessary pillars to ensure that lawful identification procedures occur: a) the operational logistics of how to produce legally admissible and professional identification procedures and related work product, b) the local and federal case law surrounding legally admissible identifications, and c) the New Jersey Attorney General Guidelines for Out-Of-Court Identification Procedures. As it pertains to this case, this appears to apply irrespective of a member's seniority or rank in the Woodbridge Police Department, up to and including Director Hubner who, while being deposed in this matter, conflated two distinct identification processes, specifically, show ups and line ups into one hybrid phrase, "showup lineups."[91] Furthermore, Director Hubner incorrectly stated that, "but there's a caveat to that, you know, with civilian witnesses, when an officer has direct contact with somebody, there's a little more weight to their identification."[92] Notwithstanding an unqualified meaning of the word "weight," which is not expanded upon in Director Hubner's deposition, the statement itself is legally incorrect. My understanding of applicable case law is that police officers are not exempt from best practices as viewing witnesses in an out-of-court identification procedure, and must still satisfy the burden of temporal proximity or prior relationship status before participating in a showup or confirmatory identification procedure. Applicable case law in effect nullifies the distinction of whether the viewer making the identification is a police officer.

Indeed, the failure of all parties involved to acknowledge clear exculpatory evidence such as the obvious disparity of the heights of the suspect encountered at The Hampton Inn and Nijeer Parks,

---

[91] Hubner deposition, page 66.
[92] Id.

BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

verifying the different shoe sizes of Nijeer Parks and the suspect at The Hampton Inn, and failing to prove or disprove Nijeer Parks' alibi, which included dates, times, locations, and participants, evinces a worrisome ethical problem for the investigating detectives and only serves to perpetuate the investigative pathologies of confirmation bias and *defensive avoidance*.

Regarding the fingerprint hit to Barrington Walker, one can only hope that the failure to acknowledge this print hit, which the WPD was notified of on February 22, 2019, and not recorded in the case until January 22, 2021, nearly two years later (and after this civil action was filed), is the product of incompetence, absentee supervision, and *defensive avoidance* in Woodbridge PD, and not indicative of greater malfeasance. In sum, it is clearly supported by the discovery, that after the initial facial recognition lead was received by Det Tapia, neither he nor anyone else involved in this case were interested in any other piece of evidence or circumstance and mistakenly rushed to arrest Nijeer Parks, without regard to pending fingerprint evidence, pending DNA evidence, or physical evidence such as disparities in height and shoe size. There was no photo array or other identification procedures administered to the hotel manager or staff, no video recovered from the Dunkin Donuts, and incorrect identification procedures were administered to witness officers. As the lead investigator, it was Det. Tapia's duty to aggressively pursue outstanding leads, not the least of which was inquiring about when the fingerprints would be returned after analysis. None of that occurred because of the misapplication of the incorrect facial recognition hit. As far as Det. Tapia was concerned, he *had his man,* and he completely and utterly failed to acknowledge any other evidence that was either pending or already in hand.

The practices of the Woodbridge Police Department will not improve, nor will its exposure to civil and perhaps criminal liability, because of a lack of understanding by local government and WPD leadership regarding what it takes to ensure that its officers are acting within the scope of legal admissibility. There is also a failure of the Woodbridge Police Department administration to ensure proper continuing education and training for its personnel. In today's society of rapidly changing technology, municipal policy, and law, the profession of police work is more challenging than ever before. As such, it demands a responsible, conscientious, and timely training regimen that should be designed at the highest levels of a police department's administration in conjunction with local prosecutors, the municipality's corporation counsel, and any other stakeholders to ensure the officers who police their community are carrying out their duties in a legal and just way.

At the time of this writing, according to reviewed depositions, no involved officer or supervisor has received discipline of any degree, nor training or re-training on the proper procedures for

25



BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

conducting out-of-court identifications procedures, specifically, line ups, show ups, and photo arrays. To date, there is still no codified policy and/or training that exists within the Woodbridge Police Department regarding investigating leads produced by Facial Recognition Technology, and Director Hubner has asserted he has no plans to create one without the Attorney General doing so first.[93] This refusal to create policy to inform and protect personnel is an irresponsible mindset for a police executive. Moreover, the general lack of overall new policies and/or policy revisions is potentially very problematic and is evidenced by the fact that the Woodbridge Police Department Policies and Procedures Manual has not been updated since 2012.[94] There are multiple "model policy" templates for the use of facial recognition technology at the disposal of Director Hubner. There are several ethical use policy templates produced by the Bureau of Justice Assistance, the Major City Chiefs Association, and a Use Case Catalogue by the International Association of Chiefs of Police (IACP), all created through the collaboration of numerous Police subject matter experts and stakeholders in the United States.[95]

"Failure in an organization occurs when some operation, employee, policy, or process produces results that deviate from expectations in substantial and disruptive ways."[96] Both the absence of training and/or retraining regarding lawful identification procedures, and the absence of a codified policy for the Use of Facial Recognition technology are particularly egregious considering the breadth of the failures in this case.


VI.   **Documents Reviewed**
- Andrew Lyszyk Deposition
- Jorge Quesada Deposition
- Santiago Tapia Deposition
- Edward Barrett Deposition
- Robert Hubner Deposition
- Nijeer Parks Deposition
- Woodbridge Incident Report #19010123, 1,2,3,4,5,6
- Woodbridge Nijeer Parks Arrest/Booking Report - PO Mirdala

---

[93] Hubner deposition, Page 80.
[94] Woodbridge Police Department Policy and Procedures Manual.
[95] IACP Model Policy, available at (WEB SITE) (restricted access) https://www.theiacp.org/
[96] Why Law Enforcement Organizations Fail, O'Hara, page 15 (2012).

BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

- CAD Incident Report #1900123
- Motor Vehicle Consent to Search form – Det. Tapia (PARKS000094)
- New Jersey Police Crash Investigation Report – PO Flavell
- Vehicle Property Description Report – PO Lyszyk
- Tennessee Driver's License – Jamel Owens
- Dunkin Donuts Receipt
- New Jersey CJIS Criminal History Report – Nijeer Parks
- CAD Incident Report #1904155 – Nijeer Parks walk in surrender.
- Civil Action No:2:21-cv-04021 – Second Amended Complaint
- Plaintiff's Opposition Brief to Motion To Dismiss Of Middlesex County Prosecutor Defts.
- Plaintiff's Answers to Interrogatories of Defendants Lyszyk and Licciardi
- Defendant Robert Hubner's Certified Answers to Plaintiff's First Set of Interrogatories
- Complaint-Warrant, The State of New Jersey vs. Nijeer Parks
- CAD Incident Report #19010176 – Impounding of Vehicle
- Rockland County Intelligence Center Officer Report for Incident 19RI00076
- New York State Intelligence Center – Request for Information form (PARKS92,93)
- Det Tapia Email communication chain/ Tapia-Lyons (PARKS 34,35)
- Woodbridge Police Department Criminal Invest. Division Voluntary Statement by Nijeer K. Parks – Det. Kondracki
- NJ ROIC form "Request for Facial Recognition/Photo Array"
- Woodbridge Police Department I.D. Bureau Report (PARKS97,98,99)
- NJCJIS 2000 Response- Criminal inquiry of Walker, Barrington dated 02/14/19 (PARKS100)
- Walker, Barrington – Print Cards (PARKS101-105)
- Letter requesting DNA discovery – Det. Quesada (PARKS106)
- Crime Scene Photos (PARKS 107-120)
- Miranda Card, signed Nijeer Parks (PARKS121)
- CODIS DNA fact sheet (PARKS122-133)
- Woodbridge Police Department Policy and Procedure "Collection and Preservation of Evidence"

BLUE TOP CONSULTING
PROFESSIONAL DEVELOPMENT FOR LAW ENFORCEMENT

- Latent Print Hit – Woodbridge PD- ID BUREAU SUSPECT REPORT "Barrington A. Walker" submitted 2/8/19, hit returned 2/22/19, Certified 1/22/21 (PARKS148)
- CODIS DNA HIT NOTIFICATION, Barrington Walker, dated July 30, 2021 (PARKS149)
- DNA LAB REPORT- NJ State Police – Results Obtained from Water bottle, not sneaker, dated 10/18/19 (PARKS151)
- Andrew Lyszyk resume (PARKS172)
- Interrogation video of Nijeer Parks

### VII.   Publications Reviewed

- https://www.nj.gov/oag/dcj/agguide/Photo-Lineup-ID-Guidelines.pdf
- Patrick O'Hara, *Why Law Enforcement Organizations Fail*, Carolina Academic Press, (2012)
- Kureva Pritchard Matuki, *Alibi Generation and Discriminability: Improving Innocent Suspects' Accuracy and Examining Alibi Discriminability*, Office of Justice Programs, (2022)
- Griffiths & Shepherd, *Investigative Interviewing,* 2nd Edition, Oxford University Press, (2013)
- Rossmo D. Kim. *Criminal Investigative Failures*. Routledge, (2009).
- Rossmo, D. Kim. Dissecting a Criminal Investigation. *J Police Crim Psych* 36, 639–651 (2021).
- Rossmo, D. Kim, and Joycelyn M. Pollock. *Confirmation bias and other systemic causes of wrongful convictions: A sentinel events perspective.* NEULR 11 (2019)
- Stelfox, P. Pease, *Cognition and detection: Reluctant Bedfellows.* (2005)
- https://www.state.nj.us/lps/dcj/agguide/photoid.pdf
- Woodbridge Town Police Department Policies and Procedures, selected sections.
- Woodbridge Municipal Website: https://www.twp.woodbridge.nj.us/197/Police-Department
- *State v. Delgado*, 188 N.J. 48 (2006)
- *State v. Anthony* (A-11-17/079344) (2019)
- *State v. Henderson*, 208 N.J. 208 (2011)
- *State v. Pressley* (A-52-16) (078747) (2018)



- NJ Courts Rule 3:11-Recording Out of Court Identifications Procedure (2012, 2020)
- Attorney General Guidelines For Preparing And Conducting Out-Of-Court Eyewitness Identifications
- New Jersey Division of Criminal Justice (Rev.10/1/12) Showup Identification Procedures Worksheet
- New Jersey Division of Criminal Justice (Rev.10/1/12) Instructions for Using Showup ID Procedures
- IDEMIA Best Practices for Facial Recognition Leads, (2021)
- New York State DCJS Model Policy on Facial Recognition (2019)
- New York City Police Department Patrol Guide
- New York City Police Department Detective Guide
- Guiding Principles for Law Enforcement's Use of Facial Recognition Technology- IACP

## VIII.   Fee Schedule

Blue Top Consulting Inc. fee schedule:

| | |
|---|---|
| Reading, Writing, Research, Phone/video conference, email, and other communication: | $400.00/hour |
| Trial prep / Scheduled and present for Testimony / Testimony: | $4000.00/day |
| Travel expenses and per diem, as they occur reimbursed or pre-paid by plaintiff | TBD |

End Note: The opinions expressed herein do not reflect the opinions of, and are not made on behalf of, the Putnam County NY District Attorney's Office, the New York City Police Department, the John Jay College of Criminal Justice, or any other group or entity listed in the **Background and Qualifications** section of this report, or associated with person, Ralph J. Cilento or company, Blue Top Consulting Inc. The opinions, assertions, and conclusions are solely the product of my own experience, education, knowledge, and research, and are offered by request of Plaintiff's counsel. The opinions stated in this report are subject to change based on new information conveyed or discovery material received.

# EXHIBIT "W"

## Office of Forensic Sciences
# EVIDENCE RECEIPT

| Submitting Agency (Case Number) | Laboratory Number |
|---|---|
| **19010123** | **E19-00917** |

**STATE OF NEW JERSEY DEPARTMENT OF LAW & PUBLIC SAFETY**
## DIVISION OF STATE POLICE

### East Regional Laboratory

NJSP Office of Forensic Sciences
Sea Girt Avenue
P.O. Box 0233
Sea Girt, NJ 08750-0233

CRIME: Aggravated Assault on a Police Officer, Resist, Obstruct, Disarm an Officer, Shoplifting

COUNTY OF: **MIDDLESEX**

| VICTIM: | | Age | Sex | Race | SUSPECT: UNKNOWN UNKNOWN | | Age | Sex M | Race B |
|---|---|---|---|---|---|---|---|---|---|

SUBMITTING AGENCY: (Address)
Woodbridge Twp PD          1 MAIN STREET          WOODBRIDGE          NJ 07095          732-634-7700

INVESTIGATED BY: P.O. QUESADA

DELIVERED BY: Michael Hanousck

**Brief History/Examination Requested:**

Offense Date: 01/26/2019

Location: HAMPTON INN WOODBRIDGE NJ

ON 01/26/2019 A MALE SUSPECT WAS APPREHENDED WHILE SHOPLIFTING IN THE HOTEL STORE. DURING THE INTERVIEW OF THE SUSPECT, THE SUSPECT FLED THE HOTEL AND JUMPED INTO HIS VEHICLE. WHILE FLEEING THE SCENE, THE SUSPECT VEHICLE ATTEMPTED TO HIT A PATROL OFFICER ON SCENE AND DID HIT A MARKED PATROL VEHICLE. PRIOR TO FLEEING THE SCENE, THE SUSPECT DRANK FROM AND DISCARDED A WATER BOTTLE AND LOST ONE OF HIS SNEAKERS. FOLLOWING THE MOTORVEHICLE PURSUIT THE SUSPECT VEHICLE WAS LOCATED AND INSIDE A SECOND WATER BOTTLE AS WELL AS A VAPE PEN WAS FOUND. OUR AGENCY IS SUBMITTING THE  WATER BOTTLE AND THE SNEAKER WITH A REQUEST TO EXAMINE FOR THE PRESENCE OF HUMAN D.N.A. FOR ANY QUESTIONS PLEASE CONTACT DET. GEORGE QUESADA AT 732-634-7700 EXT.2144

**Additional Names (if applicable):**

Case File:

| Item # | Dept. Item | Code | LIST OF SPECIMENS |
|---|---|---|---|
| 1 | JMQ#4 | SC | One paper bag containing-Biological Specimen(s) - Questioned-ONE PLASTIC WATER BOTTLE THAT WAS DISCARDED BY SUSPECT. |
| 2 | JMQ#5 | SC | One paper bag containing-Biological Specimen(s) - Questioned-ONE BLACK & RED NIKE SNEAKE THAT CAME OFF OF THE FLEEING SUSPECT. |

PARKS000173

## Office of Forensic Sciences
# EVIDENCE RECEIPT

| Submitting Agency (Case Number) | Laboratory Number |
|---|---|
| **19010123** | **E19-00917** |

**STATE OF NEW JERSEY DEPARTMENT OF LAW & PUBLIC SAFETY**
**DIVISION OF STATE POLICE**

**East Regional Laboratory**

NJSP Office of Forensic Sciences
Sea Girt Avenue
P.O. Box 0233
Sea Girt, NJ 08750-0233

| CRIME: | Aggravated Assault on a Police Officer, Resist, Obstruct, Disarm an Officer, Shoplifting | COUNTY OF: MIDDLESEX |
|---|---|---|

| VICTIM: | Age | Sex | Race | SUSPECT: UNKNOWN UNKNOWN | Age | Sex M | Race B |
|---|---|---|---|---|---|---|---|

| SUBMITTING AGENCY: (Address) | | | | | |
|---|---|---|---|---|---|
| Woodbridge Twp PD | 1 MAIN STREET | WOODBRIDGE | NJ 07095 | 732-634-7700 | |

| INVESTIGATED BY: P.O. QUESADA | DELIVERED BY: Michael Hanousek |
|---|---|

| Item # | Dept. Item | Code | LIST OF SPECIMENS |
|---|---|---|---|
| | | | |

*The evidence will be examined in accordance with established laboratory capabilities and procedures by employing appropriate methods developed by the laboratory, other reputable organizations, or documented in published journals, scientific texts, or as specified by the manufacturer of equipment, and subjected to validation and/or performance check testing. The method employed, deviations from requested analysis, the number of items analyzed, and the location of the laboratory performing necessary analyses will be at the discretion of the Office of Forensic Sciences (OFS). This may include, when necessary, the subcontracting of evidence for analysis by OFS-approved external vendors. By submitting this evidence, the submitting agency agrees to the conditions outlined above.*

Received:

2/8/19

8:48 am

Delivered By: Michael Hanousek

Received By: Sandra D. Rice

PARKS000174



**NEW JERSEY STATE POLICE**
OFFICE OF FORENSIC SCIENCES

**FORENSIC SEROLOGY
LABORATORY REPORT**

| **Central Regional Laboratory** | **Laboratory Number** |
|---|---|
| 1200 Negron Drive<br>Hamilton, New Jersey 08691<br>609-584-5054 | E19-00917 |
| **Submitting Agency** | **Agency Number** |
| Woodbridge Twp PD<br>1 Main Street<br>WOODBRIDGE NJ 07095 | 19010123 |

| Case: | Aggravated Assault on a Police Officer, Resist, Obstruct, Disarm an Officer, Shoplifting<br>UNKNOWN UNKNOWN [S] | **Date of Report**<br>04-17-2019 |
|---|---|---|

Evidence in this case was submitted to the Office of Forensic Sciences for examination.
See *Evidence Receipt* for list of items.

| Results/Opinions/Interpretations of Examinations: | | | | | | | | Page 1 of 1 |
|---|---|---|---|---|---|---|---|---|

| | Not Examined | Presumptive Testing* | | | | Spermatozoa | Portion Submitted to DNA | |
| | | Blood (Kastle-Meyer) | Semen (Acid Phosphatase) | Semen (p30) | Saliva (Amylase) | | | |
| **Item** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **Comments** |
| 1. Water Bottle (SC) | | | | | | | | |
| 1-1. Swabbing - Cap and Mouth | | | | | | | X | |
| 2. Sneaker (SC) | | | | | | | | |
| 2-1. Swabbing - Inside and Lace Ends | | | | | | | X | |

*\*A positive presumptive test does not confirm the presence of the body fluid indicated.*

A portion of #1-1 (1-1-1) and #2-1 (2-1-1) has been submitted to the DNA Laboratory.

A separate report will cover examinations conducted by the DNA Laboratory.

All remaining evidence submitted for Forensic Serology examination will be returned to the submitting agency.

This case was not processed for trace evidence (hairs, fibers, etc.). Upon receipt of the DNA results, and the assessment of those results, please contact the laboratory as soon as possible regarding the necessity for any trace evidence analysis.

| Key | |
|---|---|
| + | Positive |
| ND | Not Detected |
| NEV | Nothing of Evidential Value |
| NFE | No Further Examination |
| INC | Inconclusive |
| QNS | Quantity of stain insufficient for analysis |

Analyst: *Christina Knipper*

**Christina J. Knipper**
**Forensic Scientist 1**

Peer Reviewed:

Approved By:

*This report shall not be reproduced, except in full, without the written approval of the laboratory.*

PARKS000175

| **EVIDENCE RETURN RECEIPT** | Submitting Agency (Case Number) | Laboratory Number |
|---|---|---|
| | *19010123* | E19-00917 |

**STATE OF NEW JERSEY DEPARTMENT OF LAW & PUBLIC SAFETY**
**DIVISION OF STATE POLICE OFFICE OF FORENSIC SCIENCES**

### East Regional Laboratory

NJSP Office of Forensic Sciences
Sea Girt Avenue
P.O. Box 0233
Sea Girt, NJ 08750-0233

| Offense Information | AGENCY: Woodbridge Twp PD |
|---|---|
| | 1 MAIN STREET |
| CRIME: Aggravated Assault on a Police Officer | WOODBRIDGE        NJ 07095 |
| DATE: January 26, 2019 | 79,671.00 |

UNKNOWN, UNKNOWN (S)

**ITEM LIST AND DESCRIPTION:**

1 - DI# JMQ#4    One paper bag containing  Biological Specimen(s) - Questioned - ONE PLASTIC WATER BOTTLE THAT WAS DISCARDED BY SUSPECT.

    1-1 - DI# JMQ#    One paper bag containing  Biological Specimen(s) - Questioned - Swabbing - Cap and Mouth

2 - DI# JMQ#5    One paper bag containing  Biological Specimen(s) - Questioned - ONE BLACK & RED NIKE SNEAKER THAT CAME OFF OF THE FLEEING SUSPECT.

    2-1 - DI# JMQ#    One paper bag containing  Biological Specimen(s) - Questioned - Swabbing - Inside and Lace Ends

| DATE/TIME | | RELINQUISHED BY: | RECEIVED BY: |
|---|---|---|---|
| 11/1/19 | 10:48 | Sandra D. Rice<br>*East Regional Laboratory* | Michael Hanousek |

*New Jersey is An Equal Opportunity Employer  *  Printed on Recycled Paper and Recyclable*

3713633

*OFS (Admin) 009*        Version 02/15        *Form Approved by:  Director OFS*        Page 1 of 1

# EXHIBIT "X"

Page 1 of 1

| **NEW JERSEY STATE POLICE**<br>**OFFICE OF FORENSIC SCIENCES**<br><br>**DNA LABORATORY REPORT** | **DNA Laboratory**<br>1200 Negron Drive<br>Hamilton, NJ 08691<br>609-584-5054 | **Laboratory Number**<br>E19-00917 |
|---|---|---|
| | **Submitting Agency**<br>Woodbridge Twp PD<br>1 Main Street<br>WOODBRIDGE NJ 07095<br>732-634-7700 | **Agency Number**<br>19010123 |
| **Case:** Aggravated Assault on a Police Officer, Resist, Obstruct, Disarm an Officer, Shoplifting | | **Date of Report**<br>10/18/2019 |

See *Evidence Receipt* for list of items submitted to the Office of Forensic Sciences for examination.

| | Item(s) received by DNA Laboratory | Comments |
|---|---|---|
| 1-1-1 | Portion - Water Bottle Swabbing - Cap and Mouth (SC) | Results Obtained[1] |
| 2-1-1 | Portion - Sneaker Swabbing - Inside and Lace Ends (SC) | Results Obtained[1] |

**Key:** s/sf = sperm fraction    e/ef = epithelial fraction    CODIS = Combined DNA Index System
[1] STR amplification performed using the Promega PowerPlex Fusion 6C amplification system.
[2] YSTR amplification performed using the Applied Biosystems AmpFlSTR YFiler amplification system.

## Results/Opinions/Interpretations

The mixed STR DNA profile obtained from Item 2-1-1 is not of sufficient quantity and/or quality for comparison purposes.

No conclusion can be reached concerning a possible contributor to the STR DNA profile obtained without submission of a DNA reference.

The STR DNA profile from Item 1-1-1 was entered into the CODIS database in accordance with state and national regulations, where regular searches will be performed. Notification will occur if there is a hit in the database or if the profile is removed from the database in the future.

*Statistical calculations are performed using population frequencies from databases of unrelated African American, Caucasian, and Hispanic individuals. Source identity statements are used when the calculated frequency of the STR DNA profile is less than or equal to one in 7 trillion for randomly-selected unrelated individuals in each of these populations.*

*All remaining evidence received by the DNA laboratory is being returned to the submitting agency.*

Melissa M. Leto
Forensic Scientist 1

Peer Reviewed By

Approved By

*This report shall not be reproduced, except in full, without the written approval of the laboratory*

OFS(DNA)060                    (Rev 11/18)            Report Format Approved by: Director OFS

# EXHIBIT "Y"



NEW JERSEY STATE POLICE
OFFICE OF FORENSIC SCIENCES

# CODIS

**INVESTIGATIVE HIT
NOTIFICATION**

CODIS Unit
1200 Negron Drive
Hamilton, NJ 08691
Harpreet Singh,
CODIS Administrator
609-584-5054 x 5423

July 30, 2021

**CODIS Hit #:  CH21-0817**

To Sir/Madam:

During a search of the CODIS (Combined DNA Index System) database, a high stringency match occurred between the following:

**CASE(S):**

| Lab Specimen ID | Agency Name/Case # | Offense Date | Offense | Contact Info |
|---|---|---|---|---|
| E19-00917 #1-1-1_VC | Woodbridge Twp PD 19010123 | 01/26/2019 | Aggravated Assault on a Police Officer, Resist, Obstruct, Disarm an Officer, Shoplifting County of: MIDDLESEX | P.O. QUESADA 1 MAIN STREET WOODBRIDGE NJ 07095 732-634-7700 |

**OFFENDER:**

| State | Name | DOB | State ID # | CO # | Comments |
|---|---|---|---|---|---|
| Maine | Barrington Anthony Walker | 02/28/93 | N/A | N/A | FBI# 382204AE1 |

The purpose of this letter is to inform you of a possible investigative lead.

Please submit a buccal swab reference sample to the laboratory for comparison to the evidentiary DNA profiles.

If the New Jersey State Police Office of Forensic Sciences can be of any further assistance, please do not hesitate to contact the laboratory at 609-584-5054.

Sincerely,

Joseph Mignone
Forensic Scientist 2
NJSP Office of Forensic Sciences

Reviewed By: 

cc: County Prosecutor's Office
    NJSP Regional Operations Intelligence
    Center Section

Page 1 of 1

CH21-0817

OFS(CODIS)044

(Rev 09/20)

Letter Format Approved By: Director OFS

PARKS000149

# EXHIBIT "Z"



# Rockland County Intelligence Center

## Officer Report for Incident 19RI00076

| | | | |
|---|---|---|---|
| **Nature:** Agency Assist | | **Address:** 50 SANATORIUM RD BLDG P; YHC Building P | |
| **Location:** P7003 | | NEW HEMPSTEAD NY 10977 | |

| | | | |
|---|---|---|---|
| **Offense Codes:** | | | |
| **Received By:** Lyons, S | **How Received:** T | | **Agency:** RCI |
| **Responding Officers:** Lyons, S | | | |
| **Responsible Officer:** Lyons, S | **Disposition:** 21 01/28/19 | | |
| **When Reported:** 07:58:31 01/28/19 | **Occurred Between:** 07:58:31 01/28/19 and 07:58:31 01/28/19 | | |

| | | |
|---|---|---|
| **Assigned To:** | **Detail:** | **Date Assigned:** **/**/** |
| **Status:** | **Status Date:** **/**/** | **Due Date:** **/**/** |

| | | | |
|---|---|---|---|
| **Complainant:** 2605 | | | |
| **Last:** RC SHERIFF'S OFFICE | **First:** | **Mid:** | |
| **DOB:** **/**/** | **Dr Lic:** | **Address:** 55 NEW HEMPSTEAD RD; 1030580 - Rockland County Sheriffs Dept | |
| **Race:** R | **Sex:** R | **Phone:** ( )- | **City:** NEW CITY, NY 10956 |

## Offense Codes

**Reported:**                                        **Observed:**

## Circumstances

| | | |
|---|---|---|
| **Responding Officers:** | **Unit :** | |
| Lyons, S | RI891 | |
| **Responsible Officer:** Lyons, S | **Agency:** RCI | |
| **Received By:** Lyons, S | **Last Radio Log:** **:**:** **/**/** | |
| **How Received:** T Telephone | **Clearance:** No clearance | |
| **When Reported:** 07:58:31 01/28/19 | **Disposition:** 21 **Date:** 01/28/19 | |
| **Judicial Status:** | **Occurred between:** 07:58:31 01/28/19 | |
| **Misc Entry:** NJ PD | **and:** 07:58:31 01/28/19 | |

**Modus Operandi:**            **Description :**            **Method :**

01/31/19

PARKS000030

*Officer Report for Incident 19RI00076*                                    *Page 2 of 4*

**Involvements**

| Date | Type | Description | Relationship |
|------|------|-------------|--------------|
| 01/28/19 | Name | RC SHERIFF'S OFFICE, | Complainant |

01/31/19

PARKS000031

*Officer Report for Incident 19RI00076*                                      *Page 3 of 4*

### Narrative

RCIC was provided information from the PIP Police NJ, Sgt R. Dey regarding an
AGGRAVATED ASSAULT ON A POLICE OFFICER case. RCIC assisted the Woodbridge PD
and utilized facial recognition software and received a possible HIT on a
subject, NIJEER K. PARKS, 09/11/1987 (NJ). RCIC provided all information to the
NJ PIP Police and Woodbridge PD, Det. Santiago Tapia (732) 602-7394. See
atatched PDF and flyer. Closed by investigation.

**Responsible LEO:**

**Approved by:**

**Date**

01/31/19

## Name Involvements:

**Complainant :**  2605

| | | |
|---|---|---|
| **Last:** RC SHERIFF'S OFFICE | **First:** | **Mid:** |
| **DOB:** **/**/** | **Dr Lic:** | **Address:** 55 NEW HEMPSTEAD RD; 1030580 - Rockland County Sheriffs Dept |
| **Race:** R      **Sex:** R | **Phone:** ( ) - | **City:** NEW CITY, NY 10956 |

01/31/19

## TAPIA, SANTIAGO

| | |
|---|---|
| **From:** | Seamus Lyons <lyons@RCPIN.net> |
| **Sent:** | Monday, January 28, 2019 9:29 AM |
| **To:** | TAPIA, SANTIAGO |
| **Subject:** | RE: Aggravated Assault on a Police Officer (Flyer) |

Good news. Yes, I used facial recognition soft ware but altered the photo on the license a little to get the pixels clear. Got a high number hit and he is a Patterson NJ guy. We have facial recognition here at the Rockland County Intel Center. Keep my info and if you need anything in the future call or email. Stay safe.

Seamus

ROCKLAND COUNTY INTELLIGENCE CENTER  PO BOX 295, NEW CITY, N.Y. 10956
INVESTIGATOR SEAMUS A. LYONS  #891
ROCKLAND COUNTY SHERIFF'S DEPARTMENT INTELLIGENCE CENTER
55 NEW HEMPSTEAD ROAD, NEW CITY, N.Y. 10956
W-MAIN-845-364-3611
W-DIRECT-845-364-3632
W-CELL-845-521-0334
EMAIL- lyons@rcpin.net<mailto:lyons@rcpin.net>

From: TAPIA, SANTIAGO [santiago.tapia@twp.woodbridge.nj.us]
Sent: Monday, January 28, 2019 9:24 AM
To: Seamus Lyons
Subject: Re: Aggravated Assault on a Police Officer (Flyer)

Yes. He's fine. How did you guys ID him. Facial recognition through NYSIC or the ROIC?

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone

-------- Original message --------
From: Seamus Lyons <lyons@RCPIN.net>
Date: 1/28/19 9:17 AM (GMT-05:00)
To: "TAPIA, SANTIAGO" <santiago.tapia@twp.woodbridge.nj.us>
Subject: RE: Aggravated Assault on a Police Officer (Flyer)

Excellent !!!!!!!!!!  how is the officer. Is he ok?

ROCKLAND COUNTY INTELLIGENCE CENTER  PO BOX 295, NEW CITY, N.Y. 10956
INVESTIGATOR SEAMUS A. LYONS  #891
ROCKLAND COUNTY SHERIFF'S DEPARTMENT INTELLIGENCE CENTER
55 NEW HEMPSTEAD ROAD, NEW CITY, N.Y. 10956
W-MAIN-845-364-3611
W-DIRECT-845-364-3632

PARKS000034

W-CELL-845-521-0334
EMAIL- lyons@rcpin.net<mailto:lyons@rcpin.net>

_____

From: TAPIA, SANTIAGO [santiago.tapia@twp.woodbridge.nj.us]
Sent: Monday, January 28, 2019 9:16 AM
To: Seamus Lyons
Subject: Re: Aggravated Assault on a Police Officer (Flyer)

That's him.
Thank you and Sgt. Dey for your help.
Tapia

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone

------- Original message -------
From: Seamus Lyons <lyons@RCPIN.net>
Date: 1/28/19 8:40 AM (GMT-05:00)
To: "TAPIA, SANTIAGO" <santiago.tapia@twp.woodbridge.nj.us>
Subject: Aggravated Assault on a Police Officer (Flyer)

See attached PDF regarding your PD Police Information flyer Aggravated Assault on a Police Officer. Good possible hit on facial recognition. It was sent to us from the NJ PIP Police Sgt R. Dey. Let me know if you need any further. Good luck.

Inv Seamus Lyons

ROCKLAND COUNTY INTELLIGENCE CENTER  PO BOX 295, NEW CITY, N.Y. 10956
INVESTIGATOR SEAMUS A. LYONS  #891
ROCKLAND COUNTY SHERIFF'S DEPARTMENT INTELLIGENCE CENTER
55 NEW HEMPSTEAD ROAD, NEW CITY, N.Y. 10956
W-MAIN-845-364-3611 ✕
W-DIRECT-845-364-3632
W-CELL-845-521-0334
EMAIL- lyons@rcpin.net<mailto:lyons@rcpin.net>

This RCPIN email, including attachments, may include confidential and/or proprietary information.  If the reader of this email is not the intended recipient or his or her authorized agent, the reader is hereby notified that any disseminiation, distribution, or copying of this email is prohibited.  If you have received this email in error, please notify the sender by replying to this message and deleting this email immediately.

PRIVACY NOTICE:
This e-mail, including attachments, may include privileged, confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately.

2

# EXHIBIT "AA"



## WOODBRIDGE POLICE DEPARTMENT
## WOODBRIDGE, NJ

| INCIDENT # / REPORT # | OFFICER | BADGE | REVIEW STATUS |
|---|---|---|---|
| 19010123 / 1 | LYSZYK A | 519 | APPROVED |

### INCIDENT #19010123 DATA
As Of 02/01/2019 10:05:04

#### BASIC INFORMATION

**CASE TITLE**
AGG ASS/ WOODBRIDGE TWP

**LOCATION**
370 US HWY 9 N

**APT/UNIT #**

**DATE/TIME REPORTED**
01/26/2019 12:21:50

**DATE/TIME OCCURRED**
On or about 01/26/2019 12:21

**INCIDENT TYPE(S)/OFFENSE(S)**
(2C:20-11)SHOPLIFTING
(2C:12-1B(2))AGGRAVATED ASSAULT W/WEAPON
(2C:29-3)HINDERING APPREHENSION OR PROSECUTION
(2C:21-2.1(C))EXHIBITS A FALSE GOVERNMENT DOCUMENT
(2C:35-10(A)(4))POSSESSION OF CDS (MARIJUANA) UNDER 50G
(2C:36-2)USE OR POSSESSION DRUG PARAPHERNALIA
(39:4-129)LEAVING SCENE OF ACCIDENT
(39:4-96)TRAFFIC REGULATION
(39:3-76.2)SAFETY BELTS OR RESTRAINING DEVICES
(2C:29-2A(2))RESISTING ARREST/BY FLIGHT
(39:4-130)TRAFFIC REGULATION
(2C:29-1)OBSTRUCTING ADMINISTRATION OF LAW OR OTHER GOVERNM
(2C:29-2(B))ELUDING
(2C:17-3)CRIMINAL MISCHIEF
(2C:39-4(D))POSS WEAPON UNLAWFUL PURPOSE OTHER WEAPONS

#### PERSONS

| ROLE | NAME | SEX | RACE | AGE | DOB | PHONE |
|---|---|---|---|---|---|---|
| VICTIM | WOODBRIDGE TWP, | | | | | (HOME) 732-634-770 |
| | ADDRESS: 1 MAIN ST  WOODBRIDGE, NJ | | | | | (CELL) |
| VICTIM | HAMPTON INN, | | | | | (WORK) 732855690( |
| | ADDRESS: 370 US HIGHWAY 9 NORTH  HOPELAWN, NJ | | | | | (CELL) |
| REPORTING PERSON | CHARNECO, RICHARD A | MALE | WHITE | | | (HOME) |
| | ADDRESS: 370 RT. 9 NORTH  WOODBRIDGE, NJ | | | | | (CELL) |

PARKS000064

Main Form

| | | | | | | |
|---|---|---|---|---|---|---|
| WITNESS | HIGGINS, CALEIGH | FEMALE | WHITE | | | (HOME) |
| | ADDRESS: 370 RT. 9 NORTH   WOODBRIDGE, NJ | | | | | (CELL) |
| WITNESS | GRANT, KAMISHA | FEMALE | BLACK | | | (HOME) |
| | ADDRESS: 370 RT. 9 NORTH   WOODBRIDGE, NJ | | | | | (CELL) |
| OWNER/OPERATOR | HERTZ, | | | | | (HOME) |
| | ADDRESS: 900 DOREMUS AVE   PT NEWARK, NJ | | | | | (CELL) |
| VICTIM | LEE, FRANCIS POLICE | MALE | ASIAN/PACIFIC ISLANDER | 36 | 10/17/1982 | (WORK) 732634770C |
| | ADDRESS: 1 MAIN STREET   WOODBRIDGE, NJ | | | | | (CELL) |

## OFFENDERS

| STATUS | NAME | SEX | RACE | AGE | DOB | PHONE |
|---|---|---|---|---|---|---|
| SUSPECT | UNKNOWN, UNKNOWN UNKNOWN | | | | | (HOME) UNKNOWN |
| | ADDRESS: UNKNOWN  UNKNOWN, | | | | | (CELL) UNKNOWN |
| SUSPECT | PARKS, NIJEER K | MALE | BLACK | 31 | 09/11/1987 | (HOME) |
| | ADDRESS: 485 E. 19TH ST 3G PATTERSON, NJ | | | | | (CELL) |

## VEHICLES

| ROLE | TYPE | YEAR | MAKE | MODEL | COLOR | REG # | STATE |
|---|---|---|---|---|---|---|---|
| SUSPECT VEHICLE | | 2018 | DOD | CHA | GRAY | JBD2162 | NY |

| STOLEN $ | REC CODE | DATE REC | REC $ | REC BY |
|---|---|---|---|---|
| | | | | |

## PROPERTY

| CLASS | DESCRIPTION | MAKE | MODEL | SERIAL # | VALUE |
|---|---|---|---|---|---|
| OTHER | FAKE TENNESSE DL | | | | |
| OTHER | 2 BACKWOOD SARK STOUT CIGAR PACKS | | | 801527486 | |
| OTHER | 2 BACKWOOD SWEET AROMATIC CIGAR PACKS | | | | |
| DRUGS/NARCOTICS | 44 GRAMS OF SUSPECTED MARIJUANA | | | | |
| DRUG/NARCOTIC EQUIPMENT | MARIJUANA GRINDER | | | | |
| OTHER | SPRINT SIM CARD | | | | |
| OTHER | DUNKIN DONUTS RECEIPT | | | 8901120200 | |
| OTHER | 13 ASSORTED CANDIES | | | 855 | |
| OTHER | 2 CLEAR EYE DROPS | | | | |

PARKS000065

### OFFICER REPORT: 19010123 - 1 / LYSZYK A (519)

**DATE/TIME OF REPORT**
01/26/2019 14:18:31

**TYPE OF REPORT**
INCIDENT

**REVIEW STATUS**
APPROVED

**NARRATIVE**

While on patrol, Ptl. Lee and I were dispatched to Hampton Inn (370 Rt. 9 North Woodbridge) on a report of a shoplifting. HQ advised us that the caller stated that the male's vehicle, NY JBD2162 Gray Dodge Challenger, was parked in front of the hotel.

Ptl. Lee arrived on location prior to my arrival and was already speaking to the male, that identified himself as Jamal Owens. The male told us that he was going to pay for the snacks that he took, but left his money in the car. When he went out to his car, he placed the snacks on the seat and came back in with his money. However, when he was coming back into the hotel lobby to pay for the snacks, he felt the need to go to the bathroom. When he came out of the bathroom, he saw Ptl. Lee standing there.

I walked over to the hotel counter and spoke to the two clerks, Caleigh Higgins and Kamisha Grant, and the hotel manager, Richard Charneco. Charneco advised me that one of the cleaning personnel saw the male place a bunch of snacks into his bag and then put it in his vehicle. At that point he called the police. Charneco stated that he wanted the male to pay for the items, 13 assorted candies and 2 Clear Eye eye drops (total value $39.00), that he took. I told the male that the hotel wanted him to pay for the items and asked him where they were. The male told us that the snacks were in his car. We then walked out to his car, grabbed the snacks from the vehicle, brought them back to the counter, and paid for them. The male also purchased a bottle of water and took a sip out of it when he paid for the snacks. Ptl. Lee advised me that the Tennessee driver's license, DL # 801527486 Jamal Owens 765 Oakdell Ave. Madison TN 37115 DOB 10-15-93, that he gave him was not coming back on file and gave it to me so I can check it in the car.

While in my car, I attempted to find Jamal Owens, but kept on receiving a not on file result. At that time, I compared the license that he gave Ptl. Lee to the Tennessee license on the I.D. checking guide and found multiple discrepancies. The discrepancies that I found were that there were asterisks where numbers were supposed to be and the zip code to his mailing address was 5 digits instead of nine. At that time, I contacted the Tennessee State PD at the Knoxville, TN office and spoke with supervisor Jason Beary. I advised him of my situation and asked him if he could check his system to confirm that there was not a glitch between our systems. Supervisor Beary advised me that the DL number and the name Jamal Owens was not on file within their DMV. Supervisor Beary also advised me that the driver's license in Tennessee should start with 0 instead of 8 .

At that point I went back into to the lobby and confronted the male. The male was still holding onto the bag of candy and water bottle. I advised him of the situation and asked him if he had any other forms of identification on him. At first he stated that he did not have his wallet on him, but then took out his wallet from his pocket. He opened up his wallet and showed me a credit card with the name, Jamal Owens. I then asked him if he was staying at the hotel so that I can confirm who he is. He advised me that he was not staying at the hotel and was just there for the Hertz rental car store.

Since he admitted to shoplifting the snacks and I was not able to identify him; I told him to turn around and place his hands behind his back. The male turned around and placed his hands behind his back. When he did that, I was able to see a big bag of suspected marijuana, that was halfway in a black plastic shopping bag, protruding from his left jacket pocket. I grabbed him by the wrist, took the bag out of his pocket, dropped it on the floor, and went to place Ptl. Lee's handcuffs on him. As I was about to place the handcuff on his wrist, the male slipped away from

PARKS000066

my grip and started to run towards the rear of the lobby.

We called out the foot pursuit and began to chase him towards the rear of the lobby. His right sneaker fell off prior to exiting the rear door, which is next to the Hertz car rental kiosk. He exited the rear door and ran towards the rear gate, which was closed. He pushed open the gate, made a right turn, ran towards Dunkin Donuts, and began to run back towards the front of the hotel. While he was running, he kept placing his right hand into his jacket pocket and kept looking back at us. He ran back towards the front of the building and jumped into the driver's seat of the vehicle, NY JBD2162. We caught up to him at the vehicle, pointed our weapons at him and ordered him to shut the car off. However, the male placed the vehicle in reverse and backed the vehicle up a few feet and stopped. Once stopped he told us not to shoot him and moved his left hand towards the side of his seat. I told him to keep his hands where I could see them or I was going to shoot him. I then told him to unlock his door, but he refused and said that he will unlock the door only if we put our guns away. We told him that our guns were staying out and ordered him to open the door. However, he refused again and began to hit the steering wheel with his fists while sitting in the driver's seat unbuckled. After some time, the male placed the car in drive, hit the gas, turned the steering wheel to the left, struck the rear driver's side of patrol car #3, and then hit the pillar at the Hampton Inn. When he did that, the male turned the vehicle towards Ptl. Lee and Ptl. Lee had to move out of the way to avoid serious injury. After hitting the pillar, the male put the vehicle in reverse, I moved out of the way, and the male backed the vehicle up. The male then sped off towards Miller's Ale House, made a left towards Rt. 9 north, drove the wrong way on the ramp (ramp from Rt. 9 North to Millers Ale House), and made a right onto Rt. 9 north. Once on Rt. 9, the vehicle sped off at a high rate of speed.

We hoped in our vehicles and attempted to follow him. At this time multiple units were on Rt. 9 north, but we were unable to locate the vehicle or the suspect. Therefore, I went back to Hampton Inn to preserve the scene. As I returned to the scene, Charneco advised me that he collected the items that were dropped on the floor, placed it in a bag, and moved it to the side. Charneco then gave me the bag and I secured the items in my patrol car. I then notified HQ that I needed additional units on scene to help preserve the scene. I also asked HQ to notify the detective bureau about the incident and to notify them that we need the scene processed. Ptl. Campagnio arrived on scene and preserved the rear gate, Ptl. Lee arrived on scene and preserved the rear door, Ptl. Montalvo arrived and preserved the front entrance where the motor vehicle crash occurred, and Det. Tapia and Det. Quesada arrived on scene to process it, see additional reports.

I then went to the Hertz kiosk to talk to the employee that was dealing with the male. However, there was no one there so I went to the hotel desk. I asked the hotel clerks if they knew where the Hertz employee was. Higgins advised me that the employee came over to her and said " ah shit that was one of my cars". The employee then handed Higgins a key to another vehicle and told her that a customer is going to pick up a vehicle. After giving her the key the Hertz employee told her " I just got to step outside and figure it out". After the employee went outside, she did not see him again. None of the hotel personnel know who the Hertz employee is. I attempted to get a hold of a manager, but had negative results. Charneco also advised me that there is CCTV on site, but he would not be able to access it until Monday.

Prior to leaving the scene, I notified Det. Quesada that the male left his right shoe and water bottle behind. I also advsied him that I still had the fake driver's license that the male gave me in my possession. The following items were inside the black bag, which came out of the male's left jacket pocket, suspected marijuana, a crumpled Dunkin Donuts receipt, four packs of Backwood cigars, a Sprint sim card, and a marijuana grinder. The other bag that the male dropped contained 13 assorted candies and two Clear eyes eye drops that he purchased.

I transported the items to HQ without incident. I placed the suspected marijuana on a scale to weigh it. The total weight of the suspected marijuana was 44 grams. The information on the

PARKS000067

Main Form

Tennessee driver's license did not match any Tennessee driver's license on file. However, the image on the driver's license was the suspect. The suspected marijuana, grinder, Sprint sim card, four packs of Backwoods cigars, fake license, and the Dunkin Donuts receipt was placed into evidence locker. The candies and eye drops were also placed into the evidence locker for safe keeping. Det. Quesada came downstairs and took custody of the Air Jordan sneaker and bottle of water so that he can attempt to extract DNA from them. The detective bureau took over the investigation.

| REPORT OFFICERS | | |
|---|---|---|
| Reporting Officer: | LYSZYK A | 519 |
| Approving Officer: | LICCIARDI J | 450 |

# EXHIBIT "BB"

| | WOODBRIDGE TOWNSHIP POLICE DEPARTMENT | | |
|---|---|---|---|
| **WOODBRIDGE POLICE** | Policy & Procedures<br><br>**IN-SERVICE, SPECIALIZED AND ROLL CALL TRAINING** | | |
| | Chapter:<br>**432** | Volume Four:<br>The Personnel Process | |
| Date(s): | Authority | General Order #: | File #: |
| Effective:  Dec. 4, 1997 | Chief Wm. Trenery | 97-017 | 432-971 |
| Revised:  Nov. 7,2007 | Chief Wm. Trenery | 07-009 | 432-071 |
| Revised:  Feb. 27,2008 | Chief Wm. Trenery | 08-002 | 432-081 |
| Revised:  Oct. 8, 2010 | Chief Wm. Trenery | 10-005 | 432-101 |
| Revised: March 15, 2012 | Director R. Hubner | 11-003 | 432-121 |
| Revised: | | | |
| Revised: | | | |
| LEGAL REFERENCES: Attorney General Guidelines Re: Annual and Semiannual Training | | | |
| ACCREDITATION STANDARDS REFERENCES: 33.5.1, 33.5.2, 33.6.1, 33.6.2, 33.7.1, 33.7.2, 33.8.1, 33.8.2, 33.8.3 | | | |

## 432.1
## POLICY & PURPOSE:

**432.1.1**
**POLICY:**  It will be the policy of the Woodbridge Township Police Department to implement, and maintain, a comprehensive in-service training program.

**432.1.2**
**PURPOSE:**  The purpose of in-service training and education is to keep personnel up to date with new laws, technological improvements, and revisions in agency policy, procedures, rules, and regulations.  In-service training serves to motivate experienced officers and furthers the professionalism of the agency.

## 432.2
## ESTABLISHMENT OF IN-SERVICE TRAINING:

**432.2.1**
**ANNUAL TRAINING:**  In accordance with guidelines issued by the Attorney General of the State of New Jersey, all employees authorized to carry a weapon or make arrests shall receive annual in service training.  Training may include periodic refresher courses, specialized skill development training, career development training to include promotional supervisory training, and roll call training.  All other personnel may receive in-service training as required by their assignment or position within the organization.

   A. ANNUAL TRAINING REQUIREMENTS:  All sworn personnel of this agency are subject to complete an
      annual retraining program which, at a minimum, shall include the following elements:

1. Domestic Violence (4 hours per year)
2. Blood borne Pathogens
3. Hazardous Materials
4. Right to Know
5. Cardio Pulmonary Resuscitation
6. Legal Updates:  Changes in Statutory or Case Law Affecting Law Enforcement Operations
7. Changes to departmental policy and procedures, and rules and regulations.
8. Cell Block Management
9. Active Shooter
10. All Hazard Plan
11. Bias Based Profiling

B. SEMIANNUAL TRAINING REQUIREMENTS:  All sworn personnel of this agency are subject to complete a semiannual retraining program which, at a minimum, shall include the following elements:
   1. Firearms
   2. Use of Force
   3. Pursuit Driving

C. BIENNIAL TRAINING REQUIREMENTS: All sworn personnel of this agency are subject to complete a biennial retraining program which, at a minimum, shall include the following elements:
   1. Ethics
   2. Sexual Harassment
   3. Bias
   4. Expandable Batons
   5. OC Spray

D. TRIENNIAL TRAINING REQUIREMENTS:  All sworn personnel of this agency are subject to complete a retraining program which, at a minimum, shall include the following elements:
   1. Emotionally Disturbed Persons

E. OTHER TRIENNIAL TRAINING REQUIREMENTS:
   1. Holding Facility Training: For all employees who work in direct, continuing contact with detainees.

F. OTHER MANDATORY TRAINING:  Certain personnel assigned to specialized units shall undergo mandatory retraining, as follows:
   1. Special Operations Team Members
   2. Instructors (Re-Certifications)
   3. Marine Unit

G. TRAINING COURSES:  The Departmental Training Officer is responsible for the completion of the agency training program.  Training shall be scheduled by the departmental Training Officer and may be accomplished through several methods.  These may include, but are not limited to, scheduled training assignments at courses offered by police training academies; attendance at seminars and lectures offered by private and governmental entities presenting relevant training seminars; scheduled in-house training programs, roll call briefings, video training and computer based training.

H. INITIAL TRAINING:  All newly hired sworn officers will receive training on all Standard Operating Procedures.


## 432.3
## ESTABLISHMENT OF ROLL CALL TRAINING:


### 432.3.1
**GENERAL REQUIREMENTS:**  Roll Call training is a useful element of agency training which is used to supplement all other training.  The goal of Roll Call training is to keep officers up to date between formal training sessions.

A. PLANNING FOR ROLL CALL TRAINING:  The Departmental Training Officer shall be responsible for planning a regularly scheduled program of Roll Call training. Planning shall include reviewing topics appropriate for roll call training presentation.

B. TECHNIQUES & METHODS FOR TRAINING:  The techniques used to administer the Roll-Call Training will include review of written and video training memoranda and materials.  Supervisors will be responsible for ensuring all personnel assigned to their direct supervision will review the Roll Call training materials in the time frame specified by the departmental Training Officer.   Officers are responsible for reviewing the materials as assigned.

    1. Roll-Call training will be scheduled during an officer's normal tour of duty.  Materials (if hand-outs are made available) will be designed so that officers are able to use them as assigned, and as time permits during the course of their shifts.

    2. Each Supervisor will be responsible for documenting the training received by all employees under his/her assigned supervision. Supervisors will document such training on the daily End of Tour report and advise the Training Office (via e-mail or white sheet) that specific training was conducted.

C. EVALUATION OF ROLL CALL TRAINING:  Supervisors should regularly evaluate roll-call training as it relates to the programs presented and should also offer suggestions for roll call training which may be needed.  Evaluation will be informal and may take the form of verbal or written communications to the Departmental Training Officer.

## 432.4
## ESTABLISHMENT OF SPECIALIZED TRAINING:

### 432.4.1
**GENERAL REQUIREMENTS:**  Where necessary, this agency shall provide specialized training (pre and/or post specialized training) for positions requiring such training.

A. POSITIONS REQUIRING SPECIALIZED TRAINING:  The following positions and/or assignments will require specialized training.

    1. All personnel promoted to a supervisory positions, upon promotion or shortly thereafter.

    2. Officers assigned to the Criminal Investigative Division.

    3. Officers assigned to the Special Operations Team.

    4. Officers assigned as Hostage Negotiators.

    5. Officers assigned to Marine Unit

    6. Officers assigned to the Accreditation Office

    7. Officers assigned as narcotics detectives

B. TRAINING COMPONENTS:

    1. The Departmental Training Officer will schedule the assigned person to initial and in-service training which develops and/or enhances the skills, knowledge and abilities particular to the specialization. Initial training will be accomplished in a timely manner.

    2. The Supervisor of the person assigned to the specialized position will be responsible for completing training related to management, supervision, administration, personnel policies, and support services of the specialized function. Additionally, the Supervisor will also ensure the assigned person is given supervised on the job training.

C. MINIMAL TRAINING FOR SPECIALIZED ASSIGNMENTS:  Upon appointment the employee will attend the following minimum training as soon as practical:

    1. Newly promoted first-line supervisors:

        a. Basic supervisory training

        b. Employee assistance

    2. General detective assignment with Criminal Investigation Division

        a. Basic Criminal Investigation

        b. Interview and Interrogation school

    3. Identification detectives

        a. Crime scene school (fingerprint classification, collection of evidence, photography and DNA)

    4. Evidence technicians

        a. Property & Evidence handling and processing course

    5. Special Operations Team

      a. Basic SWAT course
6. Hostage Negotiator
      a. Basic Hostage Negotiation Course
7. Marine Unit
      a. Basic Marine Course conducted by the NJ State Police
8. Accreditation Office
      a. Accreditation Manager training
9. Traffic Enforcement Unit
      a. Crash 1
      b. Crash 2
10. Narcotic Detectives
      a. Interview and interrogation school
      b. Basic narcotics investigation
11. Internal Affairs
      a. Background Investigation school

## 432.5
## TRAINING FOR CIVILIAN PERSONNEL:

### 432.5.1
**GENERAL REQUIREMENTS:** The Departmental Training Officer or his/her designee shall ensure all newly appointed civilian personnel receive pre-service training.

A. TRAINING ELEMENTS:  Pre-service training will minimally include:
1. Orientation to the agency's role, purpose, goals, policies, and procedures.
2. Working conditions and regulations.
3. Responsibilities and rights of employees.
B. POSITIONS REQUIRING TRAINING:  In accordance with various mandates with regard to confidentiality of police records, as well as any legislative requirements, the following civilian positions require both pre-service and in-service training.
1. Special Police Officers (Class I )
      a. Use of Force
      b. Domestic Violence
      c. CPR annual training
2. School Crossing Guards
      a. Traffic Safety
3. Civilian Communications Officers
      a. Cell Block Management
      b. 911 certification
      c. Emergency Medical Dispatch
      d. CPR annual training
4. Matrons
      a. Cell Block Management
5. Domestic Violence Crisis Response Team Members.
      a. Domestic Violence 40-hour Initial Course for Crisis Response Members
6. Secretarial Positions (involving Criminal Justice Reporting and Record Keeping Functions, UCR Reporting; Maintenance of Warrants & Court Processes; Archive Regulations; etc.)
7. Civilian Accreditation Manager
      a. Accreditation Manager training
8. Civilian Evidence Technicians
      a. Property and Evidence handling and processing course
C. MANDATORY TRAINING FOR ALL EMPLOYEES:
1. Biennial Training:

a. Sexual Harassment
b. Ethics
c. Bias

# 432.6
# CAREER DEVELOPMENT

**432.6.1**

**GENERAL REQUIREMENTS:** Personnel, such as supervisors, counselors and the departmental Training Officer, who will be assigned to conduct career development activities shall undergo a period of orientation that will provide knowledge and skills.

A. TRAINING ELEMENTS: Career development training will consist of the following:
1. General counseling techniques
2. Techniques for assessing skills, knowledge, and abilities
3. Salary, benefits, and training opportunities of the agency
4. Educational opportunities and incentive programs
5. Awareness of the cultural background of ethnic groups in the program
6. Record keeping techniques
7. Career development programs of other jurisdictions
8. Availability of outside resources