UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------------------

NIJEER PARKS
     Plaintiff

**CIVIL ACTION**
**No: 2:21-cv-04021 JXN- LDW**

vs

JOHN E. McCORMACK, MAYOR OF
WOODBRIDGE, In his personal and
official capacity, ROBERT HUBNER,
DIRECTOR OF THE WOODBRIDGE POLICE,
n his personal and official capacity, CITY OF
WOODBRIDGE POLICE
OFFICER, ANDREW LYSZK and
WOODBRIDGE POLICE SGT.
JOSEPH LICCIARDI  i
WOODBRIDGE POLICE OFFICERS
JOHN AND JANE DOE, 1 – 20
being as yet unknown actors
     Defendants

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'MOTION FOR SUMMARY JUDGEMENT

**Of Counsel and on the brief**
Daniel W. Sexton, Esq, AIN 1021992
229 New Centre Road
Hillsborough, NJ 08844
(201) 406 – 9960  DanielSextonEsq@gmail.com

## TABLE OF CONTENTS

Page

Table of Contents……………………………………………………………………..…….i

Table of Authorities………………………………………………………………….…….ii

Preliminary Statement……………………………………………………………………...1

Relevant Procedural History……………………………………………………..……….2

Statement of Material Facts………………………………………………..…………..2

Summary Judgment Standard………………………………………………..……….. 2
Argument
Point I, The Motion for Summary Dismissal of the Malicious Prosecution Count Must Be Denied..

 A. Malicious Prosecution Under the Fourth Amendment……………………………………..4
 B. The Faulty and Bias Facial Recognition Hit: Investigative Lead Only………………………….. 5
 C. Defendant Lyzsyk's Probable Cause Affidavit Is False and/or Misleading…………………….6
 D. Det Tapia's Affidavit Is Also Misleading and/or False……………………………………10
 E. The Record Provides Abundant Evidence for a Jury to Infer Malice………………………11
 F. No Defense from the Review by Assistant  Prosecutor Nastasi …………………………………...12

Point II
Lt Joseph Licciardi is a Proper Defendant…………………………………………………...14

Point III

 A. Racially Selective Law Enforcement Violates Equal Protection…………………………………. .15
 B. Facial Recognition Technology Is Faulty and Biased……………………………………..16
 C. Plaintiff's Equal Protection Claim Must Go to a Jury………………………………………..18

Point IV
Plaintiff Has Presented Sufficient Evidence of Excessive Force …………………………………21

Point V
Civil Conspiracy in Counts VII and VII Cannot Be Dismissed…………………………………...24

Point VI
The Failure of Woodbridge to Train, Supervise and Discipline Its Officer Is a Basis of Entity Liability.
 A. *Monell* Liability……………………………………………………………………25
 B. Failure to Train…………………………………………………………………...26
 C. Failure to Supervise……………………………………………………………………29
 D. Failure to Discipline……………………………………………………………… 29

Conclusion……………………………………………………………………………… 39

# TABLE OF AUTHORITIES

## Cases

*Abraham v. Raso,* 183 F.3d 279, 288 (3d Cir.1999)

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, at 256 (1986)

*Andrews v. City of Phila.,* 895 F.2d 1469, 1478 (3d Cir. 1990)

*Arizona v. Edwards.,* 514 U.S. at 26, 115 S.Ct. 1185 (1995)

*Arlington Heights v. Metropolitan Housing Co.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

*Arlington Heights v. Metropolitan Housing Co.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977)

*Beck v. City of Pittsburgh,* 89 F.3d 966, 974 (3d Cir. 1996).[5]

*Berg v. County of Allegheny,* 219 F.3d 261(3dCir 2000), cert denied, 531 U.S. 1072, U.S., ( 2001),

*Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268 (1993).

*Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 407–09, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

*Celotex Corp. v. Catrett, 477* U.S. 317, 323 (1986)).

*Chambers v. Sch. Dist. of Phila. Bd. of Educ.,* 587 F.3d 176, 196 (3d Cir. 2009)

*Christopher v. Nestlerode,* 240 Fed. Appx. 481 (3d Cir 2007)

*City of Canton, Ohio v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)

*Collins v. Christie,* 337 F. App'x. 188, 192 (3d Cir.2009)

*Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)

*Deary v. Three Un—Named Police Officers,* 746 F.2d 185, 192 (3d Cir.1984)

*Estate of Roman v. City of Newark,* 914 F.3d 789 at 800–01 (3d Cir. 2019).

*Bucknell University,* 834 F.3d 457, at 469 (3d Cir 2016)

*Estate of Smith,* 318 F.3d at 515

*Estate of Smith v. Marasco,* 318 F.3d 497, 521 (3d Cir.2003)

*Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667(1978)

*Graham v. Connor*, 490 U.S. 386, 397 (1989).

*Groman v. Twp. of Manalapan,* 47 F.3d 628, 635 (3d Cir.1995)

*Halsey v. Pfeiffer,* 750 F.3d 273, 300 (3d Cir.2014)

*Hilfirty v. Shipman, 91* F. 3d 57 (3rd Cir. 1996)

*J.F. Feeser, Inc. v. Serv—A—Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990)

*Johnson v. Anhorn*, 416 F.Supp.2d 338 (ED PA 2006)

*Johnson v. Anhorn*, 416 F.Supp.2d 338  (ED PA 2006)

*Kelly v. Borough of Carlisle,* 544 F. App'x 129, 133–34 (3d Cir.2013)

*Kopec v. Tate*, 361 F.3d 772, 776.  (3d Cir. 2004)

*Lee v. Mihalich,* 847 F2d  66 (3rd Cir. 1988)

*Macolino v. McCoy, Civ.* No. 18-1476, 2022 WL 1203565, at  p. 4 (E.D. Pa. Apr. 22, 2022)

*Major Tours Inc. v. Colorel,*  720 F. Supp. 2d 587 at 606 (D.N.J. 2010)

*Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003)

*McDaniels v. City of Philadelphia* 234 F.Supp.3d 637 (ED PA 2017)

*McFadden v. Lane*, 71 N.J.L. 624, 630, 60 A. 365 (E. & A.1905).

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)

*Mody v. City of Hoboken,* 758 F.Supp. 1027 (Dist. NJ 1991)

*Upper Dublin School District,* 211 F.3d 782 at 789 (3d Cir 2000)

*Natale v. Camden County Correctional Facility,* 318 F.3d 575 at 584–85 (3d Cir 2003)

*Peterson v. Bernardi* 719 F. Supp. 2d 419 (3rd Cir 2010).

*Remillard v. City of Egg Harbor City* 424 F.Supp.2d 766 (DNJ 2006).

*Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir.1997).

*Shuman v. Penn Manor School District,* 422 F.3d 141, 151 (3d Cir.2005)

*Simmons v. City of Philadelphia ,* 947 F.2d 1042 1991  (3d Cir. 1991)

*Stewart v. Sonneborn* 98 U.S. 187  (1878) 8 Otto 187

*Simpson v. Ferry* 202 F.Supp.3d 444 (ED Penn 2016)

*State v. Scott* 474 N.J.Super. 388 (App Div 2023)

*United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29 (1983)

*United States v. Harris* 471 F.3d 507. 511

*Vance v. Erie Railway Co.*, 32 N.J.L. 334, 337 (Sup.Ct.1867).

*Wilson v. Russo,* 212 F.3d 781, 788 (3d Cir.2000)

*Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).


**Constitution of the United States**
Fourth Amendment

The Fourteenth Amendment

**Statutes**
42 USC Sect§ 1983

N.J.S.A. 2C:28-1

*N.J.S.A.* 40A:14–181



**Rules**
Federal Rule of Civil Procedure 56

Fed. R. Civ. P. 56(a)
New Jersey Rules of Court, 3:3-3 ( c )



**Secondary Sources**

Garvie, Claire, Bedoya, Alvaro, The *Perpetual Line-Up: Unregulated Police Face Recognition in America*, Georgetown Law Center on Privacy & Technology, October 18, 2016.

Garvey, Claire, April 7, 2016, Facial *Recognition Technology Might Have a  Racial Bias Problem*

Quattlebaum, Meghan, *Let's Get Real: Behavioral Realism, Implicit Bias, and the Reasonable Police Officer*, 14 an. J. C.R. & C.L. 1, 13 (2018)

## PRELIMINARY STATEMENT

Nijeer Parks, a Black male, was plucked from obscurity[1] because of a wrongful arrest and prosecution based solely on a facial recognition technology (FRT) match which is a powerful but also  a fallible and biased tool.  Upon receipt of the faulty FRT match, Defendants blindly threw every protocol of correct policing to the wind disregarding extensive exculpatory evidence which was either just ignored or buried.[2]  The individual officers, PO Lyszyk and Det Tapia, a are liable for their acts  and the entity, the Township of Woodbridge, is liable for its custom and practice related to the use of FRT.

Local governments a special  obligation to train and supervise officers in the emerging use of technology in policing.  In a leading case in the area of new technology and policing, the Third Circuit has found *Monell* liability for the failure to have proper training and checks and balances related to the use of the  computerized Integrated Court Information System (ICIS because

> [w]idespread reliance on computers to store and convey information generates, along with manifold benefits, new possibilities of error, due to both computer malfunctions and operator mistakes.... [C]omputerization greatly amplifies an error's effect, and correspondingly intensifies the need for prompt correction; inaccurate data can infect not only one agency, but the many agencies that share access to the database.

*Berg v. County of Allegheny*, 219 F.3d 261(3dCir 2000), cert denied, 531 U.S. 1072, U.S., ( 2001), quoting Ginsberg, J, dissent in *Arizona v. Edwards.*, 514 U.S. at 26, 115 S.Ct. 1185 (1995).  In the

---

[1] A google search of plaintiff's name will reveal the global media frenzy which has followed his story.

[2] "The machine knows where it's going!" yells Michael Scott in an episode of *The Office*, before driving his car directly into a lake. " Seduction or fascination with technology has many victims in our society. In this case, the Defendants abdicated all responsibility when they allowed the machine, which is  facial recognition technology, to commandeer the investigation resulting in the unlawful arrest and prosecution of Plaintiff.

same way, a jury may find Woodbridge Township liable for the failure to have proper training and supervision of the use of FRT and for the way that FRT revealed or generated a disregard for good police practices.

## RELEVANT PROCEDURAL HISTORY

Plaintiff adopts the procedural history set forth in Defendant's brief. Additionally, the Plaintiff notes that the denial of the motion to add Det Santiago Tapia as an individual defendant was wrongly denied by Magistrate Wettre on October 3, 2022 (ECF #69), and constitutes an inter locutory order which will be appealed *in limine* and at the end of this case.

## STATEMENT OF MATERIAL FACTS

Please see Plaintiff's response to the Defendant' s Statement of Facts together with his Supplemental Statement of Facts together with the Exhibits thereto.

## SUMMARY JUDGMENT STANDARD

Plaintiff has provided *prima facie* evidence to satisfy each of the elements of the four theories advanced in the Complaint (claims for Malicious Prosecution, a violation of Equal Protection, an Excessive Force violation, and a Conspiracy claim), so that the Defendants' motion for summary judgment must be denied. Federal Rule of Civil Procedure 56 permits a court to award a party summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if supported by evidence such that a reasonable jury could return a verdict in the non-

2

movant's favor.   There is evidence in support of each element for each cause of action which precludes and summary judgement decision in favor of the defendants.

Plaintiff, Nijeer Parks,  was wrongly arrested, imprisoned, and prosecuted based on a false Facial Recognition hit. There is evidence, summarized in some detail in Plaintiff's 291  paragraph Supplemental Statement of Facts, which if presented to a reasonable jury would allow a verdict in favor of plaintiff on each of the four theories of recovery. Each of these theories of recovery are brought pursuant to Sec. 1983 and the facts in evidence will allow a jury to conclude that the defendants acted with intent or reckless disregard for the Constitutional rights of plaintiff. *J.F. Feeser, Inc. v. Serv—A—Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990) (citing *Celotex Corp. v. Catrett, 477* U.S. 317, 323 (1986)).

At the summary judgment stage, "all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party. " *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, at 256 (1986). Therefore, Defendant's Motion for Summary Judgement must be denied and this case must go to a jury which will assess the evidence in light of the testimony of the defendants and of the  expert testimony and will assess the credibility of the witnesses and render a verdict as to whether the wrongdoing of defendants rises to compensable claim. *United States v. Harris* 471 F.3d 507. 511 (assessing the credibility of witnesses who have testified at trial is "a function exclusively reserved to the jury"). As the Third Circuit recently opined: "Courts should exercise caution before granting a defendant summary judgment in a malicious prosecution case when there is a question of whether there was probable cause  for the initiation of the criminal proceeding because, '[g]enerally, the existence of probable cause is a factual issue.' " *Halsey v. Pfeiffer,* 750 F.3d 273, 300 (3d Cir.2014) (citing *Groman v. Twp. of Manalapan,* 47 F.3d 628, 635 (3d Cir.1995). The Court went on to state that

3

> [i]t is certainly is inappropriate for a court to grant a defendant officer's
> motion for summary judgment in a malicious prosecution case if there are
> underlying factual disputes bearing on the issue or if 'reasonable minds
> could differ' on whether he had probable cause for the institution of the
> criminal proceedings based on the information available to him. *Id.*

*Deary v. Three Un—Named Police Officers,* 746 F.2d 185, 192 (3d Cir.1984)).

Plaintiff has provided evidence that the Affidavits of Probable Cause are materially false

and that the reliance on the facial recognition technology, which is known to be unreliable and

biased, was illegal and that the failure to conduct any investigation was malicious or in reckless

disregard by the individual officers. As to Woodbridge Township, there is significant evidence

of deliberate indifference by Woodbridge officials which is directly related to the failures of the

officers involved in Nijeer Parks' case. Therefore, the Motion for Summary Judgment must be

denied in its entirety.

## ARGUMENT

### POINT I
### THE MOTION FOR SUMMARY DISMISSAL OF THE MALICIOUS
### PROSECUTION COUNT MUST BE DENIED

**A. Malicious Prosecution Under the Fourth Amendment**

Count I asserts a claim for Malicious Prosecution under the Fourth Amendment[3]. The

Second and Third Circuits had adopted the most liberal approach by allowing Section 1983 claims

for malicious prosecution under the Fourth Amendment when the elements of the common law tort

were alleged. *Lee v. Mihalich,* 847 F2d 66 (3rd Cir. 1988). To state a *prima facie* case for malicious

---

[3] Alternatively, plaintiff asserts arrest without probable cause which merely requires that the officer or clerk acted intentionally and does not require more. Berg v. County of Allegheny, 219 F.3d 261(3dCir 2000). In this case, the Third Circuit reversed a dismissal of a case involving execution of a warrant issued based on a clerk's error.

prosecution under the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Estate of Smith v. Marasco,* 318 F.3d 497, 521 (3d Cir.2003).   See, also*, Hilfirty v. Shipman, 91* F. 3d 57 (3rd Cir. 1996) where a dismissal was reversed on the grounds that the *nolle prosequi* of the underlying criminal charge did not amount to an adverse disposition. In Nijeer Parks' case, elements one, two, and five are uncontroverted. Defendants signed Criminal Complaints against Plaintiff, these Complaints were all dismissed with prejudice and plaintiff was arrested and imprisoned for eleven days. The record is rife with evidence showing an absence of probable cause and malice.

### B. The Faulty and Biased Facial Recognition Hit: Investigative Lead Only

There was no reliable or competent identification of Nijeer Parks as the suspect. See Plaintiff's Supplemental Statement of Facts from paragraph 31 through 135. Instead, the Defendants relied only on the faulty and biased false facial recognition hit. It is a matter of common knowledge that facial recognition cannot be the basis for probable cause and at the top of the form itself, there is a prominent disclaimer about the limitations of facial recognition technology:

> If the NJ ROIC Facial Recognition Initiative produces a possible match, this should only be considered an investigative lead. Further investigation is needed to confirm a possible match through other investigative corroborated information and/or evidence.

Request for Facial Recognition search,  Exhibit T to Defendant's moving papers. Id. This disclaimer ends with the following sentence in oversized bold italics and in all caps:     investigative lead not probable cause to make an arrest. Id. *Id.*  I Therefore, despite the failure to train and supervise, the

5

officers should have known that an FRT match is only to be used as a lead to find competent evidence that may be used to establish probable cause.

### C.  Defendant Lyszyk's Probable Cause Affidavit Is False and/or Misleading

To challenge the validity of an affidavit of probable cause,  a plaintiff must make a two-pronged showing pursuant to the Supreme Court's decision in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667(1978).  Under the  *Franks* test, a plaintiff challenging the validity of an affidavit of probable cause must must prove, by a preponderance of the evidence, "(1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding o of probable cause. " *Collins v. Christie,* 337 F. App'x. 188, 192 (3d Cir.2009).

PO Lyszk's Affidavit of Probable Cause stated: "While investigating a shoplifting of $39 worth of merchandise at the Hampton Inn, the hotel manager, Richard Charneco, advised us that Parks was the suspect."   Affidavit at p 11, Exhibit O. In his deposition, Lysyzk admitted that this statement was a material falsehood false.  Deposition of Lyszyk at p. 57 lines 8 – 11. Exhibit C. Moreover, the use of Nijeer Parks name throughout the Lyszyk Affidavit- from the very first line and throughout the Affidavit is misleading. Affidavit as Exhibit O to Defendants' papers. PO Lyzsyk explained away his problematic report as a product of  "bad report writing." See Lyszyk Deposition, p 56 line 25 to p. 57 line 11. In addition to the misstatement in the Warrant, Defendant Lyszyk also omits the many pieces of evidence- some obviously exonerating such as the height disparity, the fact that the suspect ran, the fact that the suspect wore a size 12 shoe, etc.  But Defendant Lyszyk also failed to identify the extensive trove of evidence which had not been

analyzed, e.g. fingerprints, DNA, Sprint sim card. Defendant Lyszyk is liable if a jury finds that he acted either intentionally or merely with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." *Christie,* supra 337 F. App'x. at 192 (internal citations omitted).

A jury may find reckless disregard  if there were "obvious reasons to doubt the accuracy of the information he reported." first, that the officer, with at least a reckless disregard for the truth, "made false statements or  omissions that create[d] a falsehood in applying for a warrant," and second, that those assertions or omissions were "material, or necessary, to the finding of probable cause." *Dempsey v. Bucknell University,* 834 F.3d 457, at 469 (3d Cir 2016). *Wilson v. Russo,* 212 F.3d 781, 788 (3d Cir.2000). Lyszyk's Affidavit is misleading because, *inter alia:*

- PO Lyszyk's Affidavit references a "high profile comparison to the picture on the fraudulent TN DL." The record indicates that the report issued by the ROTC indicated that the comparison had a rating of 594 out of 1000, which is not a high-profile comparison.  This overstates the reliability of the FRT lead.
- The request for a FRT comparison states in it that any result shall not be the basis for probable cause. PO Lyszyk failed to reference this disclaimer anywhere in his Affidavit.
- The picture used for the FRT comparison was of low quality, and the subject either had a very marked tattoo on his forehead or the picture itself had something superimposed on it. Lysyzk's Affidavit does not note this.
- Inv. Lyons from the ROIC advised that he had "altered the pixels" on the original photo and PO Lyszyk failed to disclose this. Although Inv. Lyons averred that this did not reduce the reliability of the search, the record indicates otherwise.

7

- Inv. Lyons failed to disclosed that the wealth of evidence taken in had not yet been analyzed (fingerprints, clothing, Sprint Sim card, surveillance video at the Hampton Inn, surveillance video at the Dunkin Donuts; size 12 sneaker, ten eye witnesses. ).

Lysyk's intentional wrongdoing or reckless disregard excludes the defense of qualified immunity. To forfeit qualified immunity, a police officer must violate "clearly established statutory or constitutional right of which a reasonable person would have known." *Kelly v. Borough of Carlisle,* 544 F. App'x 129, 133–34 (3d Cir.2013) (quoting *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). Submitting a false affidavit of probable cause is a crime of the Third Degree Crime in New Jersey. (N.J.S.A. 2C:28-1), But one need not find Defendant Lyszyk guilty of a crime- reckless disregard for the truth does not support criminal liability but does support civil liability. *Halsey v. Pfeiffer,* 750 F.3d 273 (3d Cir 2014).

In a probable cause analysis, "a court must evaluate the totality of circumstances to determine whether the objective facts available to the officer were sufficient to justify a reasonable belief that a suspect had committed or was committing a crime." *Merkle v. Upper Dublin School District,* 211 F.3d 782 at 789 (3d Cir 2000). "Because a "determination [of probable cause] is necessarily fact-intensive, … it will usually be appropriate for a jury to determine whether probable cause existed." *Macolino v. McCoy, Civ.* No. 18-1476, 2022 WL 1203565, at p. 4 (E.D. Pa. Apr. 22, 2022). In this case, a jury must note that the identification process, in addition to being grounded on a facial recognition hit which by definition is not reliable enough to be a basis for probable cause, was devoid of any usable identification. Although there were 10 eyewitnesses and a surveillance video, the investigators never utilized them. Defendants relied on two purported identifications for the Affidavits of Probable Cause and the Complaint, neither of which were competent evidence. Defendant Lyszyk, as an eyewitness, made no mention in his report or in his Affidavit of making

8

any confirmatory identification.  See Lyszyk report as Exhibit D to Plaintiff's Opposition and his Affidavit at Exhibit O to Defendant's moving papers.

Similarly, Det. Tapia's Affidavit of Probable Cause made on January 27, 2019, is devoid of anything even suggesting that he subjected the facial recognition hit to any confirmatory identification. See Tapia Affidavit at Exhibit N to Defendant's moving papers. Tapia's report updated through February 4, 2019, also makes no mention of any confirmatory identifications by PO Lyszyk. See Report as Exhibit E to Plaintiff's moving papers.  Det Tapia merely references PO Lyszyk's own warrant. Id.        Thus, it seems clear that neither Lyszyk nor Tapia memorialized anything during the investigation, which suggests that a confirmatory identification was **not** done prior to the issuance of the Warrants and Complaints.

In his Warrant, Det.  Tapia recounted the confirmation by Lyszyk that the picture on the fraudulent DL matched that of the actor.  "I verified with Officer Lee and Officer Lyszyk that the picture on the fraudulent Tennessee driver's license was the picture of the suspect. Id.   It is highly unlikely that Tapia would have taken the time to document the identification of the  likeness on the driver's license with the actor but not memorialize the confirmation of the facial recognition hit.  A jury may conclude that the deposition testimony of both officers to the contrary is not credible. Lyszyk Deposition at p.29 lines 16 to p. 30 line 8, Exhibit C to Defendant's papers.  Tapia Deposition, Exhibit F to Defendants' moving papers, pp 95 – 100.  PO Lyszyk, himself, acknowledged that there was nothing in his report to even suggest that he, Lyszyk, had viewed the facial recognition hit and confirmed that it corresponded to the actor but attributed it to "bad report writing" rather than perjury. Id. p. 30 line 8. Id.  Given these many problems with the identifications, a jury may conclude that the officers either intentionally or with reckless disregard mislead the court.

Moreover, even if Lyszyk had looked at the picture of Nijeer Parks on the morning of January 28, it would have been an unreliable and unusable identification because of the failure to follow any of the usual protocols. It was too remote to be considered a show-up and a photo array would have had to have been administered.  Similarly, Det Tapia's  Affidavit also recounts a palpably improper identification when he stated: "I compared the photo on the fraudulent Tennessee driver's license to Nijeer' Parks' assigned New Jersey Driver's license # …..and it is the same person." Tapia Report, 2/5/19, p 3, Exhibit E attached to Plaintiff's papers. While PO Tapia makes no mention of PO Lyszyk identifying Nijeer Parks, he does explicitly state that he had PO Lyszyk identify the image on the Tennessee Driver's license as the actor. "I verified with Officer Lee and Officer Lyszyk that the picture on the fraudulent Tennessee driver's license was the picture of the suspect.: Id. Tapia Report, 2/5/19, p 3, E. ). Thus, there were no reliable identifications made of Nijeer Parks prior to Defendants signing off on the Affidavits and the Warrants and Complaints.[4] Without reliable and competent identifications or other reliable confident evidence which was in the possession of defendants but not yet analyzed, there was no evidence upon which to establish probable cause. Plaintiff's liability expert opined that this "evinces a worrisome ethical problem for the investigating detectives and only serves to perpetuate the investigative pathologies of confirmation bias and defensive avoidance." Exhibit V to Defendant's Moving Papers, p. 25.

### D.  Det Tapia's Affidavit Is Also Misleading and/or False

---

[4] Note that the incompetent and highly prejudicial identifcaiton of Nijeer Parks by PO Lee was done two weeks after the incident and one week after the Affidavits. This identification was therefore also incompetent.

Det Tapia's Warrant is also misleading in a material sense.[5]  The Preliminary Law Enforcement Incident Report (PLEIR) attached to the affidavit, asserts that he, "the complaining officer, personally observed the offense."  See Exhibit N (Nu) to Plaintiff's Opposition papers. By falsely claiming to be an eyewitness, Det. Tapia rendered the accompanying Affidavit of Probable cause fraudulent. If he had been an eyewitness, then his identification of the suspect as corresponding to the facial recognition hit, would have had some validity.    Had he been an eyewitness, his statement that  "I compared the photo on the fraudulent Tennessee driver's license to Nijeer Parks' real New Jersey driver's license and it is the same person," might under certain circumstances, e.g with proper procedures being used,  have been considered  appropriate evidence to consider  in a probable cause analysis.  However, since Tapia was not an eyewitness, his conclusion is improper and without any probative value.  Moreover, contrary to his deposition testimony, Det Tapia's Warrant makes no mention, explicit or implicit, that PO Lysyzk, an eyewitness, confirmed the validity of the facial recognition hit.

Det. Tapia's Affidavit also suffers from all of the defects outlined above for Defendant Lyszyk. Tapia's Affidavit also asserts that the FRT match is a "high profile comparison," but this is not consistent with the fact that he knew that the comparison was only 594 on a scale of 1000, that Inv. Lyons had altered the pixels, that the original picture was of poor quality.  Since Det. Tapia was the main investigator on this matter, his failure to disclose these facts would seem to be willful and calculating.

### E.  The Record Provides Abundant Evidence for a Jury to Infer Malice

---

[5] As referenced above, Judge Wettre denied the application to add Det Tapia as an individual defendant.  This interlocutory order will be appealed *in limine* and will be appealed at the end of the case when it becomes a final order.

"Malice in the law is the intentional doing of a wrongful act without just cause or excuse." *McFadden v. Lane*, 71 N.J.L. 624, 630, 60 A. 365 (E. & A.1905). In an action for malicious prosecution, malice is inferable from want of probable cause. *Stewart v. Sonneborn* 98 U.S. 187 (1878)8 Otto 187. The proof of malice need not be direct. It may be inferred by the jury, from the want of probable cause."). *Vance v. Erie Railway Co.*, 32 N.J.L. 334, 337 (Sup.Ct.1867). Evidence of malice—that is, is representation, withholding, or falsification of evidence, fraud, perjury, or other bad-faith conduct—is itself probative of a lack of probable cause. *Peterson v. Bernardi* 719 F. Supp. 2d 419 (3rd Cir 2010).

In this case, there was not only a complete lack of a basis for probable cause and the allegations and charges were not only completely false, but the Defendants acted with intent or, in the alternative, with reckless disregard in submitting defective reports which omitted mention of exculpatory evidence and evidence which had not yet been analyzed. Submitting a false affidavit of probable cause is a Third Degree Crime in New Jersey. (N.J.S.A. 2C:28-1). However, in this civil context there only needs to be evidence for a jury to consider if Defendant had exhibited reckless disregard.

### F. No Defense from the Review by Assistant Prosecutor Nastasi

.      The Defendants' argument that the review of the Warrant and Complaint by Assistant Prosecutor Nastasi insulates them from liability fails. In his answers to interrogatories concerning the role of the Prosecutor, Director Hubner described the role of the Hudson County Prosecutor as follows:

> The Middlesex County Prosecutors Office (MCPO) is the lead law enforcement
> agency in Middlesex County. MCPO assigns an Assistant Prosecutor to serve as a

12

liaison to the Woodbridge Police Department. The MCPO liaison to Woodbridge is Assistant Prosecutor Peter Nastasi. When an officer files a complaint alleging an indicatable offense, the Department will contact MCPO to discuss the factual allegations and obtain a legal opinion as to the proper charges to be brought against the suspect.

Response to Interrogatory Number 16, attached as Exhibit B to the moving papers of Defendants.

Director repeated this assertion that the only role of the Prosecutor was to assist in drafting

the charge, to wit:

> The Middlesex County Prosecutor's Office was involved in this matter to the extent that Assistant Prosecutor Peter Natasi reviewed the complaint and, based on the information available at that time, advised as to what charges should be brought.

Response to Interrogatory 17, attached as Exhibit B of Defendant's Motion.  Defendant Lyszyk said

the same thing in his answers to interrogatories.  See, response to Interrogatory, Number 14,

attached as Exhibit B to Plaintiff's Opposition Papers.   Defendants Hubner, Barrett and Lyszyk all

limit the Assistant Prosecutor's role to assistance in drafting the Complaint and make no mention of

engaging in a  probable cause analysis.

On direct examination in his deposition, Det Tapia, testified that his communication

with Assistant Prosecutor Nastasi was oral.  See.  Tapia Deposition, p 119 lines 12 – 16.

Det. Tapia, who testified on direct that he had no recall as to what exactly was said during

his conversation with the Prosecution, agreed with the inference "that it was brief." Tapia

Deposition, p 119 lines 12 – 16.

Thus, all of this evidence negates the assertion that Nastasi tested the sufficiency of the

proofs to determine if it satisfied the standards for probable cause. The only contrary statements in

13

support of this theory were made by Fred Rubenstein, counsel for Defendants, in his leading questions when he cross examined Det. Tapia, to which Tapia dutifully agreed. Tapia Deposition, p. 135 – 138, attached as Exhibit F to Defendants' papers.    Thus, a jury may conclude that the review by Assistant Prosecutor Nastasi only involved an inquiry as to whether the Complaint fairly reflected the wrongdoing described by the police without any assessment of the evidence.

## POINT II
## LT JOSEPH LICCIARDI IS A PROPER DEFENDANT

Lt. Joseph Licciardi was PO Lyszyk's supervising officer at the relevant time and signed off on his report.  See, Lyszyk three-page incident report attached to Plaintiff's moving papers as Exhibit D. On page one of the report, the review status in the top right corner is noted as "Approved." Id. On page three, Lt. Licciardi is notes as the "Approving Officer." Id. p. 3.  Lyszyk's report describes in straightforward fashion that the only basis for him signing an Affidavit of Probable Cause and a Criminal Complaint was the facial recognition report from the ROIC. Therefore, Sgt. Lyszyk utterly failed to exercise appropriate supervisory oversight which would have immediately respond to this biased rush to judgment and to insist on that an actual an appropriate investigation be conducted. See, for example, the discussion infra of Lt. Detective Commander Ralph Cilento, and his report attached as Exhibit V to Defendants' moving papers.  Lt. Licciardi also ratified the false and deficient Affidavit and the associated Complaint by signing off on it.

Similarly, in his answers to Interrogatories, PO Lyszyk' states that "Lt. Licciardi approved the Incident Report filed by Police Officer Andrew Lyszyk" See Exhibit A  to Plaintiff's Opposition papers, at 1b.  A supervisor is personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and

14

acquiesced in his subordinates' violations. *See Baker v. Monroe Township,* 50 F.3d 1186, 1190–91 (3d Cir.1995).   In this case, Sgt. Licciardi's supervision was so deficient as to evidence deliberate indifference at best.  Therefore, the Motion to Dismiss the claim against Licciardi must be denied.

Moreover, Licciardi's approval of a false warrant precludes invocation of qualified immunity. It is "clearly established"  that probable cause cannot be based on perjured Affidavits and Lt. Licciardi should not have approved this report. *Kelly v. Borough of Carlisle,* 544 F. App'x 129, 133–34 (3d Cir.2013) (quoting *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). Submitting a false affidavit of probable cause is a Third Degree Crime in New Jersey. (N.J.S.A. 2C:28-1) and Lt. Licciardi should have prevented this rather than having ratified it. Licciardi acted either intentionally or with reckless disregard- a question for the jury to determine.


### POINT III
### A JURY MUST DECIDE THE EQUAL PROTECTION CLAIM

#### A.  Racially Selective Law Enforcement Violates Equal Protection

The Fourteenth Amendment of the United States Constitution provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "This is essentially a direction that all persons similarly situated should be treated alike." *Shuman v. Penn Manor School District,* 422 F.3d 141, 151 (3d Cir.2005) (citation omitted) To establish a claim under § 1983 for a violation of the Equal Protection Clause, plaintiffs must show that (1) they "received different treatment from that received by other individuals similarly situated," and (2) the different treatment was purposefully discriminatory.  *Chambers v. Sch. Dist. of Phila. Bd. of Educ.,* 587 F.3d 176, 196 (3d Cir. 2009) (q2uoting *Andrews v. City of Phila.,* 895 F.2d 1469, 1478 (3d

Cir. 1990)). "Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003). Indeed, the "selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black  citizens, is the prototypical denial of equal protection." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000).

**B. Facial Recognition Technology Is Faulty and Biased**

Already by 2016, one in four local law enforcement agencies used FRT according to a study done by Georgetown University. Garvie, Claire, Bedoya, Alvaro, The *Perpetual Line-Up: Unregulated Police Face Recognition in America*, Georgetown Law Center on Privacy & Technology, October 18, 2016.[6]  Problems with the accuracy of FRT and with its disproportionate negative effect on Blacks and other minorities has been well documented over the last 20 years. Id. Nijeer Parks, an African American, appears to be one of six current cases alleging wrongful arrest based on FRT.  The other plaintiffs, all of whom are African American, are listed here:

- Robert Williams, a middle-aged Black man was handcuffed on his front lawn;[7]

- Porcha Woodruff, a Black woman, 32 and eight months pregnant;[8]

- Randal Quran Reid, a Black man visiting his mother in Atlanta;[9]

---

[6]. https://www.perpetuallineup.org/

[7] Williams, Robert, July 15, 2021*I Did Nothing Wrong: I was arrested Anyway.'* See *Williams v. City of Detroit*, No. 2:21-cv-10827 (E.D. Mich.).

[8] https://nypost.com/2023/10/04/man-was-arrested-for-six-days-over-faulty-facial-recognition-tech-lawsuit/ttps://www.cnn.com/2023/08/07/us/detroit-facial-recognition-technology-false-arrest-lawsuit/index.html. *See Woodruff v. City of Detroit*, No. 23-cv-11886 (E.D. Mich)

[9] https://www.nytimes.com/2023/03/31/technology/facial-recognition-false-arrests.html.  See, *Reid v. Bartholomew*, No. 23-cv-4035 (N.D. Ga.)

- Alonzo Sawyer, a 54-year-old wrongly arrested and imprisoned in Baltimore; [10]

- Michael Oliver, Black male, sued Detroit. the city in 2021. [11]

An internet search and review of the literature failed to reveal even one case brought by a White person alleging wrongful arrest or malicious prosecution based on faulty FRT.

In addition to the overwhelming anecdotal evidence that Facial Recognition Technology is being used in a way that is prejudicial and harmful to the African American community, scientific studies have born this out.  In 2016, Claire Garvey, Director of Georgetown Law's Center for Law and Technology, wrote an article in *The Atlantic* argued that summarizing the data which showed that facial recognition technology was particularly error prone when identifying African Americans. Garvey, Claire, April 7, 2016, Facial *Recognition Technology Might Have a  Racial Bias Problem[12]*.  A definitive study was published by the National Institute of Standards and Technology published in 2019 prior Nijeer Park's wrongful arrest detailed how some algorithms in Facial Recognition Technology had higher false positive rates when identifying images of African Americans among a group of comparison images. Grother, Patrick, Face Recognition Vendor Test (FRVT) Part 3: Demographic Effect., 2019.[13]  The study found a clear pattern of false positives summarized as follows:

> Using the higher quality application photos, false positive rates are highest
> in West and East African and East Asian people, and lowest in Eastern
> European individuals. This effect is generally large, with a factor of 100

---

[10]https://www.wired.com/story/face-recognition-software-led-to-his-arrest-it-was-dead-wrong/
[11] https://www.freep.com/story/news/local/michigan/detroit/2020/07/10/facial-recognition-detroit-michael-oliver-robert-williams/5392166002/ https://www.mprnews.org/story/2023/06/28/in-lawsuit-minneapolis-man-says-facial-recognition *Oliver v. Bussa*, No. 20-cv-12711 (E.D. Mich.)
https://www.theatlantic.com/technology/archive/2016/04/the-underlying-bias-of-facial-recognition-systems/476991/[12]
[13] https://nvlpubs.nist.gov/nistpubs/ir/2019/NIST.IR.8280.pdf

more false positives between countries. However, with a number of algorithms developed in China this effect is reversed, with low false positive rates on East Asian faces. With domestic law enforcement images, the highest false positives are in American Indians, with elevated rates in African American and Asian populations; the relative ordering depends on sex and varies with algorithm. We found false positives to be higher in women than men, and this is consistent across algorithms and datasets. This effect is smaller than that due to race. We found elevated false positives in the elderly and in children; the effects were larger in the oldest and youngest, and smallest in middle-aged adults. With domestic law enforcement images, the highest false positives are in American Indians, with elevated rates in African American and Asian populations; the relative ordering depends on sex and varies with

Id. p. 2.

In New Jersey, the ACLU has been working for over a decade to address the dangers of FRT- seeking regulations and restrictions. A moratorium was placed by the New Jersey Attorney General So far, the most notable action the AG's office has taken to limit facial recognition is to ban one system. In January of 2020, then-Attorney General Gurbir Grewal banned police department from using Clearview AI, a system that scraped social media platforms daily to build a database that contained millions of photos. Even the aloof and uninformed management in the Woodbridge Police Department is aware that FRT is believed to be racially biased.  Director Hubner testified that he had read that FRT is biased against Blacks. Id. p. 75.  Similarly, Lt. Barrett, the Commander of Internal Affairs, admitted in his deposition that Barrett conceded that he had heard that Facial Recognition Technology is  racially biased from media reports. *Id.* p. 23,  8 – 25.  Lt Barrett was also aware of the moratorium by the New Jersey Attorney General against Clearview because of concerns, inter alia, about accuracy and bias. *Id.* p. 23,  8 – 25.


### C.  Plaintiff's Equal Protection Claim Must Go to a Jury

18

There are two elements to make out an Equal Protection Clause claim of racial profiling. First, a plaintiff must prove that the defendants' actions had a discriminatory effect and, second, a plaintiff must show that Defendants were motivated by a discriminatory purpose. *See Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002). In this case, a jury will be presented with the fact that Plaintiff was arrested, charged and imprisoned based on a facial recognition hit alone.   The jury will be shown that facial recognition has been shown to be biased against African Americans and is not considered reliable enough to be used as evidence.  The rush to charge, arrest and prosecutor Plaintiff will be shown    The failure to follow all of the normal protocols and requirements of police investigation will also be evidence for the jury to consider, a jury will then decide whether or not defendants' actions "had a discriminatory effect."

The same evidence will also be a basis for a jury to conclude that Defendants were motivated by a discriminatory purpose. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. *Arlington Heights v. Metropolitan Housing Co.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977)  As to discriminator purpose, Plaintiffs need only "allege enough facts to nudge the claim into the realm of plausible." *Major Tours Inc. v. Colorel,* 720 F. Supp. 2d 587 at 606 (D.N.J. 2010). Where there is "no obvious nondiscriminatory explanation for the disparate treatment alleged," courts are more likely to find the discriminatory purpose prong satisfied. *Id.*  In this case, the entirety of the circumstances, the reliance on an incompetent and biased facial recognition hit, the fact that none of the defendants and their agents involved were African American provide ample evidence to infer discrimination. In contrast, there is no obvious nondiscriminatory explanation.  Moreover, "[a] plaintiff does not have to demonstrate that the challenged policy was taken solely for discriminatory purposes;; it is necessary only to show that a

discriminatory purpose was a motivating factor. *Mody v. City of Hoboken,* 758 F.Supp. 1027 (Dist. NJ 1991), citing *Arlington Heights v. Metropolitan Housing Co.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

In *Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), the Supreme Court held that in order to overcome summary judgment on a § 1983 claim where intent is an element of the claim, the plaintiff must "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Id.* at 600, 118 S.Ct. 1584.   Nijeer Parks has satisfied his burden to produce affirmative evidence of impermissible intent. The bogus facial recognition hit, the absence of any investigation, the disregard for the exculpatory evidence- fingerprints but also the Sprint sim card, the hospital records show a surgery that made running from police an impossibility, the solid alibis, etc.  See, for example, *Johnson v. Anhorn,* 416 F.Supp.2d 338  (ED PA 2006) (Approx. 76 pages), where the reputation of the arresting officer for anti-black bias satisfied the evidentiary burden to require the case to go to a jury on an Equal Protection claim. Additionally, New Jersey has recently accepted implicit bias[14] to establish a violation of Equal Protection challenges  in suppression hearings.  See, for example.  *State v. Scott* 474 N.J.Super. 388 (App Div 2023).[15]  For all of these reasons and because the nonmoving party is

---

[14] "[An] increasingly vast psychological literature" shows that "a substantial portion of the racial profiling that occurs in modern policing is the product not of explicit racism but of implicit [bias]." Megan Quattlebaum, *Let's Get Real: Behavioral Realism, Implicit Bias, and the Reasonable Police Officer,* 14 Stan. J. C.R. & C.L. 1, 13 (2018); *see id.* at 10–17 (summarizing the literature on this point). And "[o]ne behavioral effect of implicit bias is that it influences how individuals interpret the ambiguous behaviors of others." L. Song Richardson, *Police Efficiency and the Fourth Amendment,* 87 Ind. L.J. 1143, 1148 (2012). Thus, there are "good cognitive reasons to avoid ... bare reliance on generalizations based on officer 'experience'" when evaluating ambiguous behavior like a handshake. Andrew E. Taslitz, *Police Are People Too: Cognitive Obstacles to, and Opportunities for, Police Getting the Individualized Suspicion Judgment Right,* 8 Ohio St. J. Crim. L. 7, 31 (2010)

[15] The Appellate Division referenced the Attorney General Directive banning racially influenced policing expressly which applies to "sworn officer[s] or civilian employee[s] of a police agency acting under the authority of the laws of the State of New Jersey." Directive 2005-1, § 2(a) (emphasis added). The enactment of this policies both provides a basis to infer there is a problem and a interpretive background which disfavors an overly skeptical approach to the second prong of discriminatory intent.

afforded all favorable inferences on Summary Judgement, the Plaintiff has adequately made out a prima facie case for discriminatory intent for his Equal Protection claim.

## POINT IV
## PLAINTIFF HAS PRESENTED SUFFICENT EVIDENCE OF EXCESSIVE FORCE SO THAT IT MUST BE PRESENTED TO A JURY

Count III alleges a violation of Excessive Force under both the Fourth Amendment and the Eighth Amendment. "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Estate of Smith,* 318 F.3d at 515 (quoting *Abraham v. Raso,* 183 F.3d 279, 288 (3d Cir.1999)). Here, the record shows that this seizure that occurred was unreasonable in every aspect. The innocent Plaintiff called in to the Defendant Police Department, explained that he was innocent and that this was a case of mistaken identity. He was instructed to come down to the police department so that the matter could be cleared up. Every action of plaintiff expressed a spirit of voluntary cooperation. Despite this, the Defendants used excessive force in arresting him, placing him in handcuffs, verbally assaulting him so that he feared for his physical safety.

The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." In determining whether the use of force is reasonable in a particular situation, courts consider (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to flee. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Additional factors that should be considered are whether the suspect may be armed, and the number

of persons with whom the police officers must contend at one time. *Kopec v. Tate*, 361 F.3d 772, 776. (3d Cir. 2004), citing   (1989). *See Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir.1997).

While the events at the Hampton Inn were serious,  there was no evidence that Nijeer parks was an immediate threat to the safety of the officers and by voluntarily coming to the police station, he was doing the diametric opposite to resisting arrest or attempting to fell.  Since Nijeer Parks had undoubtedly passed through security at the police station, there was little possibility that he was armed. Nijeer Parks had arranged to come down and so the police were not dealing the apprehension of investigation of multiple suspects at one time.

"[R]easonableness under the Fourth Amendment should frequently remain a question for the jury." *Id* at p. 777.  In this case, a jury should be present with such facts asserted by plaintiff as the fact that in clear violation of New Jersey law, the Defendants failed to provide Plaintiff with a copy of the Warrant.  See New Jersey Rules of Court, 3:3-3 ( c ).  At the same time, the Defendants also refused to describe in any detail what Plaintiff was accused of in response to his questions.  See, for example, transcript of the interrogation attached to Plaintiff's Opposition as Exhibit Ξ (Xi) Because this was a case of mistaken identity, plaintiff had no idea of what was going on. Plaintiff was, in fact, terrorized as officers would come in and taunt Plaintiff, refusing to tell  him what he was accused of - instead saying "you know what you did." *Id* p 34 lines 1 – 2.

A jury should assess what the plaintiff describes as his experience. "T]hey [the officers] got aggressive like with their manner, like with their words, like trying to scare me, but no one put their hands on me."  *Id.* p. 36, lines 8 – 11. Officers were poking their heads in, expressing happiness and satisfaction and giving each other's "high fives."  p. 39 line 1.  Officer continued coming in to gape

22

at Plaintiff states "oh look at this f-cker....Oh we got him...This is the pr-ck right here."  This is the A-hole right here." *Id.* p. 41, lines 1 – 4. Plaintiff was nudged and pushed and treated rudely.  *Id.* , 43 , lines 4  - 14. While being verbally assaulted,  Plaintiff's  cuffs were removed and he was being moved down the hallway to where a crowd of officers stood and which, to plaintiff, seemed outside of the  surveillance cameras. *Id*,  p 41, lines 1  - 11.  Because Plaintiff sensed and felt that he was about to be physically beaten, he feigned an asthma attack. *Id.* p. 41, lines 12  - 22. The verbal abuse included physical threats.  Plaintiff described their words: "Get the f-ck up. Come the f-ck with us. Hurry the f-ck up. Stop moving so damn slowly, we're going to give you something to move slowly for. " *Id.* p. 50  lines 17 – 20.

Plaintiff 's psychological expert, Gianni Pirrelli, opined that this excessive force resulted in Post Traumatic Stress. See, Exhibit R attached to Plaintiff's Opposition papers. Dr. Pirelli explains how, paradoxically,  Plaintiff's prior experience with the criminal justice system- where he had been arrested and incarcerated for wrongdoing,  intensified the trauma of being arrested when he had done nothing. Id. Moreover, the hostility he experienced in the custody of Defendants was unlike any prior experience he had had notwithstanding numerous arrests and a longer sentence in state prison as very young man. *Id.*

Therefore, a jury must hear the evidence and decide whether the mistreatment of Plaintiff rises to the level of excessive force. *Id.* at 396. In this case, although the alleged crime (aggravated assault on a police officer is serious), the suspect had come in voluntarily, had not resisted arrest, had not attempted to flee, and instead only sought to reason with officials in a respectful manner despite his distress.  In this context

> at the very least, the plaintiff[] ha[s] raised a genuine issue of material fact concerning whether it was "objectively reasonable," under the standards the Supreme Court articulated in *Graham v. Connor*, 490 U.S. 386 (1989), for the officers to use the force they

23

did in arresting the plaintiffs. *Graham's* fact-sensitive inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* In light of the record before the court, a jury could reasonably find that the force the officers employed in making this arrest was excessive.

*Sharrar v. Felsing* 128 F.3d 810 (3d Cir 1997),  Pollack, J, concurring in part and dissenting.  The

Motion for Summary Judgement on the Count of Excessive Force so that the plaintiff can present

the evidence to a jury to decide whether excessive force was used in this situation.

## POINT V
## CIVIL CONSPIRACY IN COUNTS VII and VIII CANNOT BE DISMISSED

Plaintiff alleges that defendants acted in conspiracy for the purpose of depriving Plaintiff of

his rights and brings this under Sec 1985 and the NJCRA. §1985(3) provides a remedy against

private conspiracies and conspiracies by state actors. *See Bray v. Alexandria Women's Health Clinic*, 506

U.S. 263, 268 (1993).

> To establish a § 1985 conspiracy  claim, a plaintiff must show:(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29 (1983). In this case,  the plaintiff

alleges that the  defendants- the rank and file officers, particularly Tapia and Lyszyk and the Police

Director and Internal Affairs Commander-  acted singly and in concert to violate Plaintiff's

constitutional rights.

## POINT VI
## THE FAILURE OF WOODBRIDGE TO TRAIN, SUPERVISE AND DISICPLINE ITS OFFICERS IS A BASIS OF ENTITY LIABILITY

24

A. *Monell* Liability

A plaintiff seeking to hold a municipality liable under section 1983 must demonstrate that the violation of rights was caused by the municipality's policy or custom. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)Id. at 690–91, 98 S.Ct. 2018.).   In this case, the record shows multiple layers of inadequate management of the Woodbridge Police Department and a culture of blithe disregard for consequences.   Police Director Hubner had almost no knowledge of this case, was vague about policies for identifying suspects, knows nothing about Facial Recognition, and indicated that he believed that the WPD had done everything correctly. See Supplemental Statement of Facts of Plaintiff, paragraphs 154 et seq.   Indeed, the deposition of the officers, detectives and the Commander of Internal Affairs show  lack of understanding of basic policing- from making competent identifications of witnesses to the utilization of facial recognition. See Plaintiff's liability expert report attached as Exhibit R).   The WPD is a Department where there is a " failure to supervise and manage officers" and "a failure to discipline officers" leading to a "complete lack of accountability" and "a culture in which officers 'knew there would be no professional consequences for their action[s].' " *Estate of Roman v. City of Newark,*  914 F.3d 789 at 800–01 (3d Cir.  2019).

The Woodbridge Police Department had no policy regarding the use of facial recognition technology in 2019 at the time of the events at the basis of this lawsuit even though it was available to the Department through the ROIC and the New Jersey State Police.  Even after this incident and the considerable publicity it generated, there is still no Facial Recognition Policy and no plan to get one. See, Hubner Deposition, at p. 38 attached as Exhibit H to the moving papers of Defendants.

25

*Monell* liability can be established if the policy is inadequate, or illegal, or nonexistent. In *Natale v. Camden County Correctional Facility*, the Third Circuit determined that a prison with "no policy ensuring that an inmate having need for medication for a serious medical condition would be given that medication during the first 72 hours of incarceration" was a "particularly glaring omission in a program of medical care." 318 F.3d 575 at 584–85 (3d Cir 2003). A policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.' " *City of Canton, Ohio v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). In addition to the admission that Woodbridge had no policy on facial recognition, the record also makes clear that there was no policy on making use of identifications and of the normal and acceptable manner for conducting an investigation. "Failure to train," "failure to supervise," and "failure to discipline" are closely related theories which are addressed seriatim below. *Simpson v. Ferry* 202 F.Supp.3d 444 (ED Penn 2016)

### B.  Failure to Train

The record showed a very consistent failure to train the involved officers in identification procedures and had no training in the use of facial recognition software. To wit:

- PO Lee stated that he had no training on identification procedures and no training on facial recognition, even after the incident.  Lee Deposition, at page 9. Shockingly, he testified that his knowledge about lineups is derived from watching television. Id. page 8.

- PO Lyszyk testified that he has had no training on identification procedures or facial recognition hits, even after this incident. Lyszyk deposition page 21.

- Det. Tapia testified that he had had no facial recognition technology training through or from the Woodbridge Police Department. Tapia Deposition, page 101. Although Det. Tapia asserted that he had received training in identification procedures, he affirmed the blatantly false assertion that police officers do not follow the normal procedures to ensure reliable identifications. Id. p. 104. Thus, his training was either ineffective or did not happen as he testified.

- Det. Quesada testified that he had never had any training in how to complete an Affidavit of Probable Cause. Quesada Deposition, p. 54. Det Quesada testified that he had never had any training regarding the use of Facial Recognition.

- Lt. Barrett never received any training in handling of complaints and, in fact, was unaware of any way to analyze complaints and the level of sustaining those as evidence of a responsive department. Barrett Deposition. Exhibit G to Defenant's moving papers, pp 31 – 32.

These are the facts that a jury may consider when it addresses the question of whether Woodbridge has shown itself to be "deliberately indifferent" to the constitutional harms that result. *Christopher v. Nestlerode*, 240 Fed. Appx. 481 (3d Cir 2007), citing *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

A single constitutional violation can provide the basis for municipal liability for failure to train, *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407–09, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). While finding *Monell* liability on a single constitutional violation is not common, the Third Circuit has explicitly encouraged this finding in violations related to emerging technology when it held that police departments are required and expected to provide officers with training to keep them abreast of the emerging technologies. *Berg v. County of Allegheny,* 219 F.3d 261(3dCir 2000), cert denied, 531 U.S. 1072, U.S., Jan. 08, 2001. In *Berg*, an arrest warrant was issued to the wrong person because the

clerk had transposed two digits on the criminal complaint number while using the County's

computerized Integrated Court Information System (ICIS). Even though there was no prior incident

where a clerical mistake had generated a mistaken warrant, the Third Circuit reversed the dismissal

of the claim against the County because

> [h]aving employed a design where the slip of a finger could result in wrongful arrest and imprisonment, there remains an issue of fact whether the County was deliberately indifferent to an obvious risk. The County's failure to provide protective measures and fail safes against Demko's mistake seems comparable to "a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bryan County*, 520 U.S. at 409, 117 S.Ct. 1382. When such a simple mistake can so obviously lead to a constitutional violation, we cannot hold that the municipality was not deliberately indifferent to the risk as a matter of law. Accordingly, the County may be liable under *Monell*.

Id. at 276 – 277. Following this holding the *Berg* court expressed concern for the obligations of local

government to tale care and to be current to ensure that new technology is properly used.   The

Court quoted with approval Justice O'Connor concurrence in *Arizona v. Edward, supra.s*:

> In recent years, we have witnessed the advent of powerful, computer-based recordkeeping systems that facilitate arrests in ways that have never before been possible. The police, of course, are entitled to enjoy the substantial advantages this technology confers. They may not, however, rely on it blindly. With the benefits of more efficient law enforcement mechanisms comes the burden of corresponding constitutional responsibilities.

Id.  The Third Circuit then held that "widespread computerization carries with it the ability and

responsibility to institute more effective safeguards against human error than existed in the past."

Id., p. 277.   The clear signal from the Supreme Court of the United States and from the Third

Circuit is that local government cannot use the complexities and infatuation of new technology to

compromise the constitutional rights of citizens.   In other words, Woodbridge was put on notice

that it would be liable for failure to train and supervise its police officers using these new

technologies.  The record is very clear that there was no Facial Recognition Technology training in

the Woodbridge Police Department and that there was a general lack of good training to ensure adherence to the normal and usual standards of a police investigation.

The danger of technology is always twofold- the issue it presents and the displacement that it causes for tried-and-true methods.   The acts of the Woodbridge defendants were clearly improper and resulted in the wrongful arrest of the Plaintiff.   The admissions of the involved officers as well as of management showed that this misconduct was connected, inter alia, to a lack of training.


### C.  Failure to Supervise

Plaintiff's liability expert, Ralph Cilento,  opines that "[t]he lack of supervision in this case is of paramount importance and necessarily needs to be analyzed and critiqued." Exhibit V, Cilento Expert Report, p. 14.  Cilento highlights some instances of failed supervision such as:

- Det. Tapia's request to submit the Tennessee license submitted to facial recognition comparison should have required supervisory approval. Id.

- Det Tapia's incompetent identification by himself by looking at the Tennessee License and the photo of Nijeer Park should have had oversight which would have precluded it. Id.

- The Affidavits of Probable Cause of Lyszyk and Tapia should have had had supervisory review which would have flagged the many obvious problems in them.

- Supervision would have insisted on normal police procedures, e.g., eyewitness identifications; finger prints; viewing of surveillance video, following up on alibis, etc.  Id pp. 15 – 16.

These failures of supervision show both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the

supervisor's inaction could be found to have communicated a message of approval." *Remillard v. City of Egg Harbor City* 424 F.Supp.2d 766 (DNJ 2006).

### D. Failure to Discipline

The record also indicates a failure to discipline the involved officers which is indicative of a institutional weakness of the Woodbridge Police Department's disciplinary system and it is well settled that "a city may be liable for its failure to discipline an officer a…..*McDaniels v. City of Philadelphia* 234 F.Supp.3d 637 (ED PA 2017).See also, *Estate of Roman v. City of Newark,* 914 F.3d 789 (Approx. 34 pages) (3d Cir 2019) where the Third Circuit reversed a dismissal of the *Monell* claims based, *inter alia*, on evidence of a failure to discipline. In determining failure-to-discipline liability, "[i]t is not enough that an investigative process be in place;" rather, "[t]he investigative process must be real" and "have some teeth."[5]*Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996).[5]

No one involved with the incident at the base of this lawsuit received any discipline. No one received any counseling or even retraining. The sham investigation of the incident is an exemplar of the failure of Woodbridge to discipline. Firstly, note that the investigative report is dated December 28, 2021, more than two years after the charges against Plaintiff were dismissed. Report attached to Plaintiff's moving papers as Exhibit O (Omicron). At the very latest, the internal affairs investigation should have been begun at that time. Lt Det Inv Velez begins his report by noting the filing of this lawsuit on December 28, 2020, the year before as the trigger for the investigation. The Department should have initiated an investigation at the latest when the Prosecutor dismissed the case in November 2019. Having failed to do so then, Woodbridge should have at the very least initiated an Internal Affairs investigation as soon as practicable after the town was served with this

law suit.   Waiting a full year to investigate the matter is, itself, evidence of deliberate indifference or reckless disregard.  See, *Simmons v. City of Philadelphia* , 947 F.2d 1042 1991  (3d Cir. 1991)

The IA investigation in the Nijeer Parks incident was shockingly deficient- to the point where it, itself, is a basis for liability!  Firstly, the IA Investigation was not started until sometime after the filing of this Complaint and was not concluded until over a year later on December 29, 2021. Copy of Close Out Report of Internal Affairs  attached to Plaintiff's Opposition papers as Exhibit P. This delay in starting the investigation and concluding it violated the Attorney General Guidelines which require that these investigations be done in a prompt manner.  Internal Affairs Policy & Procedures, November 2022, Sec. 6.1.1. [16] Indeed, investigations are to be completed within 45 days and if not, a report is to be made to the Police Director. Id. 6.1.4. The instant investigation, despite its shocking deficiencies, took over a year and no reporting of the delay was made to Director Hubner. No notice was made as required by the Guidelines to the County Prosecutor when 180 days had elapsed.  *Id.* 6.1.6. No investigation was made of PO Lyszyk even after he admitted under oath that he had perjured himself when he made a materially false Affidavit of Probable cause in this case. No investigation was made of Lt. Ng even though he directed a subordinate, PO Lee, to engage in a patently inappropriate identification, of PO Lee to have engaged in the prejudicial identification, and  Detective Quesada for his failures including to follow up with the fingerprints.   Lt Velez failed to comply with any aspect of a appropriate Internal Affairs investigation which as set forth in 6.3.5. requires:

      a.   That the complainant be interviewed; (a certified letter was sent to a bogus address

          for complainant and no attempt was made to reach him through counsel)

---

[16] https://www.nj.gov/oag/dcj/agguide/directives/2019-Internal_Affairs_Policy_and_Procedures.pdf

b.   That all witnesses be interviewed (none were!)

c.   Review the relevant reports and documents.   In this case, the positive finger print identification, the allegations in this Civil Complaint, the false Affidavits, the false Complaints, and  the positive DNA report, the surveillance videos,

The IA investigation declared Det Tapia exonerated, the highest clearance possible of an accused officer, which equates to an affirmative finding of no misconduct.  (as opposed to the more neutral "not sustained" which only communicates that there was not enough information for the investigator to find guilt) .See  . Copy of Close Out Report of Internal Affairs  attached to Plaintiff's Opposition papers as Exhibit P. See also, Barrett Deposition, p. 76 at  Exhibit G.  Inexplicably, this investigation only looked into Det Tapia's role and did not consider the role of PO Lyszyk. *Id.* p. 82. The Internal Affairs report makes no mention of the fact that:

- The facial recognition hit was wrong;

- The Department failed to process the fingerprints which identified the actor as Barrington Walker two weeks after the incident;

- The Department failed to do any normal investigation including appropriate identifications with the ten eyewitnesses, examination of the Sprint Sim card, examination of the surveillance video at the Hampton Inn and at the Dunkin Donuts.

- The actor was over 6ft tall while Nijeer Parks is 5"7;

- Nijeer Parks voluntarily came down to police headquarters having been lied to by an officer who said he would be interviewed as part of the investigation and that he could clear up the misunderstanding.

- All of the solid alibis were ignored;

- Documentary evidence of Nijeer Parks surgery at the time which would have precluded him from running was not mentioned.

Copy of Close Out Report of Internal Affairs  attached to Plaintiff's Opposition papers as Exhibit P. The report failed in every respect to satisfy the requirements of the AG Guidelines.  See. 6.3.5.  Lt Det Inv. Velez concluded:

> I reviewed the photographs of Mr. Parks in the high-profile comparison and they are similar and could be mistaken for the same person."

Close Out Report, p, 3. Exhibit P. Lt. Velez in an official document and with knowledge that Plaintiff had been the victim of a false facial recognition lead, and that the Department had misused this led to falsely arrest Plaintiff, falsely charge plaintiff, and falsely prosecute plaintiff, essential engages in the identical wrongful acts of the subject of his investigation. When questioned in his deposition about this, Lt Barrett shrugged his shoulders and said "mistakes are made…but there was no malice here…" Id.  p. 84 lines 19 – 23.  The IA investigation was sent to the file but was not provided to the Police Director, the Mayor, or the Business Administrator. *Id.*  Only the three IA officers were given access to this report.  Id. p. 77, 1 – 6.

In other words, even with the benefit of hindsight and acting as a Monday morning quarterback, the Lt. Velez, a high ranking officer in Internal Affairs,  ratifies the very errors  that resulted in the wrongful arrest, prosecution, and imprisonment of Plaintiff! As both Director Hubner and IA Commander Barrett affirmed: the same thing that happened to Nijeer Parks could happen to someone else tomorrow in Woodbridge.

33

The egregious IA investigation of this matter is a synecdoche of the entire broken disciplinary system in a rogue Department. It is clear that discipline is not a significant aspect of the running of the Woodbridge Police Department.   Director Hubner reported one termination case in the ten years that he has been Director.   Moreover, Director Hubner had no recollection of any Woodbridge Discipline being reduced or overturned. In fact, in ten years, there has been only one disciplinary case appealed to the OAL which involved a dismissal which was upheld. Hubner deposition at p. 23.

Incredibly, Director Hubner remembers no instance over his 40 year association with the Department where the Department's discipline was reversed at OAL. Exhibit H to Defendnt's papers. Id. p. 25 line 3 – 8. This strongly suggests that Woodbridge fails to discipline its officers appropriately.  The literature clearly indicates that conscientious police administrators are regularly frustrated by having discipline which is imposed either reversed or reduced by the appeals process (whether through arbitration or the Office of Administrative law. Stephens, Daryl W.  June 2011. New Perspectives in Policing, National Institute of Justice, Harvard Kennedy School. [17] Responsible Police directors are frustrated and stymied by "the frequency with which their decisions are reversed or modified by arbitrators, civil service boards and grievance panels." Director Hubner expressed no such frustration and, indeed, it seemed clear that he had such a thought had never crossed his mind. Dir Hubner had very little knowledge about the instant case or about any case, really. Director Hubner is generally not very involved in the defense of claims against the Department and is not privy to settlement discussions involving claims against the Department. Id. pp. 45 - 46. Hubner was not even aware that an excessive force claim had been settled for $125,000. Id 47 line 6.

---

[17] https://www.ojp.gov/pdffiles1/nij/234052.pdf

Dir Hubner's disinterest and lack of involvement was, in fact, part of the standard operating procedures at the Woodbridge Police Department's Internal Affairs Department which did not give Dir. Hubner access to its files.. According to Lt. Barrett, only three persons had access to Internal Affairs records, these being the three IA officers assigned to that unit. Barrett Deposition, p. 77, 1 – 6  "No one else, not even the Director was given access to the files." This is not only contrary to the current policy of transparency but is also diametrically opposed to the long-term understanding that the chief law enforcement executive must have direct control, access and communication with internal affairs.     This is diametrically contrary to the Attorney General Guidelines which specify that "[i]nternal affairs personnel shall maintain a filing system accessible only to unit personnel and the law enforcement executive."   Internal Affairs Policy & Procedures, November 2022, Paragraph 9.5.1. [18] *N.J.S.A.* 40A:14–181. The statute "requires [e]very law enforcement" agency in this State to "adopt and implement guidelines" that are "consistent with the guidelines" that have been promulgated by the Attorney General, through the Police Bureau in the Division of Criminal Justice. *Ibid.*

Lt Barrett presents as being incompetent and/or unwilling to perform his role as Commander of Internal Affairs. Having never received any training and apparently being without any autodidact qualities   was unaware of the expectation that the performance of IA is monitored and that this is an important tool for gauging the degree to which the Department abides by relevant laws and customs.  Id. pp 31 – 32. Thus, Lt Barrett had no idea how many 500 complaints the department averaged per year. *Id* p. 34 and although Barret had been in IA for five years at the time

_____

[18] https://www.nj.gov/oag/dcj/agguide/directives/2019-Internal_Affairs_Policy_and_Procedures.pdf

of his deposition (Id. p. 9 line 7), he had only been a witness in a Departmental hearing once or twice, Id, p. 38, line 3, and had never testified in OAL. Id p. 38 line 8.

Commander Barrett also seemed to lack the most basic investigatory instincts which one might have gleaned from a career in policing. Although it is axiomatic that the past history of a suspect is extremely relevant to considering current charges or suspicions, Lt. Barrett denied this very obvious tenant.  Lt Barret did not think it significant that PO Lyszk had had three sustained complaints and that one of these involved "arresting the wrong person for a warrant."  Barrett Deposition, Exhibit G to the Defendants moving papers, pp. 65 -67. "That investigation [of the prior false arrest] would not be part of the current investigation [into the false arrest of Nijeer Parks]." Id. P. 67 lines 4 – 5. Lt Barrett categorically denied that the past history of an officer is considered when weighing current complaints. If p. 69 4 – 6.  Lt Barrett held fast to his position even when it was pointed out to him that the rules of evidence allow a jury to hear about the reputation, history, and character of a witness or party under certain circumstances.  In addition to the rules of evidence, case law clearly recognizes the importance of reputation, character, and personal history when managing police officers. See, for example, *Johnson v. Anhorn*, 416 F.Supp.2d 338 (ED PA 2006) (Approx. 76 pages), where the reputation of the arresting officer for anti-black bias satisfied the evidentiary burden of requiring the case to go to a jury on an Equal Protection claim. has even been held sufficient to satisfy the evidentiary requirement to make out a Monell claim.

Moreover,  the failure of an IA Commander to understand the value of tracking complaints is itself a basis of Monell liability. For example, the failure of a municipality to have a formalized tracking of complaints for individual officers, was held to be a sufficient basis in a Sec 1983 action

36

for jury to find that "officers are guaranteed repeated impunity, so long as do not put themselves in a position to be observed by someone other than another police officer." *Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir 1996)

In the case at hand, Barrett showed a bizarre ignorance of the relevant facts. Lt. Barrett first denied that there was any exonerating evidence related to Nijeer Parks. Exhibit G, pp. 8 – 13, but then he recalled that fingerprints and DNA evidence exonerated him. Id. 57 lines 3 - 12. Lt Barrett had no knowledge about the disparity between the reports of the suspect's height being 5'11 or more and the fact that Nijeer Parks is 5"8. *Id* 58 – 61. Lt Barret did not think it significant that PO Lyszyk had had three sustained complaints and that one of these involved "arresting the wrong person for a warrant." Id. p. 65 -67. "That investigation [of the prior false arrest] would not be part of the current investigation [into the false arrest of Nijeer Parks]." Id. P. 67 lines 4 – 5. Lt Barrett denied that the past history of an officer is considered when weight current complaints. Id. p. 69 4 – 6. Lt Barret had never seen the request for a Facial Recognition search in this case. Id. p. 73 line14, Lt Barret asserts that "I don't even know if it [FRT] was ever employed" by the Department. Id. 75 lines 7 – 8. Lt Barrett is unable to articulate the difference between an "investigative lead" and evidence which supports probable cause. Id. pp 75 – 76. Lt. Barrett did not think any red flags were raised when 7 out of 8 differential treatment/false arrest allegations were not sustained. Id. p. 31 lines 1 – 25

The deficient nature of discipline in the Department was further explicated in every deposition of defendants beyond that of Director Hubner and Commander Barrett. Thus, Andew Lyszyk testified that he was never disciplined, counseled, or retrained relating to this incident. Lyszyk Deposition, p. 21 line 1 - 17. Lt Barret did not think it significant that PO Lyszyk had had three

sustained complaints and that one of these involved "arresting the wrong person for a warrant." Barrett deposition, p. 65 -67.  But the record is uncontroverted that no discipline whatsoever, not even counseling was meted out anyone- including those involved here (Det. Tapia, Det Quesada,  Lt Ng., PO Lyszyk),

 For failure-to-discipline claims, as with failure-to-train claims, it is not enough for the plaintiff to establish merely that the disciplinary process was inadequate. Rather, the plaintiff must show that the city's failure amounted to "deliberate indifference to the rights of persons with whom the police come into contact."[56] "Only then can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *McDaniels v. City of Philadelphia,* 234 F.Supp.3d 637102 Fed. R. Evid. Serv. 850 (EDPA 2017).  The record shows in every regard that discipline at the Woodbridge Police Department was ineffectual and a sham.

> Formalism is often the last refuge of scoundrels; history teaches us that the most tyrannical regimes, from Pinochet's Chile to Stalin's Soviet Union, are theoretically those with the most developed legal procedures. The point is obviously not to tar the Police Department's good name with disreputable associations, but only to illustrate that we cannot look to the mere existence of superficial grievance procedures as a guarantee that citizens' constitutional liberties are secure. Protection of citizens' rights and liberties depends upon the substance of the OPS investigatory procedures. Whether those procedures had substance was for the jury's consideration.

*Beck v. City of Pittsburgh*  89 F.3d 966 (3dCir 1996).  "On reviewing the record, [his court will] find considerably more than [Nijeer Park's]'s complaints from which a reasonable jury could have found that the City's procedures are inadequate to protect civilians from police misuse of force."  Ibid.

**CONCLUSION**

Based on the record and relevant law, the Motion by Defendants for Summary Judgment

must be denied and this matter must be set down for a trial by jury with all deliberate speed.

Respectfully submitted,

January 22, 2024

Daniel W. Sexton, Esq.
Counsel for Plaintiff, Nijeer Parks