## Plaintiff's Responsive Statement of Material Facts

1. On January 26, 2019, Woodbridge Police Department ("WPD") Officers Francis Lee and Andrew Lyszyk were separately dispatched to the Hampton Inn on Route 9 North in Woodbridge on a report of shoplifting. (See WPD Director Robert Hubner's Answers to Interrogatories, attached hereto as Exhibit "B"). 2. Officer Lee arrived on scene first and encountered the suspect in the lobby, an African American male who identified himself as "Jamal Owens." (Id.)

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

3. The suspect produced a Tennessee driver's license which listed the name "Jamal Owens" and displayed a photograph of the suspect. (Id.).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

4. Officer Lee called WPD headquarters to have dispatch run the suspect's driver's license to determine if it was legitimate. (See Transcript of Deposition of WPD Officer Francis Lee, attached hereto as Exhibit "D" Page 18, Line 11-16).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

5. Dispatch advised Officer Lee that the suspect's driver's license was not coming back on file. Officer Lyszyk took the suspect's driver's license to his patrol vehicle to further attempt to verify its authenticity. (See Transcript of Deposition of WPD Officer Andrew Lyszyk, attached hereto as Exhibit "C" Page 13.

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

6 . Officer Lyszyk contacted the Tennessee State Police, who confirmed that the suspect's driver's license was fake. (Id. at Page 14, Line 7-13).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above to the extent that the Tennesse police reported that the license was a fake.*

7 . Since Officers Lee and Lyszyk were unable to confirm the identity of the suspect, who had admitted to shoplifting, the decision was made to place the suspect under arrest. (Id. at Page 14, Line 24-25; Page 15, Line 1-4).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

8 . When Officer Lyszyk attempted to place the suspect in handcuffs, the suspect slipped away from his grasp and fled the scene by running out the back door of the Hampton Inn lobby. (Id. at Page 15, Line 25; Page 16, Line 1-6).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

9 . Officers Lee and Lyszyk pursued the suspect as he ran around to the front of the Hampton Inn and entered his vehicle. There, the Officers confronted the suspect and drew their service weapons while demanding that the suspect turn off and exit the vehicle. (Id. at Page 16, Line 10-19).

10.      The suspect's vehicle was rented from Hertz and the suspect was at the Hampton Inn to renew his rental agreement at the Hertz kiosk located in the lobby. (See Hertz Rental Agreement, attached hereto as Exhibit "P").

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

11. The suspect refused to comply with the Officers' commands and fled the scene in his vehicle, striking Officer Lyszyk's patrol vehicle before hitting a pillar in front of the Hampton Inn. During this time, Officer Lee had to jump out of the way to avoid being struck by the suspect's vehicle. (Deposition of Ofc. Lyszyk, Exhibit "C" Page 16, Line 18-22).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above to the extent that this was the account given by PO Lee and the other officers.*

12.      Officers Lee and Lyszyk engaged in a brief vehicular pursuit of the suspect, but were unable to locate the suspect. The Officers returned to the Hampton Inn to preserve the scene. (Id. at Page 17, Line 1-13).

⸺

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

3

13.      Other officers on patrol were dispatched to the Hampton Inn to guard the doors to the lobby and preserve the scene. The WPD Detective Bureau was notified of the incident and Detective Jorge Quesada arrived to begin processing the evidence left at the scene. (Director Hubner's Answers to Interrogatories, Exhibit "B").

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

14.      Det. Quesada was assigned to the Identification Unit within the Detective Bureau and was responsible for photographing and collecting evidence at the scene. (See Transcript of Deposition of WPD Detective Jorge Quesada, attached hereto as Exhibit "E" Page 8, Line 9-16).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

15.      Upon his arrival on scene, Det. Quesada was advised of the areas of the Hampton Inn lobby that the suspect interacted with prior to and during his flight from the lobby. (Id. at Page 19, Line 14-20).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

4

16.    Det. Quesada learned that the suspect fled through the rear glass common door to the lobby. (Id. at Page 20, Line 3-5).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

17.    Det. Quesada viewed surveillance video from the Hampton Inn to determine where the suspect touched the door, but the angle of the camera did not cover the door. (Id. at Page 28, Line 3-7).

*Plaintiff denies this statement. Firstly, the provide citation is incorrect. Page 18 line 3 is a question from counsel to Det. Quesada asking about the population of Woodbrige.*

*Moreover, Plaintiff denies that Det. Quesada viewed the surveillance video. In fact, Quesada deposition testimony says the exact opposite: "I don't believe there's any type of video or anything showing that the person touched it or -..." Id. at p 38 line 5 – 7.*

18.     Det. Quesada ultimately collected three fingerprints from the rear glass common door to the lobby. (Director Hubner's Answers to Interrogatories, Exhibit "B").

*Plaintiff agrees with the factual statements contained in the paragraph immediately above .*

19.      Det. Quesada also collected a water bottle that the suspect drank from and a sneaker that the suspect lost during his flight from the Hampton Inn. (Deposition of Det. Quesada, Exhibit "E" Page 19, Line 14-20.

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

20.      Officer Lyszyk advised Det. Quesada that he still had the suspect's driver's license and that although the license was fake, the picture on the license was that of the suspect. (Deposition of Ofc. Lyszyk, Exhibit "C" Page 18, Line 10-13).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above except that PO Lyszyk merely*

*provided his opinion that the picture on the Drivers License was that of the suspect.*

21.      The suspect's vehicle was found the next day and five additional fingerprints were lifted and a vape pen was collected from the vehicle. (Director Hubner's Answers to Interrogatories, Exhibit "B").

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

22.      With the evidence collected, Det. Sgt. Tapia and the Detective Bureau took over the investigation. (Id.; see also the Transcript of Deposition of WPD Det. Sgt. Santiago Tapia, attached hereto as Exhibit "F" Page 56, Line 3-6).      ___

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

23.      The fingerprints were reviewed at WPD headquarters to determine if they were suitable to be packaged and sent to the New Jersey State Police ("NJSP") for analysis. (Deposition of Det. Quesada, Exhibit "E" Page 25, Line 1-4).

___

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

24.      24. As is the case with other local municipal police departments, the WPD does not have the capability to analyze and compare fingerprints in-house. (Id. at Page 27, Line 5-25; Page 28, Line 1-2).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

25.     The fingerprint evidence was reviewed and packaged by Det. Quesada on January 26, 2019. (See the WPD I.D. Bureau Report, attached hereto as Exhibit "K").

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

26.     Det. Sgt. Tapia had prior experience with facial recognition technology through a prior assignment with the NJSP Auto Theft Task Force, where that technology was used successfully to identify suspects. (Deposition of Det. Sgt. Tapia, attached hereto as Exhibit "F" Page 45, Line 6-13).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above to the extent that this was the testimony of Sgt. Tapia. It is further noted that Tapia prior experience included not training but consisted only of being involved in operations where someone else had used the facial recognition technology.*

facial recognition software that extracts a sample photograph and compares the characteristics of an individual's face, including the eyes, ears, nose, mouth, cheekbones, and other features. When the software identifies a potential match, the software gives a probability of a positive match. (See Transcript of Deposition of Rockland County Intelligence Center Investigator Seamus Lyons, attached hereto as Exhibit "I" Page 32, Line 2-14).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

28.     Facial recognition technology is a tool that may be utilized in an investigation. (Deposition of Det. Sgt. Tapia, Exhibit "F" Page 50, Line 22-25; See also the Deposition of Det. Quesada, Exhibit "E" Page 32, Line 1-5); See also the Deposition of Investigator Lyons, Exhibit "I" Page 30, Line 5-22; Page 86, Line 3-11).

*It is imprecise and misleading to say that facial recognition technology is a tool to be used in an investigation.     The inherent limitations as well as bias issues have shown that Facial Recognition Technology is not reliable enough to be used as a tool in an investigation such as a fingerprint or DNA hit.  The lack of reliability and the problem of false hits requires that the technology be used, at most, as "an investigative lead" and nothing further.*

29.     Local municipal police departments may submit requests for facial recognition technology analysis to the New Jersey Regional Operations Intelligence Center ("NJROIC"), the New York State Intelligence Center ("NYSIC"), or the Rockland County Intelligence Center ("RCIC"). These entities have several tools at their disposal, including facial recognition technology, that local and State police departments do not have access to. (Deposition of Det. Sgt. Tapia, Exhibit "F" Page 46, Line 10-17).

*Plaintiff admits that the factual statements contained in the paragraph immediately above accurately reflect testimony of*

*witnesses. .*

30.      On January 27, 2019, Detective Tapia created a bulletin which was sent to these entities and explained the circumstances of the incident at the Hampton Inn. The bulletin contained the suspect's driver's license photograph and requested that facial recognition analysis be performed in an effort to identify the suspect. (See WPD Bulletin Requesting Assistance Identifying Suspect, attached hereto as Exhibit "Q"; See also Facial Recognition Initiative Request Form, attached hereto as Exhibit "T").

*Plaintiff agrees with the factual statements contained in the paragraph immediately above. Plaintiff also notes that the*

*Bulletin falsely gave the impression that an officer had, in fact, been struck by the vehicle driven by the suspect as*

*indicated by the reaction of Inv. Seamus Lyons of the ROIC Lyons understood that an aggravated assault had taken*

*place where "an officer was nearly struck or was injured during the incident" based on the Bulletin. Exhibit I to*

*Defendants moving papers,. p. 41, lines 10 - 11. "My understanding that an officer was injured." Id. p. 55 line 22*

*-23. See also Id 55 lines 10 -23. , Id. p. 56 lines 5 – 11*

31.      Prior to sending the bulletin, Det. Sgt. Tapia showed the suspect's driver's license to Officers Lyszyk and Lee separately, who each confirmed that the photo on the license depicted the individual they dealt with at the Hampton Inn. (Deposition of Det. Sgt. Tapia, Exhibit "F" Page 132, Line 17-25; Page 133, Line 16).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above but notes that the manner of*

*presenting the photo to the officers was done improperly, failed to follow any established protocol rendering the identification*

*to be without probative value.*

10

32.      Defense Expert, Major Joseph Craparotta, New Jersey State Police (Ret.) opined that Sgt. Tapia properly used his training and knowledge to submit the driver's license for facial recognition analysis as a tool to identify the suspect from the Hampton Inn. (See the Report of Defense Expert Major Joseph Craparotta (Ret.), attached hereto as Exhibit "U" Page 26).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above but notes that the opinion of the defense expert is not a "fact" to be presented in this Statement of Material Facts and should be stricken.*

33.      Plaintiff's Expert, Ralph Cilento, New York Police Department (Ret.) opined that Sgt. Tapia was correct in utilizing all investigative means necessary to attempt to identify the suspect and that Sgt. Tapia determination to send the driver's license for facial recognition analysis was an appropriate investigative step. (See the Report of Plaintiff's Expert Ralph Cilento, attached hereto as Exhibit "V" Page 6).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above but notes that the opinion of Plaintiff's expert is not a "fact" to be presented in this Statement of Material Facts.*

34.      The bulletin was received by Investigator Seamus Lyons of the Rockland County Intelligence Center ("RCIC") in New York. The RCIC provides services to outside law enforcement, including manpower support, police records management, intelligence gathering, and evidence analysis. (Deposition of Investigator Lyons, attached Exhibit "I" Page 8, Line 7-12).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

35. Investigator Lyons is a 27-year law enforcement veteran and had received training regarding the use of facial recognition technology. (Id. at Page 8, Line 18-19; Page 23, Line 5-14). Investigator Lyons and the RCIC have utilized facial recognition technology with a great deal of success in identifying previously unknown individuals in hundreds of cases. (Id. at Page 21, Line 15-18; Page 27, Line 22-25). ⎯                                                      ⎯

*Plaintiff agrees with the factual statements contained in the paragraph immediately above. It is noted, that the training that Lyons received in Facial Recognition was extremely limited.*

36.     Investigator Lyons viewed the photograph of the suspect's driver's license on the bulletin and shrunk it slightly to make the pixels clearer. This is done frequently and enables the facial recognition software to get a better read on the photograph without affecting the validity of the results. (Id. Page 77, Line 1-9; Page 78, Line 1-4).

⎯

*Plaintiff disagrees with this statement.  Investigator Lyons stated that he had "altered the pixels," in the photo from the fake license: "Yes, I sued facial recognition soft ware but altered the photo on the license a little to get the pixels clear."   Email exchange attached to Plaintiff's Opposition as Exhibit F.  Plaintiff concedes that Inv. Lyons' asserted that altering the pixels did not affect the accuracy of the findings.  Id. pp 77 – 78, However, the academic literature asserts the contrary for searches based on altered images.  See, for example, Garvie, Claire,  Georgetown  Law, Center on Privacy and Technology,    Garbage In, Garbage, Out, 2017/ https://www.flawedfacedata.com/ Studies have shown that using technology to improve the resolution of a photo with poor resolution "degrades accuracy."  Flynn, Partirck J, University of Notre Dame, Prieto, Loreto, Pontificia Universidad Católica de Chile,   Face Recognition in Low Quality Images: A Survey, April 2019,*

*of 594 out of 1000. See Facial Recognition Report, page eight of Exhibit F which is, in fact, a very*

*ambivelant number.*

37.      The facial recognition software matched the photograph displayed on the suspect's fraudulent driver's license to Nijeer Parks. (Deposition of Det. Sgt. Tapia, Exhibit "F" Page 90, Line 10-13).

*Plaintiff vehemently disagrees with this as the term "match" is misleading. Investigator Lyons testified that it was a*

*"hit," that is the software correlated the photograph to a photograph in the data base. Lyons further testified that*

*although he called it a "high probability hit," it was only a 594 out of a possible 1,000. (Deposition of Investigator*

*Lyons, attached to movant's papers as Exhibit I at Page 53, Line 9-25; Page 54, Line 1-5). Thus, the accuracy by*

*the terms of the science as it is now, was just over 50/50.*

38.      Upon viewing the results of the facial recognition analysis, Investigator Lyons immediately noted striking similarities in the resemblance between the suspect's driver's license photograph and the photograph returned of Nijeer Parks. (Deposition of Investigator Lyons, Exhibit "I" Page 89, Line 18-23).

*Plaintiff denies that Lyons testified that the resemblance was "striking," The actual testimony of Inv. Lyons*

*corresponding to the citation above is much more reserved or even skeptical, to wit:*

> *My initial reaction was like, there was resemblance, the eyes and ears, there was a match. I then*
> *clarified that with Lieutenant Riche Dey and we were in agreement that there were definitely*
> *similarities that had to be looked at further that we provided to Detective Tapia.*

39.      Investigator Lyons showed the results to a fellow RCIC Investigator, Lieutenant Richard Dey, who was in agreement that the resemblance was sufficient to provide the WPD with the facial recognition results as a possible lead on the Hampton Inn suspect.
(Id. at Page 89, Line 18-23).

*Plaintiff agrees with the statements contained in the paragraph immediately above accurately reflect that account of*

*Investigator Lyons.*

40.     The facial recognition software indicated that the probability of a positive match to Plaintiff was 594 out of a possible 1,000, which is sufficient to warrant further investigation into Plaintiff. (Id. at Page 53, Line 9-25; Page 54, Line 1-5).

*Plaintiff admits that that the hit was 594 out of 1000 and admits that according to Inv. Lyons it was sufficient to*

*warrant further investigation into plaintiff but note that Inv. Lyons never asserted that it could serve as a basis for*

*probable cause.*

41.     Investigator Lyons has made positive matches with lower threshold probability scores in other investigations than that which identified Plaintiff here. (Id. at Page 53, Line 21-23).

*Plaintiff admits that Inv. Lyons testified that he had made positive matches with lower threshold probability scores but*

*denies the relevance.*

14

reviewed Plaintiff's extensive criminal history in New Jersey and noted that Plaintiff's past addresses connected him to New Jersey. (Id. at Page 47, Line 312).

*Plaintiff denies that Plaintiff's criminal history is properly understood as "extensive" but admits  that it indicated a*

*New Jersey addresses.*

43.      Investigator Lyons supplied the results of the facial recognition analysis to Sgt. Tapia via email on January 28, 2019. (See Rockland County Intelligence Center Officer Report, attached hereto as Exhibit "AA").

*Plaintiff agrees with the factual statements contained in the paragraph immediately above.*

44.      Investigator Lyons' email to Sgt. Tapia stated that the facial recognition software came back with a "high number hit" comparison to Plaintiff. (Id. Bates stamped PARKS000034).

*Plaintiff agrees with the factual statements contained in the paragraph immediately above but notes that it was a 594*

*out of 1000 which is not a high number hit. .*

Det. Sgt. Tapia summoned Officer Lyszyk to the Detective Bureau to determine if he could personally identify the suspect. Officer Lyszyk confirmed to Det. Sgt. Tapia that he was 100% certain that the image returned by the facial recognition software was the individual that he dealt with at the Hampton Inn. (Deposition of Det. Sgt. Tapia Exhibit "F" Page 90, Line 10-22).

*Plaintiff denies the factual statements contained in the paragraph immediately in toto. This is false and was fabricated in the course of defending this lawsuit. There is no mention in any report, Affidavit or anywhere else authored at the time of the investigation which reports that Tapia had Lyszyk do an identification of the facial recognition hit as part of the investigation. This was not mentioned in the Answers to interrogatories. PO Lyszyk also testified in his deposition that he had looked at the Facial Recognition hit when Tapia received it from the ROIC. Lyszyk Deposition at p.29 lines 16 to p. 30 line 8, Exhibit C to Defendant's papers. However, PO Lyszyk acknowledged that there was nothing in his report to even suggest that he, Lyszyk had viewed the facial recognition hit and confirmed that it corresponded to the actor but attributed it to "bad report writing" rather than perjury. Id. p. 30 line 8. Id. Moreover, Det. Tapia's own report conspicuously omits any mention of having PO Lyszyk made the identification:*

> *On January 27, 2019, I received notification from Investigator Seamus Lyons (Rockland County Sheriff's Intelligence Center) and Sgt. Dey (Palisades Interstate Parkway Police) that they had a high profile comparison to the picture of the fraudulent Tennessee driver's license. The suspect was identified as Nijeer Parks with a date of birth of September 11, 1987, with a last known address of 485 E. 19th Street,. Apt #3G, Paterson, NJ. I compared the photo on the fraudulent Tennessee driver's license to Nijeer' Parks' assigned New Jersey Driver's license # …..and it is the same person. Inv. Seamus Lyons emailed me the Identification Report for evidence.*

*Tapia Report,  2/5/19, p 3, E. While PO Tapia makes no mention of PO Lyszyk  identifying Nijeer Parks, he does explicitly state that he had PO Lyszyk identify the image on the Tennessee Driver's license as the actor. "I verified with Officer Lee and Officer Lyszyk that the picture on the fraudulent Tennessee driver's license was the picture of the suspect.: Id. Moreover,  PO Lyszyk own contemp44oraneous report makes no reference at all to having identified the photo. Indeed,  the report clearly narrates that no such identification was made:*

> *Det.  S. Tapia advised me that he sent out the picture of the suspect to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center*

*Investigator Seamus Lyons (Rockland Cunty Sheriff's Department Intelligence Center) and Sgt. Dey (Palisades Interstate Parkway Police) that they had a high profile comparison to the picture on the fraudulent Tennessee driver's license. The suspect was identified as Nijeer Parks. As a result, I signed a complaint for the following charges…..*

*Lyszyk Report of 1/30/19, p. 3. Exhibit D.        Moreover, even if, arguendo, Tapia had had Lyszyk make*

*such an identification it would have unsuable as it is conceded that no photo array was used.*

45.        Peter Nastasi was the Assistant Prosecutor who was the point of contact in the Middlesex County Prosecutor's Office for the WPD. (Deposition of Det. Quesada, Exhibit "E" Page 13, Line 1417; see also Director Hubner's Answers to Interrogatories, Exhibit "B").

*Plaintiff agrees that the record appears to   support the  factual statements contained in the paragraph immediately above.*

46.        Det. Sgt. Tapia and Officer Lyszyk contacted AP Nastasi and explained the facial recognition results and advised of Officer Lyszyk's positive identification of the suspect as Nijeer Parks. (Deposition of Det. Sgt. Tapia, Exhibit "F" Page 135, Line 5-23).

*Plaintiff denies the facts averred in the paragraph immediately above. The above statement is false. Responding to four*

*questions concerning the role of the Prosecutor, Director Hubner described the role of the Hudson County Prosecutor*

cause, to wit:

> The Middlesex County Prosecutors Office (MCPO) is the lead law enforcement agency in Middlesex County. MCPO assigns an Assistant Prosecutor to serve as a liaison to the Woodbridge Police Department. The MCPO liaison to Woodbridge is Assistant Prosecutor Peter Natasi. When an officer files a complaint alleging an indictable offense, the Department will contact MCPO to discuss the factual allegations and obtain a legal opinion as to the proper charges to be brought against the suspect..

Response to Interrogatory Number 16, attached as Exhibit B to the moving papers of Defendants. Director

Hubner repeated this assertion that the only role of the Prosecutor was to assist in drafting

the charge, to wit:

> The Middlesex County Prosecutor's Office was involved in this matter to the extent that Assistant Prosecutor Peter Natasi reviewed the complaint and, based on the information available at that time, advised as to what charges should be brought.

Response to Interrogatory 17, attached as Exhibit B of Defendant's Motion. PO Lyszk's response in his answers

to interrogatories is identical to that of Police Director Hubner response immediately above. See Lyszk's Answers to

Interrogatory, Number 14, attached as Exhibit B to Plaintiff's Opposition Papers. On direct examination in his

deposition, Det Tapia, having described the review with Ass t Prosecutor Nastasi was oral and, since he does not

remember what was said, he agreed with the inference "that it was brief." Tapia Deposition, p 119 lines 12 – 16.

Det Tapia recalls a brief telephone call to Judge Stahl in which Tapia informed him that he would be submitting a

Warrant and Compliant. Tapia Deposition, p. 119, lines 17 to p. 120 5. Exhibit F. On direct exam,

Detective Tapia stated that he had one brief conversation with Assistant Prosecutor Nastasi and had no recollection

about the nature and contents of the one brief conversation he had had with Nastasi. Tapia Deposition p.

119. Fred Rubenstein, counsel for Defendants, articulated for the first time in extensive and inappropriately leading

questions on cross examination conveying the theory that Det Tapia had presented the facial recognition as the main

evidence and further asserted that Nastasi had opined that probable cause existed based on the evidence to which

Tapia dutifully agreed. (Tapia Deposition, p. 135 – 138, attached as Exhibit F to Defendants' papers. In fact,

neither Det. Tapia nor PO Lyszyk had any present sense recollection of what the conversation with Peter Nastasi

consisted of.. Instead, Sgt. Tapia wrote out his Affidavits of Probable Cause in a false and misleading manner.

*(Lyszyk's falsely states that the Hertz manager identified the suspect as Nijeer Parks and Tapia's asserts that he, Tapia, was an eyewitness. Det Tapia's Warrant is also categorically false in that the Preliminary Law Enforcement Incident Report, (PLEIR), min which Det. Tapia asserts that he, "the complaining officer, personally observed the offiense. See Exhibit N. There was no competent evidence for probable cause and it is impossible to believe that Assistant Prosecutor Nastasi would have in any way opined that the contrary.*

47. AP Nastasi determined that probable cause existed and authorized Det. Sgt. Tapia and Officer Lyszyk to generate Complaint-Warrants against Nijeer Parks. AP Nastasi advised of what charges would be issued and the Complaint-Warrants were sent to AP Nastasi for his review and approval. (Id. at Page 115, Line 6-10; Page 137, Line 13-25; Page 138, Line 1-4).

*Plaintiff denies the facts averred in the paragraph immediately above. The witnesses had no present sense recollection of what was said in the brief conversation that Det. Tapia had with Nastasi. See plaintiff's response to 46 above. Upon information and belief, this is a bald attempt to transfer liability to the Assistant Prosecutor who is immune from prosecution.*

The Affidavit of Probable Cause attached to the Complaint-Warrants stated that facial recognition technology was employed and helped identify Plaintiff as the suspect. (See Complaint Warrant 1225-W-2019-000156, attached hereto as Exhibit "N" and Complaint-Warrant 1225-W-2019-000158, attached hereto as Exhibit "O").

*Plaintiff denies the facts averred in the paragraph immediately above. Instead, Sgt. Tapia wrote out his Affidavits of Probable Cause in a false and misleading manner asserting that he was an eye witness.   See above. Additionally, Lyszyk falsely asserted that the Hertz manager had identified the actor as Nijeer Parks.*

51.     Det. Sgt. Tapia contacted Judge David Stahl and advised him of the Complaint-Warrants before sending them to him for his review. (Deposition of Det. Sgt. Tapia, Exhibit "F" Page 119, Line 20-24).

*Relating to the paragraph immediately above. Plaintiff admits that Judge David Stahl signed off on the Complaint-Warrants but denies that Sgt. Tapia advised him of the woefully deficient investigation.*

52.     Judge Stahl signed off on the Complaint-Warrants on January 30, 2019. (Complaint-Warrant 1225-W-2019-000156, Exhibit "N"; Complaint-Warrant 1225-W-2019-000158, Exhibit "O").

*Relating to the paragraph immediately above. Plaintiff admits that Judge David Stahl signed off on the Complaint-Warrants but denies that Sgt. Tapia advised him of the woefully deficient investigation.*

53.      That same day, Det. Sgt. Tapia, Officer Lyszyk, and another officer drove to Paterson in an attempt to serve the Complaint /Warrants and to arrest Parks. (Deposition of Ofc. Lyszyk, Exhibit "C" Page 38, Line 24-25; Page 39, Line 1-3).

*Relating to the paragraph immediately above, Plaintiff admits that Sgt. Patia and PO Lyszyk and another officer drove to Patterson in an attempt to serve the improperly drawn up Complaint and Warrant which had been based on false and/or intentionally defective and misleading Affidavits of Probable Cause.*

54.      On February 4, 2019, Det. Quesada packaged the suspect's sneaker, water bottle, and vape pen in preparation to be sent to the NJSP for DNA analysis. (See WPD Vehicle/Property Description Report, attached hereto as Exhibit "R"; see also the Deposition of Det. Quesada, Exhibit "E" Page 29, Line 1-10).

*Relating to the paragraph immediately above, Plaintiff admits the facts asserted there and further notes that it was either willful error or wanton negligence to have filed the Affidavits of Probable Cause without having gotten the analysis back first and that it was either willful error or wanton negligence not to have ruled out Plaintiff as a suspect based on the fact that the suspect's sneaker was size 12 while Plaintiff's show size is a size eight.*

55.      It is standard procedure at the WPD that when several packages of evidence are ready for analysis, a WPD Officer physically transports the packages to the NJSP. (Deposition of Det. Quesada, Exhibit "E" Page 25, Line 12-18).

*Relating to the paragraph immediately above, Plaintiff admits the facts asserted there correspond to the testimony of the*

*witnesses for the Woodbridge Police Department.*

5 6 .        The NJSP is extremely backlogged with cases and requests for evidence analysis. It typically takes about four to six weeks for the fingerprint packages to be returned, either with a positive match or with no comparison. (Id. at Page 26, Line 1-10).

*Relating to the paragraph immediately above, Plaintiff admits the facts asserted there correspond to the testimony of the*

*witnesses for the Woodbridge Police Department but there was no other witness testifying to this fact. Plaintiff notes that*

*there was a delay of almost two weeks in submitting the evidence, that no request was made to expedite the processing, and*

*that there was no exigency related to the suspect to justify moving forward with no evidence.*

5 7 .        On February 5, 2019, Plaintiff presented to WPD Headquarters to address the active Complaint-Warrants against him and was placed under arrest without incident. (Director Hubner's Answers to Interrogatories, Exhibit "B"; see also the Transcript of the Deposition of Nijeer Parks, attached hereto as Exhibit "J" Page 34, Line 10-22).

*Paragraph 57 immediately above is false and misleading. Plaintiff called the Woodbridge Police Department after the*

*Woodbridge Police tried to serve him with an Arrest Warrant and Complaint at his grandmother's house. Plaintiff*

*advised them that he had had no involvement with the allegations contained therein, that he had never had a driver's*

*license, that he had never been in Woodbridge, that he had solid alibis, that he was unable to run and could not have*

the errors could be cleared up. Plaintiff was told explicitly that the misidentification would be cleared up.

58. Plaintiff was read the Miranda Warnings and Plaintiff signed a waiver of these rights. (See Miranda Warnings Card, attached hereto as Exhibit "S").

*Relating to the paragraph immediately above, Plaintiff admits the facts asserted there correspond to the testimony of the witnesses for the Woodbridge Police Department.*

59. While Plaintiff was in custody, he was booked, processed, and interviewed without incident. (Director Hubner's Answers to Interrogatories, Exhibit "B"; see also the Deposition of Parks, attached hereto as Exhibit "J" Page 35, Line 11-13; Page 40, Line 5-7).

*Paragraph 59 immediately above is false and misleading. Woodbridge Officer told Plaintiff was told there was no warrant – that they just wanted to question him. Id. p.27, 19 – 19. Plaintiff spoke to an officer, not a civilian. Id., p. 29, lines 17 – 21. Parks described what happened when he voluntarily had his cousin drive him to the Woodbridge Police Department: "I walked up to a desk, I talked to the lady at the desk. She asked my name. I gave her my ID. I gave her my paperwork. She told me that were waiting for me. She would go get them and she said she'll be right back: Id. p. 30, lines 15 - 23. Included in these papers were Plaintiff's medical records substantiating his recent ACL surgery which made it impossible for him to run and so being dispositive proof that he was not the actor. See Pirelli report as Exhbiit Q attached to Plaintiff's Opposition papers at 6. When she came back, she started talking to me. Me and her were having a conversation and two officers came up and asked me to put my hands behind my back and told that I was un arrest." Id. p. 30, lines 15 - 23. The lady at the desk was an officer. Id., p. 31 lines 4 – 11. Plaintiff was then taken to a room and left alone for 20 minutes. Occasionally, officers would come in and taunt Plaintiff. The officers refused to tell him what he was accused of - instead saying "you know what you did." Id p 34 lines 1 – 2. "They [the*

officers' general attitude, their manner and their words, and playing a scare game of mind games on me." Exhibit J. p. 36, lines 8 – 11. Officers were poking their heads in, expressing happiness and satisfaction and giving each others "high fives." P 39 line 1.   Officer continued coming in to gape at Plaintiff states "oh look at this f-cker….Oh we got him…This is the pr-ck right here." This is the A-hole right here. "Id. p. 41, lines 1 – 4. Plaintiff was nudged and pushed and treated rudely. Id. , 43 , lines 4  - 14. While being  verbally assaulted  Plaintiff's  cuffs were removed and he was being moved down the hallway to where a crowd of officers stood and which, to plaintiff, seemed outside of the  surveillance cameras. Id,  p 41, lines 1  - 11. Because Plaintiff senses and felt that he was about to be physically beaten, he feigned an asthma attack. Id. p. 41, lines 12  - 22.  The verbal abuse clearly included physical threats.  Plaintiff described their words: "Get the f-ck up. Come the f-ck with us. Hurry the f-ck up. Stop moving so damn slowly, we're going to give you something to move slowly for. "Id. p. 50  lines 17 – 20.  "Plaintiff told the EMTs that he "was scared for his life…and they basically stayed there until I was transported." Id.  55, lines 1 – 5. The verbal abuse and head games continued when Plaintiff was transported to the County jail. Id. pp146 – 149. Plaintiff's interrogation consisted in a the interrogator accusing Plaintiff and telling him that "there's sufficient evidence  to put you there [at the scene of the crime]. "See  Transcript of Voluntary Statement attached to Plaintiff's Opposition as Exhibit A.  Although Plaintiff had been arrested pursuant to a Criminal Complaint, he was not shown the Complaint and Warrant and Plaintiff was not informed exactly what he was being charged with.  Id. New Jersey law requires that "upon request, the officer shall shall show the warrant to the defendant as soon as possible." New Jersey Rules of Court, 3:3-3 ( c ).  Plaintiff was told the incident took place at the Hampton Inn on January 26, 2019,  and that it involved the suspect driving a Hertz Renta a Car.  Id. Plaintiff reiterated over and over that:

a.  "I've never been to Woodbridge so…" Parks Deposition,  p. 3, Exhibit J,  "Never been in Woodbridge …I haven't been to a hotel anywhere near this area…and anywhere near Middlesex County."

b.  I have no [driver's license] period.  I have my driver's permit inside my…wallet. Id. p. 5

c.  Plaintiff explained that he had never rented a car: "No, I can't rent a car without a license.:" Id.

so that he was unable to run and could not have fled the police at the Hampton Inn on January
26, 2019.

e.   Plaintiff had alibis for the entire day on January 26th - a basketball game with his two sons and
many other people that morning, being at his mother's house after the game, pp 5 – 8. .

Neither Detective Kondracki nor any other Woodbridge officer made any effort to corroborate or refute Plaintiff's

alibis and defenses. The only questioned posed to plaintiff was "about a blue Dodge Challenger, and I said I don't

even have a driver's license." Id. p. 58,. Lines 1 – 2. Plaintiff only learned what he was charged with a day or two

later when the Public Defender gave him a piece of paper with the charges prior to his initial hearing via Zoom

from the jail.  Id. p. 59. Plaintiff continued to experience the intimidation for the period of his confinement and

then from the Prosecutors until the matter was finally dropped in late 2019. Id.

59.       Officer Lee was called in to WPD Headquarters to determine if he could positively identify
Plaintiff as the suspect from the incident at the Hampton Inn. (Deposition of Ofc. Lee, Exhibit "D"
Page 24, Line 12-25; Page 25, Line 1-8).

Although there were as many as ten persons who had eye witnessed the actor at the Hampton Inn , the only identification

was an egregiously prejudiced  show up done by Patrolman F. Lee, #591.

On February 5, 2019, I was contacted , by Lt. Ng, who advised me that they currently had an
individual, Nijeer Parks, who was involved in the incident on January 26, 2019. I arrived at HQ
and was brought down to the processing area with Lt. Ng. and Det. Penicaro. Once there, I observed
Mr. Parks sitting on the rial and identified him as being the suspect from  January 26, 2019, incident
at the Hapmpton Inn on Rt. 9N.

Supplemental Report of Lee, page 3, 2/12/19, attached as Exhibit C, to Plaintiff's        Opposition papers.Det

Tapia testified that Lee's Identification did not accord with his training to ensure reliable identifications. Deposition

"5"11." Lee Deposition p. 18 line 17 – 23. Lee was called by Lt. Ng to come in to the precinct to ID Parks even though Lee was on his day off Lee was taken to the processing room where there is "a bench and then a railing behind the bench where a handcuff goes so prisoners are handcuffed to the bench." Lee Deposition, p. 26 lines 21 – 23. Exhibit E. Ng told PO Lee "that was the individual they had brought in from that incident." Lee Deposition, p. 27 line 24 to p. 26 line 1, Exhibit E. Parks was handcuffed and was sitting on a bench. Id, p. 28, lines 2 – 4. PO Lee did not get any closer than 20 to 30 feet from Parks. Although PO Lee had talked to the suspect at the Hampton Inn, had looked into the suspect's eyes, and had estimated him to be 5'11, he did not do any of these things when he identified Parks as the suspect ten days later. Id. 27 – 29.PO Lee admits that it was impossible for him to estimate Park's height since he was seated during the identification process. Id, p. 29. 5 – 10. Plaintiff admits that _____ Officer Lee was called in to WPD headquarters. However, he was told that "We have the guy and need you to ID him." This made the identification of Lee useless and without any probative value. _____ Moreover, plaintiff was seated on a bench, handcuffed to the rail. This further prejudiced the show up and also precluded PO Lee from observing that Plaintiff was 5"7 and not over 6 ft as the suspect was described. _____

61.Officer Lee observed Plaintiff while he was handcuffed to a bench in the booking area. Officer Lee identified Plaintiff as the suspect that he interacted with at the Hampton Inn on January 26, 2019. (Id. at Page 29, Line 15-20; see also Director Hubner's Answers to Interrogatories, Exhibit "B").

Plaintiff denies that the identification made by Lee was proper or competent. Rather, it was done in very improrper manner and the identification was without any probative value. See response to 60 above.

fell to the floor because he believed that he was going to be assaulted by officers. (Deposition of Parks, Exhibit "J" Page 41, Line 12-22).

*Plaintiff admits the facts asserted above and reiterates that verbal abuse and threats along with petty physical indignities like being pushed, along with the refusal to provide him a copy of the warrant and complaint made his fear of assault well founded.*

62.  The officers present helped Plaintiff off the floor, sat him on the bench, and called for EMTs to respond. (Id. at Page 41, Line 20-22).

*Plaintiff admits the facts stated immediately above.*

63.  While Plaintiff was in the custody of the WPD, he was never subjected excessive force, and conceded multiple times that none of the officers present touched Plaintiff in any kind of aggressive manner. (Id. at Page 35, Line 11-13; Page 36, Line 8-11; Page 44, Line 18-23; Page 49, Line 19-22).

*False. The force experienced by Plaintiff was excessive under the circumstances.*

64.  After the EMTs finished treating Plaintiff, he was transported to the Middlesex County Jail without incident. (Id. at Page 58, Line 10-12).

*Plaintiff continued to be threatened by the transporting police and by the receiving Corrections Officers because Plaintiff had attempted to assault an officer.*



65. Plaintiff was released from the Middlesex County Jail on February 13, 2019 after being held for eight days. (Id. at Page 119, Line 2-15).

*Paragraph 65 is accurate.*

66. The fingerprint and DNA evidence was received by the NJSP on February 8, 2019. (See Request for Latent Fingerprint Examination, attached hereto as Exhibit "L"; see also NJSP DNA Evidence Receipt, attached hereto as Exhibit "W" Bates stamped PARKS000174). \

*Paragraph 66 is consistent with the records and testimony in the case.*

67. The fingerprint evidence was analyzed on February 14, 2019 and returned to the WPD on February 22, 2019 with information that the fingerprints belonged to an individual named Barrington Walker. By this point, Plaintiff had already been released from custody. (Request for Latent Fingerprint Examination, Exhibit "L"; see also WPD I.D. Bureau Suspect Report, attached hereto as Exhibit "X").

*Paragraph 66 accurately relays that the finger print evidence was analyzed on February 14, 2019, and was returned to the Woodbridge Police on February 22, 2019, and identified the suspect as Barrington Walker. In gross violation of their obligations, Defendants made no update to their investigation of the incident and, upon information and belief, never forwarded this evidence to the Middlesex Prosecutor and / or the court so that the wrongful prosecution continued until the end of November 2019 when it was dismissed on the eve of trial.*

68. This identification was of little to no evidentiary value, as the only fingerprints suitable for analysis were recovered from the common door of the Hampton Inn lobby and it was unknown where the suspect physically touched the door. (Deposition of Det. Sgt. Tapia, Exhibit "F" Page 121, Line 6-11).

*Paragraph 68 is false and is a post facto attempt to excuse the wrongful conduct of defendants.   If this were true, why would the print have been taken and submitted for testing?   Clear testimony indicated that the suspect had opened the glass door with his hands on the glass, not using the handle.  This fact alone made the print highly probative and relevant.*

69. The DNA evidence received by the NJSP laboratory was analyzed on April 17, 2019. (NJSP DNA Evidence Receipt, Exhibit "W" Bates stamped PARKS000175).

*Paragraph 69 is consistent with the records and testimony in the case.*

70. The NJSP was not able to obtain any DNA from the sneaker, but did collect DNA from the water bottle. However, the DNA from the water bottle did not result in a match to a suspect. (Deposition of Det. Quesada, Exhibit "E" Page 39, Line 13-24).

*Paragraph 70 appears to be consistent with the records and testimony in the case.*

71.October 18, 2019, DNA analysis complete but no match made. (See the NJSP DNA Laboratory Report, attached hereto as Exhibit "Y").

*Paragraph 71 appears to be consistent with the records and testimony in the case.*

72. On January 24, 2020, the New Jersey Attorney General told state prosecutors that police officers should stop using the Clearview AI facial recognition app. (Report of Defense Expert Maj. Craparotta, Exhibit "U" Page 26).

*Paragraph 72 is not a fact in evidence in this case but is an assertion in the defense expert report.*

73. Plaintiff initiated the subject lawsuit with the filing of a Complaint with the Superior Court of New Jersey on November 25, 2020. (See Docket No. PAS-L-003672-20, Transaction ID LCV20202148483).

*Paragraph 73 is accurate.*

74. On January 15, 2021, Plaintiff amended his Complaint. (See Docket No. PAS-L-003672-20, Transaction ID LCV2021117384).

75. On March 3, 2021, the Woodbridge Defendants removed this matter to the New Jersey District Court. (ECF No. 1).

*Paragraph 75 is accurate.*

76. On April 23, 2021, a Motion to Dismiss Plaintiff's Complaint was filed on behalf of the Middlesex County Prosecutor's Office Defendants. (ECF No. 3.) This Motion was terminated on May 27, 2021 and Plaintiff was permitted to amend his Complaint. (ECF No. 15).

*Paragraph 76 is accurate.*

77. On June 1, 2021, Plaintiff filed his First Amended Complaint. (ECF No. 16). On June 22, 2021, the Middlesex County Prosecutor's Office Defendants refiled their Motion to Dismiss Plaintiff's Complaint. (ECF No. 19).

*Paragraph 77 is accurate.*

78. On July 23, 2021, the Woodbridge Defendants filed a Motion for Judgment on the Pleadings. (ECF No. 24).

*Paragraph 78 is accurate.*

79. On July 30, 2021, after further analysis the NJSP determined that the DNA from the water bottle belonged to Barrington Walker. (Deposition of Det. Quesada, Exhibit "E" Page 40, Line 14-18; see also the NJSP CODIS Investigative Hit Notification, attached hereto as Exhibit "Z").

*Paragraph 79 is accurate.*

80. On May 26, 2022, Plaintiff filed a Motion to Amend the Complaint (ECF No. 24) and the dispositive Motions referenced above were administratively terminated pending resolution of Plaintiff's request to amend the Complaint. (ECF No. 51).

*Paragraph 80 is accurate.*

81. Plaintiff's Motion was granted in part (ECF No. 69) and Plaintiff filed his Second Amended Complaint on October 7, 2022. (ECF No. 72).

82. On November 4, 2022, Plaintiff voluntarily dismissed his claims against the Middlesex County Department of Corrections. (ECF No. 76).

*Paragraph 82 is accurate.*

83. On December 19, 2022, the Middlesex County Prosecutor's Office Defendants refiled their Motion to Dismiss Plaintiff's Complaint. (ECF No. 80).

*Paragraph 83 is accurate.*

84. On July 27, 2023, Plaintiff voluntarily dismissed his claims against the Middlesex County Prosecutor's Office. (ECF No. 103).

*Paragraph 84 is accurate.*