<u>Plaintiff's Supplemental Statement of Disputed Material Facts</u>

*Nijeer Parks's Was Traumatized by His "Twilight Zone: Experience*

1. Nijeer learned about Woodbridge's interest in him when his grandmother whom he was living with to care for as she died of cancer called him, "scared half to death…and said that there's a whole bunch of police here. What did you do?" Parks Deposition, p. 16, lines 16 – 19. Exhibit J to moving papers of Defendant.

2. Nijeer called Patterson Police and was told that there was a warrant out for him by Woodbridge. Id. p. 17, lines 5 – 25.

3. Nijeer then called the Woodbridge Police Department and learned that it was "an incident at the hotel" was told to call back in the morning at which time, he was told:"…and a lady, …told me that, oh, it's a formality to come in, show us that that oh it's just a formality to come in, show us that you weren't the person we're looking for, bring ID, some paperwork and stuff like that." Id p. 17, lines 12 – 22. Exhibit J.

4. Woodbridge Officer told Plaintiff was told there was no warrant – that they just wanted to question him. Id. p.27, 19 – 19.  Plaintiff spoke to an officer, not a civilian. Id., p. 29, lines 17 – 21.

5. Parks described what happened when he voluntarily had his cousin drive him to the Woodbridge Police Department: "I walked up to a desk, I talked to the lady at the desk. She asked my name. I gave her my ID. I gave her my paperwork. She told me that were waiting for me. She would go get them and she said she'll be right back: Id. p. 30, lines 15 - 23.

6. Included in these papers were Plaintiff's medical records substantiating his recent ACL surgery which made it impossible for him to run and so being dispositive proof that he was not the actor. See Pirelli report as Exhbiit R  attached to Plaintiff's Opposition papers at 6

7. When she came back, she started talking to me. Me and her were having a conversation and two officers came up and asked me to put my hands behind my back and told that I was un arrest." Id. p. 30, lines 15 - 23.  The lady at the desk was an officer.  Id., p. 31 lines 4 – 11.

8. Plaintiff was then taken to a room and left alone for 20 minutes.  Occasionally, officers would come in and taunt Plaintiff. The officers refused to tell  him what he was accused of -  instead saying "you know what you did." Id p 34  lines 1 – 2.

9. "They [the officers] got aggressive like with their manner, like with their words, like trying to scare me, but no one put their hands on me." Id. p. 36, lines  8 – 11.

10. Officers were poking their heads in,  expressing happiness and satisfaction and giving each others "high fives." P 39 line 1.   Officer continued coming in to gape at Plaintiff states "oh look at this f-cker….Oh we got him…This is the pr-ck right here."  This is the A-hole right here. " Id. p. 41, lines 1 – 4.

11. Plaintiff was nudged and pushed and treated rudely.  Id. , 43 , lines 4  - 14.

12. While being  verbally assaulted  Plaintiff's  cuffs were removed and he was being moved down the hallway to where a crowd of officers stood and which, to plaintiff, seemed outside of the  surveillance cameras. Id,  p 41, lines 1  - 11.

13. Because Plaintiff senses and felt that he was about to be physically beaten, he feigned an asthma attack. Id. p. 41, lines 12  - 22.

14. The verbal abuse clearly included physical threats.  Plaintiff described their words: "Get the f-ck up. Come the f-ck with us. Hurry the f-ck up. Stop moving so damn slowly, we're going to give you something to move slowly for. " Id. p. 50  lines 17 – 20.

15. "Plaintiff told the EMTs that he "was scared for his life…and they basically stayed there until I was transported." Id.  55, lines 1 – 5.

16. The verbal abuse and head games continued when Plaintiff was transported to the County jail. Id. pp146 – 149.

17. Plaintiff's interrogation consisted in a the interrogator accusing Plaintiff and telling him that "there's sufficient evidence  to put you there [at the scene of the crime]. " See  Transcript of Voluntary Statement attached to Plaintiff's Opposition as Exhibit A.

18. Although Plaintiff had been arrested pursuant to a Criminal Complaint, he was not shown the Complaint and Warrant and Plaintiff was not informed exactly what he was being charged with.  Id.

19. New Jersey law requires that "upon request, the officer shall shall show the warrant to the defendant as soon as possible." New Jersey Rules of Court, 3:3-3 ( c ).

20. Plaintiff was told the incident took place at the Hampton Inn on January 26, 2019, and that it involved the suspect driving a Hertz Renta a Car.  Id.

21. Plaintiff reiterated over and over that:

    a.  "I've never been to Woodbridge so…" Parks Deposition,  p. 3, Exhibit J, "Never been in Woodbridge …I haven't been to a hotel anywhere near this area…and anywhere near Middlesex County."

    b. I have no [driver's license] period.  I have my driver's permit inside my…wallet. Id. p. 5

    c. Plaintiff explained that he had never rented a car: "No, I can't rent a car without a license.:" Id.

    d. Plaintiff explained and presented the hospital records that he had recently had surgery on his ACL so that he was unable to run and could not have fled the police at the Hampton Inn on January 26, 2019.

    e. Plaintiff had alibis for the entire day on January 26th - a basketball game with his two sons and many other people that morning, being at his mother's house after the game, pp 5 – 8. .

22. Neither Detective Kondracki nor any other Woodbridge officer made any effort to corroborate or refute Plaintiff's alibis and defenses.

23. The only questioned posed to plaintiff was "about a blue Dodge Challenger, and I said I don't even have a driver's license." Id. p. 58,. Lines 1 – 2.

24. Plaintiff only learned what he was charged with a day or two later when the Public Defender gave him a piece of paper with the charges prior to his initial hearing via Zoom from the jail.  Id. p. 59.

25. Plaintiff continued to experience the intimidation for the period of his confinement and then from the Prosecutors until the matter was finally dropped in late 2019. Id.

26. During this period awaiting prosecution, Plaintiff was threatened with 20 years in prison as the Prosecutor sought to get Plaintiff to accept a plea of five years in jail.

27. Plaintiff described his mental distress:

> Overall, it's been a very stressful moment, very stressful time. Life I've been in trouble before but for things that I di so now for being in trouble for something that I didn't do that I had no knowledge about. It's like changed my outlook on police. Like definitely afraid of them now that I

don't have to do anything to actually be charged or be in trouble for anything. It's just scary man. : Id. p 56, lines 18  to page 89 line  4.

28. Plaintiff is self-medicating for his anxiety with marijuana. Id. p. 91 lines 1 – 5.

29. Plaintiff describes anxiety attacks when he encounters police.  Id p. 91, lines

10 to page 92 line 5.

30. Plaintiff further explained:

> …this time it was different because it's like I really had no clue on what was going on. I just was lie- I felt like I was like in outer space, like out of body experience because …I'm really afraid off being involved in the system or any type of way now.

Id. p. 9323 to p. 94 line 6.

31.  In addition to anxiety, plaintiff reports feeling depressed.  Id. p. 94 line 10.

32. At the time of his deposition, plaintiff was seeking help for his anxiety and

depression from mentors- his football coaches, his father, etc. Id. p. 95 lines 3

– 11.

33. Dr. Pirelli has diagnosed Plaintiff with Post Traumatic Stress Disorder and had

given a guarded prognosis. See infra and Exhibit R attached to Plaintiff's

Opposition papers.

### Clear Rush to Judgement and Disregard of All Normal Procedures

34. On January 27, 2019, Inv. Tapia, the lead detective submitted a "Request for Facial

Recognition form to the NJ ROIC Facial Recognition Initiative See Exhibit T to the Moving

Papers of Defendant.

35. This is an initiative of the New Jersey State Police and it "serves as New Jersey's primary focal point for information sharing and intelligence production needed to support law enforcement, counter terrorism, and homeland security missions." [1]

36. The mission statement of the NJROIC is as follows:

> The NJ ROIC partners with federal, state, and local entities to collect crime, threat, and disaster related information, conduct analysis, develop intelligence products, and provide timely and relevant alerts, warnings, and notifications to law enforcement, public safety and private sector entities to strengthen preparedness, prevention, enforcement, investigative, response, and resiliency efforts.

37. At the top of the form itself, there is a prominent disclaimer about the limitations of facial recognition technology:

> If the NJ ROIC Facial Recognition Initiative produces a possible match, this should only be considered an investigative lead. Further investigation is needed to confirm a possible match through other investigative corroborated information and/or evidence.

Id.

38. This disclaimer ends with the following sentence in oversized bold italics and in all caps:

> *INVESTIGATIVE LEAD NOT PROBABLE CAUSE TO MAKE AN ARREST.*

Id

39. In the reason for the request, Det. Tapia recounted the incident and noted that "we found evidence suggesting that he, [the suspect], may be from the Bronx. NY. Id.

40. Tapia further stated:

> I attached a copy of the fake driver's license. The officers are certain the picture on the driver's license is of the suspect.

---

[1] https://www.nj.gov/njsp/division/investigations/njroic.shtml

6

Id.

41. Inv. Seamus Lyons of the Rockland County NY Cetner, ROIC initiated the Facial Recognition, response to a bulletin circulated by Det Tapia.

42. A copy of the Bulletin was not produced in discovery from defendants but was produced by the ROIC in response to a subpoena duces tecum and is attached to Defendant's papers as Exhibit Q.

43. Lyons understood that an aggravated assault had taken place where "an officer was nearly struck or was injured during the incident" based on the Bulletin.  Id. p. 41, lines 10 - 11.  "My understanding that an officer was injured." Id. p. 55 line 22 -23. See also Id 55 lines  10 -23. ,  Id. p. 56 lines  5 – 11.

44. The email exchange between Detective Tapia communicates that the  investigators were highly motivated because the suspect was wanted for an aggravated assault on an officer.   Email exchange attached to Plaintiff's Opposition as Exhibit Theta,Θ.

45. Inv. Lyons forwards the ""good possible hit" to Tapia who says "that's him." [sic]. Lyons responds "Excellent!!!!!!!! How is the officer? Is he OK?" Id.

46. The Bulletin noted that a receipt had been found in the crime vehicle from that same morning from a Dunkin Donuts in the Bronx. Id.

47. Also attached to Exhibit Q is the Facial Recognition Report.

48. See also Lyons Deposition, p. 36, lines 7 – 11... Exhibit I to Defendant's papers.

49. According to Lyons, "the process itself [that is the search] probably took less than 15 or 20 minutes." Id. p. 39 lines 16 – 17.

50. Lyons described the search:

> This was very basic. Like I said, we took the image, we submitted it, we did get a return. There were two photos…with images. There was a resemblance, there some characteristics that did match enough for us to be in agreement where we would provide Woodbridge the information as a possible lead.

Id. p. 38 line 22 to p 39 line 3.

51. Lyons asserted  that "a facial recognition hit is a photo array, or show up or any other allowable identification process but is  "just a tool to look further into the investigation." Id p 74 line 20 to p. 75  line 1.

52. Inv. Lyons testified that he was aware of the concerns that Facial Recognition Technology is racist. Id. p 79 – 80.

53. Further, Lyons confirmed that he had "altered the pixels," in the photo from the fake license: "Yes, I sued facial recognition soft ware but altered the photo on the license a little to get the pixels clear."   Email exchange attached to Plaintiff's Opposition as Exhibit F.

54. At 9:16 am,  Tapia says :  "That's him. [sic]. Thank you and Sgt. Dey for your help." " Id.

55.  Inv Lyons responds almost immediately at 9:17.  "Excellent!!!!!!!!!!!  How is the officer? Is he ok?  Id.

56. Tapia, a few minutes later at 9:24 responds: "Yes, he's fine.  How did you guys ID him?  Facial recognition through NYSIC or the ROIC?  Id

57. Inv.Lyons ends the discussion at 9:29 am :

> Good news. Yes, I used facial recognition software but altered the photo on the license a little to get the pixels clear.  Got a high number hit and he is a Patterson NJ guy. We have facial recognition here at the Rockland County Intel Center. …"

*Id.*

58. Despite the speed and the confidence of Det Tapia, which Lyons did nothing to tamp down,  Inv. Lyons further explained that all that the ROIC does is provide "a possible lead."  His role, at the ROIC, "ends pretty much when we provide you with a possible lead."   Lyons Deposition, p. 72 lines  8 – 9. . p. 39 lines  12, Exhibit I to Defendant's papers.

59. Lyons expanded saying that the results given to Tapia were " possible lead…a possible learning tool only. It's up to the investagor [at the receiving agency] to determine or take any lawful action.

Id. p 30 lines 6 – 10.

60. Inv. Lyons was asked what weight Tapia should have given his report and he testified:

> My experience is, it's a learning tool. It's a stopping stone to go on. He, let me obtain more images. Let me dig a little deeper into the background. There are investigative steps you have to take.

Id. p. 71 lines  8 – 12.

61. Inv. Lyons' asserted that altering the pixels did not affect the accuracy of the findings. Id. pp 77 – 78, however, the academic literature asserts the contrary for searches based on altered images.  See, for example,  Garvie, Claire,  Georgetown Law, Center on Privacy and Technology,   *Garbage In, Garbage, Out,* 2017/ https://www.flawedfacedata.com/

62. Studies have shown that using technology to improve the resolution of a photo with poor resolution "degrades accuracy." Flynn, Partirck J, University of Notre Dame, Prieto, Loreto, Pontificia Universidad Católica de Chile, *Face Recognition in Low Quality Images: A Survey,* April 2019,  page 15. https://arxiv.org/pdf/1805.11519.pdf

63. The hit that Lyons got  had an accuracy number of 594 out of 1000. See Facial Recognition Report,  page eight of Exhibit Q.

64. Inv. Lyons discussed this report. Lyons Deposition at p.53, lines 15 – 18. P. 54 lines 4 – 5.   Lyons explained that 594 "It's a probable. It's not a very high number, but it's worth a second look." Id. 53, lines  21 – 23.

65. After the hit, a criminal history was run by Lyons showed that the Nijeer Parks was from Patterson, NJ and did not appear to have any ties to the Bronx or NY City. See report attached Additional Inquiry Response as part of Defendant's Exhibit Q.

66. The report also indicated that Nijeer Parks was  5'7 and was 145 lbs.

67. Lyons emailed the results to Det Tapia at 8:40 am, on January 28, 2019, Id. p. 68, line 3 – 7. "Good possible hit on facial recognition."

68. The fraudulent license that was used as a basis of the search, and which the defendants assert  eyewitnesses said was the likeness of the actor,  indicated that the carrier of the license was six feet and two inches tall.  Exhibit Q to Defendant's moving papers.

69. A half hour after Lyons emailed Det. Tapia at 8:40,   Det Tapia responded: "That's him. Thank you and Sgt. Dey for your help. [sic]." Tapia Deposition, p. 69 lines 22 to 24, Attached as Exhibit F to Defendants' moving papers.

70. Inv. Lyons understood this to mean that Tapia  had "made a decision  that this was, indeed, the subject he was looking for." Lyons Deposition, Exhibit  I, p. . 70 lines 4 – 6.

71. Det Tapia  became  aware  of  Facial  Recognition  Technology  while  on  loan  to the  auto task force of the NJ State Police.  Deposition of Tapia, p. 45.

72. Det Tapia used Facial Recognition with the Auto Task Force but never used it as a basis for probable cause.  Tapia Deposition page 51, lines 5 – 8.

73. Det Tapia described how Facial Recognition was used by the Task Force when it was zeroing in on suspects who had been identified by other leads as well as competent evidence, intelligence from informants.   Tapia Deposition, pp 49 – 50.

74. Det Tapia, however, admitted having received the AG Memo from the County Prosecutor banning Clearview Technology  because it was racist.  Tapia Deposition. P. 53 line 12 p 54  21.

75. Det. Tapia was aware of no policy  or instructions from anyone governing Facial Recognition Technology.  Tapia Deposition,  p. 53.

76. Det Tapia has continued to use Facial Recognition Technology after this case!  Tapia Deposition, p. 52, lines 12  - 13.   Exhibit

77. Det Tapia asserted that he had no knowledge of Nijeer Parks height or shoe size (5'7 and size shoe size,  8, despite this being on the criminal history report he received with the Facial Recognition results. . Tapia deposition  p. 80 lines 18 – 24.

78. Det Tapia also professed ignorance of the fact that the record indicated that Barrington Walker was tall, over 6'1". p. 80 , line 9 – 12.

79. Det Tapia did not recall doing  a license plate search to find out where the suspect vehicle had been on the day in question.  Tapia Deposition p. 84  lines 11 – 13. None was produced Tapia Deposition 84 – 85.

80. Det Tapia had no knowledge of that the hit was 594 out of 1000 stating that "I don't work the software, I've never worked the software, so I don't know how it works." Tapia Deposition, p. 94 lines  5 – 7.

81. Det Tapia never bothered to inquire about what it meant to "have altered the pixels." Tapia Deposition, p. 93 lines  10 – 14.  Exhibit F.

82. Det Tapia asserts that line up safeguards are never used for police officer identifications asserting that police officers, unlike the rest of humanity, are immune from suggestive and prejudicial data.   Tapia deposition,  pp 101 - 106.   Exhibit F.

83. Det Tapia testified that he was unconcerned by Plaintiff's assertion that he had never been in Woodbridge before voluntarily coming down to the police station, that he had never had a driver's license, that he solid alibis for the day in question.  Tapia Deposition  pp 107 – 108.

84. Det Tapia was not concerned that Plaintiff had had surgery for a torn ACL several months before the incident which made it impossible for him to run.  Tapia Deposition, p. 109  lines 1 – 6.

85. Det. Tapia himself concluded that the ROIC picture of Nijeer Parks matched the picture on the false license place and asserted in his deposition that he, Tapia, showed PO Lyszyk the picture of NIjeer Parks from the ROIC and that Lyszk positively identified it.   Tapia Deposition, p.  112  line 19 to p. 113.

86. Det Tapias response indicated he failed utterly to consider the evidence that the actor was tall but Plaintiff short.  Tapia Deposition, pp 125 – 126

87. Det Tapia admitted that none of the officers involved (Lee, Lyszk, Quesada, Tapia) were black.  Tapia deposition, pp 145 -146,  Exhibit F.

88. Det Tapia never questioned any of the eyewitnesses other than the manager Dones.  Tapia Deposition, page 146.

89. PO Lyszyk also testified in his deposition that he had looked at the Facial Recognition hit when Tapia received it from the ROIC.  Lyszyk Deposition at p.29 lines 16 to p. 30 line 8, Exhibit C to Defendant's papers.

90. However, PO Lyszyk acknowledged that there was nothing in his report to even suggest that he, Lyszyk had viewed the facial recognition hit and confirmed that it corresponded to the actor but attributed it to "bad report writing" rather than perjury. Id. p. 30 line 8.  Id.

91. Moreover, Det. Tapia's own report conspicuously omits any mention of having PO Lyszyk made the identification:

> On January 27, 2019, I received notification from Investigator Seamus Lyons (Rockland County Sheriff's Intelligence Center) and Sgt. Dey (Palisades Interstate Parkway Police) that they had a high profile comparison to the picture of the fraudulent Tennessee driver's license. The suspect was identified as Nijeer Parks with a date of birth of September 11, 1987, with a last known address of 485 E. 19th Street,. Apt #3G, Paterson, NJ. I compared the photo on the fraudulent Tennessee driver's license to Nijeer' Parks' assigned New Jersey Driver's license # …..and it is the same person.  Inv. Seamus Lyons emailed me the Identification Report for evidence.

Tapia Report,  2/5/19, p 3, Exhibit E. .

92. While PO Tapia makes no mention of PO Lyszyk  identifying Nijeer Parks, he does explicitly state that he had PO Lyszyk identify the image on the Tennessee Driver's license as the actor. "I verified with Officer Lee and Officer Lyszyk that the picture on the fraudulent Tennessee driver's license was the picture of the suspect." Id.

93. Moreover,  PO Lyszyk own contemporaneous report makes no reference at all to having identified the photo.  Indeed,  the report clearly narrates that no such identification was made:

> Det.  S. Tapia advised me that he sent out the picture of the suspect to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) for facial recognition.  On January 27,  he received  notification from Investigator  Seamus  Lyons  (Rockland  Cunty  Sheriff's Department Intelligence Center)  and Sgt.  Dey (Palisades Interstate Parkway Police) that they had a high profile comparison

to the picture on the fraudulent Tennessee driver's license. The suspect was identified as Nijeer Parks. As a result, I signed a complaint for the following charges…..

Lyszyk Report of 1/30/19, p. 3. Exhibit D.

94. Lyszk's only familiarity with facial recognition technology is from watching the TV show, NCIC. Lyszk Deposition, page 23, Exhibit C of Defendants moving papers.

95. PO Lyszk had not been aware that the technician had altered the pixels on the picture he used to search for a facial recognition hit. Lyszk deposition, page 31, line 17 – 20.

96. PO Lyszyk admitted that he believes that altering the pixels would reduce the reliability of a facial recognition hit. Id, page 31 lines 21 – 25.

97.  Lt. Joseph Licciardi was PO Lyszyk's  supervising officer at the relevant time and signed off on this Reports,   Exhibit D attached to Plaintiff's Opposition papers, at three of three.

98. Lyszyk's Answers to Interrogatories also asserts that "Lt. Licciardi approvided  the Incident Report filed by Police Officer Andrew Lyszyk.  Exhibit A to Plaintiff's Opposition papers, at 1b.

99. Lyszyk's report describes in straightforward fashion that the only basis for him signing an Affidavit of Probably cause  and a Criminal Complaint was the facial recognition report from the ROIC.

100.      Lt. Lyszyk utterly failed to exercise appropriate supervisory oversight which would have immediately respond to  this biased rush to judgment and to insist on that an actual an appropriate investigation be conducted. See, for example, the

discussion infra of Lt. Detective Commander Ralph Cilento, and his report attached as Exhibit V to Defendants' moving papers.

101.     Lt. Licciardi also failed to review the Affidavit and the Complaint. Id.

102.     Det Tapia showed the fraudulent TN license to Michael Dones, the rental car manager, but did not show him the picture of Nijeer Parks "because I would have to do a photo array with him....because he's a civilian....At that point, I didn't think it was necessary." Tapia Deposition, p. 113 lines 14 – 20. Exhibit F.

103.     Det Tapia was unable to explain why he did not have to do a photo array to have Dones identify the picture on the TN license. Tapia Deposition, p. 114.   "I just didn't" Id line 16.  Exhibit F.

104.     Det. Tapia took less than 41 minutes to conclude that the Facial Recognition Hit had "solved the case:" the email from Inv. Lyons was sent at 8:40 on 1/28/19 and at 9:16 Tapia says, "That's him." [sic]. . See Exhibit Z attached to Defendant's moving papers.   "See attached PDF regarding your PD Police Information flyer Aggravated Assault on a Police Officer.  Good possible hit on facial recognition" *Id.*

105.     PO Lee was a responding officer at the scene.  See Lee Report attached as Exhibit BB to Defendant's moving papers.

106.     Although PO Lee'ss report purports to have been written on January 216, 2019, it identifies Nijeer Parks,     4 85 E. Main Street, Woodbridge, NJ, as the suspect. Id, page two.

107.     PO Lee testified that he wrote his report on January 26, 2019, the day of the incident. *Id.*

108.     When questioned about the fact that he report identified the suspect as

Nijeer Parks, he conceded that he had not put that in his report. "I did not put that

[the name of Nijeer Parks] in the report."  Lee deposition at p. 19 6 – 18.

109.     PO Lee speculated that a Detective might have put it into his report. Id at

line s 21  - 22.

110.      Although there were as many as ten persons who had eye witnessed the actor at the

Hampton Inn , the only identification was an egregiously prejudiced  show up done by

Patrolman F. Lee, #591.

> On February 5, 2019, I was contacted , by Lt. Ng, who advised me that they
> currently had an individual, Nijeer Parks, who was involved in the incident
> on January 26, 2019. I arrived at HQ and was brought down to the
> processing area with Lt. Ng. and Det. Penicaro. Once there, I observed Mr.
> Parks sitting on the rial and identified him as being the suspect from  January
> 26, 2019, incident at the Hapmpton Inn on Rt. 9N.

Supplemental Report of Lee, page 3, 2/12/19, attached as Exhibit Δ, Delta, to Plaintiff's

Opposition papers.

100.Det Tapia testified that Lee's Identification did not accord with his training to ensure

reliable identifications. Deposition at p. 29 line 1  - 8. Exhibit F.

101. PO Lee who is 5'6 was an eye witness who  testified that  the  suspect was

"5"1l."  Lee Deposition , Exhibit D to Defendants' papers, p. 18 line   17 – 23.

102. Lee was called by Lt. Ng to come in to the precinct to ID Parks even though Lee

was on his day off  Lee was taken to the processing room where there is "a bench

and then a  railing behind  the bench where a handcuff goes so prisoners are

handcuffed to the bench." Lee Deposition, p. 26 lines  21 – 23.  Exhibit D.

103. Ng told PO Lee "that was the individual they had brought in from that incident." Lee Deposition, p. 27 line 24 to p. 26 line 1, Exhibit D.

104. Parks was handcuffed and was sitting on a bench. Id, p. 28, lines 2 – 4.

105. PO Lee did not get any closer than 20 to 30 feet from Parks. Id. line 6.

106. Although PO Lee had talked to the suspect at the Hampton Inn, had looked into the suspect's eyes, and had estimated him to be 5'11, he did not do any of these things when he identified Parks as the suspect ten days later. Id. 27 – 29.

107. PO Lee admits that it was impossible for him to estimate Park's height since he was seated during the identification process. Id. p. 29. 5 – 10.

108. Det Quesada admitted that he had never sworn out an Affidavit of Probable cause based on a photo id alone. Deposition of Quesada Exhibit E. p 58 line 25 to p. 59 line 4 exhibit E

109. The Defendant police officers and detectives from all appearances ignored all of the other evidence including:

- A size 12 sneaker that had come off the suspect as he ran. (See picture attached to Plaintiff's papers as Exhibit L).

- The Sprint Sim card found in the rental car (Subscriber Identity Module (SIM) cards store various information, including your phone number, contacts, and text messages. It also holds data identifying your network, such as your number and the authentication key used to access it)

- video surveillance footage of the hotel.

- The Hertz rental car had been leased out of a New York office.

- The Dunkin Donuts receipt recovered from the car indicated that the driver had been in the Bronx on the morning of January 26th. Picture of receipt attached to Plaintiff 's papers as Exhibit M.

- The positive fingerprint report identifying Barrington Walker as the suspect which had been made on February 14, 2019. See CJIS 2000 Exhibit I

- The time line for the finger prints is notable: prints   were lifted by ID Detective Quesada on the day of the incident, that is January 26,  which was submitted to the State Police Lab on or about February 8, 2019. See Request for Latent Fingerprint Examination part of  Exhibit I. The delivery was 12 days after they were obtained, ten days after the Warrant and Compliant were issued, and three days after Plaintiff was arrested.

- The Fingerprints were processed by Defendants two years later  on January 22, 2021!  See ID Bureau Suspect Report attached to Defendant's moving papers as Exhibit  M.

- The exonerating evidence offered by plaintiff- that he had never been to Woodbridge, never had a driver's license, never rented a car, and had presented various alibis for the time of the event. See transcript of interrogation at Exhibit N attached to Plaintiff's Opposition.

- The fact that Plaintiff was recovering from surgery for his ACL which made it an impossibility that he had run from defendants.

110. Det. Quesada testified that the print was "an exact match to the left palm impression of Barrington Walker." Deposition of Quesada, Exhibit E, p. 34  23 – 25.

111.  Quesada said this had 100% reliability. Id p. 37 line 2.

112. Although the lab completed the analysis of the fingerprints and identified Barrington Wlaker as the actor on or about February 14, 2019, (See Exhibit I attached to Plaintiff's Opposition),  these prints were not processed by the defendants until almost two years later on January 22, 2021! See ID Bureau Suspect Report attached to Defendant's moving papers as Exhibit M.

113.  Other important evidence showing that Barrington Walker was indeed, the actor include his New York connections and his height, being over six feet tall. See Barrington Walker documents at Exhibit J.

114. Det Quesada's testimony that the prints were not processed for two years because they were taken from a common doorway is not comprehensible. Exhibit E,  Id. p. 38 lines 2 - 7.

115. The eyewitness accounts relayed that the suspect had fled through that door and had pushed his hands against the glass rather than using the handle which was the reason the door was secured and prints were lifted.

### The Deficient and Materially False Affidavits of Probable Cause

116.  The Complaint and Warrant signed by Tapia are attached to Defendants' moving papers at Exhibit N and the Complaint and Warrant signed by Lyszk are at Exhibit O of Defendants' moving papers.

117. The Affidavits of Probable Cause and the Criminal Complaints were all created by Lyszyk and Tapia at the same time and they immediately  went with Detective Gones to drive to Patterson to arrest plaintiff.  Lyszyk deposition,  Lyszyk deposition, p. 41, lines  8 – 15.

118. PO Lyszyk's Affidavit of Probable Cause stated: "While investigating a shoplifting of $39 worth of merchandise at the Hampton Inn, the hotel manager, Richard Charneco, advised us that Parks was the suspect."   Affidavit at p 11, Exhibit O.

119.   In his deposition,  Lysyzyk admitted that this statement was a material falsehood false.  Depostion of Lyszk at p. 57 lines 8 – 11. Exhibit C.

120. Moreover, the use of Nijeer Parks name throughout the Lyszyk Affidavit- from the very first line and throughout the Affidavit.  See Exjhibit O to Defendants' moving papers.

121. PO Lyszk's Affidavit attributes the identification to the Hertz Manager,  Richard Charneco, then refers to the actor throughout as Nijeer Parks, and at the end notes the Facial Recognition search which seems to be presented as confirmation of the identity provided by Charneco. Id.

122.  Det Tapia's Warrant is also categorically false in that the Preliminary Law Enforcemnt Incident Report,  (PLEIR),  min  which Det. Tapia asserts that he, "the complaining officer, personally observed the offiense.  See Exhibit N

123. By falsely claiming to be an eyewitness, Det. Tapia rendered the accompanying Affidavit of Probable cause fraudulent.

124. If he had been an eyewitness, then his identification of the suspect as corresponding to the facial recognition hit, would have had some validity.

125.  This falsehood was contained in documents submitted to the Assistant Prosecutor, Peter Nastasi and to the Municipal Court Judge, Judge Stahl and would naturally cause the prosecutor and judge to give Det Tapia's Affidavit more weight.

126.  Thus,  with this falsehood, the conclusion of the Afficvait ( "I compared the photo on the fraudulent Tennessee driver's license to Nijeer Parks' real New Jerwsey driver's license and it is the same person), would be perceived as an appropriate basis to find probable cause.

127. However, since Tapia was not an eyewitness, his conclusion is improper and without any probative value.

128. Moreover, contrary to his deposition testimony, Det Tapia's Warrant makes no mention, explicit or implicit,  that PO Lysyzk, an eye witness, confirmed the validity of the facial recognition hit.

129. PO Lee's  report which falsely includes the name of Nijeer Parks is a clear falsehood since the report was authored on January 26th and Parks was not identified until Febfruary 5, 2019.

130. Responding to four questions concerning the role of the Prosecutor, Director Hubner described the role of the Hudson County Prosecutor as follows:

> The Middlesex County Prosecutors Office (MCPO) is the lead law enforcement agency in Middlesex County. MCPO assigns an Assistant Prosecutor to serve as a liaison to the WQoodbridge Police Department. The MCPO liaison to Woodbridge is Assistant Prosecutor Peter Natasi. When an officer files a complaint alleging an indicatable offense, the Deparmtent will contact MCPO to discuss the factual allegations and obtain a legal opinion as to the proper charges to be brought against the supect..

Response to Interrogatory Number 16, attached as Exhibit B to the moving papers of Defendants.

131. Director repeated this assertion that the only role of the Prosecutor was to assist in drafting the charge, to wit:

> The Middlesex County Prosecutor's Office was involved in this matter to the extent that Assistant Prosecutgor Peter Natasi reviewed the complaint and, based on the information available at that time, advised as to what charges should be brought.

Response to  Interrogatory 17, attached as Exhibit  B of Defendant's Motion.

132. PO Lyszk's respone in his answers to interrogatories is identical to that of Police Director Hubner response immediately above. See Lyszk's Answers to Interrogatory, Number 14, attached as Exhibit A to Plaintiff's Opposition Papers.

133. On direct examination in his deposition, Det Tapia, having described the review with Ass't Prosecutor Nastasi was oral and, since he does not remember what was said, he agreed with the inference "that it was brief." Tapia Deposition, p 119 lines 12 – 16, Exhibit F to Defendant's papers.

134. Det Tapia recalls a brief telephone call to Judge Stahl in which Tapia informed him that he would be submitting a Warrant and Compliant. Tapia Deposition, p. 119, lines 17 to p. 120 5.   Exhibit F.

135. On direct exam,    Detective Tapia stated that he had one brief conversation with Assistant Prosecutor Natasi and had  no recollection about the nature and contents of the one brief conversation he had had with Nastasi. Tapia Depotions  p. 119.

136. Fred Rubenstein,  counsel for Defendants, articulated for the first time the theory that Det Tapia had presented the facial recognition as the main evidence and further asserted that Natasi had opined that probable cause existed based on the evidence to which Tapia dutifully agreed. (Tapia Deposition, p.  135 – 138, attached as Exhibit F to Defendants' papers.

### The Woodbridge Police To Date Have Not Pursued the Apparent Actor Barrington Walker

137. The New Jersey State police lab completed the analysis of the fingerprints and identified Barrington Walker as the actor on or about February 14, 2019, (See Exhibit I attached to Plaintiff's Opposition).

138. These prints were  processed by the defendants almost two years later  on January 22, 2021, and this report noted a New York City address for Barrington Walker at 240 West  141 Street, Manhattan, NY.   See ID Bureau Suspect Report attached to Defendant's moving papers as Exhibit  M.

139. Det. Quesada testified that the print was "an exact match to the left palm impression of Barrington Walker." Deposition of Quesada, Exhibit E, pp. 34  23 – 25 and  Quesada said this had 100% reliability. Id p. 37 line 2.

140. Barrington Walker's history connected him to New York city which is consistent with the fact that the Hertz rental car had been rented out of a New York office and that there was a Dunkin Donut receipt from a store in the Bronx in the rental car from the morning of the  incident.

141. The report generated on June 25, 2019, from the Pennsylvania Justice Network noted as origin, NYPD, another New York connection.   See Exhibit J attached to Plaintiff's Opposition Papers.

142. CODIS generated "a high stringency match " between the DNA evidence and Barrington Walker on July 30, 2021.  (Copy of report attached as Exhibit O to Plaintiff's Opposition papers.

143. This report was sent to Det Quesada. Id.

144.       Although Lt. Barrett testified that the Department charged Barrington Walker after the DNA match was received  (Barrett Deposition,  p. 88, line  11 – 12), to date, no action has been taken to follow through on these charges which, upon information and belief, were just made in a pro forma fashion.


*Facial Recognition Technology, Unreliable and Biased*

145. Facial Recognition Technology (FRT) has become a commonplace tool for law enforcement officers in both the Federal and  state levels.

146. Out of approximately 42 Federal Agencies that employ law enforcement officers, the Government Accountability Office (GOA) found that in 2021, , 20 of them or about half, utilized FRT. Lee, Nicole Turner, *Police Surveillance Facial Recognition: Why Data Privacy Is Imperative for Communities of Color*, April 2022, Brookings Institute. [2]

147. Already by 2016, one in four local law enforcement agencies used FRT according to a study done by Georgetown University. Garvie, Claire, Bedoya, Alvaro, *The Perpetual Line-Up: Unregulated Police Face Recognition in America*, Georgetown Law Center on Privacy & Technology, October 18, 2016.[3]

148. Problems with the accuracy of FRT and with its disproportionate negative effect on Blacks and other minorities has been well documented over the last 20 years. Id.

149. Nijeer Parks, an African American., appears to have been the first person to allege wrongful arrest based on FRT, and the two other cases which are pending also involve Black plaintiff, to wit.

- Robert Williams, a black man was handcuffed on his front lawn in front of his wife and two young daughters based on the flawed technology. Williams, Robert, July 15, 2021, *I Did Nothing Wrong: I was arrested Anyway.*[4] See *Williams v. City of Detroit*, No. 2:21-cv-10827 (E.D. Mich.).

- Porcha Woodruff, a black woman, 32 and eight months pregnant. , was home around 8 a.m. on February 16, helping her 6- and 12-year-olds get ready for school when six Detroit police officers arrived at her door with an arrest warrant

---

[2] https://www.brookings.edu/articles/police-surveillance-and-facial-recognition-why-data-privacy-is-an-imperative-for-communities-of-color/

[3]. https://www.perpetuallineup.org/

[4] https://www.aclu.org/news/privacy-technology/i-did-nothing-wrong-i-was-arrested-anyway

for carjacking and robbery, the complaint states.[5] *See Woodruff v. City of Detroit*,

No. 23-cv-11886 (E.D. Mich)

- Randal Quran Reid, a black man visiting his mother in Atlanta was wrongfully

  arrested and held for six days after facial recognition technology incorrectly

  identified him as a fraudster and thief in Louisiana, according to the latest lawsuit

  aimed against the controversial tech.[6]  See, *Reid v. Bartholomew*, No. 23-cv-4035

  (N.D. Ga.)

- Alonzo Sawyer, a 54 year old barber, was wrongly arrested and imprisoned in

  Baltimore. [7]

- *Michael Oliver,* Another Black man, Michael Oliver, sued the city in 2021, claiming

  that his false arrest because of the technology in 2019 led him to lose his job.

  [8]*Oliver v. Bussa*, No. 20-cv-12711 (E.D. Mich.)

150.  Searches in various databases and on the internet do not reveal any such claim advanced by

a White person.

151. In New Jersey, the ACLU has been working for over a decade to address the dangers of

FRT-  seeking regulations and restrictions.

152.  Moreover,  firmly established  police practices would preclude the use of FRT as a basis for

probable cause.

---

[5] hhttps://nypost.com/2023/10/04/man-was-arrested-for-six-days-over-faulty-facial-recognition-tech-
lawsuit/ttps://www.cnn.com/2023/08/07/us/detroit-facial-recognition-technology-false-arrest-lawsuit/index.html
[6] https://www.nytimes.com/2023/03/31/technology/facial-recognition-false-arrests.html
[7]https://www.wired.com/story/face-recognition-software-led-to-his-arrest-it-was-dead-wrong/
[8] https://www.freep.com/story/news/local/michigan/detroit/2020/07/10/facial-recognition-detroit-michael-oliver-
robert-williams/5392166002/ https://www.mprnews.org/story/2023/06/28/in-lawsuit-minneapolis-man-says-facial-
recognition

153. Indeed, as shown above, the very request form for a FRT search in New Jersey contains a disclaimer and waiver. See, supra, paragraphs 30 – 34.

## Woodbridge Has Been Deliberately Indifferent to the Problems of Facial Recognition Technology

154. The Director of Police of Woodbridge showed himself to be either deliberately indifferent or intentionally violative of constitutional norms, whether this be considered a formal policy or an informal policy, by having no policy regarding the use of FRT.

155. Director Hubner knows nothing about facial recognition. (Hubner answers to Interrogatories, Ex B, to defendants' moving paper, number 4.)

156. No Woodbridge police officer or employee was ever disciplined for anything related to Facial Recognition Technology. (Hubner answers to Interrogatories, Number five..

157. Andew Lyszyk testified that he was never disciplined, counseled, or retrained relating to this incident. Lyszyk Deposition, p. 21 line 1 - 17, Ex C

158. Woodbridge did not even advise the involved officers when the Complaint was filed and the officers learned about it through news stories months after the filing of the complaint. See Deposition of PO Andrew Lyszyk, , page 11, lines 12 – 17, attached as Exhibit C to moving papers of Defendants.

159. PO Lee knows nothing about Facial Recognition Technology. Deposition of Lee, p. 31, Exhibit D to Defendant's moving papers. .

160. Det Quesada knows nothing about Facial Recognition Tech. Deposition of Quesada, P. 31 – 32, Exhibit E.

161. No Woodbridge police officer or employee was ever disciplined for anything related to Facial Recognition Technology.   (Hubner answers to Interrogatories, Number  five, Ex B).

162. Andew Lyszyk testified that he was never disciplined, counseled, or retrained relating to this incident. Lyszyk Deposition,  p. 21 line 1 -  17, Ex  C to Defendants' papers.

163. No Woodbridge police officer or employee was ever disciplined for anything related to Facial Recognition Technology.   (Hubner answers to Interrogatories, Number  five,Ex B to Defendant's papers. ..

164. Andew Lyszyk testified that he was never disciplined, counseled, or retrained relating to this incident. Lyszyk Deposition,  p. 21 line 1 -  17, Ex C. .

165. The Director of Police of Woodbridge show himself to be either deliberately indifferent or intentionally violative of constitutional norms by  failing to train, supervise and discipline officers relating to the use of FRT"

166. Robert Hubner, the Woodbridge Police Director since 2011,  a 30  veteran of the Department, serves as the chief executive of the Department.  Hubner Deposition, p. 6 – 7, attached as Exhibit H to the Defendants" moving papers.

167. Woodbridge is budgeted for 225 officers. ID. p. 11  line 24.  This makes it the largest police department in Union County. Id. p. 29 line 9.

168. Upon information and belief, it is  one of the largest departments in the state of New Jersey.

169. Director Hubner's knowledge about FRT is limited to "what [he] read[s] in the paper." Id. p. 15 line 9.

170. In ten years, there has been only one disciplinary case appealed to the OAL which involved a dismissal which was upheld. Id.  p. 23.

171. Director Hubner remembers no instance over his 40 year association with the Department where the Department's discipline was reversed at OAL. Id. p. 25 line 3 – 8.

172. Director Hubner never read any documents related to the Nijeer Parks case and relied upon a briefing by Lt Barrett and the other IA officers. Id. p. 33

173. Director Hubner had not been aware of the ACLU lawsuit against Clearview until he became aware of it from an article in The Star Ledger.

174. Woodbridge still has no policy concerning FRT  Id. p. 38.

175. There is no written policy because the AG hasn't even created a policy. So we're not going to create something that may once he decided or she decides what the policy is we don't want to be outside of those recommendations or directives. Id.      39 lines  13 – 17

176. Director Hubner is generally not very involved in the defense of claims against the Department and is not privy to settlement discussions involving claims against the Department. Id. pp. 45 -  46.

177. Hubner was not even aware that an excessive force claim had been settled for $125,000. Id 47 line 6.

178. Director Hubner had not been told that PO Lyszyk conceded that his Warrant of Probable Cause was fraudulent.  Id. p. 61 line 17.

179. Director Hubner asserted he had no knowledge of the exculpatory evidence. Id. p. 67 line 21

180. Director Hubner was unaware of the finger print assay which correlated with Barrington Walker as of 2/14/19.  Id. p. 7 line 17.

181. Director Hubner was unaware that DNA evidence also correlated with Barrington Walker. Id. p. 73 line 4.

182. Director Hubner was not aware that Nijeer Parks asserted that he had never been in Woodbridge before voluntarily coming to police headquarters, that he had never had a driver's license, never rented a car, that he had just had ACL surgery which made running in flight impossible and that he had solid alibis. Id. p. 74.

183. Director Hubner testified that he had read that FRT is biased against Blacks. Id. p. 75.

184. Director Hubner admits that the IA report exonerating Tapia makes no mention of any evidence in support of probable cause. Id. p, 80.

185. Director Hubner conceded that the identification by PO Lee was "very suggestive." Id p. 80, line 2.

186. Director Hubner opined that  Det Tapia's opinion that the image on the Tennessee license corresponded to the image of Nijeer Parks would be adequate to support an Affidavit of Probable Cause.  Id. P/ 87 lines 4 – 9.

187. The Commander of Internal Affairs, Lt Edward Barrett,   of the  Woodbridge Police Department showed himself to be either deliberately indifferent or intentionally violative of constitutional norms, whether this be considered a formal policy or an informal policy, by having no policy regarding the use of FRT"

188. "We don't have any formal policies regarding facial recognition- not that I'm aware of. Barrett Deposition, p. 21 lines  13 – 14, attached to Defendant's moving papers as Exhibit G to Defendants' papers.

189. Although Barrett was aware that the NJ Attorney General had forbade the use of Clearview FRT,  he had no idea if it had been circulated to members of the Department. Id, p. 22 lines 2 -4.

190. Barrett admitted that "he's not really familiar with FRT." Id p. 22 lines 20.

191. Barrett said no one else in Internal Affairs had any knowledge about FTR either. Id. p. 21, lines 3 – 7.

192. Barrett  conceded that he had heard that FTR was racially biased from media reports and from the AG action against Clearview. *Id.* p. 23,  8 – 25.

193. But Barrett explained: "I don't really follow follow too much of that stuff." Id. p 23 lines 3 - 7.

194. There is no system in place to track and catalogue articles about or of relevance to the Department. *Id.* p. 23, lines 8 – 18.

195. IA did not follow or have a shadow file on the issue of fraud relating to the use of pandemic money- the so called Barbershop matter. *Id.* pp 25 – 27.

196. Lt Barrett never received and training and, in fact,  was unaware of any way to analyze complaints and the level of sustaining those as evidence of a responsive department.  *Id.* pp 31 – 32

197. Barrett had no idea how many 500 complaints the department averaged per year. *Id* p. 34.

198. Although Barret had been in IA for five years at the time of his deposition (Id. p. 9 line 7, he had only been a witness in a Departmental hearing once or twice, Id, p. 38, line 3, and had never testified in OAL. Id p. 38 line 8.

199. Lt Barrett asserts that there had never been any complaints about off duty work details in Woodbridge- though he is aware of the indictments relating to off duty work in Edison.  Id. 46 – 47.

200. Although IA asserts that it did an investigation of the Nijeer Parks matter, Lt Barrett had never seen the Affidavit of Probable Cause of Lyszyk or the Complaint until it was presented to him at his deposition. Id. p. 49 lines 9 – 13.

201. Barrett refused to concede that the Nijeer Parks incident is the highest profile complaint ever brought against the Department.  Id.  p. 50, lines 1 – 7.

202. Barrett had no knowledge  and IA had done no follow up after  PO Lyszyk had admitted  in his deposition three months prior that his Affidavit of Probable cause was materially false. Id 54.

203. At his deposition Lt. Barret first denied that there was any exonerating evidence related to Nijeer Parks. Id p.  8 – 13, but then he recalled that finger prints and  and  DNA evidence which exonerated him. Id . 57 linrd  3  - 12.

204. Lt Barrett had no knowledge about the disparity between the reports of the suspect's height being 5'11 or more and the fact that Nijeer Parks is 5'"8.  Id 58 – 61.

205. Lt Barret did not think it significant that PO Lyszk had had three sustained complaints and that one of these involved "arresting the wrong person for a warrant."  Id. p. 65 -67.

206. "That investigation [of the prior false arrest] would not be part of  the current investigation [into the false arrest of Nijeer Parks]." IOOd.  P. 67  lines 4 – 5.

207. Lt Barrett denied that the past history of an officer is considered when weighing current complaints.  If p. 69  4 – 6.

208. Lt Barret had never seen the request for a Facial Recognition search in this case.  Id.  p. 73 line14,

209. Lt Barret  asserts that  "I don't even know if it [FRT] was ever employed" by the Department.  Id. 75 lines  7 – 8.

210. Lt Barrett is unable to articulate the difference between an "investigative lead" and evidence which supports probable cause. Id. pp 75 – 76.

211. Lt. Barrett did not think any red flags were raised when 7 out of 8 differential treatment/false arrest  allegations were not sustained. Id. p. 31 lines 1 – 25.

212. The IA Investigation was not started until sometime after the filing of this Complaint and was not concluded until over a year later on December 29, 2021. Copy of Close Out Report of Internal Affairs attached to Plaintiff's Opposition papers as Exhibit P..

213. This delay in starting the investigation and concluding it violated the Attorney General Guidelines which require that these investigations be done in a prompt manner. Internal Affairs Policy & Procedures, November 2022, Sec. 6.1.1. [9]

214. Indeed, investigations are to be completed within 45 days and if not a report is to be made to the Police Director. Id. 6.1.4.

215. The instant investigation, despite its shocking deficiencies, took over a year and no reporting of the delay was made to Director Hubner.

216. No notice was made as required by the Guidelines to the County Prosecutor when 180 days had elapsed. Id. 6.1.6.

217. No investigation was made of PO Lyszyk even after he admitted under oath that he had perjured himself when he made a materially false Affidavit of Probable cause in this case.

218. Lt Velez failed to comply with any aspect of a appropriate Internal Affairs investigation which as set forth in 6.3.5. requires:

   a. That the complainant be interviewed; (a certified letter was sent to a bogus address for complainant and no attempt was made to reach him through counsel)

   b. That all witnesses be interviewed (none were!)

   c. Review the relevant reports and documents. In this case, the positive finger print identification, the allegations in this Civil Complaint, the false Affidavits, the false Complaints, and the positive DNA report, the surveillance videos,

[9] https://www.nj.gov/oag/dcj/agguide/directives/2019-Internal_Affairs_Policy_and_Procedures.pdf

219. The IA investigation declared Det Tapia, exonerated, the highest clearance possible of an accused officer which equates to an affirmative finding of no misconduct. (as opposed to the more neutral "not sustained" which only communicates that there was not enough information for the investigator to find guilt. of the Nijeer Parks matter was not sustained. .See . Copy of Close Out Report of Internal Affairs attached to Plaintiff's Opposition papers as Exhibit P. See also, Barrett Deposition, p. 76, Ex G.

220. This investigation only looked into Det Tapia's role and did not consider the role of PO Lyszyk. *Id.* p. 82.

221. The Internal Affairs report makes no mention of the fact that:

- The facial recognition hit was wrong.

- The Department failed to process the fingerprints which identified the actor as Barrington Walker two weeks after the incident.

- The Department failed to do any normal investigation including appropriate identifications with the ten eye witnesses, examination of the Sprint Sim card, examination of the surveillance video at the Hampton Inn and at Dunkin Donuts.

- The actor was over 6ft tall while Nijeer Parks is 5"7;

- Nijeer Parks voluntarily came down to police headquarters having been lied to by an officer who said he would be interviewed as part of the investigation and that he could clear up the misunderstanding.

- All of the solid alibis were ignored;

- Documentary evidence of Nijeer Parks surgery at the time which would have precluded him from running was not mentioned.

Copy of Close Out Report of Internal Affairs attached to Plaintiff's Opposition papers as Exhibit P to Plaitniff's Opposition papers.

222. The report failed in every respect to satisfy the requirements of the AG Guidelines. See. 6.3.5.

223. Defendant IA, Lt. Inv. Velez concluded:

> I reviewed the photographs of Mr. Parks in the high profile comparison and they are similar and could be mistaken for the same person."

Close Out Report, p, 3. Exhibit P to Plaitniff's Opposition).

224. Lt. Velez in an official document and with knowledge that Plaintiff had been the victim of a false facial recognition lead, and that the Department had misused this lead to falsely arrest Plaintiff, falsely charge plaintiff, and falsely prosecute plaintiff, essential engages in the identical wrongful acts of the subject of his investigation.

225. When questioned in his deposition about this, Lt Barrett shrugs his shoulders and says "mistakes are made…but there was no malice here…" Exhibit G, . p. 84 lines 19 – 23.

226. The IA investigation was sent to the file but was not provided to the Police Director, the Mayor, or the Business Administrator. *Id.* Only the three IA officers were given access to this report. Id. p. 77, 1 – 6

227. Lt Barrett had no explanation as to why the administration might have withheld the Summons and Complaint of Nijeer Parks for a year. P. 80.

228. Although Lt. Barrett testified that the Department charged Barrington Walker after the DNA match was received (Barrett Deposition, p. 88, line 11 – 12), to date, Defendants have made no efforts to extradite Barrington Walker.

229. The appearance of the DNA evidence in CODIS indicates that Walker had been in custody and charged or suspected of another crime.

230. Det Barrett throughout his deposition is at pains to say that the Department and the officers did nothing wrong and that the mistakes were understandable, and that there was no malice, etc.   Barrett Deposition, pp. 88 – 92,

231. The Commander of Internal Affairs of the Police Department  of Woodbridge show himself to be either deliberately indifferent or intentionally violative of constitutional norms by  failing to train, supervise and discipline officers relating to the use of FRT"

### Plaintiff's Expert, Lt.  Commander Ralph Cilento Catalogues the Grievous Flaws of  the Woodbridge Police Investigation

232. Plaintiff's liability expert, Ralp Cilento, is a retired Lieutenant Commander of Detectives in the NYPD with more than twenty-seven years of experience in the New York City Police Department, having been assigned to supervise investigations for more than 16 years.  CV and page three of the report found at Exhibit V to exhibits attached to Defendants' papers.

233. Mr. Cilento has testified as an expert witness for the NYPD and has provided testimony before the New York State Criminal Justice Task Force "regarding witness intimidation and open discovery statues. *Id.* p. 3

234. Cilento was responsible "for developing, implementing, and assessing training for more than 5,000 members of the NYPD's Detective Bureau, including the college-accredited and nationally recognized Homicide Investigators Courts, Special Victims Investigators Courts, Criminal Investigators Basic Course, and Custodial Interrogation Course. *Id.*

235. Cilento is an MPA candidate at John Jay College where he is also an Adjunct Professor of Police Science. *Id.* p. 4.

236. The actions of the Woodbridge Police in response to the original incident at the Hampton Inn were within the acceptable range of police practices and consistent "with best practices.". *Id.* p. 4 – 5.

237. "The immediate police response to the hotel is not what led to the wrongful arrest of Nijeer Parks. Rather it was the improper police investigation that followed. *Id.* p. 4.

238. "Once Det. Tapia verified with POs Lee and Lyszyk the person on the fraudulent Tennessee Driver's license was the same person they had encountered in the lobby, he was correct in utilizing all legal investigative means necessary to attempt to identify the suspect. As such. Det. Tapia's determination to send the photo on the Tennessee Driver's license to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) was an appropriate investigative step. Id. p. 6.

239. However, [s]everal of the necessary post-incident investigative stop in this case were ignored, dismissed, or improperly executed which led to Nijeer Parks to be misidentified, wrongly arrested and wrongly charged with the crimes at the Hampton Inn Hotel.: If. P. 7

240. Although the record casts doubt on the assertion that Det Tapia showed PO Lyszyk the picture of Nijeer Parks from the Facial Recognition hit  (neither Lyszyk's own Affidavit of Probable Cause nor Det Tapia's Affidavit of Probable Cause mentions this and no mention of this is made in the Answers to Interrogatories of defendants),  if it had been made, according to Plaintiff's expert,  it would have been an invalid and contaminating identification because:

> The correct investigative step at this time would have been to recognize this facial recognition h it for what it legal was: merely an investigative lead. Because facial recognition hits are inherently suggestive effectively creating a software generated doppelganger, it becomes critical for investigators to complete a range of investigative steps. *Id.* p. 8

241. The Photo hit on Nijeer Parks should have been subjected to a search on his incarceration status, a search of all public records, an open source social media search, a vehicle history search, known addresses, arrest history for similar events. *Id.* pp. 8-9.

242. These investigative steps that should have been done include obtaining the Dunkin Donuts video,  using the ten eye witnesses at the hotel in identification procedures, comparison of the shoe in evidence to Nijeer's foot.  Id.. p.. 21.

243. "The Dunkin Donuts video was a highly probative investigative lead which was not exploited and probably would have yielded exculpatory evidence very early in the investigation which could have eliminated Nijeer Parsk as the suspect irrespective of any facial recognition hit.: Id. p. 11

244. If *arguendo*,  Det Tapia had, contrary to fact, actually showed PO Lyszyk the photo of Nijeer Parks, that would have been an improper, inadmissible, highly suggestive and likely inadmissible identification because

> it is well known  and considered a best practice to only utilize a single-phot confirmatory identification when there is a  prior relationship between the parties and/or a close personal proximity to the incident. Neither factor was present in this case…. *Id.* p. 9.

245. Two days after the incident between the suspect, who was a stranger to Lyszyk and PO Lyszyk is "well outside any temporal proximity, as described, and thusly cannot properly participate in a confirmatory identification procedure." *Id.* p. 9.

246. Tapia's described confirmatory identification by himself, who had not been an eyewitness, of the image on the fraudulent license to the image provided of Nijeer parks is illegitimate identification also an incorrect investigative. *Id.*, p. 10

247. The identification of Nijeer Parks by PO Lee was likewise improper and inadmissible because he was ordered by a superior officer, Lt. Ng,  to come in from  in from his day off to identify "the individual from the incident"  which telegraphed the reaction that was expected of Lee.  *Id.* p.12

248. Lee had not known the suspect, had had a fleeting interaction with him, and that had been ten days prior. *Id.*

249. Therefore, "the correct investigative stop would have been to assemble a corporeal line-up where PO Lee would have been instructed on the viewing of a line up, made to fill out the necessary documents applicable for a line up procedure. Id. p. 13.

250. Police officers are subject to the same standards as lay witnesses in identification procedures and these procedures should accord with the New Jersey Attorney General Office's Guide For Out of Court Identifications. *Id.*

251. It is clear that Woodbridge was in a rush to judgement and shut down the investigation completely upon receipt of the Facial Recognition report from Inv. Lyons. *Id.* 11.

252. This rush to judgement is also seen in the is highly unusual and not normal police procedures for three detectives to drive 45 minutes away to arrest a suspect. *Id.* p. 11.

253. Detective Kondracki failed to follow up on any of the exculpatory statements of Nijeer Parks his detailed alibi on the day in question, the declaration that he did not have a driver's license, the declaration that he was recovering from ACL surgery and, therefore, could not have run." *Id.* 13 – 14.

254. All of Nijeer Parks statements could easily have been tested by Woodbridge and would have exonerated him.

255. "Nijeer Parks made no incriminating statements and Kondracki [the interrogator] made no attempt to investigate Nijeer's exculpatory information." Id. 14.

*Det. Cilento Catalogues the Failures to Train, Supervise, and Discipline*

256. There was a complete lack of supervision throughout the process.

257. Det Tapia request to submit the Tennessee License to a Facial Recognition search should require supervisory approval. *Id.* p. 14.

258. The other identifications, such as the claimed identification by Lyszyk as well as those of Tapia himself and Lee should have all received supervisory approval. *Id.* p. 14.

259. Warrants of Probable Cause had no supervisory review which departs from standard practice. Id.

260. Had the Warrants been submitted to supervisory review the false statement of Lyszyk that the Hertz manager had identified the perpetrator as Nijeer Parks would have been corrected and the use of Nijeer Parks name throughout both Warrants would have been excised. *Id.* p. 14.

261. A Detective supervisor would have insisted that the surveillance video from the scene as well as from Dunkin Donuts be viewed. *Id* . p. 15.

262. The lack of any supervisory review of the investigation allowed Woodbridge to be directed by bias and rush to judgment. *Id* p. 15.

263. The one supervisory intrusion by Lt. Ng was, in fact, highly prejudicial and contaminated the already improper show up of Nijeer Parks to PO Lee: Ltt. Ng should have conformed the show up to the Show-up Identification Procedures Report Worksheet as per the New Jersey Division of Criminal Justice. *Id.* p. 16.

264. "Latent prints collected at the crime scene were a match to a Barrington Walker who lives in upper Manhattan and in close proximity to the Dunkin Donuts related to the recovered receipt. This information was communicated to the Woodbridge Police Department on February 22, 2019, but this exculpatory evidence was not acknowledged until January 22,

2021, nearly two years later. This inexcusable delay demonstrates a failure to supervise by the detective squad supervisor.

265. Although Police Director Hubner conceded that the show up involving PO Lee was "very suggestive," no discipline or counseling was provided to Lt. Ng or to PO Lee which constitutes a failure to supervise. Id. p. 16.

266. All of the officers involved had little or no training in facial recognition technology or in identification procedures.

267. PO Lee's knowledge of identification procedures is, [s]hockingly....from TV shows." Id. p. 17.

268. PO Lyszyk had no training in identification procedures. *Id.* p. 17.

269. Det Tapia's facial recognition training was not from the Defendant public entity but from when he was on loan to the NJ State Police where he participated in investigation where it was used. Therefore, he, too, had no training from Woodbridge on Facial Recognition Technology. *Id.* p. 18.

270. Tapia repeated assertions that police officers are not subjected to the normal procedures and safeguards for identification procedures is categorically false and demonstrates a failure to train  and a failure to be supervised. Id. p. 17.

271. Det Quesada also testified that he had no training in facial recognition or about how to fill out an Affidavit of Probable Cause. Id.  p. 18.

272. Det. Quesada did describe a "double blind photo array," but did not account for why neither it nor any other approved identification process was used, again showing a lack of training and supervision. *Id.*

273. Because of the lack of training, supervision, and discipline, Woodbridge was driven by defensive avoidance and cognitive bias  which resulted in total investigative failure.  *Id.* pp 19 – 22.

274.  . "The wrongful arrest and prosecution of Nijeer Parks was due to four main causes: a vailed investitive process, improper identification procedures, failed supervision,  and a lack of training." Id. p. 23.

### Plaintiff's Emotional Damages Are Severe

275. After Plaintiff exhibited signs of a panic attack at his deposition when questioned by Woodbridge's attorney, he was referred   Gianni Pirelli, PhD,    for a psychological examination. (Dr.Pirelli's CV attached to Plaintiff's papers as Exhibit R.

276. Dr. Pirelli did a clinical/forensic examination of  plaintiff and also conducted a collateral interview of plaintiff's mother.  Pirelli Report attached to Plaintiff's Opposition papers as Exhibit R..

277. Dr. Pirellii the Trauma Symptom Inventory-2, a widely used test of trauma related symptoms, and the Personality Assessment Inventory (PAI) another widely used instrument. Id., p. 10.

278. Dr. Pirelli found that Plaintiff "meets DSM-TR criteria for Post Traumatic Stress Disorder. Id. p. 14.

279. Dr Pirelli opined:

> Mr. Parks symptoms have not appreciably remitted or lessened. If anything, may remain and have worsened. They are serious and he continues to experience them at a clinical level, meeting formal diagnostic criteria for such. *Id.* p 14.

280.  Dr. Pirelli noted that Nijeer Parks had made a concerted and successful effort to stay out of trouble, develop a strong work ethic, and be a good example to his children. *Id.* p. 14.

281. The events at the basis of this lawsuit profoundly disturbed Nijeer's new life and Dr. Pirelli

notes:

> At first glance, it is hard to understand how someone with such a notable arrest and
> detainment history could be so negatively impacted by a relatively brief jail detainment.
> However upon analyzing this case over many hours and  via numerous data source it
> is clear that Mr. Parks was greatly affected. *Id.* p. 15.

282.  Dr. Pirelli concludes:

> Regarding Mr. Park's prognosis, based on a reasonable degree of psychological probability,
> he remains at high risk of experiencing ongoing and severe mental health problems, including
> an exacerbation of existing (ad past) mental health-related symptoms an potentially
> developing new ones. *Id.* 15.

### *Woodbridge Was Deliberately Indifferent to the Accuracy and Bias Issues of FRT*

283.  As noted above in paragraph 146 et seq, , concerns about Facial Recognition Technology

had been increasing voiced over the last 25 years.

284.  Rand Public Safety had been doing work on this issue from the earliest days.  See, for

example, Woodward, John , et al, Biometrics, a Look at Facial Recognition, 2003.[10]

285. In the US and abroad, a consensus was already in place that policies and procedures were

needed by 2010.  See, for example, a British approach in Facial Identification Guidance,

2009,NIPA. [11]

286. For more than ten years, the ACLU has taken a leading role in raising consciousness in the

United Stats about the problems with Facial Recognition Technology. See, for example,

Stanley, Jay,  June 15, 2016, *FBI and Industry Failing to Provide Needed Protections For Face Recognition.*

287. See, also, Crockford, Kade, October 2018, Over 150,000 *People Tell Amazon: Stop Selling Facial*

*Recognition Tech to Police.*[12]

---

[10] https://apps.dtic.mil/sti/tr/pdf/ADA414520.pdf
[11] https://library.college.police.uk/docs/acpo/facial-identification-guidance-2009.pdf
[12] https://www.aclu.org/news/privacy-technology/over-150000-people-tell-amazon-stop-selling-facial

288. Problems with the accuracy of FRT and with its disproportionate negative effect on Blacks and other minorities has been well documented over the last 20 years. Garvie, Claire, Bedoya, Alvaro, *The Perpetual Line-Up: Unregulated Police Face Recognition in America*, Georgetown Law Center on Privacy & Technology, October 18, 2016.[13]

289. In addition to scholarly articles, these concerns were regularly voiced in the mainstream media as well. See, for example, *Op-Ed: Lawmakers need to curb face recognition searches by police, Los Angeles Times*, October , 24, 2016.

290. Model Policies for Law Enforcement Use of FRT have been circulated for many years.

291. The US Department of Justice has published numerous iterations of model policies for law enforcement agencies using Facial Recognition Technology such as the Face Recognition Policy Template from 2017.[14]

---

[13]. https://www.perpetuallineup.org/
[14] https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/Face-Recognition-Policy-Development-Template-508-compliant.pdf