Daniel W. Sexton, Esq, AIN 1021992
229 New Centre Road
Hillsborough, NJ 08844
(201) 406 – 9960
DanielSextonEsq@gmail.com

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

NIJEER PARKS

Plaintiff

vs.

JOHN E. McCORMACK, MAYOR OF WOODBRIDGE, in his personal and official capacity, ROBERT HUBNER, DIRECTOR OF THE WOODBRIDGE POLICE, in his personal and official capacity, et alii

Defendants

**Civil Action No: 2:21-cv-04021**

**CERTIFICATION OF COUNSEL**

I Daniel W. Sexton, hereby Certify as follows:

1. I am an attorney at law and represent the plaintiff in the above captioned matter.
2. Exhibit A is a true and exact copy of the Certified Answers of Andrew Lyszyk to Plaintiff's First Set of Interrogatories.
3. Exhibit B is a true and exact copy of the Certified Answers of Nijeer Parks to the Interrogatories of the Woodbridge Defendants.
4. Exhibit C is a true and exact copy of the three page Incident Report of PO Lee updated as of 2/13/24.
5. Exhibit D is a true and exact copy of the three page report of PO Andrew Lyszyk.
6. Exhibit E is a true and exact copy of the four page incident report of Det. Tapia.
7. Exhibit F is a true and exact copy of the emails by and between Santiago and Lyons.

8. Exhibit G is a true and exact copy of the NY Intelligence Center Request for Information form.

9. Exhibit H is a true and exact copy of the incident report of the Rockland County Intelligence Center.

10. Exhibit I is a true and exact copy of the ID Bureau Report and all related reports.

11. Exhibit J is a true and exact copy of the report regarding Barrington Walker

12. Exhibit K is a true and exact copy of the still photos of the lobby and other parts of the Hampton Inn.

13. Exhibit L is a true and exact copy of the still photos of the size 12 sneaker recovered at the Hampton Inn.

14. Exhibit M is a true and exact copy of the Dunkin Donuts receipt found in the rental car.

15. Exhibit N s a true and exact copy of the interrogation transcript of Plaintiff.

16. Exhibit O is a true and exact copy of the CODIS report of July 30, 2021, DNA match to Barrington Walker.

17. Exhibit P is a true and exact copy of the IA report of Lt. Velez, December 29, 2021.

18. Exhibit Q is a true and exact copy of the Gianni Pirelli CV.

19. Exhibit R is a true and exact copy of the Gianni Pirelli, PhD, report.

20. I hereby certify to the truth of the statement above and acknowledge that if anything contained therein is willfully false, then I am subject to punishment.

Date: January 22, 2024

______________________________

Daniel W. Sexton

Daniel W. Sexton, Esq, AIN 1021992
229 New Centre Road
Hillsborough, NJ 08844
(201) 406 – 9960
DanielSextonEsq@gmail.com

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

NIJEER PARKS

Plaintiff

vs.

**Civil Action No: 2:21-cv-04021**

JOHN E. McCORMACK, MAYOR OF WOODBRIDGE, in his personal and official capacity, ROBERT HUBNER, DIRECTOR OF THE WOODBRIDGE POLICE, in his personal and official capacity, et alii

Defendants

**CERTIFICATION OF COUNSEL**

I Daniel W. Sexton, hereby Certify as follows:

1. I am an attorney at law and represent the plaintiff in the above captioned matter.
2. Exhibit A is a true and exact copy of the Certified Answers of Andrew Lyszyk to Plaintiff's First Set of Interrogatories.
3. Exhibit B is a true and exact copy of the Certified Answers of Nijeer Parks to the Interrogatories of the Woodbridge Defendants.
4. Exhibit C is a true and exact copy of the three page Incident Report of PO Lee updated as of 2/13/24.
5. Exhibit D is a true and exact copy of the three page report of PO Andrew Lyszyk.
6. Exhibit E is a true and exact copy of the four page incident report of Det. Tapia.
7. Exhibit F is a true and exact copy of the emails by and between Santiago and Lyons.

8. Exhibit G is a true and exact copy of the NY Intelligence Center Request for Information form.
9. Exhibit H is a true and exact copy of the incident report of the Rockland County Intelligence Center.
10. Exhibit I is a true and exact copy of the ID Bureau Report and all related reports.
11. Exhibit J is a true and exact copy of the report regarding Barrington Walker
12. Exhibit K is a true and exact copy of the still photos of the lobby and other parts of the Hampton Inn.
13. Exhibit L is a true and exact copy of the still photos of the size 12 sneaker recovered at the Hampton Inn.
14. Exhibit M is a true and exact copy of the Dunkin Donuts receipt found in the rental car.
15. Exhibit N s a true and exact copy of the interrogation transcript of Plaintiff.
16. Exhibit O is a true and exact copy of the CODIS report of July 30, 2021, DNA match to Barrington Walker.
17. Exhibit P is a true and exact copy of the IA report of Lt. Velez, December 29, 2021.
18. Exhibit Q is a true and exact copy of the Gianni Pirelli CV.
19. Exhibit R is a true and exact copy of the Gianni Pirelli, PhD, report.
20. I hereby certify to the truth of the statement above and acknowledge that if anything contained therein is willfully false, then I am subject to punishment.

Date: January 22, 2024 ______________________________

Daniel W. Sexton

# A

**FREDRICK L. RUBENSTEIN, ESQ.**
**ATTORNEY ID. NO. 004651994**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Defendants, John E. McCormac, Mayor of Woodbridge, Robert Hubner, Director of the Woodbridge Police, Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk and Woodbridge Police Sergeant Joseph Licciardi**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NIJEER PARKS,<br><br>Plaintiff,<br><br>-v-<br><br>JOHN E. McCORMACK, MAYOR OF WOODBRIDGE, In his personal and official capacity, ROBERT HUBNER, DIRECTOR OF THE WOODBRIDGE POLICE In his personal and official capacity: CITY OF WOODBRIDGE POLICE OFFICERS, ANDREW LYSZYK and WOODBRIDGE POLICE SGT. JOSEPH LICCIARDI, WOODBRIDGE POLICE OFFICERS JOHN AND JANE DOE 1-20, MIDDLESEX DEPARTMENT OF OF CORRECTIONS, MIDDLESEX COUNTY PROSECUTOR, ACTING PROSECUTOR CHRISTOPHER KUBERIET, in his personal and Official capacity, and ASSISTANT MIDDLESEX COUNTY PROSECUTOR PETER NATASI, and IDEMIA, INC.'S being the maker of the facial recognition software and ABC CORPORATION, being an as yet unknown seller or servicer of the facial recognition programs,<br><br>Defendants. | CIVIL ACTION NO.<br>2:21-cv-04021-JXN-LDW<br><br>**DEFENDANT ANDREW LYSZYK'S CERTIFIED ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** |

TO:   Daniel W. Sexton, Esq.
      DANIEL W. SEXTON, L.L.C.
      229 New Centre Road
      Hillsborough, New Jersey 08844
      Attorneys for Plaintiff

**DEFENDANT ANDREW LYSZYK'S CERTIFIED ANSWERS TO PLAINTIFF NIJEER PARKS'S FIRST SET OF INTERROGATORIES**

1.  **State the names, titles, counsel and contact information and addresses of all persons known to you to possess knowledge of any relevant facts relating to the case and give a summary of each person's knowledge.**

**ANSWER:**

   a)   Police Director Robert Hubner
        1 Main Street
        Woodbridge, New Jersey 07095

        Director Hubner is the Director of the Woodbridge Police Department.

   b)   Lieutenant Joseph Licciardi #450
        1 Main Street
        Woodbridge, New Jersey 07095

        Lieutenant Licciardi approved the Incident Report filed by Police Officer Andrew Lyszyk.

   c)   Detective Santiago Tapia #481
        1 Main Street
        Woodbridge, New Jersey 07095

        Detective Tapia forwarded photo of suspect's fake Driver's License to Regional Operations Information Center and signed Complaint-Warrant #2019000156.

   d)   Police Officer Francis Lee #591
        1 Main Street
        Woodbridge, New Jersey 07095
        Officer Lee was on scene with suspect on January 26, 2019. Identified Suspect at Woodbridge Police Headquarters during arrest processing.

   e)   Detective Jorge Quesada #525

1 Main Street
Woodbridge, New Jersey 07095

Detective Quesada collected evidence on scene on January 26, 2019.

f)   Sergeant Scott Flavell #405
1 Main Street
Woodbridge, New Jersey 07095

Sergeant Flavell located suspect's vehicle and had same towed to Woodbridge Police Headquarters.

g)   Sergeant Anthony Penicaro #472
1 Main Street
Woodbridge, New Jersey 07095

Sergeant Penicaro approved Incident Report filed by Detective Tapia and was present when Plaintiff, Nijeer Parks, was being processed for his arrest.

h)   Police Officer David Mirdala #547
1 Main Street
Woodbridge, New Jersey 07095

Booking Officer during Plaintiff, Nijeer Parks's, arrest.

i)   Police Officer Stephanie Andersen #493
1 Main Street
Woodbridge, New Jersey 07095

Officer Anderson approved Incident Reports filed by Officer Mirdala and Officer Lee.

j)   Detective Andrew Kondracki #545
1 Main Street
Woodbridge, New Jersey 07095

Detective Kondracki interviewed Plaintiff, Nijeer Parks, while Plaintiff was in custody on February 5, 2019.

k)   Richard Charneco
370 Route 9 North
Woodbridge, New Jersey 07095

Mr. Charneco was the Manager of the Hampton Inn on January 26, 2019.

l) Caleigh Higgins
370 Route 9 North
Woodbridge, New Jersey 07095

Ms. Higgins was working as a front desk clerk at the Hampton Inn on January 26, 2019.

m) Kamisha Grant
370 Route 9 North
Woodbridge, New Jersey 07095

Ms. Grant was working as a front desk clerk at the Hampton Inn on January 26, 2019.

n) Michael Dones
370 Route 9 North
Woodbridge, New Jersey 07095

Mr. Dones was the Manager of the Hertz Rental at the Hampton Inn on January 26, 2019.

Defendant reserves the right to amend this answer throughout the continuing course of discovery.

**2. Provide your complete understanding of the police response to the incident at the Hampton Inn on January 26, 2019, through the arrest and prosecution, providing a detailed narrative of the same to Plaintiff and append any and all relevant documents including reports.**

**ANSWER:**

On January 26, 2019, Officer Francis Lee and I were dispatched to the Hampton Inn on Route 9 North due to reports of shoplifting of certain "snacks" from the gift shop. Headquarters advised that the Suspect's vehicle, a Gray Dodge Challenger, NY License Plate JBD2162, was parked in front of the Hampton Inn. Officer Lee arrived on scene prior to my arrival and was already speaking to the suspect, an African-American male, who identified himself as "Jamal Owens."

I approached the Hampton Inn front desk and spoke to the manager, Richard Charneco, and two clerks, Caleigh Higgins and Kamisha Grant. Mr. Charneco advised that he called the police after a member of the hotel cleaning staff informed him that the male

placed assorted snack items into a bag and then took the bag out
to his vehicle. I told the male that the manager wanted him to pay
for the snacks and asked him where the snacks were. The male told
me that the snacks were in his vehicle and the male and I walked
out to his vehicle to retrieve them. We returned to the front desk
where the male paid for the snacks. At this time, the male also
purchased a bottle of water and drank it during the transaction.
The male then threw the bottle away in the hotel garbage can.

Officer Lee informed me that the Tennessee driver's license
produced by the male identified him as "Jamal Owens" 765 Oakdell
Avenue, Madison, TN 37115. Officer Lee advised that the driver's
license produced was not coming back on file, and I took the
driver's license to my police vehicle to check again, with negative
results. I noted multiple discrepancies with regard to the
authenticity of the driver's license, including asterisks where
numbers were supposed to appear and a zip code containing only
five digits instead of nine.

I contacted the Tennessee State Police and spoke with
Supervisor Jason Beary in an attempt to cross-check with the
Tennessee DMV files. Again, the driver's license number and name
"Jamal Owens" was not on file. Supervisor Beary also indicated
that a Tennessee driver's license should start with an "o" instead
of an "8."

I returned to the lobby and asked the male if he had any other
forms of identification. The male produced a credit card with the
name "Jamal Owens." The male indicated that he was not a guest of
the hotel and was only there for the Hertz rental car service.

Since the male admitted to shoplifting the snacks and I was
unable to identify him, I told him to turn around and place his
hands behind his back. When the male placed his hands behind his
back, I noticed a bag of suspected marijuana protruding from his
jacket pocket. I grabbed the male by the wrist, removed the bag of
marijuana and threw it on the ground. While attempting to handcuff
the male, he slipped from my grip and ran towards the rear of the
hotel.

When the male reached the rear door, which is right next to
the Hertz kiosk, his right sneaker fell off. The male reached a
closed gate but pushed through and continued to run. Officer Lee
and I chased the male and during the pursuit, the male repeatedly
turned back to look in our direction with his right hand placed
on his jacket pocket. We caught up with the male at his vehicle.
Officer Lee and I drew our weapons and pointed them at the suspect

as he sat in the driver's seat of his locked and running vehicle. I was on the passenger side of the vehicle and Officer Lee was on the driver's side. The male refused requests to turn the vehicle off and unlock the doors. The male placed the car in reverse, backed up a few feet, then stopped. We repeated our demand that the male turn off the vehicle and unlock the doors.

After several minutes of refusing our commands, the male placed the car in drive, hit the gas, turned the steering wheel to the left, struck the rear driver's side door of patrol vehicle #3, and then hit the pillar in front of the Hampton Inn. When that happened, the male turned his vehicle towards Officer Lee, who had to abruptly move out of the way to avoid serious injury. The suspect fled the Hampton Inn parking lot at a high rate of speed and entered Route 9 North.

Officer Lee and I got into our police vehicles and attempted to follow the fleeing suspect. We were unable to locate the suspect and returned to the Hampton Inn to secure the scene. Prior to leaving the scene, I notified Detective Quesada that the male left his right shoe and water bottle behind. I also advised him that I still had the male's driver's license in my possession. I transported these items to headquarters without incident. At this point, the Detective Bureau took over the investigation.

See Incident Reports attached hereto as Bates Stamped Labeled PARKS000060-PARKS000078. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

3.  **Give a complete and exhaustive explanation and also append any relevant documents as to why you signed a criminal complaint against Plaintiff providing: (a) A detailed account of all evidence you relied upon; (b) A detailed account of all your understanding of the relevant rules and regulations; (c) A detailed account of your understanding of the utility of facial recognition technology; (d) A detailed account of the review of the sufficiency of the criminal complaint by the approving officer, Sgt. Licciardi; the name of the complainant; (e) Your understanding of how the arrest warrant came to be sworn.**

**ANSWER:**

   a) I relied upon my personal observations to identify the suspect after directly interacting with him for over twenty minutes. My observations and recognition of the suspect was corroborated by Officer Lee, who was on scene

with the suspect and myself, and directly interacted with the suspect for over twenty minutes.

b) Defendant objects to this interrogatory as vague and ambiguous such that Defendant is unable to provide an answer.

c) None at this time.

d) Defendant objects to this interrogatory because it seeks information from third parties and information not within Defendant's personal knowledge.

e) Detective Tapia advised me that he forwarded a picture of the suspect to the Regional Operations Intelligence Center (ROIC)for facial recognition. On January 27, 2019, Detective Tapia received a notification from Investigator Seamus Lyons of the Rockland County Sheriff's Department Intelligence Center and Sergeant Dey of the Palisades Interstate Parkway Police. The notification indicated that Investigator Lyons and Sgt. Dey had a high-profile comparison to the picture on the fake Tennessee driver's license. The suspect was identified as Plaintiff, Nijeer Parks. This identification was corroborated by my own personal observations of the suspect during the incident on January 26, 2019. As a result, I signed Complaint-Warrant #2019000158. Assistant Prosecutor Peter Natasi approved the warrant and same was signed by the Honorable Judge David Stahl on January 30, 2019.

See Complaint-Warrant #2019000158 attached hereto, Bates Labeled as PARKS000011-PARKS000023. See Incident Reports attached hereto, Bates Labeled as PARKS000060-PARKS000078. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

4. **Provide an exhaustive history of any and all discipline that you have faced as a law enforcement officer at this Department or any other Department, including verbal warnings.**

**ANSWER:**

Defendant objects to this request as these documents are part of Defendant Officer's personnel file and will not be produced without a Court Order. If/When said Court order is obtained, Defendant will produce all relevant documents in response to this request following the redaction of any personal identifiers and

other confidential information. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

5. **Provide an exhaustive history of any case you have been involved in, whether or not an arrest was made, which involved the use of facial recognition technology. Give the: (a) Name of the Case/Defendant/Suspect; (b) The nature of the underlying crime/incident; (c) The role of facial recognition in the case; (d) The manufacturer of the facial recognition technology; (e) The disposition of the matter.**

**ANSWER:**

This is the only case that I have been involved in which involved the use of facial recognition technology. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

6. **Provide a complete account of any and all training that you have received regarding the use of facial recognition technology.**

**ANSWER:**

I have not received any training in the use of facial recognition technology. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

7. **If you intend to argue qualified immunity, please give a complete account of the alleged factual predicates for same.**

**ANSWER:**

Defendant objects to this Interrogatory because it calls for Defendants to make a legal conclusion. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

8. **Give a complete account of your criminal history, including but not limited to, any arrest, whether or not charges were brought.**

**ANSWER:**

I do not have any criminal history. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

9.  **Give a complete account of your educational history, as well as your training for law enforcement, including on the job training.**

**ANSWER:**

See Resume attached hereto, Bates Labeled as PARKS000172. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

10. **Identify any and all persons with direct knowledge of facts material to the allegations in this matter and to defenses that are to be interposed.**

**ANSWER:**

See Answer to Interrogatory #1. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

11. **Provide a list of all personal insurance policies, appending hereto copies of the declarations page that you have, including but not limited to: (a) Homeowner's insurance; (b) Automobile Insurance; (c) Umbrella insurance; (d) Private errors and omissions insurance; (e) Private police liability insurance; (f) Insurance through the Police Union or other fraternal source; (g) Provide a list of all insurance policies, including excess policies, which pertain to acts or omissions of the WPD and its members proving copies of the Declarations page.**

**ANSWER:**

See Central Jersey Joint Insurance Fund Declaration Sheet attached hereto as Bates Stamped Labeled as PARKS000150. Defendant objects to the request for personal insurance information in the remainder of this Interrogatory. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

12. **Provide a complete account of the policies and practices of the WPD concerning the gathering of evidence, including but not limited to, fingerprints, DNA, video surveillance, and the subsequent safekeeping of said evidence.**

**ANSWER:**

See attached CODIS Fact Sheet as Bates Stamped Labeled PARKS000122-PARKS000133. See attached Woodbridge Collection and

Preservation of Evidence Policy and Procedures as Bates Stamped
Labeled PARKS000134-PARKS000147. Defendant reserves the right to
amend this answer throughout the continuing course of discovery.

13. **Please provide a complete account of the gathering of evidence
    related to the incident on January 26, 2019, at the Hampton
    Inn, including the safekeeping of said evidence and the use
    or failure to use said evidence, including but not limited
    to, the following evidence: (a) Fingerprints of the suspect;
    (b) DNA of the suspect; (c) Video surveillance of the suspect;
    (d) Analysis of the clothing of the suspect, e.g., the sneaker
    of the suspect.**

**ANSWER:**

Officer Lee and I ended our pursuit of the suspect and
returned to the Hampton Inn to secure the scene. Upon my arrival
on scene, Mr. Charneco advised me that he collected the items that
were dropped on the floor, placed them in a bag, and moved it to
the side. Mr. Charneco gave me the bag and I secured it in my
police vehicle. I then notified headquarters that I needed
additional units to help preserve the scene. I also asked
headquarters to notify the detective bureau about the incident and
the need to have the scene processed. Officer Campagnio arrived on
scene and preserved the rear gate. Officer Lee preserved the rear
door. Officer Montalvo preserved the front entrance where the motor
vehicle crash occurred. Detective Tapia and Detective Quesada
arrived and began to process the scene.

Prior to leaving the scene, I notified Detective Quesada that
the male left his right shoe and water bottle behind. I also
advised him that I still had the male's driver's license in my
possession. I transported these items to headquarters without
incident. I placed these items into the evidence locker for
safekeeping. At this point, the Detective Bureau took over the
investigation.

Detective Quesada photographed the scene and collected three
fingerprints from the rear glass door that the suspect pushed open
as he fled the scene. After the suspect's vehicle was located on
January 27, 2019, a consent search was conducted and five
additional fingerprints were lifted from the vehicle. A vape pen
was also recovered from the vehicle. See Investigation Photos
attached hereto, Bates Labeled as PARKS000152-PARKS000171. Back at
headquarters, Detective Quesada took custody of the evidence
collected and submitted same for DNA analysis and fingerprint
comparison.

On January 22, 2021, Detective Quesada received the results of the fingerprint comparison, which identified Barrington Walker as the suspect. See Fingerprint Results Report attached hereto, Bates Labeled as PARKS000148. On July 30, 2021, Detective Quesada received the results of the DNA analysis which also identified Barrington Walker as the suspect. See DNA Results Report attached hereto, Bates Labeled as PARKS000149.

Defendant reserves the right to amend this answer throughout the continuing course of discovery.

**14. Please provide a complete account of how the WPD works together with, or at the direction of, the Middlesex Prosecutor's Office, in the investigation of crimes and the execution of arrest warrants and criminal complaints, providing copies of any relevant agreements, policies, and procedures.**

**ANSWER:**

The Middlesex County Prosecutor's Office (MCPO)is the lead law enforcement agency in Middlesex County. MCPO assigns an Assistant Prosecutor to serve as a liaison to the Woodbridge Police Department. The MCPO liaison to Woodbridge is Assistant Prosecutor Peter Natasi. When an officer files a complaint alleging an indictable offense, the Department will contact MCPO to discuss the factual allegations and obtain a legal opinion as to the proper charges to be brought against the suspect. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

**15. Was the arrest of Plaintiff for the events of January 26, 2019 the result of input or assistance from the Middlesex Prosecutor's Office, and if yes, provide the following information: (a) Names, ranks, assignment of all persons involved, both from the WPD and the Middlesex Prosecutor's Office; (b) Describe in detail the assistance and involvement of the Middlesex Prosecutor's Office; (c) Provide copies of any and all communications at any time between the WPD or any member of the WPD and the Middlesex Prosecutor's Office or any member of the Middlesex Prosecutor's Office.**

**ANSWER:**

The Middlesex County Prosecutor's Office was involved in this matter to the extent that Assistant Prosecutor Peter Natasi reviewed the complaint and, based on the information available at

that time, advised as to what charges should be brought. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

16.   **Please provide a complete account of how the WPD worked together with, or at the direction of, the Middlesex Prosecutor's Office, in the investigation of crimes and the execution of arrest warrants and criminal complaints, providing copies of any relevant agreements, policies, and procedures.**

**ANSWER:**

    See Answer to Interrogatory #14. Defendant reserves the right to amend this answer throughout the continuing course of discovery.

17.   **Please give a complete account of the arrest of Plaintiff, including the names of all persons who took part in the arrest, provide any papers signed by Plaintiff during the arrest, copies of any papers provided to Plaintiff during the arrest, and copies of all video surveillance of Plaintiff during his arrest.**

**ANSWER:**

    On February 5, 2019, Plaintiff, Nijeer Parks, presented to the Woodbridge Police Station in reference to his active warrants, #2019000156 and #2019000158. See Complaint-Warrant #2019000156 attached hereto, Bates Labeled as PARKS000001-000010. See Complaint-Warrant #2019000158 attached hereto, Bates Labeled as PARKS000011-PARKS000023. Prior to being interviewed by Detective Kondracki, Plaintiff was read his Miranda Rights and signed waiver of same. See Miranda Card attached hereto, Bates Labeled as PARKS000121. Thereafter, Detective Kondracki conducted the interview in the interview room at Woodbridge Police Station. See Interview Transcript attached hereto, Bates Labeled as PARKS000045-PARKS000059.

    Plaintiff was booked and processed by Officer Mirdala. Officer Lee was contacted by Lieutenant Ng, who advised that the suspect from the January 26, 2019 Hampton Inn incident was in custody. Officer Lee was brought to the processing area accompanied by Lieutenant Ng and Detective Sergeant Penicaro. Officer Lee observed Plaintiff, Nijeer Parks, sitting in the processing area and identified him as being the suspect from the January 26, 2019 incident. Plaintiff was thereafter transported to Middlesex County Jail. See Booking Report attached hereto, Bates Labeled as

PARKS000036-PARKS000044.  See  Incident  Reports  attached  hereto,
Bates Labeled as PARKS000060-PARKS000078.

Defendant  reserves  the  right  to  amend  this  answer  throughout
the continuing course of discovery.

**CERTIFICATION**

I hereby certify that the foregoing statements made by me are true, I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

I further certify that copies of any and all reports by experts and others and any and all writings annexed hereto are exact and true copies of the entire reports and/or writings; that the existence of any other report or writing of said experts or others; either written or oral, is unknown to me and if such become later known or available, I shall serve them promptly upon the propounding party.

I further acknowledge the continuing obligation to provide the information and documentation requested by these interrogatories, and to provide same even after the original of these interrogatories have been submitted.

Dated:

Andrew Lyzsyk

# B

**Plaintiff's Answers to Interrogatories of Woodbridge Defendants.**

1 .Set forth the following: (a) your name and present address ; (b) address at the time of the February 05, 2019 incident; (c) your cell phone number at the time of the February 05, 2019 incident ; (d) your date and place of birth; (e) your social security number; (f) your driver's license number; and (g) your military service identification number, date and place of discharge, type of discharge, highest rank held, and rank upon discharge

*Nijeer Parks*

*311 Ninth Avenue*

*Patterson, NJ 07514*

*SS# *** ** 0832*

*NJDL P061956927209872*

*No military service*

2. State the complete names and addresses of all persons who have knowledge of any fact relating to the February 05, 2019 incident which is the subject of Plaintiff's Second Amended Complaint .

*All parties named in this lawsuit; All persons named in the Complaint. All persons named in the police reports*

*Lateefeh Gary, plaintiff's fiancé at the time. Address unknown at this time, but will be provided when obtained. Plaintiff's mother, Patricia Parks, 92 North Fourth Street, Patterson, NJ 07522; Tyris Robinson, Nutley, NJ _ Plaintiff's cousin.*

*Plaintiff reserves the right to amend this answer in light of continuing discovery.*

3.State in complete detail your version of the occurrence made reference to in your Second Amended Complaint. Specify dates, times, places and person (s) present

*Objection as this demand is both overbroad and vague. Without waiving this objection, plaintiff's knowledge of the events of January 26, 2019, at the Hampton Inn, Woodbridge, NJ, is upon information and belief and is based upon the documents received in the criminal investigation*

*Plaintiff's direct knowledge goings on or about January 30, 2019, Plaintiff's grandmother called him while he was at work to tell him that a warrant for his arrest had been issued out of Woodridge, NJ, and that the Patterson Police had been there trying to serve the warrant. Upon hearing this from his grandmother, Plaintiff called the Patterson Police Department which referred him to the Woodbridge Police Department causing him to call the Woodbridge Municipal Court Clerk and inquired about the Warrant. Plaintiff was told that there had been a matter involving an incident in a hotel in Woodbridge and that a summons had been issued for his arrest in relation to it. Plaintiff told the Municipal Clerk that he had never been in Woodbridge in his entire life and, indeed, that he did not know where it even was. At the time, plaintiff did not even have a driver's license, and had never had a driver's license prior to June of 2019, and the Plaintiff told the Clerk this information as well. Defendants failed to provide plaintiff with the time and date of the alleged crime and so he was not able to provide his alibi until discovery in the criminal matter gave him the details about the incident on January 26, 2019, at the Hampton Inn. Plaintiff was advised to "come down and clear the matter up," or words to that effect. Therefore, on or about February 5, 2019, plaintiff was driven by his cousin to Woodbridge, NJ, in order to clear up what he knew to be matter of mistaken identity. Plaintiff went to the municipal Clerk and explained that he was there to clear up the warrant for his arrest that was clearly an instance of mistaken identity. The clerk directed the Plaintiff to go to the Woodbridge Police Station which was located in the same municipal complex. Plaintiff, therefore, went to the Woodbridge Police window and explained that he was there to clear up what was clearly a matter of mistaken identity.*

*However, instead of being questioned or heard about this lack of involvement with the incident, plaintiff was put under arrest by being placed in handcuffs and taken into custody. Plaintiff was not read his Miranda warnings. Having been taken into the offices of the Woodbridge Police Department, Plaintiff was peppered with accusations such as: "you were the one who tried to run over a police officer at the Hampton Inn, "etc. At no time did defendants seek any information from Plaintiff but merely hurled accusations at hm. As he had previously told the clerk, Plaintiff told the interrogators that he had never had a driver's license, that he had never owned a car, and that he had never even been in Woodbridge. As the verbal harassment got more intense and hostile, the police investigators tried to have Plaintiff moved to a room in the back of the police offices out of range of the camera causing plaintiff to fear that he was going to be tortured. In order to avoid torture, plaintiff feigned an asthmatic attack falling to the ground so that he could not be moved to the back room. As a result of this feigned attack, the EMS was called, and plaintiff managed to avoid being beaten at the police headquarters. While being examined by the EMS, Plaintiff told the EMT that he feared he was going to be beaten up and asked her to take a picture of him to document his state. After the EMS left, the defendant police officers gave up on their attempt to move him to a room in the back without cameras and he was processed and transferred to the Middlesex County Corrections Center even though there was no evidence, no probable 7cause, no reasonable suspicion. After his wrongful arrest, hostile and threatening interrogation, the Middlesex Corrections officers continued the abuse of plaintiff by keeping him in functional solitary confinement by keeping Plaintiff in intake for his first week at the jail. Because he was kept in intake, Plaintiff took meals alone. Because he was kept in intake, Plaintiff was denied recreation outside. Because he was kept in intake, Plaintiff was denied recreation opportunities on the regular tiers, e.g., television, library, conversation. While wrongly kept in intake for an extended period, Plaintiff was in fear of physical abuse as the Corrections Officers verbally threatened him with excessive force because, they wrongly asserted, "he had attacked a fellow officer." Plaintiff was only transferred to a tier after his second court appearance seven days later after, upon information and belief, his Public Defender intervened. This extended stay in intake was contrary to best practices in prison management, and, upon information and belief, was contrary to the standards and procedures of the Middlesex Corrections Facility. The Middlesex Corrections Facility has a history of engaging in cruel and unusual punishment violative of the 8th Amendment as seen, inter alia,*

*in its litigation history.*

*Plaintiff's first court appearance occurred three days after his wrongful arrest. At that time, Plaintiff's testified in open court that he had never driven a car, had never been in Woodbridge, and that this was a case of mistaken identity. Due to the misconduct of the police defendants and the utter and complete failure of the Middlesex Prosecutor's office to do an appropriate investigation or to insist on an appropriate investigation by the Woodbridge defendants, Plaintiff was returned to the Middlesex Jail where he remained until the next court appearance about a week later. The conduct of the Middlesex Prosecutor and its agents was so misguided that it can only be an expression of acted out of personal motive, with malicious intent, or in excess of his jurisdiction. Again, at this second court appearance, Plaintiff asserted that this was a case of mistaken identity- telling the court again that he does not drive and that he had never been to Woodbridge prior to responding there because of the wrongful summons. The Middlesex County Prosecutor knew or should have known that the facial recognition match was based on faulty technology which is biased against African Americans and that Plaintiff was innocent because all of the other evidence was exonerating. Therefore, the Middlesex County Prosecutor should never have authorized the issuance of the arrest warrant against Plaintiff. Moreover, after the arrest of Plaintiff, the Middlesex County Prosecutor intentionally or with reckless disregard refused to consider all the other evidence which was exonerating. After receipt of the discovery from the Prosecutor, plaintiff presented to the Defendant prosecutor an iron clad alibi, namely the documents from Western Union to wire money to his fiancé which plaintiff was completing and processing in Paterson at the same time that the incident at the Hampton Inn was taking place. Despite this, the Middlesex County Prosecutor and the Woodbridge Defendants continued to argue that Plaintiff's incarceration should be continued even though no evidence tied him to the crime. Pressure was put on Plaintiff by the Prosecutor and the court to accept a plea deal where he would serve an extended sentence of many years. Plaintiff was threatened with a draconian sentence of over 25 years to get him to take the plea deal.*

*The targeting of plaintiff, his arrest, and the abusive aspects of his detention together with the insistence on proceeding with the prosecution all occurred without a scintilla of evidence to support it. Plaintiff was released but only due to the new no-bail rules Once out of jail, Plaintiff, was terrified that some inexplicable conspiracy or vendetta would destroy him, so he retained an expensive and talented criminal lawyer. However, despite this, the defendants kept Plaintiff in a state of apprehension for almost a year, refusing to drop charges, demanding a plea to lesser included charges, and promising that he would be tried and convicted and that if convicted he would incarcerated with no chance of release for at least 20 years. This pre-trial period constitutes a seizure under the Fourth Amendment and a Due Process violation, Procedural and Substantive, under the Fourteenth Amendment. The charges were only dropped on the eve of trial in late November 2019, when the plaintiff insisted to the court that he was going to trial because he was innocent and because there was no evidence. Plaintiff suffered physical and emotional pain because of the wrongful acts of defendants. Plaintiff also suffered financial loss and disruption since he was "absent without leave" from his job while wrongly incarcerated. Plaintiff continued and continues to suffer from anxiety and distress even after all charges were finally dismissed by the court when the Middlesex Prosecutor was reprimanded in court for this wrongful arrest, confinement and prosecution. The actions of the defendants were either willfully malicious or were done in reckless disregard and are actions that shock the conscience.*

4. State whether any admissions were made by any party to this action, their agents, servants or employees, and if so, state: (a) whether written or oral ; (b) the time , date, place and participants ; (c) if oral, set forth a summary of the oral admission; and (d) if written, attach a copy of same If you have obtained a statement from this party or any of its agents, servants or employees, state: (a) name, address, title and telephone number of such person; (b) when and where the statement was obtained;

(c) the name, address, occupation of the person to whom the statement was given; and (d) attach an exact copy of the statement and, if oral, a complete rendition of same .

*The reports of the defendant officers which relay that they relied solely on the facial recognition technology and did not do any other investigation and disclose that they ignored all of the exonerating evidence which constitute admissions.*

5.If you have obtained a statement from this party or any of its agents, servants or employees, state: (a) name, address, title and telephone number of such person; (b) when and where the statement was obtained; (c) the name, address, occupation of the person to whom the statement was given; and (d) attach an exact copy of the statement and, if oral, a complete rendition of same .

*The reports of Woodbridge Police officers produced in R. 26 disclosures constitute such written statements. Upon information and belief, additional such reports are in the possession of defendants.*

6.If you have obtained any documents, photographs, or other written materials from these Defendants, state: (a) title or other description; (b) date of documents; (c) where and from whom it was obtained; and (d) attach an complete and exact copy.

*Plaintiff, at this time, has the file obtained by his criminal defense counsel which includes, reports, arrest records, photographs, property inventory, and the like. While already in the possession of defendants, these were produced as part of Plaintiff's R. 26 disclosures. Plaintiff continues to seek additional documents, photographs, and the like.*

7. Without referencing the Second Amended Complaint, identify the activities or omissions of Defendant, Township of Woodbridge, that you reasonably believe are in violation of any law, rule, custom, or regulation. Identify specifically the statute , ordinance , regulation, custom, rule or usage which you allege the Township of Woodbridge acted in accordance with at the time you suffered the deprivation complained of and identify each and every right or privilege you claim to have been deprived of as a result of the alleged actions of the Defendant, Township of Woodbridge.

*Objection as this is a contention interrogatory given without leave of the court. Moreover, this interrogatory is objectionable as it seeks a legal opinion. Objection as this is a multipart question of unrelated subparts which violates the relevant Federal Rules of Civil Procedure.*

*Without waiving in anyway these objections, defendants disregarded standard police custom and practice which has evolved with intimate direction of the Federal Common Law, failed to follow standard policy custom and practice as set forth in the relevant Attorney General Guidelines and the relevant rules of the Woodbridge Police Department, written and unwritten, failed to follow and by reason, and common sense in failing to recognize the obvious: that Nijeer Parks was not the 6'2 black male involved in the underlying matter, that he had been an hour away, that he had a*

*solid alibi, that he did not drive a car, did not have a driver's license, had never been in Woodbridge. Have failed to comport with standard police custom and practices as described supra, the defendants proceeded to rely exclusively on facial recognition technology despite the fact that it is known to be unreliable and racially biased against African Americans. Upon information and belief, discovery will disclose the details about the unconstitutional and illegal policies, procedures and practices of the Woodbridge Police Department which area causally related to the wrongful acts which resulted in the wrongful arrest of plaintiff.*

*Without waiving these objections in any way, it is misleading to ask Plaintiff to explain his contention that Woodbridge "acted in accordance with" "any ordinance, regulation, custom, rule or usage" as this question suggests a validity to the action and the related ordinance, regulation, custom, rule or usage. Plaintiff does, however, contend that the conduct of the defendants was so extreme, so apparently routinized, so clearly objectionable that it suggests that this wrongdoing was an expression of a policy or practice of the Woodbridge Police Department under the Monell standard to create municipal liability. Upon information and belief and because of previously reported cases where the Woodbridge Police Department has been held to have violated constitutional norms, discovery will provide the exact details relevant to the wrongful acts of defendants in reference to this plaintiff.*

*Without waiving these objections in any way, Plaintiff alleges that defendants, inter alia, violated his:*

1. *Right to be secure in his person and property guaranteed, inter alia, by the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States of America;*
2. *Right to procedural due process as guaranteed by the Fifth and Fourteenth Amendment;*
3. *Right to Equal Protection of the Laws;*
4. *Right to privacy;*
5. *Rights and privileges guaranteed by Article I of the Constitution of the State of New Jersey, 1947.*

8. Without referencing the Second Amended Complaint, identify the "policies, customs and practices of the Woodbridge Township Police Department" that caused your contention in Paragraph 118 of Plaintiff' s Second Amended Complaint of illegal and unjust treatment

*Objection as this is a contention interrogatory given without leave of the court. Moreover, this interrogatory is objectionable as it seeks a legal opinion. Objection as this is a multipart question of unrelated subparts which violates the relevant Federal Rules of Civil Procedure.*

*Without waiving in anyway these objections, defendants engaged in illegal and unjust treatment of plaintiff when they disregarded standard police custom and practice which has evolved with intimate direction of the Federal Common Law, failed to follow standard policy custom and practice as set forth in the relevant Attorney General Guidelines and the relevant rules of the Woodbridge Police Department, written and unwritten, failed to follow and by reason, and common sense in failing to recognize the obvious: that Nijeer Parks was not the 6'2 black male involved in the underlying matter, that he had been an hour away, that he had a solid alibi, that he did not drive a car, did not have a driver's license, had never been in Woodbridge. Have failed to comport with standard police custom and practices as described supra, the defendants proceeded to rely exclusively on facial recognition technology despite the fact that it is known to be unreliable and racially biased against African Americans. Plaintiff are engaging in discovery to determine whether the policies, customs and practices resulting in the unjust and illegal treatment of plaintiff were written or unwritten and/or were a consequence of acts or omissions of management.*

9. Without referencing the Second Amended Complaint, state in complete detail the factual basis for your contention in Paragraph 120 of Plaintiff's Second Amended Complaint that the Defendant, Township of Woodbridge, failed to supervise the use of facial recognition by its police officers to attempt to curb the racially discriminatory effect of facial recognition.

*Objection as this is a contention interrogatory given without leave of the court.  Moreover, this interrogatory is objectionable as it seeks a legal opinion.  Objection as this is a multipart question of unrelated subparts which violates the relevant Federal Rules of Civil Procedure.*

*Moreover, paragraph 120 asserts liability of the Middlesex County Prosecutor for defective training, supervision, instruction of its investigators in the use of facial recognition technology.*

*Without waiving in anyway these objections,  defendants disregarded standard police custom and practice which has evolved with intimate direction of the Federal Common Law,  failed to follow standard policy custom and practice  as set forth in the relevant Attorney General Guidelines and the relevant rules of the Middlesex County Prosecutor, written and unwritten,  failed to follow and by reason, and common sense in failing to recognize the obvious: that Nijeer Parks was not the 6'2  black male involved in the underlying matter, that he had been an hour away, that he had a solid alibi, that he did not drive a car, did not have a driver's license, had never been in Woodbridge. Have failed to comport with standard police custom and practices as described supra,  the defendants proceeded to rely exclusively on facial recognition technology despite the fact that it is known to be unreliable and racially biased against African Americans. Plaintiffs are endeavoring through discovery to identify the nature of the misue of facial recognition technology by defendants.*

10. Without referencing the Second Amended Complaint, state in complete detail the factual basis for your contention in Paragraph 121 of Plaintiff's Second Amended Complaint that the Defendant, Township of Woodbridge, failed to properly train its police officers in the use of facial recognition technology to prevent it from causing racially tinged injustices.

*Objection as this is a contention interrogatory given without leave of the court.  Moreover, this interrogatory is objectionable as it seeks a legal opinion.  Objection as this is a multipart question of unrelated subparts which violates the relevant Federal Rules of Civil Procedure.*

*Objection as Paragraph 121 asserts liability of the Middlesex Prosecutor, not the Woodbridge Police.*

*Without waiving in anyway these objections, defendants disregarded standard police custom and practice which has evolved with intimate direction of the Federal Common Law, failed to follow standard policy custom and practice as set forth in the relevant Attorney General Guidelines and the relevant rules of the Middlesex County Prosecutor's Office, written and unwritten, failed to follow and by reason, and common sense in failing to recognize the obvious: that Nijeer Parks was not the 6'2 black male involved in the underlying matter, that he had been an hour away, that he had a solid alibi, that he did not drive a car, did not have a driver's license, had never been in Woodbridge. Have failed to comport with standard police custom and practices as described supra, the defendants proceeded to rely exclusively on facial recognition technology despite the fact that it is known to be unreliable and racially biased against African Americans. Plaintiffs are endeavoring through discovery to identify the nature of the misuse of facial recognition technology by defendants.*

11. Without referencing the Second Amended Complaint , state completely and in detail the factual basis for your contention in Paragraph 138 of Plaintiff' s Second Amended Complaint that Defendants, John E. McCormac, Robert Hubner, Andrew Lyszk and Sergeant Licciardi , "engaged in a conspiracy for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws"

*Objection as this is a contention interrogatory given without leave of the court. Moreover, this interrogatory is objectionable as it seeks a legal opinion. Objection as this is a multipart question of unrelated subparts which violates the relevant Federal Rules of Civil Procedure.*

*Without waiving in anyway these objections, defendants John E. McCormac, Robert Hubner, Andrew Lyszk and Sergeant Licciardi worked either by setting illegal and unconstitutional policies and practices and/or by implemented illegal and unconstitutional policies and practices which violated or disregarded standard police custom and practice which has evolved through, inter alia, Federal Common Law, to ensure Equal Protection under the law. Defendants either failed to follow standard policy custom and practice as set forth in the relevant Attorney General Guidelines and the relevant rules of the Woodbridge Police Department, written and unwritten, failed to follow and by reason, and common sense in failing to recognize the obvious: that Nijeer Parks was not the 6'2 black male involved in the underlying matter, that he had been an hour away, that he had a solid alibi, that he did not drive a car, did not have a driver's license, had never been in Woodbridge. Have failed to comport with standard police custom and practices as described supra, the defendants proceeded to rely exclusively on facial recognition technology despite the fact that it is*

*known to be unreliable and racially biased against African Americans. Plaintiffs are endeavoring through discovery to identify the nature of the misuse of facial recognition technology by defendants.*

12. Without referencing the Second Amended Complaint , state completely and in detail the factual basis for your contention in Paragraph 139 of Plaintiff' s Second Amended Complaint that Defendants, John E. McCormac, Robert Hubner, Andrew Lyszk and Sergeant Licciardi "acted in furtherance of the conspiracy."

*Objection as this is a contention interrogatory given without leave of the court. Moreover, this interrogatory is objectionable as it seeks a legal opinion. Objection as this is a multipart question of unrelated subparts which violates the relevant Federal Rules of Civil Procedure*

.

*Without waiving in anyway these objections, see response to interrogatory 11 above.*

13. Without referencing the Second Amended Complaint , state completely and in detail the factual basis for your contention in Paragraph 32 of Plaintiff's Second Amended Complaint that [t] he misconduct of the Woodbridge Police defendants is a result, inter alia, of failure to train, negligent hiring, failure to supervise, failure to discipline, and these failures were all the result of the actions or omissions of Mayor McCormack and or Police Director Hubner"

*Objection as this is a contention interrogatory given without leave of the court. Moreover, this interrogatory is objectionable as it seeks a legal opinion. Objection as this is a multipart question of unrelated subparts which violates the relevant Federal Rules of Civil Procedure.*

*Without waiving in anyway these objections, defendants John E. McCormack, Robert Hubner, Andrew Lyszk and Sergeant Licciardi worked either by setting illegal and unconstitutional policies and practices and/ or by implemented*

*illegal and unconstitutional policies and practices which violated or disregarded standard police custom and practice which has evolved through, inter alia, Federal Common Law, to ensure Equal Protection under the law. Defendants either failed to follow standard policy custom and practice as set forth in the relevant Attorney General Guidelines and the relevant rules of the Woodbridge Police Department, written and unwritten, failed to follow and by reason, and common sense in failing to recognize the obvious: that Nijeer Parks was not the 6'2 black male involved in the underlying matter, that he had been an hour away, that he had a solid alibi, that he did not drive a car, did not have a driver's license, had never been in Woodbridge. Have failed to comport with standard police custom and practices as described supra, the defendants proceeded to rely exclusively on facial recognition technology despite the fact that it is known to be unreliable and racially biased against African Americans. Plaintiffs are endeavoring through discovery to identify the nature of the misuse of facial recognition technology by defendants.*

14. Without referencing the Second Amended Complaint , state completely and in detail the factual basis for your contention in Paragraph 33 of Plaintiff's Second Amended Complaint that "the adoption and use of facial recognition technology in order to make an arrest and charge and individual with crimes is illegal, unconstitutional and actionable.

*Objection as this is a contention interrogatory given without leave of the court. Moreover, this interrogatory is objectionable as it seeks a legal opinion. Objection as this is a multipart question of unrelated subparts which violates the relevant Federal Rules of Civil Procedure.*

*Without waiving in anyway these objections, defendants John E. McCormac, Robert Hubner, Andrew Lyszk and Sergeant Licciardi worked either by setting illegal and unconstitutional policies and practices and/or by implemented illegal and unconstitutional policies and practices which violated or disregarded standard police custom and practice which has evolved through, inter alia, Federal Common Law, to ensure Equal Protection under the law. Defendants either failed to follow standard policy custom and practice as set forth in the relevant Attorney General Guidelines and the relevant rules of the Woodbridge Police Department, written and unwritten, failed to follow and by reason, and common sense in failing to recognize the obvious: that Nijeer Parks was not the 6'2 black male involved in the underlying matter, that he had been an hour away, that he had a solid alibi, that he did not drive a car, did not have a driver's license, had never been in Woodbridge. Have failed to comport with standard police custom and practices as described supra, the defendants proceeded to rely exclusively on facial recognition technology despite the fact that it is known to be unreliable and racially biased against African Americans. Plaintiffs are endeavoring through discovery to identify the nature of the misuse of facial recognition technology by defendants.*

15. State in complete detail or by computation, all items of damage or loss, including but not limited to the financial loss and disruption referenced in Paragraph 88 of Plaintiff' s Second Amended Complaint, you contend are the fault or responsibility of the Defendants and the factual basis for such allegations .

*Objection as this is a contention interrogatory given without leave of the court. Moreover, this interrogatory is objectionable as it seeks a legal opinion. Objection as this is a multipart question of unrelated subparts which violates the relevant Federal Rules of Civil Procedure.*

*Plaintiff's incarceration prevented him from working for ten days causing his employer to fire him. Fortunately, after a Plaintiff presented a complete account of the situation, the employer re-hired plaintiff. However, he lost three weeks of work. Plaintiff's weekly earnings at that time were $400.so that the total losses were $1200.*

*Additionally, pretrial monitoring for the following year continually interfered with his work schedule which resulted in a loss of a day's work. 52 x $90 = $ 4,680.00.*

*Additionally, plaintiff was forced to retain a criminal lawyer which cost him $5000.*

*Additionally, plaintiff has suffered emotional and mental distress which has impaired his ability to progress in his work for an as yet unknown amount.*

# C

**WOODBRIDGE POLICE DEPARTMENT**
**WOODBRIDGE, NJ**

| INCIDENT # / REPORT # | OFFICER | BADGE | REVIEW STATUS |
|---|---|---|---|
| 19010123 / 8 | LEE, F | 591 | APPROVED |

**INCIDENT #19010123 DATA**
As Of 02/13/2019 11:48:50

**BASIC INFORMATION**

| CASE TITLE | LOCATION | APT/UNIT # |
|---|---|---|
| AGG ASS/ WOODBRIDGE TWP | 370 US HWY 9 N | |

| DATE/TIME REPORTED | DATE/TIME OCCURRED |
|---|---|
| 01/26/2019 12:21:50 | On or about 01/26/2019 12:21 |

**INCIDENT TYPE(S)/OFFENSE(S)**
(2C:20-11)SHOPLIFTING
(2C:12-1B(2))AGGRAVATED ASSAULT W/WEAPON
(2C:29-3)HINDERING APPREHENSION OR PROSECUTION
(2C:21-2.1(C))EXHIBITIS A FALSE GOVERNMENT DOCUMENT
(2C:35-10(A)(4))POSSESSION OF CDS (MARIJUANA) UNDER 50G
(2C:36-2)USE OR POSSESSION DRUG PARAPHERNALIA
(39:4-129)LEAVING SCENE OF ACCIDENT
(39:4-96)TRAFFIC REGULATION
(39:3-76.2)SAFETY BELTS OR RESTRAINING DEVICES
(2C:29-2A(2))RESISTING ARREST/BY FLIGHT
(39:4-130)TRAFFIC REGULATION
(2C:29-1)OBSTRUCTING ADMINISTRATION OF LAW OR OTHER GOVERNM
(2C:29-2(B))ELUDING
(2C:17-3)CRIMINAL MISCHIEF
(2C:39-4(D))POSS WEAPON UNLAWFUL PURPOSE OTHER WEAPONS

**PERSONS**

| ROLE | NAME | SEX | RACE | AGE DOB | PHONE |
|---|---|---|---|---|---|
| VICTIM | WOODBRIDGE TWP,<br>**ADDRESS:** 1 MAIN ST WOODBRIDGE, NJ | | | | (HOME) 732-634-77(<br>(CELL) |
| VICTIM | HAMPTON INN,<br>**ADDRESS:** 370 US HIGHWAY 9 NORTH HOPELAWN, NJ | | | | (WORK) 73285569o(<br>(CELL) |
| REPORTING PERSON | CHARNECO, RICHARD A<br>**ADDRESS:** 370 RT. 9 NORTH WOODBRIDGE, NJ | MALE | WHITE | [redacted] | (HOME)<br>(CELL) [redacted] |

PARKS000076

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| WITNESS | HIGGINS, CALEIGH | FEMALE | WHITE | | | [redacted] | (HOME) |
| | ADDRESS: 370 RT. 9 NORTH WOODBRIDGE, NJ | | | | | | (CELL) [redacted] |
| WITNESS | GRANT, KAMISHA | FEMALE | BLACK | | | [redacted] | (HOME) |
| | ADDRESS: 370 RT. 9 NORTH WOODBRIDGE, NJ | | | | | | (CELL) [redacted] |
| OWNER/OPERATOR | HERTZ, | | | | | | (HOME) |
| | ADDRESS: 900 DOREMUS AVE PT NEWARK, NJ | | | | | | (CELL) |
| VICTIM | LEE, FRANCIS POLICE | MALE | ASIAN/PACIFIC ISLANDER | 36 | 10/17/1982 | | (WORK) 732634770( |
| | ADDRESS: 1 MAIN STREET WOODBRIDGE, NJ | | | | | | (CELL) |

**OFFENDERS**

| STATUS | NAME | SEX | RACE | AGE | DOB | PHONE |
|---|---|---|---|---|---|---|
| DEFENDANT | PARKS, NIJEER K | MALE | BLACK | 31 | 09/11/1987 | (HOME) 570-516-4620 |
| | ADDRESS: 485 E. 19TH ST 3G PATTERSON, NJ | | | | | (CELL) 570-516-4620 |

**VEHICLES**

| ROLE | TYPE | YEAR | MAKE | MODEL | COLOR | REG # | STATE |
|---|---|---|---|---|---|---|---|
| SUSPECT VEHICLE | | 2018 | DOD | CHA | GRAY | JBD2162 | NY |
| STOLEN $ | REC CODE | DATE REC | REC $ | REC BY | | | |

**PROPERTY**

| CLASS | DESCRIPTION | MAKE | MODEL | SERIAL # | VALUE |
|---|---|---|---|---|---|
| OTHER | FAKE TENNESSE DL | | | 801527486 | |
| OTHER | 2 BACKWOOD SARK STOUT CIGAR PACKS | | | | |
| OTHER | 2 BACKWOOD SWEET AROMATIC CIGAR PACKS | | | | |
| DRUGS/NARCOTICS | 44 GRAMS OF SUSPECTED MARIJUANA | | | | |
| DRUG/NARCOTIC EQUIPMENT | MARIJUANA GRINDER | | | | |
| OTHER | SPRINT SIM CARD | | | 8901120200 | |
| OTHER | DUNKIN DONUTS RECEIPT | | | 855 | |
| OTHER | 13 ASSORTED CANDIES | | | | |
| OTHER | 2 CLEAR EYE DROPS | | | | |

**OFFICER REPORT: 19010123 - 8 / LEE, F (591)**

| DATE/TIME OF REPORT | TYPE OF REPORT | REVIEW STATUS |
|---|---|---|
| 02/12/2019 10:39:32 | SUPPLEMENT | APPROVED |

**NARRATIVE**

On February 5, 2019, I was contacted by Lt. Ng, who advised me that they currently had an individual, Nijeer Parks, who was involved in the incident on January 26, 2019. I arrived at HQ and was brought down to the processing area with Lt. Ng and Det. Sgt. Penicaro. Once there, I observed Mr. Parks sitting on the rail and identified him as being the suspect from the January 26, 2019 incident at the Hampton Inn on Rt. 9N.

**REPORT OFFICERS**

| | | |
|---|---|---|
| Reporting Officer: | LEE, F | 591 |
| Approving Officer: | ANDERSEN S | 493 |

# D

# WOODBRIDGE POLICE DEPARTMENT
## WOODBRIDGE, NJ

| INCIDENT # / REPORT # | OFFICER | BADGE | REVIEW STATUS |
|---|---|---|---|
| 19010123 / 3 | LYSZYK A | 519 | APPROVED |

## INCIDENT #19010123 DATA
As Of 02/07/2019 09:21:32

### BASIC INFORMATION

| CASE TITLE | LOCATION | APT/UNIT # |
|---|---|---|
| AGG ASS/ WOODBRIDGE TWP | 370 US HWY 9 N | |

| DATE/TIME REPORTED | DATE/TIME OCCURRED |
|---|---|
| 01/26/2019 12:21:50 | On or about 01/26/2019 12:21 |

**INCIDENT TYPE(S)/OFFENSE(S)**

(2C:20-11)SHOPLIFTING
(2C:12-1B(2))AGGRAVATED ASSAULT W/WEAPON
(2C:29-3)HINDERING APPREHENSION OR PROSECUTION
(2C:21-2.1(C))EXHIBITIS A FALSE GOVERNMENT DOCUMENT
(2C:35-10(A)(4))POSSESSION OF CDS (MARIJUANA) UNDER 50G
(2C:36-2)USE OR POSSESSION DRUG PARAPHERNALIA
(39:4-129)LEAVING SCENE OF ACCIDENT
(39:4-96)TRAFFIC REGULATION
(39:3-76.2)SAFETY BELTS OR RESTRAINING DEVICES
(2C:29-2A(2))RESISTING ARREST/BY FLIGHT
(39:4-130)TRAFFIC REGULATION
(2C:29-1)OBSTRUCTING ADMINISTRATION OF LAW OR OTHER GOVERNM
(2C:29-2(B))ELUDING
(2C:17-3)CRIMINAL MISCHIEF
(2C:39-4(D))POSS WEAPON UNLAWFUL PURPOSE OTHER WEAPONS

### PERSONS

| ROLE | NAME | SEX | RACE | AGE DOB | PHONE |
|---|---|---|---|---|---|
| VICTIM | WOODBRIDGE TWP,<br>**ADDRESS:** 1 MAIN ST WOODBRIDGE, NJ | | | | (HOME) 732-634-77(<br>(CELL) |
| VICTIM | HAMPTON INN,<br>**ADDRESS:** 370 US [redacted]GHWAY 9 NORTH HOPELAWN, NJ | | | | (WORK) 73285569 0(<br>(CELL) |
| REPORTING PERSON | CHARNECO, RICHARD A<br>**ADDRESS:** [redacted] | MALE | WHITE | [redacted] | (HOME)<br>(CELL) [redacted] |

NP7

| | | | | | |
|---|---|---|---|---|---|
| WITNESS | HIGGINS, CALEIGH | FEMALE | WHITE | [redacted] | (HOME) |
| | ADDRESS: [redacted] | | | | (CELL) [redacted] |
| WITNESS | GRANT, KAMISHA | FEMALE | BLACK | [redacted] | (HOME) |
| | ADDRESS: [redacted] | | | | (CELL) [redacted] |
| OWNER/OPERATOR | HERTZ, | | | | (HOME) |
| | ADDRESS: 900 DOREMUS AVE PT NEWARK, NJ | | | | (CELL) |
| VICTIM | LEE, FRANCIS POLICE | MALE | ASIAN/PACIFIC ISLANDER | [redacted] | (WORK) [redacted] |
| | ADDRESS: [redacted] | | | | (CELL) |

**OFFENDERS**

| STATUS | NAME | SEX | RACE | AGE | DOB | PHONE |
|---|---|---|---|---|---|---|
| SUSPECT | UNKNOWN, UNKNOWN UNKNOWN | | | | | (HOME) UNKNOWN |
| | ADDRESS: UNKNOWN UNKNOWN, | | | | | (CELL) UNKNOWN |
| SUSPECT | PARKS, NIJEER K | MALE | BLACK | 31 | 09/11/1987 | (HOME) |
| | ADDRESS: 485 E. 19TH ST 3G PATTERSON, NJ | | | | | (CELL) |

**VEHICLES**

| ROLE | TYPE | YEAR | MAKE | MODEL | COLOR | REG # | STATE |
|---|---|---|---|---|---|---|---|
| SUSPECT VEHICLE | | 2018 | DOD | CHA | GRAY | JBD2162 | NY |

| STOLEN $ | REC CODE | DATE REC | REC $ | REC BY |
|---|---|---|---|---|

**PROPERTY**

| CLASS | DESCRIPTION | MAKE | MODEL | SERIAL # | VALUE |
|---|---|---|---|---|---|
| OTHER | FAKE TENNESSE DL | | | 801527486 | |
| OTHER | 2 BACKWOOD SARK STOUT CIGAR PACKS | | | | |
| OTHER | 2 BACKWOOD SWEET AROMATIC CIGAR PACKS | | | | |
| DRUGS/NARCOTICS | 44 GRAMS OF SUSPECTED MARIJUANA | | | | |
| DRUG/NARCOTIC EQUIPMENT | MARIJUANA GRINDER | | | | |
| OTHER | SPRINT SIM CARD | | | 8901120200 | |
| OTHER | DUNKIN DONUTS RECEIPT | | | 855 | |
| OTHER | 13 ASSORTED CANDIES | | | | |
| OTHER | 2 CLEAR EYE DROPS | | | | |

NPB

**OFFICER REPORT: 19010123 - 3 / LYSZYK A (519)**

| DATE/TIME OF REPORT | TYPE OF REPORT | REVIEW STATUS |
|---|---|---|
| 01/30/2019 18:56:05 | SUPPLEMENT | APPROVED |

**NARRATIVE**

Det. S. Tapia advised me that he sent out the picture of the suspect to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) for facial recognition. On Jan. 27, he received notification from Investigator Seamus Lyons (Rockland County Sheriff's Department Intelligence Center) and Sgt. Dey (Palisades Interstate Parkway Police) that they had a high profile comparison to the picture on the fraudulent Tennessee driver's license. The suspect was identified as Nijeer Parks. As a result, I signed a complaint for the following charges; shoplifting, hindering, possession of marijuana under 50 grams, possession of drug paraphernalia, obstructing administration of the law, false government documents, resisting arrest, eluding, and criminal mischief warrant # 1225 W 2019 000158. AP Peter Nastasi approved the warrant and it was signed by Honorable Judge David Stahl on 1-30-19.

After signing the warrant, Det. Tapia, Det. Goins, and I drove to Patterson PD to arrest Parks. We checked several address in Patterson, but had negative results.

**REPORT OFFICERS**

| | | |
|---|---|---|
| Reporting Officer: | LYSZYK A | 519 |
| Approving Officer: | LICCIARDI J | 450 |

NP9



**E**



## WOODBRIDGE POLICE DEPARTMENT
## WOODBRIDGE, NJ

| INCIDENT # / REPORT # | OFFICER | BADGE | REVIEW STATUS |
|---|---|---|---|
| 19010123 / 4 | TAPIA S | 481 | APPROVED |

---

### INCIDENT #19010123 DATA
As Of 02/04/2019 13:58:18

---

#### BASIC INFORMATION

**CASE TITLE**
AGG ASS/ WOODBRIDGE TWP

**LOCATION**
370 US HWY 9 N

**APT/UNIT #**

**DATE/TIME REPORTED**
01/26/2019 12:21:50

**DATE/TIME OCCURRED**
On or about 01/26/2019 12:21

**INCIDENT TYPE(S)/OFFENSE(S)**
(2C:20-11)SHOPLIFTING
(2C:12-1B(2))AGGRAVATED ASSAULT W/WEAPON
(2C:29-3)HINDERING APPREHENSION OR PROSECUTION
(2C:21-2.1(C))EXHIBITS A FALSE GOVERNMENT DOCUMENT
(2C:35-10(A)(4))POSSESSION OF CDS (MARIJUANA) UNDER 50G
(2C:36-2)USE OR POSSESSION DRUG PARAPHERNALIA
(39:4-129)LEAVING SCENE OF ACCIDENT
(39:4-96)TRAFFIC REGULATION
(39:3-76.2)SAFETY BELTS OR RESTRAINING DEVICES
(2C:29-2A(2))RESISTING ARREST/BY FLIGHT
(39:4-130)TRAFFIC REGULATION
(2C:29-1)OBSTRUCTING ADMINISTRATION OF LAW OR OTHER GOVERNM
(2C:29-2(B))ELUDING
(2C:17-3)CRIMINAL MISCHIEF
(2C:39-4(D))POSS WEAPON UNLAWFUL PURPOSE OTHER WEAPONS

#### PERSONS

| ROLE | NAME | SEX | RACE | AGE | DOB | PHONE |
|---|---|---|---|---|---|---|
| VICTIM | WOODBRIDGE TWP, | | | | | (HOME) 732-634-77~ |
| | **ADDRESS:** 1 MAIN ST  WOODBRIDGE, NJ | | | | | (CELL) |
| VICTIM | HAMPTON INN, | | | | | (WORK) 732855690~ |
| | **ADDRESS:** 370 US HIGHWAY 9 NORTH  HOPELAWN, NJ | | | | | (CELL) |
| REPORTING PERSON | CHARNECO, RICHARD A | MALE | WHITE | ~ | ~ | (HOME) |
| | **ADDRESS:** ~~~~~~~~~~~~ | | | | | (CELL) ~~~~ |

*NP10*

| | | | | | |
|---|---|---|---|---|---|
| WITNESS | HIGGINS, CALEIGH | FEMALE | WHITE | [redacted] | (HOME) |
| | ADDRESS: [redacted] J | | | | (CELL) [redacted] |
| WITNESS | GRANT, KAMISHA | FEMALE | BLACK | [redacted] | (HOME) |
| | ADDRESS: [redacted] | | | | (CELL) [redacted] |
| OWNER/OPERATOR | HERTZ, | | | | (HOME) |
| | ADDRESS: 900 DOREMUS AVE PT NEWARK, NJ | | | | (CELL) |
| VICTIM | LEE, FRANCIS POLICE | MALE | ASIAN/PACIFIC ISLANDER | 36 [redacted] | (WORK) [redacted] |
| | ADDRESS: [redacted] | | | | (CELL) |

**OFFENDERS**

| STATUS | NAME | SEX | RACE | AGE | DOB | PHONE |
|---|---|---|---|---|---|---|
| SUSPECT | UNKNOWN, UNKNOWN UNKNOWN | | | | | (HOME) UNKNOWN |
| | ADDRESS: UNKNOWN UNKNOWN, | | | | | (CELL) UNKNOWN |
| SUSPECT | PARKS, NIJEER K | MALE | BLACK | 31 | 09/11/1987 | (HOME) |
| | ADDRESS: 485 E. 19TH ST 3G PATTERSON, NJ | | | | | (CELL) |

**VEHICLES**

| ROLE | TYPE | YEAR | MAKE | MODEL | COLOR | REG # | STATE |
|---|---|---|---|---|---|---|---|
| SUSPECT VEHICLE | | 2018 | DOD | CHA | GRAY | JBD2162 | NY |

| STOLEN $ | REC CODE | DATE REC | REC $ | REC BY |
|---|---|---|---|---|

**PROPERTY**

| CLASS | DESCRIPTION | MAKE | MODEL | SERIAL # | VALUE |
|---|---|---|---|---|---|
| OTHER | FAKE TENNESSE DL | | | 801527486 | |
| OTHER | 2 BACKWOOD SARK STOUT CIGAR PACKS | | | | |
| OTHER | 2 BACKWOOD SWEET AROMATIC CIGAR PACKS | | | | |
| DRUGS/NARCOTICS | 44 GRAMS OF SUSPECTED MARIJUANA | | | | |
| DRUG/NARCOTIC EQUIPMENT | MARIJUANA GRINDER | | | | |
| OTHER | SPRINT SIM CARD | | | 8901120200 | |
| OTHER | DUNKIN DONUTS RECEIPT | | | 855 | |
| OTHER | 13 ASSORTED CANDIES | | | | |
| OTHER | 2 CLEAR EYE DROPS | | | | |

NPII

OFFICER REPORT: 19010123 - 4 / TAPIA S (481)

| DATE/TIME OF REPORT | TYPE OF REPORT | REVIEW STATUS |
|---|---|---|
| 02/04/2019 13:52:26 | DET SUPPLEMENT | APPROVED |

NARRATIVE

On Saturday, January 26, 2019, Woodbridge Police Officers Lyszyk and Lee were dispatched to the Hampton Inn Hotel on a report of a man shoplifting snacks from the lobby. Officers responded and the suspect identified himself as Jamal Owens and produced a fraudulent Tennessee driver's license # 801527486. Officer Lyszyk contacted the Tennessee State Police and they confirmed that the Tennessee driver's license was fraudulent. Officers Lyszyk and Lee attempted to place the suspect under arrest and the suspect resisted arrest. The suspect ran into a 2018 Dodge Challenger bearing New York registration JBD2162. The suspect disobeyed several verbal commands to shut off and exit the vehicle. The suspect drove at Officer Lee, rammed the rear of the police car and crashed into part of the building. Officer Lee had to jump out of the way to avoid serious injury. Patrol Officers pursued the vehicle for a short distance and lost sight of it. I requested video footage from the Hampton Inn Hotel manager, Richard Charneco and the video was later turned over to the Woodbridge Police for evidence. Woodbridge Police I.D. Detective Quesada responded to the Hampton Inn Hotel and processed the scene. The suspect's sneaker, the fraudulent Tennessee driver's license, and a water bottle that the suspect drank out of were brought back to Woodbridge headquarters for further processing. The vehicle was located by Sgt. Flavell unoccupied on Mattison St. Woodbridge which is approximately 1 mile away from the Hampton Inn. Sgt. Flavell towed the vehicle to our impound yard for further processing upon my request. I contacted Hertz corporate security manager, Matthew Knowles and I learned that the suspect went in to the Hertz rental located within the Hampton inn hotel on rt.9 North in Woodbridge with the intent of extending his rental agreement on a 2018 grey Challenger bearing New York registration JBD2162. He presented the fraudulent Tennessee Driver's License with the name Jamal Owens. Matthew Knowles gave me verbal and written consent to search the vehicle. Inside the vehicle, I found the rental agreement for the Dodge Challenger with the name Jamal Owens. Detective Quesada processed the inside of the vehicle for fingerprints and several prints were lifted.

I verified with Officer Lee and Officer Lyszyk that the picture on the fraudulent Tennessee driver's license was the picture of the suspect. They both stated that they were 100% sure it was the suspect's picture. I sent out the suspect's Tennessee driver's license picture to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) for facial recognition.

On January 27, 2019, I received notification from Investigator Seamus Lyons (Rockland County Sheriff's Intelligence Center) and Sgt. Dey (Palisades Interstate Parkway Police) that they had a high profile comparison to the picture on the fraudulent Tennessee driver's license. The suspect was identified as Nijeer Parks with a date of birth of September 11, 1987 with a last known address of 485 E. 19th St. Apt # 3G Paterson, NJ. I compared the photo on the fraudulent Tennessee driver's license to Nijeer Parks' assigned New Jersey driver's license # P06195927209872 and it is the same person. Inv. Seamus Lyons emailed me the Identification Report for evidence.

On February 1, 2019, I went to Hertz and I took a taped statement of the manager, Michael Dones who tended to the suspect. During his interview; he explained the identification procedures when renting a vehicle. Furthermore, Mr. Dones stated that he verified the picture on the Tennessee driver's license to the customer's face and it was the same person. Mr. Dones provided me with a copy of the rental agreements which were placed into evidence.

I contacted Middlesex County A.P. Nastasi and presented him with the facts of the case and he authorized a warrant. I generated warrant # 2019000156 against Nijeer Parks charging him with aggravated assault on police, possession of a weapon and possession of a weapon for unlawful purpose. The Honorable Municipal Court Judge Stahl read the affidavit of probable cause and signed the warrant. Officer Lyszyk generated warrant # 2019000158. (See officer Lyszyk's

NP 12

warrant for the list of charges)
After signing the complaints, Officer Lyszyk, Det. Goins, and I drove to Patterson and checked
several addresses looking for Nijeer Parks but were unsuccessful. All of the evidence collected
during this investigation is secured in the Woodbridge Police Evidence Bureau.
On February 2, 2019, I faxed the warrants to Patterson P.D. for service.  This investigation is
concluded pending court.


**REPORT OFFICERS**

| | | |
|---|---|---|
| Reporting Officer: | TAPIA S | 481 |
| Approving Officer: | PENICARO A | 472 |

NP13

# F



**TAPIA, SANTIAGO**

| | |
|---|---|
| **From:** | Seamus Lyons <lyons@RCPIN.net> |
| **Sent:** | Monday, January 28, 2019 9:29 AM |
| **To:** | TAPIA, SANTIAGO |
| **Subject:** | RE: Aggravated Assault on a Police Officer (Flyer) |

Good news. Yes, I used facial recognition soft ware but altered the photo on the license a little to get the pixels clear. Got a high number hit and he is a Patterson NJ guy. We have facial recognition here at the Rockland County Intel Center. Keep my info and if you need anything in the future call or email. Stay safe.

Seamus

ROCKLAND COUNTY INTELLIGENCE CENTER PO BOX 295, NEW CITY, N.Y. 10956
INVESTIGATOR SEAMUS A. LYONS #891
ROCKLAND COUNTY SHERIFF'S DEPARTMENT INTELLIGENCE CENTER
55 NEW HEMPSTEAD ROAD, NEW CITY, N.Y. 10956
W-MAIN-845-364-3611
W-DIRECT-845-364-3632
W-CELL-845-521-0334
EMAIL- lyons@rcpin.net<mailto:lyons@rcpin.net>

---

From: TAPIA, SANTIAGO [santiago.tapia@twp.woodbridge.nj.us]
Sent: Monday, January 28, 2019 9:24 AM
To: Seamus Lyons
Subject: Re: Aggravated Assault on a Police Officer (Flyer)

Yes. He's fine. How did you guys ID him. Facial recognition through NYSIC or the ROIC?

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone

-------- Original message --------
From: Seamus Lyons <lyons@RCPIN.net>
Date: 1/28/19 9:17 AM (GMT-05:00)
To: "TAPIA, SANTIAGO" <santiago.tapia@twp.woodbridge.nj.us>
Subject: RE: Aggravated Assault on a Police Officer (Flyer)

Excellent !!!!!!!!!! how is the officer. Is he ok?

ROCKLAND COUNTY INTELLIGENCE CENTER PO BOX 295, NEW CITY, N.Y. 10956
INVESTIGATOR SEAMUS A. LYONS #891
ROCKLAND COUNTY SHERIFF'S DEPARTMENT INTELLIGENCE CENTER
55 NEW HEMPSTEAD ROAD, NEW CITY, N.Y. 10956
W-MAIN-845-364-3611
W-DIRECT-845-364-3632

W-CELL-845-521-0334
EMAIL- lyons@rcpin.net<mailto:lyons@rcpin.net>

---

From: TAPIA, SANTIAGO [santiago.tapia@twp.woodbridge.nj.us]
Sent: Monday, January 28, 2019 9:16 AM
To: Seamus Lyons
Subject: Re: Aggravated Assault on a Police Officer (Flyer)

That's him.
Thank you and Sgt. Dey for your help.
Tapia

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone

-------- Original message --------
From: Seamus Lyons <lyons@RCPIN.net>
Date: 1/28/19 8:40 AM (GMT-05:00)
To: "TAPIA, SANTIAGO" <santiago.tapia@twp.woodbridge.nj.us>
Subject: Aggravated Assault on a Police Officer (Flyer)

See attached PDF regarding your PD Police Information flyer Aggravated Assault on a Police Officer. Good possible hit on facial recognition. It was sent to us from the NJ PIP Police Sgt R. Dey. Let me know if you need any further. Good luck.

Inv Seamus Lyons

ROCKLAND COUNTY INTELLIGENCE CENTER PO BOX 295, NEW CITY, N.Y. 10956
INVESTIGATOR SEAMUS A. LYONS #891
ROCKLAND COUNTY SHERIFF'S DEPARTMENT INTELLIGENCE CENTER
55 NEW HEMPSTEAD ROAD, NEW CITY, N.Y. 10956
W-MAIN-845-364-3611
W-DIRECT-845-364-3632
W-CELL-845-521-0334
EMAIL- lyons@rcpin.net<mailto:lyons@rcpin.net>

This RCPIN email, including attachments, may include confidential and/or proprietary information. If the reader of this email is not the intended recipient or his or her authorized agent, the reader is hereby notified that any disseminiation, distribution, or copying of this email is prohibited. If you have received this email in error, please notify the sender by replying to this message and deleting this email immediately.

PRIVACY NOTICE:
This e-mail, including attachments, may include privileged, confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately.

# G



# NEW YORK STATE INTELLIGENCE CENTER

31 TECH VALLEY DRIVE, SECOND FLOOR, EAST GREENBUSH, NY 12061

PHONE: 866-48-NYSIC (866-486-9742) FAX: (518) 786-9398

## Request for Information Form

**REQUESTOR INFORMATION**

| Requestor Name | Santiago Tapia | | Duty/Title | Detective | | |
|---|---|---|---|---|---|---|
| Agency | Woodbridge Police Department | | State | New Jersey | | |
| Email | santiago.tapia@twp.woodbridge.nj.us | Phone | (732) 675-2555 | | ORI: | nj0122500 |

**JUSTIFICATION**

| Case # | 19010123 | Crime Type | Aggravated Assault on Police | Status | Active Criminal Inv |
|---|---|---|---|---|---|

**SUBJECT / ADDRESS INFORMATION (For multiple subjects or addresses, please use next page.)**

| Name | unknown | DOB | | Role | |
|---|---|---|---|---|---|
| Address | | City | | State | |
| SSN | | License # | | State | |

**VEHICLE INFORMATION (For multiple vehicles, please use next page.)**

| Year | 2018 | Make | Dodge | Model | Challenger | Color | silver |
|---|---|---|---|---|---|---|---|
| Plate | JBD2162 | State | New York | VIN | | Role | Used in Crime |

**PHONE INFORMATION (For multiple phones, please use next page.)**

| Type | | Number | | Role | |
|---|---|---|---|---|---|

**BUSINESS INFORMATION (For multiple businesses, please use next page.)**

| Name | | Owner | | Role | |
|---|---|---|---|---|---|
| Address | | State | | | |

| INFORMATION REQUESTED | | | | ASSISTANCE REQUESTED | | | |
|---|---|---|---|---|---|---|---|
| | Address History | | LPR Checks | ✓ | Facial Recognition | | Link Chart / Time Line |
| | Arrest / Booking Info | | DMV Checks | | Social Media Checks | | Mapping Request |
| | Associates / Relatives | | Subscriber Info | | Toll Analysis | | Other (Describe Below) |
| | Phone / Contact Info | | Other (Describe Below) | | | | |

**OTHER (Use second page if necessary)**

**CASE DETAILS (Use second page if necessary)**

See second page.

Submit this form to the NYSIC via e-mail at CIU@nysic.ny.gov or via fax at 518-786-9398.



NEW YORK STATE INTELLIGENCE CENTER
31 TECH VALLEY DRIVE, SECOND FLOOR, EAST GREENBUSH, NY 12061
PHONE: 866-48-NYSIC (866-486-9742) FAX: (518) 786-9398

# Request for Information Form (continued)

## SUBJECT / ADDRESS INFORMATION

| Name | DOB | License # / SSN | Address | Role |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## VEHICLE INFORMATION

| Plate / VIN | State | Role |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## PHONE INFORMATION

| Type | Number | Role |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## BUSINESS INFORMATION

| Name | Owner | Address | Role |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

## ADDITIONAL INFORMATION

On Saturday January 26,2019, The suspect depicted above presented the above fake Tennessee D.L. at the Hertz rental car located within the Hampton Inn Hotel on Rt. 9 No. in Woodbridge. When he was confronted by patrol officers, he ran into the above 2018 Dodge Challenger and rammed into the patrol officer's marked police vehicle and nearly struck the officer. The vehicle was located unoccupied nearby but the suspect got away. Inside of the vehicle, we located a Dunkin Donuts receipt from earlier in the morning. The Dunkin Donuts is located on Gun Hill Rd. Bronx, NY. The picture on the D.L. is of the suspect but the other identifiers are false.

Submit this form to the NYSIC via e-mail at CIU@nysic.ny.gov or via fax at 518-786-9398.

# H





# Rockland County Intelligence Center

Officer Report for Incident 19RI00076

**Nature:** Agency Assist

**Location:** P7003

**Address:** 50 SANATORIUM RD BLDG P; YHC Building P NEW HEMPSTEAD NY 10977

**Offense Codes:**
**Received By:** Lyons, S **How Received:** T **Agency:** RCI
**Responding Officers:** Lyons, S
**Responsible Officer:** Lyons, S **Disposition:** 21 01/28/19
**When Reported:** 07:58:31 01/28/19 **Occurred Between:** 07:58:31 01/28/19 and 07:58:31 01/28/19

**Assigned To:** **Detail:** **Date Assigned:** **/**/**
**Status:** **Status Date:** **/**/** **Due Date:** **/**/**

**Complainant:** 2605
**Last:** RC SHERIFF'S OFFICE **First:** **Mid:**
**DOB:** **/**/** **Dr Lic:** **Address:** 55 NEW HEMPSTEAD RD; 1030580 - Rockland County Sheriffs Dept
**Race:** R **Sex:** R **Phone:** ( ) - **City:** NEW CITY, NY 10956

## Offense Codes

**Reported:** **Observed:**

## Circumstances

**Responding Officers:** Lyons, S **Unit :** RI891

**Responsible Officer:** Lyons, S **Agency:** RCI
**Received By:** Lyons, S **Last Radio Log:** **:**:** **/**/**
**How Received:** T Telephone **Clearance:** No clearance
**When Reported:** 07:58:31 01/28/19 **Disposition:** 21 **Date:** 01/28/19
**Judicial Status:** **Occurred between:** 07:58:31 01/28/19
**Misc Entry:** NJ PD **and:** 07:58:31 01/28/19

**Modus Operandi:** **Description :** **Method :**

*Officer Report for Incident 19RI00076*

*Page 2 of 4*

**Involvements**

| Date | Type | Description | Relationship |
|---|---|---|---|
| 01/28/19 | Name | RC SHERIFF'S OFFICE, | Complainant |

01/31/19

PARKS000031

**Narrative**

RCIC was provided information from the PIP Polce NJ, Sgt R. Dey regarding an AGGRAVATED ASSAULT ON A POLICE OFFICER case. RCIC assisted the Woodbridge PD and utilized facial recognition software and received a possible HIT on a subject, NIJEER K. PARKS, 09/11/1987 ( NJ). RCIC provided all information to the NJ PIP Police and Woodbridge PD, Det. Santiago Tapia ( 732) 602-7394. See atatched PDF and flyer. Closed by investigation.

Responsible LEO:

Approved by:

Date

01/31/19

# I

**WOODBRIDGE POLICE DEPARTMENT**
**I.D. BUREAU REPORT**

Date: 01-26-2019 Alarm#: 19010123 Case #: ____
Type of Crime: Agg Assault PD, Shoplifting
Victims Name: Hampton Inn Address: 370 US HWY 9 N Hopelawn NJ
Location of Incident: SAA
I.D. Detective: Quesada C.I.D. Detective: Det. S. Tapia
Arrival Time: 1230 Departure Time: 1330
Scene Processed? Yes ☒ No ☐
Scene Photographed? Yes ☒ No ☐ Photo File #: 014-19

| Items Processed for Latent Prints | Location | Process Type | Results |
|---|---|---|---|
| Glass Door | SAA | Metalic Powder | Lifted 3 prints off glass door |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |

Prepared for AFIS Entry: Yes ☒ No ☐

**Narrative:**
Responded to the Hampton Inn. for a shoplifting turned robbery and agg assault on PD. The scene was processd and photos taken that were placed of 2 dics 1 of 1 w 45 images and 2 of 2 with 17 images. Photos consited of the damge to patrol car #3 and damge to building from the suspect crashing into it. A water bottole that office saw the suspect drink and place into trash can was recovered. Above 3 prints recovered from glass door the suspet ran out from. The suspect sneaker that he lost during foot pursuit was recovered. All property abd CD's will be perpared for evidence or DNA comparison.

**I.D. Detective:** Quesada **Date:** 1-26-19

WPD-062 (10/05-b)

**WOODBRIDGE POLICE DEPARTMENT**
**I.D. BUREAU REPORT**

Date: 01-26-2019 Alarm#: 19010123 Case #: ____
Type of Crime: Agg Assault PD, Shoplifting
Victims Name: Hampton Inn Address: 370 US HWY 9 N Hopelawn NJ
Location of Incident: SAA
I.D. Detective: Quesada C.I.D. Detective: Det. S. Tapia
Arrival Time: 1230 Departure Time: 1330
Scene Processed? Yes ☒ No ☐
Scene Photographed? Yes ☒ No ☐ Photo File #: 014-19

| Items Processed for Latent Prints | Location | Process Type | Results |
|---|---|---|---|
| Glass Door | SAA | Metalic Powder | Lifted 3 prints off glass door |
| Vehicle outside driver window & inteior | Tow Yard | metalic powder | 5 useable prints lifted |
| Febreze air fresher spray bottles | Lab | metalic powder | Neg |
| 2 Lighter | Lab | metalic powder | Neg |
| cell phone charger | Lab | metalic powder | Neg |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |
| ____ | ____ | ____ | ____ |

Prepared for AFIS Entry: Yes ☒ No ☐

**Narrative:**
Responded to the Hampton Inn, for a shoplifting turned robbery and agg assault on PD. The scene was processed and photographed, photos were placed of 2 discs 1 of 1 w 45 images and 2 of 2 with 17 images. Photos consisted of the damage to patrol car #3 and damage to building from the suspect crashing into it. A water bottle that office observed the suspect drink and place into trash can was recovered. Above 3 prints recovered from glass door the suspect ran out from. The suspect sneaker that he lost during the foot pursuit was recovered. Consent search was conducted on the MV and additional prints and property were recovered and photographed. Prints recovered from MV and property will be sent out for processing. A Vape pen was recovered in the vehicle and a DNA along with THC test will be requested. An additional water bottle was recovered by patrol in a bag of property he dropped during the foot pursuit will be sent out for DNA along with a bag of suspected marijuana. Two Fabreze Air freshener spray bottles were recovered in MV w/Neg results. All property, prepared for evidence or DNA analysis. JMQ 1,2,3,12,13,14,15,16 was sent to Afis

**I.D. Detective:** Quesada **Date:** 1-26-19

# REQUEST FOR LATENT FINGERPRINT EXAMINATION

B0207 19 BB1225

STATE OF NEW JERSEY
DEPT. OF LAW & PUBLIC SAFET
IDENTIFICATION & INFORMATION TECHNOL
POST OFFICE BOX 7068
W. TRENTON, NEW JERSEY 08628

THIS PACKAGE CONTAINS POTENTIAL SUSPECT IDENTIFICATION. IT IS INCUMBENT UPON THE SUBMITTING AGENCY TO PROVIDE POSITIVE ID FOR PROSECUTORIAL PURPOSES.

**LAW ENFORCEMENT FINAL VERIFICATION**

NAME:
DATE:
AGENCY:

SUBMITTED AT:

- [ ] W. TRENTON: 609-882-2000 EXT. 2461
- [X] HOLMDEL: 732-441-4500 EXT. 7225
- [ ] BUENA VISTA: 609-561-1800 EXT. 3326

SUBMITTING AGENCY AND ADDRESS: Woodbridge Police 1 Main St Woodbridge NJ 07095

SUBMITTING AGENCY CASE NUMBER: 19010123

INVESTIGATIONG OFFICER:

ORI NUMBER: NJ 0122500

TELEPHONE NUMBER: 732 634-7700 ext 2114

CRIME: 2C:12-1B(2) 2C:20-11

CRIME DATE: 01/26/19

SUSPECT: UNK

BRIEF HISTORY: Shop lifting turned Robbery with Agg Assault on police.

| ITEM # | COMMENT | CANDIDATE FBI NUMBER | CANDIDATE SBI NUMBER | FING/PALM NUMBER | LIFT ID/PATTERN TYPE/MINUTIAE |
|---|---|---|---|---|---|
| JMQ1 | | 382204AE1 | | LP LP | (01-01) PALM 10 6 PTS (01-02) PALM 5[illegible] |
| JMQ2 | | 382204AE1 | | LP | (02-01) PALM 10 6 PTS |
| JMQ3 | | | | | NS |
| JMQ12 | | | | | NS |
| JMQ13 | | | | | NS |
| JMQ14 | | | | | NS |
| JMQ15 | | | | | NS |
| JMQ16 | | | | | NS |
| | | | | | |
| | | | | | |

COMMENTS:

DELIVERED BY: [illegible] 325

RECEIVED BY: (INITIALS/DATE) [illegible] 2-8-19

ADMINISTRATIVE REVIEW BY: (INITIALS/DATE) TW 2-19-19.

ENTERED BY: (INITIALS/DATE) PAB 2-13-19.

COMPARED BY: (INITIALS/DATE) PAB 2-14-19.

RETURNED TO: (INITIALS/DATE) [illegible] 375

RETURNED BY: (INITIALS/DATE) PAB 2-22-19

RELAUNCH ID BY: (INITIALS/DATE)

TP/UL ID BY: (INITIALS/DATE)

IAFIS BY: (INITIALS/DATE) 2-14-19. PAB L5 WE

IN THE EVENT THAT THIS CRIME IS CLEARED, EITHER AS A RESULT OF LATENT SEARCH OR OTHER MEANS, PLEASE ADVISE THE BIOMETRIC IDENTIFICATION UNIT.

# CJIS 2000 Response

Powered by CICS Web Services

---

## NCIC 2000 Response

```
02/14/2019 07:54:00
7L01TCP LDNM8P45EF
NJNSP8600
THIS NCIC INTERSTATE IDENTIFICATION INDEX RESPONSE IS THE RESULT OF YOUR
INQUIRY ON FBI/382204AE1 PUR/C
NAME                              FBI NO.       INQUIRY DATE
WALKER,BARRINGTON                 382204AE1     2019/02/14

SEX RACE BIRTH DATE  HEIGHT WEIGHT EYES HAIR PHOTO
M   B    1993/02/28  601    180    BRO  BLK  N

BIRTH PLACE
UNITED STATES

FINGERPRINT CLASS      PATTERN CLASS

ALIAS NAMES
WALKER,BARRINGTON A            WALKER,BARRINGTON ANTHONY

MISC NUMBERS
AR-A204017146
FN-1131291065

IDENTIFICATION DATA UPDATED 2016/10/14

THE CRIMINAL HISTORY RECORD IS MAINTAINED AND AVAILABLE FROM THE
FOLLOWING:
 FLORIDA        - STATE ID/FL08162342
 MAINE          - STATE ID/ME0293517
 FBI            - FBI/382204AE1

THE RECORD(S) CAN BE OBTAINED THROUGH THE INTERSTATE IDENTIFICATION
INDEX BY USING THE APPROPRIATE NCIC TRANSACTION.

END

END OF NCIC RESPONSE
```

Back

LEAVE BLANK | CRIMINAL | (STAPLE HERE) | LEAVE BLANK

STATE USAGE NFF SECOND SUBMISSION | APPROXIMATE CLASS | AMPUTATION | SCAR

STATE USAGE

LAST NAME, FIRST NAME, MIDDLE NAME, SUFFIX
WALKER,BARRINGTON

SIGNATURE OF PERSON FINGERPRINTED

SOCIAL SECURITY NO.

LEAVE BLANK

ALIASES/MAIDEN
LAST NAME, FIRST NAME, MIDDLE NAME, SUFFIX

| FBI NO. | STATE IDENTIFICATION NO. | DATE OF BIRTH MM DD YY | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|---|---|
| 382204AE1 | | | | | | | | |

1. R.THUMB | 2. R.INDEX | 3. R.MIDDLE | 4. R.RING | 5. R.LITTLE

6. L.THUMB | 7. L.INDEX | 8. L.MIDDLE | 9. L.RING | 10. L.LITTLE

C746DN_Holmdel 2019-02-14 08:08:46

LEFT FOUR FINGERS TAKEN SIMULTANEOUSLY | L.THUMB | R.THUMB | RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY

| JOCWU7MEI | | | 9N47VT06M |
|---|---|---|---|
| DATE PRINTED | SIGNATURE OF OFFICIAL TAKING PRINTS | ID NUMBER | CONTRIBUTOR (ORI) |

NJNSP7800

C746DN_Holmdel 2019-02-14 08:45:33



BB122519B0207-01-01-01b

382204AE1

| Field | Value |
|---|---|
| Search ID | BB122519B0207-01-01-01b |
| Respondent ID | 382204AE1-36850229 |
| Search Print Type | PALM |
| Respondent Print Type | PALM |
| Search Palm Segment | 20 |
| Respondent Palm Segment | 27 |
| Name | paulm |
| Operator | paulm |
| Workstation | NJSPWSholmdel1 |
| Date | February 14, 2019 |
| Time | 9:35:52 AM EST |
| Search Date | February 13, 2019 |
| Search Time | 4:24:48 PM EST |



BB122519B0207-02-01-01b

382204AE1--LP

| Field | Value |
|---|---|
| Search ID | BB122519B0207-02-01-01b |
| Respondent ID | 382204AE1-36850233 |
| Search Print Type | PALM |
| Respondent Print Type | PALM |
| Search Palm Segment | 20 |
| Respondent Palm Segment | 27 |
| Name | paulm |
| Operator | paulm |
| Workstation | NJSPWSholmdel1 |
| Date | February 14, 2019 |
| Time | 9:27:55 AM EST |
| Search Date | February 13, 2019 |
| Search Time | 4:25:47 PM EST |



BB122519B0207-01-02-01b

382204AE1--LP

| Field | Value |
| --- | --- |
| Search ID | BB122519B0207-01-02-01b |
| Respondent ID | 382204AE1-36850232 |
| Search Print Type | PALM |
| Respondent Print Type | PALM |
| Search Palm Segment | 20 |
| Respondent Palm Segment | 27 |
| Name | paulm |
| Operator | paulm |
| Workstation | NJSPWSholmdel1 |
| Date | February 14, 2019 |
| Time | 10:00:55 AM EST |
| Search Date | February 13, 2019 |
| Search Time | 4:24:20 PM EST |

# WOODBRIDGE POLICE DEPARTMENT
# ID BUREAU SUSPECT REPORT

Date: 01-26-2019　　Alarm #: 19010123　　Case#: _____

Suspect's Name: Walker, Barrington A
Address: 240 West 141 St Manhattan, NY
DOB: 02/28/1993
SOC: _____

Sex: Male
SBI#: -
FBI#: 382204AE1
WPD#: -

Latents Submitted to AFIS?　Yes ☒　No ☐　NA ☐
Date Submitted: 02-08-2019
Return Date: 02-22-2019
Submitted By: ID Tech W. Trevena #375
Returned By: ID Tech W. Trevena #375

**Results of AFIS Submission**

Latent Finger Print #: JMQ-2　　Identified as # Left Palm Finger
Latent Finger Print #: _____　　Identified as # _____ Finger
Latent Finger Print #: _____　　Identified as # _____ Finger

Identification Made By: Det. Douglas Cioni #476　　Date: 01-22-2021
Identification Confirmed By: Lt. J Velez #332　　Date: 01-22-2021 JSV #332

**Narrative:**

The above listed individual was supplied by New Jersey State Police A.F.I.S.(Automated Fingerprint Identification System). The candidate was supplied as a result from a hit within AFIS. The individuals rolled impressions supplied by NJSP AFIS were then compared to the latent fingerprint discovered on the Hampton Inn exit door (above listed alarm #).The latent, similar in pattern, also displayed at least twenty exact minutea details making the latent an exact match with the left palm impression of Barrington Walker.

**I.D. Detective:** [signature] Signature　　**Date:** 1-22-21 Completed

WPD-063 (10/05-b)

J



pennsylvania
JUSTICE NETWORK

## Photo Search - WebCPIN Details

06/25/2019 04:38:37 PM

| | | | |
|---|---|---|---|
| **Name** | BARRINGTON WALKER | **Photo Date** | 05/08/2019 |
| **Source** | HIDTA | **Databases** | 6 - HIDTA DATABASE |
| **Origin** | HIDTA - NYPD | **Location ID** | |
| **Alias(s)** | WALKER | **Age at Arrest** | 26 |
| **DOB** | 02/28/1993 | **Gender** | MALE |
| **Place of Birth** | UNKNOWN POB | **Weight** | 215 Lbs |
| **Height** | 6 FT 01 IN | **SSN** | 0 |
| **SID** | | **FBI** | |
| **Eye Color** | BROWN | **Hair Color** | BLACK |
| **Hair Length** | SHORT | **Complexion** | CLEAR |
| **Race** | BLACK | **Hispanic/Latino** | |
| **Teeth** | | **Jewelry** | |
| | | **Gang Member** | |
| | | **Charge Category** | ALL OTHERS |

**Glasses**

**Skin Tone**

**SMT (Scars, Marks, Tattoos)**

**Gang Affiliation**

**Charges**

*** FOR INVESTIGATION USE ONLY NOT FOR IDENTIFICATION DESTROY AFTER 90 DAYS ***

All information provided is for authorized JNET users only. This information is provided in response to the JNET user's request and is to be used exclusively by the requestor in the performance of criminal justice responsibilities only. Secondary dissemination is strictly prohibited. Although the information may continue to be valid over a period of time, it should be considered complete and accurate only on the date of response.

Welcome to Dunkin Donuts PC# 352102
Any concerns or comments please call our
Any leave a message (914)297-9042
1/26/2019 5:11:22 AM

Eat In
Order: 855

Register:2 Tran Seq No: 29855
Cashier:Cashier C.
*****SALE*****

| | | |
|---|---|---|
| 1 | Hot Choc MD Original | 2.79 |
| 1 | Crois Plain | 1.99 |
| | Toasted | |
| | Bacon | 1.75 |
| | Sub. Total: | $6.53 |
| | Tax: | $0.40 |
| | Total: | $6.93 |
| | Discount Total: | $0.00 |
| | Change | $13.07 |
| | Cash $20 | $20.00 |

***************************************
Tell us about today's visit
at www.telldunkin.com within 3 days

RECEIVE A FREE CLASSIC DONUT
on your next visit when you
purchase a Medium or Larger Beverage
Survey Code: 85501-52102-0501-2698
Enter Validation Code: ________
See restrictions on dunkindonuts.com
***************************************
Visit DunkinNation.com for product
offers and news. Enter Code DD2957
***************************************
Thank You Come Back Again

NP39

# K



PARKS000114

# L



PARKS000111

# M



Welcome to Dunkin Donuts PC# 352102
Any concerns or comments please call our
Any leave a message (914)297-9042
1/26/2019 5:11:22 AM
Eat In
Order: 855
egister:2 Tran Seq No: 29855
ashier:Cashier C.
*****SALE*****
Hot Choc MD Original 2.79
Crois Plain 1.99
Toasted
Bacon 1.75
Sub. Total: $6.53
Tax: $0.40
Total: $6.93
Discount Total: $0.00
Change $13.07
Cash $20 $20.00
*************************************
Tell us about today's visit
at www.telldunkin.com within 3 days
RECEIVE A FREE CLASSIC DONUT
on your next visit when you
purchase a Medium or Larger Beverage
Survey Code: 85501-52102-0501-2698
Enter Validation Code:
See restrictions on dunkindonuts.com
*************************************
Visit DunkinNation.com for product
offers and news. Enter Code DD2957
*************************************

# N



**WOODBRIDGE POLICE DEPARTMENT**

**CRIMINAL INVESTIGATION DIVISION**

**WOODBRIDGE, NJ**

Incident #19010123

**V O L U N T A R Y S T A T E M E N T**

Of

**NIJEER K. PARKS**
485 E. 19th Street
Paterson, NJ

DOB: 9/11/1987

PHONE: 708-516-4620

Statement taken by Detective Andrew Kondracki #545

---

DET. K.: Today's date is Tuesday, February 5th, 2018 - - 19 I'm sorry the current time is 11:51 a.m. I'm Detective Andrew Kondracki with the Woodbridge Police Department conducting an interview of Nijeer K. Parks, first name November, India, Juliet, Echo, Echo, Romeo, middle initial K as in Kilo, last name Papa, Alpha, Romeo, Kilo, Sierra, address of 485 E. 19th, Street, Apartment 3-G, Patterson, New Jersey, date of birth 9/11/1987. This interview will be in regards to W.P. Alarm #19010123 an aggravated assault on a police officer that occurred on 1/26/19.

(Detective Kondracki leaves interview room).

(Subject and Detective enter interview room).

DET. K.: Just step in here. I'll take these cuffs off of you. And if you just have seat in the green seat there alright?
SUBJ.: Not a problem.

(Removes handcuffs from Subject).

DET. K.: Back there. I'll be right with you.
DET. P.: Yeah, I'll wait for you.

(Detective Kondracki leaves interview room).

(Detective Penicaro stands in doorway and then closes interview room door).

(Detective Kondracki enters interview room).

DET. K.: Alright. Alright Nijeer, I'm Andy Kondracki, I'm a Detective here at Woodbridge Police alright? First, let me just confirm your information. Can you spell your name for me?
SUBJ.: N-I-J-E-E-R.

DET. K.: Alright.
SUBJ.: Parks, P-A-R-K-S.

DET. K.: And what's your middle name?
SUBJ.: K, Kasim.

DET. K.: Kason?
SUBJ.: Kasim.

DET. K.: Kasim okay. And where you living at now?
SUBJ.: Patterson New Jersey.

DET. K.: What's the address?
SUBJ.: 485 Apartment 3-E.

DET. K.: 3-E?
SUBJ.: Um-hmm.

DET. K.: On East 19th Street?
SUBJ.: Yes.

DET. K.: OK.
SUBJ.: 3-G pardon me I'm sorry.

DET. K.: Alright 3-G alright. And your date of birth?
SUBJ.: 9/11/1987.

DET. K.: And what's your phone number?
SUBJ.: Uh-708-516-4620.

DET. K.: 4620 alright. You've been charged pursuant to an investigation for something that happened in Woodbridge on Saturday January 26th. There's sufficient evidence like we didn't just come up with you out of the blue. There's sufficient evidence to put you there. I'll explain, you know, further, but before we talk…
SUBJ.: I've never been to Woodbridge so…

DET. K.: OK.
SUBJ.: …there's no evidence that put me there.

DET. K.: OK. There…
SUBJ.: Never.

DET. K.: There is - - there is evidence and…
SUBJ.: No.

DET. K.: …I want to get your side of the - - the story…
SUBJ.: OK.

DET. K.: …alright? But before we do that, let me make sure you're aware of your rights alright? Do you have any problem reading or writing the English language?
SUBJ.: No.

DET. K.: No?
SUBJ.: OK.

DET. K.: I'm gonna read you your rights. If you have any questions, please me know and I'll explain them further okay?
SUBJ.: Um-hmm.

DET. K.: You have the right to remain silent. Do you understand what that means?
SUBJ.: Yes.

DET. K.:   OK.  Anything you say can be used against you in a court of law.  Do you understand what that means?
SUBJ.:   Yes.


DET. K.:   OK.  You have the right to talk to a lawyer and have a lawyer present with you while you're being questioned.
SUBJ.:   Um-hmm.


DET. K.:   Do you understand that?
SUBJ.:   Um-hmm.


DET. K.:   If you cannot afford to hire a lawyer, one'll be appointed to represent you before any questioning if you wish one.  Do you understand that?
SUBJ.:   Um-hmm.


DET. K.:   And you can decide to exercise these rights at any time.  Do you understand what that means?
SUBJ.:   Yes.


DET. K.:   OK.  Can you read these two statements a loud for me?
SUBJ.:   I acknowledge that I have been advised and understand the constitutional rights found on the reverse side of this card.  I voluntarily waive these rights and agree to speak with you.


DET. K.:   Do you agree to speak to me?
SUBJ.:   I'll - - I'll speak with you.  I've never been here.  I don't have - - I have no idea what's going on.  I have nothing…


DET. K.:   OK.
SUBJ.:   …to hide.


DET. K.:   Can you just print and sign your name right there?
SUBJ.:   (Signs Miranda Card).


DET. K.:   OK.  (Takes Miranda Card from Subject).  So from what I understand, your grandmother let you know that police are looking for you?
SUBJ.:   Yes.

DET. K.:   And then you went to what Patterson PD?
SUBJ.:   (Nods head yes)

DET. K.:   You called - - or you called them and they said...?
SUBJ.:   Yes.

DET. K.:   ...Woodbridge is looking for you?
SUBJ.:   (Nods head yes)

DET. K.:   And you came here today?
SUBJ.:   Yes.

DET. K.:   OK.  Now, you said you've never been in Woodbridge...?
SUBJ.:   Never been to Woodbridge a day in my life.

DET. K.:   OK.  Now, this incident happened at - - sometimes Woodbridge is big and it encompasses a bunch a different places.  So maybe let me refresh your memory if maybe you didn't realize you're in Woodbridge or whatever.  This happened at the Hampton Inn on Route 9; north it's by a Walmart on Saturday the 26th.
SUBJ.:   I haven't been to a hotel anywhere near this area...

DET. K.:   OK.
SUBJ.:   ...and anywhere near Middlesex County.

DET. K.:   What kind of - - do you have a car?
SUBJ.:   I have no license period.  I have my driver's permit inside my - - inside of my wallet.

DET. K.:   OK.  Have you ever rented a car?
SUBJ.:   No.  I can't rent a car without a - - without a license.

DET. K.:   Right.  So you say you've never been at a Hampton Inn?
SUBJ.:   Never.

DET. K.:   Do you - - were - - do you remember what you were doing on Saturday the 26th?
SUBJ.:   Yes, I was home.

DET. K.:   OK.  In Patterson?
SUBJ.:   Yes.

DET. K.: The whole day?
SUBJ.: Yes.

DET. K.: OK. Do you remember anything specific about what you did that day or can…?
SUBJ.: Uh, I went to…

DET. K.: …can you…?
SUBJ.: …basketball game…

DET. K.: Can you prove that in anyway?
SUBJ.: I went to a basketball game that morning Kennedy basketball game, a freshman basketball game. I think maybe 9 or 10 o'clock that morning. For the rest of the day, I think I was at my mom's house…

DET. K.: Did you…?
SUBJ.: …for a little while.

DET. K.: Kennedy is what a high school in…?
SUBJ.: Yes.

DET. K.: …Patterson?
SUBJ.: Yes.

DET. K.: Did you have to pay to get in? Did anybody see you there?
SUBJ.: Yes. Yes, a lot of people were there. I'm pretty sure______…

DET. K.: OK.
SUBJ.: The game was Kennedy versus East Side.

DET. K.: OK.
SUBJ.: If I'm not mistaken.

DET. K.: And it was like 10 o'clock?
SUBJ.: And it probably…

DET. K.: And it was at Kennedy High School?
SUBJ.: It was at East High School. They're both in Patterson.

DET. K.: East side?
SUBJ.: It was a freshman game; it probably was around 9, um, 9/10 o'clock.

DET. K.: OK. And where did you go after that?
SUBJ.: To my mom's.

DET. K.: And where does she live?
SUBJ.: In Patterson.

DET. K.: What address?
SUBJ.: Um, 50 Clinton Street, oh, 60 Clinton Street I'm sorry.

DET. K.: And what time did you get there?
SUBJ.: Maybe around like toward eleven. The game ended - - the game ended probably like 10:30, 11 o'clock, got there around 11, 12.

DET. K.: Okay.
SUBJ.: And I was there most of the day with my sons.

DET. K.: OK.
SUBJ.: ______.

DET. K.: How many kids do you have?
SUBJ.: Two.

DET. K.: How old are they?
SUBJ.: A 10 year old and an 8 year old.

DET. K.: Okay, cool.
SUBJ.: And then from there, I was home for the rest of the day.

DET. K.: OK. So you've never rented a car?
SUBJ.: No.

DET. K.: Through Hertz Rental?
SUBJ.: No.

DET. K.: OK. Sometimes I understand you're saying you don't have a license. Sometimes people make up fake licenses it's fairly easy to rent a car that way…
SUBJ.: Yeah, I understand. And I haven't - - and I have nothing to hide. That's why I came down…

DET. K.: And I understand that and I appreciate that. I appreciate you coming in…
SUBJ.: It took me a couple days because I don't drive…

DET. K.: You said that.
SUBJ.: …and I actually had to pay…

DET. K.: Right.
SUBJ.: …somebody to bring me here.

DET. K.: How'd you get here today?
SUBJ.: Actually, I had a cousin bring me. He's outside probably went to go something to eat.

DET. K.: OK.
SUBJ.: Yeah, because he seen a couple of stores around here. He wanted to go look in and shop so.

DET. K.: OK. Have you ever heard the name Jamal Owens before?
SUBJ.: Never. Jamal Owens? No.

DET. K.: OK. Has your identity ever been stolen before?
SUBJ.: No.

DET. K.: That you're aware of?
SUBJ.: No. I brung every like all my paperwork down. I can't even run sir. They said somethin' - - I called the hotel and they told me something about somebody running from the Police. I just had knee surgery August 7th. I had a torn ACL and a torn Meniscus. I brung my paperwork from my physical therapy that I go to 3 times a week. Like I still - - I can't even really move that good to even be in any type of - - I'm still on Workers Comp from my job. I can't even move that good to do any type of physical, like, activity like that.

DET. K.: OK. I appreciate your story. Basically what happened is someone presented a fake ID. When confronted by the officers', he ran, the car got crashed the whole - - a whole bunch of nonsense. There is physical evidence recovered that still being processed. There is other evidence and other ways that you got linked to this. But there is other evidence that's still pending okay? So what you're telling me based on your story that you've never been to Woodbridge? You've never rented a car?
SUBJ.: So you never caught the person that you...?

DET. K.: No, that person got away.
SUBJ.: So that's - - that's how I'm trying to figure - - how did you get my name like? Well, how did my name get caught up in this?

DET. K.: Your name got - - you were identified by certain means okay?
SUBJ.: (Laughs and Shakes Head No).

DET. K.: Listen...
SUBJ.: This is unreal.

DET. K.: Listen, so - - so what you're saying is that you've never rented a car from Hertz?
SUBJ.: Never.

DET. K.: Specially a Dodge Challenger?
SUBJ.: Never.

DET. K.: So this car which we've recovered shortly after?
SUBJ.: Um-hmm.

DET. K.: So they're be no reason for your fingerprints, or DNA or...?
SUBJ.: (Shakes Head No). No.

DET. K.: ...anything to be in there?
SUBJ.: No. I'm give you them up (looks down at hands)...

DET. K.: OK.
SUBJ.: ...nothing.

DET. K.: OK. I mean we're gonna your - - did they already fingerprint you downstairs?
SUBJ.: No. That's why I came because I'm pretty sure once you fingerprint me __________ even if the officers there, it's not me.

DET. K.:   OK.  There is evidence, like, that shows probable cause that you were charged with these crimes.  There's other evidence pending the investigation is still ongoing.  So that's the story you want to stick to correct?  And I really at this point, I don't have...

SUBJ.:   Um.

DET. K.:   ...a reason to...

SUBJ.:   Can you call the Hampton Inn?

DET. K.:   Uh-huh.

SUBJ.:   I talked to regional manager.

DET. K.:   OK.

SUBJ.:   He said if you guys called and requested cameras, he can give them to you.  Because he said the guy ran once they asked for ID he said.  So he pretty - - he - - he - - okay, so he's like I know it wasn't you.  So can you guy's call he said...?

DET. K.:   How does he know it wasn't you?

SUBJ.:   He said...

DET. K.:   How does he know what you look like?

SUBJ.:   He said if you're - - he said if you're calling me requesting the cameras, then and questioning the shit like then I'm pretty sure it wasn't you if you're calling requesting - - requesting the cameras.  You guys can go get the cameras from him.  He said you can call him.

DET. K.:   So what the name the guy you spoke to?

SUBJ.:   He said he's the regional manager.

DET. K.:   Do you his name?

SUBJ.:   At the - - at the, um, Hampton Inn.  I wrote it down at my house.  I didn't even write it oh I forgot it.

DET. K.:   OK.

SUBJ.:   I ran up really um.

DET. K.:   The regional manager of the Hampton Inn though?

SUBJ.:   The Hampton Inn, uh, whatever...

DET. K.: When did you did speak with him?
SUBJ.: I spoke to him maybe Saturday or Friday.

DET. K.: This last Saturday?
SUBJ.: Yes, because I called you guys.

DET. K.: After you…?
SUBJ.: After I called you guys and…

DET. K.: Alright.
SUBJ.: …I was getting everything else calling…

DET. K.: Um-hmm.
SUBJ.: …because I didn't want to come down here without not knowing anything trying to.

DET. K.: OK. I mean like I said it's still an ongoing investigation and we'll follow up a lot with a lot of things alright? But right now you're gonna be processed for these charges. I understand you have some other warrants too NCIC warrant?
SUBJ.: NCIC warrant?

DET. K.: Yeah.
SUBJ.: And where…?

DET. K.: Outside of - - I don't know. That's what they just told me. That there's some other warrants…
SUBJ.: Oh my…

DET. K.: …besides these. I don't know if you were aware of them? I don't know specifically what they are and maybe I'm mistaken, but that's what they told me before I came in here.
SUBJ.: This is crazy. So basically you guys suckered me into coming down here so you can arrest me? I was told…

DET. K.: They didn't tell you - - they didn't tell you…?
SUBJ.: I was told on the phone…

DET. K.: ...a warrant?
SUBJ.: ...all I was coming down for was you guys are gonna fingerprint me and picture what you know - - you would take a picture and the picture would tell if I was the person...

DET. K.: No, there...
SUBJ.: ...or I'm not the person.

DET. K.: ...there was - - I don't know who you spoke with on the phone.
SUBJ.: Oh my God.

DET. K.: There was a warrant out for your arrest since last week.
SUBJ.: Can, um, can I get my phone and call my lawyer and call my fiancée so she can call...?

DET. K.: OK.
SUBJ.: ...my lawyer?

DET. K.: Alright, I'm gonna end this...
SUBJ.: Yes.

DET. K.: ...statement now, sit tight I'll right back alright?
SUBJ.: So basically I'm going Middlesex County?

DET. K.: Yes today you are.

(Detective Kondracki leaves interview room).

(Transcribed by Judy Weitzel - 2/11/19)



# P



H 10

**Woodbridge Police Department**
**Professional Standards Division**
**Internal Affairs Bureau**

To: Cleo / Captain Scott Kuzma
From: Lieutenant Joseph Velez
Date: December 29, 2021
Re: IA-2021-501
Detective Santiago Tapia #481

Complainant: Nijeer Parks
Complaint: Improper Arrest

Sir,

On December 28, 2020, Woodbridge Township Police Director Robert Hubner received a Summons notifying him that a Lawsuit had been filed against the township and police department. Nijeer Parks filed the lawsuit because of his arrest by Woodbridge Police Officers on February 5, 2019.

**Incident Summary:**

On January 26, 2019, Officers Andrew Lyszyk #519 and Officer Francis Lee #591 were dispatched to the Hampton Inn on Route #9 in Woodbridge on a report of shoplifting.

Officers located a black male in the hotel lobby. He admitted taking some items from the gift shop and placing them in his car but stated he was going to pay for them.

The suspect gave Officer Lee a Photo Tennessee Driver's license with the name Jamal Owens. Officer Lyszyk discovered the driver's license to be fraudulent. Officers decided to arrest the suspect for the shoplifting offense because they were unable to verify his identity.

When advised him he was under arrest he jumped into a Hertz rental car and drove away. While fleeing the scene he struck patrol car #3 and caused Officer Lee to move out of his path to avoid injury. He also struck a hotel pillar in front of the building before exiting onto Route #9 North. Officers attempted to follow him but could not locate. Officers returned to the hotel and collected items that the suspect left behind including the Fraudulent Tennessee driver's license.

Detective Tapia arrived on scene and determined from the Officers and employees at the scene that the photo on the driver's license was the same as the suspect that fled the scene. Detective Tapia then sent the Tennessee driver's license photo to the New Jersey State Police Regional Operations Intelligence Center (ROIC) and the New York State Intelligence (NYSIC) for entry into facial recognition software.

January 27, 2019, Detective Tapia received notification from Rockland County Sheriff's Intelligence Center that they had a high profile comparison to the photo on the fraudulent Tennessee driver's license. The high profile comparison was identified as Nijeer Parks with a date birth of September 11, 1987.  Detective Tapia compared the photo on the Fraudulent Tennessee  driver's license photo  with the photo on Nijeer Parks assigned New Jersey driver's license #P0619 59272 09872 and determined it to be the same person.

February 1, 2019, Detective Tapia contacted Middlesex County Assistant Prosecutor Nastasi and presented him with the facts of the case and he authorized a warrant. Detective Tapia then generated warrant #2019000156 against Nijeer Parks charging him with aggravated assault on a police officer, possession of a weapon and possession of a weapon for unlawful purpose. Municipal Court Judge Stahl read the affidavit of probable cause and signed the warrant.

February 5, 2019, Nijeer Parks responded to Woodbridge Police department because he became aware that a warrant was issued for his arrest. Mr. Parks was interviewed by Detective Andrew Kondracki, arrested and later in the day transported to the Middlesex County Correction Center in North Brunswick, NJ.

February 13, 2019, Nijeer Parks was released from custody at the Middlesex County Correction Center.

November 2, 2019, Middlesex County Prosecutor's Office decides not to pursue prosecution and the case is closed.

November 25, 2020, Nijeer Parks files False Arrest lawsuit against Woodbridge Township.

January 1, 2021, Woodbridge Police Internal Affairs starts investigation in to the lawsuit allegations. I started to collect and review all Reports, case files, statements, audio and video recordings and photographs related to this incident.

February 25, 2021 at 10:25am, I made contact with Nijeer Parks via phone #1-570-516-4620. I informed Mr. Parks I would be investigating the claims from his lawsuit. I asked Mr. Parks if he would speak to me about the claims and give me a statement. Mr. Parks declined my request and informed me he has an attorney.

March 3, 2021, I send out certified letter to Mr. Parks at 485 E. 19th Street Apt.#3G, Paterson, NJ 07522 formally requesting his input related to this investigation.

April 1, 2021, the certified letter is Returned to Sender unopened.


**Findings / Conclusion:**

Mr. Parks filed a lawsuit almost two years after his arrest but never made a formal Internal Affairs Complaint. When contacted by Internal Affairs he declined to comment on his complaint or provide any additional details.

I find that Detective Tapia acted in good faith when he submitted the fraudulent Tennessee driver's license photo for a facial recognition comparison. At the time of his submission, there were no restrictions on the use of facial recognition software. The New Jersey Attorney General advised Law Enforcement to stop using Certain Facial Recognition Software on January 24, 2020, almost one year after Detective Tapia used it.

Detective Tapia received approval for the warrant from an Assistant Prosecutor and a Municipal Court Judge.

I reviewed the photographs of Mr. Parks and the high profile comparison and they are similar, and could be mistaken as the same person.

I reviewed the audio and video recordings of Mr. Parks while he was in Woodbridge Police custody, and find no evidence of any mistreatment.


I conclude that Detective Santiago Tapia #481 is **EXONERATED** of the complaint of Improper Arrest. A record of this shall be entered into the Internal Affairs Index System.



Respectfully,

Lieutenant Joseph S. Velez #332
Woodbridge Police Internal Affairs



# Township of Woodbridge

Mayor John E. McCormac

Department of Police
Robert J. Hubner, Director
Joseph M. Nisky, Deputy Director

One Main Street
Woodbridge, New Jersey 07095-3399
(732) 634-7700
FAX: (732) 602-7350
TTY: (732) 634-2080

March 2, 2021

Mr. Nijeer K Parks
485 E. 19th Street Apt. #3G
Paterson, NJ 07522

Internal Affairs Case Number 2021-501

Mr. Parks,

Please be advised that the Woodbridge Police Department is conducting an investigation into a complaint of Wrongful Arrest initiated by you against members of this Department.

The investigation of this matter has been assigned to the Internal Affairs Bureau and given Case Number 2021-501. Your input related to this matter would assist us in completing a full investigation of the allegations. Contact me at 732-602-7325 regarding this matter.

If you do not respond within ten days of receipt of this letter, the investigation will proceed without your input.

Sincerely

Det. Lt. Joseph Velez #332
Internal Affairs Bureau

U.S. Postal Service™ Lt. Joseph Velez Police
CERTIFIED MAIL® RECEIPT
Domestic Mail Only
For delivery information, visit our website at www.usps.com®.
OFFICIAL USE

7019 1640 0000 1138 2573

Certified Mail Fee
$
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy) $
☐ Return Receipt (electronic) $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required $
☐ Adult Signature Restricted Delivery $
Postage
$
Total Postage and Fees
$
Postmark Here: WOODBRIDGE NJ 07095 MAR - 3 2021 USPS
Sent To: Mr. NIJeer Parks
Street and Apt. No., or PO Box No.: 485 E. 19th Street Apt. 3G
City, State, ZIP+4®: Paterson, NJ 07522
PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

*Township Web Address*
www.twp.woodbridge.nj.us

Department of Police
Township of Woodbridge
One Main Street
Woodbridge, NJ 07095
LT. Joseph Velez

CERTIFIED MAIL

7019 1640 0000 1138 2573

$ 006.96

20

3-21R

Mr. Nijeer K Parks
485 E. 19th street Apt. #3G
Paterson, N[illegible]

RETURN TO SENDER
UNABLE TO FORWARD

07514-263137

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. NiJeer Parks
485 E. 19th Street
Apt. #3G
Paterson, NJ 07522

9590 9402 5773 0003 2921 45

2. Article Number *(Transfer from service label)*

7019 1640 0000 1138 2573

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent ☐ Addressee

B. Received by *(Printed Name)*

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type

- ☐ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☐ Certified Mail®
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- Mail
- Mail Restricted Delivery
- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Return Receipt for Merchandise
- ☐ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053 Domestic Return Receipt

# Q

80 Pompton Avenue
Suite 204
Verona, NJ 07044

(973) 944-0810 (p)
(973) 239-3919 (f)
pirelli@gpirelli.com
www.gpirelli.com

# GIANNI PIRELLI, Ph.D., ABPP

Curriculum Vitae

## CERTIFICATIONS/LICENSES

Board Certified in Forensic Psychology, American Board of Professional Psychology (ABPP) #8759

Fellow, American Academy of Forensic Psychology (AAFP)

New Jersey Licensed Psychologist #4975

New York Licensed Psychologist #019418

Pennsylvania Licensed Psychologist #PS018980

## EDUCATION

Ph.D. (2010), Clinical-Forensic Psychology
The Graduate Center at John Jay College of Criminal Justice (CUNY)

M.A., *en route* (2006), Psychology
John Jay College of Criminal Justice (CUNY)

B.A., Honors, Magna Cum Laude (2004), Psychology and Criminal Justice
Montclair State University (NJ)

## PROFESSIONAL MEMBERSHIPS

American Board of Professional Psychology (ABPP)

American Academy of Forensic Psychology (AAFP)

American Psychological Association (APA)

American Psychology-Law Society (AP-LS; Division 41 of APA)

## NOTABLE PROFESSIONAL SERVICE*

*Invited Chair,* Communications Oversight and Advisory Council, NJPA (2017/2018)

*Invited Member,* NJPA Presidential Task Forces: Social Media (Chair), Listserv, & Social Adv. (2017)

*Member-At-Large*, Executive Committee of AP-LS; Division 41 of APA (2014-2017)

*Member*, Practice Committee, AP-LS; Division 41 of APA (2015-2016)
**selected, not. incl. pre-doctoral service*

## *CLINICAL POSITIONS*

***Independent Practice*** (2012-present), Pirelli Clinical and Forensic Psychology, LLC, Verona, NJ
Managing a team of licensed psychologists. Providing clinical and forensic psychological services, particularly in the area of forensic mental health assessment (FMHA) and expert testimony. Conducting and/or overseeing clinical and clinical-forensic evaluations in a range of administrative, and criminal and civil legal matters, incl. but not necessarily limited to:

***Criminal***

(a) Risk Assessment, Diversion, and Mitigation Evaluations (Pre-Trial & Sentencing)
(b) Criminal Competencies (e.g., Fitness to Proceed, *Miranda* waiver)
(c) Insanity, Dim. Capacity/Mens Rea (Mental State at time of Offense/Crim Responsibility)

***Civil***

(a) Personal Injury
(b) Employment Harassment/Discrimination/Wrongful Termination
(c) Civil Commitment, incl. Sexually Violent Predator (SVP) evaluations
(d) Civil Capacities (e.g., Guardianship)

***Administrative/Other***

(a) Firearm Evaluations (FID cards/carry permits, gun forfeiture/reinstatement/ "Red Flag" - TERPO/FERPO)
(b) Mental Health Expungements
(c) Pre-Employment & Fitness-for-Duty
(d) Diagnostic/Treatment Evaluations
(e) Violence, Sexual, and Fire-setting Risk Assessment
(f) Immigration: Hardship/Asylum/Competency/N-648
(g) Voluntariness of Confessions and Interrogation-Related Matters

***Adjunct Faculty, Internship Program*** (2014-present). Rutgers Univ. Behav/Correctional Healthcare

- Case Competency Examination (CCE) for APA-Accredited Internship Program

***Licensed Psychologist*** (2014-2018), Associates in Psychological Services, P.A., Somerville, NJ

- Forensic psychological evaluations: adults, adolescents, and children.

***Licensed Psychologist*** (2013-2014), The Center for Evaluation and Counseling, Parsippany, NJ

- Evaluations and supervised visitation with at-risk youth, adults, and families for the Superior Court, DCP&P, and others working with such populations.

***Staff Clinical Psychologist 3*** (2010-2013), Greystone Park Psychiatric Hospital, Morris Plains, NJ

- Forensic Unit: individual treatment planning/leading treatment team meetings, group therapy, and unit management for patients with Krol/NGRI status and those with notable institutional violence histories in collaboration with interdisciplinary teams; crisis management; conducting forensic and traditional psychological evaluations.
- APA-Accredited Internship Faculty: reviewing applications and interviewing candidates; providing psychological testing supervision; presenting didactic seminars.

***Mental Health Clinician II*** (2010), University Correctional Healthcare/UMDNJ, Trenton, NJ

- New Jersey State Prison – Maximum Security: conducting psychotherapy and psychological evaluations for inmates in Close Custody units [i.e., Management Control Unit (MCU); Administrative Segregation (AdSeg); Protective Custody (PC)] in collaboration with interdisciplinary teams; implementing crisis management; conducting forensic evaluations.

## *CLINICAL TRAINING*

***Clinical-Forensic Intern*** (2009-2010), UMDNJ-Newark, Univ. Behav/Correctional Healthcare

*APA Accredited Predoctoral Internship (Forensic Track)

- Northern State Prison: evaluations and individual and group psychotherapy at inpatient, outpatient, and crisis levels of care in collaboration with interdisciplinary teams; set forth systems performance improvement initiative in prison.
- University Hospital: evaluations in the psychiatric emergency room and for consultation-liaison service on medical floors; presenting educational seminars for clinical staff and community organizations.

***Clinical Extern*** (2008-2009), NYU Epilepsy Center, New York, NY

- Neuropsychological evaluation with patients diagnosed with Seizure Disorders.

***Clinical Extern*** (2008), Bronx-Lebanon Hospital Center, Bronx, NY

- Psychological evaluation with diverse patients diagnosed with various disorders.

***Clinical Extern*** (2007-2008), William Paterson University Counseling Center, Wayne, NJ

- Individual psychotherapy with college-aged students.

***Clinical Extern*** (2006-2007), Rockland Psychiatric Center, Orangeburg, NY

- Individual and group psychotherapy and evaluations with state psychiatric patients.

***Hospice Counselor*** (2006-2008), Valley Hospital Hospice and Palliative Care Program, Paramus, NJ

- Individual counseling with individuals diagnosed with terminal illnesses.

***Clinical Research Extern*** (2005-2006), Bellevue Forensic Unit, Bellevue Hospital Center, NY

- Psychological screening with forensic psychiatric patients; conducting clinical-forensic research across various areas of study.

***Clinical Research Assistant*** (2005), Bronx Psychiatric Center, NY

- Clinical-forensic research conducted on Malingering.

***Clinical Research Assistant*** (2004-2005), Kirby Forensic Psychiatric Center, NY

- Clinical-forensic research conducted on Competency to Stand Trial.

***Counselor*** (2003), Northern State Prison, Newark, NJ

- Group therapy services for 96 inmates in a Therapeutic Community (TC) program.

## *BOOKS*

**Pirelli, G.**, & DeMarco, S. (in press). *Firearms and clinical practice: A handbook for medical and mental health professionals.* Oxford University Press.

**Pirelli, G.**, Wechsler, H., & Cramer, R. (2019). *The behavioral science of firearms: A mental health perspective on guns, suicide, and violence.* Oxford University Press.

**Pirelli, G.**, Beattey, R. A., & Zapf, P. A. (2017). *The ethical practice of forensic psychology: A casebook.* Oxford University Press.

---

## *BOOK CHAPTERS*

**Pirelli, G.**, Schrantz, K., & Wechsler, H. (2020). The emerging role of psychology in shaping gun policy in the United States. *In:* M.K. Miller and B.H. Bornstein (Eds.), *Advances in psychology and law (vol. 5).* Springer.

**Pirelli, G.**, & Zapf, P. A. (2014). Conducting research with special populations. *In:* C. Pietz and C. Mattson (Eds.), *Violent offenders: Understanding and assessment.* Oxford.

Zapf, P. A., Roesch, R., & **Pirelli, G.** (2013). Competency to stand trial. *In:* I.B. Weiner & R.K. Otto (Eds.), *Handbook of forensic psychology (4th Edition).* John Wiley & Sons.

Zapf, P. A., Roesch, R., Golding, S. L. & **Pirelli, G.** (2013). Criminal responsibility. *In:* I.B. Weiner & R.K. Otto (Eds.), *Handbook of forensic psychology (4th Edition).* John Wiley & Sons.

Zapf, P. A., & **Pirelli, G.** (2012). Report writing and testimony in competency and capacity evaluations. *In:* G. Demakis (Ed.), *Civil capacities in clinical neuropsychology: Research findings and practical applications.* Oxford University Press.

Zapf, P. A., Zottoli, T., & **Pirelli, G.** (2009). Insanity and competency to stand trial. *In:* J. D. Lieberman & D. A. Krauss (Eds.), *Psychology in the Courtroom.* Ashgate Publishers.

---

## *PROFESSIONAL JOURNAL ARTICLES*

**Pirelli, G.**, Novitskie, D. W., Bergquist, B. K, Apolo, S., & Vargas, A. P. (in progress). An analysis of 30 years of psychology ethics violations in New Jersey (1991-2019): Implications for practicing psychologists.

**Pirelli, G.**, Formon, D. L., & Maloney, K. (2020). Preventing vicarious trauma (VT), compassion fatigue (CF), and burnout (BO) in forensic mental health: Forensic psychology as exemplar. *Professional Psychology: Research and Practice, 51*(5), 454-466.

**Pirelli, G.**, & Zapf, P. A. (2020). An attempted meta-analysis of the competency restoration research: Important findings for future directions. *Journal of Forensic Psychology Research and Practice, 20*(2), 134-162.

**Pirelli, G.**, & Gold, L. H. (2019). Leaving Lake Wobegon: Firearm-related education and training for medical and mental health professionals is an essential competence. *Journal of Aggression, Conflict and Peace Research, 11*(2), 78-87.

**Pirelli, G.**, Hartigan, S., & Zapf, P. A. (2018, invited). Using the Internet for collateral information in forensic mental health evaluations. *Behavioral Sciences & the Law. Special Issue: The Internet, Cyber technology and the Law, 36*(2), 157-169.

**Pirelli, G.**, & Witt, P. H. (2018). Firearms and cultural competence: Considerations for mental health practitioners. *Journal of Aggression, Conflict and Peace Research, 10*(1), 61-70.

**Pirelli, G.** (2017, Winter). Responsibility and accountability in today's psychology. *Guest Editorial, New Jersey Psychologist*, 1-4.

**Pirelli, G.**, & Scheiter, R. (2016). Contemporary issues in immigration: Implications for mental health, law, and policy. *New Jersey Psychologist, 66*(4), 15.

**Pirelli, G.** (2016). Commonly contested issues in sexual risk assessment. *Sex Offender Law Report, 17*(3), 33-43.

**Pirelli, G.**, Otto, R. K., & Estoup, A. (2016). Using Internet and social media data as a collateral source in forensic evaluations. *Professional Psychology: Research and Practice, 47*(1), 12-17.

Witt, P., & **Pirelli, G.** (2015). Female sex offenders. *Sex Offender Law Report, 17*(1), 1-2, 10-13.

**Pirelli, G.**, Wechsler, H., & Cramer, R. (2015). Psychological evaluations for firearm ownership: Legal foundations, practice considerations, and a conceptual framework. *Professional Psychology: Research and Practice, 46*(4), 250-257.

**Pirelli, G.**, & Witt, P. (2015). Psychological evaluations for civilian firearm ownership in New Jersey. *New Jersey Psychologist, 65*(1), 7-9.

**Pirelli, G.**, & Witt, P. (2014). Evaluating pornography use in sexual risk assessments. *New Jersey Psychologist, 64*(1), 11-12.

**Pirelli, G.** (2013). Evaluating violence risk in university settings. *New Jersey Psychologist, 63*(3), 11-12.

**Pirelli, G.** (2012). Forensic psychology. *New Jersey Psychologist, 62*(3), 29-31.

**Pirelli, G.** (2012). Correctional mental health. *New Jersey Psychologist, 62*(2), 10-11.

**Pirelli, G.** (2012). Therapeutic and forensic roles. *New Jersey Psychologist, 62*(1), 12-13.

**Pirelli, G.** (2011). Psychology and law. *New Jersey Psychologist, 61*(4), 15-16.

**Pirelli, G.**, Zapf, P. A., & Gottdiener, W. H. (2011). Competency to stand trial research: Guidelines and future directions. *Journal of Forensic Psychiatry and Psychology, 22*(3), 340-370.

**Pirelli, G.**, Gottdiener, W. H., & Zapf, P. A. (2011). A meta-analytic review of competency to stand trial research. *Psychology, Public Policy and Law, 17*(1), 1-53.

***cited in an APA/AAPL amicus brief to the U.S. Supreme Court**

***cited in an NYC Bar Assoc. amicus brief to the New York State Court of Appeals**

**Pirelli, G.** (2009). Forensic mental health assessment in the United States. *Korean Institute of Criminology (KIC) Bulletin, Fall Issue,* 23-26.

**Pirelli, G.**, & Jeglic, E. (2009). The influence of death exposure on suicidal thoughts and behaviors. *Archives of Suicide Research, 13*(2), 136-146.

**Pirelli, G.**, & Zapf, P. A. (2008). An investigation of psychologists' practices and attitudes toward participation in capital evaluations. *Journal of Forensic Psychology Practice, 8*(1), 39-66.

Shealy, C., Cramer, R. J., & **Pirelli, G.** (2008). Third party presence during criminal forensic evaluations: Psychologists' opinions, attitudes and practices. *Professional Psychology: Research and Practice, 39*(6), 561-569.

**Pirelli, G.** (2008). Five ways to be a good mentee. *New Jersey Psychologist, 58*(1), 41.

**Pirelli, G.** (2007). Students benefit from a solid foundation. *New Jersey Psychologist, 57*(3), 14.

## ***ENCYCLOPEDIA/REFERENCE BOOK CONTRIBUTIONS***

**Pirelli, G.,** & DeMarco, S. (in press). Forensic psychology ethics. In R. Roesch (Volume Ed.), *Psychology and law,* a volume of *Routledge encyclopedia of psychology in the real world.* New York: Routledge

DeMarco, S. & **Pirelli, G.,** & (in progress). Guns and mental health. In R. Roesch (Volume Ed.), *Psychology and law,* a volume of *Routledge encyclopedia of psychology in the real world.* New York: Routledge

**Pirelli, G.,** & DeMarco, S. (2022). Personal injury. In R. Roesch (Volume Ed.), *Psychology and law,* a volume of *Routledge encyclopedia of psychology in the real world.* New York: Routledge

**Pirelli, G.**, & Witt, P. (2017). Predicting dangerousness. *SAGE Encyclopedia of Abnormal & Clinical Psychology, pp. 952-955.* Sage.

Witt, P., & **Pirelli, G.** (2017). Insanity defense. *The SAGE Encyclopedia of Abnormal and Clinical Psychology, pp. 1808-1811.* Sage.

**Pirelli, G.** (2009). Contributor: *The SAGE Glossary of the Social & Behavioral Sciences.* Sage.

**Pirelli, G.**, & Zapf, P. A. (2008). Competence to stand trial Assessment Instrument. In B. L. Cutler (Ed.), *Encyclopedia of Psychology and Law.* Thousand Oaks, CA: Sage.

---

## ***PUBLISHED DOCTORAL DISSERTATION***

**Pirelli, G.** (2010). A meta-analytic review of competency to stand trial research. (Doctoral Dissertation). ProQuest Dissertations and Theses. (Accession Order No. AAT 3426807)

---

## ***DISSERTATION AND THESES***

*Doctoral Dissertation* (2010), A Meta-Analytic Review of Competency to Stand Trial Research

***1st Place Dissertation Award**
*New Jersey Psychological Association (NJPA)*
***2nd Place Dissertation Award**
*American Psychology-Law Society (AP-LS), Division 41 of APA*

*Second Doc. Thesis* (2007), Use of Arbitrary Metrics in Competency to Stand Trial Assess. Instruments

*Master's Thesis* (2006), An Investigation of Psychologists' Practices and Attitudes toward Participation in Capital Evaluations
***Master's Thesis Award: Best Thesis of 2006**, *New Jersey Psych. Assoc. (NJPA)*

*Bachelor's Thesis* (2004), Change Blindness and Race: The Effects of Forensic Stimuli and Environment on Perception

## LIST OF GROUPS: TRAININGS, SEMINARS, TALKS BY DR. PIRELLI

**LEGAL/LAW-Related**

New Jersey Association of Justice (NJAJ)
University of Nebraska Law School
Middlesex County Bar Association
Passaic County Ins of Court (NJ)
Nat'l Academy of Elder Law Attorneys (NAELA)
Div. of Mental Health Advocacy Alt. Cmt. Unit-
NJ Office of the Public Defender (OPD)
Lawline.com: A Division of FurtherEd, Inc.
ProLawCLE
DRD Consulting
Attorney Credits
Clear Law Institute
Access MCLE

**MEDICAL and MENTAL HEALTH**

American College of Osteopathic Family Physicians (ACOFP)
Morristown Medical Center (NJ)
U.S. Dept. of Veteran's Affairs, E. Orange (NJ)
Georgia Department of Behavioral Health and Developmental Disabilities
Rutgers University Behavioral Healthcare (UBHC) - Newark (NJ)

**PSYCHOLOGY *(National, State, Regional)***

Association for Psychological Science (APS)
American Psychology - Law Society (AP-LS), Div. 41 of APA
New Jersey Psychological Assoc. (NJPA)
New York State Psychological Assoc. (NYSPA)
Northeast Co. Assoc. Psychologists (NCAP, NJ)
Morris Co. Psychological Assoc. (MCPA, NJ)
NJPA Forensic Committee
NJPA – Graduate Students (NJPAGS)
Rutgers GSAPP Office of Professional Development and Continuing Education

**COMMUNITY**

Jersey Battered Women's Service
The Jewish Center, Princeton (NJ)
Caring Partners Community Mgt. Org. (Morris/Sussex)
Circle of Care Community Mgt. Org. (Passaic)
Amnesty Internat'l Society for Ethical Culture

**GUN RANGES and 2A**

New Jersey 2A Firearms Education Conference
Woodland Park Range/Gun for Hire (NJ)
Reloaderz Gun Range (Wayne, NJ)

**UNIVERSITY/ACADEMIC**

Chief Student Affairs Officers Org. of Independent Schools of NJ (CSAOs, AICUNJ
Monmouth County Assoc. of Directors of Special Education
William Paterson U. Student of Concern Cmte.
Ramapo College Counseling Services
Fairleigh Dickinson University's Advanced Professional Practice Seminar
Palo Alto University (CA)
John Jay College of Criminal Justice (NY)
Montclair State University (PhD Program, Psychology Club, and Multicultural Psychology Scholars, MPS)
University of Ontario, Inst. Of Technology

## ***TRAININGS AND SEMINARS PROVIDED BY DR. PIRELLI***

Mental Health Disorders: The Big 3 for Employment Lawyers (for 2022, November). *New Jersey Association for Justice (NJAJ) Meadowlands Seminar.*

The Ethical Practice of Psychology: Essentials for Reducing Professional Risk and Liability. (2022, May). *CE Workshop for Rutgers- GSAPP Office of Professional Development and CE.*

Duty to Warn and Protect in New Jersey: Essentials for Mental Health Professionals. (2021, July). *Webinar for Independent Mental Health Practice.* Union County, NJ.

Sexual Risk Assessments: A Primer on Forensic Psychological Evaluations for Lawyers. (2021, April). *Invited CLE Program,* Lawline.com: A Division of FurtherEd, Inc., NY, NY.

Preventing Vicarious Trauma (VT), Compassion Fatigue (CF), and Burnout (BO) in Forensic Mental Health. (2020, May). *Continuing Education (CE) Webinar for CONCEPT,* Palo Alto University, CA.

Duty to Warn and Protect: Considerations for New Jersey Psychologists. (2020, January). *Invited Workshop, Northeast Counties Association of Psychologists (NCAP).* Cresskill, NJ.

Applied Risk Assessment: Key Principles for New Jersey Clinicians. (2020, January). *CE Workshop for Independent Psychology Group Practice.* Essex County, NJ.

The Behavioral Science of Firearms: A Mental Health Perspective on Guns, Suicide, and Violence. (2019, December). *Continuing Education (CE) Workshop for CONCEPT,* Palo Alto University, CA.

Identifying and Managing Firearm-Related Risk Factors. (2019, October). *Invited Staff Training,* Woodland Park Range/Gun for Hire, Woodland Park, NJ.

Duty to Warn and Protect: Considerations for New Jersey Psychologists. (2019, September). *Invited Workshop for the Morris County Psych. Association (MCPA).* Florham Park, NJ.

Forensic Psychology for Lawyers. (2019, July). *Continuing Legal Education (CLE) Webinar,* ProLawCLE.

The Behavioral Science of Firearms: Understanding Guns, Domestic and Interpersonal Violence, Suicide, Mental Health and Substance Use in Context. (2019, May), *Continuing Education (CE) Workshop.* Verona, NJ.

Warning Signs of Firearm-Involved Violence and Suicide. (2018, November). *Invited Staff Training,* Reloaderz Gun Range, Wayne, NJ.

The Behavioral Science of Firearms: Understanding Guns, Domestic and Interpersonal Violence, Suicide, Mental Health and Substance Use in Context. (2018, November), *Continuing Education (CE) Workshop.* West Orange, NJ.

Firearm-Related Issues for Family Physicians. (2018, May). *Invited e-Learning Webinar,* American College of Osteopathic Family Physicians (ACOFP).

Firearms and Domestic and Intimate Partner Violence: Considerations for Professionals. (2018, May). *Invited CE,* Jersey Battered Women's Serv. Conference, Morris Plains, NJ.

The 'Expert' Expert Witness. (2018, April). *Invited Expert,* Mock Trial at John Jay College of Criminal Justice's Forensic Speaker Series. New York, NY.

A Framework for Identifying, Assessing and Managing College-Aged Students of Concern. (2018, April). *Invited Seminar,* Meeting of the Chief Student Affairs Officers organization of Independent Schools of New Jersey (CSAOs of AICUNJ) at Centenary University (NJ).

A Primer on Firearms and Firearm-Related Issues for Medical and Mental Health Professionals. (2018, February). *Invited Grand Rounds,* Morristown Medical Center, NJ.

Guns, DV, and the VA: Clinical Applications of Firearm-Related Issues for VA Mental Health Professionals. (2018, January) *Invited Training,* U.S. Dept. of Veteran's Affairs, E. Orange, NJ.

Implementing a Risk Management and Reduction-Based Approach in University Settings. (2018, January). *Invited Seminar,* William Paterson Univ. Student of Concern Committee.

Firearms and Domestic Violence-Related Considerations in Military, Law Enforcement and Correctional Populations. (2017, November). *Invited Continuing Education Training,* New Jersey Psychological Association Fall Conference. Iselin, NJ.

Forensic Psychological Evaluations in Criminal, Civil and Administrative Matters. (2017, November). *Invited CLE Seminar,* DRD Consulting. Freehold, NJ.

The Behavioral Science of Firearms: Considerations for Legal Professionals. (2017, September). *Invited CLE Seminar,* New Jersey 2A Firearms Education Conference. Princeton, NJ.

Firearm-Related Considerations in School Settings. (2017, September). *Invited Training,* Monmouth County Association of Directors of Special Education. Freehold, NJ.

Ethical Practice in Forensic Mental Health. (2017, August). *Invited Continuing Education Training,* Georgia Department of Behavioral Health and Developmental Disabilities. Atlanta, GA.

Forensic Psychological Evaluations: Considerations for Criminal and Civil Attorneys. (2017, May). *Invited CLE Program,* Attorney Credits.

The Behavioral Science of Firearms: A Primer for Psychologists. (2017, February). *Invited* CE *Seminar,* NJPA Forensic Committee.

Forensic Psychological Evaluations: Considerations for Criminal and Civil Attorneys. (2016, December). *Invited CLE Program,* Clear Law Institute.

Forensic Psychological Evaluations in Sexually Violent Predator (SVP) Matters. (2016, November). *Invited CLE seminar for the Division of Mental Health Advocacy Alternative Commitment Unit for the Office of the Public Defender (OPD), New Jersey.*

Criminal Responsibility. (2016, May). *Podcast Seminar,* TheaterOfTheCourt.com

Legal Competencies & Capacities. (2016, May).*Podcast Seminar,* TheaterOfTheCourt.com

Firearms and Mental Health: A Primer for Psychologists (2016, April). *Invited CE Seminar,* Morris County Psychological Association. Florham Park, NJ.

Evaluating At-Risk Youth. (2016, March). *Inviting Training,* Caring Partners Community Management Organization (CMO). Mt. Arlington, NJ.

Identifying and Assessing Risk in Youth. (2015, November). *Inviting Training,* Circle of Care Community Management Organization (CMO). Woodland Park, NJ.

Psychological Evaluations in Criminal and Civil Cases. (2015, July). *Invited* CLE, Access MCLE.

Psychology and Firearms. (2015, June). A seminar for Woodland Park Range, NJ.

Forensic Psychological Evaluations: Considerations for Criminal and Civil Attorneys. (2015, May). *Invited CLE Program,* Lawline.com: A Division of FurtherEd, Inc., NY, NY.

Psychological Evaluations in Personal Injury Cases. (2015, February). *Invited CLE Seminar,* Middlesex County Bar Association. New Brunswick, NJ.

Psychology and Firearms. (2014, September). A seminar for Woodland Park Range, NJ.

Assessing College Students' Risk (2014, August). *Invited Training,* Ramapo College Counseling Services. Mahwah, NJ.

Psychological Evaluations in Criminal and Civil Cases (2014, June). *Invited CLE Program,* Ins of Court. Paterson, NJ (Passaic County).

Intervention with EDPs (2006). Training for NYPD Emergency Service Unit (ESU) members, Assistant Instructor at John Jay College of Criminal Justice, New York, NY.

---

## ***INVITED ADDRESSES GIVEN BY DR. PIRELLI***

Developing an Independent Practice. (for 2022, November). Seminar in Professional Practice, PhD Program in Clinical Psychology – Montclair State University.

Private Practice Essentials. (2022, April). University Behavioral Healthcare (UBHC) – Rutgers. Newark, NJ.

Considerations for Developing an Independent Practice. (2021, April). University Behavioral Healthcare (UBHC) – Rutgers. Newark, NJ.

Firearm-Related Competence for Clinicians: Professional and Cultural Considerations (2020, October). ****Invited Keynote Speaker,*** New York State Psychological Association (NYSPA), 82nd Annual (Virtual) Convention.

COVID-19 and Elder Care. (2020, April). *Invited Webinar Panelist:* National Academy of Elder Law Attorneys (NAELA).

Senior Challenges During COVID-19. (2020, April). *Invited Webinar Panelist:* Elder Law Dept., Mandelbaum Salsburg, NJ.

Developing a Private Practice. (2019, April). University Behavioral Healthcare (UBHC) – Rutgers. Newark, NJ.

The Behavioral Science of Firearms: Contemporary Issues. (2018, September). *Invited Featured Speaker:* NJ 2A Firearms Education Conference. Vineland, NJ.

Forensic Psychological Evaluations of Civil Capacity in Elder Law. (2018, June). *Invited Guest:* Parents Are Hard to Raise Podcast with Diane Berardi.

Private Practice in Clinical-Forensic Psychology. (2018, April). University Behavioral Healthcare (UBHC) - Rutgers. Newark, NJ.

Independent Practice in Clinical-Forensic Psychology (2017, March). University Behavioral Healthcare (UBHC) - Rutgers. Newark, NJ.

Firearms and Mental Health: A Psychological Perspective. (July 2016). NJ 2A Firearms Education Conference. Parsippany, NJ.

Law Enforcement and the Community: Mental Health, Violence, and Interpersonal Relationships. (2015, May). Back Story with Joan Goldstein. Princeton, NJ.

Mental Health Considerations for Firearm Use and Ownership. (2015, May). Gun for Hire Radio at Woodland Park Range, NJ.

Assessing Response Style in Clinical and Clinical-Forensic Evaluations (2015, April). Psychology Club at Montclair State U., NJ.

Conceptualizing Objectivity and Impartiality in Clinical-Forensic Psychology Practice and Research. (2015, March). Invited Symposium Discussant: Affective and Cognitive Threats to Objectivity in the Trial Process. Annual meeting of the American Psychology-Law Society (AP-LS), San Diego, CA.

Firearms and Violence: Psychological Considerations across Contexts (2015, March). Back Story with Joan Goldstein. Princeton, NJ.

Developing a Clinical-Forensic Psychology Practice (2015, March). University Behavioral Healthcare (UBHC) - Rutgers. Newark, NJ.

Forensic Psychology (2015, February). Law Talk Today w. Daniel Agatino, Esq. Parsippany, NJ.

Private Practice in Clinical and Forensic Psychology (2014, December). New Jersey Psychological Association – Graduate Students (NJPAGS), Florham Park, NJ.

Firearm-Related Violence and Mental Health (2014, November). The Jewish Center, Princeton, NJ.

Psychological Evaluations in Immigration Proceedings (2014, November). Multicultural Psychology Scholars (MPS) Event. Montclair State University, NJ.

Solitary Confinement (2014, October). Moderator for Amnesty International's Society for Ethical Culture conference. New York, NY.

Professional Service and Advocacy: A Primer for Students and Psychologists-To-Be (2014, May). Fairleigh Dickinson University's Advanced Professional Practice Seminar, Teaneck, NJ.

Networking at Conferences (2010, March). *How to get the most out of the conference.* Annual meeting of the American Psychology-Law Society (AP-LS), Vancouver, BC.

The Internship Process (2009, May). Annual conference of the New Jersey Psychological Association – Graduate Students (NJPAGS), West Orange, NJ.

Student Professional Development (2009, March). *Conference tips from the AP-LS Teaching and Training Committee and the AP-LS Student Section.* Annual meeting of the American Psychology - Law Society (AP-LS), San Antonio, TX.

Being a Good Advisee (2008, March). *AP-LS Mentorship Breakfast.* Annual meeting of the American Psychology - Law Society (AP-LS), Jacksonville, FL.

Getting Involved and Staying Active in the Field of Psychology and Law (2008, March). *Building Bridges to New Scholars Luncheon.* Annual meeting of the American Psychology - Law Society (AP-LS), Jacksonville, FL.

Why Attend Conferences? (2008, March). *How to get the most out of the conference.* Annual meeting of the American Psychology - Law Society (AP-LS), Jacksonville, FL.

Taking Risks, Maximizing the Mentoring Relationship, & Getting Involved in the Psychology Field. (2009, May). *The Naked Truth: Getting Into Graduate School: Strategies for Survival & Success.* 19th Annual Convention, Association for Psychological Science (APS), Washington, DC.

Psychologists' Practices and Attitudes toward Conducting Capital Evaluations. (2006, October). New Jersey Psychological Assoc. (NJPA) Fall Conference, Iselin, NJ.

---

## *INVITED UNIVERSITY LECTURES GIVEN BY DR. PIRELLI*

*University of Ontario, Inst. of Technology*
Being an Expert Witness in Forensic Psychological Matters (2018)

*University of Nebraska Law School (Lincoln, NE)*
Capacity and Related Forensic Psychological Considerations in Elder Law (2017)

*John Jay College of Criminal Justice (NY, NY)*
Ethics, Indep. Forensic Practice (2017, 2019)
Private Practice (2016)
Develop. Priv. Practice: ECP Perspective (2014)

*Fairleigh Dickinson University (Teaneck, NJ)*
Board Certification…(2019)
Diversity Issues in Forensic Psychology (2016)
Evaluating Adjudicative Competency (2010)
Competency to Stand Trial (2009)
Ethical Forensic Practice (2008)

*Montclair State University (Upper Montclair, NJ)*
Developing an Independent Practice (2022)
Forensic Psychology (2014)
How the Criminal Justice System Manages Mentally Ill Offenders (2007)
Competency to Stand Trial and Insanity: Assess. and Research Considerations (2007)
Mental Illness and the Crim. Just. System (2005)

---

## *PROFESSIONAL CONFERENCE PRESENTATIONS GIVEN BY DR. PIRELLI*

**Pirelli, G.** (2019, April). Guns and mental health: A primer for New Jersey counselors. *2019 NJ Counseling Assoc. (NJCA) Conference, Brookdale Community College, Lincroft, NJ.*

Hartigan, S., **Pirelli, G.,** Zapf, P. A., & Otto, R. K. (2017, March). Forensic psychological uses of Internet-based data: A replication study. *Annual meeting of the American Psychology-Law Society (AP-LS), Seattle, WA.*

**Pirelli, G.,** Hartigan, S., Zapf, P. A., & Otto, R. K. (2016, March). The use of Internet-based data in forensic contexts: An investigation of professional attitudes and practices. *Annual meeting of the American Psychology-Law Society (AP-LS), Atlanta, GA.*

Wechsler, H., **Pirelli, G.**, Struble, C., & Cramer, R. (2015, August). Firearm ownership evaluations: A local norms perspective. *2015 Annual American Psychological Association (APA) Convention, Toronto, Canada.*

**Pirelli, G. &** Zapf, P. A. (2015, March). A meta-analysis of the competency restoration research. *Annual meeting of the American Psychology-Law Society (AP-LS), San Diego, CA.*

Wechsler, H., **Pirelli, G.**, & Cramer, R. (2014, May). Conducting forensic mental health assessments for firearm ownership. *26th Annual Convention of the Association for Psychological Science (APS), San Francisco, CA.*

Estoup, A., **Pirelli, G.**, & Otto, R. K. (2014, March). Using Internet and social media data as a collateral source in forensic evaluations. *Annual meeting of the American Psychology-Law Society (AP-LS), New Orleans, LA.*

**Pirelli, G.,** Zapf, P. A., & Gottdiener, W. H. (2011, March). Competency to stand trial research: Guidelines and future directions. *Annual meeting of the American Psychology-Law Society (AP-LS), Miami, FL.*

**Pirelli, G.,** Zapf, P. A., & Gottdiener, W. H. (2010, March). Competency to stand trial: A meta-analysis. *Annual meeting of the American Psychology-Law Society (AP-LS), Vancouver, BC.*

**Pirelli, G.,** Zapf, P. A., & Gottdiener, W. H. (2009, March). A meta-analytic review of competency to stand trial research: Preliminary findings. *Annual meeting of the American Psychology-Law Society (AP-LS), San Antonio, TX.*

**Pirelli, G.,** Zapf, P. A., & Gottdiener, W. H. (2008, July). Forensic assessment instruments' use of arbitrary metrics. *Intern'l Assoc of Forensic MH Services (IAFMHS), Vienna, Austria.*

**Pirelli, G.,** Gottdiener, W. H., & Zapf, P. A. (2008, March). The use of arbitrary metrics in competency to stand trial assessment instruments. *Annual meeting of the American Psychology-Law Society (AP-LS), Jacksonville, FL.*

Shealy, C., Cramer, R. J., & **Pirelli, G.** (2008, March). Psychologists' practices and attitudes toward third party presence in criminal forensic evaluations. *Annual mtg of the American Psychology-Law Society (AP-LS), Jacksonville, FL.*

**Pirelli, G.**, & Barber-Rioja, V. (2008, March). Personality assessment in criminal forensic evaluations. *Annual Meeting of the Society for Personality Assessment (SPA), New Orleans, LA.*

Pasquariello, E. M., Hamway, T., **Pirelli, G.,** & Gratz, Z. (2007, August). The impact of the parental/caregiving relationship on a child's emotional intelligence. *2007 Convention of the American Psychological Association (APA), San Francisco, CA.*

**Pirelli, G.,** & Jeglic, E. (2007, May). The influence of death experiences on attitudes toward death and suicide. *19th Annual Convention of the Assoc. for Psychological Science (APS), Washington, DC.*

**Pirelli, G.,** & Jeglic, E. (2007, May). Suicidality, ideation, and exposure effects on suicide and death attitudes. *19th Annual Convention of the Association for Psychological Science (APS), Washington, DC.*

**Pirelli, G.,** Barber-Rioja, V., Kucharski, L. T., & Duncan, S. (2007, March). The Personality Psychopathology-Five model of the MMPI-2: Relationships to the Personality Assessment Inventory Clinical Scales. *Annual Meeting of the Society for Personality Assessment (SPA), Arlington, VA.*

**Pirelli, G.** (2006, November). Cognitive therapy for the treatment of delusions: A case study. *Case Conference Presented to the Clinical Psychology Department at the John Jay College of Criminal Justice.*

**Pirelli, G.,** & Zapf, P. A. (2006, June). Psychologists' stances on capital participation: A survey of professionals. *International Association of Forensic Mental Health Services (IAFMHS), Amsterdam, NL.*

**Pirelli, G.,** Barber-Rioja, V., Kucharski, L. T., & Duncan, S. (2006, May). Convergent validity of the MMPI-2 PSY-5 and the PAI. *18th Annual Convention of Assoc. for Psych. Science (APS), NY, NY.*

Green, D., Rosenfeld, B., Dole, T., Zapf, P. A., Swift, A., **Pirelli, G.**, Pivovarova, E., & Marzolf, B. (2006, March). Validation of an abbreviated version of the SIRS in an outpatient psychiatric setting. *Annual mtg of AP-LS, St. Petersburg, FL.*

**Pirelli, G.**, & Zapf, P. A. (2005, March). The Suicide Assessment Manual for Inmates (SAMI): A first look at normative data. *Annual meeting of AP-LS, La Jolla, CA.*

**Pirelli, G.**, & Keenan, J. P. (2003, May) Change blindness and race: The effects of forensic stimuli and environment on perception. *11th Annual Pace University Undergraduate Psychology Conference Poster Session.*

**Pirelli, G.**, & Keenan, J. P. (2003, April) Forensic perception and race: A change blindness study. *The 14th Annual Saint Joseph's University Sigma Xi Student Research Symposium.*

---

## ***EDITORIAL RESPONSIBILITIES***

### ***EDITOR***

New Jersey Psychologist (2018-2019)

### ***EDITORIAL BOARD***

Open Access Journal of Forensic Psychology (2014-present)
Journal of Aggression, Conflict and Peace Research (2015-2020)
Law and Human Behavior (2012-2019)
New Jersey Psychologist (2010-2017)
Forensic Forum: A Publication of the Forensic Psychology Doctoral Student Council at John Jay College of Criminal Justice, *Editor-in-Chief* (2007-2008)
The New School Psychology Bulletin (NSPB) (2006-2007)
Psychology, Public Policy & Law, *Editorial Assistant* (2006-2008)

### ***REVIEWER***

American Psychological Association (APA) Books (2021-)
Springer, Criminology and Forensic Psychology Books (2021-)
Behavioral Sciences & the Law (2021-)
Journal of Forensic Psychology Research and Practice (2015-present)
International Journal of Forensic Mental Health (2014-present)
Journal of Forensic Psychiatry and Psychology (2013-present)
Psychology, Crime and Law (2019)
Psychology, Public Policy & Law (2007-2017)
Journal of Personality Assessment (2016)
International Journal of Law, Crime, and Justice (2015)
Journal of Aggression, Conflict and Peace Research (2014)
Open Access Journal of Forensic Psychology (2013)
Law and Human Behavior (2009-2011)
Violence and Victims (2011)
Current Directions in Psychological Science (2010)
American Psychology–Law Society (AP-LS) – Annual Conference (2015, 2010, 2008, 2007)
Sage Publications, Statistics in Psychology text (2008)
Association for Psychological Science – Student Research Award (2008, 2007)

## ***ACADEMIC POSITIONS***

*Adjunct Professor* (2012-2017), Postdoc Certificate Program in Forensic Psych., Montclair State Univ.

*Adjunct Professor* (2010-2015), Forensic Psychology M.A. Program, Fairleigh Dickinson University

*Assistant Professor* (2014-2015), Department of Psychology, Montclair State University

*Faculty Sub-line* (2008-2009), Department of Psychology, John Jay College of Criminal Justice

*Adjunct Instructor* (2005-2008), Department of Psychology, John Jay College of Criminal Justice

*Adjunct Lecturer* (Spring 2005), College Now Program, John Jay College of Criminal Justice

## ***UNIVERSITY COURSES TAUGHT*** **(42)**

### ***POSTDOCTORAL*** *COURSES at Montclair State University* (14)

Forensic Assessment: Criminal (Fall 2013)

Forensic Assessment: Civil (Spring 2014)

Psychopathology: Criminal (Fall 2013)

Psychopathology: Civil (Spring 2014)

Introduction to Forensic Psychology (Summer 2012, 2013, 2014, 2015 & 2016)

Research Methods in Forensic Psychology (Winter 2012, 2013, 2014, 2015, & 2016)

### ***GRADUATE*** *COURSES at Fairleigh Dickinson University* (9)

Clinical-Forensic Interviewing (Spring 2012 & 2013)

Criminal Responsibility/Competency (Spring 2012)

Clinical Psychology in Forensic Contexts (Summer 2011, 2012, 2013, 2014, & 2015)

Mental Health Law (Summer 2010)

### ***UNDERGRADUATE*** *COURSES at Montclair State University* (6)

Introduction to Forensic Psychology (Fall 2014; Spring 2015)

Introduction to Psychological Research (Fall 2014; Spring 2015; x2)

### ***UNDERGRADUATE*** *COURSES at John Jay College of Criminal Justice* (13)

Research Methods/Experimental Psychology (7 courses across 4 semesters: 2007-2009)

Abnormal Psychology (Spring 2008)

Statistics in Psychology (4 semesters: 2005-2007)

Introduction to Psychology (Spring 2005)

## *STATISTICAL & RESEARCH EXPERTISE*

### *TEACHING, MENTORING, CONSULTANCIES, AND COURSEWORK*

*Teaching (18 courses)*

**Postdoctoral Courses Taught in Research Methods (5)**

Research Methods in Forensic Psychology (Winter 2012, 2013, 2014, 2015, & 2016)

**University/College Courses Taught in Research and Statistics (13)**

Introduction to Psychological Research (Fall 2014; Spring 2015; x2)
Research Methods/Experimental Psychology (7 courses across 4 semesters: 2007-2009)
Statistics in Psychology (4 semesters: 2005-2007)

*Mentoring & Consulting*

**Clinical-Forensic Research & Externship Supervisor (2015-present) of students from:**

John Jay College of Criminal Justice
Sam Houston University
Fairleigh Dickinson University
Caldwell University
Montclair State University
Texas Tech University

*Dissertation Committee Member* (2016-present). Melanie Schneider, Fairleigh Dickinson U.
Dissertation: Competency Restoration Across the United States.
*Thesis Committee Member* (2015). PCL-R, Amanda Reed at John Jay College of Criminal Justice.
*Undergraduate Mentor* (2007-2008), Assoc. for Psychological Science Student Caucus (APSSC)
*Undergraduate Mentor* (2007-2008), Psi Chi – John Jay College of Criminal Justice Chapter
*Mentor* (2004-2005), Undergraduate Honors Program, John Jay College of Criminal Justice
*Dissertation Consultant* (2006-2013), Fordham, Rutgers, Farleigh D., Stevens, Antioch, Argosy
*Research & Statistical Consultant* (2008 – 2009), William Paterson University Counseling Center
*Chair and Consultant* (2008), Research & Statistics Peer Consultation Program (RSPCP)
*Statistical Analyst* (2003), Montclair State University

*Dr. Pirelli's Pre-Doctoral Coursework*

**Ph.D.**

Bayesian Theorem
Structural Equation Modeling (SEM)
Psychometrics
Experimental Psychology and the Law
Statistical Consulting
Statistical Methods in Psychology I
Statistical Methods in Psychology II
Research Methods and Design
Research Practicum I
Research Practicum II
Dissertation Supervision - 2 years

**B.A.**

TA in Statistics
Independent Study (Research)-full yr.
Statistics in Psychology
Statistics (in Math Dept).
Intro to Research Methods
Research Methods (II)

## HONORS AND AWARDS

*1st Place Dissertation Award* (2010), New Jersey Psychological Association

*2nd Place Dissertation Award* (2009), American Psychology-Law Society, Div. 41 - APA

*Doctoral Program Scholarly Achievement Award* (2009), John Jay College of Criminal Justice

*Doctoral Teaching Fellowship (Faculty Sub-line)* (2008-2009), Department of Psychology, John Jay College

*Doctoral Program Scholarly Achievement Award* (2008), John Jay College of Criminal Justice

*Student Travel Award* (2008), American Psychology-Law Society & Pearson Publishing
***Awarded to the top 20 student submissions to the conference**

*Doctoral Program Scholarly Productivity Award* (2007), John Jay College of Criminal Justice

*Master's Thesis Award: Best Thesis of 2006* (2006), New Jersey Psychological Association

*Presidential Research Scholarship* (2006), John Jay College of Criminal Justice

*Student Scholarly Achievement Award* (2005), John Jay College of Criminal Justice

*Graduation Speaker* (2004), College of Humanities and Social Sciences, Montclair State University

*Outstanding Service Award* (2004), State of New Jersey Department of Corrections

## GRANTS AND FUNDING (pre-doctoral)

*Student Travel and Research Fund Award* (2010), The Graduate Center (CUNY)

*Grant-in-Aid* (2009), American Psychology-Law Society (AP-LS), Division 41 of APA

*Federal Work Study* (2004-2009), The Graduate Center (CUNY)

*Student Travel Grant* (2008), Society for Personality Assessment (SPA)

*Sue Rosenberg Zalk Student Travel and Fund Award* (2008), The Graduate Center (CUNY)

*Student Travel and Research Fund Award* (2007), The Graduate Center (CUNY)

*Student Caucus Travel Award* (2007), Association for Psychological Science

*Sue Rosenberg Zalk Student Travel and Fund Award* (2007), The Graduate Center (CUNY)

*Psychological Assessment Resources Student Travel Grant* (2007), Society for Personality Assessment

*Sue Rosenberg Zalk Student Travel and Fund Award* (2006), The Graduate Center (CUNY)

*Forensic Psychology Research Institute Research Grant* (2006), John Jay College of Criminal Justice

*Grant-in-Aid* (2005), American Psychology-Law Society (AP-LS), Division 41 of APA

*Sue Rosenberg Zalk Student Travel and Fund Award* (2004), The Graduate Center (CUNY)

# R



Board Certified in Forensic Psychology
Licensed Psychologist
NJ #4975 NY #019418 PA #018980

Lina M. Aldana, Psy.D.
Licensed Psychologist
NJ #5112 NY #022907

PIRELLI
CLINICAL AND FORENSIC PSYCHOLOGY

Sarah DeMarco, Psy.D.
Licensed Psychologist
NJ #5618 NY #021383

Dorota W. Novitskie, Ph.D.
Licensed Psychologist
NJ #5474 NY #021114

Danielle Restrepo, Psy.D.
Licensed Psychologist
NJ #6403 NY #024051

A Limited Liability Company

80 Pompton Avenue, Suite 204 Verona, New Jersey 07044

T 973.944.0810 • www.gpirelli.com • F 973.239.3919

# FORENSIC PSYCHOLOGICAL EVALUATION

CLIENT NAME: **Nijeer Parks**
DATE OF BIRTH: 09/11/1987
DATE OF REPORT: 11/29/2022
EXAMINER: Gianni Pirelli, Ph.D., ABPP

**Rationale, Confidentiality, and Informed Consent**

Mr. Parks is a 35-year-old male who was referred for a psychological evaluation in the context of his legal matter, including to assess his psychological functioning and diagnostic presentation, particularly as such relates to the referral incident period beginning around the time of his 2019 arrest. Information integrated in the present evaluation was based on data generated from clinical-forensic interviewing and psychological testing with Mr. Parks, and from collateral interviewing. I also reviewed all records made available to me. At the onset of my evaluation, I provided Mr. Parks with informed consent-related information. For instance, I explained the nature and purpose of the evaluation, advised him of the limits of confidentiality, informed him that the information that he was to provide would be contrasted with any available existing information, and that I would write a report as a result. Mr. Parks demonstrated a satisfactory level of comprehension as to the purpose and nature of this evaluation and he agreed to proceed. Please note: the clinical-forensic interviewing and testing was conducted in-person.

**Sources of Data**

| | |
|---|---|
| Collateral Interview with Patricia Parks (mother) | 11/23/22 |
| Clinical-Forensic Interview and Psychological Testing w/ Mr. Parks | 10/12/22 |
| Joint Letter to Judge Wettre from D. Sexton, Esq. (6pp.) | 08/19/22 |
| R. 26 Disclosures from D. Sexton, Esq. (4pp.) | 08/11/22 |
| Letter to Rubenstein w/ Responses to Rogs…(42pp.) | 02/09/22 |
| Exhibit B: Draft of Proposed Third Amended Complaint…(30pp.) | 06/01/21 |
| First Amended Complaint (27pp.) | 01/15/21 |

**Record Review**

Please note: I have reviewed the records listed above in detail and provide a general synopsis here. I reserve the right to amend or otherwise supplement my report and associated opinions should additional information be made available by any of the involved parties in this matter, and such is warranted.

Per Mr. Parks' Complaint in this matter, he indicates he had no involvement in criminal activity in Woodbridge (NJ) and was falsely arrested due to a false match from a 'biased and inaccurate facial recognition technology.'

Namely, on 1/26/19, the Woodbridge Police responded to the Hampton Inn after being called to investigate a suspected shoplifter who had been staying in the hotel. The police reportedly questioned the suspect who ultimately fled the scene. The Complaint notes a Tennessee Driver's License was taken for a Jamal Owens, who was identified by the hotel clerk who called the police. The Complaint further details numerous faulty procedures that ultimately led to the wrongful arrest of Mr. Parks.

Specifically, on or around 1/30/19, Mr. Parks' grandmother called him while he was at work and informed him the Woodbridge PD issued a warrant for his arrest (and the Paterson police tried to serve same). Upon receiving the information, Mr. Parks contacted the Paterson PD, who redirected him to Woodbridge PD; he eventually spoke with the Woodbridge Municipal Court Clerk to inquire about the warrant. Mr. Parks was provided with the information related to the nature of the warrant, and he attempted to explain he had nothing to do with the matter in question. He was told to 'come down and clear the matter up' or something along those lines.

On 2/5/29, Mr. Parks was driven to Woodbridge by his cousin to clear his name. He was directed to the Woodbridge Police Station, at which point he was placed under arrest – handcuffed and taken into custody. Mr. Parks spoke with police in another attempt to clear the misunderstanding. According to his Complaint, Mr. Parks was harassed by police and feigned an asthma attack when he feared he was going to be attacked in an area out of the range of the camera. As a result, EMS was called, and he alerted EMS about his concerns – asking that pictures of him be taken to document his status.

Mr. Parks was processed and transferred to the Middlesex Co. Jail; he contended Correctional Officers continued to abuse him, to include keeping him in a solitary confinement scenario – i.e., maintaining him in intake for his first week (thereby isolated from others).

Of additional note is Mr. Parks was offered a 25-year plea deal. Ultimately, he was released but reportedly remained worried about his pending legal matter: '…the defendants kept Plaintiff in a state of apprehension for almost a year…' However, the charges were eventually dropped in November 2019, prior to trial, when Mr. Parks insisted he was going to trial because there was no evidence, and he was innocent.

Per his Complaint, Mr. Parks reports having suffered emotional pain (e.g., anxiety and distress), in addition to financial and physical damages due to a wrongful arrest and detainment, which he indicates was completely preventable.

**Clinical-Forensic Interviewing of Mr. Parks (Oct. 2022)**

As noted, I conducted the session in-person, which was **5.25** hours in total, *including* testing time. He was on time and dressed appropriately. He appeared his age, and his hygiene and grooming were good. He was cooperative and pleasant throughout the session. Mr. Parks set forth good effort during the session, and he appeared to answer questions and make comments in a forthright, thoughtful manner, which is consistent with psychological test results and corroborated by collateral interview data. That said, in both the interview and testing, Mr. Parks reported experiencing various mental health-related symptoms, both in the past and at present, which I explain in greater detail below. Nevertheless, he demonstrated good insight and ability to reflect on his past experiences and mental health-related issues associated with such.

***The following information is based on my interviews with Mr. Parks:***

He resides in Paterson, NJ in an apartment, which he has been renting for two (2) years; also, two (2) adolescent children live in the residence – one is his biological child and the other is the child of his child's mother. He has helped raise both of the children from birth. Mr. Parks stated he has never been married; the mother of these children is a former girlfriend. They maintain a positive, amicable relationship; he has always maintained visitation with his children, and they have primarily lived with him for almost two (2) years to this point. He has no other children.

As a matter of background, Mr. Parks was born and raised in Paterson by his biological mother along with his three (3) siblings, one is a half-sibling and the other two were adopted; he also has three (3) half-siblings on his father's side. He always maintained visitation with his father, although there were some interruptions due to his father's past legal issues. Mr. Parks stated his mother moved to Pennsylvania when he was a freshman in high school, but he stayed with his grandmother because he had an athletic scholarship (see below). However, he ultimately went to Pennsylvania; he noted legal troubles around that time.

Mr. Parks' mother is in her early 50s, as his father; he stated they are both generally healthy. He reported diabetes and high blood pressure on the maternal side; there is also breast cancer on that side. As for mental health, there is a family history of Schizophrenia on the maternal side. He is not aware of any substance use problems that run in the family. There is also no family history of suicide, to his knowledge.

Mr. Parks stated he has a good relationship with both of his parents as well as all of his siblings. He believes he has a strong social support network, such that his family is supportive, and he also has friends and positive work relationships. As for his social history, he never had problems in that regard; he stated he was always able to develop and maintain friendships – in fact, he still has strong connections with early childhood friends. That said, he does not make new friends too well as an adult. He stated, "I've had friends for 20 years – we're really close."

He described his upbringing as "very different," noting that he was exposed to a lot of issues in the City of Paterson. He stated he had "a great family environment," but spoke of being exposed to a lot of partying and the like because his mother was so young when she had him (i.e., 15). His grandmother helped raise him. Nevertheless, he stated, "it was a very loving environment," and all of his needs were always met: "We were tooken (sic) care of, but it was a bad area – a drug area – but we were well taken care of – we were never without."

Regarding his educational history, Mr. Parks completed a semester of college at George Washington University (Maryland), where he was going to be red-shirted for football (D-II); however, he was arrested, and such ended his prospects at the school. Prior, he graduated from an alternative high school in 2004 or 2005 – Vista, in Allentown, PA. He attended Paterson Catholic for a month during freshman year, to play football; he did not like the situation (playing wide receiver), so he transferred to Eastside High School. He was only there for a few months before having legal problems, leading his mother to bring him to PA. He then attended a private school to play football and basketball, which he did for 10th and 11th grade; however, he was expelled during his junior year due to a potential legal issue. He then went to public high school and began getting into more trouble; he started acting-out more in the hopes his mother would send him back to NJ. For instance, he engaged in physical altercations and was arrested for drug possession; ultimately, he was sent to an alternative high school, and he graduated the following year. However, he has never been left back and never had special education services or the like: "I was never a dumb kid; my problem was, I would get bored."

As noted, he was a behavioral problem, beginning at age 14. He has been arrested numerous times: twice as a juvenile for drug possession with intent to distribute (ages 14 and 17). As an adult, he has been arrested approximately 20 times, with the last being approximately 10 years ago (i.e., 2012). He stated "every arrest" he has had in his life has been for drug possession with intent to distribute, with one exception: an arrest in 2017 for smoking marijuana, for which he was fined.

Mr. Parks has also been incarcerated in state prison (in NJ) three (3) times: 2008-2010; 2010 for 90 days; and then from 2012-2016. He has been in the community since (i.e., 6 years), without any legal issues aside from the referral incident – other than the noted arrest in 2017 for smoking marijuana. Otherwise, he has been detained in the county jail (mostly Passaic Co.) approximately 10 times, with his lengthiest being 8-9 months in 2011.

With respect to his employment history, Mr. Parks secured his first full-time job at age 19, carrying sheetrock for a construction company for two (2) months. He quit because the job required him to be in unsafe situations (buildings). He then worked approximately five (5) jobs, but primarily to appease probation or parole. He currently works for a company that remodels kitchens; such is full-time, and he has been there almost three (3) years. He likes his job. Prior, he was an assistant manager at a grocery store for almost four (4) years, which was his lengthiest period of employment (incl. medical leave for a leg injury). He was ultimately terminated after returning from leave, as there was a new store manager who began firing various people; he stated the owner offered him his job back, but he did not take it because he is making more money at his present job. Mr. Parks has never been written-up, suspended, or terminated from any other job. In recent years, he has developed a stronger work ethic, which he attributes to his children; he does not want to keep getting into trouble and living his past lifestyle: "I want to set a good example for them."

As for his relationship history, Mr. Parks has been in 3-4 meaningful relationships; the lengthiest was five (5) years with his ex-fiancé (i.e., 2015-2020). He also been "on and off" with his child's mother over the last 15 years. He stated there has never been domestic violence in any of his relationships; he stated he is against such because he witnessed his mother get hit by a partner when he was a youth.

Mr. Parks stated he has no abuse victimization history. That said, he noted, "I've seen a lot of traumatic things," such as police brutality, shootings, overdoses, and so forth. He noted over 10 childhood friends have died – mostly via murder due to territorial issues in the city, but one from a car accident and one from cancer. However, he stated his arrests and detainments were "normal" for him given how and where he grew up.

Regarding substance use, Mr. Parks drank alcohol "socially" – only at events or parties, occasionally. He prefers marijuana, which he began smoking in high school; such turned into daily use after high school to date. He has tried ecstasy and molly once each, but he did not like them or other drugs. Mr. Parks stated he does not believe he has a marijuana use problem, as he has been able to stop for lengths of time (e.g., 90 days this past year) without any issue. He also stated he had also been able to stop while on probation and so forth in the past at times. As part of probation, he was mandated to complete drug program through drug court in or around 2010.

With respect to his medical history, Mr. Parks tore his ACL and meniscus in 2019 at work when he slipped; as noted, he was on medical leave for ~9 months after surgery. He has no other history of surgery. He has a history of one (1) head injury – a minor concussion in 9th grade during football. He has had no other head injuries nor loss of consciousness.

Mr. Parks has no notable mental health history, such that he has never had any contacts with mental health professionals outside of mandatory assessments for parole and so forth in the past. However, he has never been in mental health treatment, and he has never taken psychiatric medication.

**Referral Incident: January 2019**

Per Mr. Parks, on 1/30/19, his grandmother called him and stated there were numerous cops at her house looking for him. He then called the Paterson PD to ask what was happening, at which point they informed him there was a warrant for his arrest out of Woodbridge. He stated he was confused and then called Woodbridge PD; the confirmed but would not say what the charge was or the like – only that there was an incident at the hotel: "I told them, 'I've never been to a hotel in Woodbridge' – at the time, I didn't even know where Woodbridge was located."

Nevertheless, he told them he would come down and turned himself in within a few days:

> "I didn't do anything, so I didn't think I needed an attorney. I didn't even know what they was (sic) looking for. In my head, I thought they would know I'm not the person once I got there – and we'd figure everything out."

As noted in his Complaint, he never had a driver's license in his life to that point. He stated, he had years of suspensions due to his legal issues over the years.

Mr. Parks' cousin brought him to the Woodbridge PD; he believed it was going to be a simple process: "Because I knew I didn't do anything wrong – I never even been there – so, it was just gonna be a mistaken identity." He informed the clerk of same.

Of additional note: it was just a few months after his knee surgery, so he was still attending physical therapy and walking with a limp and so forth.

When speaking with the clerk, Mr. Parks provided his ID and his medical report (re: his surgery); then, two (2) officers came and arrested him on the spot. He was taken into custody at the station. Mr. Parks then refused to answer any further questions once he realized "they was (sic) really trying to charge me with a crime."

Mr. Parks stated:

> "I didn't know what I was accused of until three (3) days later, in jail. I didn't know the exact crime – that was the hardest part. I'm telling them, 'I've never been here before,' and they kept saying, 'You know what you did.' We just kept going back and forth."

Mr. Parks initially tried to explain to the officers that it was not even possible that he committed a crime in that town – by providing them with various pieces of information:

> "They already had their mind made up. There was really no way around it."

He was then handcuffed to a bench, and, at some point, he was waiting for an hour for transport – and uncuffed and told he had to go down a hallway with them. However, he realized there were no cameras down that hallway, so he "faked an asthma attack" – "I knew they were going to beat the hell out of me." He told the EMTs that arrived that he had faked same, as he wanted them to see that he had no physical injuries (other than the leg recovering) in case he was beaten up by the police – and the EMTs took pictures of his face and so forth.

Mr. Parks stated the officers were very "aggressive" when he was being held at the precinct; he got the sense whatever happened was different, perhaps involving an officer – because the aggression toward him (and number of officers present) was very abnormal. They were threatening to hurt him.

He was then brought to the Middlesex Co. Adult Correctional Facility. He stated he was constantly threatened during transport until arriving at the jail.

Upon his jail arrival, he observed the transport officer point at him to a correctional officer, leading him to believe he was being marked. Then, he was placed in a holding cell.

Mr. Parks was kept on an intake unit for a week, which was also abnormal – "Usually, you're only there for, like, two days – and, half the time, I was there by myself." He missed rec time because no one told him how and when to wait at the door for same.

He stated one officer "made a reference for me doing something to a cop." He added:

> "I could tell it was gonna be a hostile stay. It was different. It's different when you're in jail and you know what you did – you can mentally prepare yourself. It's different when you don't know what you're in for – your mind can't wrap – trying to wrap my head around – I know I didn't do anything."

Mr. Parks was able to make his first phone call the first day at the jail, but he could not get through; he connected with his fiancé the next day. He asked her to help get more information as to the charges and so forth. He found out he was being charged with assault of an officer, eluding, a deadly weapons charge, and drug possession. He realized he was facing decades in prison. He stated he did not have an attorney during his first court appearance; he was not released. He then secured an attorney and was released at his second appearance.

Mr. Parks was transferred to a general population unit for a few days before leaving; he has been in the jail approximately 9-10 days at that point.

He ultimately returned home – living partially with his fiancé and partially with his grandmother (both in Paterson). He stated he had to keep paying his lawyer (totaling $5,000) and had ongoing court hearings. When he was able to speak to the judge, he informed her he was not going to take a plea bargain because he was completely innocent. He was scared because of the seriousness of the charges, so he entertained the thought of a plea bargain, but he maintained his innocence. He also told the judge there was no evidence provided: "And she started asking for the evidence, but they didn't have any." Therefore, the judge put a hold, such that no pleas could be made until evidence was produced.

After a few months, Mr. Parks found a receipt from the date of the alleged crime, reflecting that he was in Haledon sending money from Western Union to his fiancé (who was in North Carolina) within 10 minutes time of the alleged crime.

The process persisted until November (2019), almost 9 months after his arrest, when he received a letter in the mail indicating all of his charges were dismissed. He then informed his criminal attorney and secured his present civil attorney.

Mr. Parks stated no evidence was ever produced, aside from faulty facial recognition. He stated:

> "How are you about to send someone to prison for that amount of time and you don't even get an apology? They about to take your life away."

As for the effects of his arrest, detainment, and the associated process:

> "It affected me a lot. I'm tense around police.  I never been like that before – I get tense, scared, sweating profusely. I was in a fender bender yesterday and I get so nervous around cops, now. I'm backing up. I don't want him to get too close to me – like, he's gonna arrest me."

The arrest, detainment, and process itself was extremely stressful: "My life almost got took from me."

In the presence of police, security, and related professions, he becomes very tense, anxious, and "scared." Again, such has never been the case – and he had significant contact with police throughout his life; however, it has become so different now "because I know they can do and say anything they want, and I'm gonna have to deal with the consequences in court." He stated:

> "To know someone had your life in their complete hands – and I'm a felon, so my word don't count. They showed me that. Now, I have no faith or trust in law enforcement. You showed me you can take me away from my kids, my mom, with no remorse – nothing's gonna happen to you. They didn't get suspended or anything. That scares the hell out of me."

Still, he remains "always alert" as well (even when police are not present). As noted, such has affected his social life; he is often not called to go out with friends. He stated, "I'm a party pooper," as he would express his ongoing worries about going out – 'where, what, when, and how' they were doing anything. Such has made him more isolative.

He also constantly worries the police will be called even in the most benign situations. He gave an example of going to a restaurant a few months back when a waiter told them to 'tone it down,' and he became highly concerned the police were going to be called:

> "I automatically go to the worst of every situation now. I just be trying to avoid things. It makes people not want to be around me.

Such causes arguments with others, as they want to relax and enjoy themselves. He feels bad that he does not get invited out with his longtime friends at times; he understands why they do not, but it is very upsetting to him. He stated the referral incidents really changed me in a lot of ways. He will preemptively talk about what they can and cannot do – to avoid getting into trouble with police.

Mr. Parks stated he went with friends to Miami in May (2022) for a friend's birthday, but he was not invited to the following Las Vegas trip "because I was too – killing everybody's vibe." He stated his brother told him, everybody was having fun and he was too cautious. This continues to happen.

Mr. Parks stated everything has worsened in terms of his symptoms and the effects on his daily (and social) functioning because it has become a cycle of problems.

Mr. Parks stated he has thought about what happened in relation to the referral incidents on a daily basis and such has even become more of a focus, due to its impact on his life in many ways. Now, he feels, "I can't make a mistake." He also stated:

> "Every day, I wake up and say a prayer that I am home – it's a blessing. I feel like I'm on borrowed time. I could've been waking up in Rahway right now with 15 or 20 years. It's not like I'm saying anything that's far-fetched. This really happened over something I didn't do – and nobody wanted to believe me."

The most salient thought is the significant amount of time he was facing, given his awareness of the law and criminal justice system.

Mr. Parks also developed sleep disturbance after his arrest; such has improved to some extent, but he does not fall asleep easily any longer – "My head's always racing. Since that, I think of everything so much more." This is the case throughout the day as well: "Now, I overthink everything." This also impacts his sexual/dating relationships and his time with his children and family (and friends, as noted) because he cannot be present. His mind is always "alert" and distracted – focused on his environment. He stated:

> "It's like I'm always looking for something – if we go somewhere and there's a camera, I make sure the camera see (sic) me. In my head, even on a date, if there's a camera we need to be on that camera because it can save us."

Mr. Parks stated he is triggered by anything police-related; he had to apologize to his cousin's partner who is an officer as well as former coaches who are police officers. He often does not notice his reactions until after the fact – sometimes, others have to tell him he is acting oddly.

As for why he has not engaged in psychotherapy, he stated, "Honestly, because growing up, I was told it was for crazy people." He stated he has strongly considered same, but still has this stigma in his mind. That said, he is not strongly opposed – he is just "not sure."

With respect to the effects of the referral incidents as compared to other challenges in his life (e.g., witnessed his mother's domestic violence as a youth; traumas in terms of deaths, exposures; grandmother's death last year - 2021; present financial challenges due to inflation and working a regular job/staying out of trouble by selling drugs), he stated:

> "Those are issues I grew up with my whole life – and this is after that. Those are normal issues, stuff I don't think about like that. I just get up and do it – that's an everyday struggle for an everyday person. Versus how I think about things now. I can't go to the park. If I take my kids right now and we see a cop, we're leaving, because I can't get out of my head that he's watching me. When I was selling drugs, I didn't think like that and that's when I was supposed to worry – that's when I was supposed to avoid them (police). I avoid them now more than I did then, and I have no reason to, so that's how I know something's not right."

**Psychological Testing**

The *Trauma Symptom Inventory-2* (TSI-2) is a widely used test of trauma-related symptoms and behaviors designed to measure acute and chronic symptomatology, including the effects of various types of trauma. It consists of 136 items for which the examinee indicates the frequency in which a particular experience has occurred in the past six months. There are a number of critical items on this measure, and Mr. Parks endorsed two (2) – related to having sex with someone he hardly knew and doing something violent because he was upset. Upon follow up, he stated he thought about doing something violent towards a man who was bothering his child's mother; he was trying to protect her – he did not act upon his thoughts, however.

Otherwise, both validity scales on this measure were intact.

As for elevations, his protocol reflects one (1) factor and five scale elevations. On the TSI-2, scores can be considered "problematic" (i.e., 60-64) or "clinically elevated" (i.e., those that exceed 64 points). Mr. Parks' protocol contains 14 scale elevations and three (3) factor elevations, including Posttraumatic Stress (TRAUMA) as well as Self-Disturbance (SELF), and Externalization (EXT). His scale elevations pertain to those designed to measure anxiety, depression, intrusive experiences, avoidance, sexual disturbance, insecure attachment, and related areas of concern. Upon follow-up, Mr. Parks stated his experience of irritability has been interfering with his sexual drive and interests as well as other issues in his life. He stated his responses with respect to anxiety and other notable symptoms and experiences are partially related to the referral incidents, in addition to other stressors, such as his grandmother's death last year (2021) and financial challenges.

I also administered the *Personality Assessment Inventory* (PAI), a 344-item self-report measure designed to assess clinical syndromes and provide information relevant for clinical diagnosis, treatment planning, and screening for psychopathology in adults. It contains validity (i.e., response style), clinical, treatment consideration, and interpersonal scales. Mr. Parks' profile indicated appropriate levels of scores on the validity scales. However, he endorsed various critical items.

Namely, he indicated feeling he was the target of a conspiracy, which is related to the referral incidents (as is his elevation on a scale measuring hypervigilance and feelings of persecution and resentment – i.e., PAR). He stated he had never been paranoid or the like prior but has become so. For example, he has become very cautious as to "where I'm gonna go and what type of situation I put myself in." He stated:

> "My brother and them don't call me to go out no more because I mess up the night, sometimes. I don't just sit there and chill. I'm always worried something's gonna happen. I'm always alert."

Mr. Parks also endorsed three (3) items associated with traumatic stressors, which he indicated were also related to the referral incidents. He stated, "I can't enjoy myself anymore," and provided an example of being at a music event, whereby security came near him, and he became very uneasy: "Before, it wouldn't have bothered me – I wouldn't have paid no attention. Now, I'm so aware of police presence." He added:

> "Before, I never had no problem with them – if I did the crime, I did the time. Now, they showed me, they can do anything they want to do. I'd never been 100% innocent in nothing I got in trouble for (in the past), so I never had a problem with them – I looked at them like they're doing their job."

As for three (3) items associated with potential for aggression, Mr. Parks stated such pertains to pre-existing issues, mainly – "Because I don't deal with things right away and just let it build up." He lets a lot of things go, but it will bother him and, eventually, he becomes very upset. That said, while this was an issue he dealt with since his teenage years, he has become "more angry" (sic) as a result of the referral incidents: "When I do go off, it's way more extreme than it need to be."

All that said, he stated he never experienced any notable anxiety, depression, or related issues in the past. He also stated, "I've been more of a loner since this happened."

A review of Mr. Parks' PAI protocol reflects numerous scale elevations as well, cutting across areas associated with anxiety-, depression-, paranoia-, and other mental health-related concerns.

**Collateral Interview with Patricia Parks (mother)**

As noted, I conducted a collateral interview with Mr. Parks' 51-year-old mother. She indicated she lives in NJ at this point, and she speaks with her son daily either on the phone or in-person. She stated they are very close, and they have always been.

She corroborated his reported history, overall. However, she corrected his report, noting he began having legal issues in PA (not in NJ, initially). That said, she reported his legal problems escalated at age 18, when he moved to NJ.

However, she stated he has been doing well, overall, since 2016: "He came home with a mindset that he was gonna change – and he has."

She corroborated her son has no pre-existing mental health history of note.

As for the referral incident, she reportedly found out police were looking for her son when her mother told her. She stated, "We didn't know what was going on and we were shocked – because he doesn't get in trouble anymore."

She also corroborated her son has never had a driver's license.

She stated she spoke with her son about the police looking for him, and he told her he was going to go to the police department with a family member; therefore, he went with his cousin. As such, she "assumed he was going to go there, find out what happened, and come back home."

However, his cousin called her and told her that they kept her son, which made her very upset:

"We knew (he) didn't do anything" because he was doing so well, reiterating he did not get into trouble anymore: "He goes to work, takes care of his children, and takes care of his grandmother." She stated, "He was a very big help to me during her sickness" (i.e., the grandmother's) and he even began staying with the grandmother to help. She corroborated he also recently came out of knee surgery and physical therapy.

The next time she saw her son was at court, but she was unable to speak with him. Such was very upsetting and confusing: "We knew he didn't do anything, especially after we heard what had happened" (the accusations) – "It wasn't him. He wasn't there. He never even been to that town." She added:

> "It was shocking. This was a young man finally trying to get his life together and then this happens."

She stated she was "very upset (about) the way he looked – because he had a look of defeat on his face – and he looked scared." She stated, "You know your children. I was scared for him because I know the charges – and police officers, when it's one of their own that get hurt, they can be very nasty."

The next time she spoke with her son was when he was in jail, albeit briefly, but not many times. She does not recall the details related to same.

She saw him when he returned home; she stated, "He was sad – like, a pitiful look, like, 'You know, I can't believe this happened.'" She stated he was in a lot of trouble, but he did not do the act; he told her he was being pressured to take a plea bargain: "He was looking at a lot of time" and was very worried because of his criminal history. She stated:

> "It didn't seem to me like they did an investigation. We were scared – he was scared, I was scared. Assault on a police officer – hitting a police officer with a vehicle. Those are big charges, and he's an inner-city kid who's been in trouble with the law – it didn't look good."

She corroborated such continued for quite some time before learning of the dismissal. During that period, "He was very aggravated – fearful and very aggravated." She stated he told her he "wasn't treated very good" in jail, making comments and he feared he was going to be beaten up (including the incident whereby he "acted like he was sick" to get medical attention).

Upon learning of the dismissal, they were "happy," but she believed there should be accountability for his wrongful arrest and detainment. She believes such affected him:

> "When it comes to young black men, it's your word against theirs, and most of the time, they win. So, if they hadn't found him – if they hadn't dropped the charges, we was just gonna lose Nijeer to the system – and this happens a lot because we don't have the money to pay for lawyers. When we don't have the money, we go to jail. We're a loving family but we're not a family that have money."

She stated, "It's different when you really didn't do it." She noted the suspect looks "nothing like" her son, noting that they were solely both black and had mustaches. She stated, "He's definitely more fearful of police than he used to be, even though he had run-ins before. Before, he was guilty and knew he was guilty." She stated, "He's fearful, a little more to himself – he's not out-and-about like he used to be. He's more of a loner than he ever was."

She reiterated he was "actively trying to change his life," so this was a "big blow," as it is "not easy for these men to come out after prison and change their lives – you gotta really want it."

**Summary and Conclusions**

I assessed Mr. Parks' psychological functioning in the context of his legal matter. The following conclusions are based on data generated from my clinical-forensic interviewing and psychological testing with him, a record review, and collateral interviewing. Please note that my opinions are based on all data available to me and are made within a reasonable degree of psychological probability. They are subject to change based on the advent of new information.

Based on my evaluation, it is my opinion that Mr. Parks developed significant mental health problems as a result of the 2019 referral incident period associated with the arrest and detainment in question, and he continues to experience many of them. Indeed, he has had other life experiences that have affected him in various ways, including but not limited to witnessing his mother's domestic violence victimization as a youth; traumas in terms of deaths, exposures; his grandmother's death last year - 2021; and present financial challenges due to inflation and working a regular job/staying out of trouble by selling drugs. However, these do not account for the types of symptoms he has developed associated with the 2019 referral incidents.

Per available data, Mr. Parks had no notable prior mental health history. It is my opinion that this referral incident period beginning in 2019 represents the proximate cause of the significant mental health problems I outline below.

Mr. Parks was arrested and detained in 2019 for charges that were ultimately dismissed outright.

As a result of what Mr. Parks experienced in this regard, he developed numerous depressive, anxiety-, and posttraumatic stress-related symptoms. There are also numerous experiences, thoughts, feelings, and the like that Mr. Parks has had to endure which do not fit neatly into a DSM-5-TR diagnosis per se. I have detailed such throughout this report, such as his reactions to the arrest, detainment, and post-detainment periods. His exposures in these contexts are significant and have formed the basis of a very problematic clinical picture.

Again, despite a lengthy history of behavioral and legal problems, to include many arrests, the referral incident was qualitatively different for him because he was adamant about his innocence. As he articulated it, he never had problems with police or the criminal justice system per se:

> "Before, I never had no problem with them – if I did the crime, I did the time. Now, they showed me, they can do anything they want to do. I'd never been 100% innocent in nothing I got in trouble for (in the past), so I never had a problem with them – I looked at them like they're doing their job."

However, this arrest, detainment, and post-detainment was very different than ever before, and has resulted in a multitude of psychiatric problems that were simply not present before.

Namely, based on my evaluation, Mr. Parks meets DSM-5-TR criteria for Posttraumatic Stress Disorder (PTSD) criteria, he exhibits, at least, the following:

Criterion A: Direct exposure

Criterion B: Intrusion symptoms related to the incident (*one is needed for diagnosis*)
   a. recurrent, intrusive and distressing thoughts and memories

Criterion C: Avoidance-related symptoms (*only one is needed for diagnosis*)
   a. trauma-related thoughts and feelings
   b. avoidance of triggers

Criterion D: Negative alterations in cognition and mood associated with the incident (*only two are needed for diagnosis*)
   a. persistent negative emotional state
   b. markedly diminished interest or participation in significant activities
   c. persistent inability to experience positive emotions
   d. feeling detached or estranged from others

Criterion E: Marked alterations in arousal and reactivity associated with the incident (*only two are needed for diagnosis*)
   a. irritability
   b. hypervigilance
   c. sleep disturbance

Criterion F: Duration of the disturbance is more than one month

Criterion G: The disturbance causes clinically significant distress or impairment in social, occupational, or other areas of functioning

Criterion H: The disturbance is not attributable to the physiological effects of a substance or another medical condition.

In addition, Mr. Parks' symptoms have not appreciably remitted or lessened. If anything, many remain and have worsened. They are serious and he continues to experience them at a clinical level, meeting formal diagnostic criteria for such. While he has experienced various incidents in his life that negatively affected him at some level, none have reached the level of clinical significance associated with the 2019 arrest, detainment, and post-detainment period. Mr. Parks was markedly psychologically damaged from such, and this represents the proximate cause of the significant mental health problems he has developed.

Mr. Parks made a concerted effort to stay largely out of trouble over the last 6+ years and he has done so with the exception of a minor 2017 marijuana charge. Otherwise, he has developed a strong work ethic, motivated by wanting to set a good example for his children.

The 2019 arrest, detainment, and post-detainment processes significantly negatively impacted Mr. Parks. He feared for his safety, particularly as a result of the way in which law enforcement and correctional officers responded to him. He desperately sought help from EMTs when he feared for such in the precinct. He was confused for some time and was confronted with a plea deal that would have meant a quarter century in prison. He feared that being a convicted 'felon' would give him no chance to overcome this case, but he maintained his innocence, resulting in an outright dismissal. As he put it, no evidence was ever produced, aside from faulty facial recognition:

> "How are you about to send someone to prison for that amount of time and you don't even get an apology? They about to take your life away."

As a result, Mr. Parks has developed significant trauma, primarily associated with law enforcement and intense levels of insecurity related to his freedom. At first glance, it is hard to understand how someone with such a notable arrest and detainment history could be so negatively impacted by a relatively brief jail detainment. However, upon analyzing this case over many hours and via numerous data sources, it is clear that Mr. Parks was greatly affected.

By all accounts, he had actually never been in this situation before. Indeed, he had been arrested and detained, but he understood he always had a role in each of those incidents. Again, this 2019 referral incident period was qualitatively different and, as a result, introduced an entirely different set of fears and traumatic reactions to Mr. Parks. He remains highly anxious, insecure, vulnerable, irritable, upset, worried, hypervigilant, and fearful. These symptoms are triggered and reoccur. As his mother stated:

> "When it comes to young black men, it's your word against theirs, and most of the time, they win. So, if they hadn't found him – if they hadn't dropped the charges, we was just gonna lose Nijeer to the system – and this happens a lot because we don't have the money to pay for lawyers. When we don't have the money, we go to jail. We're a loving family but we're not a family that have money."
>
> "It's different when you really didn't do it."

She reiterated he was "actively trying to change his life," so this was a "big blow," as it is "not easy for these men to come out after prison and change their lives – you gotta really want it."

Regarding Mr. Parks' prognosis, based on a reasonable degree of psychological probability, he remains at high risk of experiencing ongoing and severe mental health problems, including an exacerbation of existing (and past) mental health-related symptoms and potentially developing new ones.

While I recommended mental health treatment moving forward (he is somewhat ambivalent about same), it is my opinion that his significant psychiatric problems will persists at some level regardless. The 2019-related incidents have resulted in significant impairments across the spectrum of his cognitive, emotional, and behavioral functioning, and it is more probable than not that he will experience continued and permanent effects from both – although the ultimate

degree of which is likely to be at least partially dependent on his response to treatment (or lack thereof) and various life circumstances that were notably affected by the accident (e.g., marital, family, vocational, social, and general daily functioning).

Gianni Pirelli, Ph.D., ABPP
Board Certified in Forensic Psychology
Licensed Psychologist
NJ #4975 NY# 019418 PA #018980

AMERICAN BOARD OF PROFESSIONAL PSYCHOLOGY
ABPP
SPECIALTY CERTIFICATION IN PSYCHOLOGY SINCE 1947