

| | |
|---|---|
| LAW OFFICES OF<br>**JAMES P. NOLAN**<br>&<br>**ASSOCIATES**<br>A Limited Liability Company | James P. Nolan, Jr., ID #004591987<br>Certified Criminal Trial Attorney<br>Fredrick L. Rubenstein, ID #004651994<br>Eric L. Lange, ID #038441997<br>Admitted in NY & NJ<br>Brian A. Bontempo, ID #151162016<br>Garry J. Clemente, ID #305992020<br>Sanford Rader – In Memoriam<br>1960-2018 |

February 2, 2024

**_Via Electronic Filing_**
Hon. Jamel K. Semper, United States District Judge
United States District Court District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street, Courtroom: PO 03
Newark, NJ 07101

> **Re:  _Nijeer Parks v. Township of Woodbridge, et al_**
>      _Civil Action No.: 2:21-cv-04021-JKS-LDW_

Dear Judge Semper:

As directed by Your predecessor judge on this case, the Honorable Julien X. Neals, in his Order of December 14, 2023 (ECF 111), the parties submit this joint cover letter while filing in separate docket entries, the following papers:

(a) Moving papers in the Summary Judgment Motion of the Defendants.
(b) Opposition Papers of Plaintiff.
(c) Reply Brief of Defendants.

Plaintiff's counsel, Daniel W. Sexton, hereby requests Oral Argument on this matter as provided by Local Rule 78.1 b.

It is noted that the ACLU of New Jersey has filed a Motion to intervene as Amicus (ECF 114).

1

    The parties thank the Court for its continued assistance
in this matter and this letter is jointly submitted under my
signature.


                                    Respectfully submitted,


                                    Garry Joseph Clemente
                                    Counsel for Defendants


                                    Daniel W. Sexton
                                    Counsel for Plaintiff

| LAW OFFICES OF<br><br># JAMES P. NOLAN<br># &<br># ASSOCIATES<br>A Limited Liability Company | James P. Nolan, Jr., ID #004591987<br>Certified Criminal Trial Attorney<br>F. Larry Magro<br>Eric L. Lange, ID #038441997<br>Admitted in NY & NJ<br>Brian A. Bontempo, ID #151162016<br>Garry J. Clemente, ID #305992020<br>Sanford Rader – In Memoriam<br>1960-2018 |
| --- | --- |

February 2, 2024

***Via Electronic Filing Only***
Hon. Jamel K. Semper, United States District Judge
United States District Court District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street, Courtroom: PO 03
Newark, NJ 07101

> ***Re:   Nijeer Parks v. Township of Woodbridge, et al.***
> ***Civil Action No. 2:21-cv-04021-JKS-LDW***

Dear Judge Semper:

Please be advised that this firm represents the interests of Defendants, John E. McCormac of the Township of Woodbridge, Robert Hubner, Director of the Woodbridge Police Department, Township of Woodbridge, Township of Woodbridge Police Officer Andrew Lyszyk and Woodbridge Police Sergeant Joseph Licciardi, with respect to the above-referenced matter. Enclosed herewith please find Defendants' Reply Brief in support of the Motion for Summary Judgment and in response to Plaintiff's Opposition Brief thereto. Also enclosed with Defendants' Reply Brief is Defendants' Response to Plaintiff's Supplemental Statement of Material Facts and Certification of Counsel with Exhibits. Kindly provide counsel with an electronically filed copy of same at your earliest convenience.

Thank you for your kind attention to this matter.

Respectfully submitted,

/s/ Garry J. Clemente, Esq.

Enc.
Cc:   Honorable Jamel K. Semper, U.S.D.J.
Honorable Leda D. Wettre, U.S.M.J.
Daniel W. Sexton, Esq.
(Via electronic filing)

**61 GREEN STREET, WOODBRIDGE, NJ 07095**
**PHONE: (732) 636-3344   FAX: (732) 636-1175**

**Garry J. Clemente, Esq.**
**ATTORNEY ID. NO. 305992020**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Woodbridge Defendants**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NIJEER PARKS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-04021-JKS-LDW |
| -v- | : | |
| | : | |
| JOHN E. MCCORMACK, MAYOR OF | : | |
| WOODBRIDGE, et al. | : | |
| | : | |
| Defendants. | : | |

---

### WOODBRIDGE DEFENDANTS' RESPONSE TO PLAINTIFF'S SUPPLEMENTAL STATEMENT OF MATERIAL FACTS

---

## <u>WOODBRIDGE DEFENDANTS' RESPONSE TO PLAINTIFF'S</u>
## <u>SUPPLEMENTAL STATEMENT OF MATERIAL FACTS</u>

Plaintiff's Supplemental Statement of Material Facts is repeated verbatim herein, including the same spelling, grammar, and punctuation. The only alterations made by the undersigned was to justify the margins and omit footnotes.

1. Nijeer learned about Woodbridge's interest in him when his grandmother whom he was living with to care for as she died of cancer called him, "scared half to death ... and said that there's a whole bunch of police here. What did you do?" Parks Deposition, p. 16, lines 16 - 19. Exhibit] to moving papers of Defendant.

**Defendants do not dispute this statement.**

2. Nijeer called Patterson Police and was told that there was a warrant out for him by Woodbridge. Id. p. 17, lines 5 - 25.

**Defendants do not dispute this statement.**

3. Nijeer then called the Woodbridge Police Department and learned that it was "an incident at the hotel" was told to call back in the morning at which time, he was told:" ... and a lady, ... told me that, oh, it's a formality to come in, show us that that oh it's just a formality to come in, show us that you weren't the person we're looking for, bring ID, some paperwork and stuff like that." Id p. 17, lines 12 - 22. Exhibit J.

**Defendants do not dispute this statement but note that Plaintiff testified that the first individual from Woodbridge that Plaintiff spoke with was a female court clerk. Deposition of Nijeer Parks, Defendants' Exhibit "J" Page 29, Line 17-21.**

2

4.   Woodbridge Officer told Plaintiff was told there was no warrant - that they just wanted to question him. Id. p.27, 19 - 19. Plaintiff spoke to an officer, not a civilian. Id., p. 29, lines 17 - 21.

**Defendants deny this statement can be attributed to any WPD Officer. Defendants note that Plaintiff testified that the first individual from Woodbridge that Plaintiff spoke with was a female court clerk who told Plaintiff to come to WPD Headquarters. Deposition of Nijeer Parks, Defendants' Exhibit "J" Page 17, Line 18-23; Page 29, Line 17-21.**

5.   Parks described what happened when he voluntarily had his cousin drive him to the Woodbridge Police Department: "I walked up to a desk, I talked to the lady at the desk. She asked my name. I gave her my ID. I gave her my paperwork. She told me that were waiting for me. She would go get them and she said she'll be right back: Id. p. 30, lines 15 - 23.

**Defendants do not dispute this statement.**

6.   Included in these papers were Plaintiffs medical records substantiating his recent ACL surgery which made it impossible for him to run and so being dispositive proof that he was not the actor. See Pirelli report as Exhbiit R attached to Plaintiff's Opposition papers at 6

**Defendants deny that any medical records pertaining to Plaintiff's ACL surgery, seven months prior to the date of the subject incident, is dispositive proof that Plaintiff was not the actor. Medical literature on the recovery time post-ACL surgery is six to nine months:**

**https://my.clevelandclinic.org/health/diseases/16576-acl-tear**

3

https://www.medicalnewstoday.com/articles/torn-acl-recovery-time

https://www.healthline.com/health/how-long-does-an-acl-tear-take-to-heal#what-to-expect

7.   When she came back, she started talking to me. Me and her were having a conversation and two officers came up and asked me to put my hands behind my back and told that I was un arrest." Id. p. 30, lines 15 - 23. The lady at the desk was an officer. Id., p. 31 lines 4- 11.

   **Defendants do not dispute this statement.**

8.   Plaintiff was then taken to a room and left alone for 20 minutes. Occasionally, officers would come in and taunt Plaintiff. The officers refused to tell him what he was accused of - instead saying "you know what you did." Id p 34 lines 1 - 2.

   **Defendants deny the statement that officers "taunted" Plaintiff.**

9.   "They [the officers] got aggressive like with their manner, like with their words, like trying to scare me, but no one put their hands on me." Id. p. 36, lines 8 - 11.

   **Defendants agree that at no point did any WPD Officer put their hands on Plaintiff.**

10.  Officers were poking their heads in, expressing happiness and satisfaction and giving each others "high fives." P 39 line 1. Officer continued coming in to gape at Plaintiff states "oh look at this f-cker .... Oh we got him ... This is the pr-ck right here." This is the A-hole right here. "Id. p. 41, lines 1 - 4.

4

**Defendants do not dispute that this is Plaintiff's testimony.**

11.  Plaintiff was nudged and pushed and treated rudely. Id. , 43, lines 4 - 14.

**Defendants do not dispute that this is Plaintiff's testimony but note that this statement was made in the context of when Plaintiff was being escorted by two WPD Officers to the room where he was fingerprinted. Deposition of Nijeer Parks, Defendants' Exhibit "J" Page 43, Line 2-14.**

12.  While being verbally assaulted Plaintiff's cuffs were removed and he was being moved down the hallway to where a crowd of officers stood and which, to plaintiff, seemed outside of the surveillance cameras. Id, p 41, lines 1 - 11.

**Defendants deny that Plaintiff was "verbally assaulted." Defendants also note that Detective Tapia testified that surveillance cameras cover every area of the WPD processing area. Deposition of Det. Sgt. Santiago Tapia, Exhibit "F" Page 151, Line 9-12.**

13.  Because Plaintiff senses and felt that he was about to be physically beaten, he feigned an asthma attack. Id. p. 41, lines 12 - 22.

**Defendants do not dispute that this is Plaintiff's testimony.**

14.  The verbal abuse clearly included physical threats. Plaintiff described their words: "Get the f-ck up. Come the f-ck with us. Hurry the f-ck up. Stop moving so damn slowly, we're going to give you something to move slowly for. " Id. p. 50 lines 1 7 - 20.

**Defendants do not dispute that this is Plaintiff's testimony, but deny that Plaintiff was subjected to excessive force by any WPD Officer at any point in time.**

15.  "Plaintiff told the EMTs that he "was scared for his life ... and they basically stayed there until I was transported." Id. 55, lines 1 - 5.

**Defendants do not dispute that this is Plaintiff's testimony.**

16.  The verbal abuse and head games continued when Plaintiff was transported to the County jail. Id. pp 146 - 149.

**Defendants deny that Plaintiff was subjected to excessive force by any WPD Officer at any point in time.**

17.  Plaintiff's interrogation consisted in a the interrogator accusing Plaintiff and telling him that "there's sufficient evidence to put you there [at the scene of the crime]. " See Transcript of Voluntary Statement attached to Plaintiffs Opposition as Exhibit A.

**Defendants deny this statement as Plaintiff's Exhibit A is the Answers to Interrogatories of Andrew Lyszyk. However, Defendants agree that an interrogation pursuant to a criminal investigation necessarily involves an accusation.**

18.  Although Plaintiff had been arrested pursuant to a Criminal Complaint, he was not shown the Complaint and Warrant and Plaintiff was not informed exactly what he was being charged with. Id.

**Defendants agree that Plaintiff was arrested pursuant to a Criminal Complaint that was approved by Assistant Middlesex County Prosecutor Peter Nastasi and signed by the Honorable David Stahl, J.M.C.**

19.  New Jersey law requires that "upon request, the officer shall shall show the warrant to the defendant as soon as possible." New Jersey Rules of Court, 3:3-3 ( c ).

**Defendants do not deny this statement.**

20.  Plaintiff was told the incident took place at the Hampton Inn on January 26, 2019, and that it involved the suspect driving a Hertz Renta a Car. Id.

**Defendants do not deny this statement.**

21.  Plaintiff reiterated over and over that:

a. "I've never been to Woodbridge so ... " Parks Deposition, p. 3, Exhibit J, "Never been in Woodbridge ... I haven't been to a hotel anywhere near this area ... and anywhere near Middlesex County."

b. I have no [driver's license] period. I have my driver's permit inside my ... wallet. Id. p. 5

c. Plaintiff explained that he had never rented a car: "No, I can't rent a car without a license.:" Id.

d. Plaintiff explained and presented the hospital records that he had recently had surgery on his ACL so that he was unable to run and could not have fled the police at the Hampton Inn on January 26, 2019.

e. Plaintiff had alibis for the entire day on January 26th - a basketball game with his two sons and many other people that morning, being at his mother's house after the game, pp 5 – 8. .

**Defendants do not dispute that this is Plaintiff's testimony.**

7

22. Neither Detective Kondracki nor any other Woodbridge officer made any effort to corroborate or refute Plaintiffs alibis and defenses.

**Defendants deny this statement as Plaintiff does not cite to anything in the record to support this statement.**

23. The only questioned posed to plaintiff was "about a blue Dodge Challenger, and I said I don't even have a driver's license." Id. p. 58,. Lines 1 - 2.

**Defendants do not dispute that this is Plaintiff's testimony.**

24. Plaintiff only learned what he was charged with a day or two later when the Public Defender gave him a piece of paper with the charges prior to his initial hearing via Zoom from the jail. Id. p. 59.

**Defendants do not dispute that this is Plaintiff's testimony.**

25. Plaintiff continued to experience the intimidation for the period of his confinement and then from the Prosecutors until the matter was finally dropped in late 2019. Id.

**Defendants deny this statement as it pertains to former Defendants in this matter, Middlesex County Department of Corrections ("MCDC") and the Middlesex County Prosecutor's Office ("MCPO"). The MCDC Defendants were voluntarily dismissed by Plaintiff on November 4, 2022 and the MCPO Defendants were voluntarily dismissed by Plaintiff on July 25, 2023.**

26. During this period awaiting prosecution, Plaintiff was threatened with 20 years in prison as the Prosecutor sought to get Plaintiff to accept a plea of five years in jail.

**Defendants deny this statement as it pertains to the Middlesex County Prosecutor's Office ("MCPO"). The MCPO Defendants were voluntarily dismissed by Plaintiff on July 25, 2023.**

27.  Plaintiff described his mental distress:

> Overall, it's been a very stressful moment, very stressful time. Life I've been in trouble before but for things that I di so now for being in trouble for something that I didn't do that I had no knowledge about. It's like changed my outlook on police. Like definitely afraid of them now that I don't have to do anything to actually be charged or be in trouble for anything. It's just scary man. : Id. p 56, lines 18 to page 89 line 4.

**Defendants do not dispute that this is Plaintiff's testimony.**

28.  Plaintiff is self-medicating for his anxiety with marijuana.

Id. p. 91 lines 1 - 5.

**Defendants do not dispute that this is Plaintiff's testimony but note that Plaintiff used marijuana prior to the subject arrest. Deposition of Nijeer Parks, Exhibit "J" Page 90, Line 19-20.**

29.  Plaintiff describes anxiety attacks when he encounters police. Id p. 91, lines 10 to page 92 line 5.

**Defendants do not dispute that this is Plaintiff's testimony.**

30.  Plaintiff further explained:

> ...this time it was different because it's like I really had no clue on what was going on. I just was lie- I felt like I was like in outer space, like out of body experience because ... I'm really afraid off being involved in the system or any type of way now.

Id. p. 9323 to p. 94 line 6

**Notwithstanding grammatical errors in Plaintiff's recounting of this testimony, Defendants do not dispute that this is Plaintiff's testimony.**

31.  In addition to anxiety, plaintiff reports feeling depressed.

Id. p. 94 line 10.

**Defendants do not dispute that this is Plaintiff's testimony.**

32. At the time of his deposition, plaintiff was seeking help for his anxiety and depression from mentors- his football coaches, his father, etc. Id. p. 95 lines 3 - 11.

**Defendants do not dispute that this is Plaintiff's testimony, but note that Plaintiff testified that does not believe in going to a therapist. Deposition of Nijeer Parks, Exhibit "J" Page 95, Line 3-7.**

33. Dr. Pirelli has diagnosed Plaintiff with Post Traumatic Stress Disorder and had given a guarded prognosis. See infra and Exhibit R attached to Plaintiff's Opposition papers.

**Defendants do not deny that Dr. Pirelli opined that Plaintiff meets the criteria for Post-Traumatic Stress Disorder. Defendants note that Dr. Pirelli's opinion is "guarded" due in part to Plaintiff's ambivalence towards mental health treatment. Dr. Pirelli stated that the effect of Plaintiff's symptoms going forward are in part dependent on Plaintiff's response to treatment, or lack thereof. See Dr. Pirelli's Report, Plaintiff's Exhibit "R" at page 15-16.**

34. On January 27, 2019, Inv. Tapia, the lead detective submitted a "Request for Facial Recognition form to the NJ ROIC Facial Recognition Initiative See Exhibit T to the Moving Papers of Defendant.

**Defendants do not deny that Det. Tapia submitted a "Request for Facial Recognition Form" to the New Jersey Regional Operations and Intelligence Center ("NJ ROIC"). A separate request for Facial Recognition analysis was sent to the New York State Intelligence Center ("NYSIC"). (See Plaintiff's Exhibit "G").**

35. This is an initiative of the New Jersey State Police and it "serves as New Jersey's primary focal point for information sharing

and intelligence production needed to support law enforcement, counter terrorism, and homeland security missions."

**Defendants do not deny this statement.**

36. The mission statement of the NJROIC is as follows:

> The NJ ROIC partners with federal, state, and local entities to collect crime, threat, and disaster related information, conduct analysis, develop intelligence products, and provide timely and relevant alerts, warnings, and notifications to law enforcement, public safety and private sector entities to strengthen preparedness, prevention, enforcement, investigative, response, and resiliency efforts.

**Defendants do not deny this statement.**

37. At the top of the form itself, there is a prominent disclaimer about the limitations of facial recognition technology

> If the NJ ROIC Facial Recognition Initiative produces a possible match, this should only be considered an investigative lead. Further investigation is needed to confirm a possible match through other investigative corroborated information and/ or evidence.

Id.

**Defendants do not deny that this statement is contained on the NJ ROIC Facial Recognition Initiative Request Form. Defendants note that a request for facial recognition was also sent to the NY SIC and did not include this statement on its facial recognition request form. See Plaintiff's Exhibit "G".**

38. This disclaimer ends with the following sentence in oversized bold italics and in all caps:

> ***INVESTIGATIVE LEAD NOT PROBABLE CAUSE TO MAKE AN ARREST.***

Id.

**Defendants do not deny that this statement is contained on the NJ ROIC Facial Recognition Initiative Request Form. Defendants note that a request for facial recognition was also sent to the NY**

**SIC and did not include this statement on its facial recognition request form. See Plaintiff's Exhibit "G".**

39.  In the reason for the request, Det. Tapia recounted the incident and noted that "we found evidence suggesting that he, [the suspect], may be from the Bronx. NY. Id.

**Defendants do not deny this statement, but note that Det. Tapia advised that the suspect left behind a fake Tennessee driver's license. See the Facial Recognition Initiative Request Form, Defendants' Exhibit "T".**

40.  Tapia further stated:

> I attached a copy of the fake driver's license. The officers are certain the picture on the driver's license is of the suspect.

Id.

**Defendants do not deny that this statement was made by Det. Tapia on the NJ ROIC Facial Recognition Initiative Request Form.**

41.  Inv. Seamus Lyons of the Rockland County NY Cetner, ROIC initiated the Facial Recognition, response to a bulletin circulated by Det Tapia.

**Defendants do not deny that Investigator Seamus Lyons of the Rockland County Intelligence Center conducted facial recognition analysis in this matter. Defendants note that this "bulletin" was forwarded to the RCIC from the Sergeant Richard Dey of the New Jersey Palisades Interstate Police ("NJ PIP"). See the Rockland County Intelligence Center Officer Report, Defendants' Exhibit "Z" (See page Bates stamped PARKS000035.)**

42.  A copy of the Bulletin was not produced in discovery from defendants but was produced by the ROIC in response to a subpoena duces tecum and is attached to Defendant's papers as Exhibit Q.

**Defendants do not deny this statement, but object to any implication that Defendants withheld discoverable information from Plaintiff.**

43.  Lyons understood that an aggravated assault had taken place where "an officer was nearly struck or was injured during the incident" based on the Bulletin. Id. p. 41, lines 10 - 11. "My understanding that an officer was injured." Id. p. 55 line 22 - 23. See also Id 55 lines 10 -23. , Id. p. 56 lines 5 - 11.

**Defendants do not dispute that this was Inv. Lyons' testimony.**

44.  The email exchange between Detective Tapia communicates that the investigators were highly motivated because the suspect was wanted for an aggravated assault on an officer. Email exchange attached to Plaintiff's Opposition as Exhibit Theta,.

**Defendants deny this statement. Plaintiff references "[E]mail exchange attached to Plaintiff's Opposition as Exhibit Theta," however, there is no Exhibit Theta or "T" attached to Plaintiff's Opposition.**

45.  Inv. Lyons forwards the ""good possible hit" to Tapia who says "that's him." [sic]. Lyons responds "Excellent!!!!!!!! How is the officer? Is he OK?" Id.

**Defendants do not deny this statement but note that Investigator Lyons further advised Det. Tapia that he "Got a high number hit and he is a Patterson (sic) NJ guy." See page Bates stamped PARKS000035 on Defendants' Exhibit "Z".**

46.  The Bulletin noted that a receipt had been found in the crime vehicle from that same morning from a Dunkin Donuts in the Bronx. Id.

**Defendants do not deny this statement.**

13

47.  Also attached to Exhibit Q is the Facial Recognition Report.

**Defendants do not deny this statement.**

48.  See also Lyons Deposition, p. 36, lines 7 - 11 ... Exhibit I to Defendant's papers.

**Paragraph 48 is not a statement of fact and as such, Defendants are unable to confirm or deny same.**

49.  According to Lyons, "the process itself [that is the search] probably took less than 15 or 20 minutes." Id. p. 39 lines 16 - 17.

**Defendants do not deny that this was Inv. Lyons' testimony.**

50.  Lyons described the search:

This was very basic. Like I said, we took the image, we submitted it, we did get a return. There were two photos ... with images. There was a resemblance, there some characteristics that did match enough for us to be in agreement where we would provide Woodbridge the information as a possible lead.

Id. p. 38 line 22 to p 39 line 3.

**Defendants do not deny that this was Inv. Lyons' testimony.**

51.  Lyons asserted that "a facial recognition hit is a photo array, or show up or any other allowable identification process but is "just a tool to look further into the investigation." Id p 74 line 20 to p. 75 line 1.

**Defendants deny this statement as it misrepresents Inv. Lyons' testimony. Defendants do not deny that Inv. Lyons testified that facial recognition is an investigative tool.**

52.  Inv. Lyons testified that he was aware of the concerns that Facial Recognition Technology is racist. Id. p 79 - 80.

**Defendants do not deny that Inv. Lyons testified that he was aware of criticism directed at facial recognition software.**

53. Further, Lyons confirmed that he had "altered the pixels," in the photo from the fake license: "Yes, I sued facial recognition software but altered the photo on the license a little to get the pixels clear." Email exchange attached to Plaintiffs Opposition as Exhibit F.

**Defendants do not deny this statement.**

54. At 9:16 am, Tapia says: "That's him. [sic]. Thank you and Sgt. Dey for your help." "Id.

**Defendants do not deny this statement but note that in the intervening thirty-six minutes between Inv. Lyons first email and Det. Tapia's response, Det. Tapia contacted Ofc. Lyszyk and had him compare the results of the facial recognition analysis with the fake Tennessee driver's license. Ofc. "I know the first thing I did was call Officer Lyszyk to come into the Detective Bureau." See Deposition of Det. Tapia, Defendants' Exhibit "F", Page 91, Line 20-22. Continuing, on Page 104 at Line 18-21: "I get the hit back, I talk to Officer Lyszyk. I present him the photo that comes in. He says he's 100 percent sure that's the person he dealt with."**

55. Inv Lyons responds almost immediately at 9:17. "Excellent!!!!!!!!!!! How is the officer? Is he ok? Id.

**Defendants do not deny this statement.**

56. Tapia, a few minutes later at 9:24 responds: "Yes, he's fine. How did you guys ID him? Facial recognition through NYSIC or the ROIC? Id

**Defendants do not deny this statement.**

57. Inv. Lyons ends the discussion at 9:29 am :

> Good news. Yes, I used facial recognition software but altered the photo on the license a little to get the pixels clear. Got a high number hit and he is a Patterson NJ guy. We have facial recognition here at the Rockland County Intel Center .... "

**Defendants do not deny this statement.**

58.   Despite the speed and the confidence of Det Tapia, which Lyons did nothing to tamp down, Inv. Lyons further explained that all that the ROIC does is provide "a possible lead." His role, at the ROIC, "ends pretty much when we provide you with a possible lead." Lyons Deposition, p. 72 lines 8 - 9 .. p. 39 lines 12, Exhibit I to Defendant's papers.

**Defendants do not deny that this was Inv. Lyons' testimony.**

59.   Lyons expanded saying that the results given to Tapia were " possible lead ... a possible learning tool only. It's up to the investagor [at the receiving agency] to determine or take any lawful action.

Id. p 30 lines 6 - 10.

**Defendants do not deny that this was Inv. Lyons' testimony.**

60.   Inv. Lyons was asked what weight Tapia should have given his report and he testified:

> My experience is, it's a learning tool. It's a stopping stone to go on. He, let me obtain more images. Let me dig a little deeper into the background. There are investigative steps you have to take.

Id. p. 71 lines 8 - 12.

**Defendants do not deny that this was Inv. Lyons' testimony.**

61.  Inv. Lyons' asserted that altering the pixels did not affect the accuracy of the findings. Id. pp 77 - 78, however, the academic literature asserts the contrary for searches based on altered images. See, for example, Garvie, Claire, Georgetown Law, Center on Privacy and Technology, Garbage In, Garbage, Out, 2017 /https:/ /www.flawedfacedata.com/

**Defendants note that the academic literature cited by Plaintiff does not support this assertion that shrinking the pixels of a sample photograph to enhance its clarity affects the accuracy of facial recognition results. The cited article cautions law enforcement against submitting certain types of photographs for facial recognition analysis, such as artist composite sketches based upon a witnesses' description and photographs with computer-generated facial features. The article also states: "Editing photos before submitting them for search is common practice... the edits often go well beyond minor lighting adjustments and color correction, and often amount to fabricating completely new identity points not present in the original photo."**

62.  Studies have shown that using technology to improve the resolution of a photo with poor resolution "degrades accuracy." Flynn, Partirck J, University of Notre Dame, Prieto, Loreto, Pontificia Universidad Cat6lica de Chile, Face Recognition in Low Quality Images: A Survey, April 2019, page 15.

https:/ /arxiv.org/pdf/1805.11519.pdf

**Defendants deny this statement and note that the academic literature cited by Plaintiff does not support this assertion that Inv. Lyons' shrinking of the pixels of the sample photo "degraded accuracy." The article cited by Plaintiff addresses low-quality face images taken in unconstrained environments e.g., face images acquired by long-distance surveillance cameras." The article specifically distinguishes between photos captured by surveillance cameras (i.e., an unrestrained environment, subject to a variety of factors such as lighting, camera angle, face alignment, the**

subject's gait, etc.) and photos taken in a constrained environment where those factors are controlled.

63. The hit that Lyons got had an accuracy number of 594 out of 1000. See Facial Recognition Report, page eight of Exhibit Q.

**Defendants do not deny this statement.**

64. Inv. Lyons discussed this report. Lyons Deposition at p.53, lines 15 - 18. P. 54 lines 4 - 5. Lyons explained that 594 "It's a probable. It's not a very high number, but it's worth a second look." Id. 53, lines 21 -23.

**Defendants do not deny that this was Inv. Lyons' testimony.**

65. After the hit, a criminal history was run by Lyons showed that the Nijeer Parks was from Patterson, NJ and did not appear to have any ties to the Bronx or NY City. See report attached Additional Inquiry Response as part of Defendant's Exhibit Q.

**Defendants deny this statement as Defendants' Exhibit "Q", the WPD Bulletin Requesting Assistance Identifying Suspect, also list an address for Plaintiff in Elmwood Park, New Jersey, which is a thirty-minute drive from the Bronx, New York. (See page 4 of Defendants' Exhibit "Q").**

66. The report also indicated that Nijeer Parks was 5'7 and was 145 lbs.

**Defendants do not deny this statement but note that Defendants' Exhibit "Q" also states that Plaintiff is 5'8" and 150 pounds. (See pages two and three of Defendants' Exhibit "Q").**

67. Lyons emailed the results to Det Tapia at 8:40 am, on January 28, 2019, Id. p. 68, line 3 -7. "Good possible hit on facial recognition."

**Defendants do not deny that Inv. Lyons wrote this email to Det. Tapia. Defendants note that this email is contained in Defendants' Exhibit "Q" at the page Bates stamped PARKS000035. This statement was not made during the deposition of Inv. Lyons or Det. Tapia, despite the deposition transcript page and line citations contained in Paragraph 67.**

68.   The fraudulent license that was used as a basis of the search, and which the defendants assert eyewitnesses said was the likeness of the actor, indicated that the carrier of the license was six feet and two inches tall. Exhibit Q to Defendant's moving papers.

**Defendants do not deny that the fraudulent Tennessee driver's license lists the carrier of the license as 6'2". Other than the photograph of the carrier, Defendants note that the remainder of the information displayed on the license is inaccurate. Records reflect that the suspect who presented the fraudulent license to the WPD Officers on scene at the Hampton Inn was Barrington Walker, who is 6'1". See Woodbridge Police Department Master Person Report, Defendants Exhibit "DD".**

69.   A half hour after Lyons emailed Det. Tapia at 8:40, Det Tapia responded: "That's him. Thank you and Sgt. Dey for your help. [sic]." Tapia Deposition, p. 69 lines 22 to 24, Attached as Exhibit F to Defendants' moving papers.

**Defendants deny this statement insofar as Plaintiff cites to Det. Tapia's deposition testimony in support of same. The referenced testimony concerns the WPD I.D. Bureau Report, attached to Defendants' Motion as Exhibit "K". The statement referenced in Paragraph 69 by Plaintiff appears in an email exchange, attached to Defendants' Motion as Exhibit "Z". Insofar as Plaintiff purported to cite to Exhibit "Z", Defendants do not dispute the recitation of Det. Tapia's response to Inv. Lyons' initial email with the results of the facial recognition analysis. Defendants note that Det. Tapia responded to Inv. Lyons' initial email at 9:16 a.m., which is thirty-six minutes after Lyons' initial email. See Exhibit "Z" at the page Bates stamped PARKS000035.**

19

70.  Inv. Lyons understood this to mean that Tapia had "made a decision that this was, indeed, the subject he was looking for." Lyons Deposition, Exhibit I, p .. 70 lines 4 - 6.

**Defendants do not dispute that this was Inv. Lyons' testimony.**

71.  Det Tapia became aware of Facial Recognition Technology while on loan to the auto task force of the NJ State Police. Deposition of Tapia, p. 45.

**Defendants do not dispute that this was Det. Tapia's Testimony.**

72.  Det Tapia used Facial Recognition with the Auto Task Force but never used it as a basis for probable cause. Tapia Deposition page 51, lines 5 -8.

**Defendants do not dispute that this was Det. Tapia's testimony.**

73.  Det Tapia described how Facial Recognition was used by the Task Force when it was zeroing in on suspects who had been identified by other leads as well as competent evidence, intelligence from informants. Tapia Deposition, pp 49 - 50.

**Defendants do deny this statement. However, Defendants note that Det. Tapia testified that the Auto Theft Task Force used facial recognition technology to attempt to identify an individual who presented two different driver's licenses, one false and one legitimate. Facial recognition technology was employed to determine if the same individual was depicted on both licenses. See Det. Tapia Deposition, Defendants' Exhibit "F" Page 47, Line 13-25, Page 48, Line 1-20.**

74.  Det Tapia, however, admitted having received the AG Memo from

the County Prosecutor banning Clearview Technology because it was

racist. Tapia Deposition.

P. 53 line 12 p 54 21.

**Defendants do not dispute that the New Jersey Attorney General issued a Directive in January 2020 which prohibited the use by law enforcement of facial recognition technology app provided by Clearview AI.**

75.  Det. Tapia was aware of no policy or instructions from anyone

governing Facial Recognition Technology. Tapia Deposition, p. 53.

**Defendants do no dispute this statement. Defendants note that other than the January 2020 Directive, the New Jersey Attorney General has not issued further instructions, orders, or directions concerning the use of facial recognition technology.**

76.  Det Tapia has continued to use Facial Recognition Technology

after this case! Tapia Deposition, p. 52, lines 12 - 13. Exhibit

**Defendants do not deny dispute that this is Det. Tapia's Testimony. Defendants note that Det. Tapia added that facial recognition technology was used to identify known associates through a murder suspect in order to question them. See Det. Tapia's Deposition, Defendants' Exhibit "F" Page 52, Line 8-23.**

77.  Det Tapia asserted that he had no knowledge of Nijeer Parks

height or shoe size (5'7 and size shoe size, 8, despite this being

on the criminal history report he received with the Facial

Recognition results .. Tapia deposition p. 80 lines 18 - 24.

**Defendants deny this statement. Det. Tapia was asked if he knows Plaintiff's height and weight. Det. Tapia testified: "It's got to be in the report somewhere. In his DMV — off the top of my head — to answer your question, off the top of my head, I don't." Det. Tapia Deposition, Defendants' Exhibit "F" Page 80, Line 13-17. Furthermore, the facial recognition results, attached as Defendants' Exhibit "Q" does not state Plaintiff's shoe size.**

21

**Defendants also note that Plaintiff's counsel represented during Det. Tapia's deposition that Plaintiff's shoe size is 9-and-a-half. Exhibit "F" Page 80, line 21-25.**

78.  Det Tapia also professed ignorance of the fact that the record indicated that Barrington Walker was tall, over 6'1". p. 80 , line 9 - 12.

**Defendants deny this statement. Plaintiff's counsel was referring to the criminal history of Barrington Walker and represented to Det. Tapia that Barrington Walker is 6'1". At no point did Det. Tapia express that he was unaware of this. Exhibit "F" Page 80, Line 1-12.**

79.  Det Tapia did not recall doing a license plate search to find out where the suspect vehicle had been on the day in question. Tapia Deposition p. 84 lines 11 - 13. None was produced Tapia Deposition 84 - 85.

**Defendants do not dispute that this is Det. Tapia's testimony.**

80.  Det Tapia had no knowledge of that the hit was 594 out of 1000 stating that "I don't work the software, I've never worked the software, so I don't know how it works." Tapia Deposition, p. 94 lines 5 - 7.

**Defendants deny this statement. Det. Tapia testified that Inv. Lyons informed him that the facial recognition analysis of Plaintiff resulted in a "high number hit." The quoted testimony in Paragraph 80 is Det. Tapia explaining that he does not have knowledge of what constitutes a "high number hit." Exhibit "F" Page 93, Line 15-15, Page 94, Line 1-7.**

81.  Det Tapia never bothered to inquire about what it meant to "have altered the pixels." Tapia Deposition, p. 93 lines 10 - 14. Exhibit F.

**Defendants do not deny this statement.**

82.  Det Tapia asserts that line up safeguards are never used for police officer identifications asserting that police officers, unlike the rest of humanity, are immune from suggestive and prejudicial data. Tapia deposition, pp 101 - 106. Exhibit F.

**Defendants deny this statement as Det. Tapia never made such an assertion.**

83.  Det Tapia testified that-he was unconcerned by Plaintiffs assertion that he had never been in Woodbridge before voluntarily coming down to the police station, that he had never had a driver's license, that he solid alibis for the day in question. Tapia Deposition pp 107 - 108.

**Defendants do not deny this statement.**

84.  Det Tapia was not concerned that Plaintiff had had surgery for a torn ACL several months before the incident which made it impossible for him to run. Tapia Deposition, p. 109 lines 1 - 6.

**Defendants do not deny this statement.**

85.  Det. Tapia himself concluded that the ROIC picture of Nijeer Parks matched the picture on the false license place and asserted in his deposition that he, Tapia, showed PO Lyszyk the picture of Nljeer Parks from the ROIC and that Lyszk positively identified it. Tapia Deposition, p. 112 line 19 to p. 113.

**Defendants deny this statement.**

86.   Det Tapias response indicated he failed utterly to consider the evidence that the actor was tall but Plaintiff short. Tapia Deposition, pp 125 – 126

   **Defendants deny this statement. Det. Tapia testified: "I mean, we we're uncertain as to whether — how tall this person — we're going off the DMV information, which is written down by the person getting his driver's license. Nobody actually measures people when they go get their driver's license. You fill out your own card. So that's never really accurate." Exhibit "F" Page 125, Line 15-21.**

87.   Det Tapia admitted that none of the officers involved (Lee, Lyszk, Quesada, Tapia) were black. Tapia deposition, pp 145 -146, Exhibit F.

   **Defendants do not deny this statement.**

88.   Det Tapia never questioned any of the eyewitnesses other than the manager Dones. Tapia Deposition, page 146.

   **Defendants do not deny this statement. Defendants note that the Manager of the Hertz kiosk located in the lobby of the Hampton Inn was the only witness other than the responding officers to have personally interacted with the suspect while he was present at the Hampton Inn.**

89.   PO Lyszyk also testified in his deposition that he had looked at the Facial Recognition hit when Tapia received it from the ROIC. Lyszyk Deposition at p.29 lines 16 to p. 30 line 8, Exhibit C to Defendant's papers.

   **Defendants do not deny this statement.**

90.   However, PO Lyszyk acknowledged that there was nothing in his report to even suggest that he, Lyszyk had viewed the facial recognition hit and confirmed that it corresponded to the actor

24

but attributed it to 'bad report writing' rather than perjury. Id.
p. 30 line 8. Id.

**Defendants do not deny this statement.**

91.  Moreover, Det. Tapia's own report conspicuously omits any
mention of having PO Lyszyk made the identification:

> On January 27, 2019, I received notification from
> Investigator Seamus Lyons (Rockland County Sheriff's
> Intelligence Center) and Sgt. Dey (Palisades Interstate
> Parkway Police) that they had a high profile comparison
> to the picture of the fraudulent Tennessee driver's
> license. The suspect was identified as Nijeer Parks with
> a date of birth of September 11, 1987, with a last known
> address of 485 E. 19th Street,. Apt #3G, Paterson, NJ.
> I compared the photo on the fraudulent Tennessee
> driver's license to Nijeer' Parks' assigned New Jersey
> Driver's license #...and it is the same person. Inv.
> Seamus Lyons emailed me the Identification Report for
> evidence.

Tapia Report, 2/5/19, p 3, Exhibit E.

**Defendants do not deny this statement.**

92.  While PO Tapia makes no mention of PO Lyszyk identifying
Nijeer Parks, he does explicitly state that he had PO Lyszyk
identify the image on the Tennessee Driver's license as the actor.
"I verified with Officer Lee and Officer Lyszyk that the picture
on the fraudulent Tennessee driver's license was the picture of
the suspect." Id.

**Defendants do not deny this statement.**

93.  Moreover, PO Lyszyk own contemporaneous report makes no
reference at all to having identified the photo. Indeed, the report
clearly narrates that no such identification was made:

Det. S. Tapia advised me that he sent out the picture of the suspect to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) for facial recognition. On January 27, he received notification from Investigator Seamus Lyons (Rockland Cunty Sheriff's Department Intelligence Center) and Sgt. Dey (Palisades Interstate Parkway Police) that they had a high profile comparison to the picture on the fraudulent Tennessee driver's license. The suspect was identified as Nijeer Parks. As a result, I signed a complaint for the following charges....

Lyszyk Report of 1/30/19, p. 3. Exhibit D.

**Defendants do not deny the recitation of Ofc. Lyszyk's police report. Defendants deny that Ofc. Lyszyk did not identify Plaintiff as the suspect from the Hampton Inn.**

94. Lyszk's only familiarity with facial recognition technology is from watching the TV show, NCIC. Lyszk Deposition, page 23, Exhibit C of Defendants moving papers.

**Defendants do not deny that this was Ofc. Lyszyk's testimony.**

95. PO Lyszk had not been aware that the technician had altered the pixels on the picture he used to search for a facial recognition hit. Lyszk deposition, page 31, line 17 - 20.

**Defendants do not deny that this was Ofc. Lyszyk's testimony.**

96. PO Lyszyk admitted that he believes that altering the pixels would reduce the reliability of a facial recognition hit. Id, page 31 lines 21 - 25.

**Defendants do not deny that this was Ofc. Lyszyk's testimony.**

97. Lt. Joseph Licciardi was PO Lyszyk's supervising officer at the relevant time and signed off on this Reports, Exhibit D attached to Plaintiffs Opposition papers, at three of three.

26

**Defendants do not deny this statement.**

98. Lyszyk's Answers to Interrogatories also asserts that "Lt. Licciardi approvided the Incident Report filed by Police Officer Andrew Lyszyk. Exhibit A to Plaintiffs Opposition papers, at 1 b.

**Defendants do not deny this statement.**

99. report describes in straightforward fashion that the only basis for him signing an Affidavit of Probably cause and a Criminal Complaint was the facial recognition report from the ROIC.

**Defendants do not deny this statement.**

100. Lt. Lyszyk utterly failed to exercise appropriate supervisory oversight which would have immediately respond to this biased rush to judgment and to insist on that an actual an appropriate investigation be conducted. See, for example, the discussion infra of Lt. Detective Commander Ralph Cilento, and his report attached as Exhibit V to Defendants' moving papers.

**Defendants deny this statement. Ofc. Lyszyk did not serve in any supervisory capacity.**

101. Lt. Licciardi also failed to review the Affidavit and the Complaint. Id.

**Defendants deny this statement. Lt. Licciardi reviewed and approved the two (2) police reports authored by Ofc. Lyszyk which outlines the identification of Plaintiff and the basis for probable cause. See the two police reports authored by Ofc. Lyszyk in this matter, #19010123/1 identified as Plaintiff's Exhibit "D" and 19010123/3 identified as Defendants' Exhibit "EE".**

102. Det Tapia showed the fraudulent TN license to Michael Dones, the rental car manager, but did not show him the picture of Nijeer Parks "because I would have to do a photo array with him .... because he's a civilian .... At that point, I didn't think it was necessary." Tapia Deposition, p. 113 lines 14 - 20. Exhibit F.

**Defendants do not deny that this was Det. Tapia's testimony.**

103. Det Tapia was unable to explain why he did not have to do a photo array to have Dones identify the picture on the TN license. Tapia Deposition, p. 114. "I just didn't" Id line 16. Exhibit F.

**Defendants do not deny that this was Det. Tapia's testimony.**

104. Det. Tapia took less than 41 minutes to conclude that the Facial Recognition Hit had "solved the case:" the email from Inv. Lyons was sent at 8:40 on 1 /28/19 and at 9:16 Tapia says, "That's him." [sic] .. See Exhibit Z attached to Defendant's moving papers. "See attached PDF regarding your PD Police Information flyer Aggravated Assault on a Police Officer. Good possible hit on facial recognition" Id.

**Defendants deny this statement that Det. Tapia concluded that he had "solved the case." Defendants note that Det. Tapia responded to Inv. Lyons' initial email after approximately 36 minutes.**

105. PO Lee was a responding officer at the scene. See Lee Report attached as Exhibit BB to Defendant's moving papers.

**Defendants do not deny that Ofc. Lee responded to the scene of the Hampton Inn on January 26, 2019. Defendants' Exhibit "BB" refers to Woodbridge Police Department Policies and Procedures Chapter 432, In-Service, Specialized, and Roll Call Training.**

106. Although PO Lee'ss report purports to have been written on January 216, 2019, it identifies Nijeer Parks, 485 E. Main Street, Woodbridge, NJ, as the suspect. Id, page two.

**Defendants do not deny that the first police report authored by Ofc. Lee was initially dated January 26, 2019. Ofc. Lee's report was revised on February 1, 2019 after the Complaint-Warrants were signed. See Ofc. Lee's police report #19010123/3, identified as Defendants' Exhibit "FF". Plaintiff's counsel asked Ofc. Lee at his deposition: "am I understanding correctly this report was started on the day of the incident, but it's updated with additional information as it came in? Because, for instance, it identifies that the suspect is Nijeer Parks. A: Yes." Ofc. Lee Deposition, Defendants' Exhibit "D" Page 19, Line 6-12.**

107. PO Lee testified that he wrote his report on January 26, 2019, the day of the incident. *Id*.

**Defendants do not deny that Ofc. Lee authored his initial police report on January 26, 2019.**

108. When questioned about the fact that he report identified the suspect as Nijeer Parks, he conceded that he had not put that in his report. "I did not put that [the name of Nijeer Parks] in the report." Lee deposition at p. 19 6 – 18.

**Defendants do not deny that this was Ofc. Lee's testimony.**

109. PO Lee speculated that a Detective might have put it into his report. Id at line s 21 – 22.

**Defendants do not deny that this was Ofc. Lee's testimony but note that Page 21 and 22 of Ofc. Lee's Deposition do not reference Ofc. Lee's report(s).**

110. Although there were as many as ten persons who had eye witnessed the actor at the Hampton Inn , the only identification

29

was an egregiously prejudiced show up done by Patrolman F. Lee,

#591.

> On February 5, 2019, I was contacted , by Lt. Ng, who
> advised me that they currently had an individual, Nijeer
> Parks, who was involved in the incident on January 26,
> 2019. I arrived at HQ and was brought down to the
> processing area with Lt. Ng. and Det. Penicaro. Once
> there, I observed Mr. Parks sitting on the rial and
> identified him as being the suspect from January 26,
> 2019, incident at the Hapmpton Inn on Rt. 9N.

Supplemental Report of Lee, page 3, 2/12/19, attached as Exhibit,

Delta, to Plaintiff's Opposition papers.

**Defendants deny this statement. Insofar as Plaintiff contends
that there are ten eyewitnesses to the subject incident, Defendants
note only four witnesses were identified. Richard Charneco was the
manager of the Hampton Inn and contacted by Det. Tapia. Michael
Dones was the manager of the Hertz kiosk in the lobby, and was
also interviewed by Det. Tapia. The other two witnesses are Caleigh
Higgins and Kamisha Grant but there was no indication that either
of the interacted with the suspect. Plaintiff was identified by
Ofc. Lyszyk when he viewed the results of the facial recognition
analysis and confirmed to Det. Tapia that Plaintiff was the suspect
that Ofc. Lyszyk interacted with at the Hampton Inn. Defendants
deny that Ofc. Lee's identification of Plaintiff as the suspect
was "egregiously prejudiced." Det. Tapia described Ofc. Lee's
identification of Plaintiff: "Q: That's suggestive, isn't it, yes
or no? A: To a civilian, yes. To a police officer who arrests
people every day, handcuffs people every day, navigates the booking
area every day, I don't think that's highly suggestive, no."
Exhibit "F" Page 106, Line 23-25, Page 107, Line 1-3.**

100. Det Tapia testified that Lee's Identification did not accord

with his training to ensure reliable identifications. Deposition

at p. 29 line 1 - 8. Exhibit F.

**Defendants deny this statement as the referenced testimony of
Det. Tapia discussing identifications made by civilian witnesses
as compared to police officer witnesses. Exhibit "F" Page 28, Line
23-25, Page 29, Line 1-8.**

101. PO Lee who is 5'6 was an eye witness who testified that the suspect was "5"11." Lee Deposition , Exhibit D to Defendants' papers, p. 18 line 17 - 23.

**Defendants do not deny that Ofc. Lee testified that his police report lists the suspect at an estimated height of 5'11".**

102. Lee was called by Lt. Ng to come in to the precinct to ID Parks even though Lee was on his day off Lee was taken to the processing room where there is "a bench and then a railing behind the bench where a handcuff goes so prisoners are handcuffed to the bench." Lee Deposition, p. 26 lines 21 - 23. Exhibit D.

**Defendants do not deny this statement.**

103. Ng told PO Lee "that was the individual they had brought in from that incident." Lee Deposition, p. 27 line 24 to p. 26 line 1, Exhibit D.

**Defendants do not dispute that this was Ofc. Lee's testimony.**

104. Parks was handcuffed and was sitting on a bench. Id, p. 28, lines 2 - 4.

**Defendants do not deny this statement.**

105. PO Lee did not get any closer than 20 to 30 feet from Parks. Id. line 6.

**Defendants do not deny that this was Ofc. Lee's testimony.**

106.  Although PO Lee had talked to the suspect at the Hampton Inn, had looked into the suspect's eyes, and had estimated him to

be 5'11, he did not do any of these things when he identified Parks as the suspect ten days later. Id. 27 - 29.

**Defendants do not deny this statement.**

107.  PO Lee admits that it was impossible for him to estimate Park's height since he was seated during the identification process. Id. p. 29. 5 - 10.

**Defendants do not dispute that this was Ofc. Lee's Testimony.**

108.  Det Quesada admitted that he had never sworn out an Affidavit of Probable cause based on a photo id alone. Deposition of Quesada Exhibit E. p 58 line 25 to p. 59 line 4 exhibit E

**Defendants deny this statement. The referenced testimony is as follows: "Q: Have you ever sworn in an affidavit based soled on a photo *array* ID? A: I don't believe so. I don't recall. I've done quite a few of them in the past. I think it's been depending on the case."**

109.  The Defendant police officers and detectives from all appearances ignored all of the other evidence including:

- A size 12 sneaker that had come off the suspect as he ran. (See picture attached to Plaintiff's papers as Exhibit L).

- The Sprint Sim card found in the rental car (Subscriber Identity Module (SIM) cards store various information, including your phone number, contacts, and text messages. It also holds data identifying your network, such as your number and the authentication key used to access it)

- video surveillance footage of the hotel.

- The Hertz rental car had been leased out of a New York office.

32

- The Dunkin Donuts receipt recovered from the car indicated that the driver had been in the Bronx on the morning of January 26th Picture of receipt attached to Plaintiff 's papers as Exhibit M.

- The positive fingerprint report identifying Barrington Walker as the suspect which had been made on February 14, 2019. See CJIS 2000 Exhibit I

- The time line for the finger prints is notable: prints were lifted by ID Detective Quesada on the day of the incident, that is January 26, which was submitted to the State Police Lab on or about February 8, 2019. See Request for Latent Fingerprint Examination part of Exhibit I. The delivery was 12 days after they were obtained, ten days after the Warrant and Compliant were issued, and three days after Plaintiff was arrested.

- The Fingerprints were processed by Defendants two years later on January 22, 2021! See ID Bureau Suspect Report attached to Defendant's moving papers as Exhibit M.

- The exonerating evidence offered by plaintiff- that he had never been to Woodbridge, never had a driver's license, never rented a car, and had presented various alibis for the time of the event. See transcript of interrogation at Exhibit N attached to Plaintiffs Opposition.

- The fact that Plaintiff was recovering from surgery for his ACL which made it an impossibility that he had run from defendants.

**Defendants deny this statement.**

**The sneaker that was left behind by the suspect was packaged and submitted to the New Jersey State Police for DNA analysis. See Defendants' Exhibit "W" and Exhibit "X".**

**The surveillance footage from the Hampton Inn was collected by Det. Tapia. "I requested video footage from the Hampton Inn Hotel Manager, Richard Charneco and the video was later turned over to the Woodbridge Police for evidence. See Det. Tapia's police report, Plaintiff's Exhibit "E" at page 3 of 4.**

**The fingerprints collected from the glass door at the Hampton Inn were submitted for analysis on February 8, 2019. The positive fingerprint report identifying Barrington Walker was returned to the WPD on February 22, 2019, after Plaintiff had already been released from custody. Furthermore, the identification of Barrington Walker based upon the fingerprints left on the glass door of the Hampton Inn was of no probative value as the door was a common door and the officers could not determine where the suspect touched the door.**
**The "processing" of the fingerprints by the WPD on January 22, 2021 was simply to confirm the identification made by the NJSP and received by the WPD on February 22, 2019. This requires a WPD officer to independently verify points of comparison between fingerprint samples. As is noted above, the fingerprints were of no probative value at the time they were recovered as it could not be determined where the suspect touched the Hampton Inn lobby door. See Det. Quesada Deposition, Defendants' Exhibit "E" Page 36, Line 13-22.**

110. Det. Quesada testified that the print was "an exact match to the left palm impression of Barrington Walker." Deposition of Quesada, Exhibit E, p. 34 23 -25.

**Defendants deny that this was Det. Quesada's testimony. The referenced testimony cited by Plaintiff does not address fingerprints. The statement attributed to Det. Quesada was made by**

**Det. Douglas Cioni on the WPD ID Bureau Suspect Report, Defendants'
Exhibit "M".**

111. Quesada said this had 100% reliability. Id p. 37 line 2.

**Defendants do not dispute that this was Det. Quesada's
testimony.**

112. Although the lab completed the analysis of the fingerprints
and identified Barrington Wlaker as the actor on or about February
14, 2019, (See Exhibit I attached to Plaintiffs Opposition), these
prints were not processed by the defendants until almost two years
later on January 22, 2021 ! See ID Bureau Suspect Report attached
to Defendant's moving papers as Exhibit M.

**Defendants do not dispute this statement. However, as noted
above, the identification of Barrington Walker based upon the
fingerprints left on the glass door of the Hampton Inn was of no
probative value as the door was a common door and the officers
could not determine where the suspect touched the door. The
"processing" of the fingerprints by the WPD on January 22, 2021
was simply to confirm points of identification on the results
returned by the NJSP.**
113. Other important evidence showing that Barrington Walker was
indeed, the actor include his New York connections and his height,
being over six feet tall. See Barrington Walker documents at
Exhibit J.

**Defendants do not deny that Barrington Walker resided in New
York and that he is 6'1".**

114. Det Quesada's testimony that the prints were not processed
for two years because they were taken from a common doorway is not
comprehensible. Exhibit E, Id. p. 38 lines 2 - 7.

**Defendants do not dispute Det. Quesada's testimony but deny
this statement. Det. Quesada testified: "Q: Why did it take so**

**long? At the time it was a common doorway. There was nothing pointing to that fingerprint having a connection to the actual suspect. I don't believe there's any type of video or anything showing that the person touched it or–" whereupon Det. Quesada's answer was cut off by Plaintiff's counsel. See Det. Quesada's Deposition Testimony, Defendants Exhibit "E" Page 38, Line 2-7.**

115. The eyewitness accounts relayed that the suspect had fled through that door and had pushed his hands against the glass rather than using the handle which was the reason the door was secured and prints were lifted.

**Defendants deny this statement as Plaintiff offers no reference to the record in support of same.**

116. The Complaint and Warrant signed by Tapia are attached to Defendants' moving papers at Exhibit N and the Complaint and Warrant signed by Lyszk are at Exhibit O of Defendants' moving papers.

**Defendants do not deny this statement.**

117. The Affidavits of Probable Cause and the Criminal Complaints were all created by Lyszyk and Tapia at the same time and they immediately went with Detective Gones to drive to Patterson to arrest plaintiff. Lyszyk deposition, Lyszyk deposition, p. 41, lines 8 - 15.

**Defendants deny this statement. Ofc. Lyszyk testified: "Q: And did you do your Affidavit of Probable Cause and your complaint at the same time together with Tapia? A: I did mine down stairs in the report writing room. ... Q: Do you know if you did yours before, after or at the same time that Tapia was doing his? A: I don't know." Ofc. Lyszyk's Deposition Testimony, Defendants Exhibit "C" Page 39, Line 8-14. Furthermore, Defendants note that after the respective affidavits of probable cause were drafted by**

**Det. Tapia and Ofc. Lyszyk, they were subjected to prosecutorial review by AP Nastasi and signed by Judge Stahl.**

118. PO Lyszyk's Affidavit of Probable Cause stated: "While investigating a shoplifting of $39 worth of merchandise at the Hampton Inn, the hotel manager, Richard Charneco, advised us that Parks was the suspect." Affidavit at p 11, Exhibit O.

    **Defendants do not deny this Statement.**

119. In his deposition, Lysyzyk admitted that this statement was a material falsehood false. Depostion of Lyszk at p. 57 lines 8 - 11. Exhibit C.

    **Ofc. Lyszyk testified that this statement in his report was the result of "bad report writing." Ofc. Lyszyk Deposition, Defendants' Exhibit "C" Page 57, Line 7. Ofc. Lyszyk conceded that Mr. Charneco did not advise that Plaintiff was the suspect. Mr. Charneco confirmed that the image on the fake Tennessee driver's license matched the likeness of the suspect from the Hampton Inn. Lyszyk further explained that it is standard practice to add a suspect's name to a report or complaint after they have been identified. Defendants' Exhibit "C" Page 57, Line 18-20.**

120. Moreover, the use of Nijeer Parks name throughout the Lyszyk Affidavit- from the very first line and throughout the Affidavit. See Exjhibit O to Defendants' moving papers.

    **Defendants do not deny that Ofc. Lyszyk's Affidavit of Probable Cause references Plaintiff.**

121. PO Lyszk's Affidavit attributes the identification to the Hertz Manager, Richard Charneco, then refers to the actor throughout as Nijeer Parks, and at the end notes the Facial Recognition search which seems to be presented as confirmation of the identity provided by Charneco. Id.

**Ofc. Lyszyk testified that this statement in his report was the result of "bad report writing." Ofc. Lyszyk Deposition, Defendants' Exhibit "C" Page 57, Line 7. Ofc. Lyszyk conceded that Mr. Charneco did not advise that Plaintiff was the suspect. Mr. Charneco confirmed that the image on the fake Tennessee driver's license matched the likeness of the suspect from the Hampton Inn. Lyszyk further explained that it is standard practice to add a suspect's name to a report or complaint after they have been identified. Defendants' Exhibit "C" Page 57, Line 18-20.**

122. Det Tapia's Warrant is also categorically false in that the Preliminary Law Enforcemnt Incident Report, (PLEIR), min which Det. Tapia asserts that he, "the complaining officer, personally observed the offiense. See Exhibit N

**Defendants deny this statement. Det. Tapia's PLEIR accurately states that the complaining officer, in this case Ofc. Lyszyk, personally observed the offense.**

123. By falsely claiming to be an eyewitness, Det. Tapia rendered the accompanying Affidavit of Probable cause fraudulent.

**Defendants deny this statement.**

124. If he had been an eyewitness, then his identification of the suspect as corresponding to the facial recognition hit, would have had some validity.

**Defendants reiterate that the complaining officer, Ofc. Lyszyk, personally observed the offense and personally identified Plaintiff as corresponding to the facial recognition hit. As such, Plaintiff concedes that Ofc. Lyszyk's and by extension, Ofc. Lee's identification of Plaintiff was valid.**

125. This falsehood was contained in documents submitted to the Assistant Prosecutor, Peter Nastasi and to the Municipal Court Judge, Judge Stahl and would naturally cause the prosecutor and judge to give Det Tapia's Affidavit more weight.

**Defendants deny this statement.**

126. Thus, with this falsehood, the conclusion of the Afficvait ("I compared the photo on the fraudulent Tennessee driver's license to Nijeer Parks' real New Jerwsey driver's license and it is the same person), would be perceived as an appropriate basis to find probable cause.

**Defendants reiterate that the complaining officer, Ofc. Lyszyk, personally observed the offense and personally identified Plaintiff as corresponding to the facial recognition hit. As such, Plaintiff concedes that Ofc. Lyszyk's identification of Plaintiff was sufficient to establish probable cause to arrest Plaintiff.**

127. However, since Tapia was not an eyewitness, his conclusion is improper and without any probative value.

**Defendants do not deny that Det. Tapia was not an eyewitness to the incident at the Hampton Inn.**

128. Moreover, contrary to his deposition testimony, Det Tapia's Warrant makes no mention, explicit or implicit, that PO Lysyzk, an eye witness, confirmed the validity of the facial recognition hit.

**Defendants do not deny that Det. Tapia's affidavit of Probable Cause omits reference to Ofc. Lyszyk's confirmatory identification of Plaintiff.**

129. PO Lee's report which falsely includes the name of Nijeer Parks is a clear falsehood since the report was authored on January 26th and Parks was not identified until Febfruary 5, 2019.

**Defendants deny this statement. Ofc. Lee's initial police report, #19010123/2 was initially drafted on January 26, 2019 and was updated to include Plaintiff's name on February 1, 2019 after the Complaint-Warrants were signed. See Ofc. Lee's police report #19010123/2, identified as Defendants' Exhibit "FF". Ofc. Lee's second report was drafted after Plaintiff was arrested. See Ofc.**

**Lee's police report #19010123/8, identified as Plaintiff's Exhibit
"C".**

130. Responding to four questions concerning the role of the

Prosecutor, Director Hubner described the role of the Hudson County

Prosecutor as follows:

> The Middlesex County Prosecutors Office (MCPO) is the
> lead law enforcement agency in Middlesx County. MCPO
> assigns an Assistant Prosecutor to serve as a liaison to
> the WQoodbridge Police Department. The MCPO liaison to
> Woodbridge is Assistant Prosecutor Peter Natasi. When an
> officer files a complaint alleging an indicatable
> offense, the Deparmtent will contact MCPO to discuss the
> factual allegations and obtain a legal opinion as to the
> proper charges to be brought against the supect ..

Response to Interrogatory Number 16, attached as Exhibit B to the

moving papers of Defendants.

**Defendants note that Plaintiff's Paragraph 130 inaccurately
references the Hudson County Prosecutor. Notwithstanding same and
the grammatical errors in Plaintiff's recitation of the Answers to
Interrogatories above, Defendants do not deny that this was
Director Hubner's answer to Interrogatory #16.**

131. Director repeated this assertion that the only role of the

Prosecutor was to assist in drafting the charge, to wit:

> The Middlesex County Prosecutor's Office was involved in
> this matter to the extent that Assistant Prosecutgor
> Peter Natasi reviewed the complaint and, based on the
> information available at that time, advised as to what
> charges should be brought.

Response to Interrogatory 17, attached as Exhibit B of Defendant's

Motion.

**Notwithstanding the grammatical errors in Plaintiff's
recitation of the Answers to Interrogatories above, Defendants do
not deny that this was Director Hubner's answer to Interrogatory
#17.**

132. PO Lyszk's respone in his answers to interrogatories is identical to that of Police Director Hubner response immediately above. See Lyszk's Answers to Interrogatory, Number 14, attached as Exhibit A to Plaintiffs Opposition Papers.

**Defendants do not deny this statement.**

133. On direct examination in his deposition, Det Tapia, having described the review with Ass't Prosecutor Nastasi was oral and, since he does not remember what was said, he agreed with the inference "that it was brief." Tapia Deposition, p 119 lines 12 - 16, Exhibit F to Defendant's papers.

**Defendants do not dispute that this was Det. Tapia's testimony.**

134. Det Tapia recalls a brief telephone call to Judge Stahl in which Tapia informed him that he would be submitting a Warrant and Compliant. Tapia Deposition, p. 119, lines 17 to p. 120 5. Exhibit F.

**Defendants do not dispute that this was Det. Tapia's testimony.**

135. On direct exam, Detective Tapia stated that he had one brief conversation with Assistant Prosecutor Natasi and had no recollection about the nature and contents of the one brief conversation he had had with Nastasi. Tapia Depotions p. 119.

**Defendants do not dispute that this was Det. Tapia's testimony.**

41

136. Fred Rubenstein, counsel for Defendants, articulated for the first time the theory that Det Tapia had presented the facial recognition as the main evidence and further asserted that Natasi had opined that probable cause existed based on the evidence to which Tapia dutifully agreed. (Tapia Deposition, p. 135 - 138, attached as Exhibit F to Defendants' papers.

**Defendants deny this statement. Det. Tapia's testimony was as follows: "Q: What did you do first, did you contact the prosecutor's office, or did you begin to compare (sic) the complaints? A: No, I contacted AP Nastasi. Q: Okay. So you contacted Assistant Prosecutor Nastasi and you relayed to him all of the facts that you had at this point in time? A: Yes. Q: Did you tell him that you ran — that the facial recognition software came back with a hit to Nijeer Parks? A: Yes. Q: Did you tell Officer Nastasi — I'm sorry, Prosecutor Nastasi, that Officers Lee and Lyszyk confirmed that, in fact, this was the person that — based on the actions on January 26, 2019? A: At that time it was Officer Lyszk (sic)." See Det. Tapia's Deposition, Defendants' Exhibit "F" Page 135, Line 1-18.**

137. The New Jersey State police lab completed the analysis of the fingerprints and identified Barrington Walker as the actor on or about February 14, 2019, (See Exhibit I attached to Plaintiff's Opposition).

**Defendants do not deny this statement. Defendants note that the fingerprints collected from the glass door at the Hampton Inn were submitted for analysis on February 8, 2019. The positive fingerprint report identifying Barrington Walker was returned to the WPD on February 22, 2019, after Plaintiff had already been released from custody. Furthermore, the identification of Barrington Walker based upon the fingerprints left on the glass door of the Hampton Inn was of no probative value as the door was a common door and the officers could not determine where the suspect touched the door.**

42

138. These prints were processed by the defendants almost two years later on January 22, 2021, and this report noted a New York City address for Barrington Walker at 240 West 141 Street, Manhattan, NY. See ID Bureau Suspect Report attached to Defendant's moving papers as Exhibit M.

**The "processing" of the fingerprints by the WPD on January 22, 2021 was simply to confirm the identification made by the NJSP and received by the WPD on February 22, 2019. This requires a WPD officer to independently verify points of comparison between fingerprint samples. As is noted above, the fingerprints were of no probative value at the time they were recovered as it could not be determined where the suspect touched the Hampton Inn lobby door. See Det. Quesada Deposition, Defendants' Exhibit "E" Page 36, Line 13-22.**

139. Det. Quesada testified that the print was "an exact match to the left palm impression of Barrington Walker." Deposition of Quesada, Exhibit E, pp. 34 23 - 25 and Quesada said this had 100% reliability. Id p. 37 line 2.

**Defendants deny that this was Det. Quesada's testimony. The referenced testimony cited by Plaintiff does not address fingerprints. The statement attributed to Det. Quesada was made by Det. Douglas Cioni on the WPD ID Bureau Suspect Report, Defendants' Exhibit "M".**

140. Barrington Walker's history connected him to New York city which is consistent with the fact that the Hertz rental car had been rented out of a New York office and that there was a Dunkin Donut receipt from a store in the Bronx in the rental car from the morning of the incident.

**Defendants do not deny this statement.**

141. The report generated on June 25, 2019, from the Pennsylvania Justice Network noted as origin, NYPD, another New York connection. See Exhibit J attached to Plaintiffs Opposition Papers.

**Defendants do not deny this statement. However, there is no indication that Plaintiff's Exhibit "J" or the information contained therein was in existence prior to Plaintiff's arrest on February 5, 2019. It is noted that Plaintiff's Exhibit "J" lists May 8, 2019 as the "photo date."**

142. CODIS generated "a high stringency match" between the DNA evidence and Barrington Walker on July 30, 2021. (Copy of report attached as Exhibit Oto Plaintiffs Opposition papers.

**Defendants do not deny this statement.**

143. This report was sent to Det Quesada. Id.

**Defendants do not deny this statement. Det. Quesada testified regarding this report: "Q: ... Was this the first indication from a DNA standpoint that Mr. Walker's DNA was on the water bottle and — was that the first time you had found that out? A: Yes, sir. Q: Okay. There was no previous notice from the state police? A: No, sir. Q: Okay. If there had been anything earlier than that would Woodbridge have received notification that there was a hit? A: Yes." Det. Quesada's Deposition, Defendants' Exhibit "E" Page 80, Line 13-14.**

144. Although Lt. Barrett testified that the Department charged Barrington Walker after the DNA match was received (Barrett Deposition, p. 88, line 11 - 12), to date, no action has been taken to follow through on these charges which, upon information and belief, were just made in a pro forma fashion.

**Paragraph 144 references an ongoing criminal matter and as such, Defendants neither confirm nor deny this statement.**

145. Facial Recognition Technology (FRT) has become a commonplace tool for law enforcement officers in both the Federal and state levels.

**Defendants do not deny this statement.**

146. Out of approximately 42 Federal Agencies that employ law enforcement officers, the Government Accountability Office (GOA) found that in 2021,, 20 of them or about half, utilized FRT. Lee, Nicole Turner, *Police Surveillance Facial Recognition: Why Data Privary Is Imperative for Communities of Color*, April 2022, Brookings Institute.

**Defendants do not deny this statement.**

147. Already by 2016, one in four local law enforcement agencies used FRT according to a study done by Georgetown University. Garvie, Claire, Bedoya, Alvaro, *The Perpetual Line-Up: Unregulated Police Face Recognition in America*, Georgetown Law Center on Privacy & Technology, October 18, 2016.

**Defendants do not deny this statement.**

148. Problems with the accuracy of FRT and with its disproportionate negative effect on Blacks and other minorities has been well documented over the last 20 years. Id.

**Defendants do not deny this statement.**

149. Nijeer Parks, an African American., appears to have been the first person to allege wrongful arrest based on FRT, and the two

other cases which are pending also involve Black plaintiff, to wit.

- Robert Williams, a black man was handcuffed on his front lawn in front of his wife and two young daughters based on the flawed technology. Williams, Robert, July 15, 2021, *I Did Nothing Wrong: I was arrested Anyway*. See *Williams v. City of Detroit*, No. 2:21-cv-10827 (E.D. Mich.).

- Porcha Woodruff, a black woman, 32 and eight months pregnant., was home around 8 a.m. on February 16, helping her 6- and 12-year-olds get ready for school when six Detroit police officers arrived at her door with an arrest warrant for carjacking and robbery, the complaint states. *See Woodruff v. City of Detroit*, No. 23-cv-11886 (E.D. Mich)

- Randal Quran Reid, a black man visiting his mother in Atlanta was wrongfully arrested and held for six days after facial recognition technology incorrectly identified him as a fraudster and thief in Louisiana, according to the latest lawsuit aimed against the controversial tech. See, *Reid v. Bartholomew*, No. 23-cv-4035 (N.D. Ga.)

- Alonzo Sawyer, a 54 year old barber, was wrongly arrested and imprisoned in Baltimore.

- Michael Oliver, _Another Black man, Jv1ichael Oliver☐ sued the city in 2021, claiming that his false arrest because of

the technology in 2019 Jed him to lose his job. *Oliver v. Bussa*, No. 20-cv-12711 (E.D. Mich.)

**Defendants do not deny this statement. Defendants note that the Williams, Woodruff, and Oliver cases all involved the Detroit Police Department. Williams and Woodruff were subsequently identified by a witness through a photo array. In the Reid case, it is alleged that the police department responsible for the facial recognition analysis used Clearview AI, a software that is banned in New Jersey.**

150. Searches in various databases and on the internet do not reveal any such claim advanced by a White person.

**Defendants are unable to confirm or deny this statement.**

151. In New Jersey, the ACLU has been working for over a decade to address the dangers of FRT- seeking regulations and restrictions.

**Defendants are unable to confirm or deny this statement.**

152. Moreover, firmly established police practices would preclude the use of FRT as a basis for probable cause.

**Defendants are unable to confirm or deny this statement.**

153. Indeed, as shown above, the very request form for a FRT search in New Jersey contains a disclaimer and waiver. See, supra, paragraphs 30 - 34.

**Defendants do not deny this statement, notwithstanding Plaintiff's insufficient citation to a reference in the record in support of same.**

154. The Director of Police of Woodbridge showed himself to be either deliberately indifferent or intentionally violative of constitutional norms, whether this be considered a formal policy

or an informal policy, by having no policy regarding the use of FRT.

**Defendants deny this statement.**

155. Director Hubner knows nothing about facial recognition. (Hubner answers to Interrogatories, Ex B, to defendants' moving paper, number 4.)

**Defendants do not deny this statement.**

156. No Woodbridge police officer or employee was ever disciplined for anything related to Facial Recognition Technology. (Hubner answers to Interrogatories, Number five ..

**Defendants do not deny this statement.**

157. Andew Lyszyk testified that he was never disciplined, counseled, or retrained relating to this incident. Lyszyk Deposition, p. 21 line 1 - 17, Ex C

**Defendants do not deny this statement.**

158. Woodbridge did not even advise the involved officers when the Complaint was filed and the officers learned about it through news stories months after the filing of the complaint. See Deposition of PO Andrew Lyszyk, , page 11, lines 12 - 17, attached as Exhibit C to moving papers of Defendants.

**Defendants deny this statement insofar as it attempts attribute Ofc. Lyszyk's testimony to the entire Woodbridge Police Department. Ofc. Lyszyk was speaking for himself when he testified that he learned of the subject Complaint on the news.**

159. PO Lee knows nothing about Facial Recognition Technology. Deposition of Lee, p. 31,Exhibit D to Defendant's moving papers ..

**Defendants deny this statement. Ofc. Lee testified: "Q: What is your knowledge of facial recognition technology? A: Not much." Ofc. Lee was never asked about the extent of his knowledge regarding facial recognition technology.**

160. Det Quesada knows nothing about Facial Recognition Tech. Deposition of Quesada, P. 31 - 32, Exhibit E.

**Defendants deny this statement. Det. Quesada testified: Q: Do you know anything about facial recognition technology? A: It was a tool that could have been used."**

161. No Woodbridge police officer or employee was ever disciplined for anything related to Facial Recognition Technology. (Hubner answers to Interrogatories, Number five, Ex B).

**Defendants do not deny this statement.**

162. Andew Lyszyk testified that he was never disciplined, counseled, or retrained relating to this incident. Lyszyk Deposition, p. 21 line 1 - 17, Ex C to Defendants' papers.

**Defendants do not deny this statement, which is duplicative of Paragraph 157 above.**

163. No Woodbridge police officer or employee was ever disciplined for anything related to Facial Recognition Technology. (Hubner answers to Interrogatories, Number five,Ex B to Defendant's papers. ..

**Defendants do not deny this statement, which is duplicative of Paragraph 156 above.**

164. Andew Lyszyk testified that he was never disciplined, counseled, or retrained relating to this incident. Lyszyk Deposition, p. 21 line 1 - 17, Ex C. .

**Defendants do not deny this statement, which is duplicative of Paragraph 157 and 162 above.**

165. The Director of Police of Woodbridge show himself to be either deliberately indifferent or intentionally violative of constitutional norms by failing to train, supervise and discipline officers relating to the use of FRT"

**Defendants do not deny this statement, which is duplicative of Paragraph 154 above.**

166. Robert Hubner, the Woodbridge Police Director since 2011, a 30 veteran of the Department, serves as the chief executive of the Department. Hubner Deposition, p. 6 - 7, attached as Exhibit H to the Defendants" moving papers.

**Defendants deny this statement. Director Hubner, following his retirement from the WPD, was appointed as the civilian Police Director in 2011. As a civilian, Director Hubner does not have police powers and does not participate in criminal investigations. The highest-ranking officer in the Department is the Chief Law Enforcement Officer, not the Police Director.**

167. Woodbridge is budgeted for 225 officers. ID. p. 11 line 24. This makes it the largest police department in Union County. Id. p. 29 line 9.

**Defendants do not dispute that the WPD is budgeted for 225 police officers. Defendants deny that it is one of the largest police departments in Union County. Woodbridge is located in Middlesex County.**

168. Upon information and belief, it is one of the largest departments in the state of New Jersey.

**Defendants do not deny this statement.**

169. Director Hubner's knowledge about FRT is limited to "what [he] read[s] in the paper." Id. p. 15 line 9.

**Defendants do not deny this statement.**

170. In ten years, there has been only one disciplinary case appealed to the OAL which involved a dismissal which was upheld. Id. p. 23.

**Defendants do not deny this statement.**

171. Director Hubner remembers no instance over his 40 year association with the Department where the Department's discipline was reversed at OAL. Id. p. 25 line 3 - 8.

**Defendants deny this statement. Director Hubner's testimony as in response to an inquiry that specifically asked about cases that Director Hubner was pesonally been involved in.**

172. Director Hubner never read any documents related to the Nijeer Parks case and relied upon a briefing by Lt Barrett and the other IA officers. Id. p. 33

**Defendants do not deny this statement.**

173. Director Hubner had not been aware of the ACLU lawsuit against Clearview until he became aware of it from an article in The Star Ledger.

**Defendants deny this statement as Plaintiff fails to cite to any portion of the record in support of same.**

174. Woodbridge still has no policy concerning FRT Id. p. 38.

   **Defendants do not deny this statement.**

175. There is no written policy because the AG hasn't even created a policy. So we're not going to create something that may once he decided or she decides what the policy is we don't want to be outside of those recommendations or directives. Id. 39 lines 13-17

   **Defendants do not deny this statement.**

176. Director Hubner is generally not very involved in the defense of claims against the Department and is not privy to settlement discussions involving claims against the Department. Id. pp. 45 - 46.

   **Defendants do not deny this statement.**

177. Hubner was not even aware that an excessive force claim had been settled for $125,000. Id 47 line 6.

   **Defendants do not deny this statement.**

178. Director Hubner had not been told that PO Lyszyk conceded that his Warrant of Probable Cause was fraudulent. Id. p. 61 line 17.

   **Defendants do not deny that Director Hubner was not contacted regarding Ofc. Lyszyk's testimony in this matter.**

179. Director Hubner asserted he had no knowledge of the exculpatory evidence. Id. p. 67 line 21

   **Defendants deny this statement. Director was specifically asked about exonerating evidence that was ignored by the**

**department. Director Hubner testified: "Q: Are you aware of exonerating evidence that was – in this case from the start that your department ignored? A: No, I'm not aware." See Dir. Hubner's Deposition, Defendants' Exhibit "H" Page 67, Line 17-21.**

180. Director Hubner was unaware of the finger print assay which correlated with Barrington Walker as of 2/14/19. Id. p. 7 line 17.

**Defendants do not deny this statement.**

181. Director Hubner was unaware that DNA evidence also correlated with Barrington Walker. Id. p. 73 line 4.

**Defendants do not deny this statement.**

182. Director Hubner was not aware that Nijeer Parks asserted that he had never been in Woodbridge before voluntarily coming to police headquarters, that he had never had a driver's license, never rented a car, that he had just had ACL surgery which made running in flight impossible and that he had solid alibis. Id. p. 74.

**Defendants deny this statement. Director Hubner testified that he was not aware of Plaintiff's claims regarding not having a driver's license and having never been to Woodbridge. In this line of questioning, Director Hubner was not asked about Plaintiff's ACL surgery or that Plaintiff purported to have never rented a car. As such, Dir. Hubner did not testify that he was unaware of those claims. See Dir. Hubner's Deposition, Defendants' Exhibit "H" Page 74, Line 1-25.**

183. Director Hubner testified that he had read that FRT is biased against Blacks. Id. p. 75.

**Defendants do not deny this statement.**

184. Director Hubner admits that the IA report exonerating Tapia makes no mention of any evidence in support of probable cause. Id. p, 80.

**Defendants do not deny this statement.**

185. Director Hubner conceded that the identification by PO Lee was "very suggestive." Id p. 80, line 2.

**Defendants do not deny that this was Dir. Hubner's testimony.**

186. Director Hubner opined that Det Tapia's opinion that the image on the Tennessee license corresponded to the image of Nijeer Parks would be adequate to support an Affidavit of Probable Cause. Id. P / 87 lines 4 - 9.

**Defendants do not deny this statement.**

187. The Commander of Internal Affairs, Lt Edward Barrett, of the Woodbridge Police Department showed himself to be either deliberately indifferent or intentionally violative of constitutional norms, whether this be considered a formal policy or an informal policy, by having no policy regarding the use of FRT"

**Defendants deny this statement.**

188. "We don't have any formal policies regarding facial recognition- not that I'm aware of. Barrett Deposition, p. 21 lines 13 - 14, attached to Defendant's moving papers as Exhibit G to Defendants' papers.

**Defendants do not deny this statement.**

189. Although Barrett was aware that the NJ Attorney General had forbade the use of Clearview FRT, he had no idea if it had been circulated to members of the Department. Id, p. 22 lines 2 -4.

**Defendants do not deny this statement except insofar as it suggests that Lt. Barrett did not receive the Attorney General directive banning the use of Clearview AI: "At some point it came across my desk, so I — I'm not sure who received it, but I did." See Lt. Barrett's Deposition, Defendants Exhibit "G" page 21, Line 25, Page 22, Line 1.**

190. Barrett admitted that "he's not really familiar with FRT." Id p. 22 lines 20.

**Defendants do not deny this statement.**

191. Barrett said no one else in Internal Affairs had any knowledge about FTR either. Id. p. 21, lines 3 - 7.

**Defendants do not deny this statement but note that Plaintiff inaccurately refers to page 21 of Lt. Barrett's deposition. This statement appears on page 23 of Lt. Barrett's deposition.**

192. Barrett conceded that he had heard that FTR was racially biased from media reports and from the AG action against Clearview. *Id*. p. 23, 8 - 25.

**Defendants do not deny this statement.**

193. But Barrett explained: "I don't really follow follow too much of that stuff." Id. p 23 lines 3 - 7.

**Defendants do not deny this statement but note that Plaintiff inaccurately refers to page 23 of Lt. Barrett's deposition. This statement appears on page 24 of Lt. Barrett's deposition.**

194. There is no system in place to track and catalogue articles about or of relevance to the Department. *Id*. p. 23, lines 8 - 18.

**Defendants do not deny this statement. However, it is noted that Lt. Barrett explained that there is no need for such a system given the long-lasting nature of digital media: "Everything pretty much persists forever online, so it's not like where you had the newspaper and you've got to cut it out and laminate it. Just generally it's always available now." See Lt. Barrett's**

**Deposition, Defendants' Exhibit "G" Page 24, Line 25, Page 25, Line 1.**

195. IA did not follow or have a shadow file on the issue of fraud relating to the use of pandemic money- the so called Barbershop matter. *Id.* pp 25 - 27.

**Defendants deny this statement, which appears to be entirely unrelated to this matter.**

196. Lt Barrett never received and training and, in fact, was unaware of any way to analyze complaints and the level of sustaining those as evidence of a responsive department. Id. pp 31 - 32

**Defendants deny this statement. Lt. Barrett's testimony was in regards to an inquiry regarding the rate of sustained IA complaints as a function of the overall effectiveness of the IA unit as a whole.**

197. Barrett had no idea how many 500 complaints the department averaged per year. *Id* p. 34.

**Defendants do not deny this statement.**

198. Although Barret had been in IA for five years at the time of his deposition (Id. p. 9 line 7, he had only been a witness in a Departmental hearing once or twice, Id, p. 38, line 3, and had never testified in OAL. Id p. 38 line 8.

**Defendants do not deny this statement.**

199. Lt Barrett asserts that there had never been any complaints about off duty work details in Woodbridge- though he is aware of the indictments relating to off duty work in Edison. Id. 46 - 47.

**Defendants deny this statement insofar as Paragraph 199 implies that any WPD Officer was indicted in connection with off-duty work in Edison. Upon information and belief, this is in reference to four Edison Police Officers who were charged with racketeering offenses in connection with off-duty work.**

200. Although IA asserts that it did an investigation of the Nijeer Parks matter, Lt Barrett had never seen the Affidavit of Probable Cause of Lyszyk or the Complaint until it was presented to him at his deposition. Id. p. 49 lines 9 - 13.

**Defendants do not deny that this was Lt. Barrett's testimony. However, Defendants note that Lt. Joseph Velez was the officer assigned to investigate the IA complaint related to Plaintiff's arrest. Lt. Barrett was not involved in the investigation of the IA complaint in this matter. See Lt. Barrett's Deposition, Defendants Exhibit "G" Page 49, Line 9-18.**

201. Barrett refused to concede that the Nijeer Parks incident is the highest profile complaint ever brought against the Department. Id. p. 50, lines 1 - 7.

**Defendants do not deny this statement.**

202. Barrett had no knowledge and IA had done no follow up after PO Lyszyk had admitted in his deposition three months prior that his Affidavit of Probable cause was materially false. Id 54.

**Defendants do not deny that Lt. Barrett was not contacted regarding Ofc. Lyszyk's testimony in this matter.**

203. At his deposition Lt. Barret first denied that there was any exonerating evidence related to Nijeer Parks. Id p. 8 - 13, but then he recalled that finger prints and and DNA evidence which exonerated him. Id . 57 linrd 3 - 12.

**Defendants do not deny this statement.**

57

204. Lt Barrett had no knowledge about the disparity between the reports of the suspect's height being 5'11 or more and the fact that Nijeer Parks is 5"'8. Id 58 - 61.

**Defendants do not deny this statement.**

205. Lt Barret did not think it significant that PO Lyszk had had three sustained complaints and that one of these involved "arresting the wrong person for a warrant." Id. p. 65 -67.

**Defendants deny this statement. Lt. Barrett testified that a past allegations of misconduct is not probative evidence in determining whether current allegations of misconduct occurred or not. However, Lt. Barrett did testify that such past instances of misconduct would have a bearing on the disciplinary action taken against the officer. See Lt. Barrett's Deposition, Defendants' Exhibit "G" Page 67, Line 14. Lt. Barrett continued: "Each investigation is based on the facts pertaining to that investigation, not prior investigations." Page 69, Line 4-6.**

206. "That investigation [ of the prior false arrest] would not be part of the current investigation [into the false arrest of Nijeer Parks]." IOOd. P. 67 lines 4- 5.

**Defendants do not deny this statement.**

207. Lt Barrett denied that the past history of an officer is considered when weighing current complaints. If p. 69 4 - 6.

**Defendants do not deny this statement.**

208. Lt Barret had never seen the request for a Facial Recognition search in this case. Id. p. 73 line 14,

**Defendants do not deny this statement.**

209. Lt Barret asserts that "I don't even know if it [FRT] was ever employed" by the Department. Id. 75 lines 7 - 8.

**Defendants do not deny this statement.**

210. Lt Barrett is unable to articulate the difference between an "investigative lead" and evidence which supports probable cause. Id. pp 75 - 76.

**Defendants deny this statement. Lt. Barrett testified: "I guess an investigative lead gives you a starting point, gives you an idea ... of where to begin." See Lt. Barrett's Deposition, Defendants' Exhibit "G" Page 75, Line 18-21.**

211. Lt. Barrett did not think any red flags were raised when 7 out of 8 differential treatment/ false arrest allegations were not sustained. Id. p. 31 lines 1 - 25.

**Defendants deny this statement as a complete misrepresentation of Lt. Barrett's testimony. For clarity, the allegations referenced in Paragraph 211 were from 2014.**

212. The IA Investigation was not started until sometime after the filing of this Complaint and was not concluded until over a year later on December 29, 2021. Copy of Close Out Report of Internal Affairs attached to Plaintiff's Opposition papers as Exhibit P ..

**Defendants deny this statement. Defendants note that Plaintiff's civil lawsuit was filed on or about November 25, 2020. The IA investigation in this matter was initiated on January 1, 2021. Multiple attempts were made to contact Plaintiff in order for him to participate in the investigation. After Plaintiff did not respond to certified letters, the investigation proceeded without Plaintiff's participation on April 1, 2021. Lt. Velez' Report outlining his findings is dated December 29, 2021.**

213. This delay in starting the investigation and concluding it violated the Attorney General Guidelines which require that these investigations be done in a prompt manner. Internal Affairs Policy & Procedures, November 2022, Sec. 6.1.1.

**Defendants deny this statement as the Guideline cited by
Plaintiff was not in effect until 2022 and thus is not applicable.**

214. Indeed, investigations are to be completed within 45 days and
if not a report is to be made to the Police Director. Id. 6.1.4.

215. The instant investigation, despite its shocking deficiencies,
took over a year and no reporting of the delay was made to Director
Hubner.

**Defendants deny this statement as the Guideline cited by
Plaintiff was not in effect until 2022 and thus is not applicable.**

216. No notice was made as required by the Guidelines to the County
Prosecutor when 180 days had elapsed. Id. 6.1.6.

**Defendants deny this statement as the Guideline cited by
Plaintiff was not in effect until 2022 and thus is not applicable.**

217. No investigation was made of PO Lyszyk even after he admitted
under oath that he had perjured himself when he made a materially
false Affidavit of Probable cause in this case.

**Defendants do not deny that Ofc. Lyszyk was not the subject
of an IA investigation in relation to this matter. Defendants deny
that Ofc. Lyszyk made any admission of perjury or made a materially
false statement in the Affidavit of Probable Cause.**

218. Lt Velez failed to comply with any aspect of a appropriate
Internal Affairs investigation which as set forth in 6.3.5.
requires:

a. That the complainant be interviewed; (a certified letter was
   sent to a bogus address for complainant and no attempt was
   made to reach him through counsel)

b. That all witnesses be interviewed (none were!)

60

c. Review the relevant reports and documents. In this case, the positive finger print identification, the allegations in this Civil Complaint, the false Affidavits, the false Complaints, and the positive DNA report, the surveillance videos,

**Defendants deny this statement as the Guideline cited by Plaintiff was not in effect until 2022 and thus is not applicable. Defendants note that Lt. Velez called Plaintiff on February 25, 2021 whereupon Plaintiff declined to participate in the IA investigation and stated that he has an attorney. A certified letter was sent on March 3, 2021 to 485 E. 19th Street, Paterson. This "bogus address" is the same address listed on Plaintiff's civil Complaint, dated November 25, 2020. Plaintiff ignores that Det. Tapia, in addition to conferring with Ofc. Lyszyk, interviewed the manager of the Hertz kiosk, Michael Dones and spoke with the manager of the Hampton Inn, Richard Charneco.**

219. The IA investigation declared Det Tapia, exonerated, the highest clearance possible of an accused officer which equates to an affirmative finding of no misconduct. (as opposed to the more neutral "not sustained" which only communicates that there was not enough information for the investigator to find guilt. of the Nijeer Parks matter was not sustained. .See . Copy of Close Out Report of Internal Affairs attached to Plaintiff's Opposition papers as Exhibit P. See also, Barrett Deposition, p. 76, Ex G.

**Defendants deny this statement as there is no reference to this testimony on page 76 of Lt. Barrett's deposition. Notwithstanding same. Defendants do not deny this statement insofar as Det. Tapia was exonerated of the allegation of improper arrest. Defendants deny this statement as a finding of "unfounded" i.e., that the alleged conduct did not occur, is the highest clearance possible. See Lt. Barrett's Deposition, Defendants' Exhibit "G" Page 34, Line 11-21.**

61

220. This investigation only looked into Det Tapia's role and did not consider the role of PO Lyszyk. *Id.* p. 82.

**Defendants do not deny this statement. However, Defendants note that Lt. Barrett testified that Det. Tapia was the target of the IA investigation because: "He was the primary investigator and he was the one who submitted the evidence that was relative to the matter." See Lt. Barrett's Deposition, Defendants' Exhibit "G" Page 82, Line 6-10.**

221. The Internal Affairs report makes no mention of the fact that:

- The facial recognition hit was wrong.

- The Department failed to process the fingerprints which identified the actor as Barrington Walker two weeks after the incident.

- The Department failed to do any normal investigation including appropriate identifications with the ten eye witnesses, examination of the Sprint Sim card, examination of the surveillance video at the Hampton Inn and at Dunkin Donuts.

- The actor was over 6ft tall while Nijeer Parks is 5"7;

- Nijeer Parks voluntarily came down to police headquarters having been lied to by an officer who said he would be interviewed as part of the investigation and that he could clear up the misunderstanding.

- All of the solid alibis were ignored;

- Documentary evidence of Nijeer Parks surgery at the time which would have precluded him from running was not mentioned.

62

Copy of Close Out Report of Internal Affairs attached to Plaintiffs

Opposition papers as Exhibit P to Plaitniffs Opposition papers.

**Defendants do not deny this statement.**

222. The report failed in every respect to satisfy the requirements

of the AG Guidelines. See. 6.3.5.

**Defendants deny this statement as the Guideline cited by Plaintiff was not in effect until 2022 and thus is not applicable.**

223. Defendant IA, Lt. Inv. Velez concluded:

> I reviewed the photographs of Mr. Parks in the high
> profile comparison and they are similar and could be
> mistaken for the same person."

Close Out Report, p, 3. Exhibit P to Plaitniffs Opposition).

**Defendants do not deny that Lt. Velez made this statement in the IA report in this matter.**

224. Lt. Velez in an official document and with knowledge that

Plaintiff had been the victim of a false facial recognition lead,

and that the Department had misused this lead to falsely arrest

Plaintiff, falsely charge plaintiff, and falsely prosecute

plaintiff, essential engages in the identical wrongful acts of the

subject of his investigation.

**Defendants deny this statement.**

225. When questioned in his deposition about this, Lt Barrett

shrugs his shoulders and says "mistakes are made ... but there was

no malice here... " Exhibit G,. p. 84 lines 19 -23.

**Defendants deny this statement insofar as it purports to reference body language and movements that are not reflected on**

**the deposition transcript in an attempt to suggest that Lt. Barrett was ambivalent regarding false arrest.**

226. The IA investigation was sent to the file but was not provided to the Police Director, the Mayor, or the Business Administrator. *Id*. Only the three IA officers were given access to this report. Id. p. 77, 1 – 6

**Defendants do not deny this statement. Defendants note that Lt. Barrett testified that, as per Attorney General Guidelines, IA files are confidential. The Mayor, Business Administrator, and Police Director are not privy to IA files or reports. This is done to maintain the integrity of the IA filing system and ensure that only authorized individuals are permitted to access IA files. See Lt. Barrett's Deposition, Defendants' Exhibit "G" Page 77, Line 1-15, Page 78, Line 1-7.**

227. Lt Barrett had no explanation as to why the administration might have withheld the Summons and Complaint of Nijeer Parks for a year. P. 80.

**Defendants deny this statement. This statement attributed to Lt. Barret does not appear on Page 80, or any of the surrounding pages, of Lt. Barrett's deposition transcript.**

228. Although Lt. Barrett testified that the Department charged Barrington Walker after the DNA match was received (Barrett Deposition, p. 88, line 11 - 12), to date, Defendants have made no efforts to extradite Barrington Walker.

**Defendants are unable to confirm or deny this statement as the WPD cannot comment on pending criminal matters.**

229. The appearance of the DNA evidence in CODIS indicates that Walker had been in custody and charged or suspected of another crime.

**Defendants deny this statement. The fact that Barrington Walker was not identified by the NJSP through DNA until July 31, 2021 suggests just the opposite. If Barrington Walker had been in custody prior to the CODIS identification, Walker's DNA would have been in the system and would have been available for comparison with the evidence collected at the scene of the Hampton Inn.**

230. Det Barrett throughout his deposition is at pains to say that the Department and the officers did nothing wrong and that the mistakes were understandable, and that there was no malice, etc. Barrett Deposition, pp. 88 - 92,

**Defendants do not deny this statement.**

231. The Commander of Internal Affairs of the Police Department of Woodbridge show himself to be either deliberately indifferent or intentionally violative of constitutional norms by failing to train, supervise and discipline officers relating to the use of FRT"

**Defendants deny this statement.**

232. Plaintiff's liability expert, Ralp Cilento, is a retired Lieutenant Commander of Detectives in the NYPD with more than twenty-seven years of experience in the New York City Police Department, having been assigned to supervise investigations for more than 16 years. CV and page three of the report found at Exhibit V to exhibits attached to Defendants' papers.

**Defendants do not deny this statement.**

233. Mr. Cilento has testified as an expert witness for the NYPD and has provided testimony before the New York State Criminal

Justice Task Force "regarding witness intimidation and open discovery statues. *Id*. p. 3

**Defendants do not deny this statement.**

234. Cilento was responsible "for developing, implementing, and assessing training for more than 5,000 members of the NYPD's Detective Bureau, including the college-accredited and nationally recognized Homicide Investigators Courts, Special Victims Investigators Courts, Criminal Investigators Basic Course, and Custodial Interrogation Course. *Id*.

**Defendants do not deny this statement.**

235. Cilento is an MPA candidate at John Jay College where he is also an Adjunct Professor of Police Science. *Id*. p. 4.

**Defendants do not deny this statement.**

236. The actions of the Woodbridge Police in response to the original incident at the Hampton Inn were within the acceptable range of police practices and consistent "with best practices.". *Id*. p. 4- 5.

**Defendants do not deny this statement.**

237. "The immediate police response to the hotel is not what led to the wrongful arrest of Nijeer Parks. Rather it was the improper police investigation that followed. *Id*. p. 4.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

66

238. "Once Det. Tapia verified with POs Lee and Lyszyk the person on the fraudulent Tennessee Driver's license was the same person they had encountered in the lobby, he was correct in utilizing all legal investigative means necessary to attempt to identify the suspect. As such. Det. Tapia's determination to send the photo on the Tennessee Driver's license to the Regional Operations Intelligence Center (ROIC) and the New York State Intelligence Center (NYSIC) was an appropriate investigative step. Id. p. 6.

**Defendants do not deny this statement.**

239. However, [s]everal of the necessary post-incident investigative stop in this case were ignored, dismissed, or improperly executed which led to Nijeer Parks to be misidentified, wrongly arrested and wrongly charged with the crimes at the Hampton Inn Hotel.: If. P. 7

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

240. Although the record casts doubt on the assertion that Det Tapia showed PO Lyszyk the picture of Nijeer Parks from the Facial Recognition hit (neither Lyszyk's own Affidavit of Probable Cause nor Det Tapia's Affidavit of Probable Cause mentions this and no mention of this is made in the Answers to Interrogatories of defendants), if it had been made, according to Plaintiffs expert, it would have been an invalid and contaminating identification because:

The correct investigative step at this time would have
been to recognize this facial recognition hit for what
it legal was: merely an investigative lead. Because
facial recognition hits are inherently suggestive
effectively creating a software generated doppelganger,
it becomes critical for investigators to complete a
range of investigative steps. *Id*. p. 8

**Defendants do not deny that this statement is contained in
Mr. Cilento's report.**

241. The Photo hit on Nijeer Parks should have been subjected to
a search on his incarceration status, a search of all public
records, an open source social media search, a vehicle history
search, known addresses, arrest history for similar events. *Id*.
pp. 8-9.

**Defendants do not deny that this statement is contained in
Mr. Cilento's report.**

242. These investigative steps that should have been done include
obtaining the Dunkin Donuts video, using the ten eye witnesses at
the hotel in identification procedures, comparison of the shoe in
evidence to Nijeer's foot. Id .. p .. 21.

**Defendants do not deny that this statement is contained in
Mr. Cilento's report.**

243. "The Dunkin Donuts video was a highly probative investigative
lead which was not exploited and probably would have yielded
exculpatory evidence very early in the investigation which could
have eliminated Nijeer Parsk as the suspect irrespective of any
facial recognition hit.: Id. p. 11

**Defendants do not deny that this statement is contained in
Mr. Cilento's report.**

244. If arguendo, Det Tapia had, contrary to fact, actually showed PO Lyszyk the photo of Nijeer Parks, that would have been an improper, inadmissible, highly suggestive and likely inadmissible identification because

> it is well known and considered a best practice to only utilize a single-phot confirmatory identification when there is a prior relationship between the parties and/or a close personal proximity to the incident. Neither factor was present in this case .... *Id*. p. 9.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

245. Two days after the incident between the suspect, who was a stranger to Lyszyk and PO Lyszyk is "well outside any temporal proximity, as described, and thusly cannot properly participate in a confirmatory identification procedure." *Id*. p. 9.

**Defendants are unable to confirm or deny this statement as it is unintelligible.**

246. Tapia's described confirmatory identification by himself, who had not been an eyewitness, of the image on the fraudulent license to the image provided of Nijeer parks is illegitimate identification also an incorrect investigative. *Id*., p. 10

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

247. The identification of Nijeer Parks by PO Lee was likewise improper and inadmissible because he was ordered by a superior officer, Lt. Ng, to come in from in from his day off to identify "the individual from the incident" which telegraphed the reaction that was expected of Lee. *Id*. p.12

69

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

248. Lee had not known the suspect, had had a fleeting interaction with him, and that had been ten days prior. *Id*.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

249. Therefore, "the correct investigative stop would have been to assemble a corporeal line-up where PO Lee would have been instructed on the viewing of a line up, made to fill out the necessary documents applicable for a line up procedure. Id. p. 13.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

250. Police officers are subject to the same standards as lay witnesses in identification procedures and these procedures should accord with the New Jersey Attorney General Office's Guide For Out of Court Identifications. *Id*.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

251. It is clear that Woodbridge was in a rush to judgement and shut down the investigation completely upon receipt of the Facial Recognition report from Inv. Lyons. *Id*. 11.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

252. This rush to judgement is also seen in the is highly unusual and not normal police procedures for three detectives to drive 45 minutes away to arrest a suspect. *Id*. p. 11.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

253. Detective Kondracki failed to follow up on any of the exculpatory statements of Nijeer Parks his detailed alibi on the day in question, the declaration that he did not have a driver's license, the declaration that he was recovering from ACL surgery and, therefore, could not have run." *Id*. 13 - 14.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

254. All of Nijeer Parks statements could easily have been tested by Woodbridge and would have exonerated him.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

255. "Nijeer Parks made no incriminating statements and Kondracki [the interrogator] made no attempt to investigate Nijeer's exculpatory information." Id. 14.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

256. There was a complete lack of supervision throughout the process.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

257. Det Tapia request to submit the Tennessee License to a Facial Recognition search should require supervisory approval. *Id*. p. 14.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

258. The other identifications, such as the claimed identification by Lyszyk as well as those of Tapia himself and Lee should have all received supervisory approval. *Id*. p. 14.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

259. Warrants of Probable Cause had no supervisory review which departs from standard practice. Id.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

260. Had the Warrants been submitted to supervisory review the false statement of Lyszyk that the Hertz manager had identified the perpetrator as Nijeer Parks would have been corrected and the use of Nijeer Parks name throughout both Warrants would have been excised. *Id*. p. 14.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

261. A Detective supervisor would have insisted that the surveillance video from the scene as well as from Dunkin Donuts be viewed. *Id*. p. 15.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

262. The lack of any supervisory review of the investigation allowed Woodbridge to be directed by bias and rush to judgment. *Id* p. 15.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

263. The one supervisory intrusion by Lt. Ng was, in fact, highly prejudicial and contaminated the already improper show up of Nijeer Parks to PO Lee: Ltt. Ng should have conformed the show up to the Show-up Identification Procedures Report Worksheet as per the New Jersey Division of Criminal Justice. *Id*. p. 16.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

264. "Latent prints collected at the crime scene were a match to a Barrington Walker who lives in upper Manhattan and in close proximity to the Dunkin Donuts related to the recovered receipt. This information was communicated to the Woodbridge Police Department on February 22, 2019, but this exculpatory evidence was not acknowledged until January 22, 2021, nearly two years later. This inexcusable delay demonstrates a failure to supervise by the detective squad supervisor.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

265. Although Police Director Hubner conceded that the show up involving PO Lee was "very suggestive," no discipline or counseling was provided to Lt. Ng or to PO Lee which constitutes a failure to supervise. Id. p. 16.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

266. All of the officers involved had little or no training in facial recognition technology or in identification procedures.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

267. PO Lee's knowledge of identification procedures is, [s]hockingly .... from TV shows." Id. p. 17.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

268. PO Lyszyk had no training in identification procedures. *Id*. p. 17.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

269. Det Tapia's facial recognition training was not from the Defendant public entity but from when he was on loan to the NJ State Police where he participated in investigation where it was used. Therefore, he, too, had no training from Woodbridge on Facial Recognition Technology. *Id*. p. 18.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

270. Tapia repeated assertions that police officers are not subjected to the normal procedures and safeguards for identification procedures is categorically false and demonstrates a failure to train and a failure to be supervised. Id. p. 17.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

271. Det Quesada also testified that he had no training in facial recognition or about how to fill out an Affidavit of Probable Cause. Id. p. 18.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

272. Det. Quesada did describe a "double blind photo array," but did not account for why neither it nor any other approved identification process was used, again showing a lack of training and supervision. *Id*.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

273. Because of the lack of training, superviSion, and discipline, Woodbridge was driven by defensive avoidance and cognitive bias which resulted in total investigative failure. *Id*. pp 19 - 22.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

274. . "The wrongful arrest and prosecution of Nijeer Parks was due to four main causes: availed investtive process, improper identification procedures, failed supervision, and a lack of training." Id. p. 23.

**Defendants do not deny that this statement is contained in Mr. Cilento's report.**

275. After Plaintiff exhibited signs of a panic attack at his deposition when questioned by Woodbridge's attorney, he was referred Gianni Pirelli, PhD, for a psychological examination. (Dr.Pirelli's CV attached to Plaintiff's papers as Exhibit R.

**Defendants do not deny that Plaintiff was examined by Dr. Pirelli. However, Defendants note that Dr. Pirelli's report, Plaintiff's Exhibit "R" does not make reference any to Plaintiff experiencing a panic attack during his deposition.**

276. Dr. Pirelli did a clinical/ forensic examination of plaintiff and also conducted a collateral interview of plaintiff's mother. Pirelli Report attached to Plaintiff's Opposition papers as Exhibit R ..

**Defendants do not deny this statement.**

277. Dr. Pirellii the Trauma Symptom Inventory-2, a widely used test of trauma related symptoms, and the Personality Assessment Inventory (PAI) another widely used instrument. Id., p. 10.

**Defendants are unable to confirm or deny this statement as it is unintelligible.**

278. Dr. Pirelli found that Plaintiff "meets DSM-TR criteria for Post Traumatic Stress Disorder. Id. p. 14.

**Defendants do not deny that this statement is contained in Dr. Pirelli's report.**

279. Dr Pirelli opined:

> Mr. Parks symptoms have not appreciably remitted or lessened. If anything, may remain and have worsened. They are serious and he continues to experience them at a clinical level, meeting formal diagnostic criteria for such. Id. p 14.

**Defendants do not deny that this statement is contained in Dr. Pirelli's report.**

280. Dr. Pirelli noted that Nijeer Parks had made a concerted and successful effort to stay out of trouble, develop a strong work ethic, and be a good example to his children. Id. p. 14.

**Defendants do not deny that this statement is contained in Dr. Pirelli's report.**

281. The events at the basis of this lawsuit profoundly disturbed Nijeer's new life and Dr. Pirelli notes:

> At first glance, it is hard to understand how someone with such a notable arrest and detainment history could be so negatively impacted by a relatively brief jail detainment. However upon analyzing this case over many hours and via numerous data source it is clear that Mr. Parks was greatly affected. *Id*. p. 15.

**Defendants do not deny that this statement is contained in Dr. Pirelli's report.**

282. Dr. Pirelli concludes:

> Regarding Mr. Park's prognosis, based on a reasonable degree of psychological probability, he remains at high risk of experiencing ongoing and severe mental health problems, including an exacerbation of existing (ad past) mental health-related symptoms an potentially developing new ones. *Id*. 15.

**Defendants do not deny that this statement is contained in Dr. Pirelli's report.**

283. As noted above in paragraph 146 et seq, , concerns about Facial Recognition Technology had been increasing voiced over the last 25 years.

**Defendants do not deny this statement.**

284. Rand Public Safety had been doing work on this issue from the earliest days. See, for example, Woodward,John , et al, Biometrics, a Look at Facial Recognition, 2003.

**Defendants do not deny this statement.**

285. In the US and abroad, a consensus was already in place that policies and procedures were needed by 2010. See, for example, a British approach in Facial Identification Guidance, 2009,NIPA.

**Defendants do not deny this statement.**

286. For more than ten years, the ACLU has taken a leading role in raising consciousness in the United Stats about the problems with Facial Recognition Technology. See, for example, Stanley, Jay, June 15, 2016, *FBI and Industry Failing to Provide Needed Protections For Face Recognition*.

**Defendants do not deny this statement.**

287. See, also, Crockford, Kade, October 2018, *Over 150,000 People Tell Amazon: Stop Seiling Facial Recognition Tech to Police*.

**Paragraph 287 is not a statement of a fact and as such, Defendants are unable to confirm or deny same.**

288. Problems with the accuracy of FRT and with its disproportionate negative effect on Blacks and other minorities has been well documented over the last 20 years. Garvie, Claire, Bedoya, Alvaro, *The Perpetual Line-Up: Unregulated Police Face Recognition in America*, Georgetown Law Center on Privacy & Technology, October 18, 2016.

**Defendants do not deny this statement.**

289. In addition to scholarly articles, these concerns were regularly voiced in the mainstream media as well. See, for example, *Op-Ed: Lawmakers need to curb face recognition searches by police, Los Angeles Times*, October , 24, 2016.

**Defendants do not deny this statement.**

290. Model Policies for Law Enforcement Use of FRT have been circulated for many years.

**Defendants do not deny this statement.**

291. The US Department of Justice has published numerous iterations of model policies for law enforcement agencies using Facial Recognition Technology such as the Face Recognition Policy Template from 2017.

**Defendants do not deny this statement.**

**Garry J. Clemente, Esq.**
**ATTORNEY ID. NO. 305992020**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Woodbridge Defendants**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NIJEER PARKS, | : |
| | : |
| Plaintiff, | :   CIVIL ACTION NO. |
| | :   2:21-cv-04021-JKS-LDW |
| -v- | : |
| | : |
| JOHN E. MCCORMACK, MAYOR OF | : |
| WOODBRIDGE, et al. | : |
| | : |
| Defendants. | : |

---

### WOODBRIDGE DEFENDANTS' REPLY BRIEF IN RESPONSE TO PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT

---

Garry J. Clemente, Esq. (#305992020)
On The Brief

<u>**TABLE OF CONTENTS**</u>

<u>**PRELIMINARY STATEMENT**</u>

<u>**RESPONSE TO PLAINTIFF'S SUPPLEMENTAL STATEMENT OF MATERIAL FACTS**</u>

<u>**ARGUMENT**</u>

I.  COUNT ONE MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO PROVE EACH ELEMENT OF A CAUSE OF ACTION FOR MALICIOUS PROSECUTION

    A. <u>Probable cause existed to arrest Plaintiff</u>

    B. <u>Any alleged misrepresentations or omissions in the Affidavits of Probable Cause supporting the Complaint-Warrants were not material to a determination of probable cause</u>

    C. <u>The Woodbridge Defendants did not act maliciously or for a purpose other than to bring Plaintiff to justice</u>

II.  COUNT ONE MUST BE DISMISSED WITH PREJUDICE AS AGAINST LT. JOSEPH LICCIARDI IS HE NOT A PROPER DEFENDANT TO THIS MATTER

III.  COUNT TWO ALLEGING A VIOLATION OF THE EQUAL PROTECTION CLAUSE MUST BE DISMISSED WITH PREJUDICE

IV.  COUNT THREE MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO ESTABLISH THAT HE WAS SUBJECTED TO EXCESSIVE FORCE

V.  COUNT FOUR ALLEGING MONELL LIABILITY ON BEHALF OF THE TOWNSHIP OF WOODBRIDGE MUST BE DISMISSED WITH PREJUDICE

VI.  COUNT SEVEN AND COUNT NINE ALLEGING CIVIL CONSPIRACY MUST BE DISMISSED WITH PREJUDICE

<u>**CONCLUSION**</u>

## TABLE OF AUTHORITIES

Berg v. County of Allegheny, 219 F.3d 261 (3d Cir. 2000).

Dreary v. Three Un Named Police Officers, 746 F.2d 185, 192 (1984).

Fears v. Beard, 532 F.App'x 78 (3d Cir. 2013).

Franks v. Delaware, 438 U.S. 154, 164 (1978).

Hankin Family P'Ship v. Upper Merion Twp., No. 01-1622, 2012 WL 43599 (E.D. Pa. 2012).

Holmes v. City of Wilmington, 79 F.Supp. 3d 497 (D.Del. 2015).

Hope v. Pelzer, 536 U.S. 730, 739 (2002).

Kelley v. Borough of Carlisle, 622 F.3d 248 (2010).

Lankford v. City of Clifton Police Department, 546 F.Supp. 3d 296 (D.N.J. 2021).

Monell v. Department of Social Services, 436 U.S. 658 (1978).

Orsatti v. N.J. State Police, 71 F.3d 480 (3d Cir. 1995).

Penwag Property Co. v. Landau, 76 N.J. 595, 288 A.2d 1265 (1978).

Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).

Snell v. City of New York, 564 F.3d 659 (3d Cir. 2009).

Stanton v. Sims, 531 U.S. 3, 5 (2013).

United States v. Halsey, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966).

Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000).

## PRELIMINARY STATEMENT

This office represents the interests of Woodbridge Township Mayor John E. McCormac, Woodbridge Police Department Director Robert Hubner, Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk and Woodbridge Police Sergeant Joseph Licciardi (collectively herein, "Woodbridge Defendants" or simply, "Defendants") with respect to the above-referenced matter. Defendants maintain that probable cause existed to support the Complaint-Warrants for Plaintiff's arrest.

Defendants respectfully submit that this matter is ripe for summary judgment as the record reveals that Plaintiff has failed to establish facts sufficient to maintain a cause of action for malicious prosecution, and that Count One of Plaintiff's Second Amended Complaint muse be dismissed with prejudice. Defendants maintain that Lt. Joseph Licciardi is not a proper defendant in this matter because he was not involved in the investigation of the incident at the Hampton Inn and played no role whatsoever in the determination that probable cause existed to arrest Plaintiff. As such, Count One against Lt. Licciardi should be dismissed with prejudice. Finally, Plaintiff's claims for violation of the Equal Protection Clause (Count Two), excessive force (Count Three), Monell liability (Count Four), and civil conspiracy (Count Seven and Count Nine) also fail and must be dismissed with prejudice.

On January 29, 2024, a proposed amicus brief was filed by the American Civil Liberties Union. (ECF No. 113-1). "Amici write to aid the Court in rendering a decision based on an accurate understanding of face recognition technology and how it was misused in this case. This is particularly important because this case will likely yield the first judicial opinion in the nation on a developed record addressing some of the questions raised here by FRT, and the Court's decision could affect the lives of countless individuals." (See ECF 113-1 at 3). The Woodbridge Defendants agree that this case raises a serious and complicated legal issue that no other court has addressed. Notwithstanding that this learned Court needs guidance to understand the fallibility of facial recognition technology, Plaintiff and the ACLU as amicus curiae contend that the Woodbridge Defendants should have known that facial recognition technology is unreliable. Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Hope v. Pelzer, 536 U.S. 730, 739 (2002). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Stanton v. Sims, 531 U.S. 3, 5 (2013). The Woodbridge Defendants respectfully submit that qualified immunity applies given the ambiguity surrounding the law

4

with regard to the use of facial recognition technology by law enforcement.

## WOODBRIDGE DEFENDANTS' RESPONSE TO PLAINTIFF'S SUPPLEMENTAL STATEMENT OF MATERIAL FACTS

See Defendants' Responses to Plaintiff's Supplemental Statement of Material Facts.

## ARGUMENT

### I. COUNT ONE MUST BE DISMISSED WITH PREJUDICE AS PLAINTIFF HAS FAILED TO PROVE EACH ELEMENT OF A CAUSE OF ACTION FOR MALICIOUS PROSECUTION

Defendants maintain that Plaintiff has failed to establish each element required to prevail on his claim for malicious prosecution. See Penwag Property Co. v. Landau, 76 N.J. 595, 597, 288 A.2d 1265 (1978) (reciting the elements of malicious prosecution). Plaintiff has failed to establish at least two of these elements. First, Plaintiff has failed to establish that Defendants initiated a criminal proceeding without probable cause. Second, Plaintiff has failed to establish that Defendants acted maliciously or for a purpose other than bringing Plaintiff to justice.

### A. Probable cause existed to arrest Plaintiff

As to the probable cause element of Plaintiff's malicious prosecution claim, Defendants have maintained that probable cause existed to arrest Plaintiff. "Probable cause to arrest exists when the facts and circumstances within the arresting officer's

5

knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000) quoting Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995). Simply put, probable cause exists if there is a "fair probability" that the person committed the crime at issue. Wilson, 212 F.3d at 789. See Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).

In opposition to this Motion, Plaintiff argues that the sufficiency of probable cause is a factual issue exclusively reserved to the jury. However, in Dreary, a case cited by Plaintiff for that proposition, the Court expressly stated: "We do not hold that every civil case involving an issue of probable cause must be tried to a jury and cannot be resolved on summary judgment where there are no genuine issues as to any material fact." Dreary v. Three Un Named Police Officers, 746 F.2d 185, 192 (1984). Defendants submit that this Court is best suited to evaluate the sufficiency of probable cause.

Plaintiff notes that an affidavit of probable cause can be challenged if it can be proved, by a preponderance of the evidence, "that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for the warrant." See Collins v. Christie, 337 F.App'x 188, 192 (3d Cir. 2009). However, as the

6

_Franks_ court noted: "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a truthful showing". This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true. See _Franks v. Delaware_, 438 U.S. 154, 164 (1978) citing _United States v. Halsey_, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966). The _Franks_ court, while not providing guidance as to what constitutes reckless disregard for the truth in Fourth Amendment cases, explained that a Plaintiff challenging the sufficiency of probable cause on the grounds that the affiant made statements with a reckless disregard for the truth must show more than "negligence or innocent mistakes." _Wilson_, 212 F.3d at 787 (quoting _Franks v. Delaware_, 438 U.S. 154, 171 (1978).

Plaintiff has continuously and erroneously contended that the facial recognition results were the sole basis of probable cause to arrest Plaintiff. The record is clear that Ofc. Andrew Lyszyk identified Plaintiff as the suspect from the Hampton Inn. As is indicated by Det. Tapia, Ofc. Lyszyk was 100% certain that

Plaintiff was the suspect when he identified him two days after the incident at the Hamton Inn. See Det. Tapia's Deposition, **Defendants' Exhibit "F"** Page 90, Line 14-17. Plaintiff essentially concedes that a positive identification by an eyewitness at the Hampton Inn "would have some validity" and would be considered "appropriate evidence" upon which a probable cause determination may be based. See Plaintiff's Opposition Brief at 11. A positive identification by a victim witness, without more, is usually sufficient to establish probable cause." Wilson v. Russo, 212 F.3d 781, 790 (3d Cir. 2000). The Wilson court noted a caveat to this general statement, such as when the police have DNA evidence which conclusively determines that the accused could not have committed the crime. Id. That caveat is not applicable in this matter because although DNA evidence was collected and analyzed, the results were not made available to the Woodbridge Police Department until July 2021. As such, there was no exonerating DNA evidence until well after the Complaint-Warrants were signed.

If Ofc. Lyszyk was unable to identify Plaintiff as the suspect, the facial recognition results alone would have been insufficient to establish probable cause. The facial recognition results alone amount only to an investigative lead. Further investigation was required and took place in the form of the identification made by Ofc. Lyszyk. Investigator Seamus Lyons of the Rockland County Intelligence Center, who was responsible for

running the facial recognition analysis in this matter, and who is not affiliated with the Woodbridge Police Department whatsoever, testified as follows:

> "Q: If the officer who dealt with the suspect who was identified through facial recognition software, he came in, he compared the photos and said that's the individual that I dealt with, would you agree with me that that's a proper investigative step to follow up on that lead? A: Yes, it is."

See Inv. Lyons' Deposition, **Defendants' Exhibit "I"** Page 85, Line 15-22.

The results of the facial recognition analysis and Ofc. Lyszyk's confirmatory identification were communicated to Assistant Middlesex County Prosecutor Peter Nastasi, who gave his approval that these facts supported probable cause to arrest Plaintiff. Complaint-Warrants with Affidavits of Probable Cause were drafted and submitted to Municipal Judge David Stahl for approval. Judge Stahl approved and signed the Complaint-Warrants for Plaintiff's arrest. "A police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause." Kelley v. Borough of Carlisle, 622 F.3d 248, 256-258 (3d Cir. 2010).

As the Third Circuit explained, "one of the reasons for requiring a neutral magistrate to evaluate probable cause is that an uninterested party is presumably better suited to review and evaluate facts than an officer pursuing a lead." Wilson v. Russo,

212 F.3d 781, 787 (3d Cir. 2000). Ofc. Lyszyk also conceded that his affidavit of probable cause in support of the Complaint-Warrant to arrest Plaintiff was inartfully worded. Notwithstanding same, a genuinely mistaken identification and a poorly worded affidavit of probable cause is not equivalent to a statement made knowingly, purposefully, or with reckless disregard for the truth. Both the prosecutor and the judge who reviewed the Complaint-Warrants found sufficient probable cause for the charges against Plaintiff.

B. **Any alleged misrepresentations or omissions in the Affidavits of Probable Cause supporting the Complaint-Warrants were not material to a determination of probable cause**

Plaintiff outlines the portions of the affidavits of probable cause that Plaintiff claims are misleading and each such portion is addressed in turn by the Woodbridge Defendants. Both affidavits make reference to the "high profile comparison to the picture on the fraudulent TN DL." Inv. Lyons testified regarding the number 594/1000 accompanying the facial recognition analysis results and stated that "It's a probable. It's not a very high number, but it's worth a second look. I've had cases with lower numbers than that." Inv. Lyons' Deposition, **Defendants' Exhibit "I"** Page 53, Line 19-23. However, when the results of the facial recognition analysis were communicated to Det. Tapia by Inv. Lyons, he told Det. Tapia that he received "a high number hit." See **Defendants' Exhibit "Z".**

10

As it pertains to the disclaimer language contained on the NJ Regional Operations and Intelligence Center, it is noted that Det. Tapia submitted an additional request for facial recognition analysis to the New York State Intelligence Center ("NYSIC"). It was the NYSIC form that was ultimately received and acted upon by Inv. Lyons. See Inv. Lyons' Deposition, **Defendants' Exhibit "I"** Page 57, Line 15-23, Page 59, Line 6-15. The NYSIC form does not contain any disclaimer language. See the New York Intelligence Center Request for Information Form, **Defendants' Exhibit "GG".**

Insofar that Plaintiff contends that the affidavits failed to mention that the picture on the fake Tennessee driver's license was of "low quality", Plaintiff does not offer any support for this contention. In any event, Defendants submit that the affidavit's failing to disclose the quality of the image submitted for facial recognition analysis was not material to the finding of probable cause.

Plaintiff states that the affidavits did not mention that Inv. Lyons "altered the photo on the license a little to get the pixels clear." Inv. Lyons, who is trained in the use of facial recognition software, testified about altering the photo: "It is basically like any photo. Once you take the photo image, if you expand it, the blurrier it gets. The more you crop it, the pixels become more visual, and it's submitted through the software, and gets a better read." Inv. Lyons' Deposition, **Defendants' Exhibit**

11

"**I**" Page 77, Line 5-9. Plaintiff offers no support for his contention that this altering of the photo reduced the reliability of the facial recognition results.

Plaintiff claims that the affidavits failed to disclose evidence that was collected the scene but was awaiting analysis. Despite Plaintiff's assertions to the contrary, Det. Tapia obtained a copy of the surveillance footage from the Hampton Inn and reviewed it. However, upon Det. Tapia's review of the video, it was discovered that the angle of the camera did not cover the glass door that the suspect exited from when he fled the Hampton Inn. It could not be determined where, or if, the suspect touched the door. As such, the fingerprints collected were not of any evidentiary value because there was no way to corroborate where the suspect touched the door. Nor could it be determined that the fingerprints collected belonged to the suspect. See Det. Tapia's Deposition, **Defendants' Exhibit "F"** Page 120, Line 23-25, Page 121, Line 1-11.

Plaintiff asserts that the Dunkin' Donuts receipt collected from the suspect's rental vehicle is conclusive proof that the suspect had New York connections and contends that Defendants failed to pursue this evidence. See **Plaintiff's Exhibit "M"**. Notwithstanding Plaintiff's assertion that Defendants ignored this evidence, Det. Tapia testified that he contacted the Dunkin' Donuts location referenced on the receipt and attempted to obtain a copy

12

of the surveillance video from the morning of January 26, 2019.
**Defendants' Exhibit "F"** Page 61, Line 15-16.

Plaintiff points to various pieces of "exonerating" evidence that was not mentioned in the affidavits of probable cause: a height disparity between Plaintiff and the suspect, the fact that the suspect ran from the scene and that Plaintiff underwent ACL surgery seven months prior, and the fact that the suspect wore a size 12 shoe. Taking this evidence in turn, the height disparity that Plaintiff references is between three to seven inches. Plaintiff's criminal history report and DMV report list Plaintiff as being 5'7" and 5'8". In Ofc. Lee's police report, he estimated that the suspect was 5'11". The fraudulent Tennessee driver's license left behind by the suspect listed his height at 6'2". Upon information and belief, the actual height of the suspect, Barrington Walker, is 6'1". Defendants respectfully submit that this purported height disparity does not amount to probative exonerating evidence.

The fact that the suspect ran is also of no import. Plaintiff indicated that he underwent knee surgery in August 2018, seven months before the incident at the Hampton Inn. Medical literature addressing ACL surgeries state that the average recovery time is between six to nine months.[1] While Plaintiff might not have been

---

[1] https://my.clevelandclinic.org/health/diseases/16576-acl-tear
https://www.medicalnewstoday.com/articles/torn-acl-recovery-time

100% recovered, it is not an impossibility that Plaintiff would have been able to run over a short distance, especially in a situation where fight or flight instincts take over when a person is being pursued. A solid alibi would eliminate the possibility that Plaintiff was the suspect from the Hampton Inn. The ACL surgery alibi does not eliminate that possibility.

As for the size 12 sneaker, Defendants would have had no knowledge regarding Plaintiff's shoe size prior to his arrest. The shoe collected from the scene had been packaged in evidence in preparation to be submitted to the New Jersey State Police ("NJSP") for DNA analysis. There was no means of comparing the shoe to Plaintiff's foot, as was suggested by Plaintiff's counsel, that would not have risked contaminating any DNA that might be found on the sneaker. With regards to the fingerprints collected at the scene, those prints were submitted to the NJSP for analysis on February 8, 2019 and the results were returned on February 22, 2019. Although the fingerprints were identified as belonging to Barrington Walker, the results were not probative in confirming or eliminating any suspects because it could not be determined where, or if, the suspect touched the door when fleeing from the Hampton Inn lobby. Finally, any evidence collected at the scene which might contain DNA evidence was collected and submitted to the NJSP for

https://www.healthline.com/health/how-long-does-an-acl-tear-take-to-heal#what-to-expect

14

DNA analysis. The NJSP DNA analysis process takes a long time given the numerous and competing demands for evidence to be analyzed. The NJSP eventually provided the results of a DNA match on July 31, 2021, which confirmed that the DNA belonged to Barrington Walker. By this point, the criminal charges against Plaintiff had already been dismissed.

The Third Circuit case <u>Wilson v. Russo</u>, 212 F.3d 781 (3d Cir. 2000), is factually analogous to this matter with the exception that facial recognition technology was not used. The plaintiff, Wilson, was arrested and incarcerated for a month after being charged with an armed robbery of a florist that he did not commit. Wilson argued that the arresting officer, Russo, lied and omitted material facts during his application for Wilson's arrest warrant. <u>Id</u>. Wilson pointed to three exculpatory facts that were omitted from Russo's affidavit of probable cause: the discrepancy between his height and the suspect's height; that although one witness identified Wilson as the suspect, another witness failed to identify Wilson; and that another witness stated that she observed Wilson in the vicinity of the florist shop at a time that the suspect would have already been in the florist shop. <u>Id</u>.

Eyewitnesses described the robbery suspect as tall with height estimates ranging from 6' to 6'4". <u>Id</u>. at 784. Wilson's criminal history report and DMV record listed his height as 5'10" and 5'11" respectively. When Russo applied for Wilson's arrest

15

warrant, he told the Judge that witnesses described the suspect as 6'3" to 6'5" and did not mention the official documents mentioned above which list Wilson as between 5'10" and 5'11". The owner of the florist shop quickly identified Wilson as the suspect upon viewing a photo array and this was communicated by Russo to the Judge. Russo did not tell the Judge that another witness viewing the same photo array was unable to make a positive identification of Wilson. The witness who reported seeing Wilson in the vicinity of the florist shop stated that she observed Wilson walking on the street at approximately 3:30 p.m. However, by this time the robbery suspect would have already been in the florist shop. Russo told the Judge that the witness saw Wilson at 3:00 p.m.

The District Court granted summary judgment and dismissed Wilson's claims against the arresting officer. The court held that although Russo acted in reckless disregard for the truth in his omissions and assertions to the Judge, none of those misstatements or omissions were material, in that the warrant would have established probable cause even if Russo had not made them. The Third Circuit affirmed the District Court's dismissal of Wilson's claims. Id. The court reached this conclusion by rewriting the affidavit of probable cause. The offending inaccuracies were removed and the facts omitted were inserted in to the affidavit. If the rewritten affidavit is sufficient to establish probable cause, then the misstatements and omissions in the affidavit were

16

not material to the finding of probable cause. <u>Wilson</u>, 212 F.3d at 789.

The <u>Wilson</u> court found the positive identification by the victim to be the strongest inculpatory evidence, noting that the victim had considerable opportunity to view the robber at the scene, and the victim exhibited a high degree of certainty. Further, there was only three days between the crime and the identification, so that the lapse of time could not call into question the victim's recollection. Similarly, Ofc. Lyszyk had ample time to observe the suspect at the scene of the Hampton Inn, he identified Parks two days after the incident, and he was 100% certain that Parks was the suspect. With regard to the height discrepancy in Wilson, the court stated that from the vantage point of the arresting officer, any suggested indication of unreliability caused by this discrepancy was insufficient to outweigh the forceful positive identification. <u>Id</u>. at 791.

Defendants argue that if the affidavits of probable were rewritten to correct the purported inaccuracies listed by Plaintiff, the facts in the affidavits would still support probable cause.

## C. **The Woodbridge Defendants did not act maliciously or for a purpose other than to bring Plaintiff to justice**

Plaintiff makes the argument that Defendants were in a rush to judgment and looking to make an arrest because the suspect was

17

charged with aggravated assault on a police officer. Plaintiff's theory is that the Woodbridge Defendants were blinded by a desire to arrest the suspect because the suspect almost stuck a fellow officer with a vehicle during his flight from the Hampton Inn. What is lost in that argument is an explanation or reason as to why Defendants would knowingly, purposefully, or with reckless disregard for the truth, arrest an innocent person. What benefit is there to be gained? How would this sate the desire to see the suspect brought to justice? Defendants maintain that there is no evidence in the record from which a jury may infer that Defendants acted maliciously. There is nothing in the record to suggest that any evidence was intentionally or purposefully withheld, nor is there any evidence suggesting fraud, perjury, or bad faith conduct.

## II. COUNT ONE MUST BE DISMISSED WITH PREJUDICE AS AGAINST LT. JOSEPH LICCIARDI IS HE NOT A PROPER DEFENDANT TO THIS MATTER

Defendants' Brief in support of the Motion for Summary Judgment outlines the factual basis for dismissal with prejudice of the malicious prosecution claim against Lt. Licciardi. Lt. Licciardi served as a supervisor in the Patrol Division and oversaw Ofc. Lyszyk and Ofc. Lee, among several other officers. Lt. Licciardi was never present at the scene of the Hampton Inn. Lt. Licciardi did not collect any evidence nor did he direct any other officer to collect evidence. Once the scene was processed and all available evidence was collected, the investigation was turned

over to the Detective Bureau. This is an entirely separate unit from the Patrol Division, with its own supervisory hierarchy.

Subsequent to the Detective Bureau taking the lead on the investigation, fingerprint and DNA evidence was submitted for analysis, the facial recognition analysis took place, Plaintiff was identified as the suspect by Ofc. Lyszyk, Assistant Middlesex County Prosecutor Peter Nastasi was contacted to advise as to the sufficiency of probable cause, and the Complaint-Warrants were drafted and signed by Judge Stahl. Lt. Licciardi had no supervisory oversight as to the investigative steps taken by the Detective Bureau. Lt. Licciardi did not identify Plaintiff as the suspect, was not involved in the determination of probable cause, and did not draft an Affidavit of Probable Cause or a Complaint-Warrant.

The only fact that Plaintiff's opposition points to is that Lt. Licciardi supervised Ofc. Lyszyk and Ofc. Lee and approved the police reports authored by them. Lt. Licciardi was never deposed by Plaintiff, nor was any testimony elicited from other witnesses or parties regarding Lt. Licciardi's purported role in this matter. Indeed, if Lt. Licciardi had been more involved in this case, it stands to reason that would have been addressed during one of the six (6) depositions taken of WPD officers. Plaintiff has not, and cannot, offer any basis to hold Lt. Licciardi liable under the theory of malicious prosecution.

**III. COUNT TWO ALLEGING A VIOLATION OF THE EQUAL PROTECTION CLAUSE MUST BE DISMISSED WITH PREJUDICE**

Plaintiff refers to purported deficiencies in the application of facial recognition technology that reduces the reliability facial recognition results where the subject is African-American or has a darker complexion. However, whatever Plaintiff's qualms with respect to the state of facial recognition technology, the fact remains that the Woodbridge Defendants did not create the facial recognition technology that was used in this case. Nor did Defendants themselves engage with any facial recognition software to perform an analysis of the fraudulent Tennessee driver's license.

Plaintiff's initial Complaint, filed in the New Jersey Superior Court, did not name a manufacturer or provider of facial recognition software. On January 15, 2021, Plaintiff amended his Complaint to add "Idemia, Inc., being the maker of the facial recognition software" as a defendant. Idemia, Inc. remained as a defendant in Plaintiff's Second Amended Complaint, and indeed, Idemia, Inc. remains an active party in this matter. Plaintiff asserts a claim against Idemia, Inc. for negligent manufacture or sale of facial recognition software. Plaintiff specifically alleges that "Idemia knew or should have known that its facial recognition product is flawed yet it failed to advise its customers

20

and users of this fact." See Plaintiff's Second Amended Complaint, ECF No. 72.

Yet, for reasons never explained by Plaintiff, there has been no effort to prosecute Plaintiff's claims against Idemia, Inc. (or any other manufacturer/provider of facial recognition software for that matter). Instead, Plaintiff is content to lay the misgivings about facial recognition technology at the feet of the Woodbridge Defendants. In doing so, Plaintiff seeks to ascribe these deficiencies with facial recognition technology and the companies that provide it to the Woodbridge Defendants. Nothing that the Woodbridge Defendants did caused Plaintiff to be treated disparately based upon of his race.

Plaintiff argues that "facial recognition has been shown to be biased against African Americans and is not considered reliable enough to be used as evidence." See Plaintiff's Opposition Brief at 19. The State of New Jersey and the Office of the Attorney General have not provided guidance to local law enforcement agencies about the use of facial recognition technology in criminal investigations. The only guidance was provided by then-New Jersey Attorney General Grubir Grewal in a January 2020 Directive which forbade the use of one facial recognition application, Clearview AI.

Plaintiff's opposition references five other lawsuits across the country wherein African-American individuals were arrested due

in part to a facial recognition hit. Defendants note that three of these cases deal with the use of facial recognition by the Detroit City Police Department, one of them claimed that the since-banned-in-New Jersey Clearview AI software was used, and in another the person arrested had been identified by an eyewitness.

Plaintiff's equal protection claim might have some merit if there was any indication that the Woodbridge Defendants utilized facial recognition technology disproportionately to identify African-American individuals. However, that is not the case and Plaintiff has not provided any evidence to suggest that he was treated differently than others similarly situation. As such, Plaintiff's equal protection claim should be dismissed with prejudice.

## IV.   COUNT THREE ALLEGING EXCESSIVE FORCE MUST BE DISMISSED WITH PREJUDICE

Viewing all of the facts in the light most favorable to Plaintiff, it is clear that Plaintiff has failed to establish that he was subjected to excessive force. Defendants maintain that the manner in which Plaintiff was taken into custody and the treatment of Plaintiff while he was in custody was reasonable. As was noted in Defendants' Brief in support of this Motion, an excessive force claim must be based on an actual allegation of unreasonable force. See Lankford v. City of Clifton Police Department, 546 F.Supp. 3d 196, 317 (D.N.J. 2021) (citing Holmes v. City of Wilmington, 79

22

F.Supp. 3d 497, 506 (D.Del. 2015)). A plaintiff should not be permitted to "bootstrap excessive force claims and probable cause challenges" where there is no actual use of force employed against the plaintiff. See Lankford, 546 F.Supp. 3d at 317 (citing Snell v. City of New York, 564 F.3d 659, 672 (3d Cir. 2009)). Defendants need only refer to Plaintiff's deposition testimony to demonstrate that Plaintiff was never subjected to excessive force in this case. Plaintiff testified multiple times that he was never touched by an officer or while he was in custody at WPD headquarters, with the exception of when he was placed into handcuffs. See Plaintiff's deposition testimony cited in Defendants' Brief in Support of Summary Judgment, at 47.

In Fears v. Beard, the plaintiff was incarcerated in a correctional facility. Fears v. Beard, 532 F.App'x 78 (3d Cir. 2013). Plaintiff Fears asserted a claim for excessive force after a guard handcuffed plaintiff before he was to be moved from his cell to the recreation yard. Id. All similarly situated inmates were handcuffed when being escorted to and from the recreation yard. Id. The District Court, affirmed by the Third Circuit, granted summary judgment and dismissed Fears' excessive force claim, noting that the record did not reflect that Fears was handcuffed for any reason other than institutional safety and security. Id. at 82. The District Court determined that "Fears' allegations, taken as true, only established a de minimis use of

force, which was insufficient to state a claim of excessive force under the Eighth Amendment." Id.

Fears is analogous to the present matter in that, at best, Plaintiff's allegations describe a de minimis use of force that does not rise to the level of excessive force. Defendants respectfully submit that Count Three of Plaintiff's Second Amended Complaint alleging excessive force should be dismissed with prejudice.

**V.    COUNT FOUR ALLEGING MONELL LIABILITY ON BEHALF OF THE TOWNSHIP OF WOODBRIDGE MUST BE DISMISSED WITH PREJUDICE**

Plaintiff correctly notes that a single constitutional violation is disfavored as a basis for Monell Liability. See Berg v. County of Allegheny, 219 F.3d 261 (3d Cir. 2000). This is especially true given the recent emergence of facial recognition technology as an investigative tool for law enforcement, the uncertainty surrounding the permissibility of its use, and the contemporary lack of guidance regarding such use. Plaintiff is critical that the Woodbridge Police Department does not have a policy concerning the use of facial recognition technology. Defendants reiterate that the only guidance from the New Jersey Attorney General was provided in January 2020, nearly a year after Plaintiff's arrest. All of the policies and procedures governing the Woodbridge Police Department are drafted to be consistent with the Attorney General Guidelines for Law Enforcement.

24

Plaintiff alleges a failure of the Woodbridge Police Department to train and supervise its officers and that this failure is evidences deliberate indifference. Plaintiff ignores the fact that the Woodbridge Police Department is accredited by the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). CALEA accreditation requires compliance with the highest standards applicable to law enforcement agencies. To ensure these standards are met, CALEA continuously reviews policies and procedures of the Woodbridge Police Department.

## VI. COUNT SEVEN AND COUNT NINE ALLEGING CIVIL CONSPIRACY MUST BE DISMISSED WITH PREJUDICE

Defendants' Brief in support of Summary Judgment outlines the elements of a civil conspiracy claim under 42 U.S.C. 1985(3). A plaintiff is required to establish three elements: the period of the conspiracy, the object of the conspiracy, and certain overt acts taken by the conspirators in furtherance of that purpose. See Lankford, 546 F. Supp. 3d at 317 (citing Hankin Fmily P'Ship v. Upper Marion Twp., No. 01-1622, 2012 WL 43599 (E.D. Pa. 2012). Plaintiff's one paragraph opposition seeking to preserve this claim simply repeats the elements of a civil conspiracy and perfunctorily alleges that the Woodbridge Defendants "acted singly and in concert to violate Plaintiff's constitutional rights." See Plaintiff's Opposition Brief at 24. Defendants submit that Plaintiff is unable to establish the elements of a civil conspiracy

and there is no genuine issue of material fact that would preclude this Court from dismissing Counts Seven and Nine of Plaintiff's Second Amended Complaint with prejudice.

## CONCLUSION

Based upon the foregoing authorities and reasons outlined herein, as well as in Defendants' Brief in Support of its Motion for Summary Judgment, Defendants respectfully submit that Plaintiff's Second Amended Complaint should be dismissed in its entirety.

Respectfully submitted,

*/s/ Garry J. Clemente, Esq.*

Garry J. Clemente, Esq.
Law Office of James P. Nolan &
Associates, Attorneys for
Woodbridge Defendants

## CERTIFICATION OF SERVICE

I, Garry J. Clemente, hereby certify that on the date set forth below, I caused a true and correct copy of the foregoing Notice of Motion for Summary Judgment and all accompanying documents to be served upon the following counsel of record via operation of the Court's CM/ECF system:

Daniel W. Sexton, Esq.
Daniel W. Sexton, Esquire, LLC
229 New Centre Road
Hillsborough, New Jersey 07304
Attorney for Plaintiff

Dated: January 29, 2024          */s/ Garry J. Clemente, Esq.*
                                  Garry J. Clemente, Esq.

26

**Garry J. Clemente, Esq.**
**ATTORNEY ID. NO. 305992020**
**JAMES P. NOLAN AND ASSOCIATES, L.L.C.**
**61 GREEN STREET, WOODBRIDGE, NEW JERSEY 07095**
**TELEPHONE: (732) 636-3344 FAX: (732) 636-1175**
**Attorneys for Defendants, Mayor of Woodbridge Township, John E. McCormac, Woodbridge Police Department Director Robert Hubner, Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk, Woodbridge Police Sergeant Joseph Licciardi**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| NIJEER PARKS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 2:21-cv-04021-JXN-LDW |
| -v- | : | |
| | : | **CERTIFICATION OF COUNSEL** |
| JOHN E. MCCORMACK, MAYOR OF | : | **SUPPLEMENTAL EXHIBITS** |
| WOODBRIDGE, et al. | : | |
| | : | |
| Defendants. | : | |

I, Garry J. Clemente, hereby certify as follows:

1.   I am the Attorney of Record employed at the Law Firm of James P. Nolan and Associates, L.L.C., Attorneys for Defendants, Mayor of Woodbridge Township, John E. McCormac (improperly pled as John E. McCormack), Woodbridge Police Department Director Robert Hubner, Township of Woodbridge, Woodbridge Police Officer Andrew Lyszyk, and Woodbridge Police Sergeant Joseph Licciardi in the within matter.

2.   **Exhibit "DD"** is a true and accurate copy of the Woodbridge Police Department Master Person Report for Barrington Walker;

3.   **Exhibit "EE"** is a true and accurate copy of Ofc. Andrew Lyszyk's police report #19010123/1;

1

4.    **Exhibit "FF"** is a true and accurate copy of Ofc. Francis Lee's police report #19010123/2;

5.    **Exhibit "GG"** is a true and accurate copy of the New York State Intelligence Center Request for Information Form.

6.    I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

JAMES P. NOLAN & ASSOCIATES, L.L.C.
Attorneys for Woodbridge Defendants

Dated: January 29, 2024        /s/ Garry J. Clemente, Esq.

# EXHIBIT "DD"



## WOODBRIDGE POLICE DEPARTMENT
*WOODBRIDGE, NJ*
# Master Person #: 302750

| Basic Person Information | | |
|---|---|---|
| Name: | **BARRINGTON ANTHONY WALKER** | |
| Address: | **15 UNIVERSITY AVE. 6B** | |
| City: | **BRONX** | |
| State/Zip: | **NY 10453** | Unable to connect to database serve |
| Gender: | **MALE** | |
| Height: | **601** | Weight: **215** |
| DOB: | **02/28/1993** | Age: **30** |
| SSN #: | | Unable to connect to database serve |

| Physical Characteristics | | | |
|---|---|---|---|
| **Hair Color** | **Eye Color** | **Build** | **Complexion** |
| BLACK | BROWN | THIN | DARK |
| **Scars Marks and Tattoos** | | | |
| | | | |

| Personal Data | | | |
|---|---|---|---|
| **Race** | **Ethnicity** | | **Residency** |
| BLACK | UNKNOWN | | NONRESIDENT |
| **Home Phone** | **Work Phone** | | **Cell Phone** |
| | | | |
| **Email Address** | | | |
| - | | | |
| **Marital Status** | | | **Maiden Name** |
| UNKNOWN | | | |
| **Mother** | **Mothers Maiden Name** | | **Father** |
| | | | |
| **Birth City** | **Birth State** | **Birth Country** | **Citizen** |
| | | | Y |

| License # | State | Country | Class | Expiration Date |
|-----------|-------|---------|-------|-----------------|
| | | | | |

# Employer

| Employer | | |
|----------|--|--|
| **Occupation** | **Employer** | **Employer Phone** |
| **Employer Address** | | |

# Finger Prints

| Finger Prints | | |
|---------------|--|--|
| **Prints Taken?** | **Print #** | **Date/Time Taken** |
| **SID #** | **FBI #**<br>382204AE1 | **State Prob Num** |

# Entry Information

| Entry Information | |
|-------------------|--|
| **Entered By: ID / Name**<br>520 VELLA B | **DT Entered**<br>10/04/2022 |
| **Updated By: ID / Name**<br>4032 DAZZO D | **DT Updated**<br>06/19/2023 |

# Names

| Name(s) | | | | |
|---------|--|--|--|--|
| **Name Type** | **Last Name** | **First Name** | **Middle Name** | **Suffix** |
| TRUE | WALKER | BARRINGTON | ANTHONY | |

# Addresses

| Address(es) | | | | | |
|-------------|--|--|--|--|--|
| **Num** | **Street Name** | **Apt** | **City** | **State** | **Date Entered** |
| 15 | UNIVERSITY AVE. | 6B | BRONX | NY | 10/04/2022 00:00:00 |

# Links

| Activities | | |
|------------|--|--|
| **Application** | **Record Date** | **Record Information** |

| *Link Information* | | |
|---|---|---|
| COURT DOCUMENT | 06/21/2023 | Person Type: DEFENDANT Court: MIDDLESEX COUNTY Document #: 23000128 |
| Document Type: SUBPOENA SCHEDULER | | |
| OFFENDER | 01/26/2019 | WOO-PD INCIDENT #: 19010123-0 OFFENDER #: 2 |
| SUSPECT | | |

# EXHIBIT "EE"



**WOODBRIDGE POLICE DEPARTMENT**
**WOODBRIDGE, NJ**

| INCIDENT # / REPORT # | OFFICER | BADGE | REVIEW STATUS |
|---|---|---|---|
| 19010123 / 1 | LYSZYK A | 519 | APPROVED |

## INCIDENT #19010123 DATA

As Of 02/13/2019 11:48:50

### BASIC INFORMATION

| CASE TITLE | LOCATION | APT/UNIT # |
|---|---|---|
| AGG ASS/ WOODBRIDGE TWP | 370 US HWY 9 N | |

**DATE/TIME REPORTED**
01/26/2019 12:21:50

**DATE/TIME OCCURRED**
On or about 01/26/2019 12:21

**INCIDENT TYPE(S)/OFFENSE(S)**
(2C:20-11)SHOPLIFTING
(2C:12-1B(2))AGGRAVATED ASSAULT W/WEAPON
(2C:29-3)HINDERING APPREHENSION OR PROSECUTION
(2C:21-2.1(C))EXHIBITIS A FALSE GOVERNMENT DOCUMENT
(2C:35-10(A)(4))POSSESSION OF CDS (MARIJUANA) UNDER 50G
(2C:36-2)USE OR POSSESSION DRUG PARAPHERNALIA
(39:4-129)LEAVING SCENE OF ACCIDENT
(39:4-96)TRAFFIC REGULATION
(39:3-76.2)SAFETY BELTS OR RESTRAINING DEVICES
(2C:29-2A(2))RESISTING ARREST/BY FLIGHT
(39:4-130)TRAFFIC REGULATION
(2C:29-1)OBSTRUCTING ADMINISTRATION OF LAW OR OTHER GOVERNM
(2C:29-2(B))ELUDING
(2C:17-3)CRIMINAL MISCHIEF
(2C:39-4(D))POSS WEAPON UNLAWFUL PURPOSE OTHER WEAPONS

### PERSONS

| ROLE | NAME | SEX | RACE | AGE | DOB | PHONE |
|---|---|---|---|---|---|---|
| VICTIM | WOODBRIDGE TWP, | | | | | (HOME) 732-634-77( |
| | **ADDRESS:** 1 MAIN ST   WOODBRIDGE, NJ | | | | | (CELL) |
| VICTIM | HAMPTON INN, | | | | | (WORK) 732855690( |
| | **ADDRESS:** 370 US HIGHWAY 9 NORTH   HOPELAWN, NJ | | | | | (CELL) |
| REPORTING PERSON | CHARNECO, RICHARD A | MALE | WHITE | 31 | 04/22/1987 | (HOME) |
| | **ADDRESS:** 370 RT. 9 NORTH   WOODBRIDGE, NJ | | | | | (CELL) 845-596-282! |

| | | | | | | |
|---|---|---|---|---|---|---|
| WITNESS | HIGGINS, CALEIGH | FEMALE | WHITE | 21 | 05/05/1997 | (HOME) |
| | **ADDRESS:** 370 RT. 9 NORTH   WOODBRIDGE, NJ | | | | | (CELL) 551-655-3428 |
| WITNESS | GRANT, KAMISHA | FEMALE | BLACK | 36 | 12/27/1982 | (HOME) |
| | **ADDRESS:** 370 RT. 9 NORTH   WOODBRIDGE, NJ | | | | | (CELL) 973-681-8928 |
| OWNER/OPERATOR | HERTZ, | | | | | (HOME) |
| | **ADDRESS:** 900 DOREMUS AVE   PT NEWARK, NJ | | | | | (CELL) |
| VICTIM | LEE, FRANCIS POLICE | MALE | ASIAN/PACIFIC ISLANDER | 36 | 10/17/1982 | (WORK) 7326347700 |
| | **ADDRESS:** 1 MAIN STREET   WOODBRIDGE, NJ | | | | | (CELL) |

## OFFENDERS

| STATUS | NAME | SEX | RACE | AGE | DOB | PHONE |
|---|---|---|---|---|---|---|
| DEFENDANT | PARKS, NIJEER K | MALE | BLACK | 31 | 09/11/1987 | (HOME) 570-516-4620 |
| | **ADDRESS:** 485 E. 19TH ST 3G PATTERSON, NJ | | | | | (CELL) 570-516-4620 |

## VEHICLES

| ROLE | TYPE | YEAR | MAKE | MODEL | COLOR | REG # | STATE |
|---|---|---|---|---|---|---|---|
| SUSPECT VEHICLE | | 2018 | DOD | CHA | GRAY | JBD2162 | NY |

| STOLEN $ | REC CODE | DATE REC | REC $ | REC BY |
|---|---|---|---|---|
| | | | | |

## PROPERTY

| CLASS | DESCRIPTION | MAKE | MODEL | SERIAL # | VALUE |
|---|---|---|---|---|---|
| OTHER | FAKE TENNESSE DL | | | 801527486 | |
| OTHER | 2 BACKWOOD SARK STOUT CIGAR PACKS | | | | |
| OTHER | 2 BACKWOOD SWEET AROMATIC CIGAR PACKS | | | | |
| DRUGS/NARCOTICS | 44 GRAMS OF SUSPECTED MARIJUANA | | | | |
| DRUG/NARCOTIC EQUIPMENT | MARIJUANA GRINDER | | | | |
| OTHER | SPRINT SIM CARD | | | 8901120200 | |
| OTHER | DUNKIN DONUTS RECEIPT | | | 855 | |
| OTHER | 13 ASSORTED CANDIES | | | | |
| OTHER | 2 CLEAR EYE DROPS | | | | |

## OFFICER REPORT: 19010123 - 1 / LYSZYK A (519)

| DATE/TIME OF REPORT | TYPE OF REPORT | REVIEW STATUS |
|---|---|---|
| 01/26/2019 14:18:31 | INCIDENT | APPROVED |

**NARRATIVE**

While on patrol, Ptl. Lee and I were dispatched to Hampton Inn (370 Rt. 9 North Woodbridge) on a report of a shoplifting. HQ advised us that the caller stated that the male's vehicle, NY JBD2162 Gray Dodge Challenger, was parked in front of the hotel.

Ptl. Lee arrived on location prior to my arrival and was already speaking to the male, that identified himself as Jamal Owens. The male told us that he was going to pay for the snacks that he took, but left his money in the car. When he went out to his car, he placed the snacks on the seat and came back in with his money. However, when he was coming back into the hotel lobby to pay for the snacks, he felt the need to go to the bathroom. When he came out of the bathroom, he saw Ptl. Lee standing there.

I walked over to the hotel counter and spoke to the two clerks, Caleigh Higgins and Kamisha Grant, and the hotel manager, Richard Charneco. Charneco advised me that one of the cleaning personnel saw the male place a bunch of snacks into his bag and then put it in his vehicle. At that point he called the police. Charneco stated that he wanted the male to pay for the items, 13 assorted candies and 2 Clear Eye eye drops (total value $39.00), that he took. I told the male that the hotel wanted him to pay for the items and asked him where they were. The male told us that the snacks were in his car. We then walked out to the car, grabbed the snacks from the vehicle, brought them back to the counter, and paid for them. The male also purchased a bottle of water and took a sip out of it when he paid for the snacks. Ptl. Lee advised me that the Tennessee driver's license, DL # 801527486 Jamal Owens 765 Oakdell Ave. Madison TN 37115 DOB 10-15-93, that he gave him was not coming back on file and gave it to me so I can check it in the car.

While in my car, I attempted to find Jamal Owens, but kept on receiving a not on file result. At that time, I compared the license that he gave Ptl. Lee to the Tennessee license on the I.D. checking guide and found multiple discrepancies. The discrepancies that I found were that there were asterisks where numbers were supposed to be and the zip code to his mailing address was 5 digits instead of nine. At that time, I contacted the Tennessee State PD at the Knoxville, TN office and spoke with supervisor Jason Beary. I advised him of my situation and asked him if he could check his system to confirm that there was not a glitch between our systems. Supervisor Beary advised me that the DL number and the name Jamal Owens was not on file within their DMV. Supervisor Beary also advised me that the driver's license in Tennessee should start with 0 instead of 8 .

At that point I went back into to the lobby and confronted the male. The male was still holding onto the bag of candy and water bottle. I advised him of the situation and asked him if he had any other forms of identification on him. At first he stated that he did not have his wallet on him, but then took out his wallet from his pocket. He opened up his wallet and showed me a credit card with the name, Jamal Owens. I then asked him if he was staying at the hotel so that I can confirm who he is. He advised me that he was not staying at the hotel and was just there for the Hertz rental car store.

Since he admitted to shoplifting the snacks and I was not able to identify him; I told him to turn around and place his hands behind his back. The male turned around and placed his hands behind his back.  When he did that, I was able to see a big bag of suspected marijuana, that was halfway in a black plastic shopping bag, protruding from his left jacket pocket. I grabbed him by the wrist, took the bag out of his pocket, dropped it on the floor, and went to place Ptl. Lee's handcuffs on him. As I was about to place the handcuff on his wrist, the male slipped away from my grip and started to run towards the rear of the lobby.

We called out the foot pursuit and began to chase him towards the rear of the lobby. His right sneaker fell off prior to exiting the rear door, which is next to the Hertz car rental kiosk. He exited the rear door and ran towards the rear gate, which was closed. He pushed open the gate, made a right turn, ran towards Dunkin Donuts, and began to run back towards the front of the hotel. While he was running, he kept placing his right hand into his jacket pocket and kept looking back at us. He ran back towards the front of the building and jumped into the driver's seat of the vehicle, NY JBD2162. We caught up to him at the vehicle, pointed our weapons at him and ordered him to shut the car off. However, the male placed the vehicle in reverse and backed the vehicle up a few feet and stopped. Once stopped he told us not to shoot him and moved his left hand towards the side of his seat. I told him to keep his hands where I could see them or I was going to shoot him. I then told him to unlock his door, but he refused and said that he will unlock the door only if we put our guns away. We told him that our guns were staying out and ordered him to open the door. However, he refused again and began to hit the steering wheel with his fists while sitting in the driver's seat unbuckled. After some time, the male placed the car in drive, hit the gas, turned the steering wheel to the left, struck the rear driver's side of patrol car #3, and then hit the pillar at the Hampton Inn. When he did that, the male turned the vehicle towards Ptl. Lee and Ptl. Lee had to move out of the way to avoid serious injury. After hitting the pillar, the male put the vehicle in reverse, I moved out of the way, and the male backed the vehicle up. The male then sped off towards Miller's Ale House, made a left towards Rt. 9 north, drove the wrong way on the ramp (ramp from Rt. 9 North to Millers Ale House), and made a right onto Rt. 9 north. Once on Rt. 9, the vehicle sped off at a high rate of speed.

We hoped in our vehicles and attempted to follow him. At this time multiple units were on Rt. 9 north, but we were unable to locate the vehicle or the suspect. Therefore, I went back to Hampton Inn to preserve the scene. As I returned to the scene, Charneco advised me that he collected the items that were dropped on the floor, placed it in a bag, and moved it to the side. Charneco then gave me the bag and I secured the items in my patrol car. I then notified HQ that I needed additional units on scene to help preserve the scene. I also asked HQ to notify the detective bureau about the incident and to notify them that we need the scene processed. Ptl. Campagnio arrived on scene and preserved the rear gate, Ptl. Lee arrived on scene and preserved the rear door, Ptl. Montalvo arrived and preserved the front entrance where the motor vehicle crash occurred, and Det. Tapia and Det. Quesada arrived on scene to process it, see additional reports.

I then went to the Hertz kiosk to talk to the employee that was dealing with the male. However, there was no one there so I went to the hotel desk. I asked the hotel clerks if they knew where the Hertz employee was. Higgins advised me that the employee came over to her and said " ah shit that was one of my cars". The employee then handed Higgins a key to another vehicle and told her that a customer is going to pick up a vehicle. After giving her the key the Hertz employee told her " I just got to step outside and figure it out". After the employee went outside, she did not see him again. None of the hotel personnel know who the Hertz employee is. I attempted to get a hold of a manager, but had negative results. Charneco also advised me that there is CCTV on site, but he would not be able to access it until Monday.

Prior to leaving the scene, I notified Det. Quesada that the male left his right shoe and water bottle behind. I also advsied him that I still had the fake driver's license that the male gave me in my possession. The following items were inside the black bag, which came out of the male's left jacket pocket, suspected marijuana, a crumpled Dunkin Donuts receipt, four packs of Backwood cigars, a Sprint sim card, and a marijuana grinder. The other bag that the male dropped contained 13 assorted candies and two Clear eyes eye drops that he purchased.

I transported the items to HQ without incident. I placed the suspected marijuana on a scale to weigh it. The total weight of the suspected marijuana was 44 grams. The information on the Tennessee driver's license did not match any Tennessee driver's license on file. However, the image on the driver's license was the suspect. The suspected marijuana, grinder, Sprint sim card,

four packs of Backwoods cigars, fake license, and the Dunkin Donuts receipt was placed into evidence locker. The candies and eye drops were also placed into the evidence locker for safe keeping. Det. Quesada came downstairs and took custody of the Air Jordan sneaker and bottle of water so that he can attempt to extract DNA from them. The detective bureau took over the investigation.

| REPORT OFFICERS | | |
|---|---|---|
| Reporting Officer: | LYSZYK A | 519 |
| Approving Officer: | LICCIARDI J | 450 |

# EXHIBIT "FF"



**WOODBRIDGE POLICE DEPARTMENT**
**WOODBRIDGE, NJ**

| INCIDENT # / REPORT # | OFFICER | BADGE | REVIEW STATUS |
|---|---|---|---|
| 19010123 / 2 | LEE, F | 591 | APPROVED |

## INCIDENT #19010123 DATA

As Of 02/13/2019 11:48:50

### BASIC INFORMATION

**CASE TITLE**
AGG ASS/ WOODBRIDGE TWP

**LOCATION**
370 US HWY 9 N

**APT/UNIT #**

**DATE/TIME REPORTED**
01/26/2019 12:21:50

**DATE/TIME OCCURRED**
On or about 01/26/2019 12:21

**INCIDENT TYPE(S)/OFFENSE(S)**
(2C:20-11)SHOPLIFTING
(2C:12-1B(2))AGGRAVATED ASSAULT W/WEAPON
(2C:29-3)HINDERING APPREHENSION OR PROSECUTION
(2C:21-2.1(C))EXHIBITIS A FALSE GOVERNMENT DOCUMENT
(2C:35-10(A)(4))POSSESSION OF CDS (MARIJUANA) UNDER 50G
(2C:36-2)USE OR POSSESSION DRUG PARAPHERNALIA
(39:4-129)LEAVING SCENE OF ACCIDENT
(39:4-96)TRAFFIC REGULATION
(39:3-76.2)SAFETY BELTS OR RESTRAINING DEVICES
(2C:29-2A(2))RESISTING ARREST/BY FLIGHT
(39:4-130)TRAFFIC REGULATION
(2C:29-1)OBSTRUCTING ADMINISTRATION OF LAW OR OTHER GOVERNM
(2C:29-2(B))ELUDING
(2C:17-3)CRIMINAL MISCHIEF
(2C:39-4(D))POSS WEAPON UNLAWFUL PURPOSE OTHER WEAPONS

### PERSONS

| ROLE | NAME | SEX | RACE | AGE | DOB | PHONE |
|---|---|---|---|---|---|---|
| VICTIM | WOODBRIDGE TWP, | | | | | (HOME) 732-634-77( |
| | **ADDRESS:** 1 MAIN ST   WOODBRIDGE, NJ | | | | | (CELL) |
| VICTIM | HAMPTON INN, | | | | | (WORK) 732855690( |
| | **ADDRESS:** 370 US HIGHWAY 9 NORTH   HOPELAWN, NJ | | | | | (CELL) |
| REPORTING PERSON | CHARNECO, RICHARD A | MALE | WHITE | 31 | 04/22/1987 | (HOME) |
| | **ADDRESS:** 370 RT. 9 NORTH   WOODBRIDGE, NJ | | | | | (CELL) 845-596-282! |

| WITNESS | HIGGINS, CALEIGH | FEMALE | WHITE | 21 | 05/05/1997 | (HOME) |
| | **ADDRESS:** 370 RT. 9 NORTH   WOODBRIDGE, NJ | | | | | (CELL) 551-655-3428 |
| WITNESS | GRANT, KAMISHA | FEMALE | BLACK | 36 | 12/27/1982 | (HOME) |
| | **ADDRESS:** 370 RT. 9 NORTH   WOODBRIDGE, NJ | | | | | (CELL) 973-681-8928 |
| OWNER/OPERATOR | HERTZ, | | | | | (HOME) |
| | **ADDRESS:** 900 DOREMUS AVE   PT NEWARK, NJ | | | | | (CELL) |
| VICTIM | LEE, FRANCIS POLICE | MALE | ASIAN/PACIFIC ISLANDER | 36 | 10/17/1982 | (WORK) 7326347700 |
| | **ADDRESS:** 1 MAIN STREET   WOODBRIDGE, NJ | | | | | (CELL) |

## OFFENDERS

| STATUS | NAME | SEX | RACE | AGE | DOB | PHONE |
|---|---|---|---|---|---|---|
| DEFENDANT | PARKS, NIJEER K | MALE | BLACK | 31 | 09/11/1987 | (HOME) 570-516-4620 |
| | **ADDRESS:** 485 E. 19TH ST 3G PATTERSON, NJ | | | | | (CELL) 570-516-4620 |

## VEHICLES

| ROLE | TYPE | YEAR | MAKE | MODEL | COLOR | REG # | STATE |
|---|---|---|---|---|---|---|---|
| SUSPECT VEHICLE | | 2018 | DOD | CHA | GRAY | JBD2162 | NY |
| STOLEN $ | REC CODE | DATE REC | REC $ | REC BY | | | |

## PROPERTY

| CLASS | DESCRIPTION | MAKE | MODEL | SERIAL # | VALUE |
|---|---|---|---|---|---|
| OTHER | FAKE TENNESSE DL | | | 801527486 | |
| OTHER | 2 BACKWOOD SARK STOUT CIGAR PACKS | | | | |
| OTHER | 2 BACKWOOD SWEET AROMATIC CIGAR PACKS | | | | |
| DRUGS/NARCOTICS | 44 GRAMS OF SUSPECTED MARIJUANA | | | | |
| DRUG/NARCOTIC EQUIPMENT | MARIJUANA GRINDER | | | | |
| OTHER | SPRINT SIM CARD | | | 8901120200 | |
| OTHER | DUNKIN DONUTS RECEIPT | | | 855 | |
| OTHER | 13 ASSORTED CANDIES | | | | |
| OTHER | 2 CLEAR EYE DROPS | | | | |

## OFFICER REPORT: 19010123 - 2 / LEE, F (591)

| DATE/TIME OF REPORT | TYPE OF REPORT | REVIEW STATUS |
|---|---|---|
| 01/26/2019 14:46:30 | SUPPLEMENT | APPROVED |

**NARRATIVE**

On January 26, 2019, I was dispatched to the Hampton Inn on Rt. 9N to assist Car 3 on a shoplifting . CAD notes showed that the suspect vehicle a, Dodge Challenger NY Reg#JBD2162, was in the lot and that a black male had taken some items from the gift shop, then went to the vehicle and was now in the bathroom. The vehicle had come back as a gray 2018 Dodge Challenger registered to Hertz. It should be noted that the hotel does have a Hertz rental desk in the main lobby.

Upon arrival to the hotel, I was met by the reporting person, Richard Charneco, who advised that the suspect was still in the rest room. There had not been any clothing description given while I was en route to the hotel, so he advised that the suspect was about 5'10 - 5'11 wearing a black jacket. After several minutes the suspect came out of the bathroom and I asked about the snacks/candy he was being suspected of taking. He apologized and said he will pay for the items. I then asked him for his ID and he handed me a Tennessee driver's license with DL#801527486 and with a name of Jamal Owens. I then had dispatch run the DL. Dispatch came back stating that the DL did not come back on file. At about that time Officer Lyszyk arrived on scene. I advised Officer Lyszyk about the incident and about the driver's license not coming back on file. While we were talking with the suspect he did pay for the items and apologized. Officer Lyszyk then went to his vehicle to further investigate the DL (See Officer Lyszyk's report). I was watching the suspect and he was pacing around, then bought a bottle of water from the hotel and drank it quick. He then threw it away in one of the hotel garbage can. He then continued to pace and got another bottle of water, this time from the Hertz rental car employee. Then I had him sit down on one of the sofas in the lobby. Officer Lyszyk then came back in and had the suspect turn around and that was when Officer Lyszyk observed a big bag of suspected Marijuana in the left pocket of the suspects jacket. As he was handcuffing the suspect, the suspect darted across the lobby, lost a sneaker, then went out the back door. We then began to chase the suspect calling out a foot pursuit over the air. We had also commanded for the suspect to stop but he kept running. The suspect ran around the hotel back to his vehicle that was in front of the hotel. He was able to get in and back the vehicle slightly. He stopped as we drew our service weapons. Officer Lyszyk was by the front passenger window, while I was next to the front driver side window. We gave him commands to stop moving and to shut the vehicle off. We had also radioed for additional units. The suspect was not complying with our commands and the suspect vehicle drove directly towards me, as a result, I had to jump out of the way to avoid serious bodily injury. The vehicle did strike Car 3's rear bumper and a column that was part of the hotel. The vehicle sustained major driver side front end damage. Despite this, the suspect was able to drive the vehicle onto Rt.9N in an extremely high rate of speed. By the time I got into my vehicle and got onto Rt. 9N, I no longer had visual of the vehicle. A description of the suspect along with the description of the vehicle was radioed to dispatch along with direction of travel. Multiple units were dispatched checking the area. I drove up Rt. 9N to Rt.1 N up to the Rahway border and did not see the vehicle. I then turned around to go back to the hotel. The suspect vehicle was found later by Sgt. Flavell parked in a parking lot off of Mattison St. just off the Main St. exit of Rt. 9N (See incident#19010148). Investigation was turned over to the Detective Bureau.

**REPORT OFFICERS**

| | | |
|---|---|---|
| Reporting Officer: | LEE, F | 591 |
| Approving Officer: | LICCIARDI J | 450 |

# EXHIBIT "GG"



# NEW YORK STATE INTELLIGENCE CENTER

31 TECH VALLEY DRIVE, SECOND FLOOR, EAST GREENBUSH, NY 12061

PHONE: 866-48-NYSIC (866-486-9742) FAX: (518) 786-9398

## Request for Information Form

### REQUESTOR INFORMATION

| Requestor Name | Santiago Tapia | | Duty/Title | Detective | |
|---|---|---|---|---|---|
| Agency | Woodbridge Police Department | | State | New Jersey | |
| Email | santiago.tapia@twp.woodbridge.nj.us | Phone | (732) 675-2555 | ORI: | nj0122500 |

### JUSTIFICATION

| Case # | 19010123 | Crime Type | Aggravated Assault on Police | Status | Active Criminal Inv |
|---|---|---|---|---|---|

### SUBJECT / ADDRESS INFORMATION (For multiple subjects or addresses, please use next page.)

| Name | unknown | DOB | | Role | |
|---|---|---|---|---|---|
| Address | | City | | State | |
| SSN | | License # | | State | |

### VEHICLE INFORMATION (For multiple vehicles, please use next page.)

| Year | 2018 | Make | Dodge | Model | Challenger | Color | silver |
|---|---|---|---|---|---|---|---|
| Plate | JBD2162 | State | New York | VIN | | Role | Used in Crime |

### PHONE INFORMATION (For multiple phones, please use next page.)

| Type | | Number | | Role | |
|---|---|---|---|---|---|

### BUSINESS INFORMATION (For multiple businesses, please use next page.)

| Name | | Owner | | Role | |
|---|---|---|---|---|---|
| Address | | State | | | |

### INFORMATION REQUESTED

| | |
|---|---|
| Address History | LPR Checks |
| Arrest / Booking Info | DMV Checks |
| Associates / Relatives | Subscriber Info |
| Phone / Contact Info | Other (Describe Below) |

### ASSISTANCE REQUESTED

| | |
|---|---|
| ✓ Facial Recognition | Link Chart / Time Line |
| Social Media Checks | Mapping Request |
| Toll Analysis | Other (Describe Below) |

### OTHER (Use second page if necessary)

### CASE DETAILS (Use second page if necessary)

See second page.

Submit this form to the NYSIC via e-mail at CIU@nysic.ny.gov or via fax at 518-786-9398.

PARKS000092



# NEW YORK STATE INTELLIGENCE CENTER

31 TECH VALLEY DRIVE, SECOND FLOOR, EAST GREENBUSH, NY 12061

PHONE: 866-48-NYSIC (866-486-9742)  FAX: (518) 786-9398

## Request for Information Form (continued)

### SUBJECT / ADDRESS INFORMATION

| Name | DOB | License # / SSN | Address | Role |
|------|-----|-----------------|---------|------|
|      |     |                 |         |      |
|      |     |                 |         |      |
|      |     |                 |         |      |
|      |     |                 |         |      |

### VEHICLE INFORMATION

| Plate / VIN | State | Role |
|-------------|-------|------|
|             |       |      |
|             |       |      |
|             |       |      |

### PHONE INFORMATION

| Type | Number | Role |
|------|--------|------|
|      |        |      |
|      |        |      |
|      |        |      |

### BUSINESS INFORMATION

| Name | Owner | Address | Role |
|------|-------|---------|------|
|      |       |         |      |
|      |       |         |      |
|      |       |         |      |

### ADDITIONAL INFORMATION

On Saturday January 26,2019, The suspect depicted above presented the above fake Tennessee D.L. at the Hertz rental car located within the Hampton Inn Hotel on Rt. 9 No. in Woodbridge. When he was confronted by patrol officers, he ran into the above 2018 Dodge Challenger and rammed into the patrol officer's marked police vehicle and nearly struck the officer. The vehicle was located unoccupied nearby but the suspect got away. Inside of the vehicle, we located a Dunkin Donuts receipt from earlier in the morning. The Dunkin Donuts is located on Gun Hill Rd. Bronx, NY. The picture on the D.L. is of the suspect but the other identifiers are false.

Submit this form to the NYSIC via e-mail at CIU@nysic.ny.gov or via fax at 518-786-9398.

PARKS000093